IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| DR. JOHN ROE, PH.D. | ) | |
| **Plaintiff,** | ) | |
| vs. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, and, | ) | |
| FRANK KENDALL, III, | ) | **Civil Action No.: 5:22-CV-00869** |
| LT. GEN. KEVIN KENNEDY (USAF), | ) | |
| LT. GEN. SHAUN Q. MORRIS (USAF) | ) | |
| JOSEPH DANIEL BURGHARD (USAF), | ) | |
| LT COL JARED EKHOLM (USAF) | ) | |
| CAPTAIN WILLIAM MCVEIGH (USAF), | ) | |
| UNKNOWN NAMED USAF OSI AGENT, | ) | |
| JOHN DOES 1 – 50, | ) | |
| **Defendants.** | ) | |
| | ) | |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

Comes now the Plaintiff, Dr. John Roe, Ph.D. ("Dr. Roe")[1], and presents this, his First Amended Complaint for his claims against the United States of America and its agents in their official and individual capacity, as listed, alleges and would respectfully show the Court as follows:

### I. JURISDICTION AND VENUE

1.      Plaintiff, Dr. John Roe, Ph.D., is a citizen of the State of Texas who resides in the Western District of Texas. The amount in controversy, exclusive of interest and costs, exceeds $75,000.00. Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 1331 (federal question), 1346(b)(1) (U.S. as Defendant and FTCA), 28 U.S.C. § 1367 (supplemental jurisdiction), the

---

[1] Given Dr. Roe's past and present work in highly sensitive and classified areas of national security, Plaintiff seeks leave to file and proceed under the anonymous pseudonym "Dr. Roe" to preserve to the greatest degree the national security interests described herein. Contemporaneous to this filing, Plaintiff files a Motion for Leave to file under seal a motion addressing this request and detailing Plaintiff's identity and the basis therefor.

Declaratory Judgement Act, 28 U.S.C. §§ 2201 and 2202 and Rule 18 of the Federal Rules of Civil Procedure (Joinder of Claims). Venue is proper pursuant to 28 U.S.C. §§ 1391(b)(2) and 1402 because a substantial part of the events which form the basis of Plaintiff's claim occurred within the Western District of Texas and Dr. Roe resides in the Western District of Texas.

2.      This case is brought pursuant to the Administrative Procedures Act Sec. 706, 5 U.S. Code § 706, the Privacy Act of 1974, 5 U.S.C. § 552a(g)(1), the Federal Tort Claims Act, 28 U.S.C. § 2671, *et. seq.*, (FTCA) as well as the common law of the State of Texas.

3.      "In the unique context of the Federal Tort Claims Act (FTCA), all elements of a meritorious claim are also jurisdictional. So even though a plaintiff need not prove a 28 U.S.C.S. § 1346(b)(1) jurisdictional element for a court to maintain subject-matter jurisdiction over his claim, a plaintiff must plausibly allege all six FTCA elements not only to state a claim upon which relief can be granted but also for a court to have subject-matter jurisdiction over the claim." *Brownback v. King*, 141 S. Ct. 740, 744 (2021).

4.      For the FTCA claims *infra*, Plaintiff asserts that this is a 1) claim against the United States for 2) money damages 3) due to injury and loss of property 4) caused by the negligent or wrongful act or omissions of employees and officers of the U.S. Government 5) while acting in the scope of their office or employment and 6) under circumstances where the United States, if a private person would be liable to the Plaintiff in accordance with the law of the place where the act or omission occurred, to wit: the State of Texas. *Id.*

## II. INTRODUCTION

5.      Isaac Newton, Thomas Edison, Marie Curie, Alexander Graham Bell, Albert Einstein, Steve Jobs, Bill Gates; the mere utterance of their names evokes their discoveries and concomitant products and advances. Yet, imagine if, after accepting a progressive such as these

into its ranks, the U.S. Government suddenly reversed its position and merely by the association of their name, would *de facto* reject their offerings and debar their involvement in any government programs or developments in national security.

6.      Imagine further that this storied group suffered this wholesale rejection, exclusion, and ostracism by the U.S. Government and its agents, occurring without notice, hearing, evidence, or substantiation of misconduct of any kind; rather a whim by a collection of at least four military officers and government civilians weaponized by law enforcement and solidified by the Pentagon.

7.      These four officers and civilian employees misused the OSI criminal investigation process and Dr. Roe's information to functionally debar Dr. Roe completely from government work under the pretext Dr. Roe's alleged of lack of integrity, to wit: casting him as a criminal scam artist and his projects as defunct frauds – all because they lacked the unique training and experience to comprehend their mathematical viability.[2]

8.      It is this exact injury that brings Dr. Roe to court in this matter. Moreover, it is the same magnitude of violation for the United States and its agents to misuse Dr. Roe's information and turn its collective bureaucratic back on Dr. Roe as it would be to shun these giants of innovation and invention.

9.      Dr. Roe, in August of 2020, despite years of dutiful, genius-level contributions and service to many varied lettered agencies within the Intelligence Community ("IC"), was blacklisted and debarred from personally solving what had been viewed as unsolvable problems in the Artificial Intelligence and Machine Learning ("AI/ML") and Adversarial Machine Learning (

---

[2] Analogous to early physicists' categorical rejection of nuclear physics and the atom bomb during its original theoretical inception.

"AML") and cyber defense and intelligence realms – a field he all but founded given his singular contributions to this national security priority.

10.     This strategic tragedy began at the hands of an envious and politically calculating cadre of military officers and civilian employees, who seeing an opportunity to remove a threat to their careers and projects, used Captain William McVeigh's, USAF, connections to a U.S. Air Force ("USAF") agent for the Office of Special Investigations ("OSI") in an effort to divert Dr. Roe's program funding by wrongfully ostracizing him from his government contractor position. This resulted in his permanent and total removal from participating in any form of contracting and consultation with the government in his chosen field, in which he excels.

11.     Given their efforts to initiate a bad faith investigation and discredit and ostracize Dr. Roe, all four of Dr. Roe's contracted projects and funding were indeed terminated and reassigned to Captain McVeigh's failing project.

12.     Now, Dr. Roe stands *persona non grata* or "blackballed" at the procurement office of the Air Force Cyber ("HNCO")[3], the department that not only handles procurement for Air Force Cyber, but functionally acts as the gatekeeper for many of the other military component's cyber programs as well. Further, he now stands ostracized from other components of the IC as well, even his former NSA employer. This exclusion was without notice of any kind as to the issue, let alone a hearing and the ability to contest these specious character assassinations.

13.     However, it is not Dr. Roe's brilliance and revolutionary products and contributions that are rejected (e.g., the same excluding officers and agencies are now begging for his private solutions). It is only Dr. Roe himself. The U.S. Government refuses to purchase or use his needed

---

[3] HNCO, while describing the procurement arm of Air Force Cyber, is not known to have any independent title or meaning beyond the acronym itself.

creations unless he scrubs his name from any association therewith but is happy to purchase and use them if Dr. Roe is not associated and his subordinates are the ones briefing them.

14.    Dr. Roe is not allowed to exist in the field of offensive cyber operations anymore as far as the U.S. Government is concerned, based on unknown facts and unilateral decisions, but he's more than welcome to solve its problems.

15.    To fully comprehend the severity of this deprivation and damage, as well as the outrageousness of the conduct in question, it's crucial to appreciate the unique and irreplaceable nature of Dr. Roe's intellectual prowess, training, and contributions in the field of applied AI within the intelligence community. Without exaggeration, excluding him equates to willingly compromising the nation's security.

### III. PARTIES

16.    Plaintiff Dr. Roe is a nationally renowned expert in applied mathematics, probability theory, and its applications and utilization within the AI/ML field. Dr. Roe has dedicated much of his career to better arming our intelligence and military communities to combat ever-advancing cyber-attack and defense realms.

17.    The United States of America is named as a defendant pursuant to 28 U.S.C. § 2674, for actions attributable to it by its agency, the U.S. Department of Defense and its subordinate unit, the U.S. Air Force.

    a.    Pursuant to the Federal Tort Claims Act 28 U.S.C. § 2671, et. seq. and 43 C.F.R. § 22.3(b), notice of claim was provided to the Department of Defense and United States Air Force and its pertinent subordinate units dated January 24, 2022.

    b.    The notice of claim was denied on March 29, 2022.

c.   The Original Complaint was filed within six (6) months of the denial of this notice of claim and is thusly timely filed. Jurisdiction is appropriate pursuant to 28 U.S.C. §2675(a).

18.   Defendant Frank Kendall, III, is the Secretary of the Air Force and, by statute, is responsible for all affairs of the Department of the Air Force and therefore all actions of the subordinate named Defendants herein. Defendant Kendall is sued in his official capacity as Secretary of the Air Force.

19.   Defendant Lieutenant General Kevin Kennedy, USAF is the commander for the 16th Air Force (Air Forces Cyber) and, by statute and regulation, is responsible for all affairs of the Air Forces Cyber Command and therefore all actions of the subordinate named Defendants herein. Defendant Lt. Gen. Kennedy is sued in his official capacity as Commander, 16th Air Force.

20.   Lieutenant General Shaun Q. Morris, USAF is the Commander of the Air Force Life Cycle Management Center and, by statute and regulation, is responsible for all affairs of the Air Force Life Cycle Management Center ("AFLCMC") to include the Offensive Cyber Systems Branch, and therefore is all actions of the subordinate named Defendants herein. Defendant Lt. Gen. Shawn Q. Morris is sued in his official capacity as Commander, AFLCMC.

21.   Defendant Captain William McVeigh (USAF), during all material times, is an active-duty commissioned military officer employed by the United States in the U.S. Air Force. Captain McVeigh works for the subordinate Air Force Life Cycle Management Center, Offensive Cyber Systems Branch located at Joint Base San Antonio – Lackland as a Lead Engineer for Special Projects. Captain McVeigh is sued in his capacity as an officer and employee of the U.S. Government. At all material times, Defendant Captain McVeigh, through the powers vested in his rank and office through the Uniform Code of Military Justice, was a commissioned military officer

of the United States who is empowered by law to execute searches (Manual for Courts-Martial Part III Mil. R. Evid. 315(d)), to seize evidence (Manual for Courts-Martial Part II, Mil.R. Evid. 316(d), or to make arrests for violations of Federal law (10 U.S. Code § 809).

