# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

DR. JOHN ROE,

        Plaintiff,

v.

UNITED STATES OF AMERICA, et al.,

        Defendants.

Civil Action No. 5:22-CV-00869-JKP-HJB

## <u>DEFENDANTS' OPPOSED MOTION TO EXCLUDE<br> PLAINTIFF'S EXPERT TESTIMONY</u>

The United States Defendants move for an order precluding Plaintiff from testifying as an expert at trial.

## INTRODUCTION

Plaintiff claims that HNCO, a small Air Force subcomponent, unlawfully subjected him to a de facto debarment in 2020. As a result, Plaintiff allegedly could not enter into contracts with HNCO to develop CyberAI tools for offensive cyber operations. He seeks in his lawsuit, among other things, damages for the alleged debarment and identifies himself as an expert witness to provide relevant background on AI and his damages calculation. His expert report forecasts damages of approximately $28.5 million per year for the five year period 2020 to 2024.

Plaintiff and his opinion fail to satisfy the requirements of Federal Rule of Evidence 702. Although he may be an expert mathematician, he lacks expertise in the fields that inform a damages assessment: marketing analysis and damages forecasting. Indeed, he has no degrees, education, or certifications in these fields, and has neither published relevant scholarly work, nor contributed to relevant scholarly textbooks. His professional experience as a Chief AI Scientist

1

fails to substitute. Nothing he described about that work bears any similarity to the damages projection in his opinion testimony.

Plaintiff also fails to establish that his opinion "is the product of reliable principles and methods." Fed. R. Evid. 702(c). He cites no support for his calculation methodology beyond his unsupported assertion that it is "generally accepted by the industry." The purported procedures outlined in his report expose the shortcoming. He arrives at core premises by conclusory assurances of his expertise—the "mechanism is my subject matter expertise in this arena"—not by reliable principles and methods. Testing of his methodology highlighted the unreliability. Plaintiff's data inputs produce contracts not just with HNCO and not just for the type of products Plaintiff develops, thus demonstrating that Plaintiff seeks damages for contracts not attributable to Defendants.

Finally, the opinion lacks "sufficient facts or data" necessary to establish a reliable methodology. Fed. R. Evid. 702(b). Plaintiff, who has never before bid on a prime contract, assumes that he would have won all 77 prime contracts upon which he bases his damages opinion. Moreover, he makes this assumption even though the companies holding those contracts are, unlike him, established market participants with an average of 84 employees. That assumption rests on nothing more than him being "one of the best in this field" and his ability to use "thousands of [AI] agents to do the work of thousands of people."

As set forth in more detail below, the Court should exclude Plaintiff's proposed expert testimony.

## BACKGROUND

**Relevant Facts.** Plaintiff is a mathematician that develops advanced Artificial Intelligence (AI) and Machine Learning (ML) cyber tools. *See* 2d Am. Compl. (SAC) ¶¶ 14, 46-

47. In 2020, he held two paid positions—full-time government employee at the National Security Agency (NSA) and part-time subcontractor providing mathematics support to HNCO,[1] a small Air Force subcomponent. In August 2020, some officials at HNCO became concerned that Plaintiff may have violated conflict of interest rules by holding both positions and initiated an inquiry. *See* **Exhibit No. 1**, Appointment of Inquiry Official. Less than two weeks later, Plaintiff accepted an executive-level position in the private sector and resigned from the NSA. HNCO ended its inquiry when it learned of the resignation. No adverse finding was ever made against Plaintiff. **Exhibit No. 2,** Inquiry of Security Incident. He remains, as he always has, in good standing with the federal government and free to bid on any contracts. **Exhibit No. 3**, Bremer 30(b)(6) Dep. at 20:7–22:3.

In August 2022, Plaintiff filed suit against HNCO, the Air Force's Office of Special Investigations ("OSI"), and several Air Force officials. He alleges that Air Force employees used the inquiry as a pretext for a de facto debarment. SAC ¶ 4. That prevented him from "participating in any form of contracting and consultation with the government," *id*. at ¶ 8, and thus "prohibited [him] from engaging in his specific offensive cyber field without any due process," *id*. at ¶ 150. *See generally*, Counts I and IV.

**Expert Opinion and Qualifications.** To support his claims, Plaintiff designated himself as an expert witness.[2] Plaintiff's Expert Disclosure at 2, ECF No. 87. He describes himself as an

---

[1] HNCO is also known as "Air Force Life Cycle Management."

