**IN THE UNITED STATES DISTRICT COURT FOR**
**THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **DR. JOHN ROE, PH.D.** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | Civil Action No.: 5:22-CV-00869-JKP-HJB |
| | ) | |
| **UNITED STATES OF AMERICA, et. al.,** | ) | |
| | ) | |
| **Defendant(s)** | ) | |

---

### PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO EXCLUDE PLAINTIFF'S EXPERT TESTIMONY

COMES NOW, Plaintiff, by and through counsel, and provides the following Response to the Defendants' (hereinafter, collectively referred to as the "Government") Motion to Exclude Expert Testimony presented by the Plaintiff himself (the "Motion"). In support of this Response, Plaintiff would respectfully show the following:

I.
INTRODUCTION

1.    This Cause concerns the unlawful debarment of a critical national security contractor. In 2020, Dr. Roe is the victim of a *de facto* debarment from a government agency that contracts cyber security products and services.

2.    Dr. Roe designated himself as an expert witness to testify concerning the amount of revenue he lost as the result of his unlawful debarment. Despite his multiple post-graduate degrees in applied mathematics and probability theory, and his lengthy, personal experience within the classified cybersecurity field, the Government now seeks to exclude his testimony of lost revenue.

3.     The Government's Motion should be DENIED because Dr. Roe meets the requirements of Fed. R. Civ. Evid. 702, and the Government confuses the fundamental distinction between admissibility of evidence and weight of evidence.

II.
FACTUAL BACKGROUND

4.     The factual background applicable to the Motion and this Response are largely undisputed.

5.     Dr. Roe is at the top of a very short list of artificial intelligence/machine learning (AI/ML) experts within the national security cyberspace field.  There are very few people in the world who can create software and other cybersecurity products such as his to protect the United States' cyber secrets.   *See* Exhibit 7, Deposition of D. Burghard, 38:18-23.  It is undisputed that Dr. Roe spearheaded many of the AI/ML and CyberAI programs that are now being used and developed within the U.S. Government.  It is further undisputed that Dr. Roe's products are top quality and not available from any other source.  *See* Exhibit 7.

6.     Dr. Roe has an extensive educational background; he holds bachelor's and master's degrees in mechanical, aeronautical, and electrical engineering, and a Ph.D. in electrical engineering.  *See* Dr. Roe's *curriculum vitae* included with this Response as Exhibit 2.  His studies focused on applied mathematics and probability theory.  See Dr. Roe's deposition ("Deposition") included with this Response as Exhibit 5, 119:1-10.  He has written textbooks on math, artificial intelligence and machine learning, and he has taught courses and seminars on data science and artificial intelligence.  Exhibit 2.  There is no dispute that Dr. Roe is one of our country's most qualified AI/ML and CyberAI experts.

7.     Dr. Roe was hired by a contractor to work at the Air Force Life Cycle Management Center ("AFLCMC" and also known throughout this litigation as "HNCO") to work on a program known as Fibonacci.  During his time at HNCO, he was also asked to evaluate other programs/projects.

He was critical of some of these programs and explained that they've become outdated or overcome by more advanced software. It was this analysis that led to the *de facto* debarment which is the basis of this Cause.

8. Following his debarment and expulsion from these classified cyber programs, the 'black eye' on Dr. Roe's reputation resulted in the lost opportunity to work in his field of expertise.

9. During this litigation, Dr. Roe designated himself as a testifying expert witness for three important topics:

    a. AI/ML, including its background, purpose, applicability, and importance to national security;
    b. AI/ML programs used and developed for use by the U.S. Air Force and the Department of Defense; and,
    c. The current and anticipated value of his employment/services contract at issue in this Cause and the likelihood of renewal of any such contract.

10. There is no dispute before this Court regarding the timeliness or sufficiency of the designation of Dr. Roe as an expert witness. Further, the Government does not dispute the substance of designations of the first two topics. Instead, the Government seeks to prevent Dr. Roe's testimony about the value of the contract opportunities that he has lost.

