Page 1

1          UNITED STATES DISTRICT COURT

            WESTERN DISTRICT OF TEXAS

2              SAN ANTONIO DIVISION

3    ------------------------:

    DR. JOHN ROE,            :

4                            :

              Plaintiff,    :

5                            : Case No.

        vs.                 : 5:22-cv-00869-JKP-HJB

6                            :

    UNITED STATES, et al.,   :

7                            :

              Defendants.  :

8    ------------------------:

9

10       DEPOSITION OF ████████████    PH.D.

11

12   DATE:            Friday, May 30, 2025

13   TIME:            10:43 a.m.

14   LOCATION:        Department of Justice

                      175 N Street, N.E., 7th Floor

15                    Washington, D.C. 20002

16

17   REPORTED BY:     Erick M. Thacker

                      Reporter, Notary

18

19

20

21

22   Job No. CS7396796

```
DEFENDANT'S
EXHIBIT

2
```

██████████, Ph.D.                                              May 30, 2025

Page 5

```
 1                P R O C E E D I N G S

 2    WHEREUPON,

 3                    ████████████  PH.D.

 4    called as a witness, and having been first duly

 5    sworn, was examined and testified as follows:

 6                EXAMINATION BY COUNSEL FOR DEFENDANTS

 7     BY MS. SEEMAN

 8          Q    Good morning, Dr. ███████

 9          A    Good morning, ma'am.

10          Q    It's nice to see you again.

11          A    Likewise.

12          Q    Friendly reminder, my name is Katrina

13    Seeman.  I'm a trial attorney at the Department

14    of Justice, and I'll be taking your deposition

15    today --

16          A    Yes, ma'am.

17          Q    -- in your lawsuit against the

18    government defendants.

19          A    Yes, ma'am.

20          Q    Other than the deposition you had in

21    this case a couple weeks ago, have you ever been

22    deposed before?
```

, Ph.D.                                    May 30, 2025

1         A    I don't recall.  It could have been a

2    close friend.

3         Q    I just want to be clear.  You don't

4    remember who you talked to about this lawsuit?

5         A     If I happened to talk about it, it

6    might have been a friend of mine by the name of

7    Steven, but that's --

8         Q    Does Steven have a last name?

9         A    I'm not sure I mentioned this to him.

10   Banks.

11        Q    And how do you know Steven?

12        A    We've known each other for many years

13   from school, college.  But no details.

14        Q    You don't remember any details about

15   that --

16        A    We didn't --

17        Q    -- conversation if it happened?

18        A    We didn't discuss details, just --

19        Q    Okay.  Just --

20        A    -- the fact that I was doing something

21   to clear my name.

22        Q    Okay.  What's your current job?

, Ph.D.                                         May 30, 2025

Page 14

1          A     Deputy Director of National

2      Intelligence.

3          Q     And at what agency?

4          A     Office of the Director of National

5      Intelligence.

6          Q     What's your current pay rate?

7          A     I'm a SNIS Level 3.

8          Q     All right.  Generally --

9          A     S-N-I-S, SNIS Level 3.

10         Q     Thank you.

11         A     Yes, ma'am.

12         Q     Generally, what are your job

13     responsibilities?

14         A     I oversee a large portfolio for the

15     entire intelligence community.  That includes

16     major acquisitions, studies and analysis prior to

17     those acquisitions, policy for the entire IC,

18     awards, JDAs.

19         Q     What's a JDA?

20         A     A joint duty assignment.  That's --

21     that gives somebody the ability to, say, work at

22     NSA for two to three years and then take a short

Page 15

1    assignment of maybe a year at CIA or FBI.  Joint

2    duty assignment.

3              I also oversee the entire science and

4    technology portfolio for the intelligence

5    community.  That includes things like AI and

6    cyber and a bunch of other things.

7         Q    Where's your office located?

8         A    McLean.

9         Q    Virginia?

10        A    Yes, ma'am.

11        Q    And how long have you been in your

12   current role?

13        A    Nine weeks.

14        Q    Do you -- other than your job at ODNI,

15   do you have any other current income sources?

16        A    No, ma'am.

17        Q    Are you permitted to have outside

18   employment in your current role?

19        A    Define outside employment.

20        Q    Employment that is not through ODNI.

21        A    I'm allowed to serve on boards, but I'm

22   not allowed to necessarily serve in positions

Page 16

1     where I make a salary.

2          Q    Okay.  So you're not permitted to make

3     a salary in any outside --

4          A    Correct.

5          Q    Okay.  Do you serve on boards right

6     now?

7          A    I serve on one nonprofit.

8          Q    What's that?

9          A    Oh, I'm forgetting the name of it.

10    It's -- I forget the name of it.  The purpose is

11    to provide funding for military service members

12    in the event of, like, a legal need.

13         Q    Are you in your current role permitted

14    to compete for any government contracts?

15         A    Am I permitted to compete?

16         Q    Yes.

17         A    No.

18         Q    Why not?

19         A    Because I do major acquisitions for the

20    intelligence community.

21         Q    And then are you --

22         A    It's strictly foreboden.  Sorry.

, Ph.D.                                    May 30, 2025

1     Strictly forbidden.

2          Q     Are you permitted to work on any

3     subcontracts?

4          A     No, ma'am.

5          Q     How about consulting for a fee?

6          A     No.

7          Q     Consulting for free?

8          A     Consulting for free.  I don't believe

9     that's permitted because it would create a

10    conflict of interest.  I haven't asked and I'm

11    not performing any sort of duties like this.  I

12    wouldn't even consider it.

13         Q     All right.  Prior to your position at

14    ODNI, what -- where did you work?

15         A     Leidos.

16         Q     What was your -- actually, when did you

17    start at Leidos?

18         A     September 2020.

19         Q     And when did you leave Leidos?

20         A     March 2025, nine weeks ago.

21         Q     Did you have any gap in employment

22    between --

Page 18

```
 1          A     Zero.

 2          Q     -- Leidos and ODNI?

 3          A     Zero.

 4          Q     Why did you leave Leidos?

 5          A     I received a political appointment to

 6    serve at ODNI.

 7          Q     And you wanted to take it?

 8          A     Yes, ma'am.

 9          Q     What was the title that you held when

10    you first started at Leidos?

11          A     When I first started, I was the AI

12    chief or chief AI solutions architect, and when I

13    left, I was the chief AI scientist for the

14    company.

15          Q     Did you hold any -- actually, let me

16    rephrase.

17                Are either of those executive-level

18    positions at Leidos?

19          A     Yes, ma'am.

20          Q     Both?

21          A     Not when I entered.

22          Q     Not when you entered.  Okay.  But by
```

```
 1      the time you left?

 2              A      Yes, ma'am.

 3              Q      What was your pay rate when you first

 4      started at Leidos?

 5              A      Pay rate?

 6              Q      Or your salary.

 7              A      271 annual without bonus.

 8              Q      Okay.  Do you know how much your

 9      bonuses were?

10              A      My first year, I did not get a bonus.

11      No, that's not right.  I did receive a small

12      bonus of maybe -- maybe 50,000.

13              Q      And that would have been for 2020?

14              A      I would have received that in '21.  I

15      can't recall exactly.

16              Q      And when you left Leidos, what was your

17      salary?

18              A      Total compensation was 520,000.  Base

19      salary was maybe 302.  I don't recall exactly.

20              Q      What were your general duties -- let's

21      start with when you first started at Leidos.

22              A      When I first started, I worked within
```

1      the AI accelerator at Leidos.  My general duties

2      were to oversee AI developments broadly for

3      research projects that the accelerator was

4      working on.

5              The accelerator served the needs of

6      each of the business sectors of Leidos.  Business

7      sectors are defense, intelligence, health, civil

8      and international.  Those are the defined sectors

9      of the company, each with like a division

10     president.  And each had research and development

11     projects that the AI accelerator assisted in, and

12     I kind of oversaw the architecture of those AI

13     elements.

14         Q    Were -- did any of those business

15     sectors include cyber AI?

16         A    Yes.

17         Q    Can you tell me which ones?

18         A    Primarily the defense and intelligence

19     sectors.

20         Q    All right.  And then by the time you

21     left -- actually, let me back up.

22              Did you have any position between your

1        first position at Leidos and your -- the position

2        you had when you left?

3                A      No, ma'am.

4                Q      Okay.  When you left Leidos, what were

5        your general duties?

6                A      I oversaw the science and technology AI

7        portfolio for the entire company.

8                Q      Did that include cyber AI?

9                A      Among many, yes.

10               Q      What sort of difference in

11       responsibilities did you have from your first

12       position to your second?

13               A      The impact was broader.

14               Q      What do you mean by that?

15               A      In the -- in the last position, I was

16       more or less responsible for AI developments

17       across the company, so this included a lot of

18       human language translation, a lot of imagery,

19       particularly as we were doing work with the

20       health sector and civil sector.  There was a

21       component with -- with AI and cyber for the DoD

22       and intelligence sector.  It was just larger

1          responsibilities.  I was involved in more

2          proposals for the company, involved in more

3          presentations.

4                Q    Did you participate in any work to

5          obtain contracts?

6                A    Proposals, yes.

7                Q    Proposals.  So the proposals, just to

8          be clear, are for government contracts?

9                A    Those are all government contracts,

10         yeah.  So that would be a response to -- like for

11         DARPA, it would be a BAA, a broad agency

12         announcement, or an RFI, request for information,

13         or an RFP, which is request for proposal, so

14         you'd often write proposals for each of those.

15         The different government agencies call them

16         different things, but, usually, it's an RFI or an

17         RFP, with the exception of DARPA --

18               Q    Is --

19               A    -- who calls it a BAA.

20               Q    Is it fair to say that at least some of

21         your work in Leidos was in the cyber AI field,

22         then?

1          A     Yes, ma'am.

2          Q     All right.  Do you personally break

3     that down between offensive and defensive cyber?

