*AB Litigation Services*

```
        IN THE UNITED STATES DISTRICT COURT
             WESTERN DISTRICT OF TEXAS
                SAN ANTONIO DIVISION

Case No. 5:22-CV-00869-JKP-HJB
_____

            REMOTE VIDEO RULE 30(b)(6)
              DEPOSITION OF AFLCMC#4
            BY DESIGNEE JARED EKHOLM
                    May 7, 2025
_____

DR. JOHN ROE,

Plaintiff,

vs.

UNITED STATES OF AMERICA, et al.,

Defendants.
_____

APPEARANCES:

    ALLEN VELLONE WOLF HELFRICH & FACTOR, P.C.
        By Jason R. Wareham, Esq.
           1600 Stout Street, Suite 1900
           Denver, Colorado 80202
           303.534.4499
           jwareham@allen-vellone.com
            Appearing remotely on behalf of
            Plaintiff

    HENDLEY & HODGES LAW, PLLC
        By John W. Hodges, Jr., Esq.
           4594 US Highway 281 N
           Spring Branch, Texas 78070
           210.714.0924
           john@hhtx.law
            Appearing remotely on behalf of
            Plaintiff
```

DEFENDANT'S EXHIBIT
**3**

*AB Litigation Services*

```
 1                P R O C E E D I N G S
 2            THE VIDEOGRAPHER:  Okay.  We're on the
 3   record this morning at 12:02 Eastern Time, 10:02
 4   Mountain Time.  Today is Wednesday, May 7th, 2025.
 5   This begins the 30(b)(6) deposition of Air Force Life
 6   Cycle Management Center No. 4, whose designee is
 7   Colonel Jared Ekholm, taken in the matter of Roe
 8   versus United States of America, et al.
 9            This deposition is being recorded via Zoom
10   videoconferencing.  The court reporter is Teresa
11   Cardenas.  The videographer is Dan Schmitz.  Counsel
12   will introduce themselves and the parties they
13   represent beginning with plaintiff's counsel first.
14            MR. WAREHAM:  Hi, I'm Jason Wareham.  I'm
15   lead counsel in this matter for plaintiff.  I'm
16   joined along with John Hodges and then my paralegal
17   Rebecca Bradshaw.
18            MS. SEEMAN:  Good afternoon.  This is
19   Katrina Seeman joined by Robert Green and Joseph
20   Gonzalez on behalf of the government defendants.
21                      JARED EKHOLM,
22   having been first duly sworn to state the whole
23   truth, testified as follows:
24                       EXAMINATION
25   BY MR. WAREHAM:
```

```
 1        Q      Okay.  Great.  All right.  Well, the first
 2   few sets of questions are going to be pretty broad,
 3   but we'll -- we'll kind of work through it.  And the
 4   first question I'm going to is No. 1 on our sheet,
 5   which is the comprehensive overview of HNCO's
 6   organizational structure, functions,
 7   responsibilities, and reporting lines regarding cyber
 8   programs, security clearances, and contractor
 9   oversight.  Are you prepared to answer questions
10   about that today?
11        A      I am prepared.
12        Q      Okay.  So can you -- and for your clarity
13   and clarity of the record, I use HNCO and Air Force
14   Life Cycle Management Center somewhat
15   interchangeably.  I think I -- I prefer HNCO just
16   because the other one is quite a, you know, mouthful.
17               Can you just give a high-level overview of
18   HNCO's organizational structure, what command they
19   fall under, how it's organized within the office, and
20   the like, and -- and I'll ask follow-up questions
21   after that.
22        A      Yeah, I'll be happy to -- to eliminate
23   that one for you.  And so what I will be talking to
24   is the agency organization at the time of this event.
25   And if it has changed, I'm not aware of those.
```

```
 1      Q    Okay, great.
 2      A    So during the event, HNCO was largely
 3  organized into -- into a matrix organization.
 4  Internally, we had several different branches.  They
 5  were platforms, access, payloads, and then a fourth
 6  one called black label.  Each one of those was
 7  basically charged with functions of developing,
 8  acquiring, and fielding and sustaining separate
 9  weapon systems through those.
10           When you looked at -- we also had other
11  organizations that were matrixed in.  Those included
12  finance, security, contracting, administration, and
13  portfolio management.  These functions serve more
14  broad-based and would serve those four ones I
