1

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

DR. JOHN ROE,                    )
                                 )
          Plaintiff,             )
                                 )
VS.                              )         CIVIL ACTION
                                 ) NO. 5:22-CV-00869-JKP-HJB
UNITED STATES OF AMERICA,        )
et al.,                          )
                                 )
          Defendant.             )


------------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF DANIEL D.S. BROWN

MARCH 24, 2025

VOLUME 1

CONFIDENTIAL
------------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF DANIEL D.S.
BROWN, produced as a witness at the instance of the
PLAINTIFF, and duly sworn, was taken in the above-styled
and numbered cause on March 24, 2025, from 10:02 a.m. to
5:11 p.m., before Marta M. Johnson, CSR No. 10743, in
and for the State of Texas, reported by machine
shorthand, at the law offices of Hendley & Hodges Law
PLLC, 4594 US Highway 281 N, Spring Branch, Texas 78070,
pursuant to the Federal Rules of Civil Procedure, and
the provisions stated on the record or attached hereto.

DEFENDANT'S
EXHIBIT

**4**

6

```
 1   introduce themselves.
 2              MR. WAREHAM:  Yeah.  Apparently, AI wants
 3   us to know they're here.
 4              MR. HODGES:  Siri entering their
 5   appearance.
 6              MR. WAREHAM:  Exactly.  All right.  Lance,
 7   do you want to do that again?
 8              MR. HENRY:  Lance Henry.
 9              MR. SKINNER:  Good Afternoon,
10   Reginald Skinner, U.S. Department of Justice, for the
11   defendants.
12              MS. SEEMAN:  And Katrina Seeman, same.
13              MR. GREEN:  And Robert Green for the
14   defendants.
15              MR. BARRERA:  I'm Bobby Barrera for
16   Mr. Dan Brown individually, not a party to the
17   litigation.
18                   DANIEL D.S. BROWN,
19   having been first duly sworn, testified as follows:
20                      EXAMINATION
21   BY MR. WAREHAM:
22       Q.  All right.  Now, I'm not usually in this chair,
23   so do you guys usually give the long form instruction?
24   Like -- or is that -- where you guys are good?  Kind of
25   leave it up to me?  Okay.  Great.
```

12

1   employment?

2       A.  I'm an engineer -- or lead engineer for the

3   section in Air -- AFLCMC, Air Force Life Cycle

4   Management Center.

5       Q.  Okay.  And there's a term --

6                   MR. SKINNER:  I want to --

7                   MR. WAREHAM:  Go ahead.

8                   MR. SKINNER:  I want to object.  But I just

9   need to ask the witness to -- he has hands covering his

10  mouth.

11                  THE WITNESS:  Oh.

12                  MR. SKINNER:  So it makes it a little bit

13  difficult to make out everything he's saying.  So, you

14  know -- thank you, Mr. Brown.  I understand this is not

15  the most comfortable thing to be doing on a Monday

16  morning.  But, yeah, if you could just make sure that we

17  can hear everything that you're saying.  Thank you.

18                  MR. WAREHAM:  Yeah.

19                  MR. HODGES:  Reggie, are you having any --

20  this is John Hodges.  Are you having any trouble hearing

21  the witness?

22                  MR. SKINNER:  Not volumewise, you know.  I

23  can -- we can definitely hear him.

24                  MR. HODGES:  Okay.  Thank you.

25                  MR. SKINNER:  The volume is good.

Daniel D.S. Brown                                    CONFIDENTIAL TRANSCRIPT
March 24, 2025

18

1   for 90th?

2        A.   90th IOS, Information Operation Center.

3        Q.   Okay.  And how long did you do that?

4        A.   Oh, just what are -- I -- from -- ah, geez.

5   I'm not going to get the dates right.  2003 to 2013 or

6   so.  I'm not -- I'm not going to get the dates right.

7   And then I worked at AFCERT for about a year and then I

8   went to Life Cycle Management Center.

9        Q.   Okay.  And in the Air Force Life Cycle

10  Management Center, what -- did you have any role with

11  respect to hiring or contracting?

12       A.   At what?

13       Q.   Hiring or contracting.

14       A.   I'm an engineer, so I provide technical advice.

15       Q.   All right.  Have you ever been involved in

16  retaining contractors as part of that role?

17       A.   What do you mean?

18       Q.   Have you ever suggested that somebody present a

19  contract for contracting to Air Force Life Cycle

20  Management Center?

21            MR. SKINNER:  Object -- object to form.

22       Q.   (BY MR. WAREHAM)  Go ahead.

23       A.   Say it again.

24       Q.   Have you ever suggested that someone present a

25  contract to Air Force Life Cycle Management Center?

CONFIDENTIAL TRANSCRIPT

33

1  not a contract.  Maybe I'm misunderstanding your

2  question.  If you can rephrase it.

