IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

Civil Action No. 5:22-CV-00869-JKP-HJB

_____

DEPOSITION OF JOSEPH DANIEL BURGHARD

May 15, 2025

_____

Plaintiff:

DR. JOHN ROE,

v.

Defendants:

UNITED STATES OF AMERICA, et al.

_____

APPEARANCES:

        Hendley & Hodges Law PLLC
            By John W. Hodges, Jr., Esq.
                4594 US Hwy. 281 N
                Spring Branch, Texas 78070
                210-714-0924
                john@hhtx.law

            and

        Allen Vellone Wolf Helfrich & Factor P.C.
            By Lance Henry, Esq.
                1600 Stout Street, Suite 1900
                Denver, Colorado 80202
                303-534-4499
                lhenry@allen-vellone.com
                    Appearing on behalf of Plaintiff.

DEFENDANT'S
EXHIBIT

5

```
 1                    P R O C E E D I N G S
 2               THE VIDEOGRAPHER:  The time is 10 a.m.  We
 3    are on the record.  Today is May 15, 2025.  This
 4    begins the recorded deposition of Daniel Burghard in
 5    the matter of Dr. John Roe versus United States of
 6    America, et al.
 7               This deposition is being recorded via Zoom
 8    videoconferencing.  The court reporter is Sheila
 9    Schiesser.  The videographer is Maryvonne Tompkins.
10               The attorneys will introduce themselves
11    starting with the Plaintiff, please.
12               MR. HODGES:  Yes.  Good morning.  This is
13    John Hodges on behalf of the Plaintiff.  I'm joined
14    by co-counsel, Lance Henry, and we also have our
15    paralegal on this conference.  She's here with us.
16    Her name is Rebecca Bradshaw.
17               MS. SEEMAN:  Katrina Seeman on behalf of
18    the Government Defendants along with my co-counsel
19    Joseph Gonzalez and Robert Green.
20               THE VIDEOGRAPHER:  Our court reporter will
21    please swear in the witness, and we can proceed.
22               THE COURT REPORTER:  Mr. Burghard, would
23    you raise your right hand, please.
24
25
```

```
 1                  JOSEPH DANIEL BURGHARD,

 2   called as a witness by the Plaintiff, having been

 3   duly sworn, testified as follows:

 4                           EXAMINATION

 5   BY MR. HODGES:

 6       Q.    Good morning, Mr. Burghard.  My name is

 7   John Hodges.  I'm one of the attorneys that

 8   represents Dr. Roe.  I think -- I think it's kind of

 9   out in the open now he goes by Dr. ██████

10             And so I know that people call you "Danny"

11   or "Daniel."  Would you mind, for the record, giving

12   us your full name, please, here.

13       A.    It's Joseph Daniel Burghard.  I go by the

14   name of Danny.

15       Q.    Yes, sir.  I know -- Mr. Burghard, I know

16   you gave your deposition testimony on behalf of a

17   government witness -- or as a government witness a

18   few weeks ago, but I also understand that was your

19   first deposition.

20             So I'm going to go through a few rules

21   just as a refresher to keep this moving along

22   smoothly, okay?

23       A.    Sounds great.

24       Q.    Yes, sir.  So you're aware that the oath

25   that you just took is the same oath that you would
```

```
 1   Special Programs.  Within AQL, I run the AQLQ
 2   Division, which is the Advanced Cyber Intelligence
 3   Division there.
 4        Q.    Okay.  Yes, sir.  And can you tell us --
 5   can you tell us what role you had before then -- what
 6   position you had before this one?
 7        A.    Sure.  Before being a division chief
 8   there, I was in the same division, but as a PEM, the
 9   Program Element Monitor.
10        Q.    Yes, sir.  Okay.  So as the -- as the
11   AQ -- as the division chief, AQLQ, can you tell us
12   how long you've been there?
13        A.    Sure.  I've been there since 2017 both in
14   my PEM and chief capacity.
15        Q.    Okay.  Okay.  And then, so how long did
16   you have that -- how long were you in that PEM
17   capacity?
18        A.    I only have become a division chief within
19   the last year and a half or so, so the PEM the rest
20   of the time.
21        Q.    Okay.  So you've been with AQL since 2017,
22   but only the division chief for about the last year
23   and a half or so?
24        A.    That's right.
25        Q.    Okay.  I see.  And so can you tell us how
```

1    there at AQL?

