*AB Litigation Services*

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

_____

DR. JOHN ROE,

       Plaintiff,

v.

UNITED STATES OF AMERICA, et al

       Defendants.

CIVIL ACTION NO.
5:22-CV-00869-HJB

(Jury Demanded)

_____

VIDEO 30(b)(6) DEPOSITION OF AIR FORCE LIFE CYCLE
MANAGEMENT CENTER REPRESENTATIVE BY WILLIAM ROWE
April 21, 2025

_____

APPEARANCES:

       JASON WAREHAM, ESQ.
       and
       LANCE HENRY, ESQ.
       ALLEN VELLONE WOLF HEINRICH & FACTOR, PC
       1600 Stout Street, Suite 1900
       Denver, CO 80202
       Phone: 303-534-4499
       E-mail: Jwareham@allen-vellone.com
       appearing on behalf of Plaintiff

       JOHN W. HODGES, JR., ESQ.
       HENDLEY & HODGES LAW, PLLC.
       4594 US Hwy 281 N
       Spring Bach, TX 78070
       Phone: 210-640-3398
       E-mail: John@hhtx.law
       appearing on behalf of Plaintiff

       KATRINA SEEMAN, ESQ.
       US DEPARTMENT OF JUSTICE, CIVIL DIVISION
       950 Pennsylvania Avenue NW
       Washington, DC 20530
       Phone: 202-724-6604
       E-mail: Katrina.seeman@dc.gov
       appearing on behalf of Defendants

DEFENDANT'S
EXHIBIT

**13**
_____

*AB Litigation Services*

```
1               P R O C E E D I N G S

2               THE VIDEOGRAPHER:  The time is 10:04.  We

3    are on the record.  Today is April the 21, 2025.

4    This begins the recorded deposition 30(b)(6) of Air

5    Force Life Cycle Management represented by William

6    Rowe in the matter of Dr. John Roe versus United

7    States of American, et al.

8               This deposition is being recorded via Zoom

9    videoconferencing.  The court reporter is Linnea

10   Busby.  The videographer is Maryvonne Tompkins.

11              The attorneys will introduce themselves

12   please.

13              MR. WAREHAM:  Hi.  It's Jason Wareham for

14   the Plaintiff.  Also on my team is John Hodges, Lance

15   Henry, and our paralegal, Rebecca Bradshaw.

16              MS. SEEMAN:  Good morning.  Katrina Seeman

17   on behalf of the Defendants.  I'm joined by my

18   co-counsel Mr. Joseph Gonzalez and Mr. Robert Green.

19              THE VIDEOGRAPHER:  Our court reporter will

20   please swear in the witness, and we can proceed.

21              COURT REPORTER:  Could you please raise your

22   right hand.

23                   WILLIAM ROWE,

24   being first duly sworn in the above cause, was

25   examined and testified as follows:
```

*AB Litigation Services*

1          THE DEPONENT:  May I answer?

2          MS. SEEMAN:  Yes.

3     A.   Okay.  At OSI we do what's called a security

4     incident report, and we give as much facts of what

5     has been reported to us in a form on a separate

6     network to OSI PJ.  And we also inform the material

7     leader.  And together it's made a determination

8     whether there should be a preliminary inquiry

9     conducted.

10     Q.  (By Mr. Wareham)  And you kind of

11     presupposed my next set of questions.  So that's

12     great.

13          When you meet together like that, is there

14     any term for that kind of initial meeting when you

15     initially coordinate on a complaint?

16     A.   Not specific term, no.

17     Q.   What are the different options available to

18     the progression of a complaint arising from that

19     meeting?

20          MS. SEEMAN:  Objection to form.  You can

21     answer, Mr. Rowe.

22     A.   Sir, can I have you clarify your question

23     please?

24     Q.  (By Mr. Wareham)  Sure.  So you mentioned

25     that a preliminary inquiry is one option, right, in

1    your last answer?  Do you recall that?

2         A.  Yes, I do.

3         Q.  What are the other options besides a

4    preliminary inquiry?

5         A.  The other options could be a minor security

6    infraction where there's just statements or MFRs

7    gathered, and possibly -- depends on the

8    determination of OSI PJ and the material leader to

9    whether it's retraining or documented as an

10   infraction as such.

11        I very rarely see those.  Most -- 99 percent

12   of the time they do an inquiry just to gather

13   complete facts.

14        Q.  And can you describe what the preliminary

15   inquiry process is in general?

16        A.  There is -- once a material leader makes a

17   determination for a preliminary inquiry, they choose

18   that inquiry official.  They are formally appointed

19   by memorandum, by letter which I do have copies of

20   with me.

21        And then that individual is briefed by our

22   office on the basic information or synopsis of the

23   inquire and is given a continuity book as far as how

24   to write the template for a report, points of contact

25   to reach out to do the inquiry.  And then they look

1    into the matter with all possible personnel they need

2    to talk to or interview or take statements from to

3    gather all the facts.

