*AB Litigation Services*

```
IN THE UNITED STATES DISTRICT COURT FOR THE
         WESTERN DISTRICT OF TEXAS
            SAN ANTONIO DIVISION

   Civil Action No. 5:22-CV-00869-JKP-HJB
```
_____

**VIDEOCONFERENCE DEPOSITION OF THOMAS PARISI**

**April 16, 2025**

_____

Plaintiff,

DR. JOHN ROE,

v.

Defendant,

UNITED STATES OF AMERICA, et al.

_____

**APPEARANCES:**

```
ALLEN VELLONE WOLF HELFRICH & FACTOR, PC
    By Jason R. Wareham, Esq.
       1600 Stout Street, Suite 1900
       Denver, Colorado 80202Denver, Colorado 80202
          Appearing on behalf of Plaintiff.


HENDLEY & HODGES LAW, PLLC
    By John W. Hodges Jr., Esq.
       4594 US Highway 281 North
       Spring Branch, Texas 78070
          Appearing on behalf of Plaintiff.
```

**DEFENDANT'S EXHIBIT 20**

```
 1                P R O C E E D I N G S
 2              THE VIDEOGRAPHER:  The time is 10:04.  We
 3   are on the record.  Today is April the 16th, 2025.
 4   This begin the recorded deposition of Thomas Parisi
 5   in the matter of Dr. John Roe versus United States
 6   of America, et al.  This deposition is being
 7   recorded via Zoom videoconferencing.  The court
 8   reporter is Marcus Boyer.  The videographer is
 9   Maryvonne Tompkins.
10              The attorney will introduce themselves
11   starting with the plaintiff, please.
12              MR. WAREHAM:  Hi, good afternoon or good
13   morning, wherever you're at.  This is Jason Wareham,
14   lead counsel for the plaintiff.  Along with me is
15   John Hodges, Lance Henry, and Rebecca Bradshaw on
16   our -- on our team.
17              MR. GREEN:  Good morning.  This is Robert
18   Green for Defendants.  Also with me are lead counsel
19   Joseph Gonzalez and Katrina Seeman from the
20   Constitutional Torts Branch of DOJ and we also have
21   John Fuentes and Brian Noble with the Air Force.
22              THE VIDEOGRAPHER:  Our court reporter
23   will please swear in the witness and we can proceed.
24                     THOMAS PARISI,
25   being first duly sworn in the above cause, was
```

```
 1   examined and testified as follows:
 2              MR. WAREHAM:  All right.  Good morning.
 3   Before we go much further, Mr. Green, if you
 4   wouldn't mind telling me the role of the Air Force
 5   attendees today, just so I'm clear?
 6              MR. GREEN:  They're here with the agency.
 7              MR. WAREHAM:  Okay.  Do they intend to --
 8   to be another source of objection or anything like
 9   that today or any sort of information guidance?
10              MR. GREEN:  I don't believe so, no.
11              MR. WAREHAM:  Okay.  Great.
12                      EXAMINATION
13   BY MR. WAREHAM:
14       Q    Mr. Parisi, hi.  My name is Jason, as I
15   said.  I -- I thank you for making time, although I
16   know it's not optional today for -- for this kind of
17   thing.  I'm going to go over a few instructions with
18   you, just to make sure that as we kind of work
19   through the questions today, that as best as we can,
20   especially given the virtual platform, we're able to
21   ensure that -- that -- that the record is clear.
22              Have you ever been deposed before?
23       A    Not as an adult.
24       Q    Okay.  Well, I won't peel that particular
25   onion.  That's an interesting response.
```

```
 1      Q      Would you happen to know any other names
 2   in that time period if it's not Danny Burgard, who
 3   would have been the PEM?
 4      A      No, I didn't -- I never worked very
 5   closely with AQL.  I worked closely with AQI, which
 6   is the Acquisition Office for Information Dominance.
 7   So the AQL was -- was kind of a whole 'nother group
 8   of people outside of my purview.
 9      Q      Okay.  In the event of a hypothetical
10   where Dr. ██████ advises on funding decisions
11   around other programs not including ACT 2, would you
12   see a conflict of interest?
13             MR. GREEN:  Objection to form.
14      A      Yeah, I'm not going to -- I -- I don't
15   want to -- I can give you an answer.  I'm not going
16   to answer a hypothetical, but I still can answer
17   your question.  If Dr. ██████ was doing any kind of
18   advising underneath our ACT 2 contract as a
19   subcontractor, he should not have been because
20   that's outside of scope of the contract.
21             The scope of that contract is to develop
22   technology, it's to write code and things of that
23   nature.  It's not what we call A&AS, administrative
24   and advisory services contract.  That's outside the
25   scope of the contract.  So, again, it's not a
```

```
 1    hypothetical.  That's just the rule.
 2         Q    So I just want to understand the limits
