# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | |
|---|---|
| DR. JOHN ROE, | |
| *Plaintiff*, | |
| v. | No. 5:22-cv-00869-JKP-HJB |
| UNITED STATES, *et al.*, | |
| *Defendants*. | |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

STATEMENT OF UNDISPUTED MATERIAL FACTS ................................................... 2

I.      Plaintiff Brings His Ideas to the Air Force. ........................................................... 2

II.     Plaintiff Moonlights at HNCO as a Subcontractor. .............................................. 4

III.    The Air Force Discovers that Plaintiff is Moonlighting as a Subcontractor. ........ 6

IV.     Plaintiff Sends an Email Omitting Significant Portions of NSA OGC's Guidance. .......... 8

V.      HNCO Appoints an Inquiry Official. ..................................................................... 8

VII.    Plaintiff's Purported De Facto Debarment and "Harm" to His Reputation. ........ 10

LEGAL STANDARD .......................................................................................................... 13

ARGUMENT ....................................................................................................................... 14

I.      Defendants Are Entitled to Summary Judgment on Plaintiff's Stigma-Plus Due Process
        Claim (Count IV). .................................................................................................. 14

        A.      Plaintiff Cannot Prove a Deprivation of a Protected Liberty Interest Because He
                Has Not Experienced Preclusion from His Chosen Field. ...................... 14

        B.      Plaintiff's Routine Read-Out from the HNCO Classified Program Did Not Violate
                Due Process Standards Under *Bledsoe*. ................................................ 17

                1.      Plaintiff was Never "Discharged" from HNCO. .......................... 18

                2.      The HNCO Inquiry Was Not Based on False or Pretextual Information,
                        and Plaintiff's Read Out of the Program was Routine. ............... 18

                3.      HNCO Did Not Publicly Release Any Information About Plaintiff. ....... 19

                4.      Plaintiff Never Requested, And the Air Force Never Denied, A Hearing to
                        Clear His Name. ........................................................................... 20

II.     Plaintiff's De Facto Debarment Claim Fails (Count I). ........................................ 21

        A.      Plaintiff Never Bid On or Competed For Government Contracts in His Personal
                Capacity. ................................................................................................... 23

        B.      Plaintiff Cannot Prove Broad Preclusion from Government Work. ........ 25

        C.      Plaintiff Is Not Entitled to Declaratory Relief. ...................................... 26

III.    Plaintiff's Privacy Act Claims Fail as a Matter of Law. ...................................... 26

        A.      Plaintiff Has Not Shown Disclosure of the NSA OGC Emails from a "System of
                Records." ................................................................................................... 28

        B.      Plaintiff Cannot Show Inter-Agency Disclosure of Privacy Act Material. .......... 30

        C.      Plaintiff Cannot Show That He Was Adversely Affected by Any Disclosure of
                Privacy Act Material. ............................................................................... 31

        D.      Plaintiff Cannot Show a "Willful" Violation of the Privacy Act. ........... 31

        E.      Plaintiff Cannot Show Disclosure Beyond the "Need to Know" Exception of 5
                U.S.C. § 552a(b)(1). ................................................................................. 32

CONCLUSION ..................................................................................................................... 33

i

## <u>TABLE OF AUTHORITIES</u>

## CASES

*Adams v. City of Harahan,*
  95 F.4th 908 (5th Cir. 2024) ........................................................................ 15, 16, 18

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986) ..................................................................................... 14, 15, 34

*Bettersworth v. F.D.I.C.,*
  248 F.3d 386 (5th Cir. 2001) ................................................................................. 36

*Bigelow v. Dep't of Defense,*
  217 F.3d 875 (D.C. Cir. 2000) .............................................................................. 39

*Bledsoe v. City of Horn Lake, Mississippi,*
  449 F.3d 650 (5th Cir. 2006) .......................................................................... 21, 25

*Brown v. City of Houston, Tex.,*
  337 F.3d 539 (5th Cir. 1994) ................................................................................. 15

*Cacho v. Chertoff,*
  No. 06-00292, 2006 WL 3422548 (D.D.C. Nov. 28, 2006) .................................. 39

*Cafeteria & Rest. Workers Union, Loc. 473, AFL-CIO v. McElroy,*
  367 U.S. 886 (1961) .............................................................................................. 18

*Carrington v. U.S., Dep't of Def.,*
  46 F.3d 66 (5th Cir. 1995) ..................................................................................... 38

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986) .............................................................................................. 14

*Clarkson v. Internal Revenue Serv.,*
  811 F.2d 1396 (11th Cir. 1987) ............................................................................. 37

*Coburn v. Potter,*
  No. 06 C 5397, 2008 WL 4390153 (N.D. Ill. Sept. 24, 2008) .............................. 37

*Coleman v. United States,*
  912 F.3d 824 (5th Cir. 2019) ................................................................................. 38

*Cunningham v. Castloo,*
  983 F.3d 185 (5th Cir. 2020) ................................................................................. 26

*Dynamic Aviation v. Dep't of Interior,*
  898 F. Supp. 11 (D.D.C. 1995) ....................................................................... 30, 31

*Edison v. Department of the Army,*
  672 F.2d 840 (11th Cir. 1982) ............................................................................... 38

*Evangelou v. District of Columbia,*
  63 F. Supp. 3d 96 (D.D.C. 2014) .......................................................................... 19

*FAA v. Cooper,*
  566 U.S. 284 (2012) .............................................................................................. 38

*Ferrell v. Dallas Indep. Sch. Dist.,*
  392 F.2d 697 (5th Cir. 1969) ................................................................................. 16

*Ghedi v. Mayorkas,*
  16 F.4th 456 (5th Cir. 2021) .......................................................................... 16, 25

*Gowan v. United States Dep't of the Air Force,*
  148 F.3d 1182 (10th Cir. 1998) ............................................................................. 37

*Greene v. McElroy*,
   360 U.S. 474 (1959).............................................................................................29

*Henke v. United States Dep't of Commerce*,
   83 F.3d 1453 (D.C. Cir. 1996)............................................................................36

*Hernandez v. Johnson*,
   514 F. App'x 492 (5th Cir. 2013).......................................................................37

*Highview Eng'g, Inc. v. U.S. Army Corps of Engineers*,
   864 F. Supp. 2d 645 (W.D. Ky. 2012)..........................................................31, 33

*Hill v. Dep't of Def.*,
   981 F. Supp. 2d 1 (D.D.C. 2013).......................................................................39

*Hughes v. City of Garland*,
   204 F.3d 223 (5th Cir. 2000)..............................................................................24

*IFONE NEDA Internet Servs. v. Army & Air Force Exch. Serv.*,
   No. 4:21-CV-330, 2021 WL 1148345 (S.D. Tex. Mar. 25, 2021)...............30, 32

*Jacobs v. Nat'l Drug Intel. Ctr.*,
   423 F.3d 512 (5th Cir. 2005)..............................................................................35

*Kartseva v. Dep't of State*,
   37 F.3d 1524 (D.C. Cir. 1994)...........................................................................32

*Macklin v. City of New Orleans*,
   300 F.3d 552 (5th Cir. 2002)..............................................................................27

*Marcotte v. Sec'y of Def.*,
   618 F. Supp. 756 (D. Kan. 1985).......................................................................37

*Martin v. Mem'l Hosp. at Gulfport*,
   130 F.3d 1143 (5th Cir. 1997)............................................................................16

*Maydak v. United States*,
   630 F.3d 166 (D.C. Cir. 2010)...........................................................................38

*McCarthy v. U.S. Section Int'l Boundary & Water Comm'n, U.S.-Mexico*,
   No. EP-11-CV-208-PRM, 2011 WL 11741033 (W.D. Tex. Nov. 30, 2011)......36

*Mitchell Eng'g v. City & Cnty. of San Francisco*,
   No. C 08-04022 SI, 2009 WL 440486 (N.D. Cal. Feb. 23, 2009)......................30

*National Career College, Inc. v. Spellings*,
   371 Fed. Appx. 794 (9th Cir. 2010)...................................................................31

*Navarro v. City of Bryan*,
   No. H-22-2047, 2022 WL 3588050 (S.D. Tex. Aug. 22, 2022).........................26

*Old Dominion Dairy Prods., Inc. v. Sec'y of Def.*,
   631 F.2d 953 (D.C. Cir. 1980)...........................................................................28

*Orange v. Dist. of Columbia*,
   59 F.3d 1267 (D.C. Cir. 1995)...........................................................................19

*Phillips v. Mabus*,
   894 F. Supp. 2d 71 (D.D.C. 2012)................................................................27, 32

*Redondo-Borges v. U.S. Dep't of Hous. & Urb. Dev.*,
   421 F.3d 1 (1st Cir. 2005)........................................................................30, 31, 33

*Roe v. United States*,
   No. SA-22-CV-00869-JKP, 2024 WL 925556 (W.D. Tex. Mar. 4, 2024)..........17

*Rosales v. Wormuth*,
   No. 1:23-CV-00440-DAE, 2024 WL 5703320 (W.D. Tex. May 23, 2024)..........33

*Rosenstein v. City of Dallas,*
  876 F.2d 392 (5th Cir. 1989) ............................................................... 25

*Sullivan v. Fed. Bureau of Prisons,*
  No. CV 20-00269 LEK-KJM, 2021 WL 3519907 (D. Haw. Aug. 10, 2021) ........................ 37

*Sweeney v. Chertoff,*
  178 F. App'x 354 (5th Cir. 2006) ........................................................... 38

*Taylor v. Resolution Trust Corp.,*
  56 F.3d 1497 (D.C. Cir. 1995) .............................................................. 28

*TLT Const. Corp. v. United States,*
  50 Fed. Cl. 212 (2001) .................................................................... 28

