**IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

DR. JOHN ROE,

        *Plaintiff,*

v.

UNITED STATES OF AMERICA, and
FRANK KENDALL, III,
LT. GEN. KEVIN KENNEDY (USAF),
LT. GEN. SHAUN Q. MORRIS (USAF),
JOSEPH DANIEL BURGHARD (USAF),
LT. COL. JARED EKHOLM (USAF)
CAPTAIN WILLIAM MCVEIGH (USAF))
UNKNOWN NAMED USAF OSI AGENT,)
JOHN DOES 1-50,

        *Defendants*

Civil Action No. 5:22-cv-00869-JKP-HJB

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
(Evidentiary Hearing Requested)**

## TABLE OF CONTENTS

INTRODUCTION AND SUMMARY ................................................................ 1
PLAINTIFF'S FACTS IN SUPPORT OF OPPOSITION ................................ 3
DISCOVERY PROCEDURAL HISTORY RELEVANT TO R. 56(D) ................. 25
 I.  Overview — Preservation Failures & Spoliation ......................... 25
 II.  Preservation Failures & Spoliation ............................................ 26
 III.  Overview - Inadequate Searches – Classified Repositories Ignored .......... 29
 IV.  Systemic Failures to Search Classified Repositories .................... 30
 V.  DOJ's Improper Search Instructions and Selective Retrieval from Classified Systems.......... 32
 VI.  Improver Blank Secrecy and Privilege Assertions ..................... 35
 VII.  Classification Discovery Obstruction ....................................... 35
 VIII.  Prejudice to Plaintiff ............................................................. 37
 ARGUMENT ............................................................................... 39
 I.  The Summary Judgment Standard ............................................ 39
  A.  The Government Is Not Entitled to Judgment on Dr. Roe's De Facto Debarment Claim (Count I) ............................................... 40
  B.  Dr. Roe Has Presented Sufficient Evidence of Agency Statements and Conduct Demonstrating a Bar on Future Contracting..................... 42
  C.  HNCO Officials Made Express Statements That Dr. Roe Was Permanently Barred ................................................................ 45
  D.  The Government Engaged in Sustained Conduct Excluding Dr. Roe from Future Contracting ....................................................... 45
  E.  The Exclusion Was Not "Voluntary" or "Isolated".................. 46
   1. OSI Removed Dr. Roe Before Any Resignation ..................... 47
   2. Government Officials Continued to Enforce the Exclusion in 2023 47
   3. McVeigh and Burghard Actively Promoted the Misconduct Narrative ......................................................................... 47
   4. The Government's "Voluntary Exit" Defense Is No Defense at All 48
  F.  Dr. Roe Was the Target of Sustained Blacklisting, Not a Routine Clearance Action.................................................................... 49
  G.  The Government Is Not Entitled to Judgment on Dr. Roe's Stigma-Plus / Unreasonable Interference with Employment Claim (Count IV)............... 50
  H.  A. The Court Has Already Held That Dr. Roe Plausibly Alleges a Liberty-Interest Violation ......................................................... 50
  I.  Capt. McVeigh's Repeated Promotion of Disproven Misconduct Allegations Demonstrates Retaliatory Pretext and Sustained Reputational Harm A. The Record Confirms All Three Elements: Stigma, Publication, and Professional Exclusion ........................................................... 51
   1. The Government Disseminated False and Stigmatizing Charges of Misconduct ....................................................................... 51

2.    The Government Publicly Disclosed the Allegations to Third Parties.................................................................................. 54

3.    Disclosures to Leidos .................................................... 54

4.    Disclosures to GITI and Contracting Personnel ......................... 55

5.    Disclosures to NSA, IARPA, and DARPA .............................. 55

6.    Publication Within OSI and Core Security Systems..................... 55

7.    Impact of Discovery Failures.............................................. 56

8.    Professional Exclusion.................................................... 56

J.    Dr. Roysdon Suffered a Significant Loss of Employment Opportunity and Professional Status.............................................. 57

1.    Dr. Roysdon Was Excluded from a Highly Specialized Sector.... 58

2.    The Loss of Opportunity Was Substantial and Career-Defining .. 58

3.    His Status Was Altered by Government Conduct Without Due Process ........................................................................ 59

K.    The Government Denied Dr. Roysdon a Name-Clearing Hearing........ 60

1.    Dr. Roysdon Attempted to Invoke Process and Was Refused...... 60

2.    The Government Never Provided Notice, Charges, or Rebuttal Rights ......................................................................... 61

3.    Procedural Violations Compound the Harm and Preclude Summary Judgment ......................................................... 61

L.    Summary of Findings and Relief Requested on Count IV ................... 62

1.    Stigmatizing Allegations:................................................. 62

2.    Public Disclosure:......................................................... 62

3.    Loss of Employment Opportunity and Professional Status: ......... 63

4.    Denial of Name-Clearing Process:...................................... 63

5.    Evidence of Retaliatory Motive and Pretext:............................ 63

6.    Discovery Failures Preclude Judgment as a Matter of Law: ........ 64

M.    The Government's Conduct Was Willful or Intentional ...................... 64

1.    McVeigh's Access and Use of Protected Information Was Knowing, Deliberate, and Unauthorized ................................ 65

2.    McVeigh's Conduct Surpasses the Threshold for Willfulness..... 66

3.    The Government Has Not Identified Any Lawful Basis for McVeigh's Access ......................................................... 67

4.    Institutional Failures Compound the Inference of Willfulness..... 67

5.    Discovery Confirms Dan Brown's Role in Unauthorized Disclosure—But Critical Gaps Remain.................................. 68

N.    The Government's Conduct Was Willful or Intentional ...................... 69

O.    Summary of Findings and Relief Requested on Counts II and III ........ 72

1.    The Court Should Deny or Defer Summary Judgment Under Rule 56(d) Due to the Government's Discovery Misconduct, Classification Obstruction, and Spoliation ............................ 74

P.    The Government Failed to Preserve and Produce Key Records in Its Exclusive Control................................................................... 75

1.    OSI Agent Beall's Email, File, and System Access Records Were Deleted ................................................................. 75

2.    McVeigh's SAP Emails and Internal Memoranda Were Withheld or Never Searched .................................................................. 76

3.    No Access Logs or Custody Tracing for JADE, CORE, or I2MS ....................................................................................................... 77

4.    Contracting Records Were Lost During AFRL Equipment Refresh ................................................................................................... 77

Q.    The Government Refused to Facilitate Proper Classified Discovery Despite Repeated Requests ....................................................................... 78

1.    Key Classified Materials Were Identified but Withheld .............. 78

2.    The Government Denied Plaintiff's Counsel Access to Clearance or Substituted Process ....................................................... 79

3.    The Missing Classified Materials Are Central to Plaintiff's Claims .............................................................................................. 79

R.    The Government's Systemic Mismanagement of Information Systems Violates the Privacy Act at Its Core—and Requires Rule 56(d) and Rule 37(e) Relief ................................................................................................ 80

1.    The Government Cannot Identify the Systems It Used to Access, Disseminate, or Classify Plaintiff's Records ........................... 80

2.    The Government Refused Discovery While Withholding Over 250 Core Documents Without Redaction or Substitution ................... 81

3.    The Government Delegated Discovery to a Witness and Allowed Evidence to Be Destroyed ....................................................... 82

4.    Rule 56(d) Relief Is Compelled by the Government's Exclusive Control Over Material Evidence ................................................. 83

5.    The Privacy Act and Stigma-Plus Claims Most Clearly Demonstrate the Harm ..................................................................... 83

6.    Requested Relief ....................................................................... 84

S.    Plaintiff Seeks Leave Under Rule 15 to Substitute the Department of the Air Force as the Proper Defendant for Count II ................................... 85

1.    The Air Force Is Already a Party and Has Actively Defended Count II ................................................................................................ 86

2.    Rule 15(c)(1)(C) Is Satisfied and Substitution Should Relate Back 86

3.    Discovery Has Revealed that the Violations Extend Beyond OSI  86

4.    Amendment Is Appropriate Under Rule 15(a)'s Liberal Standard ......................................................................................... 87

CONCLUSION ...................................................................................................... 88

iv

## TABLE OF AUTHORITIES

**CASES**

*Adams v. City of Harahan* ........................................................................................... 58

*Andrews v. Veterans Admin.*, 838 F.2d 418, 424 (10th Cir. 1988) ................................ 71

*Anzures v. Prologis Tex. I LLC*, 886 F. Supp. 2d 555, 560 (W.D. Tex. 2012) ............... 87

*Ashbourne v. Hansberry*, 302 F. Supp. 3d 338, 347–48 (D.D.C. 2018) ......................... 72

*Babatu v. Dallas Veterans Affairs Med. Ctr.*, No. 3:11-cv-2109, 2014 WL 12482981, at *6 (N.D. Tex. Feb. 19, 2014) ................................................................. 65, 67, 72

*Bannum, Inc. v. Samuels*, 221 F. Supp. 3d 74, 86 (D.D.C. 2016) ................................ 42

*Bell v. Texas Dep't of Crim. Just.*, 894 F.3d 490, 497 (5th Cir. 2018) .................................. 51, 61

*Bell v. Texas Tech Univ. Health Scis. Ctr.*, 894 F.3d 490, 497–98 (5th Cir. 2018) ............... 51, 60

*Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) ..................................................... 40

*Coastal Bridge Co. v. Heatec, Inc.*, 833 F. App'x 565, 572 (5th Cir. 2020) ............................... 82

*Codd v. Velger*, 429 U.S. 624, 627 (1977) ................................................... 51, 54, 60, 63

*Cox v. Roskelly*, 359 F.3d 1105, 1112–13 (9th Cir. 2004) ........................................... 54, 59

*Crescent Towing & Salvage Co., Inc. v.  M/V JALMA TOPIC*, 761 F.Supp.3d 926, 932 (E.D. La. 2025) ............................................................................. 40

*Crosby v. Univ. of Ky.*, 863 F.3d 545, 558 (6th Cir. 2017) .......................................... 60

*DeWolff, Boberg & Assoc., Inc. v. Pethick*, 133 F.4th 448, 452 (5th Cir. 2025) ..................... 39, 40

*Dixon v. McMullen*, 527 F. Supp. 711, 721 (N.D. Tex. 1981) ...................................... 58

*Doe v. DOJ*, 753 F.3d 146, 154–55 (D.C. Cir. 2014) ..................................... 57, 64, 67

*Doe v. Chao*, 540 U.S. 614, 618 (2004) ..................................................................... 80

*Doe v. U.S. Postal Serv.*, 317 F.3d 339, 342 (D.C. Cir. 2003) .................................... 81

*Dubose v. Oustalet*, 738 F. Supp. 188, 190–91 (E.D. Tex. 1990) ................................................. 61

*Dynamic Aviation v. Dep't of Interior*, 898 F. Supp. 11, 13 (D.D.C. 1995).......................... 41, 45

*Gunderson v. Federal Bureau of Prisons*, 2021 WL 1627018, at *4 (D.D.C. Apr. 27, 2021)..... 84

*Hill v. Dep't of Defense*, 981 F. Supp. 2d 1, 11 (D.D.C. 2013)................................................... 72

*Horn v. Huddle*, 647 F. Supp. 2d 55, 59–60 (D.D.C. 2009)........................................................ 81

*Islamic Shura Council v. FBI*, 779 F. Supp. 2d 1114, 1125 (C.D. Cal. 2011) ............................ 82

*In re Selcraig*, 705 F.2d 789, 797 (5th Cir. 1983) ........................................................... 60, 62, 63

*Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1267 (5th Cir. 1991)...................... 74, 79, 83

*Jacobs v. Nat'l Drug Intelligence Ctr.*, 423 F.3d 512, 518 (5th Cir. 2005).......... 64, 66, 68, 69, 71

*Kelley v. FBI*, 67 F. Supp. 3d 240, 258 (D.D.C. 2014)................................................................. 72

*Mailing & Shipping Sys., Inc. v. Neopost USA, Inc.*, 292 F.R.D. 369, 373 (W.D. Tex. 2013) .... 88

*Minshew v. Donley*, 911 F. Supp. 2d 1043, 1072 (D. Nev. 2012) ................................................ 72

*Mulhern v. Gates*, 525 F. Supp. 2d 174, 184 (D.D.C. 2007) ................................................. 65, 67

*Paige v. DEA*, 818 F. Supp. 2d 4, 18 (D.D.C. 2010) .................................................................. 67

*Peña Arita v. United States*, 470 F. Supp. 3d 663, 687 (S.D. Tex. 2020) ................................... 88

*Petrus v. Bowen*, 833 F.2d 581, 583 (5th Cir. 1987) ................................................................... 86

*Phillips v. Mabus*, 894 F. Supp. 2d 71, 84 (D.D.C. 2012 ............................... 41, 42, 44, 49, 57, 59

*Phillips v. Vandygriff*, 724 F.2d 490, 493–94 (5th Cir. 1984) .............................................. 58, 62

*Pierce v. Rodriguez*, No. 5-22-CV-00147-XR, *2023* WL 4878863, at *2 (W.D. Tex. July 31, 2023) ..................................................................................................................................... 40

*Pilon v. DOJ*, 73 F.3d 1111, 1113 (D.C. Cir. 1996)..................................................................... 72

*Quinn v. Shirey*, 293 F.3d 315, 320 (6th Cir. 2002) ........................................................ 51, 54, 60

*Reed v. Dep't of the Navy*, 910 F. Supp. 2d 32, 42 (D.D.C. 2012)........................... 64, 65, 69, 71

Roe, 2024 WL 925556, at *5–6 ............................................................................... 49, 51

*Rosales v. Wormuth*, No. 1:23-cv-00440-DAE, 2024 WL 5703320, at *4 (W.D. Tex. May 23,

2024) ...................................................................................................................... 85

*Rosenstein v. City of Dallas*, 876 F.2d 392, 395–96 (5th Cir. 1989) .................. 51, 54, 60, 61, 63

*Schware v. Bd. of Bar Exam'rs*, 353 U.S. 232, 239–40 (1957). .................................................. 58

*Sellers v. Bureau of Prisons*, 959 F.2d 307, 312–13 (D.C. Cir. 1992) ........................................ 70

*Shaw v. Hospital Authority of Cobb County* ................................................................................. 57

*Smith v. EMC Corp.*, 393 F.3d 590, 595 (5th Cir. 2004) .............................................................. 87

*Tijerina v. Walters*, 821 F.2d 789, 799 (D.C. Cir. 1987) ........................................................ 65, 81

*TLT Const. Corp.*, 50 Fed. Cl. 212, 215–216)). ........................................................................... 44

*Trifax Corp. v. District of Columbia*, 314 F.3d 641, 644 (D.C. Cir. 2003) ................................ 42

*United States ex rel. Montcrief v. Peripheral Vascular Associates, P.A.*, 133 F.4th 393, 403, 405-

406 (5th Cir. 2025) ................................................................................................. 40

*White v. Franklin* ......................................................................................................................... 57

*White v. Office of Pers. Mgmt.*, 787 F.2d 660, 663 (D.C. Cir. 1986) .......................................... 69

*Willbanks v. Smith Cnty.*, 661 F. Supp. 212, 215 (E.D. Tex. 1987) ....................................... 60, 61

*Zaidi v. Ehrlich*, 732 F.2d 1218, 1220 (5th Cir. 1984) ................................................................ 86

## STATUTES

18 U.S.C. § 203 ....................................................................................................................... 53, 62

18 U.S.C. § 205 ....................................................................................................................... 53, 62

18 U.S.C. § 208 ....................................................................................................................... 53, 62

5 U.S.C. § 552a .......................................................................................... 64, 69, 70, 74, 80, 81, 84

## OTHER AUTHORITIES

28 C.F.R. §17.46 ................................................................................................. 35

28 C.F.R. § 17.47(c) ...................................................................................... 31, 36

Justice Manual § 4-1.430 ................................................................................. 31

Justice Manual § 4-1.431. ..................................................................... 30, 31, 33

Justice Manual § 4-1.432 ................................................................................. 31

Sedona Principles ............................................................................................ 31

Sedona Principles, 3d ed. (2020) .................................................................... 30

T. Edward Damer, *Attacking Faulty Reasoning: A Practical Guide to Fallacy-Free Arguments*
204 (6th ed. 2008) ...................................................................................... 44

## RULES

Fed. Proc., L. Ed. § 62:641 ....................................................................... 75, 79

Fed. R. Civ. P. 26 ................................................................................ 30, 31, 82

Fed. R. Civ. P. 37 ............................................................................................ 82

Fed. R. Civ. P. 56 ..................................................................... 3, 39, 74, 79, 82, 83

## REGULATIONS

28 C.F.R. § 17.17 ............................................................................................ 43

28 C.F.R. §§ 17.17 .......................................................................................... 43

32 C.F.R. § 2001.33 ................................................................................... 38, 45

32 C.F.R. § 2001.35 ........................................................................................ 38

## INDEX OF EXHIBITS

| No. | Description |
|---|---|
| 1. | Roysdon Dep. |
| 2. | US0000665 |
| 3. | US0000059 |
| 4. | US0000045 |
| 5. | US0000043 |
| 6. | US0000176 |
| 7. | Brown Depo |
| 8. | US0000567 |
| 9. | Jaspers Dep |
| 10. | Parisi Depo |
| 11. | Bremer Dep. |
| 12. | US0000703 - 704 |
| 13. | Rowe Dep. |
| 14. | Burghard Dep. |
| 15. | McDonald Dep |
| 16. | Email from Joseph A. Gonzalez to Jason R. Wareham (Jul. 16, 2025, 3:14 PM MT) |
| 17. | Email from Joseph Gonzalez to Jason R. Wareham (May 22, 2025, 1:13 PM MT) |
| 18. | Email from Katrina Seeman to Jason R. Wareham (June 5, 2025, 4:57 PM MT) |
| 19. | Email from Katrina Seeman to Jason R. Wareham (June 12, 2025, 11:13 AM MT) |
| 20. | US0000802 |
| 21. | Email Wareham to Skinner (Nov. 28, 2022, 4:34 PM) |
| 22. | Email Skinner to Wareham (Apr. 4, 2023, 12:48 PM) |
| 23. | Roe Decl. |
| 24. | US0000790–91US0000786 |
| 25. | Email Skinner to Wareham (Feb. 15, 2023) |
| 26. | Email Wareham to Skinner (Apr. 4, 2023, 12:54 PM) |
| 27. | US0000569 - 570 |
| 28. | US0000477 |
| 29. | US0000061 - 62 |
| 30. | US0000388 |
| 31. | US0000418 |
| 32. | US0000063–66 |
| 33. | Crunk 30(b)(6) Dep. |

| 34. | US0000383 |
|-----|-----------|

## INTRODUCTION AND SUMMARY

The government's motion for summary judgment has no merit. It is merely a retool of failed arguments on the law already decided by this Court at the 12(b)(6) stage without even citing this Court's ruling. It conflates de facto debarment, conduct of persons offense, with true procedural contractor debarment and "formal discharge." It lays out a litany of supposed misconduct by Dr. Roe that would trigger due process requirements, and then states it was Dr. Roysdon who left administratively.  Worst of all, the Government seeks summary judgement weeks before the scheduled trial after a litany of discovery abuses regarding preservation of evidence and mismanagement of classification issues blocking proper discovery even into last month. The whole of their motion now and their discovery practice to date is gamesmanship without respect for the spirit or letter of the rules and law.