22.     Defendant Joseph "Danny" Burghard, Director, USAF Special Projects, is a civilian employee of the United States Government believed to be working at the Pentagon in Washington, D.C. Mr. Burghard is sued in both his capacity as an employee of the U.S. Government.

23.     Defendant Lieutenant Colonel Jared Ekholm, USAF, is the Material Leader for the Cyber Warfare unit within the AFLCMC Cyber Weapon Systems division. At all material times, Defendant Lt. Col. Ekholm was an employee and commissioned officer of the U.S. Government located at Joint Base San Antonio – Lackland. At all material times, Defendant Lt. Col. Ekholm, through the powers vested in his rank and office through the Uniform Code of Military Justice, was a commissioned military officer of the United States who is empowered by law to execute searches (Manual for Courts-Martial Part III Mil. R. Evid. 315(d)), to seize evidence (Manual for Courts-Martial Part II, Mil.R. Evid. 316(d), or to make arrests for violations of Federal law (10 U.S. Code § 809). Lt. Col. Ekholm is sued in both his capacity as an employee and officer of the U.S. Government.

24.     Defendant Unknown Named USAF OSI Agent ("OSI Agent") is an employee and law enforcement agent of the U.S. Air Force Office of Special Investigations working at Joint Base San Antonion - Lackland. At all material times, this OSI Agent was an officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of federal law. Defendant OSI Agent is sued in his capacity as a law enforcement officer and employee of the United States.

25.     Doe Defendants are numerous unknown individuals working within the U.S. Government, most likely within the Pentagon and/or the U.S. Air Force and its subordinate units and commands, that, due to strict compartmentalization and classification rules are as of yet unidentified tortfeasors who are the direct and proximate cause to Plaintiff Dr. Roe's damages and violations contained herein. The Doe Defendants are sued in their official.

26.     All Defendants were within the scope of their employment or service with the U.S. Government during all material times alleged herein.

## IV. BACKGROUND FACTS

27.     Plaintiff was discovered at the age of 13 by a literal rocket scientist, Ray Crowell, at The Aerospace Museum in San Diego.

28.     Mr. Crowell offered Plaintiff a first-of-its-kind apprenticeship in aircraft and rocket design, including aerodynamics, airframe, power plant, and electronic systems.

29.     Plaintiff apprenticed with Mr. Crowell for four years before heading on to higher education and proceeding to college at the age of 18.

30.     By the time Plaintiff finished his initial education he possessed bachelor's degrees in Mechanical and Aerospace Engineering, and master's degrees in Mechanical and Aeronautical Engineering.

31.     It was during his meteoric educational pursuits that Plaintiff (repeatedly testing at an IQ level of 174 – "genius level" occurring at 140 and above) began experimenting with new methods of artificial intelligence and machine learning.

32.    Following his initial foray into higher education, Plaintiff worked for ten years in the aerospace field – often working on classified projects for the U.S. Government Department of Defense and Intelligence Community ("IC")[4].

33.    During this commercial work, Plaintiff solved unique problems related to navigation and missile guidance systems, Unmanned Aerial Vehicles (UAVs) and autonomous automobiles.

34.    Recognizing his further aptitude in this field, Plaintiff pursued and obtained a master's degree and Ph.D. in Electrical Engineering at the age of 34 with a dual-focused dissertation on both applied mathematics and probability theory, specifically, creating a completely new field of outlier detection and mitigation using full non-linear Bayesian optimal estimation – enabled an order of magnitude improvement in GPS signal integrity in safety of life critical systems in commercial and general aviation and autonomous automobiles.

35.    By the age of 35, now-Dr. Roe, had designed and built both the software and hardware (as primary or sole author for both) for seven autopilots, four navigation systems, and three camera stabilization systems – most top performers in the field will only design one of those in a lifetime and usually will only work on either the software or the hardware side alone.

36.    Despite these accomplishments, and after both starting and selling a startup company between the years of 2011 and 2013, Dr. Roe couldn't help but feel the pull to public

---

[4] *See* 50 USC § 3003(4) ("The term "intelligence community" includes the following: (A)The Office of the Director of National Intelligence. (B)The Central Intelligence Agency. (C)The National Security Agency. (D)The Defense Intelligence Agency. (E)The National Geospatial-Intelligence Agency. (F)The National Reconnaissance Office. (G)Other offices within the Department of Defense for the collection of specialized national intelligence through reconnaissance programs. (H)The intelligence elements of the Army, the Navy, the Air Force, the Marine Corps, the Coast Guard, the Federal Bureau of Investigation, the Drug Enforcement Administration, and the Department of Energy. (I)The Bureau of Intelligence and Research of the Department of State. (J)The Office of Intelligence and Analysis of the Department of the Treasury. (K)The Office of Intelligence and Analysis of the Department of Homeland Security. (L)Such other elements of any department or agency as may be designated by the President, or designated jointly by the Director of National Intelligence and the head of the department or agency concerned, as an element of the intelligence community.

service originally engendered through his family's military service history (his grandfather a flag officer in the Navy, and his brother a special operator in the Navy special forces field).

37.     Recognizing, however, that his greatest contributions would likely not occur through traditional military service, Dr. Roe began applying to agencies within the IC in 2014.

38.     Dr. Roe's exceptionalism and aptitude continued to shine in the IC application process.  Dr. Roe scored so highly on special reasoning and permutation analysis questions (scoring 12 when the average is 6) that the IC agency made him repeat the test twice, believing he was possibly cheating (he wasn't).

39.     Dr. Roe was accepted to work within the IC, as a federal civil servant, at the age of 35 and continued his work there until the age of 40.

40.     While much of the details and inordinately impactful work in the IC is classified, Dr. Roe would continually distinguish himself as a top innovator solving problems previously taking years to resolve in a matter of months often in the direct support of the War on Terror. In particular, Dr. Roe invented new math techniques and solved a national security problem involving cryptanalysis that enabled access to foreign intelligence.

41.     Dr. Roe invented a technique that the other top mathematicians at NSA spent years trying to solve and failed at the Top Secret // SCI level.  Dr. Roe solved it in 2 months and received the NSA innovator award for his work.

42.     Using his unprecedented knowledge in artificial intelligence and machine learning, Dr. Roe invented new math (classified at the TS//SCI level) that solved three national security problems involving cyber security that enabled intelligence collection and analysis. Again, Dr. Roe received an award for his contributions to National Security.

43.    Dr. Roe solved these problems individually when previously, teams of researchers working for years to solve these problems failed.  Dr. Roe solved them in a matter of months using a combination of cyber techniques combined with ML and optimal state estimation (expert knowledge of these three fields being the key and unique element unlocking the solution).

44.    Dr. Roe received the Director of NSA "Director Reserve Award" for his varied AI/ML innovations in the IC.

45.    During his time within the IC, Dr. Roe was the only known person in the IC with training, experience and expert knowledge in cyber, AI/ML, and signal processing/optimal state estimation.

46.    Dr. Roe leveraged this unique combination of training to build a new field of "CyberAI" within the IC.  Most IC practitioners have one or two skillsets but have never worked on hardware, let alone designed and built their own printed circuit boards with real-time software.  This unprecedented combination positioned Dr. Roe to tackle incredibly sophisticated nation state cyber-attacks with new advanced CyberAI counter attacks and defenses.  Dr. Roe received the Office of the Director of National Intelligence award for AI/ML innovation in the IC for his broad impact AI developments.

47.    After these already mammoth contributions to the IC and the field of CyberAI in general, Dr. Roe continued to innovate and at the age of 40 invented new classified math leveraging AI/ML that enables spoofing adversaries and discovering covert traffic and communication.  Prior to Dr. Roe's solutions, there was an entire research field dedicated to this problem using classical methods, and yet, no one had solved it.  Dr. Roe solved the covert traffic math equation derivations and proofs in a week and took only a few months to demonstrate the resolution in prototype.

48.    Presently Dr. Roe works at Leidos, a large general contactor to the Government. He leads seven CyberAI research projects based on intelligence community and department of defense customer mission needs.

49.    In the sensitive but unclassified (SBU) domain, he uses game theory and AML models to do both offense and defense, such that the attacker ML model learns new and novel attacks, while the defense ML model learns how to detect and defend against such attacks.

50.    He leads research at several network security layers, e.g., perimeter (i.e., firewalls and intrusion detection systems (IDS)), midpoint (security information and event management systems (SIEM), routers and switches), and endpoint (endpoint detection and response (EDR) and anti-virus (AV) systems).

51.    His team's military weapons-grade AML models are tested against real systems by commercial manufacturers, installed and monitored by Leidos security, and instantiated as if they are protecting all 50,000 employees and over 100,000 devices at Leidos.

52.    His models have successfully bypassed, in milli-seconds, all best-in-class network security products at all security layers, perimeter through endpoint.

53.    The single most important advancement of his work is automation through AI/ML, specifically using AML.  Current methods in offensive cyber require months of development by large teams of experts for a single exploit that works on only one product manufacturer and product version, and then requires manual methods to deploy and monitor the exploit.

54.    Dr. Roe's methods automatically discover millions of exploits that work on many manufacturers and product versions, and the AML exploits can deploy and collect autonomously.

55.    The innovations of this work (described by Defendant McVeigh as nearly impossible or demonstrating Dr. Roe as a crackpot, *infra.*) is memorialized in four patents-pending

and recognized in three publications in the top international conferences in cyber and AI/ML, netting him two prestigious Leidos CTO and Leidos Innovation in R&D awards.

56.    Dr. Roe has even been invited to serve as keynote speaker at the 2022 C3E conference (organized by the Office of the President), and was an invited speaker at National Intelligence University seminar series on Next Generation Cyber and CyberAI.

57.    His teams have performed demonstrations for the Defense Advanced Research Projects Agency (DARPA), the National Security Agency (NSA), the Central Intelligence Agency (CIA), the Air Force Cyber Command (AF Cyber), the Army Cyber Command (AR Cyber), the United States Cyber Command (CYBERCOM), and the Air Force Distributed Common Ground System (AF DCGS) , and many others.  In these demos, customers have described his work as "terrifying", "concerning", "orders of magnitude more advanced than what is presently available [to them]."