[2] Although the Federal Rules of Evidence do not prohibit a party from serving as their own expert witness, the bias arising from their party status "is properly considered when the court assesses the witnesses' credibility" at trial. *Rodriguez v. Pacificare of Texas, Inc.*, 980 F.2d 1014, 1019 (5th Cir. 1993); *see also Hathaway v. Bazany*, 507 F.3d 312, 317 n.1 (5th Cir. 2007) (same, citing *Rodriguez*); *Tagatz v. Marquette University*, 861 F.2d 1040 (7th Cir. 1988) (noting that an expert whose "'reward' for testifying depends . . . on the outcome of the suit" presents an

"expert electrical engineer, mathematician, statistician/ probability analyst, and an expert in artificial intelligence ('AI') and machine learning ('AI/ML')." *Id.* Plaintiff's CV reflects that he has degrees in electrical, mechanical, and aerospace engineering, and professional experience in machine learning and mathematics. *See* **Exhibit No. 4**, Plaintiff CV at 1. Neither document reflects any training or experience in economics, business, accounting, or any related field.

The first two topics of his designation do not relate to these fields either, as he states that he will provide expert opinions regarding the background and development of AI/ML with a focus "on programs used and developed for use by the U.S. Air Force." *See* ECF. No. 87 at 2. But his third opinion does relate to marketing and damages projections. Plaintiff says he will opine on "the current and anticipated value of his employment/ services contract at issue in this Cause and the likelihood of the renewal of any such contract." *Id*. His asserted expert opinion is "that he has suffered damages in the range between 5 million for the loss of just the last contract, as well as forecasted damages of approximately $28.5 Million dollars per year." *Id*. at 3. Plaintiff's expert report, which he calls a "market analysis," explains the "methodology" for how he arrived at $28.5 million. **Exhibit No. 5**, Expert Report at 3.

All three opinions are based on Plaintiff's professional and research experience in the field of Cyber AI development and, more generally, his averments of excellence in the field. *See, e.g.*, **Exhibit No. 6**, Roe Expert Deposition at 91:6, hereinafter "Dep.," ("I'm one of the best in this field."); 94:5 ("I'm considered the godfather of CyberAI at NSA."). Plaintiff's most recent professional experience includes "consulting work for the U.S. government for a little over a year, and then [doing] the same thing at Leidos for about five years," *id*. at 28:5-7, where, for

---

"obvious . . . conflict of interest[,]" although the Federal Rules of Evidence do not render such testimony inadmissible).

example, he used "AI to detect malware or insider threats," *id*. at 29:5-6. With respect to his

educational and research experience, he testified that:

> In AI, I've been doing mathematics that we now, today, consider AI but years ago
> were just considered math statistics and probability theory, and the numerical
> application of those in the last 20 years. Similarly in cyber, I've done work
> professionally and studied it deeply in several aspects of the field of cybersecurity,
> specifically offensive and defensive of cyber.

Dep. at 45:15-22.

Plaintiff's designation states that his math background allows him "to calculate his lost

income/revenue." ECF No. 87 at 2. At his deposition, he cited his role as a chief scientist at

Leidos as experience relevant to his damages projection because on occasion he provided market

analyses.[3] Those analyses were in "some cases . . . verbal" and in others "some sort of

presentation form." Dep. at 33:24-5.  He also recalled performing "market analysis on several

occasions in the last five years" as a consultant, but no more than four times over that period. *Id*.

at 12:18-23. These were focused on "market capture." *Id*. at 12:4.

Beyond Plaintiff's characterization of the above, Plaintiff has no other experience in

damages calculation or market analysis. Specifically, he has:

i.   Never before served as a vocational or economic expert in a lawsuit. *Id*. at 10:24 –
     11:1 ("Q: [] So, you have never before served as a vocational expert in a lawsuit, is
     that correct? A: Correct."); *id*. at 11:8-10 ("Q. Have you ever provided an expert
     opinion on a market or an economy in a lawsuit before? A. No.").

ii.  Never before provided a market analysis in Cyber AI. *Id*. at 14:10-16 ("Q: Have you
     ever performed a market analysis of CyberAI? A: Yes. Q: When? A: This one. Q:
     Before this one? A: No.").

---

[3] *See* Dep. 32:22 – 33:3 ("Q: So, I'm looking at page 2 of your CV. Can you show me what in
there references the market analysis work that you're talking about? A: Sure the work was done
as a principal investigator [at Leidos], for cyber artificial intelligence machine learning research,
the position as a chief scientist, and the position as [principal investigator] for Horizon Research
& Development.").

iii. No formal education analyzing markets. *Id*. at 47:4-6 ("Q: What formal education do you have in analyzing markets? A: I have no formal education in analyzing markets.").

iv. No degrees in economics, business, or other field relating to projected damages or markets. *See generally* Plaintiff CV.

v. Never taken classes regarding market analysis or received relevant certifications. Dep. 38:11-16 ("Q: Have you ever taken a class on how to perform a market analysis? A: No. Q: Have you received any certification with respect to how to perform a market analysis? A: No.").

vi. Never published a scholarly article regarding market analysis or damages calculation. *Id*. at 148:3-7 ("Q: [] Have you ever published an article about market analysis? A: Publicly published an article? Q: Yes. A: No.").

vii. Never contributed to an economics textbook and could not name a single economics textbook. *Id*. at 147:10 – 148:2 ("Q: Can you identify the title of any economics textbooks you have read? A: There's a reader that was produced in conjunction with some research I was doing . . . Q: Can you not recall the title? A: I can't recall the titles, no. Q: Have you ever authored a textbook focused on market analysis? . . . A: Authored, no.").