III.
EVIDENCE IN SUPPORT OF RESPONSE

11. Dr. Roe provides the following exhibits in support of his Response to the Government's Motion:

    Exhibit 1    Expert Witness Disclosure

    Exhibit 2    Dr. Roe's curriculum vitae

    Exhibit 3    Dr. Roe's CyberAI Market Analysis

    Exhibit 4    Exemplar of Data Reviewed

    Exhibit 5    Deposition Transcript of Dr. Roe ("Deposition")

Exhibit 6        Deposition Transcript of Dan Brown (Pg 74)

Exhibit 7        Deposition Transcript of Joseph Burghard

IV.
ARGUMENT AND AUTHORITES

### A. Legal Standard

12.    The admissibility of Dr. Roe's expert testimony is governed by Rule 702 of the Federal

Rules of Evidence which provides:

> A witness who is qualified as an expert by knowledge, skill, experience,
> training or education may testify in the form of an opinion or otherwise if
> the proponent demonstrates to the court that it is more likely than not that:
> (a) the expert's scientific, technical or other specialized knowledge will help
> the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient fats or data; (c) the testimony is the
> product of reliable principles and methods; and, (d) the expert's opinion
> reflects a reliable application of the principles and methods to the facts of
> the case.

FED. R. EVID. 702.  The United States Supreme Court set forth the following non- exclusive

factors to consider when assessing the validity or reliability of expert testimony under Rule 702:

a)  Whether the theory or technique has been tested;

b)  Whether the theory or technique has been subject to peer review and
    publication;

c)  The known or potential rate of error of the method used;

d)  The existence and maintenance of standards and controls in the methodology;
    and,

e)  Whether the theory or method has been generally accepted by the scientific
    community.

13.    *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579, 593-95, 113 S.Ct. 2786, 125

L.Ed.2d 469 (1993).

14.    The reasoning or methodology employed by the expert, not the ultimate conclusion, is the focus of the *Daubert* analysis. *Eagle Oil & Gas Co. v. Travelers Property Cas. Co. of America*, 2014 WL 3744976, at *3 (N.D. Tex. 2014).  The purpose of a court's inquiry is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Skidmore v. Precision Printing and Packaging, Inc.*, 188 F.3d 606, 618 (5th Cir.1999).  *See also, Kumho Tire Company, Ltd. v. Carmichael,* 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). This distinction highlights the misplaced basis of the Government's objection to Dr. Roe's testimony; that his opinions do not have conclusive or indisputable to be admissible, rather his reasoning or methodology only has to provide sufficient reliability to be admissible.  Thus, the court "must review only the reasonableness of the expert's use of such an approach, together with his particular method of analyzing the data so obtained, to draw a conclusion regarding the specific matter to which the expert testimony is directly relevant." *American Tourmaline Fields v. International Paper Co., No. 3-96-CV-3363-D, 1999 WL 242690 at *2 (N.D. Tex. Apr. 19, 1999), citing Kumho Tire, 119 S.Ct. at 1177.*

15.    The test of reliability is a flexible one.  *Kumho Tire*, 526 U.S. at 141.  As explained by the United States Supreme Court, the *Daubert* factors "may or may not be pertinent  in assessing reliability,  depending on the nature  of the issue, the expert's particular expertise, and the subject of his testimony." *Id.* at 150.  "*Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Id.* at 141.  Thus, a trial court has wide latitude in both deciding how to determine reliability and in assessing whether the testimony is ultimately reliable. *Id.* at 152.

16.     Moreover, "the rejection of expert testimony is the exception rather than the rule." *See Sulak v. American Eurocopter Corp.*, 2012 WL 6567237, at *6 (N.D. Tex. 2012); FED. R. EVID. 702  adv. comm. notes (2000).   *Daubert* did not change the basic precepts of federal evidence law, and "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system." *United States v. 14.38 Acres of Land, More or Less, Situated in Leflore County, Mississippi,* 80 F.3d  1074, 1078 (5th Cir.1996); FED. R. EVID. 702 adv. comm. notes (2000). Even after *Daubert,* "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional  and  appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.  "The grounds for the expert's opinion merely have to be good, they do not have to be perfect.".  *In re Paoli Railroad Yard PCB Litigation,* 35 F.3d 717, 744 (3d Cir.1994).