4          A     You can.  We didn't.

5          Q     Okay.  Did that matter to you?

6          A     It does a lot.

7          Q     Why?

8          A     In order to do good defensive work, you

9     really have to attack a system and do good

10    offense.  We took a game theory approach where we

11    combined the two in kind of a war against each

12    other.  As one algorithm becomes very good at

13    attacking, as long as these are in a tight,

14    closed loop, the other algorithm can learn about

15    those attacks and improve their defenses.

16              So I do not -- I do not look at them as

17    distinct.  Most of the industry does, and this is

18    where this emerging field of cyber AI is

19    changing.

20         Q     And it's changing to understanding that

21    the best offense -- or the best defense is a good

22    offense?

, Ph.D.                                        May 30, 2025

Page 24

 1          A    Yes, ma'am.

 2          Q    Okay.  Did you have any other income

 3     sources when you were working at Leidos?

 4          A    Yes.  I did some consulting.

 5          Q    For who?

 6          A    A company called StarNav in California.

 7               (Reporter clarification.)

 8               THE WITNESS:  StarNav.

 9               MS. SEEMAN:  S-T-A-R-N-A-V.

10               THE WITNESS:  Yes, ma'am.

11     BY MS. SEEMAN

12          Q    Did you have to get permission before

13     working with StarNav?

14          A    Yes.

15          Q    Why?

16          A    Just to make sure there wasn't a

17     conflict of interest.

18          Q    Were you permitted to have outside

19     employment during your time at Leidos?

20          A    Yes.

21          Q    Did you?

22          A    Yes.

1        Q     What outside employment did you have?

2        A     Consulting.

3        Q     Other than StarNav, did you do any

4    other consulting work during your time at Leidos?

5        A     No.  I published a few books.

6        Q     Casual.

7        A     They didn't generate positive revenue,

8    but there were several that were sold.

9        Q     What books did you publish?

10       A     I published a book on how to do

11   research, titled How to do Research.  The

12   precursor was that was How to do Research

13   Remotely.  Keep in mind, this was in the time of

14   COVID.

15             I published another book titled Math

16   Refresher for Data Science Machine Learning and

17   AI and a math handbook for data science machine

18   learning and AI.  And then, during that time, I

19   was working on a book that I recently finished in

20   March titled a comprehensive -- I can't remember

21   the title exactly.  A Comprehensive Review of

22   Data Science Machine Learning and AI.  And I sold

1    the books at the cost of the publishing to make

2    those widely available as possible.

3         Q    Were you permitted to have any

4    government contracts during your time at Leidos,

5    you personally?

6         A    No, ma'am.

7         Q    I'll ask the follow-up even though I

8    know the answer.

9         A    Okay.

10        Q    So did you have any government

11   contracts during your time at Leidos?

12        A    No, ma'am.

13        Q    Okay.  Other than StarNav, did you work

14   on any other subcontracts?

15        A    No.

16        Q    And just to be clear, was StarNav --

17   was that -- were you working as a consultant

18   subcontractor?

19        A    I was working as a 1099.

20        Q    Was the work that StarNav was doing --

21   did they have a contract with the government?

22        A    They did.  The work that I did for

1    them, just to clarify, was leveraging the

2    algorithms and software that I built, derived and

3    built during my Ph.D.  So I was providing,

4    essentially, software updates.  I gave the

5    software to them for free because they're a

6    colleague of mine.

7        Q    Did the StarNav consulting have

8    anything to do with cyber AI?

9        A    It did not.

10       Q    Okay.

11       A    No conflict of interest.

12       Q    Other than -- so you're saying conflict

13   of interest.  So do outside consulting -- did it

14   have to be an area that Leidos didn't operate in?

15       A    No.  It had to be an area that I was

16   not performing duties in my job.

17       Q    At Leidos, right?

18       A    At Leidos.

19       Q    Okay.

20       A    So it could not be related to AI.  It

21   also couldn't be related to cyber since I was

22   doing some cyber work.  The work that I was doing

1        for StarNav was in the title.  It was navigation

2        system stuff.

3              Q    I was like, stars?  Great.  Okay.

4                   Other than StarNav, did you have any

5        other -- did you do any other outside

6        consulting --

7              A    No, ma'am.

8              Q    -- during your time at Leidos?

9              A    Sorry.

10             Q    Go ahead.

11             A    No, ma'am.

12             Q    Before Leidos, where were you employed?

13             A    Before Leidos, I worked for the

14       National Security Agency.

15             Q    And when did you leave NSA?

16             A    And I also had a JDA at ODNI in the --

17       the year just before I left.

18             Q    So your joint duty assignment was at

19       ODNI?

20             A    Yes, ma'am.

21             Q    Okay.

22             A    From 2019 to 2020.

```
 1          Q    Let's start with just NSA generally.
 2     When did --
 3          A    Okay.
 4          Q    -- you start working there?
 5          A    I started work at NSA in 2015.
 6          Q    What was your salary or grade when you
 7     first started?
 8          A    So the first time I was there, I was
 9     there as an intern during my Ph.D., and my grade
10     might have been a GS-12.  I did two summer tours,
11     one at NSA Texas and one at NSA Washington.
12          Q    Do you have a preference for offices?
13          A    No.
14          Q    What was your grade when you left NSA?
15          A    GS-14.
16          Q    Do you remember what your annual salary
17     would have been then?
18          A    I don't.  Maybe around 94,000.
19          Q    What was your -- I know you mentioned
20     you were an intern when you started.
21               What was your title when you left?
22          A    I was the chief data scientist for
```

1    the -- for the field site in Texas.  That would

2    be kind of an unofficial title because our

3    official titles have -- well, I'll just say that

4    they're different.

5         Q    Let's talk about your joint duty

6    assignment.  You mentioned it was 2019 to 2020.

7              How was that different than your just

8    NSA responsibilities?

9         A    So I still continued some of my NSA

10   responsibilities in that role.  However, when I

11   was at ODNI, I was brought in as a -- like an AI

12   technical fellow -- that was my title there -- to

13   try to get AI integrated into the entire IC.

14        Q    So --

15        A    Which is a bit different than what --

16   I'm sorry.

17        Q    Oh, no, go ahead.  You were going to

18   say --

19        A    It's a bit different --

20        Q    -- it's different?

21        A    -- than my role now where I'm

22   overseeing AI for the entire IC.

Page 31

```
 1        Q    And who is included in the intelligence
 2   community?
 3        A    There are 18 agencies.  I'll give you
 4   maybe the top five.  Okay.
 5        Q    Great.
 6        A    CIA, NSA, NRO, NGA and DIA are the
 7   largest of the 18.
 8        Q    Is there any connection between the
 9   Department of Defense and ODNI?
10        A    Yes.
11        Q    How are they related to each other?
12        A    Okay.  So there's a few ways that the
13   DoD and the IC are related, in that there are
14   several agencies like the ones I just provided
15   you, with the exception of CIA, that have what is
16   called MIP and NIP funding.  NIP funding is
17   National Intelligence Program funding.  MIP
18   funding is Military Intelligence Program funding.
19             NSA, NRO, NGA and DIA have both
20   military and IC -- or, rather, DoD and IC
21   funding.  As a consequence of that, I am
22   overseeing -- in my position overseeing all 18 IC
```

1    an NSA employee?

2          A    It is my understanding, yes, but I

3    don't -- I don't know.  I, for one, never had to

4    bid on anything.  I was requested by name.

5          Q    All right.  Do you have any businesses?

6          A    Yes, I've had a few businesses.

7          Q    What are they?

8          A    At the moment, I only have one.  It

9    is -- it's a kind of open-ended consulting

10   company.

11         Q    What's the name of it?

12         A    ██████████ LLC.  It's an official LLC in

13   Texas.

14         Q    How long have you had your consulting

15   company?

16         A    So, as ██████████ -- well, ██████████ LLC as

17   ██████████ LLC was founded maybe two years ago, but

18   I did work as, you know, ██████████ Consultants, not

19   an LLC, just as a consultant on a 1099 for many

20   years prior to that.

21         Q    Other than your consulting company,

22   what other companies do you have?

Page 46

1     the best techniques and tools for cyber network

2     operations to defend the country at the speed and

3     scale of machines and to subvert our adversaries

4     at the speed and scale of machines.  What it

5     comes down to is not more humans, but more GPUs.

6          Q    During your employment at NSA as these

7     things were developing, did you present any

8     projects to NSA leadership?

9          A    I did.

10         Q    And I'll just put the disclaimer here.

11    I am not asking for any classified information

12    today, and so to the extent you think my question

13    might start to impede on that, don't interpret it

14    any other way.

15         A    Okay.

16         Q    And if you need clarify that as we go

17    through this, please just do so.

18         A    Yes, ma'am.

19         Q    Okay.  So how many cyber AI projects

20    did you present at NSA?

21         A    Roughly six.

22         Q    Who do you present those to?

```
 1        A     I presented to my immediate leadership,
 2    which was in one organization, and I was
 3    dual-hatted in an operations organization.  I
 4    also presented to that leadership and several of
 5    the operators.  Operators are kind of like your
 6    Navy Seals that work on keyboards to navigate
 7    into other countries and do stuff for this
 8    country.
 9        Q     Were there any projects that NSA was
10    interested in pursuing?
11        A     No.
12        Q     Okay.  For all six?
13        A     Correct, for all six.  They were very
14    interested, but were worried about risk.
15        Q     And what do you mean by that?
16        A     New things are always deemed to have
17    risk.  This was very new.  Any form of
18    automation, nobody had done before, not this type
19    of automation.
20        Q     So, once you sort of get the no on
21    these projects, what do you do next with them, if
22    anything?
```

1          A     I did nothing.

2          Q     Did anybody at NSA suggest you pursue

3     your projects with outside organizations?

4          A     Yes.  There was an individual by the

5     name of Todd Jaspers who worked in NSA operations

6     and was dual-hatted with CYBERCOM, specifically

7     Air Force Cyber, and he requested that I present

8     these ideas to Air Force Cyber, because in their

9     mission, they tend to be much more forward

10     leaning and much more tolerant of risk.