15  previously mentioned across.
16           Outside external kind of leadership, most
17  of our administrative and acquisition functions were
18  governed by AFLCMC and all of those chains through
19  the Air Force.  We also had several other reporting
20  channels that included our requirements that we got
21  to which capabilities we were being asked to field.
22  Those largely came from air combat command who owned
23  the authorities to tell us which requirements that
24  the Air Force needed, as well as to give us your
25  funding allocations to what we could spend
```

```
 1   resource-wise on those specific efforts.  So we
 2   would -- we would report elements such as what
 3   capabilities were being developed, the cost of those,
 4   as well as fielding dates to that organization.
 5              Tangentially to that, AQL also served as a
 6   requirement of funding authority for us, more focused
 7   on the SAP and classified programs.  Not wholly, but
 8   they certainly focused more on that area.  They would
 9   also provide us requirements as well as funding to go
10   after those specific activities.  So those broader
11   levels, that's what we really -- kind of how the
12   agency was organized at the time frame.
13              When it came down to specific contractor
14   oversight, that was mainly managed by our contracting
15   officer representatives as assigned, as well as the
16   warranted contracting officers and their team.  To
17   make sure that the contracts AFLCMC had, in fact,
18   awarded or the Air Force awarded, basically the --
19   the contract and the work that was being done was in
20   accordance with the contract itself.
21       Q    Okay.  That was a very helpful answer.
22   I'm going to check on one thing.
23              MR. WAREHAM:  Court reporter, are you able
24   to get everything down with the speed he's currently
25   talking?
```

```
 1   onboard it and certify it for the weapon systems.
 2        Q    Okay.  Well, very helpful.  Thanks.
 3             So can you help me understand the
 4   internal -- and this might not be a term that's
 5   perfect for you, so if you want to change it, feel
 6   free, but the internal chain of command of HNCO for,
 7   like, oversight and supervision?  How is that
 8   organized?
 9             MS. SEEMAN:  Objection to form.  You can
10   answer.  Go ahead.
11             THE DEPONENT:  Okay.
12        A    Yeah, so internal oversight would have
13   been those four areas were all -- there was a person
14   appointed to each one of those, and they would have
15   reported directly to me for basically authority of
16   what they were looking at and what they were doing.
17             We also had additional ones that were
18   stepping out of there mainly for referrals and
19   recommendations.  That's where ACC, AQL, and all of
20   our other partners would have been participants as
21   well.
22        Q    Okay. And at the time of this -- this
23   incident -- and let's just assume that I -- that's
24   always what I'm asking for time period is this time
25   period.  Who was in the highest level of command of
```

```
 1   HNCO?
 2        A      That would be myself.
 3        Q      And what was your billet description or
 4   title?
 5        A      I would have been the material leader of
 6   HNCO.
 7        Q      Okay.  Did you have special court martial
 8   convening authority?
 9        A      I'm sorry.  Can you repeat the question?
10        Q      Did you have special court martial
11   convening authority?
12        A      No, I did not.  A material leader does not
13   contain G series orders, so I do not have court
14   martial authority.
15        Q      Got it.  So -- and forgive me.  I was in
16   the Marine Corps a long time, and sometimes Air Force
17   translation can be a little different.
18               Is it fair to describe your role as, like,
19   section head or -- or -- I mean, I guess contrast for
20   me the commander's role versus your role in HNCO, if
21   that's a better question?
22               MS. SEEMAN:  Objection to form.  You can
23   answer.
24               THE DEPONENT:  Okay.
25        A      Yeah, so that -- that was -- that's a good
```