3              MR. WAREHAM:  Sure.

4      Q.  (BY MR. WAREHAM)  Did you ever -- did -- to

5  your knowledge, did Dr. Roe ever get a contract at Air

6  Force Life Cycle Management Center?

7      A.  No.

8      Q.  No?  He was never contracted to work there?

9      A.  It was an AFRL contract.

10     Q.  Say that again.

11     A.  It was an AFRL contract.

12     Q.  What is that?

13     A.  It's another agency in the Air Force.  It's not

14  a Life Cycle Management Center contract.

15     Q.  Okay.  Did he ever work at Air Force Life Cycle

16  Management Center?

17     A.  I -- I don't know.  That's, like, a loaded --

18  like, he didn't have a contract with -- I -- I don't

19  believe he had a contract with Life Cycle Management

20  Center.

21     Q.  Was he present in the spaces of Air Force Life

22  Cycle Management Center?

23     A.  He did have access to the building.

24     Q.  Okay.  Did you see him at Air Force Life Cycle

25  Management Center?

34

1      A.  Yes.

2      Q.  Did -- do you communicate with him as part of

3  Air Force Life Cycle Management Center?

4      A.  Yes.

5      Q.  Did he attend meetings as part of Air Force

6  Life Cycle Management Center?

7      A.  As part of -- I mean, he did attend meetings

8  for the project.

9      Q.  As part of Air Force Life Cycle Management

10  Center?

11      A.  I guess so.  I -- it's just, like, because his

12  contract's not with us, so --

13      Q.  Sure.

14      A.  -- I don't know how to phrase -- answer the

15  question.

16      Q.  So regardless of whose contract it was with,

17  like, the enabling agency, he -- he attended Air Force

18  Life Cycle Management Center meetings as a contractor?

19      A.  Yes.

20      Q.  And same with working in the spaces for Air

21  Force Life Cycle Management Center as a contractor?

22      A.  Yeah.

23      Q.  Did he ever at any point hold himself out to be

24  present in any of those spaces as an NSA employee?

25      A.  Yes.

Daniel D.S. Brown                                    CONFIDENTIAL TRANSCRIPT
March 24, 2025

35

1        Q.   When?

2        A.   I -- I don't know.

3        Q.   Before --

4        A.   In a lot of meetings.

5        Q.   All right.  And what do you recollect about

6   that specifically?

7        A.   I don't remember.

8        Q.   Okay.

9        A.   He -- he would -- yeah.

10       Q.   So you just answered rather conclusively --

11       A.   He was -- yeah.

12       Q.   -- yes, and then couldn't remember.  So can you

13   help me --

14       A.   You're asking me to remember each time that he

15   represented himself.  Like, how am I going to remember

16   that?

17       Q.   Do you remember a time when he did so?

18       A.   I guess the main date that's in the dep- -- in

19   the thing -- in the complaint or whatever it's called.

20   I don't know what it's called.

21       Q.   Okay.  The main date, do you know what date

22   that was?

23       A.   He was dual-hatted.  He had, like, a -- I don't

24   know.  He would -- he would go to some high-level

25   meetings as an NSA employee.

Daniel D.S. Brown                          CONFIDENTIAL TRANSCRIPT
March 24, 2025

36

1       Q.   Within Air Force Life Cycle Management Center?

2       A.   I don't even know what that means.  He was an

3   NSA employee.  He went to high-level meetings as an NSA

4   employee.

5       Q.   Were these the same meetings that the Air Force

6   Life Cycle Management Center was attending?

7       A.   No.

8       Q.   Okay.  So he would attend meetings as an NSA

9   employee, but not the Air Force Life Cycle Management

10  Center meetings?

11                  MR. SKINNER:  Object to form.

12                  THE WITNESS:  No.  He did -- he had

13  introduced himself as an NSA employee at some Life Cycle

14  Management Center meetings.

15      Q.   (BY MR. WAREHAM)  Okay.  So just referring to

16  the, quote, high-level meetings that you just referred

17  to, he was not --

18      A.   I wasn't at the high-level meetings.

19      Q.   Okay.  So you weren't -- didn't attend that?

20      A.   I was just told of the high-level meetings.

21      Q.   You were told about them?

22      A.   Yes.

23      Q.   Who were you told about them from?

24      A.   ███████    These are ████████ -- these are

25  meetings he attended in his NSA capacity.