2    A.    Sure.  Like I said, I'm the division chief

3    there, so I manage both our cyber team and our intel

4    team.  And really what that means is we run several

5    portfolios that span the entire Air Force.  So we'll

6    do primarily offensive cyber development there --

7    development does not happen there.  It happens in

8    program offices across the country.  So we basically

9    manage the security and funding that supports all of

10   those organizations across the Air Force.

11   Q.    Yes, sir.  Okay.  So what I'm trying to

12   understand -- and I appreciate you giving us that.

13   Are you -- as the division chief, are you in the

14   business of developing some of these programs or

15   implementing these programs?

16   A.    So we -- we basically see over -- we

17   oversee the execution of funds and kind of the

18   security classification governance that applies to

19   special access programs like the ones we're talking

20   about today.

21   Q.    Yes, sir.  And so are you procuring these

22   programs for implementation within the Air Force and

23   other DoD, or are you --

24   A.    Correct.

25   Q.    I'm sorry.  Go ahead.

1    out of now as well?

2        A.    It is, yes.

3        Q.    Okay.  And so approximately -- you

4    mentioned it was approximately five years ago that

5    you first met Captain McVeigh?

6        A.    Roughly five or six years; yes, sir.

7        Q.    Yes, sir.  Okay.  And can you tell us --

8    he was a program manager.  Can you tell us what you

9    understand that to mean?

10        A.    Sure.  That means he runs a subset of

11    projects for that organization, and "by run

12    projects," I mean he -- he oversees contract award,

13    contractor performance, whoever the vendor might be

14    for that effort.  He oversees cost, schedule, and

15    delivery of products associated with those contracts

16    and then ensures that we're meeting proper milestones

17    to eventually deliver capability.

18        Q.    Okay.  And can you tell us what your role

19    is as between your role then as a PEM and Captain

20    McVeigh?

21        A.    Sure.  So as a PEM, your role is to ensure

22    that funding is being spent appropriately in terms of

23    the scope of the program and that you're meeting OSD

24    standards, those standards referred to as obligation

25    and expenditures, and that we're eventually making

1    sure the funds get us through that capability that we

2    need at the end of the day for the warfighter.

3                So basically, we're the ones that issue

4    funds to HNCO.  They're the ones that would award to

5    a vendor pursuant to executed, specific, identified

6    projects, and they oversee the project there locally

7    to completion.

8         Q.    Yes, sir.  Okay.  And so in your role as

9    the PEM and you mentioned that you're releasing

10   funds, you would have been releasing funds to Captain

11   McVeigh for his project; is that fair?

12        A.    That's correct.

13        Q.    And would you -- would you be receiving

14   information from Captain McVeigh before you're

15   releasing funds?

16        A.    Regularly.  We had weekly syncs, if you

17   will, and then they're required to submit a monthly

18   activity brief to us in terms of the status of the

19   efforts.

20        Q.    Okay.  And so he's sending you information

21   about the progress of certain projects; is that fair?

22        A.    Yes.

23        Q.    Yes, sir.  The relationship between you as

24   the PEM and Captain McVeigh, would it be fair to say

25   that you're his supervisor?

1    HNCO to some other team.  I'm unaware of what that

2    team was or what the reason was for moving him.

3         Q.    Okay.  You've heard that term "special

4    programs" before?

5         A.    Yes.

6         Q.    Can you tell our judge, what's that mean,

7    special programs?