4        Q.  And once that -- the facts have been

5    gathered, do you what, if any, document or product

6    they produce after a preliminary inquiry?

7        A.  They do produce a preliminary inquiry report

8    that is reviewed just for technical by our office to

9    make sure it meets the template standard.  And then

10   it goes to material leader for his review or her

11   review.  And then off to AFOSI PJ for final.  And

12   then any recommendations between material leader and

13   AFOSI is made part of that entire report.

14       Q.  All right.  So I want to the drill down a

15   little bit on that process.  It sounds to me like a

16   draft report is initially generated and sent to your

17   office for review, as well as OSI; is that correct?

18       A.  Those go to -- sometimes it goes to OSI for

19   a draft review.  Sometimes it doesn't.  It depends on

20   the agent.  We do a draft initial review, and the

21   material leader also does a draft initial review.

22       Q.  All right.  So how are those draft reviews

23   usually submitted?

24       A.  Usually based on the level of the case on

25   the appropriate network.

*AB Litigation Services*

1    before you flop around.  Is that fair?

2              MR. WAREHAM:  That's fine.  I'll do my best.

3              MS. SEEMAN:  Thank you.

4        Q.  (By Mr. Wareham)  So briefly going under 6

5    to understand the restrictions or the nature of the

6    security violation, can you describe what the --

7    what, if any, guidelines or policies exist around the

8    issue of one person having -- a person having a

9    clearance on one issue versus a clearance on another

10   issue, that issue that you -- this is terrible.  Let

11   me rephrase.  See, I told you it was going to happen.

12             So, look, in your testimony you described

13   that the security violation involved Dr. ████████  or

14   an individual having access to spaces under one

15   clearance level and not other clearance reason to

16   access.  Can you describe what that means in general

17   and what guidelines or SOPs govern that problem?

18   Does that make sense what I said?

19       A.  Yes.

20       Q.  Okay.  Are you able to answer that question?

21             MS. SEEMAN:  I'm still going to object to

22   form.  But, Mr. Rowe, you can answer.

23       A.  In general we follow a DOD 52O5.07, which is

24   the security guideline, and the JADE SOP, standard

25   operating procedure.  That's the database that has

1    those clearances.

2          When visit requests are sent, they're

3    validated for the visitor who cleared them and who

4    they're cleared under, what agency, if they're

5    industry or Government or military.  And that's how

6    we validate the clearance.

7          So then we validate the clearance for the

8    visit.  And then if they then gain access and they

9    are -- it is determined that they are engaging in

10   level of access classified conversations not as they

11   were sent for their clearance, then there's where a

12   violation occurs.

13   Q.   (By Mr. Wareham)  Okay.  So if I'm

14   understanding your testimony -- I just want for

15   clarity of the record -- if somebody is employed in

16   one capacity and has a clearance in that capacity,

17   the guidelines and SOPs restrict that same individual

18   having the same access on their original capacity for

19   a second job; is that right?  Is that what you're

20   saying?

21   A.   No, sir.

22   Q.   Yeah.  Please clarify -- try to simplify it

23   for somebody as simple as I am.

24   A.   Okay.  If -- if you're -- in general if

25   you're cleared for special access as a Government

*AB Litigation Services*

1   employee --

2       Q.  Yeah.

3       A.  -- and you gain access as a Government

4   employee, and you engage in discussions or

5   conversations at those clearance levels but you are

6   not in the capacity as a Government employee but as,

7   let's say, an industry employee where you don't have

8   those accesses, you're not cleared for that, as an

9   industry employee, that's where the incident occurs.

10      Q.  Okay.  And, again, where do those -- where

11  are those rules kept?  What SOPs and guidelines

12  control that?

13      A.  So we have the DOD 5205.07 which is the

14  Department of Defense guidelines for SOP operations,

15  and we have our own standard operating procedure for

16  our facility which reiterates a lot of those

17  guidelines for our facility, and then the database

18  where those accesses are passed have its own SOP on

19  how we -- how we work the database.

20      Q.  And in any of those resources that you

21  described, is it clearly defined this Government

22  employee versus industry employee problem?

23      A.  I will take a pause just to gather my

24  thoughts on this.

25      Q.  Yeah.  Do you what you need.

*AB Litigation Services*

1        A.  Specifically it would be the JADE SOP

2    because the JADE SOP states looking the folks up in

3    the JADE and validating what category they're in for

4    those accesses.

5        Q.  Okay.  And the JADE SOP is held by what

6    agency or at what level?

7        A.  I'm trying to remember.  Whoever -- I'll

8    apologize.  I don't recall specifically who manages

9    or runs the JADE database itself.  It might be what

10   we call the SAPCO, which is the high level of office

11   on the East Coast.