 3    of the -- the conflict of interest and, you know, as
 4    you viewed it and how it changed.  So as I'm
 5    understanding this e-mail, the -- it's the -- the
 6    problem is that Dr. ███████ was under the AC 2 --
 7    ACT 2 contract; is that right?
 8         A    The problem -- the problem that we were
 9    trying to -- what we were trying to discover,
10    whether or not it was a problem, was threefold.  It
11    was, A, he's an NSA employee and is he using his
12    government influence as an NSA employee to steer
13    money over to basically his own LLC through --
14    through a subcontract.  That was the first thing
15    that we wanted to make sure was not happening.
16              The second thing we wanted to make sure
17    was not happening is if he is providing advice to
18    PEMs in this -- in these meetings, like Captain
19    McVay said, he should not have been because that's
20    outside of scope of the contract.  We pay them to
21    develop software, not to attend meetings and try to
22    influence Pentagon level officials.  So that would
23    have been outside of scope and, also, would have had
24    the conflict of interest of him, once again,
25    providing advice to somebody outside of -- outside
```

```
 1   the scope of his contract to basically further his
 2   own contract.  So that -- that's the concern that we
 3   were trying to uncover.
 4              And, initially, from going through this
 5   e-mail, it didn't look like there was -- it looked
 6   like that there were enough barriers in between that
 7   it wasn't too much of an issue until, you now,
 8   Captain McVay chimed in and said what he -- what he
 9   said in the e-mail, that this -- this, in fact, is
10   happening, there's advisory services being -- being
11   provided.
12        Q    Okay.  So help me understand then why are
13   we referencing -- or why are you referencing ACT 2
14   specifically?
15        A    Let's see what -- in his job with NSA,
16   was he ever in a position to fund or influence
17   funding that could be obligated to the ACT 2
18   contract -- that -- I -- I -- I don't know how to
19   explain it more clearly than -- that what I have,
20   but the question is, you know, verbatim, what I
21   wrote.  In his job with NSA, was he ever in a
22   position to [audio disruption] ACT 2 contract -- he
23   was a [audio disruption] -- the answer was yes to
24   that.  Then we got -- we have a conflict of interest
25   [audio disruption] --
```

```
 1   not involve the contracting officer, we did not
 2   request any kind of formal correspondence to be
 3   contractually sent to the company, and we did not
 4   request any reprimand.
 5              We certainly did not insinuate that the
 6   company, either directly or indirectly, that they
 7   should terminate the subcontract.  We took our
 8   attorney's advice and we said, "Okay.  We'll keep
 9   you up to date with what's going on and, in the
10   meantime, we're going to tell our colleagues at LCMC
11   that things appear to be on the up and up here,
12   according to our acquisition attorney."
13        Q    And to your recollection, did you take --
14   did Air Force Research Laboratory recommend any
15   actions to debar Dr. ████████
16        A    Absolutely not.
17              MR. WAREHAM:  All right.  Let's --
18   Rebecca, let's go to 409, which will be Exhibit 7.
19   Same process, if you will.
20              MR. GREEN:  Jason, would it be Exhibit 7
21   or would it be Exhibit 8?
22              MR. WAREHAM:  Oh.  It might be 8.  Did I
23   say 7 last time, Mr. Green?
24              MR. GREEN:  I was tracking the -- this
25   document, 400, was Exhibit 7.
```

```
1    STATE OF COLORADO)
                      ) ss.        REPORTER'S CERTIFICATE
2    COUNTY OF DENVER )

3

4              I, Marcus K. Boyer, do hereby certify that
5    I am a Shorthand Reporter and Notary Public for the
6    State of Colorado; that previous to the commencement
7    of the examination, the deponent was duly sworn to
8    testify to the truth.
9              I further certify that this deposition was
10   taken in shorthand by me at the time and place
11   herein set forth, that it was thereafter reduced to
12   typewritten form, and that the foregoing constitutes
13   a true and correct transcript.
14             I further certify that I am not related
15   to, employed by, nor of counsel for any of the
16   parties or attorneys herein, nor otherwise
17   interested in the result of the within action.
18             In witness whereof, I have affixed my
19   signature this 29th day of April, 2025.
20             My commission expires April 30, 2027.
21
22
                             Marcus K. Boyer
23
24
25
```