*Trifax Corp. v. District of Columbia,*
  314 F.3d 641 (D.C. Cir. 2003) ......................................................... passim

*Walia v. Napolitano,*
  986 F. Supp. 2d 169 (E.D.N.Y. 2013) ....................................................... 36

*White v. Thomas,*
  660 F.2d 680 (5th Cir. 1981) .............................................................. 21

*Williams v. Reilly,*
  743 F. Supp. 168 (S.D.N.Y. 1990) .......................................................... 37

*Zeng v. Texas Tech Univ. Health Sci. Ctr. at El Paso,*
  836 F. App'x 203 (5th Cir. 2020) .......................................................... 23

**STATUTES**

5 U.S.C. § 552a(a)(4) ........................................................................ 35
5 U.S.C. § 552a(a)(5) ........................................................................ 35
5 U.S.C. § 552a(b)(1) .................................................................... 35, 39
5 U.S.C. § 552a(g)(1)(D) ..................................................................... 33
5 U.S.C. § 704 .............................................................................. 33
5 U.S.C. §§ 552a(a)(1) ...................................................................... 33
18 U.S.C. § 203 ......................................................................... 5, 7, 9

**RULES**

Fed. R. Civ. P. 56(a) ....................................................................... 14

**REGULATIONS**

48 C.F.R. § 9.402 ........................................................................... 27
48 C.F.R. § 9.406–3 ......................................................................... 27

# INDEX OF EXHIBITS

| No. | Description |
| --- | --- |
| 1 | Plaintiff's CV |
| 2 | Plaintiff Deposition Transcript Excerpts |
| 3 | Colonel Ekholm 30(b)(6) Deposition Transcript Excerpts |
| 4 | Dan Brown Deposition Transcript Excerpts |
| 5 | Joseph Daniel Burghard Deposition Transcript Excerpts |
| 6 | OSI Form 40 with Attachments |
| 7 | GITI Contract |
| 8 | GITI Task Orders |
| 9 | NSA OGC Emails |
| 10 | GITI Work Summaries (Feb. 2020 and Aug. 2020) |
| 11 | McVeigh/Burghard Email Chain |
| 12 | McVeigh Witness Statement (Sept. 10, 2020) |
| 13 | William Rowe 30(b)(6) Deposition Transcript Excerpts |
| 14 | McVeigh Email to Brown (Aug. 19, 2020) |
| 15 | Brown Email (Aug. 20, 2020) |
| 16 | Memo For Record (Aug. 21, 2020) |
| 17 | Guerrero Email (Aug. 20, 2020) |
| 18 | Bremer Appointment Email |
| 19 | Bremer Appointment Letter |
| 20 | Thomas Parisi Deposition Transcript Excerpts |
| 21 | Inquiry of Security Incident (Bremer Report) |
| 22 | Beall Email (Aug. 24, 2020) |
| 23 | Special Agent Michael Crunk 30(b)(6) Deposition Transcript Excerpts |
| 24 | Leidos Teams Meetings |
| 25 | Todd Jaspers Deposition Transcript Excerpts |
| 26 | Richard Bremer Rule 30(b)(6) Deposition Transcript Excerpts |
| 27 | Plaintiff Expert Deposition Transcript Excerpts |
| 28 | Beall CORE Email |

## INTRODUCTION

Despite Plaintiff's allegations of a broad conspiracy within the United States Air Force to blacklist and debar him from government contracting, the undisputed evidence paints a much simpler picture: (1) while employed as a data scientist at the National Security Agency, a small Air Force division recruited Plaintiff to consult on a classified project; (2) the division granted Plaintiff access and a security clearance to perform that work strictly in his capacity as an NSA employee; (3) Air Force officials later discovered that Plaintiff was not performing the work in his NSA capacity, but instead as a subcontractor, giving rise to concerns that he did not have the proper clearance and might have violated conflict of interest rules; (4) when the Air Force began looking into these concerns, Plaintiff announced that he was resigning from the NSA; and (5) with his government employment now ended, and the basis for his access to classified information gone, Plaintiff was administratively and routinely read-out of the Air Force classified project.

Still, Plaintiff sues the United States Defendants[1] for de facto debarment (Count I) and "unreasonable interference with employment" (Count IV) in violation of the Fifth Amendment's Due Process Clause. Second Amended Complaint (SAC) ¶¶ 160–192, 247–54, ECF No. 65. In particular, Plaintiff claims exclusion from opportunities to pursue government contracts within the field of "offensive cyber operations." *Id.* ¶ 250. Plaintiff also brings two claims under the

---

[1]     Defendants United States of America; Department of the Air Force; Air Force Office of Special Investigations; and Joseph Daniel Burghard; Colonel Jared Ekholm; Major William McVeigh; Secretary of the Air Force Troy E. Meink, Lieutenant General Thomas K. Hensley, Commander, Sixteenth Air Force; Lieutenant General Donna D. Shipton, Commander, Air Force Life Cycle Management Center; in their official capacities.

Privacy Act for alleged unlawful disclosures of his personal information (Counts II–III). *Id.* at ¶¶ 193–246.

Defendants now move for summary judgment on all Plaintiff's claims. Defendants are entitled to judgment on Plaintiff's stigma-plus claim (Count IV) because Plaintiff has adduced no evidence that he has been excluded from his chosen profession and thus, he cannot establish the requisite deprivation of a protected property interest. Plaintiff also cannot prove any due process deprivation because (1) he was never "discharged" from an employment opportunity; (2) the Air Force's inquiry into Plaintiff's possible conflict of interest was not based on any "false" or pretextual information; (3) no stigmatizing information about Plaintiff was ever made public; and (4) Plaintiff never requested—so the Air Force never denied—a name clearing hearing. Plaintiff's de facto debarment claim (Count I) fails because Plaintiff has never bid on a government contract and thus, he has not experienced any broad preclusion from government contracting. Finally, Plaintiff's Privacy Act claims (Counts II–III) fail for several reasons, including (1) the disclosures at issue were not contained within a system of records; (2) no information was disclosed outside of the Air Force; (3) the disclosures did not have an actionable adverse effect on Plaintiff; (4) the disclosures were not "willful"; and (5) the recipients of the information had a proper "need to know."

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### I.    Plaintiff Brings His Ideas to the Air Force.

Plaintiff is a mathematician and software engineer that has developed CyberAI products. *See generally* **Ex. 1, Plaintiff's CV**; Pl. Expert Disclosure at 2, ECF. No. 87. In 2019, while working as an NSA data scientist, Plaintiff proposed several CyberAI ideas to NSA with applications for national defense. **Ex. 2, Pl. Dep.** at 46:2–3, 6–9. NSA declined to develop the

proposals but allowed Plaintiff to present his ideas to other government entities involved in the CyberAI arena. *Id*. at 47:9–14.

The Air Force Life Cycle Management Center ("AFLCMC") is a think tank charged with developing and implementing Air Force weapons systems. SAC ¶¶ 71–72. An organization known only by the acronym "HNCO" is the procurement office of AFLCMC. *Id*. ¶¶ 12, 74; **Ex. 3, Ekholm 30(b)(6) Dep.** at 9:7–9. Todd Jaspers, an NSA employee, believed that HNCO might be interested in Plaintiff's ideas. **Ex. 2, Pl.'s Dep.** at 48:4–10, 49:7–9.

Jaspers introduced Plaintiff to a Lead Engineer at HNCO, Dan Brown. **Ex. 2, Pl. Dep.** at 49:10–11, 20–22; **Ex. 4, Brown Dep.** at 12:2–4. In 2019, Brown facilitated a meeting for Plaintiff to pitch his ideas to Air Force Program Element Monitor Danny Burghard. **Ex. 5, Burghard Dep.** at 34:2–24. Burghard worked for the Advanced Cyber Intelligence Division, a division in the office of the Assistant Secretary of the Air Force (Acquisition, Technology, and Logistics) (SAF/AQL). *Id*. at 10:1–3. This division "oversee[s] the execution of funds" for "primarily offensive cyber development" for the Air Force. *Id*. at 12:17–19. Burghard's role as a Program Element Monitor *vis-a-vis* HNCO cyber operations was "to ensure that funding [was] being spent appropriately." *Id*. at 17:21–18:7.

Burghard was intrigued by Plaintiff's ideas, *id*. at 38:18–23, and discussed his interest with Captain William McVeigh, *id*. at 36:16–20, a project manager that supervised Dan Brown's projects, *id*. at 22:22–24; 26:13–15. *See also* **Ex. 4, Brown Dep.** at 93:5–11. Ultimately, Burghard dedicated some funding to HNCO so that HNCO could add funds to an existing prime contract and execute Plaintiff's ideas, **Ex. 5, Burghard Dep.** at 37:7–9. Plaintiff had "the role of a technical advisor to those efforts," and Burghard understood that Plaintiff was providing that advice in his capacity as an NSA employee. *Id*. at 38:2–12; *see also id*. at 129:5–9 ("Q: So, Mr.

Burghard, when [plaintiff] came over to HNCO, what capacity were you aware that he was working in? A: In his NSA capacity as the chief data scientist at NSA-San Antonio, Texas.").

HNCO submitted—and AQL approved—Plaintiff's Program Access Request[2] only in his NSA government employee capacity and read him into the classified program only in his NSA capacity. *Id.* at 42:15–45:14 (describing the program access requests and read-in process); 129:10–22 (the basis for Plaintiff's access to the HNCO SAP was "providing technical guidance and advice in his government capacity to the program"). **Ex. 6, OSI Form 40** at 10–11 (Program Access Request) and 8–9 (Special Access Program Indoctrination).