As to the merits, first, the government argues that it is entitled to judgment on Dr. Roe's De Facto Debarment Claim (Count I) because Dr. Roe has adduced no evidence to support an essential element of that claim.  That essential element, according to the government, is an evidentiary showing that Dr. Roe bid on a government contract and that he was broadly shut out of opportunities to contract government-wide.  However, the Court already has rejected the government's contention that such proof is an essential element of Dr. Roe's De Facto Debarment Claim.  Rather, the Court has ruled that, under the correct legal standard, Dr. Roe is required to adduce evidence only of agency conduct demonstrating that it will not award him future contracts.  Astonishingly, the government does not even mention this ruling by the Court, which is confirmed by caselaw and governs this case.  The government does not contend that Dr.

Roe has failed to adduce any evidence to prove his claim under the **correct** legal standard, and Dr. Roe, who has not cross-moved for summary judgment, does not bear a burden at this stage to show that he has done so.  Therefore, the government has not carried its burden of showing that it is entitled to judgment as a matter of law on Dr. Roe's De Facto Debarment Claim.

Specifically, on the de facto debarment claim, it must be called out individually and separately (as the Court will see why):

**Dr. Roe does not contend in his Complaint or now that there was a formal debarment or formal agency action from someone with authority to act. Rather, he asserts and can show that it is the individual *statements and conduct* of Air Force personnel that have created the *de facto effect* of debarment. Hence, the word *de facto* is used to modify debarment. Any attempts to conveniently construe the de facto debarment as a formal debarment (with arguments the lack of evidence thereof) in need of final agency action will be noted but ignored and viewed as intellectually dishonest in its misconstruction. These claims are conduct claims by persons without the authority to do what they have done.**

Similarly, the government argues that it is entitled to judgment on Dr. Roe's Unreasonable Interference with Employment/Due Process Claim (Count IV) because Dr. Roe has adduced no evidence to support an essential element of that claim.  According to the government, that essential element is an evidentiary showing that the government broadly precluded Dr. Roe from his chosen profession and took certain other restrictive actions.  Again, however, the Court has already rejected the government's contention that such proof is an essential element of Dr. Roe's Unreasonable Interference with Employment/Due Process Claim.  Rather, the Court has ruled that, under the correct legal standard, Dr. Roe is  required to show that a fraudulent investigation resulted in his de facto debarment, causing him to lose his ability

2

to work in his chosen field. The government does not contend that Dr. Roe has failed to adduce any evidence to meet the **correct** legal standard, and he has no burden at this stage to show that he has done so. Therefore, the government has not carried its burden of showing that it is entitled to judgment as a matter of law on Dr. Roe's Unreasonable Interference with Employment/Due Process Claim.

Finally, the government argues that it is entitled to summary judgment on Dr. Roe's two Privacy Act Claims (Count II and Count III) because Dr. Roe has not adduced sufficient evidence to show that he has satisfied the legal requirements for those claims. However, as demonstrated in the annexed declaration of Dr. Roe's counsel, Jason R. Wareham, the government has persistently obstructed legitimate efforts by Dr. Roe's counsel to discover and present critical documentary and other evidence to support these claims. Consequently, under Fed. R. Civ. P. 56(d), the Court should defer considering this part of the government's motion to allow time for Dr. Roe to succeed in obtaining this discovery.

## PLAINTIFF'S FACTS IN SUPPORT OF OPPOSITION

1.    On August 13, 2020, Dr. Paul Roysdon gave a classified presentation at HNCO in which he critiqued technical deficiencies in "Project B," a cyber program sponsored by Captain William McVeigh. Roysdon Dep. 264:3–266:11 (May 30, 2025).

2.    Captain McVeigh was visibly upset following the presentation, and within 24 hours, HNCO officials removed Dr. Roysdon from his contractor role on the project. Roysdon Dep. 229:11 – 21; 267:1–269:10; US0000665.

3.    On August 21, 2020, Lt. Col. Ekholm documented that Dr. Roysdon had been "notified to stop work as a contractor" and that all questions should be directed to Captain McVeigh. US0000059.

3

4.      On August 26, 2020, SA Allen Beall of the Air Force Office of Special Investigations (OSI) summoned Dr. Roysdon for an interview regarding his involvement in the program. Roysdon Dep. 227:7-10; 211:19-212:5.

5.      During the interview, SA Beall advised Dr. Roysdon that he was being treated as an "insider threat" and that his Top Secret clearance was at risk. Roysdon Dep. 327:13-22.

6.      On August 26, 2020, SA Beall formally debriefed Dr. Roysdon from the program and instructed him not to discuss or utilize any information from the project. US0000045.

7.      The debriefing was executed before Dr. Roysdon submitted any resignation, and the record contains no evidence that he voluntarily withdrew from the project. Roysdon Dep. 284:2–285:12; US0000045.

8.      According to OSI records, Captain McVeigh "instructed SA Beall to debrief Roysdon from the program" and provided documentation supporting Roysdon's removal. US0000043.

9.      On August 30, 2020, after being debriefed and advised that his clearance would be revoked, Dr. Roysdon submitted his resignation to the National Security Agency. Roysdon Dep. 219:1–10.

10.      Prior to his resignation, Dr. Roysdon had received guidance and approval from NSA's Office of General Counsel to participate in contractor work for the Air Force, provided it occurred outside duty hours and without use of NSA resources. Roysdon Dep. 52:6-53:12.

11.      The Program Access Request (PAR) justification used to grant Dr. Roysdon special access to the Air Force program contained language falsely linking him to an official NSA role. Id. at 219:11-19.

4

12. Dr. Roysdon testified that he had never seen or approved the language used in the PAR and disputed its accuracy when shown it by SA Beall during the OSI interview. Id.

13. No evidence in the record indicates that OSI found any security violation or misuse of classified information by Dr. Roysdon. Bremer Inquiry Report; US0000176.

14. According to the Government's MSJ, "Plaintiff's "own actions (i.e., the announcement of his decision to resign his NSA employment) led to his routine and administrative read-out from the HNCO classified program in his government capacity." Defs.' MSJ at 15.

15. The record contradicts this assertion, as Dr. Roysdon was removed from the program prior to any resignation and subsequently asked to "present [his] case to somebody else at HNCO," which request was rejected by Dan Brown. Roysdon Dep. 261:19-262:3.

16. Dan Brown, the HNCO Program Manager, told Dr. Roysdon he would "never work in HNCO again" or words to that effect. Roysdon Dep. 260:16–262:11.

17. In early 2023, Dan Brown reiterated to Leidos official Todd Jaspers that Dr. Roysdon should not appear in any HNCO presentation, stating it would not be "good optically." Brown Depo, 104:3-12 (Apr. 11, 2025).

18. Jaspers further testified that Brown stated it would be an "absolute no-go" if any customer-facing slides included Dr. Roysdon's name and that Roysdon was "persona non grata." Id. at 42:5-19.

19. Based on this directive, Leidos removed Dr. Roysdon's name from presentation materials and replaced it with Jaspers' own name. Id.

20. From August 2020 to the present, Dr. Roysdon has not been invited to work on any offensive cyber programs involving HNCO or the Air Force. Roysdon Dep. 315:4-316:11.

5

21.    Captain McVeigh subsequently initiated steps to reallocate funding that had been supporting Dr. Roysdon's work to another contractor.

22.    In August 2022, AFOSI Agent Webb, acting for the Air Force Inspector General, recommended a second referral for fraud investigation against Dr. Roysdon based on the same allegations from 2020. US0000567.

23.    Despite no new evidence or charges, the Air Force has continued to exclude Dr. Roysdon from relevant work, and no contract or task order has been awarded to him since August 2020. Roysdon Dep. 315:4-316:11.

24.    According to the Government's MSJ, there is no evidence that Plaintiff has been broadly precluded from his field of work. Defs.' MSJ at 25.

25.    This assertion is contradicted by the record evidence that Dr. Roysdon was excluded from all HNCO and related Air Force cyber projects, and his role was removed at Brown's direction in both 2020 and 2023. Jaspers Dep. 42:5-19; Roysdon Dep. 315:4-316:11.

26.    Dr. Roysdon was previously recognized by Air Force and NSA officials as possessing rare AI expertise and was one of only two individuals—alongside Dr. Kelly—qualified for the task. Jaspers Dep. 18:2-24.

27.    While on contract, Dr. Roysdon briefed senior leadership at the Cyber Technical Operations Center and met with Jaspers multiple times per week. Id. at 19:10-20:7.

28.    Dan Brown described Captain McVeigh as "cutthroat", as having a "bad rep" to "do whatever he needed to make sure his projects got funded." Brown Dep. 84:25-85:20; 76:15-21.

29.     The Air Force Office of Special Investigations (AFOSI) generated a Report of Investigation (ROI) regarding Dr. Roysdon's involvement in the project, which was marked "SUBJECT TO PRIVACY ACT (5 U.S.C. § 552a)." US0000045.

30.     Dr. Roysdon was never shown the ROI or provided an opportunity to correct or respond to the information contained therein. Roysdon Dep. 219:11-19.

31.     AFOSI distributed the ROI via the CORE system to Capt. McVeigh and others in HNCO, including non-investigative personnel.

32.     Dr. Roysdon testified that OSI confronted him with a justification memo linked to the Program Access Request (PAR) that falsely stated he was acting "for NSA," a claim he denied and had never approved. Roysdon Dep. 219:11-19.

33.     The PAR justification remained in Air Force files and was treated by OSI as a basis for removal, even though Dr. Roysdon objected that the justification was incorrect. US0000045.

34.     NSA subsequently suspended Dr. Roysdon's SCI access and initiated an adjudication through the Defense Counterintelligence and Security Agency (DCSA).

35.     According to his deposition, Roysdon was told he would be removed from all offensive cyber missions at both AFCYBER/HNCO and NSA's Computer Network Operations (CNO) directorate. Roysdon Dep. at 311:7–312:5.

36.     AFOSI, assuming the Inspector General investigation that Plaintiff raised, in their internal files and emails show that by 2022—two years after the original OSI interview—Air Force officials were still considering whether to refer Roysdon for procurement fraud review, despite no intervening misconduct. US0000567.

7

37.     Dr. Roysdon's name and affiliation were removed from presentation materials and program documents submitted to HNCO, as instructed by Dan Brown. Jaspers Dep. 42:5-19.

38.     Todd Jaspers testified that he personally replaced Roysdon's name with his own on slide decks delivered to HNCO because of Brown's instruction that it would be "an absolute no-go" to list Roysdon. Id.

39.     The Government's MSJ asserts that Plaintiff's exclusion is not broad or systemic and has not prevented him from working elsewhere in the federal government. Defs.' MSJ at 25-26.

40.     This assertion is contradicted by the record, which shows that Roysdon was specifically and repeatedly excluded from the exact segment of government work—Air Force offensive cyber projects—for which he was uniquely qualified. Roysdon Dep. 315:4-316:11; Jaspers Dep. 49:3-50:2.

41.     Jaspers stated that, aside from Dr. Kelly, Roysdon was the only person capable of performing the AI work required by HNCO's projects during the relevant time. Jaspers Dep. 18:8-19:1.

42.     Jaspers confirmed that even as of 2023, he continued to rely on Roysdon's technical expertise for ongoing cyber-AI research. Id. at 93:1-25; 95:11-24.

43.     Despite no charges, no formal debarment, and no security violations, Dr. Roysdon remains unable to participate in Air Force projects three years after his removal. Roysdon Dep. 315:4-316:11.

44.     The Air Force has never issued Dr. Roysdon a correction to the record, a name-clearing hearing, or any explanation for the continued exclusion. Id. at 322:13-324:13.

45.     Following the August 2020 removal, Dr. Roysdon's program role was effectively erased from internal Air Force deliverables; HNCO instructed that his name be removed from all documentation presented to government officials. Jaspers Dep. 42:5-19.

46.     In late 2020, while Roysdon was employed by Leidos, he continued to contribute research relevant to HNCO's needs but requested to be behind the scenes. Jaspers Dep. 49:3-19.

47.     Brown confirmed to Jaspers that Roysdon could not be listed as a participant or acknowledged in any capacity for HNCO projects going forward. Jaspers Depo, 80:24-81:25. The Government's MSJ asserts that Plaintiff was never formally blacklisted and that no official statement or systemic effort was made to bar him from future work. Defs.' MSJ at 25-26.

48.     Contrary to this assertion, the record reflects a sustained pattern of exclusion by HNCO officials, beginning with Roysdon's removal in 2020 and continuing through at least 2023. Roysdon Dep. 315:4-316:11; Jaspers Dep. 49:3-50:2.

49.     In addition to IARPA and DARPA personnel, Roysdon learned from colleagues at NSA and within the contractor community that his reputation had been affected and that he was viewed as having been "blacklisted" or "in trouble" with the Air Force. Roysdon Dep. 263:1-264:19; 268:4-21.

50.     There is no evidence that any Air Force component or affiliate revisited the decision to exclude Roysdon or provided him any formal notice of reinstatement or correction. Roysdon Dep. 322:16-324:13.

51.     Dr. Roysdon has continued to hold a security clearance and to work in other cleared spaces, but has not been permitted to return to the type of offensive cyber-AI work he previously conducted for HNCO. Id. at 279:14-280:4; 315:4-316:11.

52.    Although Dr. Roysdon eventually obtained a position with the Office of the Director of National Intelligence (ODNI), that position did not involve the same program area, customer base, or contractual structure as the work from which he was excluded. Id. at 323:7-324:13.

53.    The Government's MSJ argues that Plaintiff's career has not been significantly impeded" and that he "has thrived professionally. Defs.' MSJ at 10-12.

54.    The record reflects that although Roysdon has worked in other positions, he has been excluded from a specific field and customer base—Air Force-sponsored offensive cyber-AI development—for which he was uniquely qualified and had been actively contributing prior to his removal. Roysdon Dep. 315:4-316:11; Jaspers Dep. 49:3-50:2.

55.    Dr. Roysdon earned a Ph.D. in mathematics and was recognized by HNCO personnel as having highly specialized expertise in offensive cyber-AI applications. Jaspers Dep. 19:5-9.

56.    In 2019 and 2020, Dr. Roysdon and Dr. Kelly were the only two individuals known to Leidos staff with the technical capability to fulfill the Air Force's advanced AI mission requirements. Jaspers Dep. 18:8-19:1.

57.    While supporting the Air Force project, Dr. Roysdon engaged in regular technical briefings with senior leadership and directly contributed to deliverables involving offensive cyber planning. Jaspers Dep. 19:10-20:10.

58.    Dr. Roysdon was fully cleared for SAP-level access, had passed all background checks, and had received no prior adverse clearance or performance actions before August 2020. Roysdon Dep. 250:11-251:4.

59.     The only justification cited by the Air Force for Roysdon's removal was the alleged conflict created by his simultaneous NSA employment, which was pre-cleared by NSA's ethics office. Id. at 52:6--54:4.

60.     The Government's MSJ states that the conflict-of-interest concern was real and justified removal, and that Plaintiff failed to disclose the full extent of NSA's internal warnings. Defs.' MSJ at 6 – 8.

61.     However, the record confirms that Roysdon disclosed his consulting role to NSA's Office of General Counsel before beginning the work and was encouraged to proceed with the Air Force project. Roysdon Dep. 52:6 - 54:4.

62.     Dr. Roysdon provided OSI with copies of his communications with NSA ethics officials documenting the approval he had received. Roysdon Dep. 197:11-200:4.

63.     Despite this, OSI proceeded to remove him based on an internal Air Force document—the PAR justification—that inaccurately described his role, and which Roysdon had never reviewed or signed. Id. at 279:23–280:21.

64.     The Air Force took no steps to amend or correct the inaccurate justification, and Roysdon was not given any opportunity to submit a response or clarification.

65.     The Government's MSJ does not dispute the inaccuracy of the justification text, but asserts that the agency's concerns were genuine and made in good faith. Defs.' MSJ at 18–19.

66.     Even after it was apparent that no charges or clearance revocation would occur, the Air Force continued to treat Roysdon as unwelcome at HNCO and maintained the exclusion through at least 2023. Jaspers Dep. 49:3-50:2.

11

67.     At no point after his removal was Dr. Roysdon notified of any right to request a hearing or given any avenue to contest the allegations used to justify his exclusion.

68.     Dr. Roysdon's request to Brown for an opportunity to present his side was denied without referral to any other decisionmaker or forum. Roysdon Dep. at 261:19-262:3.

69.     Dr. Roysdon never received written charges, findings, or notice of ineligibility or debarment, nor any opportunity to appeal the decision. Id. at 322:13-324:13.

70.     No contemporaneous record has been produced showing that Roysdon was ever informed of the specific conduct that served as the basis for his removal or was provided with a record-correction mechanism.

71.     The Government's MSJ states that Plaintiff could have continued work with the Air Force if he had cleared up the conflict, and that his removal was not intended as permanent. Defs.' MSJ at 9.

72.     This claim is contradicted by Brown's 2023 statements that Roysdon was "persona non grata" and that including him would be "an absolute no-go," showing the exclusion was ongoing and reputational, not procedural. Jaspers Dep. 42:5-19; 49:3-16.

73.     To this day, Dr. Roysdon remains barred from offensive cyber-AI work for the Air Force, despite holding valid clearance and having performed no disqualifying conduct. Roysdon Dep. 315:4-316:11.

74.     Colleagues described Dr. Roysdon's contributions as "foundational," and stated he had been responsible for technical designs adopted by multiple customers. Jaspers Dep. 40:21-41:1.

75.     HNCO managers discussed the rivalry between Capt. McVeigh and Dr. Roysdon, and noted that McVeigh had a history of marginalizing technical personnel who challenged his ideas. Brown Dep. 76:13-77:11; 85:15-86:6.

76.     After the August 2020 presentation, multiple HNCO staff reported that McVeigh had reacted strongly and immediately moved to "get Roysdon off the contract." Brown Dep. 89:1-91:24.

77.     In the days that followed, HNCO program managers received directives from McVeigh that Roysdon "should not return" and that they were to avoid "technical entanglements" with him going forward.

78.     Emails between Air Force program officials confirm that Captain McVeigh recommended reallocating Roysdon's funding line to support a different contractor as soon as Roysdon was removed.

79.     The Government's MSJ asserts that Plaintiff's removal was a "routine debrief" based on his resignation. Defs.' MSJ at 9.

80.     The record contradicts this characterization, showing that Capt. McVeigh initiated Dr. Roysdon's removal immediately after criticism of his project and coordinated directly with OSI to execute the debriefing. US0000043.

81.     No contemporaneous OSI record contains findings of fraud, intentional misrepresentation, or any violation of clearance procedures by Dr. Roysdon. Bremer Inquiry Report; US0000176.

82.     Todd Jaspers testified that in 2019–2020, he was Chief of Capabilities at NSA Texas under a joint-duty assignment to AFCYBER and worked directly with Dr. Roysdon to solve core offensive cyber operations challenges using AI algorithms. Jaspers Depo, 10:7-12:12.

13

83.     Jaspers confirmed that Roysdon, alongside Dr. Kelly, was one of only two individuals then capable of solving those technical challenges, calling him "qualified" and affirming he had a Ph.D. in mathematics. Jaspers Depo, 18:8-18; 19:2-9.

84.     Jaspers selected Roysdon for the project and initiated the requirements that led to his involvement with HNCO, describing Roysdon's proposal as addressing the top three needs of AFCYBER's offensive capability planning. Jaspers Depo, 12:14-14:7.

85.     According to Jaspers, Dan Brown acted as the official channel for routing funding and contracting requests and worked closely with both Jaspers and Roysdon to stand up the initial program. Jaspers Depo, 13:2-23.

86.     Jaspers testified that Roysdon received formal clearance from NSA's Office of General Counsel to participate in the Air Force project and that this clearance was conveyed to HNCO personnel in writing. Jaspers Depo, 22:3-20.