58.    In fact, his related work received a DARPA contract in March 2023, however this work is now led by one of his subordinates.

59.    In addition to the work above, Dr. Roe has concurrently published five peer-reviewed textbooks in this field, and taught short courses, seminars and boot camps in AI/ML and CyberAI. In short, he is an irreplaceable and renowned expert in AI/ML and its applications to national security.

60.    Yet, despite these overwhelming accomplishments, accolades, prototypes, and innovations, Dr. Roe stands totally barred from acting as a consultant in his own right, or even associating his name with any of the above accomplishments, from the one Government agency that acts as the gatekeeper to the cyber offense field.

61.    Due to the serious, unlawful, and outrageous conduct of Defendants, Dr. Roe, without any notice or hearing, must now cloak his name under his employers or his subordinates to have his work considered. He is also permanently barred from ever acting as a contracting consultant within Defendants' organization.

## V. GENERAL CLAIMS FACTS

62.    During his time as an employee for NSA in 2019, Dr. Roe was approached by members of the Sixteenth Air Force ("Air Forces Cyber" or "AF Cyber"), a new information warfare major subordinate command headquartered in San Antonio, Texas.

63.    While at NSA, Dr. Roe developed offensive cyber capabilities against national security threats to America (e.g., Russia, China, Iran, etc.).  His prior employment with AF Cyber HNCO enabled him to be the first person in the DoD to apply AI/ML to offensive cyber in the most sensitive missions and against the most important threats to national security.

64.    During his time with NSA, Dr. Roe would deploy seven times into harms way to support operations through his AI/ML offensive applications.

65.    The Air Force Cyber (AF Cyber) invited Dr. Roe to serve as a part-time consultant for a new classified project, unrelated to his previous work with the National Security Agency (NSA). This project involved applying his algorithm development skills as a subcontractor for a commercial firm, referred to as "GiTi" or the "Prime Contractor," which was contracted to implement applied mathematics for cyber-physical systems. Specifically, Dr. Roe was asked to consult on the offensive capabilities and functions of his work.

66.    Wanting to "do what is right in service of our national security mission", Dr. Roe sent a series of emails to OGC_AdminEthics requesting review of the AF Cyber request to ensure compliance with the letter and spirit of law and ethics in accepting this consultancy.

67.     NSA OGC assigned a reviewing attorney to review and advise on the request. Through detailed analysis of applicable statutes and the scope of work for both the NSA work and the GiTi contract, it was determined that neither role offended U.S. law and Dr. Roe was cleared to begin work in both capacities.

68.     Dr. Roe worked as a subcontractor in these separate and distinct capacities for over a year without issue and with the full support of both NSA and AF Cyber leadership – doing truly remarkable and irreplaceable work for the U.S. Government national security interests.

69.     Specifically, Dr. Roe was contracted to consult and develop "Project A"[5] which employed his innovated and revolutionary AML capabilities described generally above that existed on several network security layers; giving the United States a potential advantage in the offensive cyber field that eclipses current near-peer technologies.

70.     Unfortunately, Dr. Roe's singular success in this field of his own creation, as well as the potential significant ramifications of Project A's effect on this field, created animosity among those Air Force officers and government civilians whose own projects were being eclipsed by his specialized knowledge and success.

71.     One such military officer is Defendant, Captain William McVeigh, USAF, who was charged with the management and development of classified "Project B" within the Air Force Life Cycle Management Center – Offensive Cyber Systems Branch.

72.     The Air Force Life Cycle Management Center ("AFLCMC") is a "think tank" charged with development and implementation of cutting-edge weapons systems for the U.S. Air Force.

---

[5] Due to the highly classified nature of the HNCO cyber projects, no additional information rather than the lettered projects are available in this unclassified forum.

73.     The AFLCMC develops cutting-edge offensive cyber weapons in addition to traditional weapons.

74.     HNCO is the procurement subagency of AFLCMC.

75.     In fact, the HNCO is practically the only source for offensive cyber weapons within the Air Force and their influence in the offensive cyber field extends into many other DoD components as well.

76.     Dr. Roe's subcontract work was within AF Cyber and AFLCMC commands. But more specifically, his work was within and directed by HNCO.

77.     All relevant individual Defendants work within HNCO.

78.     In February 2020, at a classified briefing, Dr. Roe was asked by Dan Brown, the program manager working in HNCO at or near Joint Base San Antonio – Lackland, and Defendant Burghard to express his expert opinion as to the continued viability of Captain McVeigh's Project B in light of recent developments in the CyberAI field.  This February 2020 briefing was also the first time that Dr. Roe briefly met Defendant Captain McVeigh.  In asking this question, Mr. Brown and Defendant Burghard provided Dr. Roe with limited insight into Captain McVeigh's Project B and its overall operational goals and exploits, as well as the operating systems impacted by the project.

79.     Dr. Roe's initial assessment, based on the limited access he was granted, was that Project B was "way out of scope" not having provided a usable product in more than 10 years of work. Dr. Roe further described that the "fix" sought by Project B was obsolete and "overcome by events" such that it was no longer relevant. And should an obsolete fix ever be needed, the fix already existed in current open-source tools.

80.    Moreover, he bluntly observed that Project B was developing exploits for technologies that were no longer in use. In short, he communicated that continued funding for Project B constituted fraud, waste, and abuse.

81.    Unbeknownst to Dr. Roe, despite HNCO affirmatively seeking his evaluation, his answer engendered significant resentment and derision within the insular AFLCMC and HNCO community for those affected by his expert assessment. Further unknown to Dr. Roe, this resentment continued to build as his evaluation was communicated to Defendant Captain McVeigh, whom at that time Dr. Roe had met only the one time.

82.    Captain McVeigh had no supervisory, contract oversight, or any other managerial or leadership responsibilities relative to Dr. Roe or his project.

83.    The only relationship between Dr. Roe's project and Captain McVeigh's Project B was that it shared a common, yet limited, funding source. This common funding source created an implicit competition between the two programs and its managers; funding for Project B was actively being reassigned to Project A.

84.    This competition for funding created a concern in Dan Brown that Captain McVeigh would take some sort of nefarious action against Dr. Roe.

85.    In fact, Dan Brown warned Dr. Roe to avoid any conversations with Captain McVeigh as he understood that Captain McVeigh has an extensive history of targeting government personnel or projects seen as function or budgetary competitors to his own.

86.    According to Dan Brown, Captain McVeigh would utilize his contacts within the AFLCMC and the USAF Office of Special Investigations (OSI) to falsely discredit personnel or destroy projects.  Captain McVeigh would then work to absorb the destroyed project's budget to sustain his own obsolete Project B.

87.    Dan Brown was not the only personnel aware of Captain McVeigh's false reporting strategies. Specifically, according to Dan Brown, nearly everyone at AFLCMC and HNCO knew of Captain McVeigh's false accusation strategies.

88.    Specifically, the security personnel at AFLCMC, Defendant Burghard, Defendant Lt. Col. Ekholm, and Alan Rabayda, deputy for Danny Burghard, were all aware of Captain McVeigh's history of falsely accusing personnel to harm their ability to compete with his projects.

89.    On or about August 13, 2020, Captain McVeigh struck again following a meeting of the relevant Cyber Warfare AFLCMC personnel aboard Joint Base San Antonio - Lackland including Dr. Roe, Dan Brown, Defendant Burghard, and Defendant Lt. Col. Ekholm. Some personnel were present in-person in San Antonio while others were present via secure video link.

90.    After that meeting, Captain McVeigh introduced himself to Dr. Roe for the second time. The conversation, while brief, was odd to Dr. Roe, in that Captain McVeigh asked a number of questions about his background and status with the organization; questions that seemed out-of-place for that meeting and context. Dr. Roe had no further interaction with Captain McVeigh after that point.

91.    Shortly after that meeting, Dr. Roe was asked again by Dan Brown and Defendant Burghard, in private, to share his expert opinion of Project B's viability in light of current systems and methodologies. Again, Dr. Roe shared the opinion that Project B was "OBE" and constituted a fraud, waste, or abuse.

92.    At the conclusion of the meeting, which, in part, determined the future of project funding, Dr. Roe's Project A had received additional funding while Project B still received funding but at a reduced level compared to Dr. Roe's project.

93. On information and belief, Captain McVeigh and Defendants Burghard, Elkholm, and various Defendant John Does (collectively, "the Officers") were furious at this assessment and additional funding and they began working collectively to destroy Dr. Roe. They worked together to undermine his role and eligibility as a subcontractor, cancel his program, and de facto debar him from further government consulting of any kind in the field of offensive cyber AI/ML.

94. Those Defendant Officers above developed an agreement and plan to leverage Captain McVeigh's prior association and collaboration with the Defendant OSI Agent to engineer a knowingly specious and unsupported criminal investigation into Dr. Roe completely devoid of probable cause. This agreement and plan was intentionally and knowingly without legitimate factual basis and done with the specific intent only to injure Dr. Roe and summarily remove him from eligibility for government service in bad faith.

95. To effectuate this collective goal, Captain McVeigh, at the behest of the Defendant Officers, approached Defendant OSI Agent and convinced him to open a knowingly false investigation into Dr. Roe in bad faith and without probable cause for the sole purpose of injuring Dr. Roe.

96. Moreover, this plan was predicated in whole on knowingly false allegations made to OSI.

97. Both Captain McVeigh and the OSI Agent knew the claims were false but had utilized this approach before to benefit Captain McVeigh.

98. Captain McVeigh specifically falsely alleged that Dr. Roe was a "scam artist", his proposed CyberAI solutions "were not possible", that he believed that Dr. Roe was an insider threat attempting to wrongfully gain access to another classified TS/SCI - Special Access Program.

99.    Both Captain McVeigh and the OSI Agent knew the claims were false and that there was no probable cause to initiate an investigation.

100.    Despite the known falsehoods, OSI Agent opened a criminal investigation into Dr. Roe without probable cause or a good faith purpose to investigate crime.

101.    Opening this OSI investigation was intentional misconduct as a bad faith abuse of authority and violated regulatory, statutory, and constitutional provisions prohibiting such abuses.