Plaintiff believes that his knowledge of Cyber AI technology necessarily makes him an expert in evaluating the contracts value of the Cyber AI market. *Id*. at 46:19-22 ("Q: [] Your testimony here is that your expertise in cyber and AI also makes you an expert on the CyberAI market, is that correct? A: Yes.").

**Methodology.** Plaintiff's expert report sets forth his methodology for arriving at his damages opinion. Expert Rpt. at 1-3. First, he selected five companies based on two conditions: (1) they held contracts in a "very specific niche or small area of Cyber AI work that includes offensive— predominantly offensive work," *id*. at 98:5-6 and (2) all of those contracts were with HNCO, *id*. at 53:1-4 ("Q: Is it your testimony here today that all of the contracts you used in your analysis were with Air Force Life Cycle Management? A: I believe that's correct."); *see id*. at 60:10-13. However, Plaintiff hedged on both premises during his deposition. HNCO did not hold all of the contracts relied upon in the report. *See id*. at 82:8-14 ("Q: Of the 77 contracts that

6

you relied on in your expert report, how many of them say Air Force Life Cycle Management [HNCO] for awarding office and funding office? A: I don't recall. Q: So, at least some of them do not? A: That's possible, yes."). And not all of the contracts were listed as offensive. *Id*. at 87:21-23 ("while [the contracts] might state something that is strictly defensive, I know differently as a subject matter expert").

Next, Plaintiff used a government contracts website to determine the total value of the contracts those five companies held from FY 2020 to FY 2024. Expert Rpt. at 2-3. Then, he divided the total contract value for that five-year period ($713.85 million) by the number of companies (five) to obtain the average contract value per company over the five-year period, which is $142.5 million. Dep. at 54:16-55:5. Finally, Plaintiff divided that number by the number of years (five) to obtain "an average value of $28.5M per year for each company." Expert Rpt. at 3. This figure is his "forecasted damages of approximately 28.5 Million a year." ECF No. 87 at 2.

Plaintiff cites no authority supporting his methodology in his expert report. His deposition was no different. Although he claimed to have "researched hundreds" of market analysis techniques and asserted that his methodology is "generally accepted by the industry," Dep. at 39:1, 9-10, he could not identify any external validation for his methodology:

Q: [] Can you point to any resource or scholarly article or textbook that supports your assessment that [your methodology] is generally recognized by the industry?

A: I read several scholarly articles and several textbooks. I can't point to a single one off the top of my head.

Q: You can't identify any right now?

A: I don't recall.

*id*. at 39:14-22. Plaintiff appears to believe that he needs no external validation because his analysis is "basic mathematics." *Id*. at 55:8-9 ("Q: Where did you get this formula from? A: It's

basic mathematics."). This makes the market report "trivial" for him. *Id*. at 132:23-25 ("Q: Given your work as a data scientist how hard is a market analysis for you? A: It's easy, trivial.").

Plaintiff also testified that his methodology did not require other features common to market analysis and damages calculation. For example, he believes that his actual income in 2019, the year before his damages forecast, has no relevance to his opinion:

> Q: Let me ask you this, why don't you think it's relevant what your income was in 2019?
>
> A: Relevance of income relative to a market analysis, there's no relation.
>
> Q: You're also forecasting your anticipated earning in this expert report, is that correct?
>
> A: That's correct.
>
> Q: Do you not think that it is important to know what someone made in order to forecast what they could have made?
>
> A: No.

*Id*. at 106:20 – 107:5. Likewise, Plaintiff holds the same view about his income for 2020. He testified "I don't think that's relevant to the analysis," *id*. at 106:11, even though he claims damages for the year 2020.

**Assumptions**. Plaintiff has never had an employee and never bid on a prime contract, much less won a prime contract. *id*. at 101:16 ("I have never bid on a prime contract."); 94:9-14 (no employees). But Plaintiff assumes that he is a market competitor with these five companies. For example, although Kudu Dynamics, LLC had 112 employees and has won 26 prime contracts, Plaintiff believes that he could compete with Kudu for contracts:

> Q: But your assumption is that you would have been able to compete with Kudu, regardless of the difference in size?
>
> A: Absolutely, the contract value has nothing to do with the size or capability of the AI. I can scale all of my AI with GPUs. I don't need employees.