### B.  Dr. Roe's Opinions and Methodology Withstand Rule 702 Scrutiny

*Dr. Roe is qualified to render his opinion*

17.     Fed. R. Evid. 702 provides the criteria for a witness to qualify as an expert witness; these witnesses are qualified according to their "knowledge, skill, experience, training or education." There can be no doubt that Dr. Roe is the most educated man in nearly every room that he enters. His *curriculum vitae* and deposition testimony remind us of his multiple advanced degrees in electrical, mechanical and aerospace engineering, but more  importantly his focus on applied mathematics and probability theory.  His formal education is exactly the type necessary to calculate his damage model.   The uncontroverted evidence shows that he studied statistics, advanced statistics, and "numerical modeling or estimation" including "modeling of markets."  Deposition at 120:13-20.  His advanced education also includes statistical modeling and includes economic modeling.  *Id*. at 121:6-14.   The Government cannot reasonably dispute his qualifications to

calculate the market rate of contracts Government has awarded and compare those contracts to those that he was personally involved with.

18.     For the purpose of this Response, we can ignore Dr. Roe's IQ test result of 174. See Exhibit 2, Deposition at 122:19-25. Dr. Roe is not qualified because he's generally "smart" and "very good mathematician" or well-educated. *See* Exs. 6, 74:8 and 7, 38:8, respectively. Instead, it is his knowledge, skill, and experience which render him uniquely qualified to offer expert testimony. He has personal experience in this classified subject matter, which is exceptionally rare as compared to the rest of the world. He spearheaded AI/ML development and CyberAI, a field which has only been in existence for approximately 5 years. Further still, he personally conducted "frequent" market analyses while he led his team at Leidos. Deposition at 33:8-15.

19.     Dr. Roe's experience should be given more consideration than even the experience of market analysts who conduct general analyses because of the nature of AI/ML and CyberAI fields. The issue in this Cause is not market analyses or government contracting generally because we're not comparing landscaping or construction contracts. This Cause concerns an exceptionally narrow and complex field. An ordinary market analyst could not provide a proper analysis because of the unique knowledge and experience necessary to understand the complexities of the contracts.

20.     The Government's critique of Dr. Roe's qualifications is tremendously narrow-focused. The Motion cites the following:

        a.   Lack of published relevant scholarly work;

        b.   Lack of contribution to relevant scholarly textbooks;

        c.   No previous vocational or economic expert witness experience;

        d.   No experience lecturing or teaching courses on damages;

The issue with the Government's reliance on these factors is that nothing in the law requires a proffered expert witness to be a career academic.  Certainly, these factors may help a court weigh the qualifications of an expert witness, but if these factors were controlling, they would have be required by a rule or interpretive opinion.  Instead, Dr. Roe's market experience satisfies the factors which are required by Fed. R. Evid. 702.

21.    Because Dr. Roe's education and experience place him at the intersection of both fields – classified cyber AI and statistical market analysis – Dr. Roe is exceptionally qualified to render his expert opinion.

*Dr. Roe's Technical and Specialized Knowledge will help the Trier of Fact Understand the Classified Cyber AI Facts in Issue*

22.    Dr. Roe's testimony is critical for the trier of fact to understand the nature of the cyber AI market and why it is so unique.  First, Dr. Roe is known to have 'spearheaded' the cyber AI market. He testified that prior to 2019, there was no market for cyber AI.  "There really was no CyberAI market prior to 2019.  Nobody was doing work in Cyber AI."  Deposition at 129:10-14.  He testified that he is known as the "godfather" of cyber AI.  *Id* at 130:8-15.  Additionally, the work product that Dr. Roe presented to the United States is unique to him alone.  Daniel Burghardt is the leader of the Air Force Advanced Cyber Intelligence Division.  He testified of Dr. Roe's products and concepts that "theirs is nothing quite like it, as far as I'm aware in the current industry. So the contempt was pretty game-changing, pretty state of the art, and there's no question it would have been a phenomenal capability."  Exhibit 7 at 38:18-23.  It would take an expert in the CyberAI field to help the trier of fact understand why Dr. Roe's products and services are so specialized.

23.    Finally, Dr. Roe's testimony and opinions are exceptionally unique because of the unique nature of the field.  He provided an explanation that only three people would have the "span of knowledge" and "clearances necessary to be able to perform a similar analysis."  Deposition at

131:16-18. Dr. Roe is uniquely positioned to explain how and why his products and technology were so important to the Government, and why the contracts that he missed were so valuable to the Government.

24.    Dr. Roe's opinions are technical, necessary and exceptionally specialized, and therefore his testimony is necessary to help the trier of fact understand the issues presented by this Cause.