11          Q     How did Todd Jaspers know that you were

12     working on cyber AI projects?

13          A     He was in the same office that I was

14     presenting the information to.

15          Q     Was there any supervisory subordinate

16     relationship between the two of you?

17          A     No.  We were peers.

18          Q     Okay.  So --

19          A     And based on his deposition, he

20     confirmed this.

21          Q     For -- once Todd Jaspers brings up, you

22     know, presenting to the Air Force, what do you do

1       next?

2               A     Todd Jaspers introduced me to a member

3       of Air Force Life Cycle Management HNCO and

4       arranged a time to present the information.

5               I asked my leadership if it was okay

6       for me to present this to Air Force, and they

7       said yes.  Since they were not interested, I was

8       free to do with it what I wanted to provided that

9       it remained in the classified environment.

10              Q     Who did Todd Jaspers introduce you to?

11              A     Dan Brown.

12              Q     I'll get into this a little bit later,

13      but had -- to that point, had you ever heard of

14      Dan Brown?

15              A     No, ma'am.

16              Q     And you'd never met him before?

17              A     No, ma'am.

18              Q     Okay.  When you -- so do you have a

19      meeting with Dan Brown?

20              A     Yes.  We had -- I had a meeting with

21      Dan Brown.  He introduced me to Dan Brown during

22      one of their weekly meetings.  I guess you'd call

, Ph.D.                                                    May 30, 2025

Page 50

 1      it like a soft hand offer introduction.  There

 2      was a follow-up meeting -- I'm sorry.  I'll let

 3      you ask the questions.

 4           Q    Okay.  So you have a weekly meeting.

 5      Todd Jaspers and Dan Brown are there, correct?

 6           A    This was their meetings, yes, their

 7      weekly meeting.

 8           Q    Okay.

 9           A    He asked me to --

10           Q    Was there --

11           A    -- attend at the end to just introduce

12      me.

13           Q    Was there anybody else at that first

14      meeting?

15           A    There were several people, and I don't

16      know them.

17           Q    Okay.  Were there people there that you

18      ended up working with --

19           A    No, ma'am.

20           Q    -- at any point?  Okay.

21                And then you mentioned a follow-up

22      meeting, correct?

```
1          A    The follow-up meeting was the first

2    opportunity I had to present the ideas.  Dan

3    Brown brought with him David Rivera from

4    Def-Logix and his deputy -- I don't recall his

5    name -- to, essentially, vet the ideas that I was

6    proposing.

7          Q    What do you mean by vetting your ideas?

8          A    The ideas that I was proposing were

9    very revolutionary.  He wanted somebody else in

10   the room that was smart enough to understand the

11   ideas even though they didn't have a background

12   in AI, understand the level of automation and

13   potential of the algorithms and whether or not

14   that's something that the Air Force should

15   pursue.

16         Q    Other than Mr. Rivera and his deputy

17   and Dan Brown, was there anybody else at that

18   meeting?

19         A    No, ma'am.

20         Q    Okay.  What happens after that second

21   meeting?

22         A    I don't recall the timeline, but,
```

1    somehow, I guess maybe within a week or two, Dan

2    Brown reached out to me, asked me if I'd consider

3    working as a consultant.  At the time, that

4    hadn't even occurred to me, so I had to check

5    with legal.

6              So I reached out to Office of General

7    Counsel, OGC, at NSA.  I spoke with an Amy

8    Riviera, I think.  Fairly confident on the first

9    name.  Last name, I might be mixing up the

10   letters.

11             She gave me a lot of legal advice.  It

12   basically came down to, as long as it didn't

13   conflict with my work -- and you have some of the

14   e-mails that she followed up with.  I provided

15   that content to leadership.  She said my

16   leadership had to approve.  My leadership did

17   approve.

18             We worked flexible work hours at NSA,

19   so it allowed me to do some of that work, say,

20   during lunch or a break.  If I had to go over to

21   Air Force, I would just take a long lunch and

22   make sure I put in my 40 hours at NSA and then --

Page 53

1     you know, at some point during the week, so I

2     didn't have to be there necessarily nine to five,

3     and often I would stay late at NSA to complete my

4     hours.  And then, of course, nights and weekends,

5     I would work.

6             My leadership approved.  I went back.

7     I had several phone conversations with Amy.  I

8     tried to ensure we also had an e-mail tracking of

9     those conversations so I had evidence of what I

10    was doing, that it was above board.  In case

11    anybody in the future disputed it, I wanted to

12    make sure I had that in e-mails.

13            And at some point, Dan arranged -- I

14    would call it a line of funding.  I didn't work

15    for Dan directly.  He arranged for me to be

16    brought on a contract that GITI had.  So the

17    funding somehow went from Air Force Life Cycle

18    Management HNCO through AFRL, Air Force Research

19    Laboratory, to a contract that GITI was on, which

20    I believe was the ACT 2, A-C-T 2, contract.

21            I was brought on to that as a

22    consultant on a 1099, and the money was kind of

1      routed through there so I could help -- excuse

2      me -- so that I could help advise the Air Force

3      on these cyber AI projects.  I know it sounds

4      convoluted.  It was.

5           Q    We're going to break it all down.

6      Don't worry.

7               So let's sort of back up.  So is it

8      fair to say that Dan Brown was your Air Force

9      point of contact?

10          A    Yes, ma'am.

11          Q    Was there anybody else at the Air Force

12     that you regularly communicated with?

13          A    No, ma'am.

14          Q    And did you regularly communicate with

15     Dan Brown?

16          A    Yes, ma'am.

17          Q    What e-mail address did you use to

18     communicate with Dan Brown?

19          A     It varied.  For unclassified

20     communication, I used an unclassified e-mail

21     address.  For classified communication, though

22     infrequent, I was allowed to use my NSA address.

, Ph.D.                                                    May 30, 2025

Page 57

1    associated with?

2         A     AeroAnalysis.  Or, no.  I had

3    started -- based on my Ph.D. research, I had

4    started -- or created a website -- I think I

5    created a website.  I don't even know.  I don't

6    recall.  But the AidedNav term was based on my

7    research, my Ph.D. research.

8              Again, the work I did for GITI, I did

9    on a 1099 as ████████████  not as AidedNav,

10   though there are references for AidedNav.

11        Q     Did you use the AidedNav Gmail to

12   communicate with GITI?

13        A     I did.  So, for example, my weekly

14   reports were communicated to the program manager,

15   Ted Oakley, through that Gmail account.

16        Q     Okay.  So, as you're advancing --

17   actually, I just want to make sure I understand

18   this.

19             So you present the Fibonacci projects

20   to Dan Brown and the Air Force HNCO staff,

21   correct?

22        A     Just to Dan Brown.

1          Q     Just to Dan Brown.   Okay.

2          A     Later it was presented to his

3     leadership.

4          Q     Okay.  Were you in that presentation to

5     the leadership?

6          A     I was in one of those presentations.   I

7     believe he had presented it to his leadership

8     maybe once or twice before he brought me in as a

9     subject matter expert to present.

10         Q     Okay.  How many, to your knowledge,

11    presentations were there to the leadership about

12    the Fibonacci projects before you were brought on

13    as a consultant?

14         A     It would only be one.

15         Q     Okay.  And for the one that you

16    participated in, how did you identify yourself at

17    that meeting?

18         A     As ▮▮▮▮▮

19         Q     Did you identify yourself as an NSA

20    employee?

21         A     I identified myself as ▮▮▮▮▮▮

22    someone who also worked at NSA.

1      Q    And for the meeting you were at, do you

2    remember anybody other than Dan Brown that was

3    there?

4      A    I don't recall.  At least for that

5    meeting, I don't recall.

6      Q    You mentioned leadership.  Do you know

7    like what level or position?

8      A    It could have been -- though I don't

9    recall, it could have been his local leadership

10   in that HNCO office in Texas.  It probably also

11   included his leadership in Washington, D.C.,

12   which would have included Danny Burghard and

13   Allen Rabayda.  But, again, at that meeting, I

14   don't recall.

15     Q    Okay.

16     A    I do recall the last meeting we had.

17     Q    When you -- earlier you mentioned you

18   had a flexible work schedule at NSA.

19          When you were presenting to the Air

20   Force, were you on the clock at NSA?

21     A    No, ma'am.

22     Q    And were -- these presentations of the

1    Fibonacci projects, were those your first

2    interactions with the Air Force as an NSA

3    employee?

4         A    Yes, ma'am.

5         Q    Okay.  Other than the initial meetings

6    we discussed and the presentations we discussed,

7    were there any other meetings that you were

8    involved in before you became a consultant with

9    GITI?

10        A    No, ma'am.

11        Q    Okay.  When you presented at the -- did

12   you talk at the presentation with Air Force

13   leadership?

14        A    Yes.  I was presenting.

15        Q    Okay.  In an unclassified manner --

16        A    Okay.

17        Q    -- what were you presenting?

18        A    I presented several ideas that then

19   became or maybe at that point were already titled

20   part of this Fibonacci series.  I think at that

21   point I presented maybe three or four projects.

22              To clarify, when I presented these

1      having like personal representation of demos to

2      Air Force leaders or officials, senior leaders,

3      talks of budget.  These are more substantive.

4              But behind the scenes -- this is where

5      I needed clarification was -- behind the scenes

6      is more -- if you have to talk about the

7      mathematics about something, then I could brief

8      on the mathematics and how that -- how that is

9      used within the car example, used within the

10     navigation system, but not be there for, you

11     know, driving the car.

12         Q    And just to be clear, in a situation

13     where you are with Air Force employees --

14     actually, let me -- we'll come back to that

15     later.

16              And there's this long e-mail that

17     starts at the bottom of 18, and earlier I

18     mentioned it should -- the numbers at the bottom

19     should actually go 18, 20, 19 for the full

20     e-mail.  Are you able to tell me where in this --

21     actually, let me back up.

22              Did NSA OGC ever issue a formal

1      approval for your outside employment?