1  distinction.  So I would have been in charge of the
2  acquisition elements of this to ensure we're meeting
3  the requirements in the funding profiles and we're
4  executing contracts to according to where they need
5  to know.
6           I believe you're looking for -- if we had
7  actually investigation on terms of G series orders,
8  that would actually be handled through AFLCMC.  The
9  commander there, in fact, does have G series orders,
10 and they would be the ones to be able to instill
11 that.
12     Q    Okay.
13     A    That authority is often delegated down to
14 a separate individual that governs multiple branches
15 that was outside of our chain.
16     Q    Got it.  Okay.  So on the day to day as
17 the material leader, who reported directly to you as
18 material leader?
19     A    That would have been any number of
20 individuals within HNCO, the four branch chiefs
21 specifically and a number of civilians as well.
22     Q    So that's -- that's where I wanted to go
23 is -- is -- so what level of -- what level of
24 personnel is below you by billet title?
25     A    Branch chiefs.

```
 1   and timeline regarding HNCO's referral of allegations
 2   against Dr. Roe -- you know, for understanding
 3   purposes that -- that also means Dr. Royston.  From
 4   Dr. Roe to OSI, including all communications,
 5   instructions, and formal or informal coordination.
 6   Are you prepared to answer that question?
 7        A    I am prepared, yes.
 8        Q    Okay.  Can you start with a narrative and
 9   timeline regarding HNCO's referral of allegations
10   against Dr. Roe.
11        A    Yeah.  So the first one would have been --
12   one of the documents that we have dated 8/19/2020
13   would have been the first one.  We would have started
14   encouraging -- or encountering with AFOSI due to some
15   peculiarities that we started noticing or questions
16   that we had at our level.  And we would have been
17   seeking AFOSI's guidance and expertise in what we
18   should do next.
19        Q    And do you have that document you
20   referenced in front of you?
21        A    I do.
22        Q    What is the little number in the bottom
23   right-hand corner?
24        A    The last three is 276.
25        Q    Okay.  So was that, to your knowledge,
```

```
 1   the -- the first communication in the timeline
 2   regarding allegations made against Dr. Roe?
 3        A     Yes.
 4        Q     Okay.  Where did it go from there?  What
 5   was next?
 6        A     The next would have been -- Major McVeigh
 7   would have drafted that MFR that was asked for in
 8   this memo to begin capturing all of the events
 9   that -- and incidences that we knew at the time so we
10   could have a body of evidence.
11        Q     When you say "Major McVeigh," just for
12   clarity of the record, at the time he was Captain
13   McVeigh?
14        A     Yes.  Yes.
15        Q     And help me understand where he fit within
16   the described complaint escalation situation, right,
17   the -- what we just described.  Help me understand
18   how he -- how his involvement would be -- fit within
19   what we described earlier.
20        A     Yeah, so Major McVeigh would have been my
21   single focal point at our level for all staff-level
22   programs.  He would have been primary interface back
23   to AQL to make sure that HNCO was pulling together
24   all of the specific documentation that AQL would
25   require.
```

1      But things within his scope would have
2 been making sure we had accurate tracking of all the
3 projects and programs we were administering for AQL
4 at the SAP level.  All of the funding profiles that
5 we were doing, he would have been the one building
6 those for ultimate presentation back to AQL to make
7 sure we were executing things in accordance with what
8 AQL was wanting to be delivered and the funding that
9 they were provided.
10     He was also, as with all military officers
11 and everybody assigned there, asked to always look
12 out for any kind of security, fraud, waste and abuse
13 instances and be able to report those as anybody
14 noticed.
15     Q    And as I understand it, in the narrative
16 of the allegations, Captain McVeigh was the initial
17 accuser?
18     A    He would have been the ones to -- to first
19 highlight the concern.
20     Q    Okay.  And, yet, it was also his role
21 to -- to, like, develop and file the memorandum for
22 record?
23          MS. SEEMAN:  Objection to form.
24          You can answer.
25     A    Yes.

```
 1      Q      (BY MR. WAREHAM)  Is it common in that
 2   process to have both -- actually, I'm going back --
 3   for clarity, I'm going back now to --
 4           MS. SEEMAN:  Back to 7?  Thank you.
 5           MR. WAREHAM:  Yeah.
 6      Q      (BY MR. WAREHAM)  Is it common in that
 7   process to have -- I'm going to use the term accuser,
 8   it makes sense to me; but however you want to think
 9   of it -- the initial accuser also be the one to do
10   the memorandum for record?
11           MS. SEEMAN:  Objection to form.
12           You can answer.
13      A      Yes, I would like the accuser, the person
14   to -- who is noticing these -- these facts that are
15   on the ground that we have to be able to write those
16   up for -- for later adjudication by myself or other
17   authorities.
18      Q      (BY MR. WAREHAM)  And so apologies if I
19   read into something or I misunderstood earlier, so I
20   just want to clarify the process a little more.
21           I understood kind of the reporting or the
22   handling of complaints to be handled at, like, the
23   next level of leadership from where the complaint
24   was.  So can you tell me -- I want to ask this
25   question better.
```

```
 1             Can you tell me if there was -- if the
 2   process included analysis of complaints by somebody
 3   above the person that was -- that was actually making
 4   the complaint?
 5        A    Yes, that would occur.
 6        Q    Okay.  And did that occur here, going back
 7   to 9.
 8        A    Yes, it did.  When I was notified of the
 9   MFR, that's when I appointed a Rich Bremer to look
10   into this matter further to gain an unbiased opinion
11   of what was going on.
12        Q    All right.  And so going back, again, to
13   9, the narrative and timeline.  So do you recall
14   the -- the narrative and timeline from when the first
15   day that Captain McVeigh, as you said, noticed
16   problems with Dr. Roe?
17        A    I'm just prepared to answer that first
18   time on the 8/19/2020.
19        Q    Okay.  You're not familiar -- I mean, is
20   there any reason to think that's not the first day he
21   noticed that?
22        A    Maybe in verbal correspondence back and
23   forth at some point.
24        Q    Okay.  But you don't have any recollection
25   of that?
```