Daniel D.S. Brown                                    CONFIDENTIAL TRANSCRIPT
March 24, 2025

93

1    understanding how much Captain McVeigh's authority has
2    been in this as a captain in the Air Force; right?
3                   And I -- if you can help me understand.
4         A.   Captains are in charge of a lot of things.
5         Q.   What -- what specifically was he in charge of?
6         A.   He was in charge of special projects.
7         Q.   Okay.  And when we say "special projects" --
8         A.   That was the name of the section.
9         Q.   Okay.  So he was the officer in charge of
10   special projects?
11        A.   Yeah.
12        Q.   Did he oversee contracts for special projects?
13        A.   I don't know.
14        Q.   Did he approve or disapprove funding for
15   special projects?
16        A.   I can't talk about that.
17        Q.   Okay.  Did he write performance evaluations for
18   special projects?
19        A.   I don't know.
20        Q.   Did he write your performance evaluation?
21        A.   No.
22        Q.   Did he write Dr. Roe's performance evaluation?
23        A.   Not that I'm aware of.
24        Q.   Did he have direct command authority over any
25   person in Air Force Life Cycle Management Center?

Daniel D.S. Brown                              CONFIDENTIAL TRANSCRIPT
March 24, 2025

                                                                    99

1       Q.  Did McVeigh ever discuss engaging OSI with

2   respect to Dr. Roe?

3       A.  I don't know McVeigh's discussion with OSI.

4       Q.  Did you ever observe McVeigh interact with

5   Agent Beal?

6       A.  Ever, I don't know.  But not about Roe.

7       Q.  Do you recall ever informing Dr. Roe that

8   Captain McVeigh was sharing his information all over the

9   office?

10      A.  No.

11      Q.  Do you recall --

12      A.  I --

13      Q.  -- any conversation --

14              Go ahead.

15      A.  No.  No.  No.

16              MR. SKINNER:  I -- if we can --

17              THE WITNESS:  No.

18              MR. SKINNER:  -- just try to keep it --

19   yeah.  Thank you.  But if we can keep the question and

20   answer format for our benefit, as well as the court

21   reporter's.

22              THE WITNESS:  I was not involved in that

23   investigation.  Like -- I'm, like -- I don't know

24   anything about the investigation.

25      Q.  (BY MR. WAREHAM)  Do you recall ever -- well --

101

1   speculation and then we'll unpack it.

2                    MR. SKINNER:  Object to form.

3                    THE WITNESS:  I -- that he was working in a

4   dual capacity.  They -- they just thought it was -- I

5   think they just overreacted because he was working in a

6   dual capacity.  Like, it's not uncommon for someone that

7   starts an idea to want to work on it.  I don't know,

8   like, why that was considered so bad.

9        Q.  (BY MR. WAREHAM)  And when you say "they

10  overreacted," who was that?

11       A.  I think McVeigh.

12       Q.  All right.  Were you ever instructed not to

13  talk to Dr. Roe?

14       A.  I don't -- I don't know.  I don't think so.

15       Q.  Were you ever instructed not to talk to Dr. Roe

16  for a year?

17       A.  I don't believe so.

18       Q.  What do you recall about any comments about

19  Dr. Roe after he was read out?

20       A.  They were -- they were mainly mistrusting of

21  him because he was working in a dual capacity.  And then

22  it got worse because they asked for, like -- they --

23  they wanted to get proof from his employer, his NSA

24  employer, that NSA had sanctioned him working in the

25  dual capacity.  And when they did not get -- I believe

Daniel D.S. Brown                                    CONFIDENTIAL TRANSCRIPT
March 24, 2025

102

1   they did not get -- they were not -- we were -- they did

2   not get the complete unredacted email, that made them

3   even more suspicious.  And then I think he -- around

4   this time he quit NSA, and that made it even worse.

5       Q.  Why did that make it worse?

6       A.  Because it was just the timing of it.  I -- I

7   don't remember exactly when he quit, though.

8       Q.  What do you recollect people saying about...

9       A.  It just -- I mean, it just put him in a bad

10  light.

11      Q.  According to who?

12      A.  I mean, I just -- I mean -- I mean, to everyone

13  it would look bad.  I mean, like -- I don't know.  I

14  just -- I just thought it didn't look good either.

15      Q.  Are you aware if Dr. Roe was ever given a

16  debarment order?

17      A.  No.

18      Q.  You're not aware or he wasn't?

19      A.  I'm not aware of that.

20      Q.  Are you aware if Dr. Roe was ever given a

21  hearing on --

22      A.  I have no --

23      Q.  -- a debarment?

24      A.  -- I have no idea.

25      Q.  Were you ever informed of why -- did anybody

CONFIDENTIAL TRANSCRIPT

103

1  ever tell you why they wanted to exclude Dr. Roe from

2  HNCO?

3              MR. SKINNER:  Object to -- object to form.

4              THE WITNESS:  I don't remember, like, them

5  saying anything about excluding him specifically.  They

6  just were mistrusting of him because of what I just

7  described.

8      Q.  (BY MR. WAREHAM)  But he was eventually read

9  out; right?  It wasn't just a mistrust?

10      A.  That's OSI's jurisdiction.

11      Q.  OSI has jurisdiction over who is read in and

12  who is read out?