8         A.    So special programs referred to a program

9    that requires additional protections.  Typically it's

10   called SAP, or Special Access Program.  When you

11   think of a security classification of critical data,

12   national security, you have different classification

13   levels.  You know, I'm classified all the way up to

14   top secret.

15        And you have -- even further means to

16   protect that information like SITK and others, and

17   then it goes beyond that to the most critical things,

18   which are in SAPs, or Special Access Programs is what

19   we're referring to here.

20        Q.    Was Fibonacci a Special Access Program?

21        A.    It was a project within a Special Access

22   Program.

23        Q.    Okay.  So fair to say if it's a project

24   within a Special Access Program, it would also

25   qualify for whatever protections are afforded a

1    Special Access Program?

2         A.    That's correct.

3         Q.    Okay.  Okay.  I want to ask you now about

4    Dr. ███████  ████████    Can you tell us when you first --

5    when you first met Dr. ████████

6         A.    Sure.  That was probably also in that 2019

7    time frame.

8         Q.    It would have been about late summer,

9    2019?

10         A.    Probably, yeah, summertime of some sort,

11    then.

12         Q.    Okay.  In the summer, yes, sir.  And when

13    you met him, had someone already discussed him before

14    you met him?

15         A.    Dan Brown had before, yes.

16         Q.    Yes.  So he -- he maybe -- can you tell us

17    what Dan Brown said or suggested with regard to

18    Dr. ████████

19         A.    Sure.  I guess Dan had close ties to some

20    people at the National Security Agency, also known as

21    NSA, in San Antonio, Texas.  At the time I think he

22    had this connection with Dr. ████████

23              He introduced us to Dr. ████████ because of

24    the field Dr. ████████ was working in at the time.  He

25    was the chief data scientist for NSA, and they had

1    some ideas that he thought would be applicable to

2    kick-starting a new program, which turned into

3    Fibonacci.

4         Q.    I see.  And so Dan Brown presented

5    Dr. ███████ to you or suggested Dr. ███████  Was

6    that communication that Dan Brown had directly to

7    you, or was that only through Captain McVeigh?

8         A.    It's one that he made sure McVeigh was

9    tracking it and aware of and then was recommended to

10   come talk, you know, to us directly.

11        Q.    Yes, sir.  Okay.  So about how long after

12   that proposal did you first interact with

13   Dr. ███████

14        A.    It would have been a pretty short time

15   frame.  Maybe a month or two.

16        Q.    Okay.  And how did you first interact with

17   Dr. ███████

18        A.    I believe he actually flew up and came and

19   saw saw us in person there at the Joint

20   Bolling-Anacostia Base.

21        Q.    Okay.  And when he came, was he by

22   himself, or were others with him?

23        A.    It's been a long time.  I don't remember,

24   to be honest with you.

25        Q.    Sorry.  Let me ask a better question.

1    When he came -- he came up to Anacostia.  Did Dan

2    Brown and/or Captain McVeigh come with him?

3              MS. SEEMAN:  Objection to form.

4              You can answer.

5         A.    Like I mentioned, it's been five,

6    six years.  I don't remember, to be honest with you.

7         Q.    (BY MR. HODGES)  Okay.  Can you -- can you

8    tell us what the substance of that meeting was?

9         A.    Sure.  At the time there was the concept

10   that he wanted to propose to be, you know, performed

11   out of HNCO.  It's his projects that he named the

12   Fibonacci series, and he wanted to come tell us and

13   provide a technical, kind of deep dive on what is

14   this concept.  How does it work?  Is it something

15   that we should, as the government, fund and go do?

16        Q.    Okay.  And so when he made that -- when he

17   had that discussion with you, was it -- did you have

18   another conversation with Mr. Brown or Captain

19   McVeigh about it?

20        A.    Absolutely.

21        Q.    Did it -- were they already suggesting

22   that this program be approved?