12       Q.  Okay.  All right.  Well, let's -- for now

13   let's go back to the 16 question, the one

14   specifically dealing with the specific processes

15   employed for Dr. ██████████

16           So I think we're at the point where a

17   security violation is alleged.  From there, you have

18   some coordination with Mr. Ranft.  What happens after

19   that.

20       A.  The inquiry official is appointed, and he

21   runs his inquiry and drafts a memorandum -- or a

22   report itself based on the personnel he had talked

23   to, and he makes a recommended conclusion from the

24   facts and a recommendation to the material leader and

25   OSI on the case.

1      Q.  And if I'm understanding your answer, that's

2   the process that was followed in this particular

3   case?

4      A.  Yes, sir.

5      Q.  Are you aware of the outcomes and

6   determinations made in this process?

7      A.  Only from what I can read from the report

8   itself.

9      Q.  That's fine.  Go ahead.  Are you able to

10  answer that having reviewed the report?

11     A.  The last statement note, the inquiry

12  official's report?

13     Q.  Yeah.  What determination -- what was final

14  determination made in this case?

15     A.  This is his conclusion, and I said he's

16  gathering facts, he or she would be gathering facts

17  and making a recommended conclusion to material

18  leader and OSI.

19     Q.  And what was the conclusion made?

20         THE DEPONENT:  Counsel, can I confirm

21  that --

22         MS. SEEMAN:  Yeah, Mr. Rowe, you can read

23  the conclusion from the document that's in front of

24  you.  Just for the record, what are the numbers down

25  in the corner of the document that you're looking at?

1    instruction, and then the instruction you described

2    as JADE, and then some other SOPs.

3            Would you just briefly list again as much as

4    you can the specific title of each regulation or SOP

5    or guidelines that's relevant to this -- this issue?

6        A.   So as best I can the titles -- like I said,

7    I am aging.  So I apologize.

8        Q.   Don't worry.

9        A.   The DOD 5205.7 which contains four volumes

10   which is the DOD special access program guidelines.

11   I don't know if that's the exact title, but that's

12   pretty much what it is.

13           JADE is a database used for passing and

14   validating and gathering special access program

15   clearance and accesses.  Like I said, I believe the

16   SAPCO they came out with a JADE standard operating

17   procedure, SOP, on how to operate that database and

18   the rules thereof.

19           We have our own standard operating procedure

20   or SOP for our facility.  We're no longer at that

21   facility but for that facility and every facility we

22   have standard SOP which kind of expounds on the DOD

23   guidance on how we specifically execute and conduct

24   business under those guidelines for any particular

25   facility.

1      Q.  All right.  Are there any others that you

2  can think of either by general or specific

3  description that would control the Dr. ████████ case?

4      A.  No, sir.

5      Q.  Do each of those that you listed, do those

6  lay out the roles, duties, investigative steps, and

7  reporting requirements of a security manager?

8      A.  It does.

9      Q.  Are you aware of any variance from those

10  guidelines, SOPs, or regulations with respect to how

11  Dr. ████████ case was handled?

12      A.  No, sir.

13      Q.  So to your knowledge, it was all handled as

14  it should have been?

15      A.  To the best of my knowledge, yes, sir.

16      Q.  All right.  Do you know if any of those

17  SOPs, guidelines, or policies are public facing

18  documents or if they're internal documents?

19      A.  Standard operating procedures are usually

20  what used to be for official use only or now as

21  controlled unclassified information.  The DOD

22  regulations pretty much are public.

23      Q.  And just to clarity for the record, was

24  there a point where in this timeline that something

25  you would have labeled FOUO or for official use only

*AB Litigation Services*

```
 1                    REPORTER'S CERTIFICATE
      STATE OF COLORADO        )
 2                             )      ss.
      CITY AND COUNTY OF DENVER )
 3

 4    I, LINNEA BUSBY, Professional Reporter and Notary

 5    Public, State of Colorado, do hereby certify that

 6    previous to the commencement of the examination, the

 7    said WILLIAM ROWE was duly sworn by me to testify to

 8    the truth in relation to the matters in controversy

 9    between the parties hereto; that the said deposition

10    was taken in machine shorthand by me at the time and

11    place aforesaid and was thereafter reduced to

12    typewritten form, consisting of 54 pages herein; that

13    the foregoing is a true transcript of the questions

14    asked, testimony given, and proceedings had.  I

15    further certify that I am not employed by, related

16    to, nor of counsel for any of the parties herein, nor

17    otherwise interested in the outcome of this

18    litigation.

19            IN WITNESS WHEREOF, I have affixed my

20    signature this 8th day of May, 2025.

21            My commission expires October 28, 2028.

22
                    Linnea Busby
23
                    Linnea Busby
24                  Professional Court Reporter

25
```