## II.     Plaintiff Moonlights at HNCO as a Subcontractor.

On June 3, 2019, Plaintiff entered a consulting agreement with Global Infotek Inc. ("GITI") to work on a contract that GITI had with the Air Force. **Ex. 7**, **GITI Contract**; **Ex. 2, Pl. Dep. at 53:13–20**. He would "[p]rovide computational and mathematical analysis for a classified project." **Ex. 7, GITI Contract** at 7; **Ex. 8, GITI Task Orders**. Plaintiff also kept his full-time job at the NSA as a government employee where he was required to work 40 hours a week. **Ex. 2, Pl. Dep.** at 52:18–53:5.

From the beginning, Plaintiff had "concerns" about holding both jobs and emailed the NSA's Office of General Counsel (OGC) to make "sure that there is no conflict of interest." **Ex. 9, NSA OGC emails**. When an NSA ethics attorney asked if the work would "be considered 'behind-the-scenes' without requiring any direct involvement with Air Force representatives,"

---

[2]      A Program Access Request (PAR) is a formal request for access to national security information that specifies an individual's need to know and contribution recommendation, the type of access required, and the justification for needing access. DoD Instruction 5205.11, Management, Administration, and Oversight of DoD Special Access Programs, Section 5, available at https://irp.fas.org/doddir/dod/i5205_11.pdf (last accessed July 1, 2025).

Plaintiff responded "I will not be required. In fact, all of my work can be provided 'behind-the-scenes.'" *Id*. Based on Plaintiff's representation, the NSA attorney advised him that any contracting work must be limited to the ministerial, "behind the scenes" kind of work he described. *Id.* Specifically, the NSA attorney advised:

> Applying this rule to your circumstances, you may not be the individual responsible for communications with Air Force representatives (or any other federal employees) on the contract for which you are providing services. This includes oral or written communications. It does not include ministerial communications, such as requests for factual information. However, if a communication transitions from a factual exchange to a conversation in which differences of opinion may occur, this can create problems under the representation rule.

*Id*. The NSA attorney also warned that "in most cases," 18 U.S.C. § 203 criminalizes moonlighting as a contractor while also maintaining government employment, and thus "makes such employment impossible." *Id.* She explained that anything beyond purely ministerial communications was unlawful, as the statute would even criminalize, for example, "a security guard [] discuss[ing] with federal employees [] the guard's decision to deny admission to a visitor." *Id*. As a result, the NSA attorney concluded "Bottom line: . . . it is almost impossible for federal personnel to work for a contractor in the federal workplace." *Id*. The NSA attorney never formally approved the arrangement, **Ex. 2, Pl. Dep.** at 84:22 – 85:5, and Plaintiff knew NSA's OCG "was not [] granting permission" to him, *id.* at 100:10–11.

Plaintiff still took the consulting job with GITI. And except for Brown, Plaintiff never shared with anyone at HNCO that he was working there as a consultant:

> Q: Is it your testimony you never introduced yourself by any organizational affiliation to HNCO employees?
>
> A: I did not introduce myself as any sort of affiliation.

> Q: When I say affiliation, I mean, did you ever identify yourself as either a consultant, a GITI consultant, or an NSA employee to any HNCO employee?
>
> A: No.

*Id.* at 205:20–206:10. Over the course of the next 14 months, Plaintiff attended several Air Force meetings, including two Project Management Review (PMR) meetings. *See* **Ex. 10, Pl. GITI Work Summaries** (Plaintiff stating for August 2020 that he "[p]resented results to the AF customer at several milestone program reviews" and for February 2020 that he "presented initial project results at February 11th PMR" and supported project status reviews and demos for "Pentagon officials"). Despite the NSA attorney's guidance that he could only have "ministerial communications" with government employees and must not engage in "conversation in which differences of opinion may occur," **Ex. 9, NSA OGC emails**, he provided his opinions in both PMRs. In the February 2020 PMR, he proffered "expert advice" and opined that another program was "something that shouldn't continue" because it was "over budget, not delivering, and using old technology[.]" **Ex. 2, Pl. Dep.** at 161:20–162:4. On August 13, 2020, Plaintiff attended another PMR meeting with Burghard and Brown and again did the same thing. Plaintiff explained that the project was "using outdated technology" and then "presented a solution [] that would solve the problem." *Id*. at 171:2–5. Burghard assumed that Plaintiff attended the PMRs in "his NSA government capacity" and recalled "slides [Plaintiff] presented that say he was an NSA data scientist." **Ex. 5, Burghard Dep.** at 130:21–131:2. *See also* **Ex. 4, Brown Dep.** at 34:16–25.

## III.   The Air Force Discovers that Plaintiff is Moonlighting as a Subcontractor.

Shortly before the August 13, 2020 PMR meeting, McVeigh learned from Dan Brown that Plaintiff was working as a subcontractor for GITI on the same matters on which he was

advising the Air Force. **Ex. 11, McVeigh/Burghard Email Chain**. The information was shared in the context of a separate funding issue and McVeigh "didn't think much of it" at the time. *Id*. Subsequently, McVeigh noticed that Plaintiff was "acting and representing himself as a Government employee," not as a contractor. **Ex. 12, McVeigh Witness Statement.** McVeigh then looked up Plaintiff on a program called the Joint Access Data Environment (JADE) that memorializes various clearances such as Program Access Requests. **Ex. 11, McVeigh/Burghard Email Chain**; **Ex. 13, Rowe 30(b)(6)** at 41:13–18. McVeigh did this because he needed to determine whether Plaintiff had a clearance to the classified program as a contractor. **Ex. 12, McVeigh Witness Statement**. JADE showed that Plaintiff was only cleared to work at HNCO as NSA employee, not as a contractor. **Ex. 11, McVeigh/Burghard Email Chain**; *see also* **Ex. 6, OSI Form 40** at 11–12 (Program Access Request). Because of the possibility of unauthorized disclosures of classified information, this potentially qualified as a security incident and required review. **Ex. 13, Rowe 30(b)(6) Dep.** at 31:24–32:19.

McVeigh notified Burghard, **Ex. 5, Burghard Dep.** at 61:23–62:3, who thanked him for "notifying us about [Plaintiff's] possible conflict of interest situation" and asked McVeigh to "draft up a quick [Memorandum for Record] to document what we know." **Ex. 11, McVeigh/Burghard Email Chain**. McVeigh also notified his supervising officer, Materiel Leader Lt. Col. Jared Ekholm, the officer in charge of HNCO. **Ex. 3, Ekholm 30(b)(6) Dep.** at 15:3–6; 49:15–19. Ekholm testified that McVeigh was "my single focal point at our level for all staff-level programs" and, as the person "noticing [] these facts" about Plaintiff, he wanted him to "write those up [] for later adjudication" by someone else. *Id*. at 48:20–22; 50:14–16; *see id*. 53:15–17 (Ekholm testifying that he told McVeigh to "start capturing all this information in the memorandum for record so we can move forward.").

IV.     **Plaintiff Sends an Email Omitting Significant Portions of NSA OGC's Guidance.**

To gather information for the MFR, McVeigh asked Brown to explain "how [Plaintiff] is avoiding a conflict of interest" between his government and contractor roles. **Ex. 14, McVeigh Email to Brown (Aug. 19, 2020).** Brown forwarded McVeigh an email he received from Plaintiff. **Ex. 15, Brown Email (Aug. 20, 2020).** In that email, Plaintiff represented to Brown that NSA OGC "concurred" that Plaintiff's work as a contractor would not "violate[] any laws or statutes." Plaintiff's email also stated that "OGC Provided the following guidance in April 2019," and the email purported to copy and paste the guidance in the NSA attorney's email to Plaintiff. But the NSA attorney's email was altered. Specifically, nine paragraphs were removed. *Compare* **Ex. 15, Brown Email** *with* **Ex. 9, NSA OGC Emails**. The removed paragraphs contained the NSA attorney's strongest reservations, including that "it is almost impossible for federal personnel to work for a contractor in the federal workplace" and that "in most cases" 18 U.S.C. § 203 "make[s] such employment impossible."

V.      **HNCO Appoints an Inquiry Official.**

On August 21, Ekholm signed the MFR which noted a "likely conflict of interest," given that Plaintiff "was cleared as a Government employee to [the project], but not as a contractor." **Ex. 16, MFR.** Notably, although Plaintiff was "notified to stop work *as a contractor*," the MFR documented the fact that the Air Force would permit Plaintiff to "continue supporting the project *as a Government employee under the NSA*." *Id.* (emphasis added); *see also* **Ex. 17, Guerrero Email** (Aug. 20, 2020). However, by this date, Plaintiff already told HNCO that "he [was] planning to resign from the NSA." **Ex. 16, MFR.**

Ekholm believed that the discovery of Plaintiff's dual government employee-contractor status "justified a short inquiry" into "HNCO security practices" and appointed Richard Bremer,

Chief of the Cyber Contracting Branch, to conduct the inquiry. **Ex. 18, Bremer Appointment Email (Aug. 25, 2020)**. The appointment letter stated that "[t]he purpose of this inquiry is to determine whether a compromise occurred and to categorize this security incident." **Ex. 19, Appointment of Inquiry Official**.

## VI.    Plaintiff Leaves Government Service and Is Routinely Read Out of the Classified Program.

After Plaintiff advised HNCO officials that he was resigning from NSA, OSI Special Agent Allen Beall met with Plaintiff on August 26, 2020, to formally debrief him and conduct his "read out" from the classified program. **Ex. 6, OSI Form 40**; *see also* **Ex. 22, Beall Email (Aug. 24, 2020)** ("I will debrief [Plaintiff] from the program this week since his clearance and program access were all based upon his position at NSA."); **Ex. 23, Crunk 30(b)(6) Dep.** at 21:8–12 ("Mr. Beall would debrief [Plaintiff] from the program . . . because his clearance and program access were based upon his position within the NSA."). Beall performed the debrief in his "capacity [] serving as a program security officer" to HNCO, a role which has "overall cognizance of security for [the] program that [Plaintiff] was accessed to." **Ex. 23, Crunk Dep.** at 22:10–13; *see id*. at 19:13–14 ("OSI did not conduct an investigation on [Plaintiff]."). During the debrief, Plaintiff "confirmed he had accepted a position with large government contactor and has submitted his letter of resignation to the NSA." **Ex. 6, OSI Form 40**. Beall then explained Plaintiff was losing access to the program as a result and that if he wanted to work on it again "he would need to be submitted for access again with proper justification[.]" *Id*. Nothing in Beall's report states or suggests that Plaintiff's security credentials were subject to any cloud of suspicion or stigma. *See id*. Ultimately, Plaintiff was read-out from the HNCO classified program for administrative reasons (i.e., his resignation from government employment), not "for cause" as in the case of a finding of misconduct.