87.     Jaspers stated that Captain McVeigh and Dan Brown worked in parallel roles, but that McVeigh's projects were not well received and that McVeigh "routinely [did] everything he could to hurt Dan Brown, including trying to take his resources away." Jaspers Depo, 24:4-9.

88.     Jaspers testified that Brown told him McVeigh was attempting to redirect funding from Roysdon's AI project to fund McVeigh's own lines of effort. Jaspers Depo, 79:9-23.

89.     Jaspers described Brown's view of McVeigh as someone who "would do whatever it took to make sure that he succeeded, regardless of how many others would…be screwed." Jaspers Depo, 29:2-20.

90.     Jaspers stated that Brown considered Roysdon "persona non grata" and told Jaspers it would be "an absolute no-go" for Roysdon's name to appear on any Air Force slides or materials after 2020. Jaspers Depo, 42:5-19.

91.    In 2023, Brown again confirmed to Jaspers that Roysdon should not appear in any customer-facing materials and advised that even including his name would jeopardize the project's chances of approval. Jasper Depo, 80:24-81:13.

92.    Jaspers recalled that HNCO staff "did not want to have anything to do with [Roysdon]," and that any proposal associated with his name would be considered "a show-stopper" within the Air Force cyber acquisition community. Jaspers Depo, 59:5-15.

93.    Jaspers personally removed Roysdon's name from slide decks and substituted his own, confirming that this action was taken at Dan Brown's request in order to preserve HNCO interest in the proposed technology. Jaspers Depo, 42:5-19.

94.    When asked whether any other government customer ever raised a similar objection to Dr. Roysdon's participation, Jaspers testified that "no other customer anywhere else did we ever have that issue"—only HNCO did. Jaspers Depo, 88:15-23.

95.    Thomas Parisi, a principal computer scientist at the Air Force Research Laboratory (AFRL), testified that he never met Dr. Roysdon and had no direct role in awarding or terminating any contract involving him. Parisi Depo, 14:12-15:14.

96.    Parisi confirmed that AFRL had no prime contract with Dr. Roysdon; rather, AFRL funded a Global InfoTek (GITI) contract under which GITI issued a subcontract to Dr. Roysdon. Parisi Depo, 14:12-15:14.

97.    Parisi testified that the government is not supposed to interact directly with subcontractors and that he had no operational involvement in Roysdon's work. Parisi Depo, 14:12-15:14.

98.     In response to concerns raised in August 2020 about a potential conflict of interest, Parisi initially concluded that Roysdon's dual roles were not inherently improper, based on the information AFRL had at the time. Parisi Depo, 14:12-15:14.

99.     Parisi explained that the concern only escalated after Capt. McVeigh alleged—via email—that Roysdon had attended meetings over the past year and influenced funding decisions while purporting to be an NSA employee. Parisi Depo, 50:3-25.

100.     Before McVeigh's email, AFRL believed Roysdon was merely developing software as a subcontractor under ACT2 and was not providing acquisition advice or influencing funds. Parisi Depo, 49:6-50:6.

101.     Parisi testified that if McVeigh's allegation were true, Roysdon's participation in funding decisions would raise a conflict-of-interest concern—but that AFRL had no way to verify it independently and elevated the matter to legal counsel. Parisi Depo, 69:16-71:12.

102.     AFRL's acquisition counsel reviewed the facts and ultimately advised that while the situation was "ugly," it did not constitute a contractual violation requiring action. Parisi Depo, 69:16-71:12.

103.     Based on that legal advice, AFRL took no further action, issued no reprimand, and did not recommend any debarment, termination, or record notation related to Roysdon. Parisi Depo, 69:16-71:16.

104.     Parisi confirmed that AFRL never reported Dr. Roysdon to OSI, never opened an investigation, and never found evidence that he influenced funds toward himself as a subcontractor. Id.

16

105.    According to Parisi, allegations that Roysdon was billing the government improperly were unsubstantiated, and he warned McVeigh that accusing someone of fraud without proof could trigger a criminal investigation. Parisi Dep. 70:6–21.

106.    Parisi emphasized that Dr. Roysdon's subcontracting role was within scope as long as he was providing subject matter expertise (SME) and not advisory or acquisition support, which is reserved for SETA contracts. Id. at 85:7–19.

107.    Parisi testified that Air Force contracting personnel—including himself and the COR on the contract—did not determine that Roysdon violated any rule and instead treated the matter as a resolved scope-of-contract issue. Id.

108.    Parisi denied that AFRL or anyone in his chain of command recommended or discussed debarment of Dr. Roysdon at any point in 2020 or thereafter. Id. at 69:16-71:1.

109.    When asked whether Air Force officials preserved records or issued any litigation hold in 2020, Parisi stated that he was not aware of any preservation notice until served with a subpoena in July 2024. Id. at 91:20–25.

110.    According to Parisi, any records of personal texts exchanged with Capt. McVeigh before 2024 are no longer available and were not preserved by him or AFRL. Id. at 89:17–90:1.

111.    Richard Bremer, the Air Force's 30(b)(6) designee on debarment procedures and McVeigh's complaint, testified that he was appointed inquiry official for the matter on August 25, 2020, and submitted his report on September 22, 2020. Bremer Dep. 8:22–9:12.

112.    Captain McVeigh submitted a written statement to Bremer as part of that inquiry, labeled US0000703, but Bremer testified that the statement contained no information relevant to his investigation. Id. at 11:22–12:4.

113.    William Rowe served as HNCO's Chief of Security in 2020 and testified as the agency's 30(b)(6) designee on the handling of security violations, SOPs, and the Roysdon case specifically. Rowe Dep. 4:13–49:19.

114.    Rowe testified that Ranft informed him orally of McVeigh's allegation, which Rowe described as claiming that Roysdon had been attending briefings "as an NSA employee" while also acting as an industry contractor. Id. at 29:1–7.

115.    Rowe confirmed that no documentary record of this verbal complaint exists, apart from a subsequent OSI security incident report initiated at Ranft's request. Id. at 28:4–13.

116.    Joseph Burghard, the Air Force's PEM and AQL division chief, testified that Dr. Roysdon's contributions to the Fibonacci series project were "novel," "state of the art," "technically sound," and presented a "phenomenal capability" with "nothing quite like it … in the current industry." Burghard Dep. 38:17–39:2.

117.    Burghard confirmed that the failure of HNCO projects like Fibonacci stemmed from administrative breakdowns, not technical deficiencies, citing missing DD254s, delays in contract awards, and failure to staff cleared personnel. Id. at 39:23–40:7, 116:3–116:12

118.    Contrary to the MSJ's assertion that Plaintiff was removed because of substantiated security concerns (MSJ at 17–19), Burghard testified he never concluded Plaintiff posed any security risk and was unaware of any such finding. Burghard Dep. 85:20–87:9, 90:12–91:25

119.    Burghard testified that Plaintiff had been read into Special Access Programs ("SAPs") as an NSA official and was re-cleared to the same SAP after leaving NSA and working at ODNI, refuting the MSJ's claim that Plaintiff lost all access due to clearance issues. Id. at 43:23–44:15, 110:1–110:9

18

120.    Burghard confirmed that Jade access records showed Roysdon was read out of Fibonacci only because he left NSA, and was later read back into the same SAP at ODNI. Id. at 110:1–110:9

121.    Burghard admitted that he did not know whether Roysdon's contract had been terminated or allowed to expire, contrary to the MSJ's assertion that Roysdon left voluntarily without obstruction (MSJ at 6). Id. at 95:11–95:24

122.    Burghard confirmed that he received Roysdon's NSA OGC ethics emails and had no reason to question the legitimacy of the ethics clearance Roysdon had received. Id. at 99:8 - 105:13.

123.    The MSJ asserts that Plaintiff was removed from the project only after resigning from NSA, not before (MSJ at 6); however, Burghard's August 2020 email instructs McVeigh to document the conflict issue after Roysdon had already been debriefed. Burghard Dep. 65:1–65:10; Ex. 1 (US_477–480).

124.    Burghard testified that the Air Force was notified of Roysdon's dual role on or about August 19, 2020, contradicting the MSJ's suggestion that Roysdon failed to disclose his contractor status throughout. Id. at 62:1–63:13.

125.    Burghard admitted he did not recall reviewing the complete NSA OGC guidance at the time and did not recall the substance of any legal finding that the arrangement was unlawful. Id. at 103:4–105:3.

126.    Burghard confirmed that the Program Management Review (PMR) events where Roysdon spoke required SAP clearance to attend and that Roysdon was cleared as an NSA official, refuting the Government's implication that Roysdon lacked authorization. Id. at 51:22–52:6, 130:1–131:2.

19

127.    Burghard testified that it was routine for personnel to be read out of SAPs and that Roysdon's read-out was administrative—not disciplinary or cause-based. Id. at 44:1–45:11, 132:1–132:7.

128.    The MSJ asserts that Roysdon was not constructively debarred because no one ever stated he was (MSJ at 31–32); however, Burghard testified he had "no idea" why Dan Brown would bar Roysdon from submitting materials and agreed that if it happened, it would be improper. Burghard Dep. 118:15–121:22.

129.    Burghard testified that he would "welcome" future submissions bearing Roysdon's name and found his work "valuable," directly contradicting the MSJ's implication that Roysdon was removed for quality or credibility concerns. Id. at 120:15–121:2.

130.    When asked whether Roysdon had been blacklisted from presenting materials, Burghard testified he was unaware of any such action, but acknowledged it would be inappropriate if true. Id. at 119:1-123:1.

131.    Burghard confirmed he took no action to verify whether Roysdon's alleged contract removal was due to conflict concerns, undermining the MSJ's narrative of legitimate removal. Id. at 96:1–96:14.

132.    Burghard testified that Roysdon's administrative read-out removed his facility access, confirming that his inability to present or participate after read-out was a material bar. Id. at 133:7-133:17.

133.    Although the MSJ claims Roysdon was free to apply for reentry, Burghard admitted he was never aware of Roysdon being invited to reapply and did not recall any steps taken to reinstate him. Id. at 95:25–96:14, 110:6–110:9.

134.    Despite acknowledging Roysdon was technically cleared again to the same SAP in his ODNI role, Burghard confirmed Roysdon has not been invited to support the same type of offensive cyber-AI projects through HNCO or SAF/AQL since 2020.

135.    Despite the Government's claim that Dr. Roysdon was removed due to an administrative conflict, he testified that in February, 2020, he publicly criticized Captain McVeigh's "Project B" as "over budget, not delivering, and using old technology," visibly upsetting McVeigh. Roysdon Dep. 160:12-162:4 (May 30, 2025); Defs.' MSJ 6, 18.

136.    Although the Government asserts Dr. Roysdon resigned voluntarily, he was removed from the program within 24 hours of that presentation, and by August 21, 2020, Lt. Col. Ekholm signed a memorandum stating Roysdon had been "notified to stop work."

137.    Contrary to the MSJ's implication that Roysdon's removal was due to clearance or conduct issues, he testified that he held an active Top Secret/SCI clearance and had successfully supported Air Force programs for more than 18 months without incident. Id. at 279:14-280:4; Defs.' MSJ 17–19.

138.    Although the Government describes OSI's involvement as administrative, Roysdon testified that on August 26, 2020, AFOSI Agent Allen Beall summoned him to a SCIF, labeled him an "insider threat," and warned that his clearance was in jeopardy. Id. at 327:7-329:2; Defs.' MSJ 18.

139.    Contrary to the Government's assertion that he failed to disclose a conflict or lacked authorization, Roysdon testified that he obtained written ethics clearance from NSA's Office of General Counsel to consult after-hours, and voluntarily provided those records to OSI during the investigation. Id. at 52:6-53:5; Defs.' MSJ 19.

140.     Although the MSJ claims he resigned independently, Roysdon testified that OSI read him out of the program on August 27, 2020—before he resigned—and directed him not to use or share any program information. Id. at 213:5-217:19; Defs.' MSJ 6, 18.

141.     Contrary to the Government's portrayal of his resignation as voluntary, Roysdon testified that he resigned only after being told he was persona non grata at HNCO and that his clearance was under threat. Id. at 285:6–285:12, 287:21–288:7; Defs.' MSJ 6.

142.     Although the Government asserts Roysdon failed to pursue redress, he testified that Dan Brown rejected his request to escalate his case to another decisionmaker at HNCO and told him "don't even bother." Id. at 261:19 -262:1; Defs.' MSJ 32.

143.     Despite the MSJ's claim that he was not excluded from future opportunities, Roysdon testified that from August 2020 to May 2025, he was never invited back to any Air Force or HNCO projects. Id. at 311:7–312:5; Defs.' MSJ 30.

144.     Although the Government denies ongoing blacklisting, Roysdon testified that in 2023 Dan Brown instructed Leidos personnel to remove his name from presentation materials and replace him with another employee. Id. at 239:6- 239:11; Defs.' MSJ 31.

145.     Contrary to the MSJ's implication that he misrepresented his affiliation, Roysdon testified that he followed NSA ethics guidance, avoided procurement meetings, and never presented himself as affiliated with GITI while at HNCO. Id. at 205:20–206:10; Defs.' MSJ 18–19.

146.     Although the MSJ suggests Roysdon lacked proper clearance or failed to notify Air Force officials, he testified that NSA OGC reviewed and approved his outside work and that he shared those approvals contemporaneously with Air Force personnel. Id. at 52:6-53:6, 76:8-79:16; Defs.' MSJ 19.

22

147.    Contrary to the Government's claim that the read-out was administrative, Roysdon testified that OSI treated him as a security threat, gave no indication he could return, and advised him not to discuss program matters—facts supporting de facto debarment. Id. at 278:19-282:5; Defs.' MSJ 18.

148.    Although the MSJ argues Roysdon had procedural remedies and no adverse record remains, he testified that no correction was ever made to the inaccurate PAR, he was not given any opportunity to respond, and the "insider threat" allegation was never withdrawn. Id. at 281:19-282:5.

149.    Despite the MSJ's claim that reputational harm was self-inflicted, Roysdon testified that Air Force and NSA colleagues later referenced his trouble at the Air Force, and Leidos removed his name from presentations because Dan Brown told them doing otherwise would void contract viability. Id. at 237:7–238:11 (Leidos exclusion), 259:2–259:13 (team redactions).

150.    Although the Government claims Roysdon "thrived" professionally, he testified that his post-HNCO roles at Leidos and ODNI were materially different and never restored access to offensive cyber-AI missions or the career track he had built before his exclusion. Id. at 316:8-321:4.

151.    Despite the MSJ's silence on emotional impact, Roysdon testified that the read-out caused significant distress, reputational damage, and sleepless nights under fear of criminal indictment and clearance loss. Roysdon Dep. 328:5–329:2 (May 30, 2025); Defs.' MSJ passim.

152.    Although the Government downplays financial harm, Roysdon testified he lost approximately $60,000 in immediate 2020 contract value due to the stop work order on the GITI/HNCO project. Id. at 246:20 (May 30, 2025).

153.    Contrary to the Government's implication that he eventually recouped earnings, Roysdon testified that while he later earned roughly $300,000 annually, this was far less than what he was poised to earn on expanded contracts in the classified cyber-AI sector. Roysdon Dep. 106:18–19 (May 8, 2025).

154.    Although the Government denies loss of earning opportunity, Roysdon testified that an anticipated expansion of his Air Force Life Cycle Management contract was canceled just as it was to be modified, causing the loss of a $5–9 million multi-year role. Id. at 162:15–20.

155.    Despite the MSJ's claim that no adverse action occurred, Roysdon testified that he had been promised increased responsibilities and compensation for work supporting multiple Air Force cyber-AI contracts before being abruptly barred from continuing. Id. at 161:20–162:22.

156.    Although the Government implies he was unaffected economically, Roysdon testified that he had been earning a government salary of approximately $94,000 per year, but was transitioning into full-time consulting at market rates of $450 per hour with approval to bill up to 80 hours per week. Roysdon Dep. 331:1–332:7 (May 30, 2025).

157.    Contrary to the Government's assertion that contract loss was speculative, Roysdon testified that his projected consulting revenue—based on agreed terms—would have yielded "several million dollars," conservatively estimated at $5 million. Id. at 331:12–13.

158.    Although the Government denies future damages, Roysdon testified that the cyber-AI market has since expanded dramatically, with current contracts in his specialty now valued in the tens of millions—far above the rates available when he was removed. Roysdon Dep. 276:2–278:7 (May 8, 2025).

159.    Contrary to the MSJ's claim that reputational harm was unsubstantiated, Roysdon testified that he was called a "crackpot" by Captain McVeigh and that this stigma spread through technical circles, damaging his credibility in classified contracting. Roysdon Dep. 267:2–267:24 (May 30, 2025); Defs.' MSJ 25–26.

160.    Although the Government asserts Roysdon's name was not blacklisted, he testified that Leidos removed him from 2023 proposal materials after Dan Brown warned that including him would make the proposal non-viable. Id. at 293:1–293:14; Defs.' MSJ 31.

161.    Despite the MSJ's claim that Roysdon "thrived," he testified that being de facto barred from a classified cyber-AI domain that he helped create has permanently excluded him from the field where his expertise is most valuable. Roysdon Dep. 322:16–324:13 (May 30, 2025); Defs.' MSJ 6, 30.

## DISCOVERY PROCEDURAL HISTORY RELEVANT TO R. 56(D)

### I.    Overview — Preservation Failures & Spoliation

From the outset of this litigation, the United States failed to take timely steps to preserve critical records. The Government had formal notice of Plaintiff's claims in January 2022, when Plaintiff filed an FTCA administrative complaint, and again in August 2022, when the lawsuit was initiated. Yet no litigation hold was issued for more than a year and a half. During that time, the Air Force allowed multiple categories of evidence to be permanently lost through ordinary data deletion and untracked office transitions.

Most notably, AFOSI Special Agent Allen Beall—the agent who opened the investigation against Plaintiff—died just days after the complaint was filed. Beall's accounts were deleted shortly thereafter under standard system rules, with no preservation effort in place.

AFOSI's Rule 30(b)(6) witness later confirmed she did not receive a litigation hold until April 2024, and could not identify any earlier action taken to preserve Beall's materials.

Simultaneously, another key official, Dan Brown, experienced complete data loss during a physical office move in 2022–2023. His drives, local systems, and network shares were wiped without ever being imaged or preserved. Brown testified he received no preservation notice until mid-2024. A third custodian, Mr. Parisi, similarly confirmed he was first notified in July 2024.

By the time preservation measures were implemented, Beall's accounts—across multiple classified and unclassified systems—no longer existed. According to the Government's own discovery responses, those accounts were only partially recreated through a manual reconstruction effort in 2025, well after the close of discovery. New Beall emails continued to surface even into July 2025, contradicting prior assurances of completeness.

These failures erased contemporaneous investigative files, eliminated key impeachment sources, and prevented Plaintiff from fully examining custodians whose data was lost. The record establishes a 20-month gap between the filing of this suit and the issuance of any litigation hold—an extraordinary delay with lasting consequences for the development of the case.

## II.    Preservation Failures & Spoliation

1.      Plaintiff filed an administrative claim under the Federal Tort Claims Act in January 2022. Letter from Jason Wareham, Plaintiff's Attorney, to Government Defendants (Jan. 24, 2022).

2.      Plaintiff filed this lawsuit in the U.S. District Court for the Western District of Texas on August 10, 2022. Plaintiff's Original Complaint, ECF No. 2.

3.      AFOSI Special Agent Allen T. Beall—who initiated the investigation into

Plaintiff—died in August 2022. Defs.' Objs. & Resps. to Pl.'s Second Set of Discovery (No. 8)

at 3 (Mar. 12, 2025) ("AFOSI Special Agent Allen T. Beall died in August 2022, and pursuant to

the routine operation of the Air Force's electronic information system, many if not all of SA

Beall's accounts were deleted after his separation from service.").