102.    The intent of the allegations and opening the investigation were not done to properly investigate or adjudicate Dr. Roe, but to serve as a basis to debar him and inflict severe emotional damage such that Dr. Roe's threat to Project B would be neutralized.

103.    Opening the investigation under those circumstances was an illegal, improper, perversion of the OSI investigation process and was not warranted or authorized by any applicable regulation or statute.

104.    On or about August 14, 2020, the day after the meeting where Dr. Roe shared his unpopular assessment, he was notified that his programs and subcontract would indeed be terminated by the Air Force. This termination was made without notice or any evidence supporting the basis for the termination or opportunity to respond. On August 18, 2020, Dr. Roe's termination from his AFLCMC subcontractor role was complete.

105.    On August 24, 2020, Dr. Roe received notice from Defendant OSI Agent, under the guise of the bad faith investigation, that he was to report to the Joint Base San Antonio – Lackland OSI office on August 26, 2020 for interview and "read out." [6]

---

[6] "Read out", a colloquial term for the process of being excluded from a compartmentalized classified program wherein, although eligible, a person may no longer possess, review, or in any way have contact with the compartmentalized program. *See generally*, Sensitive Compartmented Information (SCI) at DC Security Consultants (available at https://www.dcsecurityclearanceconsultants.com/sensitive-compartmented-information.php). *Cf.* Wikipedia, *Read into*, (available at https://en.wikipedia.org/wiki/Read_into).

106.    On August 26, 2020, without hearing or notice of any kind, Dr. Roe was "read out" of the classified Special Access Program (SAP), terminating him from access of any kind to his pending projects or the CyberAI field within the IC that he had developed.

107.    Then, the so-called "interview" by Defendant OSI Agent quickly turned into an interrogation of Dr. Roe complete with accusations that he was an insider security threat and/or operating in violation of federal law.  Defendant OSI Agent further ordered Dr. Roe to turn over agency-privileged NSA emails despite the NSA general counsel attorney instructing Dr. Roe not to share portions of that material with outside agencies, including the AFLCMC.  Defendant OSI Agent, without warrant or search authorization, informed Dr. Roe that he was required to provide this material because "he had opened an investigation into him", or words to that effect.

108.    In that interrogation, OSI Agent would call Dr. Roe a "traitor" and an obvious insider threat who was scamming the government and whose clearance was in the process to be revoked and that he was going to lose his job. OSI Agent doubled-down and even told Dr. Roe that he would be going to prison as a traitor. For nearly a year, Dr. Roe was convinced that his arrest and prosecution was imminent and that he would be sent to prison.

109.    OSI Agent also informed Dr. Roe that the Office of Personnel Management ("OPM"), the agency responsible for security clearance grants, suspensions, and denials, had opened an administrative adjudication to remove his clearance. Dr. Roe would later determine that an OPM action had indeed occurred but had resolved favorably. He learned of this not from any member of OPM, OSI, or HNCO, but upon a clearance check when working with the Defense Intelligence Agency.

110.    This interrogation caused Dr. Roe extreme stress, worry, shame, fear of criminal prosecution, and other similar severe emotional states. Dr. Roe lived in a constant state of

helplessness and was terrified for these many months because he had no hearing in which to defend himself.

111.    Despite its falsity, Dr. Roe fully complied with the bad faith OSI investigation, hoping to prevail and return to work.

112.    Both the OSI Investigation and the OPM adjudication concluded favorably for Dr. Roe.

113.    Dr. Roe never received any information regarding the OSI conclusion but was informed of the favorable conclusion by Dan Brown.

114.    In addition to the specious investigation and clearance adjudication, both OSI Agent and Captain McVeigh violated the Privacy Act of 1974.

115.    Specifically, the OSI Agent disclosed material and records contained within protected systems of records held by OSI, the Air Force, and on information and belief, systems held by the DoD and NSA governing Dr. Roe's status and work within AF Cyber as well as the NSA in violation of the Privacy Act of 1974, 5 U.S.C. § 552a.

116.    That unauthorized disclosure by the OSI Agent and Captain McVeigh, as related by Dan Brown, included documents and records related to Dr. Roe's contract, Dr. Roe's employment at the NSA, the fact that OPM had opened an investigation into Dr. Roe's clearance eligibility, specific communications and agreements between NSA and Dr. Roe regarding his consultancy with HNCO.

117.    Overall, Captain McVeigh was kept apprised of the entirety of the OSI investigation into Dr. Roe by OSI Agent in violation of the Privacy Act.

118.    Captain McVeigh, in turn, broadcasted this information and records throughout HNCO to others without need to know, saying words to the effect of: "this proves he's a traitor, scammer, and/or insider threat."

119.    Dr. Roe was shocked at the amount of information provided to Defendant Captain McVeigh and knows the only potential source of this information would have been OSI Agent.

120.    Dr. Roe never authorized the release of this information.

121.    Captain McVeigh had no "need to know" this information obtained by the various system of records as defined by the Privacy Act of 1974 and attendant case law and regulation.

122.    Both the OSI Agent and Captain McVeigh knew that Captain McVeigh had no appropriate need to know within the bounds of the Privacy Act.

123.    On information and belief, Defendant OSI Agent and Defendant Officers were working in concert to intentionally distribute the products of this bad faith investigation to harass, intimidate, and ostracize and debar Dr. Roe from the commands and the offensive CyberAI field in general.  Much of the details how the Officers and OSI Agent accomplished the exclusion and ostracization of Dr. Roe are currently classified and/or restricted to Defendants' information systems.

124.    Dr. Roe was immediately debarred from HNCO starting in August of 2020.

125.    Dr. Roe continually sought to be restored to HNCO – protesting his innocence and the false nature of the OSI investigation.

126.    Specifically, in September 2020, Dr. Roe asked to be restored to HNCO.

127.    Dr. Roe was told by Dan Brown that the false OSI investigation was ongoing and that he would have to wait until conclusion.

128.    Dr. Roe then waited until January 2021 and asked Dan Brown again to be restored to HNCO. Dan Brown told him to wait again.

129.    Dan Brown then informed him in May of 2021 by phone call that both the OSI investigation and OPM adjudication had all concluded favorably for Dr. Roe but "you can never work in HNCO again", or words to that effect.

130.    In that same call, Dan Brown stated that the funds Dr. Roe had obtained for his Project A had indeed been reassigned to Captain McVeigh's defunct Project B.

131.    Dan Brown further affirmed that he believes Dr. Roe, that he knew that the actions taken against Dr. Roe were false and unsupported, that Dr. Roe's work was necessary to the success of their mission and the future of the offensive cyber field, but that he had been threatened by the OSI Agent and feared further retaliation if he were to raise the unlawfulness of Dr. Roe's debarment from HNCO and the ostracism from the field.

132.    At no time was Dr. Roe provided any notice or opportunity to contest his debarment.

133.    Adding to the outrageousness of the overall conduct of Defendants, the proliferation of Project B over Project A has significantly degraded the national security of the United States. Said bluntly, the conduct of Captain McVeigh and the OSI Agent, and other Defendants has set back the offensive capabilities of the United States by over a decade.

134.    Worse yet, the harassment, ostracism, and de facto debarment of Dr. Roe have continued to present day.

135.    In November 2021, Dr. Roe mentioned to Dan Brown that his current work with a different general contractor would solve the problems in HNCO's current mission.

136.    Dan Brown said "let me know if the tools are ready."

137.    Dr. Roe since developed working prototypes for the offensive cyber tools, using AI/ML techniques similar to what was being produced for HNCO, further invalidating the claims by Captain McVeigh.

138.    In June 2022, Dan Brown related through Dr. Roe's deputy assistant, Todd Jaspers, that he wanted to see the tools as soon as they were ready but that "Dr. Roe cannot be present or have his name associated with the tools."

139.    In September 2022, Dan and Todd had another conversation regarding the status of the tools in which Dan Brown related that Dr. Roe cannot not be involved or associated with the tools in any way and that he cannot be present during the demonstration.

140.    In January 2023, Dr. Roe spoke with Dan Brown who stated, "I am excited by the prototypes and I want to see the demonstration, but that Dr. Roe could not be present due to what occurred at HNCO", or words to that effect.

141.    In February 2023, Dan Brown contacted Todd Jaspers and asked if Dr. Roe's research projects were ready for the classified TS//SCI SAP offensive cyber mission on which he had worked previously.

142.    Dr. Roe responded directly to Dan Brown in the affirmative and told him he was ready to coordinate the demonstration.

143.    Dan stated several times to Dr. Roe that his name could not be associated with the demonstration or even the research done at Dr. Roe's current employer.

144.    Dan Brown reaffirmed Dr. Roe's debarment by relating that any association with Dr. Roe would eliminate the possibility of Dr. Roe's new employer being awarded an AF Cyber contract through HNCO procurement office.

145.    Dr. Roe's debarment is complete in that he is not even allowed to enter HNCO spaces to support his products.

146.    Dr. Roe, literally, must train and educate his subordinates on his solutions and have them present his answers, his brilliance, as their own in briefings to directors of the IC as if he never existed.

147.    In short, the Defendants, through unilateral actions wholly lacking due process, have debarred Dr. Roe from his offensive CyberAI field in total; analogously removing Einstein from $E=MC^2$.

148.    Worse yet, the debarment originating with HNCO has grown. Dr. Roe now stands barred from all interaction within the USG on offensive cyber work, regardless of agency.  He is strictly relegated to cyber defense work (so long as he shields his name under his employer Leidos), which resides in a separate sub-community of cyber.

149.    The impact of the debarment can be likened to the situation of a firearms manufacturer who is only permitted to develop bullet-proof vests, or a missile designer who is restricted to creating radars and radar tracking algorithms. These are separate and distinct fields, different from their primary areas of expertise. Similarly, Dr. Roe is permanently prohibited from engaging in his specific offensive cyber field without any due process.

150.    The U.S. Government, with HNCO its primary procurement agency, is practically the sole source for these products such that a debarment from HNCO is realistically a debarment from the field and participation in the U.S. Government on this front completely.

151.    In fact, without process, Dr. Roe is permanently debarred from any work as a consultant in his own right with the U.S. Government; requiring the mask of another corporation to allow his work to move forward.