*Id*. at 94:15-20. He testified that he could easily compete with the other four companies in his report as well. *See id*. at 94:21 – 95:3. In support, Plaintiff testified that he "could use thousands of [AI] agents to do the work of thousands of people . . . like a conductor in an orchestra." *Id*. at 140:24 – 141:3.

Plaintiff not only assumed that he could compete with the five companies, but also that he would have won each of the 77 contracts, despite never bidding on any of them himself, and not knowing the contract requirements for all 77 contracts:

> Q: So, that goes back to my original question, your assumption in this expert report is that if you had bid on a contract, you would have won it.
>
> A: Yes.
>
> Q: Okay. Of the 77 contracts in this expert report, how many did you bid on?
>
> A: Zero.

*id*. at 91:11-17; *see id*. at 91:3-4 ("I would not assume to bid on contracts and lose them."); 95:24 – 96:1 ("Q: And you looked up the contract requirements for each of these 77 contracts? A: Not all 77."). Plaintiff later explained that the possibility of not winning every contract was irrelevant to his damages analysis— "This report was strictly about contract wins." *Id*. at 108:25. He reasoned that the "analysis here is to determine what the damages were," which "doesn't include losses" because "that's a double negative." *Id*. at 109:10-11. This premise, according to Plaintiff, obviated the need to include an error rate. *Id*. at 110:3-7 ("Q: Does this expert report incorporate any type of error rate, for example, whether you wouldn't be able to enter into a contract? A: It's for a market analysis. I'm not going to include an error rate.").

**LEGAL STANDARD**

Under Federal Rule of Evidence 702 districts court hold a gatekeeping role to determine the admissibility of expert testimony. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592-93 (1993). Several preconditions must be met. As an initial matter, the witness must qualify "as an expert by knowledge, skill, experience, training, or education," *id*, and do so in the relevant field in which the opinion is offered. *See Rally Concepts, LLC v. Republican Nat. Comm.*, No. 5:05-CV-41-DF, 2006 WL 6889673, at *3 (E.D. Tex. Nov. 9, 2006) (finding damages expert sufficiently qualified because he had "substantial knowledge, skill, experience, training, and education in the field of economics and in the field of damage assessment"). The Fifth Circuit has "never required formal educational credentials" to satisfy this requirement. *United States v. Haines*, 803 F.3d 713, 727 (5th Cir. 2015). "Experience in the field can be the predominant, if not the sole, basis for expert testimony in some cases." *Id*. (citations omitted). But regardless of the basis for qualification, expertise outside of the relevant field cannot serve as a substitute for the necessary expertise in the field for which the opinion is offered. Accordingly, "[a] district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify *in a particular field or on a given subject*." *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999)) (emphasis added).[4]

The proponent also must establish that the expert's testimony is (1) "based on sufficient facts or data"; is (2) "the product of reliable principles and methods"; and that (3) "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. These

---

[4] In 2023, Rule 702 was amended to clarify that a proponent must establish admissibility by a preponderance of the evidence. The rules committee observed that many courts had analyzed admissibility under an "incorrect application of Rules 702 and 104(a)" by holding that "the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility." Advisory Committee's note to 2023 amendments.

reduce to two considerations—"relevancy and reliability." *See Cedar Lodge Plantation, LLC v. CSHV Fairway View I, LLC*, 753 F. App'x 191, 195 (5th Cir. 2018) (unpublished). (Trial courts are "tasked . . . with ensuring the relevancy and reliability of all expert scientific testimony."). Relevancy turns upon whether the "expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Daubert*, 509 U.S. at 591.

Reliability "requires some objective, independent validation of the expert's methodology." *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998); *see Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012) ("The reliability prong mandates that expert opinion be grounded in the methods and procedures of science[.]") (citation omitted). An "expert's assurances that he has utilized generally accepted scientific methodology is insufficient" by itself because assurances do not provide external validation. *Moore*, 151 F.3d at 276; *see Albert as Next Friend of Doe v. United States Dep't of the Army*, No. SA-17-CV-00703-JKP, 2019 WL 5783420, at *4 (W.D. Tex. Nov. 5, 2019) (excluding vocational expert's opinion because his "testimony appears to be an *ipse dixit*: he will tell the fact finder that his opinions are true because he says they are. *Daubert* requires more than a black box"). Reliability also requires that "'the facts underlying the expert's opinion'" are accurate. *Jacked Up, LLC v. Sara Lee Corp.*, 291 F. Supp.3d 795, 802 (N.D. Tex. 2018), *aff'd*, No. 3:11-CV-3296-L, 2018 WL 2064126 (N.D. Tex. May 2, 2018) (citation omitted). And so "an opinion based on 'insufficient, erroneous information,' fails the reliability standard." *Id.*; *see Hathaway v. Bazany*, 507 F.3d 312, 318 (5th Cir. 2007) ("[T]he existence of sufficient facts . . . is in all instances mandatory.").