*Dr. Roe's Opinion is Based on Sufficient Market Data*

25.    The data to be analyzed in this matter is classified.  Neither Dr. Roe nor Government witnesses would divulge contract details within the cyber AI field, so the data concerning contract pricing or purpose of cyber AI products is limited.  Dr. Roe utilized the information from the only public sources:  https://sam.gov and https://www.usaspending.gov.  Deposition at 70:1-9.  Dr. Roe's analysis report also lists these two sites and provides detailed steps to study these contracts. *See* Exhibit 3.

26.    Consequently, Dr. Roe's analysis is not merely sufficient, it is based on the complete market data available.

*Dr. Roe's Testimony is the Product of Reliable Market Analysis Principles and Mathematical Methods*

27.    Dr. Roe used the same market analysis that would apply to "any other market analysis." Deposition at 31:3-10.  He began by sourcing competitors that provide similar services/products and comparing their capabilities against his own.  He then specifically considers the "current landscape within the U.S. Government." *Id.* at 12-20.

28.    The method of analysis that Dr. Roe used is the "fairly common method."  *Id*. at 32:1.  He is familiar with the methods and principles employed because he frequently conducted market analyses of this type in his position as the Principal Investigator at a Leidos ("dozens").  *Id* at 36:12-15. He also researched hundreds of marketing analysis techniques, including those used by

McKenzie, and reviewed "several scholarly articles and several textbooks" in determining the appropriate market analysis method. *Id*.at 39:18-20.

29.    Plainly, Dr. Roe relied on his extensive industry experience and research and conduced a market analysis utilizing common principles and methodologies that are "generally recognized by the industry." *Id*.  There is no evidence – even a shred – that Dr. Roe's methodology is incorrect or otherwise unreliable.  Instead, the conclusive weight of the evidence is that Dr. Roe's methodology is reliable and therefore must be admissible.  The singular reason that the Government attacks Dr. Roe's technique, all without offering any competing evidence, is that the Government doesn't like the conclusion that Dr. Roe's proper method takes us to.

*Dr. Roe's Opinion Reflects a Reliable Application of Principles/Methods to this Cause*

30.    Finally, Dr. Roe's opinions are based on a proper use of his methodology to determine his damages.  He produced a report (Exhibit 3 to this Response) that details the steps that he took to research the contracts within his field, the initial contract value, and the contract growth over time. *See* Exhibit 3.  He further details how he searched for the known companies that provide "CyberAI" products/services to the Government, and that the field was limited because the Government did not award CyberAI contracts until before 2019.   He completed case studies of five defense contractors and limited the analysis to relevant contracts.  His research found 77 relevant contracts across the five vendors who are providing CyberAI products/services.  He found the average value of the contracts awarded during the most-recent 5-year period was $28,500,000.00 for each company.

31.    Dr. Roe's specialized education, experience, and reliable research and analytical methodologies exceed the 'gatekeeping' standards of Fed. R. Civ. Evid. 702.  Of course, the Government does not offer any evidence or competing theory which would tend to show the Court

where Dr. Roe falls short in either qualification or approach. Instead, the Court is only left with the Government's suggestive questions, yet no answers. Dr. Roe provides those answers through detailed, reliable analysis.

### C. Dr. Roe's Methodology is Reliable

32.    The Government's complaint of Dr. Roe's methodology is misplaced.    Certainly, Dr. Roe's methodology must be reliable, but its independent validation is only a factor that is helpful in determining reliability, but it is not outcome determinative. *See generally Kumho Tire*, 526 US at 149-50. As discussed above, "the *Daubert* factors are not a rigid checklist that must be satisfied individually in order for the opinion to be admissible." *Sulak*, 2012 WL 6567237, at *9. Where, as in this case, the expert is relying on his experience, and his review of the evidence involved in the subject case, the lack of validation or scientific testing is not fatal to admission of the expert's opinions. *Id.* The basis of an of an expert's opinion informs the trier of fact on the weight of the evidence, and not the admissibility of the expert's opinion. *See United States v. 14.38 Acres*, 80 F.3d 1074, 1077 (5th Cir. 1996) (citing *Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 422 (5th Cir. 1987)). Consequently, even if Dr. Roe's methods and techniques were completely devoid of independent validation, his opinions would nevertheless be reliable and admissible.