2          A    No.  That was not something that Amy

3      was authorized to do.  And we talked about that

4      on the phone.  I think she followed up on that in

5      an e-mail somewhere, but I don't recall.

6          Q    On Bates 20, there's a bold and

7      underlined sentence from Amy's e-mail, and it

8      says, "If this outside arrangement requires you

9      to work in a government facility, please review

10     the below guidance."

11             Did -- did you know whether or not your

12     consulting work would require you to work in a

13     government facility?

14         A    Again, this comes down to some nuance

15     that she and I had to talk about over the phone.

16     The work that I was doing was -- the work was

17     unclassified, development of the mathematics,

18     overseeing the contractors, also done in an

19     unclassified space, not done in a government

20     facility.  The only time I was in a government

21     facility was for a presentation, but there was no

22     work performed in the sense of like doing

Page 86

1      software development --

2          Q    Okay.

3          A    -- or mathematics development in a

4      government facility.

5               So, based on my understanding of the

6      conversation that she and I had, that was -- that

7      was an acceptable understanding.

8          Q    Okay.  And then I want to turn your

9      attention to Bates 19 at the middle of the page,

10     where it starts with "Bottom line."

11         A    I'm sorry.  Where?

12         Q    Where it starts with "Bottom line."

13         A    Oh, yes.  Uh-huh.

14         Q    So this says, "As stated earlier, it is

15     almost impossible for federal personnel to work

16     for a contractor in the federal workplace.  In

17     theory, they could perform roles that do not

18     involve communications or that involve only

19     ministerial communications.  However, if the

20     quality, quantity, or timeliness of their work is

21     challenged, they may not participate in such

22     discussions."

1        you recall, correct?

2              A    Yes, ma'am.

3              Q    When you say that you recall, do you

4        mean you might have had other interactions with

5        him before then; you just don't remember?

6              A    It's possible.  I just don't remember.

7              Q    Okay.

8              A    Correct.

9              Q    Sometimes people use don't recall in

10       different ways, so I just wanted to clarify what

11       you meant.

12                  In your -- you said you reviewed your

13       second amended complaint before coming here?

14             A    Yes, ma'am.

15                  MS. SEEMAN:  Okay.  I guess I can hand

16       you a copy.  It's not a quiz, I promise.

17                  So we'll mark the second amended

18       complaint as Exhibit 8.  A copy to counsel.

19                  (Deposition Exhibit Number 8 was

20                  marked for identification.)

21       BY MS. SEEMAN

22             Q    So I want to direct your attention

Page 160

1       to -- let me get my copy -- I believe paragraph

2       78.

3              A    Yes.

4              Q    Okay.  A couple things.  Why do you

5       refer to this other project, which we'll call

6       Project B -- why do you refer to that as Captain

7       McVeigh's project?

8              A    Because it was his project.

9              Q    How do you know?

10             A    Dan Brown told me about those projects

11      a few times.

12             Q    All right.  In paragraph 78, you say,

13      in February 2020, at a classified briefing, you

14      were asked by Dan Brown and Mr. Burghard to

15      express your expert opinion on the continued

16      viability of Captain McVeigh's Project B, et

17      cetera, et cetera, et cetera.

18             Do you -- do you recall what this

19      paragraph is talking about?

20             A    Yes, I do.

21             Q    What can you tell me about it?

22             A    So, in this case, Dan Brown was asking

, Ph.D.                                                    May 30, 2025

Page 161

1    on behalf of Danny Burghard to get my subject

2    matter expertise opinion on the viability of

3    this -- this program that -- that Captain McVeigh

4    was overseeing as program manager.  I was given

5    insight into the targets, meaning, you know,

6    China or Taiwan or -- sorry -- China, Iran, et

7    cetera, adversaries, the technology that was

8    used, et cetera.

9              I asked a number of questions.  For

10   example, did they have -- when was their last

11   deliverable?  Apparently, the program had been

12   going on for maybe ten years.  They hadn't

13   delivered any deliverables in several years.

14             The technology that they were using was

15   outdated, meaning that they were developing

16   software for, say, Windows 2000 instead of

17   Windows 8 or 10.

18             And there was -- there was no

19   automation.  He asked for things like would I --

20   he asked for expert advice, and it was my -- my

21   assessment that based on the program being over

22   budget, not delivering, and using old technology,

Page 162

1    outdated technology that was essentially overcome

2    by events, it wasn't necessary in the field

3    anymore, that it's something that shouldn't

4    continue.

5         Q    I want to break that down just a little

6    bit.

7              So did you ever have a conversation

8    with Mr. Burghard about this assessment?

9         A    No.

10        Q    Okay.  Did you only communicate with

11   Dan Brown for information?

12        A    Yes.

13        Q    Okay.  And you said they a lot.  Who is

14   they that you're referring to?

15        A    They meaning the performers on Project

16   B.

17        Q    Would that be the Air Force?

18        A    The performers are typically a

19   contractor.

20        Q    Okay.

21        A    It could also -- it could also be the

22   Air Force, but I -- I was not privy to that

1    division-level office at -- in Washington.

2         Q    Have you had any interactions with

3    Mr. Rabayda?

4         A    I had maybe two.

5         Q    When were they?

6         A    They would have been during these --

7    these meetings.

8         Q    And when you say these meetings --

9         A    Sorry.

10        Q    We talked about a lot of meetings

11   today, so --

12        A    Sure.  I don't recall whether or not he

13   was at the February meeting.  I'm fairly certain,

14   though not absolutely certain, he was at the

15   August meeting.

16        Q    The August 2020 meeting?

17        A    Yes, ma'am.

18        Q    Did you have any communication with him

19   on either of those occasions?

20        A    We might have exchanged pleasantries.

21        Q    Did you identify yourself as a private

22   contractor or a private consultant?

1        A    I did not identify myself other than --

2    as anything other than Dr. ██████ or ██████

3    ████████

4        Q    And have you had any contact with

5    Mr. Rabayda since leaving your consulting role?

6        A    No, ma'am.

7        Q    Okay.  You can put that to the side for

8    now.  So let's go back to August 2020.

9        A    Yes, ma'am.

10       Q    Were you aware that, generally, until

11   this time, several Air Force employees were not

12   aware that you were a private consultant?

13       A    No, ma'am.

14       Q    Did you ever become aware of that?

15       A    Only after the fact.

16       Q    And when was that?

17       A    Sometime between August 14th, 2020 and

18   today, or the filing of this document, the second

19   amendment -- amended complaint.

20       Q    Okay.

21       A    Sorry.  Correct that.  I was not aware

22   until we received discovery and I was reading

Page 205

1    e-mails.

2          Q     Okay.  So in this lawsuit is how you --

3          A     Yes, ma'am.

4          Q      -- became aware?  Okay.

5               Is that concerning to you that most --

6    a good amount of Air Force employees did not know

7    how you were interact -- in what capacity you

8    were interacting with them in?

9          A     I think, in hindsight, that is

10   concerning.  That was really the duty of Dan

11   Brown to message that correctly.  Again, I was

12   brought in as a subject matter expert to talk

13   about certain topics.  Again, that is something

14   that Dan Brown should have done.

15              I think it would be odd for you to walk

16   into a room and say, hi, I'm Bob, I'm the

17   director of such and such, when everybody knows

18   that you are there to present on some topic.  You

19   just introduce yourself as, hi, I'm Bob.

20         Q     Is it your testimony you never

21   introduced yourself by any organizational

22   affiliation to HNCO employees?

Page 206

1          A     I did not introduce myself as any sort

2     of affiliation.

3          Q     And when I -- I guess let me clarify my

4     question.

5          A     Yes, ma'am.

6          Q     When I say affiliation, I mean, did you

7     ever identify yourself as either a consultant, a

8     GITI consultant, or an NSA employee to any HNCO

9     employee?

10         A     No.

11         Q     Okay.

12         A     Not to my recollection.  There were

13    times when Dan Brown wanted to use my -- loosely

14    use my affiliation with NSA, because NSA has, I

15    guess you could say, some gravitas, some impact,

16    that, you know, this is -- this information is

17    coming from an NSA-trained mathematician or an

18    NSA-trained exploit developer or something like

19    this.

20         Q     Did you have any concerns about him

21    using your NSA affiliation to throw -- throw some

22    weight around at HNCO?

1         A    Yes.  Because of the -- the definitions

2    and conversations I had with Amy, it was my

3    request to make sure that I was not introduced as

4    that person or representing that agency, because

5    I was not introduced -- I was not that person or

6    not representing that agency.

7              But that is no different than me being

8    introduced anywhere as, you know, Dr. ████████

9    versus ████████████    If somebody wants to use my

10   education as some form of way to convey subject

11   matter expertise or intelligence or stuff like

12   that, that is often what's used instead of just

13   calling me ██████

14        Q    I'm just using it out of respect,

15   but --

16        A    Thank you.

17        Q    So, you know, you said you requested

18   not to be introduced as an NSA employee.

19              Did I hear that correctly?

20        A    Yes, ma'am.

21        Q    When did you make that request?

22        A    On several occasions.

1      Q    And who did you make that request to?

2      A    Dan Brown.

3      Q    Did he introduce you in meetings as an

4  NSA employee?

5      A    I don't recall.

6      Q    Okay.

7      A    I think he often introduced me, as I

8  recall, as Dr. ███████   I'm fairly sensitive to

9  this because, in certain circles, especially for

10  leaders or program managers, it's kind of

11  bragging rights to say that you have some math

12  Ph.D. that works for you.  I've heard this kind

13  of off the cuff in conversations in halls and

14  that sort of thing.

15          Some people may be very proud of that.

16  I find that to be challenging because they're

17  proud of the title and not necessarily -- not

18  necessarily the accomplishments.

19      Q    In August of 2020, did you have any

20  communications with anybody about a potential

21  conflict of interest between your role as an NSA

22  employee and your consulting work?

, Ph.D.                                          May 30, 2025

Page 213

1      then, had you told anybody at the Air Force that

2      you were planning on leaving your NSA employee --

3      employment?