1    A    That's correct.

2    Q    Okay. So it went from that first email to the MFR. What happened after the MFR and then what date was the next event?

5    A    So the next event that would have occurred would have been on Tuesday, August 25th, where I would have wanted to reach out and begin that secondary kind of look, that inquiry to make sure that we had an unbiased opinion and what facts we were going through. So that's when I would have reached out to a Mr. Robert Brown, who is actually the supervisor of Mr. Bremer, just ask for his permission to use one of his employees to conduct this little inquiry.

15    Q    And to your knowledge and preparation, were there any other communications occurring between these two written events?

18    A    No.

19    Q    So you don't recall having any oral communications with Captain McVeigh about this or the like?

22    A    I don't specifically recall dates and timelines for those.

24    Q    Do you know if they existed?

25    A    I definitely had a conversation with

```
 1   Major McVeigh as he was writing that MFR.
 2        Q      Okay.  Do you recall what that was?
 3               MS. SEEMAN:  Objection, form.
 4               You can answer.
 5        A      Can you specify on what "that" is?
 6        Q      (BY MR. WAREHAM)  The conversation you had
 7   with Mr. Major McVeigh, then Captain McVeigh, while
 8   he was doing his MFR?
 9        A      Yeah, he just would have come into my
10   office, and he would have been -- simply said, Hey,
11   I'm starting to notice these things.  Here's the
12   facts as I'm starting to see them.  And at that
13   point, I would have agreed, like, Yes, this is --
14   this is time to elevate.  This is something I want to
15   be engaged with, so please start capturing all this
16   information in the memorandum for record so we can
17   move forward.
18        Q      All right.  And did you have any
19   communication with anyone above your level as to this
20   incident?
21        A      That information is outside the scope of
22   my preparation.
23        Q      Do you recollect any communications
24   relating to contacting the COTR on this?
25        A      Can you repeat the name?
```

```
 1      Q      The COTR, so the -- the -- the contracting
 2   technical representative.
 3      A      Oh, the COTR.  Yes.
 4      Q      COTR.  Sorry.
 5      A      No, I do not.
 6      Q      Okay.  Okay.  So after -- going back to
 7   the timeline, after the -- the last event you
 8   described, were there any other additional events in
 9   the timeline relevant to this issue?
10      A      So the next couple of events would have
11   been officially assigning or requesting that
12   Mr. Bremer conduct this inquiry on my behalf.
13      Q      And what -- were there any other attendant
14   communications that you're aware of related to that
15   event?
16      A      No.
17      Q      What event occurred after the -- the last
18   event you described and on what date?
19      A      So the next event, after gaining
20   concurrence from Mr. Brown that it was okay to use
21   Mr. Bremer as a resource, I would have officially
22   appointed Mr. Bremer to conduct this investigation or
23   inquiry, and it would have been on 25 August 2020.
24      Q      And do you have both of those
25   correspondence for those events in front of you?
```

1       A       Yes, I do.

2       Q       Can you tell me what the number is in the
3   bottom right-hand corner for each?

4       A       The MFR requesting Mr. Bremer as the
5   appointment of inquiry official is No. 741.

6       Q       And the next one?

7       A       The next one would have been Mr. Brown
8   basically concurring -- this would have actually
9   happened beforehand on the 25th of August -- to make
10  sure that he, in fact, concurred that it was eligible
11  for me to use Mr. Bremer in this capacity.