13      A.  I mean, like, they're one of the key people.

14      Q.  Are they classification authorities for these

15  projects?

16      A.  I don't know.  I mean, I -- maybe.  I don't

17  know.  I don't know.

18      Q.  Do you recall having a conversation with

19  Dr. Roe in January of 2023 relevant to his work at

20  Leidos?

21      A.  He presented -- he presented -- I'm not sure of

22  the specifics, but he did provide a demo.

23      Q.  In January 2023?

24      A.  I think it was later in April.

25      Q.  In April 2023?

Daniel D.S. Brown
March 24, 2025

CONFIDENTIAL TRANSCRIPT

104

1      A.   Around there somewhere.  I -- I don't remember

2   the exact dates, but there was a demo that he provided.

3      Q.   Between January and April 2023, do you recall

4   ever informing members of Leidos that, quote, "Dr. Roe

5   could not be present at Leidos Cyber AI briefings due to

6   events at HNCO"?

7      A.   I -- I wouldn't characterize it like that.

8      Q.   How would you characterize it?

9      A.   That it probably wouldn't be, like -- I don't

10  know.  I don't remember exactly, but I wouldn't

11  characterize it like that.  It probably wouldn't be,

12  like, maybe good optically, I guess.

13     Q.   Why?

14     A.   Because of everything that happened.

15     Q.   Do you recall ever having conversation with a

16  Mr. Todd Jasper saying that --

17     A.   I -- I've talked to him.

18     Q.   Okay.

19               -- saying that Dr. Roe can't be in the room

20  when he -- when presenting on Leidos topics?

21     A.   I don't -- I don't recall that, but he was in

22  the room presenting Leidos stuff in --

23     Q.   What?

24     A.   -- demo in April.

25     Q.   Was he in the room --

Daniel D.S. Brown
March 24, 2025

CONFIDENTIAL TRANSCRIPT

105

1      A.   He provided -- he provided the demo on telcon.

2      Q.   Was he in the room in the January 2023 meeting?

3      A.   I don't remember a meeting in January 2023.

4      Q.   Do you remember a meeting in March 2023?

5      A.   There might have been a meet -- a demo

6  possibly, in March.

7      Q.   Do you recall him presenting?

8      A.   No.  But he did present in April of -- I -- I

9  believe.  He did present a -- I'm pretty sure he

10 presented, but I believe it's in April of 2023.

11     Q.   Do you recall ever informing --

12     A.   And that -- that did not garner any attention.

13     Q.   Okay.

14     A.   And it -- and I was -- I -- I -- it was -- it

15 was described to me earlier by, I believe, Todd about

16 the technologies.  And when it was presented, it did not

17 live up to its claims.

18     Q.   Do you recall ever making the statement

19 "Dr. Roe cannot associate his name with Leidos Cyber AI

20 products"?

21     A.   No.

22     Q.   Do you ever remember --

23     A.   He -- he actually presented, though.

24     Q.   Do you ever recall making a communication that

25 was similar in substance?

119

1    Q.  Okay.  All right.  So from Paragraph 9, what

2  was downward into the complaint, Exhibit 1, what other

3  areas did you identify as exaggerative in nature?

4    A.  I mean, a lot of this is just, like -- a lot of

5  this is just, like, hyperbole.  But, like, I'm just

6  focusing on the stuff that's related to me --

7    Q.  Sure.

8    A.  -- or what you're saying that I know.

9    Q.  So to be clear, I'm not saying you know

10  anything.  I'm -- this is an inquiry to understand what

11  you do know.  And so there's not really a wrong answer

12  here.

13    A.  I mean, some of them in here you're saying I'm

14  -- I've said something.  Like, later on it goes into it.

15    Q.  All right.  What is the next area you can

16  identify as something, as you've described, exaggerated

17  or lies or whatever words you used to describe it?

18    A.  Page 14, it's 61.  I don't know of any

19  permanent bar from ever acting as a contract consultant.

20    Q.  Okay.  Meaning, have you ever seen any

21  documentation related to a debarment?

22    A.  I haven't -- I don't know of any bar in any way

23  from him permanently being barred.

24    Q.  Okay.  What is the next area?

25    A.  Page 16, bullet 78.  I don't remember asking

145

1  it because I had too much work.

2      Q.  (BY MR. WAREHAM)  Why did Captain McVeigh

3  suggest that it was your responsibility to have that

4  email?

5              MR. SKINNER:  Objection.  Object to form.

6  Objection, speculation.

7              THE WITNESS:  Because he was working in a

8  dual-hat capacity.

9      Q.  (BY MR. WAREHAM)  But why did -- you just said

10  Captain McVeigh thought you needed to have that due

11  diligence done.  Do you remember saying that?

12      A.  (Witness nods affirmatively.)

13      Q.  Why did Captain McVeigh tell you that you

14  needed to have that?