23        A.    Yes.

24        Q.    Okay.  And so after that meeting with

25   Dr. ███████    was it approved?

1        A.      It was.

2        Q.      Okay.  And so who was that project awarded

3    to?

4        A.      It was awarded to HNCO --

5        Q.      Okay.  And --

6        A.      -- as far as I'm concerned.  I'm sorry.  I

7    would have dedicated some base funding to HNCO, and

8    then it's up to them to go find a formal contractor

9    to actually award a contract and execute the effort.

10       Q.      I see.  So were you the approval authority

11   for the Fibonacci program?

12       A.      For the funding, yes.

13       Q.      For the funding, yes, okay.  And so you

14   awarded it to HNCO, and it was HNCO's responsibility

15   to go find a contractor to do that program?

16       A.      Correct.

17       Q.      What's your understanding of who they

18   found?

19       A.      As far as I know, the biggest one that

20   rings a bell is Kudu Dynamics.

21       Q.      And what role did Dr. ████████ have once

22   this -- once the Fibonacci programs were approved for

23   funding?

24       A.      When they started, he was an NSA, a

25   government employee.  He was the chief data scientist

1    there at NSA-Texas.

2         Q.    Yes, sir.

3         A.    We kept him in the role of a technical

4    advisor to those efforts.

5         Q.    Okay.  And how was he kept in that role as

6    a technical advisor?  Was he paid separately?

7         A.    No.  He -- as an NSA employee, he has a

8    special skill set.  He's a very good mathematician,

9    to be honest with you, and so he's there locally to

10   San Antonio.  As far as I understand it, he had just

11   kind of that direct advisory, regular communication

12   from his NSA capacity to HNCO.

13        Q.    Yes, sir.  Okay.  So I want to ask about

14   that.  You mentioned that he was -- he was a very

15   good mathematician and things like that.  Can you

16   tell us generally your observations or evaluations of

17   the work that he was -- that he was presenting?

18        A.    Sure.  It was a very novel concept.  To be

19   honest with you, there is nothing quite like it, as

20   far as I'm aware of in the current industry.  So the

21   concept was pretty game-changing, pretty state of the

22   art, and there's no question it would have been a

23   phenomenal capability.

24              So it's -- and his concept was very

25   technically sound.  You know, at the time I was -- I

1      Q.    Okay.

2      A.    There was one issue, up and to the point,

3  I was notified maybe a year into the effort that he

4  took on some type of contractor role and started

5  being paid for that, which, you know, was perceived

6  it could have been a potential conflict of interest

7  there.

8      Q.    Yes, sir.  We'll talk about that in a few

9  moments, yes, sir.  I appreciate you bringing that

10  up.  Did Dr. Roe work on any other projects at HNCO?

11      A.    Not that I'm aware of.

12      Q.    Okay.  Are you aware of whether or not he

13  presented any other projects at HNCO?

14      A.    If he did, I was not aware.

15      Q.    Yes, sir.  You've heard this term being

16  "read in" to programs and projects; is that right?

17      A.    Yes.

18      Q.    Yes, sir.  Can you tell us what that

19  means, to be "read in"?

20      A.    Sure.  I'm happy to.  That just means

21  you're getting clearance to that Special Access

22  Program, and what that means, once you're cleared, it

23  means you're able to talk about that program,

24  contribute to the program, access to the data and the

25  files for that program, and as long as you're treated

1    within those SAP-protected channels.

2        Q.    Yes, sir.  And can we do the reverse for

3    being read out?

4        A.    Sure.  When you're read off of a program,

5    you know, all's that really means is that you no

6    longer have a need to know.  You're no longer

7    materially contributing to the effort.  And then your

8    access to everything that's protected in there, it's

9    cut off at that time.

10       Q.    Okay.  And so any permissions that you had

11   to access information, that's withdrawn?