9

Beall's report also states that Plaintiff "provided" Beall his correspondence with the NSA attorney. *Id*. The correspondence contains the complete email from the NSA attorney, which included the nine paragraphs that were removed. *Compare* **Ex. 6, OSI Form 40** at 3–9 (NSA Email Attachment) *with* **Ex. 9, NSA OGC Emails** *and* **Ex. 15, Brown Email**.

On September 22, 2020, Bremer completed his inquiry. **Ex. 21, Inquiry of Security Incident (Bremer Report)**. He concluded that "no compromise of classified information occurred" and Plaintiff's actions "should not be classified as such." *Id*. Bremer reasoned that Plaintiff had "given/attended classified briefings on the status" of his project at HNCO "as an NSA Official" and thus "maintained the proper security clearance for access" to the briefings. *Id*. Ekholm testified that "no further actions would have been done," which was informed by the facts that Plaintiff "no longer had a contract" and "had also been read out" after he resigned from the NSA. **Ex. 3, Ekholm 30(b)(6) Dep.** at 56:11–12, 56:24–57:2.

## VII. **Plaintiff's Purported De Facto Debarment and "Harm" to His Reputation.**

Contrary to allegations that he was shut out of his chosen profession, Plaintiff began his employment at Leidos, where Plaintiff was making "three times more than he was making at NSA" on day one. **Ex. 2, Pl. Dep.** at 232:6–7. He continued to work in the CyberAI field. As a Principal Investigator he "created the Leidos Offense/Defense CyberAI research portfolio from scratch . . . and led the team to a successful demonstration of 7 projects[.]" **Ex. 1, CV** at 2. Similarly, in his position as "AI Chief Scientist, [he] provided general AI guidance across all Leidos business sectors[.]" *Id*. In Plaintiff's last position with Leidos he was "more or less responsible for AI developments across the company" and "involved in more proposals for the company, involved in more presentations." **Ex. 2, Pl. Dep.** at 21:16–22:3. In this capacity, he earned approximately $520,000 for 2024. *Id*. at 19:18. Plaintiff also gave numerous presentations

in the CyberAI space as well during this period. *See* **Ex. 1, CV** at 7. In 2025, Plaintiff's career culminated with a prominent political appointment in the Office of the Director of National Intelligence (ODNI). **Ex. 2, Pl. Dep.** at 255:7–16.

Despite this success, Plaintiff claims that his "reputation in certain communities at this point is ruined," **Ex. 2, Pl. Dep.** at 267:19–20 and that he has been "de facto debarred from a field that [he] created," *id*. at 324:12. The debarment allegation rests on one incident. In late 2022, Brown contacted Jaspers about whether Leidos had anything would "might help his team." **Ex. 25, Jaspers Dep.** at 36:14–20. Jaspers, who now worked for Plaintiff at Leidos, was a part of Plaintiff's team. **Ex. 25, Jaspers Dep.** at 82:8–15. Before a demo presentation occurred in March or April 2023, Brown called Jaspers and told him that "[i]t probably wouldn't be, like, maybe good optically" if Plaintiff presented. **Ex. 4, Brown Dep.** at 104:11–12; *see also* **Ex. 24, Leidos Demo Meeting Invites**. Jaspers had a more vivid recollection. He testified that "Dan Brown made it clear to me that — that [Plaintiff] should not be on any presentations going forward," **Ex. 25, Jaspers Dep.** at 104:10–12, but clarified that Brown was the only person that ever told him that, *id*. at 104:15–17 ("Q: And Dan Brown is the only person that told you that; is that correct? A: That's correct."). *See also id.* at 49:17–24 (testifying "it was pretty clear" that Brown did not want Plaintiff on the call "because of the lawsuit").

Brown also testified that "I don't think [Plaintiff is] debarred from any work" and was "sure someone would have said something" if so. **Ex. 4, Brown Dep.** at 155:18–25. HNCO's Rule 30(b)(6) deponent confirmed as much:

> Q: Okay. Are you aware of in your review, again in terms of the agency, of any formal or informal processes executed against [Plaintiff] with regards to his contract?
>
> A: No, I am not.

11

Q: Did you see any presence of any historical actions of any kind within debarment related to [Plaintiff]?

A: No, sir, I did not.

**Ex. 26, Bremer 30(b)(6) Dep.** at 21:4–8, 21:25–22:3. Tom Parisi, another contracting professional, testified to the same with respect to HNCO's sister division, the Air Force Research Laboratory. **Ex. 20, Parisi Dep.** at 71:13–16: ("Q: And to your recollection, did you take — did Air Force Research Laboratory recommend any actions to debar [Plaintiff]? A: Absolutely not."). Plaintiff has no evidence of impaired prospects beyond the 2023 conversations with Jaspers and Brown. Indeed, he testified that he has "not had anybody tell [him] that they could not work with [him] because of the investigation" **Ex. 2, Pl. Dep.** at 272:9–11, and responded "I don't know" when asked to identify any such person at HNCO, *id.* at 271:2–4. Plaintiff's "ruined" reputation evidence also rests solely on Jaspers and Brown. *See id.* at 269:5–11 ("Q: Other than those two individuals […] has anybody ever told you that your reputation is ruined because of the events that happened at HNCO? A: No, ma'am."). But Jaspers has no first-hand information about Plaintiff's dealings with McVeigh or HNCO. *See* **Ex. 25, Jaspers Dep.** at 80:14–18 ("Q: So you only know what [Plaintiff] and Dan Brown told you; is that correct? A: That — that is correct. My [] understanding of the situation comes from Dan Brown and [Plaintiff]."); 81:14-25.

As for outside of HNCO, Jaspers testified that no other government customers ever had reservations about working with Plaintiff. *See id.* 88:24–89:4 ("Q: Okay. And by other customer,' are you referring to like Space Force, DARPA, CIA? A: Yeah, exactly, yeah. Q: Okay.· None — none of them ever expressed any reservations about Dr. [Plaintiff]? A: No."). And Brown testified that he had "no idea" about Plaintiff's industry reputation, **Ex. 4, Brown Dep.** at 205:2–4, let alone how Plaintiff's reputation had been effected by leaving HNCO, *id.* at

204:13–17. The evidence that did emerge was favorable. When Burghard was asked how he would feel about Plaintiff's "name or products com[ing] across [his] desk" he responded that he "would welcome that, actually[.]" **Ex. 5, Burghard Dep.** at 120:15–22.

Nevertheless, Plaintiff still claims that he has lost opportunities because of Defendants. These opportunities appear to be contracts that he believes that he could have bid on. *See* Pl. Expert Disclosure, ECF No. 87. But Plaintiff has never bid on any contract, ever, **Ex. 2, Pl. Dep.** at 308:15–19, and in fact he could not bid on any contracts as a condition of his employment at Leidos, *id*. at 307:3–21. He concedes that as a political appointee at ODNI that remains the case. *Id*. at 308:4–7.

## LEGAL STANDARD

Under Rule 56, a court should "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of demonstrating the absence of a genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If that burden is met, the non-moving party must "designate specific facts showing that there is a genuine issue for trial." *Id*. at 324 (internal quotation marks omitted). Although the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, the "mere existence of a scintilla of evidence in support of" the non-moving party is "insufficient" to stave off summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *see also Brown v. City of Houston, Tex.*, 337 F.3d 539, 541 (5th Cir. 1994) ("Unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment."). The non-moving party must adduce "evidence on which the jury could reasonably find for" it at trial. *Anderson*, 477 U.S. at 252.

## ARGUMENT

I. **Defendants Are Entitled to Summary Judgment on Plaintiff's Stigma-Plus Due Process Claim (Count IV).**

In Count IV, Plaintiff alleges that Defendants "unreasonably interfered with [his] range of opportunities within offensive cyber operations" in violation of the Fifth Amendment Due Process Clause. SAC ¶ 250. The Fifth Circuit recognizes that the "right to follow [a] chosen business or occupation free from unreasonable government interference comes within the liberty and property concepts of the Fifth Amendment." *Adams v. City of Harahan*, 95 F.4th 908, 913–14 (5th Cir. 2024) (quoting *Ferrell v. Dallas Indep. Sch. Dist.*, 392 F.2d 697, 703 (5th Cir. 1969)). To succeed on Count IV, Plaintiff must establish "(1) the deprivation of a protected property or liberty interest, and (2) that the deprivation occurred without due process of law." *Adams*, 95 F.4th at 918 (citations omitted). As explained below, Plaintiff cannot satisfy these elements, and thus, Defendants are entitled to summary judgment on Count IV.