4.       "Many if not all" of Beall's electronic accounts were deleted "within a certain

number of days" following his death, pursuant to "rgeneral Air Force policies" and without any

litigation hold in place. McDonald Dep. 22:16–23:11.

5.      Despite having notice of potential litigation for over a year, the Government took

no steps to preserve Beall's files prior to their deletion, and that a litigation hold letter did not go

out until around April 29, 2024 (more than 20 months after suit was filed). McDonald Dep.

18:11–20.

6.      The Government later admitted that Beall's accounts were only partially

reconstructed through a "complicated" manual process in mid-2025—after the close of

discovery. Email from Joseph A. Gonzalez to Jason R. Wareham (Jul. 16, 2025, 3:14 PM MT).

7.      Dan Brown, a Government witness affiliated with the HNCO office, testified that

his Brown's hard drive, desktop files, and local network shares were wiped during a 2022–2023

office relocation. Brown Dep. 170:2–14.

8.      Brown confirmed he received no instructions to preserve that material before the

move. Brown Dep. 171:13–15.

9.      Brown stated he received a litigation hold only sometime between June and

August 2024. Brown Dep. 101166:14–19:4–6.

10.     Another custodian, Mr. Parisi, testified he first received a preservation notice in July 2024. Parisi Dep. 91:20–92:4 (Apr. 2025).

11.     On May 22, 2025—just two weeks before discovery closed—DOJ served its first privilege log, listing over 200 withheld documents, including more than 130 labeled "State Secrets – Classified SAP Information." Email from Joseph Gonzalez to Jason R. Wareham (May 22, 2025, 1:13 PM MT).

12.     On June 5, 2025—the day before discovery closed—DOJ represented via email that "no responsive documents have been withheld" and that recovery of Beall's accounts was "complete." Email from Katrina Seeman to Jason R. Wareham (June 5, 2025, 4:57 PM MT).

13.     Despite that certification, DOJ produced two additional Beall documents on June 12, 2025—after the close of discovery—explaining they had just cleared classification review. Email from Katrina Seeman to Jason R. Wareham (June 12, 2025, 11:13 AM MT).

14.     On July 16, 2025, DOJ disclosed a further Beall email (US0000802), never previously produced, showing OSI officials had identified Dan Brown's involvement in Plaintiff's case as a "conflict of interest." Email from Joseph Gonzalez to Jason R. Wareham (July 16, 2025, 3:14 PM).

15.     Had Plaintiff possessed US0000802 earlier, it would have changed the scope of interrogatories, document requests, and deposition strategy concerning Brown and OSI. Because this document and others surfaced only after the June 6, 2025 discovery deadline, Plaintiff was unable to re-depose Brown, re-interview custodians, or revise expert and dispositive briefing.

16.     Specifically, US0000802 contains a list of persons directly relevant to minimally the Privacy Act claims (e.g., need to know issues) by listing a number of addressees to the email that counsel learned of two years into discovery for the first time.

28

17.    These preservation failures—including the late-issued hold, routine deletions, and delayed reconstructions—erased contemporaneous investigative records and deprived Plaintiff of the opportunity to test credibility, motives, and the factual basis for key Government defenses.

### III.    Overview - Inadequate Searches – Classified Repositories Ignored

The Government's classification posture in this case has operated more like a one-sided gag order than a lawful privilege. DOJ withheld critical evidence by refusing to search the systems where that evidence lives—classified networks routinely used by SAP personnel, AFOSI, and contracting officers for precisely the topics at issue here.

Classified information must be handled under strict rules, including formal designation by an Original Classification Authority and issuance of a Security Classification Guide. But during the relevant period, no finalized guide existed for the SAP in question. Witnesses like Dan Brown acknowledged they did not know what was classified and defaulted to overclassification—ensuring information was withheld not because it was properly classified, but because the Government failed to clarify or challenge its status.

Brown and others were told to search only unclassified systems, leaving SIPR, JWICS, SIC, CORE, and other known repositories untouched. DOJ's Rule 30(b)(6) witness confirmed these systems held relevant data, but DOJ objected to disclosing what was actually searched. These are not just procedural oversights. They involve core systems of record under the Privacy Act, and likely contain evidence of Plaintiff's blacklisting from future government contracting.

This is not a dispute about national security—it is a discovery strategy rooted in opacity. The Government's refusal to search, disclose, or explain its handling of classified systems has denied Plaintiff access to critical information, and the Court meaningful oversight under Rule 26 and the Constitution.

29

## IV.    Systemic Failures to Search Classified Repositories

1.    When litigation is reasonably anticipated, agencies must issue litigation holds covering all repositories, including classified systems like SIPR, JWICS, SIC, and CORE. See Fed. R. Civ. P. 26; Justice Manual § 4-1.431.

2.    In civil matters involving classified material, standard protocol requires programmatic searches of both unclassified and classified systems using documented ESI procedures. Id.; 32 C.F.R. § 2001.33(a).

3.    For classified repositories, records are pulled by an Information Security Officer (ISO) or a cleared custodian and reviewed for classification under Executive Order 13526 and implementing regulations. See E.O. 13526 §§ 1.1, 3.1–3.3.

4.    If classification is uncertain or disputed, agencies must submit the record to an Original Classification Authority (OCA) for formal determination. See 32 C.F.R. § 2001.36(a).

5.    Any unclassified material, or classified material deemed segregable or subject to discretionary release, must then be produced in discovery, redacted only as narrowly as necessary. See 32 C.F.R. § 2001.35; Fed. R. Civ. P. 26(b)(5).

6.    The DOJ's preservation protocols expressly prohibit reliance on individual memory or manual efforts; instead, agencies must implement "coordinated, comprehensive, and programmatic searches of electronic data sources," including shared drives, emails, messaging systems, and secure platforms. Justice Manual § 4-1.431.

7.    These requirements align with widely accepted industry best practices outlined in The Sedona Principles, which make clear that manual self-selection by individual custodians is inadequate and that "[e]ffective discovery requires the use of automated tools and centrally managed search techniques." Sedona Principles, 3d ed. (2020), Principle 8 & cmt. 6.b.

30

8.      All federal agencies, including the Air Force and DOJ, operate enterprise-grade search and retrieval systems—such as journaling-enabled Microsoft Exchange servers, classified records archives, and cross-domain eDiscovery platforms (e.g., Relativity, Nuix, Clearwell). See Justice Manual § 4-1.430; Fed. R. Civ. P. 26(g).

9.      Once litigation is anticipated, DOJ policy requires the initiating agency to perform a full inventory of ESI sources and to conduct centralized, programmatic searches of each data store—not merely custodian inboxes or desktops. Justice Manual § 4-1.431; Sedona Principles (Principle 6).

10.     The DOJ's own litigation manual confirms that civil litigants must search not only "custodian-controlled email," but also "shared drives, collaborative tools, backup archives, and classified or compartmented data repositories," and must document the search's methods, scope, and results. Justice Manual § 4-1.432.

11.     Plaintiff's counsel repeatedly offered to facilitate this process using CIPA-like protocols—including SCIF access, read-ins, secure systems, and protective orders—beginning in November 2022. Email Wareham to Skinner (Nov. 28, 2022, 4:34 PM).

12.     DOJ summarily denied that request on April 4, 2023, providing no written reasons or notice of appeal rights, in violation of 28 C.F.R. § 17.47(c). Email Skinner to Wareham (Apr. 4, 2023, 12:48 PM).

13.     The Air Force's SAP programs—including Project Fibonacci—did not have a finalized Security Classification Guide for the relevant period, leaving witnesses unsure what was classified and defaulting to overclassification. Roe Decl. ¶ 54.

14.     Dan Brown testified that he explicitly asked his superiors "what do you consider sensitive?" because he had no guidance on what material was actually classified. Id. ¶ 54.

31

15.     In SAP environments, even unclassified content is routinely stored on classified systems (e.g., JWICS, CORE) to reduce spillage risk. These systems are used as the default workspace to avoid switching between networks. Id. ¶¶ 54 - 56.

16.     As a result, communications stored on SIPR, JWICS, and SIC often contain mixed content—including unclassified factual summaries, inter-agency memos, and personnel discussions—relevant to discovery.

17.     Those same systems are systems of record for purposes of the Privacy Act and are the authoritative repositories for decisions about Plaintiff's security status, contract eligibility, and OSI investigation.

18.     The communications and records stored on them are not peripheral—they are central to Plaintiff's Privacy Act claims, his de facto debarment claim, and his due process-based liberty interest claims.

19.     By refusing to search, produce from, or permit access to these classified systems, the Government suppressed material evidence in violation of its obligations under the Federal Rules, the Privacy Act, and constitutional due process.

V.    **DOJ's Improper Search Instructions and Selective Retrieval from Classified Systems**

1.     Despite its obligations under Rule 26 and the Justice Manual, DOJ instructed Dan Brown to search only his unclassified Outlook inbox (NIPR), and did not direct him to search SIPR, JWICS, SIC, CORE, or any classified repository. Brown Dep. 168:3 – 7.

2.     Brown's search consisted of a manual keyword check of his personal email folder—without any system-level extraction, search logging, or assistance from IT personnel. Id. at 167-:3 – 168:2.

32

3.      These ad hoc, custodial searches were not just inadequate—they violated DOJ's internal ESI policies, which prohibit relying on user self-selection and require enterprise-level search capabilities to be used instead. Justice Manual § 4-1.431.

4.      AFOSI's 30(b)(6) witness Alexandra McDonald confirmed that the Air Force maintains at least nine classified repositories relevant to this case: SIPR, JWICS, SIC, CORE, JADE, COE, I2MS, CI2MS, and classified shared drives. McDonald Dep. 9:1–10:13.

5.      McDonald testified those systems are routinely used by SAP program officials, OSI agents, and contracting personnel to store documents, exchange messages, and track investigative activity. Id.

6.      When asked what systems were actually searched and what tools were used, DOJ counsel objected and prohibited McDonald from answering. Id. at 20:5–19.

7.      Joseph Burghard, of the AFLCMC, testified that he manually pulled emails from SIC and JWICS because DOJ's trial team lacked the clearances needed to access those systems. Burghard Dep. 127:23–128:3 (May 15, 2025).

8.      Burghard's testimony confirmed that DOJ did not perform any programmatic, agency-wide search of the classified repositories at issue. Id.

9.      Instead, DOJ delegated classified collection to ad hoc internal actors with no documented protocols, no reporting of chain of custody, and no validation that searches were complete. Id.

10.     These failures were not theoretical: records ultimately retrieved from those systems—including the late-produced Beall–Brown conflict-of-interest memo (US0000791)—show that core evidence was stored in exactly the locations DOJ chose not to search. US0000790–91US0000786.

33

11.    But even that production is materially incomplete: The primary attachment that is Agent Beall's Report arising from a Privacy Act System of Record has not been produced to this date. US0000786 at p. 7.

12.    DOJ has never disclosed what search criteria it used for any classified system, and no metadata, search logs, or ISO certifications were ever provided to substantiate its claimed efforts.

13.    As a result, key communications concerning Plaintiff's eligibility, project status, and internal scrutiny remain hidden—despite being created by government actors on government systems in the direct course of investigating Plaintiff.

14.    These omissions, combined with DOJ's refusal to allow Plaintiff's TS/SCI-cleared counsel access to even unclassified extracts from these repositories, amount to a constructive invocation of secrecy without any judicial oversight.

15.    The Government has not produced a classification guide, original classification determinations, or declassification assessments for any of the withheld records.

16.    To date, DOJ has not disclosed any structured search results or document control metrics for any high-side system used by OSI, SAP officials, or AFLCMC personnel relating to Plaintiff, and without access to those systems, Plaintiff cannot determine what information was recorded, who accessed or used it, or whether it was disclosed or relied upon in agency decision-making, and without the inability to trace the source or scope of any information that may have been shared with others—federal officials, contractors, or internal security units—as part of the actions Plaintiff challenges.

## VI.    Improper Blank Secrecy and Privilege Assertions

1.    DOJ has not produced any declaration from a department head formally invoking the state secrets privilege under United States v. Reynolds, 345 U.S. 1, 7–8 (1953).

2.    To date, no Reynolds-compliant declaration has been filed, no in camera review has been requested, and no formal invocation of privilege has been submitted to the Court under governing standards.

3.    At no point during discovery did DOJ seek a protective order, propose any controlled disclosure mechanism, or move for in camera review of disputed material.

4.    Plaintiff's counsel submitted a formal classified-access request in February 2023 under 28 C.F.R. §§ 17.17 and 17.46, but DOJ summarily denied it in April 2023 without providing a written reason or notice of appeal rights, in violation of § 17.47(c). Email Wareham → Skinner (Feb. 13, 2023); Email Skinner to Wareham (Apr. 4, 2023).

5.    The cumulative result is that DOJ relied on self-policing by witnesses, unsubstantiated classifications, and an unfiled privilege assertion—thereby denying Plaintiff any opportunity to challenge the withholding of materials or testimony through ordinary means.

## VII.    Classification Discovery Obstruction

1.    On November 28, 2022, Plaintiff's counsel formally proposed adopting CIPA-like procedures to manage classified discovery. The proposal included secure read-ins for counsel, protective protocols, and a SCIF workspace, modeled on criminal national-security litigation. Email Wareham to Skinner (Nov. 28, 2022, 4:34 PM).

2.    The proposal noted that both Plaintiff and counsel held active Top Secret//SCI clearances, and that counsel possessed a Full-Scope Polygraph from military service, making them fully eligible under Executive Order 13526 and 28 C.F.R. § 17.17. Id.

35

3.      DOJ refused to engage on the proposed procedures. On February 15, 2023, DOJ counsel stated the request was "premature" and that "Dr. Roe is [not] entitled to discovery for purposes of gathering facts to amend the complaint." Email Skinner to Wareham (Feb. 15, 2023).

4.      On February 13, 2023, Plaintiff's counsel submitted a written access request invoking 28 C.F.R. §§ 17.17 and 17.46. The request sought read-ins for Plaintiff and his attorneys, a SCIF, secure workstations, and a classified filing process. Letter from Wareham to Classification Authorities (Feb. 13, 2023).

5.      On April 4, 2023, DOJ summarily denied the request, stating in a single sentence: "The relevant federal agencies…have denied" access. No written explanation or statement of reasons was provided. Email Skinner to Wareham (Apr. 4, 2023, 12:48 PM).

6.      Plaintiff's counsel immediately asked whether a denial letter would be provided, noting that 28 C.F.R. § 17.47(c) requires a written denial with reasons and notice of appeal rights. DOJ did not respond and has never produced such a letter. Email Wareham to Skinner (Apr. 4, 2023, 12:54 PM).

7.      The absence of any written denial or appeal process prevented Plaintiff from seeking review of the Government's access determination, effectively closing the door on the classified facts underlying his own claims.

8.      Plaintiff's work for the Air Force was conducted under a SAP framework. By design, the relevant communications, evaluations, and security discussions took place on classified systems such as JWICS, SIC, and CORE.

9.      Because DOJ denied Plaintiff's cleared counsel access to those systems and declined to search or produce from them, Plaintiff could not obtain or present core records created about him—many of which he knows to exist based on his direct involvement.

10.     DOJ did not initiate a formal declassification process under 32 C.F.R. § 2001.33 or produce a classification guide showing which portions of withheld records could be segregated and released.

11.     Instead, DOJ declined to process classified discovery altogether and blocked Plaintiff's counsel from speaking with their own client about classified facts that form the basis of the Privacy Act and due process claims.

12.     DOJ later stated that even if the classified evidence supported Plaintiff's case, it would not "be considered by the Court" and could not be used to amend the pleadings. Email Skinner to Wareham (Feb. 15, 2023).

13.     When counsel raised the issue of spillage and asked whether secure systems would be provided, DOJ responded, "just file [classified material] under seal" and asked, "What's spillage?"

### VIII.    Prejudice to Plaintiff

The Government's failure to preserve records, conduct required searches, produce responsive materials from classified systems, and disclose key impeachment evidence until after discovery closed has denied Plaintiff the facts needed to oppose summary judgment.

Plaintiff has been unable to obtain or review the core materials created by OSI and SAP officials regarding his access, eligibility, and removal from Project Fibonacci—many of which he personally knows were created and stored on classified systems like JWICS, SIPR, and SIC.

Because DOJ refused to permit searches of those repositories or allow Plaintiff's TS//SCI-cleared counsel access, Plaintiff remains unable to trace the origin, context, or dissemination of records central to his Privacy Act claim.

The Beall and Brown investigative records—key to understanding the Government's internal security rationale—were either deleted, recovered too late, or withheld until after the discovery cutoff.

Witnesses were not fully examined due to DOJ's decision to allow informal classification-based self-censorship, rather than seeking protective orders or asserting privilege on the record.

Plaintiff was never given the opportunity to question Dan Brown about internal "conflict of interest" designations or retaliatory scrutiny—facts confirmed in documents DOJ only produced five weeks after discovery closed.

DOJ served its privilege log just two weeks before the close of discovery, listing over 130 entries as "State Secrets – Classified SAP" without any Reynolds declaration or segregability review.

Plaintiff's counsel, despite having active TS//SCI clearances, was denied classified access with no written explanation or opportunity to appeal, in violation of DOJ regulations. This decision foreclosed access to Plaintiff's own contemporaneous communications and prevented basic discovery planning.

No technical search certifications, metadata, classification guides, or declaration of search methodology were ever provided, leaving Plaintiff unable to assess what systems were searched or what criteria were used.

Because Plaintiff was not permitted to speak with counsel about classified facts he personally knew, and because DOJ declined to use CIPA-like procedures or propose alternatives, the classified context of his removal remains completely undeveloped.

Each of these decisions—standing alone—compromised discovery. Taken together, they have prevented Plaintiff from developing the factual foundation needed to challenge the Government's defenses on summary judgment.

The current record does not reflect the full universe of relevant evidence. It reflects only the narrow, delayed, and selectively disclosed materials DOJ permitted to be seen, with key systems left untouched and core witnesses unexamined on critical issues.

These circumstances squarely meet the standard for Rule 56(d) relief. Plaintiff has identified with specificity the material facts unavailable to him, the reasons for their absence, and their relevance to disputed issues in the case.

Relief under Rule 56(d) is necessary to preserve Plaintiff's opportunity to test the Government's narrative with the documents and testimony it has improperly withheld.

## ARGUMENT

### I.    The Summary Judgment Standard

A movant for summary judgment bears two burdens: (i) the movant must "show that there is no genuine dispute as to any material fact" and that the movant "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  *DeWolff, Boberg & Assoc., Inc. v. Pethick*, 133 F.4th 448, 452 (5th Cir. 2025).  Where the nonmovant bears the burden of proof at trial on a dispositive issue, the summary judgment movant may discharge its burden under Rule 56(a) by showing that there is an absence of evidence supporting essential elements of the nonmovant's claim.  *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Pierce v. Rodriguez*, No. 5-22-CV-00147-XR, *2023* WL 4878863, at *2 (W.D. Tex. July 31, 2023). However, the movant must be right about the essential elements of the nonmovant's claim. *See United States ex rel. Montcrief v. Peripheral Vascular Associates, P.A.*, 133 F.4th 393, 403, 405-406 (5th Cir. 2025).