152.    Once again, adding to the outrageousness of the Defendants' conduct here, Dr. Roe sits in his new employer's office directly adjacent and facing Dan Brown's HNCO office in Texas, but is not allowed to walk across the street and enter their offices.

153.    Moreover, he is allowed to solve HNCO's problems but can't own the solution.

154.    Furthermore, the outrageous conduct of Defendants is the direct and proximate cause Dr. Roe's severe emotional harm.

155.    Specifically, Dr. Roe has suffered damages and severe emotional harm through:

a.  Daily stress, humiliation, and shame regarding his exclusion of HNCO; having to constantly discuss the issue with the team he leads regarding why he must be absent from briefings or demonstrations and his name being removed from all documentation.

b.  Constantly having to train others to present on his behalf.

c.  A loss of self-esteem and trust from his current leadership and employees requiring him to bear the shame of regularly briefing multiple levels of his new organization, to include: Senior and Executive Vice Presidents, the Chief Technology Officer, and General Counsel of his current multinational employer.

d.  Regular and persistent thoughts and feelings of shame, ostracism, and stress over his future within his designated cyber offense field.

e.  Regular sleepless nights pondering his future while under both criminal investigation as well as the OPM adjudication potentially revoking the clearance necessary to study much of his field.

f.  Constant fear during the criminal investigation that he would be indicted as an insider threat or somehow violating espionage statutes.

     g.   Feelings of despondency or powerlessness in the face of unchecked fallacious conduct by government officials.

156.    Dr. Roe has suffered continual, and current, harm and damages as a direct and proximate cause arising from the Defendants' conduct involving the unauthorized disclosures under the Privacy Act of 1974 ("Privacy Act") as well as the debarment.

157.    The unauthorized disclosures under the Privacy Act directly and proximately caused the unlawful *de facto* debarment from HNCO, the loss of his previous and current contracts, future contracts, employment opportunities, and earnings, reputational harm, standing in the community, personal humiliation, and mental anguish and suffering.  Additionally, Dr. Roe has been deprived the benefit from any intellectual property or goodwill created associated with his name with his revolutionary cyber products. *See Jacobs v. Nat'l Drug Intelligence Ctr.*, 548 F.3d 375, 378 (5th Cir. 2008).

158.    These damages are further compounded by the fact that Dr. Roe is forced to remove any association with this material during a time when the national focus on AI, and its implications to national security within the intelligence communities, are at the height of its governmental interests and demands.

## VI. CAUSES OF ACTION

### COUNT 1 – DECLARATORY AND INJUNCTIVE RELIEF – DE FACTO DEBARMENT
*(ALL DEFENDANTS)*

159.    Plaintiff incorporates each and every of the foregoing paragraphs as if fully set forth herein.

160.    Plaintiff seeks injunctive relief and a declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C §§ 2201 *et. seq*., to determine the rights and other legal relations between the Plaintiff and Defendants.

161.    At the outset, Plaintiff's Count 1 does not complain of, or seek reinstatement to, a government agency or classified program. Plaintiff's Count 1 seeks termination of an unlawful *de facto* debarment that violates the Fifth Amendment to the Constitution and the regular opportunities afforded all contractors to freely contract with the agency without an unlawful stigma attached.

162.    Debarment is a policy tool that is used by the government to ensure that it contracts only with "responsible" contractors. *Ifone Neda Internet Serv. v. Army & Air Force Exch*. Serv., No. 4:21-CV-330, 2021 U.S. Dist. LEXIS 56800, at *11 (S.D. Tex. Mar. 25, 2021) citing 48 CFR 9.402.

163.    Debarment is the exclusion of a contractor from receiving or bidding on contracts and also excludes contractors from even conducting business with the Government. 48 CFR 9.402.

164.    Debarment must be supported by a compelling reason for such action. *Id.*

165.    "As this language makes clear, debarment carries serious consequences. In effect, it is an administrative action which excludes nonresponsible contractors from government contracting. As a general matter, debarment must occur pursuant to formal proceedings and is taken by a debarring official. The initiation of a debarment proceeding requires the existence of past misconduct. . . . [T]he debarring official must determine whether any mitigating factors show that the business risk to the government has been eliminated to the extent that debarment would be unnecessary." *iFone* at *11 (internal quotations and citations cleaned up).

166.    "Nevertheless, in the absence of formal proceedings, a party may allege that a *de facto* debarment has occurred, when a contractor or subcontract has, for all practical purposes, been suspended or blacklisted from working with a government agency without due process, namely, adequate notice and a meaningful hearing. Phillips v. Spencer, 390 F. Supp. 3d 136, 155

(D.D.C. 2019) (emphasis added). Because the consequences of *de facto* debarment are so severe, when it occurs without due process and on grounds of dishonesty, fraud or lack of integrity, [it] violates the Fifth Amendment." *Id.* at 11 citing *Phillips v. Spencer*, 390 F. Supp. 3d 136, 155 (D.D.C. 2019).

167.    Dr. Roe performed contract work as a subcontractor in support of HNCO operations from 2019 to August 18, 2020.

168.    On August 18, 2020, Dr. Roe contract and projects were summarily canceled without notice or hearing of any kind.

169.    Dr. Roe has not been awarded any additional contract or work since that time and has been permanently and continually barred from contracting with (or even being associated with contracts), entering the offices of, consulting for, associating his name with his work, or otherwise having any interaction with HNCO or its parent organizations. Dr. Roe further alleges this debarment is growing into other areas of the IC as well.

170.    This debarment was predicated on assertions and grounds that Dr. Roe is dishonest, fraudulent, or lacking integrity in the representation of his CyberAI tools.

171.    Specifically, Dr. Roe learned from Dan Brown that Defendant Captain McVeigh, and one or more of the Defendants, convinced the HNCO leadership that Dr. Roe lacked integrity and that he and his theoretical innovations were a scam and/or fraudulent.

172.    Dr. Roe further learned from Dan Brown, a U.S. Government employee attached to HNCO, that Defendants Burghard, and Lt. Col. Ekholm, are the source of this debarment.

173.    On information and belief, various John Does are also the source of this debarment.

174.    Specifically, Dr. Roe has learned that the specific basis of the debarment is that the HNCO "does not want to be associated with a scam and/or a scam artist, or fraud", or words to that effect.

175.    These assertions were and are false; Dr. Roe now has fully functional patent-pending prototypes for many of the theoretical products described as a scam and/or fraudulent.

176.    In fact, it is expected that the U.S. Government will seek to classify those patents as they are processed through.

177.    "Two options exist to establish a *de facto* debarment claim: 1) by an agency's statement that it will not award the contractor future contracts; or 2) by an agency's conduct demonstrating that it will not award the contractor future contracts. To show that an agency's conduct amounts to debarment, a plaintiff does not have to prove that it has lost 100% of its work, but only that the government's actions were aimed at the overall status of the plaintiff as a contractor, specifically at plaintiff receiving new contracts. In other words, *de facto* debarment may lie where there has been exclusion from virtually all government work for a fixed period of time, . . . or where the government's conduct has the broad effect of largely precluding plaintiffs from pursuing government work." *Id.* (internal modifications and citations omitted) citing *Phillips v. Mabus*, 894 F. Supp. 2d 71, 81 (D.D.C. 2012).

178.    Dr. Roe, through statements from Dan Brown, qualifies under both options.

179.    Dan Brown stated outright that Dr. Roe is barred from HNCO permanently.

180.    Additionally, HNCO continues to exclude Dr. Roe through conduct (including, but not limited to: forced removal of his name or association with projects; denial of his requests to return; preventing his entry to their spaces).

181.    Dr. Roe was never given notice or an opportunity to refute the false allegations that he lacks integrity.

182.    The actions of Defendants Captain McVeigh, Burghard, and Lt. Col. Ekholm, and John Does, above constitutes an unlawful *de facto* debarment evidenced in both words and conduct.

183.    Defendants Captain McVeigh, Burghard, and Lt. Col. Ekholm, and John Does, possessed a duty as employees and officers of the U.S. Government to adhere to the requirements of the due process clause of Amend. V of the U.S. Constitution and failed in that duty as described above.

184.    Secretary Frank Kendall, III, in his capacity as Secretary of the Air Force provides guidance and direction to the U.S. Air Force and its subordinate units for, *inter alia*, adherence to regulation, statutes, and constitutional requirements. In that role, Secretary Kendall, III, holds a duty and is responsible for assuring that military and civilian members of the U.S. Air Force adhere to and comply with all laws of the land including the due process clause of the Amend. V to the U.S. Constitution, including the procurement of all goods and services.

185.    Secretary Frank Kendall, III, failed in this duty to assure that AF Cyber and AFLCMC complied with Amend. V. to the U.S. Constitution in the debarment of Dr. Roe, without due process of law.

186.    Lt. Gen. Kevin Kennedy, USAF, in his capacity as Commander of the 16th Air Force, provides guidance and direction to AF Cyber and its subordinate units for, *inter alia*, adherence to regulation, statutes, and constitutional requirements. In that role, Lt. Gen. Kennedy, holds a duty and is responsible for assuring that military and civilian members of AF Cyber adhere

to and comply with all laws of the land including the due process clause of the Amend. V to the U.S. Constitution, including the procurement of all goods and services.

187.    Lt. Gen. Kevin Kennedy, USAF, failed in this duty to assure that AF Cyber and AFLCMC complied with Amend. V. to the U.S. Constitution in the debarment of Dr. Roe, without due process of law.

188.    Lt. Gen. Shaun Q. Morris, USAF, in his capacity as Commander of the AFLCMC, provides guidance and direction to AFLCMC and its subordinate units for, *inter alia*, adherence to regulation, statutes, and constitutional requirements. In that role, Lt. Gen. Morris, holds a duty and is responsible for assuring that military and civilian members of AFLCMC adhere to and comply with all laws of the land including the due process clause of the Amend. V to the U.S. Constitution, including the procurement of all goods and services.

189.    Lt. Gen. Shaun Morris, USAF, failed in this duty to assure that AF Cyber and AFLCMC complied with Amend. V. to the U.S. Constitution in the debarment of Dr. Roe, without due process of law.