**ARGUMENT**

I.    <u>Plaintiff lacks the qualifications necessary to render an expert opinion in the fields of market analysis and damages forecasting.</u>

Plaintiff lacks the benchmarks of expertise in the fields of market analysis and damages forecasting to qualify as expert in those fields. *See* Fed. R. Evid. 702 (witness must qualify "as an expert by knowledge, skill, experience, training, or education"). He has "no formal education analyzing markets," dep. at 47:6., has never taken relevant classes or received relevant certifications, *id.* at 38:11-16, and his CV demonstrates that he has no degrees in any field relating to projected damages or markets. *See GeoDynamics, Inc. v. DynaEnergetics US, Inc.*, No. 2:17-CV-00371-RSP, 2018 WL 5292659, at \*1 (E.D. Tex. Sept. 21, 2018) (excluding expert testimony because the expert's "curriculum vitae reflects no education or experience that suggests he is a qualified technical expert in the relevant area"). Plaintiff also has never served as a vocational or economic expert in a lawsuit, dep. at 10:24 – 11:10, and has neither published scholarly work, nor contributed to scholarly textbooks in these fields, *id.* at 147:10 – 148:7. *See LifeWise Master Funding v. Telebank*, 374 F.3d 917, 928 (10th Cir. 2004) (witness did not qualify as a damages expert because "he took no accounting or finance courses, had no training in damage analysis, had never testified as a damages expert or prepared an expert damages report, had never taught a course or lectured on damages, and has never been published in the field").

Plaintiff lacks relevant professional experience as well. *See* Fed. R. Evid. 702 Advisory Committee Note to 2000 amendment ("If the witness is relying solely or primarily on experience, then the witness must explain . . . why that experience is a sufficient basis for the opinion[.]"). His work in "applied mathematics, statistical analysis and probability theory" does not qualify him "to calculate his lost income/revenue." ECF No. 87 at 3; *see also* 46:19-22. In *Fracalossi v. MoneyGram Pension Plan*, the court rejected an analogous assertion when the

plaintiff attempted to name herself as a rebuttal damages expert. 3:17-CV-00336-X, 2021 WL 5505604, at *14 (N.D. Tex. Nov. 24, 2021). The court reasoned that "knowing how to do math and [plaintiff's] experience as CFO" did not qualify her as an expert in calculating actuarial tables. *Id.* (cleaned up); *see also Wilson*, 163 F.3d at 937. The same reasoning applies here. Plaintiff's technical expertise in his scientific field does not confer expertise in the economic modeling of that field even though both subject areas involve math. *See Smith v. Goodyear Tire & Rubber Co.*, 495 F.3d 224, 226 (5th Cir. 2007) ("Polymer scientist" did not qualify as a tire expert on tire defects because he "has never been employed in any capacity dealing with the design or manufacture of tires."). Creating artificial intelligence is a fundamentally different undertaking than performing market analysis and forecasting damages.

Plaintiff's reliance on his work at Leidos confirms the absence of qualifying experience. He testified that his technical work as a data scientist sometimes encompassed marketing analysis that "in some cases [] was verbal" and in others "some sort of presentation form." Dep. at 33:12-15, 24-25. That was "no different than any other market analysis" because it "look[ed] at current companies" similar to Leidos to determine "whether or not [the companies would] be competitive on something that we'd be competing on." *Id*. at 31:3-8.

The purported marketing analysis he offers here differs substantially. It is neither verbal, nor part of a presentation; it is a document in a lawsuit that projects five years of damages for a total of $142.5 million for an individual. Labeling it a market analysis obscures the fact that it is a speculative damages projection masquerading as economic analysis. But even if that was not the case, nothing Plaintiff claims to have done at Leidos shares any similarity to the work Plaintiff claims he was excluded from here, much less similarity sufficient to support expert witness qualification. *See Virginia Vermiculite Ltd. v. W.R. Grace & Co.-Conn.*, 98 F. Supp. 2d

729, 732 (W.D. Va. 2000) (marketing analysis excluded in an antitrust case because the expert's "market analyses generally are utilized to define a market for investment purposes," not "antitrust purposes" for a lawsuit). The alleged marketing at Leidos had an entirely different focus than here. Plaintiff purportedly analyzed whether other companies would "be competitive on something that [Leidos would] be competing on." Dep. at 31:7-8. The report here, conversely, did not contain any competitive analysis. Instead, Plaintiff assumed a complete absence of competition to forecast damages. *Id*. at 91:3-4 ("I would not assume to bid on contracts and lose them."); 108:25 ("This report was strictly about contract wins."). The Leidos experience, even accepting Plaintiff's characterization of it, does not support qualification.