33.    Of course, the independent validation that the Government seeks is not only present in Dr. Roe's testimony and research, but also sufficient. Dr. Roe testified that he "studied or researched what other people use for doing a market analysis, including what other experts would use for market analysis and base my assessments and the market analyses that I performed on those, I would say, commonly used techniques." Dep. At 38:9-13. When pressed, he explained that he "researched hundreds" of sources in performing his own technique, including those listed by

"McKenzie."  Dep. at 39:1-5.   specifically explained that his methodology is accepted by the industry – an industry that he has particular experience in.  Dep. at 40:14.

34.     The Government's attack on Dr. Roe's opinion relates to the weight of his evidence, and not its admissibility.  *Sulak* is instructive because the defendant in that case also confused weight of evidence and admissibility of evidence.  In *Sulak*, at issue was the cause of a helicopter crash.  The plaintiffs' expert offered opinions regarding several factors  that led to the loosening and separation of components in the helicopter.  The defendant in *Sulak*, like the Government in this action, argued that the expert's opinions were unreliable because the expert "did not subject his opinions to appropriate scientific testing in developing his theory."  *Id.* at *9.  In holding that the expert was not required to conduct tests for his opinion to be based on a reliable foundation, the court noted that tests are not necessary if the expert "can point to another type of investigation or analysis that substantiates his conclusions."  *Id.*  The court further wrote: "If the expert's opinions are based on facts, a reasonable investigation, and the traditional technical/mechanical expertise, and he provides a reasonable link between the information and the procedures he uses and the conclusions he reaches, then rigid compliance with *Daubert* is not necessary."  *Id.*

35.     Like the expert in *Sulak*, Dr. Roe's report and deposition testimony demonstrate that his opinions are based on the facts of the case, the expert's education and experience a reasonable, and traditional techniques.  Furthermore, Dr. Roe has provided an explanation that he utilized methods within his small industry, and how he used the procedures to reach the conclusions that he did in this case.  As such, he was not required to independently verify his method, write a book, or teach a class for his method to be reliable.  The Government's contention that Dr. Roe's methods were flawed or insufficient, that position "goes to the weight the [fact finder] should give the evidence."

*United States v. 14.38 Acres*, 80 F.3d 1074, 1077.  *See also Robinson v. Garlock Equipment Co.*, 2009 WL 104197, at * 2-4 (W.D. New York 2009).

### D.  Conclusion

36.      The Government's Motion to Exclude is an attack on the weight of Dr. Roe's opinions and methods of reaching his conclusions, masquerading as an objection to the admissibility of Dr. Roe's expert witness testimony.   The Motion and the arguments contained therein purport to show a lack of reliability, but instead only invade the province of the jury by discussing the weight of Dr. Roe's opinions.  Applying the *Daubert* factors to the facts and circumstances of this case, there is no question that Dr. Roe's opinions rest upon a reliable foundation.  The Government's Motion must be denied, and Dr. Roe should be allowed to provide reliable analysis and explain his damage model to our trier of fact.

37.      Wherefore, Plaintiff, Dr. John Roe, prays that the Court enter an order denying Defendants' Motion to Exclude the Testimony of Dr. John Roe.  Plaintiff further prays for all relieve to which he shows himself to be eligible.

Respectfully submitted,

**HENDLEY & HODGES LAW PLLC**
4594 US Hwy 281 North
Spring Branch, Texas 78070
Tel:   (210) 714-0924
Fax:  (210) 640-3398


By:  _____ /s/ *John W. Hodges, Jr.* _____
John W. Hodges Jr.
TX Bar No. 24090167
Email: john@hhtx.law


**ALLEN, VELLONE, WOLF,**
**HELFRICH & FACTOR, P.C.**
1600 Stout Street, Suite 1900

Denver, Colorado 80202
Tel:    (702) 245-2440


By:        /s/ *Jason R. Wareham*
Jason R. Wareham
CO. State Bar No. 5697
jwareham@allen-vellone.com

**ATTORNEYS FOR PLAINTIFF**


<u>CERTIFICATE OF SERVICE</u>

I certify that on June 20, 2025, I filed the foregoing Response to the Defendants' Motion to Exclude Plaintiff's Expert Testimony and served the same on all counsel of record via the Court's electronic filing system.


        /s/ *John W. Hodges, Jr.*
John W. Hodges Jr.
TX Bar No. 24090167
Email: john@hhtx.law