4           A    No, ma'am.

5           Q    Okay.  In August of 2020, did you have

6      other career opportunities arise?

7           A    In August of 2020?

8           Q    Yes.

9           A    Yes.  I got a phone call from Leidos.

10          Q    And about when was that phone call?

11          A    As it happens, within a week of one of

12     these -- these conversations with this readout.

13          Q    All right.  So you're at the readout --

14          A    Yes, ma'am.

15          Q    -- at Lackland.  Are you seated?  What

16     room are you in?

17               Let me start there.  What room are you

18     in at Lackland?

19          A    I was brought in to a SCIF.

20          Q    Okay.  Was it just you and Agent Beall?

21          A    Yes, ma'am.

22          Q    All right.  About how long was the

1          Q    Okay.

2          A    Not prior to this.

3          Q    At this point, so you are going to

4     resign -- let me back up.

5               What do you mean by that?  When did you

6     seek other employment?

7               MR. HENRY:  Objection to form.

8               THE WITNESS:  I didn't seek other

9     employment.  It sought me.

10    BY MS. SEEMAN

11         Q    Okay.  When did it seek you?

12         A    Sometime after August 13th.

13         Q    And both --

14         A    So the presentation was August 13th.

15    So, within a few days, I received a phone call

16    out of the blue.  I was not seeking employment.

17              Within a few days, I was also told that

18    this program was going to be canceled -- Dan

19    Brown told me that -- and that I was going to be

20    terminated, and it was going to be within a few

21    days that I'd have to be read out.  So, within

22    the span of a week, I had this information.  The

, Ph.D.                                    May 30, 2025

Page 232

1    program was going to be canceled or was canceled.

2    I was going to be terminated.

3              I had already spent several years

4    working at NSA.  I got a phone call on a Monday,

5    did two interviews throughout the week.  I had an

6    offer on a Friday for a job at Leidos making

7    three times more than I was making at NSA.  It

8    was an easy decision.

9         Q    When you say the projects were going to

10   be canceled, all six of them?

11        A    I don't think there were six at that

12   point.

13        Q    Okay.

14        A    I think there might have been three.

15        Q    Are you aware of whether or not any of

16   the projects were put into actual use?

17        A    No.

18        Q    You're not aware?

19        A    No, they were canceled.  I think

20   they -- there was some parts of the program, as I

21   was told by Dan Brown, that maybe because they

22   were on contract with Kudu or Def-Logix, they

1    continued for a short period of time, but they

2    were all ultimately canceled as far as I know.

3         Q    Okay.  And your only source for that

4    information is Dan Brown, correct?

5         A    Yes, ma'am.

6         Q    Okay.  Did you ever request to meet

7    with anybody to discuss what happened at your OSI

8    debrief?

9         A    Yeah.  I requested to meet with Dan

10   Brown.  He was told that he could not -- at some

11   point, he was told that I was being investigated

12   and he could not talk with me.

13        Q    Did he tell you who he had spoken

14   with --

15        A    No.

16        Q    -- about you?

17        A    No.

18        Q    Is it fair to say you don't know if

19   that person was local to HNCO or a different

20   office?

21        A    I don't know.

22        Q    Okay.  What, if anything, do you know

, Ph.D.                                    May 30, 2025

Page 234

1        about HNCO's security inquiry?

2                    At the time -- at the time, what did

3        you know about it?  Let me --

4            A    Okay.

5            Q    -- start there.

6            A    At the time, I had no information other

7        than Dan Brown saying I was -- I was being

8        investigated, and during the investigation, he

9        couldn't talk with me.  He did on a couple of

10       occasions talk to Todd Jaspers, and Todd Jaspers

11       talked to me.

12           Q    Okay.  Is it fair to say that only

13       through discovery you know about HNCO's security

14       inquiry?

15           A    Yes, ma'am.

16           Q    Okay.  As far as you are aware, no Air

17       Force inquiry determined you've committed any

18       misconduct, correct?

19           A    Correct.

20           Q    Okay.

21           A    They, in fact, cleared me of

22       misconduct.

, Ph.D.                                    May 30, 2025

Page 240

1                (Recess 4:16 p.m. to 4:29 p.m.)

2        BY MS. SEEMAN

3            Q    So, Dr. ████████ earlier you testified

4        that McVeigh was spreading information about you

5        around the office.  Do you remember that?

6            A    Yes, ma'am.

7            Q    What office were you referring to?

8            A    HNCO.

9            Q    Are you aware of whether Captain

10       McVeigh spread your information outside of HNCO?

11           A    No, ma'am.

12           Q    Okay.  Am I correct that Captain

13       McVeigh's spreading of information about you is

14       the factual basis for one of your Privacy Act

15       claims?

16           A    Yes, ma'am.

17           Q    To your knowledge, did anyone else

18       spread information about you around HNCO?

19           A    No, ma'am.

20           Q    To your knowledge, what information did

21       McVeigh spread that you believe was in violation

22       of the Privacy Act?

Page 241

1          A      To my knowledge, the information that

2     he had, based on what Dan Brown told me, because

3     he had copies of the e-mails from Amy with the

4     NSA Office of General Counsel and other

5     privileged information that he had no business

6     having access to.

7          Q      Okay.  And when you say other

8     privileged information, what are you referring

9     to?

10         A      Like a read-in or readout of -- a

11    read-in for programs that include personal

12    information or personal identifiable information,

13    PII, like a birth date, social security number,

14    address, things like this.

15         Q      Are the documents you're referring to

16    the materials that were attached to the OSI Form

17    40 in Exhibit 7?

18         A      Yes.  Among others, yes.

19         Q      Okay.  What others that are not

20    attached?

21         A      I don't know.  This is information I

22    received from Dan Brown.

1          Q     Okay.  I'll give you a chance to look

2     at that.  So you don't -- other than the

3     attachments on Exhibit 7, the OSI Form 40, are

4     you aware of any other documents that --

5          A     I --

6          Q     Actually, let me -- let me back up.

7                When you're saying McVeigh's spreading

8     information about you around the office, are you

9     referring to just word of mouth information, or

10    are you referring to documents?

11         A     Documents.

12         Q     Okay.  And your basis for that is Dan

13    Brown?

14         A     Yes, ma'am.

15         Q     Okay.  For your Privacy Act claim that

16    relates to OSI and Captain McVeigh, am I correct

17    in understanding that the basis for that claim is

18    the OSI agent providing information to Captain

19    McVeigh?

20         A     Yes, ma'am.

21         Q     Okay.  Is there anything else

22    factually -- I'm not asking for, like, a legal

, Ph.D.                                    May 30, 2025

Page  243

1     conclusion, don't worry -- that you think

2     supports that Agent Beall sharing information

3     with Captain McVeigh is a violation of the

4     Privacy Act?

5          A    It's my understanding that Captain

6     McVeigh showed documents to Dan Brown that I had

7     only shared with the Air Force OSI agent.

8               If the Air Force OSI agent is

9     conducting an investigation, he should not be

10    sharing sensitive information with other people

11    in that office, specifically attorney-client

12    privileged information.

13         Q    And to be clear for the record, you're

14    referring to the NSA OGC e-mail correspondence,

15    correct?

16         A    Correct.

17         Q    Is there any other document you believe

18    was shared with Dan Brown about your -- your

19    debrief or an HNCO security inquiry or any other

20    situation?

21         A    That's the only one that I remember.

22         Q    Okay.

, Ph.D.                                                    May 30, 2025

Page 244

1         A    I recall Dan Brown saying that there

2    were several other documents.  I don't know what

3    they are.

4         Q    Okay.

5         A    But that one stuck out because the only

6    way McVeigh could have had access to those

7    documents is if Air Force OSI shared those

8    documents with McVeigh.

9         Q    Okay.

10        A    It wasn't until later, so after -- that

11   is to say, after that phone call with Dan, Dan

12   Brown, that Dan asked me for a copy of those

13   documents because he wanted to compare them.  I

14   then sent an e-mail to Dan Brown with those

15   documents.

16        Q    Okay.  And, I guess, just for the

17   record -- I don't know if I actually asked this

18   earlier -- Dan Brown, Captain McVeigh, Danny

19   Burghard, Colonel Ekholm, they're all Air Force

20   employees, correct?

21        A    Yes, ma'am.

22        Q    Okay.  So --

Page 245

1          A     As far as I know.

2          Q     Okay.  At the time.  Good clarifier.

3     At the time, were those four individuals Air

4     Force employees?

5          A     Say again.

6          Q     Captain McVeigh --

7          A     Yes, ma'am.

8          Q     -- Dan Brown, Danny Burghard, Colonel

9     Ekholm.

10         A     Yes, ma'am.

11         Q     Okay.  So, earlier, you mentioned a

12    phone call with Dan Brown about Fibonacci being

13    canceled, and you also mentioned your contract

14    with GITI being canceled.

15              Do you remember that?

16         A     Yes, ma'am.

17         Q     Okay.  Did you get a stop work order

18    before you were aware that your contract was

19    canceled?

20         A     I got a stop work order at the same

21    time that I was informed that my contract was

22    canceled.

, Ph.D.                                                May 30, 2025

Page 255

1      him was via e-mail.

2              Q     Okay.  Did you talk about this lawsuit

3      with him?

4              A     We did talk about this early on.  He

5      actually encouraged me to file a lawsuit.

6              Q     And did he say why?

7              A     Yes, because this Captain McVeigh had

8      so thoroughly destroyed my reputation and made

9      false accusations that if I was ever to take a

10     political appointment, like Deputy Director of

11     National Intelligence, that it would be good to

12     clear my name or at least follow through with a

13     lawsuit, yes, to clear my name.

14             Q     Did you have any difficulties obtaining

15     your current political appointment?

16             A     No, ma'am.

17             Q     Do you like working with Todd -- did

18     you like working with Todd Jaspers at Leidos?