12      Q       All right.  What was the next event in the
13  chain of title relevant to this issue?

14      A       The next event would have been the -- the
15  letter of -- from Mr. Bremer basically requesting
16  additional time to complete his inquiry.

17      Q       Okay.  And do you have that for me?

18      A       Yes, Mr. Bremer would have sent that to me
19  on 9/9/2020.

20      Q       And what is the bottom right-hand number
21  for that event or that document?

22      A       7 -- it is 745.

23      Q       Okay.  All right.  What's the next event
24  in the timeline that occurred?

25      A       The next event in the timeline would have

```
 1   have actually been Mr. Bremer submitting his report
 2   from his inquiry.  It would have occurred on
 3   9/22/2020.  And the number for that one is 744.
 4        Q     Okay.  All right.  Then what was the next
 5   event after that?
 6        A     The letter we would have received from
 7   Mr. Bremer, it indicated that there was no -- no
 8   compromise of information at this point.  Everything
 9   had been done in accordance with our policies and
10   procedures, and he offered no corrective actions at
11   the time.  So no further actions would have been
12   done.
13        Q     Okay.  But there was an event in this
14   timeline where Dr. Roe was read out of the program.
15   Are you familiar with that event?
16        A     Yes, I am.
17        Q     When did that occur?
18        A     He was officially read out on 08/26/2020.
19        Q     Okay.  And what is -- well, were there any
20   other relevant events between the -- the -- his
21   report and Dr. Roe being read out?
22        A     Yes.  The two other events that we would
23   have been informed of is one is the prime contractor
24   had terminated his -- his subcontract, so he no
25   longer had a contract -- or the -- the government no
```

1    longer had a reason to keep him read in for that
2    purposes.  And he had also been read out -- or he had
3    resigned from NSA at the time.
4         Q     All right.  Any other events that we have
5    yet to cover?
6         A     Not to my knowledge.
7         Q     Okay.  All right.  Was there any --
8    besides what we described, was there any other
9    additional formal or informal coordination that
10   occurred to your recollection relevant to this issue?
11        A     No.
12              MR. WAREHAM:  All right.  Well, we have
13   reached the point where I am now going to check in
14   with my team.  So if we could take ten minutes off
15   record, and I'll be right back, okay?
16              THE VIDEOGRAPHER:  Okay.  The time is
17   1:08 p.m. Eastern Time, 11:08 Mountain Time.  And
18   we're off the record.
19              (Recess taken, 11:08 a.m. to 11:17 a.m.)
20              THE VIDEOGRAPHER:  The time is 1:17 p.m.
21   Eastern Time, 11:17 a.m. Mountain Time.  And we're
22   back on the record.
23              MR. WAREHAM:  All right.  I don't actually
24   have any further questions.  So thank you very much.
25   Your -- your counsel may have some supplemental

```
 1   STATE OF COLORADO)
 2                   )  ss.    REPORTER'S CERTIFICATE
 3   COUNTY OF DENVER )
 4              I, Teresa L. Cardenas, do hereby certify
 5   that I am a Registered Professional Reporter and
 6   Certified Realtime Reporter within the State of
 7   Colorado; that previous to the commencement of the
 8   examination, the deponent was duly sworn to testify
 9   to the truth.
10              I further certify that this deposition was
11   taken in shorthand by me at the time and place herein
12   set forth, that it was thereafter reduced to
13   typewritten form, and that the foregoing constitutes
14   a true and correct transcript.
15              I further certify that I am not related to,
16   employed by, nor of counsel for any of the parties or
17   attorneys herein, nor otherwise interested in the
18   result of the within action.
19              In witness whereof, I have affixed my
20   signature this 19th day of May, 2025.
21
22                       [signature: Teresa L Cardenas]
                         Teresa L. Cardenas, CRR, RPR
23                       216 - 16th Street, Suite 600
                         Denver, Colorado  80202
24
25
```