15              MR. SKINNER:  Objection to form.

16              THE WITNESS:  Because I guess I was on the

17  project longer than he was.

18      Q.  (BY MR. WAREHAM)  Did you have authority over

19  the project?

20      A.  I'm only an engineer.  I don't have PM

21  responsibilities or authority.

22      Q.  So did you have any authority on the project

23  whatsoever?

24      A.  Again, I'm an engineer.  I've -- I offer

25  technical advice.  That's my position description.

Daniel D.S. Brown
March 24, 2025                           CONFIDENTIAL TRANSCRIPT

                                                                146

1       Q.  Is your answer, then, "no" to that question?

2       A.  What was the question?

3       Q.  Did you have authority over the projects as an

4    engineer?

5       A.  I don't know.  It's, like, a broad term.  Like,

6    I have to answer precisely.

7       Q.  Did you supervise personnel?

8       A.  No.

9       Q.  Did you write fitness reports?

10      A.  No.

11      Q.  Did you write evaluation reports for civilians?

12      A.  No.

13      Q.  Did you sign contracts?

14      A.  No.

15      Q.  Did you vet contractors?

16      A.  Did I vet contractors?  No.

17      Q.  Did you recommend contractors to positions?

18      A.  No.

19      Q.  So when you say it is confusing to you when I

20   asked, did you have authority over the projects, what

21   authorities did you have, if not those?

22      A.  I just -- I provided technical advice, I guess,

23   so that wouldn't be an authority.

24      Q.  So why would a technical advisor need to have

25   the NSA email?

147

1    A.   That's my position.  I -- that was my position;
2  his position was different.
3    Q.   When you say it was different, what was his
4  position?
5    A.   His position was that I should have made sure
6  from NSA that he could work in a dual-hat capacity.
7    Q.   Because you'd been around longer?
8    A.   I guess, yeah.  I mean, that was his position.
9  Like, I don't know how many times -- his position was
10  that I should have done due diligence.  My position was,
11  it wasn't -- it's not my role to do that.
12    Q.   And when was this conversation?
13    A.   Around that day, August 13, I think.
14    Q.   All right.  What is the next paragraph that you
15  take umbrage with?
16    A.   Oh, my gosh.  What were we on, 132?
17    Q.   I believe so, or around there.
18    A.   136, I don't remember saying this.
19    Q.   You don't remember that conversation?
20    A.   Correct.
21         137, I don't remember this.  I remember
22  that Todd said that they were doing cool work.  Like,
23  this -- this next -- this next set of -- page 25, I
24  remember Todd saying that they were doing -- they were
25  doing cool work because -- but then when it was demoed

Daniel D.S. Brown
March 24, 2025

CONFIDENTIAL TRANSCRIPT

148

1  in April, it did not live up to expectations and it was

2  not -- it was not considered that great.

3      Q.  So you do recall making the statement "Let me

4  know when the tools are ready"?

5      A.  No.

6      Q.  Okay.  What was the next paragraph?

7      A.  139.

8      Q.  And what is the issue with that paragraph?

9      A.  I thought it was bad optics if -- if Roe were

10  to present it, I guess.

11      Q.  All right.  And because you don't remember

12  making that statement --

13      A.  What?

14      Q.  -- or you did not make that statement?

15      A.  I don't remember.  I just -- I would think -- I

16  would think it would be bad optics if he presented.

17      Q.  Would it be possible that you made that

18  statement?

19              MR. SKINNER:  Object -- objection, form.

20              THE WITNESS:  I don't remember making that

21  statement.

22      Q.  (BY MR. WAREHAM)  But you can't conclusively

23  say you did not?

24              MR. SKINNER:  Objection to form.

25              THE WITNESS:  I -- I -- yeah.  I don't

149

1  think I did, but I -- I can't remember.

2       Q.  (BY MR. WAREHAM)  Okay.  The next part.

3               MR. SKINNER:  Sorry.  What was the

4  question?  You mumbled.

5       Q.  (BY MR. WAREHAM)  I said, the next part.

6       A.  Same thing for 140.

7       Q.  You don't remember making that statement or you

8  did not make?

9       A.  I don't remember making that statement.

10      Q.  Okay.

11      A.  And I -- I would just think it would be bad

12  optics.  I don't think I would make that statement.

13      Q.  Okay.  The next one.

14      A.  141, same thing.

15      Q.  You don't remember?

16      A.  I just want to point out, like -- like, Todd

17  kept describing that these tools were cool, but it

18  would -- did -- did not go anywhere near what his claims

19  were.

20      Q.  So usefulness of the tools is not really my

21  focus.  My focus is, did you ever show -- did you make

22  that statement, one -- in 141?

23      A.  I don't -- I don't remember making that

24  statement.

25      Q.  Okay.  And to be clear, you -- you don't

150

1   remember, not that you didn't make that statement?