12       A.    That's correct.

13       Q.    All right.  Okay.  Do you know if Dr. Roe

14   was ever read into Special Access Programs?

15       A.    He was, yes.

16       Q.    And was he -- was he ever read out of

17   Special Access Programs?

18       A.    He was, but to my knowledge, he was

19   actually cleared to some currently still today.

20       Q.    Okay.  When you say that he's cleared to

21   some, can you tell us, first, how do you know that?

22       A.    So part of my job is actually approving

23   people to get cleared, and so I have access to the

24   database called Jade, so as soon as someone is

25   submitted to become cleared to Special Access

1    Programs, you know, you put what's called a PAR,

2    P-A-R, and that goes into Jade.  It gets adjudicated

3    through many different security checks and eventually

4    approved so someone can get read in, and then the

5    reverse is true to get read out.

6        Q.    And it's -- you mentioned in your role you

7    have access, but you are -- are you an approving

8    authority for people being read in?

9        A.    Yes.  I had the authority delegated down

10   to me.

11       Q.    Okay.  And so for Dr. █████████ were you

12   the approving authority that read him in?

13       A.    Most likely, yes, because at the time as a

14   PEM, I only got -- it's called triple A authority.  I

15   didn't get triple A authority until kind of half my

16   tenure into being a PEM.  And so I'm not sure if I

17   would have been at the initial onset of him being

18   read in.  Definitely was by the time he got read out,

19   though.

20       Q.    Okay.  And so is the reverse true, then,

21   that you're the authority, and you have the authority

22   to revoke someone's access?

23       A.    I can do that, but we typically also allow

24   our program offices to do that locally so they can --

25   you know, they have firsthand knowledge and need an

1  understanding of the security requirements for their

2  people; and so, typically, we like it to be done

3  locally at the program offices.  But, yes, I can do

4  that also.

5      Q.    Yes, sir.  And so HNCO has the authority

6  to read someone out?

7      A.    Correct.  That's a routine thing.  I mean,

8  if you think about it, military people, PCS people

9  move on all the time.  People quit and go to other

10  jobs, and so those are pretty routine actions, yes.

11      Q.    Yes, sir.  But did HNCO have the authority

12  read someone in?

13      A.    They do.  They can conduct the read-in

14  once the approval has been granted.

15      Q.    So fair to say that they can't

16  unilaterally do a full read-in?

17      A.    Correct.

18      Q.    And so they would need access from someone

19  like you to do the full access?

20      A.    Correct.

21      Q.    Okay.  They can do the full read-out

22  without your permission?

23      A.    They can, yes.

24      Q.    Okay.  All right.  Okay.  And so you

25  mentioned that he is still in some programs.  Can you

1                    MS. SEEMAN:  Objection to form.

2                    You can answer.

3          A.    No.

4                    MR. HODGES:  Okay.  We've been going for

5     about an hour, and I apologize, y'all.  I probably

6     had a little too much water before we got started.

7     Do you mind if we take ten?

8                    MS. SEEMAN:  That's fine.

9                    MR. HODGES:  Yeah, maybe -- 12:03.  I

10    guess come back at 13.

11                   THE VIDEOGRAPHER:  Let's go off the

12    record.  The time is 11:03.  We are going off the

13    record.

14                   (Break was taken from 11:03 a.m. to

15    11:15 a.m.)

16                   THE VIDEOGRAPHER:  The time is 11:15.  We

17    are back on the record.

18         Q.    (BY MR. HODGES)  Okay.  Mr. Burghard, I

19    want to ask you a little bit now about you mentioned

20    that you became aware of this -- that there was an

21    issue with Dr. ███████ in his NSA capacity and a

22    contractor capacity.

23                   Can you tell us -- you may have already

24    said it, and I apologize if this is a repeated

25    question.  Can you tell us how you became aware of

1    that allegation?

2        A.    Sure.  It would have been a phone call

3    from Will McVeigh.