A. **Plaintiff Cannot Prove a Deprivation of a Protected Liberty Interest Because He Has Not Experienced Preclusion from His Chosen Field.**

A stigma claim under the Due Process clause is a high bar. A plaintiff needs to show that the government "'effectively foreclosed' him from practicing his chosen profession." *Ghedi v. Mayorkas*, 16 F.4th 456, 467 (5th Cir. 2021) (quoting *Martin v. Mem'l Hosp. at Gulfport*, 130 F.3d 1143, 1148 (5th Cir. 1997)); *see Adams*, 95 F.4th at 916 (plaintiff must be "completely prevented from working in [the] field" of their choosing). As a result, here, Plaintiff must establish that Defendants "seriously affected, if not destroyed, [his] ability to obtain employment" in his field. *Trifax Corp. v. District of Columbia*, 314 F.3d 641, 644 (D.C. Cir. 2003) (cited favorably in *Roe v. United States*, No. SA-22-CV-00869-JKP, 2024 WL 925556, at *4 (W.D. Tex. Mar. 4, 2024)). Plaintiff comes nowhere close.

14

Plaintiff alleges an inability to enter into contracts with one small Air Force division, HNCO, and for one type of contract, developing offensive Cyber AI products. *See* **Ex. 27, Pl. Expert Dep.** at 98:5-6 (damages premised upon a "very specific niche or small area of Cyber AI work that includes offensive — predominantly offensive work"). This purported circumstance, even if Plaintiff had evidence supporting it, is not preclusion from a "chosen profession" or "career." *Adams*, 95 F.4th at 915; *see Trifax Corp.*, 314 F.3d at 644 (plaintiff must establish "broad preclusion" from the field). The fact that other entities in DoD, and even in the Air Force, also work in Cyber AI and solicit contracts in this space, reinforces the point. **Ex. 25, Jaspers Dep** at 102:2–103:17 (identifying market for offensive cyber tools at DoD as including CIA, DARPA, CYBERCOM, Fleet Cyber, AFCyber, Space Force). Plaintiff remains free to work with any of them and has no evidence otherwise. HNCO's status as just one division out of others in DoD undercuts his claim of preclusion from a field. *See Cafeteria & Rest. Workers Union, Loc. 473, AFL-CIO v. McElroy*, 367 U.S. 886, 895–96 (1961) (plaintiff not precluded from his chosen trade or profession because "[a]ll that was denied [him] was the opportunity to work at one isolated and specific military installation.").

Evidence of the preclusion itself is even weaker. As an initial matter, Plaintiff was never shut out of opportunities with HNCO. Rather he was issued a stop work order limited to his work as a GITI consultant. **Ex. 17, Guerrero Email** (Aug. 20, 2020). The undisputed evidence is that Plaintiff's own actions (i.e., the announcement of his decision to resign his NSA employment) led to his routine and administrative read-out from the HNCO classified program in his government capacity. **Ex. 22, Beall Email** (Aug. 24, 2020); **Ex. 23, Crunk 30(b)(6) Dep.** at 21:8–12. And the Air Force specifically documented that while he was not cleared (and thus could not continue working on that classified program) *as a contractor* at that time, he was

welcome to continue working on the program *as an NSA employee*. **Ex. 16, MFR**. Plaintiff was also specifically told he could resubmit for access with the proper justification. **Ex. 6, OSI Form 40.**

Further, no evidence establishes Plaintiff's so-called inability to enter into contracts with HNCO. Plaintiff has never *bid* on any contract, ever, with HNCO or any other division or entity. *See* **Ex. 2, Pl. Dep.** at 308:15–19; **Ex. 27, Pl. Expert Dep**. at 101:16 ("I have never bid on a prime contract."). This renders Plaintiff's assertions of preclusion inherently speculative. He sues Defendants to re-enter a market in which he never participated, never attempted to participate, and in fact, could not participate by virtue of his executive-level employment. *See* **Ex. 2, Pl. Dep.** at 26:3-6; 308:15–19. A stigma claim, by contrast, requires proof of exclusion, which necessarily implies both previous membership in the field and then attempts to re-enter it. *See Orange v. District of Columbia*, 59 F.3d 1267, 1275 (D.C. Cir. 1995) (Plaintiffs unable to establish preclusion because "neither sought a position in the government" since their terminations.); *Evangelou v. District of Columbia*, 63 F. Supp. 3d 96, 104 (D.D.C. 2014) (Plaintiff unable to establish preclusion because he "only applied to two police departments since his termination" and "admits that he never sent out other applications.") *aff'd*, 639 F. App'x 1 (D.C. Cir. 2016). Plaintiff has no evidence of either prerequisite.

Plaintiff's success in the field of CyberAI demonstrates an absence of preclusion as well. He considers himself a "luminary" who until March of 2025 was "developing new ideas, performing research and development on those ideas" for commercial purposes. **Ex. 2, Pl. Dep.** at 317:3–8. Indeed, at Leidos he built the entire CyberAI portfolio during his tenure, which included offensive work, and he was paid handsomely for doing so. *Id.* at 19:16-19; 21:4–22, 271:7–15, 316:8–321:4. **Ex. 1, CV** at 2 (Plaintiff stating on his CV that he "created the Leidos

Offense/Defense CyberAI research portfolio from scratch . . . and led the team to a successful demonstration of 7 projects[.]"). Now, as a political appointee at ODNI, his work continues to include CyberAI projects. *Id.* at 13:22–15:6. Plaintiff cannot seriously claim that he has experienced "destroyed" employment prospects in the field of Cyber AI, *Trifax Corp.*, 314 F.3d at 644, when in fact he still works in the field, has established himself as a luminary, and has risen to professional success within the field.

Accordingly, Plaintiff fails to establish the requisite deprivation and cannot proceed on Count IV.

**B.   Plaintiff's Routine Read-Out from the HNCO Classified Program Did Not Violate Due Process Standards Under *Bledsoe*.**

 "[A] liberty interest is infringed, and the right to notice and an opportunity to clear one's name arises, only when an employee is 'discharged in a manner that creates a false and defamatory impression about him and thus stigmatizes him and forecloses him from other employment opportunities.'" *Bledsoe v. City of Horn Lake, Mississippi*, 449 F.3d 650, 653 (5th Cir. 2006) (quoting *White v. Thomas*, 660 F.2d 680, 684 (5th Cir. 1981)). "Neither damage to reputation alone nor the stigma resulting from the discharge itself trigger the protections of due process." *Id.* To succeed on a "stigma-plus-infringement" claim, a plaintiff must show: (1) he was discharged; (2) stigmatizing charges were made against him in connection with the discharge; (3) the charges were false; (4) he was not provided notice or an opportunity to be heard prior to the discharge; (5) the charges were made public; (6) he requested a hearing to clear his name; and (7) the employer denied the request. *Bledsoe*, 449 F.3d at 653. As explained below, Plaintiff fails on at lease factors one, three, five, six, and seven, each of which is separately dispositive.

17

### 1. Plaintiff was Never "Discharged" from HNCO.

As a matter of law, Plaintiff's due process claim fails on the first element because he was never "discharged" from HNCO. As discussed above, *supra* Section I.A., Plaintiff's voluntary resignation from NSA vitiated the basis for his access to classified information and precipitated his routine read-out from the Air Force classified program. The Air Force would have permitted him to continue working on the program at HNCO in his capacity as a government employee. **Ex. 16, MFR**. Plaintiff also was specifically advised that "if he wanted to continue his work" as a private sector employee that he would need to be submitted for access again with proper justification. **Ex. 6, OSI Form 40.** But Plaintiff elected to resign his government employment and pursue his career at Leidos, which was his choice. **Ex. 2, Pl. Dep.** at 213:5–9, 232:3–8. Thus, the undisputed evidence establishes that Plaintiff was never "discharged" from HNCO.

### 2. The HNCO Inquiry Was Not Based on False or Pretextual Information, and Plaintiff's Read Out of the Program Was Routine.

As for the third element, the record reflects that Air Force officials were not initially aware of Plaintiff's dual role as a government employee and subcontractor. **Ex. 5, Burghard Dep.** at 61:23–62:3, 65:1–4, **Ex. 3, Ekholm 30(b)(6) Dep.** at 49:18–19, 51:17–18 (first written correspondence highlighting concern with dual-roles on August 19, 2020). Considering that Plaintiff failed to disclose his contractor status in his dealings with HNCO, **Ex. 2, Pl. Dep.** at 205:20–206:10, and at least some Air Force employees were under the impression he was consulting as a government employee only, *see* **Ex. 5, Burghard Dep.** at 130:21–131:2, there was a clear disconnect that warranted inquiry. Thus, the Air Force officials had a good faith basis to investigate a potential conflict of interest and determine whether a security incident occurred because Plaintiff lacked clearance to the SAP as a contractor. **Ex. 13, Rowe 30(b)(6) Dep.** at 16:14–17:3 (describing preliminary security inquiry process); 29:4–7 (inquiry was into

individual cleared as NSA employee who was attending briefing as an industry contractor where he was not cleared); 31:24–32:19 (testifying that it is a security incident when someone is not cleared in the capacity they are working in); *see also* DoD Special Access Program Security Manual 5205.07, Enclosure 8, https://securityawareness.dcsa.mil/cdse/multimedia/shorts/sap-sec-incident/common/scenarios/industry_day/common/files/resources/5205.pdf (last accessed June 30, 2025); **Ex. 5, Burghard Dep.** at 132:1–11; **Ex. 16, MFR**; **Ex. 20, Parisi Dep.** at 52:17–54:11. Even the NSA OGC emails Plaintiff provided to HNCO highlight the near impossibility of avoiding such a conflict if he continued working as a government employee. **Ex. 9, NSA OGC Emails.** And Plaintiff omitted information from the emails when forwarding the information to Brown, which suggests his own awareness that he may have violated conflict of interest rules. **Ex. 15, Brown Email** *with* **Ex. 9, NSA OGC Emails**. The "charges" against Plaintiff were not false, and the reasons for the inquiries were not pretextual. *Zeng v. Texas Tech Univ. Health Sci. Ctr. at El Paso*, 836 F. App'x 203, 212 (5th Cir. 2020) (classifying termination for misconduct was accurate where employee violated university policy).