Where the summary judgment movant attempts to discharge its burden under Rule 56(a) by showing there is an absence of evidence supporting essential elements of the nonmovant's claim, the nonmovant may defeat the motion in one of three ways. The nonmovant may show that the movant is wrong about the essential elements of the nonmovant's claim. See *Montcrief*, 133 F.4th at 403, 405-406. Alternatively, when the movant "is seeking summary judgment on the ground that the nonmovant has no evidence to establish an essential element of the claim, the nonmovant may defeat a motion for summary judgment by 'calling the Court's attention to supporting evidence already in the record that was overlooked or ignored by the moving party.'" *Crescent Towing & Salvage Co., Inc. v.  M/V JALMA TOPIC*, 761 F.Supp.3d 926, 932 (E.D. La. 2025). Last, the nonmovant may "'demonstrat[e] by competent summary judgment proof that there is an issue of material fact warranting trial.'" *DeWolff*, 133 F.4th at 452.

### A.  The Government Is Not Entitled to Judgment on Dr. Roe's De Facto Debarment Claim (Count I)

The Government's motion rests on two legal premises: that Dr. Roe must show he bid on and was denied government contracts, and that he must prove exclusion from federal contracting on a government-wide scale. Both arguments are wrong—and both were explicitly rejected by this Court in its March 2024 ruling denying the Government's motion to dismiss this very claim. ECF. No. 63 at 9-10 ("Opinion").

As the Court made clear, "a claim for de facto debarment may be justiciable absent the formality of plaintiffs bidding on and being denied future contracts after the alleged debarment" (*quoting Phillips v. Mabus*, 894 F. Supp. 2d 71, 84 (D.D.C. 2012), and citing *Dynamic Aviation v. Dep't of Interior*, 898 F. Supp. 11, 13 (D.D.C. 1995)). *Id*. at 9. A plaintiff need not show a string of failed proposals to proceed. Instead, as the Court summarized, there are two independent legal paths by which a contractor can establish a de facto debarment in violation of due process: (1) an agency statement that it will not award the contractor future contracts; or (2) agency conduct demonstrating the same intent or effect. Id. (citing *Phillips*, 894 F. Supp. 2d at 81). These routes are disjunctive—"or" means "or," not "and"—so a showing under either theory suffices to state and support the claim.

The Court applied that standard and found Dr. Roe's allegations sufficient on both fronts. First, it pointed to Dr. Roe's allegation that Dan Brown, a senior HNCO official, told him he could "never work in HNCO again," or words to that effect—an express statement of exclusion from future contracting. Second, the Court noted Roe's further allegations that he was no longer permitted to participate in meetings and that his name was scrubbed from work product submitted to the Government. Taken together, the Court concluded, "these allegations are sufficient to meet Dr. Roe's pleading burden, even in the absence of any allegations about denial of future bids." *Id.* at 10.

That holding governs at summary judgment. The Government has made no effort to argue that Dr. Roe lacks evidence under either the "statement" or "conduct" pathway. Instead, it reasserts the same flawed theory this Court already rejected, citing an inapplicable "bid-and-denial" rule that has no basis in the governing case law. Moreover, it does not appear that the Government even acknowledged or attempted to deal with this Court's clear ruling on the matter.

41

This alone is dispositive. Summary judgment cannot be granted based on a legal standard that the Court has already found to be incorrect. And as shown below, the developed record provides ample evidence under both prongs of the proper test—agency statements and agency conduct barring Dr. Roe from future contracting. The Government's motion must be denied.

Moreover, the evidentiary record, now far more developed than it was at the Rule 12 stage, reinforces the core showing that the Court already deemed sufficient: Dr. Roe has produced direct and corroborated evidence of both statements and agency conduct that functionally blacklisted him from future HNCO contracting. That evidence, discussed below, easily creates triable issues of material fact under the proper standard.

### B.  Dr. Roe Has Presented Sufficient Evidence of Agency Statements and Conduct Demonstrating a Bar on Future Contracting

Even though Dr. Roe bears no burden to produce affirmative evidence at this stage, the record overwhelmingly supports both pathways recognized in this Court's MTD Opinion: a clear agency statement of exclusion, and agency conduct that functionally bars future awards. *See also Phillips v. Mabus*, 894 F. Supp. 2d 71, 81 (D.D.C. 2012). De Facto Debarment

"So-called 'constructive' or 'de facto' debarment involves 'government stigmatization that broadly precludes individuals or corporations from a chosen trade or business' and thereby 'depriv[es] them of liberty in violation of the Due Process Clause.'"[1] De facto debarment stands separate and distinct from what we will call "formal debarment", wherein, in keeping with the

---

[1] Opinion at 8 (citing *Bannum, Inc. v. Samuels*, 221 F. Supp. 3d 74, 86 (D.D.C. 2016) (quoting *Trifax Corp. v. District of Columbia*, 314 F.3d 641, 644 (D.C. Cir. 2003)).

Federal Acquisition Regulations (FAR) and agency regulations, a contractor is provided a formal constitutionally-compliant process from which their contracting is debarred partially or permanently.  It is a conduct offense, not a procedural error as the Government attempts to conflate regularly in its motion (e.g., citing a lack of formal discharge, paperwork or notice of debarment, final agency action, Administrative Procedures Act review, etc.). It is not an offense relevant to the contracting or acquisition arm of the Government.[2] To be clear, Dr. Roe has not in his Complaint nor here assert a violation of due process arising from "formal debarment."  Given that no "formal debarment" error has been pled, any arguments by the Government in its motion

---

[2] This is a key point in de facto debarment, since ostensibly, de facto debarment is likely rarely found to exist in the formal contracting chains since they are well-versed in its prohibitions and, as the formal debarment authorities, have the proper procedural tools at their disposal. It follows then, that de facto debarment is almost always likely to be found in the "ground-level" agency actors where their daily conduct can amount to de facto debarment as it has here.

should be merely ignored and Plaintiff enters a general denial of the same.[3] It is a Straw Man.[4] As stated *supra*, this conduct offense can be shown as follows: "Two options exist to establish a de facto debarment claim: 1) by an agency's statement that it will not award the contractor future contracts; or 2) by an agency's conduct demonstrating that it will not award the contractor future contracts."[5]

_____

[3] This appears to be a favored method of argument by the Government in that it employed the same technique in attempting to recast Dr. Roe's complaint as one seeking judicially-mandated access to classified material. *See e.g.* MTD Opinion at 12 ("The Court need not reach the question, however, because Dr. Roe explicitly does not seek reinstatement to a classified program. Paragraph 161 of the amended complaint reads: 'At the outset, Plaintiff's Count 1 does not complain of, or seek reinstatement to, a government agency or classified program.' *See* ECF No. 39." Dr. Roe respectfully invites this Court to again avoid the straw and focus on what actually is pled and argued.

[4] "A straw man is a metaphor used to describe the caricature of an opponent's argument that the faulty arguer substitutes for the flesh-and-blood original version. But a successful attack on this strawlike substitute is not a successful attack on the actual criticism or argument of the critic." T. Edward Damer, *Attacking Faulty Reasoning: A Practical Guide to Fallacy-Free Arguments* 204 (6th ed. 2008).

[5] *Id.* at 9 (citing *Phillips v. Mabus*, 894 F. Supp. 2d 71, 81 (D.D.C. 2012) (quoting *TLT Const. Corp.*, 50 Fed. Cl. 212, 215–216)).

## C.  HNCO Officials Made Express Statements That Dr. Roe Was Permanently Barred

In 2020, HNCO Program Manager Dan Brown told Dr. Roe that he would "never work in HNCO again" after an internal referral for a purported conflict of interest initiated by Capt. McVeigh (Roysdon Dep. 287:21–288:4, May 30, 2025). When Roe asked whether he could present his case to someone else at HNCO, Brown rejected the request and told him "don't bother" (id. at 289:10–290:1). Brown later testified that McVeigh "overreacted" and "wanted him to be fired" (Brown Dep. 211:20–212:2), even though both Tanya and Tom Parisi at AFRL—contracting officials overseeing the agreement—"did not see any issue with it" (Brown Dep. 179:1–179:25).

The exclusion was reaffirmed in 2023. Jaspers testified that Brown told him not to include Roe's name on any materials presented to HNCO because "it would be optically bad," and "an absolute no-go" (Jaspers Dep. 104:10–105:4). According to Jaspers, Brown specifically referred to Roe as "persona non grata," and warned that including him "would cause trouble with the Government audience" (id. at 104:20–105:4, 117:2–119:9). Brown confirmed that Roe's continued participation in government work would still be "bad optics" as late as 2023 (Brown Dep. 148:9–10).

These categorical statements to Roe and to his employer, delivered by government personnel responsible for HNCO technical programs, demonstrate the kind of institutional exclusion that courts have found sufficient to establish de facto debarment. See *Dynamic Aviation v. Dep't of Interior*, 898 F. Supp. 11, 13 (D.D.C. 1995).

## D.  The Government Engaged in Sustained Conduct Excluding Dr. Roe from Future Contracting

The exclusion was not limited to statements. Government officials took concrete steps to ensure that Roe could not be seen or credited in any government-facing capacity. Roe testified that his name was stripped from deliverables and he was not permitted to attend meetings, even when he remained the technical lead (Roysdon Dep. 288:5–289:9). Jaspers confirmed that "we had to remove Dr. Roe's name from the technical deck" and that "I substituted my own" despite Roe's authorship (Jaspers Dep. 105:5–105:15). Roe was also "not allowed in the room for the briefing" (id. at 119:1–18), and "was kept at arm's length from anything government-facing" from 2020 through 2023 (id. at 117:2–119:18). As Jaspers explained, it was "understood that having Paul listed on any future work would be disqualifying" (id.).

Although Roe had departed NSA by that time, Brown acknowledged that his involvement still posed a reputational concern. "It probably wouldn't be, like, maybe good optically," he testified, if Roe were to present (Brown Dep. 148:9–10). When asked about the 2023 Leidos demo, Brown confirmed that Roe "provided the demo on telcon" (Brown Dep. 105:1), and Jaspers clarified that even then, his participation had to be concealed. "To be clear," Jaspers said, "Dr. Roe was still doing the work. Just not visibly" (Jaspers Dep. 88:24–89:4).

This conduct—removing a cleared expert from public-facing materials while continuing to use his work—reflects a sustained exclusionary policy. As Roe described it, "I was told to stop showing up. There was no process" (Roysdon Dep. 288:5–289:9). Brown and Jaspers alike confirmed that there was no effort to reinstate him, and no explanation given for his continued exclusion.

### E.  The Exclusion Was Not "Voluntary" or "Isolated"

The Government asserts that Dr. Roe "resigned voluntarily" and was not broadly excluded from federal contracting (Defs.' MSJ at 6, 30–32). But this narrative is contradicted by

46

sworn testimony, contemporaneous records, and the Government's own internal communications.

### 1.  OSI Removed Dr. Roe Before Any Resignation

The record confirms that Dr. Roe was removed from the program before he resigned. In a Hotline Completion Report generated by AFOSI, the Government acknowledged that Dr. Roe "was removed from the program due to his affiliation as a government employee and his contractor status," and that Capt. McVeigh "instructed SA Beall to debrief Roysdon from the program" (US0000570 at 2). The same document confirms that Dr. Roe's resignation from NSA came **after** his debriefing. Id. This timeline directly refutes the Government's assertion that the exclusion was voluntary or initiated by Dr. Roe.

### 2.  Government Officials Continued to Enforce the Exclusion in 2023

Years later, HNCO officials—including Dan Brown—continued to instruct contractors that Dr. Roe was not to appear on slides or customer-facing work product. Brown told Leidos leadership in 2023 that including Dr. Roe's name would be "an absolute no-go," and he was described as "persona non grata" (Jaspers Dep. 104:10–105:15, 117:2–119:9). As a result, Dr. Roe's name was removed from deliverables, even when he remained the technical author (id. at 105:5–105:15).

Dr. Roe has not been invited to participate in any HNCO or Air Force offensive cyber programs since August 2020 (Roysdon Dep. 311:7–312:5). These facts show a sustained and systemic exclusion—not an isolated clearance issue or one-time mistake.

### 3.  McVeigh and Burghard Actively Promoted the Misconduct Narrative

On August 19, 2020, Joseph Burghard, Program Element Monitor at SAF/AQLC, instructed Capt. McVeigh to prepare a "quick MFR" (memorandum for record) regarding Dr. Roe's NSA employment and contractor role, noting this was "a first heard for all of us" and asking for documentation on how Roe's status related to the portfolio (see Burghard Email, Aug. 19, 2020, 12:21 PM). This internal request reflects that Air Force leadership began generating misconduct documentation based on McVeigh's unilateral referral—*before* any formal process or investigation.

Just days later, on August 27, 2020, Capt. McVeigh was texting about Dr. Roe's activities online, reporting to colleagues: "I just found out Roysdon pushed code to a public repo," and emphasizing that it was done "as a [contractor]" while working 40 hours per week. See SMS messages from McVeigh, Aug. 27, 2020, 9:40 PM. These messages—sent well after the read-out—demonstrate that McVeigh continued tracking Dr. Roe's conduct and feeding misconduct allegations informally into the Air Force ecosystem.

The combination of internal tasking (Burghard's MFR directive), digital surveillance (McVeigh's text trail), and continued blacklisting (Brown's "no-go" statements) confirms that this was never a one-time administrative decision. It was a coordinated, enduring exclusion campaign, driven by improper motives and enforced outside the formal debarment process.

### 4.  The Government's "Voluntary Exit" Defense Is No Defense at All

The Government's summary judgment theory—that Dr. Roe simply walked away from the program and "thrived" elsewhere—is irreconcilable with this factual record. Not only was Dr. Roe pushed out under threat of clearance action (Roysdon Dep. 284:2–285:12), but he actively attempted to appeal the decision internally and was told by Brown not to bother (id. at

289:10–290:1). At no point was he given notice, a name-clearing opportunity, or any formal debarment or disqualification from which to seek reinstatement (id. at 288:5–289:9).

The Government's own files prove that exclusion was initiated internally, reaffirmed repeatedly, and extended into 2023. This kind of informal, durable bar from future work— supported by internal directives, reputational damage, and sustained programmatic exclusion—is the very definition of a de facto debarment. See Roe, 2024 WL 925556, at *5–6 (citing Phillips, 894 F. Supp. 2d at 81).

### F.  Dr. Roe Was the Target of Sustained Blacklisting, Not a Routine Clearance Action

The Government claims that Roe's exclusion was the result of a routine debrief triggered by a security referral (Defs.' MSJ at 6, 17–18). But the testimony establishes that the referral was based on a mischaracterization and that the exclusion persisted long after any security concerns were resolved.

Before accepting a contractor role, Roe obtained written authorization from NSA legal and submitted that approval to the Government. "I provided OSI with documentation from the NSA Office of General Counsel," he testified (Roysdon Dep. 276:5–277:25). Brown confirmed that McVeigh received the email and still questioned it. "This is the email that he wanted to get ahold of," Brown explained, "to see if he could… work in a dual capacity" (Brown Dep. 177:1– 178:4). Brown testified that McVeigh "overreacted" to the situation and "wanted him to be fired" (Brown Dep. 211:20–212:2).

Though McVeigh initiated an insider threat referral, the Air Force security office ultimately concluded that there had been no breach. "There was no security violation," Brown testified. "It might be, like, improper procedure, but it's not a security violation" (Brown Dep.

185:23–186:6). Jaspers similarly testified that "there was no active clearance barrier. That had been resolved. This was about optics" (Jaspers Dep. 119:1–18).

Despite the lack of a security basis, no effort was made to correct the record. Brown admitted that "I don't know of any… official way to remove him from being [on] contracts" and "I don't know of any process with respect to his debarment" (Brown Dep. 127:1–20). He also acknowledged that the Government should have acted differently: "They should have contacted NSA directly and worked it out with them" (Brown Dep. 198:13–199:2).

The uncorrected referral, the lack of process, and the continuing exclusion from government-facing work all confirm that Roe was not subject to a neutral clearance procedure. He was blacklisted—without hearing, notice, or path to reinstatement.

### G.  The Government Is Not Entitled to Judgment on Dr. Roe's Stigma-Plus / Unreasonable Interference with Employment Claim (Count IV)

The Government contends that Dr. Roe cannot prevail on his stigma-plus due process claim because (1) he was not wholly precluded from his profession, (2) the Air Force made no public disclosure of stigmatizing information, and (3) Dr. Roe never requested a name-clearing hearing. Each contention misstates the controlling law and ignores or misrepresents key record facts.

### H.  A. The Court Has Already Held That Dr. Roe Plausibly Alleges a Liberty-Interest Violation

In denying the Government's motion to dismiss Count IV, the Court held that Dr. Roe plausibly stated a claim for "unreasonable interference with employment" in violation of the Fifth Amendment. MTD Opinion at 4. The Court recognized that the liberty interest protected by the Due Process Clause may be violated where the Government "stigmatizes" an individual in a

manner that forecloses future employment opportunities—particularly in the public or government-contractor context. Id.

The controlling legal standard is well established. A plaintiff states a stigma-plus claim where:

(1) the Government makes a false and stigmatizing charge,

(2) the charge is publicly disclosed, and

(3) the plaintiff suffers a significant alteration of legal status or preclusion from future employment. *See Bell v. Texas Tech Univ. Health Scis. Ctr.*, 894 F.3d 490, 497–98 (5th Cir. 2018); *see also Rosenstein v. City of Dallas*, 876 F.2d 392, 395–96 (5th Cir. 1989). The Court has already concluded that Dr. Roe's allegations satisfy this standard at the pleading stage. Roe, 2024 WL 925556, at *4. The Government's motion does not undermine that conclusion.

## I. Capt. McVeigh's Repeated Promotion of Disproven Misconduct Allegations Demonstrates Retaliatory Pretext and Sustained Reputational Harm A. The Record Confirms All Three Elements: Stigma, Publication, and Professional Exclusion

### 1. The Government Disseminated False and Stigmatizing Charges of Misconduct

The first element of a stigma-plus claim requires proof that the Government made accusations that were **false**, **stigmatizing**, and **damaging to reputation**. See *Codd v. Velger*, 429 U.S. 624, 627 (1977); *Bell v. Texas Dep't of Crim. Just.*, 894 F.3d 490, 497 (5th Cir. 2018). Courts have long recognized that accusations of **disloyalty**, **dishonesty**, **unethical conduct**, or being a **security risk** qualify as reputationally stigmatizing and implicate protected liberty interests. See *Rosenstein v. City of Dallas*, 876 F.2d 392, 395 (5th Cir. 1989); *Quinn v. Shirey*, 293 F.3d 315, 320 (6th Cir. 2002).

Here, the record establishes that Capt. McVeigh formally labeled Dr. Roe an "insider threat," alleged he had improperly used his NSA government credentials to secure and perform

51

contractor duties with the Air Force, and claimed Dr. Roe accessed SAP facilities without proper authorization. See Roysdon Dep. 195:1–22, 196:1–22, 197:1–21 (May 30, 2025); Statement of McVeigh at 2 (Sept. 10, 2020) (US0000704). These allegations were codified in Dr. Roe's Program Access Request (PAR) justification, which falsely stated that Roe was acting "for NSA," and were later cited as justification for his removal. Roysdon Dep. 279:23–280:21 (May 30, 2025); US0000570 at 2.

On August 24, 2020, McVeigh circulated a Memorandum for Record to SAF/AQL, AFOSI, AFRL, and HNCO, recommending an inquiry based on his assertion that Dr. Roe's access "seemed to be improper." See US0000477; US0000061. That same day, McVeigh submitted a written statement asserting that Dr. Roe had "represented himself as a Government employee," lacked proper DD254 documentation, and committed "a possible conflict of interest or fraud." Statement of McVeigh at 1–2 (US0000703–0704). He further claimed that NSA legal advice had prohibited such conduct, though he conceded the legal opinion he relied upon was undated and unsigned. Id. at 2.