190.    Dr. Roe seeks judgment and injunctive relief pursuant to the Declaratory Judgement Act and the Administrative Procedures Act Sec. 706, the Amend. V of the U.S. Constitution that the above-named defendants violated his Constitutional rights in the debarment of Dr. Roe without due process of law.  Dr. Roe further seeks injunctive relief against the above-named Defendants ordering that the unlawful *de facto* debarment cease immediately and that all rights and opportunities afforded to him prior to the debarment be reinstated, including but not limited to: being treated as any other contractor would without the stigma of Defendants' unlawful conduct, being allowed to associate his name with his products and tools that the Government wants to buy,

being allowed to brief on those same products and tools as required, and any other injunctive or equitable relief this Court deems necessary.

191.    In the alternative, Dr. Roe seeks an order from this Court that he be afforded a debarment hearing with all attendant due process and discovery so that he may properly contest his debarment before the agency.

COUNT 2 – VIOLATION OF THE PRIVACY ACT OF 1974
*(Defendants OSI Agent and Captain McVeigh,)*

192.    Plaintiff incorporates each and every of the foregoing paragraphs as if fully set forth herein.

193.    The Privacy Act of 1974 ("Privacy Act") states "No agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains [subject to 12 exceptions]."  5 U.S.C. § 552a(b).

194.    The Privacy Act provides for a cause of action for an agency's failure to comply its provisions and that failure has an adverse effect on the individual. *Jacobs v. Nat'l Drug Intelligence Ctr.*, 423 F.3d 512, 515 (5th Cir. 2005).

195.    Such a cause of action includes a Government actor's disclosure of a record contained in a system of records in violation of §552a(b) of the Privacy Act. *Id.*

196.    To prevail on such a claim, a plaintiff must present evidence of the following elements: (1) the information is a "record" in a "system of records"; (2) the agency disclosed the information; (3) the disclosure had an adverse effect on him; and (4) the disclosure was willful. *Id.*

197.    The Privacy Act prohibits the disclosure of any record which is contained in a system of records by any means of communication. § 552a(b). *Id.*

198.    "A record means any item, collection, or grouping of information about an individual that is maintained by an agency, including, but not limited to…criminal or employment history, and that contains his name or other identifying particular assigned to an individual." *Id.*

199.    According to Air Force Policy Directive 17-1, OSI's system of records are F0 71 AF OSI A, Counterintelligence Operations and Collection Records, and F0 71 AF OSI D, Investigative Information Management System (I2MS).

200.    On information and belief, OSI Agent searched and obtained records from this information system during his unlawful investigation into Dr. Roe.

201.    It is further alleged that OSI Agent searched and obtained records from additional systems of records during his unlawful investigation such as: F031 497IG A Sensitive Compartmented Information (SCI) Personnel Records, F031 497IG B Special Security Case Files, F031 AF SP M Personnel Security Access Records, F071 JTF A Computer Network Crime Case System, GNSA 03 NSA/CSS Office of General Counsel Correspondence, Claims, Complaints, and Litigation Files, GNSA 09 NSA/CSS Personnel File, GNSA 10 NSA/CSS Personnel Security File, among others.

202.    The records included, *inter alia*, Dr. Roe's employment history, criminal investigation history and status, security clearance adjudication status and history, NSA employment records, and NSA General Counsel correspondence and files.

203.    OSI Agent regularly disclosed all information obtained from the system of records to Captain McVeigh.

204.    Any disclosures by OSI Agent to Captain McVeigh were improperly disclosed without the consent of Dr. Roe.

205.    Captain McVeigh had no requisite need to know the record or information provided by OSI Agent since Captain McVeigh had no supervisory or leadership roles relative to Dr. Roe, his projects, or any issue having to do with his personnel and security files.

206.    This unauthorized disclosure had an adverse effect on Dr. Roe, including but not limited to those damages described *supra* and: loss of contracts and position, loss of reputation in the DoD and within his community, debarment from the HNCO, mental anguish, and other damages to be proven at trial. There is a direct and proximate causal nexus between the unauthorized disclosure and the adverse effect on Dr. Roe.

207.    OSI Agent knew that Captain McVeigh lacked any requisite need to know this information but willfully disclosed it anyway in violation of the Privacy Act.

<u>COUNT 3 – VIOLATION OF THE PRIVACY ACT OF 1974</u>
*(Defendants Captain McVeigh, Lt. Col. Ekholm, and John Does)*

208.    Plaintiff incorporates each and every of the foregoing paragraphs as if fully set forth herein, specifically those paragraphs in Count 2 and supplements as follows.

209.    Captain McVeigh obtained a number of protected records without authority from OSI Agent.

210.    The records included, *inter alia*, Dr. Roe's employment history, criminal investigation history and status, security clearance adjudication status and history, NSA employment records, and NSA General Counsel correspondence and files.

211.    Captain McVeigh had no requisite need to know the record or information provided by OSI Agent due to the fact that Captain McVeigh had no supervisory or leadership roles relative to Dr. Roe, his projects, or any issue having to do with his personnel and security files.

212.     Captain McVeigh knew that he did not have the requisite need to know this information and that he should not disclose information communicated from the aforementioned systems of record.

213.     Captain McVeigh ignored the provisions of the Privacy Act and communicated the information from the records to Defendant Lt. Col. Ekholm as well as Ian Crone, Kevin M Thomas, William P Bridges, Allen C Rabayda, Christine L Uptain, and Maj Daniel J Casey.

214.     Any disclosures by Captain McVeigh or other Defendants were improperly disclosed without the consent of Dr. Roe.

215.     This unauthorized disclosure had an adverse effect on Dr. Roe, including but not limited to those damages described *supra* and: loss of contracts and position, loss of reputation in the DoD and within his community, debarment from the HNCO, mental anguish, and other damages to be proven at trial.

216.     Captain McVeigh knew the individuals he disclosed this information to lacked any requisite need to know this information but willfully disclosed it anyway in violation of the Privacy Act.

<u>COUNT 4 – FTCA ABUSE OF PROCESS</u>
*(Defendant United States)*

217.     Plaintiff incorporates each and every of the foregoing paragraphs as if fully set forth herein.

218.     Plaintiff brings this claim against the United States for money damages and alleges that he was injured and/or lost property as described herein. This injury or damage was caused by the negligent or wrongful act or omissions of Defendants while acting in the scope of their office or employment and under circumstances where the United States, if a

private person would be liable to the Plaintiff in accordance with the law of the place where the act or omission occurred, to wit: the State of Texas.

219.    Pursuant to the law enforcement proviso contained within 28 U.S.C. § 2680(h), Plaintiff alleges that Defendants Captain McVeigh, Lt. Col. Ekholm, and OSI Agent abused the OSI criminal investigation process.

220.    "For the purpose of this subsection, "investigative or law enforcement officer" means any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law." 28 U.S.C § 2680(h).

221.    Under this definition, both Defendants Captain McVeigh and Lt. Col. Ekholm qualify for the FCTA law enforcement proviso, along with OSI Agent.

222.    At all material times Defendants Captain McVeigh, Lt. Col. Ekholm, and OSI Agent were employees or commissioned officers of the U.S. Air Force and acting within the scope of their employment and duties as assigned by the U.S. Government.

223.    Specifically, Texas law on abuse of process governs this claim.

224.    In Texas, a litigant prevails on an abuse of process claim if (1) the defendant made an illegal, improper, or perverted use of the process, a use neither warranted nor authorized by the process; (2) the defendant had an ulterior motive or purpose in exercising such illegal, perverted, or improper use of the process; and (3) damage to the plaintiff as a result of such illegal act. *Bossin v. Towber*, 894 S.W.2d 25, 33 (Tex. App.—Houston [14th Dist.] 1994, writ denied). The focus for abuse of process is whether the process was utilized for a purpose for which it was not intended. *Id.*

225.    While normally process refers to pure legal process, Plaintiff could find no Texas law governing an abuse of process claim where an OSI agent did open a criminal investigation

and an administrative adjudication process (OPM) commenced therefrom. *But c.f.*, *Warner Bros. Entm't, Inc. v. Jones*, 538 S.W.3d 781, 816 (Tex. App. 2017) ("If [the plaintiff] has not been arrested, then there has been no 'use' of any process (presumably a warrant for his arrest) issued as the result of the filing of the criminal complaints against him." [We are not persuaded] that we should broaden the traditional notion of an abuse-of-process claim to encompass conduct that occurs before the commencement of some judicial process.").

226.    However, given that an administrative proceeding has been found to constitute a civil proceeding in Texas, then Plaintiff asserts that the institution of an OPM adjudication derived from an abusive criminal investigation, this constitutes commencement of "some judicial process." *See Columbia Valley Healthcare Sys., L.P. v. Pisharodi infra.* at 50.

227.    On or about August 13, 2020, Defendants Captain McVeigh, Lt. Col. Ekholm, and became angered and vindictive over Dr. Roe's critical assessment of Project B.

228.    These same Defendants approached OSI Agent with a plan to abuse the OSI Agent's authority to initiate an OSI criminal investigation to harass, humiliate, ostracize, and intimidate Dr. Roe and remove him from government service.

229.    These Defendant Officers and OSI Agent knew that the OSI investigations process required probable cause before opening an investigation.

230.    Knowing they lacked probable cause, Defendant Officers and OSI Agent utilized the criminal investigation, not for its intended purposes: to investigate crimes supported by probable cause, but to scuttle Dr. Roe and neutralize his effects on Project B through harassing, humiliating, ostracizing, and intimidating Dr. Roe to remove him from government service.

231.    Defendant Officers and Defendant OSI Agent employed a bad faith OSI criminal investigation into Dr. Roe with an ulterior motive, to remove Dr. Roe and Project A from the agency and absorb the budget of that project into Project B, which they accomplished. Pursuant to the law enforcement proviso contained within 28 U.S.C. § 2680(h), Plaintiff alleges that Defendants Captain McVeigh, Lt. Col. Ekholm, and OSI Agent abused the OSI criminal investigation process.

232.    This unwarranted OSI criminal investigation was improper and illegal, and a perversion of the power and authority entrusted to them through regulation, statute and the Constitution.