## II.    <u>Plaintiff's methodology is unreliable.</u>

As explained below, Plaintiff's methodology for his expert opinions is unreliable for three independent reasons, each of which warrant excluding his expert testimony at trial.

**No independent validation**. Rule 702 "requires some objective, independent validation of an expert's methodology." *Moore*, 151 F.3d at 276. In *Daubert*, the Supreme Court listed factors to guide this inquiry, such as, "whether the technique is subject to peer review and publication, any known potential rate of error, [and] . . . whether the method has been generally accepted in the relevant scientific community." *Hathaway*, 507 F.3d at 318. Although these factors are not mandatory, the expert opinion must "be grounded in the methods and procedures of science" *id*., or other technical or specialized knowledge. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999); *see also* Advisory Committee Note to 2000 Amendments to Fed. R. Evid. 702. Otherwise, the opinion amounts to no "more than unsupported speculation or subjective belief," *Johnson*, 685 F.3d at 459, that "is merely a conclusory statement [that] cannot

be considered probative evidence," *Ellis v. United States*, 673 F.3d 367, 373 (5th Cir. 2012) (citation omitted).

Plaintiff's expert opinion is unsupported speculation devoid of external validation. He asserts that his methodology is "generally accepted by the industry," dep. at 39:9-10, but failed to cite to any industry support in his expert report or in his deposition. The Fifth Circuit requires more than that. *See Moore*, 151 F.3d at 276. ("The expert's assurances that he has utilized generally accepted scientific methodology is insufficient."). Yet Plaintiff provided nothing. When pressed for "any resource or scholarly article or textbook" supporting his methodology, he responded that "I can't point to a single one off the top of my head." Dep. at 39:14-20; *see Sportsband Network Recovery Fund, Inc. v. PGA Tour, Inc.*, 136 F.3d 1329 (5th Cir. 1998) (affirming exclusion of expert based on district court's "determin[ation] that there was no evidence that [the expert's lost profit] methodology had been authoritatively expressed by other proclaimed experts in the field").

Plaintiff's claim that he double checked his methodology against "[c]ommon techniques in the field" is no better. Dep. at 40:14. When pressed for a basis for that claim, he yet again failed to provide any external validation. *Id.* at 40:15-20 ("Q: But you keep saying common techniques, what is the basis for that? I'm trying to understand. A: Right. Q: Is there an article? A: I don't recall a specific article, I've stated that several times. . . ."). His response that he tried to "use data that's available from an unbiased source," *id.* at 40:21-22, was a non-response that concedes the shortcoming. *See DeWolff, Boberg & Assocs., Inc. v. Pethick*, No. 3:20-CV-3649-L, 2024 WL 1396267, at *13 (N.D. Tex. Mar. 31, 2024) (striking expert that avoided "directly address[ing] the question of whether there is any industry support for his decision to apply the

[pricing model] in this case … to arrive at a lost profit damages amount"), *aff'd on other grounds*, 133 F.4th 448 (5th Cir. 2025). Plaintiff fails to provide validation for his methodology.

**Flawed Procedures.** Scrutiny of the steps in the methodology underscores the absence of credibility in terms of scientific, technical, or other specialized knowledge. Plaintiff selected the five companies used in his opinion by "[f]iltering down from many companies" to companies that he "know[s] specifically [] do this work . . . in this specific area of CyberAI research." Dep. at 62:22 – 63:2. When asked whether this filtering was an "arbitrary choice" or used "some sort of mechanism," he responded that the "mechanism is my subject matter expertise in this arena." *Id*. at 63:11-12; *see id.* at 59:22-23 ("Q: Why did you select these five companies? A: I know the work that these companies do."). In other words, the Court should just take Plaintiff's word for it that he has correctly selected the companies. But "*Daubert* requires more than a black box," and courts exclude "testimony [that] appears to be an *ipse dixit*," in which the expert asserted that "his opinions are true because he says they are." *Albert as Next Friend of Doe*, 2019 WL 5783420, at *4. An "'it is so'" because I say so opinion "is not admissible" for this reason. *Viterbo v. Dow Chem. Co.,* 826 F.2d 420, 424 (5th Cir.1987). Here, Plaintiff premises his opinion on a classic "it is so" assertion without ever providing the required methodology that demonstrates *why* "it is so."