19             A     He's a good engineer.

20             Q     Okay.  Would you work with him again?

21             A     Yes.  He's a good engineer.

22             Q     Do you have the capacity to -- again,

1    been debarred, meaning contractor, subcontractor,

2    consultant?

3         A    I've been debarred as anything

4    pertaining to my name, Dr. ████████ whether

5    it's contractor Dr. ████████ consultant

6    Dr. ████████ or otherwise.

7         Q    What date do you believe you were

8    constructively debarred?

9         A    August 14th, 2020.

10        Q    And why that date?

11        A    That's when all of this blew up.

12        Q    Okay.  In your second amended

13   complaint, you say you continually sought to be

14   restored to HNCO.

15        A    Yes, ma'am.

16        Q    How did you seek to be restored to

17   HNCO?

18        A    I asked Dan Brown a few times if -- if

19   I could present our new research at Leidos -- at

20   that time, I was at Leidos -- because the

21   capabilities we were developing would be very

22   interesting to his mission.  In their mission,

Page 261

1        they serve -- just a little bit of background,

2        they serve, like, the special forces community,

3        so like Seal Team 6, those kinds of people, and

4        they needed certain capabilities.  And we were

5        developing tools that would work kind of at the

6        front end of cyber offense and defense.  He said

7        he couldn't talk to me about that.

8                Eventually, he reached out to Todd

9        Jaspers, eventually meaning a few months later,

10       saying that he had some money available, like

11       end-of-year money, and was interested in us

12       proposing projects, because he knew that I was

13       still involved and always appreciated the work

14       that I had done -- he's very complimentary -- but

15       again reminded him and reminded me that I could

16       not be present and it could not bear my name.

17            Q    Okay.

18            A    So I have been de facto debarred.

19            Q    Did you ever try to talk to anybody in

20       HNCO's contracting office about this issue?

21            A    I asked if I could present my case to

22       somebody else at HNCO, and Dan at one point

Page 262

1    advised me, don't even bother.

2         Q    And you took that advice?

3         A    Yes, ma'am.

4         Q    Okay.  And so it's fair to say you've

5    never contracted -- never contacted a contracting

6    official?

7         A    Correct, ma'am.

8         Q    Okay.  Other than Dan Brown, did you

9    ever talk to anybody at HNCO about being

10   constructively debarred?

11        A    No, ma'am.

12        Q    In your complaint, it says you sought

13   to be restored.

14             Did you seek to be restored as a

15   private consultant?

16        A    I sought to be restored in that I just

17   wanted to clear my name.  Whether or not I was

18   able to be a consultant didn't really matter.

19   Reputation in my -- my line of work is -- is very

20   important, and to have somebody continue to

21   perpetuate falsehoods will continue to damage my

22   reputation.

Page 263

1           So, even though, for example, this has

2     happened five years ago, there's still people

3     that hear my name and still think that I am some

4     sort of fraud or crackpot, even though I have

5     many people from the scientific community that

6     have read my papers and my patents and my books

7     and applauded me for my work, including the U.S.

8     government, where they also have seen the

9     capabilities of the stuff that I've invented and

10    have asked for access to it.

11         Q    Okay.  Just to follow up, you said

12    people.  What people?

13         A    So there are certain individuals in the

14    Air Force and certain individuals that they

15    communicated with at NSA that still believe these

16    falsehoods about me.

17         Q    Okay.  And who are those people?

18         A    I can't remember names specifically.

19         Q    Okay.  And how do you -- how do you

20    know that they know anything about any of this?

21         A    Through communication by -- or from

22    Todd and Dan Brown.  There is a recent example in

Page 264

1       2023, during a presentation where I was

2       presenting.  Todd was in the audience, and he was

3       sitting next to several folks from NSA who were

4       at that time unrelated to all of this.  And they

5       were making derogatory remarks about my

6       presentation and who I was because of what they

7       had heard at NSA Texas through other people.  So,

8       again, not only de facto debarment, but a

9       destruction of reputation that continues to

10      evolve over time.

11          Q    You said derogatory remarks.  Well,

12      actually, let me back up.

13               Do you know who any of these NSA people

14      were?

15          A    Yes.  I mean, I don't know them

16      personally.  One of them oversees aspects of

17      operations.  Another one oversees aspects of

18      what's called capabilities directorate.  I can't

19      remember the names right now.

20          Q    And did you hear any of these

21      statements yourself?

22          A    No, but this was corroborated by other

, Ph.D.                                May 30, 2025

Page 265

1          colleagues of mine that were at the table.

2               Q    Who?

3               A    One of them was a subordinate that

4          worked for me at Leidos.  Another one was a

5          friend.

6               Q    Okay.  Names?

7               A    The individual at Leidos?  I can't

8          remember which team member.  I had several team

9          members.  I can't remember which team member

10         specifically.

11              Q    And then the friend?

12              A    Same.  It was another just kind of work

13         colleague.

14              Q    Okay.  So you don't remember either

15         person?

16              A    It was not a subordinate.

17              Q    Okay.

18              A    They were obviously very upset by this

19         and opposed the comment, because they worked for

20         me and they saw my work.

21              Q    Did they tell you whether or not they

22         said anything to your former colleagues?

1          A    They both said they said something.

2          Q    Okay.  And did they tell you what

3     response they got?

4          A    I don't recall.  Again, this

5     demonstrates lasting damage by one Captain

6     McVeigh, one person, with false allegations.

7          Q    Is that your -- what's your basis for

8     that statement?

9          A    Can you ask the question again?

10          Q    Yeah.  What is the basis for your

11     statement -- what I just -- your statement that

12     your reputation has been ruined?

13          A    Or continues to be ruined?

14          Q    Yes.

15          A    Examples like this keep -- keep popping

16     up, where people that I don't know, have never

17     interacted with, somehow have heard through

18     someone else or this originated from Captain

19     McVeigh that I had -- or that I was some sort of

20     a crackpot or had unrealistic expectations or

21     capabilities or, you know, a number of things,

22     that I didn't know what I was talking about or

, Ph.D.                                          May 30, 2025

Page 267

1    couldn't prove the results or whatever.

2         Q    You keep using the phrase or the term

3    "crackpot."

4         A    Yes.

5         Q    Where did that come from?  Not -- I'm

6    not asking for the origin of the linguistic term,

7    just to be clear.  I'm asking, who -- who told

8    you that people were calling you a crackpot and

9    who was calling you a crackpot?

10        A    Dan Brown said that Captain McVeigh

11   called me this several times.

12        Q    Okay.  Did anybody else other than Dan

13   Brown tell you?

14        A    I have never heard this from anyone

15   else.

16        Q    Okay.  Has anybody told you that your

17   reputation is, in fact, ruined?

18        A    That is difficult to answer, in that my

19   reputation in certain communities at this point

20   is ruined.  I would not be able to -- without

21   some sort of restorative memo or something like

22   this from the U.S. government to HNCO, for

, Ph.D.                                            May 30, 2025

                                              Page  268

1       example, would not have that reputation restored.

2       So, certainly, my reputation within HNCO is

3       ruined.

4                 My reputation with certain individuals

5       at NSA is ruined as a result of this -- this

6       event with HNCO.

7                 Outside of that community, I interact

8       with many communities in many disciplines.  I

9       have, in fact, a very good reputation.  I would

10      not be in the position I'm in now if I didn't

11      have a good reputation in many other communities.

12           Q    So I'm just going to drill down a

13      little bit more, so -- but has anybody told you

14      that your reputation is ruined?

15           A    Dan Brown told me this, yes.

16           Q    Okay.  Anybody other than Dan Brown?

17           A    Todd Jaspers told me the same.

18           Q    And Todd Jaspers knows because Dan

19      Brown told him?

20           A    Well, Todd Jaspers also worked with the

21      HNCO office as an NSA employee.

22           Q    You read his transcript, though, yeah?

, Ph.D.                                May 30, 2025

Page 269

1          A    Yes, ma'am.

2          Q    Did he say that he had any personal

3     interaction with Captain McVeigh?

4          A    I don't recall.

5          Q    Okay.  Other than those two

6     individuals --

7          A    Yes, ma'am.

8          Q    -- has anybody ever told you that your

9     reputation is ruined because of the events that

10    happened at HNCO?

11         A    No, ma'am.

12         Q    Okay.  Has anybody told you that they

13    did not want to work with you because of the

14    events that happened at HNCO?

15         A    Told me face to face that they did not

16    want to work with me?

17         Q    Let's start with that.

18         A    No.

19         Q    Okay.  Face to face implies there's a

20    behind your back, so I'm going to ask:  Has

21    anybody said that they would not work with you to

22    somebody else, and you found out about it?

Page 270

1          A    Yes.  I've heard that through Dan Brown

2     and Todd Jaspers, but that has not prevented many

3     other people seeking to work with me because of

4     my --

5          Q    Okay.

6          A    -- otherwise good reputation in many

7     other areas.

8          Q    Okay.

9          A    When I say seeking, these people are

10    willing to leave their current jobs to go join me

11    in another job, because I treat people well.  I

12    elevate their ability professionally.  In many of

13    these people's lives, I've been able to grow them

14    as individuals and as professionals and teach

15    them things that they didn't know were possible,

16    and so they've trusted me with their livelihoods

17    to move from one organization to another because

18    they wanted to work with me.

19          Q    And --

20          A    It's only this unique circumstance

21    where there are people within HNCO or within Air

22    Force Cyber, specifically the cyber AI community,

, Ph.D.                                    May 30, 2025

Page 271

1    that don't want to work with me.

2         Q    So who specifically at HNCO do you

3    think does not want to work with you?

4         A    I don't know.

5         Q    Okay.  Has anyone -- actually, I want

6    to ask this first:  You, at Leidos -- not to, you

7    know, gas you up, but you basically created an

8    entire cyber AI portfolio for them, correct?

9         A    Yes, ma'am.

10        Q    And you developed that entire -- you

11   were the leader of that, correct?

12        A    Yes, ma'am.

13        Q    Is it fair to call you an industry

14   leader in cyber AI?