2       A.  I -- I mean, I -- how can I say I didn't make

3   the statement if I don't remember?

4       Q.  Are you uncertain or are you sure you didn't

5   make that statement?

6       A.  I don't remember making the statement.

7       Q.  Okay.  Next one.

8       A.  142.

9       Q.  And what -- what about that one?

10      A.  I would never say it like -- I would never say

11  this stuff.  For classified TS -- I would never say that

12  stuff.

13      Q.  Okay.  And, like, which part wouldn't you have

14  said?

15      A.  Talking about classified stuff.  I would never

16  say that.

17      Q.  Well, you do agree that you can label something

18  classified to --

19      A.  I would never -- I would never say something

20  the way it's phrased here.

21      Q.  How would you have said it?

22      A.  I -- I would -- I wouldn't have said any --

23  like, the most I would have asked for is a demo.

24  Because people say stuff all the time that aren't true.

25  Like, it's the number one thing with contractors.  They

154

1      Q.  Were you in the new location in 2023?

2      A.  No.

3      Q.  It was the old location?

4      A.  Yeah.

5      Q.  And what was your extension?

6      A.  I don't know.

7      Q.  You don't recall your phone extension?

8      A.  No.

9      Q.  All right.  What next portion of the complaint

10  do you take exception with?

11      A.  I don't remember 143, but it could happen.  I

12  don't remember 144.

13      Q.  But could it have happened?

14             MR. SKINNER:  Object to form.

15             THE WITNESS:  It's just -- again, it's the

16  bad light.

17      Q.  (BY MR. WAREHAM)  What do you mean by bad

18  light?

19      A.  I mean, just bad optics.

20      Q.  When you say "bad optics," you mean your

21  communications that Dr. Roe being involved was bad

22  optics.  Is that what you mean?

23      A.  I mean, like -- it's just -- it would be bad

24  optics if he was, like, demonstrating the stuff.

25      Q.  All right.  And what's next?

Daniel D.S. Brown                                    CONFIDENTIAL TRANSCRIPT
March 24, 2025

155

1      A.  I don't know about any debarment.

2      Q.  All right.  That's 145?

3      A.  Yeah.

4      Q.  Okay.  How about after that?

5      A.  146, I don't know anything about debarment.

6      Q.  Do you know if whether -- whether or not at

7  this moment Dr. Roe is allowed to enter HNCO?

8      A.  I'm sure he's allowed to enter HNCO.

9      Q.  Okay.  And he's -- have you seen him do so

10  since August of 2020?

11      A.  No.

12      Q.  All right.  How about the next part?

13      A.  149, I don't think that's true.  I don't know

14  if it's true.  I don't think it is.

15      Q.  Okay.  How about the next?

16      A.  150, I don't think he was permanently

17  prohibited at all.

18      Q.  All right.  How about after that?

19      A.  152, I don't think he's debared from any work.

20      Q.  Would you be involved in a debarment process at

21  Air Force Life Cycle Management Center?

22      A.  No.

23      Q.  So you wouldn't have reason to know if one had

24  been started or not?

25      A.  I'm sure someone would have said something, but

156

1    I -- that's just -- this is, like, I would find that

2    very, very unlikely.  Like, this is -- I -- yeah.  I

3    would just find it very unlikely.

4         Q.   Okay.  Next.

5         A.   153, that doesn't sound right.

6         Q.   What doesn't sound right about it?

7         A.   "But is not allowed to walk across the street

8    and enter another office."  Again, he was -- he briefed

9    their -- he briefed their technology in April.

10        Q.   Is it accurate that they're somewhat co-located

11   physically?

12        A.   What?

13        Q.   The two offices.

14        A.   I guess Leidos is across the street.

15        Q.   Yeah.

16             To be clear, when you say "there," you

17   meant Leidos?

18        A.   Their offices, I thought you meant HNCO

19   offices.  "But is not allowed to walk across the street

20   and enter their offices."

21        Q.   Just when you said just now "their tech, they

22   briefed their tech" --

23        A.   Oh.

24        Q.   -- you meant Leidos?

25        A.   Yeah.

157

1       Q.  Yeah.

2               And Leidos and HNCO are co-located?

3       A.  I mean, the one's across the street from the

4   other.

5       Q.  Yeah.  Okay.  Next part.

6       A.  I don't know about any of this debarment stuff,

7   again.

8       Q.  Okay.

9               MR. SKINNER:  What paragraph are we looking

10  at?

11              MR. WAREHAM:  Say again, Reggie?  Sorry.  I

12  didn't hear you.

13              MR. SKINNER:  I didn't hear him refer to a

14  specific paragraph.  Did he mention a specific

15  paragraph?

16              MR. WAREHAM:  No, he didn't.

17              THE WITNESS:  I was --

18              MR. WAREHAM:  He said he didn't know

19  anything about this debarment stuff.