4        Q.    Okay.  And can you tell us why that would

5    have come from Captain McVeigh instead of Colonel

6    Ekholm?

7        A.    I mean, I think it's just because he's --

8    it's one of McVeigh's programs involving somebody

9    from one of his programs, so he would have had the

10   first exposure, first chance to report, you know.

11       Q.    Okay.  And so you say he would have given

12   you a phone call.  Can you tell us what he said?

13       A.    You know, I don't remember to the tee, but

14   it would have been something, you know, to the extent

15   of, Hey, I think we have a potential conflict of

16   interest here.  We just found out that Dr. ████

17   was basically performing the same work in a

18   contractor capacity that he was in his government

19   capacity.

20       Q.    Okay.  And did he explain to you why he

21   felt that was a conflict of interest?

22       A.    He did.  And, you know, his take on it at

23   the time is, you know, he's getting paid from the

24   government for the same thing twice.  I mean, that --

25   and what I mean by that is he's providing technical

1    advice in his NSA role while he's also providing

2    technical advice in his contractor role for the exact

3    same project.

4         Q.    Okay.  And can you tell us, what did you

5    do after you got this information or this allegation

6    from Captain McVeigh?

7         A.    Sure.  I told him to document it and to

8    kind of start looking into the facts to see, is that

9    really truly a conflict of interest.

10             MR. HODGES:  Okay.  And so I'll ask

11   Rebecca -- Rebecca, would you pull up 477.  Looks

12   like 477 to 480.

13        Q.    (BY MR. HODGES)  So, Mr. Burghard, are you

14   able to see the screen?  It's changed, of course, and

15   I believe we've got a document -- we've got a

16   document up on the screen.  Do you mind reading the

17   bottom right-hand corner?  I just want to confirm

18   that you and I are looking at the same thing.

19             MS. SEEMAN:  Are we able to zoom in?

20        A.    Yeah, I was going to say it's pretty

21   small.

22             MR. GONZALEZ:  I have a copy of it here

23   that's unmarked that I'm going to put in front of the

24   witness.  You said 477 to 480?

25             MR. HODGES:  Yes, sir, we're going 477

AB Litigation Services

1   to 480.

2           MR. GONZALEZ:  Okay.  I'm going to put a

3   copy that's unmarked in front of him.

4       A.   Sure.  And to your question, John, the

5   lower right-hand corner says, "US," a bunch of zeros,

6   "477."

7           (Deposition Exhibit 1 was marked for

8   identification.)

9       Q.   (BY MR. HODGES)  Okay.  Thank you, sir. So

10  I'm going to offer this as Exhibit 1 to your

11  deposition.  So Exhibit 1, for the record, is a

12  four-page document starting at US_477, ending at

13  US_480.

14          Okay.  And so I've asked Rebecca to kind

15  of show us --

16          MR. HODGES:  If you would, Rebecca, show

17  us maybe the last -- the bottom of the third and the

18  top of the last.  Okay.  So thank you, Rebecca.

19      Q.   (BY MR. HODGES)  So, Mr. Burghard, when we

20  look at this document here -- I know you've got 480

21  in front of you in print -- do you recognize this

22  document?

23      A.   I do, yes.

24      Q.   Yes, sir.  Can you tell us what we're

25  looking at here?

*AB Litigation Services*

1      A.    Sure.  This would have been an e-mail from

2   me to, at the time, Captain Will McVeigh and probably

3   would have followed our phone call that we just

4   discussed.

5      Q.    Yes, sir.  And so do you see the date on

6   this e-mail that you sent Captain McVeigh?

7      A.    I do, yes.

8      Q.    Yes, sir.  It says, April 19th, 2020.

9   Does that fit your recollection of approximately when

10   you would have become aware of Captain McVeigh's

11   allegations?