Because there is no evidence that the HNCO inquiry into whether a security incident occurred was based on "false" information, Plaintiff cannot as a matter of law satisfy the third *Bledsoe* factor.

### 3.    HNCO Did Not Publicly Release Any Information About Plaintiff.

Regarding the fifth factor, the Air Force did not make any information about Plaintiff public, including his potential conflict of interest, concerns about his access to SAP-protected information, or his clearance to any SAP programs. "[P]ublic disclosure must be fairly attributable to the defendant employer." *Hughes v. City of Garland*, 204 F.3d 223, 227 (5th Cir. 2000). Plaintiff testified he learned that he was supposedly being "investigated" from a call with

Dan Brown, but he also testified that he only learned about HNCO's security inquiry through discovery in this lawsuit. **Ex. 2, Pl. Dep.** at 234:6–15. Brown testified that he did not recall any rumors about Plaintiff after he left. **Ex. 4, Brown Dep.** at 161:22–24. Plaintiff suggests that some of his former NSA employees "made derogatory remarks about [his] presentation" and his reputation in 2023 because of "what they had heard at NSA Texas through other people." **Ex. 2, Pl. Dep.** at 263:21–264:7. But "[t]his causal gossip falls well short of 'intentional or official disclosure'" by the Air Force. *Hughes*, 204 F.3d at 228 (some people in community hearing rumors about events leading to discharge insufficient to establish public disclosure). There is no record evidence that the Air Force made any information about Plaintiff's potential conflict of interest, the HNCO security inquiry, or Plaintiff's read out "public," and thus Plaintiff fails on the fifth *Bledsoe* factor. *See Ghedi*, 16 F.4th at 468 (dismissing stigma-plus claim where status on watchlist is government secret that is not public).

### 4. Plaintiff Never Requested, And the Air Force Never Denied, A Hearing to Clear His Name.

Plaintiff's due process claim also fails on the sixth and seventh factors. "Though an employee need not use the term 'name-clearing hearing' to satisfy the sixth element of the stigma-plus-infringement test, the employee must still petition the employer in a manner that can be construed as asking for an opportunity to clear his name." *Bledsoe*, 449 F.3d at 653 (request to record or postpone meeting to fire employee insufficient); *see also Rosenstein v. City of Dallas*, 876 F.2d 392, 396 (5th Cir. 1989) ("request to participate in established grievance, appeals, or other review procedures to contest defamatory charges" constituted request for name-clearing hearing). In the Fifth Circuit, the request generally must be to confront the governing body that discharged the plaintiff, in a public forum. *Cunningham v. Castloo*, 983 F.3d 185, 194 (5th Cir.

2020); *see also Navarro v. City of Bryan*, No. H-22-2047, 2022 WL 3588050, at *3 (S.D. Tex. Aug. 22, 2022).

Here, there is no evidence that Plaintiff ever requested a name-clearing hearing or that the Air Force denied such a request. In fact, Plaintiff never had any communication with anyone in the Contracting Office at HNCO. **Ex. 2, Pl. Dep.** at 262:4–7. Instead, Plaintiff only spoke with Brown, an engineer who provides technical advice in the context of the spring 2023 Leidos demos. *Id.*; **Ex. 4, Brown Dep.** at 12:2–4, 18:9–15, 145:18–146:22. He asked Brown if he could "present his case to somebody else at HNCO," and Brown purportedly told Plaintiff, "Don't even bother." **Ex. 2, Pl. Dep.** at 260:16–262:3. This is not a legally sufficient request and is similar to the request in *Cunningham*, where the employee asked to speak with the sheriff after being fired, and the sheriff's subordinates denied the request. 983 F.3d at 194. The Fifth Circuit found that granting the request to speak with the sheriff would not have provided the employee with a "public forum" of any sort and would have only resulted in a private audience with the Sheriff. *Id.* Thus, the Fifth Circuit concluded that the employee's request did not rise to the level of a name-clearing hearing request. *Id.* The same is true here. There is no record evidence that Plaintiff ever sought a hearing, and thus, the Air Force also did not have the opportunity to deny that request. Accordingly, Count VI cannot proceed to trial. *Macklin v. City of New Orleans*, 300 F.3d 552, 553 (5th Cir. 2002) ("[T]he requirement that [a name-clearing] hearing be requested by the claimant is well-established in Fifth Circuit law.").

## II.  **Plaintiff's De Facto Debarment Claim Fails (Count I).**

In Count I, Plaintiff "seeks termination of an unlawful de facto debarment that violates the Fifth Amendment to the Constitution and the regular opportunities afforded all contractors to freely contract with the agency without an unlawful stigma attached." SAC ¶ 162. Debarment is

a policy tool that is used by the government to ensure that it contracts only with "responsible" contractors. 48 C.F.R. § 9.402. While the Federal Acquisition Regulations require that an agency provide the contractor with a notice and an opportunity to be heard before debarment, *see* 48 C.F.R. § 9.406–3, "[d]e facto debarment occurs when a contactor has, for all practical purposes, been suspended or blacklisted form working with a government agency without due process, namely, adequate notice and a meaningful hearing." *Phillips v. Mabus*, 894 F. Supp. 2d 71, 81 (D.D.C. 2012) (citations omitted).

To succeed on his de facto debarment claim, Plaintiff must demonstrate a "systemic effort by the procuring agency to reject all of the bidder's contractor bids." *TLT Const. Corp. v. United States*, 50 Fed. Cl. 212, 215 (2001). Two options exist to establish a de facto debarment: (1) "an agency's statement that it will not award the contractor future contracts;" or (2) "an agency's conduct demonstrating that it will not award the contractor future contracts." *Id.* But this sort of government action would only implicate the constitution if a contractor is effectively barred from "virtually all [g]overnment work." *Old Dominion Dairy Prods., Inc. v. Sec'y of Def.,* 631 F.2d 953, 955 (D.C. Cir. 1980); *see also Taylor v. Resolution Trust Corp.,* 56 F.3d 1497, 1506 (D.C. Cir. 1995) (quoting *Greene v. McElroy*, 360 U.S. 474, 492 (1959) (finding plaintiff must show that the government "has seriously affected, if not destroyed, his ability to obtain employment in [his] field" to show broad preclusion)). Merely showing that the plaintiff "won some and lost some in retaining and bidding on government contracts" is insufficient. *See Trifax Corp.*, 314 F.3d at 644.

Here, the undisputed evidence shows that the Air Force neither formally nor constructively debarred Plaintiff. **Ex. 26, Bremer 30(b)(6) Dep.** at 20:7–24, 21:9–22:3 (HNCO did not debar Plaintiff). *See also* **Ex. 20, Parisi Dep.** at 71:13–16 (AFRL did not debar Plaintiff);

**Ex. 4, Brown Dep.** at 102:12–1-03:7, 119:15–23, 155:1–5, 156:25–157:3 (Brown not aware of any debarment against Plaintiff); **Ex. 5, Burghard Dep.** at 120:15–22 ("welcom[ing]" working with Plaintiff again); **Ex. 6, OSI Form 40** (to continue his work Plaintiff would need to be submitted for access with proper justification and forms); **Ex. 16, MFR** (Plaintiff could continue working on the program as a government employee). As set forth below, Plaintiff's de facto debarment claim is too speculative to proceed to trial because he has never bid or competed for any government contracts *ever*, and Plaintiff has not experienced the necessary broad preclusion from contracts government-wide. Thus, Defendants are entitled to summary judgment on Count I.

### A.    Plaintiff Never Bid On or Competed For Government Contracts in His Personal Capacity.

The record is undisputed that Plaintiff never attempted to bid or compete for any government contract as a prime or subcontractor. **Ex. 2, Pl. Dep.** at 16:13–17:12, 36:3–4, 308:15–19. Indeed, as a condition of the employment he accepted with Leidos after leaving NSA, Plaintiff was ineligible to bid on or compete for government contracts. *Id.* at 307:3–21. The same is true of his current position at ODNI. *Id.* at 308:4–7. The Air Force therefore cannot have excluded Plaintiff from contracts that he never sought because "de facto debarment has generally been found only where the party claiming debarment bid on and was denied more than one contract." *Dynamic Aviation v. Dep't of Interior*, 898 F. Supp. 11, 13 (D.D.C. 1995); *see also Redondo-Borges v. U.S. Dep't of Hous. & Urb. Dev.*, 421 F.3d 1, 9 (1st Cir. 2005) (construction contractor could not establish a "pattern or practice of exclusion" necessary for a de facto debarment claim given contractor's failure to allege that it bid on any government contracts post suspension); *IFONE NEDA Internet Servs. v. Army & Air Force Exch. Serv.*, No. 4:21-CV-330, 2021 WL 1148345, at *5 (S.D. Tex. Mar. 25, 2021) (refusing to infer "that the

government was prohibiting IFONE from all or virtually all future government work . . . without knowing, for example, if a bid by IFONE was rejected by the government following th[e] termination decision"); *Mitchell Eng'g v. City & Cnty. of San Francisco*, No. C 08-04022 SI, 2009 WL 440486, at *3 (N.D. Cal. Feb. 23, 2009) ("[P]laintiff has not pled a 'systematic effort' to reject all of its bids. Indeed, plaintiff does not allege that the City has rejected any of its bids. Plaintiff cites no authority establishing that a contractor can be constructively debarred when none of its bids has been rejected."). Although in some cases, courts have found it technically possible to proceed with a debarment claim without any bids, *see, e.g.*, *Dynamic Aviation*, 898 F. Supp. at 11–13, Plaintiff's circumstances are readily distinguishable because the Air Force did not prevent Plaintiff from obtaining a legal requisite to participate in the bid process. *Highview Eng'g, Inc. v. U.S. Army Corps of Engineers*, 864 F. Supp. 2d 645, 653 (W.D. Ky. 2012) (distinguishing *Dynamic Aviation*, 898 F. Supp. at 11–13).