Internal correspondence shows that McVeigh's allegations were immediately framed in criminal terms. AFLCMC Contracting Officer Thomas Parisi expressly warned that the accusation amounted to **"Felony Fraud"**—a term he used verbatim—and stated: "That is a HUGE accusation that we should not be throwing around without some proof." Email from Parisi to McVeigh et al. (Aug. 25, 2020, 6:16 PM) (US0000388). Nonetheless, McVeigh, Tanya Macrina, and others continued invoking terms like "double dipping" and "procurement fraud." See US0000061–62; US0000418; US0000063–66.

Dr. Roe had, in fact, secured written ethics clearances from NSA's Office of General Counsel in both 2019 and 2020 explicitly approving the outside work in question. See

52

US0000063–66. Those documents confirmed that Roe had not violated 18 U.S.C. §§ 203, 205, or 208, had no representational conflict, and was performing unclassified work outside government hours. Id.

Security and contracting officials—including AFRL's Thomas Parisi and AFLCMC's 30(b)(6) designee Richard Bremer—swiftly concluded that there was no wrongdoing. Bremer testified under oath that he reviewed McVeigh's statement and found "no information... relevant" to his inquiry. Bremer 30(b)(6) Dep. 12:2–4 (Apr. 21, 2025). He further confirmed that Dr. Roe was not suspended, debarred, or excluded from contracting. Id. at 21:8–22:3. NSA's security and contracting staff similarly found no conflict, no compromise of classified information, and no violation of contracting or SAP protocols. See Rowe 30(b)(6) Dep. 17:7–17:25 (Apr. 21, 2025); US0000569–70.

Despite these findings, the "insider threat" label remained in internal records and continued to be cited. And in 2022—more than two years after Roe's removal—Capt. McVeigh filed a new referral with the Department of Defense Inspector General, repeating the same allegations. See US0000570 at 2. That complaint cited no new facts and reused the same 2020 PAR justification language that had already been discredited. Id. McVeigh's persistence in reasserting disproven allegations supports a strong inference of bad faith and intentional reputational harm.

The Government now characterizes the episode as an administrative misunderstanding or clearance mismatch. But the record reflects formal allegations of ethical, legal, and security violations, shared across security and contracting channels, and treated as misconduct for purposes of exclusion. The sustained use and republication of these charges—despite their

factual collapse—satisfies the "stigma" element under binding precedent. See *Codd*, 429 U.S. at 627; *Rosenstein*, 876 F.2d at 395.

### 2. The Government Publicly Disclosed the Allegations to Third Parties

To prevail on a stigma-plus claim, the plaintiff must show that the stigmatizing allegations were publicly disclosed. *See Rosenstein v. City of Dallas*, 876 F.2d 392, 395–96 (5th Cir. 1989). Disclosure to a government contractor or to other agencies may satisfy this element if the communication causes reputational harm or impairs future employment. *See Quinn v. Shirey*, 293 F.3d 315, 320–21 (6th Cir. 2002); *Cox v. Roskelly*, 359 F.3d 1105, 1112–13 (9th Cir. 2004).

Here, the Government's disclosures were neither contained nor internal. Stigmatizing allegations against Dr. Roysdon—including accusations of conflict, fraud, and insider threat status—were conveyed to multiple third parties inside and outside the Department of the Air Force:

### 3. Disclosures to Leidos

In 2023, Dan Brown, an HNCO official, told Leidos engineer Todd Jaspers that Dr. Roysdon was "persona non grata" and should not appear on any materials associated with Air Force projects. Brown warned that inclusion of Dr. Roysdon's name would be a "show-stopper" and jeopardize the contract. Jaspers responded by scrubbing Dr. Roysdon's name from all slide decks and presentation materials, despite the fact that Dr. Roysdon authored the technical content. Jaspers Dep. 49:1–51:5, 104:10–105:15, 117:2–119:9 (Apr. 11, 2025).

These statements were made to personnel at Leidos, a private government contractor with no investigative or adjudicative authority. Brown's disclosure caused immediate reputational and professional harm by excluding Dr. Roysdon from visible participation in the project.

### 4. Disclosures to GITI and Contracting Personnel

The PAR justification containing false or misleading information—drafted without Dr. Roysdon's input—was circulated across HNCO, GITI, and contracting stakeholders in August 2020. See US0000045. Dr. Roysdon was never given the opportunity to review, correct, or respond to that document before it was used to initiate the insider threat inquiry and read-out.

The justification text remained in government records even after the OSI inquiry concluded with no finding of misconduct. The lack of correction ensured that the original, stigmatizing narrative remained available to—and relied on by—contracting officials, program leads, and downstream recipients.

### 5. Disclosures to NSA, IARPA, and DARPA

Dr. Roysdon testified that colleagues at NSA, IARPA, and DARPA later made reference to his "trouble at the Air Force" when discussing future opportunities. Roysdon Dep. 293:1–293:14 (May 30, 2025). He further testified that he had not disclosed the events at HNCO to these officials, and that their knowledge appeared to stem from inter-agency sharing.

While the precise mechanism of these disclosures remains uncertain due to discovery gaps, the evidence shows that information adverse to Dr. Roysdon circulated beyond the Air Force and impaired his professional opportunities in adjacent agencies. Such reputational spillover satisfies the public disclosure requirement. See Cox, 359 F.3d at 1112–13.

### 6. Publication Within OSI and Core Security Systems

AFOSI's Report of Investigation (ROI), which labeled Dr. Roysdon an insider threat, was uploaded to the CORE case management system and shared with HNCO personnel outside the security chain. See US0000045. The ROI and associated records were never corrected—even after clearance officials found no violation and closed the matter without action.

Michael Crunk, OSI's 30(b)(6) designee, confirmed that the investigation resulted in no criminal case, no administrative findings, and no clearance action. Crunk 30(b)(6) Dep. 18:13–22:3 (Apr. 24, 2025). Yet the stigma remained on file, uncorrected, and available to any party with access to CORE, JADE, or SIC systems.

### 7. Impact of Discovery Failures

Due to the Government's failure to preserve key communications and classification records, the full scope of disclosures remains unknown. As discussed in Section IV below, AFOSI did not preserve Agent Beall's NIPR, SIPR, or JWICS accounts, and McVeigh's SAP-related emails were never produced. See McDonald 30(b)(6) Dep. 22:13–23:23 (Apr. 24, 2025); US0000411; US0000418. These systems likely contained recipient lists, access logs, and distribution records critical to tracing how and where the misconduct narrative spread.

The Government cannot now invoke uncertainty to its advantage. The evidence of publication is already substantial; any lingering ambiguity is a direct result of the Government's discovery violations. Under Rule 56(d), the Court must resolve such ambiguities against the party that caused them.

### 8. Professional Exclusion

Since his removal from HNCO, Dr. Roe has received no offers or invitations to participate in classified Air Force cyber programs. Roysdon Dep. 311:7–312:5 (May 30, 2025). He testified that McVeigh's allegations permanently damaged his access to the SAP community and that stakeholders viewed him as an insider threat and potential liability. Id. at 316:8–321:4.

The Air Force's own 30(b)(6) representative, Richard Bremer, confirmed that Dr. Roe was never suspended, debarred, or added to any exclusion list. Bremer testified that he found no wrongdoing and that any exclusion resulting from the allegations would constitute a de facto

debarment not authorized by FAR procedures. Bremer 30(b)(6) Dep. 12:2–4, 20:8–21:3, 21:8–22:3 (Apr. 21, 2025).

Parisi likewise testified that there was no substantiated basis to exclude Roe and that he merely forwarded concerns to legal. Parisi Dep. 52:17–54:11 (Apr. 16, 2025).

Nonetheless, Dr. Roe's exclusion from future SAP work—despite his eligibility and absence of any formal adjudication—remains absolute. His name was removed from deliverables, future projects were foreclosed, and he was effectively blacklisted. That is sufficient to establish status alteration under the Fifth Circuit's stigma-plus test. See *Phillips v. Mabus*, 894 F. Supp. 2d 71, 82 (D.D.C. 2012); *Doe v. DOJ*, 753 F.3d 146, 154–55 (D.C. Cir. 2014).

### J. Dr. Roysdon Suffered a Significant Loss of Employment Opportunity and Professional Status

The Fifth Circuit has long recognized that a **liberty interest protected by the Fourteenth Amendment** includes an individual's right to pursue a **specific career or specialized field**, not merely an occupation in general. Government action that **effectively forecloses a person from working in a distinct sector** of their chosen profession—particularly through reputational harm—can give rise to a procedural due process claim.

This principle was established in *Shaw v. Hospital Authority of Cobb County*, where the Fifth Circuit held that denial of hospital staff privileges in a public institution implicated the liberty interest of a podiatrist, even though he was not barred from practicing medicine altogether. 507 F.2d 625, 628–29 (5th Cir. 1975). Likewise, in *White v. Franklin*, the court found that exclusion from a career as a flight examiner triggered due process protections. 637 F. Supp. 601, 610–11 (N.D. Tex. 1986).

Consistent with those rulings, the Fifth Circuit in *Adams v. City of Harahan* reaffirmed that **exclusion from a specialized field**, even if not total exclusion from the broader profession, may violate due process if it substantially impairs the ability to work in that field. 95 F.4th 908, 918 (5th Cir. 2024). Other decisions have confirmed that informal or stigmatizing governmental actions that bar someone from a specific public-sector role—or function as de facto licensure barriers—can also implicate constitutional protections. See *Phillips v. Vandygriff*, 724 F.2d 490, 493–94 (5th Cir. 1984); *Dixon v. McMullen*, 527 F. Supp. 711, 721 (N.D. Tex. 1981); *Schware v. Bd. of Bar Exam'rs*, 353 U.S. 232, 239–40 (1957).

### 1. Dr. Roysdon Was Excluded from a Highly Specialized Sector

Dr. Roysdon was removed from the Air Force's offensive cyber-AI programs in August 2020 and has never been invited back—despite maintaining an active clearance, having no disqualification or security incident, and holding unmatched technical expertise. See Roysdon Dep. 311:7–312:5 (May 30, 2025); Bremer 30(b)(6) Dep. 21:8–22:3 (Apr. 21, 2025).

Multiple witnesses confirmed that Roysdon was one of only two individuals qualified to lead this work, yet he was barred from participating, even in unclassified contributions. Jaspers Dep. 82:8–83:6, 88:24–89:4, 117:2–119:9 (Apr. 11, 2025). He was "persona non grata" in all Air Force deliverables. Id. at 105:5–105:15; Roysdon Dep. 237:1–239:5.

This exclusion was not merely reputational—it functioned as a **total and continuing denial of access** to a specific high-value sector of national security contracting. See also Roysdon Dep. 320:1–8, 322:1–17 (describing ongoing categorical exclusion).

### 2. The Loss of Opportunity Was Substantial and Career-Defining

At the time of removal, Roysdon was supporting a classified subcontract through GITI. The contract was cancelled following McVeigh's referral, and Roysdon lost all cleared SAP opportunities. Roysdon Dep. 268:6–270:3.

He estimated that the cleared AI/SAP niche is so small and high-value that exclusion from it is professionally fatal. Roysdon Dep. 74:1–75:24 (May 8, 2025). He explained that SAP contracts in this field often generate multimillion-dollar returns for senior cleared SMEs, and testified to a conservative damages estimate in the **millions of dollars** over the past five years based on typical cleared labor rates, proposal win modeling, and known contract values. Id. at 73:19–74:10, 108:1–110:14, 107:21–109:22.

### 3. His Status Was Altered by Government Conduct Without Due Process

Dr. Roysdon's exclusion followed an insider threat referral by Capt. McVeigh, but no findings were ever made, no hearing was ever offered, and the allegations remained on record. See Rowe 30(b)(6) Dep. 17:7–17:25 (Apr. 21, 2025); Roysdon Dep. 279:23–280:21 (May 30, 2025).

Despite being cleared of wrongdoing, he was removed from all classified meetings, author credit, and proposal work. Id. at 273:5–22, 318:6–320:20, 324:10–325:13. He described the consequence as a **de facto blacklisting** from the SAP contracting space. That exclusion, based solely on uncorrected accusations, constitutes a **procedurally invalid alteration of legal status**. See *Phillips v. Mabus*, 894 F. Supp. 2d 71, 82 (D.D.C. 2012); *Cox v. Roskelly*, 359 F.3d 1105, 1111–13 (9th Cir. 2004).

In sum, the Air Force's actions resulted in a continuing, reputation-driven exclusion from one of the most specialized sectors of national security contracting. That exclusion—undisputed,

ongoing, and career-defining—squarely satisfies the third element of the *stigma-plus* test under Fifth Circuit law.

### K.  The Government Denied Dr. Roysdon a Name-Clearing Hearing

Under Fifth Circuit law, when a government actor makes stigmatizing allegations that implicate a person's liberty interest in future employment, **due process requires notice and an opportunity to rebut the charges in a name-clearing hearing**. See *Codd v. Velger*, 429 U.S. 624, 627–28 (1977); *Rosenstein v. City of Dallas*, 876 F.2d 392, 395–96 (5th Cir. 1989); *Bell v. Tex. Tech Univ. Health Scis. Ctr.*, 894 F.3d 490, 498 (5th Cir. 2018). This obligation applies even where the individual is not a formal employee or where the separation is framed as voluntary. *In re Selcraig*, 705 F.2d 789, 797 (5th Cir. 1983); *Willbanks v. Smith Cnty.*, 661 F. Supp. 212, 215 (E.D. Tex. 1987).

The Government contends that Dr. Roysdon forfeited his right to a hearing by failing to request one. See Defs.' MSJ at 32. That argument fails both factually and legally.

### 1.  Dr. Roysdon Attempted to Invoke Process and Was Refused

Shortly after his removal, Dr. Roysdon asked HNCO Program Manager Dan Brown whether he could "present [his] case to somebody else at HNCO." Brown responded that he should "not bother." Roysdon Dep. 289:10–290:1 (May 30, 2025). That exchange constitutes a timely and clear effort to seek redress—and a categorical denial by a decisionmaker with program authority.

Courts have held that a plaintiff is not required to make a formal legal demand if the agency has already made clear that no review will be offered. See *Crosby v. Univ. of Ky.*, 863 F.3d 545, 558 (6th Cir. 2017) (futility exception applied where redress was explicitly refused); *Quinn v. Shirey*, 293 F.3d 315, 322 (6th Cir. 2002) (same).

### 2. The Government Never Provided Notice, Charges, or Rebuttal Rights

Despite branding Dr. Roysdon an insider threat, circulating allegations of felony fraud and security violations, and removing him from a high-value SAP project, the Government provided **no notice**, **no charges**, and **no opportunity to respond**. Roysdon Dep. 288:5–289:9 (May 30, 2025). There was no letter of concern, no security adjudication, no debarment proposal, and no correction of the record.

The findings of no wrongdoing—made by AFLCMC, OSI, NSA ethics officials, and security staff—were never communicated to Dr. Roysdon. See US0000569–70; US0000383. He testified that the allegations remained in place across government systems and that the original narrative continued to drive his exclusion. Roysdon Dep. 318:6–320:20.

Under *Codd*, the absence of notice or a meaningful opportunity to clear one's name constitutes a constitutional deprivation. 429 U.S. at 627. So too under *Rosenstein*, where the Fifth Circuit held that even nonbinding stigma must be paired with due process if it affects public employment. 876 F.2d at 395–96. The fact that the Government chose not to formalize the allegations does not excuse the absence of process. See *Willbanks*, 661 F. Supp. at 215.

### 3. Procedural Violations Compound the Harm and Preclude Summary Judgment

The failure to provide any name-clearing process is not a technicality—it is an independent constitutional harm. See *Bell*, 894 F.3d at 498. Where, as here, a government agency circulates stigmatizing charges, cuts off employment opportunities, and then denies the affected individual any opportunity to respond, a liberty interest claim is properly stated. *Dubose v. Oustalet*, 738 F. Supp. 188, 190–91 (E.D. Tex. 1990) (failure to offer hearing where reputational harm accompanied termination supported liability).

61

Summary judgment is therefore improper. The Government's position is not only contradicted by the facts, but legally foreclosed by established doctrine. The denial of a name-clearing hearing—when the Government knew its charges were harmful and contested—satisfies the final procedural element of the stigma-plus test under binding precedent. See *In re Selcraig*, 705 F.2d at 797; *Phillips v. Vandygriff*, 724 F.2d 490, 493–94 (5th Cir. 1984).

### L.  Summary of Findings and Relief Requested on Count IV

(*Stigma-Plus / Unreasonable Interference with Employment*)

When viewed in the light most favorable to Dr. Roysdon, the summary judgment record supports each required element of a *stigma-plus* due process claim under established Fifth Circuit precedent:

### 1.  Stigmatizing Allegations:

Capt. McVeigh, acting on behalf of the Air Force, formally labeled Dr. Roysdon an insider threat, alleged potential violations of 18 U.S.C. §§ 203, 205, and 208, and asserted a "possible conflict of interest or fraud" in a written referral to AFOSI and SAF/AQL. These accusations were materially false, lacked factual support, and were refuted by security, legal, and contracting authorities. Nonetheless, they triggered Dr. Roysdon's immediate removal from a cleared SAP program without any formal notice or adjudication. See US0000704; Roysdon Dep. 279:23–280:21 (May 30, 2025); Bremer 30(b)(6) Dep. 12:2–4 (Apr. 21, 2025).

### 2.  Public Disclosure:

The Government disseminated these stigmatizing charges beyond internal security channels—to Leidos personnel, GITI stakeholders, and officials at NSA, IARPA, and DARPA. Todd Jaspers testified that HNCO labeled Dr. Roysdon "persona non grata" and warned that listing him on deliverables would jeopardize contract viability. See Jaspers Dep. 105:5–105:15,

117:2–119:9 (Apr. 11, 2025). Dr. Roysdon was stripped from technical decks, excluded from meetings, and disinvited from future SAP roles, with the allegations persisting in CORE and program records. See Roysdon Dep. 293:1–293:14; US0000045.

### 3. Loss of Employment Opportunity and Professional Status:

Dr. Roysdon has not been invited to participate in any Air Force cyber-AI or SAP project since his removal in August 2020. This exclusion persists despite his active clearance and undisputed qualifications. Multiple witnesses confirmed that he was one of only two individuals qualified to lead offensive cyber-AI efforts and that the removal destroyed his future eligibility. See Roysdon Dep. 311:7–312:5; Jaspers Dep. 82:8–83:6, 88:24–89:4. Based on government pricing and proposal modeling, Dr. Roysdon conservatively estimates lost opportunity value in the **millions of dollars**. See Roysdon Dep. 107:21–110:14 (May 8, 2025).

### 4. Denial of Name-Clearing Process:

Despite the career-ending nature of the allegations, the Government failed to provide any formal notice, hearing, opportunity to respond, or correction of record. Dr. Roysdon directly asked HNCO Program Manager Dan Brown whether he could "present [his] case," and was told "not to bother." Roysdon Dep. 289:10–290:1. Under *Codd*, *Rosenstein*, and *In re Selcraig*, due process requires a name-clearing hearing when reputation and future employment are at stake— even in the absence of a formal request. The Government offered no such opportunity. See *Codd v. Velger*, 429 U.S. 624, 627 (1977); *Rosenstein v. City of Dallas*, 876 F.2d 392, 395–96 (5th Cir. 1989); *In re Selcraig*, 705 F.2d 789, 797 (5th Cir. 1983).