233.    As a direct and proximate cause of Defendants' Captain McVeigh, Lt. Col. Ekholm, and OSI Agent actions above, Dr. Roe suffered damages as alleged *supra* in the form of harassment, humiliation, ostracism, *de facto* debarment from Government service, loss of work, loss of esteem and regard in the field of CyberAI and other damages, mental anguish and harm, the amount of which is to be proven at trial.

COUNT 5 – FTCA CONSPIRACY TO ABUSE OSI INVESTIGATION PROCESS
*(Defendant United States)*

234.    Plaintiff incorporates each and every of the foregoing paragraphs as if fully set forth herein, specifically including Count 3 *supra*.

235.    Plaintiff brings this claim against the United States for money damages and alleges that he was injured and/or lost property as described herein. This injury or damage was caused by the negligent or wrongful act or omissions of Defendants while acting in the scope of their office or employment and under circumstances where the United States, if a private person would be liable to the Plaintiff in accordance with the law of the place where the act or omission occurred, to wit: the State of Texas.

236.    Specifically, Texas law on abuse of process governs this claim.

237.    In Texas, the tort of civil conspiracy is the combination of two or more persons to accomplish an unlawful purpose, or to accomplish a lawful purpose by unlawful means. *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996).

238.    Liability for civil conspiracy depends on participation in an underlying tort for which the plaintiff seeks to hold at least one of the defendants liable. *Id.*

239.    In Texas, a claim for civil conspiracy has been found to be supported when supported by an abuse of process claim. *Toles v. Toles*, 113 S.W.3d 899, 920 (Tex. App. 2003) ("However, because we have found the trial court erred by granting summary judgment on Lougay's claims for "abuse of litigation and litigation process," abuse of process, aiding and abetting a breach of fiduciary duty, and invasion of privacy, we conclude the trial court also erred by granting summary judgment on Lougay's civil conspiracy claim.").

240.    Defendant Officers and Defendant OSI Agent combined together with the specific intent to abuse the OSI investigation process.

241.    These Defendants knew that the OSI investigations process required probable cause before opening an investigation.

242.    Knowing they lacked probable cause, Defendant Officers and OSI Agent agreed to utilize the OSI criminal investigation, not for its intended purposes: to investigate crimes supported by probable cause, but to scuttle Dr. Roe and neutralize his affects on Project B through harassing, humiliating, ostracizing, and intimidating Dr. Roe to remove him from government service.

243.    One or more overt acts were done in furtherance of this illicit goal, including but not limited to:

    a.   Opening the baseless investigation.

    b.   Interrogating and threatening Dr. Roe as if he were an insider threat.

    c.   Leaking documents and other fruits of the OSI investigation to Defendant Officers and other John Does associated with HNCO in violation of the Privacy Act.

    d.   Publishing those investigation fruits to persons within HNCO not authorized to receive active OSI investigation materials.

    e.   Making false reports and accusations against Dr. Roe being a scam artist or insider threat and his work being fraudulent.

    f.   Given Defendant Conspirator's and OSI Agent's conspiracy above, all are vicariously liable for OSI Agent's tort of Abuse of Process.

244.    As a direct and proximate cause of Defendant Officers and OSI Agent conspiratorial actions above, Dr. Roe suffered damages as alleged *supra* in the form of harassment, humiliation, ostracism, debarment from Government service, loss of esteem and reputation in the field of CyberAI, severe emotional harm, and other damages to be proven at trial.

## COUNT 6 – FTCA INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### *(Defendant United States)*

245.    Plaintiff incorporates each and every of the foregoing paragraphs as if fully set forth herein.

246.    Plaintiff brings this claim against the United States for money damages and alleges that he was injured and/or lost property as described herein. This injury or damage was caused by the negligent or wrongful act or omissions of Defendants while acting in the scope of their office or employment and under circumstances where the United States, if a

private person would be liable to the Plaintiff in accordance with the law of the place where the act or omission occurred, to wit: the State of Texas.

247.    Intentional Infliction of Emotional Distress (IIED) is not barred by the FTCA if the IIED allegations do not arise from torts that are otherwise barred. *Grost v. United States*, No. EP-13-CV-158-KC, 2014 U.S. Dist. LEXIS 61608, at *30 (W.D. Tex. May 4, 2014) ("By contrast, the allegations that Defendant's employees abused, harassed, threatened, and mistreated Plaintiff, subjected her to offensive conduct, caused her to be ostracized, and caused her to be without employment do not arise out of libel or slander because they do not concern the publication of false statements about Plaintiff… Thus, because aspects of the conduct alleged in [Plaintiff's] complaint do not constitute a tort enumerated in section 2680(h), her IIED claim is not barred to the extent it is based on that conduct.) (internal quotations and cites omitted and cleaned up).

248.    To recover for intentional infliction of emotional distress under Texas law, "a plaintiff must prove that (1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's actions caused the plaintiff emotional distress; and (4) the emotional distress suffered by the plaintiff was severe. Extreme and outrageous conduct is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. In the workplace context, conduct including demeaning comments, unfair criticism, demotion, termination or other harassment, is not sufficiently extreme and outrageous, however deplorable it may be. *Id.* (cleaned up).

249.    The crux of the courts' focus is on whether the conduct is considered extreme and outrageous and whether severe emotional harm exists.

250.    As a predicate matter, Defendants acted intentionally or recklessly acted to harass, humiliate, threaten, ostracize, and intimidate Dr. Roe to force Dr. Roe from his life work and the field of science and math that he created (actions found by *Grost* that do not arise from defamation), and cause severe emotional harm.

251.    To properly observe the extreme and outrageous conduct perpetrated by Defendants, one must take in the whole of the course of conduct within the context of the environment in which it occurred and the length of violations.

252.    Removing the false reports, or any other tort that may link to defamation issues, there is still sufficient outrageous conduct at issue:

    a.  First, the outrageousness of the conduct has to be evaluated within the context that these acts occurred within the national security environment in an era where near-peer adversaries are racing for AI/ML dominance (akin to the race for the Atomic Bomb). *See* Ben Cost, *Rogue AI 'could kill everyone,' scientists warn as ChatGPT craze runs rampant*, New York Post (January 26, 2023 available at https://nypost.com/2023/01/26/rogue-ai-could-kill-everyone-scientists-warn/).

    b.  Further, the extreme nature of the conduct has to be evaluated in the context of who Dr. Roe is within the greater context of AI/ML – he is the foundational creator of the literally "new math" that operates the AI brain. He is the answer to this century's Manhattan Project.

    c.  Additionally, he is a man who has dedicated his life to the advancement of American interests both domestically and abroad. He has deployed multiple times

in harm's way with the IC to ensure that American intelligence operatives and its military are ahead of our adversaries through his work. He suffers even now with PTSD related to those deployments – yet doesn't get the recognition even an E-1 in our Armed Services get when they walk down the street in uniform. He, instead, simply, and silently, continues to try and improve the United States' position in the AI/ML race – even repeatedly asking to rejoin Defendants so he can "just do the math" again.

d.  Given these contexts, Dr. Roe, suffering the barbs and harassments of Defendants in HNCO calling him names like "scam artist", fraud, and an insider threat to national security, when he is the solemn and proven protector of it, is outrageous and extreme.

e.  Similarly, calling him a "traitor" and an insider threat within a knowingly false criminal interrogation and telling him he's going to lose his clearance, his job, and be sent to prison is outrageous and extreme.

f.  Forcing him to endure through a criminal interrogation for nearly a year lacking probable cause is outrageous and extreme.

g.  Forcing him through an illegitimate adjudication of his security clearance – his very ability to maintain a livelihood in this field – is outrageous and extreme.

h.  Forcing him to remove his very likeness or association from the innovations he creates without reason or rational basis is outrageous and extreme.

i.  Forcing him to divest himself and his identity entirely from future contracts related to an entire offensive cyber field that he created is outrageous and extreme.

j.  Ostracizing him throughout the Intelligence Community is outrageous and extreme.

k. Setting the United States back in its CyberAI field by more than a decade due to grabs for budgets, is outrageous and extreme.

l. Continuing this conduct years after he has already had his contract summarily terminated and moved to other employment, is outrageous and extreme.

253. The actions described above directly and proximately caused, and is continuing to cause, Dr. Roe severe emotional distress as described in detail *supra*, including but not limited to, damages such as loss of sleep, anxiety, depression, humiliation, loss of place in society, severe mental and emotional distress and anguish, loss of enjoyment of life, and fear of further reprisals and further ostracism.

## COUNT 7 - CIVIL CONSPIRACY FOR IIED
*(Defendant United States)*

254. Plaintiff incorporates each and every of the foregoing paragraphs as if fully set forth herein.

255. Plaintiff brings this claim against the United States for money damages and alleges that he was injured and/or lost property as described herein. This injury or damage was caused by the negligent or wrongful act or omissions of Defendants while acting in the scope of their office or employment and under circumstances where the United States, if a private person would be liable to the Plaintiff in accordance with the law of the place where the act or omission occurred, to wit: the State of Texas.

256. Specifically, Texas law on abuse of process governs this claim.

257. In Texas, the tort of civil conspiracy is the combination of two or more persons to accomplish an unlawful purpose, or to accomplish a lawful purpose by unlawful means. *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996).

258.      Liability for civil conspiracy depends on participation in an underlying tort for which the plaintiff seeks to hold at least one of the defendants liable. *Id.*

259.      The named Defendants combined in agreement to intentionally inflict emotional distress on Dr. Roe.

260.      The named Defendants agreed collectively to take the outrageous and extreme course of action that would inflict severe emotional harm.

261.      The named Defendants took a number of overt acts in further of the course of action to inflict severe emotional distress on Dr. Roe, including but not limited to:

   a.   Calling him names and accusing him of fraud and being an insider threat.

   b.   Refusing to purchase or adopt any of Dr. Roe's products unless he removed his name from association therewith.

   c.   Refusing to consider contracts that had his name associated with them.

262.      These actions by the named Defendants directly and proximately caused Dr. Roe The actions described above directly and proximately caused and is continuing to cause Dr. Roe severe emotional distress as described in detail *supra*, including but not limited to, damages such as loss of sleep, anxiety, depression, humiliation, loss of place in society, severe mental and emotional distress and anguish, loss of enjoyment of life, and fear of further reprisals and further ostracism.