Testing what Plaintiff offers as his methodology revealed other flaws. Inputting Plaintiff's search parameters for Kudu, dep. at 65:3 - 69:21, failed to produce Kudu contracts solely and "specifically [with] HNCO" and "[m]ore specifically for offensive – classified offensive cyber capabilities," *id*. at 50:11-16, despite Plaintiff's claim at his deposition that it would.[5] *See Bibbs*

---

[5] *See* Dep. at 53:1-6 ("Q: Is it your testimony here today *that all of the 77 contracts* you used in your analysis were with Air Force Life Cycle Management? A: I believe that's correct. Q: Do you know if that's correct? A: I'm fairly certain that's correct.") (emphasis added).

*v. Molson Coors Beverage Co., USA, LLC*, 699 F. Supp. 3d 509, 512 (N.D. Tex. 2023) ("Generally, a key inquiry illuminating whether a methodology is reliable is whether it can be tested (and repeated)[.]"); *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005) ("Someone else using the same data and methods must be able to replicate the result."). Instead, as demonstrated at the deposition, Kudu's three highest contracts were with DARPA, not with HNCO, and there was no information to determine whether the contract was for defensive of offensive cyber products. *See* Dep. at 71:18-20 ("Q: [] So, we looked at three contracts. Those three contracts were with DARPA, correct? A: Correct."); 70:19-21 ("Q: [] So, none of that information on USA Spending tells you whether it's defensive or offensive, is that correct? A: That's correct.").[6]

Plaintiff hedged as a result. After reviewing the Kudu data, he conceded that he was "not certain" that most of the contracts he relied upon were with HNCO. Dep. at 71:21 – 72:2.[7] Plaintiff also clarified that additional research would provide the contract type, but only he had the skills to determine whether the contracts listed as defensive were in fact offensive:

> [I]t's my subject matter expertise that helps me understand that these contracts, while they might state something that is strictly defensive, I know differently as a subject matter expert that these actually include offensive work, specifically the type of offensive work that I do.

---

[6] The expert disclosure stated that Plaintiff would provide an "exemplar of that data" with the report. ECF No. 87 at 2. But the exemplar did not contain any case study data. Plaintiff testified that he did not memorialize the data used in his report. Dep. at 71:10-17 ("Q: Okay. Do you know what contracts you included in your analysis? A: I included whatever contracts were available within that window. Q: So, you don't have a document memorializing what documents [contracts] you included in your analysis, is that correct? A: I do not have a document of that nature, no.").

[7] *See also* 82:8-14 ("Q: Of the 77 contracts that you relied on in your expert report, how many of them say Air Force Life Cycle Management [HNCO] for awarding office and funding office? A: I don't recall. Q: So, at least some of them do not? A: That's possible, yes."); 86:21-23 ("Q: [] Am I correct that your forecast [of] damages is based in part on contracts that were not with HNCO? A: Correct.").

Dep. at 87:20-25. This is yet another black box constructed of *ipse dixit* assertions. *See LeBlanc ex rel. Est. of LeBlanc v. Chevron USA, Inc.*, 396 F. App'x 94, 100 (5th Cir. 2010) ("Even when an expert is extrapolating from personal experience . . . 'nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert.'") (unpublished) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

But the more fundamental problem with these concessions is they expose a disconnect between the methodology and the damages conclusion. Plaintiff claims exclusion from 77 contracts held by HNCO and for offensive products. Yet, his methodology resulted in the inclusion of some contracts not with HNCO and some for defensive products. Plaintiff cannot seek damages against HNCO for contracts HNCO never held or funded and that were for products Plaintiff did not want to create. The fact that Plaintiff's methodology does so exposes an "analytical gap between the data and the opinion proffered" fatal to the opinion. *Joiner*, 522 U.S. 136 at 146.

**Unsupported Assumptions.** Finally, the methodology contains unsupported and improbable assumptions that invalidate the opinion. *Jacked Up, LLC*, 291 F. Supp. 3d at 806-07 ("[A]ssumptions must have some factual basis in the record and an underlying rationale."); *see Moore v. Int'l Paint, L.L.C.*, 547 F. App'x 513, 516 (5th Cir. 2013) (affirming exclusion of expert opinion because "the expert made numerous assumptions with no apparent underlying rationale") (unpublished). Plaintiff not only assumed that he could compete with the five companies, but also that "[h]ead to head, every time" he would have won each of the 77 contracts held by them. Dep. at 94:25 – 95:2; *see id*. 91:3-4 ("I would not assume to bid on contracts and lose them."). The facts suggest otherwise or at least beg an explanation. The five

companies had an average 84 employees, *id*. at 94:21-24, yet Plaintiff has never had a single

employee, *id*. at 94:9-14. The five companies also had previously bid on prime contracts and

won them. Plaintiff, by contrast, has never bid on a prime contract, let alone any of the 77

contracts in his report. *Id*. at 101:16 ("I have never bid on a prime contract."); 91:15-17 ("Q: []

Of the 77 contracts in this expert report, how many did you bid on? A: Zero."). Plaintiff needed

to explain his basis for his assumptions in light of these facts. He failed to do so.