15        A    Yes, ma'am.

16        Q    Okay.  Has anyone told you that they

17   couldn't work on a project because of the HNCO

18   security inquiry?

19        A    Can you refine that?

20        Q    What part don't you understand?

21        A    Has anybody told me that they couldn't

22   work on a project because of the HNCO --

, Ph.D.                                    May 30, 2025

                                                    Page 272

1          Q     Yes.

2          A     -- security investigation?

3          Q     Yeah.

4                MR. GONZALEZ:  With you.

5                MS. SEEMAN:  Other --

6                MR. HENRY:  With you.

7     BY MS. SEEMAN

8          Q     With you.

9          A     I have not had anybody tell me that

10    they could not work with me because of the

11    investigation.

12         Q     Okay.  And --

13         A     Aside from Dan Brown.

14         Q     Naturally.  To your knowledge, did the

15    HNCO security inquiry cause anyone to view you

16    negatively?

17         A     Yes.  I mean, there's several people in

18    that office as well as several people that were

19    affiliated with that office at NSA.

20         Q     Okay.

21         A     Strictly because there was an

22    investigation, there's -- oddly enough, as soon

, Ph.D.                                   May 30, 2025

Page  273

1      as an investigation is launched, there's this

2      assumption of fault instead of assumption of

3      innocence.

4           Q    In this inquiry, though, you weren't

5      found to have done anything wrong, though,

6      correct?

7           A    That's correct.

8           Q    Okay.

9           A    Part of the request that I have as part

10     of this lawsuit is to have the government state

11     that there was an investigation, no fault was

12     found, and issue that to an office like HNCO so

13     that those people that made this assumption that

14     I -- because I was under investigation did

15     something wrong, they don't find out, as Dan

16     Brown did not find out, what the -- what the

17     conclusion of an investigation is.  They just

18     hear there's an investigation, so, therefore,

19     they assume there's fault.  I think it's probably

20     good practice by the U.S. government that if

21     other people are aware of this, they are later

22     told, yes, there was an investigation.  However,

                                          Page 291

1    don't know that.

2         Q    Fair enough.

3         A    Or accusation.  I don't want to make

4    that accusation.

5         Q    That's fair.  Did Leidos end up getting

6    a contract out of these presentations?

7         A    No.

8         Q    Okay.  Do you know why?

9         A    It would be speculative.  No.

10        Q    Okay.  It wouldn't have anything to do

11   with your position at Leidos, though, correct?

12        A    No.  What Dan Brown testified to --

13        Q    I just want to know what you know,

14   though, right now.

15        A    I don't know.

16        Q    Okay.  Outside of these two

17   presentations, were there any other presentations

18   at HNCO that you did not attend that you wanted

19   to attend?

20        A    I don't recall.  There were several

21   communications, and there were several kind of

22   sprint exercises to put together, like, a bid

, Ph.D.                                                          May 30, 2025

Page 292

1       based on Dan Brown's requirements, but I don't

2       recall.

3              Q    Okay.

4              A    At this point, basically everything had

5       to be handled by Todd Jaspers.  I was -- I was

6       asked to not participate.  And my leadership

7       was -- was fine with that.  I informed them that

8       there was an ongoing litigation.

9                   And they said that this actually does

10      happen.  It's not -- it's are not unusual to have

11      a situation where, in their case, like a Leidos

12      employee could not present in front of a

13      government employee for fear of, you know,

14      reputational harm to Leidos.

15                  So they said, you know, no problem,

16      it's not going to look poorly on me as an

17      individual or leader at Leidos.  As long as Todd

18      Jaspers was equipped to do the presentation on my

19      behalf, they didn't see any issue with it.

20             Q    And do you believe Todd Jaspers was

21      equipped to do the presentations?

22             A    Mostly, yes.  Todd does not have the

, Ph.D.                                    May 30, 2025

                                                    Page 293

1      background that I have, so he -- as I said

2      before, he is a -- he's a very good engineer.  He

3      is excellent when it comes to cyber operations,

4      and he has very good intuition.  His depth of

5      knowledge in AI is not as strong as mine is, but

6      I believe that he did a good job representing the

7      research.

8           Q    Part of your second amended complaint

9      says that you're not allowed to enter HNCO

10     spaces.  Is that accurate?

11          A    Yes, ma'am.

12          Q    What -- what need do you have to enter

13     HNCO spaces?

14          A    I currently have no need.

15               MS. SEEMAN:  Okay.  Let's mark this as

16     12.  A copy to counsel.  I don't know why this

17     doesn't have the Bates numbers, either, but it's

18     from your production.

19               (Deposition Exhibit Number 12 was

20               marked for identification.)

21     BY MS. SEEMAN

22          Q    So what is Exhibit 12, Dr. ▉▉▉▉▉

Page 306

1           Q    Are you aware of whether Leidos lost

2      out on any contracts because of your situation at

3      HNCO?

4           A    I am not aware.

5           Q    Great.  All right.  Next -- you can put

6      that to the side.

7                MS. SEEMAN:  Do you guys want to take a

8      little break?

9                MR. HENRY:  I guess not.  What -- what

10     is our time on the record?

11               THE REPORTER:  Five-and-a-half hours.

12               THE WITNESS:  Really?

13               MS. SEEMAN:  Time stops moving in

14     these.

15     BY MS. SEEMAN

16          Q    All right.  Let's -- all right.

17               So, when you're in 2020, other than

18     being fired from the GITI consulting contract,

19     were there any contract opportunities that you

20     lost out on?

21          A    I didn't apply for any other contracts.

22          Q    Okay.  Is that because you were at

Page 307

1    Leidos then?

2         A    Correct.

3         Q    How about in 2021?

4         A    Same answer.

5         Q    So you did not bid on any contracts in

6    2021 because of your employment at Leidos?

7         A    Yes, ma'am.

8         Q    Okay.  2022, I have to ask the same

9    question.

10        A    Same answer.

11        Q    What -- you did not bid on any

12   contracts in 2022 because of your employment at

13   Leidos, correct?

14        A    Yes, ma'am.

15        Q    How about in 2023?  Did you -- you did

16   not bid on any contracts in 2023 because of your

17   employment at Leidos?

18        A    Yes, ma'am.

19        Q    And, 2024, you did not bid on any

20   contracts because of your employment at Leidos?

21        A    Yes, ma'am.

22        Q    And then 2025 through when you left

1    Leidos, you did not bid on any contracts because

2    of your employment at Leidos?

3        A    Yes, ma'am.

4        Q    And from when you started at ODNI to

5    date, you have not bid on any contracts because

6    of your employment at ODNI, correct?

7        A    Yes, ma'am.

8        Q    Okay.  Earlier we talked about StarNav

9    and your work for them while you were working at

10   Leidos.

11            Were there any consulting opportunities

12   you did not pursue from 2021 to 2025 during your

13   employment at Leidos?

14       A    No.

15       Q    Okay.  You've never bid on any

16   contracts as a prime contractor, correct?

17       A    Me as ██████████ or me as Leidos?

18       Q    Let's start with you as ██████████

19       A    No, ma'am.

20       Q    Okay.  And you as Leidos?

21       A    I assisted in several contracts that

22   were prime contracts at Leidos.

, Ph.D.                                    May 30, 2025

Page 309

 1          Q    And did Leidos receive any of those
 2     contracts that they bid on?
 3          A    Yes, ma'am.
 4          Q    Okay.  Were any of those contracts with
 5     Department of Defense agencies?
 6          A    Yes, ma'am.
 7          Q    Okay.  Which ones?  Just which
 8     agencies, not which contracts.
 9          A    I don't remember.
10          Q    Okay.
11          A    We had several.
12          Q    Were any of those contracts in the
13     cyber AI space?
14          A    Yes.
15          Q    Are you able to say with which
16     agencies?
17          A    There was one with DARPA.  I helped
18     write proposals, though my name was not on
19     them -- same thing with DARPA -- with IARPA.
20               (Reporter clarification.)
21               THE WITNESS:  IARPA, I-A-R-P-A.  Army
22     Futures Command.  There were several.  I can't

1       remember them all.  I'm sorry.

2       BY MS. SEEMAN

3            Q    That's fine.  If -- if I wanted to go

4       look and find those contracts, do you know where

5       I would look for that?

6            A    Yes.  You could look at

7       USASPENDING.gov.

8            Q    Okay.  Did -- you know, you mentioned

9       like your name being on or off of things.

10                For these contracts with other

11      agencies, was your name on or off of bids?

12           A    Only one some of them.

13           Q    Okay.  Which agencies was your name

14      left off of?

15           A    My name was not on a contract or a bid

16      at NSA and another one at DARPA.  However, there

17      were other -- other proposals in a different

18      office at DARPA where my name was on the

19      proposal.

20           Q    And did -- DARPA did, in fact, award

21      some of those contracts to Leidos, correct?

22           A    Yes, ma'am.

1          Q     Okay.  Including ones that had your

2     name on it?

3          A     Yes, ma'am.

4          Q     Okay.  How about NSA?  Did they award

5     any contracts to Leidos?

6          A     Yes, but my name was not on it.

7          Q     Okay.  As                    would you in

8     your individual capacity qualify to be a prime

9     contractor on a cyber AI contract?

10         A     Would I qualify?

11         Q     Yes.  I can rephrase if you would like.

12         A     Sure.

13         Q     What qualifications, if any, are you

14    aware of that are required for prime contractors

15    in the cyber AI field?