20              THE WITNESS:  Page 29.

21              MR. WAREHAM:  Yeah.

22              THE WITNESS:  172, I don't think that he

23  was characterized as a scam or fraudulent.

24      Q.  (BY MR. WAREHAM)  Okay.

25      A.  173, I don't know about debarment.  175, I

158

1    don't know about any scam or scam artist or fraud.  They

2    were, again, worried about him being dual hat.

3         Q.  Do you know what the core offense of somebody

4    being dual hat is called under the statutes?

5         A.  No.  They were worried about a conflict of

6    interest.

7         Q.  All right.  What's next?

8         A.  I never said 180.  Bro- -- I do not remember.

9    I do not think I would ever say this, "Dr. Roe is barred

10   from HNCO permanently."

11        Q.  Did you express anything regarding Dr. Roe's

12   absence from HNCO, to your recollection?

13        A.  To Roe?

14        Q.  To anyone.

15        A.  I mean, it's just, again, a bad light, bad

16   optics.

17        Q.  Okay.

18        A.  I don't know about 181.  I'm not part of this

19   project.  Again, I was out of special projects, like, a

20   month after all this happened.

21        Q.  Okay.  Was there any paperwork with --

22        A.  No.

23        Q.  -- that was produced from your exclusion from

24   the project?

25        A.  I don't -- I don't know.

Daniel D.S. Brown
March 24, 2025

CONFIDENTIAL TRANSCRIPT

161

1  remember -- like, to be clear, do you remember learning

2  about the security incident investigation?

3       A.  I have, like, a faint recollection, but I don't

4  remember the details.

5       Q.  Were you a security manager at the time?

6       A.  Me?

7       Q.  Yeah.

8       A.  No.

9       Q.  All right.  Next.

10      A.  I don't know about 211.  Oh, wait.  I already

11  did that.  Did we already do 211?  Golly.  I don't know

12  about 212.  I don't know about 215.  Yeah, we did that.

13  I -- these are just general statements.  I don't know

14  about...

15      Q.  That's fine.

16               Any factual basis that you object to or

17  find -- or -- or --

18      A.  223, I never said that [as read] "...learned of

19  these Privacy Act from Dan Brown on 'all your stuff' is

20  being sent around to everyone..."  I would -- I don't

21  even know that stuff.

22      Q.  Okay.  Do you recall any rumors about Dr. Roe

23  after he left?

24      A.  No.

25      Q.  Do you recall HNCO personnel discussing Dr. Roe

204

1    record at 4:50.

2        Q.  (BY MR. WAREHAM)  So you seem to be rather tied

3    into the reputation around Captain McVeigh.  Are you

4    aware of --

5                MR. HODGES:  Hey, Jason, can you give me

6    just a second?

7                MR. WAREHAM:  Yeah.  Sure.

8            (Discussion off the written record.)

9                THE VIDEOGRAPHER:  We're still on the

10   record.

11       Q.  (BY MR. WAREHAM)  All right.  Back to -- back

12   to my question.  You seem to be pretty tied in with the

13   understanding of Captain McVeigh's reputation.  Do you

14   know how Dr. Roe's reputation has been affected in this

15   process?

16               MR. SKINNER:  Object to form.

17               THE WITNESS:  No.

18       Q.  (BY MR. WAREHAM)  No, you're not aware of

19   Dr. Roe's reputation?

20               MR. SKINNER:  Same objection.

21               THE WITNESS:  I mean, like, I know -- I

22   mean -- I mean, McVeigh didn't like him, I guess, after

23   this.

24       Q.  (BY MR. WAREHAM)  Excuse me?

25       A.  McVeigh didn't -- didn't trust him, I guess.

205

1       Q.   Uh-huh.

2            Do you know how he's regarded in the

3  industry?

4       A.   No.  I have no idea.

5       Q.   All right.  Did you ever know how he was

6  regarded in the industry, even before this?

7       A.   Just from Todd, I guess.

8       Q.   All right.  And what did Todd tell you?

9       A.   Thought -- thought he was pretty good.

10      Q.   Okay.

11           (Exhibit 10 was marked for identification.)

12      Q.   (BY MR. WAREHAM)  So going to what will be

13  Exhibit 10.  This is the subpoena for a deposition to

14  include production of documents.

15           I want to be clear, do you believe you have

16  anything in your possession regarding -- in your

17  personal possession, not belonging to the federal

18  government --

19      A.   No.

20      Q.   -- or stored on government devices related to

21  the plaintiff, any defendant, or any Fibonacci program?

22      A.   I -- I don't have any stuff on my -- on my

23  personal things.

24      Q.   All right.  Did you ever take phone calls on

25  your personal cell phone relative to any of these

Daniel D.S. Brown                              CONFIDENTIAL TRANSCRIPT
March 24, 2025

213

1    the exact words or, like, a -- a direct order given.