12      A.    Yes.

13            MR. GONZALEZ:  Did you say April or

14   August?

15      A.    It's August on the document.

16            MR. HODGES:  Yeah, Joseph, it sounds like

17   you might know better about what I said.  Sorry,

18   y'all.

19      Q.    (BY MR. HODGES)  The document says what it

20   says, right, Mr. Burghard?

21            MS. SEEMAN:  Just to interject quickly.

22   If we could stop with the highlighting.  It's a

23   little difficult to track, and I think the witness,

24   because he has the print copy, can look for the

25   information without prompting from the screen?

1    blacklisted isn't something that's written down in

2    some -- in some book somewhere, right?

3                MS. SEEMAN:  Objection to form.

4                You can answer.

5       A.    Maybe.

6       Q.    (BY MR. HODGES)  Maybe, but the common --

7    your understanding of the common use of that term is

8    just this person's name, we don't want them around;

9    we can't work with them?

10      A.    For the common definition, true.

11      Q.    Yes, sir.  And so was Dr. ████████ ever

12   blacklisted from HNCO?

13      A.    Not to my knowledge.

14      Q.    Okay.  From your perspective at AQL, if

15   Dr. ████████ name or products come across your desk,

16   is he blacklisted?

17      A.    No, not at all.  I would --

18      Q.    And so --

19                THE COURT REPORTER:  You what?

20      Q.    (BY MR. HODGES)  I'm sorry.  I cut you

21   off.

22      A.    I said I would welcome that, actually.

23      Q.    In fact, you would prefer Dr. ████████

24   products because you know that he presents a good

25   product and he's got novel ideas; is that fair?

1    up at any point, please just let me know, okay?

2            THE COURT REPORTER:  Okay.

3                    EXAMINATION

4    BY MS. SEEMAN:

5        Q.    So, Mr. Burghard, when Dr. ██████ came

6    over to HNCO, what capacity were you aware that he

7    was working in?

8        A.    In his NSA capacity as the chief data

9    scientist at NSA-San Antonio, Texas.

10       Q.    Earlier we talked about PARs, or Program

11   Access Requests.  Who did Dr. ██████ Program

12   Access Requests to the HNCO special programs?

13       A.    As far as who submitted it, it would have

14   been someone at HNCO, and then I would have likely

15   approved it.

16       Q.    What was the basis for his access to the

17   HNCO SAP?

18       A.    He was providing technical guidance and

19   advice in his government capacity to the program.

20       Q.    And that's through his employment with the

21   NSA, correct?

22       A.    That's right.

23       Q.    Did Dr. ██████ ever tell you that NSA was

24   no longer interested in the technology or project?

25       A.    No.

1      Q.      Did anyone at NSA ever tell you that the

2  agency was no longer interested?

3      A.      They -- he did mention that NSA is not

4  investing in this area, and so it was available to be

5  invested in, yes.

6      Q.      Did anyone at NSA ever tell you personally

7  that Dr. ███████       work at HNCO was not done in his

8  capacity as a government employee?

9      A.      No.

10     Q.      Earlier we also talked about PMRs, or

11 Program Management Reviews.  Just briefly, what is

12 the purpose of those?

13     A.      Those are events held twice a year to

14 assess the programmatic status of the programs we

15 invest in.

16     Q.      Who is allowed in the room?

17     A.      Only folks that are appropriately cleared.

18     Q.      Do you have to be read in to attend the

19 PMR?

20     A.      You do, yes.

21     Q.      Did Dr. ██████  ever attend any PMRs?

22     A.      He did.

23     Q.      In what capacity?

24     A.      In his NSA government capacity.

25     Q.      How do you know?

1       A.      I have slides he presented that say he was

2  an NSA data scientist.

3       Q.      Are contractors permitted to attend PMRs?

4       A.      Very rarely.

5       Q.      Under what circumstances would they be

6  allowed?

7       A.      Typically, they would present at a PMR if

8  there's reason that a program office wants to go to a

9  certain level of technical details that that

10 contractor or vendor can speak better to.