To the extent Plaintiff's debarment claim relies on Dan Brown's testimony that it would not have been "good optics" for Plaintiff to participate in the Leidos spring 2023 demos to HNCO, Plaintiff's claim still fails. First, Plaintiff is not Leidos. Plaintiff's debarment claim cannot properly rest on a theory that *Leidos* somehow missed out on a contracting opportunity with the Air Force because of the circumstances of Plaintiff's departure from HNCO. Moreover, Plaintiff is "not aware" of whether Leidos lost any contracts because of his situation at HNCO. **Ex. 2, Pl. Dep.** at 306:1–4. Second, no contract or bid opportunities materialized from the 2023 presentation. **Ex. 2, Pl. Dep.** at 291:5–15. Following the spring 2023 demos, HNCO was ultimately not interested in the technology because it "did not live up to expectations." **Ex. 4, Brown Dep.** at 147:21–2; 149:16–19. Even if these demos had ever materialized into a biddable contract at HNCO (which it did not), "[p]reclusion from a single contract is insufficient to

establish a *de facto* debarment." *Highview Eng'g, Inc.*, 864 F. Supp. 2d at 653 (granting summary judgment for agency where prime contractor removed plaintiff from one project proposal); *see also Redondo-Borges*, 421 F.3d at 9 (A single incident is insufficient to establish a pattern or practice of exclusion for debarment); *National Career College, Inc. v. Spellings*, 371 Fed. Appx. 794, 796 (9th Cir. 2010) (same).

### B. Plaintiff Cannot Prove Broad Preclusion from Government Work.

The second key feature of a de facto debarment is that the plaintiff has been broadly shut out of opportunities to contract *government-wide. See IFONE NEDA Internet Servs.*, 2021 WL 1148345, at *4 (quoting *Phillips v. Mabus*, 894 F. Supp. 2d at 82 ("[D]e *facto* debarment may lie where there has been exclusion from virtually all government work for a fixed period of time, . . . or where the government's conduct has the broad effect of largely precluding plaintiffs from pursuing government work.")). As with Plaintiff's occupational liberty claim, *supra* Section I, he cannot prove the necessary preclusion.

First, Plaintiff's debarment claim is based solely on exclusion from a narrow subclass of contracting opportunities, namely offensive CyberAI contracts with HNCO. SAC ¶¶ As a matter of law, debarment must more broadly defined. *See IFONE NEDA Internet Servs.*, 2021 WL 1148345, at *5; *Kartseva v. Dep't of State*, 37 F.3d 1524, 1530 (D.C. Cir. 1994) (If disqualification does not encompass all State contracts, then the determination is not broadly preclusive). And as outlined above, other entities in DoD, and even in the Air Force, also work in CyberAI and solicit contracts in this space. *See supra* Section I.A; **Ex. 25, Jaspers Dep** at 102:2–103:17. Because a de facto debarment claim requires proof of a systemic effort exclusion from "virtually all government work," Plaintiff's claim fails.

Second, even apart from the basic legal deficiency in Plaintiff's debarment theory, the

undisputed evidence shows that he actually has performed work in his chosen field. For example, with Leidos's approval Plaintiff worked as a 1099 consultant for StarNav, a company with a government contract. **Ex. 2, Pl. Dep.** at 24:2–25:5, 26:10–22. Plaintiff did not seek other consulting work unaffiliated from Leidos during his tenure. *Id.* Second, as a Leidos executive, Plaintiff has been involved in numerous successful bids on government contracts including with DoD agencies. **Ex. 2, Pl. Dep.** at 308:20–311:3. And Jaspers testified that outside of the comments from Brown, no other government customers ever expressed any reservations about working with Plaintiff. **Ex. 25, Jaspers Dep.** at 88:24–89:4. Thus, in addition to failing to bid on any contracts as an individual, Plaintiff also fails to establish systemic exclusion from opportunities to contract government-wide. *Trifax Corp.*, 314 F.3d at 642 (affirming summary judgment on de facto debarment claim because even if "injured in some respects" plaintiff could not demonstrate broad preclusion from government contracting).

### C.      Plaintiff Is Not Entitled to Declaratory Relief.

Judicial review under the Administrative Procedure Act is limited to final agency action. 5 U.S.C. § 704. Because Plaintiff cannot establish a de facto debarment, there is no final agency action to review under the APA. *Highview Eng'g, Inc.*, 864 F. Supp. 2d at 649, 653. *See also* SAC ¶ 191. Plaintiff is also not entitled to relief for any Fifth Amendment violation, such as a debarment hearing, because the record establishes that there is no debarment at all. *See Redondo-Borges*, 421 F.3d at 8.

### III.     Plaintiff's Privacy Act Claims Fail as a Matter of Law.

Plaintiff asserts two Privacy Act claims under 5 U.S.C. § 552a(g)(1)(D), claiming improper disclosure of Privacy Act-protected information by the Air Force Office of Special

Investigations (Count 2)[3] and the Air Force (Count 3). *See* SAC ¶¶ 193–246. Plaintiff's Privacy

Act claims are based on alleged improper disclosures of the NSA OGC emails and debrief

documents.

First, Plaintiff claims that OSI Special Agent Beall, disclosed email correspondence

between Plaintiff and an attorney from NSA's Office of General Counsel (the NSA OGC emails)

to Captain William McVeigh, which Plaintiff provided to SA Beall during an interview and read

out on August 26, 2020. *See* **Ex. 2, Pl. Dep.** at 240:20–241:21, 242:15–244:3. Agent Beall sent

this email along with the debrief documents to Captain McVeigh and the HNCO Security Office

with the request to provide the information to the inquiry official when appointed. **Ex. 28, Beall**

**CORE Email**; **Ex. 6, OSI Form 40**.

Second, Plaintiff alleges that Captain McVeigh disseminated information about

Plaintiff—specifically, the NSA OGC emails and records related to his August 26, 2020

debriefing from HNCO special access programs (the debrief records)—to others within HNCO.

*Id.* at 240:12–241:22 (identifying OSI Form 40 and attachments, marked as Deposition Exhibit 7,

US000045–56); 325:8–12.[4] The undisputed record evidence demonstrates that Captain McVeigh

---

[3]     As an initial matter, the Court should dismiss Count 2 because OSI is not an "agency" subject to suit under the Privacy Act. *See* 5 U.S.C. §§ 552a(a)(1), 552(f) (Privacy Act definition of "agency"); *Rosales v. Wormuth*, No. 1:23-CV-00440-DAE, 2024 WL 5703320, at *4 (W.D. Tex. May 23, 2024) (dismissing Privacy Act claim against Army component).

[4]     Plaintiff testified that his source of information about those disclosures was HNCO engineer Dan Brown. **Ex. 2, Pl. Dep.** at 241:2 (alleging improper disclosure "based on what Dan Brown told me"); 241:19–22 ("**Q** Okay. What others [documents] that are not attached? **A** I don't know. This is information I received from Dan Brown."); 242:12–14 ("**Q** Okay. And your basis for [claiming that Captain McVeigh was spreading information] is Dan Brown? **A** Yes, ma'am."); 243:5–7, 244:1–3 ("**A** It's my understanding that Captain McVeigh showed documents to Dan Brown that I had only shared with the Air Force OSI agent. . . . **A** I recall Dan Brown saying that there were several other documents. I don't know what they are."). For his part, Dan Brown denied relaying this information to Plaintiff and denied saying that "all your stuff" is being sent around to everyone. *See* **Ex. 4, Brown Dep.** at 99:7–10; 161:18–21 (reading

collected information about Plaintiff as part of an initial inquiry as requested by his superiors, Colonel Ekholm and Burghard, and then provided a witness statement in connection with inquiry. **Ex. 5, Burghard Dep.** at 63:4–9; **Ex. 11, McVeigh/Burghard Email Chain**; **Ex. 12, McVeigh Witness Statement**; **Ex. 14, McVeigh Email to Brown** (Aug. 19, 2020); **Ex. 16, MFR**; **Ex. 3, Ekholm 30(b)(6) Dep.** at 48:20–22; 50:14–16; 53:15–17. There is no evidence that Captain McVeigh disclosed any information about Plaintiff outside of either of these processes or disclosed any information to individuals who were not involved in the inquiries.

To survive summary judgment on a Privacy Act claim brought under Section 552a(g)(1)(D), Plaintiff "must present evidence of the following elements: (1) the information is a "record" in a "system of records"; (2) the agency disclosed the information; (3) the disclosure had an adverse effect on him; and (4) the disclosure was willful." *Jacobs v. Nat'l Drug Intel. Ctr.*, 423 F.3d 512, 516 (5th Cir. 2005). As explained below, the NSA OGC Email "disclosure" fails on all elements and the debrief document "disclosure" fails on the second, third, and fourth elements. Counts II and III also fail because the recipients of the information had "a need for the record in the performance of their duties[,]" 5 U.S.C. § 552a(b)(1).

A.   **Plaintiff Has Not Shown Disclosure of the NSA OGC Emails from a "System of Records."**

First, the disclosure of the NSA OGC emails does not support a Privacy Act claim because that correspondence is not a "record" retrieved from a "system of records" within the meaning of the Privacy Act. The Privacy Act defines "record" as:

> any item, collection, or grouping of information about an individual that is maintained by an agency, including, but not limited to, his education, financial transactions, medical history, and criminal or

---

allegation in SAC ¶ 223). This dispute is not material because Plaintiff's Privacy Act claims turn on what was disclosed, not on how Plaintiff learned of the disclosure. *See Anderson*, 477 U.S. at 248 (facts are only material if they "might affect the outcome of the suit under governing law").

employment history and that contains his name, or the identifying number, symbol, or other identifying particular assigned to the individual, such as a finger or voice print or photograph.