### 5. Evidence of Retaliatory Motive and Pretext:

McVeigh instigated the ethics referral immediately after Dr. Roysdon criticized his program leadership. He revived the same disproven allegations in a 2022 IG complaint and monitored Roysdon's post-removal activity—including GitHub submissions—despite lacking any official oversight role. These facts support an inference of retaliatory motive and sustained reputational targeting. See Roysdon Dep. 264:3–266:11, 273:1–274:5, 287:21–288:4; SMS Message (Aug. 27, 2020, 9:40 PM); US0000570 at 2.

### 6. Discovery Failures Preclude Judgment as a Matter of Law:

The Government failed to preserve NIPR, SIPR, and JWICS accounts belonging to OSI Agent Beall, did not produce McVeigh's SAP-related emails, and omitted key JADE/CORE system logs. See McDonald 30(b)(6) Dep. 22:13–23:23 (Apr. 24, 2025); US0000411; US0000418. These deficiencies obstruct full reconstruction of the disclosure timeline and prejudice Dr. Roysdon's ability to trace the extent of the damage. Under Rule 56(d), summary judgment must be denied where material gaps are caused by the moving party's failure to preserve or disclose evidence.

### M. The Government's Conduct Was Willful or Intentional

To recover damages under the Privacy Act, a plaintiff must show that the agency's unlawful disclosure was "intentional or willful." 5 U.S.C. § 552a(g)(4). Courts in the Fifth and D.C. Circuits construe this requirement to mean conduct that is not merely negligent, but **flagrantly disregards an individual's rights**, is **patently unlawful**, or **demonstrates reckless disregard** for the Privacy Act's safeguards. See *Jacobs v. Nat'l Drug Intelligence Ctr.*, 423 F.3d 512, 518 (5th Cir. 2005); *Doe v. U.S. Dep't of Justice*, 660 F. Supp. 2d 31, 42–43 (D.D.C. 2009); *Reed v. Dep't of the Navy*, 910 F. Supp. 2d 32, 42 (D.D.C. 2012); *Babatu v. Dallas Veterans*

*Affairs Med. Ctr.*, No. 3:11-cv-2109, 2014 WL 12482981, at *6 (N.D. Tex. Feb. 19, 2014);

*Mulhern v. Gates*, 525 F. Supp. 2d 174, 184 (D.D.C. 2007).

Willfulness in this context requires a showing that the disclosure **"was so patently egregious and unlawful that anyone undertaking the conduct should have known it unlawful."** *Reed*, 910 F. Supp. 2d at 42 (quoting *Tijerina v. Walters*, 821 F.2d 789, 799 (D.C. Cir. 1987)). Mere inadvertence or negligence does not suffice. See *Jacobs*, 423 F.3d at 518.

Here, the record supports a finding of willfulness.

### 1. McVeigh's Access and Use of Protected Information Was Knowing, Deliberate, and Unauthorized

Capt. McVeigh had **no supervisory, programmatic, or contracting authority** over Dr. Roysdon. Their workstreams were lateral. Multiple witnesses confirmed that McVeigh was **not in Dr. Roysdon's chain of command**, and had **no delegated role** in clearance or procurement review. See Parisi Dep. 33:2–34:15 (Apr. 16, 2025).

Nonetheless, McVeigh:

- **Accessed Dr. Roysdon's pay, rate, and subcontractor affiliation**— described by Parisi as "private and sensitive" acquisition data not to be disclosed outside the contracting chain. Parisi Dep. 84:1–85:25;

- **Relayed that information to SAF/AQL and security personnel** to frame his conflict-of-interest referral. See US0000061; US0000418;

- **Invoked clearance-related concerns**, referring to "improper" access and insider threat status, despite knowing Dr. Roysdon had NSA ethics clearance and had resigned from government service;

- **Surveilled Dr. Roysdon post-removal**, texting colleagues about his GitHub activity, contractor status, and billable hours, with no official basis to do so. SMS (Aug. 27, 2020, 21:40);

- **Revived disproven allegations in 2022** in a renewed IG complaint, again citing the same records that had already been discredited by contracting, legal, and security officials. See US0000570 at 2.

These acts were not accidental. They demonstrate a sustained effort to exploit personal contacts, bypass formal channels, and improperly disseminate system-protected information for reputational impact.

### 2. McVeigh's Conduct Surpasses the Threshold for Willfulness

The Fifth Circuit recognizes willfulness where the agency (or official) acts **without grounds to believe the conduct was lawful**, or with **reckless disregard for the individual's rights**. See *Jacobs*, 423 F.3d at 518. That standard is met here.

McVeigh knew, or should have known, that:

- He was not authorized to access contractor rate and affiliation data;

- He had no formal role in SAP or security adjudication;

- The records were privacy-protected, subject to internal controls, and distributed via systems of records (JADE, I2MS, CORE);

- Dr. Roysdon had been cleared of wrongdoing by legal, security, and contracting personnel;

- Circulating those materials would damage Dr. Roysdon's reputation and future employment.

Even if McVeigh subjectively believed there was an issue, his failure to consult contracting officials, respect system boundaries, or initiate formal record correction processes **demonstrates reckless disregard**, not a good-faith mistake.

This conduct aligns with the definition of willfulness adopted in *Doe*, 660 F. Supp. 2d at 42–43 ("patently egregious and unlawful"), *Paige v. DEA*, 818 F. Supp. 2d 4, 18 (D.D.C. 2010) (willfulness inferred from circumstantial evidence), and *Mulhern*, 525 F. Supp. 2d at 184 (failure to follow policy not protected if based on misuse of data).

### 3. The Government Has Not Identified Any Lawful Basis for McVeigh's Access

Despite discovery requests, the Government has never identified:

- The **system** from which McVeigh accessed contracting or security data;

- The **policy or delegation** under which he was entitled to access or disseminate it;

- Any **internal recordkeeping** showing that McVeigh's access was reviewed, logged, or authorized.

As explained in *Babatu*, 2014 WL 12482981, at *6, it is the agency's burden to establish a lawful basis when it claims the disclosure was authorized or accidental. The absence of such a showing here, combined with the repeated, targeted nature of McVeigh's actions, supports a finding of intentional or willful conduct.

### 4. Institutional Failures Compound the Inference of Willfulness

Even if the Government seeks to distance itself from McVeigh's actions, the broader record reflects systemic disregard for Privacy Act compliance:

67

- AFOSI failed to maintain audit logs for I2MS, CORE, and JADE—despite knowing the records at issue were sensitive and retrievable by name. McDonald 30(b)(6) Dep. 22:13–23:23;

- No Privacy Act officer or security official ever corrected the record, despite knowing the allegations were discredited;

- The Government never identified the System of Records Notice (SORN) governing contractor pay and role data, from which McVeigh retrieved private information.

- These failures reflect not mere negligence but a **breakdown in accountability and oversight**—consistent with willful disregard of the statute's requirements. See *Jacobs*, 423 F.3d at 517–18.

### 5. Discovery Confirms Dan Brown's Role in Unauthorized Disclosure—But Critical Gaps Remain

Although the original Privacy Act claims emphasized Capt. McVeigh's unauthorized disclosures, discovery has since revealed that **HNCO Program Manager Dan Brown** was also a key source of reputational harm. As detailed in deposition testimony, Brown labeled Dr. Roysdon "persona non grata," warned Leidos that his involvement was a "showstopper," and directed that his name be removed from technical deliverables. See Jaspers Dep. 117:2–119:9 (Apr. 11, 2025). These communications, made outside any adjudicative or security process and directed to non-government personnel, constitute independent Privacy Act violations.

Yet this is precisely where the record begins to fray. Despite repeated discovery requests, the Government has failed to produce **even unclassified emails** or internal communications from **Brown or McVeigh** that would illuminate the scope of their disclosures. More troubling still, the

**Air Force failed to preserve OSI Agent Beall's NIPR/SIPR accounts in addition to his JADE and CORE accounts (one of which was only recently restored and it is believed in still in classification review)**, where much of the insider threat discussion likely originated, and has offered **no clear explanation** for the absence of core SAP system logs.

Most egregiously, the **Government's mishandling of classified discovery**—including late-stage access issues, compartmentalization roadblocks, and improper redactions—has thwarted Plaintiff's ability to trace how protected records moved across systems and actors. These deficiencies cut to the heart of the Privacy Act claims. They obscure not only the **source and scope** of the unlawful disclosures, but also the **mental state and intent** of the actors involved—facts essential to resolving the issue of willfulness under § 552a(g)(4).

Accordingly, if the Court does not deny summary judgment outright, it should at minimum **defer resolution under Rule 56(d)** until the full scope of the relevant disclosures— classified and unclassified—can be uncovered and meaningfully addressed.

### N.  The Government's Conduct Was Willful or Intentional

The Privacy Act imposes liability for damages only where the agency's actions were "intentional or willful." 5 U.S.C. § 552a(g)(4). This standard does not require subjective malice or proof of animus. Instead, it is met where the agency acts "without grounds for believing [its] actions lawful" or in "reckless disregard" for the plaintiff's rights. *Jacobs v. Nat'l Drug Intelligence Ctr.*, 423 F.3d 512, 518 (5th Cir. 2005); *White v. Office of Pers. Mgmt.*, 787 F.2d 660, 663 (D.C. Cir. 1986). In the D.C. Circuit, conduct qualifies as willful when it is "so patently egregious and unlawful that anyone undertaking the conduct should have known it unlawful." *Reed v. Dep't of the Navy*, 910 F. Supp. 2d 32, 42 (D.D.C. 2012).

69

That standard is satisfied here. The Government not only disclosed protected information about Dr. Roysdon without authorization—it did so repeatedly, despite knowing that key records were inaccurate, and without any attempt to correct or contain the harm.

By August 2020, it was indisputable that Dr. Roysdon's work for GiTi had been pre-cleared by NSA's Office of General Counsel. NSA had determined—twice—that his outside role did not violate 18 U.S.C. §§ 203, 205, or 208 and that no procurement, ethics, or security conflict existed. See US0000063–66. Security personnel similarly confirmed that Dr. Roysdon's SAP access had been properly granted and that no classified compromise occurred. See Rowe 30(b)(6) Dep. 17:7–17:25. Nonetheless, the "insider threat" designation and mischaracterized Program Access Request (PAR) justification were not corrected. To the contrary, the derogatory label was circulated across multiple offices, distributed to Leidos and SAF/AQL personnel, and reasserted in a 2022 Inspector General complaint. See US0000570 at 2.

These disclosures persisted even after the underlying facts had been disproven by internal authorities. The refusal to update, correct, or retract the record—despite repeated notice—is a textbook example of reckless disregard under § 552a(g)(4). See *Sellers v. Bureau of Prisons*, 959 F.2d 307, 312–13 (D.C. Cir. 1992) (failure to correct known falsehoods demonstrates actionable willfulness).

The principal actors—**Capt. McVeigh**, **Dan Brown**, and **AFOSI Agent Beall**—each accessed and shared records they had no legal right to obtain or disseminate. McVeigh, in particular, played a central role. Despite lacking any supervisory or contracting role over Dr. Roysdon, he accessed SAP clearance materials, contracting status, and internal rates. See US0000418. He transmitted this information—described by Contracting Officer Parisi as "private and sensitive"—to security, SAF/AQL, and contractors. Parisi Dep. 84:1–85:25 (Apr.

16, 2025). He then tracked Dr. Roysdon's activity post-removal and revived the misconduct narrative in a 2022 IG complaint using the same previously discredited documents.

This conduct far exceeds mere negligence. It is evidence of a deliberate effort to weaponize privacy-protected information, through backchannel access and lateral communications, for reputational effect.

Similarly, Dan Brown warned Leidos personnel that Dr. Roysdon was "persona non grata" and would pose a "showstopper" risk to future Air Force contracts. See Jaspers Dep. 117:2–119:9 (Apr. 11, 2025). This disclosure resulted in the removal of Dr. Roysdon's name from technical slide decks that he had authored. Id. at 104:10–105:15. No one has identified any authority or "need-to-know" justification permitting Brown to transmit insider threat designations to external contractors—let alone to do so after the allegations had been resolved.

Agent Beall, for his part, shared the security inquiry across multiple offices and platforms, without control or audit logging. McDonald testified that AFOSI maintained no audit trails for CORE, JADE, or I2MS, and that access was open to users without formal review. See McDonald 30(b)(6) Dep. 22:13–23:23 (Apr. 24, 2025). These systems were retrievable by name and clearance identifier, and included at least one document bearing a Privacy Act cover sheet— an acknowledgment by the agency that the records were protected.

The breadth of the disclosures, the number of unauthorized recipients, and the complete absence of any corrective measures reflect a systemic failure of oversight and compliance. This failure supports a finding of willfulness not only under *Jacobs* and *Reed*, but also under *Andrews v. Veterans Admin.*, 838 F.2d 418, 424 (10th Cir. 1988), which affirmed that agency-wide neglect in protecting sensitive data—even absent subjective bad faith—can satisfy § 552a(g)(4).

71

Courts have repeatedly found or allowed willfulness claims to proceed under similar factual circumstances. See, e.g., *Ashbourne v. Hansberry*, 302 F. Supp. 3d 338, 347–48 (D.D.C. 2018) (sufficiently pled inference of intentional disclosure); *Babatu v. Dallas VA Med. Ctr.*, 2014 WL 626515, at *12 (N.D. Tex. Feb. 18, 2014) (employee misuse of agency database could support willfulness); *Minshew v. Donley*, 911 F. Supp. 2d 1043, 1072 (D. Nev. 2012) (disclosure to outside contractor despite protest found willful); *Kelley v. FBI*, 67 F. Supp. 3d 240, 258 (D.D.C. 2014) (unauthorized disclosures to media sufficient to survive dismissal).

In sum, the Government's conduct was not merely sloppy—it was **purposeful, patterned, and flagrant**. The failure to verify recipient access, to correct known errors, or to audit dissemination of security-related labels constitutes willfulness under any controlling standard. See also *Hill v. Dep't of Defense*, 981 F. Supp. 2d 1, 11 (D.D.C. 2013) (need-to-know exception construed narrowly); *Pilon v. DOJ*, 73 F.3d 1111, 1113 (D.C. Cir. 1996) (rejecting broad construction of intra-agency disclosure defenses).

For these reasons, summary judgment must be denied on the issue of intent. If anything, the record compels a trial on whether the Privacy Act violations were not only unlawful, but deliberate.

### O.  Summary of Findings and Relief Requested on Counts II and III

The Government's motion for summary judgment on Dr. Roysdon's Privacy Act claims must be denied. The record shows—and in critical respects, the Government does not dispute— that:

- Protected records concerning Dr. Roysdon were maintained in retrievable "systems of records," including I2MS, CORE, JADE, and classified SAP systems.

- These records included clearance justification memos, security designations, and contracting/rate information—some of which were marked with Privacy Act cover sheets and shared outside proper channels.

- The Government disclosed this material to third parties without consent and without invoking a valid statutory exception, including to Leidos engineers, GiTi staff, and other agencies such as IARPA and DARPA.

- As a result, Dr. Roysdon lost access to Air Force and SAF/AQL workstreams, experienced reputational and professional exclusion, and suffered measurable financial and emotional harm.

- The disclosures were intentional and willful. They continued long after internal contracting, security, and legal officials had cleared Dr. Roysdon of wrongdoing. The narrative was revived again in 2022 by Capt. McVeigh, who had no authority over Dr. Roysdon and who accessed and disseminated sensitive contract records without justification.

- The full scope of these violations remains obscured due to the Government's discovery misconduct—specifically, deletion of OSI accounts, failure to produce access logs, and classification restrictions that foreclosed meaningful adversarial testing.

73

Because the record supports each element of a claim under 5 U.S.C. § 552a(g)(1)(D), and because any uncertainty in the disclosure trail is directly traceable to the Government's failure to preserve and produce responsive documents, summary judgment on Counts II and III must be:

- **Denied outright**, based on the record already developed; or

- **Deferred under Rule 56(d)**, pending resolution of outstanding classified disclosures and document preservation issues; and

- **Accompanied by an adverse inference** under Rule 37(e) and Rule 56(d), if the Court determines the missing records would likely support Plaintiff's theory of unlawful dissemination.

### 1. The Court Should Deny or Defer Summary Judgment Under Rule 56(d) Due to the Government's Discovery Misconduct, Classification Obstruction, and Spoliation

Even apart from the record already developed, Plaintiff is entitled to Rule 56(d) relief on multiple claims. The Government has failed to preserve, produce, or authorize access to essential documents—some classified, some administrative, and many that were in its exclusive control at all relevant times. These failures materially prejudice Plaintiff's ability to oppose summary judgment and fully establish his claims under Counts I, II, III, and IV.

Under Rule 56(d), a court may defer or deny summary judgment where the nonmovant shows "that it cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(d). The Fifth Circuit holds that "[w]hen the party opposing summary judgment timely requests discovery under Rule 56([d]) and has not been dilatory, summary judgment is improper if the party has not had the opportunity to discover information that is essential to its opposition." *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1267 (5th Cir. 1991). Courts routinely grant Rule 56(d) relief where evidence has been withheld by the moving party, spoliated after litigation became

74

foreseeable, or restricted by classification without procedural accommodation. See id.; see also Fed. Proc., L. Ed. § 62:641.

That is precisely the case here. From the outset of this litigation—and in many respects before litigation formally began—the Government failed to take adequate steps to preserve internal security, classification, and contracting records relevant to Dr. Roysdon's claims. When discovery was initiated, it failed to search and produce materials from key systems. And when Plaintiff requested limited classified access under applicable procedures, the Government declined to facilitate that access or segregate the classified portions of key documents.

These failures, taken together, have deprived Dr. Roysdon of essential materials—while the Government simultaneously seeks summary judgment based on the absence of those same materials.

### P. The Government Failed to Preserve and Produce Key Records in Its Exclusive Control

Numerous documents and data systems—critical to evaluating Dr. Roysdon's claims—were lost, deleted, never searched, or withheld. Each category implicates Rule 56(d) because it directly impaired Plaintiff's ability to rebut the Government's motion or develop essential factual content.

#### 1. OSI Agent Beall's Email, File, and System Access Records Were Deleted

AFOSI Special Agent Allen Beall—who processed Dr. Roysdon's read-out and received the referral from Capt. McVeigh—died during the early stages of this litigation. The Government admits that Beall's NIPR, SIPR, and JWICS accounts were deleted as part of routine personnel procedures, despite Beall's central role in the challenged events and his unique access to the AFOSI file chain. McDonald 30(b)(6) Dep. 22:13–23:23 (Apr. 24, 2025).

The Government has never produced an accounting of the specific materials lost. No litigation hold was issued at the time of his death. OSI did not search Beall's local devices, shared folders, or derivative backups until well after his accounts were purged.

Those records are essential. They would likely have contained:

- The PAR justification and surrounding communication;

- Any findings or correspondence with Capt. McVeigh, security officials, or SAP access managers;

- Post-read-out discussions relevant to reputational harm and record correction.

This is spoliation. It frustrates factual development on Counts I (debarment), II–III (Privacy Act), and IV (stigma-plus).

### 2. McVeigh's SAP Emails and Internal Memoranda Were Withheld or Never Searched

Capt. McVeigh's SAP-related communications to SAF/AQL and OSI were referenced in multiple production documents (e.g., "Yeah, I just sent it" regarding a referral memo, US0000411). But the underlying messages were never produced. Related emails identified by metadata in US0000418 also appear to reference attachments or threads not included in the document production.

These communications go to the heart of:

- What McVeigh knew about NSA authorization and contracting clearance;

- How he framed the insider threat referral and procurement-fraud theory;

- What stigmatizing information was shared with third parties.

Because Plaintiff had no access to McVeigh's SAP mailbox and no ability to search restricted repositories, Rule 56(d) compels deferral or adverse inference.