### COUNT 8 – DECLARATORY AND INJUNCTIVE RELIEF – UNREASONABLE INTERFERENCE WITH EMPLOYMENT
### *(ALL DEFENDANTS)*

263.      Plaintiff incorporates each and every of the foregoing paragraphs as if fully set forth herein but specifically those contained within Count 1.

264.    Plaintiff seeks injunctive relief and a declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C §§ 2201 et. seq., to determine the rights and other legal relations between the Plaintiff and Defendants.

265.    The right to liberty includes the right to engage in any of the common occupations of life. [T]he right to hold specific private employment and to follow a chosen profession free from unreasonable government interference comes within the 'liberty' and 'property' concepts of the Fifth Amendment. A state, in regulating eligibility for a type of professional employment, cannot foreclose a range of opportunities in a manner . . . that contravene[s] . . . Due Process." *Edelstein v. City of Brownsville*, No. 1:19-CV-00042, 2019 U.S. Dist. LEXIS 239597, at *10 (S.D. Tex. Nov. 13, 2019) citing *Roth v. Bd. of Regents*, 408 U.S. 564, 572, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972); *Greene v. McElroy*, 360 U.S. 474, 492, 79 S. Ct. 1400, 3 L. Ed. 2d 1377 (1959) (a case involving *security clearance* and employment).

266.    In this case, Defendants have unreasonably interfered with Dr. Roe's range of opportunities within offensive cyber operations.

267.    This interference is aggravated by the fact that the market for offensive cyber operations is almost entirely procured through Defendants' influence.

268.    Defendants, through the combination of actions alleged herein, have effectively stopped Dr. Roe from being able to work in the offensive cyber field (to make firearms instead of bullet proof vests) permanently. They have essentially blocked him from ever starting his own business in this field or serving as a consultant without the mask of another employer shielding his name.

269.     These actions were arbitrary and lacking a rational basis, or any semblance of due process.

270.     Dr. Roe seeks judgment and injunctive relief pursuant to the Declaratory Judgement Act and the Administrative Procedures Act Sec. 706, the Amend. V of the U.S. Constitution that the above-named defendants violated his Constitutional rights in the unreasonable interference with his chosen profession or field of employment. Dr. Roe further seeks injunctive relief against the above-named Defendants ordering that the unlawful interference with his chosen employment cease immediately and that all rights and opportunities afforded to him prior to the debarment be reinstated, including but not limited to: being treated as any other contractor, consultant, or professional in this field would without the stigma of Defendants' unlawful conduct, being allowed to associate his name with his products and tools that the Government wants to buy, being allowed to brief on those same products and tools as required, and any other injunctive or equitable relief this Court deems necessary.

## COUNT 9 – FTCA MALICIOUS PROSECUTION
### *(Defendant United States)*

271.     Plaintiff incorporates each and every of the foregoing paragraphs as if fully set forth herein but specifically emphasizes those facts and claims in Count 4.

272.     Plaintiff brings this claim against the United States for money damages and alleges that he was injured and/or lost property as described herein. This injury or damage was caused by the negligent or wrongful act or omissions of Defendants while acting in the scope of their office or employment and under circumstances where the United States, if a private person would be liable to the Plaintiff in accordance with the law of the place where the act or omission occurred, to wit: the State of Texas.

273.    Pursuant to the law enforcement proviso contained within 28 U.S.C. § 2680(h), Plaintiff alleges that Defendants Captain McVeigh, Lt. Col. Ekholm, and OSI Agent abused the OSI criminal investigation process.

274.    "For the purpose of this subsection, "investigative or law enforcement officer" means any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law." 28 U.S.C § 2680(h).

275.    Under this definition, both Defendants Captain McVeigh and Lt. Col. Ekholm qualify for the FCTA law enforcement proviso, along with OSI Agent.

276.    At all material times Defendants Captain McVeigh, Lt. Col. Ekholm, and OSI Agent were employees or commissioned officers of the U.S. Air Force and acting within the scope of their employment and duties as assigned by the U.S. Government.

277.    Specifically, Texas law on malicious prosecution governs this claim.

278.    To prove malicious prosecution of a civil claim, a plaintiff must establish: (1) the institution or continuation of civil proceedings against the plaintiff, (2) by or at the insistence of the defendant, (3) malice in the commencement of the proceeding, (4) lack of probable cause for the proceeding, (5) termination of the proceeding in plaintiff's favor, and (6) special damages. *Columbia Valley Healthcare Sys., L.P. v. Pisharodi*, No. 13-18-00660-CV, at *13 (Tex. App. Jan. 30, 2020).

279.    The first element may be satisfied by showing that there were administrative proceedings initiated against Plaintiff. *Id.*

280.    "If wrongful intent or malice caused the process to be issued initially, the claim is [is] one for malicious prosecution." *Bossin*, 894 S.W.2d at 33.

281.    In this case, the OPM administrative adjudication proceeding was initiated against Dr. Roe by, or at the insistence of, Defendants. Specifically, OSI Agent and Defendant Captain McVeigh initiated this administrative action. On information and belief, other Doe Defendants or named Defendants also worked to initiate this action.

282.    The Defendants malice has been fully described *supra*, but restated, they did so not out of good faith concerns with Dr. Roe's security status and clearance, but to skuttle his ability to negatively impact Project B or Captain McVeigh.

283.    There was an utter lack of probable cause for this proceeding as it was entirely founded on invented and false claims and assertions that the Defendants knew were false.

284.    The OPM adjudication terminated favorably.

285.    As a direct and proximate cause of Defendants' actions above, Dr. Roe suffered special damages as alleged *supra* in the form of harassment, humiliation, ostracism, de facto debarment from Government service, loss of work, loss of esteem and regard in the field of CyberAI, suspension of his security clearance for several months while the process was adjudicated, and other damages, mental anguish and harm,  the amount of which is to be proven at trial. *Pisharodi*, at *17 (Tex. App. Jan. 30, 2020)("In any event, the suspension of Pisharodi's admitting privileges does not constitute 'ordinary losses' incident to defending an administrative proceeding such as the peer reviews undertaken in this case. Instead, it constitutes interference with a property right, akin to an injunction, and therefore satisfies the special damages requirement.").

### COUNT 10 – FTCA CONSPIRACY TO MALICIOUSLY PROSECUTE
*(Defendant United States)*

286.    Plaintiff incorporates each and every of the foregoing paragraphs as if fully set forth herein but specifically emphasizes those facts and claims in Count 4.

287.    Plaintiff brings this claim against the United States for money damages and alleges that he was injured and/or lost property as described herein. This injury or damage was caused by the negligent or wrongful act or omissions of Defendants while acting in the scope of their office or employment and under circumstances where the United States, if a private person would be liable to the Plaintiff in accordance with the law of the place where the act or omission occurred, to wit: the State of Texas.

288.    Specifically, Texas law on abuse of process governs this claim.

289.    In Texas, the tort of civil conspiracy is the combination of two or more persons to accomplish an unlawful purpose, or to accomplish a lawful purpose by unlawful means. *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996).

290.    Liability for civil conspiracy depends on participation in an underlying tort for which the plaintiff seeks to hold at least one of the defendants liable. *Id*.

291.    Defendant Officers and Defendant OSI Agent combined together with the specific intent to maliciously prosecute Dr. Roe through false claims and malice in the commencement of the OPM action administrative adjudication against Dr. Roe.

292.    These Defendants knew that there was no probable cause before seeking the institution of the OPM action.

293.    Knowing they lacked probable cause, Defendant Officers and OSI Agent agreed to utilize the OSI criminal investigation, and the false allegations to engage the OPM and insist that they suspend and adjudicate Dr. Roe's security clearance.

294.    One or more overt acts were done in furtherance of this illicit goal, including but not limited to:

    a.  Opening the baseless investigation.

    b.   Making false reports and accusations against Dr. Roe being a scam artist or insider threat and his work being fraudulent.

    c.   Reporting the false claims and issues to OPM.

295.    Given Defendant Conspirator's and OSI Agent's conspiracy above, all are vicariously liable for the tort of Malicious Prosecution.

296.    As a direct and proximate cause of Defendants' actions above, Dr. Roe suffered special damages as alleged supra in the form of harassment, humiliation, ostracism, de facto debarment from Government service, loss of work, loss of esteem and regard in the field of CyberAI, suspension of his security clearance for several months while the process was adjudicated, and other damages, mental anguish and harm,  the amount of which is to be proven at trial.

## VII. JURY DEMAND

297.    Plaintiff demands jury trial on all issues so triable.

## VIII. PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiff requests that the Defendants be cited to appear and answer, and that upon final hearing, respectfully prays that this Court enter judgment against Defendants as presented herein and provide the following relief:

A.    Declaratory judgement and injunctive relief as described herein;

B.    Award Plaintiff actual, compensatory, special, and punitive damages (if allowed), in an amount to be determined by a jury at trial, and attorney's fees and costs pursuant to 28 U.S.C. § 2412, and additionally for the bad faith conduct of Defendants, and any other appropriate fees and costs statute that may be applicable;

C.    Award Plaintiff any other relief that this Court deems just and proper at law and in equity.

Dated this 7th day of July, 2023.


Respectfully submitted,

HENDLEY & HODGES LAW PLLC
29710 US Hwy 281 North, Ste. 300
Bulverde, Texas 78163
Tel:   (210) 714-0924
Fax:  (210) 640-3398


By:            /s/ *John W. Hodges, Jr.*
John W. Hodges Jr.
TX Bar No. 24090167
Email: john@hhtx.law


THE LAW CENTER P.C.
300 Plaza Drive, Ste. 200
Bulverde, Texas 78163
Tel:   (303) 991-5200


By:            /s/ *Jason R. Wareham*
Jason R. Wareham
CO. State Bar No. 5697
*Pro Hac Vice*
Litigation@thelawcenterpc.com

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I certify that on July 7, 2023, I filed the foregoing *First Amended Complaint* and served the same on all counsel of record via the same.

/s/ Jason R. Wareham
Jason R. Wareham, CO Bar No: 56974
The Law Center P.C.
300 Plaza Dr., Ste 200
Highlands Ranch CO 80129
303-991-5200
Litigation@thelawcenterpc.com