In *Stelluti Kerr, L.L.C. v. Mapei Corp.*, 703 F. App'x 214 (5th Cir. 2017) the Fifth Circuit

invalidated expert damages testimony under similar circumstances. The "economic expert

estimated that [plaintiff] would sell seven machines per year" if not for the defendant's actions.

*Id*. at 230 (unpublished). However, this projection "was not supported by any empirical analysis

or any evidence" such as "real-world sales, customer surveys, or current market demand," and

thus "based on nothing more than speculation." *Id*. at 230-31. Here, Plaintiff commits the same

error. He bases his assumption of complete market dominance not on sales or data, but rather on

being "one of the best in this field." Dep. at 91:6.

Here, however, the speculation is far more bold. Unlike the company in *Stelluti Kerr,

L.L.C.*, Plaintiff here was never an established market participant; he has never bid on prime

contracts and has no history of winning prime contracts. Instead, he assumes, without any

explanation, that he would have completed various steps to *become* the dominant market

participant. *See Britestarr Homes, Inc. v. Piper Rudnick LLP*, 256 F. App'x 413, 414 (2d Cir.

2007) (expert's opinion excluded because she "measured lost profits on the improperly

speculative assumptions that [the construction] project would have had a developer, that it would

have been permitted, obtained financing and been constructed") (unpublished). This unsupported

assumption disregards basic market analysis features, such as barriers to entry, and thus further

19

discredits the opinion. *See* 43:18-22 ("Q: Does your expert report include any information about barriers to entry? A: No. Q: Do you think that was necessary to include? A: No."). Plaintiff's unsupported assumptions invalidate his opinion.[8]

## CONCLUSION

For the foregoing reasons, the Court should preclude Plaintiff's expert opinion and testimony at trial.

Date:  June 6, 2025                             Respectfully submitted,

                                                YAAKOV M. ROTH
                                                Acting Assistant Attorney General
                                                Civil Division

                                                C. SALVATORE D'ALESSIO, JR.
                                                Director, Torts Branch

                                                RICHARD MONTAGUE
                                                Senior Trial Counsel, Torts Branch

                                                */s/ Joseph A. Gonzalez*
                                                Joseph A. Gonzalez
                                                D.C. Bar No. 995057
                                                Trial Attorney
                                                Torts Branch, Civil Division
                                                United States Department of Justice

---

[8] Plaintiff's designation stated "that he has suffered damages in the range between 5 million for the loss of just the last contract." ECF No. 87 at 3. He also stated that "will explain why his contract-based employment was nearly certain to be renewed[.]" *Id*. However, his expert report contained no opinions regarding the subcontract that was allegedly lost. Only at his deposition did he discuss the lost contract and his calculations. That renders those opinions inadmissible. *See Primerica Life Ins. Co. v. Gross*, No. A-15-CV-759-DAE, 2017 WL 9325510, at *3 (W.D. Tex. Oct. 12, 2017) (Because opinions "were not disclosed in his report and only given at his deposition were not timely disclosed," the expert's testimony was "limit[ed] [] to those opinions he expressed in his report."). But even if that were not the case, those opinions falter for, among other reasons, relying on the unsupported speculation discussed above. Plaintiff did not have a contract for additional work. Instead, he anticipated the contract "expand[ing] roughly around August of 2020, which would have significantly increased [his] scope and involvement[.]" Dep. at 161:17-19. That is impermissibly speculative.

P.O. Box 7146, Ben Franklin Station
Washington, D.C. 20044
(202) 598-3888
joseph.a.gonzalez@usdoj.gov

*/s/ Katrina M. Seeman*
KATRINA M. SEEMAN
D.C. Bar No. 1671729
Trial Attorney
Torts Branch, Civil Division
United States Department of Justice
P.O. Box 7146, Ben Franklin Station
Washington, D.C. 20044
(202) 616-0674
katrina.m.seeman@usdoj.gov

*Counsel for the Defendants*

## CERTIFICATE OF CONFERENCE

I certify that I have conferred with counsel for Plaintiff pursuant to Local Rule 7(g).

Plaintiff's counsel indicated that Plaintiff is opposed to the relief sought in the foregoing

motion.

*/s/ Joseph A. Gonzalez*
Joseph A. Gonzalez
Trial Attorney
Torts Branch, Civil Division
United States Department of Justice