16              MR. HENRY:  Objection to form.

17              THE WITNESS:  I don't know that there

18    are specific qualifications.  There's certain

19    requirements of a prime contractor.  If you're

20    doing classified work, you have to have a

21    security person.  If you're doing work that's

22    fairly technical, they expect you to have a

██████████, Ph.D.                                    May 30, 2025

Page 312

```
 1      technical person.  There might be things like

 2      reporting requirements that might require another

 3      person.

 4             However, there's nothing that prevents

 5      all three of those people to be the same person,

 6      and, in fact, with a small company, this is often

 7      the case.  The person that writes the contracts

 8      or does all the contracting work is not, you

 9      know, one of 20 people.  It's the same person who

10      is also doing the technical work.  It's the same

11      person's who's overseeing the security for the

12      program, et cetera.  I know people who do this.

13          Q    As -- if you, ██████████ were to be

14      a prime contractor on a program in a SAP

15      environment, would you be able to do that?

16          A    Yes, ma'am.

17          Q    Okay.  How would your -- let's start

18      with the security clearance, because earlier we

19      talked about how somebody has to sponsor, host.

20             How would that work if it's just you,

21      ████████████

22          A    If it's just me, ██████████ I have
```

, Ph.D.                                                    May 30, 2025

Page 315

1              MS. SEEMAN:  Let's go off the record.

2              (Recess 5:47 p.m. to 5:55 p.m.)

3     BY MS. SEEMAN

4         Q    So, Dr. ████████ in your second amended

5     complaint, there's an allegation that says you

6     are barred from all interaction within the United

7     States Government on offensive cyber work

8     regardless of the agency.

9              Is that statement accurate?

10        A    At the time, yes, that was accurate.

11        Q    And when you say at the time, do you

12    mean at the time of the filing of the second

13    amended complaint?

14        A    At the time of the filing of the second

15    amended complaint.

16        Q    Okay.

17        A    Yes, ma'am.  This is not it.  I have

18    it.

19        Q    Okay.  What's the date of the filing at

20    the top?

21        A    At the top?

22        Q    Yeah.

 1          A    3/18/24.

 2          Q    Was that statement accurate at the time

 3     of your initial complaint filing?

 4          A    Initial complaint, yes.

 5          Q    Okay.  This statement is no longer

 6     accurate, though, correct?

 7          A    I don't know.  I haven't tried.

 8          Q    You haven't tried to work on -- within

 9     the United States Government on offensive cyber

10     work?

11          A    Not as ████████████  no.

12          Q    As Leidos, though, have you been able

13     to through Leidos?

14          A    Through Leidos, not as ████████████

15     yes.

16          Q    Okay.  All right.  Moving on to --

17     well, I guess back sort of towards your position

18     in the cyber AI field, is it fair to say you're

19     still a key player in the cyber AI field?

20          A    I would -- I wouldn't say a key player.

21     I would say I'm probably one of the luminaries in

22     this field.  A key player to me implies that I am

Page 317

1       applying for contracts and winning contracts and

2       demonstrating success in the field; whereas, a

3       luminary is somebody who would be developing new

4       ideas, performing research and development on

5       those ideas and demonstrating maybe within a

6       company, and then, on behalf of the company,

7       those capabilities are presented to a customer

8       for that company to then gain traction.

9             Q     Is -- okay.  Let me ask it this way:

10      During your time at Leidos, was Leidos -- did

11      they establish themselves as a key player --

12            A     They did.

13            Q     -- in the cyber AI field?

14            A     They did.  I maintained my position as

15      a researcher by publishing papers and patents, so

16      among the scientific community, I maintain my

17      position as what I called a luminary.

18            Q     And you -- since leaving your

19      consulting role, you were still able to work in

20      the cyber AI field, correct?

21            A     Define work in the cyber AI field.

22            Q     At Leidos, you were doing cyber AI work

Page 318

1      at least as part of your job, correct?

2            A    That was part of my duties at Leidos,

3      yes.

4            Q    Okay.  So you were still able to work

5      in cyber AI?

6            A    Under the umbrella of Leidos without my

7      name attached to it, yes.

8            Q    Okay.  You mentioned you were

9      publishing papers and those sorts of things,

10     correct?

11           A    Yes, ma'am.

12           Q    Did those have your name on it?

13           A    Yes, ma'am.

14           Q    Were those in the cyber AI field?

15           A    They were in the cyber AI field within

16     the scientific community, not within the U.S.

17     government.

18           Q    Okay.  That was as ███ -- ████

19     ████████

20           A    Yes, ma'am.

21           Q    Okay.  Not as a Leidos employee?

22           A    It was also as a Leidos employee.  You

Page 319

1      will see the documents that it does say some sort

2      of Leidos e-mail address.

3           Q    Okay.  Outside of potential

4      contracts -- actually, yeah.  Outside of

5      potential contracts, what if any interference

6      have you experienced with your ability to work in

7      the cyber AI field?

8           A    Since 2020, I've not been able to

9      regain a foothold into the dominant players in

10     offensive and defensive cyber, namely, Air Force

11     Cyber.  Of the -- the players in this field, they

12     are the most forward leaning in the field, and I

13     have not been able to kind of regain a foothold

14     as Dr. ███████  in -- in that arena.

15          Q    And when you say Air Force Cyber, is it

16     all of Air Force Cyber, or is it just

17     specifically HNCO?

18          A    In this case, specifically HNCO,

19     because they're the ones who do the acquisitions.

20     Air Force Cyber is rather large, and they do a

21     lot of different things.

22          Q    Which is why I asked.

Page 320

1          Have you -- do you believe you've been

2     deprived of your ability to work in the cyber AI

3     field generally?

4          A    As a consultant, yes.  As a researcher,

5     no.  So my ability to make a salary and some sort

6     of wage to provide for my family, yes,

7     absolutely.

8          Q    But to be clear, you were still making

9     a salary at Leidos?

10         A    Yes, but my -- my duties at Leidos were

11    varied.  Again, going back to earlier testimony,

12    when I first came to Leidos, I was working as a

13    chief AI solutions architect, which was doing AI

14    and ML for imagery, medical records, things like

15    this, not cyber.

16         Q    And then it turned into including

17    cyber, correct?

18         A    Later on, it did include cyber, again,

19    but that was under the umbrella of Leidos, and I

20    was not able to represent that work back to the

21    U.S. government.

22         Q    But you were to some agencies able to

1    represent yourself, correct, or to represent

2    yourself as associated?

3         A    I was able to represent Leidos, not

4    myself.  There was a huge difference.

5         Q    Yeah, I'm just trying to understand

6    that, because earlier we were talking about, you

7    know, contract proposals that had your name on

8    them versus didn't have your name on them, and

9    you said a few for part of -- a specific DARPA

10   office and then NSA.

11        A    Uh-huh.

12        Q    Were -- were those the only contracts

13   that were cyber AI?

14        A    Good question.  The ones that had my

15   name on them were not cyber AI.

16        Q    Okay.  Did they still deal with AI?  I

17   hate to make assumptions.

18        A    Some dealt with AI.  Some dealt with

19   cyber.

20        Q    Okay.

21        A    Some were just purely mathematics.

22        Q    Other than being excluded from the two

1    presentations at HNCO, did you have any other

2    exclusions at HNCO?

3         A    I'm sorry.  Say that again.

4         Q    Yeah.  That's a bad question.

5              Other than the presentations at HNCO,

6    were you deprived of any other opportunities at

7    HNCO?

8         A    Those are the only opportunities that

9    were presented.

10        Q    Okay.  And no contracts came of that,

11   correct?

12        A    No, ma'am.

13        Q    Okay.  You've sort of alluded to this

14   throughout today, but what are you hoping to get

15   out of this lawsuit?

16        A    At a minimum, I'd like to clear my

17   name.  I've said a couple of times, damage to

18   reputation comes in two forms, and we talked

19   about those two forms.

20             I've also mentioned that when an

21   investigation is mentioned and that someone is

22   being investigated, the people that hear that

, Ph.D.                                    May 30, 2025

Page 327

1        Q    Okay.

2        A    -- on what those emotional damages

3    were.

4        Q    Okay.

5        A    Those begin on page 27, item --

6    paragraph 156.

7        Q    And I want to ask you just about one of

8    these questions.  So it says -- 156(f), it says,

9    "constant fear during the criminal investigation

10   that he would be indicted as an insider threat or

11   somehow violating espionage statutes."

12       A    Yes, ma'am.

13       Q    Did -- at any point, did you believe

14   that you had violated any espionage statutes?

15       A    Yes.  The OSI agent attempted to

16   convince me that I had violated some sort of

17   statutes like this and that my indictment was

18   imminent, which was terrifying.

19       Q    Did Agent Beall call you an insider

20   threat at any point during your meeting with him?

21       A    He said I was being accused of an -- as

22   an insider threat.

Page 328

1          Q    Accused.  Okay.  And he didn't name who

2     was accusing you?

3          A    He would not answer.

4          Q    Okay.

5          A    So for more than a year, until I got a

6     phone call from Dan Brown saying that the

7     investigation was over, I spent a year under the

8     belief that I was imminently going to be indicted

9     for some false claim, which is why I then felt I

10    needed to file a lawsuit to clear my name,

11    because I knew that I had done nothing wrong.

12         Q    Okay.  For --

13         A    I take allegations like this very

14    seriously given the type of work that I do for

15    this country.

16         Q    And, also, they're serious allegations,

17    so I get it.

18         A    Not only are they serious allegations.

19    The type of work that I do is -- it carries with

20    it grave damage for this country.

21         Q    In section (e), just a quick question.

22    It talks about regular sleepless nights pondering

Page 345

1                  CERTIFICATE OF NOTARY PUBLIC

2            I, ERICK M. THACKER, the officer before whom

3        the foregoing deposition was taken, do hereby

4        certify that the witness whose testimony appears

5        in the foregoing deposition was duly sworn by me;

6        that the testimony of said witness was taken by

7        me in stenotype and thereafter reduced to

8        typewriting under my direction; that said

9        deposition is a true record of the testimony

10       given by said witness; that I am neither counsel

11       for, related to, nor employed by any of the

12       parties to the action in which this deposition

13       was taken; and, further, that I am not a relative

14       or employee of any counsel or attorney employed

15       by the parties hereto, nor financially or

16       otherwise interested in the outcome of this

17       action.

18                      ERICK M. THACKER

19               Notary Public in and for the

20                    District of Columbia

21       My commission expires:

22       June 30, 2029