2    There was a lot of things going on that day.

3         Q.  (BY MR. SKINNER)  And what made you believe

4    that McVeigh wanted Dr. ███████ fired?

5         A.  The -- the conflict of interest.

6         Q.  What did McVeigh say to you that made you

7    believe he wanted Dr. ███████ fired?

8         A.  I don't remember.

9                   MR. WAREHAM:  Objection, form.

10                  THE WITNESS:  I don't remember.

11        Q.  (BY MR. SKINNER)  You testified about it not

12   being, quote, "good optically if ██████ was present for

13   presentations by Leidos to HNCO."  Do you remember that?

14        A.  I remember saying that today.

15        Q.  And by saying it wouldn't be good optically,

16   was that your personal opinion?

17                  MR. WAREHAM:  Objection, form.

18                  THE WITNESS:  Yes.  That was a personal

19   opinion.

20        Q.  (BY MR. SKINNER)  In other words, you were not

21   telling ██████ that he could not present; is that

22   correct?

23                  MR. WAREHAM:  Objection, form.

24                  THE WITNESS:  Ultimately he did present.

25        Q.  (BY MR. SKINNER)  So you were not telling

Daniel D.S. Brown
March 24, 2025

CONFIDENTIAL TRANSCRIPT

214

1   him --

2       A.  He did -- I --

3       Q.  You were not --

4       A.  -- I just remember it -- it looked bad

5   optically, and he was able -- he did present in April.

6       Q.  Got it.  Understood.

7               So here's my question, you were not

8   directing ▆▆▆▆▆ not to be present for the

9   presentation?

10      A.  I don't believe --

11              MR. WAREHAM:  Objection, form.

12              THE WITNESS:  -- I don't believe so.

13      Q.  (BY MR. SKINNER)  Were you telling Dr. ▆▆▆▆▆

14  that others did not want him to present?

15              MR. WAREHAM:  Objection, form.

16              THE WITNESS:  I don't believe so.

17      Q.  (BY MR. SKINNER)  Were you telling Leidos that

18  ▆▆▆▆▆  cannot present?

19              MR. WAREHAM:  Objection, form.

20              THE WITNESS:  I -- I don't believe so.  All

21  I remember is that I thought it would look bad

22  optically.

23              MR. SKINNER:  No further questions.  We're

24  done.

25              MR. WAREHAM:  Just a moment, please.

217

1          IN THE UNITED STATES DISTRICT COURT FOR THE
                    WESTERN DISTRICT OF TEXAS
2                     SAN ANTONIO DIVISION
3    DR. JOHN ROE,                )
                                  )
4            Plaintiff,           )
                                  )
5    VS.                          )          CIVIL ACTION
                                  ) NO. 5:22-CV-00869-JKP-HJB
6                                 )
     UNITED STATES OF AMERICA,    )
7    et al.,                      )
                                  )
8            Defendant.           )
9
10                 REPORTER'S CERTIFICATION
11           ORAL DEPOSITION OF DANIEL D.S. BROWN
12                      MARCH 24, 2025
13
14        I, Marta M. Johnson, Certified Shorthand Reporter
15   No. 10743, in and for the State of Texas, hereby certify
16   to the following:
17        That the witness, DANIEL D.S. BROWN, was duly sworn
18   by the officer and that the transcript of the deposition
19   is a true record of the testimony given by the witness;
20        That pursuant to FCRP Rule 30(f)(1), request to
21   review the transcript was not made by either deponent or
22   party before the deposition was completed.
23        That pursuant to information given to the
24   deposition officer at the time said testimony was taken,
25   the following includes all parties of record and the

218

1   amount of time used by each party at the time of the

2   deposition:

3        MR. JASON R. WAREHAM, ESQ. - 03 HOURS:50 MINUTE(S)
              Attorney for Plaintiff
4        MR. REGINALD M. SKINNER, ESQ. - 00 HOURS:06
    MINUTE(S)
5              Attorney for Defendant
         MR. ROBERT J. BARRERA, ESQ. - 00 HOURS:00 MINUTE(S)
6              Attorney for Dan D.S. Brown

7

8        I further certify that I am neither counsel for,

9   related to, nor employed by any of the parties or

10  attorneys in the action in which this proceeding was

11  taken, and further that I am not financially or

12  otherwise interested in the outcome of the action.

13       Certified to by me this 9th day of April, 2025.

14

15                      /s/ Marta M. Johnson

16                      _____
                        Marta M. Johnson, Texas CSR 10743
17                      Expiration Date:  10/31/26
                        Firm Registration No. 413
18                      Koole Court Reporters of Texas
                        8000 IH-10 West, Suite 600
19                      San Antonio, Texas  78230
                        210.558.9484   210.558.3129 fax

20

21

22

23

24

25