11              And typically, vendors won't be as broadly

12 cleared to people that are allowed to be at a PMR, so

13 we'll bring the security level down, have those

14 people present -- those people being the vendors --

15 present at that lower classification level and then

16 leave, and the security level is brought back up at a

17 higher level after they're gone.

18      Q.      When Dr. ███████ attended and presented at

19 a PMR, were you aware he was also working as a Global

20 InfoTek consultant or subcontractor?

21      A.      I was not.

22      Q.      Do PMRs have any influence on funding?

23      A.      It can.  It -- I mean, it gives a

24 record-check on where is the program actually in it's

25 status based on the schedules, cost, and performance.

```
1          Q.     Is it concerning to you when a government
2    employee does not disclose their subcontractor role?
3          A.     It is.
4                 MR. HODGES:  Object to form.
5          Q.     (BY MS. SEEMAN)  If you can repeat your
6    answer.
7          A.     It is, yeah.
8          Q.     Why?
9          A.     Even if there's an appearance of a
10   conflict of interest, it's concerning, you know, just
11   from appearances, if nothing else.
12         Q.     Earlier we also talked about being read
13   out and debriefed.  When you found out that
14   Dr. ██████ was leaving NSA, what did you do?
15         A.     I administratively read him out.
16         Q.     What does that mean?
17         A.     It basically means I go into Jade.  I
18   click the button to read him out, and that's -- it's
19   pretty routine.  For example, we have military folks
20   that PCS all the time or people that are -- they quit
21   in a short time span when people are out of the
22   office to do an official read-in.
23                But it doesn't mean that people can't also
24   still have them sign and understand what he's signing
25   for it to be read out.
```

1      Q.    What are the consequences of an

2  administrative debrief?

3      A.    It means you basically lose access to

4  information protected by the -- that SAP program.

5  You lose information.  You lose the ability to access

6  the information.  You essentially lose access.

7      Q.    Do you also lose access to the facilities?

8      A.    You do.

9      Q.    Why?

10      A.    Typically there's a common level to the

11  facility to enter, and if you're not read into that,

12  are you not allowed to enter the facility.

13      Q.    So if Dr. ██████ as a contractor did

14  not -- was not read in, in that respect, would he be

15  able to access the facility after his administrative

16  debriefing?

17      A.    He would not be able to.

18            MS. SEEMAN:  Nothing further.

19            THE VIDEOGRAPHER:  Okay.  The time -- oh,

20  sorry.  I need my glasses.  The time is 1 o'clock.

21  We are going off the record.  This will complete the

22  deposition for today.

23            THE COURT REPORTER:  Mr. Hodges, do you

24  want a transcript?

25            MR. HODGES:  Yes, please, E-tran.

```
 1    STATE OF COLORADO      )
 2                           )  ss.     REPORTER'S CERTIFICATE
 3    COUNTY OF DENVER        )
 4              I, Sheila R. Schiesser, do hereby certify
 5    that I am a Registered Professional Reporter,
 6    Certified Realtime Reporter, and Notary Public within
 7    the State of Colorado; that previous to the
 8    commencement of the examination, the deponent was
 9    duly sworn to testify to the truth.
10              I further certify that this deposition was
11    taken in shorthand by me via Zoom videoconferencing
12    and was thereafter reduced to typewritten form, and
13    that the foregoing constitutes a true and correct
14    transcript.
15              I further certify that I am not related to,
16    employed by, nor of counsel for any of the parties or
17    attorneys herein, nor otherwise interested in the
18    result of the within action.
19              In witness whereof, I have affixed my
20    signature this 27th day of May, 2025.
21              My commission expires January 11, 2027.
22
23                        Sheila Schiesser
                          Sheila R. Schiesser, RPR, CRR
24                        216 - 16th Street, Suite 600
                          Denver, Colorado  80202
25
```