5 U.S.C. § 552a(a)(4). A "system of records" is "a group of records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual." 5 U.S.C. § 552a(a)(5). It is not sufficient that information is "about" an individual—if records are not, "as a practical matter" used by searching for the plaintiff's name or other identifier, they are not "records" within a "system of records" for purposes of the Privacy Act. *Bettersworth v. F.D.I.C.*, 248 F.3d 386, 391 (5th Cir. 2001) ("records not accessible under the Privacy Act, even though agency *could* search for the records by the plaintiff's name, because the agency *as a practical matter* did not use the information that way" (quoting *Henke v. United States Dep't of Commerce*, 83 F.3d 1453 (D.C. Cir. 1996); collecting cases)); *see also Walia v. Napolitano*, 986 F. Supp. 2d 169, 186 (E.D.N.Y. 2013), on reconsideration in part (Feb. 4, 2014) ("to be covered by the Privacy Act, a record must actually be retrieved from a system of records by using a personal identifier."); *McCarthy v. U.S. Section Int'l Boundary & Water Comm'n, U.S.-Mexico*, No. EP-11-CV-208-PRM, 2011 WL 11741033, at *5 (W.D. Tex. Nov. 30, 2011).

Rather than being retrieved by searching a system of records using Plaintiff's name or particular identifier, the NSA OGC emails were provided to the Air Force by Plaintiff himself, twice: First, in Plaintiff's August 20, 2020 email to Dan Brown, *see* **Ex. 15, Brown Email**, and second, in person to SA Beall during his debriefing interview six days later. Plaintiff cannot maintain a Privacy Act claim as to the NSA OGC emails because they were not "actually . . . retrieved from a system of records by using a personal identifier[,]" *Walia*, 986 F. Supp. 2d at 186, but were provided by Plaintiff himself to Brown and Beall.

**B.**     **Plaintiff Cannot Show Inter-Agency Disclosure of Privacy Act Material.**

Second, Plaintiff's Privacy Act claims fail because, by his own account, the information-sharing at issue occurred entirely within the Air Force, and certainly within the Department of Defense. *See* **Ex. 2, Pl. Dep.** at 240:9–19; 244:16–245:10. "[I]ntra-agency disclosure 'is not the evil against which the Privacy Act was enacted'"—"thus information shared within the same agency . . . is 'not subject to the requirements of the Privacy Act.'" *Coburn v. Potter*, No. 06 C 5397, 2008 WL 4390153, at *4 (N.D. Ill. Sept. 24, 2008), *aff'd,* 329 F. App'x 644 (7th Cir. 2009) (quoting *Clarkson v. Internal Revenue Serv.*, 811 F.2d 1396, 1398 (11th Cir. 1987) and *Williams v. Reilly*, 743 F. Supp. 168, 175 (S.D.N.Y. 1990)). Plaintiff's Privacy Act claims arise from information-sharing within and between OSI and HNCO—both Air Force components— and he cannot point to any evidence of any disclosure of information about him outside the Department of Defense. *Compare, e.g.*, *Sullivan v. Fed. Bureau of Prisons*, No. CV 20-00269 LEK-KJM, 2021 WL 3519907, at *4 (D. Haw. Aug. 10, 2021), *aff'd,* No. 21-16527, 2022 WL 9730920 (9th Cir. Oct. 17, 2022) (granting summary judgment on Privacy Act claim arising from disclosure between the Bureau of Prisons and a U.S. Attorney's Office); *Williams*, 743 F. Supp. at 175 (granting motion to dismiss Privacy Act claim; noting that "[the Naval Investigative Service] and [the Defense Logistics Agency] are considered components of one agency, the Department of Defense. . . . any information shared between NIS and DLA was not subject to the requirements of the Privacy Act."); *Marcotte v. Sec'y of Def.*, 618 F. Supp. 756, 763 (D. Kan. 1985) (same result from disclosure between Air Force Office of Inspector General and Corrections Board). The intra-agency disclosures Plaintiff complains of are not actionable under the Privacy Act.

**C.    Plaintiff Cannot Show That He Was Adversely Affected by Any Disclosure of Privacy Act Material.**

Because Plaintiff himself disclosed the NSA OGC emails to the Air Force, he cannot satisfy the Privacy Act requirement of showing that an improper disclosure had an "adverse effect" on him. *Hernandez v. Johnson*, 514 F. App'x 492, 500 (5th Cir. 2013) (favorably noting holding in *Gowan v. United States Dep't of the Air Force*, 148 F.3d 1182, 1194 (10th Cir. 1998) that Air Force disclosure of information "did not have adverse effect on plaintiff within meaning of Privacy Act because plaintiff had disclosed the same information to the same entity"). As to his remaining Privacy Act claims, the only adverse effects Plaintiff has claimed flow not from the disclosure of his debriefing records, but from the debriefing itself and from a supposed constructive debarment from doing business with HNCO—events not actionable under the Privacy Act. *See* **Ex. 2, Pl. Dep.** at 327:7–328:11 (Plaintiff describing emotional distress based on fear of indictment based on statements during debriefing interview); *see also Sweeney v. Chertoff*, 178 F. App'x 354, 357 (5th Cir. 2006) (affirming summary judgment against Privacy Act claim where "[plaintiff's] injury is not 'fairly traceable,' . . . to DHS's failure to inform him of the voluntary nature of the OF–612. Rather, [plaintiff's] loss of pay was caused by his suspension, which, in turn, was the result of an internal agency disciplinary action"); *FAA v. Cooper*, 566 U.S. 284 (2012) ("Actual damages" means "proven pecuniary or economic harm" and does not include damages for mental or emotional distress.).

**D.    Plaintiff Cannot Show a "Willful" Violation of the Privacy Act.**

To survive summary judgment, Plaintiff must show a willful violation of the Privacy Act—that is, disclosures "so patently egregious and unlawful that anyone undertaking the conduct should have known it unlawful, or conduct committed without grounds for believing it to be lawful[,] or action flagrantly disregarding others' rights under the Act[.]" *Coleman v.*

*United States*, 912 F.3d 824, 837 (5th Cir. 2019) (affirming summary judgment on Privacy Act claims based on failure to show willful violation) (internal citations and quotation marks omitted). This requirement imposes a standard "somewhat greater than gross negligence." *Carrington v. U.S., Dep't of Def.*, 46 F.3d 66 n.1 (5th Cir. 1995) (quoting *Edison v. Department of the Army*, 672 F.2d 840 (11th Cir. 1982)); *see also Maydak v. United States*, 630 F.3d 166, 179 (D.C. Cir. 2010). Plaintiff does not come close. The undisputed facts show no disclosure outside the Air Force and no disclosure beyond the personnel tasked with reviewing for potential security incidents or conflicts of interest related to the discovery of Plaintiff's dual role as NSA employee and subcontractor.

**E.**     **Plaintiff Cannot Show Disclosure Beyond the "Need to Know" Exception of 5 U.S.C. § 552a(b)(1).**

Finally, Plaintiff's claims fail as a matter of law because the Privacy Act does not prohibit agency disclosure to individuals with "a need for the record in the performance of their duties[,]" 5 U.S.C. § 552a(b)(1), which includes, in this context, making an assessment of an employee or contractor's involvement in the handling of "classified material and other sensitive information and tasks." *Hill v. Dep't of Def.*, 981 F. Supp. 2d 1, 11 (D.D.C. 2013) (discussing *Bigelow v. Dep't of Defense*, 217 F.3d 875, 877 (D.C. Cir. 2000)). Notwithstanding Plaintiff's focus on Beall's and Captain McVeigh's supposed animus against him, "[w]hat matters [] is the 'need to know' of the agency official who *received* the disclosure, not the authority of the agency official who *made* the disclosure." *Cacho v. Chertoff*, No. 06-00292, 2006 WL 3422548, *4–7 (D.D.C. Nov. 28, 2006). The individuals who received the NSA OGC emails and the debrief record were all Air Force employees involved in researching the potential security and conflicts issues raised by the discovery of Plaintiff's dual status as an NSA employee (with a security clearance based on his NSA employment) and as a subcontractor of an HNCO-contracted entity,

GITI, that had not satisfied the security requirements to perform classified work. *See* **Ex. 2, Pl. Dep.** at 244:16–245:10; **Ex. 28, Beall CORE Email**; **Ex. 6, OSI Form 40**; **Ex. 15, Brown Email (Aug. 20, 2020)**.

## CONCLUSION

For these reasons, the Court should grant this motion and enter judgment in favor of Defendants.

Dated: July 2, 2025

Respectfully Submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

C. SALVATORE D'ALESSIO, JR.
Director, Torts Branch

REGINALD M. SKINNER
Senior Trial Attorney

*/s/ Joseph A. Gonzalez*
Joseph A. Gonzalez
D.C. Bar No. 995057
Trial Attorney
Torts Branch, Civil Division
United States Department of Justice
P.O. Box 7146, Ben Franklin Station
Washington, D.C. 20044
(202) 598-3888
joseph.a.gonzalez@usdoj.gov

*/s/ Katrina M. Seeman*
KATRINA M. SEEMAN
D.C. Bar No. 1671729
Trial Attorney
Torts Branch, Civil Division
United States Department of Justice
P.O. Box 7146, Ben Franklin Station
Washington, D.C. 20044
(202) 616-0674
katrina.m.seeman@usdoj.gov

-and-

JUSTIN R. SIMMONS
United States Attorney

*/s/ Robert D. Green*
ROBERT D. GREEN
Texas Bar No. 24087626
Assistant United States Attorney
U.S. Attorney's Office
601 NW Loop 410, Suite 600
San Antonio, Texas 78216
(210) 384-7362 (phone)
(210) 384-7312 (fax)
robert.green3@usdoj.gov

*Counsel for Defendants*