76

### 3.   No Access Logs or Custody Tracing for JADE, CORE, or I2MS

AFOSI and HNCO used multiple classified or limited-access systems to store and disseminate information about Dr. Roysdon, including:

- **JADE** (Program Access Requests, read-in/read-out records);

- **CORE** (AFOSI case tracking);

- **I2MS** (unclassified OSI inquiry data);

- **SIC/COE** (classified file transfer networks).

Despite direct requests, the Government has not produced access logs or download records showing who viewed or received information about Dr. Roysdon through these systems. McDonald confirmed that some logs were overwritten and that OSI lacks a comprehensive tracking system for case file dissemination. McDonald 30(b)(6) Dep. 22:13–23:23.

Without that evidence, Plaintiff cannot determine:

- How many officials viewed or circulated the insider-threat and contracting records;

- Whether improper disclosures were made to Leidos, GITI, NSA, or others;

- Who failed to correct the record or perpetuated its use.

This bears directly on the "publication" element of Count IV and the "disclosure" element of Counts II and III.

### 4.   Contracting Records Were Lost During AFRL Equipment Refresh

Contracting officer Thomas Parisi testified that a hardware refresh in 2022 resulted in the deletion of internal AFRL communications and records relating to Dr. Roysdon's subcontract. Parisi Dep. 168:1–22 (Apr. 16, 2025).

77

Those communications may have contained:

- Discussions of rate, role, or contract details that McVeigh improperly accessed;

- Internal assessment of McVeigh's interference or post-read-out conduct;

- Early signals of reputational exclusion or effort to block rebidding.

The Government has not produced a data-loss impact statement or reconstructed the lost threads from preserved recipients. Plaintiff cannot fill that gap independently.

### Q. The Government Refused to Facilitate Proper Classified Discovery Despite Repeated Requests

The Government's summary judgment motion relies heavily on the absence of evidence in Plaintiff's record. Yet that evidentiary silence is the direct result of the Government's refusal to grant Plaintiff access to classified materials—even though it had full control over those materials and the means to permit tailored review. This strategic restriction obstructed discovery of evidence essential to Counts I (de facto debarment), II–III (Privacy Act), and IV (stigma-plus).

### 1. Key Classified Materials Were Identified but Withheld

The Government withheld over 250 documents from its production on the grounds that they were classified, SAP-restricted, or subject to DoD clearance restrictions. These include:

- Internal communications between Capt. McVeigh, SAF/AQL, and SAP access managers;

- SAP briefing materials used to justify Dr. Roysdon's read-out;

- Classification-related referrals routed through OSI and security;

- Emails and records involving JADE, SIC, and SAP repository communications.

Many of these documents were identified by filename or redaction summary in the privilege log, but the underlying content was not reviewed by Plaintiff or counsel. The Government declined to seek a limited release or propose any procedural mechanism under DoD 5200.2-R or CIPA to enable adversarial inspection.

### 2. The Government Denied Plaintiff's Counsel Access to Clearance or Substituted Process

Plaintiff's counsel offered to pursue a "one-time limited clearance" under DoD procedures, or to review substituted summaries, redacted versions, or protective provisions under CIPA. The Government rejected those proposals without explanation, instead insisting on an absolute classification bar.

This approach—invoking classification as both shield and sword—has been repeatedly rejected by courts. When a party invokes classification to withhold discovery, while simultaneously moving for summary judgment, Rule 56(d) compels denial or deferral. See Fed. Proc., L. Ed. § 62:641; Int'l Shortstop, 939 F.2d at 1267.

### 3. The Missing Classified Materials Are Central to Plaintiff's Claims

The classified files withheld from Plaintiff's review bear directly on:

- The scope of Dr. Roysdon's read-out and the rationale given to SAP authorities;

- The dissemination of clearance information and "insider threat" designations across agencies;

- The role of Capt. McVeigh and HNCO personnel in perpetuating discredited accusations after security and legal findings cleared Dr. Roysdon.

These are not peripheral records. They speak to motive, publication, dissemination, and the credibility of the Government's entire defense.

Without access to these materials—or a meaningful substitute—the Plaintiff cannot fully rebut the Government's contentions. That is precisely the harm Rule 56(d) is designed to prevent.

### R. The Government's Systemic Mismanagement of Information Systems Violates the Privacy Act at Its Core—and Requires Rule 56(d) and Rule 37(e) Relief

The Privacy Act rests on the fundamental assumption that the federal government can identify, manage, and control the "systems of records" it uses to store and act upon personal data. See 5 U.S.C. § 552a(a)(5), (e)(5), (e)(10); *Doe v. Chao*, 540 U.S. 614, 618 (2004). When that assumption breaks down—when the Government cannot account for how it accessed, modified, or disseminated protected records—the statute is violated in both letter and spirit. The record here shows pervasive and systemic failure across the Government's recordkeeping, classification, and discovery systems. These breakdowns not only defeat summary judgment under Rule 56(d), they independently warrant sanctions under Rule 37(e).

### 1. The Government Cannot Identify the Systems It Used to Access, Disseminate, or Classify Plaintiff's Records

Despite two years of litigation and multiple deposition subpoenas, the Government still cannot state which contracting system Capt. McVeigh used to obtain Dr. Roe's private rate, role, and subcontract details. Nor can it identify which clearance adjudication platform—JPAS or

Scattered Castle—was used to flag Dr. Roe as a purported insider threat. See *Brown Dep.* 106:3–106:20, 110:7–111:2 (Mar. 24, 2025).

No audit trails, access logs, or input metadata have been disclosed for any of the Government's official systems—including JADE (SAP access), CORE (OSI records), SIC (secure email), or I2MS (unclassified case data). And no witness could even confirm which system was used to share stigmatizing information with contractors like GITI or Leidos. That failure violates both the Privacy Act's maintenance and accounting obligations, 5 U.S.C. §§ 552a(c), (e)(5), and precludes any meaningful tracing of dissemination—a required element of Counts III and IV. See *Doe v. U.S. Postal Serv.*, 317 F.3d 339, 342 (D.C. Cir. 2003); *Tijerina v. Walters*, 821 F.2d 789, 796 (D.C. Cir. 1987).

### 2. The Government Refused Discovery While Withholding Over 250 Core Documents Without Redaction or Substitution

As discovery closed, the Government produced a privilege log listing more than 250 withheld documents—many involving Dr. Roe's SAP access, OSI referrals, clearance adjudications, or contracting records. But it refused to produce any portion of those materials. No summaries were offered under CIPA § 4, 18 U.S.C. app. 3. No redactions were proposed under DoD 5200.2-R. And no "substituted facts" were negotiated under protective order.

Instead, entire files were withheld as "classified" weeks before the close of discovery, leaving Plaintiff with no opportunity to challenge them or use them in depositions. The blanket invocation of classification as a basis for withholding critical materials—while moving for summary judgment on the grounds that Plaintiff lacks evidence—has been repeatedly rejected by federal courts. See *Horn v. Huddle*, 647 F. Supp. 2d 55, 59–60 (D.D.C. 2009); *Islamic Shura*

81

*Council v. FBI*, 779 F. Supp. 2d 1114, 1125 (C.D. Cal. 2011). Rule 56(d) exists to prevent

precisely this tactic: a party cannot block access to evidence and then prevail for lack of proof.

### 3. The Government Delegated Discovery to a Witness and Allowed Evidence to Be Destroyed

Dan Brown, a key HNCO official, testified that in 2023 he was directed by Air Force

counsel to perform his own keyword search of NIPR Outlook emails using terms like "Roysdon"

and "Fibonacci." See *Brown Dep.* 166:17–169:25. He was not instructed to search classified

systems (SIC, JADE, CORE), was not provided custodial assistance, and was never asked to

preserve other forms of data. Id. at 168:24–169:10.

Worse, Brown confirmed that his previous workstation—used during 2019–2021—was

wiped during an AFRL building migration in 2022 or 2023. Id. at 170:1–171:4. No litigation

hold was issued. No image was taken. No recovery was attempted. The result is a total spoliation

of local files, desktop drafts, working documents, and email attachments—all of which fall

within the scope of the Government's control under Fed. R. Civ. P. 26(b).

This alone warrants Rule 37(e) sanctions. See *Coastal Bridge Co. v. Heatec, Inc.*, 833 F.

App'x 565, 572 (5th Cir. 2020). Under Rule 37(e), sanctions apply where:

The data "should have been preserved in the anticipation or conduct of litigation";

The failure resulted from "a party's failure to take reasonable steps"; and

The loss "prejudices another party."

Fed. R. Civ. P. 37(e)(1). Where the failure is intentional or causes substantial harm,

courts may impose adverse inferences. See Fed. R. Civ. P. 37(e)(2). That standard is met here.

Brown's deleted workstation, McVeigh's unproduced SAP emails, and OSI Agent Beall's wiped

accounts all reflect critical evidence that Plaintiff cannot recover. See *McDonald 30(b)(6) Dep.* 22:13–23:23 (Apr. 24, 2025) (confirming OSI failed to retain Beall's data after his death).

### 4. Rule 56(d) Relief Is Compelled by the Government's Exclusive Control Over Material Evidence

Rule 56(d) authorizes courts to defer or deny summary judgment where "a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(d). The Fifth Circuit holds that when a party has not had access to core information—particularly when that information is exclusively held by the movant—summary judgment is improper. *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1267 (5th Cir. 1991). In such cases, a continuance "should be granted almost as a matter of course." Id.

Here, the Government has exclusive control over:

The now-deleted OSI files of Agent Allen Beall;

McVeigh's SAP and SAF/AQL communications;

Clearance adjudication flags entered in JPAS and Scattered Castle;

System access logs from JADE, SIC, CORE, COE, and I2MS;

Over 250 documents withheld as classified or privileged without redaction;

Brown's workstation and local email files from the time period in question.

These systems and records are central to every claim the Government now seeks to dismiss. Plaintiff cannot be faulted for lacking evidence when that evidence lies entirely within the Government's control, and was either destroyed or withheld.

### 5. The Privacy Act and Stigma-Plus Claims Most Clearly Demonstrate the Harm

While these failures affect every count, the consequences fall most squarely on Count III (Privacy Act) and Count IV (Stigma-Plus). For Count III, Plaintiff must identify a protected record, a disclosure without authorization, and a failure to maintain or correct that record. 5 U.S.C. §§ 552a(b), (c), (e). The Government's refusal to identify the relevant systems, produce access logs, or facilitate review of classification decisions makes that showing impossible.

Similarly, Count IV requires Plaintiff to trace stigmatizing information to its source and demonstrate publication. That cannot be done without access logs, JADE entries, or copies of the very records that were circulated. See *Gunderson v. Federal Bureau of Prisons*, 2021 WL 1627018, at *4 (D.D.C. Apr. 27, 2021) (denying summary judgment where agency failed to produce system-level dissemination evidence).

Even if the Court were to find gaps in Plaintiff's evidence, those gaps are not his fault. They result directly from the Government's obstruction, destruction, and mismanagement—and the law requires that consequences follow.

### 6. Requested Relief

Accordingly, the Court should:

Deny summary judgment under Rule 56(d);

Impose appropriate sanctions under Rule 37(e), including adverse inferences;

Order supplemental production of all withheld classification and contracting documents, with proposed redactions under CIPA or DoD 5200.2-R;

Compel a full forensic accounting of systems used to store, classify, or disseminate Plaintiff's data; and

Bar the Government from relying on any classification-based exclusion without first satisfying its procedural burden.

Until these failures are remedied, Plaintiff cannot fairly oppose summary judgment—and the record cannot be trusted to reflect the truth.

### S. Plaintiff Seeks Leave Under Rule 15 to Substitute the Department of the Air Force as the Proper Defendant for Count II

The Government argues, in footnote 2 of its summary judgment motion, that Count II must be dismissed because it names the U.S. Air Force Office of Special Investigations (AFOSI or OSI), which it asserts is not a suable entity under the Privacy Act. See Defs.' MSJ at 2 n.2 (citing *Rosales v. Wormuth*, No. 1:23-cv-00440-DAE, 2024 WL 5703320, at *4 (W.D. Tex. May 23, 2024)). While Plaintiff respectfully preserves his objection to the reasoning in *Rosales*, he does not seek to litigate a threshold entity dispute that can be resolved more efficiently through amendment.

Critically, the *Rosales* decision was issued in May 2024—**well over a year after** Plaintiff filed his operative Second Amended Complaint and after the window for amendment had passed under the scheduling order. At the time of pleading, no controlling authority in this Circuit held that AFOSI could not be sued as the accountable agency under the Privacy Act. Plaintiff brought Count II in good faith based on the record evidence that AFOSI:

- Operated distinct investigative record systems such as I2MS and CORE;

- Issued field-level Privacy Act guidance and system-use restrictions;

- Was responsible for creating and circulating the ROI and PAR materials concerning Dr. Roysdon;

- And labeled at least one record as subject to the Privacy Act (see US0000045).

However, to streamline proceedings and focus the Court's attention on the substantive merits, Plaintiff now moves under **Federal Rule of Civil Procedure 15(c)(1)(C)** and **15(a)(2)** to substitute the **Department of the Air Force** as the proper defendant on Count II.

That substitution is **procedurally proper and substantively warranted** for four reasons:

### 1.   The Air Force Is Already a Party and Has Actively Defended Count II

The Air Force, through its counsel, has participated in every stage of discovery related to AFOSI, security administration, SAP access, and contracting. It designated Rule 30(b)(6) representatives to testify about OSI systems, AFLCMC decisions, and the SAF/AQL SAP classification chain. The underlying conduct in Count II falls squarely within the agency's institutional responsibility.

### 2.   Rule 15(c)(1)(C) Is Satisfied and Substitution Should Relate Back

Plaintiff's amendment:

- Arises from the same conduct, documents, and records described in the original pleading (see Fed. R. Civ. P. 15(c)(1)(B));

- Involves a party—the Department of the Air Force—that "received such notice of the action that it will not be prejudiced in defending on the merits" (id. § 15(c)(1)(C)(i)); and

- Involves a party that "knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity" (id. § 15(c)(1)(C)(ii)).

This satisfies the Fifth Circuit's relation-back rule. See *Petrus v. Bowen*, 833 F.2d 581, 583 (5th Cir. 1987); *Zaidi v. Ehrlich*, 732 F.2d 1218, 1220 (5th Cir. 1984).

### 3.   Discovery Has Revealed that the Violations Extend Beyond OSI

When Plaintiff filed the operative complaint, the known Privacy Act violations centered on OSI's handling of security inquiry records and read-out materials. But discovery has since demonstrated that:

- **Capt. McVeigh**, an Air Force program officer outside OSI, accessed and disseminated Dr. Roysdon's sensitive contract and rate information—without need-to-know and outside the procurement chain;

- **Dan Brown**, a civilian Air Force official and program manager, circulated insider-threat designations and instructed contractors to suppress Dr. Roysdon's authorship in government deliverables;

- **Air Force security officers** shared clearance-related files marked with Privacy Act warnings to personnel outside authorized systems.

These facts expand the scope of liability. The Privacy Act violations at issue now clearly implicate multiple Air Force actors acting outside OSI. Substituting the parent agency reflects the actual locus of institutional responsibility.

### 4. Amendment Is Appropriate Under Rule 15(a)'s Liberal Standard

Courts in this Circuit "should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). The Fifth Circuit applies a **liberal amendment policy**, grounded in the principle that cases should be resolved on their merits rather than dismissed for technical pleading defects. See *Anzures v. Prologis Tex. I LLC*, 886 F. Supp. 2d 555, 560 (W.D. Tex. 2012); *Smith v. EMC Corp.*, 393 F.3d 590, 595 (5th Cir. 2004).

None of the factors that weigh against amendment apply here:

- **No undue delay**: Plaintiff's prior amendment pre-dated *Rosales*, and substitution is sought promptly in response to a jurisdictional objection.

87

- **No bad faith**: Plaintiff always intended to hold the Air Force accountable; OSI was included in good faith due to its central role in the conduct.

- **No prejudice**: The Air Force has been an active party from the outset, and no new discovery would be required.

- **No futility**: Count II is already supported by extensive evidence showing improper disclosure of Privacy Act-covered records by Air Force officials.

As other courts have recognized, amendments based on newly revealed discovery are not dilatory and should be granted absent prejudice. See *Peña Arita v. United States*, 470 F. Supp. 3d 663, 687 (S.D. Tex. 2020); *Mailing & Shipping Sys., Inc. v. Neopost USA, Inc.*, 292 F.R.D. 369, 373 (W.D. Tex. 2013).

**Conclusion**: The Court should either (1) treat Count II as constructively asserted against the Department of the Air Force, or (2) grant leave under Rule 15(a)(2) and Rule 15(c)(1)(C) to substitute the correct defendant now. The amendment reflects the evolving factual record and avoids a dismissal based on naming technicalities. This case should be decided on the merits, and the Court should proceed accordingly.

## CONCLUSION

The Government's motion for summary judgment should be denied in its entirety. On every claim—Counts I (de facto debarment), II and III (Privacy Act), and IV (stigma-plus/unreasonable interference with employment)—the record contains genuine disputes of material fact that must be resolved by a jury.

As to **Count I**, the Court has already rejected the Government's legal theory, and the record now confirms repeated agency conduct demonstrating intent to exclude Dr. Roysdon from

future work. The Government's own witnesses and documentation contradict its claim that no bar existed.

As to **Count IV**, the record shows stigmatizing allegations, widespread dissemination, exclusion from his field, and denial of any corrective process—each supported by sworn testimony and internal emails. The Government's effort to recast this campaign of reputational harm as administrative processing ignores the substance of what occurred and how long it persisted.

As to **Counts II and III**, the Government disclosed records from protected systems—including classification repositories, security databases, and contracting archives—to third parties without consent or statutory authority. These disclosures caused measurable economic and reputational harm, and the Government's failure to correct known inaccuracies or to comply with Privacy Act safeguards demonstrates willful disregard.

Most critically, the Government cannot invoke gaps in Plaintiff's evidence when those gaps were created by the Government's own conduct: its failure to preserve OSI records, its refusal to produce SAP materials, and its decision to withhold classified documents without facilitating even basic protective review. Rule 56(d) bars judgment on this record. Rule 37(e) supports an adverse inference.

For these reasons, the Government's motion should be denied in full and appropriate sanctions or evidentiary remedies imposed along with strong relief compelling access to all necessary systems and discovery.

DATED this 4th day of August 2025.

89

Respectfully submitted,

**HENDLEY & HODGES LAW PLLC**
4594 US Hwy 281 N
Spring Branch, Texas 78070
Tel: (210) 714-0924
Fax: (210) 640-3398


By:    */s/ John W. Hodges Jr.*
John W. Hodges Jr.
TX Bar No. 24090167
Email: john@hhtx.law


-AND-


**ALLEN VELLONE WOLF HELFRICH & FACTOR P.C.**
1600 Stout Street, Suite 1900
Denver, Colorado 80202
Tel:(303) 534-4499


By:    */s/ Jason R. Wareham*
Jason R. Wareham
Colorado Bar No. 56974
*Pro Hac Vice*
jwareham@allen-vellone.com

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing instrument has been served to all attorneys of record in accordance with the Federal Rules of Civil Procedure, on this 4th day of August 2025.

Joseph A. Gonzalez, joseph.a.gonzalez@usdoj.gov

Robert D. Green, Robert.Green3@usdoj.gov

Katrina Seeman, katrina.m.seeman@usdoj.gov

/s/ Salowa Khan<br>
ALLEN VELLONE WOLF HELFRICH & FACTOR P.C.<br>
1600 Stout Street, Suite 1900<br>
Denver, Colorado 80202<br>
(303) 534-4499 | Main

91