## INDEX OF EXHIBITS

| No. | Description |
|-----|-------------|
| 1. | Roysdon Fact Witness Deposition Transcript; Roysdon Expert Witness Deposition Transcript |
| 2. | US0000665 |
| 3. | US0000059 |
| 4. | US0000045 |
| 5. | US0000043 |
| 6. | US0000176 |
| 7. | Brown Depo |
| 8. | US0000567 |
| 9. | Jaspers Dep |
| 10. | Parisi Depo |
| 11. | Bremer Dep. |
| 12. | US0000703 - 704 |
| 13. | Rowe Dep. |
| 14. | Burghard 30(b)(6) Deposition Transcript; Burghard Fact Deposition Transcript |
| 15. | McDonald Dep |
| 16. | Email from Joseph A. Gonzalez to Jason R. Wareham (Jul. 16, 2025, 3:14 PM MT) |
| 17. | Email from Joseph Gonzalez to Jason R. Wareham (May 22, 2025, 1:13 PM MT) |
| 18. | Email from Katrina Seeman to Jason R. Wareham (June 5, 2025, 4:57 PM MT) |
| 19. | Email from Katrina Seeman to Jason R. Wareham (June 12, 2025, 11:13 AM MT) |
| 20. | US0000802 |
| 21. | Email Wareham to Skinner (Nov. 28, 2022, 4:34 PM) |
| 22. | Email Skinner to Wareham (Apr. 4, 2023, 12:48 PM) |
| 23. | Roysdon Declaration. |
| 24. | US0000790–91US0000786 |
| 25. | Email Skinner to Wareham (Feb. 15, 2023) |
| 26. | Email Wareham to Skinner (Apr. 4, 2023, 12:54 PM) |
| 27. | US0000569 - 570 |
| 28. | US0000477 |
| 29. | US0000061 - 62 |
| 30. | US0000388 |
| 31. | US0000418 |
| 32. | US0000063–66 |
| 33. | Crunk 30(b)(6) Dep. |
| 34. | US0000383 |

Page 1

1            UNITED STATES DISTRICT COURT

2            WESTERN DISTRICT OF TEXAS

3               SAN ANTONIO DIVISION

4       - - - - - - - - - - - - - - +

5     DR. JOHN ROE,

6            Plaintiff,              CASE NUMBER:

7     v.                            5:22-CV-00869-JKP-HJB

8     UNITED STATES, et al.

9            Defendants.

10      - - - - - - - - - - - - - - +

11

12

13

14

15            DEPOSITION OF DR. PAUL ROYSDON

16                 Washington, D.C.

17              Thursday, May 8, 2025

18                   10:05 a.m.

19

20

21

22

23      Job No. CS 7351249

24      Pages: 1 - 172

25      Transcribed by:  Danielle E. Lawrence

      Job No. CS1

**EXHIBIT 1**
**Page 1 of 639**

Roysdon Expert_000001

Page 2

1             On the 8th day of May, 2025, the deposition of

2     Dr. Paul Roysdon was held at the Department of Justice,

3     175 N Street Northeast, 7th floor, Washington, DC 20002.

4             This proceeding was stenographically transcribed

5     by Danielle Lawrence, Shorthand Reporter and Notary

6     Public in and for the State of Maryland.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**EXHIBIT 1**
**Page 2 of 639**

Roysdon Expert_000002

Page 3

1                    A P P E A R A N C E S

2          ON BEHALF OF PLAINTIFF:

3              JASON R. WAREHAM, ESQUIRE

4              Allen Vellone Wolf Helfrich & Factor, P.C.

5              1600 Stout Street, Suite 1900

6              Denver, Colorado 80202

7              Telephone: (303) 534-4499

8              jwareham@allen-vellone.com

9

10         ON BEHALF OF DEFENDANTS:

11             JOSEPH A. GONZALEZ, ESQUIRE

12             KATRINA SEEMAN, ESQUIRE

13             United States Department of Justice

14             P.O. Box 7146, Ben Franklin Station

15             Washington, D.C. 20044

16             Telephone: (202) 598-3888

17             joseph.a.gonzalez@usdoj.gov

18

19         ALSO PRESENT: Robert Green (via Zoom)

20

21

22

23

24

25

**EXHIBIT 1**
**Page 3 of 639**

Page 4

1                     C O N T E N T S

2  DR. PAUL ROYSDON                              PAGE

3  Direct Examination by Mr. Gonzalez            5

4  Cross-Examination by Mr. Wareham              118

5  Redirect Examination by Mr. Gonzalez          147

6

7

8

9

10

11                     E X H I B I T S

12               (Attached to the transcript.)

13 DR. PAUL ROYSDON                              PAGE

14 Exhibit 1   Notice of Deposition              7

15 Exhibit 2   Disclosure of Expert Witness      8

16 Exhibit 3   Expert Report                     9

17 Exhibit 3A  CV                                16

18

19

20

21

22

23

24

25

**EXHIBIT 1**
**Page 4 of 639**

Page 5

P R O C E E D I N G S

DR. PAUL ROYSDON

1. Having duly been sworn, testifies as follows:

MR. GONZALEZ:  Good morning.  My name is Joseph
Gonzalez.  I'm joined with my colleague, Katie Seeman.
We represent the United States, Defendant.

MR. WAREHAM:  I'm Jason Wareham.  I represent
the Plaintiff and the Plaintiff's here with me in
person.

MS. SEEMAN:  And we're also joined by
Robert Green, also counsel for Defendant, virtually.

DIRECT EXAMINATION BY COUNSEL FOR DEFENDANT
BY MR. GONZALEZ:

Q.    Good morning, Dr. Roysdon.  Thank you for being
here.  Could you please state your full name for the
record?

A.    Paul Franklin Roysdon.

Q.    Dr. Roysdon, have you ever been deposed before?

A.    No.

Q.    So, it's like a discovery device to obtain
information for a lawsuit.  You've been put under oath
and I ask you questions, you answer them to the best of
your ability.  So, you have a responsibility to tell the
truth, do you understand that?

A.    Yes.

**EXHIBIT 1**
**Page 5 of 639**

Roysdon Expert_000005

1    Q.    If you can't answer the question or you don't

2    know the answer, just let me know.  Similarly, we don't

3    understand, just let me know and we'll take it from

4    there, does that make sense?

5    A.    Yes.

6    Q.    Okay.  So, I need verbal responses.  Like, head

7    shaking or nodding or kind of like uh-hum type of

8    responses, the court reporter can't really make an

9    accurate record.  So, to the best of your ability, can

10   you avoid those?

11   A.    Yes.

12   Q.    Okay.  Your counsel may object during my

13   questions.  He has every right to do that but unless he

14   tells you not to answer, you still need to answer the

15   question.  Do you understand all these instructions?

16   A.    Yes.

17   Q.    Any reason why you can't tell the truth here

18   today?

19   A.    No.

20   Q.    I'm going to ask you just to speak up a little

21   because we have people listening in.

22   A.    Okay.

23   Q.    You've got a deep voice, I'm jealous, so let's

24   show it off.  Let's start with this, and mark this as

25   Exhibit 1.  This is your notice of deposition.  Have you

**EXHIBIT 1**
**Page 6 of 639**

Roysdon Expert_000006

Page 7

1     seen this document before?

2     A.     No.

3            (Exhibit 1 marked for identification and

4     attached to the transcript.)

5     Q.     I want you to go to the last page, attachment A.

6     Did you bring any of the materials that I requested in

7     this subpoena here today?

8     A.     No.

9     Q.     So, you didn't bring all the data you considered

10    in forming your expert opinion?

11    A.     No.

12    Q.     Okay.  I want you to go to the number 4 there,

13    this requests a current CV, do you see that part?

14    A.     Yes.

15    Q.     When's the last time you drafted a CV, a resume

16    or something along those lines?

17    A.     December 2024.

18    Q.     December 2024, okay.  Is it your understanding

19    that you didn't have to bring one of those today?

20    A.     Yes.

21           MR. WAREHAM:  For the record, I believe all of

22    this had been produced to you previously.  So, bringing

23    a duplicative set of discovery that's with us today, I

24    didn't think was in play.  It was produced.

25           MR. GONZALEZ:  I'll check with my colleague.  To

**EXHIBIT 1**
**Page 7 of 639**

Roysdon Expert_000007

Page 8

1      my understanding, there is no December 2024 resume or CV

2      or anything like that that's been produced.

3             MR. WAREHAM:  I'll double-check as well and make

4      sure to update it but, my understanding is, everything

5      is current and produced to you.

6             MR. GONZALEZ:  They're listening in, they can

7      double-check that.  It's pretty important for an expert

8      witness --

9             MR. WAREHAM:  Of course it is.  I don't fight

10     that at all.  I thought it was produced.  I believe it

11     was produced last trotch but if you don't have it, I'll

12     get that done, get it fixed.

13            MR. GONZALEZ:  Okay.

14     BY MR. GONZALEZ:

15     Q.     All right, let's take a look at this document.

16     I'll mark this as Exhibit Number 2.  This is Plaintiff's

17     Disclosure of Expert Witness.  Let me know when you're

18     done reviewing.

19     A.     Okay.

20            (Exhibit 2 marked for identification and

21     attached to the transcript.)

22     Q.     Let's go to page 2.  Says, Plaintiff,

23     Dr. Joe Roe, that's you, correct?

24     A.     Yes.

25     Q.     So, this is expert designation for you, is that

**EXHIBIT 1**
**Page 8 of 639**

Roysdon Expert_000008

1    correct?

2    A.    Yes.

3    Q.    Okay.  Have you reviewed this document?

4    A.    I'm familiar with this document.

5    Q.    Under 1I, the last sentence for the first

6    paragraph there says, Dr. Roe's CV is provided as

7    Exhibit 1 to this disclosure.  Was it your understanding

8    that I had been provided your CV?

9    A.    Yes.

10    Q.    Is this disclosure the complete subject matter

11    for which you've been designated as an expert?

12    A.    I don't understand the question.

13    Q.    Sure.  You understand you've been designated as

14    an expert in this case?

15    A.    Yes.

16    Q.    Do you have any expert opinions outside of what

17    you've been designated as an expert in, in this

18    disclosure?

19    A.    No.

20    Q.    I'm marking this as Exhibit 3.  Do you recognize

21    this document?

22    A.    Yes.

23        (Exhibit 3 marked for identification and

24    attached to the transcript.)

25    Q.    What is that?

**EXHIBIT 1**
**Page 9 of 639**

1      A.      It's a market analysis.

2      Q.      Is this your expert report?

3      A.      Yes.

4      Q.      Did you draft this document?

5      A.      Yes.

6      Q.      Did you research this document?

7      A.      Yes.

8      Q.      Did you have any help from anybody in putting

9      this document together?

10     A.      No.

11     Q.      Have you ever served as an expert witness in a

12     lawsuit before?

13     A.      No.

14     Q.      Have you ever served as a vocational expert in a

15     lawsuit before?

16     A.      Define vocational.

17     Q.      An expert that provides an opinion with respect

18     to earning capacity.

19     A.      In what context?

20     Q.      What context?

21     A.      In what context?

22     Q.      In what context, okay.  In a lawsuit.

23     A.      No.

24     Q.      Okay.  So, you have never before served as a

25     vocational expert in a lawsuit, is that correct?

EXHIBIT 1
Page 10 of 639

Roysdon Expert_000010

Page 11

1      A.      Correct.

2      Q.      Have you ever served as an economic expert in

3      any capacity?

4      A.      Can you refine the question?

5      Q.      Sure.  Have you ever served as an economic

6      expert in a lawsuit before?

7      A.      No.

8      Q.      Have you ever provided an expert opinion on a

9      market or an economy in a lawsuit before?

10     A.      No.

11     Q.      Okay.  Have you ever before served as an expert

12     in an economic matter or a market analysis or an

13     industry analysis?

14     A.      In what context?

15     Q.      Any context.

16     A.      Yes.

17     Q.      Tell me about that.

18     A.      I provided expert advice within the context of

19     business.

20     Q.      What expert advice and what do you mean by

21     "business"?

22             MR. WAREHAM:  Object as to form.

23             THE WITNESS:  A mathematical analysis based on

24     publicly available information for the assessment of

25     potential market capture of the company.

**EXHIBIT 1**
**Page 11 of 639**

Roysdon Expert_000011

1    BY MR. GONZALEZ:

2    Q.    Okay.  Let's break that down.  Mathematical

3    analysis of potential market capture of a company, okay.

4    What does the term "market capture" mean?

5    A.    Available for -- the availability of business or

6    revenue within a certain market segment.

7    Q.    What market segment?

8    A.    There have been a few.

9    Q.    Could you go through each one?

10   A.    I'll give you one example, a potential market

11   capture within cybersecurity.

12   Q.    Potential market capture within cybersecurity.

13   When did you provide this analysis?

14   A.    Within the last five years.

15   Q.    I need you to be more specific, what year?

16   A.    I don't recall.

17   Q.    How many times in the last five years?

18   A.    I've done market analysis on several occasions

19   in the last five years.

20   Q.    So, several, more than two?

21   A.    Yes.

22   Q.    More than five?

23   A.    No.

24   Q.    Between two and five, okay.  And were those

25   market analyses all for CyberAI?

**EXHIBIT 1**
**Page 12 of 639**

Roysdon Expert_000012

1  A.  I said cyber.

2  Q.  Cyber, okay.  Were those market analyses all for

3  cyber?

4  A.  No.

5  Q.  What markets were they for?

6  A.  In those instances, both cyber and AI.

7  Q.  Okay.  What's the difference between cyber and

8  AI?

9  A.  I don't understand the question.

10  Q.  So, you made a distinction.  You said, cyber and

11  then you said AI as two different industries or markets

12  for which you have performed analyses, is that correct?

13  A.  That's correct.

14  Q.  What's the difference between cyber and AI?

15  A.  They're distinct markets.

16  Q.  Okay.  Tell me about the cyber market, what does

17  that consist of?

18  A.  The cyber market consists of both offensive and

19  defensive techniques in cyber security.

20  Q.  Okay.  What is the AI market?

21  A.  The AI market has many potential opportunities

22  across a vast number of disciplines too numerous to

23  mention.

24  Q.  In your expert report, you use the term

25  "CyberAI", what is that?

**EXHIBIT 1**
**Page 13 of 639**

Roysdon Expert_000013

1    A.    CyberAI is the confluence of both cybersecurity

2    and AI.

3    Q.    So, how do you define the CyberAI market?

4    A.    The CyberAI market can be defined as

5    cybersecurity tools that use algorithms that are

6    fundamental with AI and machinery.

7    Q.    You previously testified you had performed two

8    and five market analysis of cyber and AI, correct?

9    A.    Correct.

10    Q.    Have you ever performed a market analysis of

11    CyberAI?

12    A.    Yes.

13    Q.    When?

14    A.    This one.

15    Q.    Before this one?

16    A.    No.

17    Q.    This is your first time performing a market

18    analysis of CyberAI, is that correct?

19    A.    Within this specific domain, yes.

20    Q.    What does that mean, "this specific domain"?

21    A.    Specific to U.S. government contracts.

22    Q.    So, you have never performed a market analysis

23    of CyberAI in the context of government contracts,

24    correct?

25    A.    Correct.

**EXHIBIT 1**
**Page 14 of 639**

Roysdon Expert_000014

1    Q.    Other than this case, have you ever written an

2    expert report before?

3    A.    Define expert report.

4    Q.    Do you know what an expert report is?  I can

5    define it but I want to ask you first, do you know what

6    an expert report is?

7    A.    I'm asking for a definition.

8    Q.    If you don't know, that's fine.

9    A.    I'm uncertain.

10    Q.    Okay.  An expert report is a summary of your

11    opinions and the basis for your opinions in the context

12    of a lawsuit.

13    A.    In a context of a lawsuit, no.

14    Q.    Okay.  But you have provided expert reports

15    outside of the lawsuit context, is that correct?

16    A.    Yes.

17    Q.    Tell me about some of those.

18    A.    I would define, based on your definition of an

19    expert report, to include engineering or mathematical

20    analysis and observations, not necessarily opinions but

21    things based on facts.

22    Q.    We'll come back to this.  I want to get a little

23    background first.  I don't have your CV here so I

24    understand this question may be a little bit lengthy but

25    could you tell me what degrees you have and go a little

**EXHIBIT 1**
**Page 15 of 639**

Roysdon Expert_000015

Page 16

1    slow because I'm going to be writing this down.

2           MS. SEEMAN:  Can we actually go off the record

3    for a second, if you don't mind?

4           MR. GONZALEZ:  Sure.

5           (Off the record discussion was held.)

6    BY MR. GONZALEZ:

7    Q.     I have here what I'm going to mark as

8    Exhibit 3A, your CV.

9    A.     Okay.

10          (Exhibit 3A marked for identification and

11   attached to the transcript.)

12   Q.     Let's start with the degrees.  Ph.D. in

13   electrical engineering, okay.  That's why I'm calling

14   you doctor?

15   A.     Correct.

16   Q.     A lot of degrees here but is that the only

17   Ph.D.?

18   A.     It was a dual-focused Ph.D.

19   Q.     What else was it focused on?

20   A.     Applied math and probability theory.

21   Q.     What classes did you have to take to obtain that

22   Ph.D.?  Give me just a rough overview of the education

23   involved with it.

24   A.     There are a variety of advanced mathematics

25   classes, statistics or probability theory courses,

**EXHIBIT 1**
**Page 16 of 639**

Roysdon Expert_000016

1      numerical analysis, modeling, modeling simulation.  It's

2      a long list.

3      Q.      Okay.  Do you have a degree in economics?

4      A.      No.

5      Q.      Do you have a MBA?

6      A.      No.

7      Q.      So, we'll come back to your CV but -- rather,

8      your education.  Let's talk about Roysdon, LLC,

9      all right.  You started this company?

10     A.      Yes.

11     Q.      And it is currently still in existence?

12     A.      It is.

13     Q.      Okay.  Have you started any other companies?

14     A.      Yes.

15     Q.      That would be Arrow Analysis?

16     A.      Yes.

17     Q.      Any other companies?

18     A.      Yes.

19     Q.      Which ones?

20     A.      In January, I founded a company called

21     Mojave Research.

22     Q.      Can you speak up?  I'm having trouble --

23     A.      In January 2025, I founded a company called

24     Mojave Research.

25     Q.      Mojave Research.  And what services or products

**EXHIBIT 1**
**Page 17 of 639**

Page 18

1    does Mojave provide?

2    A.    Primarily cyber and AI services that I'm no

3    longer affiliated with that company.

4    Q.    So, Roysdon LLC is the only company that is

5    currently still active?

6    A.    Yes, it's active in the sense that the LLC still

7    exists and I pay taxes.

8    Q.    Okay.

9    A.    There is zero revenue.

10    Q.    When's the last time you received income from

11    Roysdon LLC?

12    A.    LLC, as the entity, official entity within

13    Texas, I have not received any revenue.

14    Q.    Okay.  When is the last time you've done work

15    under the entity Roysdon LLC?

16    A.    Effectively, sometime last year.

17    Q.    What was that work?

18    A.    At the time, it was just doing research and

19    preparation for potential contracts but no paid work.

20    Q.    Okay.  What products or services does

21    Roysdon LLC provide?

22    A.    A variety of mathematical analysis and

23    engineering services.

24    Q.    Which companies has Roysdon LLC worked with?

25    A.    Zero, so far.

**EXHIBIT 1**
**Page 18 of 639**

Roysdon Expert_000018

Page 19

1    Q.    Why is that, in your opinion?

2    A.    Understand the banner of Roysdon LLC, as an

3    official entity within Texas, as an LLC within Texas, it

4    was not founded until -- as an LLC, it was not founded

5    until sometime in the '23 maybe.  But I did contract or

6    consulting as a -- for Roysdon consultant on a 1099 for

7    several years before that.

8    Q.    Okay.  So, you did consulting in, I guess, a

9    predecessor of Roysdon LLC?

10    A.    Correct.

11    Q.    Should we just call that your consulting work?

12    A.    Yes, call it a consultancy.

13    Q.    Okay.  Consultancy, okay.  So, what contracts,

14    if any, did you enter into with your consultancy?

15    A.    The most recent would be with a company called

16    GITI, Global Info Tech, that was the most recent one.

17    Q.    Okay.

18    A.    That was in -- that contract ended in roughly

19    August of 2020 as a consultancy.  It was a 1099.

20    Q.    Okay.  Before your work with GITI, did your

21    consultancy have any other engagements?

22    A.    Not that I can recall.

23    Q.    So, am I correct that the only engagement your

24    consultancy had was with GITI?

25    A.    I'm sorry, no.  I also did consultancy work for

**EXHIBIT 1**
**Page 19 of 639**

Roysdon Expert_000019

Page 20

```
 1        a company called StarNav.

 2        Q.      When did you perform that consultancy?

 3        A.      Not recently, the work was done -- I did some

 4        consulting work for StarNav in early 2024, to the best

 5        of my recollection.

 6        Q.      So, that work wasn't through Roysdon LLC,

 7        correct?

 8        A.      No, it was still a consultancy on a 1099.

 9        Q.      Why didn't you do that work through Roysdon LLC?

10        A.      Because the way that StarNav wanted to contract

11        me was as a consultant.

12        Q.      What services did you provide for StarNav?

13        A.      Engineering statistical modeling, and

14        engineering numerical analysis.

15        Q.      Is that the only work you've performed for

16        StarNav in 2024?

17        A.      In 2024, yes.

18        Q.      Did you perform work for StarNav prior to 2024?

19        A.      Yes.

20        Q.      What was the time period for which you provided

21        that work?

22        A.      Maybe 2022 and 2023, there were a couple of

23        instances.

24        Q.      So from 2022 onward, you have periodically

25        performed consultancy work for StarNav?
```

**EXHIBIT 1**
**Page 20 of 639**

Roysdon Expert_000020

1    A.      Correct, same work.

2    Q.      The consultancy work for GITI, was that in the

3    field of CyberAI?

4    A.      Yes, it was.

5    Q.      Other than that consulting work you performed

6    for GITI, have you ever before performed consultancy

7    work in the field of CyberAI?

8    A.      CyberAI didn't exist before that.

9    Q.      So, the answer is no?

10   A.      No.

11   Q.      What about after your consultancy work with

12   GITI?

13   A.      No.

14   Q.      So, the only consultancy work you've ever

15   provided with GITI -- I'm sorry, let me strike that.

16   The only consultancy work that you have ever provided in

17   the field of CyberAI with was GITI, is that correct?

18   A.      Correct.

19   Q.      Has anyone ever hired you to perform a market

20   analysis of the field of CyberAI?

21   A.      As a consultant?

22   Q.      Yes.

23   A.      No.

24   Q.      Who's your current employer?

25   A.      United States government.

**EXHIBIT 1**
**Page 21 of 639**

Roysdon Expert_000021

Page 22

```
 1      Q.      Can you be a little more specific?

 2      A.      Office of the director of national intelligence.

 3      Q.      What's your title?

 4      A.      Deputy director of national intelligence.

 5      Q.      Do you have a direct report?

 6      A.      I have several.

 7      Q.      Who are your direct reports to whom you report

 8      to?

 9      A.      To whom I report to?

10      Q.      Yes.

11      A.      Or direct reports to me?

12      Q.      Who you report to.

13      A.      I report to the principal deputy director of

14      national intelligence and the director of national

15      intelligence.

16      Q.      Who are those people?

17      A.      Tulsi Gabbard is the director of national

18      intelligence.

19      Q.      And who else do you report to?

20      A.      Functionally, I report directly to her.

21      Q.      Okay.  Generally speaking, what are your job

22      responsibilities?

23      A.      I oversee the directorate of policy and

24      capabilities, that includes ICY policy, ICY science and

25      technology, to include AI, cyber and a few others.
```

**EXHIBIT 1**
**Page 22 of 639**

Roysdon Expert_000022

Page 23

1      Acquisitions of a variety of classified systems,

2      analysis of -- so, includes things like market analysis

3      of current available technologies and how those meet the

4      objectives of national security requirements.  It's a

5      very large portfolio.  I oversee many things for the

6      entire intelligence community.

7      Q.      Do you have like responsibility over a certain

8      subsection or a group within the NSA?

9      A.      Within the NSA?

10     Q.      I'm sorry.  Within your current position.

11     A.      Can you restate the question?

12     Q.      Sure.  Do you directly supervise anyone?

13     A.      Yes.

14     Q.      How many people do you directly supervise?

15     A.      I don't know directly.  It's in the order of --

16     like I said, depends on what you define as directly

17     supervise, but it's somewhere in the other of 180

18     people.

19     Q.      But you don't interact personally with all those

20     180 people, is that correct?

21     A.      On a weekly basis, I interact with maybe 40

22     people.  I also receive things across the entire

23     intelligence community which is classified.

24     Q.      During the period you were a subcontractor for

25     GITI, did you make any presentations about CyberAI?

**EXHIBIT 1**
**Page 23 of 639**

Roysdon Expert_000023

Page 24

1    A.    Yes.

2    Q.    Tell me about those presentations.

3    A.    I don't think those presentations pertain to my

4    expert witness.

5    Q.    If you're refusing to answer, you need to say

6    that.

7         MR. GONZALEZ:  But this is based off his

8    personal experience.

9         MR. WAREHAM:  Would you repeat the question?

10        MR. GONZALEZ:  Sure.  Would you please read the

11   question back?

12        THE COURT REPORTER:  During the period you were

13   a subcontractor for GITI, did you make any presentations

14   about CyberAI.

15        MR. WAREHAM:  No objection to that question.

16   You can answer.

17        THE WITNESS:  There were a few presentations.

18   One in particular, January 2020 at a general classified

19   conference, presented program updates on the programs

20   that I was overseeing at the time as a consultant to

21   GITI advising Air Force Life Cycle Management.

22   BY MR. GONZALEZ:

23   Q.    Okay.

24   A.    Sorry, as a consultant paid by and through GITI,

25   on behalf of Air Force Life Cycle Management agency.

**EXHIBIT 1**
**Page 24 of 639**

Roysdon Expert_000024

1      Q.      Is that the only presentation you made on

2      CyberAI while you were doing the consultancy for GITI?

3      A.      No, there were several.  Over the period of at

4      least a year, there were several.

5      Q.      Did they all concern the same subject matter?

6      A.      Yes.

7      Q.      And that subject matter was technical

8      explanations?

9      A.      Yes, on between four to six different projects,

10     technical explanations of those projects.  They're all

11     classified projects.

12     Q.      Okay.  We talked about Roysdon LLC, we talked

13     about the consultancy.  In any capacity, have you ever

14     been on any contracts or subcontracts in the field of

15     CyberAI?

16     A.      In any capacity, yes, several.

17     Q.      Tell me about those.

18     A.      In my capacity at Leidos as a vice president and

19     overseeing the CyberAI research team, which I built,

20     there were several opportunities to respond to an RFP,

21     request for proposal from DARPA, as well as Air Force

22     Life Cycle Management.  I assisted in writing several of

23     those proposals.

24     Q.      So, those were Leidos proposals though, correct?

25     A.      That's correct.

**EXHIBIT 1**
**Page 25 of 639**

Roysdon Expert_000025

Page 26

1    Q.    Those weren't you, personally?

2    A.    No.

3    Q.    Have you personally been on any contracts or

4    subcontracts in the field of CyberAI?

5    A.    Since 2020, no.

6    Q.    Let's take a look at your expert report, which I

7    believe is Exhibit Number 3.  You drafted this document,

8    correct?

9    A.    Correct.

10    Q.    Could you read the first sentence?

11    A.    A market analysis can be created using a United

12    States Government (USG) website, usaspending.gov.

13    Q.    Okay.  Is this document your market analysis?

14    A.    Yes.

15    Q.    What is your understanding of what constitutes a

16    market?

17    A.    Can you rephrase the question?

18    Q.    Sure.  What is a market?

19    A.    I define a market as a field or a subfield of an

20    industry that has certain technologies or goods that can

21    be bought and sold.

22    Q.    Is this your definition or just your general

23    understanding or are you relying on a specific scholarly

24    source?

25    A.    This is my understanding.

**EXHIBIT 1**
**Page 26 of 639**

Page 27

1    Q.    What is your understanding premised upon?

2    A.    Reading expert sources.

3    Q.    What expert sources?

4    A.    I can't recall.

5    Q.    You can't recall any?

6    A.    No.

7    Q.    Is this opinion based in part on your own

8    experience in CyberAI?

9    A.    Are you asking if my opinion is based on my own

10   experience in CyberAI, is that the question?

11   Q.    Yes.

12   A.    Yes, my opinion is based on my experience.

13   Q.    Okay.  What experience in CyberAI supports this

14   opinion?

15   A.    I provided in this document references to

16   several companies as well as references to, for example,

17   Harvard Business Review, McKenzie, and others that kind

18   of state the relevance of CyberAI research and it's

19   market capture.

20   Q.    Okay.  So, maybe I should be a little bit more

21   specific, is this opinion based on your personal

22   experience at all?

23   A.    This document?

24   Q.    Yes.

25   A.    It is based partially on my experience, yes.

EXHIBIT 1
Page 27 of 639

Roysdon Expert_000027

Page 28

1    Q.    What personal experience informs this document?

2    A.    The experience doing work in the field of

3    CyberAI.

4    Q.    Okay.  What work have you performed in CyberAI?

5    A.    I did consulting work for the U.S. government

6    for a little over a year, and then I did the same thing

7    at Leidos for about five years.

8    Q.    Your experience with the government, you're

9    referring to GITI?

10   A.    G-I-T-I, yes, that's correct.

11   Q.    Okay.  And your experience at Leidos also

12   informs this?

13   A.    Correct.

14   Q.    Okay.

15   A.    Specifically in CyberAI, I have prior experience

16   in cyber that predates this, as well as AI that predates

17   this.

18   Q.    What experience at Leidos informs this expert

19   report?

20   A.    I was vice president at Leidos and built a

21   research team that did this work.

22   Q.    Did what work?

23   A.    Work in CyberAI.

24   Q.    Okay.

25   A.    It is a new field.

**EXHIBIT 1**
**Page 28 of 639**

Roysdon Expert_000028

1    Q.      What work did your team perform in CyberAI?

2    A.      There were a variety of things, for example,

3    penetration of firewalls using AI techniques as part of

4    the offensive cybersecurity -- I guess you call it tools

5    or techniques.  Using AI to detect malware or insider

6    threats and doing remediation AI to manipulate or create

7    new techniques that provide entry into computer systems

8    or networks.  There were a variety of things we worked

9    on.

10   Q.      Is there any other work that you performed at

11   Leidos that informs this opinion?

12   A.      In addition to?

13   Q.      What you've just gone over.

14   A.      No.

15   Q.      You would agree that the work that you just

16   described is not a market analysis, though, correct?

17   A.      No.

18   Q.      You couldn't agree?

19   A.      No.

20   Q.      Why won't you agree with that?

21   A.      Because part of doing research requires doing a

22   market analysis.

23   Q.      So, you have performed market analysis in the

24   field of CyberAI?

25   A.      Yes.

**EXHIBIT 1**
**Page 29 of 639**

Roysdon Expert_000029

Page 30

1    Q.      How many?

2    A.      In the capacity at Leidos -- because previously

3    you asked me as a consultant -- in the capacity of

4    Leidos, I would say several.

5    Q.      And when you say "several", I thought you told

6    me this was the first CyberAI report or market analysis

7    that you've ever performed?

8    A.      You asked me specifically about as a consultant.

9    Q.      So, you have performed other market analysis of

10   CyberAI?

11   A.      Within the context of, say, writing proposals or

12   conducting research, yes.

13   Q.      When you say "several", how many is that at

14   Leidos?

15   A.      It's difficult to quantify.

16   Q.      Do you not know?

17   A.      I don't know.

18   Q.      Less than two?

19   A.      No.

20   Q.      Less than five?

21   A.      No.

22   Q.      How many?

23   A.      Maybe dozens.

24   Q.      Dozens, okay.  So, at least 24?

25   A.      Maybe, I don't know.  I don't recall.

**EXHIBIT 1**
**Page 30 of 639**

Page 31

```
 1    Q.     Walk me through your methodology for performing
 2    a market analysis at Leidos.
 3    A.     It's no different than any other market
 4    analysis.  It would include looking at current companies
 5    that are -- espouse you to do similar technology and
 6    roughly the size of that company, current contracts,
 7    whether or not they'd be competitive on something that
 8    we'd be competing on.  So, if we're responding to an RFP
 9    from, say, DARPA, we would do this to try to understand
10    if we would be competitive against other performers on a
11    DARPA contract.
12           Understanding the current landscape within the
13    U.S. government.  For example, the executive orders and
14    how they pertain to this type of work.  Often we'd get
15    additional information through McKenzie or Gartner to
16    understand the position of the current technology and
17    how that would position the company to be successful in
18    a particular area or if there's things we needed to
19    focus on to improve certain aspects of the technology
20    for that to be competitive.
21    Q.     You started off saying, it's no different than
22    any other market analysis.  Is there a specific
23    methodology that one should employ in performing a
24    market analysis?
25    A.     I think what I've outlined is, from what I
```

**EXHIBIT 1**
**Page 31 of 639**

Roysdon Expert_000031

1    understand, a fairly common method.

2    Q.    What do you mean "from what you understand"?  Do

3    you understand that the method that you have outlined is

4    the standard methodology for performing a market

5    analysis?

6    A.    Based on my research, yes.

7    Q.    What research?

8    A.    I research other market analysis and what they

9    typically include.  I think it varies by field or

10   technology.  But, based on my research and folks that

11   I've talked with, this is precisely what you'd have in a

12   market analysis.

13   Q.    "Folks that you've talked with", did you ask

14   other people about how to perform this market analysis?

15   A.    No, not for this specific one.  No.

16   Q.    So, have you ever drafted your own market

17   analysis before?

18   A.    Yes.

19   Q.    You submitted that at Leidos?

20   A.    These were part of the research done at Leidos,

21   yes.

22   Q.    So, I'm looking at page 2 of your CV.  Can you

23   show me what in there references the market analysis

24   work that you're talking about?

25   A.    Sure.  The work done as a principal investigator

**EXHIBIT 1**
**Page 32 of 639**

Roysdon Expert_000032

1    for cyber artifical intelligence machine learning

2    research, the position as a chief scientist, and the

3    position as PI for Horizon Research & Development.

4    Q.    So, I'm talking a little slow.  Part of the

5    reason why I'm talking a little slow is for the court

6    reporter.

7    A.    Sorry.

8    Q.    So, is it your testimony here that the function

9    of being a principal investigator includes performing

10   market analyses?

11   A.    Yes.

12   Q.    And as a principal investigator, that was a

13   regular part of your job?

14   A.    I would say it's frequent.  I wouldn't say it's

15   a regular part of the job.

16   Q.    Okay.

17   A.    We'd have to define regular.

18   Q.    As a principal investigator, was performing

19   market analyses a responsibility attended to that

20   position?

21   A.    Yes.

22   Q.    When you performed these market analyses, did

23   you provide them to anyone at Leidos?

24   A.    Yes, in some cases it was verbal.  Others, it

25   would have been some sort of presentation form to help

**EXHIBIT 1**
**Page 33 of 639**

Roysdon Expert_000033

Page 34

1    decisionary understand current market cap and available

2    potential revenue.

3    Q.    What is the current market cap for CyberAI?

4    A.    It is a rapidly growing field.  Current market

5    cap is in the billions.

6    Q.    How many billions?

7    A.    I don't know.

8    Q.    Okay.  What was the current market cap for

9    CyberAI in 2024?

10   A.    I provided some estimates in this document.  It

11   was in the hundreds of millions -- I'm sorry.  2023,

12   I've got a bullet point here of 1.7 billion for CyberAI

13   that sits alone.  So, it was in the billion in 2023.

14   Q.    Okay.  I think you said, hundreds of billions.

15   Is it hundreds of billions now?

16   A.    I said hundreds of millions.

17   Q.    Hundreds of millions, okay.

18   A.    That was my initial estimate but I've got a

19   bullet point here for 2023, it says, CISA approved

20   $1.7 billion contrat funding CyberAI.  So, in 2023, it

21   was in the billions.  As I said, it's a rapidly

22   advancing field.

23   Q.    And that 1.7 number that you referenced there,

24   how many entities are operating within that market?

25   A.    Can you define your question?

**EXHIBIT 1**
**Page 34 of 639**

Roysdon Expert_000034

Page 35

1    Q.    Sure.  How many companies are offering CyberAI

2    services in the CyberAI market in 2023?

3    A.    That's different than what you just asked.  You

4    asked specifically to that bullet point in CISA.

5    Q.    So, I'm just trying to clarify.  Can you answer

6    the question?

7    A.    Can you restate the question.

8          MR. GONZALEZ:  Could you please read that back?

9          THE COURT REPORTER:  How many companies are

10   offering CyberAI services in the CyberAI market in 2023.

11         THE WITNESS:  I don't know, several.

12   BY MR. GONZALEZ:

13   Q.    So, several, I think is defined as like two or

14   three.  Are you saying there's only two or three in the

15   CyberAI market?

16   A.    I would define several as tens or hundreds.

17   Q.    Is it tens or is it hundreds?

18   A.    I don't know.

19   Q.    So, it could be tens, correct?

20   A.    It could be.

21   Q.    Could be hundreds, correct?

22   A.    I don't know.

23         MR. WAREHAM:  Objection as to form.

24   BY MR. GONZALEZ:

25   Q.    You don't know if it could be hundreds?

**EXHIBIT 1**
**Page 35 of 639**

1      A.      I don't know.

2      Q.      Can you give me any type of estimate of how many

3      companies that could be operating in the CyberAI market

4      in 2023?

5      A.      I can't.

6              MR. WAREHAM:  Objection to form.

7      BY MR. GONZALEZ:

8      Q.      I'm sorry, you said, you can't?

9      A.      I cannot.

10     Q.      What about 2024?

11     A.      Still it'd be speculation, I cannot.

12     Q.      So, I want to go back to the market analyses you

13     performed at Leidos.  I think you testified that you had

14     performed dozens, correct?

15     A.      Yes.

16     Q.      Was it important to know how many companies were

17     operating in the CyberAI market for those market

18     analyses?

19     A.      It's important to know specific to -- I'll use

20     the example of an RFP.  The companies that were

21     operating in that specific space that pertained to that

22     RFP.  So, if it was firewalls, it was important to know

23     specifically the companies that were doing CyberAI

24     research and have province that were targeting

25     firewalls.

EXHIBIT 1
Page 36 of 639

Roysdon Expert_000036

1    Q.      Okay.  So, your market analyses as Leidos were

2    more targeted, is that correct?

3    A.      Correct.

4    Q.      And am I correct that those market analyses you

5    were performing were in response to RFPs?

6    A.      Generally speaking, yes, not always.

7    Q.      And you used the example of firewalls, so a

8    market analysis that you were performing at Leidos was

9    like specific to a set of products?

10   A.      Generally, yes.

11   Q.      So, you were defining a specific market for

12   specific products, is that correct?

13   A.      I was refining the search to a specific market

14   segment and product segment.

15   Q.      Okay.

16   A.      Does that answer your question?

17   Q.      I think it does.  Could you give me an example

18   in the context?  You used firewall, I don't know, that

19   seems like one maybe you could use.

20   A.      Yes, we've used this a few times.  So, within

21   the area of firewalls, there's a certain number of

22   companies that build firewalls at large scale that the

23   government would be interested in.  There's a subset of

24   those companies that employ a variety of rule-based

25   techniques, which are not machine learning, they're not

**EXHIBIT 1**
**Page 37 of 639**

Roysdon Expert_000037

Page 38

1    AI.  Other companies use AI or more machine-like

2    techniques.  Things like a market analysis require a

3    deep understanding and a deeper dive into the company's

4    capabilities to understand whether or not the product

5    they're going to be bringing forward to be competitive

6    would be similar to something we were developing and a

7    lot of new ones.

8    Q.     Have you ever created a market analysis outside

9    of CyberAI?

10   A.     Not that I can recall.

11   Q.     Have you ever taken a class on how to perform a

12   market analysis?

13   A.     No.

14   Q.     Have you received any certification with respect

15   to how to perform a market analysis?

16   A.     No.

17   Q.     Do you know what methodology economist employ

18   when they are performing market analyses?

19   A.     I've studied or researched what other people use

20   for doing a market analysis, including what other

21   experts would use for market analysis and I base my

22   assessments and the market analyses that I performed on

23   those, I would say, commonly used techniques.

24   Q.     What other experts or sources have you relied

25   upon in performing or refining your own technique?

**EXHIBIT 1**
**Page 38 of 639**

Roysdon Expert_000038

Page 39

1    A.      I researched hundreds.

2    Q.      Can you name a few?

3    A.      Techniques listed by, say, McKenzie.  There's

4    several you can find online and, in some cases, it's as

5    similar as a Google search.

6    Q.      So, is it your testimony here today that the

7    methodology you have employed is generally recognized by

8    McKenzie?

9    A.      I'd say it's generally recognized by the

10   industry.

11   Q.      Do you know if it's generally recognize by

12   McKenzie?

13   A.      I don't know.

14   Q.      Okay.  Can you point to any resource or

15   scholarly article or textbook that supports your

16   assessment that it is generally recognized by the

17   industry?

18   A.      I read several scholarly articles and several

19   textbooks.  I can't point to a single one off the top of

20   my head.

21   Q.      You can't identify any right now?

22   A.      I don't recall.

23   Q.      Do you have any concerns that your market

24   analysis here is incorrect?

25   A.      No.

**EXHIBIT 1**
**Page 39 of 639**

Roysdon Expert_000039

Page 40

1    Q.      Did you take any steps to verify the accuracy of

2    your market analysis?

3    A.      What do you mean, "verify the accuracy"?

4    Q.      To make sure it's correct.

5    A.      Yes, I double-checked my numbers several times.

6    Q.      So, you double-checked your numbers.  Did you

7    double-check your methodology?

8    A.      Yes.

9    Q.      How?

10   A.      Reviewing the common technique for performing a

11   market analysis.

12   Q.      And what did you cross reference your

13   methodology against?

14   A.      Common techniques in the field.

15   Q.      But you keep saying common techniques, what is

16   your basis for that?  I'm trying to understand.

17   A.      Right.

18   Q.      Is there an article?

19   A.      I don't recall a specific article, I've stated

20   that several times.  What I do recall is that for a

21   market analysis to be unbiased, for example, you try to

22   use data that's available from an unbiased source, like

23   a government website, using several -- at least in a

24   particular subfield -- several examples from that

25   subfield.  So, you refine your analysis to things within

**EXHIBIT 1**
**Page 40 of 639**

Roysdon Expert_000040

1    that subfield and then analyze the contracts awarded

2    within the subfield.  Make sure they pertain to the

3    field that you're comparing to and then back that up

4    with additional research that supports the information

5    that's presented in that analysis.  For example, are the

6    reports that come out of supporting agencies, government

7    agencies, other companies, documents that they provide

8    as white papers, et cetera.

9    Q.    So, your testimony is that this is unbiased

10   because you obtained the data from a government website,

11   is that correct?

12          MR. WAREHAM:  Objection to form and foundation.

13          THE WITNESS:  To the best of my knowledge, yes,

14   this is an unbiased assessment of what currently exists

15   at the time within the domain of CyberAI.  It's similar

16   to the work that was being done as a consultant.

17   BY MR. GONZALEZ:

18   Q.    This market analysis contains five companies,

19   correct?

20   A.    Correct.

21   Q.    Okay.  Are there more than five companies within

22   the market segment of CyberAI services for DOD?

23   A.    Specific to Air Force Life Cycle Management, no,

24   not at that time.

25   Q.    At what time?

**EXHIBIT 1**
**Page 41 of 639**

Roysdon Expert_000041

1    A.      The time this work was being performed in 2020.

2    Q.      In 2024, are there any other companies operating

3    within the CyberAI market that provide services to DOD?

4    A.      To Air Force Life Cycle Management,

5    specifically, or to DOD?

6    Q.      To DOD.

7    A.      To DOD, yes, there are many.

8    Q.      How many?

9    A.      I don't know.

10   Q.      So, am I correct then in saying that sitting

11   here today, you do not know how many companies were

12   offering CyberAI services to the Department of Defense

13   in 2024?

14   A.      In 2024, no, this is a simple search on

15   usaspending.gov.  You can identify this, however, you'd

16   have to refine your search and understand those

17   contracts to understand specifically whether or not they

18   are truly CyberAI or whether they're just referencing

19   that they're using some form of AI in their cyber

20   techniques.  They're distinctly different.

21   Q.      Same question but for 2023?

22   A.      Same answer.

23   Q.      You don't know?

24   A.      I don't know.

25   Q.      Should a market analysis include the number of

EXHIBIT 1
Page 42 of 639

Roysdon Expert_000042

Page 43

```
 1      customers in an industry?

 2      A.      No.

 3      Q.      Should a market analysis include the number of

 4      businesses offering services in an industry?

 5      A.      Yep.

 6      Q.      Have you ever heard of the concept called a

 7      competitive analysis?

 8      A.      I'm not sure.

 9      Q.      Should a market analysis include anything about

10      barriers to entry from an entrance?

11      A.      No.

12      Q.      I'm going to ask you the same question for 2022,

13      do you know how many companies were offering AI cyber

14      services to the Department of Defense in 2022?

15      A.      I don't know.

16      Q.      Same question for 2021?

17      A.      Don't know, it's a large field.

18      Q.      Does your expert report include any information

19      about barriers to entry?

20      A.      No.

21      Q.      Do you think that was necessary to include?

22      A.      No.

23      Q.      Why?

24      A.      A barrier to entry is not necessary for a market

25      analysis in this instance.
```

**EXHIBIT 1**
**Page 43 of 639**

Roysdon Expert_000043

Page 44

1    Q.    If your analyzing a market, does that market

2    analysis then -- let me ask this a different way.  Is it

3    your understanding that a typical market analysis should

4    not include barriers to entry?

5    A.    You're making a generalization.  I'm not making

6    that assumption, no.

7    Q.    Should a market analysis include barriers to

8    entry?

9    A.    It could.

10   Q.    Should it, is my question?

11   A.    No.

12   Q.    Why?

13   A.    You said, should.

14   Q.    Yes.  I said, why should it not?

15   A.    It does not need to include a barrier to entry

16   for that market.

17   Q.    A market analysis is something more narrow?

18   A.    A market analysis, in this example, is something

19   that is comparing current performers within that market

20   segment.

21   Q.    So, this market analysis says nothing about

22   difficulty of entering a market, correct?

23   A.    I don't recall putting something like that in

24   this document.

25   Q.    So, the answer is no, correct?

**EXHIBIT 1**
**Page 44 of 639**

Roysdon Expert_000044

Page 45

1    A.      I don't recall.

2    Q.      Take an opportunity to look over it.

3    A.      I don't see a specific listing of barrier to

4    entry in this document.

5    Q.      Okay.  Let's take a look at the opinion section

6    of your expert report.  I'm going to read the first

7    clause, based on my opinion and as a subject matter

8    expert in AI and cyber, what does it mean to be a

9    subject matter expert in AI and cyber?

10   A.      A subject matter expert knows both -- well,

11   knows the field deeply, meaning they understand the

12   theory and numerical application of that there.

13   Q.      What experience or education makes you a subject

14   matter expert in AI and cyber?

15   A.      In AI, I've been doing mathematics that we now,

16   today, consider AI but years ago were just considered

17   math statistics and probability theory, and the

18   numerical application of those in the last 20 years.

19   Similarly in cyber, I've done work professionally and

20   studied it deeply in several aspects of the field of

21   cybersecurity, specifically offensive and defensive of

22   cyber.

23   Q.      Does that education inform that expertise?

24   A.      Yes.

25   Q.      What education?

EXHIBIT 1
Page 45 of 639

Roysdon Expert_000045

1      A.      I have several degrees that inform this

2      expertise, as well as studying graduate level work in

3      several of these areas.

4      Q.      I don't see here you saying that you're a

5      subject matter expert in the AI cyber market, is that

6      correct?

7      A.      I did not specifically state in that line that

8      I'm a subject matter expert in the CyberAI market.

9      Q.      Okay.  You didn't state that anywhere in here,

10     though, correct?

11     A.      Not on that line, no.

12     Q.      In the expert report, you didn't state anywhere

13     that you are a subject market expert in the AI cyber

14     market, is that correct?

15     A.      I don't recall.  I know both fields and I know

16     that field very well.  I worked in that field for many

17     years.  Having a subject matter expertise in both cyber

18     and AI, makes me a subject matter expert in CyberAI.

19     Q.      That's what I was getting at.  Your testimony

20     here is that your expertise in cyber and AI also makes

21     you an expert on the CyberAI market, is that correct?

22     A.      Yes.

23     Q.      Okay.  Can we agree that you have no formal

24     education, though, in analyzing markets?

25     A.      No.

**EXHIBIT 1**
**Page 46 of 639**

Roysdon Expert_000046

1    Q.      What formal education do you have in analyzing

2    markets?

3    A.      I don't understand the question.

4    Q.      What formal education do you have in analyzing

5    markets?

6    A.      I have no formal education in analyzing markets.

7    Q.      You also write, "based on my opinion", that's

8    the first four words there.  When you say "based on my

9    opinion", is that your personal opinion or something

10   else?

11   A.      Personal opinion.

12   Q.      Okay.  I'm going to read that full sentence into

13   the record, okay?  Based on my opinion as a subject

14   matter expert in AI and cyber, the average CyberAI

15   contract's value for small businesses working for DOD

16   over the last five-year period is 142.5 million.  This

17   is based on evidence provided above and data gathered

18   from a government website.  When you say, "data gathered

19   from a government website", what data are you referring

20   to?

21   A.      Contracts and contract value gathered from the

22   usaspending.gov website.

23   Q.      And that data that you're referring to is the

24   data that you go over in your case studies?

25   A.      Correct.

**EXHIBIT 1**
**Page 47 of 639**

Roysdon Expert_000047

Page 48

1    Q.    What constitutes as small business?

2    A.    It's my understanding that a small business is,

3    say, fewer than 100, maybe 200 employees, I'm not sure.

4    Q.    Okay.

5    A.    But that's my understanding on a government

6    definition.

7    Q.    When did you obtain that understanding?

8    A.    Based on things that I've read.

9    Q.    What things have you read that provided you that

10   understanding?

11   A.    Documents, papers, references on government

12   websites, like small business administration, et cetera.

13   Q.    And your understanding, collectively from that

14   research, is that a small business is how big?

15   A.    I don't know, between 50 and 200 employees is my

16   estimate.

17   Q.    And that's just your personal estimate?

18   A.    Based on what I recall.

19   Q.    Does the government have a different definition

20   in the contract context for what constitutes a small

21   business?

22   A.    I don't recall.

23   Q.    Do you know?

24   A.    I don't know if I don't recall.

25   Q.    So, we talked about your data set, the five

**EXHIBIT 1**
**Page 48 of 639**

Roysdon Expert_000048

Page 49

1    companies.  Did you exclude any companies from your data

2    set?

3    A.      This data set was pulled specifically for

4    contracts awarded to the companies with Air Force Life

5    Cycle Management and specifically HNCO.

6    Q.      Okay.  That's helpful but my question is, did

7    you exclude any companies from your data set?

8    A.      Not to my knowledge.

9    Q.      So, is it your testimony here that these

10   companies are the only companies that had contracts with

11   Air Force Life Cycle Management over the five-year

12   period?

13   A.      Doing this specific work within CyberAI

14   specifically, yes.

15   Q.      Okay.

16   A.      As far as I recall.

17   Q.      So, this is important.  I want to make sure I

18   understand, you selected these companies because they

19   were the only companies over the five-year period that

20   provide services to Air Force Life Cycle Management,

21   correct?

22   A.      To the best of my knowledge.

23   Q.      Okay.  Do you have any doubts or are you

24   certain?

25   A.      I'm not certain.

**EXHIBIT 1**
**Page 49 of 639**

Roysdon Expert_000049

Page 50

```
1    Q.      You're not certain, okay.  If I pull up the

2    website here, could we go over it?

3    A.      Yes.

4    Q.      Okay.  Do these companies that you selected

5    provide services to any other DOD entities?

6    A.      That's possible.

7    Q.      Do you know?

8    A.      I don't know.

9    Q.      Is that information at all relevant to your

10   market analysis?

11   A.      This market analysis was specific to Air Force

12   Life Cycle Management, specifically HNCO.

13   Q.      Okay.

14   A.      So, no.  It was a very narrow scope market

15   analysis.  More specifically for offensive -- classified

16   offensive cyber capabilities.

17   Q.      Got it.  You're calculating the average value of

18   contracts over a five-year period for these five

19   companies, is that correct?

20   A.      Correct.

21   Q.      By my count, there are 77 contracts, does that

22   sound right?

23   A.      It's possible.

24   Q.      You can probably do the math a little quicker

25   than me.
```

**EXHIBIT 1**
**Page 50 of 639**

Roysdon Expert_000050

Page 51

1    A.    I guess it's possible.

2    Q.    So, 77?

3    A.    Sounds reasonable, yes.

4    Q.    What was the average duration of the contract?

5    A.    It varied by contract.  I don't recall the

6    average duration.

7    Q.    Were these contracts entered into all in a

8    specific year?

9    A.    No.

10   Q.    Okay.  So, some of these contracts could have

11   been entered into in 2023?

12   A.    Yes.

13   Q.    Some could have been entered into in fiscal year

14   2020?

15   A.    Yes.

16   Q.    Okay.  Is the year that they entered into the

17   contract at all relevant to your analysis?

18   A.    No.

19   Q.    Why?

20   A.    It's irrelevant.

21   Q.    For fiscal year 2023, are these the only five

22   companies that were providing services to -- offensive

23   CyberAI to DOD?

24   A.    I don't know, it is a very small subfield, the

25   field of offensive cyber and even a smaller field of

**EXHIBIT 1**
**Page 51 of 639**

Roysdon Expert_000051

Page 52

```
 1     CyberAI offensive cyber, and there are very few
 2     companies that compete in this space.  It's also a new
 3     and emerging space.
 4     Q.     Is it your testimony here that these five
 5     companies only provide cyber offensive products?
 6     A.     That is not my testimony.
 7     Q.     Okay.  Is it your testimony here that the 77
 8     contracts that you used in your analysis were all for
 9     cyber offensive products?
10     A.     To the best of my knowledge.
11     Q.     Okay.  Can you say so with certainty?
12     A.     I can't say so with certainty.
13     Q.     Okay.  So, it could be what, some of them are
14     defensive cyber contracts.
15     A.     Could be that some of them are defensive cyber
16     contracts.  However, often in defensive work, you also
17     perform offensive work to understand the landscape.
18     Q.     So, any one of the cyber offensive contracts
19     could also be a defensive cyber contract?
20     A.     Not necessarily, no.
21     Q.     Okay.  Is that not what you just told me?
22     A.     Typically in this space, you lean more on the
23     offensive side to discovery where your defenses need to
24     be increased to understand how your attacker is
25     attacking you.
```

**EXHIBIT 1**
**Page 52 of 639**

Roysdon Expert_000052

Page 53

1    Q.      Is it your testimony here today that all of the

2    77 contracts you used in your analysis were with

3    Air Force Life Cycle Management?

4    A.      I believe that's correct.

5    Q.      Do you know if that's correct?

6    A.      I'm fairly certain that's correct.

7    Q.      Did you perform any research or any efforts to

8    assure yourself of that?

9    A.      I don't recall.

10   Q.      Let me ask you a hypothetical, let's say of the

11   77 contracts, 15 were with DARPA and another 15 were

12   with -- were for defensive cyber operations, would that

13   change your analysis at all?

14          MR. WAREHAM:  Objection to form.

15   BY MR. GONZALEZ:

16   Q.      And that's a hypothetical.

17   A.      Are you assuming that these companies are

18   performing CyberAI work?

19   Q.      Yes.

20   A.      If it's CyberAI work specifically, it would not

21   change my assessment.

22   Q.      Okay.  So, the numbers you've arrived at in your

23   expert report, it makes no difference whether it was

24   offensive CyberAI work or defensive CyberAI work, is

25   that correct?

**EXHIBIT 1**
**Page 53 of 639**

Roysdon Expert_000053

Page 54

1    A.    That's correct.  As I stated earlier, defensive

2    work is often also including offensive work.

3    Q.    And as I understand it, the conclusions that you

4    have made in this expert work, it doesn't make a

5    difference if the contract was with DARPA or Air Force

6    Life Cycle Management, is that correct?

7    A.    That's correct.  I believe so, yes.

8    Q.    So, you arrive at this number, 142.5 million,

9    how do you get there?

10   A.    That was based on this market survey of these

11   contracts awarded to these companies over that period.

12   Q.    Okay.

13   A.    And an average of those contracts.

14   Specifically, the money that was paid out during that

15   period.

16   Q.    So, you added up the contracts' value over that

17   five-year period, correct?

18   A.    Correct.

19   Q.    And then you divided that by five?

20   A.    Correct.

21   Q.    And that's how you reached 142.5 million?

22   A.    Yes, I believe that's what I stated in here.

23   The last line of case studies with an average value of

24   28.5 million per year for each company.

25   Q.    Okay.

**EXHIBIT 1**
**Page 54 of 639**

Roysdon Expert_000054

Page 55

1    A.    Total value of contracts awarded during this

2    period were 713.85 million.

3    Q.    So, you divided that 700 number by 5, you got

4    the 142 right?

5    A.    Correct, divided by five companies, 20.5.

6    Q.    Did you develop this formula yourself?

7    A.    No.

8    Q.    Where did you get this formula from?

9    A.    It's basic mathematics.

10    Q.    So, you applied basic mathematics?

11    A.    Correct.

12    Q.    What does the 142.5 million represent, is that a

13    market or something else?

14            MR. WAREHAM:  Objection to form.

15            THE WITNESS:  It represents the data that's

16    available on the public website.

17    BY MR. GONZALEZ:

18    Q.    You're not saying that that 142.5 million is the

19    average value of contracts for CyberAI per year, are

20    you?

21    A.    No.

22    Q.    Okay.  So --

23    A.    Generally speaking, no.

24    Q.    It could be more?

25    A.    It could be much more.

**EXHIBIT 1**
**Page 55 of 639**

Roysdon Expert_000055

Page 56

1    Q.      It could be less?

2    A.      Could be less but the evidence does not show

3    that.

4    Q.      How much more could it be?

5    A.      Outside of specifically Air Force Life Cycle

6    Management, I could not speculate, it's quite large.

7    Q.      Is it your testimony that this 142.5 million is

8    the market value for Air Force Life Cycle Management per

9    year over the five-year period?

10   A.      Based on publically available numbers, yes.

11   Q.      But how do you know that if you don't know if

12   there was other entities operating in that space during

13   that five-year period?

14   A.      It's a classified space.  They do not disclose

15   their classified numbers.

16   Q.      So, you don't know?

17   A.      I didn't say that.  I said based on publically

18   available information.

19   Q.      Based on publically available information?

20   A.      Right.

21   Q.      So, there's some information that's not public?

22   A.      That's correct.

23   Q.      And would that information change your numbers

24   about it?

25   A.      Can't talk about it.

**EXHIBIT 1**
**Page 56 of 639**

Roysdon Expert_000056

Page 57

```
 1    Q.      I just asked if it would change your numbers.

 2    A.      I can't answer that.

 3            MR. GONZALEZ:  Jason, we're going to have to

 4    come back to that.  I'm going to move on but that's like

 5    a pretty core premise of evaluation.

 6            MR. WAREHAM:  I mean, there's -- I'm happy to

 7    explore -- I mean, look, we've had this classification

 8    issue pop up a bunch of times, right?

 9            MR. GONZALEZ:  I just asked if it would change

10    the numbers.

11            MR. WAREHAM:  Yes, but --

12            THE WITNESS:  You're talking about classified

13    numbers.

14            MR. WAREHAM:  So, he can't -- so, here's the

15    problem, right, it's tainted.  You guys can go a class

16    review on these contracts and release them, right, but

17    let me give an example.  I was just in a budget meeting

18    yesterday, and in that budget meeting, the budget is

19    classified.  If we rely on those budgetary numbers in

20    saying something like this, right, we are imputing and

21    adjusting the moving average of that testimony based on

22    classified information.

23            That becomes a problem.  It's called derivative

24    classification.  So, the answer -- I mean, the

25    government is in control of this information, right, and
```

**EXHIBIT 1**
**Page 57 of 639**

Roysdon Expert_000057

Page 58

1    can release that to us.  And then once we have a class

2    review, we can do a full answer around that, right?  But

3    he is correct, and if I have a security officer or

4    classification security officer, they will confirm that

5    if he adjusts down.

6            For example, let's say, 142 is his number, based

7    on classified information there's a number of smaller

8    contracts out there and he adjusts his number down, that

9    is derivative classification because it's communicating

10   the size of a value of a classified contract of market,

11   see what I'm saying.

12           THE WITNESS:  Stating those numbers on

13   classified information is considered spillage of

14   classified information, it's a felony offense.

15           MR. GONZALEZ:  I didn't ask for the numbers.  I

16   said --

17           MR. WAREHAM:  No, you see what I'm saying --

18           THE WITNESS:  You asked if it would change the

19   numbers.

20           MR. WAREHAM:  Hold on, you see the derivative

21   problem, see?

22           MR. GONZALEZ:  I understood your explanation.

23           MR. WAREHAM:  And if you want to certify that we

24   can discuss certain sets, right, and get a class

25   review --

**EXHIBIT 1**
**Page 58 of 639**

Roysdon Expert_000058

Page 59

1          MR. GONZALEZ:  We're going to move on but you

2     and me need to talk about it during lunch, okay, because

3     I want to just get through it.

4          MR. WAREHAM:  Yeah, I'm with you.  I actually

5     have no problem with him answering, but for the

6     derivative classification problem and that's not

7     something we hold.  We can't make that decision.

8     BY MR. GONZALEZ:

9     Q.     The 142.5 million number is based on publically

10    available information?

11    A.     That's correct.

12    Q.     And the -- is it your testimony that in 2023,

13    the five companies that you identified are the only

14    companies operating in the CyberAI offensive space with

15    AFCLO?

16    A.     These are the five companies that were operating

17    for Air Force Life Cycle Management, specifically HNCO

18    doing cyber and AI work that was similar to the work

19    that I was analyzing, yes.

20    Q.     But were there other companies in 2023?

21    A.     Working for HNCO, not to my knowledge.

22    Q.     Okay.  Why did you select these five companies?

23    A.     I know the work that these companies do.

24    Q.     Okay.

25    A.     It's a very small group of companies that do

**EXHIBIT 1**
**Page 59 of 639**

Roysdon Expert_000059

Page 60

1    this work.

2    Q.      How big is the group?

3    A.      Within HNCO, it really comes down to these five.

4    Q.      It's your testimony here that there with no

5    other companies over the five-year period that were

6    provided CyberAI services or products to HNCO, is that

7    correct?

8    A.      As public information, yes.  I can't state

9    classified information.

10   Q.      And it's your testimony here today, that these

11   77 contracts were mostly providing contracts with HNCO?

12   A.      To the best of my knowledge, based on publically

13   available information, yes.

14   Q.      Do you know if any of these 77 contracts were

15   with DARPA?

16   A.      I don't recall.

17   Q.      Okay.  Do you know if any of these 77 contracts

18   were with Cyberspace Command?

19   A.      You're getting into an area where there's

20   classified information.  I can't discuss that.

21   Q.      I just asked if you know.

22   A.      I can't answer.

23           MR. WAREHAM:  Just so you're aware, the

24   requirement is that you neither confirm or deny.  So,

25   the answer is, he can't confirm or deny.  That's the

**EXHIBIT 1**
**Page 60 of 639**

Roysdon Expert_000060

Page 61

1     instruction under classified management by the

2     government.

3     BY MR. GONZALEZ:

4     Q.     Do you know in any of the companies in the 77

5     contracts that you identified had contracts with

6     U.S. Fleet Cyber Command?

7     A.     I can't answer that.

8            MR. GONZALEZ:  So, here's the problem -- let me

9     speak.  So, he has said that these 77 contracts were all

10    with Air Force Life Cycle Management --

11           MR. WAREHAM:  I'll fix this.  Give me

12    10 minutes.

13           MR. GONZALEZ:  If they're all with Air Force

14    Life Cycle Management and he's --

15           MR. WAREHAM:  I'm tracking.  Give me 10 minutes,

16    I'll get this figured out, all right?  I'll make this

17    easy.

18           MR. GONZALEZ:  Okay.

19           MS. SEEMAN:  Can we go off the record?

20           THE COURT REPORTER:  Off the record.

21           (Short recess was taken.)

22    BY MR. GONZALEZ:

23    Q.     So, there's five companies in your case study,

24    correct?

25    A.     Yes.

**EXHIBIT 1**
**Page 61 of 639**

Roysdon Expert_000061

1    Q.    Okay.  Why did you choose or use those five

2    companies?

3    A.    Because of the type of work that I was doing, it

4    was most similar to the type of work I was doing.  I

5    know specifically what these companies are doing on

6    those contracts and specifically what's in those RFPs.

7    Q.    Are there other companies that would have met

8    that criteria?

9    A.    It's possible but there are few companies that

10   have the skill sets to be able to meet that criteria.  I

11   happen to know, at least on the government's space, the

12   contractors that are competitive in this space.

13   Q.    Are you able to identify any other companies

14   that would have met the criteria for selection in your

15   expert report?

16   A.    No.

17   Q.    So, to your knowledge, these are the only five

18   that meet your criteria?

19   A.    To my knowledge, these are the only five that

20   meet the criteria.

21   Q.    What was your criteria?

22   A.    Filtering down from many companies that do this

23   sort of work and many companies that espouse to or

24   purport to do CyberAI work.  I filter from there to

25   companies that I know specifically that do this work and

**EXHIBIT 1**
**Page 62 of 639**

Roysdon Expert_000062

Page 63

1    are performers regularly in this specific area of

2    CyberAI research.

3    Q.    So, your filter was companies that you were

4    personally aware of?

5    A.    The companies that I know exist within this

6    space.

7    Q.    Okay.

8    A.    As I said, it's a very small subset of

9    companies.

10   Q.    What I'm trying to understand, though, was this

11   your arbitrary choice or when you say "filter", was

12   there like some sort of mechanism you applied?

13   A.    The mechanism is my subject matter expertise in

14   this arena.

15   Q.    Okay.  So, going back to 2023, is it your

16   testimony that these were the only five companies

17   offering CyberAI services to the Department of Defense?

18   A.    No.

19   Q.    Is it your testimony that these five companies

20   were the only companies providing CyberAI services to

21   the Air Force?

22   A.    We have to refine the definition of CyberAI.

23   CyberAI relative to what I was doing at that time, there

24   were only five companies that were doing a similar level

25   of CyberAI work in this space.  There were probably

**EXHIBIT 1**
**Page 63 of 639**

Roysdon Expert_000063

Page 64

1    several that were purporting to do CyberAI work but

2    their contracts or the work they were doing did not

3    actually include any AI, it was just automation.  Does

4    that help refine the question?

5    Q.     It's helpful.  So, if I understand your

6    testimony, these 77 contracts were the only contracts in

7    CyberAI over the five-year period with the Air Force?

8    A.     Specific to the type of CyberAI work that I was

9    doing, yes, that's my testimony.

10   Q.     Were these 77 contracts, the only CyberAI

11   contracts that were with HNCO?

12          MR. WAREHAM:  That were publically facing.

13   BY MR. GONZALEZ:

14   Q.     That were publically facing.

15   A.     That were publically facing, to the best of my

16   knowledge, yes.

17   Q.     So, all 77 of these contracts were with HNCO, is

18   that correct?

19   A.     To the best of my knowledge.

20   Q.     When you say, "to the best of your knowledge",

21   are you saying that some might not be?

22   A.     I'm saying, it's possible.

23   Q.     Possible's a wide range.  To a reasonable degree

24   of scientific certainty given your expertise, are you

25   certain that these 77 contracts in your case study were

**EXHIBIT 1**
**Page 64 of 639**

Roysdon Expert_000064

Page 65

1    with HNCO?

2    A.      To the best of my knowledge.

3    Q.      Let's take a look at USA Spending.  I'd like you

4    to just kind of walk me through your analysis.  You

5    talked about it a little bit in the report but, like,

6    let's start with Kudu and just show me how you filter

7    through.

8    A.      Okay.

9    Q.      So, here's what I'd like you to do, I'd like you

10   just to filter for the contracts.  I guess the contracts

11   with Kudu?

12   A.      Okay.  That's very easy.

13   Q.      For the five-year period.

14   A.      Key word search.

15   Q.      Okay.

16   A.      Kudu Dynamics, I actually checked this this

17   morning.  Filtered updated, submit the search.

18   Q.      So, this -- that's like all time, though, right?

19   A.      Yes, you can give a date to a date, for example.

20   Q.      Yes.

21   A.      So, you could say 1-1-2020 --

22   Q.      Let's see the five-year period that you did.

23   I'm kind of trying to replicate what you did.

24   A.      Okay.

25   Q.      I think you said fiscal year 2020 to fiscal year

EXHIBIT 1
Page 65 of 639

Roysdon Expert_000065

Page 66

1      2024, is that correct?

2      A.      I believe so.

3      Q.      And this would be with DOD or HNCO.  I guess

4      maybe you just want to do DOD --

5      A.      You can refine down from here so this would give

6      you the list of contracts within this period.

7      Q.      Okay.

8      A.      And then you could further refine using this

9      website.

10     Q.      So, how many contracts do we have?

11     A.      For example, you can look at agency.  Contracts

12     for DOD, here's 20, for example, in that range.  From

13     there, you can look at awarding agency.  So, I think the

14     example I gave here was --

15     Q.      I think you said Department of Defense.

16     A.      We also need to extend this.

17     Q.      Let's six, though.  I think you said five-year

18     period, right?

19     A.      Five-year period.

20     Q.      So, let's remove 2019.  I believe you said DOD,

21     that was your assumption.  I think if you just do DOD,

22     it'll show up.  So, for our filters here -- can you go

23     to the top, please?  For the filters, we have, Kudu

24     Dynamics, fiscal year 2020 through 2024, and Department

25     of Defense, is that correct?

**EXHIBIT 1**
**Page 66 of 639**

Roysdon Expert_000066

Page 67

1    A.    Correct.

2    Q.    So, we have 25 contracts, is that correct?

3    A.    That's what it says there, yes.

4    Q.    Okay.  Which is -- I think you had 26, 25, you

5    were close.  I want to ask you about these contracts

6    right now.

7    A.    Okay.

8    Q.    These were all contracts with HNCO?

9    A.    Not necessarily, no.

10   Q.    Okay.  How many of these contracts were with

11   HNCO?

12   A.    So, we can refine these.

13   Q.    All right.

14   A.    For example, awarding agency or fending agency.

15   It takes a bit of digging.  We're not going to be able

16   to do this just right off the bat here.  I think what's

17   important to note here is this also only considers prime

18   contract award.

19   Q.    Okay.

20   A.    If they're a subcontractor, you're not going to

21   see those.  So, there's Department of Defense.  So,

22   there's research and development type of contract.  This

23   appears to be a DARPA contract, as an example.

24   Q.    So, let's start with the first one, let's go

25   back.

**EXHIBIT 1**
**Page 67 of 639**

Roysdon Expert_000067

Page 68

```
 1     A.      Okay.

 2             MS. SEEMAN:  If you just click on the other tab

 3     up top.

 4             MR. WAREHAM:  The third tab from the top.

 5     BY MR. GONZALEZ:

 6     Q.      So, the third one down, that contract with was

 7     DARPA, right?

 8     A.      Correct.

 9     Q.      So, that's not HNCO, correct?

10     A.      That's not HNCO.

11     Q.      So, this is the first one?

12     A.      Based on public information, that is not HNCO.

13     Q.      So, this is the first one, correct?

14     A.      This is the first one.

15     Q.      Who is this contract with?  Could you go down a

16     little bit to the bottom of the page?  No, the one you

17     just -- right.  So, can you go to the bottom of the

18     page?  Where it says, agency details, can you open that

19     tab?

20     A.      Sure.

21     Q.      Where it says, awarding office, do you see that?

22     A.      Yes.

23     Q.      That says A-F --

24     A.      A-F-R-L.

25     Q.      -- R-L.  And then --
```

**EXHIBIT 1**
**Page 68 of 639**

Roysdon Expert_000068

Page 69

1    A.      Air Force research laboratory.

2    Q.      And it says, funding subagency, what does that

3    say?

4    A.      Department of Defense.

5    Q.      Funding subagency?

6    A.      Subagency, Defense Advance Research Projects

7    Agency, that's DARPA.

8    Q.      Okay.  So, this contract was funded by DARPA?

9    A.      Yes, based on publically available information.

10   Q.      Let's go look at the second contract now.  Could

11   you go to the bottom of the page and look at the funding

12   information again?

13   A.      DARPA.

14   Q.      DARPA funded this one as well, correct?

15   A.      Correct.

16   Q.      So, these are the three highest contract values

17   within your search for Kudu, is that correct?

18   A.      Yes.

19   Q.      And all three of these contracts are funded by

20   DARPA, is that correct?

21   A.      According to public information, yes.

22   Q.      These three contracts, can you tell from this

23   information whether they are defensive cyber or

24   offensive cyber?

25   A.      Yes, you can drill down into the details of

**EXHIBIT 1**
**Page 69 of 639**

Roysdon Expert_000069

Page 70

1    these contracts to gain more insight into specifically

2    what the contract is and then you can compare that to

3    sam.gov.  Sam.gov is where contracts are -- or RFP are

4    released or a BAA is released.  DARPA releases a BAA,

5    broad agency announcement.  And after doing additional

6    research on the broad agency announcement, you can find

7    additional information on who the partner agencies are,

8    as well as the specifics of the contract, the contract

9    details.

10          So, whether or not that contract is strictly a

11   cyber contract or an AI contract or a CyberAI contract,

12   then specifically what sort of details within the

13   CyberAI contract -- or specifically what sort of details

14   for CyberAI.

15   Q.     Is there any information in what we've looked at

16   right now on USA Spending that would tell you whether it

17   was cyber defensive or cyber offensive?

18   A.     No, you have to do more research.

19   Q.     Okay.  So, none of that information on

20   USA Spending tells you whether it's defensive or

21   offensive, is that correct?

22   A.     That's correct.

23   Q.     Is it your representation here today that all 77

24   of the contracts you've identified are offensive cyber

25   contracts?

**EXHIBIT 1**
**Page 70 of 639**

Roysdon Expert_000070

Page 71

1    A.      No.

2    Q.      Approximately, how many are offensive cyber

3    contracts of the 77?

4    A.      I don't recall.  As I said earlier, in some

5    sense, anything that's being done in cyber is often

6    offensive as well as defensive.

7    Q.      Were those three contracts included in your

8    analysis?

9    A.      I don't recall.

10    Q.      Okay.  Do you know what contracts you included

11    in your analysis?

12    A.      I included whatever contracts were available

13    within that window.

14    Q.      So, you don't have a document memorializing what

15    documents you included in your analysis, is that

16    correct?

17    A.      I do not have a document of that nature, no.

18    Q.      Okay.  So, we looked at three contracts.  Those

19    three contracts were with DARPA, correct?

20    A.      Correct.

21    Q.      Earlier, I asked you if most of the contracts

22    were with HNCO of the 77, I believe your answer was yes?

23    A.      To the best of my knowledge.

24    Q.      Is your answer still yes?

25    A.      To the best of my knowledge.

**EXHIBIT 1**
**Page 71 of 639**

Roysdon Expert_000071

1    Q.    Okay.  But you're not certain?

2    A.    No, I'm not certain.

3    Q.    So, there are 25 on that list there.  If we went

4    through all 25 in the context of this deposition, is it

5    your testimony that other contracts would be funded

6    through HNCO?

7    A.    Yes, explicitly stated on the website.  Yes.

8    Q.    Approximately how many?

9    A.    I don't recall.

10    Q.    If we remove those three contracts from your

11    analysis, so now there's three less and the approximate

12    value of those contracts, does that in any way change

13    your numbers?

14    A.    It's possible.

15    Q.    As of 2023, how much of the market do the five

16    companies that you listed represent within the cyber

17    contracts for DOD?

18    A.    Cyber contracts specifically and only?

19    Q.    Yes.

20    A.    I don't know.  Cyber?

21    Q.    CyberAI?

22    A.    Well, that's different.

23    Q.    Then I'll ask it a better way.  As of 2023, how

24    much -- let me say this a different way, okay.  What

25    percentage of the market do the 5 companies that you've

EXHIBIT 1
Page 72 of 639

Roysdon Expert_000072

1       identified represent in terms of market value for fiscal

2       year 2023 for CyberAI?

3       A.      Market value, that's a very different question.

4       Q.      Contract value?

5       A.      In the millions.

6       Q.      Okay.

7       A.      In 2023 alone, doing specifically work that was

8       similar to what I was doing for HNCO, you're in the

9       neighborhood of several million -- several hundred

10      million, sorry, to be more precise.

11      Q.      Several hundred million.  What percentage of the

12      CyberAI market for DOD does that 100 million represent?

13      A.      I don't understand the question.  Can you

14      restate that?

15      Q.      Can you just speak up a little because I have a

16      colleague listening in?

17      A.      Sure.

18      Q.      So, you testified that as of fiscal year 2023,

19      the approximate value of the contracts held by those

20      five companies was hundreds of millions, is that

21      correct?

22      A.      Yes.

23      Q.      Okay.  Of that hundreds of millions, what

24      percentage does that represent of the CyberAI market for

25      DOD?

**EXHIBIT 1**
**Page 73 of 639**

Page 74

```
 1     A.      I really don't know.

 2     Q.      Okay.

 3     A.      It's a small -- that's a difficult question to

 4     answer.  I really don't know.

 5     Q.      A small part or a large part?

 6     A.      The question is nuanced or the answer is nuanced

 7     in that there are -- there's a large body of work in --

 8     allegedly, in CyberAI but, again, it's not similar to

 9     the work that I was doing for HNCO.  It's a very

10     specific subset of offensive and defensive CyberAI

11     research and development.

12     Q.      I wasn't asking about your specific work,

13     though.  I just asked in general.

14     A.      You asked in general relative to these

15     companies.

16     Q.      Yes.

17     A.      This specific work that I also do.

18     Q.      Yes.

19     A.      The type of work that they do within that small

20     domain of CyberAI work is small compared to the totality

21     of cybersecurity within the DOD.  There are several

22     billion dollars of contracts in cybersecurity within the

23     DOD.  Offensive and defensive, it's a very small subset.

24     Offensive, specifically, is an even smaller subset.

25     Most of this work is classified.  I hope that helps.
```

**EXHIBIT 1**
**Page 74 of 639**

Roysdon Expert_000074

Page 75

1    Q.    It does, thank you.

2    A.    There's a very small number of people that even

3    work in this space that understand this space.

4    Q.    So, these five companies represent a very narrow

5    space within the broader CyberAI market, is that what

6    you're telling me?

7    A.    Within the broader cybersecurity market and even

8    within the CyberAI, or what we can term CyberAI, yes.

9    Q.    So, you selected these five companies because

10   they're representative of a very specialized market?

11   A.    Yes.

12   Q.    And that's the market that your expert opinion

13   is premised upon?

14   A.    Yes.

15   Q.    Okay.

16   A.    For this market analysis, yes.

17   Q.    Do you know how many companies offer defensive

18   CyberAI products to the Department of Defense?

19   A.    No, there are many and not all are actually

20   CyberAI.

21   Q.    But you don't know the number, is that correct?

22   A.    I don't know the number.

23   Q.    Do you know how many contracts there are for,

24   let's say, fiscal year 2024 for CyberAI defensive

25   products with DOD?

**EXHIBIT 1**
**Page 75 of 639**

Roysdon Expert_000075

Page 76

1    A.      I don't know.

2    Q.      Is that at all relevant to your analysis?

3    A.      No.

4    Q.      We're talking about a very specialized market

5    here.  Over the five-year period for your market

6    analysis, are these the only five companies that were

7    operating in that specialized market?

8    A.      To the best of my knowledge, yes, it's an

9    exceptionally small community.

10   Q.      And you define that market as CyberAI offensive

11   products for the Department of Defense?

12   A.      No, this is broadly CyberAI, specifically

13   offensive and defensive cyber, that's using certain AI

14   products specific to classified programs within the DOD.

15   Q.      So, these 77 contracts represent both offensive

16   and defensive contracts, right?

17   A.      Correct.

18   Q.      Okay.  How many of the contracts are just for

19   offensive products?

20   A.      You've asked this several times.

21   Q.      Do you not know?

22   A.      I've stated that the contracts in, say, that 77,

23   offensive work is often performed while doing defensive

24   research.

25   Q.      Okay.

**EXHIBIT 1**
**Page 76 of 639**

Roysdon Expert_000076

Page 77

1      A.      So, you could say all are offensive or some are

2      offensive, depending on your definition.  My definition

3      is that all of them include some form of offensive

4      research.

5      Q.      So, we're getting there.  Is it your testimony

6      that there is no real distinction then between offensive

7      and defensive contracts?

8      A.      From the position of research, no.

9      Q.      Okay.

10     A.      To be able to perform defensive research, you

11     have to do offensive work.

12     Q.      So, let's set research aside, okay.  The

13     purposes of your market analysis, all right?

14     A.      Okay.

15     Q.      The contracts, all right?

16     A.      Okay.

17     Q.      Is there a distinction between offensive and

18     defensive contracts?

19     A.      If you're reading specifically the lettering or

20     the verbiage that's in each contract and it states it

21     specifically that it is a defensive product that is

22     required, then in the contract definition, no.  But in

23     order to be able to perform the research and develop a

24     necessary -- be a performer on that contract then, yes,

25     you also have to do offensive research.  That's the

EXHIBIT 1
Page 77 of 639

Roysdon Expert_000077

Page 78

1    nature of the work.

2    Q.    Okay.

3    A.    Any funding agency knows that.

4    Q.    So, there are contracts for defensive products

5    but you need to have offensive know how in order to

6    effectively provide those products?

7    A.    You are correct.  As I stated earlier, in order

8    to understand your attacker, you have to attack

9    yourself.

10   Q.    So, of the 77 contracts here, you don't make a

11   distinction between offensive and defensive operations,

12   is that correct?

13   A.    I do not.

14   Q.    Okay.  We talked about these five companies.

15   Let's say hypothetically, let's say hypothetically the

16   total contract value for five years, four of these five

17   companies was 300 million, okay?  Which I think means

18   then per company, that means for the five-year period it

19   would be 60 million per company, is that correct?

20   A.    Okay.

21   Q.    And then per year, 12 million?

22   A.    Okay.

23   Q.    Okay.  Can we agree then that the total contract

24   value for that five-year period has a direct affect on

25   the yearly value average for each of those five

**EXHIBIT 1**
**Page 78 of 639**

Roysdon Expert_000078

Page 79

1      companies?

2              MR. WAREHAM:  Objection, form and foundation.

3              THE WITNESS:  Your question doesn't make sense

4      to me.

5      BY MR. GONZALEZ:

6      Q.      Okay.  Let try this a different way.  You write

7      that the average value for each company's contracts per

8      year is 28.5 million, is that your conclusion?

9      A.      Yes.

10     Q.      If that number -- if the 713.85 million number

11     you selected was lower, would that affect your ultimate

12     conclusion about the 28.5 million?

13             MR. WAREHAM:  Objection to form and foundation.

14             THE WITNESS:  Sir, state that again.

15     BY MR. GONZALEZ:

16     Q.      Sure.  Your conclusion that the total value of

17     contracts awarded during the period was 713.85 million,

18     right?

19     A.      That's correct.

20     Q.      And from that, you reached a conclusion that

21     each company's contract value per year on average was

22     28.5 million, is that correct?

23     A.      Based on this very narrow scope and analysis for

24     specifically CyberAI work specifically within the DOD,

25     yes, 713.85 million and an average value of 28.5 million

**EXHIBIT 1**
**Page 79 of 639**

Roysdon Expert_000079

Page 80

1      per year for each company.

2      Q.      If the contract value was lower that 713.85

3      million, would that affect your ultimate conclusion of

4      28.5 or would 28.5 still remain your numerical

5      conclusion?

6      A.      Of course that changes the math.

7      Q.      How?

8      A.      If your top line number changes, your result is

9      going to change.

10     Q.      How will it change?

11             MR. WAREHAM:  Objection, form and foundation.

12             THE WITNESS:  The average value per year would

13     be different.

14     BY MR. GONZALEZ:

15     Q.      Less?

16     A.      If the number decreased for the total value,

17     yes, the average value would be less.  If it increased

18     for the total value, then the average value would

19     increase.

20     Q.      So, can we agree that the numbers provided in

21     your conclusion are -- your dependent on your top line

22     number?

23     A.      It's dependent upon the contracts that were

24     available or publically listed during that period.

25     Q.      Wasn't exactly my question.

**EXHIBIT 1**
**Page 80 of 639**

1    A.      I understand.

2    Q.      So, what I want to know is, if the top line

3    number changed in your analysis and became lower, would

4    your bottom line number change and also become lower?

5    A.      If the top line number increases, then the

6    bottom line number increases.  If the top line number

7    decreases, then the bottom line number decreases.

8    Q.      Okay.

9    A.      Using this simple formula of an average.

10    Q.      Okay.  Let's go back to your expert report,

11    page 2.  Third screenshot down, do you see awarding

12    office?

13    A.      Yes.

14    Q.      Okay.  What was the awarding office in that

15    instance?

16    A.      I can't see it here.

17    Q.      I'm reading as AFLCMC HNCK?

18    A.      HNCK, is that what you see here?

19    Q.      Yep.  That what I see.

20    A.      Okay.

21    Q.      Is that Air Force Life Cycle Management?

22    A.      Yes, it is.

23    Q.      And the bottom line says funding office, okay,

24    says the same thing?

25    A.      I can't read it in my document.

**EXHIBIT 1**
**Page 81 of 639**

Roysdon Expert_000081

Page 82

1    Q.    Okay.

2    A.    I'll trust you.

3    Q.    That's Air Force Life Cycle Management, right?

4    A.    If it says LCMC, that is Life Cycle Management.

5    Q.    It says, yes, AFLCMC?

6    A.    So, Air Force Life Cycle Management, yes --

7    well, rather, Air Force Life Cycle Management Center,

8    that is the last C.

9    Q.    Of the 77 contracts that you relied on in your

10   expert report, how many of them say Air Force Life Cycle

11   Management for awarding office and funding office?

12   A.    I don't recall.

13   Q.    So, at least some of them do not?

14   A.    That's possible, yes.

15   Q.    What, if anything, can you tell me about the

16   company Death Logics, LLC?

17   A.    What do you want to know?

18   Q.    I don't want to get into information that makes

19   you uncomfortable, so just a general overview of the

20   company that you can provide.

21   A.    It's a small company located in San Antonio.

22   They primarily do work for the U.S. government,

23   predominately contracts within the DOD.  I know that

24   they worked on several contracts within Air Force Life

25   Cycle Management, specifically HNCO.

**EXHIBIT 1**
**Page 82 of 639**

Page 83

1    Q.    Okay.  To your knowledge, do they focus on

2    offensive operations for DOD or defensive operations for

3    DOD?

4    A.    Their personnel, who I know, do both.

5    Q.    Okay.  To your knowledge, do they have contracts

6    with DOD for defensive CyberAI work?

7    A.    They did at one time.  I don't know if they do

8    currently.

9    Q.    Are any of those contracts included in your 77

10   for your market analysis?

11   A.    Yes.

12   Q.    If we removed the defensive CyberAI contracts

13   from your market analysis, so we have 77 and if we took

14   out the ones that were defensive CyberAI, can we agree

15   that the 77 number would be lower?

16   A.    Your premise is irrelevant.

17   Q.    Sir, I just need you to answer the question.

18   A.    The premise is irrelevant.

19   Q.    Can I ask it in a hypothetical way and then you

20   can explain but it's a hypothetical, and you're welcome

21   to tell me why I'm wrong.

22   A.    Say it again, please.

23   Q.    If we removed -- of the 77 contracts that you

24   relied on in your market analysis, if we remove the

25   contracts that were for defensive CyberAI operations,

**EXHIBIT 1**
**Page 83 of 639**

Roysdon Expert_000083

Page 84

1     would there be less than 77 contracts?

2              MR. WAREHAM:  Objection, form and foundation.

3              THE WITNESS:  This goes back to the same

4     question you've asked several times.  My answer is

5     consistent, defensive cyber requires offensive cyber

6     work.  Does that help?

7     BY MR. GONZALEZ:

8     Q.      So, every contract that is for defensive cyber

9     operations is also a contract for offensive cyber

10    operations, is that your testimony?

11    A.      As a subject matter expert, yes.

12    Q.      Okay.

13    A.      And vise versa.

14    Q.      Have you ever provided CyberAI work for a

15    private company?

16    A.      Yes.

17    Q.      And that work also entailed offensive cyber

18    operations?

19    A.      Yes.

20    Q.      Did it entail cyber offensive work every time?

21    A.      Within the domain of CyberAI, yes.

22    Q.      Okay.

23    A.      To some degree, yes.

24    Q.      Let's focus, then, on your work in defensive

25    CyberAI.

**EXHIBIT 1**
**Page 84 of 639**

Roysdon Expert_000084

1    A.      Okay.

2    Q.      You provided it to private companies, correct?

3    A.      Yes, I worked at one.

4    Q.      But when you were working at Leidos, you were

5    providing products to other companies, though, right?

6    A.      I was building products within Leidos that were

7    then going to be used by the U.S. government.

8    Q.      So, you were building products within Leidos

9    that were going to be used by the U.S. government?

10    A.      Performing research and development, yes.

11    Q.      So, when you were at Leidos, were any of the

12    products you were building provided to private

13    companies?

14    A.      I don't recall.

15    Q.      So, the majority of your work at Leidos was

16    developing products that were ultimately used for the

17    U.S. government, is that correct?

18    A.      That was the goal, yes.  There were several

19    companies we also collaborated with.

20    Q.      So, it's 12:45.  I think we could probably take

21    a break here.

22            MR. GONZALEZ:  Fine with me.

23            MR. WAREHAM:  Do lunch.

24            MS. SEEMAN:  Can we go off the record?

25            THE COURT REPORTER:  Off the record.

**EXHIBIT 1**
**Page 85 of 639**

1                (Lunch recess was taken.)

2        BY MR. GONZALEZ:

3        Q.      Let's take a look at your expert disclosure, I

4        think that is Exhibit Number 2.  Page 3 of 4, second

5        paragraph down from the top, looking at the concluding

6        sentence, could you read that into the record?

7        A.      Sure.  Dr. Roe's opinion is that he has suffered

8        damages in the range between 5 million for the loss of

9        just the last contract, as well as forecasted damages of

10       approximately $28.5 million per year.

11       Q.      Okay.  That 28.5 is the same number that's in

12       your expert report, correct?

13       A.      That's correct.

14       Q.      So, the case study analysis is how you arrived

15       at the 28.5 number in estimated damages, correct?

16       A.      Correct.

17       Q.      So, your forecasted damages is the average value

18       of contracts per year for the five companies that you

19       selected?

20       A.      Correct.

21       Q.      Okay.  Am I correct that your forecast damages

22       is based in part on contracts that were not with HNCO?

23       A.      Correct.

24       Q.      Am I correct that your forecasted damages is

25       based on contracts that are listed for defensive cyber

EXHIBIT 1
Page 86 of 639

Roysdon Expert_000086

Page 87

1    operations?

2    A.    It would include both offensive and defensive,

3    predominately offensive cyber.

4    Q.    Okay.  So, my question was a little different

5    but that is a caveat which is important.  So, your

6    forecasted damages, though, are based in part on

7    contracts that were for defensive cyber operations, is

8    that right?

9    A.    Yes, but with that caveat we said earlier, I

10    stated earlier, that any defensive work requires

11    offensive work.  My speciality here is offensive cyber.

12    Q.    I'm asking, though, what the contract was listed

13    as, for defensive cyber operations, right?  You're

14    telling me what's actually entailed, there's a

15    difference, right?

16    A.    There is.

17    Q.    And some of the contracts that were involved in

18    your damages forecast were identified or listed for

19    defensive cyber operations, correct?

20    A.    Yes, but it's my subject matter expertise that

21    helps me understand that these contracts, while they

22    might state something that is strictly defensive, I know

23    differently as a subject matter expert that these

24    actually include offensive work, specifically the type

25    of offensive work that I do.

EXHIBIT 1
Page 87 of 639

Roysdon Expert_000087

Page 88

1    Q.      So, it's your testimony that all of the

2    defensive contracts of the 77 in your expert report that

3    list defensive operations as their subject matter are,

4    in fact, also offensive?

5    A.      That's correct.

6    Q.      Okay.  Is it your testimony here today that you

7    could have obtained any of the 77 contracts in your

8    expert report?

9    A.      That I, as an individual, could obtain those?

10   Q.      Yes.

11   A.      Absolutely.

12   Q.      Is it an assumption in your expert report that

13   you would have obtained any of those 77 contracts?

14   A.      There's no assumption in the report that states

15   that.

16   Q.      But I'm asking you not if it's stated but is it

17   an assumption in your analysis?

18   A.      It's possible that anybody that's doing work in

19   this very unique area of offensive cyber, would obtain

20   work with the U.S. government doing offensive cyber,

21   myself included.

22   Q.      So, let me ask this a different way --

23   A.      The U.S. government has very few people to go to

24   in this country to be able to do this sort of work.

25   Q.      Speak up a little bit.

**EXHIBIT 1**
**Page 88 of 639**

Roysdon Expert_000088

Page 89

1    A.      Sorry.

2    Q.      Is there an assumption in your expert report

3    that you would have been on any of these 77 contracts,

4    if not for the actions of the Defendants?

5    A.      Yes.

6    Q.      Okay.  Is there an assumption in this report

7    that you would have won the contracts that you bid on,

8    if not for the actions on the Defendants?

9    A.      I want to get a refinement on the question, what

10   do you mean by "assumption in this report"?

11   Q.      So, you have assumed that you would have won

12   these contracts if you had applied and if not for the

13   actions of the Defendants, correct?

14   A.      That's correct.

15   Q.      Is it your assumption that you would have won

16   all of the contracts?

17   A.      Not all, no.

18   Q.      Is it your assumption that you would have lost

19   some contracts?

20   A.      Some, yes.

21   Q.      I don't see that anywhere in this expert report.

22   Did you assume anywhere in this expert report that you

23   would have lost any of the contracts you bid on?

24   A.      I didn't make any assumptions that I was

25   applying for contacts within this report.  The report or

**EXHIBIT 1**
**Page 89 of 639**

Roysdon Expert_000089

Page 90

```
 1    the assessment or the analysis was strictly based on who

 2    performed during that five-year period, no assumptions.

 3    Q.      So, the 28.5 million in forecasted damages per

 4    year, okay, are you saying that that damages is not

 5    damages that you personally sustained?

 6    A.      The 28.5 million a year is, as an average, if

 7    you will, the total quantity of money available per year

 8    on average for CyberAI work.  There are very few

 9    performers in this country able to do that work, I am

10    one of them.  Specifically, work with the U.S.

11    government, specifically with the DOD, specifically

12    within HNCO, specifically somebody that has a top secret

13    SCI clearance that also is an expert in offensive and

14    defensive CyberAI.

15    Q.      So, I'm going to go back to that sentence in

16    Exhibit Number 2.  It says, Dr. Roe's opinion is that he

17    suffered damages, do you see that?

18    A.      Yes, sir.

19    Q.      And then the last clause says, as well as

20    forecasted damages of approximately $28.5 million per

21    year do you see that?

22    A.      Yes.

23    Q.      Do you agree with that statement?

24    A.      I do.

25    Q.      Okay.  Is it -- is there an assumption in this
```

**EXHIBIT 1**
**Page 90 of 639**

Roysdon Expert_000090

1    expert report that you would have bid on contracts and

2    lost them?

3    A.    I would not assume to bid on contracts and lose

4    them.

5    Q.    Okay.

6    A.    I'm one of the best in this field.

7    Q.    So, your assumption is given that you are one of

8    the best, if you had bid on a contract, you probably

9    would have won it?

10   A.    Yes.

11   Q.    So, that goes back to my original question, your

12   assumption in this expert report is that if you had bid

13   on a contract, you would have won it.

14   A.    Yes.

15   Q.    Okay.  Of the 77 contracts in this expert

16   report, how many did you bid on?

17   A.    Zero.

18   Q.    And is the reason you didn't bid on them because

19   of the action on the Defendants?

20   A.    Yes, I was told in advance I would not be

21   competitive on any CyberAI projects in this domain.  But

22   that goes outside this analysis.

23   Q.    So, if it's between you and Kudu for a contract,

24   you're going to win 100 percent of the time?

25   A.    I can't state conclusively, no.

**EXHIBIT 1**
**Page 91 of 639**

Roysdon Expert_000091

1    Q.    You're going to win almost all of the time?

2    A.    I can't state conclusively.

3    Q.    So, there is a possibility in your mind that if

4    you had competed with Kudu, not withstanding the actions

5    of the Defendants, you may not have gotten the

6    contracts?

7    A.    I've competed with Kudu in the past and won.

8    Q.    That wasn't my question, though.  My question

9    was, is there doubt in my mind that if you had competed

10   for any of the 25 contracts that are listed for Kudu,

11   that you would have lost some of those contracts?

12   A.    I think it's possible that if we competed

13   head-to-head with exactly the same technology, it would

14   be a toss up.

15   Q.    Okay.

16   A.    If we had different technologies and they had a

17   technology that was better than mine for that particular

18   contract, it's likely that they would win.  If I had

19   better technology for that particular contract, it's

20   likely that I would win it.

21   Q.    So, I think you're saying then depending on the

22   circumstance, you could have lost out on some contracts

23   competing directly with Kudu, correct?

24   A.    Depending on the contract.

25   Q.    Okay.  Of the 25 contracts that are listed for

EXHIBIT 1
Page 92 of 639

Roysdon Expert_000092

```
 1    Kudu, how many of those do you think you would have won,

 2    if you had bid?

 3    A.    I'd have to go through ever single contract

 4    before I could give you an answer.

 5    Q.    But you've assumed in your expert report that

 6    you would have won any of them, correct?

 7    A.    I would have won several of them, yes.

 8    Q.    I didn't say "several".  Any.  My question is,

 9    you've assumed in your expert report that you would have

10    won any of them, is that correct?  Yes?

11    A.    Yes.

12    Q.    That assumption that you would have won any of

13    them, is that based on some sort of methodology or what?

14    A.    What do you mean, "based on some sort of

15    methodology"?

16    Q.    So, just what is your basis for the assumption

17    that if -- you would have beat Kudu out on any of the

18    contracts?

19    A.    Several of the top technology that I've brought

20    forward over the last decade or so has outperformed

21    their technology head-to-head.  I'm one of the top

22    integrators in this space.  I also define the field at

23    NSA.

24          MS. SEEMAN:  Can you repeat that, sorry?

25          THE WITNESS:  I said, I also defined the field
```

EXHIBIT 1
Page 93 of 639

Roysdon Expert_000093

Page 94

1    at the National Security Agency.

2    BY MR. GONZALEZ:

3    Q.    What do you mean, "you defined the field at the

4    NSA"?

5    A.    I'm considered the godfather of CyberAI at NSA.

6    Q.    How many employees does Kudu have?

7    A.    Currently, I don't know.  I think I listed the

8    number of employees at the time of this report, 112.

9    Q.    Okay.  When you had your consultancy, did you

10    have any employees working under you?

11    A.    No.

12    Q.    For your LLC, did you ever hire any employees to

13    work under you?

14    A.    No.

15    Q.    But your assumption is that you would have been

16    able to compete with Kudu, regardless of the difference

17    in size?

18    A.    Absolutely, the contract value has nothing to do

19    with the size or capability of the AI.  I can scale all

20    of my AI with GPUs.  I don't need employees.

21    Q.    So, I think on average for the five companies

22    that you selected, there were like 84 employees on

23    average, right?

24    A.    Okay.

25    Q.    Your testimony here is that you could compete

**EXHIBIT 1**
**Page 94 of 639**

Roysdon Expert_000094

1    with a company at scale that has 84 employees?

2    A.      Head-to-head every time.  My work scales with

3    GPUs.

4    Q.      What's that mean, "your work scales with GPUs"?

5    A.      Meaning, I can accomplish more in the same

6    amount of time as people.  I don't have to scale with

7    people.  I can scale with compute.  That's often why my

8    work is more innovative than several of these other

9    companies.  That's why I've helped several of these

10   company innovate in this space.

11   Q.      Would the fact that you're just one person

12   exclude you from bidding on any of the 77 contracts?

13   A.      No.

14   Q.      Did any of the 77 contracts necessarily require

15   more than one person working on them?

16   A.      Not necessarily, no.

17   Q.      What do you mean, "not necessarily"?

18   A.      Contracts don't necessarily define the number of

19   people that are necessary.  They define the technology

20   that's required.

21   Q.      Okay.

22   A.      They might describe roles and responsibilities

23   but that could be done by one person.

24   Q.      And you looked up the contract requirements for

25   each of these 77 contracts?

**EXHIBIT 1**
**Page 95 of 639**

Roysdon Expert_000095

Page 96

1    A.      Not all 77.

2    Q.      Not all 77?

3    A.      I'm very familiar with many contracts, I've

4    worked on hundreds.

5    Q.      Okay.

6    A.      So, it's based on my expert opinion.

7    Q.      When you say "you've worked on hundreds of

8    contracts", are these DOD contracts?

9    A.      Yes, over my career, yes, these are all DOD

10   contracts.

11   Q.      And some of them are in CyberAI?

12   A.      Yes, many.

13   Q.      Approximately how many are in CyberAI?

14   A.      I don't recall.

15   Q.      Can you give me an estimate?

16   A.      50 or 60, more, maybe.

17   Q.      So, you've worked on 50 or 60 CyberAI contracts

18   in the course of your career?

19   A.      Sorry.  50 or 60 contracts associated with

20   cyber.  Specifically CyberAI, maybe dozens.

21   Q.      Dozens.

22   A.      And I've reviewed dozens more, hundreds more.

23   My role at Leidos, I was required to look at hundreds of

24   contracts.

25   Q.      Did you consider for your case studies using any

**EXHIBIT 1**
**Page 96 of 639**

Roysdon Expert_000096

1    entities that are more similar to your situation?

2    A.    Such as?

3    Q.    Smaller.

4    A.    I'm sorry, such as?

5    Q.    So, on average the five companies that you

6    selected have 84 employees, all right?  Did you consider

7    for your case studies using any companies that were

8    smaller than an average of 84 employees?

9    A.    No, it's irrelevant.

10    Q.    Why is it irrelevant?

11    A.    Because they were not competitive in this space.

12    They did not have the requisite knowledge to be able to

13    do this work.  The body of people that exists to do

14    CyberAI work specifically within this domain is

15    exceptionally small, these are the five.

16    Q.    Do you know if HNCO currently have offensive

17    cyber contracts with any entities beyond these five?

18    A.    I don't know.

19    Q.    Do you know if DARPA has offensive cyber

20    contracts with any entities other than these five?

21    A.    Absolutely.

22    Q.    Okay.  What entities?

23    A.    I don't know them.  Leidos is one.

24    Q.    So, why didn't you use Leidos then as one of

25    your comparators?

**EXHIBIT 1**
**Page 97 of 639**

Roysdon Expert_000097

1    A.    For this time period doing specifically what I

2    was doing?  They're not doing exactly the same thing.

3    This market analysis was very specific to what was being

4    done at HNCO at which the time I was doing my work.

5    It's a very specific niche or small area of CyberAI work

6    that includes offensive -- predominately offensive work,

7    specifically at TS/SCI level and, specifically,

8    compartmented level.

9    Q.    So, you identified these companies not just

10   because they do offensive cyber work, but because they

11   do a specific kind of CyberAI work, is that correct?

12   A.    Correct, that's a fair market analysis.  It

13   would be unfair otherwise.

14   Q.    But there are other companies beyond these five

15   that do CyberAI work in general, like Leidos?

16   A.    There are other companies that do cyber work in

17   general.  There are thousands.

18   Q.    But offensive CyberAI work in general?

19   A.    No.

20   Q.    These are the only five?

21   A.    There are other companies that do offensive

22   cyber work.  There are other companies that purport to

23   do offensive CyberAI work.  But within the TS/SCI

24   specifically compartmented levels, these are the five

25   that do that for the Air Force.  That was the

**EXHIBIT 1**
**Page 98 of 639**

Roysdon Expert_000098

Page 99

1    comparison.

2    Q.      Right, okay.  So, I think you're telling me

3    there are other CyberAI -- there are other CyberAI

4    companies that do CyberAI offensive work for the DOD but

5    not the Air Force?

6    A.      There are other companies that do CyberAI work

7    for the DOD and the Air Force that are -- where the

8    technology is different than what was being developed

9    for HNCO.

10    Q.      So, your market analysis is really specific to

11    the products and services that were being solicited by

12    HNCO?

13    A.      Yes.

14    Q.      It doesn't encompass products and services in

15    cyber offensive field that were provided to other

16    entities within the DOD?

17    A.      It does include aspects of what happens within

18    the DOD, other aspects, specifically the TS/SCI level

19    and specifically the compartmented level.  There is

20    overlap in other departments.

21    Q.      Okay.

22    A.      I can't discuss the details.

23    Q.      Have you ever bid on a subcontract?

24    A.      I have not bid on a subcontract as a consultant.

25    Q.      Okay.  Have you ever worked on a subcontract?

**EXHIBIT 1**
**Page 99 of 639**

Roysdon Expert_000099

Page 100

```
1    A.      Yes, I have.

2    Q.      How did you obtain that subcontract?

3    A.      That work was done -- in this example of CyberAI

4    work, the work was done at Leidos.  I've worked on other

5    subcontracts with other technologies.

6    Q.      Have you ever been on a prime contract?

7    A.      As a consultant?

8    Q.      As a consultant.

9    A.      No.

10   Q.      Has Roysdon, LLC?

11   A.      No.

12   Q.      So, you have never been on a prime contract?

13   A.      I have at Leidos.

14   Q.      Okay.  So -- but that was Leidos bidding on the

15   prime contract, right?

16   A.      I was a dominant factor in that, yes.

17   Q.      That was Leidos bidding on the contract,

18   correct?

19   A.      Yes.

20   Q.      Okay.  How many employees does Leidos have?

21   A.      48,000.

22   Q.      Other than your work for Leidos, have you ever

23   bid on a prime contract?

24   A.      In CyberAI, no.

25   Q.      Other than CyberAI?
```

**EXHIBIT 1**
**Page 100 of 639**

1    A.    As a consultant, no.  As an individual helping

2    another company, yes.

3    Q.    Tell me about that circumstance, please.

4    A.    I helped write and do the numerical analysis for

5    several contracts that were awarded to StarNav.

6    Q.    So, StarNav was the one that applied for those

7    contracts, correct?

8    A.    That's correct.  I was recruited as a technical

9    expert.

10   Q.    How many employees does StarNav have?

11   A.    Maybe 10.

12   Q.    I just want to make sure I understand that.  As

13   either Roysdon, LLC, as a consultant or just you

14   personal, you have never bid on a prime contract,

15   correct?

16   A.    I have never bid on a prime correct.  I've been

17   recruited to work on contracts.

18   Q.    Got it.

19   A.    In the case of the work that I did for HNCO, I

20   was recruited because my subject matter expertise, at

21   the time, I was the only person that could do this work

22   in the U.S. government at the TS/SCI level, specifically

23   in the compartmented level.

24   Q.    I'm aware.  I've done my research.  I'm just

25   asking about the bid, though?

**EXHIBIT 1**
**Page 101 of 639**

Roysdon Expert_000101

Page 102

1    A.    I did not have to bid.

2    Q.    Have you ever then been the contractor for a

3    prime contract?

4    A.    I'm sorry, say that again.

5    Q.    Have you ever entered into a contract for a

6    prime contract?

7    A.    As a consultant, no.

8    Q.    Okay.

9    A.    I did my work as a 1099.

10   Q.    So, through your consultancy, you have accepted

11   and been the one who won a prime contract?

12   A.    Yes.

13   Q.    Tell me about that.

14   A.    As I said, there was no bid.  I was recruited.

15   That work was done that GITI.  That contract award was

16   money that was filtered from HNCO because the work was

17   done at HNCO through AFRL to GITI on the aptitude

18   contract.

19   Q.    Were you a subcontractor with GITI?

20   A.    I was listed as a consultant on a 1099.

21   Q.    But that contract that you're referring to was

22   GITI's contract, right?

23   A.    That was GITI's contract.

24   Q.    Okay.  So, through your consultancy, you've

25   never been the primary face of a contract with HNCO, is

**EXHIBIT 1**
**Page 102 of 639**

Roysdon Expert_000102

1    that correct?

2    A.      Correct.

3    Q.      And you've never personally had a prime

4    contract, is that correct?

5    A.      Correct, I didn't need to.

6    Q.      You've projected your damages at 28.5 million a

7    year, right?

8    A.      Based on the numbers that are available, yes.

9    But I think it states here that it's a range between 5

10   and the loss.  The forecasted damages of approximately

11   28.5 million.

12   Q.      Okay.  So, are you saying that for like 28.5

13   million per year, that could have been less?

14   A.      If the contract awards for those years for less

15   then, yes, those could be less.

16   Q.      Okay.  What's the floor of what your forecasted

17   damages could have been for, let's say, 2022?

18   A.      That's speculation, I can't speculate.

19   Q.      What's the ceiling of what your forecasted

20   damages could have been for 2022?

21   A.      28.5.

22   Q.      Okay.

23   A.      On average.  You're asking a specific year, we

24   have to average out that one year.  This is an average

25   over five years.

**EXHIBIT 1**
**Page 103 of 639**

Roysdon Expert_000103

1    Q.    Okay.  So, you don't know what your forecasted

2    damages would have been for year 2022, is that correct?

3    A.    I'd have to recalculate it.  I don't know

4    offhand.

5    Q.    And how would you recalculate that?

6    A.    Going back to the market analysis using the data

7    that's available on usaspending.gov.

8    Q.    But, like, walk me through how that works for

9    2022.

10    A.    Again, using the website and filtering by year,

11    filtering by department, filtering by awarding agency,

12    and then filtering by the type of work specifically, and

13    then researching every single one of the contracts, make

14    sure they're aligned with exactly the same type of work

15    that I was doing at HNCO.

16    Q.    Now, for that analysis, is that contracts that

17    were entered into in 2022 or contracts that were entered

18    into before?

19    A.    Those are awards based on that year.

20    Q.    Okay.

21    A.    Those are payments made during that year.

22    Q.    Payments made during that year?

23    A.    That's correct.

24    Q.    A payment, though, could occur during 2022 for a

25    contract that was entered into earlier, though, right?

**EXHIBIT 1**
**Page 104 of 639**

Roysdon Expert_000104

Page 105

1       A.      '21, sure.  It also could be for that same year.

2       Q.      So, let me ask you this, is it your testimony

3       that there were no CyberAI contracts at all in the

4       market for 2019?

5       A.      There were many contracts that were listed as

6       AI-enabled contracts.  They were not specifically

7       CyberAI contracts, there's a difference.  The field of

8       AI was emerging, basically did not exist before 2019.

9       Q.      What do you forecast your damages to be for

10      2021?

11      A.      Again, I'd have to look at the numbers.

12      Q.      So, you don't know sitting here today?

13      A.      Same answer as before.

14      Q.      Do you not know sitting here today what your

15      forecasted damages would be for 2021?

16      A.      I'd have to go back and calculate for that year

17      specifically, and specifically for CyberAI, and

18      specifically for HNCO.

19      Q.      Sitting here today, do you know what your

20      forecasted damages are for the year 2021?

21      A.      No.

22      Q.      You didn't perform that calculation in your

23      report, correct?

24      A.      I did not.

25              MR. WAREHAM:  Objection, form and foundation.

**EXHIBIT 1**
**Page 105 of 639**

Roysdon Expert_000105

1    BY MR. GONZALEZ:

2    Q.    I'm sorry, what was your answer?

3    A.    I did it as an average over five years.

4    Q.    What was your approximate income in 2019 from

5    all sources?

6    A.    Is that relevant?

7    Q.    Do you not think it's relevant?

8    A.    I don't think it's relevant.

9    Q.    What was your approximate income for 2020 from

10   all sources?

11   A.    I don't think that's relevant to this analysis.

12         MR. WAREHAM:  There's no objection.  You need to

13   answer the question, if you know.

14         THE WITNESS:  Okay.

15   BY MR. GONZALEZ:

16   Q.    What was your approximate income in 2022 from

17   all sources?

18   A.    Approximate income at that time was about

19   300,000.

20   Q.    Let me ask you this, why don't you think it's

21   relevant what your income was in 2019?

22   A.    Relevance of income relative to a market

23   analysis, there's no relation.

24   Q.    You're also forecasting your anticipated earning

25   in this expert report, is that correct?

**EXHIBIT 1**
**Page 106 of 639**

Roysdon Expert_000106

1    A.    That's correct.

2    Q.    Do you not think that it is important to know

3    what someone made in order to forecast what they could

4    have made?

5    A.    No.

6    Q.    Okay.

7    A.    Because what that person could have made based

8    on the contracts that are available during that time has

9    nothing to do with how much they make.

10    Q.    Okay.

11    A.    You, for example, could be a billionaire

12    expecting to make 28 thousand or 28 billion each year.

13    Has nothing to do with how much you make.  It's the

14    expected contracts that are available.

15    Q.    Have you ever before calculated -- let me ask

16    you this, I asked you earlier if you know what a

17    vocational expert was?

18    A.    Yes.

19    Q.    Have you ever done any vocational expert work?

20    A.    Could you redefine vocational expert?

21    Q.    Earnings loss, have you ever performed any

22    expert work in the category of earnings loss?

23    A.    Absolutely.

24    Q.    Okay.  Tell me about that.

25    A.    I've worked on several analyses where earnings

**EXHIBIT 1**
**Page 107 of 639**

Roysdon Expert_000107

Page 108

1     were lost and -- I mean, this is a simple data science

2     problem that a lot of data scientists will do.  I've

3     done data science for many years.  You look at available

4     data on a variety of different websites, whether

5     government websites or internal data, and analyze the

6     potential for contract wins, what would be called a

7     probability of win, or P-win, against losses.

8          Probably of loss, or P-loss.  Assess the

9     differences and then figure out what led to those wins

10    or losses to maybe reinforce certain techniques that a

11    company might use to either improve these techniques or

12    change their techniques to improve a safety win.  In

13    both cases, you're going to look at P-win versus P-loss.

14    Q.     Did you perform that P-win/P-loss analysis in

15    this expert report?

16    A.     Certainly those techniques were included in

17    this.  I have a background in data science and I'm going

18    to use those techniques for this analysis.

19    Q.     I didn't ask if you would.  Did you?

20    A.     Absolutely.

21    Q.     And how many losses did you calculate in this

22    expert report?

23    A.     I don't recall.

24    Q.     Okay.

25    A.     This report was strictly about contract wins.

**EXHIBIT 1**
**Page 108 of 639**

Roysdon Expert_000108

1    Q.      Okay.

2    A.      And specifically contract wins that were

3    publically available information on usaspending.gov and

4    specifically filtered to agency or HNCO work.

5    Q.      So, let me ask you, why did you deviate from the

6    P-wins verse P-losses methodology when doing this expert

7    report?

8    A.      It wasn't relevant.

9    Q.      Why?

10    A.      The analysis here is to determine what the

11    damages were.  In order to determine damages, you need

12    to figure out how many wins you could have had to assess

13    damages.  Damages doesn't include losses, that's a

14    double negative.

15    Q.      Okay.  What's the process of entering into a

16    subcontract with someone that holds a prime contract?

17    A.      It varies by the contract, to be honest.

18    Q.      Is there a bidding process?

19    A.      Entering into a subcontract, again, it depends

20    on the contracts.  Sometimes you align a subcontractor

21    with a prime contractor based on a relationship or prior

22    existing relationship or based on the desire of the

23    awarding agency's needs or requests or demands, it

24    varies.  Not a simple answer, I apologize.

25    Q.      Do you know what the concept of an error rate

**EXHIBIT 1**
**Page 109 of 639**

Page 110

```
 1    is?

 2    A.      Yes.

 3    Q.      Does this expert report incorporate any type of

 4    error rate, for example, whether you wouldn't be able to

 5    enter into a contract?

 6    A.      It's for a market analysis.  I'm not going to

 7    include an error rate.

 8    Q.      Do you know what the Federal Acquisition

 9    Regulation guidelines are?

10    A.      The FAR?

11    Q.      Yes.

12    A.      I'm familiar with it.

13    Q.      Do you know what the DFAR is?

14    A.      It's the defense version of this, I believe.

15    Q.      Exactly.  Are there any requirements for a prime

16    contractor under the FAR in the CyberAI space?

17    A.      I don't know.

18    Q.      Does a cyber contract -- I'm sorry.  Does a

19    prime contractor in the CyberAI space need security

20    personnel?

21    A.      I'm sorry, say that question again.

22    Q.      Sure.  Does a prime contractor in the CyberAI

23    space need security personnel in order to enter into a

24    contract with the Department of Defense?

25    A.      Does a prime contractor --
```

**EXHIBIT 1**
**Page 110 of 639**

Roysdon Expert_000110

Page 111

1    Q.    Yes.

2    A.    -- or a subcontractor?

3    Q.    Prime contractor.

4    A.    I'm not sure, I can't state with certainty.

5    Q.    Does a prime contractor need any type of

6    certification under FAR in order to enter into a prime

7    contract in the CyberAI space?

8    A.    Certification or like a registration, like a

9    cage code?

10    Q.    Certification.

11    A.    I'm not certain.

12    Q.    Have you ever worked on a large prime contract?

13    A.    Yes, I have.

14    Q.    Are there any requirements under the FAR in

15    general to have some sort of contract manager on the

16    prime contract on the company's side?

17    A.    I'm not sure.  I have not memorized the FAR or

18    the DFAR.  It's thousands of pages of details.

19    Q.    Are prime contracts typically with large

20    companies?

21    A.    No.

22    Q.    Are they typically with smaller companies?

23    A.    It's not typically with either company.

24    Q.    Is your expert report based solely on prime

25    contracts?

**EXHIBIT 1**
**Page 111 of 639**

Roysdon Expert_000111

Page 112

1    A.    The data contained in this report is based on

2    prime contracts.

3    Q.    So, you did not consider whether you could have

4    worked on subcontracts under the prime contracts in this

5    report?

6         MR. WAREHAM:  Objection to form, foundation.

7         THE WITNESS:  I noted in the report that each of

8    these, and I put in parenthesis prime contractor in each

9    of these, the values that I was providing was based on

10   the prime contractor.  I also noted that had we

11   considered additional contracts as subcontractors, then

12   the numbers would have been much larger.  Therefore, the

13   averages for year, the value of 28.5 million per year,

14   would have been much larger.  To narrow the scope of the

15   analysis, I only included prime contractor, prime

16   contractor contracts.

17        MR. GONZALEZ:  Could you read my question back

18   to me?

19        THE COURT REPORTER:  So, you did not consider

20   whether you could have worked on subcontracts under the

21   prime contracts in this report.

22        MR. WAREHAM:  Same objection.

23   BY MR. GONZALEZ:

24   Q.    Do you want me to state it again?

25   A.    Please.

**EXHIBIT 1**
**Page 112 of 639**

Roysdon Expert_000112

Page 113

1    Q.    In your expert report, do you consider whether

2    you could have worked under subcontracts to the prime

3    contracts that you've identified in your report?

4    A.    I did not consider subcontracts.  I considered

5    prime contracts only.

6    Q.    Okay.

7    A.    Keeping in mind, subcontracts and prime

8    contracts do not necessarily define the dollar amount.

9    In fact, some subcontracts are the majority of the

10   dollar amount of the prime contract, as in, could be

11   90 percent of the prime contract or more or less.

12   Q.    Of the subcontracts to the prime contracts in

13   this report, did you apply to any of those subcontracts?

14   A.    I did not.

15   Q.    Could you have been competitive for any of those

16   subcontracts?

17   A.    Yes.

18   Q.    If you had worked on any of those subcontracts,

19   would that have mitigated your damages in any way?

20   A.    If I was not barred -- this gets into something

21   outside of this analysis -- but if I was not barred from

22   doing this sort of work, then it would have mitigated my

23   damages.

24   Q.    Okay.  So, hypothetically speaking, if you were

25   not, as you say, barred, your damages would have been

**EXHIBIT 1**
**Page 113 of 639**

Roysdon Expert_000113

Page 114

1    mitigated if you had worked on subcontracts to the 77

2    contract you listed in your expert report, correct?

3            MR. WAREHAM:  Objection, form and foundation.

4            THE WITNESS:  In the hypothetical case, that's

5    possible.

6    BY MR. GONZALEZ:

7    Q.    Did you make any attempts to try to work on any

8    of those subcontracts?

9    A.    I answered this before.  I was told I would not

10   be competitive on these contracts.

11   Q.    So, I'm trying to keep it in the scope of what

12   you want me to keep it in the scope of, so my questions

13   aren't getting into the response you want to give me so

14   I'm going to ask it again.

15   A.    Okay.

16   Q.    I'm not asking what you were told or not told, I

17   don't want to get into that.  That will be for a

18   separate deposition.

19   A.    Okay.

20   Q.    But if you give me that, then you're opening the

21   door, as they say.

22           MR. WAREHAM:  I'm actually a little confused

23   because this was discussed earlier, so I'm not objecting

24   to scope.  Go ahead and ask the question.  He was

25   informed not to, so if that's your question, I'm fine

EXHIBIT 1
Page 114 of 639

Roysdon Expert_000114

Page 115

1       with that.  That, I think, does go into the analysis and

2       it does into lost opportunity damages.

3              MR. GONZALEZ:  Jason.

4              MR. WAREHAM:  Yes, do what you mean.

5       BY MR. GONZALEZ:

6       Q.     So, did you attempt to enter into any of the

7       subcontracts under the 77 contracts you've listed in

8       your expert report?

9       A.     No.  Thank you for refining the question.

10      Q.     So, I realize your expert report is very narrow

11      but I want to just ask a little bit about the CyberAI

12      market in general.

13      A.     Okay.

14      Q.     How many government customers are there in a

15      CyberAI market?  So, we know HNCO, right, we know DARPA?

16      A.     It could be in the several hundreds, easily.

17      Q.     Okay.

18      A.     In the government space -- in the DOD,

19      specifically, it could be in the several hundreds.

20      Q.     In DOD, specifically, it could be in the several

21      hundreds?

22      A.     Yes, absolutely.  In each of the different

23      offices -- you're asking -- let me see if I understand,

24      you're asking about cyber broadly?

25      Q.     CyberAI.

**EXHIBIT 1**
**Page 115 of 639**

Roysdon Expert_000115

Page 116

```
 1      A.      CyberAI broadly?

 2      Q.      This is helpful, let me narrow it.  How many

 3      government customers, DOD government customers, are

 4      there in the CyberAI market?

 5      A.      Today?

 6      Q.      Yes.

 7      A.      Offensive or defensive?

 8      Q.      Offensive.

 9      A.      Very few.

10      Q.      Okay.  What are those government customers?

11              MR. WAREHAM:  Assuming public information.

12              THE WITNESS:  Agencies that are publically

13      known, there are many.  Cybercon, I believe, has several

14      public contracts or work that you could find today.

15      There are many.  It's difficult for me to know the

16      totality in what exists today because the field has

17      grown so much.  It was easier in 2019 because there just

18      was not anybody doing this work.  Does that help?

19      Q.      Let's take approximately 2024, okay.  More than

20      10?

21      A.      More than 10.

22      Q.      More than 10, okay.  So, in 2024, there were

23      more than 10 DOD government customers in CyberAI

24      offensive operations?

25      A.      Offensive operations, yes, but I think the
```

**EXHIBIT 1**
**Page 116 of 639**

Roysdon Expert_000116

Page 117

1      answer is more nuanced, specifically if we're going to

2      consider the work that I was doing in HNCO.  That

3      specific aspect of offensive cyber work, specifically

4      CyberAI work, is still very limited.

5      Q.      Okay.

6      A.      And there just are not many people in this

7      country that do that work.  It's a handful of people and

8      in that handful of people, there are only a few that are

9      experts.  I'm one of them.

10     Q.      What I think I understand you saying is,

11     specific to the specialized work that was in HNCO, very

12     few government customers.  But when it comes to DOD

13     customers for offensive cyber work in general, there are

14     more than ten?

15     A.      Offensive cyber work in general, yes.  This

16     would be something that would encompass like red and

17     blue team operations, or what's considered purple team

18     operations, to do penetration testing of networks.

19     There are many companies that do this sort of work.

20     Leidos, for example, does this work, so does

21     Bruce Allen, ManTech, Rayeon, Locke Heed, they offer

22     services doing some sort of cyber penetration testing or

23     capture of light operations.

24     Q.      Outside of the specific work that you identified

25     at NHCO, have you applied to perform offensive cyber

**EXHIBIT 1**
**Page 117 of 639**

Roysdon Expert_000117

Page 118

1      operations for any of those ten-plus other government

2      customers?

3      A.     No, that's not my speciality.  I have expertise

4      in those areas but my speciality is very unique.

5      Q.     You do have expertise in those other areas,

6      though?

7      A.     I do, yes.

8      Q.     Okay.  Can we go off the record?

9             (Short recess was taken.)

10            MR. GONZALEZ:  I have no more questions,

11     Dr. Roysdon.  Thank you.  I don't know if your counsel

12     does.

13            MR. WAREHAM:  Yes, I do have some.

14            THE WITNESS:  Thank you.

15            CROSS-EXAMINATION BY COUNSEL FOR PLAINTIFF

16     BY MR. WAREHAM:

17     Q.     So, Dr. Roysdon?

18     A.     Yes.

19     Q.     Let's start with your training and education,

20     formal training and education.  Can you just run through

21     that briefly?

22     A.     How much of it, just degrees?

23     Q.     Degrees.

24     A.     Background?

25     Q.     Yep.

**EXHIBIT 1**
**Page 118 of 639**

1    A.        I've got a dual bachelor's degree in aerospace

2    and mechanical engineering.  Several master's degrees in

3    the same, aerospace and mechanical and electrical

4    engineering.  I have a dual Ph.D. in the electrical

5    engineering department, with a dual focus of applied

6    math and probability theory.  I've also studied

7    extensively outside of that.  For example, I've studied

8    graduate -- the complete series of material for graduate

9    level theoretical physics and constitutional law,

10   specifically focused on AI.

11   Q.        So, most of us in this room don't have a

12   functional understanding of what those degrees mean what

13   you studied, okay.  So, can you run through in order to

14   obtain those degrees, what subjects are you studying?

15   A.        That's a broad range.  Study mathematics,

16   physics, chemistry.  Also study history, economics,

17   political science.  Different discipline within

18   engineering so that includes mechanic structures,

19   electronics, computer systems, a lot of software

20   development.  Kind of all the fundamental underpinnings

21   of, for example, CyberAI which is pertinent to this

22   particular discussion today.  There are several others,

23   it's a vast set of courses and disciplines.

24   Q.        Did your academic training include mathematics,

25   you said?

EXHIBIT 1
Page 119 of 639

Roysdon Expert_000119

1       A.      Yes, a lot.

2       Q.      How much?

3       A.      Undergraduate, I had four years of mathematics

4       with a math class every quarter, including over the

5       summers.  The Ph.D. was all mathematics.

6       Q.      Did that include applied mathematics?

7       A.      It did, there was a lot of mathematics in all of

8       the graduate degrees.

9       Q.      Did you study any statistics?

10      A.      In most of that, yes, there are statistics, both

11      basic statistics and advanced statistics.

12      Q.      Have you ever studied any form of modeling?

13      A.      Absolutely, all sorts of modeling, physical

14      modeling -- or physic-based modeling, as well as

15      numerical modeling or estimation.  That would include

16      things like modeling things of a pandemic, which was

17      convenient four years, modeling of markets, modeling of

18      cyber attacks, like intrusion detections, modeling of

19      unrest in foreign countries.  Those (inaudible) stuff

20      that I did for the agency.

21      Q.      Are you ever published any textbooks or academic

22      articles related to AI engineering or computational

23      systems?

24      A.      Yes, I have authored peer-reviewed textbooks in

25      math and AI.  I've authored at least 60 peer-reviewed

**EXHIBIT 1**
**Page 120 of 639**

Roysdon Expert_000120

Page 121

1    publications on the topics of math and AI and various

2    aspects of engineering, and co-authored dozens more.

3    Q.    Have you -- have any of the books or articles or

4    publications of any kind address the aggregate of

5    mathematical modeling to real world scenarios?

6    A.    Absolutely, I've read literally hundreds of

7    textbooks.  There's a period over the last many years

8    where I was reading, on average, about five textbooks a

9    week.  Dozens of papers in like medical journals and law

10   journals and math journals each week.  Often, I'm

11   looking at papers that talk about modeling, statistical

12   modeling specifically, and mirror modeling on a variety

13   of topics, including things that are relative to

14   economics.

15   Q.    So, I want to understand better the phrase,

16   "five textbooks a week" because to the rest us of, that

17   seems crazy.  Can you please describe in detail your

18   ability to digest knowledge?

19   A.    I'm an avid reader.  I go through periods where

20   I have an insatiable thirst on a particular topic.  For

21   example, there was a period a couple years ago where I

22   read about 20 theoretical physic books in the span of

23   two weeks.

24   Q.    And what does that look like when you're reading

25   a textbook?

**EXHIBIT 1**
**Page 121 of 639**

Roysdon Expert_000121

Page 122

```
 1    A.     I'm a deliberative reader.  I'm not a passive

 2    reader so I often take notes, make marks in my books,

 3    and usually provide some sort of a summary often so that

 4    I can remember all the stuff that I read and cross

 5    corollate that with other books that I've read.  It's

 6    actually pretty interesting.

 7           Sometimes you read certain books by certain

 8    authors, say physicists or mathematician, and they

 9    happen to reference something by another mathematician

10    during their time or before their time mentions and it

11    kind of becomes like, what people call an Easter egg or

12    an inside joke.  That's actually rather interesting to

13    find those events or those pieces of information in

14    those books.  And then for the while, I was posting my

15    reviews publically.  I had to take those down with my

16    current job.

17    Q.     What's the faster you've ever read a textbook?

18    A.     In evening, several hours.

19    Q.     Have you ever had your IQ studied?

20    A.     Yes.

21    Q.     What were the results of that study?

22    A.     I've had it studied three times.  The last set

23    of results that I had pertained to some work that I was

24    doing with the U.S. government.  The actual result that

25    was disclosed to me was 174.
```

**EXHIBIT 1**
**Page 122 of 639**

Roysdon Expert_000122

Page 123

1    Q.      Where does that fit on a range?

2    A.      140 and above is considered genius level.

3    Q.      Can you walk me through your last two

4    professional roles, the one you're currently in and the

5    last one?

6    A.      Can you elaborate?

7    Q.      Sure.  What do you do now?

8    A.      Currently, I am the principal deputy director of

9    national intelligence.

10   Q.      And what does --

11   A.      Sorry.  Currently, I am the deputy director of

12   national intelligence.  The P came from specifically

13   within the directorate, I oversee policy and

14   capabilities.

15   Q.      That's fine, you gave yourself a promotion.  So,

16   what is the scope, generally in plain language, of the

17   policies and capabilities division?  Be as unclassified

18   at you possible can.

19   A.      I will try.  Policy and capabilities oversees

20   policy for the intelligence community.  Prints all

21   policy that flows down from the DNI.  So, it'd be like

22   policy and guidelines of the DNI as dictating to the

23   other 18 elements of the intelligence community.  It

24   also includes, until recently, IC human capital.  So, I

25   kind of oversee the billets and clearances and

**EXHIBIT 1**
**Page 123 of 639**

Roysdon Expert_000123

Page 124

```
 1      professional development of the intelligence officers
 2      cross the intelligence community.  The portfolio also
 3      include science technology, so it's overseeing all the
 4      major programs and acquisition programs within the
 5      intelligence community.
 6              So, that would include purchases, acquisitions,
 7      et cetera.  Things that would go to, say, NRO, or NSA,
 8      or CIA.  Also, requirements and analysis, market
 9      assessments, modeling.  Those are also part of the
10      portfolio and all those elements report to me.  The
11      funding of a lot of things that are within the, what's
12      called the NIP budget.  The NIP is the, kind of national
13      intelligence budget where the MIP is the military
14      intelligence budget of the DOD.  So, the majority of the
15      NIP budget goes through me.  I think that's all that I
16      can say publically.  It's a vast portfolio.
17      Q.      I heard a few things in there.  One, so you're
18      actually in charge of acquisitions?
19      A.      Yes.
20      Q.      Does that involve contracts?
21      A.      Yes.
22      Q.      Does that involve contract analysis?
23      A.      Yes.
24      Q.      Does it involve contract analysis of CyberAI
25      contracts?
```

**EXHIBIT 1**
**Page 124 of 639**

Roysdon Expert_000124

Page 125

1    A.      It can, yes.

2    Q.      Going to Leidos, what roles did you fill at

3    Leidos?

4    A.      At Leidos, I was a vice president.  I was the IA

5    chief scientist.  I filled a number of roles.  I brought

6    in former colleagues of mine from the agencies to built

7    out a new team to build a new technology in a new field,

8    that was CyberAI, and I oversaw that team.  Not just

9    leading the team but actually performing the research.

10   I authored several papers and patents.  We authored six,

11   at least six provisional patents.  There should be one

12   that's now a full utility patent.  The others are still

13   pending.

14           Assisted with code development, for example, did

15   peer review.  Of course, led the team, dealt with all

16   the finances.  Also did presentations to different

17   entities within the DOD, for example.  However, there

18   were exceptions.  There were certain aspects of the DOD

19   which I was told I was not allowed to present because my

20   name had been do destroyed, dragged through the mud,

21   somebody put it.  Presented publically on a couple of

22   occasions talking about the unclassified research that's

23   being done in CyberAI.

24           I worked on several proposals, several responses

25   to RFIs.  A request for information, that's an RFI.  I

EXHIBIT 1
Page 125 of 639

Roysdon Expert_000125

Page 126

```
 1      wrote several responses to RFIs.  I wrote several

 2      responses to RFPs, request for proposals.  Those are a

 3      number of things I did at Leidos.

 4      Q.      How much of that work on a percentage basis

 5      involved contracts or contract evaluations?

 6      A.      I don't know.  Out of the totality of the work I

 7      was doing, maybe a few percent.

 8      Q.      What's a few?

 9      A.      Seven or eight.

10      Q.      What, numerically, does that percentage

11      represent, like how many contracts or evaluations did

12      you evaluate?

13              MR. GONZALEZ:  Objection to form.

14              THE WITNESS:  I had to -- I don't know, many.

15      Each time we were doing research in a new area, part of

16      the roles and responsibilities included like a market

17      survey or a market analysis of current competitors in

18      this area.  Most of that was necessary to be able to do

19      like a justification for funding, for research funding.

20      It's called IRAD, Internal Research and Development, as

21      well as justification for external funded research and

22      development, what is called Contract Research and

23      Development, or CRAD.  That'd be something like DARPA,

24      for example.  There's a lot.

25      BY MR. WAREHAM:
```

**EXHIBIT 1**
**Page 126 of 639**

Roysdon Expert_000126

1    Q.      Okay.  In your opinion, how familiar are you

2    with the contracts process?

3    A.      Fairly familiar.

4    Q.      What's your competence at?  You know math, how

5    competent are you that you're able to evaluate contracts

6    effectively?

7    A.      Can you define evaluating effectively.

8    Q.      Well, I'm trying to play in your world, it's

9    probably a mistake, but can you assign a confidence

10   value when you review a contract how well you understand

11   that contract and the related issues?

12   A.      Certainly within my domain I would say with high

13   confidence I can evaluate contracts and whether or not

14   we should compete or bid on a contract versus not.

15   Q.      And a high confidence includes greater than

16   80 percent competence level?

17   A.      95 or better.

18   Q.      95 or better?

19   A.      In some cases, with absolute certainty.

20   Q.      Actually, that brings up a good point.  A few

21   times, you said in response to Government counsel that

22   you were uncertain about -- or you could not be certain

23   about something?

24   A.      Okay.

25   Q.      What does certainty mean in your world?

**EXHIBIT 1**
**Page 127 of 639**

Roysdon Expert_000127

Page 128

```
1              MR. GONZALEZ:  Objection to form.  If you're
2         referencing a particular question.
3              MR. WAREHAM:  I don't have a memory that that's
4         good.  When he said certainty, what did that mean to
5         him.
6              MR. GONZALEZ:  You used it in a variety of
7         context.
8              MR. WAREHAM:  Okay.  Object to form.
9              THE WITNESS:  For me, certainty versus
10        uncertainty comes back to my training in probability
11        theory.  Certainty means, that if you are counting ten
12        items, you know there are exactly ten.  Uncertain means,
13        that you don't know that there are exactly ten, if you
14        have ten countable items.  You can have degrees of
15        certainty and this kind of varies based on the
16        application and what's considered acceptable.
17             So, a degree of uncertainty, maybe 90 percent
18        certain is fine in a particular context with a certain
19        amount of variance, say, 10 percent variance.  So, I can
20        see something and say that I'm mostly certain, say 90
21        percent with a 10 percent variance.  Or uncertain, that
22        I think it's unlikely, maybe 20 percent or below, let's
23        say 20 percent.  That still doesn't get you over the
24        mathematical threshold of 50 percent, where you're
25        basically guessing.
```

**EXHIBIT 1**
**Page 128 of 639**

Page 129

1    BY MR. WAREHAM:

2    Q.    What certainty value do you assess to your

3    ability to effectively evaluate CyberAI markets?

4          MR. GONZALEZ:  Objection to form.

5          THE WITNESS:  Very certain.

6    BY MR. WAREHAM:

7    Q.    What would you provide a percentage value?

8    A.    Depending on the technology, 90 percent of more.

9    And in some cases, absolutely certain.

10   Q.    Talking a little bit about the field of CyberAI,

11   going back to pre-2019, what markets related to CyberAI

12   existed prior to 2019a?

13   A.    There really was no CyberAI market prior to

14   2019.  Nobody was doing work in CyberAI.

15   Q.    Was there a cyber market?

16   A.    Absolutely, there is a cyber market.

17   Q.    Was there an AI market?

18   A.    Not really.

19   Q.    Okay.  So, what happened in 2019 to create a

20   CyberAI market?

21   A.    There was some innovations that I worked on with

22   some other mathematician at the time that allowed us to

23   do some things we couldn't do previously and we started

24   applying those techniques, at the time classified

25   techniques, to cyber problems, which was great because

**EXHIBIT 1**
**Page 129 of 639**

Roysdon Expert_000129

Page 130

1    we were all working in classified domains.  Since then,

2    I think several of these techniques have become more

3    widely known but I can't confirm certain techniques or

4    deny certain techniques because it's classified

5    knowledge.  But, certainly AI techniques are widely

6    known and certainty within the public conscious since

7    2022 with ChatGPT.

8    Q.      So, earlier when you said words to the effect of

9    somebody called you godfather of AI, is that the time,

10   like the instance, that you're describing?

11   A.      Yes, that was specifically somebody at NSA,

12   specifically within cyber network operations,

13   specifically around the time, around 2019.  I was

14   described that way to other folks in the government.  It

15   was not my definition.

16   Q.      Based on the existence of the CyberAI market as

17   it existed when you published this report, do you know

18   approximately how many people would have the expertise

19   to implement on the CyberAI market?

20          MR. GONZALEZ:  Objection to form.  What report

21   was published?

22          MR. WAREHAM:  The expert report.

23          THE WITNESS:  You're talking about the marketing

24   analysis?

25   BY MR. WAREHAM:

EXHIBIT 1
Page 130 of 639

Roysdon Expert_000130

1    Q.    Yes, the market analysis.

2    A.    This wasn't published, though.

3         MR. WAREHAM:  Sorry, to you.  I meant when we

4    sent it to you.

5         THE WITNESS:  Okay.

6    BY MR. WAREHAM:

7    Q.    How about this, strike that question.  When you

8    wrote this market analysis --

9    A.    Yes.

10   Q.    -- do you know how many people could have opined

11   competently on that market analysis?

12   A.    I would say a handful of people would have the

13   knowledge and the clearances necessary to be able to

14   perform a similar analysis.

15   Q.    So, can you try to give handful a number?

16   A.    Maybe three.  I would say it's probably down to

17   one or two that would have the span of knowledge that I

18   have because of the work that I did in the government.

19   Q.    What's a data scientist?

20   A.    A data scientist is someone who uses any form of

21   data, a variety -- sorry.  Variety forms of data and

22   numerical models.  Typically, the definition is

23   machinery remodels or AI to perform an analysis of that

24   data.  Part of that includes looking for outliers of the

25   data.  Some of it is data cleaning.  And then the rest

**EXHIBIT 1**
**Page 131 of 639**

Roysdon Expert_000131

Page 132

1     of it is a complete analysis.  Usually, you're combining

2     one data set with another data set, it's called data

3     enrichment, to give a more holistic picture of what that

4     data represents.

5     Q.      Have you ever worked as a data scientist?

6     A.      Absolutely.

7     Q.      Can you describe that?

8     A.      I was the chief data scientist at NSA.  In that

9     role, I did a variety of things.  Analyzing a variety of

10    different types of data.  Things as mundane as growth

11    and decay of plant life to markets, typically foreign

12    markets, because that's kind of the domain of NSA.

13    Cyber attacks, I mentioned a lot of this earlier, or

14    intrusion detection.  Analysis of people, maybe like

15    riots or density of people within a certain domain using

16    certain types of, what is called, signets, or signals

17    intelligence, to analyze the density of people in a

18    certain area.  Providing assessments of potential

19    threats based on data that was available, et cetera.

20    Q.      Given your --

21    A.      The national policy was actually written as a

22    result of all these assessments.

23    Q.      Given your work as a data scientist, how hard is

24    a market analysis for you?

25    A.      It's easy, trivial.

**EXHIBIT 1**
**Page 132 of 639**

Roysdon Expert_000132

1    Q.      On a scale of one to ten, how difficult?

2    A.      Compared to the other types of analysis I've had

3    to do, one.  It's trivial.

4    Q.      Let's talk specifically about what you studied

5    or read in preparation of the market analysis in front

6    of you today.

7    A.      Okay.

8    Q.      Can you describe how much material you reviewed

9    to prepare that?

10   A.      To perform a market analysis?

11   Q.      This market analysis or, yes, any market

12   analysis.

13   A.      I mean, in the span of time that I've done these

14   sorts of studies, I mean, I've read hundreds of papers,

15   many hundreds of papers.  That would include websites or

16   pages.  Reviewing code, for example, like, Jupiter

17   Notebooks, these are usually written in Python but also

18   Math Lab and the techniques that are used and the

19   mathematical models that are used in those files.

20   There's a variety of things that I've reviewed in order

21   to be able to do things like this, including this.

22   Q.      And over how many years would you stretch the

23   reading you've done on market analysis?

24   A.      Several years, at least ten years.

25   Q.      Does that affect your memory at all of what

**EXHIBIT 1**
**Page 133 of 639**

Roysdon Expert_000133

Page 134

1      you've been able to review?

2      A.      Given the span of time and the number of things

3      that I've had to analyze in that period, yes, it makes

4      it difficult to pinpoint an exact number.

5      Q.      Shifting to the discussion around the 77

6      contracts that was part of the prior discussion, can you

7      discuss in as much detail as possible your

8      inclusion/exclusion criteria, specifically?

9      A.      Yes, relative to those contracts, I did not

10     apply for any of the contracts because I was told

11     repeatedly over the span of those five years that I

12     would not be competitive on any of those contracts,

13     would not be awarded, would not be considered.

14     Essentially, to not bother applying for any sort of work

15     within that domain.

16             MR. GONZALEZ:  I'm going to object to the

17     response.  I'll just leave it at that or I can state my

18     basis.

19             MR. WAREHAM:  Yeah, I got you.

20             MR. GONZALEZ:  Okay.

21     BY MR. WAREHAM:

22     Q.      Let's talk just about the 77 contracts, right?

23     You included some and not others in your analysis as the

24     five companies you choose to analyze, right?

25     A.      Yes.

**EXHIBIT 1**
**Page 134 of 639**

Roysdon Expert_000134

1    Q.    What was your inclusion or exclusion criteria

2    for why you did not include part of that 77, while

3    including other parts of that 77?

4    A.    The ones that I included in the 77 were work

5    based on the contracts that were similar -- to the best

6    of my recollection, similar to the work that I was doing

7    for Air Force Life Cycle Management, specifically HNCO.

8    Q.    Sure.  To the degree that it's publically -- you

9    can discuss it publically, I'm trying to understand what

10    criteria you assessed that that was similar to your

11    work, specific criteria?

12    A.    Looking at specific aspects of the contracts

13    that would note something like offensive cyber, or

14    firewall penetration techniques, or malware development

15    techniques, or exploitation techniques, or malware

16    reverse engineering techniques.  Specifically leveraging

17    AI to facilitate scaling of the discovery of those

18    techniques or the remediation of those techniques.

19    Q.    And you discussed that, in part, that filtering

20    came from your own knowledge, is that right?

21    A.    Specific subject matter expertise, yes.

22    Q.    Can you describe, as publically as you can, what

23    knowledge you were relying on in evaluating those?  So,

24    not necessarily something that comes out of training or

25    education but what actual knowledge do you have?

EXHIBIT 1
Page 135 of 639

Roysdon Expert_000135

1    A.      So, because these contracts often include, or

2    almost always include classified work, the people

3    writing the contracts will often write certain terms or

4    kind of vague descriptions to try to identify what the

5    need is without necessarily saying specifics of the

6    techniques that they're looking for or the technology

7    that they're looking for.

8           And it takes subject matter expertise to

9    understand or interpret what those contracts are and

10   then able to write an appropriate response to those RFPs

11   that would answer the needs of that contracting agency.

12   Q.      You mentioned some correlative patterns or words

13   just then.  Did you see those correlative patterns or

14   words in the contracts that you included?

15   A.      Yes.

16   Q.      You discussed in the earlier deposition portion

17   the lack on an error rate in your market analysis?

18   A.      Yes.

19   Q.      Can you discuss why there is a lack of an error

20   rate?

21   A.      In this instance, it didn't merit using an error

22   rate to determine the total market availability of

23   contracts and then assess damages.

24   Q.      And why not?

25   A.      Because there's no errors in the data.  I mean,

**EXHIBIT 1**
**Page 136 of 639**

Roysdon Expert_000136

Page 137

```
 1      you can make assumptions that there might be an error in

 2      how the data's being reported on usaspending.gov, but

 3      the data is what it is.  I mean, as it's reported on the

 4      website is what's publically available and in order to

 5      perform a market analysis that's unbiased, you have to

 6      use only the knowledge -- or the information that's

 7      available publically.

 8           If you're bias, saying you're adding information

 9      that you happen to know what's considered dirty

10      knowledge of where other money might come from would be

11      affiliated with the same type of work.

12      Q.     And, specifically, you discussed earlier the use

13      of a five-year average as the math supporting your

14      determination, do you remember that?

15      A.     Yes.

16      Q.     Is there an error rate in applying an average?

17      A.     No, an average is a simple mathematical

18      principal that takes a series of numbers and divides by

19      the -- takes a series of numbers, add those numbers

20      cumulatively, and then divides by the number -- the

21      quantity of numbers.  It's a simple mathematical

22      principal.

23      Q.     You discussed in the earlier portion of the

24      deposition that you did not consider barriers to entry

25      to the markets, do you remember that?
```

**EXHIBIT 1**
**Page 137 of 639**

Roysdon Expert_000137

1    A.    I do.

2    Q.    Why did you not consider barriers to entry?

3    A.    I did not a barrier to entry as something that

4    was something that was necessary for doing a market

5    analysis on contracts awarded.  The contracts awarded,

6    in this case, at least for this analysis, have nothing

7    to do with barrier entry.

8    Q.    Is contract awarded a prospective or

9    retrospective analysis?

10   A.    It's a retrospective analysis.  Going back to

11   your barrier of entry, you could make the statement that

12   a barrier to enter in this area would be, people that

13   have this exquisite knowledge of this domain,

14   specifically.  That is certainly a barrier to entry,

15   especially when that knowledge is tightly held and only

16   a few people have this knowledge.

17   Q.    Would it be fair to describe that as an implied

18   assumption in your analysis?

19   A.    Yes, it's an applied assumption.  There's only a

20   handful of people in the country who have this

21   knowledge, and can do work at the top secret level.

22   Q.    Let's talk about the choices you made around --

23   well, do you remember a discussion, in general, with

24   Government counsel regarding -- I'm just going to try to

25   summarize it -- the discussion around assuming you would

**EXHIBIT 1**
**Page 138 of 639**

Roysdon Expert_000138

Page 139

1    have won every contract that you analyzed?

2    A.    Yes.

3    Q.    Is it fair to describe that as a lost

4    opportunity analysis?

5          MR. GONZALEZ:  Objection to form.

6          THE WITNESS:  You could describe this as a lost

7    opportunity analysis instead of a market analysis.

8    BY MR. WAREHAM:

9    Q.    Say more about that.

10         MR. GONZALEZ:  Objection to form.

11         THE WITNESS:  I think a lost opportunity

12   analysis is more explicit stating that, if during a

13   certain period of time someone could perform work that

14   was barred from entry to that work, that would be a lost

15   opportunity.  A market analysis is just stating, this is

16   the opportunity that existed during this period of time.

17   We also included, as part of this market analysis and

18   opinion, and the opinion stated that the lost -- the

19   loss work or damages resulted in an average over that

20   period of time for that performer.

21   BY MR. WAREHAM:

22   Q.    And I want to understand a little better.  Do

23   you remember discussing relative size of companies in

24   your analysis?

25   A.    Yes.

**EXHIBIT 1**
**Page 139 of 639**

Roysdon Expert_000139

Page 140

1    Q.      Can you go into details around your statement

2    that you don't need more people, you just need more

3    GPUs, or words to that effect?

4    A.      Sure.  Yes, with proper application of AI,

5    especially today, you do not need more people to perform

6    jobs.  Most jobs today can be performed by, what are

7    called, AI agents.  Agentic AI is actually something

8    that actually I proposed in 2019 for one of these

9    contracts.  It wasn't labeled as agentic AI, like it is

10   today, but we did label them as AI agents on a

11   particular contract, without going into classified

12   details.

13         So, I was already operating with the assumption

14   that I could enable further -- I guess you could call it

15   AI workers -- to automate work that often other people

16   would do.  So, that is to say that you could use one AI

17   agent to do, for example, write code.  Another agent to

18   do analyzes of that code.  Another agent, still, to do

19   exploitation of that code, and then another agent to

20   write the results of vulnerabilities found in the code.

21         Now, this would be the equivalent of having four

22   or five humans doing this work.  But, instead, you

23   could, effectively, scale the number of agents by just

24   having more GPUs.  Which means, I could use thousands of

25   agents to do the work of thousands of people, if I have

**EXHIBIT 1**
**Page 140 of 639**

Roysdon Expert_000140

Page 141

1    a GPU cluster large enough to do this work, and I would

2    be the one conducting it.  Sort of like a conductor in

3    an orchestra.

4    Q.    So, based on your background and experience,

5    what is your opinion as to your ability to compete with

6    an 80-person company in this space?

7    A.    On any given contract, I think I can be very

8    competitive just scaling my availability with GPUs and

9    automating much of the work.

10   Q.    Do you know the people at Kudu, like the leaders

11   of Kudu Dynamics?

12   A.    I do.

13   Q.    How does your expertise compare to

14   Kudu Dynamics's leadership?

15   A.    Kudu Dynamic's leadership?

16   Q.    Yes.

17   A.    Most of their leadership is focused or has

18   background in offensive cyber.  They do not have a

19   background in AI.  The way that company often works in

20   order to be able to do AI work, is they've got a couple

21   of folks that they bring in to do their AI work but

22   those are employees or consultants.  They're not

23   leadership.

24   Q.    Same question for Death Logics.

25   A.    Same answer.

**EXHIBIT 1**
**Page 141 of 639**

Roysdon Expert_000141

Page 142

1    Q.      Expressed as a percentile, where would you have

2    put yourself in the percentile of expertise compared to

3    those persons?

4            MR. GONZALEZ:  Objection to form.

5    BY MR. WAREHAM:

6    Q.      Go ahead.

7    A.      Top 1 percent.  I've been fortunate to have both

8    broad and deep expertise in many areas that have made me

9    very effective in what I do, including my current

10   position.

11   Q.      I want to talk a little bit about the work and

12   demonstrations you did around usaspending.gov.  There

13   were a number of fields of which agency awarded

14   something versus which agency funded something, do you

15   remember those fields?

16   A.      I do.

17   Q.      Based on your knowledge of contracts over the

18   years, do you have any insight as to whether or not the

19   agency funding something is the agency managing

20   something?

21           MR. GONZALEZ:  Objection to form.

22           THE WITNESS:  I do.

23   BY MR. WAREHAM:

24   Q.      And what is that understanding?

25   A.      Often -- well, I don't know if I should say

**EXHIBIT 1**
**Page 142 of 639**

Roysdon Expert_000142

Page 143

```
 1        often or sometimes -- but it does occur that the funding

 2        agency or entity is entirely different than the managing

 3        agency.

 4        Q.      Do you recall as with respect to the contract

 5        that is the subject of this case that you had?

 6        A.      Yes.

 7        Q.      Do you know who the agencies were managing your

 8        contract?

 9        A.      Yes.

10        Q.      And what are those agencies?

11        A.      So, as it pertains to this work, the managing

12        agency was HNCO.

13        Q.      Who was the contract processing agent?

14        A.      There were several, AFRL was one of them, DARPA

15        was another one.  Sometimes it was managed through -- or

16        filtered through just Air Force cyber.  There are many

17        ways to kind of make money flow through the government

18        to certain contracts through repurposing that money.

19        And this can be done up to -- I forget the dollar amount

20        before you have to include like a congressional

21        oversight into the repurposing of funds or the, kind of,

22        change of funds.  I think it somewhere around 1.4

23        billion.

24        Q.      You mentioned AFRL in your answer.  Do you know

25        what AFRL stands for?
```

**EXHIBIT 1**
**Page 143 of 639**

Roysdon Expert_000143

Page 144

1    A.    Air Force Research Laboratory.

2          MR. WAREHAM:  If you would indulge me, can I use

3    your same projection with the website.

4          MR. GONZALEZ:  Can we go off the record for a

5    second?

6          (Off the record discussion was held.)

7    By MR. WAREHAM:

8    Q.    So, Dr. Roysdon, would you please apply the same

9    filters on the usaspending website that you did with

10   Government counsel?  And, for the record while it's

11   populating, what were those filters?

12   A.    Kudu Dynamics, agency, Department of Defense,

13   time period, fiscal years 2020 through 2024.

14   Q.    Okay.  And do you recognize the contract that

15   you selected when speaking with Government counsel?

16   A.    Yes.

17         MR. GONZALEZ:  We selected the first three.

18         THE WITNESS:  That's correct.

19   BY MR. WAREHAM:

20   Q.    Great.  Will you select the one first?

21   A.    First one?

22   Q.    Uh-hum.  Can you scroll down to the like agency

23   data you were reviewing previously?

24   A.    Yes.

25   Q.    Do you see the field, awarding office?

EXHIBIT 1
Page 144 of 639

Roysdon Expert_000144

1    A.    Award office says, FA8750 AFRLQ.

2    Q.    And who was the office to organize your contract

3    with HNCO?

4    A.    AFRL.

5    Q.    That was all I wanted after all that.  Going to

6    -- why did you choose a five-year average for your

7    report?

8    A.    Because that was the period from when I had

9    started doing work to the time which I was asked to do

10   this report, roughly speaking.

11   Q.    If you need to, would you have sufficient data

12   and knowledge to do it per year?

13   A.    Yes.

14   Q.    Did you have any -- so, just talking about the

15   contract with GITI that underpins this lawsuit, did you

16   suffer any damages from the cancelation of that

17   contract?

18   A.    Monetary damages.

19   Q.    Yes.  What were those?

20         MR. GONZALEZ:  Before you answer him, I'm just

21   going to object to this line of questioning because the

22   premise of your question hasn't been put on the record.

23         MR. WAREHAM:  You said, my question?

24         MR. GONZALEZ:  You said, the contract was

25   cancelled with GITI.  What contract was canceled with

**EXHIBIT 1**
**Page 145 of 639**

Roysdon Expert_000145

Page 146

1    GITI?

2         MR. WAREHAM:  Fair enough.

3    BY MR. WAREHAM:

4    Q.     Do you have knowledge of what happened to the

5    contract related to this that underpins this action?

6    A.     I'm sorry, say that again.

7    Q.     Do you have knowledge of what happened to your

8    contract that is part of this lawsuit?

9    A.     Yes, I do.

10    Q.     What happened to it?

11    A.     It was canceled.

12    Q.     Thank you.  Now, did you suffer any damages from

13    the cancelation of that contract?

14    A.     Yes, I suffered financial damages.

15    Q.     And what were those?

16    A.     The quantity?

17    Q.     Yep.

18    A.     That contract alone was maybe about a half

19    million a year.

20    Q.     Over how many years?

21    A.     Had potential of being several million over the

22    next five years, that's what I was told from Air Force

23    HNCO but an Air Force official or government official of

24    that agency.

25         MR. WAREHAM:  One second, I think that's all the

**EXHIBIT 1**
**Page 146 of 639**

Roysdon Expert_000146

1      questions I have.

2              MR. GONZALEZ:  Little bit of follow-up.

3              REDIRECT EXAMINATION BY COUNSEL FOR DEFENDANTS

4      BY MR. GONZALEZ:

5      Q.      You testified that you're, I guess, like a

6      voracious consumer of knowledge?

7      A.      Yes.

8      Q.      At times, you've read multiple textbooks a week?

9      A.      Yes, that's correct.

10     Q.      Can you identify the title of any economics

11     textbooks you have read?

12     A.      There's a reader that was produced in

13     conjunction with some research I was doing with

14     Art Laffer, who's an economist, famous economist.  I

15     can't recall the reader that was affiliated with that

16     but it was, in essence, an assessment of like the

17     American economy.  Art Laffer is well-known.  He's an

18     economist that worked for the Reagan administration.

19     Q.      Can you not recall the title?

20     A.      I can't recall the titles, no.

21     Q.      Have you ever authored a textbook focused on

22     market analysis?

23     A.      Have I ever offered a textbook?

24     Q.      Focused on market analysis.

25     A.      As in, authored a textbook or offered?

**EXHIBIT 1**
**Page 147 of 639**

Roysdon Expert_000147

Page 148

1    Q.    Authored.

2    A.    Authored, no.

3    Q.    Okay.  Have you ever published an article about

4    market analysis?

5    A.    Publically published an article?

6    Q.    Yes.

7    A.    No.

8    Q.    You have published in journals and scholarly

9    resources, correct?

10   A.    Yes, I have.

11   Q.    Have you published in any journal or scholarly

12   resource an article about market analysis?

13   A.    No, all that was done either private for a

14   company or for the U.S. government on classified

15   information.

16   Q.    What have you published publically in journals

17   or articles about that?

18   A.    Mostly research in CyberAI, navigation systems,

19   aircraft design, guidance and control systems, a variety

20   of applied math, probability theory, data science.  Data

21   science examples in one of the guides that I wrote, I

22   don't know, eight years ago include a variety of

23   different types of analyses, including like an analysis.

24   A number of different things.

25   Q.    Is your market analysis in your expert report

**EXHIBIT 1**
**Page 148 of 639**

Roysdon Expert_000148

Page 149

1    just concerning small businesses in the offensive cyber

2    space?

3    A.    The market analysis in my -- the businesses that

4    were included in the market analysis that I put together

5    were predominately small businesses.  Not by selection

6    just by existence.

7    Q.    Is it your testimony that there are no large

8    entities operating in the CyberAI offensive operations

9    context?

10          MR. WAREHAM:  Objection to form and foundation.

11          THE WITNESS:  Presently?

12    BY MR. GONZALEZ:

13    Q.    Let's start with presently.

14    A.    No, that was not my testimony.

15    Q.    Okay.  So --

16    A.    I did this work at Leidos.  They are a large

17    company.

18    Q.    But Leidos isn't included in this market

19    analysis?

20    A.    It is not.

21    Q.    When did you perform this market analysis?

22    A.    In '24, '23, something like that.  I don't

23    recall.  I don't recall.

24    Q.    So, why have you excluded larger businesses for

25    this market analysis?

**EXHIBIT 1**
**Page 149 of 639**

Roysdon Expert_000149

Page 150

1           MR. WAREHAM:  Objection to form.

2           THE WITNESS:  I included -- in this market

3      analysis, I included specifically companies that were

4      doing work that was similar to the work that I was doing

5      for Air Force Life Cycle Management, HNCO.  The work

6      that was doing done at other companies is not relevant

7      or was that relevant.

8      BY MR. GONZALEZ:

9      Q.    So, I'm going to read your opinion here.  Based

10     on my opinion and as a subject matter expert in AI and

11     cyber, the average CyberAI contracts value for small

12     businesses working for the DOD over the last five-year

13     period is 142.5 million?

14     A.    That's a correct statement based on this

15     analysis.

16     Q.    Got it.  So, you have used the caveat small

17     businesses working in the CyberAI contracts field,

18     correct?

19     A.    Yes.

20     Q.    There are larger businesses that you have

21     excluded from this report, correct?

22     A.    No.

23     Q.    So, why did you use small business?

24     A.    Because the only businesses that existed in this

25     space during this time period that were doing this

**EXHIBIT 1**
**Page 150 of 639**

Roysdon Expert_000150

Page 151

```
 1    specific work happen to be small businesses.
 2    Q.      And what is the time period?
 3    A.      This time period was, what, 2020 to 2024, 2019
 4    to 2024.
 5    Q.      So, it's your testimony that from fiscal year
 6    2020 --
 7    A.      2019.
 8    Q.      -- 2019 to fiscal year 2024, there were no large
 9    businesses operating in CyberAI working for the DOD for
10    that time period?
11            MR. WAREHAM:  Objection to form, foundation.
12            THE WITNESS:  State that again.
13    BY MR. GONZALEZ:
14    Q.      Sure.  Is it your testimony here today that
15    there were no large businesses working for DOD during
16    the five-year period in the CyberAI field?
17    A.      Specific to the work that was being done at
18    HNCO, no.
19    Q.      Okay.  Forget about the specific work being done
20    at HNCO.
21    A.      Well, then it invalidates this market analysis.
22    Q.      So, I don't see that term, though, specific work
23    at HNCO, anywhere in here.  Can you show me that?
24    A.      That's mentioned several times in here.
25    Employment consulting with Air Force Life Cycle
```

**EXHIBIT 1**
**Page 151 of 639**

Page 152

1    Management, HNCO.  Contract awarding office, HNCO.  Part

2    of my job was to review their work, HNCO.  Refinement of

3    work specifically to this analysis, Air Force Life Cycle

4    Management, HNC -- that actually extends HNCO, by the

5    way -- et cetera, et cetera.

6    Q.    Okay.  So, for the sentence I read here in the

7    beginning of your opinion, is it correct that this is

8    the average of CyberAI contracts value for small

9    businesses working for DOD over the last five years, is

10   that correct?

11   A.    I think you're adding more nuance to this

12   sentence than what is written.

13   Q.    Okay.  What am I adding?

14   A.    You're making implications that there are other

15   businesses, large or small.

16   Q.    Well, you used the term small businesses, so

17   that's what I'm trying to understand.

18   A.    Okay.

19   Q.    Are you telling me that you shouldn't have used

20   the term "small businesses"?

21   A.    Let's work on it, can you refine it?

22   Q.    Why did you add the term "small businesses

23   there?

24   A.    I added small businesses here because that was

25   what was representative in the available data on the

**EXHIBIT 1**
**Page 152 of 639**

Roysdon Expert_000152

Page 153

1   website.

2   Q.      Okay.  If we took out the qualifier small, is

3   this statement still true?

4   A.      Not for the small -- not for the business that

5   were doing specifically this type of work.  Again, that

6   comes back to market -- sorry.  That comes back to

7   subject matter expertise for this particular type of

8   market analysis.  A subject matter expertise that's

9   necessary and requires understanding the details of

10  those contracts awarded and, specifically, what those

11  contracts are referencing when it comes to offensive

12  cyber capabilities or, specifically, CyberAI

13  capabilities.  So, I stand by what I wrote.

14  Q.      Okay.  I think I understand what you've said.  I

15  just don't understand how what you said represents what

16  you wrote, that what's I'm trying to understand here,

17  okay?  So let's break it down, all right?  The first

18  clause is CyberAI contracts value, do you see that?

19  A.      I do.

20  Q.      Okay.  And then the second part is for small

21  businesses, okay?

22  A.      Yes.

23  Q.      Is your expert opinion providing the cyber

24  contracts value for small businesses over a five-year

25  period?

**EXHIBIT 1**
**Page 153 of 639**

Roysdon Expert_000153

Page 154

1    A.       Are you saying does my expert understanding only

2    contained to five years?

3    Q.       No, I'm asking, is your expert opinion providing

4    the CyberAI contracts value for small businesses working

5    with DOD?

6    A.       I still don't understand your question.

7    Q.       Okay.  So, I want to understand exactly what

8    you're valuing here, okay?

9    A.       Okay.

10   Q.       All right, I'm reading the average CyberAI

11   contracts value for small businesses, that's what you

12   wrote, right?

13   A.       Yes.

14   Q.       Okay.  And so am I correct that this expert

15   opinion is providing the cyber contracts value for small

16   businesses, as you write?

17   A.       It is, but I think you're missing the next

18   clause that says, this is based on evidence provided

19   above.  So, I think there's something implicit in that

20   part of the sentence that is identifying -- the rest of

21   this document also talks about nuances that are not

22   strictly DOD broadly or strictly CyberAI.  But things

23   specific to the nuanced things that I was doing with

24   HNCO and specifically, the contracts within HNCO.

25   Q.       Okay.

**EXHIBIT 1**
**Page 154 of 639**

Roysdon Expert_000154

1    A.        Specifically, offensive CyberAI.

2    Q.        So, this clause right here, as I read it by

3    itself, is not accurate?

4    A.        I don't think you can read independently out of

5    a sentence and try to make assumptions.

6    Q.        When you referenced the, I guess, evidence

7    provided above, is that where you're getting from the

8    more narrow market caveat?

9    A.        Yes.

10   Q.        And define for me the market caveat of evidence

11   provided above in the context of your conclusion?

12   A.        Can you restate the question?

13   Q.        Sure.  I believe your testimony is that the

14   evidence provided above is an important caveat to

15   understanding the proceeding clause in the sentence,

16   correct?

17   A.        Correct.

18   Q.        Okay.  And that caveat is that, it's not just

19   any CyberAI contracts for small businesses with DOD,

20   it's a specific type of CyberAI contract with HNCO, is

21   that correct?

22   A.        That is more to the point, yes.

23   Q.        So, this expert report is not premised on the

24   CyberAI market overall.  It's premised upon that defined

25   market, correct?

**EXHIBIT 1**
**Page 155 of 639**

Roysdon Expert_000155

1    A.      That small market segment, yes.

2    Q.      Got it, okay.  And it's your testimony that for

3    the entire five-year period, these five companies were

4    the only operators within that market segment, correct?

5    A.      To the best of my knowledge, yes.

6    Q.      And it's your testimony then that there were no

7    other larger entities operating within that small market

8    segment?

9    A.      Not to my recollection, no.

10   Q.      And Leidos was not operating in that market

11   segment, correct?

12   A.      No, they were not.

13   Q.      I heard you testify that there wasn't an error

14   rate concern in this expert report because the data was

15   accurate, is that correct?

16   A.      Well, there's an assumption the data reported on

17   the government website is accurate, yes.

18   Q.      I gotcha.  So, if the data was not accurate,

19   then the analysis could also be wrong?

20   A.      This is true.  There's a certain amount of trust

21   placed in a government website and their reported data.

22   Q.      Is the data the only assumptions that you have

23   made supporting this report?

24   A.      You mean, the assumption of the authenticity or

25   correctness of the data that's available on the

**EXHIBIT 1**
**Page 156 of 639**

1      government website, is that what you're asking is my

2      assumption, or only assumption?

3      Q.     Yes?

4      A.     Yes, that's my only assumption.  To the best of

5      my recollection, yes, that's my only assumption in this

6      report.

7      Q.     You've also assumed, though, that these are the

8      only five companies operating in the narrow market that

9      you've defined, correct?

10     A.     To the best of my recollection, yes.

11     Q.     Okay.  If that assumption was incorrect, would

12     that have any bearing on your conclusion?

13     A.     I would have to see evidence to determine

14     whether or not it has a bearing on my conclusion.

15     Q.     Okay.

16     A.     There might be other competitors but they might

17     not be able to do work in this space.  They also may not

18     be competitive, meaning, that they produce subpar work.

19     Q.     So, it's possible that there are competitors in

20     this space but that are not actually that competitive?

21     A.     That's correct.

22     Q.     Do you know if that's a problem at all within

23     the space, that there are, quote-unquote, competitors

24     who actually aren't that competitive?

25     A.     Yes.

**EXHIBIT 1**
**Page 157 of 639**

Roysdon Expert_000157

Page 158

```
 1              MR. WAREHAM:  Objection to form
 2      BY MR. GONZALEZ:
 3      Q.      Give me an example.
 4      A.      A common example is a company that might over
 5      promise and under deliver.  They can provide
 6      capabilities that they actually do not end up providing.
 7      Q.      Have you ever seen a company do that in this
 8      space?
 9      A.      I have seen companies do that in -- well, in the
10      broader space of cybersecurity, I've seen companies do
11      that in this space.
12      Q.      So, if am understanding you correctly, if there
13      were other companies in this space that were comparable
14      to the five you selected, you don't know whether that
15      would change your conclusions?
16      A.      As far as I know, there are -- at this time,
17      there were no other companies that were able to do this
18      sort of work within this space, that's my recollection.
19      As I've said in prior testimony, there are very few
20      people that work in this space.
21      Q.      Do you know if there's other companies that
22      claim to be able to provide these products in this
23      space?
24      A.      Yes.
25      Q.      And you didn't include them, though, in your
```

**EXHIBIT 1**
**Page 158 of 639**

Roysdon Expert_000158

Page 159

1      market analysis?

2      A.      No.

3      Q.      Why?

4      A.      Because they were completely irrelevant.  They

5      do not have the technology, nor do they have the

6      expertise.

7      Q.      Which companies?

8      A.      There were a few companies that purported to do

9      similar work.  I can't recall the companies I reviewed

10     as part of my official capacities, other companies, but

11     I can't recall names right now.

12     Q.      Okay.  I want to look at your expert report.  We

13     looked at this before on page 2 and, it says, awarding

14     office and funding office and it lists Air Force Life

15     Cycle Management for both.  Is it your testimony that

16     even though it lists that, that, in fact, Air Force Life

17     Cycle Management may not actually be funding or awarding

18     the contract?

19             MR. WAREHAM:  Objection as to form, foundation.

20             THE WITNESS:  Based on publically available

21     information only, I have to assume that if it states

22     Air Force Life Cycle Management, that it is Air Force

23     Life Cycle Management.

24     BY MR. GONZALEZ:

25     Q.      So, you take what it says at face value?

**EXHIBIT 1**
**Page 159 of 639**

Roysdon Expert_000159

Page 160

1    A.      Within the context of your questioning, yes.

2    Q.      Of the GITI contract, how much money did you

3    ultimately make?

4    A.      Is that relevant to this market analysis?

5           MR. WAREHAM:  It is, go ahead and answer.

6           THE WITNESS:  Okay.  I don't recall.  A short

7    contract, maybe rough order of magnitude of a half

8    million.

9    BY MR. GONZALEZ:

10   Q.      That's your best guess, half million?

11   A.      That's my rough order guess, I don't recall.

12   Q.      How long were you working under that contract?

13   A.      I don't remember the number of months that I

14   worked under that contract before cancelation.  Rough

15   order of magnitude, maybe eight months to a year.

16   Q.      So, to your best estimate, you maybe had made a

17   half million off the contract?

18   A.      Rough order of magnitude, yes.

19   Q.      Where do you get the 5 million in damages then,

20   if you only made 500 off that first year?

21   A.      My role and possibility was limited to advising,

22   advising other companies, as I stated during the first

23   page.  Advising other companies on their contracts often

24   using math that I had derived or built, not actually

25   building the tools myself.

**EXHIBIT 1**
**Page 160 of 639**

Roysdon Expert_000160

Page 161

```
1     Q.      Okay.  So, I think you're saying you would of

2     entered into subsequent business relationships with

3     other entities?

4     A.      I was planning to, yes.  That was going to be

5     the next phase of the work before the work was canceled.

6     Q.      So, when you wrote on your expert designation on

7     page 3, Dr. Roe's opinion is that he has suffered

8     damages in the range between 5 million for the loss of

9     just the last contract?

10    A.      Correct.

11    Q.      You're actually not referring to damages

12    directly relating to your contract with GITI, is that

13    correct?

14    A.      Yes, it is nuance to the contract so I'm having

15    some pause.  Yes, I'm referring to that contract or the

16    continuation of that contract or expansion of that

17    contract.  That contract was to expand roughly around

18    August of 2020, which would have significantly increased

19    my scope and involvement in the contract from strictly

20    an advisory role to a much more involved role.  I was

21    asked to be -- I was asked to, effectively, take on more

22    responsibility for a variety of contracts related to

23    Air Force HNCO.  So, that's why I say it's more nuance

24    than just the statement that you made.

25    Q.      Okay.  So, 5 million in anticipated losses just
```

**EXHIBIT 1**
**Page 161 of 639**

Roysdon Expert_000161

Page 162

1    from the loss of that contract, correct?

2    A.      Just that contract, yes.

3    Q.      Okay.  And your basis for that, is that you

4    anticipated more responsibilities, correct?

5    A.      Not anticipated.  I was promised more

6    responsibilities, more to the point.

7    Q.      Who promised you these responsibilities?

8    A.      An Air Force officer or Air Force HNCO officer

9    or official.

10   Q.      And had you negotiated terms or pricing for

11   those additional responsibilities?

12   A.      Yes.

13   Q.      How much were you going to be compensated for

14   those additional responsibilities?

15   A.      Something that would amount to over the life of

16   the contract, about 5-9, for that one contrat only.

17   Q.      Okay.  And how long was the life of the contract

18   going to be?

19   A.      It was going to be three or five years, as I

20   recall, to the best of my recollection.

21   Q.      So, the arrangement that you anticipated, was

22   that memorialized in your present contract where GITI?

23   A.      I don't understand the question.  Can you repeat

24   that?

25   Q.      Sure.  You testified that you anticipated

**EXHIBIT 1**
**Page 162 of 639**

Roysdon Expert_000162

Page 163

1    5 million coming from your relationship with GITI,

2    correct?

3    A.      My relationship with Air Force Life Cycle

4    Management.

5    Q.      Air Force Life Cycle Management, okay.

6    A.      The money was going through GITI.

7    Q.      So, you were being paid by GITI, though,

8    correct?

9    A.      That's correct.

10   Q.      And are you telling me here that it's your

11   testimony that you anticipated that the contract would

12   expand in scope?

13   A.      Correct.

14   Q.      But, it hadn't expanded in scope, correct?

15   A.      It hadn't expanded in scope because the time at

16   which the money was awarded for contract expansion was

17   precisely the same time that I was terminated and barred

18   from future work.  The presentation to expand the scope

19   or the -- this is based on a presentation of new

20   technology and capabilities for HNCO and directly after

21   that presentation, I was barred from work and my

22   contract was terminated.

23   Q.      So, was there an existing contract for the

24   expansion of scope, whether it was signed or not?

25   A.      I am not sure how that contract would have been

**EXHIBIT 1**
**Page 163 of 639**

Roysdon Expert_000163

Page 164

1     negotiated.  To the best of my knowledge, it would have

2     gone through something like the Act 2 or Act 3 contracts

3     and the money would have been routed from HNCO through

4     Air Force Research Laboratory to GITI on an Act 2 or Act

5     3 contract, to the best of may knowledge.  Contract

6     funding is not simple.  It's not as simple as the

7     statements that you were making.

8     Q.     Would your rate of pay on the anticipated

9     expansion of work been the same as your current rate of

10    pay?

11    A.     No.

12    Q.     How would it have been different?

13    A.     I would have increased my rate of pay based on

14    current market rates and, published on government

15    websites, current rates.

16    Q.     Okay.

17    A.     I think there's a nice rate calculator on GSA.

18    Q.     So, it was your intention for this contract to

19    ask for a higher rate?

20    A.     My intention for this contract was to match

21    current rates.  My rate before that time was much lower

22    as an advisor.

23    Q.     So, you were going to raise your rates, correct?

24    A.     I would have raised my rates.

25    Q.     Just give me one moment.

**EXHIBIT 1**
**Page 164 of 639**

Roysdon Expert_000164

1    A.      Sure.  I would have made my rates equivalent to

2    what was normal in the market at the time.  At the time,

3    I had lowered my rates to be, essentially, a patriotic

4    American.  I was also planning, at that time, to go

5    full-time instead of do this as a consultant part-time.

6    Q.      Understood.  I think you mentioned that you were

7    negotiating this with someone at HNCO?

8    A.      Correct.

9    Q.      Who?

10   A.      His name is Dan Brown and his leadership is

11   Daniel Burkhart.

12   Q.      Other than Dan Brown, was anybody else a part of

13   these discussions?

14   A.      No, not to my knowledge.  I don't recall.

15   Q.      In rendering your expert opinion in this report,

16   did you rely on any of your own publications?

17   A.      Can you restate the question?

18   Q.      Sure.  You testified that you have published on

19   a number of articles and journals.  Did you rely on any

20   of those publications in rendering your expert report?

21   A.      I relied on knowledge based on a vast knowledge

22   base that includes writing papers, but not any specific

23   paper to write this specific market analysis, no.

24   Q.      So, you didn't rely on any specific journal or

25   article that you had drafted, correct?

**EXHIBIT 1**
**Page 165 of 639**

Roysdon Expert_000165

Page 166

1    A.       Correct.

2    Q.       I think you testified that some companies state

3    or otherwise present that they have capabilities in the

4    CyberAI offensive field that they do not, in fact, have,

5    right?

6    A.       Yes.

7    Q.       Is that your expert opinion or your personal

8    opinion?

9    A.       This is my expert opinion.

10   Q.       Okay.  And what expertise are you relying on to

11   make that assessment?

12   A.       To assess that other companies or that any

13   company is making statements about the work that they're

14   doing, just based on my expertise in this field, as well

15   as my experience working in both government and in

16   industry.

17   Q.       Have you looked at the contracts that those

18   companies are soliciting?

19   A.       In my capacity and industry?

20   Q.       Yes.

21   A.       I'm not allowed to look at those contracts

22   unless the contract is made public.

23   Q.       Have you looked at, I guess, advertising or

24   marketing material that states that these companies are

25   capable of providing those services?

**EXHIBIT 1**
**Page 166 of 639**

Roysdon Expert_000166

1    A.      Yes, and then evaluated the tools and

2    capabilities of those companies, showing that they

3    actually do not have the capabilities.

4    Q.      How did you perform that evaluation?

5    A.      Sometimes, this evaluation is rather easy.  You

6    can take, for example, a tool that company A says that

7    it can perform certain actions.  And by evaluating or

8    reverse engineering the tool, you can figure out whether

9    those actions are actually generated using some sort of

10   AI or machine learning or if it's truly just a

11   rules-based model.

12          In many cases, these are rule-based models.  I

13   can give you examples.  For example, if you go back to

14   the firewall example, there are companies that would

15   purport to use AI as part of their firewall capability,

16   Palo Alto, for example, when, in fact, when you do,

17   what's calling fuzzing to evaluate the capability of

18   that firewall, it's very clear that it is a rule-based

19   system.

20          There is no learning behind the wall, but it

21   takes deep subject matter expertise to be able to dig

22   into these types of models or these types of tools.

23   Often AI is used as a marketing capability.  Similarly,

24   AI is often used as a marketing necessity in contrast.

25   Q.      One last question, when you left Leidos you were

**EXHIBIT 1**
**Page 167 of 639**

Roysdon Expert_000167

Page 168

```
 1      chief AI data scientist, was that your title?

 2      A.      No.

 3      Q.      What was your title?

 4      A.      I was the chief -- the AI chief scientist.

 5      Q.      The AI chief scientist, okay.

 6      A.      I switched around to also be the chief AI

 7      scientist for the executive role.

 8      Q.      Does Leidos have a marketing department?

 9      A.      Yes, I do.

10              MR. GONZALEZ:  No further questions from me.

11              THE WITNESS:  Thank you.

12              MR. GONZALEZ:  Thank you.  I appreciate it.

13              MR. WAREHAM:  I'm done too.  We're going to read

14      it and sign, yes.

15              THE COURT REPORTER:  On the record, who wants a

16      copy of the transcript?

17              MS. SEEMAN:  DOJ.

18              MR. WAREHAM:  And Plaintiff.

19              (Deposition of Paul Roysdon, adjourned at

20      4:12 p.m.)

21

22

23

24

25
```

**EXHIBIT 1**
**Page 168 of 639**

1                    ACKNOWLEDGMENT OF DEPONENT

2

3

4            I, PAUL ROYSDON, do hereby acknowledge that I

5        have read and examined the foregoing testimony, and the

6        same is a true, correct and complete transcription of

7        the testimony given by me and any corrections appear on

8        the attached Errata sheet signed by me.

9

10

11

12

13        _____        _____

14            (SIGNATURE)                    (DATE)

15

16

17

18

19

20

21

22

23

24

25        Job No. CS7351249

**EXHIBIT 1**
**Page 169 of 639**

Roysdon Expert_000169

1                     E R R A T A   S H E E T

2         IN RE:  John Roe v. United States

3         RETURN BY: _____

4         PAGE      LINE      CORRECTION AND REASON

5         _____     _____     _____

6         _____     _____     _____

7         _____     _____     _____

8         _____     _____     _____

9         _____     _____     _____

10        _____     _____     _____

11        _____     _____     _____

12        _____     _____     _____

13        _____     _____     _____

14        _____     _____     _____

15        _____     _____     _____

16        _____     _____     _____

17        _____     _____     _____

18        _____     _____     _____

19        _____     _____     _____

20        _____     _____     _____

21        _____     _____     _____

22        _____     _____     _____

23        _____     _____     _____

24        _____

25          (DATE)                    (SIGNATURE)

          Job No. CS170

**EXHIBIT 1**
**Page 170 of 639**

Page 171

1                    E R R A T A   S H E E T

2        IN RE:  John Roe v. United States

3        RETURN BY: _____

4        PAGE      LINE      CORRECTION AND REASON

5        _____     _____     _____

6        _____     _____     _____

7        _____     _____     _____

8        _____     _____     _____

9        _____     _____     _____

10       _____     _____     _____

11       _____     _____     _____

12       _____     _____     _____

13       _____     _____     _____

14       _____     _____     _____

15       _____     _____     _____

16       _____     _____     _____

17       _____     _____     _____

18       _____     _____     _____

19       _____     _____     _____

20       _____     _____     _____

21       _____     _____     _____

22       _____     _____     _____

23       _____     _____     _____

24       _____

25          (DATE)                    (SIGNATURE)

         Job No. CS171

**EXHIBIT 1**
**Page 171 of 639**

Roysdon Expert_000171

Page 172

1          CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

2

3          I, Danielle Lawrence, court reporter, the

4     officer before whom the foregoing proceedings were

5     heard, do hereby certify that the foregoing transcript

6     and said proceedings were taken by me stenographically

7     and thereafter reduced to typewriting under my

8     supervision; and that I am neither counsel for, related

9     to, nor employed by any of the parties to this case and

10    have no interest, financial or otherwise, in its

11    outcome.

12          IN WITNESS WHEREOF, I have hereunto set my

13    hand and affixed my notarial seal this 20th day of

14    May 2025.

15

16

17

18

19

20

21

22

23    _____

24    NOTARY PUBLIC IN AND FOR THE

25    STATE OF MARYLAND

**EXHIBIT 1**
**Page 172 of 639**

Roysdon Expert_000172

Page 173

1    JASON R. WAREHAM, ESQUIRE

2    jwareham@allen-vellone.com

3                        May 21, 2025

4    RE: Roe, John v. United States

5        5/8/2025, Paul Roysdon (#7351249)

6        The above-referenced transcript is available for

7    review.

8        Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12       The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to

15   Erratas-CS@veritext.com.

16    Return completed errata within 30 days from

17   receipt of testimony.

18     If the witness fails to do so within the time

19   allotted, the transcript may be used as if signed.

20

21

22                    Yours,

23                    Veritext Legal Solutions

24

25

**EXHIBIT 1**
**Page 173 of 639**

Roysdon Expert_000173

| & | | | |
|---|---|---|---|

**&**   3:4 33:3

**0**

**00869**   1:7

**1**

**1**   1:24 4:14
6:25 7:3 9:7
142:7
**1-1-2020**   65:21
**1.4**   143:22
**1.7**   34:12,20,23
**10**   61:12,15
101:11 116:20
116:21,22,23
128:19,21
**100**   48:3 73:12
91:24
**1099**   19:6,19
20:8 102:9,20
**10:05**   1:18
**112**   94:8
**118**   4:4
**12**   78:21
**12:45**   85:20
**140**   123:2
**142**   55:4 58:6
**142.5**   47:16
54:8,21 55:12
55:18 56:7
59:9 150:13
**147**   4:5
**15**   53:11,11
**16**   4:17
**1600**   3:5
**172**   1:24

**174**   122:25
**175**   2:3
**18**   123:23
**180**   23:17,20
**1900**   3:5
**1i**   9:5

**2**

**2**   4:15 8:16,20
8:22 32:22
81:11 86:4
90:16 159:13
164:2,4
**20**   45:18 66:12
121:22 128:22
128:23
**20.5.**   55:5
**200**   48:3,15
**20002**   2:3
**20044**   3:15
**2019**   66:20
105:4,8 106:4
106:21 116:17
129:11,14,19
130:13 140:8
151:3,7,8
**2019a**   129:12
**202**   3:16
**2020**   19:19
24:18 26:5
42:1 51:14
65:25 66:24
106:9 144:13
151:3,6 161:18
**2021**   43:16
105:10,15,20
**2022**   20:22,24
43:12,14

103:17,20
104:2,9,17,24
106:16 130:7
**2023**   20:22
34:11,13,19,20
35:2,10 36:4
42:21 51:11,21
59:12,20 63:15
72:15,23 73:2
73:7,18
**2024**   7:17,18
8:1 20:4,16,17
20:18 34:9
36:10 42:2,13
42:14 66:1,24
75:24 116:19
116:22 144:13
151:3,4,8
**2025**   1:17 2:1
17:23 172:14
173:3
**20458**   172:22
**20th**   172:13
**21**   105:1 173:3
**23**   19:5 149:22
**24**   30:24
149:22
**25**   67:2,4 72:3
72:4 92:10,25
**26**   67:4
**28**   107:12,12
**28.5**   54:24 79:8
79:12,22,25
80:4,4 86:10
86:11,15 90:3
90:6,20 103:6
103:11,12
112:13

**28.5.**   103:21

**3**

**3**   4:16 9:20,23
26:7 86:4
161:7 164:2,5
**30**   173:16
**300**   78:17
**300,000**   106:19
**303**   3:7
**3a**   4:17 16:8,10

**4**

**4**   7:12 86:4
**40**   23:21
**48,000**   100:21
**4:12**   168:20

**5**

**5**   4:3 55:3
72:25 86:8
103:9 160:19
161:8,25 163:1
**5-9**   162:16
**5/8/2025**   173:5
**50**   48:15 96:16
96:17,19
128:24
**500**   160:20
**534-4499**   3:7
**598-3888**   3:16
**5:22**   1:7

**6**

**60**   78:19 96:16
96:17,19
120:25

EXHIBIT 1
Page 174 of 639

Roysdon Expert_000174

| | | | |
|---|---|---|---|
| **7** | **90** 113:11 | **accomplish** | **added** 54:16 |
| **7** 4:14 | 128:17,20 | 95:5 | 152:24 |
| **700** 55:3 | 129:8 | **accuracy** 40:1 | **adding** 137:8 |
| **713.85** 55:2 | **95** 127:17,18 | 40:3 173:9 | 152:11,13 |
| 79:10,17,25 | **a** | **accurate** 6:9 | **addition** 29:12 |
| 80:2 | **a.m.** 1:18 | 155:3 156:15 | **additional** |
| **7146** 3:14 | **ability** 5:23 6:9 | 156:17,18 | 31:15 41:4 |
| **7351249** 1:23 | 121:18 129:3 | **acknowledge** | 70:5,7 112:11 |
| 173:5 | 141:5 | 169:4 | 162:11,14 |
| **77** 50:21 51:2 | **able** 62:10,13 | **acknowledg...** | **address** 121:4 |
| 52:7 53:2,11 | 67:15 77:10,23 | 169:1 173:12 | **adjourned** |
| 60:11,14,17 | 88:24 90:9 | **acquisition** | 168:19 |
| 61:4,9 64:6,10 | 94:16 97:12 | 110:8 124:4 | **adjusting** |
| 64:17,25 70:23 | 110:4 126:18 | **acquisitions** | 57:21 |
| 71:3,22 76:15 | 127:5 131:13 | 23:1 124:6,18 | **adjusts** 58:5,8 |
| 76:22 78:10 | 133:21 134:1 | **act** 164:2,2,4,4 | **administration** |
| 82:9 83:9,13 | 136:10 141:20 | **action** 91:19 | 48:12 147:18 |
| 83:15,23 84:1 | 157:17 158:17 | 146:5 | **advance** 69:6 |
| 88:2,7,13 89:3 | 158:22 167:21 | **actions** 89:4,8 | 91:20 |
| 91:15 95:12,14 | **above** 47:17 | 89:13 92:4 | **advanced** |
| 95:25 96:1,2 | 123:2 154:19 | 167:7,9 | 16:24 120:11 |
| 114:1 115:7 | 155:7,11,14 | **active** 18:5,6 | **advancing** |
| 134:5,22 135:2 | 173:6 | **actual** 122:24 | 34:22 |
| 135:3,4 | **absolute** | 135:25 | **advertising** |
| **7th** 2:3 | 127:19 | **actually** 16:2 | 166:23 |
| **8** | **absolutely** | 59:4 64:3 | **advice** 11:18 |
| **8** 1:17 4:15 | 88:11 94:18 | 65:16 75:19 | 11:20 |
| **80** 127:16 | 97:21 107:23 | 87:14,24 | **advising** 24:21 |
| 141:6 | 108:20 115:22 | 114:22 122:6 | 160:21,22,23 |
| **80202** 3:6 | 120:13 121:6 | 122:12 124:18 | **advisor** 164:22 |
| **84** 94:22 95:1 | 129:9,16 132:6 | 125:9 127:20 | **advisory** |
| 97:6,8 | **academic** | 132:21 140:7,8 | 161:20 |
| **8th** 2:1 | 119:24 120:21 | 152:4 157:20 | **aerospace** |
| **9** | **acceptable** | 157:24 158:6 | 119:1,3 |
| **9** 4:16 | 128:16 | 159:17 160:24 | **afclo** 59:15 |
| | **accepted** | 161:11 167:3,9 | **affect** 78:24 |
| | 102:10 | **add** 137:19 | 79:11 80:3 |
| | | 152:22 | 133:25 |

EXHIBIT 1
Page 175 of 639

Roysdon Expert_000175

**affiliated** 18:3
137:11 147:15
**affixed** 172:13
**aflcmc** 81:17
82:5
**afrl** 102:17
143:14,24,25
145:4
**afrlq** 145:1
**agencies** 41:6,7
70:7 116:12
125:6 143:7,10
**agency** 24:25
66:11,13 67:14
67:14 68:18
69:7 70:5,6
78:3 94:1
104:11 109:4
120:20 136:11
142:13,14,19
142:19 143:2,3
143:12 144:12
144:22 146:24
**agency's**
109:23
**agent** 140:17
140:17,18,19
143:13
**agentic** 140:7,9
**agents** 140:7
140:10,23,25
**aggregate**
121:4
**ago** 45:16
121:21 148:22
**agree** 29:15,18
29:20 46:23
78:23 80:20

83:14 90:23
**ahead** 114:24
142:6 160:5
**ai** 13:6,8,11,14
13:20,21 14:2
14:6,8 18:2
22:25 28:16
29:3,5,6 38:1,1
42:19 43:13
45:8,9,14,15
45:16 46:5,13
46:18,20 47:14
59:18 64:3
70:11 76:13
94:19,20 105:6
105:8 119:10
120:22,25
121:1 129:17
130:5,9 131:23
135:17 140:4,7
140:7,9,10,15
140:16 141:19
141:20,21
150:10 167:10
167:15,23,24
168:1,4,5,6
**air** 24:21,25
25:21 41:23
42:4 49:4,11
49:20 50:11
53:3 54:5 56:5
56:8 59:17
61:10,13 63:21
64:7 69:1
81:21 82:3,6,7
82:10,24 98:25
99:5,7 135:7
143:16 144:1

146:22,23
150:5 151:25
152:3 159:14
159:16,22,22
161:23 162:8,8
163:3,5 164:4
**aircraft** 148:19
**al** 1:8
**algorithms**
14:5
**align** 109:20
**aligned** 104:14
**allegedly** 74:8
**allen** 3:4,8
117:21 173:2
**allotted** 173:19
**allowed** 125:19
129:22 166:21
**alto** 167:16
**american**
147:17 165:4
**amount** 95:6
113:8,10
128:19 143:19
156:20 162:15
**analyses** 12:25
13:2,12 33:10
33:19,22 36:12
36:18 37:1,4
38:18,22
107:25 148:23
**analysis** 10:1
11:12,13,23
12:3,13,18
14:8,10,18,22
15:20 17:1,15
18:22 20:14
21:20 23:2,2

26:11,13 29:16
29:22,23 30:6
30:9 31:2,4,22
31:24 32:5,8
32:12,14,17,23
37:8 38:2,8,12
38:15,20,21
39:24 40:2,11
40:21,25 41:5
41:18 42:25
43:3,7,9,25
44:2,3,7,17,18
44:21 50:10,11
50:15 51:17
52:8 53:2,13
65:4 71:8,11
71:15 72:11
75:16 76:2,6
77:13 79:23
81:3 83:10,13
83:24 86:14
88:17 90:1
91:22 98:3,12
99:10 101:4
104:6,16
106:11,23
108:14,18
109:10 110:6
112:15 113:21
115:1 124:8,22
124:24 126:17
130:24 131:1,8
131:11,14,23
132:1,14,24
133:2,5,10,11
133:12,23
134:23 136:17
137:5 138:5,6

**EXHIBIT 1**
**Page 176 of 639**

Roysdon Expert_000176

138:9,10,18
139:4,7,7,12
139:15,17,24
147:22,24
148:4,12,23,25
149:3,4,19,21
149:25 150:3
150:15 151:21
152:3 153:8
156:19 159:1
160:4 165:23
**analyze** 41:1
108:5 132:17
134:3,24
**analyzed** 139:1
**analyzes**
140:18
**analyzing** 44:1
46:24 47:1,4,6
59:19 132:9
**announcement**
70:5,6
**answer** 5:22
6:1,2,14,14
21:9 24:5,16
35:5 37:16
42:22 44:25
57:2,24 58:2
60:22,25 61:7
71:22,24 74:4
74:6 83:17
84:4 93:4
105:13 106:2
106:13 109:24
117:1 136:11
141:25 143:24
145:20 160:5

**answered**
114:9
**answering** 59:5
**anticipated**
106:24 161:25
162:4,5,21,25
163:11 164:8
**antonio** 1:3
82:21
**anybody** 10:8
88:18 116:18
165:12
**apologize**
109:24
**appear** 169:7
**appears** 67:23
**applicable**
173:8
**application**
45:12,18
128:16 140:4
**applied** 16:20
55:10 63:12
89:12 101:6
117:25 119:5
120:6 138:19
148:20
**apply** 113:13
134:10 144:8
**applying** 89:25
129:24 134:14
137:16
**appreciate**
168:12
**appropriate**
136:10
**approved**
34:19

**approximate**
72:11 73:19
106:4,9,16,18
**approximately**
71:2 72:8
86:10 90:20
96:13 103:10
116:19 130:18
**aptitude**
102:17
**arbitrary**
63:11
**area** 31:18
37:21 60:19
63:1 88:19
98:5 126:15,18
132:18 138:12
**areas** 46:3
118:4,5 142:8
**arena** 63:14
**arrangement**
162:21
**arrive** 54:8
**arrived** 53:22
86:14
**arrow** 17:15
**art** 147:14,17
**article** 39:15
40:18,19 148:3
148:5,12
165:25
**articles** 39:18
120:22 121:3
148:17 165:19
**artifical** 33:1
**aside** 77:12
**asked** 30:3,8
35:3,4 57:1,9

58:18 60:21
71:21 74:13,14
76:20 84:4
107:16 145:9
161:21,21
**asking** 15:7
27:9 74:12
87:12 88:16
101:25 103:23
114:16 115:23
115:24 154:3
157:1
**aspect** 117:3
**aspects** 31:19
45:20 99:17,18
121:2 125:18
135:12
**assess** 108:8
109:12 129:2
136:23 166:12
**assessed**
135:10
**assessment**
11:24 39:16
41:14 53:21
90:1 147:16
166:11
**assessments**
38:22 124:9
132:18,22
**assign** 127:9
**assisted** 25:22
125:14
**associated**
96:19
**assume** 89:22
91:3 159:21

**EXHIBIT 1**
**Page 177 of 639**

Roysdon Expert_000177

**assumed** 89:11
93:5,9 157:7
**assuming**
53:17 116:11
138:25
**assumption**
44:6 66:21
88:12,14,17
89:2,6,10,15
89:18 90:25
91:7,12 93:12
93:16 94:15
138:18,19
140:13 156:16
156:24 157:2,2
157:4,5,11
**assumptions**
89:24 90:2
137:1 155:5
156:22
**assure** 53:8
**attached** 4:12
7:4 8:21 9:24
16:11 169:8
173:11
**attachment** 7:5
**attack** 78:8
**attacker** 52:24
78:8
**attacking**
52:25
**attacks** 120:18
132:13
**attempt** 115:6
**attempts** 114:7
**attended** 33:19
**attorney**
173:13

**august** 19:19
161:18
**authenticity**
156:24
**authored**
120:24,25
121:2 125:10
125:10 147:21
147:25 148:1,2
**authors** 122:8
**automate**
140:15
**automating**
141:9
**automation**
64:3
**availability**
12:5 136:22
141:8
**available** 11:24
12:5 23:3 34:1
40:22 55:16
56:10,18,19
59:10 60:13
69:9 71:12
80:24 90:7
103:8 104:7
107:8,14 108:3
109:3 132:19
137:4,7 152:25
156:25 159:20
173:6
**average** 47:14
50:17 51:4,6
54:13,23 55:19
57:21 78:25
79:7,21,25
80:12,17,18

81:9 86:17
90:6,8 94:21
94:23 97:5,8
103:23,24,24
106:3 121:8
137:13,16,17
139:19 145:6
150:11 152:8
154:10
**averages**
112:13
**avid** 121:19
**avoid** 6:10
**award** 67:18
102:15 145:1
**awarded** 41:1
49:4 54:11
55:1 79:17
101:5 134:13
138:5,5,8
142:13 153:10
163:16
**awarding**
66:13 67:14
68:21 81:11,14
82:11 104:11
109:23 144:25
152:1 159:13
159:17
**awards** 103:14
104:19
**aware** 60:23
63:4 101:24

**b**

**b** 4:11
**baa** 70:4,4

**bachelor's**
119:1
**back** 15:22
17:7 24:11
35:8 36:12
41:3 57:4
63:15 67:25
81:10 84:3
90:15 91:11
104:6 105:16
112:17 128:10
129:11 138:10
153:6,6 167:13
**background**
15:23 108:17
118:24 141:4
141:18,19
**banner** 19:2
**barred** 113:20
113:21,25
139:14 163:17
163:21
**barrier** 43:24
44:15 45:3
138:3,7,11,12
138:14
**barriers** 43:10
43:19 44:4,7
137:24 138:2
**base** 38:21
165:22
**based** 11:23
15:18,21 24:7
27:7,9,12,21
27:25 32:6,10
37:24 45:7
47:7,8,13,17
48:8,18 54:10

**EXHIBIT 1**
**Page 178 of 639**

Roysdon Expert_000178

56:10,17,19
57:21 58:6
59:9 60:12
68:12 69:9
79:23 86:22,25
87:6 90:1
93:13,14 96:6
103:8 104:19
107:7 109:21
109:22 111:24
112:1,9 120:14
128:15 130:16
132:19 135:5
141:4 142:17
150:9,14
154:18 159:20
163:19 164:13
165:21 166:14
167:11,12,18
**basic**  55:9,10
120:11
**basically**  105:8
128:25
**basis**  15:11
23:21 40:16
93:16 126:4
134:18 162:3
**bat**  67:16
**bearing**  157:12
157:14
**beat**  93:17
**beginning**
152:7
**behalf**  3:2,10
24:25
**believe**  7:21
8:10 26:7 53:4
54:7,22 66:2

66:20 71:22
110:14 116:13
155:13
**ben**  3:14
**best**  5:22 6:9
20:4 41:13
49:22 52:10
60:12 64:15,19
64:20 65:2
71:23,25 76:8
91:6,8 135:5
156:5 157:4,10
160:10,16
162:20 164:1,5
**better**  72:23
92:17,19
121:15 127:17
127:18 139:22
**beyond**  97:17
98:14
**bias**  137:8
**bid**  89:7,23
91:1,3,8,12,16
91:18 93:2
99:23,24
100:23 101:14
101:16,25
102:1,14
127:14
**bidding**  95:12
100:14,17
109:18
**big**  48:14 60:2
**billets**  123:25
**billion**  34:12
34:13,20 74:22
107:12 143:23

**billionaire**
107:11
**billions**  34:5,6
34:14,15,21
**bit**  15:24 27:20
65:5 67:15
68:16 88:25
115:11 129:10
142:11 147:2
**blue**  117:17
**body**  74:7
97:13
**books**  121:3,22
122:2,5,7,14
**bother**  134:14
**bottom**  68:16
68:17 69:11
81:4,6,7,23
**bought**  26:21
**box**  3:14
**break**  12:2
85:21 153:17
**briefly**  118:21
**bring**  7:6,9,19
141:21
**bringing**  7:22
38:5
**brings**  127:20
**broad**  70:5,6
119:15 142:8
**broader**  75:5,7
158:10
**broadly**  76:12
115:24 116:1
154:22
**brought**  93:19
125:5

**brown**  165:10
165:12
**bruce**  117:21
**budget**  57:17
57:18,18
124:12,13,14
124:15
**budgetary**
57:19
**build**  37:22
125:7
**building**  85:6,8
85:12 160:25
**built**  25:19
28:20 125:6
160:24
**bullet**  34:12,19
35:4
**bunch**  57:8
**burkhart**
165:11
**business**  11:19
11:21 12:5
27:17 48:1,2
48:12,14,21
150:23 153:4
161:2
**businesses**  43:4
47:15 149:1,3
149:5,24
150:12,17,20
150:24 151:1,9
151:15 152:9
152:15,16,20
152:22,24
153:21,24
154:4,11,16
155:19

**EXHIBIT 1**
**Page 179 of 639**

Roysdon Expert_000179

| c | | | |
|---|---|---|---|
| **c**  3:1 4:1 5:1 | 50:16 123:14 | **ceiling**  103:19 | **change**  53:13 |
| 82:8 | 123:17,19 | **center**  82:7 | 53:21 56:23 |
| **cage**  111:9 | 153:12,13 | **certain**  12:6 | 57:1,9 58:18 |
| **calculate** | 158:6 163:20 | 23:7 26:20 | 72:12 80:9,10 |
| 105:16 108:21 | 166:3 167:2,3 | 31:19 37:21 | 81:4 108:12 |
| **calculated** | **capability** | 49:24,25 50:1 | 143:22 158:15 |
| 107:15 | 94:19 167:15 | 53:6 58:24 | **changed**  81:3 |
| **calculating** | 167:17,23 | 64:25 72:1,2 | **changes**  80:6,8 |
| 50:17 | **capable**  166:25 | 76:13 108:10 | 173:10 |
| **calculation** | **capacities** | 111:11 122:7,7 | **charge**  124:18 |
| 105:22 | 159:10 | 125:18 127:22 | **chatgpt**  130:7 |
| **calculator** | **capacity**  10:18 | 128:18,18,20 | **check**  7:25 8:3 |
| 164:17 | 11:3 25:13,16 | 129:5,9 130:3 | 8:7 40:7 |
| **call**  19:11,12 | 25:18 30:2,3 | 130:4 132:15 | **checked**  40:5,6 |
| 29:4 122:11 | 166:19 | 132:16,18 | 65:16 |
| 140:14 | **capital**  123:24 | 136:3 139:13 | **chemistry** |
| **called**  17:20,23 | **capture**  11:25 | 143:18 156:20 | 119:16 |
| 19:15 20:1 | 12:3,4,11,12 | 167:7 | **chief**  33:2 |
| 43:6 57:23 | 27:19 117:23 | **certainly** | 125:5 132:8 |
| 108:6 124:12 | **career**  96:9,18 | 108:16 127:12 | 168:1,4,4,5,6 |
| 126:20,22 | **case**  1:6 9:14 | 130:5 138:14 | **choice**  63:11 |
| 130:9 132:2,16 | 15:1 47:24 | **certainty**  52:11 | **choices**  138:22 |
| 140:7 | 54:23 61:23 | 52:12 64:24 | **choose**  62:1 |
| **calling**  16:13 | 64:25 86:14 | 111:4 127:19 | 134:24 145:6 |
| 167:17 | 96:25 97:7 | 127:25 128:4,9 | **cia**  124:8 |
| **cancelation** | 101:19 114:4 | 128:11,15 | **circumstance** |
| 145:16 146:13 | 138:6 143:5 | 129:2 130:6 | 92:22 101:3 |
| 160:14 | 172:9 | **certificate** | **cisa**  34:19 35:4 |
| **canceled** | **cases**  33:24 | 172:1 | **claim**  158:22 |
| 145:25 146:11 | 39:4 108:13 | **certification** | **clarify**  35:5 |
| 161:5 | 127:19 129:9 | 38:14 111:6,8 | **class**  38:11 |
| **cancelled** | 167:12 | 111:10 | 57:15 58:1,24 |
| 145:25 | **category** | **certify**  58:23 | 120:4 |
| **cap**  34:1,3,5,8 | 107:22 | 172:5 | **classes**  16:21 |
| **capabilities** | **caveat**  87:5,9 | **cetera**  41:8 | 16:25 |
| 22:24 38:4 | 150:16 155:8 | 48:12 124:7 | **classification** |
| | 155:10,14,18 | 132:19 152:5,5 | 57:7,24 58:4,9 |
| | | | 59:6 |

**EXHIBIT 1**
**Page 180 of 639**

Roysdon Expert_000180

**classified** 23:1
23:23 24:18
25:11 50:15
56:14,15 57:12
57:19,22 58:7
58:10,13,14
60:9,20 61:1
74:25 76:14
129:24 130:1,4
136:2 140:11
148:14
**clause** 45:7
90:19 153:18
154:18 155:2
155:15
**cleaning**
131:25
**clear** 167:18
**clearance**
90:13
**clearances**
123:25 131:13
**click** 68:2
**close** 67:5
**cluster** 141:1
**code** 111:9
125:14 133:16
140:17,18,19
140:20
**collaborated**
85:19
**colleague** 5:5
7:25 73:16
**colleagues**
125:6
**collectively**
48:13

**colorado** 3:6
**combining**
132:1
**come** 15:22
17:7 41:6 57:4
137:10
**comes** 60:3
117:12 128:10
135:24 153:6,6
153:11
**coming** 163:1
**command**
60:18 61:6
**common** 32:1
40:10,14,15
158:4
**commonly**
38:23
**communicati...**
58:9
**community**
23:6,23 76:9
123:20,23
124:2,5
**companies**
17:13,17 18:24
27:16 31:4
35:1,9 36:3,16
36:20,23 37:22
37:24 38:1
41:7,18,21
42:2,11 43:13
49:1,1,4,7,10
49:10,18,19
50:4,19 51:22
52:2,5 53:17
54:11 55:5
59:13,14,16,20

59:22,23,25
60:5 61:4,23
62:2,5,7,9,13
62:22,23,25
63:3,5,9,16,19
63:20,24 72:16
72:25 73:20
74:15 75:4,9
75:17 76:6
78:14,17 79:1
85:2,5,13,19
86:18 94:21
95:9 97:5,7
98:9,14,16,21
98:22 99:4,6
111:20,22
117:19 134:24
139:23 150:3,6
156:3 157:8
158:9,10,13,17
158:21 159:7,8
159:9,10
160:22,23
166:2,12,18,24
167:2,14
**company** 11:25
12:3 17:9,20
17:23 18:3,4
19:15 20:1
31:6,17 54:24
78:18,19 80:1
82:16,20,21
84:15 95:1,10
101:2 108:11
111:23 141:6
141:19 148:14
149:17 158:4,7
166:13 167:6

**company's**
38:3 79:7,21
111:16
**comparable**
158:13
**comparators**
97:25
**compare** 70:2
141:13
**compared**
74:20 133:2
142:2
**comparing**
41:3 44:19
**comparison**
99:1
**compartment...**
98:8,24 99:19
101:23
**compensated**
162:13
**compete** 52:2
94:16,25
127:14 141:5
**competed** 92:4
92:7,9,12
**competence**
127:4,16
**competent**
127:5
**competently**
131:11
**competing** 31:8
92:23
**competitive**
31:7,10,20
38:5 43:7
62:12 91:21

EXHIBIT 1
Page 181 of 639

Roysdon Expert_000181

97:11 113:15
114:10 134:12
141:8 157:18
157:20,24
**competitors**
126:17 157:16
157:19,23
**complete** 9:10
119:8 132:1
169:6
**completed**
173:16
**completely**
159:4
**computational**
120:22
**compute** 95:7
**computer** 29:7
119:19
**concept** 43:6
109:25
**concern** 25:5
156:14
**concerning**
149:1
**concerns** 39:23
**concluding**
86:5
**conclusion**
79:8,12,16,20
80:3,5,21
155:11 157:12
157:14
**conclusions**
54:3 158:15
**conclusively**
91:25 92:2

**conducting**
30:12 141:2
**conductor**
141:2
**conference**
24:19
**confidence**
127:9,13,15
**confirm** 58:4
60:24,25 130:3
**confluence**
14:1
**confused**
114:22
**congressional**
143:20
**conjunction**
147:13
**conscious**
130:6
**consider** 45:16
96:25 97:6
112:3,19 113:1
113:4 117:2
137:24 138:2
**considered** 7:9
45:16 58:13
94:5 112:11
113:4 117:17
123:2 128:16
134:13 137:9
**considers**
67:17
**consist** 13:17
**consistent** 84:5
**consists** 13:18
**constitutes**
26:15 48:1,20

**constitutional**
119:9
**consultancy**
19:12,13,14,19
19:21,24,25
20:2,8,25 21:2
21:6,11,14,16
25:2,13 94:9
102:10,24
**consultant** 19:6
20:11 21:21
24:20,24 30:3
30:8 41:16
99:24 100:7,8
101:1,13 102:7
102:20 165:5
**consultants**
141:22
**consulting** 19:6
19:8,11 20:4
21:5 28:5
151:25
**consumer**
147:6
**contacts** 89:25
**contained**
112:1 154:2
**contains** 41:18
**context** 10:19
10:20,21,22
11:14,15,18
14:23 15:11,13
15:15 30:11
37:18 48:20
72:4 128:7,18
149:9 155:11
160:1

**continuation**
161:16
**contract** 19:5
19:18 20:10
31:11 47:21
48:20 51:4,5
51:17 52:19
54:5 58:10
67:18,22,23
68:6,15 69:8
69:10,16 70:2
70:8,8,10,11
70:11,11,13
73:4 77:20,22
77:24 78:16,23
79:21 80:2
84:8,9 86:9
87:12 91:8,13
91:23 92:18,19
92:24 93:3
94:18 95:24
100:6,12,15,17
100:23 101:14
102:3,5,6,11
102:15,18,21
102:22,23,25
103:4,14
104:25 108:6
108:25 109:2
109:16,17
110:5,18,24
111:7,12,15,16
113:10,11
114:2 124:22
124:24 126:5
126:22 127:10
127:11,14
138:8 139:1

**EXHIBIT 1**
**Page 182 of 639**

Roysdon Expert_000182

| | | | |
|---|---|---|---|
| 140:11 141:7 | 55:19 57:16 | 109:20 111:19 | 19:10,23 20:7 |
| 143:4,8,13 | 58:8 60:11,11 | 111:25 112:2,4 | 21:1,17,18 |
| 144:14 145:2 | 60:14,17 61:5 | 112:11,16,21 | 23:20 25:24,25 |
| 145:15,17,24 | 61:5,9 62:6 | 113:3,5,8,12 | 26:8,9 28:10 |
| 145:25 146:5,8 | 64:2,6,6,10,11 | 114:10 115:7 | 28:13 29:16 |
| 146:13,18 | 64:17,25 65:10 | 116:14 124:20 | 35:19,21 36:14 |
| 152:1 155:20 | 65:10 66:6,10 | 124:25 126:5 | 37:2,3,4,12 |
| 159:18 160:2,7 | 66:11 67:2,5,8 | 126:11 127:2,5 | 40:4 41:11,19 |
| 160:12,14,17 | 67:10 69:19,22 | 127:13 134:6,9 | 41:20 42:10 |
| 161:9,12,14,15 | 70:1,3,24,25 | 134:10,12,22 | 44:22,25 46:6 |
| 161:16,17,17 | 71:3,7,10,12 | 135:5,12 136:1 | 46:10,14,21 |
| 161:19 162:1,2 | 71:18,19,21 | 136:3,9,14,23 | 47:25 49:21 |
| 162:16,17,22 | 72:5,10,12,17 | 138:5,5 140:9 | 50:19,20 53:4 |
| 163:11,16,22 | 72:18 73:19 | 142:17 143:18 | 53:5,6,25 54:1 |
| 163:23,25 | 74:22 75:23 | 150:11,17 | 54:6,7,17,18 |
| 164:5,5,18,20 | 76:15,16,18,22 | 152:8 153:10 | 54:20 55:5,11 |
| 166:22 | 77:7,15,18 | 153:11,18,24 | 56:22 58:3 |
| **contract's** | 78:4,10 79:7 | 154:4,11,15,24 | 59:11 60:7 |
| 47:15 | 79:17 80:23 | 155:19 160:23 | 61:24 64:18 |
| **contracting** | 82:9,23,24 | 161:22 164:2 | 66:1,25 67:1,2 |
| 136:11 | 83:5,9,12,23 | 166:17,21 | 68:8,9,13 |
| **contractor** | 83:25 84:1 | **contrast** | 69:14,15,17,20 |
| 102:2 109:21 | 86:18,22,25 | 167:24 | 70:21,22 71:16 |
| 110:16,19,22 | 87:7,17,21 | **contrat**   34:20 | 71:19,20 73:21 |
| 110:25 111:3,5 | 88:2,7,13 89:3 | 162:16 | 75:21 76:17 |
| 112:8,10,15,16 | 89:7,12,16,19 | **control**   57:25 | 78:7,12,19 |
| **contractors** | 89:23 91:1,3 | 148:19 | 79:19,22 85:2 |
| 62:12 | 91:15 92:6,10 | **convenient** | 85:17 86:12,13 |
| **contracts**   14:21 | 92:11,22,25 | 120:17 | 86:15,16,20,21 |
| 14:23 18:19 | 93:18 95:12,14 | **copies**   173:14 | 86:23,24 87:19 |
| 19:13 25:14 | 95:18,25 96:3 | **copy**   168:16 | 88:5 89:13,14 |
| 26:3 31:6 41:1 | 96:8,8,10,17 | **core**   57:5 | 92:23 93:6,10 |
| 42:17 47:21 | 96:19,24 97:17 | **corollate**   122:5 | 98:11,12 |
| 49:4,10 50:18 | 97:20 101:5,7 | **correct**   8:23 | 100:18 101:7,8 |
| 50:21 51:7,10 | 101:17 104:13 | 9:1 10:25 11:1 | 101:15,16 |
| 52:8,14,16,18 | 104:16,17 | 13:12,13 14:8 | 103:1,2,4,5 |
| 53:2,11 54:11 | 105:3,5,6,7 | 14:9,18,24,25 | 104:2,23 |
| 54:13,16 55:1 | 107:8,14 | 15:15 16:15 | 105:23 106:25 |

EXHIBIT 1
Page 183 of 639

Roysdon Expert_000183

107:1 114:2
144:18 147:9
148:9 150:14
150:18,21
152:7,10
154:14 155:16
155:17,21,25
156:4,11,15
157:9,21
161:10,13
162:1,4 163:2
163:8,9,13,14
164:23 165:8
165:25 166:1
169:6
**correction**
170:4 171:4
**corrections**
169:7
**correctly**
158:12
**correctness**
156:25
**correlative**
136:12,13
**counsel**  5:11,12
6:12 118:11,15
127:21 138:24
144:10,15
147:3 172:8
173:14
**count**  50:21
**countable**
128:14
**counting**
128:11
**countries**
120:19

**country**  88:24
90:9 117:7
138:20
**couple**  20:22
121:21 125:21
141:20
**course**  8:9 80:6
96:18 125:15
**courses**  16:25
119:23
**court**  1:1 6:8
24:12 33:5
35:9 61:20
85:25 112:19
168:15 172:3
**crad**  126:23
**crazy**  121:17
**create**  29:6
129:19
**created**  26:11
38:8
**criteria**  62:8,10
62:14,18,20,21
134:8 135:1,10
135:11
**cross**  4:4 40:12
118:15 122:4
124:2
**cs**  1:23 173:15
**cs1**  1:25
**cs170**  170:25
**cs171**  171:25
**cs7351249**
169:25
**cumulatively**
137:20
**current**  7:13
8:5 21:24 23:3

23:10 31:4,6
31:12,16 34:1
34:3,4,8 44:19
122:16 126:17
142:9 164:9,14
164:15,21
**currently**
17:11 18:5
41:14 83:8
94:7 97:16
123:4,8,11
**customers**  43:1
115:14 116:3,3
116:10,23
117:12,13
118:2
**cv**  1:7 4:17
7:13,15 8:1 9:6
9:8 15:23 16:8
17:7 32:22
**cyber**  13:1,2,3
13:6,7,10,14
13:16,18,19
14:8 18:2
22:25 28:16
33:1 42:19
43:13 45:8,9
45:14,19,22
46:5,13,17,20
47:14 50:16
51:25 52:1,5,9
52:14,15,18,19
53:12 59:18
61:6 69:23,24
70:11,17,17,24
71:2,5 72:16
72:18,20 76:13
84:5,5,8,9,17

84:20 86:25
87:3,7,11,13
87:19 88:19,20
96:20 97:17,19
98:10,16,22
99:15 110:18
115:24 117:3
117:13,15,22
117:25 120:18
129:15,16,25
130:12 132:13
135:13 141:18
143:16 149:1
150:11 153:12
153:23 154:15
**cyberai**  12:25
13:25 14:1,3,4
14:11,18,23
21:3,7,8,17,20
23:25 24:14
25:2,15,19
26:4 27:8,10
27:13,18 28:3
28:4,15,23
29:1,24 30:6
30:10 34:3,9
34:12,20 35:1
35:2,10,10,15
36:3,17,23
38:9 41:15,22
42:3,12,18
46:8,18,21
47:14 49:13
51:23 52:1
53:18,20,24,24
55:19 59:14
60:6 62:24
63:2,17,20,22

**EXHIBIT 1**
**Page 184 of 639**

Roysdon Expert_000184

63:23,25 64:1
64:7,8,10
70:11,13,14
72:21 73:2,12
73:24 74:8,10
74:20 75:5,8,8
75:18,20,24
76:10,12 79:24
83:6,12,14,25
84:14,21,25
90:8,14 91:21
94:5 96:11,13
96:17,20 97:14
98:5,11,15,18
98:23 99:3,3,4
99:6 100:3,24
100:25 105:3,7
105:17 110:16
110:19,22
111:7 115:11
115:15,25
116:1,4,23
117:4 119:21
124:24 125:8
125:23 129:3
129:10,11,13
129:14,20
130:16,19
148:18 149:8
150:11,17
151:9,16 152:8
153:12,18
154:4,10,22
155:1,19,20,24
166:4
**cybercon**
116:13

**cybersecurity**
12:11,12 14:1
14:5 29:4
45:21 74:21,22
75:7 158:10
**cyberspace**
60:18
**cycle** 24:21,25
25:22 41:23
42:4 49:5,11
49:20 50:12
53:3 54:6 56:5
56:8 59:17
61:10,14 81:21
82:3,4,6,7,10
82:25 135:7
150:5 151:25
152:3 159:15
159:17,22,23
163:3,5

**d**

**d** 5:1
**d.c.** 1:16 3:15
**damages** 86:8,9
86:15,17,21,24
87:6,18 90:3,4
90:5,17,20
103:6,10,17,20
104:2 105:9,15
105:20 109:11
109:11,13,13
113:19,23,25
115:2 136:23
139:19 145:16
145:18 146:12
146:14 160:19
161:8,11

**dan** 165:10,12
**daniel** 165:11
**danielle** 1:25
2:5 172:3
**darpa** 25:21
31:9,11 53:11
54:5 60:15
67:23 68:7
69:7,8,13,14
69:20 70:4
71:19 97:19
115:15 126:23
143:14
**data** 7:9 40:22
41:10 47:17,18
47:19,23,24
48:25 49:1,3,7
55:15 104:6
108:1,2,3,4,5
108:17 112:1
131:19,20,21
131:21,24,25
131:25 132:2,2
132:2,4,5,8,10
132:19,23
136:25 137:3
144:23 145:11
148:20,20
152:25 156:14
156:16,18,21
156:22,25
168:1
**data's** 137:2
**date** 65:19,19
169:14 170:25
171:25
**day** 2:1 172:13

**days** 173:16
**dc** 2:3
**dealt** 125:15
**death** 82:16
141:24
**decade** 93:20
**decay** 132:11
**december** 7:17
7:18 8:1
**decision** 59:7
**decisionary**
34:1
**decreased**
80:16
**decreases** 81:7
81:7
**deep** 6:23 38:3
142:8 167:21
**deeper** 38:3
**deeply** 45:11
45:20
**defendant** 5:6
5:11,12
**defendants** 1:9
3:10 89:4,8,13
91:19 92:5
147:3
**defense** 42:12
43:14 63:17
66:15,25 67:21
69:4,6 75:18
76:11 110:14
110:24 144:12
**defenses** 52:23
**defensive** 13:19
45:21 52:14,15
52:16,19 53:12
53:24 54:1

**EXHIBIT 1**
**Page 185 of 639**

Roysdon Expert_000185

69:23 70:17,20
71:6 74:10,23
75:17,24 76:13
76:16,23 77:7
77:10,18,21
78:4,11 83:2,6
83:12,14,25
84:5,8,24
86:25 87:2,7
87:10,13,19,22
88:2,3 90:14
116:7
**define** 10:16
14:3 15:3,5,18
23:16 26:19
33:17 34:25
35:16 76:10
93:22 95:18,19
113:8 127:7
155:10
**defined** 14:4
35:13 93:25
94:3 155:24
157:9
**defining** 37:11
**definition** 15:7
15:18 26:22
48:6,19 63:22
77:2,2,22
130:15 131:22
**degree** 17:3
64:23 84:23
119:1 128:17
135:8
**degrees** 15:25
16:12,16 46:1
118:22,23
119:2,12,14

120:8 128:14
**deliberative**
122:1
**deliver** 158:5
**demands**
109:23
**demonstrations**
142:12
**density** 132:15
132:17
**denver** 3:6
**deny** 60:24,25
130:4
**department**
2:2 3:13 42:12
43:14 63:17
66:15,24 67:21
69:4 75:18
76:11 104:11
110:24 119:5
144:12 168:8
**departments**
99:20
**dependent**
80:21,23
**depending** 77:2
92:21,24 129:8
**depends** 23:16
109:19
**deponent** 169:1
173:13
**deposed** 5:18
**deposing**
173:13
**deposition** 1:15
2:1 4:14 6:25
72:4 114:18
136:16 137:24

168:19
**deputy** 22:4,13
123:8,11
**derivative**
57:23 58:9,20
59:6
**derived** 160:24
**describe** 95:22
121:17 132:7
133:8 135:22
138:17 139:3,6
**described**
29:16 130:14
**describing**
130:10
**descriptions**
136:4
**design** 148:19
**designated**
9:11,13,17
**designation**
8:25 161:6
**desire** 109:22
**destroyed**
125:20
**detail** 121:17
134:7
**details** 68:18
69:25 70:9,12
70:13 99:22
111:18 140:1
140:12 153:9
**detect** 29:5
**detection**
132:14
**detections**
120:18

**determination**
137:14
**determine**
109:10,11
136:22 157:13
**develop** 55:6
77:23
**developed** 99:8
**developing**
38:6 85:16
**development**
33:3 67:22
74:11 85:10
119:20 124:1
125:14 126:20
126:22,23
135:14
**deviate** 109:5
**device** 5:20
**dfar** 110:13
111:18
**dictating**
123:22
**difference** 13:7
13:14 53:23
54:5 87:15
94:16 105:7
**differences**
108:9
**different** 13:11
25:9 31:3,21
35:3 42:20
44:2 48:19
72:22,24 73:3
79:6 80:13
87:4 88:22
92:16 99:8
108:4 115:22

EXHIBIT 1
Page 186 of 639

Roysdon Expert_000186

119:17 125:16
132:10 143:2
148:23,24
164:12
**differently**
87:23
**difficult** 30:15
74:3 116:15
133:1 134:4
**difficulty** 44:22
**dig** 167:21
**digest** 121:18
**digging** 67:15
**direct** 4:3 5:12
22:5,7,11
78:24
**directly** 22:20
23:12,14,15,16
92:23 161:12
163:20
**director** 22:2,4
22:13,14,17
123:8,11
**directorate**
22:23 123:13
**dirty** 137:9
**discipline**
119:17
**disciplines**
13:22 119:23
**disclose** 56:14
**disclosed**
122:25
**disclosure** 4:15
8:17 9:7,10,18
86:3
**discovery** 5:20
7:23 52:23

135:17
**discuss** 58:24
60:20 99:22
134:7 135:9
136:19
**discussed**
114:23 135:19
136:16 137:12
137:23
**discussing**
139:23
**discussion** 16:5
119:22 134:5,6
138:23,25
144:6
**discussions**
165:13
**distinct** 13:15
**distinction**
13:10 77:6,17
78:11
**distinctly** 42:20
**district** 1:1,2
**dive** 38:3
**divided** 54:19
55:3,5
**divides** 137:18
137:20
**division** 1:3
123:17
**dni** 123:21,22
**doctor** 16:14
**document** 7:1
8:15 9:3,4,21
10:4,6,9 26:7
26:13 27:15,23
28:1 34:10
44:24 45:4

71:14,17 81:25
154:21
**documents**
41:7 48:11
71:15
**dod** 41:22 42:3
42:5,6,7 47:15
50:5 51:23
66:3,4,12,20
66:21 72:17
73:12,25 74:21
74:23 75:25
76:14 79:24
82:23 83:2,3,6
90:11 96:8,9
99:4,7,16,18
115:18,20
116:3,23
117:12 124:14
125:17,18
150:12 151:9
151:15 152:9
154:5,22
155:19
**doing** 18:18
25:2 28:2 29:6
29:21,21 36:23
38:20 45:15
49:13 59:18
62:3,4,5 63:23
63:24 64:2,9
70:5 73:7,8
74:9 76:23
88:18,20 98:1
98:2,2,4
104:15 109:6
113:22 116:18
117:2,22

122:24 126:7
126:15 129:14
135:6 138:4
140:22 145:9
147:13 150:4,4
150:6,25 153:5
154:23 166:14
**doj** 168:17
**dollar** 113:8,10
143:19
**dollars** 74:22
**domain** 14:19
14:20 41:15
74:20 84:21
91:21 97:14
127:12 132:12
132:15 134:15
138:13
**domains** 130:1
**dominant**
100:16
**door** 114:21
**double** 8:3,7
40:5,6,7
109:14
**doubt** 92:9
**doubts** 49:23
**dozens** 30:23
30:24 36:14
96:20,21,22
121:2,9
**dr** 1:5,15 2:2
4:2,13 5:2,14
5:18 8:23 9:6
86:7 90:16
118:11,17
144:8 161:7

EXHIBIT 1
Page 187 of 639

Roysdon Expert_000187

**draft** 10:4
**drafted** 7:15
  26:7 32:16
  165:25
**dragged**
  125:20
**drill** 69:25
**dual** 16:18
  119:1,4,5
**duly** 5:3
**duplicative**
  7:23
**duration** 51:4
  51:6
**dynamic's**
  141:15
**dynamics**
  65:16 66:24
  141:11 144:12
**dynamics's**
  141:14

**e**

**e** 1:25 3:1,1 4:1
  4:11 5:1,1
  170:1,1,1
  171:1,1,1
**earlier** 54:1
  71:4,21 78:7
  87:9,10 104:25
  107:16 114:23
  130:8 132:13
  136:16 137:12
  137:23
**early** 20:4
**earning** 10:18
  106:24

**earnings**
  107:21,22,25
**easier** 116:17
**easily** 115:16
**easter** 122:11
**easy** 61:17
  65:12 132:25
  167:5
**economic** 11:2
  11:5,12
**economics** 17:3
  119:16 121:14
  147:10
**economist**
  38:17 147:14
  147:14,18
**economy** 11:9
  147:17
**education**
  16:22 17:8
  45:13,23,25
  46:24 47:1,4,6
  118:19,20
  135:25
**effect** 130:8
  140:3
**effective** 142:9
**effectively**
  18:16 78:6
  127:6,7 129:3
  140:23 161:21
**efforts** 53:7
**egg** 122:11
**eight** 126:9
  148:22 160:15
**either** 101:13
  108:11 111:23
  148:13

**elaborate**
  123:6
**electrical** 16:13
  119:3,4
**electronics**
  119:19
**elements**
  123:23 124:10
**emerging** 52:3
  105:8
**employ** 31:23
  37:24 38:17
**employed** 39:7
  172:9
**employees** 48:3
  48:15 94:6,8
  94:10,12,20,22
  95:1 97:6,8
  100:20 101:10
  141:22
**employer**
  21:24
**employment**
  151:25
**enable** 140:14
**enabled** 105:6
**encompass**
  99:14 117:16
**ended** 19:18
**engagement**
  19:23
**engagements**
  19:21
**engineering**
  15:19 16:13
  18:23 20:13,14
  119:2,4,5,18
  120:22 121:2

  135:16 167:8
**enrichment**
  132:3
**entail** 84:20
**entailed** 84:17
  87:14
**enter** 19:14
  110:5,23 111:6
  115:6 138:12
**entered** 51:7,11
  51:13,16 102:5
  104:17,17,25
  161:2
**entering** 44:22
  109:15,19
**entire** 23:6,22
  156:3
**entirely** 143:2
**entities** 34:24
  50:5 56:12
  97:1,17,20,22
  99:16 125:17
  149:8 156:7
  161:3
**entity** 18:12,12
  18:15 19:3
  143:2
**entrance** 43:10
**entry** 29:7
  43:10,19,24
  44:4,8,15 45:4
  137:24 138:2,3
  138:7,11,14
  139:14
**equivalent**
  140:21 165:1
**errata** 169:8
  173:11,13,16

EXHIBIT 1
Page 188 of 639

Roysdon Expert_000188

**erratas** 173:15
**error** 109:25
  110:4,7 136:17
  136:19,21
  137:1,16
  156:13
**errors** 136:25
**especially**
  138:15 140:5
**espouse** 31:5
  62:23
**esquire** 3:3,11
  3:12 173:1
**essence** 147:16
**essentially**
  134:14 165:3
**estimate** 34:18
  36:2 48:16,17
  96:15 160:16
**estimated**
  86:15
**estimates** 34:10
**estimation**
  120:15
**et** 1:8 41:8
  48:12 124:7
  132:19 152:5,5
**evaluate**
  126:12 127:5
  127:13 129:3
  167:17
**evaluated**
  167:1
**evaluating**
  127:7 135:23
  167:7
**evaluation** 57:5
  167:4,5

**evaluations**
  126:5,11
**evening** 122:18
**events** 122:13
**evidence** 47:17
  56:2 154:18
  155:6,10,14
  157:13
**exact** 134:4
**exactly** 80:25
  92:13 98:2
  104:14 110:15
  128:12,13
  154:7
**examination**
  4:3,4,5 5:12
  118:15 147:3
**examined**
  169:5
**example** 12:10
  27:16 29:2
  31:13 36:20
  37:7,17 40:21
  41:5 44:18
  57:17 58:6
  65:19 66:11,12
  66:14 67:14,23
  100:3 107:11
  110:4 117:20
  119:7,21
  121:21 125:14
  125:17 126:24
  133:16 140:17
  158:3,4 167:6
  167:13,14,16
**examples** 40:24
  148:21 167:13

**exceptionally**
  76:9 97:15
**exceptions**
  125:18
**exclude** 49:1,7
  95:12
**excluded**
  149:24 150:21
**exclusion** 134:8
  135:1
**executive** 31:13
  168:7
**exhibit** 4:14,15
  4:16,17 6:25
  7:3 8:16,20 9:7
  9:20,23 16:8
  16:10 26:7
  86:4 90:16
**exist** 21:8 63:5
  105:8
**existed** 129:12
  130:17 139:16
  150:24
**existence** 17:11
  130:16 149:6
**existing** 109:22
  163:23
**exists** 18:7
  41:14 97:13
  116:16
**expand** 161:17
  163:12,18
**expanded**
  163:14,15
**expansion**
  161:16 163:16
  163:24 164:9

**expected**
  107:14
**expecting**
  107:12
**experience**
  24:8 27:8,10
  27:12,13,22,25
  28:1,2,8,11,15
  28:18 45:13
  141:4 166:15
**expert** 4:15,16
  7:10 8:7,17,25
  9:11,14,16,17
  10:2,11,14,17
  10:25 11:2,6,8
  11:11,18,20
  13:24 15:2,3,4
  15:6,10,14,19
  24:4 26:6 27:2
  27:3 28:18
  43:18 45:6,8,9
  45:10,14 46:5
  46:8,12,13,18
  46:21 47:14
  53:23 54:4
  62:15 75:12
  81:10 82:10
  84:11 86:3,12
  87:23 88:2,8
  88:12 89:2,21
  89:22 90:13
  91:1,12,15
  93:5,9 96:6
  101:9 106:25
  107:17,19,20
  107:22 108:15
  108:22 109:6
  110:3 111:24

EXHIBIT 1
Page 189 of 639

Roysdon Expert_000189

113:1 114:2
115:8,10
130:22 148:25
150:10 153:23
154:1,3,14
155:23 156:14
159:12 161:6
165:15,20
166:7,9
**expertise** 45:23
46:2,17,20
63:13 64:24
87:20 101:20
118:3,5 130:18
135:21 136:8
141:13 142:2,8
153:7,8 159:6
166:10,14
167:21
**experts** 38:21
38:24 117:9
**explain** 83:20
**explanation**
58:22
**explanations**
25:8,10
**explicit** 139:12
**explicitly** 72:7
**exploitation**
135:15 140:19
**explore** 57:7
**expressed**
142:1
**exquisite**
138:13
**extend** 66:16
**extends** 152:4

**extensively**
119:7
**external**
126:21

**f**

**f** 68:23,24
**fa8750** 145:1
**face** 102:25
159:25
**facilitate**
135:17
**facing** 64:12,14
64:15
**fact** 88:4 95:11
113:9 159:16
166:4 167:16
**factor** 3:4
100:16
**facts** 15:21
**fails** 173:18
**fair** 98:12
138:17 139:3
146:2
**fairly** 32:1 53:6
127:3
**familiar** 9:4
96:3 110:12
127:1,3
**famous** 147:14
**far** 18:25 49:16
110:10,16
111:6,14,17
158:16
**faster** 122:17
**federal** 110:8
**felony** 58:14

**fending** 67:14
**fewer** 48:3
**field** 21:3,7,17
21:20 25:14
26:4,19 28:2
28:25 29:24
32:9 34:4,22
40:14 41:3
43:17 45:11,20
46:16,16 51:25
51:25 91:6
93:22,25 94:3
99:15 105:7
116:16 125:7
129:10 144:25
150:17 151:16
166:4,14
**fields** 46:15
142:13,15
**fight** 8:9
**figure** 108:9
109:12 167:8
**figured** 61:16
**files** 133:19
**fill** 125:2
**filled** 125:5
**filter** 62:24
63:3,11 65:6
65:10
**filtered** 65:17
102:16 109:4
143:16
**filtering** 62:22
104:10,11,11
104:12 135:19
**filters** 66:22,23
144:9,11

**finances**
125:16
**financial**
146:14 172:10
**find** 39:4 70:6
116:14 122:13
**fine** 15:8 85:22
114:25 123:15
128:18
**firewall** 37:18
135:14 167:14
167:15,18
**firewalls** 29:3
36:22,25 37:7
37:21,22
**first** 9:5 14:17
15:5,23 26:10
30:6 45:6 47:8
67:24 68:11,13
68:14 144:17
144:20,21
153:17 160:20
160:22
**fiscal** 51:13,21
65:25,25 66:24
73:1,18 75:24
144:13 151:5,8
**fit** 123:1
**five** 12:14,17
12:19,22,24
14:8 28:7
30:20 41:18,21
47:16 48:25
49:11,19 50:18
50:18 51:21
52:4 54:17,19
55:5 56:9,13
59:13,16,22

**EXHIBIT 1**
**Page 190 of 639**

Roysdon Expert_000190

60:3,5 61:23
62:1,17,19
63:16,19,24
64:7 65:13,22
66:17,19 72:15
73:20 75:4,9
76:5,6 78:14
78:16,16,18,24
78:25 86:18
90:2 94:21
97:5,15,17,20
98:14,20,24
103:25 106:3
121:8,16
134:11,24
137:13 140:22
145:6 146:22
150:12 151:16
152:9 153:24
154:2 156:3,3
157:8 158:14
162:19
**fix** 61:11
**fixed** 8:12
**fleet** 61:6
**floor** 2:3
103:16
**flow** 143:17
**flows** 123:21
**focus** 31:19
83:1 84:24
119:5
**focused** 16:18
16:19 119:10
141:17 147:21
147:24
**folks** 32:10,13
130:14 141:21

**follow** 147:2
**follows** 5:3
**force** 24:21,25
25:21 41:23
42:4 49:4,11
49:20 50:11
53:3 54:5 56:5
56:8 59:17
61:10,13 63:21
64:7 69:1
81:21 82:3,6,7
82:10,24 98:25
99:5,7 135:7
143:16 144:1
146:22,23
150:5 151:25
152:3 159:14
159:16,22,22
161:23 162:8,8
163:3,5 164:4
**forecast** 86:21
87:18 105:9
107:3
**forecasted** 86:9
86:17,24 87:6
90:3,20 103:10
103:16,19
104:1 105:15
105:20
**forecasting**
106:24
**foregoing**
169:5 172:4,5
**foreign** 120:19
132:11
**forget** 143:19
151:19

**form** 11:22
33:25 35:23
36:6 41:12
42:19 53:14
55:14 77:3
79:2,13 80:11
84:2 105:25
112:6 114:3
120:12 126:13
128:1,8 129:4
130:20 131:20
139:5,10 142:4
142:21 149:10
150:1 151:11
158:1 159:19
**formal** 46:23
47:1,4,6
118:20
**former** 125:6
**forming** 7:10
**forms** 131:21
**formula** 55:6,8
81:9
**fortunate**
142:7
**forward** 38:5
93:20
**found** 140:20
**foundation**
41:12 79:2,13
80:11 84:2
105:25 112:6
114:3 149:10
151:11 159:19
**founded** 17:20
17:23 19:4,4
**four** 25:9 47:8
78:16 120:3,17

140:21
**franklin** 3:14
5:17
**frequent** 33:14
**front** 133:5
**full** 5:15 47:12
58:2 125:12
165:5
**function** 33:8
**functional**
119:12
**functionally**
22:20
**fundamental**
14:6 119:20
**funded** 69:8,14
69:19 72:5
126:21 142:14
**funding** 34:20
69:2,5,11 78:3
81:23 82:11
124:11 126:19
126:19 142:19
143:1 159:14
159:17 164:6
**funds** 143:21
143:22
**further** 66:8
140:14 168:10
**future** 163:18
**fuzzing** 167:17

### g

**g** 5:1 28:10
**gabbard** 22:17
**gain** 70:1
**gartner** 31:15

EXHIBIT 1
Page 191 of 639

**gathered** 47:17
47:18,21
**general** 24:18
26:22 74:13,14
82:19 98:15,17
98:18 111:15
115:12 117:13
117:15 138:23
**generalization**
44:5
**generally** 22:21
37:6,10 39:7,9
39:11,16 55:23
123:16
**generated**
167:9
**genius** 123:2
**getting** 46:19
60:19 77:5
114:13 155:7
**giti** 19:16,20,24
21:2,6,12,15
21:17 23:25
24:13,21,24
25:2 28:9
102:15,17,19
145:15,25
146:1 160:2
161:12 162:22
163:1,6,7
164:4
**giti's** 102:22,23
**give** 12:10
16:22 36:2
37:17 57:17
61:11,15 65:19
66:5 93:4
96:15 114:13

114:20 131:15
132:3 158:3
164:25 167:13
**given** 64:24
91:7 132:20,23
134:2 141:7
169:7
**global** 19:16
**go** 7:5,12 8:22
12:9 15:25
16:2 36:12
47:24 50:2
57:15 61:19
66:22 67:24
68:15,17 69:10
69:11 81:10
85:24 88:23
90:15 93:3
105:16 114:24
115:1 118:8
121:19 124:7
140:1 142:6
144:4 160:5
165:4 167:13
**goal** 85:18
**godfather** 94:5
130:9
**goes** 84:3 91:11
91:22 124:15
**going** 6:20 16:1
16:7 38:5
43:12 45:6
47:12 57:3,4
59:1 63:15
67:15,20 80:9
85:7,9 90:15
91:24 92:1
104:6 108:13

108:17 110:6
114:14 117:1
125:2 129:11
134:16 138:10
138:24 140:11
145:5,21 150:9
161:4 162:13
162:18,19
163:6 164:23
168:13
**gonzalez** 3:11
4:3,5 5:4,5,13
7:25 8:6,13,14
12:1 16:4,6
24:7,10,22
35:8,12,24
36:7 41:17
53:15 55:17
57:3,9 58:15
58:22 59:1,8
61:3,8,13,18
61:22 64:13
68:5 79:5,15
80:14 84:7
85:22 86:2
94:2 106:1,15
112:17,23
114:6 115:3,5
118:10 126:13
128:1,6 129:4
130:20 134:16
134:20 139:5
139:10 142:4
142:21 144:4
144:17 145:20
145:24 147:2,4
149:12 150:8
151:13 158:2

159:24 160:9
168:10,12
**good** 5:4,14
127:20 128:4
**goods** 26:20
**google** 39:5
**gotcha** 156:18
**gotten** 92:5
**government**
14:21,23 21:25
26:12 28:5,8
31:13 37:23
40:23 41:6,10
47:18,19 48:5
48:11,19 57:25
61:2 82:22
85:7,9,17
88:20,23 90:11
101:22 108:5
115:14,18
116:3,3,10,23
117:12 118:1
122:24 127:21
130:14 131:18
138:24 143:17
144:10,15
146:23 148:14
156:17,21
157:1 164:14
166:15
**government's**
62:11
**gpu** 141:1
**gpus** 94:20
95:3,4 140:3
140:24 141:8
**graduate** 46:2
119:8,8 120:8

EXHIBIT 1
Page 192 of 639

Roysdon Expert_000192

**great** 129:25
144:20
**greater** 127:15
**green** 3:19 5:11
**group** 23:8
59:25 60:2
**growing** 34:4
**grown** 116:17
**growth** 132:10
**gsa** 164:17
**guess** 19:8 29:4
51:1 65:10
66:3 140:14
147:5 155:6
160:10,11
166:23
**guessing**
128:25
**guidance**
148:19
**guidelines**
110:9 123:22
**guides** 148:21
**guys** 57:15

**h**

**h** 4:11 170:1
171:1
**half** 146:18
160:7,10,17
**hand** 172:13
**handful** 117:7
117:8 131:12
131:15 138:20
**happen** 62:11
122:9 137:9
151:1

**happened**
129:19 146:4,7
146:10
**happens** 99:17
**happy** 57:6
**hard** 132:23
**harvard** 27:17
**head** 6:6 39:20
92:13,13 93:21
93:21 95:2,2
**heard** 43:6
124:17 156:13
172:5
**heed** 117:21
**held** 2:2 16:5
73:19 138:15
144:6
**helfrich** 3:4
**help** 10:8 33:25
64:4 84:6
116:18
**helped** 95:9
101:4
**helpful** 49:6
64:5 116:2
**helping** 101:1
**helps** 74:25
87:21
**hereunto**
172:12
**high** 127:12,15
**higher** 164:19
**highest** 69:16
**hire** 94:12
**hired** 21:19
**history** 119:16
**hjb** 1:7

**hnc** 152:4
**hnck** 81:17,18
**hnco** 49:5
50:12 59:17,21
60:3,6,11
64:11,17 65:1
66:3 67:8,11
68:9,10,12
71:22 72:6
73:8 74:9
82:25 86:22
90:12 97:16
98:4 99:9,12
101:19 102:16
102:17,25
104:15 105:18
109:4 115:15
117:2,11 135:7
143:12 145:3
146:23 150:5
151:18,20,23
152:1,1,2,4
154:24,24
155:20 161:23
162:8 163:20
164:3 165:7
**hold** 58:20 59:7
**holds** 109:16
**holistic** 132:3
**honest** 109:17
**hope** 74:25
**horizon** 33:3
**hours** 122:18
**hum** 6:7 144:22
**human** 123:24
**humans** 140:22
**hundred** 73:9
73:11

**hundreds**
34:11,14,15,16
34:17 35:16,17
35:21,25 39:1
73:20,23 96:4
96:7,22,23
115:16,19,21
121:6 133:14
133:15
**hypothetical**
53:10,16 83:19
83:20 114:4
**hypothetically**
78:15,15
113:24

**i**

**ia** 125:4
**ic** 123:24
**icy** 22:24,24
**identification**
7:3 8:20 9:23
16:10
**identified**
59:13 61:5
70:24 73:1
87:18 98:9
113:3 117:24
**identify** 39:21
42:15 62:13
136:4 147:10
**identifying**
154:20
**implement**
130:19
**implications**
152:14

EXHIBIT 1
Page 193 of 639

Roysdon Expert_000193

**implicit** 154:19
**implied** 138:17
**important** 8:7
  36:16,19,22
  49:17 67:17
  87:5 107:2
  155:14
**improve** 31:19
  108:11,12
**imputing** 57:20
**inaudible**
  120:19
**include** 15:19
  22:25 31:4
  32:9 42:25
  43:3,9,18,21
  44:4,7,15 64:3
  77:3 87:2,24
  99:17 109:13
  110:7 119:24
  120:6,15 124:3
  124:6 133:15
  135:2 136:1,2
  143:20 148:22
  158:25
**included** 71:7
  71:10,12,15
  83:9 88:21
  108:16 112:15
  126:16 134:23
  135:4 136:14
  139:17 149:4
  149:18 150:2,3
**includes** 22:24
  23:2 33:9 98:6
  119:18 123:24
  127:15 131:24
  165:22

**including**
  38:20 54:2
  120:4 121:13
  133:21 135:3
  142:9 148:23
**inclusion** 134:8
  135:1
**income** 18:10
  106:4,9,16,18
  106:21,22
**incorporate**
  110:3
**incorrect** 39:24
  157:11
**increase** 80:19
**increased**
  52:24 80:17
  161:18 164:13
**increases** 81:5
  81:6
**independently**
  155:4
**individual** 88:9
  101:1
**indulge** 144:2
**industries**
  13:11
**industry** 11:13
  26:20 39:10,17
  43:1,4 166:16
  166:19
**info** 19:16
**inform** 45:23
  46:1
**information**
  5:21 11:24
  31:15 41:4
  43:18 50:9

  56:18,19,21,23
  57:22,25 58:7
  58:13,14 59:10
  60:8,9,13,20
  68:12 69:9,12
  69:21,23 70:7
  70:15,19 82:18
  109:3 116:11
  122:13 125:25
  137:6,8 148:15
  159:21
**informed**
  114:25
**informs** 28:1
  28:12,18 29:11
**initial** 34:18
**innovate** 95:10
**innovations**
  129:21
**innovative** 95:8
**insatiable**
  121:20
**inside** 122:12
**insider** 29:5
**insight** 70:1
  142:18
**instance** 43:25
  81:15 130:10
  136:21
**instances** 13:6
  20:23
**instruction**
  61:1
**instructions**
  6:15
**integrators**
  93:22

**intelligence**
  22:2,4,14,15
  22:18 23:6,23
  33:1 123:9,12
  123:20,23
  124:1,2,5,13
  124:14 132:17
**intention**
  164:18,20
**interact** 23:19
  23:21
**interest** 172:10
**interested**
  37:23
**interesting**
  122:6,12
**internal** 108:5
  126:20
**interpret** 136:9
**intrusion**
  120:18 132:14
**invalidates**
  151:21
**investigator**
  32:25 33:9,12
  33:18
**involve** 124:20
  124:22,24
**involved** 16:23
  87:17 126:5
  161:20
**involvement**
  161:19
**iq** 122:19
**irad** 126:20
**irrelevant**
  51:20 83:16,18
  97:9,10 159:4

**EXHIBIT 1**
**Page 194 of 639**

Roysdon Expert_000194

**issue**  57:8
**issues**  127:11
**it'd**  36:11
  123:21
**it'll**  66:22
**items**  128:12
  128:14

**j**

**january**  17:20
  17:23 24:18
**jason**  3:3 5:7
  57:3 115:3
  173:1
**jealous**  6:23
**jkp**  1:7
**job**  1:23,25
  22:21 33:13,15
  122:16 152:2
  169:25 170:25
  171:25
**jobs**  140:6,6
**joe**  8:23
**john**  1:5 170:2
  171:2 173:4
**joined**  5:5,10
**joke**  122:12
**joseph**  3:11 5:4
**joseph.a.gon...**
  3:17
**journal**  148:11
  165:24
**journals**  121:9
  121:10,10
  148:8,16
  165:19
**jupiter**  133:16

**justice**  2:2 3:13
**justification**
  126:19,21
**jwareham**  3:8
  173:2

**k**

**katie**  5:5
**katrina**  3:12
**keep**  40:15
  114:11,12
**keeping**  113:7
**key**  65:14
**kind**  6:7 27:17
  65:4,23 98:11
  119:20 121:4
  122:11 123:25
  124:12 128:15
  132:12 136:4
  143:17,21
**know**  6:2,2,3
  8:17 15:4,5,8
  23:15 30:16,17
  30:25 34:7
  35:11,18,22,25
  36:1,16,19,22
  37:18 38:17
  39:11,13 42:9
  42:11,23,24
  43:13,15,17
  46:15,15 48:15
  48:23,24 50:7
  50:8 51:24
  53:5 56:11,11
  56:16 59:23
  60:14,17,21
  61:4 62:5,11
  62:25 63:5

71:10 72:20
74:1,4 75:17
75:21,22,23
76:1,21 78:5
81:2 82:17,23
83:4,7 87:22
94:7 97:16,18
97:19,23 104:1
104:3 105:12
105:14,19
106:13 107:2
107:16 109:25
110:8,13,17
115:15,15
116:15 118:11
126:6,14 127:4
128:12,13
130:17 131:10
137:9 141:10
142:25 143:7
143:24 148:22
157:22 158:14
158:16,21
**knowledge**
  41:13 49:8,22
  52:10 59:21
  60:12 62:17,19
  64:16,19,20
  65:2 71:23,25
  76:8 83:1,5
  97:12 121:18
  130:5 131:13
  131:17 135:20
  135:23,25
  137:6,10
  138:13,15,16
  138:21 142:17
  145:12 146:4,7

147:6 156:5
164:1,5 165:14
165:21,21
**known**  116:13
  130:3,6 147:17
**knows**  45:10
  45:11 78:3
**kudu**  65:6,11
  65:16 66:23
  69:17 91:23
  92:4,7,10,23
  93:1,17 94:6
  94:16 141:10
  141:11,14,15
  144:12

**l**

**l**  68:24,25
**lab**  133:18
**label**  140:10
**labeled**  140:9
**laboratory**
  69:1 144:1
  164:4
**lack**  136:17,19
**laffer**  147:14
  147:17
**landscape**
  31:12 52:17
**language**
  123:16
**large**  23:5
  37:22 43:17
  56:6 74:5,7
  111:12,19
  141:1 149:7,16
  151:8,15
  152:15

**EXHIBIT 1**
**Page 195 of 639**

larger  112:12
112:14 149:24
150:20 156:7
law  119:9
121:9
lawrence  1:25
2:5 172:3
lawsuit  5:21
10:12,15,22,25
11:6,9 15:12
15:13,15
145:15 146:8
lcmc  82:4
leaders  141:10
leadership
141:14,15,17
141:23 165:10
leading  125:9
lean  52:22
learning  33:1
37:25 167:10
167:20
leave  134:17
led  108:9
125:15
left  167:25
legal  173:23
leidos  25:18,24
28:7,11,18,20
29:11 30:2,4
30:14 31:2
32:19,20 33:23
36:13 37:1,8
85:4,6,8,11,15
96:23 97:23,24
98:15 100:4,13
100:14,17,20
100:22 117:20

125:2,3,4
126:3 149:16
149:18 156:10
167:25 168:8
lengthy  15:24
lettering  77:19
level  46:2
63:24 98:7,8
99:18,19
101:22,23
119:9 123:2
127:16 138:21
levels  98:24
leveraging
135:16
life  24:21,25
25:22 41:23
42:4 49:4,11
49:20 50:12
53:3 54:6 56:5
56:8 59:17
61:10,14 81:21
82:3,4,6,7,10
82:24 132:11
135:7 150:5
151:25 152:3
159:14,16,22
159:23 162:15
162:17 163:3,5
light  117:23
likely  92:18,20
limited  117:4
160:21
line  46:7,11
54:23 80:8,21
81:2,4,5,6,6,7
81:23 145:21
170:4 171:4

lines  7:16
list  17:2 66:6
72:3 88:3
listed  39:3
72:16 80:24
86:25 87:12,18
92:10,25 94:7
102:20 105:5
114:2 115:7
listening  6:21
8:6 73:16
listing  45:3
lists  159:14,16
literally  121:6
little  6:20
15:22,24,25
22:1 27:20
28:6 33:4,5
50:24 65:5
68:16 73:15
87:4 88:25
114:22 115:11
129:10 139:22
142:11 147:2
llc  17:8 18:4,6
18:11,12,15,21
18:24 19:2,3,4
19:9 20:6,9
25:12 82:16
94:12 100:10
101:13
located  82:21
locke  117:21
logics  82:16
141:24
long  17:2
160:12 162:17

longer  18:3
look  8:15 26:6
45:2,5 57:7
65:3 66:11,13
69:10,11 86:3
96:23 105:11
108:3,13
121:24 159:12
166:21
looked  70:15
71:18 95:24
159:13 166:17
166:23
looking  31:4
32:22 86:5
121:11 131:24
135:12 136:6,7
lose  91:3
loss  86:8
103:10 107:21
107:22 108:8,8
108:13,14
139:19 161:8
162:1
losses  108:7,10
108:21 109:6
109:13 161:25
lost  89:18,23
91:2 92:11,22
108:1 115:2
139:3,6,11,14
139:18
lot  16:16 38:7
108:2 119:19
120:1,7 124:11
126:24 132:13
lower  79:11
80:2 81:3,4

EXHIBIT 1
Page 196 of 639

Roysdon Expert_000196

83:15 164:21
**lowered** 165:3
**lunch** 59:2
85:23 86:1

**m**

**machine** 33:1
37:25 38:1
167:10
**machinery**
14:6 131:23
**made** 13:10
25:1 54:4
104:21,22
107:3,4,7
138:22 142:8
156:23 160:16
160:20 161:24
165:1 166:22
**magnitude**
160:7,15,18
**major** 124:4
**majority** 85:15
113:9 124:14
**make** 6:4,8 8:3
23:25 24:13
40:4 41:2
49:17 54:4
59:7 61:16
78:10 79:3
89:24 101:12
104:13 107:9
107:12,13
114:7 122:2
137:1 138:11
143:17 155:5
160:3 166:11

**makes** 45:13
46:18,20 53:23
82:18 134:3
**making** 44:5,5
152:14 164:7
166:13
**malware**
135:14,15
**malwear** 29:5
**managed**
143:15
**management**
24:21,25 25:22
41:23 42:4
49:5,11,20
50:12 53:3
54:6 56:6,8
59:17 61:1,10
61:14 81:21
82:3,4,6,7,11
82:25 135:7
150:5 152:1,4
159:15,17,22
159:23 163:4,5
**manager**
111:15
**managing**
142:19 143:2,7
143:11
**manipulate**
29:6
**mantech**
117:21
**mark** 6:24 8:16
16:7
**marked** 7:3
8:20 9:23
16:10

**market** 10:1
11:9,12,25
12:3,4,6,7,10
12:12,18,25
13:2,16,18,20
13:21 14:3,4,8
14:10,17,22
21:19 23:2
26:11,13,16,18
26:19 27:19
29:16,22,23
30:6,9 31:2,3
31:22,24 32:4
32:8,12,14,16
32:23 33:10,19
33:22 34:1,3,4
34:8,24 35:2
35:10,15 36:3
36:12,17,17
37:1,4,8,11,13
38:2,8,12,15
38:18,20,21,22
39:23 40:2,11
40:21 41:18,22
42:3,25 43:3,9
43:24 44:1,1,3
44:7,16,17,18
44:19,21,22
46:5,8,13,14
46:21 50:10,11
50:14 54:10
55:13 56:8
58:10 72:15,25
73:1,3,12,24
75:5,7,10,12
75:16 76:4,5,7
76:10 77:13
83:10,13,24

98:3,12 99:10
104:6 105:4
106:22 110:6
115:12,15
116:4 124:8
126:16,17
129:13,15,16
129:17,20
130:16,19
131:1,8,11
132:24 133:5
133:10,11,11
133:23 136:17
136:22 137:5
138:4 139:7,15
139:17 147:22
147:24 148:4
148:12,25
149:3,4,18,21
149:25 150:2
151:21 153:6,8
155:8,10,24,25
156:1,4,7,10
157:8 159:1
160:4 164:14
165:2,23
**marketing**
130:23 166:24
167:23,24
168:8
**markets** 13:5
13:11,15 46:24
47:2,5,6
120:17 129:3
129:11 132:11
132:12 137:25
**marking** 9:20

**EXHIBIT 1**
**Page 197 of 639**

Roysdon Expert_000197

| | | | |
|---|---|---|---|
| **marks** 122:2 | **mba** 17:5 | **memory** 128:3 | **mine** 92:17 |
| **maryland** 2:6 | **mckenzie** 27:17 | 133:25 | 125:6 |
| 172:25 | 31:15 39:3,8 | **mention** 13:23 | **minutes** 61:12 |
| **master's** 119:2 | 39:12 | **mentioned** | 61:15 |
| **match** 164:20 | **mean** 11:20 | 132:13 136:12 | **mip** 124:13 |
| **material** 119:8 | 12:4 14:20 | 143:24 151:24 | **mirror** 121:12 |
| 133:8 166:24 | 32:2 40:3 45:8 | 165:6 | **missing** 154:17 |
| **materials** 7:6 | 57:6,7,24 | **mentions** | **mistake** 127:9 |
| **math** 16:20 | 89:10 93:14 | 122:10 | **mitigated** |
| 45:17 50:24 | 94:3 95:4,17 | **merit** 136:21 | 113:19,22 |
| 80:6 119:6 | 108:1 115:4 | **met** 62:7,14 | 114:1 |
| 120:4,25 121:1 | 119:12 127:25 | **method** 32:1,3 | **model** 167:11 |
| 121:10 127:4 | 128:4 133:13 | **methodology** | **modeling** 17:1 |
| 133:18 137:13 | 133:14 136:25 | 31:1,23 32:4 | 17:1 20:13 |
| 148:20 160:24 | 137:3 156:24 | 38:17 39:7 | 120:12,13,14 |
| **mathematical** | **meaning** 45:11 | 40:7,13 93:13 | 120:14,15,16 |
| 11:23 12:2 | 95:5 157:18 | 93:15 109:6 | 120:17,17,18 |
| 15:19 18:22 | **means** 78:17,18 | **military** 124:13 | 121:5,11,12,12 |
| 121:5 128:24 | 128:11,12 | **million** 47:16 | 124:9 |
| 133:19 137:17 | 140:24 | 54:8,21,24 | **models** 131:22 |
| 137:21 | **meant** 131:3 | 55:2,12,18 | 133:19 167:12 |
| **mathematician** | **mechanic** | 56:7 59:9 73:9 | 167:22 |
| 122:8,9 129:22 | 119:18 | 73:10,11,12 | **mojave** 17:21 |
| **mathematics** | **mechanical** | 78:17,19,21 | 17:24,25 18:1 |
| 16:24 45:15 | 119:2,3 | 79:8,10,12,17 | **moment** 164:25 |
| 55:9,10 119:15 | **mechanism** | 79:22,25,25 | **monetary** |
| 119:24 120:3,5 | 63:12,13 | 80:3 86:8,10 | 145:18 |
| 120:6,7 | **medical** 121:9 | 90:3,6,20 | **money** 54:14 |
| **matter** 9:10 | **meet** 23:3 | 103:6,11,13 | 90:7 102:16 |
| 11:12 25:5,7 | 62:10,18,20 | 112:13 146:19 | 137:10 143:17 |
| 45:7,9,10,14 | **meeting** 57:17 | 146:21 150:13 | 143:18 160:2 |
| 46:5,8,17,18 | 57:18 | 160:8,10,17,19 | 163:6,16 164:3 |
| 47:14 63:13 | **memorialized** | 161:8,25 163:1 | **months** 160:13 |
| 84:11 87:20,23 | 162:22 | **millions** 34:11 | 160:15 |
| 88:3 101:20 | **memorializing** | 34:16,17 73:5 | **morning** 5:4,14 |
| 135:21 136:8 | 71:14 | 73:20,23 | 65:17 |
| 150:10 153:7,8 | **memorized** | **mind** 16:3 92:3 | **move** 57:4 59:1 |
| 167:21 | 111:17 | 92:9 113:7 | |

**EXHIBIT 1**
**Page 198 of 639**

Roysdon Expert_000198

**moving** 57:21
**mud** 125:20
**multiple** 147:8
**mundane**
132:10

**n**

**n** 2:3 3:1 4:1,1
5:1
**name** 5:4,15
39:2 125:20
165:10
**names** 159:11
**narrow** 44:17
50:14 75:4
79:23 112:14
115:10 116:2
155:8 157:8
**national** 22:2,4
22:14,14,17
23:4 94:1
123:9,12
124:12 132:21
**nature** 71:17
78:1
**navigation**
148:18
**necessarily**
15:20 52:20
67:9 95:14,16
95:17,18 113:8
135:24 136:5
**necessary**
43:21,24 77:24
95:19 126:18
131:13 138:4
153:9

**necessity**
167:24
**need** 6:6,14
12:15 24:5
44:15 52:23
59:2 66:16
78:5 83:17
94:20 103:5
106:12 109:11
110:19,23
111:5 136:5
140:2,2,5
145:11
**needed** 31:18
**needs** 109:23
136:11
**negative**
109:14
**negotiated**
162:10 164:1
**negotiating**
165:7
**neighborhood**
73:9
**neither** 60:24
172:8
**network**
130:12
**networks** 29:8
117:18
**never** 10:24
14:22 100:12
101:14,16
102:25 103:3
**new** 28:25 29:7
38:7 52:2
125:7,7,7
126:15 163:19

**nhco** 117:25
**nice** 164:17
**niche** 98:5
**nip** 124:12,12
124:15
**nodding** 6:7
**normal** 165:2
**northeast** 2:3
**notarial** 172:13
**notary** 2:5
172:1,24
**note** 67:17
135:13 173:10
**notebooks**
133:17
**noted** 112:7,10
**notes** 122:2
**notice** 4:14
6:25
**nro** 124:7
**nsa** 23:8,9
93:23 94:4,5
124:7 130:11
132:8,12
**nuance** 152:11
161:14,23
**nuanced** 74:6,6
117:1 154:23
**nuances** 154:21
**number** 1:6
7:12 8:16
13:22 26:7
34:23 37:21
42:25 43:3
54:8 55:3 58:6
58:7,8 59:9
75:2,21,22
79:10,10 80:8

80:16,22 81:3
81:4,5,6,6,7
83:15 86:4,11
86:15 90:16
94:8 95:18
125:5 126:3
131:15 134:2,4
137:20 140:23
142:13 148:24
160:13 165:19
**numbers** 40:5
40:6 53:22
56:10,15,23
57:1,10,13,19
58:12,15,19
72:13 80:20
103:8 105:11
112:12 137:18
137:19,19,21
**numerical** 17:1
20:14 45:12,18
80:4 101:4
120:15 131:22
**numerically**
126:10
**numerous**
13:22

**o**

**o** 4:1 5:1
**oath** 5:21
**object** 6:12
11:22 128:8
134:16 145:21
**objecting**
114:23
**objection** 24:15
35:23 36:6

**EXHIBIT 1**
**Page 199 of 639**

Roysdon Expert_000199

**[objection - okay]**

41:12 53:14
55:14 79:2,13
80:11 84:2
105:25 106:12
112:6,22 114:3
126:13 128:1
129:4 130:20
139:5,10 142:4
142:21 149:10
150:1 151:11
158:1 159:19
**objectives**  23:4
**observations**
15:20
**obtain**  5:20
16:21 48:7
88:9,19 100:2
119:14
**obtained**  41:10
88:7,13
**occasions**
12:18 125:22
**occur**  104:24
143:1
**offense**  58:14
**offensive**  13:18
29:4 45:21
50:15,16 51:22
51:25 52:1,5,9
52:17,18,23
53:24 54:2
59:14 69:24
70:17,21,24
71:2,6 74:10
74:23,24 76:10
76:13,15,19,23
77:1,2,3,6,11
77:17,25 78:5

78:11 83:2
84:5,9,17,20
87:2,3,11,11
87:24,25 88:4
88:19,20 90:13
97:16,19 98:6
98:6,10,18,21
98:23 99:4,15
116:7,8,24,25
117:3,13,15,25
135:13 141:18
149:1,8 153:11
155:1 166:4
**offer**  75:17
117:21
**offered**  147:23
147:25
**offering**  35:1
35:10 42:12
43:4,13 63:17
**offhand**  104:4
**office**  22:2
68:21 81:12,14
81:23 82:11,11
144:25 145:1,2
152:1 159:14
159:14
**officer**  58:3,4
162:8,8 172:4
**officers**  124:1
**offices**  115:23
**official**  18:12
19:3 146:23,23
159:10 162:9
**okay**  6:6,12,22
7:12,18 8:13
8:19 9:3 10:22
10:24 11:11

12:2,3,24 13:2
13:7,16,20
15:10,14 16:9
16:13 17:3,13
18:8,14,20
19:8,13,13,17
19:20 22:21
24:23 25:12
26:13 27:13,20
28:4,11,14,24
30:24 33:16
34:8,14,17
37:1,15 39:14
41:21 45:5
46:9,23 47:12
47:13 48:4
49:6,15,23
50:1,4,13
51:10,16 52:7
52:11,13,21
53:22 54:12,25
55:22 59:2,22
59:24 60:17
61:18 62:1
63:7,15 65:8
65:12,15,24
66:7 67:4,7,10
67:19 68:1
69:8 70:19
71:10,18 72:1
72:24 73:6,23
74:2 75:15
76:18,25 77:9
77:12,14,16
78:2,14,17,20
78:22,23 79:6
81:8,10,14,20
81:23 82:1

83:1,5 84:12
84:22 85:1
86:11,21 87:4
88:6 89:6 90:4
90:25 91:5,15
92:15,25 94:9
94:24 95:21
96:5 97:22
99:2,21,25
100:14,20
102:8,24
103:12,16,22
104:1,20
106:14 107:6
107:10,24
108:24 109:1
109:15 113:6
113:24 114:15
114:19 115:13
115:17 116:10
116:19,22
117:5 118:8
119:13 127:1
127:24 128:8
129:19 131:5
133:7 134:20
144:14 148:3
149:15 151:19
152:6,13,18
153:2,14,17,20
153:21 154:7,8
154:9,14,25
155:18 156:2
157:11,15
159:12 160:6
161:1,25 162:3
162:17 163:5
164:16 166:10

**EXHIBIT 1**
**Page 200 of 639**

Roysdon Expert_000200

**[okay - patents]**

168:5
**once**  58:1
**ones**  17:19 38:7
83:14 135:4
**online**  39:4
**onward**  20:24
**open**  68:18
**opening**  114:20
**operating**
34:24 36:3,17
36:21 42:2
56:12 59:14,16
76:7 140:13
149:8 151:9
156:7,10 157:8
**operations**
53:12 78:11
83:2,2,25 84:9
84:10,18 87:1
87:7,13,19
88:3 116:24,25
117:17,18,23
118:1 130:12
149:8
**operators**
156:4
**opined**  131:10
**opinion**  7:10
10:17 11:8
19:1 27:7,9,12
27:14,21 29:11
45:5,7 47:7,9,9
47:11,13 75:12
86:7 90:16
96:6 127:1
139:18,18
141:5 150:9,10
152:7 153:23

154:3,15 161:7
165:15 166:7,8
166:9
**opinions**  9:16
15:11,11,20
**opportunities**
13:21 25:20
**opportunity**
45:2 115:2
139:4,7,11,15
139:16
**orchestra**
141:3
**order**  23:15
77:23 78:5,7
107:3 109:11
110:23 111:6
119:13 133:20
137:4 141:20
160:7,11,15,18
**orders**  31:13
**organize**  145:2
**original**  91:11
**outcome**
172:11
**outliers**  131:24
**outlined**  31:25
32:3
**outperformed**
93:20
**outside**  9:16
15:15 38:8
56:5 91:22
113:21 117:24
119:7
**overall**  155:24
**overlap**  99:20

**oversaw**  125:8
**oversee**  22:23
23:5 123:13,25
**overseeing**
24:20 25:19
124:3
**oversees**
123:19
**oversight**
143:21
**overview**  16:22
82:19
**own**  27:7,9
32:16 38:25
135:20 165:16

**p**

**p**  3:1,1 5:1
108:7,8,13,13
108:14,14
109:6,6 123:12
**p.c.**  3:4
**p.m.**  168:20
**p.o.**  3:14
**page**  4:2,13 7:5
8:22 32:22
68:16,18 69:11
81:11 86:4
159:13 160:23
161:7 170:4
171:4
**pages**  1:24
111:18 133:16
**paid**  18:19
24:24 54:14
163:7
**palo**  167:16

**pandemic**
120:16
**paper**  165:23
**papers**  41:8
48:11 121:9,11
125:10 133:14
133:15 165:22
**paragraph**  9:6
86:5
**parenthesis**
112:8
**part**  7:13 27:7
29:3,21 32:20
33:4,13,15
74:5,5 86:22
87:6 124:9
126:15 131:24
134:6 135:2,19
139:17 146:8
152:1 153:20
154:20 159:10
165:5,12
167:15
**partially**  27:25
**particular**
24:18 31:18
40:24 92:17,19
119:22 121:20
128:2,18
140:11 153:7
**parties**  172:9
**partner**  70:7
**parts**  135:3
**passive**  122:1
**past**  92:7
**patent**  125:12
**patents**  125:10
125:11

**EXHIBIT 1**
**Page 201 of 639**

Roysdon Expert_000201

**patriotic**  165:3
**patterns**
   136:12,13
**paul**  1:15 2:2
   4:2,13 5:2,17
   168:19 169:4
   173:5
**pause**  161:15
**pay**  18:7 164:8
   164:10,13
**payment**
   104:24
**payments**
   104:21,22
**peer**  120:24,25
   125:15
**pending**  125:13
**penetration**
   29:3 117:18,22
   135:14
**people**  6:21
   22:16 23:14,18
   23:20,22 32:14
   38:19 75:2
   88:23 95:6,7
   95:19 97:13
   117:6,7,8
   122:11 130:18
   131:10,12
   132:14,15,17
   136:2 138:12
   138:16,20
   140:2,5,15,25
   141:10 158:20
**percent**  91:24
   113:11 126:7
   127:16 128:17
   128:19,21,21

128:22,23,24
129:8 142:7
**percentage**
   72:25 73:11,24
   126:4,10 129:7
**percentile**
   142:1,2
**perform**  20:2
   20:18 21:19
   29:1 32:14
   38:11,15 52:17
   53:7 77:10,23
   105:22 108:14
   117:25 131:14
   131:23 133:10
   137:5 139:13
   140:5 149:21
   167:4,7
**performed**
   13:12 14:7,10
   14:22 20:15,25
   21:5,6 28:4
   29:10,23 30:7
   30:9 33:22
   36:13,14 38:22
   42:1 76:23
   90:2 107:21
   140:6
**performer**
   77:24 139:20
**performers**
   31:10 44:19
   63:1 90:9
**performing**
   14:17 31:1,23
   32:4 33:9,18
   37:5,8 38:18
   38:25 40:10

53:18 85:10
125:9
**period**  20:20
   23:24 24:12
   25:3 47:16
   49:12,19 50:18
   54:11,15,17
   55:2 56:9,13
   60:5 64:7
   65:13,22 66:6
   66:18,19 76:5
   78:18,24 79:17
   80:24 90:2
   98:1 121:7,21
   134:3 139:13
   139:16,20
   144:13 145:8
   150:13,25
   151:2,3,10,16
   153:25 156:3
**periodically**
   20:24
**periods**  121:19
**person**  5:9
   95:11,15,23
   101:21 107:7
   141:6
**personal**  24:8
   27:21 28:1
   47:9,11 48:17
   101:14 166:7
**personally**
   23:19 26:1,3
   63:4 90:5
   103:3
**personnel**  83:4
   110:20,23

**persons**  142:3
**pertain**  24:3
   31:14 41:2
**pertained**
   36:21 122:23
**pertains**
   143:11
**pertinent**
   119:21
**ph.d.**  16:12,17
   16:18,22 119:4
   120:5
**phase**  161:5
**phrase**  121:15
**physic**  120:14
   121:22
**physical**
   120:13
**physicists**
   122:8
**physics**  119:9
   119:16
**pi**  33:3
**picture**  132:3
**pieces**  122:13
**pinpoint**  134:4
**placed**  156:21
**plain**  123:16
**plaintiff**  1:6
   3:2 5:8 8:22
   118:15 168:18
**plaintiff's**  5:8
   8:16
**planning**  161:4
   165:4
**plant**  132:11
**play**  7:24 127:8

**EXHIBIT 1**
**Page 202 of 639**

Roysdon Expert_000202

**please**  5:15
24:10 35:8
66:23 83:22
101:3 112:25
121:17 144:8
**plus**  118:1
**point**  34:12,19
35:4 39:14,19
127:20 155:22
162:6
**policies**  123:17
**policy**  22:23,24
123:13,19,20
123:21,22
132:21
**political**  119:17
**pop**  57:8
**populating**
144:11
**portfolio**  23:5
124:2,10,16
**portion**  136:16
137:23
**position**  23:10
31:16,17 33:2
33:3,20 77:8
142:10
**possibility**  92:3
160:21
**possible**  50:6
50:23 51:1
62:9 64:22
72:14 82:14
88:18 92:12
114:5 123:18
134:7 157:19
**possible's**
64:23

**posting**  122:14
**potential**  11:25
12:3,10,12
13:21 18:19
34:2 108:6
132:18 146:21
**pre**  129:11
**precise**  73:10
**precisely**  32:11
163:17
**predates**  28:16
28:16
**predecessor**
19:9
**predominately**
82:23 87:3
98:6 149:5
**premise**  57:5
83:16,18
145:22
**premised**  27:1
75:13 155:23
155:24
**preparation**
18:19 133:5
**prepare**  133:9
**present**  3:19
125:19 162:22
166:3
**presentation**
25:1 33:25
163:18,19,21
**presentations**
23:25 24:2,3
24:13,17
125:16
**presented**
24:19 41:5

125:21
**presently**
149:11,13
**president**
25:18 28:20
125:4
**pretty**  8:7 57:5
122:6
**previously**  7:22
14:7 30:2
129:23 144:23
**pricing**  162:10
**primarily**  18:2
82:22
**primary**
102:25
**prime**  67:17
100:6,12,15,23
101:14,16
102:3,6,11
103:3 109:16
109:21 110:15
110:19,22,25
111:3,5,6,12
111:16,19,24
112:2,4,8,10
112:15,15,21
113:2,5,7,10
113:11,12
**principal**  22:13
32:25 33:9,12
33:18 123:8
137:18,22
**prints**  123:20
**prior**  20:18
28:15 109:21
129:12,13
134:6 158:19

**private**  84:15
85:2,12 148:13
**probability**
16:20,25 45:17
108:7 119:6
128:10 148:20
**probably**  50:24
63:25 85:20
91:8 108:8
127:9 131:16
**problem**  57:15
57:23 58:21
59:5,6 61:8
108:2 157:22
**problems**
129:25
**proceeding**  2:4
155:15
**proceedings**
172:4,6
**process**  109:15
109:18 127:2
**processing**
143:13
**produce**
157:18
**produced**  7:22
7:24 8:2,5,10
8:11 147:12
**product**  37:14
38:4 77:21
**products**  17:25
18:20 37:9,12
52:5,9 60:6
75:18,25 76:11
76:14,19 78:4
78:6 85:5,6,8
85:12,16 99:11

EXHIBIT 1
Page 203 of 639

Roysdon Expert_000203

99:14 158:22
**professional**
123:4 124:1
**professionally**
45:19
**program**  24:19
**programs**
24:19 76:14
124:4,4
**projected**
103:6
**projection**
144:3
**projects**  25:9
25:10,11 69:6
91:21
**promise**  158:5
**promised**
162:5,7
**promotion**
123:15
**proper**  140:4
**proposal**  25:21
**proposals**
25:23,24 30:11
125:24 126:2
**proposed**  140:8
**prospective**
138:8
**provide**  12:13
18:1,21 20:12
29:7 33:23
41:7 42:3
49:20 50:5
52:5 78:6
82:20 122:3
129:7 158:5,22

**provided**  9:6,8
11:8,18 15:14
20:20 21:15,16
27:15 34:10
47:17 48:9
60:6 80:20
84:14 85:2,12
99:15 154:18
155:7,11,14
**provides**  10:17
**providing**
51:22 60:11
63:20 85:5
112:9 132:18
153:23 154:3
154:15 158:6
166:25
**province**  36:24
**provisional**
125:11
**public**  2:6
55:16 56:21
60:8 68:12
69:21 116:11
116:14 130:6
166:22 172:1
172:24
**publically**
56:10,17,19
59:9 60:12
64:12,14,15
69:9 80:24
109:3 116:12
122:15 124:16
125:21 135:8,9
135:22 137:4,7
148:5,16
159:20

**publications**
121:1,4 165:16
165:20
**publicly**  11:24
**published**
120:21 130:17
130:21 131:2
148:3,5,8,11
148:16 164:14
165:18
**pull**  50:1
**pulled**  49:3
**purchases**
124:6
**purple**  117:17
**purport**  62:24
98:22 167:15
**purported**
159:8
**purporting**
64:1
**purposes**  77:13
**put**  5:21 112:8
125:21 142:2
145:22 149:4
**putting**  10:8
44:23
**python**  133:17

**q**

**qualifier**  153:2
**quantify**  30:15
**quantity**  90:7
137:21 146:16
**quarter**  120:4
**question**  6:1,15
9:12 11:4 13:9
15:24 23:11

24:9,11,15
26:17 27:10
34:25 35:6,7
37:16 42:21
43:12,16 44:10
47:3 49:6 64:4
73:3,13 74:3,6
79:3 80:25
83:17 84:4
87:4 89:9
91:11 92:8,8
93:8 106:13
110:21 112:17
114:24,25
115:9 128:2
131:7 141:24
145:22,23
154:6 155:12
162:23 165:17
167:25
**questioning**
145:21 160:1
**questions**  5:22
6:13 114:12
118:10 147:1
168:10
**quicker**  50:24
**quite**  56:6
**quote**  157:23

**r**

**r**  3:1,3 5:1
68:24,25 170:1
170:1 171:1,1
173:1
**raise**  164:23
**raised**  164:24

**EXHIBIT 1**
**Page 204 of 639**

Roysdon Expert_000204

**range** 64:23
66:12 86:8
103:9 119:15
123:1 161:8
**rapidly** 34:4,21
**rate** 109:25
110:4,7 136:17
136:20,22
137:16 156:14
164:8,9,13,17
164:19,21
**rates** 164:14,15
164:21,23,24
165:1,3
**rather** 17:7
82:7 122:12
167:5
**rayeon** 117:21
**reached** 54:21
79:20
**read** 24:10
26:10 35:8
39:18 45:6
47:12 48:8,9
81:25 86:6
112:17 121:6
121:22 122:4,5
122:7,17 133:5
133:14 147:8
147:11 150:9
152:6 155:2,4
168:13 169:5
173:9
**reader** 121:19
122:1,2 147:12
147:15
**reading** 27:2
77:19 81:17

121:8,24
133:23 154:10
**reagan** 147:18
**real** 77:6 121:5
**realize** 115:10
**really** 6:8 60:3
74:1,4 99:10
129:13,18
**reason** 6:17
33:5 91:18
170:4 171:4
173:11
**reasonable**
51:3 64:23
**recalculate**
104:3,5
**recall** 12:16
19:22 27:4,5
30:25 38:10
39:22 40:19,20
44:23 45:1
46:15 48:18,22
48:24 49:16
51:5 53:9
60:16 71:4,9
72:9 82:12
85:14 96:14
108:23 143:4
147:15,19,20
149:23,23
159:9,11 160:6
160:11 162:20
165:14
**receipt** 173:17
**receive** 23:22
**received** 18:10
18:13 38:14

**recent** 19:15,16
**recently** 20:3
123:24
**recess** 61:21
86:1 118:9
**recognize** 9:20
39:11 144:14
**recognized**
39:7,9,16
**recollection**
20:5 135:6
156:9 157:5,10
158:18 162:20
**record** 5:16 6:9
7:21 16:2,5
47:13 61:19,20
85:24,25 86:6
118:8 144:4,6
144:10 145:22
168:15
**recruited** 101:8
101:17,20
102:14
**red** 117:16
**redefine**
107:20
**redirect** 4:5
147:3
**reduced** 172:7
**reference** 40:12
122:9
**referenced**
34:23 155:6
173:6
**references**
27:15,16 32:23
48:11

**referencing**
42:18 128:2
153:11
**referring** 28:9
47:19,23
102:21 161:11
161:15
**refine** 11:4
40:25 42:16
63:22 64:4
66:5,8 67:12
152:21
**refinement**
89:9 152:2
**refining** 37:13
38:25 115:9
**refusing** 24:5
**regarding**
138:24
**regardless**
94:16
**registration**
111:8
**regular** 33:13
33:15,17
**regularly** 63:1
**regulation**
110:9
**reinforce**
108:10
**related** 120:22
127:11 129:11
146:5 161:22
172:8
**relating** 161:12
**relation** 106:23
**relationship**
109:21,22

**EXHIBIT 1**
**Page 205 of 639**

Roysdon Expert_000205

163:1,3
**relationships**
161:2
**relative** 63:23
74:14 106:22
121:13 134:9
139:23
**release** 57:16
58:1
**released** 70:4,4
**releases** 70:4
**relevance**
27:18 106:22
**relevant** 50:9
51:17 76:2
106:6,7,8,11
106:21 109:8
150:6,7 160:4
**relied** 38:24
82:9 83:24
165:21
**rely** 57:19
165:16,19,24
**relying** 26:23
135:23 166:10
**remain** 80:4
**remediation**
29:6 135:18
**remember**
122:4 137:14
137:25 138:23
139:23 142:15
160:13
**remodels**
131:23
**remove** 66:20
72:10 83:24

**removed** 83:12
83:23
**rendering**
165:15,20
**repeat** 24:9
93:24 162:23
**repeatedly**
134:11
**rephrase** 26:17
**replicate** 65:23
**report** 4:16
10:2 13:24
15:2,3,4,6,10
15:19 22:5,7,9
22:12,13,19,20
26:6 28:19
30:6 43:18
45:6 46:12
53:23 62:15
65:5 81:10
82:10 86:12
88:2,8,12,14
89:2,6,10,21
89:22,25,25
91:1,12,16
93:5,9 94:8
105:23 106:25
108:15,22,25
109:7 110:3
111:24 112:1,5
112:7,21 113:1
113:3,13 114:2
115:8,10
124:10 130:17
130:20,22
145:7,10
148:25 150:21
155:23 156:14

156:23 157:6
159:12 165:15
165:20
**reported** 137:2
137:3 156:16
156:21
**reporter** 2:5
6:8 24:12 33:6
35:9 61:20
85:25 112:19
168:15 172:1,3
**reports** 15:14
22:7,11 41:6
**represent** 5:6,7
55:12 72:16
73:1,12,24
75:4 76:15
126:11
**representation**
70:23
**representative**
75:10 152:25
**represents**
55:15 132:4
153:15
**repurposing**
143:18,21
**request** 25:21
125:25 126:2
**requested** 7:6
**requests** 7:13
109:23
**require** 38:2
95:14
**required** 77:22
95:20 96:23
**requirement**
60:24

**requirements**
23:4 95:24
110:15 111:14
124:8
**requires** 29:21
84:5 87:10
153:9
**requisite** 97:12
**research** 10:6
17:21,24,25
18:18 25:19
27:18 28:21
29:21 30:12
32:6,7,8,10,20
33:2,3 36:24
41:4 48:14
53:7 63:2
67:22 69:1,6
70:6,18 74:11
76:24 77:4,8
77:10,12,23,25
85:10 101:24
125:9,22
126:15,19,20
126:21,22
144:1 147:13
148:18 164:4
**researched**
38:19 39:1
**researching**
104:13
**resource** 39:14
148:12
**resources**
148:9
**respect** 10:17
38:14 143:4

**EXHIBIT 1**
**Page 206 of 639**

Roysdon Expert_000206

**respond**  25:20
**responding**
    31:8
**response**  37:5
    114:13 127:21
    134:17 136:10
**responses**  6:6,8
    125:24 126:1,2
**responsibilities**
    22:22 95:22
    126:16 162:4,6
    162:7,11,14
**responsibility**
    5:23 23:7
    33:19 161:22
**rest**  121:16
    131:25 154:20
**restate**  23:11
    35:7 73:14
    155:12 165:17
**result**  80:8
    122:24 132:22
**resulted**  139:19
**results**  122:21
    122:23 140:20
**resume**  7:15
    8:1
**retrospective**
    138:9,10
**return**  170:3
    171:3 173:13
    173:16
**revenue**  12:6
    18:9,13 34:2
**reverse**  135:16
    167:8
**review**  27:17
    57:16 58:2,25

125:15 127:10
134:1 152:2
173:7
**reviewed**  9:3
    96:22 120:24
    120:25 133:8
    133:20 159:9
**reviewing**  8:18
    40:10 133:16
    144:23
**reviews**  122:15
**rfi**  125:25
**rfis**  125:25
    126:1
**rfp**  25:20 31:8
    36:20,22 70:3
**rfps**  37:5 62:6
    126:2 136:10
**right**  6:13 8:15
    17:9 39:21
    40:17 50:22
    55:4 56:20
    57:8,15,16,20
    57:25 58:2,24
    61:16 65:18
    66:18 67:6,13
    67:16 68:7,17
    70:16 76:16
    77:13,15 79:18
    82:3 85:5 87:8
    87:13,15 94:23
    97:6 99:2
    100:15 102:22
    103:7 104:25
    115:15 134:22
    134:24 135:20
    153:17 154:10
    154:12 155:2

159:11 166:5
**riots**  132:15
**robert**  3:19
    5:11
**roe**  1:5 8:23
    170:2 171:2
    173:4
**roe's**  9:6 86:7
    90:16 161:7
**role**  96:23
    132:9 160:21
    161:20,20
    168:7
**roles**  95:22
    123:4 125:2,5
    126:16
**room**  119:11
**rough**  16:22
    160:7,11,14,18
**roughly**  19:18
    31:6 145:10
    161:17
**routed**  164:3
**roysdon**  1:15
    2:2 4:2,13 5:2
    5:14,17,18
    17:8 18:4,11
    18:15,21,24
    19:2,6,9 20:6,9
    25:12 100:10
    101:13 118:11
    118:17 144:8
    168:19 169:4
    173:5
**rule**  37:24
    167:12,18
**rules**  167:11

**run**  118:20
    119:13

s

**s**  3:1 4:1,11 5:1
    170:1 171:1
**safety**  108:12
**sam.gov**  70:3
**sam.gov.**  70:3
**san**  1:3 82:21
**saying**  31:21
    35:14 40:15
    42:10 46:4
    55:18 57:20
    58:11,17 64:21
    64:22 90:4
    92:21 103:12
    117:10 136:5
    137:8 154:1
    161:1
**says**  8:22 9:6
    34:19 44:21
    67:3 68:18,21
    68:23 69:2
    81:23,24 82:4
    82:5 90:16,19
    145:1 154:18
    159:13,25
    167:6
**scale**  37:22
    94:19 95:1,6,7
    133:1 140:23
**scales**  95:2,4
**scaling**  135:17
    141:8
**scenarios**  121:5
**scholarly**  26:23
    39:15,18 148:8

EXHIBIT 1
Page 207 of 639

Roysdon Expert_000207

148:11
sci 90:13 98:7
   98:23 99:18
   101:22
science 22:24
   108:1,3,17
   119:17 124:3
   148:20,21
scientific 64:24
scientist 33:2
   125:5 131:19
   131:20 132:5,8
   132:23 168:1,4
   168:5,7
scientists 108:2
scope 50:14
   79:23 112:14
   114:11,12,24
   123:16 161:19
   163:12,14,15
   163:18,24
screenshot
   81:11
scroll 144:22
seal 172:13
search 37:13
   39:5 42:14,16
   65:14,17 69:17
second 16:3
   69:10 86:4
   144:5 146:25
   153:20
secret 90:12
   138:21
section 45:5
security 13:19
   23:4 58:3,4
   94:1 110:19,23

see 7:13 45:3
   46:4 58:11,17
   58:20,21 65:22
   67:21 68:21
   81:11,16,18,19
   89:21 90:17,21
   115:23 128:20
   136:13 144:25
   151:22 153:18
   157:13
seeman 3:12
   5:5,10 16:2
   61:19 68:2
   85:24 93:24
   168:17
seems 37:19
   121:17
seen 7:1 158:7
   158:9,10
segment 12:6,7
   37:14,14 41:22
   44:20 156:1,4
   156:8,11
select 59:22
   144:20
selected 49:18
   50:4 75:9
   79:11 86:19
   94:22 97:6
   144:15,17
   158:14
selection 62:14
   149:5
sense 6:4 18:6
   71:5 79:3
sent 131:4
   173:14

sentence 9:5
   26:10 47:12
   86:6 90:15
   152:6,12
   154:20 155:5
   155:15
separate
   114:18
series 119:8
   137:18,19
served 10:11
   10:14,24 11:2
   11:5,11
services 17:25
   18:2,20,23
   20:12 35:2,10
   41:22 42:3,12
   43:4,14 49:20
   50:5 51:22
   60:6 63:17,20
   99:11,14
   117:22 166:25
set 7:23 37:9
   48:25 49:2,3,7
   77:12 119:23
   122:22 132:2,2
   172:12
sets 58:24
   62:10
seven 126:9
several 12:18
   12:20 19:7
   22:6 25:3,4,16
   25:20,22 27:16
   30:4,5,13
   35:11,13,16
   39:4,18,18
   40:5,20,23,24

45:20 46:1,3
   64:1 73:9,9,11
   74:21 76:20
   82:24 84:4
   85:18 93:7,8
   93:19 95:8,9
   101:5 107:25
   115:16,19,20
   116:13 119:2
   119:22 122:18
   125:10,24,24
   126:1,1 130:2
   133:24 143:14
   146:21 151:24
shaking 6:7
sheet 169:8
   173:11
shifting 134:5
short 61:21
   118:9 160:6
shorthand 2:5
   172:1
show 6:24
   32:23 56:2
   65:6 66:22
   151:23
showing 167:2
side 52:23
   111:16
sign 168:14
   173:12
signals 132:16
signature
   169:14 170:25
   171:25 172:22
signed 163:24
   169:8 173:19

EXHIBIT 1
Page 208 of 639

Roysdon Expert_000208

**signets**  132:16
**significantly**
    161:18
**similar**  31:5
    38:6 39:5
    41:15 59:18
    62:4 63:24
    73:8 74:8 97:1
    131:14 135:5,6
    135:10 150:4
    159:9
**similarly**  6:2
    45:19 167:23
**simple**  42:14
    81:9 108:1
    109:24 137:17
    137:21 164:6,6
**simulation**
    17:1
**single**  39:19
    93:3 104:13
**sir**  79:14 83:17
    90:18
**sits**  34:13
**sitting**  42:10
    105:12,14,19
**situation**  97:1
**six**  25:9 66:17
    125:10,11
**size**  31:6 58:10
    94:17,19
    139:23
**skill**  62:10
**slow**  16:1 33:4
    33:5
**small**  47:15
    48:1,2,12,14
    48:20 51:24

59:25 63:8
74:3,5,19,20
74:23 75:2
76:9 82:21
97:15 98:5
149:1,5 150:11
150:16,23
151:1 152:8,15
152:16,20,22
152:24 153:2,4
153:20,24
154:4,11,15
155:19 156:1,7
**smaller**  51:25
    58:7 74:24
    97:3,8 111:22
**software**
    119:19
**sold**  26:21
**solely**  111:24
**solicited**  99:11
**soliciting**
    166:18
**solutions**
    173:23
**somebody**
    90:12 125:21
    130:9,11
**sorry**  19:25
    21:15 23:10
    24:24 33:7
    34:11 36:8
    73:10 89:1
    93:24 96:19
    97:4 102:4
    106:2 110:18
    110:21 123:11
    131:3,21 146:6

153:6
**sort**  33:25
    62:23 63:12
    70:12,13 88:24
    93:13,14
    111:15 113:22
    117:19,22
    122:3 134:14
    141:2 158:18
    167:9
**sorts**  120:13
    133:14
**sound**  50:22
**sounds**  51:3
**source**  26:24
    40:22
**sources**  27:2,3
    38:24 106:5,10
    106:17
**space**  36:21
    52:2,3,22
    56:12,14 59:14
    62:11,12 63:6
    63:25 75:3,3,5
    93:22 95:10
    97:11 110:16
    110:19,23
    111:7 115:18
    141:6 149:2
    150:25 157:17
    157:20,23
    158:8,10,11,13
    158:18,20,23
**span**  121:22
    131:17 133:13
    134:2,11
**speak**  6:20
    17:22 61:9

73:15 88:25
**speaking**  22:21
    37:6 55:23
    113:24 144:15
    145:10
**speciality**
    87:11 118:3,4
**specialized**
    75:10 76:4,7
    117:11
**specific**  12:15
    14:19,20,21
    22:1 26:23
    27:21 31:22
    32:15 36:19,21
    37:9,11,12,13
    40:19 41:23
    45:3 49:13
    50:11 51:8
    63:1 64:8
    74:10,12,17
    76:14 98:3,5
    98:11 99:10
    103:23 117:3
    117:11,24
    135:11,12,21
    151:1,17,19,22
    154:23 155:20
    165:22,23,24
**specifically**
    28:15 30:8
    35:4 36:23
    42:5,17 45:21
    46:7 49:3,5,14
    50:12,15 53:20
    54:14 56:5
    59:17 62:5,6
    62:25 70:1,12

**EXHIBIT 1**
**Page 209 of 639**

Roysdon Expert_000209

70:13 72:18
73:7 74:24
76:12 77:19,21
79:24,24 82:25
87:24 90:10,11
90:11,12 96:20
97:14 98:1,7,7
98:24 99:18,19
101:22 104:12
105:6,17,17,18
109:2,4 115:19
115:20 117:1,3
119:10 121:12
123:12 130:11
130:12,13
133:4 134:8
135:7,16
137:12 138:14
150:3 152:3
153:5,10,12
154:24 155:1
**specifics** 70:8
136:5
**speculate** 56:6
103:18
**speculation**
36:11 103:18
**spending** 65:3
70:16,20
**spillage** 58:13
**stand** 153:13
**standard** 32:4
**stands** 143:25
**starnav** 20:1,4
20:10,12,16,18
20:25 101:5,6
101:10

**start** 6:24
16:12 65:6
67:24 118:19
149:13
**started** 17:9,13
31:21 129:23
145:9
**state** 2:6 5:15
27:18 46:7,9
46:12 60:8
79:14 87:22
91:25 92:2
111:4 112:24
134:17 151:12
166:2 172:25
**stated** 40:19
54:1,22 72:7
76:22 78:7
87:10 88:16
139:18 160:22
**statement**
90:23 138:11
140:1 150:14
153:3 161:24
**statements**
164:7 166:13
**states** 1:1,8
3:13 5:6 21:25
26:12 77:20
88:14 103:9
159:21 166:24
170:2 171:2
173:4
**stating** 58:12
139:12,15
**station** 3:14
**statistical**
20:13 121:11

**statistics** 16:25
45:17 120:9,10
120:11,11
**stenographic...**
2:4 172:6
**steps** 40:1
**stout** 3:5
**street** 2:3 3:5
**stretch** 133:22
**strictly** 70:10
87:22 90:1
108:25 154:22
154:22 161:19
**strike** 21:15
131:7
**structures**
119:18
**studied** 38:19
45:20 119:6,7
119:13 120:12
122:19,22
133:4
**studies** 47:24
54:23 96:25
97:7 133:14
**study** 61:23
64:25 86:14
119:15,16
120:9 122:21
**studying** 46:2
119:14
**stuff** 120:19
122:4
**subagency** 69:2
69:5,6
**subcontract**
99:23,24,25
100:2 109:16

109:19
**subcontractor**
23:24 24:13
67:20 102:19
109:20 111:2
**subcontractors**
112:11
**subcontracts**
25:14 26:4
100:5 112:4,20
113:2,4,7,9,12
113:13,16,18
114:1,8 115:7
**subfield** 26:19
40:24,25 41:1
41:2 51:24
**subject** 9:10
25:5,7 45:7,9
45:10,13 46:5
46:8,13,17,18
47:13 63:13
84:11 87:20,23
88:3 101:20
135:21 136:8
143:5 150:10
153:7,8 167:21
**subjects** 119:14
**submit** 65:17
**submitted**
32:19
**subpar** 157:18
**subpoena** 7:7
**subsection** 23:8
**subsequent**
161:2
**subset** 37:23
63:8 74:10,23
74:24

**EXHIBIT 1**
**Page 210 of 639**

Roysdon Expert_000210

**successful**
   31:17
**suffer**  145:16
   146:12
**suffered**  86:7
   90:17 146:14
   161:7
**sufficient**
   145:11
**suite**  3:5
**summarize**
   138:25
**summary**
   15:10 122:3
**summers**  120:5
**supervise**
   23:12,14,17
**supervision**
   172:8
**supporting**
   41:6 137:13
   156:23
**supports**  27:13
   39:15 41:4
**sure**  8:4 9:13
   11:5 16:4
   23:12 24:10
   26:18 32:25
   35:1 40:4 41:2
   43:8 48:3
   49:17 68:20
   73:17 79:16
   86:7 101:12
   104:14 105:1
   110:22 111:4
   111:17 123:7
   135:8 140:4
   151:14 155:13

   162:25 163:25
   165:1,18
**survey**  54:10
   126:17
**sustained**  90:5
**switched**  168:6
**sworn**  5:3
**system**  167:19
**systems**  23:1
   29:7 119:19
   120:23 148:18
   148:19

─────── **t** ───────

**t**  4:1,1,11 28:10
   170:1,1 171:1
   171:1
**tab**  68:2,4,19
**tainted**  57:15
**take**  6:3 8:15
   16:21 26:6
   40:1 45:2,5
   65:3 85:20
   86:3 116:19
   122:2,15
   159:25 161:21
   167:6
**taken**  38:11
   61:21 86:1
   118:9 172:6
**takes**  67:15
   136:8 137:18
   137:19 167:21
**talk**  17:8 56:25
   59:2 121:11
   133:4 134:22
   138:22 142:11

**talked**  25:12,12
   32:11,13 48:25
   65:5 78:14
**talking**  32:24
   33:4,5 57:12
   76:4 125:22
   129:10 130:23
   145:14
**talks**  154:21
**targeted**  37:2
**targeting**  36:24
**taxes**  18:7
**team**  25:19
   28:21 29:1
   117:17,17
   125:7,8,9,15
**tech**  19:16
**technical**  25:7
   25:10 101:8
**technique**
   38:25 40:10
**techniques**
   13:19 29:3,5,7
   37:25 38:2,23
   39:3 40:14,15
   42:20 108:10
   108:11,12,16
   108:18 129:24
   129:25 130:2,3
   130:4,5 133:18
   135:14,15,15
   135:16,18,18
   136:6
**technologies**
   23:3 26:20
   92:16 100:5
**technology**
   22:25 31:5,16

   31:19 32:10
   92:13,17,19
   93:19,21 95:19
   99:8 124:3
   125:7 129:8
   136:6 159:5
   163:20
**telephone**  3:7
   3:16
**tell**  5:23 6:17
   11:17 13:16
   15:17,25 24:2
   25:17 69:22
   70:16 82:15
   83:21 101:3
   102:13 107:24
**telling**  75:6
   87:14 99:2
   152:19 163:10
**tells**  6:14 70:20
**ten**  117:14
   118:1 128:11
   128:12,13,14
   133:1,24
**tens**  35:16,17
   35:19
**term**  12:4
   13:24 75:8
   151:22 152:16
   152:20,22
**terminated**
   163:17,22
**terms**  73:1
   136:3 162:10
**testified**  14:7
   36:13 73:18
   147:5 162:25
   165:18 166:2

**EXHIBIT 1**
**Page 211 of 639**

Roysdon Expert_000211

testifies  5:3
testify  156:13
testimony  33:8
  39:6 41:9
  46:19 49:9
  52:4,6,7 53:1
  56:7 57:21
  59:12 60:4,10
  63:16,19 64:6
  64:9 72:5 77:5
  84:10 88:1,6
  94:25 105:2
  149:7,14 151:5
  151:14 155:13
  156:2,6 158:19
  159:15 163:11
  169:5,7 173:9
  173:17
testing  117:18
  117:22
texas  1:2 18:13
  19:3,3
textbook  39:15
  121:25 122:17
  147:21,23,25
textbooks
  39:19 120:21
  120:24 121:7,8
  121:16 147:8
  147:11
thank  5:14
  75:1 115:9
  118:11,14
  146:12 168:11
  168:12
that'd  126:23
theoretical
  119:9 121:22

theory  16:20
  16:25 45:12,17
  119:6 128:11
  148:20
thing  28:6
  81:24 98:2
things  15:21
  23:2,5,22 29:2
  29:8 31:18
  38:2 40:25
  48:8,9 120:16
  120:16 121:13
  124:7,11,17
  126:3 129:23
  132:9,10
  133:20,21
  134:2 148:24
  154:22,23
think  7:24 24:3
  31:25 32:9
  34:14 35:13
  36:13 37:17
  43:21 65:25
  66:13,15,17,21
  67:4,16 78:17
  85:20 86:4
  92:12,21 93:1
  94:7,21 99:2
  103:9 106:7,8
  106:11,20
  107:2 115:1
  116:25 117:10
  124:15 128:22
  130:2 139:11
  141:7 143:22
  146:25 152:11
  153:14 154:17
  154:19 155:4

161:1 164:17
  165:6 166:2
third  68:4,6
  81:11
thirst  121:20
thought  8:10
  30:5
thousand
  107:12
thousands
  98:17 111:18
  140:24,25
threats  29:6
  132:19
three  35:14,14
  69:16,19,22
  71:7,18,19
  72:10,11
  122:22 131:16
  144:17 162:19
threshold
  128:24
thursday  1:17
tightly  138:15
time  7:15 14:17
  18:10,14,18
  20:20 24:20
  41:15,24,25
  42:1 63:23
  65:18 83:7
  84:20 91:24
  92:1 94:8 95:2
  95:6 98:1,4
  101:21 106:18
  107:8 122:10
  122:10 126:15
  129:22,24
  130:9,13

133:13 134:2
  139:13,16,20
  144:13 145:9
  150:25 151:2,3
  151:10 158:16
  163:15,17
  164:21 165:2,2
  165:4,5,5
  173:18
timeframe
  173:8
times  12:17
  37:20 40:5,20
  57:8 76:20
  84:4 122:22
  127:21 147:8
  151:24
title  22:3
  147:10,19
  168:1,3
titles  147:20
today  6:18 7:7
  7:19,23 39:6
  42:11 45:16
  53:1 60:10
  70:23 88:6
  105:12,14,19
  116:5,14,16
  119:22 133:6
  140:5,6,10
  151:14
together  10:9
  149:4
told  30:5 52:21
  91:20 114:9,16
  114:16 125:19
  134:10 146:22

EXHIBIT 1
Page 212 of 639

Roysdon Expert_000212

**took** 83:13
153:2
**tool** 167:6,8
**tools** 14:5 29:4
160:25 167:1
167:22
**top** 39:19 66:23
68:3,4 80:8,21
81:2,5,6 86:5
90:12 93:19,21
138:21 142:7
**topic** 121:20
**topics** 121:1,13
**toss** 92:14
**total** 55:1
78:16,23 79:16
80:16,18 90:7
136:22
**totality** 74:20
116:16 126:6
**tracking** 61:15
**training** 118:19
118:20 119:24
128:10 135:24
**transcribed**
1:25 2:4
**transcript** 4:12
7:4 8:21 9:24
16:11 168:16
172:5 173:6,19
**transcription**
169:6
**trivial** 132:25
133:3
**trotch** 8:11
**trouble** 17:22
**true** 153:3
156:20 169:6

**truly** 42:18
167:10
**trust** 82:2
156:20
**truth** 5:24 6:17
**try** 31:9 40:21
79:6 114:7
123:19 131:15
136:4 138:24
155:5
**trying** 35:5
40:16 63:10
65:23 114:11
127:8 135:9
152:17 153:16
**ts** 98:7,23
99:18 101:22
**tulsi** 22:17
**two** 12:20,24
13:11 14:7
30:18 35:13,14
121:23 123:3
131:17
**type** 6:7 31:14
36:2 62:3,4
64:8 67:22
74:19 87:24
104:12,14
110:3 111:5
137:11 153:5,7
155:20
**types** 132:10
132:16 133:2
148:23 167:22
167:22
**typewriting**
172:7

**typical** 44:3
**typically** 32:9
52:22 111:19
111:22,23
131:22 132:11

**u**

**u.s.** 14:21 28:5
31:13 61:6
82:22 85:7,9
85:17 88:20,23
90:10 101:22
122:24 148:14
**uh** 6:7 144:22
**ultimate** 79:11
80:3
**ultimately**
85:16 160:3
**unbiased** 40:21
40:22 41:9,14
137:5
**uncertain** 15:9
127:22 128:12
128:21
**uncertainty**
128:10,17
**unclassified**
123:17 125:22
**uncomfortable**
82:19
**under** 5:21 9:5
18:15 61:1
94:10,13
110:16 111:6
111:14 112:4
112:20 113:2
115:7 158:5
160:12,14

172:7
**undergraduate**
120:3
**underpinnings**
119:20
**underpins**
145:15 146:5
**understand**
5:24 6:3,15
9:12,13 13:9
15:24 19:2
31:9,16 32:1,2
32:3 34:1 38:4
40:16 42:16,17
45:11 47:3
49:18 52:17,24
54:3 63:10
64:5 73:13
75:3 78:8 81:1
87:21 101:12
115:23 117:10
121:15 127:10
135:9 136:9
139:22 152:17
153:14,15,16
154:6,7 162:23
**understanding**
7:18 8:1,4 9:7
26:15,23,25
27:1 31:12
38:3 44:3 48:2
48:5,7,10,13
119:12 142:24
153:9 154:1
155:15 158:12
**understood**
58:22 165:6

**EXHIBIT 1**
**Page 213 of 639**

Roysdon Expert_000213

**unfair** 98:13
**unique** 88:19
  118:4
**united** 1:1,8
  3:13 5:6 21:25
  26:11 170:2
  171:2 173:4
**unquote**
  157:23
**unrest** 120:19
**update** 8:4
**updated** 65:17
**updates** 24:19
**usa** 65:3 70:16
  70:20
**usaspending**
  144:9
**usaspending....**
  47:22 109:3
  137:2
**usaspending....**
  26:12 42:15
  104:7 142:12
**usdoj.gov** 3:17
**use** 13:24 14:5
  36:19 37:19
  38:1,19,21
  40:22 62:1
  97:24 108:11
  108:18 137:6
  137:12 140:16
  140:24 144:2
  150:23 167:15
**used** 37:7,18,20
  38:23 52:8
  53:2 85:7,9,16
  128:6 133:18
  133:19 150:16

152:16,19
  167:23,24
  173:19
**uses** 131:20
**usg** 26:12
**using** 26:11
  29:3,5 40:23
  42:19 66:8
  76:13 81:9
  96:25 97:7
  104:6,10
  132:15 136:21
  160:24 167:9
**usually** 122:3
  132:1 133:17
**utility** 125:12

## v

**v** 1:7 170:2
  171:2 173:4
**vague** 136:4
**value** 47:15,21
  50:17 54:16,23
  55:1,19 56:8
  58:10 72:12
  73:1,3,4,19
  78:16,24,25
  79:7,16,21,25
  80:2,12,16,17
  80:18,18 86:17
  94:18 112:13
  127:10 129:2,7
  150:11 152:8
  153:18,24
  154:4,11,15
  159:25
**values** 69:16
  112:9

**valuing** 154:8
**variance**
  128:19,19,21
**varied** 51:5
**varies** 32:9
  109:17,24
  128:15
**variety** 16:24
  18:22 23:1
  29:2,8 37:24
  108:4 121:12
  131:21 132:9,9
  133:20 148:19
  148:22 161:22
**various** 121:1
**vast** 13:22
  119:23 124:16
  165:21
**vellone** 3:4
**vellone.com**
  3:8 173:2
**verbal** 6:6
  33:24
**verbiage** 77:20
**verify** 40:1,3
  173:9
**veritext** 173:23
**veritext.com.**
  173:15
**versa** 84:13
**verse** 109:6
**version** 110:14
**versus** 108:13
  127:14 128:9
  142:14
**vice** 25:18
  28:20 125:4

**virtually** 5:11
**vise** 84:13
**vocational**
  10:14,16,25
  107:17,19,20
**voice** 6:23
**voracious**
  147:6
**vulnerabilities**
  140:20

## w

**walk** 31:1 65:4
  104:8 123:3
**wall** 167:20
**want** 7:5,12
  15:5,22 36:12
  49:17 58:23
  59:3 66:4 67:5
  81:2 82:17,18
  89:9 101:12
  112:24 114:12
  114:13,17
  115:11 121:15
  139:22 142:11
  154:7 159:12
**wanted** 20:10
  145:5
**wants** 168:15
**wareham** 3:3
  4:4 5:7,7 7:21
  8:3,9 11:22
  24:9,15 35:23
  36:6 41:12
  53:14 55:14
  57:6,11,14
  58:17,20,23
  59:4 60:23

EXHIBIT 1
Page 214 of 639

Roysdon Expert_000214

61:11,15 64:12
68:4 79:2,13
80:11 84:2
85:23 105:25
106:12 112:6
112:22 114:3
114:22 115:4
116:11 118:13
118:16 126:25
128:3,8 129:1
129:6 130:22
130:25 131:3,6
134:19,21
139:8,21 142:5
142:23 144:2,7
144:19 145:23
146:2,3,25
149:10 150:1
151:11 158:1
159:19 160:5
168:13,18
173:1
**washington**
1:16 2:3 3:15
**way** 20:10 44:2
72:12,23,24
79:6 83:19
88:22 113:19
130:14 141:19
152:5
**ways** 143:17
**we've** 37:20
57:7 70:15
**website** 26:12
40:23 41:10
47:18,19,22
50:2 55:16
66:9 72:7

104:10 137:4
144:3,9 153:1
156:17,21
157:1
**websites** 48:12
108:4,5 133:15
164:15
**week** 121:9,10
121:16 147:8
**weekly** 23:21
**weeks** 121:23
**welcome** 83:20
**went** 72:3
**western** 1:2
**when's** 7:15
18:10
**whereof** 172:12
**white** 41:8
**wide** 64:23
**widely** 130:3,5
**win** 91:24 92:1
92:18,20 108:7
108:7,12,13,14
**window** 71:13
**wins** 108:6,9,25
109:2,6,12
**withstanding**
92:4
**witness** 4:15
8:8,17 10:11
11:23 24:4,17
35:11 41:13
55:15 57:12
58:12,18 79:3
79:14 80:12
84:3 93:25
106:14 112:7
114:4 116:12

118:14 126:14
128:9 129:5
130:23 131:5
139:6,11
142:22 144:18
149:11 150:2
151:12 159:20
160:6 168:11
172:12 173:8
173:10,12,18
**wolf** 3:4
**won** 89:7,11,15
91:9,13 92:7
93:1,6,7,10,12
102:11 139:1
**word** 65:14
**words** 47:8
130:8 136:12
136:14 140:3
**work** 18:14,17
18:19 19:11,20
19:25 20:3,4,6
20:9,15,18,21
20:25 21:1,2,5
21:7,11,14,16
28:2,4,5,21,22
28:23 29:1,10
29:15 31:14
32:24,25 41:16
42:1 45:19
46:2 49:13
52:16,17 53:18
53:20,24,24
54:2,2,4 59:18
59:18,23 60:1
62:3,4,23,24
62:25 63:25
64:1,2,8 73:7

74:7,9,12,17
74:19,20,25
75:3 76:23
77:11 78:1
79:24 82:22
83:6 84:6,14
84:17,20,24
85:15 87:10,11
87:24,25 88:18
88:20,24 90:8
90:9,10 94:13
95:2,4,8 97:13
97:14 98:4,5,6
98:10,11,15,16
98:18,22,23
99:4,6 100:3,4
100:4,22
101:17,19,21
102:9,15,16
104:12,14
107:19,22
109:4 113:22
114:7 116:14
116:18 117:2,3
117:4,7,11,13
117:15,19,20
117:24 122:23
126:4,6 129:14
131:18 132:23
134:14 135:4,6
135:11 136:2
137:11 138:21
139:13,14,19
140:15,22,25
141:1,9,20,21
142:11 143:11
145:9 149:16
150:4,4,5

**EXHIBIT 1**
**Page 215 of 639**

Roysdon Expert_000215

**[work - zoom]**                                    Page 43

151:1,17,19,22
152:2,3,21
153:5 157:17
157:18 158:18
158:20 159:9
161:5,5 163:18
163:21 164:9
166:13
**worked**  18:24
29:8 46:16
82:24 85:3
96:4,7,17
99:25 100:4
107:25 111:12
112:4,20 113:2
113:18 114:1
125:24 129:21
132:5 147:18
160:14
**workers**
140:15
**working**  47:15
59:21 85:4
94:10 95:15
130:1 150:12
150:17 151:9
151:15 152:9
154:4 160:12
166:15
**works**  104:8
141:19
**world**  121:5
127:8,25
**write**  47:7 79:6
101:4 136:3,10
140:17,20
154:16 165:23

**writing**  16:1
25:22 30:11
136:3 165:22
**written**  15:1
132:21 133:17
152:12
**wrong**  83:21
156:19
**wrote**  126:1,1
131:8 148:21
153:13,16
154:12 161:6

| x |
| --- |

**x**  4:11

| y |
| --- |

**yeah**  59:4
134:19
**year**  12:15
18:16 25:4
28:6 47:16
49:11,19 50:18
51:8,13,16,21
54:17,24 55:19
56:9,9,13 60:5
64:7 65:13,22
65:25,25 66:17
66:19,24 73:2
73:18 75:24
76:5 78:18,21
78:24 79:8,21
80:1,12 86:10
86:18 90:2,4,6
90:7,21 103:7
103:13,23,24
104:2,10,19,21
104:22 105:1
105:16,20

107:12 112:13
112:13 137:13
145:6,12
146:19 150:12
151:5,8,16
153:24 156:3
160:15,20
**yearly**  78:25
**years**  12:14,17
12:19 19:7
28:7 45:16,18
46:17 78:16
103:14,25
106:3 108:3
120:3,17 121:7
121:21 133:22
133:24,24
134:11 142:18
144:13 146:20
146:22 148:22
152:9 154:2
162:19
**yep**  43:5 81:19
118:25 146:17
**yesterday**
57:18

| z |
| --- |

**zero**  18:9,25
91:17
**zoom**  3:19

**EXHIBIT 1**
**Page 216 of 639**

Roysdon Expert_000216

Federal Rules of Civil Procedure

Rule 30


(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

**EXHIBIT 1**
**Page 217 of 639**

Roysdon Expert_000217

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

**EXHIBIT 1**
**Page 218 of 639**

Roysdon Expert_000218

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

**EXHIBIT 1**
**Page 219 of 639**

Roysdon Expert_000219

Page 1

1              UNITED STATES DISTRICT COURT

               WESTERN DISTRICT OF TEXAS

2                  SAN ANTONIO DIVISION

3        ------------------------:

         DR. JOHN ROE,            :

4                                 :

                    Plaintiff,    :

5                                 : Case No.

            vs.                   : 5:22-cv-00869-JKP-HJB

6                                 :

         UNITED STATES, et al.,   :

7                                 :

                    Defendants.   :

8        ------------------------:

9

10           DEPOSITION OF PAUL ROYSDON, PH.D.

11

12       DATE:            Friday, May 30, 2025

13       TIME:            10:43 a.m.

14       LOCATION:        Department of Justice

                          175 N Street, N.E., 7th Floor

15                        Washington, D.C. 20002

16

17       REPORTED BY:     Erick M. Thacker

                          Reporter, Notary

18

19

20

21

22       Job No. CS7396796

Paul Roysdon , Ph.D.                                      May 30, 2025

                                                          Page 2

 1                  A P P E A R A N C E S

 2      On behalf of Plaintiff:

 3          LANCE HENRY, ESQUIRE

            Allen Vellone Wolf Helfrich & Factor P.C.

 4          1600 Stout Street

            Suite 1900

 5          Denver, Colorado 80202

            lhenry@allen-vellone.com

 6

 7      On behalf of Defendants:

 8          KATRINA M. SEEMAN, ESQUIRE

            JOSEPH GONZALEZ, ESQUIRE

 9          Torts Branch, Civil Division

            United States Department of Justice

10          P.O. Box 7146

            Ben Franklin Station

11          Washington, D.C. 20044

            katrina.m.seeman@usdoj.gov

12

13      ALSO PRESENT:

14          Robert Green, Esq., United States Attorneys'

              Office (Via Videoconference)

15

16

17

18

19

20

21

22

Paul Roysdon , Ph.D.                                    May 30, 2025

Page 3

```
 1              C O N T E N T S
 2   EXAMINATION BY:                        PAGE
 3       Counsel for Defendants               5
 4
 5
             E X H I B I T S
 6
     NUMBER          DESCRIPTION           PAGE
 7
     Exhibit 1  E-mail correspondence        64
 8              PLAINTIFF_00000015 - 026
 9   Exhibit 2  Consulting Agreement No. 2019-003  114
                PLAINTIFF_00000100 - 106
10
     Exhibit 3  Task Order Award, 7 June 2019  116
11              through 5 September 2019
12   Exhibit 4  Task Order Award, 1 October 2019  121
                through 31 December 2019
13
     Exhibit 5  Modification of Consulting    123
14              Agreement No. 2019-003
                PLAINTIFF_00000108
15
     Exhibit 6  Plaintiff's Initial Disclosures  132
16              Pursuant to Federal Rule of Civil
                Procedure 26(a)
17
     Exhibit 7  Report of Investigative Activity  134
18              US0000045 - 056
19   Exhibit 8  Plaintiff's Second Amended    159
                Complaint
20
     Exhibit 9  E-mail correspondence         227
21              US0000238 - 239
22
```

EXHIBIT 1
Page 222 of 689
www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000003

Page 4

1               C O N T E N T S (Continued)

2                  E X H I B I T S

3      NUMBER              DESCRIPTION               PAGE

4      Exhibit 10 E-mail correspondence               284

                  US0000303 - 304

5

       Exhibit 11 E-mail correspondence               284

6                  US0000331 -332

7      Exhibit 12 Memo, Subject: AFCYBER HNCO         293

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22          (*Exhibits attached to transcript.)

Paul Roysdon , Ph.D.                                    May 30, 2025

Page 5

```
 1                P R O C E E D I N G S

 2    WHEREUPON,

 3                     PAUL ROYSDON, PH.D.

 4    called as a witness, and having been first duly

 5    sworn, was examined and testified as follows:

 6                EXAMINATION BY COUNSEL FOR DEFENDANTS

 7     BY MS. SEEMAN

 8         Q    Good morning, Dr. Roysdon.

 9         A    Good morning, ma'am.

10         Q    It's nice to see you again.

11         A    Likewise.

12         Q    Friendly reminder, my name is Katrina

13    Seeman.  I'm a trial attorney at the Department

14    of Justice, and I'll be taking your deposition

15    today --

16         A    Yes, ma'am.

17         Q    -- in your lawsuit against the

18    government defendants.

19         A    Yes, ma'am.

20         Q    Other than the deposition you had in

21    this case a couple weeks ago, have you ever been

22    deposed before?
```

**EXHIBIT 1**
**Page 221 of 639**

www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000005

                                                    Page 6

 1          A    No, ma'am.

 2          Q    Have you ever filed any other lawsuit?

 3          A    No, ma'am.

 4          Q    Have you been a party to any other

 5     lawsuit?

 6          A    No, ma'am.

 7          Q    Have you testified in court before?

 8          A    No, ma'am.

 9          Q    All right.  So just a few rules of the

10     road before we get going, this is a formal legal

11     proceeding.  It will be just like you are

12     testifying in court.  Your entire deposition is

13     being recorded by our court reporter, and you are

14     testifying under oath.

15               Do you understand?

16          A    Yes, ma'am.

17          Q    A couple things to make it easier on

18     our court reporter:  It will be important to give

19     verbal answers today and to the extent possible

20     yeses and noes, because uh-huhs, unh-unhs,

21     mm-hmms, very difficult to read back in a

22     transcript.

Paul Roysdon , Ph.D.                                    May 30, 2025

Page 7

     1          A    Yes, ma'am.

     2          Q    And you're doing a great job of this

     3     already.  We'll do our best not to speak over

     4     each other.  Just, that way, I'll ask my

     5     question.  I'll give you a chance to give your

     6     full answer, and I'll move on to the next

     7     question.

     8               Does that make sense?

     9          A    Yes, ma'am.

    10          Q    If you don't understand a question,

    11     please just ask me to clarify.  I'm happy to do

    12     so.  But if you do answer, I'm going to assume

    13     that you understood the question.

    14               Is that fair?

    15          A    Yes, ma'am.

    16          Q    If you need a break, just let me know.

    17     We'll stop.  But if there's a question pending, I

    18     just ask that you answer it first before we go on

    19     the break.

    20          A    Yes, ma'am.

    21          Q    Have you taken any medications today

    22     that might affect your ability to testify?

```
 1          A    No, ma'am.

 2          Q    Is there any reason you would not be

 3     able to testify truthfully and completely today?

 4          A    No, ma'am.

 5          Q    And I guess before we get going too

 6     far, we're also -- I just should introduce the

 7     parties in the room as well.  So, like I said, my

 8     name is Katrina Seeman.

 9               I'm joined by my colleague, Joseph

10     Gonzalez, and Robert Green is joining us

11     virtually.  And then?

12               MR. HENRY:  Lance Henry for the

13     plaintiff is present as well.

14               MS. SEEMAN:  Okay.  Great.

15     BY MS. SEEMAN

16          Q    And I'll do my best at this, too.  I

17     know we're sitting close to each other.  It's

18     easy to sort of speak softly, but we'll have to

19     make sure we both keep our voices up, so our

20     court reporter has an easier time recording what

21     we're both saying.

22          A    Yes, ma'am.
```

EXHIBIT 1
Page 227 of 639

www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000008

Paul Roysdon , Ph.D.                                    May 30, 2025

Page 9

1        Q    And if I start talking too fast, which
2    I am prone to do, please just let me know, and
3    I'll slow down for you.  Okay?
4        A    Okay.
5        Q    Okay.  Great.  Dr. Roysdon, have you
6    gone by any other name?
7        A    No, ma'am.
8        Q    Any nicknames?
9        A    No, ma'am.
10        Q    What's your current address?
11        A    26710 Turkey Run, Boerne, Texas 78006.
12        Q    And how long have you lived there?
13        A    Eight years.
14        Q    Did you live in Texas before that?
15        A    No.
16        Q    Where did you live?
17        A    California.
18        Q    Okay.  How long did you live in
19    California?
20        A    I moved a lot.  I don't recall.
21        Q    Do you have an estimate?
22        A    Off and on for about 14 years.

Paul Roysdon , Ph.D.                                                          May 30, 2025

Page 10

```
 1          Q    Okay.  Last four of your social?

 2          A    4481.

 3          Q    Date of birth?

 4          A    3/10/81.

 5          Q    That makes you how old today?

 6          A    44.

 7          Q    Are you married?

 8          A    Yes, ma'am.

 9          Q    How long have you been married?

10          A    This will be 15 years.

11          Q    What's your spouse's name?

12          A    Elizabeth.

13          Q    Is that your only marriage?

14          A    Yes, ma'am.

15          Q    Any kids?

16          A    Yes, ma'am.

17          Q    Just first names and ages, if they're

18     over 18.

19          A    Just one.  Under 18.

20          Q    Under 18.  Okay.  How old?

21          A    She's five.

22          Q    Fun age.
```

Paul Roysdon , Ph.D.                                    May 30, 2025

Page 11

 1          A    Yes.

 2          Q    Highest grade you attended in school?

 3          A    A Ph.D.

 4          Q    Other than your Ph.D., what other

 5     degrees have you earned?

 6          A    I've earned several.  The Ph.D. was a

 7     dual Ph.D., three master's degree, dual

 8     bachelor's degree.

 9          Q    Other than those, any other

10     certificates or professional licensures?

11          A    Professional licenses, for example?

12          Q    For example, civil engineers typically

13     have an engineering license.

14          A    Oh, no.

15          Q    Okay.  Do you have any social media?

16          A    No.

17          Q    Because of your job?

18          A    Not in my line of work, yes.

19          Q    Have you given any interviews or

20     statements to the media about this lawsuit?

21          A    No.

22          Q    Okay.  Did you bring any documents,

Paul Roysdon , Ph.D.                                    May 30, 2025

Page 12

1      pictures or anything like that with you today

2      that deal with this case?

3              A     No, ma'am.

4              Q     Did you review any documents in

5      preparation for today's deposition?

6              A     Yes, ma'am.

7              Q     What did you look at?

8              A     The second amended -- second amended

9      complaint.

10             Q     Anything else?

11             A     No, ma'am.

12             Q     Other than your attorneys, did you

13     discuss your deposition with anyone?

14             A     No, ma'am.

15             Q     Other than your attorneys, who have you

16     discussed this lawsuit with?

17             A     My wife and maybe a close friend.  This

18     has been fairly close-held.

19             Q     And what's the friend's name?

20             A     I said maybe because I don't recall.

21             Q     Okay.  What's the friend's name,

22     though?

Paul Roysdon , Ph.D.                                    May 30, 2025

```
 1          A    I don't recall.  It could have been a

 2     close friend.

 3          Q    I just want to be clear.  You don't

 4     remember who you talked to about this lawsuit?

 5          A    If I happened to talk about it, it

 6     might have been a friend of mine by the name of

 7     Steven, but that's --

 8          Q    Does Steven have a last name?

 9          A    I'm not sure I mentioned this to him.

10     Banks.

11          Q    And how do you know Steven?

12          A    We've known each other for many years

13     from school, college.  But no details.

14          Q    You don't remember any details about

15     that --

16          A    We didn't --

17          Q    -- conversation if it happened?

18          A    We didn't discuss details, just --

19          Q    Okay.  Just --

20          A    -- the fact that I was doing something

21     to clear my name.

22          Q    Okay.  What's your current job?
```

EXHIBIT 1
Page 233 of 639

www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000013

 1          A     Deputy Director of National

 2     Intelligence.

 3          Q     And at what agency?

 4          A     Office of the Director of National

 5     Intelligence.

 6          Q     What's your current pay rate?

 7          A     I'm a SNIS Level 3.

 8          Q     All right.  Generally --

 9          A     S-N-I-S, SNIS Level 3.

10          Q     Thank you.

11          A     Yes, ma'am.

12          Q     Generally, what are your job

13     responsibilities?

14          A     I oversee a large portfolio for the

15     entire intelligence community.  That includes

16     major acquisitions, studies and analysis prior to

17     those acquisitions, policy for the entire IC,

18     awards, JDAs.

19          Q     What's a JDA?

20          A     A joint duty assignment.  That's --

21     that gives somebody the ability to, say, work at

22     NSA for two to three years and then take a short

1        assignment of maybe a year at CIA or FBI.   Joint

2        duty assignment.

3                    I also oversee the entire science and

4        technology portfolio for the intelligence

5        community.   That includes things like AI and

6        cyber and a bunch of other things.

7              Q     Where's your office located?

8              A     McLean.

9              Q     Virginia?

10             A     Yes, ma'am.

11             Q     And how long have you been in your

12       current role?

13             A     Nine weeks.

14             Q     Do you -- other than your job at ODNI,

15       do you have any other current income sources?

16             A     No, ma'am.

17             Q     Are you permitted to have outside

18       employment in your current role?

19             A     Define outside employment.

20             Q     Employment that is not through ODNI.

21             A     I'm allowed to serve on boards, but I'm

22       not allowed to necessarily serve in positions

Roysdon Fact Witness_000015

 1      where I make a salary.

 2           Q    Okay.  So you're not permitted to make

 3      a salary in any outside --

 4           A    Correct.

 5           Q    Okay.  Do you serve on boards right

 6      now?

 7           A    I serve on one nonprofit.

 8           Q    What's that?

 9           A    Oh, I'm forgetting the name of it.

10      It's -- I forget the name of it.  The purpose is

11      to provide funding for military service members

12      in the event of, like, a legal need.

13           Q    Are you in your current role permitted

14      to compete for any government contracts?

15           A    Am I permitted to compete?

16           Q    Yes.

17           A    No.

18           Q    Why not?

19           A    Because I do major acquisitions for the

20      intelligence community.

21           Q    And then are you --

22           A    It's strictly foreboden.  Sorry.

Page 17

1       Strictly forbidden.

2            Q     Are you permitted to work on any

3       subcontracts?

4            A     No, ma'am.

5            Q     How about consulting for a fee?

6            A     No.

7            Q     Consulting for free?

8            A     Consulting for free.  I don't believe

9       that's permitted because it would create a

10      conflict of interest.  I haven't asked and I'm

11      not performing any sort of duties like this.  I

12      wouldn't even consider it.

13           Q     All right.  Prior to your position at

14      ODNI, what -- where did you work?

15           A     Leidos.

16           Q     What was your -- actually, when did you

17      start at Leidos?

18           A     September 2020.

19           Q     And when did you leave Leidos?

20           A     March 2025, nine weeks ago.

21           Q     Did you have any gap in employment

22      between --

Paul Roysdon , Ph.D.                                    May 30, 2025

Page 18

```
 1          A    Zero.

 2          Q    -- Leidos and ODNI?

 3          A    Zero.

 4          Q    Why did you leave Leidos?

 5          A    I received a political appointment to

 6     serve at ODNI.

 7          Q    And you wanted to take it?

 8          A    Yes, ma'am.

 9          Q    What was the title that you held when

10     you first started at Leidos?

11          A    When I first started, I was the AI

12     chief or chief AI solutions architect, and when I

13     left, I was the chief AI scientist for the

14     company.

15          Q    Did you hold any -- actually, let me

16     rephrase.

17               Are either of those executive-level

18     positions at Leidos?

19          A    Yes, ma'am.

20          Q    Both?

21          A    Not when I entered.

22          Q    Not when you entered.  Okay.  But by
```

EXHIBIT 1
www.CapitalReportingCompany.com
Page 23 of 639
202-857-3376

Roysdon Fact Witness_000018

Page 19

1     the time you left?

2          A     Yes, ma'am.

3          Q     What was your pay rate when you first

4     started at Leidos?

5          A     Pay rate?

6          Q     Or your salary.

7          A     271 annual without bonus.

8          Q     Okay.  Do you know how much your

9     bonuses were?

10         A     My first year, I did not get a bonus.

11    No, that's not right.  I did receive a small

12    bonus of maybe -- maybe 50,000.

13         Q     And that would have been for 2020?

14         A     I would have received that in '21.  I

15    can't recall exactly.

16         Q     And when you left Leidos, what was your

17    salary?

18         A     Total compensation was 520,000.  Base

19    salary was maybe 302.  I don't recall exactly.

20         Q     What were your general duties -- let's

21    start with when you first started at Leidos.

22         A     When I first started, I worked within

EXHIBIT 1
Page 238 of 639
www.CapitalReportingCompany.com
202-857-3376
Roysdon Fact Witness_000019

1    the AI accelerator at Leidos.  My general duties

2    were to oversee AI developments broadly for

3    research projects that the accelerator was

4    working on.

5              The accelerator served the needs of

6    each of the business sectors of Leidos.  Business

7    sectors are defense, intelligence, health, civil

8    and international.  Those are the defined sectors

9    of the company, each with like a division

10   president.  And each had research and development

11   projects that the AI accelerator assisted in, and

12   I kind of oversaw the architecture of those AI

13   elements.

14        Q    Were -- did any of those business

15   sectors include cyber AI?

16        A    Yes.

17        Q    Can you tell me which ones?

18        A    Primarily the defense and intelligence

19   sectors.

20        Q    All right.  And then by the time you

21   left -- actually, let me back up.

22              Did you have any position between your

Paul Roysdon , Ph.D.                                    May 30, 2025

Page 21

1       first position at Leidos and your -- the position

2       you had when you left?

3               A       No, ma'am.

4               Q       Okay.  When you left Leidos, what were

5       your general duties?

6               A       I oversaw the science and technology AI

7       portfolio for the entire company.

8               Q       Did that include cyber AI?

9               A       Among many, yes.

10              Q       What sort of difference in

11      responsibilities did you have from your first

12      position to your second?

13              A       The impact was broader.

14              Q       What do you mean by that?

15              A       In the -- in the last position, I was

16      more or less responsible for AI developments

17      across the company, so this included a lot of

18      human language translation, a lot of imagery,

19      particularly as we were doing work with the

20      health sector and civil sector.  There was a

21      component with -- with AI and cyber for the DoD

22      and intelligence sector.  It was just larger

EXHIBIT 1
Page 240 of 639

www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000021

Paul Roysdon , Ph.D.                                    May 30, 2025

Page 22

```
 1      responsibilities.  I was involved in more

 2      proposals for the company, involved in more

 3      presentations.

 4           Q    Did you participate in any work to

 5      obtain contracts?

 6           A    Proposals, yes.

 7           Q    Proposals.  So the proposals, just to

 8      be clear, are for government contracts?

 9           A    Those are all government contracts,

10      yeah.  So that would be a response to -- like for

11      DARPA, it would be a BAA, a broad agency

12      announcement, or an RFI, request for information,

13      or an RFP, which is request for proposal, so

14      you'd often write proposals for each of those.

15      The different government agencies call them

16      different things, but, usually, it's an RFI or an

17      RFP, with the exception of DARPA --

18           Q    Is --

19           A    -- who calls it a BAA.

20           Q    Is it fair to say that at least some of

21      your work in Leidos was in the cyber AI field,

22      then?
```

EXHIBIT 1
www.CapitalReportingCompany.com
Page 241 of 639
202-857-3376

Roysdon Fact Witness_000022

Paul Roysdon , Ph.D.                              May 30, 2025

Page 23

1          A     Yes, ma'am.

2          Q     All right.  Do you personally break

3     that down between offensive and defensive cyber?

4          A     You can.  We didn't.

5          Q     Okay.  Did that matter to you?

6          A     It does a lot.

7          Q     Why?

8          A     In order to do good defensive work, you

9     really have to attack a system and do good

10    offense.  We took a game theory approach where we

11    combined the two in kind of a war against each

12    other.  As one algorithm becomes very good at

13    attacking, as long as these are in a tight,

14    closed loop, the other algorithm can learn about

15    those attacks and improve their defenses.

16              So I do not -- I do not look at them as

17    distinct.  Most of the industry does, and this is

18    where this emerging field of cyber AI is

19    changing.

20         Q     And it's changing to understanding that

21    the best offense -- or the best defense is a good

22    offense?

EXHIBIT 1
www.CapitalReportingCompany.com
Page 242 of 689
202-857-3376

Roysdon Fact Witness_000023

Paul Roysdon , Ph.D.                                    May 30, 2025

Page 24

```
 1          A    Yes, ma'am.

 2          Q    Okay.  Did you have any other income

 3     sources when you were working at Leidos?

 4          A    Yes.  I did some consulting.

 5          Q    For who?

 6          A    A company called StarNav in California.

 7               (Reporter clarification.)

 8               THE WITNESS:  StarNav.

 9               MS. SEEMAN:  S-T-A-R-N-A-V.

10               THE WITNESS:  Yes, ma'am.

11     BY MS. SEEMAN

12          Q    Did you have to get permission before

13     working with StarNav?

14          A    Yes.

15          Q    Why?

16          A    Just to make sure there wasn't a

17     conflict of interest.

18          Q    Were you permitted to have outside

19     employment during your time at Leidos?

20          A    Yes.

21          Q    Did you?

22          A    Yes.
```

EXHIBIT 1
Page 244 of 639

www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000024

Paul Roysdon , Ph.D.                                May 30, 2025

Page 25

```
 1          Q    What outside employment did you have?

 2          A    Consulting.

 3          Q    Other than StarNav, did you do any

 4    other consulting work during your time at Leidos?

 5          A    No.  I published a few books.

 6          Q    Casual.

 7          A    They didn't generate positive revenue,

 8    but there were several that were sold.

 9          Q    What books did you publish?

10          A    I published a book on how to do

11    research, titled How to do Research.  The

12    precursor was that was How to do Research

13    Remotely.  Keep in mind, this was in the time of

14    COVID.

15               I published another book titled Math

16    Refresher for Data Science Machine Learning and

17    AI and a math handbook for data science machine

18    learning and AI.  And then, during that time, I

19    was working on a book that I recently finished in

20    March titled a comprehensive -- I can't remember

21    the title exactly.  A Comprehensive Review of

22    Data Science Machine Learning and AI.  And I sold
```

Paul Roysdon , Ph.D.                                    May 30, 2025

Page 26

 1    the books at the cost of the publishing to make

 2    those widely available as possible.

 3         Q    Were you permitted to have any

 4    government contracts during your time at Leidos,

 5    you personally?

 6         A    No, ma'am.

 7         Q    I'll ask the follow-up even though I

 8    know the answer.

 9         A    Okay.

10         Q    So did you have any government

11    contracts during your time at Leidos?

12         A    No, ma'am.

13         Q    Okay.  Other than StarNav, did you work

14    on any other subcontracts?

15         A    No.

16         Q    And just to be clear, was StarNav --

17    was that -- were you working as a consultant

18    subcontractor?

19         A    I was working as a 1099.

20         Q    Was the work that StarNav was doing --

21    did they have a contract with the government?

22         A    They did.  The work that I did for

EXHIBIT 1
Page 246 of 639
www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000026

1    them, just to clarify, was leveraging the

2    algorithms and software that I built, derived and

3    built during my Ph.D.  So I was providing,

4    essentially, software updates.  I gave the

5    software to them for free because they're a

6    colleague of mine.

7         Q    Did the StarNav consulting have

8    anything to do with cyber AI?

9         A    It did not.

10        Q    Okay.

11        A    No conflict of interest.

12        Q    Other than -- so you're saying conflict

13   of interest.  So do outside consulting -- did it

14   have to be an area that Leidos didn't operate in?

15        A    No.  It had to be an area that I was

16   not performing duties in my job.

17        Q    At Leidos, right?

18        A    At Leidos.

19        Q    Okay.

20        A    So it could not be related to AI.  It

21   also couldn't be related to cyber since I was

22   doing some cyber work.  The work that I was doing

Paul Roysdon , Ph.D.                                    May 30, 2025

Page 28

1    for StarNav was in the title.  It was navigation

2    system stuff.

3         Q    I was like, stars?  Great.  Okay.

4              Other than StarNav, did you have any

5    other -- did you do any other outside

6    consulting --

7         A    No, ma'am.

8         Q    -- during your time at Leidos?

9         A    Sorry.

10        Q    Go ahead.

11        A    No, ma'am.

12        Q    Before Leidos, where were you employed?

13        A    Before Leidos, I worked for the

14   National Security Agency.

15        Q    And when did you leave NSA?

16        A    And I also had a JDA at ODNI in the --

17   the year just before I left.

18        Q    So your joint duty assignment was at

19   ODNI?

20        A    Yes, ma'am.

21        Q    Okay.

22        A    From 2019 to 2020.

EXHIBIT 1
Page 247 of 639
www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000028

Paul Roysdon , Ph.D.                                    May 30, 2025

Page 29

```
 1          Q    Let's start with just NSA generally.
 2     When did --
 3          A    Okay.
 4          Q    -- you start working there?
 5          A    I started work at NSA in 2015.
 6          Q    What was your salary or grade when you
 7     first started?
 8          A    So the first time I was there, I was
 9     there as an intern during my Ph.D., and my grade
10     might have been a GS-12.  I did two summer tours,
11     one at NSA Texas and one at NSA Washington.
12          Q    Do you have a preference for offices?
13          A    No.
14          Q    What was your grade when you left NSA?
15          A    GS-14.
16          Q    Do you remember what your annual salary
17     would have been then?
18          A    I don't.  Maybe around 94,000.
19          Q    What was your -- I know you mentioned
20     you were an intern when you started.
21               What was your title when you left?
22          A    I was the chief data scientist for
```

EXHIBIT 1
Page 248 of 639

www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000029

Paul Roysdon , Ph.D.                                    May 30, 2025

```
 1      the -- for the field site in Texas.  That would

 2      be kind of an unofficial title because our

 3      official titles have -- well, I'll just say that

 4      they're different.

 5           Q    Let's talk about your joint duty

 6      assignment.  You mentioned it was 2019 to 2020.

 7                How was that different than your just

 8      NSA responsibilities?

 9           A    So I still continued some of my NSA

10      responsibilities in that role.  However, when I

11      was at ODNI, I was brought in as a -- like an AI

12      technical fellow -- that was my title there -- to

13      try to get AI integrated into the entire IC.

14           Q    So --

15           A    Which is a bit different than what --

16      I'm sorry.

17           Q    Oh, no, go ahead.  You were going to

18      say --

19           A    It's a bit different --

20           Q    -- it's different?

21           A    -- than my role now where I'm

22      overseeing AI for the entire IC.
```

EXHIBIT 1
Page 250 of 639

www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000030

Paul Roysdon , Ph.D.                                    May 30, 2025

Page 31

1          Q    And who is included in the intelligence

2     community?

3          A    There are 18 agencies.  I'll give you

4     maybe the top five.  Okay.

5          Q    Great.

6          A    CIA, NSA, NRO, NGA and DIA are the

7     largest of the 18.

8          Q    Is there any connection between the

9     Department of Defense and ODNI?

10         A    Yes.

11         Q    How are they related to each other?

12         A    Okay.  So there's a few ways that the

13    DoD and the IC are related, in that there are

14    several agencies like the ones I just provided

15    you, with the exception of CIA, that have what is

16    called MIP and NIP funding.  NIP funding is

17    National Intelligence Program funding.  MIP

18    funding is Military Intelligence Program funding.

19              NSA, NRO, NGA and DIA have both

20    military and IC -- or, rather, DoD and IC

21    funding.  As a consequence of that, I am

22    overseeing -- in my position overseeing all 18 IC

Paul Roysdon , Ph.D.                              May 30, 2025

Page 32

1      agencies.  I have to coordinate often with the

2      DoD on projects and programs for those agencies.

3           Q    When -- when coordinating with DoD,

4      what level are you coordinating with?

5           A    What do you mean?  Like the people I'm

6      coordinating with?

7           Q    Yeah, like what position.

8           A    Deputy Secretary of Defense --

9           Q    Okay.

10          A    -- that kind of level, yes.

11          Q    Where were you -- where was your work

12     station when you were on your joint duty

13     assignment?

14          A    At Liberty Crossing in McLean, same

15     location.

16          Q    When you -- I'm just trying to get a

17     sense of like where you were at what time.

18               So, for NSA, when were you in San

19     Antonio?

20          A    2017 through 2019 and then off -- on

21     and off again in 2020 for the first part of --

22     no.  Yeah, on and off again in the first half of

EXHIBIT 1
Page 251 of 639

www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000032

Paul Roysdon , Ph.D.                                  May 30, 2025

1       the year.  The shutdown happened in March, so all

2       of us were sent home at that point and --

3       including myself from ODNI.

4                 So, at that time, I was reporting to

5       duty for ODNI and for NSA to NSA Texas from

6       about -- I don't know -- end of March until I

7       resigned in September.

8            Q    During the shutdown, were you able to

9       work remotely?

10           A    Yes and no.  The work I do is

11      classified, which, of course, I can't do at home.

12      There was some unclassified work that I could do,

13      but, generally speaking, no.

14           Q    Okay.  And I forgot to ask you this.

15      Where was your Leidos office located?

16           A    From 2020 -- okay.  Well, technically,

17      my -- my office at that time was headquarters

18      here in Reston, Virginia.  I worked from home,

19      but I traveled once a month for about a week at a

20      time to Reston from roughly 2020 all the way

21      through 2025.

22           Q    Did you have other income sources when

Paul Roysdon , Ph.D.                                    May 30, 2025

Page 34

1      you worked at NSA?

2          A    Only for the period of 2019 through

3      2020.

4          Q    And that would have been on the Global

5      Infotek --

6          A    That was the GITI --

7          Q    -- consultant --

8          A    -- contract.  Correct.

9          Q    Okay.

10         A    I was a consultant on a 1099.

11         Q    Did you have any other outside

12     employment other than the --

13         A    No, ma'am.

14         Q    -- GITI contract?

15              And just for the record, GITI is

16     G-I-T-I.

17              Were you permitted to have government

18     contracts yourself during your time at NSA?

19         A    I don't know.  I had a conversation --

20     and you have the documents of the conversation

21     that I had, at least with the e-mails, you have

22     the documents -- with NSA Office of General

EXHIBIT 1
Page 253 of 639
www.CapitalReportingCompany.com
202-857-3376
Roysdon Fact Witness_000034

1      Counsel.  It is permissible to do -- to work on a

2      government contract provided that it does not

3      conflict and you're not working for the same

4      agency.

5              I'll give you an example.  The people

6      who clean our rooms and empty our trash often are

7      people that are employees at NSA during the day.

8      They work on a separate government contract

9      because they're cleared employees that then in

10     the evening take a job to basically empty the

11     trash.  So it is permissible for examples like

12     that, and it's simply because we require people

13     with clearances to enter our spaces.  I was not

14     emptying trashes.

15        Q    I actually wasn't going to ask that,

16     but I want to refine my earlier question.

17              So were you permitted to compete for

18     government contracts during your time at NSA?

19        A    I don't know.  I imagine so based on

20     the example I just gave you, but I don't know.

21        Q    Okay.  And another question along this

22     line:  Were you permitted to bid on contracts as

EXHIBIT 1
Page 254 of 639

Roysdon Fact Witness_000035

1      an NSA employee?

2           A     It is my understanding, yes, but I

3      don't -- I don't know.  I, for one, never had to

4      bid on anything.  I was requested by name.

5           Q     All right.  Do you have any businesses?

6           A     Yes, I've had a few businesses.

7           Q     What are they?

8           A     At the moment, I only have one.  It

9      is -- it's a kind of open-ended consulting

10     company.

11          Q     What's the name of it?

12          A     Roysdon, LLC.  It's an official LLC in

13     Texas.

14          Q     How long have you had your consulting

15     company?

16          A     So, as Roysdon -- well, Roysdon, LLC as

17     Roysdon, LLC was founded maybe two years ago, but

18     I did work as, you know, Roysdon Consultants, not

19     an LLC, just as a consultant on a 1099 for many

20     years prior to that.

21          Q     Other than your consulting company,

22     what other companies do you have?

Page 37

1          A     I don't have any companies currently.

2          Q     What company -- have you had any other

3     companies in the past, let's say, ten years?

4          A     Yes.

5          Q     Just what -- how many?

6          A     I had another company called

7     AeroAnalysis, LLC.  It was a California company.

8     I closed that when I left California, so it's

9     more than ten years ago, but I kept the name and

10    the website and the e-mail address.

11         Q     Did that company have anything to do

12    with cyber AI?

13         A     I did consulting under that name.

14         Q     For your -- for the Roysdon, LLC or

15    Roysdon Consulting, is it okay if I call it LLC?

16    Will you understand I'm talking about your entire

17    consulting --

18         A     Sure.

19         Q     -- business?  Okay.  Great.

20               So, for Roysdon, LLC --

21         A     Sorry.  Yes.

22         Q     Thank you.  For Roysdon, LLC, do you

1      have any business partners?

2              A     No.

3              Q     Do you have any staff?

4              A     No.

5              Q     What government contracts have --

6      actually, let me ask it this way:  Have you

7      worked on any government contracts outside of

8      your consulting business?

9              A     No.

10             Q     Okay.  So, for your consulting

11     business, what -- how many government contracts

12     have you worked on?

13             A     So far, as Roysdon, LLC, I have not

14     worked any government contracts.

15             Q     Okay.  And then Roysdon Consulting --

16             A     As Paul Roysdon, I worked on a contract

17     for StarNav, but not any government contracts.

18             Q     Okay.  How about -- have you had any

19     subcontracts for your Roysdon Consulting

20     business?

21             A     No, ma'am.

22             Q     How about consulting agreements?

Paul Roysdon , Ph.D.                                    May 30, 2025

Page 39

 1          A    For Roysdon, LLC or Paul Roysdon?

 2          Q    Either.

 3          A    No, because on the 1099, it was still

 4     listed as Paul Roysdon.  For both the work that I

 5     did for GITI and for StarNav, it still said Paul

 6     Roysdon.

 7          Q    Is there -- other than GITI and

 8     StarNav, have you been a 1099 -- I hate to say

 9     employee -- independent contractor --

10          A    Right.

11          Q    -- for any other companies?

12          A    No, ma'am.

13          Q    Okay.  Have you advised on -- have you

14     advised any subcontractors in your role as a

15     consultant?

16          A    Yes, ma'am.

17          Q    Which companies?

18          A    Okay.  So the work that I did for

19     StarNav, I was advising StarNav on algorithms.

20     The work that I did at -- for -- well, for GITI,

21     I was advising on behalf of Air Force Life Cycle

22     Management HNCO.  For the context of this

EXHIBIT 1
Page 258 of 639

www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000039

Paul Roysdon , Ph.D.                              May 30, 2025

Page 40

1      deposition, HNCO has no meaning.  It's just an

2      acronym without a definition.

3               The work that I was doing on behalf of

4      the Air Force, I was advising a few companies,

5      Kudu Dynamics in Chantilly, Virginia,

6      Cynnovative -- I think they're in Falls Church,

7      Virginia -- Def-Logix in San Antonio, and then on

8      one occasion for a contract that I was not going

9      to be involved in, I advised GITI on how they

10     might be more competitive on a particular

11     contract by including certain types of AI.

12          Q    And have you ever been employed by the

13     Air Force?

14          A    No, ma'am.

15          Q    Okay.  Have you ever been employed by

16     any component of DoD?

17          A    No, ma'am.

18          Q    In your consulting role, have you been

19     on any prime contracts?

20          A    No, ma'am.

21          Q    And how do you get a subcontract, to

22     your -- to your understanding?

EXHIBIT 1
www.CapitalReportingCompany.com
Page 259 of 639
202-857-3376

Roysdon Fact Witness_000040

 1              MR. HENRY:  Objection to form.

 2              THE WITNESS:  Can you reframe the

 3      question?

 4      BY MS. SEEMAN

 5          Q    Yeah.  If you -- if I wanted to go out

 6      and get a subcontract today and I was a cyber AI

 7      guru --

 8          A    Okay.

 9          Q    -- what do I do to get that

10      subcontract?

11              MR. HENRY:  Objection.  Form.

12      Foundation.

13              THE WITNESS:  Usually, a prime

14      contractor will select the subcontractors that

15      they want to work with.

16      BY MS. SEEMAN

17          Q    Do they do that before they bid on the

18      contract?

19          A    Often, yes.  Not always.

20          Q    And if -- if somebody wanted to go

21      get -- go be a consultant on one of these

22      government contracts, what do they need to do to

EXHIBIT 1
Page 260 of 689

www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000041

1    do that?

2         A    In my experience with consulting, the

3    prime contractor or the subcontractor will

4    contact that consultant because of name and

5    reputation to assist them on a contract.

6         Q    And you're not currently doing any

7    consulting work through your LLC, correct?

8         A    No, ma'am.

9         Q    And that's because you don't have any

10   outside employment?

11        A    Correct.  Yes, ma'am.

12        Q    All right.  And then did you ever work

13   at Composite Engineering Incorporated?

14        A    Yes, ma'am.

15        Q    What was your role there?

16        A    I had many roles.

17        Q    What was -- what was the last role you

18   held?

19        A    It was the equivalent of like a senior

20   researcher.  We didn't really hold titles.  If

21   you looked at our business cards, our business

22   cards did also not hold titles because our roles

1       and responsibilities were very fluid.

2            Q    What was your pay rate or salary when

3       you left that place?

4            A    I don't recall.  It was many years ago.

5            Q    Do you remember if it was less than

6       what you were making at NSA when you started at

7       NSA?

8            A    I was making more.

9            Q    You were making more at Composite --

10           A    Composite --

11           Q    -- Engineering?

12           A    -- engineering, yeah.  Going to the

13      government was a pay reduction.

14           Q    Did you have any other income sources

15      when you were working at Composite Engineering?

16           A    Yes.

17           Q    What were those sources?

18           A    Again, I was doing consulting.  That

19      was around the time that I had started the

20      AeroAnalysis, LLC in California, which I

21      mentioned earlier.

22           Q    So when did you first start pursuing

EXHIBIT 1
Page 262 of 639

www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000043

 1      work in the cyber AI field?

 2                  MR. HENRY:  Objection.  Foundation.

 3                  THE WITNESS:  Can you refine your

 4      question?

 5      BY MS. SEEMAN

 6          Q    Yeah.  I guess this is sort of a

 7      difficult question because you kind of helped

 8      create the field, so --

 9          A    Yes, ma'am.

10          Q    How did you first get involved in

11      pursuing and/or creating the cyber AI field?

12          A    Okay.  Thank you.  As you stated

13      correctly, I essentially created the cyber AI

14      field starting at NSA.  The work I was doing at

15      NSA -- when I -- so, unclassified, we'd state the

16      work as being tool development for cyber network

17      operations, and in that role, I worked both in

18      the capabilities directorate and the operations

19      directorate, initially using common software

20      practices to develop these tools.

21                  It was clear to me almost immediately

22      that -- I'm sorry.  I'm having to be careful with

EXHIBIT 1
Page 263 of 639

www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000044

Paul Roysdon , Ph.D.                                    May 30, 2025

Page 45

1    my words because of classification.

2          Q    I understand.

3          A    So I'm trying to think carefully.  It

4    was clear to me early on that to be competitive

5    against our adversaries, the current set of

6    tools, essentially, could not be operated by a

7    human.  We really needed to have machines doing

8    these operations.  And so, around 2018 and 2019,

9    I started building tools that included

10   statistical algorithms and then statistical

11   learning algorithms, what commonly would be

12   called machine learning.  Today the new term is

13   AI, even though not much of it is really

14   intelligent yet.  I would still call it

15   statistical learning or machine learning.  And

16   then, during that time, essentially, created

17   within the agency, essentially, a new field of

18   what we were calling even at that time cyber AI.

19         Q    Why were you interested in developing

20   and pursuing cyber AI?

21         A    Because it was the only way to,

22   essentially, beat our adversaries is to create

Paul Roysdon , Ph.D.                                    May 30, 2025

Page 46

1      the best techniques and tools for cyber network

2      operations to defend the country at the speed and

3      scale of machines and to subvert our adversaries

4      at the speed and scale of machines.  What it

5      comes down to is not more humans, but more GPUs.

6           Q    During your employment at NSA as these

7      things were developing, did you present any

8      projects to NSA leadership?

9           A    I did.

10          Q    And I'll just put the disclaimer here.

11     I am not asking for any classified information

12     today, and so to the extent you think my question

13     might start to impede on that, don't interpret it

14     any other way.

15          A    Okay.

16          Q    And if you need clarify that as we go

17     through this, please just do so.

18          A    Yes, ma'am.

19          Q    Okay.  So how many cyber AI projects

20     did you present at NSA?

21          A    Roughly six.

22          Q    Who do you present those to?

EXHIBIT 1
www.CapitalReportingCompany.com
Page 265 of 639
202-857-3376

Roysdon Fact Witness_000046

1          A    I presented to my immediate leadership,

2     which was in one organization, and I was

3     dual-hatted in an operations organization.  I

4     also presented to that leadership and several of

5     the operators.  Operators are kind of like your

6     Navy Seals that work on keyboards to navigate

7     into other countries and do stuff for this

8     country.

9          Q    Were there any projects that NSA was

10    interested in pursuing?

11         A    No.

12         Q    Okay.  For all six?

13         A    Correct, for all six.  They were very

14    interested, but were worried about risk.

15         Q    And what do you mean by that?

16         A    New things are always deemed to have

17    risk.  This was very new.  Any form of

18    automation, nobody had done before, not this type

19    of automation.

20         Q    So, once you sort of get the no on

21    these projects, what do you do next with them, if

22    anything?

Paul Roysdon , Ph.D.                                    May 30, 2025

Page 48

1          A     I did nothing.

2          Q     Did anybody at NSA suggest you pursue

3     your projects with outside organizations?

4          A     Yes.  There was an individual by the

5     name of Todd Jaspers who worked in NSA operations

6     and was dual-hatted with CYBERCOM, specifically

7     Air Force Cyber, and he requested that I present

8     these ideas to Air Force Cyber, because in their

9     mission, they tend to be much more forward

10    leaning and much more tolerant of risk.

11         Q     How did Todd Jaspers know that you were

12    working on cyber AI projects?

13         A     He was in the same office that I was

14    presenting the information to.

15         Q     Was there any supervisory subordinate

16    relationship between the two of you?

17         A     No.  We were peers.

18         Q     Okay.  So --

19         A     And based on his deposition, he

20    confirmed this.

21         Q     For -- once Todd Jaspers brings up, you

22    know, presenting to the Air Force, what do you do

EXHIBIT 1
Page 267 of 659

www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000048

Paul Roysdon , Ph.D.                                    May 30, 2025

Page 49

1      next?

2           A     Todd Jaspers introduced me to a member

3      of Air Force Life Cycle Management HNCO and

4      arranged a time to present the information.

5                I asked my leadership if it was okay

6      for me to present this to Air Force, and they

7      said yes.  Since they were not interested, I was

8      free to do with it what I wanted to provided that

9      it remained in the classified environment.

10          Q     Who did Todd Jaspers introduce you to?

11          A     Dan Brown.

12          Q     I'll get into this a little bit later,

13     but had -- to that point, had you ever heard of

14     Dan Brown?

15          A     No, ma'am.

16          Q     And you'd never met him before?

17          A     No, ma'am.

18          Q     Okay.  When you -- so do you have a

19     meeting with Dan Brown?

20          A     Yes.  We had -- I had a meeting with

21     Dan Brown.  He introduced me to Dan Brown during

22     one of their weekly meetings.  I guess you'd call

EXHIBIT 1
Page 268 of 639

www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000049

Paul Roysdon , Ph.D.                                    May 30, 2025

Page 50

1      it like a soft hand offer introduction.  There

2      was a follow-up meeting -- I'm sorry.  I'll let

3      you ask the questions.

4           Q    Okay.  So you have a weekly meeting.

5      Todd Jaspers and Dan Brown are there, correct?

6           A    This was their meetings, yes, their

7      weekly meeting.

8           Q    Okay.

9           A    He asked me to --

10          Q    Was there --

11          A    -- attend at the end to just introduce

12     me.

13          Q    Was there anybody else at that first

14     meeting?

15          A    There were several people, and I don't

16     know them.

17          Q    Okay.  Were there people there that you

18     ended up working with --

19          A    No, ma'am.

20          Q    -- at any point?  Okay.

21               And then you mentioned a follow-up

22     meeting, correct?

Page 51

```
 1        A    The follow-up meeting was the first

 2    opportunity I had to present the ideas.  Dan

 3    Brown brought with him David Rivera from

 4    Def-Logix and his deputy -- I don't recall his

 5    name -- to, essentially, vet the ideas that I was

 6    proposing.

 7        Q    What do you mean by vetting your ideas?

 8        A    The ideas that I was proposing were

 9    very revolutionary.  He wanted somebody else in

10    the room that was smart enough to understand the

11    ideas even though they didn't have a background

12    in AI, understand the level of automation and

13    potential of the algorithms and whether or not

14    that's something that the Air Force should

15    pursue.

16        Q    Other than Mr. Rivera and his deputy

17    and Dan Brown, was there anybody else at that

18    meeting?

19        A    No, ma'am.

20        Q    Okay.  What happens after that second

21    meeting?

22        A    I don't recall the timeline, but,
```

EXHIBIT 1
Page 270 of 639
www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000051

1      somehow, I guess maybe within a week or two, Dan

2      Brown reached out to me, asked me if I'd consider

3      working as a consultant.  At the time, that

4      hadn't even occurred to me, so I had to check

5      with legal.

6                  So I reached out to Office of General

7      Counsel, OGC, at NSA.  I spoke with an Amy

8      Riviera, I think.  Fairly confident on the first

9      name.  Last name, I might be mixing up the

10     letters.

11                 She gave me a lot of legal advice.  It

12     basically came down to, as long as it didn't

13     conflict with my work -- and you have some of the

14     e-mails that she followed up with.  I provided

15     that content to leadership.  She said my

16     leadership had to approve.  My leadership did

17     approve.

18                 We worked flexible work hours at NSA,

19     so it allowed me to do some of that work, say,

20     during lunch or a break.  If I had to go over to

21     Air Force, I would just take a long lunch and

22     make sure I put in my 40 hours at NSA and then --

Paul Roysdon , Ph.D.                                    May 30, 2025

Page 53

1      you know, at some point during the week, so I

2      didn't have to be there necessarily nine to five,

3      and often I would stay late at NSA to complete my

4      hours.  And then, of course, nights and weekends,

5      I would work.

6               My leadership approved.  I went back.

7      I had several phone conversations with Amy.  I

8      tried to ensure we also had an e-mail tracking of

9      those conversations so I had evidence of what I

10     was doing, that it was above board.  In case

11     anybody in the future disputed it, I wanted to

12     make sure I had that in e-mails.

13              And at some point, Dan arranged -- I

14     would call it a line of funding.  I didn't work

15     for Dan directly.  He arranged for me to be

16     brought on a contract that GITI had.  So the

17     funding somehow went from Air Force Life Cycle

18     Management HNCO through AFRL, Air Force Research

19     Laboratory, to a contract that GITI was on, which

20     I believe was the ACT 2, A-C-T 2, contract.

21              I was brought on to that as a

22     consultant on a 1099, and the money was kind of

EXHIBIT 1
Page 272 of 689

www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000053

Paul Roysdon , Ph.D.                                    May 30, 2025

Page 54

```
1     routed through there so I could help -- excuse

2     me -- so that I could help advise the Air Force

3     on these cyber AI projects.  I know it sounds

4     convoluted.  It was.

5          Q    We're going to break it all down.

6     Don't worry.

7               So let's sort of back up.  So is it

8     fair to say that Dan Brown was your Air Force

9     point of contact?

10         A    Yes, ma'am.

11         Q    Was there anybody else at the Air Force

12    that you regularly communicated with?

13         A    No, ma'am.

14         Q    And did you regularly communicate with

15    Dan Brown?

16         A    Yes, ma'am.

17         Q    What e-mail address did you use to

18    communicate with Dan Brown?

19         A    It varied.  For unclassified

20    communication, I used an unclassified e-mail

21    address.  For classified communication, though

22    infrequent, I was allowed to use my NSA address.
```

Paul Roysdon , Ph.D.                              May 30, 2025

Page 55

1          Q    And for your unclassified e-mail, would

2    that have been a personal e-mail?

3          A    It was a personal e-mail.

4          Q    Do you remember the e-mail address?

5          A    I don't.  It's since been deleted.

6          Q    Is it something like AidedNav?

7          A    Yes.  Probably yes.

8               (Reporter clarification.)

9               THE WITNESS:  AidedNav,

10   A-I-D-E-D-N-A-V.

11   BY MS. SEEMAN

12         Q    At Gmail.com?

13         A    Yes, ma'am.  Thank you.

14         Q    All right.  And, earlier, you know, you

15   said six projects.

16              Were all of those projects part of the

17   same umbrella?

18         A    Yes, the umbrella, and the unclassified

19   name was titled Fibonacci.

20         Q    And so all six of those projects were

21   related?

22         A    Yes, ma'am.

**EXHIBIT 1**
**Page 274 of 689**
www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000055

Page 56

1          Q    Okay.  So I just want to clarify.  So,

2     earlier, when you were presenting your projects

3     to NSA, you didn't do six separate ones for each

4     part of the Fibonacci projects?

5          A    When I presented to NSA, there were, I

6     would say, generally speaking, six different

7     areas and ideas for how we could improve cyber

8     network operations in those areas using the

9     combination of cyber and AI tools, where AI was

10    built into the cyber tools fundamentally.

11         Q    All right.  And then going back to your

12    e-mail address, you mentioned your -- the Gmail

13    that we talked about.  You said it's since been

14    deleted.

15              Do you know when it was deleted?

16         A    I don't.

17         Q    Do you know if it was after 2022?

18         A    I don't recall.

19         Q    Do you know why you deleted it?

20         A    When I closed down the business, I no

21    longer had a need for it.

22         Q    And which business was that e-mail

Paul Roysdon , Ph.D.                                    May 30, 2025

Page 57

 1    associated with?

 2         A    AeroAnalysis.  Or, no.  I had

 3    started -- based on my Ph.D. research, I had

 4    started -- or created a website -- I think I

 5    created a website.  I don't even know.  I don't

 6    recall.  But the AidedNav term was based on my

 7    research, my Ph.D. research.

 8              Again, the work I did for GITI, I did

 9    on a 1099 as Paul Roysdon, not as AidedNav,

10    though there are references for AidedNav.

11         Q    Did you use the AidedNav Gmail to

12    communicate with GITI?

13         A    I did.  So, for example, my weekly

14    reports were communicated to the program manager,

15    Ted Oakley, through that Gmail account.

16         Q    Okay.  So, as you're advancing --

17    actually, I just want to make sure I understand

18    this.

19              So you present the Fibonacci projects

20    to Dan Brown and the Air Force HNCO staff,

21    correct?

22         A    Just to Dan Brown.

EXHIBIT 1
Page 270 of 639
www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000057

1          Q     Just to Dan Brown.  Okay.

2          A     Later it was presented to his

3     leadership.

4          Q     Okay.  Were you in that presentation to

5     the leadership?

6          A     I was in one of those presentations.  I

7     believe he had presented it to his leadership

8     maybe once or twice before he brought me in as a

9     subject matter expert to present.

10         Q     Okay.  How many, to your knowledge,

11    presentations were there to the leadership about

12    the Fibonacci projects before you were brought on

13    as a consultant?

14         A     It would only be one.

15         Q     Okay.  And for the one that you

16    participated in, how did you identify yourself at

17    that meeting?

18         A     As Paul Roysdon.

19         Q     Did you identify yourself as an NSA

20    employee?

21         A     I identified myself as Paul Roysdon,

22    someone who also worked at NSA.

Paul Roysdon , Ph.D.                                    May 30, 2025

Page 59

1        Q    And for the meeting you were at, do you

2    remember anybody other than Dan Brown that was

3    there?

4        A    I don't recall.  At least for that

5    meeting, I don't recall.

6        Q    You mentioned leadership.  Do you know

7    like what level or position?

8        A    It could have been -- though I don't

9    recall, it could have been his local leadership

10   in that HNCO office in Texas.  It probably also

11   included his leadership in Washington, D.C.,

12   which would have included Danny Burghard and

13   Allen Rabayda.  But, again, at that meeting, I

14   don't recall.

15       Q    Okay.

16       A    I do recall the last meeting we had.

17       Q    When you -- earlier you mentioned you

18   had a flexible work schedule at NSA.

19            When you were presenting to the Air

20   Force, were you on the clock at NSA?

21       A    No, ma'am.

22       Q    And were -- these presentations of the

EXHIBIT 1
Page 278 of 639

www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000059

Page 60

1    Fibonacci projects, were those your first

2    interactions with the Air Force as an NSA

3    employee?

4          A    Yes, ma'am.

5          Q    Okay.  Other than the initial meetings

6    we discussed and the presentations we discussed,

7    were there any other meetings that you were

8    involved in before you became a consultant with

9    GITI?

10         A    No, ma'am.

11         Q    Okay.  When you presented at the -- did

12   you talk at the presentation with Air Force

13   leadership?

14         A    Yes.  I was presenting.

15         Q    Okay.  In an unclassified manner --

16         A    Okay.

17         Q    -- what were you presenting?

18         A    I presented several ideas that then

19   became or maybe at that point were already titled

20   part of this Fibonacci series.  I think at that

21   point I presented maybe three or four projects.

22              To clarify, when I presented these

EXHIBIT 1
www.CapitalReportingCompany.com
Page 279 of 639
202-857-3376

Roysdon Fact Witness_000060

1       topics within computer network operations at --

2       at NSA, Fibonacci was not associated or

3       affiliated with the projects as far as the name.

4       That was a name that Dan Brown wanted to create

5       to have some kind of pizazz to the projects for

6       his senior leadership, so that when it was

7       presented to the senior leadership, it, you know,

8       had a fancy title.  For me, I was focused on the

9       technology --

10          Q    Okay.

11          A    -- not on fancy names.  So, by the time

12      it was presented to his leadership, it did have

13      these names, and there were at least three

14      projects, and I can't remember the other ones at

15      the moment.

16              Are you looking for more details?

17          Q    No, that's all right.

18          A    Okay.

19          Q    For the naming, though, so you did not

20      name the projects Fibonacci and Fibonacci XYZ and

21      the like?

22          A    I facilitated this, yes.

Paul Roysdon, Ph.D.                                    May 30, 2025

Page 62

1          Q    You facilitated it?

2          A    He wanted something that was very

3     mathy, and I -- I mentioned a couple of names.

4     Fibonacci was one of them.  He liked that.

5          Q    It has nothing to do with the Fibonacci

6     sequence?

7          A    Of course it does.  It's --

8          Q    Okay.

9          A    It's math.

10         Q    You just wanted a fun math name,

11    though, is what I'm --

12         A    He wanted a fun math name, yes --

13         Q    Okay.

14         A    -- to emphasize that we were going to

15    use some very advanced mathematics as part of the

16    cyber tools, and it was kind of a sales point.

17         Q    And you might have already mentioned

18    this, but I just want to be clear.

19              Did you get -- who at NSA did you get

20    approval from to present at the Air Force?

21         A    My immediate leadership.

22         Q    What are their titles, if you can say?

EXHIBIT 1
Page 281 of 689
www.CapitalReportingCompany.com
202-857-3376
Roysdon Fact Witness_000062

Paul Roysdon, Ph.D.                                    May 30, 2025

Page 63

1          A     At the time -- their titles have

2     changed.  At the time, my immediate leader was,

3     I'll say, a branch chief.

4          Q     Other than the Air Force, had you made

5     any other pitches of projects to external

6     agencies?

7          A     No, ma'am.

8          Q     Okay.  Is it fair to say the Air Force

9     one was your only one?

10         A     Yes, but there's nuance to that,

11    because through the course of doing that work,

12    Dan Brown asked me on a number of occasions to

13    present to a larger audience.

14               One occasion in particular -- I believe

15    it was January 2020 -- I was asked to go to El

16    Segundo, California to the Aerospace Corporation,

17    which is an FFRDC, Federally Funded Research and

18    Development, FFRDC, Company.  And there were many

19    other agencies present at that -- it was

20    essentially a classified conference.  He asked me

21    to present at that conference.  So that would

22    have included, like, Department of the Navy,

EXHIBIT 1
Page 282 of 639

www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000063

1        DARPA and a few others.

2                    I was not there to pitch them, so

3        that's why I say there's nuance.  I was not there

4        to pitch them.  I was there to -- to brief at

5        Dan's request the progress that was -- the

6        progress of the Fibonacci projects to kind of

7        give awareness to other, like, IC and DoD

8        components, but it was not to pitch them.

9                    MS. SEEMAN:  Okay.  So let's -- we've

10       talked a little bit about these NSA e-mails.

11                   We'll go ahead and mark this as Exhibit

12       1.  And a copy for counsel.

13                   (Deposition Exhibit Number 1 was

14                   marked for identification.)

15                   THE WITNESS:  Rivera, yeah.  I was

16       close.

17                   MS. SEEMAN:  I will note, I think,

18       there's -- two pages of this are out of order.

19       And just for the record, this is Plaintiff Bates

20       15 through 26, and I believe pages 19 and 20 are

21       backwards.

22

1    BY MS. SEEMAN

2         Q    All right.  So I'd like to direct your

3    attention to the page that has Bates No. 24 and

4    an e-mail from you to the OGC Admin Ethics NSA

5    Office of General Counsel.

6              And what was the date of this e-mail?

7         A    March 21, 2019.

8         Q    All right.  And this e-mail --

9    actually, do you -- I'll give you a chance to

10   review it.  Let me know when you're ready.

11        A    Yes, ma'am.

12        Q    All right.  And so, when you sent this

13   e-mail to NSA OGC, what was your understanding of

14   what your role would be with the Air Force?

15        A    A technical advisor.

16        Q    Did you understand this would be a paid

17   position?

18        A    I believe so, yes.  That's why I was

19   reaching out to OGC.

20        Q    And on the page that has Bates 25, you

21   mentioned two concerns, one of them being you

22   wanted to make sure there wasn't a conflict of

Paul Roysdon , Ph.D.                                May 30, 2025

Page 66

1      interest.

2              A    Correct.

3              Q    Why were you concerned about whether

4      there was a conflict of interest?

5              A    At the time, I wasn't -- I wasn't clear

6      of what the, like, legal statutes were for

7      doing -- doing work that was similar to -- to

8      work that I was doing at NSA.

9                   At the time, I was the chief data

10     scientist, chief or lead data scientist, leading

11     a team -- it's actually in here -- in Enterprise

12     Discovery Operations, EDO.  And I was

13     proposing -- so the work that I was doing there

14     was as a data scientist, and I was proposing

15     ideas to include data science, things here within

16     the discipline, to cyber.  And I wanted to make

17     sure there wasn't a concern of, like, overlap.

18                  At that point, I had prior experience

19     working in the capabilities directorate doing

20     tool development, which would include cyber

21     network operations tools, but that was not my job

22     role at that -- at this time.  And that's where

EXHIBIT 1
Page 285 of 689
www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000066

Paul Roysdon , Ph.D.                              May 30, 2025

Page 67

1      the -- the concern came in is that, while I had

2      prior experience doing that, I was not currently

3      doing that, but I was recommending things that

4      should be done by tool developers, and I wanted

5      to make sure there was no conflict of interest.

6           Q    In just like a very basic term, was the

7      work you were doing at NSA the same work that you

8      intended to do as a consultant?

9           A    No.

10          Q    Okay.

11          A    Thank you for clarifying.

12          Q    In elementary terms, how -- how is it

13     not?

14          A    How is it not?

15          Q    Yes, meaning --

16          A    Okay.

17          Q    So you, you know, sort of created these

18     projects when you were at NSA, and then you were

19     going to go work on those projects at the Air

20     Force, correct?

21          A    Correct.

22          Q    Okay.  So can you explain to me how we

EXHIBIT 1
www.CapitalReportingCompany.com
Page 286 of 639
202-857-3376

Roysdon Fact Witness_000067

Paul Roysdon , Ph.D.                                      May 30, 2025

1    get from moving this project over here to it not

2    being the same as you do at NSA?

3              MR. HENRY:  Objection.  Form.

4              THE WITNESS:  So the work that I was

5    doing at EDO with my job title as lead or chief

6    data scientist was to build algorithms for

7    collection of data.  That's the easiest way I can

8    describe it.  The mission of NSA is Signals

9    Intelligence, SIGINT, so we collect data from

10   networks, from hard drives, et cetera.

11             At the time, I was developing or

12   leading and helping develop tools to do, like,

13   imagery analysis, so using machine learning for

14   imagery analysis, using machine learning to look

15   at, like, RF telemetry.  So your cell phone

16   transmits signals.  So I was assisting analysts

17   in building software and algorithms for doing

18   signals analysis, which is different than the

19   work that I was proposing for CNO, again, moving

20   back to what I did several years prior as a tool

21   developer, cyber network operations tools

22   developer.

EXHIBIT 1
www.CapitalReportingCompany.com
Page 287 of 639
202-857-3376

Roysdon Fact Witness_000068

Paul Roysdon , Ph.D.                                May 30, 2025

Page 69

1          Sorry.  I can more easily talk about my

2     Leidos stuff that was unclassified entirely than

3     this because it's unclassified.

4          Q    That's fair.  That's fair.

5          A    But it was distinctly different, in

6     that I was not developing machine learning

7     algorithms for cyber network operation tools.

8          Q    Okay.

9          A    I had a background in cyber network

10    operation tool development.  I was not currently

11    doing that, but I knew exactly what the tools

12    were that they were using because I had -- I had

13    previously built those tools.  I was saying, you

14    know what, these tools could be a lot more

15    effective if you included AI in those tools.

16         Q    Okay.  When you were at NSA, were you

17    doing cyber AI work?

18         A    I was not.

19         Q    Okay.  All right.  In --

20         A    I was proposing it.

21         Q    Proposing it.  Okay.  So you never at

22    NSA worked on cyber AI?

EXHIBIT 1
Page 288 of 689

www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000069

1          A    For NSA, no.

2          Q    Okay.  On -- in this e-mail, on the

3     top -- after it says, "I have the following

4     concerns" -- "I was asked if I would consider

5     working the math problems as a part-time evenings

6     and weekends consultant to CYBERCOM."

7               Who asked you?

8          A    Dan Brown.

9          Q    And were you asked to consult as a

10    government employee?

11         A    No.

12         Q    How were you asked to consult?

13         A    As a 1099 consultant.

14         Q    Okay.  So that would be a private

15    consultant, correct?

16         A    Yes.

17         Q    Okay.  And then for the second number,

18    it says this will be cleared work due to the

19    sensitivity of the application while the

20    algorithm development will be, in parenthesis, U,

21    for unclassified.

22         A    Correct.

1          Q      "The application will be S/NF or above.

2     Would CYBERCOM have to sponsor my clearance for

3     that work?"

4                  Why were you asking about this?

5          A      At the time I didn't quite understand

6     how sponsoring of a clearance worked when it came

7     to something like this.  And through the phone

8     conversations with Amy, she said, no, because

9     once you have a clearance, especially like an NSA

10    clearance, you can't hold a dual clearance.  So

11    NSA would hold my clearance, and I'd be able to

12    do work on their stuff and they -- they should be

13    able to just read me into a program.  And that

14    was the understanding I had at the time.

15                  But that's why I was asking this

16    question, because the work there, which you kind

17    of skipped over, was secret/no foreign, S/NF,

18    secret/no foreign and above.

19         Q      So, for your consultant work, was that

20    going to be unclassified, or was it going to be

21    at a higher level?

22         A      So there would be aspects of the work

1       that would be unclassified, leveraging algorithms

2       that I'd previously built and had posted on -- on

3       GitHub working with some collaborators.

4               And then the advising -- often the

5       advising would be unclassified, except for when

6       we talked about things specific to the program,

7       and then that would -- that would be at the

8       program level, which was TS-SAP, Special Access

9       Program, so a Top Secret Special Access Program,

10      SAP.

11          Q    Okay.  And did you think you needed to

12      have clearance to be able to perform your

13      consulting work?

14          A    It was required.

15          Q    By who?

16          A    By the Air Force.

17          Q    All right.  And I'd like to direct your

18      attention to Bates No. 23.

19               So this is an e-mail from you to Amy

20      Rivera at NSA Office of General Counsel, correct?

21          A    Yes, ma'am.

22          Q    And what's the date of this e-mail?

Paul Roysdon , Ph.D.                                          May 30, 2025

Page 73

1           A    April 9, 2019.

2           Q    All right.  And once you've had a

3     chance to review, please let me know.

4           A    Okay.

5           Q    All right.  So, at this point, had you

6     had communications with Ms. Rivera outside of

7     e-mail?

8           A    We talked on the phone several times,

9     yeah.

10          Q    Do you know any, like, date range of

11    those calls?

12          A    Yeah.  It would have been between the

13    first one and the last few.  We had several phone

14    conversations.  So the first one was in

15    March '21, but we probably spoke on the phone

16    within a couple of days of that.  We had a few

17    phone conversations, but we followed up with

18    e-mails.

19          Q    And earlier you mentioned you wanted to

20    make sure that you documented those conversations

21    in e-mail, correct?

22          A    Yes, ma'am.  As much as possible, yes.

Roysdon Fact Witness_000073

Page 74

```
 1          Q    Yeah.  Is there anything as you're

 2     looking back through this that you think you

 3     talked about on a call that was not memorialized

 4     in an e-mail?

 5          A    With what you brought up so far, no.

 6          Q    Okay.  And so, in this e-mail, it says,

 7     "I misunderstood the consultant work, and I

 8     received clarification last week."

 9               And then it says you've been asked to

10     consult for a private sector company.

11          A    Correct.

12          Q    How is that different than your prior

13     understanding from March 21st, 2019?

14          A    So I think, at this time, my

15     understanding when I talked with Dan Brown is

16     that I was going to be consulting for the Air

17     Force, and the conversation I had with Amy was,

18     well, this might be a problem if you represent to

19     like senior leadership in the Air Force or

20     something like that.  So I need clarification.

21               When I talked again with Dan Brown, he

22     had somehow also done some legwork -- I don't
```

EXHIBIT 1
Page 293 of 689

Capital Reporting Company
www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000074

Paul Roysdon , Ph.D.                              May 30, 2025

Page 75

1     know what -- and that's where this clarification

2     came in of, like, okay, well, I'd like you to

3     work for a private company.  And at this point,

4     I -- I don't recall -- I don't -- I don't recall

5     that I knew which company.  So, now, we know it

6     as GITI, but at this time, I don't think it was

7     GITI.  I didn't know at this point.

8          Q    At this point, did you understand that

9     Dan Brown would -- I hate to use -- hook you up

10    with a company?

11              MR. HENRY:  Objection to foundation.

12              THE WITNESS:  It was my understanding

13    that Dan Brown had made arrangements to bring me

14    on as a consultant by name and do a by name

15    recommendation or nomination or something like

16    that.

17              Now, there's some legal restrictions

18    where you can't say, I want this person, but it's

19    like, I want to have a person with these skill

20    sets, with this sort of knowledge, and at that

21    time, I was kind of the only person in the

22    government that had that knowledge, government or

Roysdon Fact Witness_000075

1        industry, that also had the clearances.

2        BY MS. SEEMAN

3            Q    And the last bullet point -- so one,

4        two, three, four, five -- the fifth bullet point

5        says, "I have discussed this matter with my

6        leadership, and I have their approval to do this

7        consulting outside of work hours."

8                 Who in your leadership approved your

9        consulting work?

10           A    So it would have been the same person I

11       mentioned earlier, the chief of the division.

12           Q    Did you have to fill out any --

13           A    Branch --

14           Q    -- paperwork?

15           A    I'm sorry.  I said branch chief.  It

16       would be more branch level, yes, a branch chief.

17       Pardon?

18           Q    Did you have to fill out any

19       paperwork --

20           A    No, ma'am.

21           Q    -- for that?

22                When you approached the branch chief

1      about this opportunity, what did you tell them?

2              Is it a him?

3         A    Told her.

4         Q    Her.  Thank you.

5         A    Yes, ma'am.  I mentioned that I had

6      been approached by somebody at Air Force via --

7      Todd Jaspers introduced me.  They wanted to build

8      out the algorithms that I proposed or build out

9      the tools that I proposed based on these

10     algorithms.

11             And she and her deputy were very

12     encouraging, primarily because they wanted to see

13     this sort of work, you know, serve the country,

14     and they knew that I was kind of the only guy to

15     do it.

16        Q    Did -- was your branch chief or her

17     deputy the ones that recommended you reach out to

18     the Office of General Counsel?

19        A    No.  I did that on my own.

20        Q    All right.  So turning to --

21        A    And I did tell them that I talked with

22     OGC --

Paul Roysdon , Ph.D.                                    May 30, 2025

```
 1          Q    Okay.

 2          A    -- because they asked.

 3          Q    Yeah.  That actually gives me a good

 4     follow-up.  So they gave you an approval.

 5               Did you have any other communication

 6     with them about your consulting work?

 7          A    At that time?

 8          Q    Yes.  Let's start at that time.

 9          A    At that time, no.

10          Q    Okay.  Did you ever have any additional

11     conversation with them about your consulting

12     work?

13          A    There were some occasions where I may

14     have mentioned -- I don't recall specifically --

15     that I was going to take a long lunch to give a

16     presentation, something of that nature, but,

17     generally speaking, they just wanted to know

18     whether or not things were successful or if the

19     work was successful.  But they -- no, they

20     generally did not ask any questions.

21          Q    And they didn't -- did they ask for

22     regular status updates?
```

EXHIBIT 1
www.CapitalReportingCompany.com
Page 297 of 689
202-857-3376

Roysdon Fact Witness_000078

1         A    No.  The reason is that within the

2     community -- this is fairly obvious for people on

3     the outside -- the community is fairly siloed,

4     and it has to be.  I was doing a lot of work even

5     in that office where they were not read into that

6     work, so they couldn't ask.

7              Similarly, because this work was a SAP,

8     they would not get into that SAP.  They couldn't

9     ask.  But, generally, within the community, this

10    is acceptable.  You ask somebody how they're

11    doing.  Are things going well?  Yes.  Are there

12    any concerns?  No.  It's things like that, but

13    asking details about a program, sometimes even

14    acknowledging a program, is -- is forbidden.  So

15    it's not a surprise to me that they did not ask

16    much.

17        Q    Turning your attention to Bates 22,

18    there's two e-mails on the bottom of this page,

19    both from Tuesday, April 9th, 2019.

20             And I'll give you a chance to read, and

21    then let me know when you're ready.

22        A    Yes, ma'am.

Paul Roysdon , Ph.D.                                    May 30, 2025

Page 80

1          Q    All right.  So these e-mails talk about

2     a sort of, quote, behind-the-scenes arrangement

3     versus having direct contact with Air Force

4     employees.

5          A    Correct.

6          Q    What -- can you explain what that

7     means?

8          A    So the way I understood this from Amy

9     is that I was not to present myself as -- you

10    know, as somebody from NSA recommending things to

11    senior Air Force officials, that the work for,

12    like, demos of -- of the work -- like, as the

13    project is progressing, if there's a

14    demonstration of it, my work was to be behind the

15    scenes, that the contractors were to do those

16    demos.

17              And this is, in essence, how I had to

18    conduct my work, occasionally presenting it

19    within the confines of an Air Force conference

20    room, but still like a behind-the-scenes advisor,

21    not a direct advisor.

22          Q    Okay.  I want to make sure I understood

Paul Roysdon , Ph.D.                                    May 30, 2025

Page 81

1      the last part of what you just said.

2                  So you could still be in the conference

3      rooms for presentations or briefings?

4          A    So I was still allowed to be -- only

5      under certain circumstances was I allowed to

6      present.

7          Q    Okay.  And what were those

8      circumstances?

9          A    For example, briefing the -- the maths

10     behind a particular technique, I was allowed to

11     present in that context, but it was really

12     limited to that.

13                 Program progress, demos and things like

14     this had to be presented by the contractor.

15         Q    Just so the record's clear, what's

16     the -- what's a demo?

17         A    Like a technical demonstration.  So

18     that would be -- can I give an analogy?  Okay.

19     An unclassified example would be:  The work that

20     I was doing was the -- the algorithms behind,

21     say, the autonomous navigation of a car, like in

22     a Tesla, and the reliability of those algorithms.

EXHIBIT 1
www.CapitalReportingCompany.com
Page 300 of 639
202-857-3376

Roysdon Fact Witness_000081

Paul Roysdon , Ph.D.                                    May 30, 2025

Page 82

1     Whereas, a demo would be you going out and test

2     driving the vehicle with a salesperson next to

3     you and talking about the capabilities of that --

4     that vehicle.  I wouldn't even be in the car.

5          Q    All right.  So turning to Bates 17 --

6     we'll go a little bit out of order.  I'll flip

7     back through a few things.

8               So for this e-mail from Ms. Rivera on

9     May 13th, 2019, the last sentence says, "While it

10    is helpful that the Air Force wants to help you

11    avoid potential problems, the law would still

12    prohibit you from having substantive interactions

13    with Air Force representatives while you are

14    working for NSA, even if the Air Force signs an

15    MOU."

16              First, is MOU a memorandum of

17    understanding?

18         A    Correct.

19         Q    Okay.  Who from the Air Force offered

20    to prepare an MOU for your work?

21         A    Dan Brown.

22         Q    And did you get any drafts of that MOU?

EXHIBIT 1
www.CapitalReportingCompany.com
Page 302 of 639
202-857-3376

Roysdon Fact Witness_000082

Paul Roysdon , Ph.D.                                May 30, 2025

1           A       No.

2           Q       Okay.  All right.  And I'm turning to

3       18.  This talks about that MOU to make sure

4       that's clear that when you're interacting with

5       Air Force employees that it would not be

6       interpreted as an official from the government,

7       but, rather, as a consultant and subject matter

8       expert in mathematics.

9           A       Correct.

10          Q       So does this go to that -- what we were

11      just talking about, the demos versus

12      presentations versus whatever other briefing?

13          A       Correct.

14          Q       Okay.  Did this advice give you pause

15      about taking this consulting job or opportunity?

16          A       It did until I had a conversation with

17      Amy.

18          Q       Okay.  And can you tell me more about

19      that?

20          A       We had to clarify what substantive

21      meant in the prior e-mail.  Substantive, as she

22      and I worked through our understanding, meant

Paul Roysdon , Ph.D.                                    May 30, 2025

Page 84

1        having like personal representation of demos to

2        Air Force leaders or officials, senior leaders,

3        talks of budget.  These are more substantive.

4                  But behind the scenes -- this is where

5        I needed clarification was -- behind the scenes

6        is more -- if you have to talk about the

7        mathematics about something, then I could brief

8        on the mathematics and how that -- how that is

9        used within the car example, used within the

10       navigation system, but not be there for, you

11       know, driving the car.

12            Q    And just to be clear, in a situation

13       where you are with Air Force employees --

14       actually, let me -- we'll come back to that

15       later.

16                  And there's this long e-mail that

17       starts at the bottom of 18, and earlier I

18       mentioned it should -- the numbers at the bottom

19       should actually go 18, 20, 19 for the full

20       e-mail.  Are you able to tell me where in this --

21       actually, let me back up.

22                  Did NSA OGC ever issue a formal

**EXHIBIT 1**
**Page 303 of 639**

www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000084

Paul Roysdon , Ph.D.                                May 30, 2025

Page 85

1      approval for your outside employment?

2           A    No.  That was not something that Amy

3      was authorized to do.  And we talked about that

4      on the phone.  I think she followed up on that in

5      an e-mail somewhere, but I don't recall.

6           Q    On Bates 20, there's a bold and

7      underlined sentence from Amy's e-mail, and it

8      says, "If this outside arrangement requires you

9      to work in a government facility, please review

10     the below guidance."

11          Did -- did you know whether or not your

12     consulting work would require you to work in a

13     government facility?

14          A    Again, this comes down to some nuance

15     that she and I had to talk about over the phone.

16     The work that I was doing was -- the work was

17     unclassified, development of the mathematics,

18     overseeing the contractors, also done in an

19     unclassified space, not done in a government

20     facility.  The only time I was in a government

21     facility was for a presentation, but there was no

22     work performed in the sense of like doing

EXHIBIT 1
www.CapitalReportingCompany.com
Page 304 of 639
202-857-3376

Roysdon Fact Witness_000085

Paul Roysdon , Ph.D.                                    May 30, 2025

Page 86

```
 1    software development --

 2         Q    Okay.

 3         A    -- or mathematics development in a

 4    government facility.

 5              So, based on my understanding of the

 6    conversation that she and I had, that was -- that

 7    was an acceptable understanding.

 8         Q    Okay.  And then I want to turn your

 9    attention to Bates 19 at the middle of the page,

10    where it starts with "Bottom line."

11         A    I'm sorry.  Where?

12         Q    Where it starts with "Bottom line."

13         A    Oh, yes.  Uh-huh.

14         Q    So this says, "As stated earlier, it is

15    almost impossible for federal personnel to work

16    for a contractor in the federal workplace.  In

17    theory, they could perform roles that do not

18    involve communications or that involve only

19    ministerial communications.  However, if the

20    quality, quantity, or timeliness of their work is

21    challenged, they may not participate in such

22    discussions."
```

EXHIBIT 1
www.CapitalReportingCompany.com
Page 305 of 639
202-857-3376

Roysdon Fact Witness_000086

Paul Roysdon , Ph.D.                              May 30, 2025

Page 87

```
 1              So were you -- based on your
 2       communications with the Office of General
 3       Counsel, was it your understanding that you were
 4       allowed to directly communicate with Air Force
 5       employees?
 6              A    Provided that it was only on the
 7       substance of the mathematics, yes.
 8              Q    Okay.  And if they said, Dr. Roysdon,
 9       the numbers aren't crunching, the math isn't
10       mathing, could you respond to that?
11              A    Can you clarify that question?
12              Q    Yes.  If they had -- if they were like,
13       hey, I think there's something wrong with the
14       formula, it's not working, could you respond to
15       that in your role as a consultant?
16                  MR. HENRY:  Objection to form.
17                  THE WITNESS:  Yes.  In my role as a
18       consultant, I could clarify the mathematics.
19       BY MS. SEEMAN
20              Q    Okay.  Directly to the Air Force?
21              A    To whomever was asking the question.
22              Q    Okay.
```

EXHIBIT 1
Page 306 of 639

www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000087

Paul Roysdon , Ph.D.                                May 30, 2025

Page 88

1          A    In the few times that I presented,

2     nobody asked questions.

3          Q    Oh?

4          A    Nope.

5          Q    So at any time during your -- we'll

6     just say in the 2019 to 2020 time frame -- were

7     you ever at the Air Force office of Life Cycle --

8     Air Force Life Cycle Management Center, HNCO,

9     were you ever there in your capacity as an NSA

10    employee?

11         A    No.

12         Q    And so is it fair to say, then, that

13    you would not have informed NSA OGC that you

14    would also be working as an NSA employee because

15    you weren't?

16         A    That's correct.

17         Q    Correct.  Okay.

18         A    From the day that I was read in until

19    the day that I was read out, I was working as a

20    consultant when entering those spaces.

21         Q    During this time frame that you had the

22    GITI consulting work, did you ever reevaluate

EXHIBIT 1
Page 30 of 68

www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000088

Paul Roysdon , Ph.D.                                    May 30, 2025

Page 89

1     your consulting work when you started your joint

2     duty assignment?

3          A    I may have had a conversation with --

4     with Amy that -- well, she and I did have a few

5     different conversations.  I don't recall whether

6     or not I identified the kind of change of duty

7     station, as it were, to go work at ODNI here in

8     Virginia.

9          Q    Is there -- was there any -- did you

10    anticipate or was there any overlap between your

11    joint duty assignment job and your consulting

12    work?

13         A    Yes.

14         Q    What's that overlap?

15         A    Are you asking for a time?

16         Q    No, substance.

17         A    Oh, zero overlap.

18         Q    So is it fair to say you were not

19    working on cyber AI while at ODNI --

20         A    Correct.

21         Q    -- back in --

22         A    Yes.

EXHIBIT 1
Page 309 of 659
www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000089

1        Q    -- 2019 to 2020?

2        A    Correct.

3        Q    Okay.  Outside of OGC and your branch

4    chief and her deputy, did you seek anybody else's

5    approval at NSA before starting your consulting

6    work?

7        A    No.

8        Q    Did you seek approval from any other

9    entity before starting your consulting work?

10       A    No.  It was not required.

11            MS. SEEMAN:  Can we go off the record

12    for a second?

13            (Recess 12:21 p.m. to 12:47 p.m.)

14    BY MS. SEEMAN

15       Q    So, Dr. Roysdon, I want to direct your

16    attention back to Exhibit 1, this group of NSA

17    e-mails.

18            Let's turn back to Plaintiff Bates 22

19    and the last line of Amy's e-mail to you from

20    April 9th, 2019, which says, or would your work

21    be considered, quote, behind-the-scenes, unquote,

22    without requiring any direct involvement with Air

1      Force representatives?

2              So what did this question mean to you?

3      A     At the time, the way I understood the

4      question was, would the -- would the development

5      work that I was doing on -- on any of the math or

6      algorithms be behind-the-scenes development work,

7      and in phone conversations with her, that's kind

8      of how we clarified the work, as behind the

9      scenes.

10     Q     Okay.  And then moving up to your

11     e-mail response to her that same day, you say, I

12     think I need to clarify -- further clarify.  You

13     asked if I would be, quote, required, end quote,

14     to have direct contact with anyone at the Air

15     Force.  No, I will not be required.

16             Here, when you're saying you won't be

17     required, what do you mean by that?

18     A     There was nothing that would be, like,

19     in the contract where I'd have to present the

20     information, meaning I could be in a conference

21     room like this one and be asked to clarify

22     content of a presentation.

```
 1          Q    All right.  And then we're going to go
 2     through the long e-mail that --
 3          A    Yeah.
 4          Q    -- starts on 18.
 5          A    I think you'll notice that there's a
 6     lot of back and forth here, and there's also
 7     quite a bit of conversations that weren't
 8     necessarily documented.
 9               But all of this is to try to make sure
10     even throughout the program, as soon as I did --
11     did start doing the work after clarification from
12     her, that I was making sure that I was doing
13     things, you know, legally, on the up and up, make
14     sure it wasn't affecting my position at NSA or
15     doing anything unethical, and that's -- that's
16     why we had several back and forths via e-mail and
17     via phone.
18          Q    All right.  So in this e-mail from
19     Ms. Rivera on Monday, April 15th, 2019, she --
20     this is essentially a three-page e-mail to you
21     outlining potential concerns with the consulting
22     work; is that correct?
```

Page 93

1        A    Yes.

2        Q    And she says, "You should read over all

3    of the information before pursuing outside

4    employment."

5             Is that correct?

6        A    Yes.

7        Q    At this point in time, had you pursued

8    outside employment?

9        A    Not yet.

10       Q    Okay.

11       A    And at this point in time, I did read

12   over this e-mail, including the links that she

13   recommended, and we had a couple of conversations

14   after this e-mail to help me better understand

15   the contents of the e-mail.

16       Q    Okay.  I want to direct your attention

17   to the last paragraph that says, "A second

18   criminal law (18 U.S.C. section 205) prohibits

19   you from personally representing any other person

20   (including companies) -- with or without

21   compensation -- before a Federal department,

22   agency or employee.  You may not make

Paul Roysdon , Ph.D.                                        May 30, 2025

Page 94

1      representations to any federal officials (not

2      just NSA personnel) on behalf of outside

3      entities."

4              What did this -- the first part of this

5      paragraph mean to you?

6      A    Yeah.  This is another one where I

7      needed some clarification because, again, it was

8      my understanding that I was going to be doing --

9      when Dan approached me, I was going to be doing

10     some math development for these programs, working

11     with contractors, and then occasionally

12     presenting the results or presenting updates on

13     those.

14             This particular paragraph, I think, is

15     a great one to highlight, because I did have

16     concerns about this.  Again, with a phone

17     conversation that I had later on with Amy,

18     clarifying some of the work that I'd be doing,

19     she did not see any issue with this.

20             I also clarified this with my

21     leadership to make sure they understood where the

22     laws were and the information that I received

EXHIBIT 1
Page 35 of 69

www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000094

Paul Roysdon , Ph.D.                                    May 30, 2025

Page 95

 1    from Amy, again to make sure that I was not doing

 2    anything that was a conflict of interest or

 3    outside of what would be correct or ethical given

 4    the responsibility I had at NSA.

 5        Q    Moving down in that paragraph to the

 6    sentence that says, "Applying this rule to your

 7    circumstances, you may not be the individual

 8    responsible for communications with Air Force

 9    representatives (or any other federal employees)

10    on the contract for which you are providing

11    services."

12            So you were not going to be the

13    individual responsible for communicating with the

14    Air Force?

15        A    I was not the individual responsible

16    for the communications, correct.  So this would

17    be again going back to that -- the definition we

18    talked about earlier with the analogy of the car

19    with the demo.  I was not responsible for these

20    demos and representing this back to the Air

21    Force.  I was not responsible for the program and

22    program updates.  That was Dan Brown's -- that

Paul Roysdon , Ph.D.                                          May 30, 2025

                                                              Page 96

 1    was Dan Brown's responsibility.

 2              So as we got to finer definitions of

 3    these statements -- and she, I guess you could

 4    say, alerted me before she sent this e-mail.  We

 5    had a phone conversation where she said, look,

 6    I'm going to send you an e-mail that has all the

 7    kind of legalese kind of stuff, we'll have to

 8    have a conversation to discuss it after you've

 9    read it.  And then we went through and refined

10    each one of these things.

11              I'll note that I frequently referred

12    back to these e-mails as I was continuing the

13    work on Dan Brown's behalf with -- you know, as

14    the program progressed, continued concern,

15    because I wanted to make sure that -- if there

16    was a blurring of the lines, I wanted to make

17    sure I was on the right side of things, so I

18    frequently reached out to her to make sure that

19    that was the case --

20        Q    Did you --

21        A    -- and if so, I was going to stop

22    immediately.

Paul Roysdon , Ph.D.                                    May 30, 2025

Page 97

1           Q    Sorry.  Did you ever memorialize your

2     understanding of the difference between the

3     potential options to present to the Air Force as

4     a consultant?

5                 MR. HENRY:  Objection to form.

6                 THE WITNESS:  Can you refine your

7     question?

8     BY MS. SEEMAN

9           Q    I can.  So, earlier, you mentioned you

10    put a lot of -- your conversations with Amy, you

11    put them back in an e-mail just so you could

12    refer to them later, have a record of it, that

13    sort of stuff.

14                Did I -- is that accurate?

15          A    That's correct.  Yes.

16          Q    Okay.  So now my question is:  In any

17    of your e-mail communications, did you document

18    or memorialize this further conversation you had

19    defining what the bounds were between

20    communications with Air Force employees?

21          A    Yeah, there might have been another

22    e-mail, but I don't recall, you know, writing

EXHIBIT 1
www.CapitalReportingCompany.com
Page 316 of 639
202-857-3376

Roysdon Fact Witness_000097

Page 98

1    something down in a journal or something like

2    this, no.

3           Q    Okay.  Turning to what will be 20,

4    which is the next page in the sequence of this

5    e-mail, so I'll start with -- it says, "However,

6    if a communication transitions from a factual

7    exchange to a conversation in which differences

8    of opinion may occur, this can create problems

9    under the representation rule.  Additionally, if

10   the CyberCom prime contractor submits a product

11   to CyberCom under your name, this would be

12   considering a communication by you to CyberCom."

13              So, for that last part, what did that

14   mean to you?

15          A    Which part?

16          Q    The --

17          A    The first part or the second?

18          Q    Let's start with the first.

19          A    So I understood this to mean that my

20   communication with anybody at the Air Force

21   needed to be limited to presentations strictly to

22   the facts, in this case, the mathematics, not an

1      argument or a dialogue over which math is better

2      or how to apply it, strictly the recommendation

3      of this -- this particular set of maths will

4      achieve the desired goals that Air Force Cyber

5      had on that particular program.

6           Q    Okay.  And then sticking sort of with

7      that, so based on your understanding at the time,

8      does that mean -- were you allowed to communicate

9      directly with Air Force personnel as a

10     consultant?

11          A    Under that pretext, yes --

12          Q    Okay.

13          A    -- with folks like Dan Brown to

14     communicate the -- the underlying algorithms.

15          Q    And did this e-mail give you permission

16     to attend meetings with Air Force personnel?

17          A    This e-mail did not give me permission

18     to attend meetings.

19          Q    Okay.  Did this e-mail anywhere give

20     you permission to work as a private consultant?

21          A    This e-mail did not give me permission

22     to work as a private consultant.

Paul Roysdon , Ph.D.                        May 30, 2025

Page 100

1          Q    Okay.  And I just want to clarify.

2     Earlier, I think you testified this, but I just

3     want to be sure.

4               OGC did not offer an opinion on whether

5     or not outside employment was appropriate or not

6     for you, correct?

7               MR. HENRY:  Objection to form.

8               THE WITNESS:  The communication that I

9     had with OGC was one of, from their -- from their

10     position, guiding and recommending.  It was not

11     of granting permission.

12     BY MS. SEEMAN

13          Q    All right.  Under the boundaries that

14     have sort of been set up in this e-mail and in

15     your communications with Amy, did you

16     understand -- were you allowed to, as a

17     consultant, answer questions from Air Force

18     personnel?

19          A    Clarifying questions, yes.

20          Q    Okay.

21          A    I was asked many questions for which I

22     did not respond to.

EXHIBIT 1
Page 80 of 89

www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000100

```
 1          Q    Okay.  What type of questions would you
 2     not respond to?
 3          A    Anything that was outside of the
 4     technical domain.
 5          Q    Okay.  And were those questions from
 6     Air Force personnel?
 7          A    Yes.
 8          Q    Okay.  Under the guidance provided from
 9     the Office of General Counsel, is it your
10     understanding you were permitted to make
11     recommendations to Air Force personnel?
12          A    Recommendations limited to the
13     algorithms for the programs that they -- that
14     they decided to fund, yes.
15          Q    Okay.  And why was that your
16     understanding?
17          A    I don't understand the question.
18          Q    Yeah.  So I'm just trying to figure out
19     sort of where -- where the lines are, right?  And
20     so if -- because it seems -- it seems like a
21     difficult needle to thread, to be quite honest
22     with you.
```

Page 102

1          A     It seems like a difficult what?

2          Q     Needle to thread.

3          A     Absolutely, which is why I frequently

4     talked with Amy about this.

5          Q     Which is why I'm just trying to

6     understand, like, the very -- at a very granular

7     level, like what's in and what's out.

8                So I understand you to be saying you

9     could give recommendations to Air Force personnel

10    as a consultant under the guidance that you were

11    given?

12         A     Correct.

13         Q     Okay.  And I want to understand why you

14    think that.

15         A     So, based on, again, these e-mails that

16    you have here, as well as the conversations that

17    I had with Amy, recommendations would, again,

18    include types of algorithms that -- that could be

19    used on different cyber operation programs, and

20    my advice was -- or my -- my position there was

21    to be a technical advisor.  The way I understood

22    it was a technical advisor giving those

Paul Roysdon , Ph.D.                                      May 30, 2025

Page 103

1    recommendations.

2         Q    Did you see any potential for your

3    recommendations to have an impact on what

4    projects received funding or not?

5         A    It could have an impact on which

6    projects get funded, but that was completely

7    outside of my roles and responsibilities to --

8    to, you know, sway opinion or stuff like this.

9    My job is strictly to produce the facts.

10             For example, if algorithm A has a

11   capability of analyzing a certain quantity of

12   information, and algorithm B can analyze 10X that

13   quantity, identify why 10X and that's it.

14   Whether or not they decided to fund it was

15   entirely up to them.

16        Q    Okay.  Are your recommendations or --

17   yeah -- recommendations to Air Force personnel --

18   would that potentially lead to a conversation

19   about differences of opinion?

20             MR. HENRY:  Objection.  Foundation.

21             THE WITNESS:  If there was a difference

22   of opinion, I was not aware of it.

Paul Roysdon , Ph.D.                                    May 30, 2025

Page 104

1    BY MS. SEEMAN

2         Q    Okay.  And then kind of along the same

3    lines, was it your understanding, based on the

4    advice given and the conversations you had with

5    NSA Office of General Counsel, were you permitted

6    to provide advice to Air Force personnel as a --

7    as a consultant?

8         A    I wouldn't say I was providing advice.

9    I mean, I was providing guidance strictly based

10   on advancements.  This kind of goes along with

11   your previous question about a difference of

12   opinion.

13             As a subject matter expert and the one

14   who was creating this field, they were looking

15   for guidance, and I don't ever recall a

16   difference of opinion because most of these folks

17   were non-technical.  They didn't -- they didn't

18   understand the field, and they didn't understand

19   the art of the possible.  They were looking for

20   solutions.

21        Q    When you said they were looking for

22   solutions, who do you mean, they?

Page 105

 1          A     Air Force.

 2          Q     Okay.

 3          A     Specifically Dan Brown.

 4          Q     All right.  Going back to the second

 5     half of the part that I read earlier about a

 6     CYBERCOM prime contractor not being able to

 7     submit a product under your name, what does --

 8     what does that mean?

 9          A     So I'm not entirely sure what that

10     means within this context.  I think it can mean a

11     number of things.

12          Q     What did it mean to you?

13          A     Again, I'm not sure what this meant

14     under this context, so, in subsequent

15     conversations I had with Amy, we clarified these

16     statements as well as several other statements.

17          Q     Okay.  And what clarification did you

18     get on whether or not a prime contractor such as

19     GITI could submit a product that has your name on

20     it to Air Force?

21                MR. HENRY:  Objection to form.

22                THE WITNESS:  As long as the

EXHIBIT 1
Page 324 of 689
www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000105

Paul Roysdon , Ph.D.                                    May 30, 2025

Page 106

1      recommendations were strictly mathematical in

2      nature, like, for example, if there was a

3      document that had my name on it, that was

4      something that could be transmitted by GITI to

5      Air Force.

6      BY MS. SEEMAN

7           Q    I guess I never asked this:  Were your

8      name -- was your name on the Fibonacci series?

9           A    I don't recall.  I think it would not

10     be unusual for a company like GITI to produce a

11     document and forward it on to someone.  I publish

12     many papers, and they could have pulled anything

13     that I published.

14          Q    To your knowledge, at any point, did

15     GITI provide a product to CYBERCOM under your

16     name?

17          A    I don't know.

18          Q    Okay.  All right.  Let's go ahead and

19     move to this section about working in a

20     government facility.  Amy describes this as quite

21     difficult.

22               In practice, was it difficult?

Page 107

1          A     Was what difficult?

2          Q     Was it difficult to appropriately

3     identify yourself and your limitations when

4     visiting HNCO workspaces?

5          A     I still don't understand the question.

6          Q     Okay.

7          A     Was it difficult for me to identify

8     myself?

9          Q     Let's -- let's -- here, we'll come back

10    to that.

11         A     Okay.

12         Q     So let's -- I want to direct your

13    attention to -- actually, let's see.  So it says,

14    "Few federal personnel are aware that a criminal

15    statute, 18 U.S.C. section 203, prohibits them

16    from receiving compensation for acting as an

17    agent or attorney (e.g., representing); for

18    anyone; before any part of the Executive or

19    Judicial branches of the Federal Government; in

20    connection with the particular matter; in which

21    the United States is a party or has a direct or

22    substantial interest."

Paul Roysdon , Ph.D.                                May 30, 2025

Page 108

```
 1              And then Amy goes on to identify the

 2       relevance in two situations and then, you know,

 3       military officers who where contracting and then

 4       personnel who are moonlighting.

 5          A    Uh-huh.

 6          Q    In your situation, is it fair to

 7       characterize your consulting work more as the

 8       moonlighting?

 9          A    Yes, which she identified -- she writes

10       here that in most cases -- most cases, not all

11       cases -- I think the verbiage matters here -- in

12       most cases, makes such employment impossible.

13       Again, this is something where I asked for

14       clarification, and we worked through this.

15              I gave you some other examples

16       previously, one in particular where you have

17       cleared NSA individuals that do their work during

18       the day and then moonlight as the people who

19       clear the trash in the evening.  They're doing

20       exactly -- working in exactly the same spaces.

21       They're not doing the same work.

22          Q    Okay.  All right.  And then I want to
```

**EXHIBIT 1**
www.CapitalReportingCompany.com
**Page 327 of 639**
202-857-3376

Roysdon Fact Witness_000108

Page 109

1       turn our attention to page 19.  And here it -- it

2       talks about these sort of scenarios a little bit

3       more, and so I'll -- we'll look at, like, the

4       first -- I'll call it a bullet.

5                It says, "A federal employee could

6       moonlight as a security guard at a federal

7       facility but would not be able to engage in a

8       discussion with federal employees about the

9       guard's decision to deny admission to a visitor

10      whose identity was in question."

11               Did this hypothetical offer you any

12      insight into the potential limitations you would

13      have if you pursued this consulting work?

14      A    Yes and no.  Again, this was -- as with

15      most of this e-mail, required further

16      clarification that I received over the phone.

17      Q    And for that -- I just want to be clear

18      on the clarification with respect to working in a

19      federal facility as a consultant.

20               What additional clarification that's

21      not captured in these e-mails did you receive?

22      A    I wanted to be specific to my scenario.

EXHIBIT 1
www.CapitalReportingCompany.com
Page 328 of 639
202-857-3376

Roysdon Fact Witness_000109

Paul Roysdon , Ph.D.                                    May 30, 2025

Page 110

1          So she -- she provided a couple of analogous

2     examples that still were not clear to me.

3               My backgrounds is mathematics and

4     engineering.  I'm fairly precise in my thinking.

5     The phone conversation that we had was very

6     precise to make sure that I was not running afoul

7     of the laws or policies.

8          Q    And then, for the second example here,

9     it says, "A military officer on terminal leave,

10    who is employed by a contractor as a consultant

11    for a federal agency, could not provide advice or

12    consultant services to the federal agency

13    concerning a particular matter if the matter has

14    potential for divergent views."

15              So was -- the work you were doing or

16    intended to do as a consultant, was there the

17    potential for divergent views in the workplace?

18         A    Same answer as before.

19         Q    And just for the --

20         A    Clarifying --

21         Q    -- record?

22         A    Yeah.  Clarifying this bullet point, I

EXHIBIT 1
Page 330 of 639

www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000110

Page 111

1    spoke with Amy, again, same conversation, to

2    clarify this bullet point, like I did with the

3    previous bullet points.  Same answer.

4         Q    Okay.  And when you're reading this and

5    talking to her, do you still have any concern --

6    or do you have any concern about pursuing the

7    consulting work?

8         A    After the several conversations that

9    she and I had, including these e-mails, I did not

10   have any concerns, which is why I proceeded with

11   the work.  If I had lingering concerns, I would

12   not have proceeded with the work.

13        Q    You can put that to the side.  All

14   right.  So let's talk about GITI.

15        A    Okay.

16        Q    How were you first connected to Global

17   Infotek?

18        A    Dan Brown.

19        Q    And when were you connected with them?

20        A    Within a few weeks of the initial

21   conversation with Dan Brown, Dan Brown said he'd

22   make arrangements so they could work as a

EXHIBIT 1
Page 33 of 63
www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000111

Paul Roysdon , Ph.D.                                    May 30, 2025

Page 112

1        consultant through some contract.  He identified

2        the contract.  He introduced me to GITI.  They

3        reached out to me, asked me to sign some

4        paperwork to work as a 1099.

5             Q    Who from GITI did you work with?

6             A    Primarily, I worked with Ted Oakley.

7        Not initially.  I don't remember who I worked

8        with initially, but, eventually, he was the

9        program manager and I eventually worked with him.

10       Well, I didn't work with him.  He asked for

11       weekly updates and -- how do I say this?  I

12       communicated weekly updates and time cards to Ted

13       Oakley.  I wouldn't say that we worked together.

14            Q    When you were presented with the

15       consulting agreement, did you have any concerns

16       about working with GITI?

17            A    No.

18            Q    Okay.  How much -- what was your hourly

19       rate as a GITI consultant?

20            A    It was somewhere -- somewhere around

21       $200 an hour, which was inexpensive considering

22       the work I was doing.

EXHIBIT 1
www.CapitalReportingCompany.com
Page 331 of 639
202-857-3376

Roysdon Fact Witness_000112

Paul Roysdon , Ph.D.                                    May 30, 2025

Page 113

1          Q    Who, to your knowledge, sets the rate?

2          A    The consultant sets the rate.

3          Q    Are you aware of anything in GITI's

4     prime contract with the Air Force --

5          A    No.

6          Q    -- that would lay out labor categories

7     with associated billing rates?

8          A    No.

9          Q    Did you --

10         A    I wasn't --

11         Q    I'm sorry.  Go ahead.

12         A    Go ahead.

13         Q    Did you have anything else to add?

14         A    No, ma'am.

15         Q    Did you get any say in the rate?

16         A    I declared my rate.  They asked me what

17    my rate was.  I based my rate on a national

18    survey through IEEE.

19         Q    What's IEEE?

20         A    Oh, I forget the acronym.  You can look

21    it up.

22         Q    What is it, though?

EXHIBIT 1
Page 332 of 639

www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000113

Paul Roysdon , Ph.D.                    May 30, 2025

Page 114

```
1            A    IEEE is an international organization

2      for electrical and electronics engineers, hence

3      the EE or three Es.  They conduct an annual

4      national survey on professionals and consultants.

5                 There wasn't a category for cyber AI,

6      but there was a category for cyber and

7      mathematics, and we merged those two as

8      justification for the rate.

9                 Also, as a patriotic American, I

10     positioned my rate below the national average.

11           Q    On behalf of the taxpayer?

12           A    I did.

13                MS. SEEMAN:  All right.  So I'm going

14     to hand you what we'll as mark Exhibit 2.  A copy

15     to counsel.  And for the record, this is

16     Plaintiff Bates 100 to 106.

17                (Deposition Exhibit Number 2 was

18                marked for identification.)

19     BY MS. SEEMAN

20           Q    Dr. Roysdon, what is Exhibit 2?

21           A    A consulting agreement with GITI.

22           Q    Is this the consulting agreement you
```

Page 115

1    executed?

2         A    Yes.  My signature is on page 6.

3         Q    And what is the date of execution?

4         A    6/3/2019.

5         Q    In this consulting agreement,

6    obviously, it's effective June 3rd, 2019.

7              Was there any end date set in the

8    agreement?

9         A    Well, the agreement states, I believe,

10   something around two years.  Yeah, there you go.

11   On page 6, "period of two years from the

12   expiration or termination of this Agreement."

13             Oh, I'm sorry.  This is a -- okay.  So

14   this is a -- like a noncompete statement, because

15   they mention ten years on page 3.

16        Q    Okay.  I don't think that that

17   reference provides a limitation on the agreement.

18   I just didn't -- it's really not a trick

19   question.

20             Do you see -- was there an end date

21   agreed to when you signed this consulting

22   agreement?

Page 116

1          A    No, ma'am.

2          Q    Did you have any idea how long your

3     consulting would last --

4          A    No, ma'am.

5          Q    -- when you entered into this

6     agreement?

7          A    No, ma'am.

8          Q    Okay.  Do you know what a task order

9     is?

10         A    Yes, I do.

11         Q    Okay.  What is it?

12         A    This is something that usually is

13    assigned from, like, a primary contractor to a

14    subcontractor on things to complete, tasks to

15    perform.

16         Q    Did you have any task orders with GITI?

17         A    I don't recall a task order.

18              MS. SEEMAN:  Okay.  I'm going to hand

19    you what we'll mark as Exhibit 3.  One to

20    counsel.

21              (Deposition Exhibit Number 3 was

22              marked for identification.)

EXHIBIT 1
www.CapitalReporting Company.com
Page 33 of 639
202-857-3376

Roysdon Fact Witness_000116

Page 117

1            THE WITNESS:  The details of the

2    project were classified, and that was mentioned

3    on page 7 of Exhibit 2.

4    BY MS. SEEMAN

5        Q    Yeah.  I guess let me -- referencing

6    Exhibit 2, this was a consulting agreement --

7        A    Yeah.

8        Q    -- to work on the Fibonacci projects,

9    correct?

10       A    Yes, but it's not stated here.

11       Q    Yes, yes, yes.  But just, like, to

12   clarify now that we know, we can --

13       A    Yes.

14       Q    -- say the name?

15       A    Yes.

16       Q    Perfect.  Okay.  So I just handed you

17   Exhibit 3.  What is Exhibit 3?

18       A    A task order.

19       Q    What is the date for it or the period

20   of performance?

21       A    7 June 2019 to 5 September 2019.

22       Q    Do you see your hourly rate on this

EXHIBIT 1
Page 336 of 639

Roysdon Fact Witness_000117

Paul Roysdon , Ph.D.                                    May 30, 2025

Page 118

1      task order?

2           A    218.

3           Q    And earlier you said you couldn't

4      recall it.  Do you think 218's accurate?

5           A    Yes, ma'am.

6           Q    Okay.  How many hours per week were you

7      working for -- as a consultant from June 7th,

8      2019 to September 5th, 2019?

9           A    It varied.

10          Q    Okay.  What was the maximum hours?

11          A    I don't recall.

12          Q    Okay.  I'd like to direct your

13     attention to "T&M Funding Details" at 21.

14               So this has a level of effort?

15          A    Yes.

16          Q    What is the level of effort listed?

17          A    The level of effort states 20 hours per

18     week for 13 weeks for a total of 260 hours.

19          Q    Okay.  And then does that map with the

20     funding ceiling listed in 20 -- item 22?

21          A    Are you asking about the mathematics of

22     260 hours times $218 per hour equals $56,680?

Page 119

1          Q    Dr. Roysdon, I would literally never

2     ask someone to do math.

3          A    Okay.

4          Q    No, I'm just asking, is that the

5     same -- so it says 260 hours.  Is it 260 hours

6     also listed in the funding calculation?

7          A    Yes, ma'am.

8          Q    Okay.  And for the same rate of $218 an

9     hour?

10         A    Yes, ma'am.

11         Q    And then it has an award ceiling

12    listed, correct?

13         A    Yes, ma'am.

14         Q    Okay.  Did -- to your knowledge or

15    recollection, did you go over that award ceiling

16    during this period?

17         A    The award ceiling?  No.  But the hours

18    were flexible.

19         Q    Okay.  Who -- I guess when you say the

20    hours are flexible, what do you mean by that?

21         A    So, typically, the way these documents

22    are written is that it's made so the math is

Paul Roysdon , Ph.D.                                    May 30, 2025

Page 120

1      easy.  For example, 13 -- sorry -- 20 hours for

2      13 weeks equals 260 hours.  The reason there is

3      an award ceiling and a funny calculation for that

4      ceiling is so that regardless of the number of

5      hours that you are reporting for work, you don't

6      exceed that ceiling and the number of charges for

7      those hours.

8              So, for example, if somebody was to

9      work 22 hours in a week, provided that the

10     program manager did not have an issue with this,

11     and then worked the following week 18 hours, the

12     total over two weeks would be 40 hours or 20

13     hours per week.

14        Q     Understood.  It just ran out of my

15     brain.  Let's see.

16              For your invoicing, how did you do

17     that?

18        A     They had me fill out a spreadsheet.

19        Q     And --

20        A     And I e-mailed that.

21        Q     To who?

22        A     To Ted Oakley.

EXHIBIT 1
Page 338 of 639
www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000120

Page 121

1          MS. SEEMAN:  All right.  I'm going to

2     hand you what we'll mark as Exhibit 4.  A copy to

3     counsel.

4               (Deposition Exhibit Number 4 was

5               marked for identification.)

6     BY MS. SEEMAN

7          Q    Dr. Roysdon, what is Exhibit 4?

8          A    Task order award.

9          Q    What's the period of performance?

10         A    1 October 2019 through 31

11    December 2019.

12         Q    And is this your signature in box 19?

13         A    Yes, ma'am.

14         Q    And going back to Exhibit 3, is this

15    your signature in box 19?

16         A    Yes, ma'am.

17         Q    Is the hourly rate the same in this

18    task order?

19         A    Yes, ma'am.

20         Q    And looking at item 21, has the level

21    of effort increased or decreased from the

22    previous task --

EXHIBIT 1
www.CapitalReportingCompany.com
Page 340 of 639
202-857-3376

Roysdon Fact Witness_000121

Paul Roysdon , Ph.D.                                          May 30, 2025

Page 122

1          A    It has --

2          Q    -- order?

3          A    -- increased.  Sorry.

4          Q    To how many hours?

5          A    30 hours per week.

6          Q    Not to exceed how many hours?

7          A    390 hours.

8          Q    Okay.  And what is the award ceiling

9     listed?

10         A    Award ceiling dollar amount is $85,020.

11         Q    All right.  You can put that to the

12    side.

13              MR. HENRY:  Did this -- Katie, does

14    this have a Bates label?

15              MS. SEEMAN:  I might have printed it

16    off without one.  I don't have it with me.

17    Sorry.

18              MR. HENRY:  Okay.

19    BY MS. SEEMAN

20         Q    All right.  Moving on -- actually,

21    let's go back.

22              So for the consulting agreement,

EXHIBIT 1
Page 341 of 639
www.CapitalReportingCompany.com
202-857-3376
Roysdon Fact Witness_000122

Page 123

1     Exhibit 2, was this the only consulting agreement

2     you executed with GITI?

3          A    I don't recall.  There might have been

4     another.

5          Q    Another for the same contract?

6          A    So I believe -- again, I don't recall.

7     I believe the way that they were paying me was

8     through the ACT 2 contract, and there might have

9     been one for the ACT 3 contract or a follow-on to

10    ACT 2.  Like I said, I don't recall.

11         Q    For your purposes, did the source of

12    the funding make any difference?

13         A    No, ma'am.

14              MS. SEEMAN:  Okay.  I'm going to hand

15    you what we'll mark as Exhibit 5.  And it's two

16    pages, but it's printed front and back.  Copy to

17    counsel.

18              (Deposition Exhibit Number 5 was

19              marked for identification.)

20    BY MS. SEEMAN

21         Q    All right.  Dr. Roysdon, what is

22    Exhibit 5?

EXHIBIT 1
www.CapitalReportingCompany.com
Page 342 of 639
202-857-3376

Roysdon Fact Witness_000123

1          A    Exhibit 5 is a modification of a

2     consulting agreement from 2019, the modification

3     of Exhibit 2.

4          Q    And at Reference A, what's the level of

5     effort listed?

6          A    On Attachment A?

7          Q    Yes.

8          A    On the back side?

9          Q    Uh-huh.

10         A    Not to exceed 30 hours per week until

11    12/31/2020.

12         Q    Assuming you had continued your work,

13    what, if anything, would have happened at the end

14    of 2020 with respect to your consulting?

15         A    I anticipated that the work would

16    continue for several years based on what I was

17    told.

18         Q    And what do you mean by that?

19         A    By what?  Can you please clarify?

20         Q    Based on -- based on what you were

21    told.  Based on what -- what were you told, I

22    guess?

Paul Roysdon , Ph.D.                                    May 30, 2025

Page 125

1         A    Okay.  I -- I was told by Dan Brown

2    sometime in the summer of 2020 that the Air Force

3    wanted to continue doing development for up to

4    five years.

5         Q    Development of the Fibonacci projects?

6         A    Correct.  And they wanted my guidance

7    to ensure that those programs would be

8    successful.

9         Q    And you said that was in the summer?

10         A    Summer of 2020, correct.

11         Q    Other than Dan Brown, did you talk to

12    anybody else about that?

13         A    I may have talked with Todd Oakley --

14    or sorry -- Ted Oakley about that.

15         Q    What would you have told Ted Oakley, or

16    what did you tell Ted Oakley about that?

17         A    He would have heard the same thing from

18    Dan Brown, so we would have had a conversation

19    just confirming that I'd be available.

20         Q    Do you know the total amount of money

21    you made at GITI?

22         A    I don't recall.

EXHIBIT 1
www.CapitalReportingCompany.com
Page 345 of 689
202-857-3376

Roysdon Fact Witness_000125

Paul Roysdon , Ph.D.                                    May 30, 2025

Page 126

1          Q    Earlier you mentioned something called

2     GitHub.  What is that?

3          A    GitHub is a -- it's an online -- you

4     can call it like a storage for, primarily,

5     software.

6          Q    Can you publish code to it?

7          A    You can post code to it.  I hesitate to

8     say publish.

9          Q    Okay.  When you post -- how do you use

10    GitHub?

11         A    I've used it in the past.  I don't

12    currently.  I've used it in the past to post

13    code, results, user guides for that code,

14    technical notes on mathematics.

15         Q    Did you use GitHub as a consultant to

16    GITI?

17         A    I frequently posted things on GitHub

18    while working for GITI.

19         Q    About the work that you were doing for

20    GITI?

21         A    I was not doing work for -- well, I was

22    not doing work for GITI, necessarily.  But, yes,

1     there was code that I had uploaded on several

2     occasions while I was working for GITI.

3          Q    Related to cyber AI?

4          A    Related to several projects.

5          Q    Okay.  Was any of it related to

6     Fibonacci?

7          A    As we discussed earlier, the

8     mathematics that I was working on was

9     unclassified, so there was material that I did

10    post on GitHub for unclassified mathematics.  I

11    cannot confirm whether or not those were related

12    to a classified program.

13         Q    Are the things that you post on GitHub

14    public or private?

15         A    Public.

16         Q    Okay.  Can anybody access them?

17         A    Some are also private.  The public

18    repositories, yes.  The private repositories,

19    with invitation, anyone can -- anyone with an

20    invitation can access those.

21         Q    When working as a consultant for GITI,

22    did you have to obtain permission before posting

EXHIBIT 1
www.CapitalReportingCompany.com
Page 346 of 639
202-857-3376

Roysdon Fact Witness_000127

Page 128

1      anything to GitHub?

2            A     Can you refine the question?

3            Q     Yes.  Did you need to get permission

4      before posting the unclassified portions of what

5      you were working on to GitHub?

6            A     Permission from who?

7            Q     Well, let's start with GITI.

8            A     No.

9            Q     Did you need to get permission from the

10     Air Force?

11           A     No.

12           Q     Okay.  Why not?

13           A     Because the work that I was doing was

14     deemed as unclassified work.  And the work that I

15     was doing for GITI was referencing a body of

16     research that I was continuing to evolve prior to

17     my work at GITI, and so, for OPSEC purposes, I

18     continued to post to a variety of repositories to

19     maintain for outsiders consistent scientific

20     work.

21           Q     I want to direct your attention back to

22     Exhibit 2, Article 10, which is Bates 103 at the

Paul Roysdon , Ph.D.                              May 30, 2025

Page 129

1     bottom.

2              And I just want to be clear.  I'm not

3     accusing you of anything.  I'm just trying to

4     understand how does posting on GitHub comply with

5     the requirement that you, as a consultant, shall

6     not disclose to others, publish, or authorize

7     anybody to publish any technical or confidential

8     information acquired in the course of performing

9     work or rendering services under this agreement.

10         A    Good question.  The work that I was

11    doing on the outside posting to GitHub was a

12    project or a few projects that were

13    collaborations with other researchers.  They were

14    not necessarily related to the work that I was

15    doing for -- for GITI.

16              The work that I was doing for GITI was

17    not published on the outside.  A large majority

18    of the work that I did for GITI was research,

19    which included reading probably thousands of

20    papers on cyber and AI and then providing

21    recommendations.  If somebody wanted to use some

22    of the work that I was doing separately that I

EXHIBIT 1
Page 348 of 639

www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000129

Page 130

```
 1    was posting on GitHub, they're free to use it.
 2         Q    When you were sent -- or let me back
 3    up.  Did you -- in your communications with Ted
 4    Oakley would you send him sort of updates on
 5    tasks that you were working on?
 6         A    Yes.
 7         Q    Did you ever send him GitHub links?
 8         A    I don't recall.
 9         Q    Okay.  Let's talk a little bit about
10    Ted Oakley.  So who -- who is he?
11         A    He was a program manager at GITI.
12         Q    And did you know him before working
13    with GITI?
14         A    No.
15         Q    All right.  How would you describe your
16    relationship with him?
17         A    I reported my research findings and
18    updates and time cards.
19         Q    How frequently would you interact with
20    him?
21         A    Define interact.
22         Q    Call, e-mail.
```

EXHIBIT 1
Page 549 of 639

www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000130

Paul Roysdon , Ph.D.                                    May 30, 2025

Page 131

```
 1          A     Casual conversations?

 2          Q     Anything.

 3          A     No casual conversations.

 4          Q     No casual conversations?

 5          A     Not at that time, no.

 6          Q     How about since then?

 7          A     Since then, he's reached out to me

 8     asking for a job.

 9          Q     Where?

10          A     Leidos.

11          Q     Does Ted Oakley work at Leidos?

12          A     I don't know.

13          Q     Are you still in contact with Ted

14     Oakley?

15          A     I am not.

16          Q     Do you recall when he reached out to

17     you about getting a position with Leidos?

18          A     Spring of last year, 2024.

19          Q     Thank you.  Have you spoken with Ted

20     Oakley about this lawsuit?

21          A     No.

22          Q     So what information, to your knowledge,
```

```
 1      would Mr. Oakley have about your claims in this

 2      lawsuit?

 3           A    I am not sure.  I think that's highly

 4      speculative.

 5                MS. SEEMAN:  Okay.  Let me do it this

 6      way, actually.  Let's do it this way.  All right.

 7      I'll hand you what we'll mark as Exhibit 6.  A

 8      copy to counsel.

 9                (Deposition Exhibit Number 6 was

10                marked for identification.)

11      BY MS. SEEMAN

12           Q    Have you seen this document before?

13           A    Yes, ma'am.

14           Q    What is it?

15           A    Plaintiff's initial disclosures

16      pursuant to federal court -- Federal Rule of

17      Civil Procedure 26(a).

18           Q    Okay.  And I'll direct your attention

19      to page 4, No. 12.

20           A    Yes.

21           Q    So this is you as the plaintiff

22      identifying Ted Oakley, and so my question is --
```

Paul Roysdon , Ph.D.                                    May 30, 2025

Page 133

1          you know, you've identified him as a witness who

2          has discoverable information to the claims of --

3          to your claims of damages, so I'm just trying to

4          figure out what information you think Ted Oakley

5          has about -- we'll start with your claims.

6                A    So he would certainly know that the

7          contract was canceled.  Around the time -- around

8          August 13th, I believe, 2020, maybe the 14th,

9          sometime within a week of that time, there would

10         have been a conversation with him about the

11         termination of the contract.  I asked him why.

12         He said he didn't know.  So there was certainly a

13         conversation at that time.

14                     As far as damages, he would know that

15         the contract at a minimum was continuing --

16         excuse me -- until December 31, 2020, so there

17         would have been lost wages between August and

18         December.  So he'd have information about that.

19                     I think, also, he would have been a

20         good character reference, in that he knew that

21         the work I was doing was unique.  He heard

22         frequently from -- and he relayed this to me --

 1      from the customer that -- meaning Dan Brown --

 2      was happy with the work that I was doing.

 3           Q    Anything else?

 4           A    No, ma'am.

 5           Q    All right.  You can put that to the

 6      side.  All right.  So let's talk about HNCO.

 7           A    Okay.

 8           Q    Is it fair to say that you were not

 9      working with HNCO until June 2019?

10           A    Correct.

11                MS. SEEMAN:  I'm going to hand you what

12      we'll mark as Exhibit 7.  A copy to counsel.

13                (Deposition Exhibit Number 7 was

14                marked for identification.

15      BY MS. SEEMAN

16           Q    And I don't want to look at the first

17      page yet.  We'll come back to that later on.  But

18      I want to turn to Bates 55.  And just for the

19      record, this is the Form 40 with attachments, so

20      it's US Bates 45 to 56.

21                So turning to Bates 55 and recognizing

22      that the print quality is not the best, Dr.

Paul Roysdon , Ph.D.                                    May 30, 2025

Page 135

```
 1      Roysdon, do you know what this document is?

 2           A    Yes.

 3           Q    What is it?

 4           A    It's a program access request.  This is

 5      part of being -- this document is -- you sign as

 6      part of a nondisclosure agreement when read into

 7      a classified program.

 8           Q    Okay.  Did you have to sign your

 9      program access request?

10           A    I did have to sign a document like

11      this.

12           Q    When you said you had to sign one like

13      this, was the document you signed different?

14           A    I don't recall.

15           Q    All right.  Let's go -- so what --

16      what's the date requested in box 3?

17           A    28 March 2019.

18           Q    Okay.  And what in box 5 are you

19      identified as?

20           A    Government Civilian DoD.

21           Q    Okay.  And then, in 14, what is your

22      organization or company name identified as?
```

EXHIBIT 1
Page 354 of 639

www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000135

Paul Roysdon , Ph.D.                                    May 30, 2025

                                                 Page 136

1              A    NSA.

2              Q    All right.  What's a cage code?

3              A    A cage code is -- it's a reference

4      number for a -- for a contractor to do work with

5      the U.S. government on a contract.

6              Q    Here, I guess it also says

7      command/facility, maybe, slash cage code.

8                   MR. HENRY:  Can you -- can you say

9      where you're looking?

10                  MS. SEEMAN:  Yeah.  Box 16.

11                  THE WITNESS:  Oh, uh-huh.

12     BY MS. SEEMAN

13             Q    What -- what is identified in that box

14     for -- for you?

15             A    NSA.

16             Q    All right.  And do you know when your

17     program access request was approved?

18             A    I don't recall.

19             Q    Okay.  At the time this was submitted

20     for you, you -- this was back in March of 2019,

21     correct?

22             A    Correct.

Page 137

1          Q    You didn't have a contractual

2      relationship with GITI at -- in March 2019,

3      correct?

4          A    Correct.

5          Q    And have you ever seen your program

6      access request before?

7          A    I've seen several.  I don't recall this

8      one.

9          Q    All right.  Let's turn to Bates 53.

10     And I guess 53 and 54.

11              What is this document?

12         A    This is your indoc for a special access

13     program, so this one titled "Special Access

14     Program Indoctrination Agreement."  It's

15     essentially an NDA, non-disclosure agreement.

16         Q    What was the date that you were read

17     into this --

18         A    6/4 --

19         Q    Go ahead.

20         A    6/4/19.

21         Q    And by June 4th, 2019, did you have a

22     contractual relationship with GITI?

EXHIBIT 1
Page 356 of 639

www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000137

          1          A    I don't recall the date, but we have

          2     that in prior exhibits.

          3          Q    Do you want to reference one of them

          4     just to confirm?

          5          A    Yes.  By this date, I had signed

          6     Exhibit 2 on page 6 on 6/3/19.

          7          Q    Okay.  You can set that to the side.

          8     We'll come back to that one later.

          9               So, when you started working at HNCO --

         10     and I just want to be clear because it's super

         11     important -- you were never there in your NSA

         12     capacity?

         13          A    Correct.

         14          Q    You -- were you only working at HNCO as

         15     a consultant?

         16          A    That's correct.

         17          Q    Okay.  And just to be clear, you were a

         18     consultant to GITI, correct?

         19          A    I was a consultant to GITI, 1099 to

         20     GITI.

         21          Q    Okay.  And you had no direct employment

         22     relationship with the Air Force?

Page 139

1          A     Correct.

2          Q     Okay.  Was -- I guess, just in an

3     unclassified brief manner, what is HNCO?  I know

4     it doesn't stand for anything, but what is the

5     office?

6          A     They do primarily offensive cyber tool

7     acquisition for the Air Force.

8          Q     In June 2020, and I guess leading up to

9     that time, when you started working there, were

10     these your first interactions with Air Force

11     employees in HNCO?

12          A     Yes, ma'am.

13          Q     Had you done any consulting work in

14     your other consulting work before then with the

15     Air Force?

16          A     No, ma'am.

17          Q     How would you describe HNCO's standing

18     in the cyber AI field?

19          A     The cyber AI field or the cyber field?

20          Q     Well, let's start with the cyber field.

21          A     What do you mean by standing?

22          Q     How would you -- what's their

Paul Roysdon , Ph.D.                                    May 30, 2025

                                                    Page 140

1     reputation?

2            A     I don't know specifically the

3     reputation.

4            Q     Okay.  How about with cyber AI?

5            A     There wasn't cyber AI work at the time.

6            Q     Okay.  And then there was, though,

7     yeah?

8            A     With the Fibonacci projects, there was.

9            Q     Okay.  Did you know anything about HNCO

10    going into your consulting work?

11           A     No.

12           Q     And are there -- did you say they were

13    primarily offensive?

14           A     They do acquisitions of primarily

15    offensive cyber tools.

16           Q     Earlier you mentioned that good

17    offensive cyber tools also have defensive

18    capabilities.

19           A     Uh-huh.

20           Q     Is it your understanding that HNCO is

21    only acquiring offensive cyber products, cyber AI

22    products, or both, offensive and defensive?

EXHIBIT 1
Page 35 of 68

www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000140

Paul Roysdon , Ph.D.                              May 30, 2025

                                                  Page 141

1          A    I hesitate because I don't know what I

2     can say in an unclassified -- unclassified

3     environment.  So I don't know.

4          Q    As far as -- would you prefer to call

5     them government customers?

6          A    Who?

7          Q    HNCO.  Good question.

8          A    Customer to who?

9          Q    The prime contractors.  I want to -- I

10    want to make sure we have like a good language to

11    talk about how these contracts sort of work --

12         A    Okay.

13         Q    -- and so if you want to walk me

14    through your understanding of that process so I

15    can -- you know, so we're speaking the same

16    language on that --

17         A    Threading the needle?

18         Q    Yeah.

19         A    Threading the needle again.  Yeah.  The

20    definition of customer is -- is nuanced.  Within

21    the Air Force, they'll have a program office that

22    does acquisition of tools, like HNCO, for another

EXHIBIT 1
Page 360 of 639

www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000141

Paul Roysdon , Ph.D.                                    May 30, 2025

Page 142

1        Air Force customer, also military, DoD, civilians

2        and -- and military personnel that will use the

3        tools.  So there's a nuance within the

4        government.

5                   A contractor will also refer to the Air

6        Force, any of these offices, as a customer.

7                   So what is it that you were asking?

8            Q    Good question.  I want to -- let's

9        switch gears, actually.

10                   So, as far as government agencies that

11        acquire cyber AI products, is HNCO the only one?

12            A    At that time, yes.

13            Q    Okay.  At that -- when you say "at that

14        time," what time are you talking about?

15            A    Around 2019 and 2020.

16            Q    Okay.  Since 2020, are there other

17        government agencies that acquire cyber AI

18        offensive capabilities?

19            A    Since 2020 -- again, this is a field

20        that was essentially created in 2019.  It has

21        grown since then.  There are now many customers,

22        many government customers, that seek to acquire

EXHIBIT 1
Page 361 of 639

www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000142

Page 143

1    cyber AI tools from industry contractors or

2    academics or other government agencies.

3         Q    Okay.  I'm going to just hit this one

4    more time.  You were never at HNCO as an NSA

5    employee?

6         A    Correct.

7         Q    Did you ever tell anybody at HNCO that

8    you were an NSA employee?

9         A    I did not offer that I was an NSA

10   employee.

11        Q    If asked -- when you say you did not

12   offer, did anybody ask if you worked somewhere?

13        A    Yes.  On August 14th or 13th, 2020,

14   Captain McVeigh specifically asked if I had

15   worked at NSA.

16        Q    He asked you?

17        A    He asked me directly.

18        Q    Did you see him in person on --

19        A    This was the second --

20        Q    -- one of those days?

21        A    -- time I had seen him in person.

22        Q    Okay.  Did you have business cards when

Page 144

1    you were at HNCO?

2         A    I don't recall.  I have business cards

3    now, but I don't think I did at that time.

4         Q    Was GITI aware that you were an NSA

5    employee?

6         A    Ted Oakley was.

7         Q    Did -- how did he -- to your knowledge,

8    how did he know?

9         A    I don't know.  Certainly, after

10   August 14th, we had discussed that.

11        Q    Did you discuss that with Ted Oakley

12   before August 2020?

13        A    I don't recall.

14        Q    Okay.  Who did you interact with at

15   HNCO once you started your consulting there?

16             MR. HENRY:  Objection to form.

17             THE WITNESS:  The interactions I had

18   with HNCO were primarily limited to interactions

19   with Dan Brown.

20   BY MS. SEEMAN

21        Q    To your knowledge, was Dan Brown aware

22   that you were a private consultant?

EXHIBIT 1
Page 363 of 659
www.CapitalReportingCompany.com
202-857-3376

Page 145

1          A     Yes.  He's the one that made the

2     arrangements.

3          Q     Do you know whether anybody else at Air

4     Force HNCO was aware that you were a private

5     consultant?

6          A     To my knowledge, anybody I interacted

7     with there, including the people that were

8     reading me in, which would be for this document

9     here on Exhibit 7, were aware, to my knowledge,

10    that I was there as a consultant.

11         Q     Did you have a separate clearance as a

12    contractor?

13         A     No.

14         Q     Why not?

15         A     It doesn't -- it doesn't exist.

16         Q     Why do you think it doesn't exist?

17         A     So, if you have a clearance at a place

18    like NSA, they will hold your clearance.  Whether

19    you work at NSA or in the evenings as the person

20    who empties the trash for another contractor, the

21    NSA still holds your clearance.

22         Q     Are you aware of any additional

EXHIBIT 1
Page 364 of 639
www.CapitalReportingCompany.com
202-857-3376
Roysdon Fact Witness_000145

Page 146

1     security mechanisms necessary for consultants --

2     I'm going to get there.  Hold on.  Let's see.

3             Actually, do you know what a DD254 is?

4        A    Yes.

5        Q    Okay.  Did you have a DD254 as a

6     consultant?

7        A    I don't recall.

8        Q    Do you think you needed a DD254?

9        A    I don't think so.

10       Q    Why not?

11       A    To my knowledge, in order to -- a

12    requirement for a DD254 is -- it's a security

13    document relating to working as a -- like a

14    subcontractor to a prime.  I was working as a

15    consultant.  It wasn't necessary.

16       Q    Is it fair to say that you were still a

17    consultant underneath the prime contract, though?

18       A    Yes.

19       Q    Okay.

20       A    But the Air Force made agreements

21    outside of my knowledge that they could use the

22    NSA clearance without having to have a DD254.

Paul Roysdon , Ph.D.                                    May 30, 2025

1          Q     And why do you think that?

2          A     Because Dan Brown made the

3     arrangements.

4          Q     Made the arrangements for what?

5          A     For the clearance -- for the clearance

6     pass-through so that I could be read on to a SAP

7     program.

8          Q     Other than Dan Brown, are you aware of

9     any other Air Force employee being involved in

10    that process?

11         A     I am not.

12         Q     Was your consulting work -- it was

13    unclassified, correct?

14              MR. HENRY:  Objection to form.

15              THE WITNESS:  The mathematics were

16    unclassified.  The research was also

17    unclassified.

18    BY MS. SEEMAN

19         Q     In an unclassified manner, what part of

20    it was classified?

21         A     The application to a specific program

22    or a specific target.  The target would be like

EXHIBIT 1
Page 366 of 639

www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000147

Page 148

1     Iran or China.

2          Q    Okay.  Earlier we went over sort of the
3     NSA guidance given to you.

4               Once you're in your consulting role,
5     what steps did you take to avoid blurring any
6     lines at HNCO?

7          A    Good question.  I made sure that I was
8     not in contract negotiations, the primary person
9     to present to any sort of senior officials.
10    Again, I limited my work to being behind the
11    scenes and advising.

12         Q    Did you ever go to HNCO's office in San
13    Antonio?

14         A    I did.

15         Q    Is that a secure facility?

16         A    It is.

17         Q    Approximately how many times did you go
18    there?

19         A    Maybe four occasions.

20         Q    When?

21         A    The read-in for access to the SAP
22    program listed in -- well, I guess the program's

1      not even listed in Exhibit 7.  The read-in.

2               There was another time to assist or

3      provide recommendations to Dan Brown on the

4      classification guide.

5          Q    Do you remember when that was?

6          A    I don't.  And then there were two

7      presentations where I -- I think there were two.

8      There might have only been one presentation where

9      I, again, assisted to explain the mathematics.

10     Dan Brown was presenting.  I assisted to explain

11     mathematics.

12         Q    And you don't remember if it was one or

13     two presentations?

14         A    I can't recall.  I know that there was

15     at least one that was August 13th --

16         Q    Of --

17         A    -- or thereabouts.  August 13th of

18     2020.

19         Q    Okay.

20         A    13th or 14th.

21         Q    Okay.  Why do you remember that one?

22         A    That was the last presentation.  That

Page 150

1    was also the impetus for the de facto debarment.

2    This is where I was attacked by McVeigh after the

3    presentation.  It was a memorable event.

4         Q    Tell me more about it.  So you said

5    he -- he attacked you.  How did he attack you?

6         A    I would say he aggressively approached

7    me after the presentation.

8         Q    Did he physically touch you during

9    this?

10        A    No.

11        Q    Okay.

12        A    I'd been told on many occasions by Dan

13   Brown to avoid Captain McVeigh.

14        Q    Before the August 13th incident?

15        A    Oh, I'd been told many months prior.

16        Q    And why did Dan Brown tell you that?

17        A    As I stated in the second amended --

18   amended complaint, the -- the reputation that

19   Captain McVeigh had within HNCO was well known.

20   He often would attack people and attempt to

21   destroy their reputation in order to get program

22   funds from another program shifted over to his

Paul Roysdon , Ph.D.                        May 30, 2025

1        program.

2                Dan Brown mentioned this on a couple of

3        occasions, a phone call, one time in his office,

4        as just somebody to avoid and not interact with.

5                I had also heard from Todd Jaspers that

6        this -- this -- Captain McVeigh had that

7        reputation, even with their counterparts at NSA,

8        and to try to avoid this individual.

9                MR. GONZALEZ:  What time is it?

10                THE WITNESS:  And --

11                MS. SEEMAN:  2:02.

12                THE WITNESS:  -- Todd Jaspers confirmed

13        this in his testimony, in his depo.

14                Actually, to note, Dan Brown also

15        confirmed this in his testimony.

16                MS. SEEMAN:  I'm just worried about

17        your testimony today, so --

18                MR. GONZALEZ:  Do we want to take like

19        a 30-minute break for lunch and then --

20                MS. SEEMAN:  Yeah, I guess.  People are

21        hungry.  We can go --

22                THE WITNESS:  You're hungry now?

Page 152

1                    MS. SEEMAN:  -- off the record.

2                    MR. GONZALEZ:  Yeah, let's take a

3          30-minute break for lunch.

4                    (Whereupon, at 2:03 p.m., a

5                    luncheon recess was taken.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

                                              Page 153

1              A F T E R N O O N   S E S S I O N

2                                        (2:43 p.m.)

3    WHEREUPON,

4                    PAUL ROYSDON, PH.D.

5    was called for continued examination, and having

6    been previously duly sworn, was examined and

7    testified further as follows:

8              EXAMINATION BY COUNSEL FOR DEFENDANTS

9              CONTINUED

10    BY MS. SEEMAN

11        Q    Dr. Roysdon, did you discuss your

12    deposition testimony with anybody over the break?

13        A    I discussed with my attorney.

14        Q    What did you discuss with him?

15        A    I just asked how things are going.

16        Q    And what did he say?

17        A    He said fine.

18        Q    Anything else?

19        A    No.

20        Q    Okay.  When you were a consultant, who

21    paid for your travel?

22        A    I traveled on only one occasion, and

EXHIBIT 1
Page 572 of 639
www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000153

Paul Roysdon, Ph.D.                                    May 30, 2025

Page 154

1      GITI paid for the travel.  I had to submit an

2      expense report.

3              Q     Where did you travel to?

4              A     El Segundo, California.

5              Q     Who did you present to?

6              A     It was a classified conference --

7      that's the best way I can describe it -- or a

8      classified gathering.

9              Q     Were Air Force employees there?

10             A     Yes.

11             Q     Any other government employees?

12             A     Yes.

13             Q     Do you know what agencies?

14             A     I don't.

15             Q     Okay.  Did you ever -- did GITI ever

16     pay for your travel when you were on your joint

17     duty assignment back to San Antonio?

18             A     No.

19             Q     When you were in person at HNCO's

20     offices -- so, earlier, you said you were there a

21     maximum of four occasions in person.  Do I have

22     that correct?

Paul Roysdon , Ph.D.                                    May 30, 2025

Page 155

1          A    Yes.

2          Q    Okay.  Your read-in, a meeting with Dan

3      Brown, and then a presentation or two, correct?

4          A    Correct.  The meeting with Dan Brown,

5      to clarify, was to create that -- that

6      classification document.  Do you understand what

7      a classification document is?

8          Q    Yes.

9          A    Okay.  This classification document,

10      just for the record, defines what is classified

11      at the sensitive, secret, top secret level.

12      However, it was never approved.

13          Q    Let's talk about that meeting a little

14      bit more.  So what was your role in that meeting?

15          A    Again, providing guidance.  Dan Brown

16      was authoring the class guide and wanted to know

17      what I considered to be sensitive.

18          Q    Is that subject to a difference of

19      opinion?

20          A    No.

21          Q    Why not?

22          A    He was asking for my guidance.  He did

EXHIBIT 1
Page 374 of 639
www.CapitalReportingCompany.com
202-857-3376
Roysdon Fact Witness_000155

Page 156

```
 1      not have an opinion.  He didn't know the math.

 2      He didn't know what was sensitive and what

 3      wasn't.

 4          Q    Do you know whether or not he asked

 5      anybody else at the Air Force about the

 6      classification guide?

 7          A    He would have taken it through his

 8      chain of command to get it approved.

 9          Q    And you said it was not approved,

10      correct?

11          A    I found out through discovery that it

12      was not approved.

13          Q    What discovery?

14          A    Through this lawsuit discovery.

15          Q    Yeah.  What document, though?

16          A    I don't recall.  I think we had asked

17      for the classification guide, and they said they

18      couldn't produce it.

19          Q    Did you take that to mean that it was

20      not approved?

21          A    There's some sort of conversation with

22      Dan Brown or someone else that said it was not
```

EXHIBIT 1
www.CapitalReportingCompany.com
Page 376 of 639
202-857-3376

Roysdon Fact Witness_000156

Page 157

```
 1      approved, and I think he also testified to that

 2      in his -- his deposition.

 3          Q    Did you read Dan Brown's deposition

 4      testimony?

 5          A    I was present at his deposition.

 6          Q    In person?

 7          A    Yes.

 8          Q    Oh, it was virtual, so you have to see

 9      who's in the room.

10               How about Todd Jaspers?

11          A    I read the testimony.

12          Q    Testimony.  Have you read any other

13      depositions in this case?

14          A    I've been briefed on all the

15      depositions.

16          Q    Briefed, but you haven't read all of

17      the transcripts?

18          A    I have not read all of the transcripts.

19          Q    Okay.

20          A    I've read several of them.

21          Q    Let's talk about Dan Burghard.  Is it

22      okay if I call him Danny?  Do you know who I'm
```

Paul Roysdon, Ph.D.                                    May 30, 2025

Page 158

1      talking about?

2           A    Yes.

3           Q    Okay.

4           A    Yeah.

5           Q    Who is Mr. Burghard?

6           A    To my understanding, Danny Burghard is

7      like a program chief for the work that HNCO does,

8      so like a final decisionary.

9           Q    Was that your understanding of his role

10     in 2019 to 2020?

11          A    Correct.

12          Q    Okay.  Do you know what his current

13     role is?

14          A    I don't.

15          Q    Okay.  What interactions did you have

16     with Mr. Burghard in 2019 to 2020?

17          A    I only had one interaction with Danny

18     Burghard that I recall, where he was present at

19     the meeting or -- yeah, the meeting,

20     presentation, whatever it was in August 2020,

21     August 14th or 13th, 2020.

22          Q    So you said that's the only interaction

EXHIBIT 1
Page 377 of 689
www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000158

Page 159

```
 1      you recall, correct?

 2           A    Yes, ma'am.

 3           Q    When you say that you recall, do you

 4      mean you might have had other interactions with

 5      him before then; you just don't remember?

 6           A    It's possible.  I just don't remember.

 7           Q    Okay.

 8           A    Correct.

 9           Q    Sometimes people use don't recall in

10      different ways, so I just wanted to clarify what

11      you meant.

12                In your -- you said you reviewed your

13      second amended complaint before coming here?

14           A    Yes, ma'am.

15                MS. SEEMAN:  Okay.  I guess I can hand

16      you a copy.  It's not a quiz, I promise.

17                So we'll mark the second amended

18      complaint as Exhibit 8.  A copy to counsel.

19                (Deposition Exhibit Number 8 was

20                marked for identification.)

21      BY MS. SEEMAN

22           Q    So I want to direct your attention
```

Paul Roysdon , Ph.D.                    May 30, 2025

Page 160

1      to -- let me get my copy -- I believe paragraph

2      78.

3            A    Yes.

4            Q    Okay.  A couple things.  Why do you

5      refer to this other project, which we'll call

6      Project B -- why do you refer to that as Captain

7      McVeigh's project?

8            A    Because it was his project.

9            Q    How do you know?

10           A    Dan Brown told me about those projects

11     a few times.

12           Q    All right.  In paragraph 78, you say,

13     in February 2020, at a classified briefing, you

14     were asked by Dan Brown and Mr. Burghard to

15     express your expert opinion on the continued

16     viability of Captain McVeigh's Project B, et

17     cetera, et cetera, et cetera.

18                Do you -- do you recall what this

19     paragraph is talking about?

20           A    Yes, I do.

21           Q    What can you tell me about it?

22           A    So, in this case, Dan Brown was asking

EXHIBIT 1
Page 379 of 689
www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000160

Page 161

1    on behalf of Danny Burghard to get my subject

2    matter expertise opinion on the viability of

3    this -- this program that -- that Captain McVeigh

4    was overseeing as program manager.  I was given

5    insight into the targets, meaning, you know,

6    China or Taiwan or -- sorry -- China, Iran, et

7    cetera, adversaries, the technology that was

8    used, et cetera.

9         I asked a number of questions.  For

10   example, did they have -- when was their last

11   deliverable?  Apparently, the program had been

12   going on for maybe ten years.  They hadn't

13   delivered any deliverables in several years.

14        The technology that they were using was

15   outdated, meaning that they were developing

16   software for, say, Windows 2000 instead of

17   Windows 8 or 10.

18        And there was -- there was no

19   automation.  He asked for things like would I --

20   he asked for expert advice, and it was my -- my

21   assessment that based on the program being over

22   budget, not delivering, and using old technology,

Page 162

1      outdated technology that was essentially overcome

2      by events, it wasn't necessary in the field

3      anymore, that it's something that shouldn't

4      continue.

5           Q    I want to break that down just a little

6      bit.

7                So did you ever have a conversation

8      with Mr. Burghard about this assessment?

9           A    No.

10          Q    Okay.  Did you only communicate with

11     Dan Brown for information?

12          A    Yes.

13          Q    Okay.  And you said they a lot.  Who is

14     they that you're referring to?

15          A    They meaning the performers on Project

16     B.

17          Q    Would that be the Air Force?

18          A    The performers are typically a

19     contractor.

20          Q    Okay.

21          A    It could also -- it could also be the

22     Air Force, but I -- I was not privy to that

 1      information.

 2           Q    Okay.  And you mentioned -- I believe

 3      you mentioned that this was a project that was

 4      under Captain McVeigh --

 5           A    Correct.

 6           Q    -- in his role as project manager or

 7      program manager?

 8           A    One or the other, yes.

 9           Q    One of the -- one of the PMs?

10           A    Yes.

11           Q    Is that the only reason why you

12      describe it as his project is because it was

13      under his group of projects that he had?

14           A    Correct.

15           Q    Is Fibonacci also, then -- would it

16      have been one of Captain McVeigh's projects?

17           A    At that time, no.  That was not my

18      understanding.

19           Q    What was your understanding?

20           A    My understanding is that, at that time,

21      McVeigh and Dan Brown were peers, Dan Brown

22      operating the Office of Special Projects.  Dan

Paul Roysdon , Ph.D.                                    May 30, 2025

Page 164

```
 1     Brown had his set of projects, and McVeigh had
 2     his set of projects.
 3              I think this -- based on my
 4     understanding, this created the tension that
 5     existed in the office, where funding that was
 6     going to Dan's Brown -- Dan Brown's projects,
 7     McVeigh felt, as he did on prior occasions,
 8     apparently, should have gone to McVeigh's
 9     projects, that funding should have gone to
10     McVeigh's projects instead of Dan Brown's
11     projects, as if any projects that Dan Brown was
12     overseeing was kind of taking money away from the
13     money available to all of the projects.
14         Q    Is the understanding of where they
15     are -- let me rephrase.
16              Is your understanding of the working
17     relationship between Dan Brown and Captain
18     McVeigh based on your conversations with Dan
19     Brown?
20         A    Yes, and my understanding of the Air
21     Force.  It would be very unusual to have a
22     captain overseeing a GS-13.
```

1          Q    Okay.

2          A    As in it almost never happens.

3          Q    But, specifically, you don't have

4     any -- do you have any reason to dispute that

5     Captain McVeigh would have been overseeing

6     projects that Dan Brown was working on?

7          A    Yes, because I was told otherwise --

8          Q    Okay.

9          A    -- by Dan Brown.

10         Q    By Dan Brown.  Okay.  So you offer your

11    expert opinion on what we're calling Project B,

12    correct?

13         A    Correct.

14         Q    When did you offer that assessment?

15         A    I offered an initial assessment

16    sometime in February, and then there was another

17    conversation in August.

18              And I followed up with -- well, when

19    asked again, based on the progress in the span of

20    seven months, I again said, it's still OBE.  It's

21    still dated technology.  They still have not

22    delivered.

EXHIBIT 1
Page 384 of 635
www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000165

1          Q     What does OBE mean?

2          A     Overcome by events.

3          Q     And when you say overcome by events,

4     what does that mean?

5          A     Meaning that they're developing

6     capabilities for something like Windows 2000 when

7     the current version of Windows was Windows 8.

8          Q     So it's outdated?

9          A     It's outdated.

10          Q     Okay.  You said you had another

11     conversation in August.  Who was that

12     conversation with?

13          A     Dan Brown.  It's my understanding that

14     Dan Brown conveyed that information to Danny

15     Burghard and Allen Rabayda.

16          Q     Were you included in any

17     communications --

18          A     No.

19          Q     -- between -- I've got to finish the

20     question.

21          A     I'm sorry.

22          Q     Were you included in any communications

Paul Roysdon , Ph.D.                    May 30, 2025

Page 167

1     that relayed your opinion of Project B?

2          A    No.

3          Q    Do you know whether or not Dan Brown

4     used your name in providing that assessment of

5     Project B to Allen Rabayda or to Danny Burghard?

6          A    I don't know.

7          Q    Okay.  Do you know what a performance

8     management review is?

9          A    A PMR?

10         Q    Yes.

11         A    Yes.  There are many types.

12         Q    Is that what the August 13th or 14th,

13    2020 meeting was?

14         A    I don't know.

15         Q    Did you participate in any PMRs as a

16    consultant?

17         A    I participated in a briefing of -- in

18    August.  It was a briefing of some new math that

19    could be used on a project that -- that Dan Brown

20    expressed as being important.  It was the

21    presentation of that new math that, at least

22    according to Dan Brown and Todd Jaspers -- and

Paul Roysdon , Ph.D.                                May 30, 2025

Page 168

1      they confirmed this in their testimony -- that's

2      something that Danny Burghard wanted to create a

3      program out of and fund, and that money for the

4      funding was then pulled from Captain McVeigh's

5      program.

6              Apparently, this angered Captain

7      McVeigh, as I was told -- told this by Dan Brown,

8      and he used that as an opportunity to destroy the

9      program and destroy the individual as he had done

10     on prior occasions.  Again, he had a reputation

11     for destroying people's reputations and trying to

12     take money from one program to his own programs.

13         Q    Did you ever tell Danny Burghard you

14     were an NSA employee?

15         A    I don't recall, no.

16         Q    Did you ever tell him that you were a

17     private consultant?

18         A    I don't recall.

19         Q    In the PMRs you -- I guess let me back

20     up.

21              How many PMRs did you participate in at

22     the Air Force?

EXHIBIT 1
Page 89 of 659
Capital Reporting Company
www.CapitalReportingCompany.com
202-857-3376
Roysdon Fact Witness_000168

Paul Roysdon , Ph.D.                                    May 30, 2025

Page 169

```
1          A    I don't recall participating in a PMR.

2          Q    You -- you didn't -- you don't --

3          A    I don't recall participating in a PMR.

4          Q    Okay.  What do you want to call it?

5          A    I participated in a meeting to discuss

6     the math pertaining to the Fibonacci series.

7          Q    Other than Mr. Burghard, who was

8     present at that meeting?

9          A    I don't recall.

10         Q    Do you know how many people were -- was

11    it an in-person meeting?

12         A    It was in person in San Antonio.  The

13    room may have had five people in it.  Captain

14    McVeigh was one of them.  And I don't know if

15    Danny Burghard was in that meeting in person or

16    virtually.

17         Q    But he was present?

18         A    To the best of my knowledge, yes.

19         Q    Okay.  Do you remember anybody else

20    there other than McVeigh and Burghard?

21         A    Dan Brown.  It was Dan Brown -- Dan

22    Brown's program.
```

EXHIBIT 1
Page 388 of 639

www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000169

Paul Roysdon , Ph.D.                    May 30, 2025

Page 170

1          Q    Anybody else?

2          A    I don't remember.

3          Q    Does the five include you?

4          A    Yes.

5          Q    Okay.  So we're just missing one?

6          A    I was there, yes.

7          Q    All right.  And what was the date of

8     that meeting?

9          A    I believe that was the August 13th

10    meeting.

11         Q    Okay.  Going back to -- actually, let's

12    go one at a time.

13              So for the opinion that you gave on

14    Project B, how does that comply with the guidance

15    that you were given by NSA OGC?

16              MR. HENRY:  Objection to form.

17              THE WITNESS:  As far as that program

18    being any different than any other program, there

19    was no difference.  I was presented with, like, a

20    problem to solve and methods that could solve it,

21    and I presented my -- my evidence on how to solve

22    that problem.

Page 171

1              And, you know, in -- in this dialogue,

2      in view of program B using outdated technology, I

3      presented -- in essence, to show that it's --

4      it's overcome by events, I presented a solution

5      that would -- that would solve that problem,

6      meaning the network operations that were

7      necessary against that target and -- and how one

8      might use certain mathematics to -- that would be

9      implemented to solve that problem.  So, in that

10     sense, it is no different.

11             So I was presented -- in the same way

12     presented with the Fibonacci series problems that

13     needed solutions that had outdated solutions that

14     were currently being used in operations, and I

15     proposed modern solutions that could work at the

16     speed and scale of machines.  So it was no

17     different.

18     BY MS. SEEMAN

19         Q    Did your expert opinion about Project B

20     have the capability to create a difference of

21     opinion at the Air Force?

22         A    Well, it certainly did with Captain

Paul Roysdon, Ph.D.                                    May 30, 2025

Page 172

1      McVeigh.  However, I was not aware that this

2      information would be conveyed to Captain McVeigh.

3           Q    More generally speaking, you know, you

4      mentioned Project B had been around for ten years

5      at the time --

6           A    Correct.

7           Q    -- give or take?

8           Did you -- when -- did you hesitate to

9      offer this opinion based on the NSA guidance you

10     received?

11          A    No.  Again, same answer as before.  I

12     was -- I was presented with different --

13     different problems with the Fibonacci series.  My

14     job is to present facts on how to solve those

15     problems.  Yeah.

16          Q    Okay.  If you are offered -- were --

17     did you offer a different solution for Project B

18     in your assessment?

19          MR. HENRY:  Objection to form.

20          THE WITNESS:  What do you mean, a

21     different solution?

22

EXHIBIT 1
www.CapitalReportingCompany.com
Page 391 of 639
202-857-3376

Roysdon Fact Witness_000172

Page 173

1       BY MS. SEEMAN

2            Q    Did you offer something that would be

3       better than Project B?

4                 MR. HENRY:  Objection to form.

5                 THE WITNESS:  I didn't offer a

6       solution.

7       BY MS. SEEMAN

8            Q    Okay.  In your opinion and assessment

9       of Project B, what did you offer?

10           A    I presented the facts.

11           Q    And the facts were what?

12           A    That it's using outdated technology.

13           Q    Did you provide any solution for that

14      outdated technology?

15           A    I did not provide a solution.

16           Q    Okay.  You know, you mentioned you

17      learned there was a difference of opinion with

18      Captain McVeigh at the time.

19                Did that -- when did -- when did you

20      become aware of Captain McVeigh having an issue

21      with your assessment?

22           A    My assessment was to inform Dan Brown

Page 174

1    so that he can inform his leadership.  I was,

2    sometime after August 13th, notified by -- I

3    received a phone call from Dan Brown saying that

4    he had relayed that information to Captain

5    McVeigh and that there was a difference of

6    opinion between he and Captain McVeigh, not

7    between Captain McVeigh and myself.

8        Q    I'm going to need you to explain that

9    to me a little bit further, but -- yeah.  Can

10    you -- I don't -- I don't follow there.

11           So Dan Brown called you later in August

12    of 2020?

13        A    Uh-huh.

14        Q    Okay.  And he told you there was a

15    difference of opinion between him and Captain

16    McVeigh?

17        A    Yes, based on his, I guess you could

18    say, assessment.

19        Q    Okay.  But you said there was no

20    difference of opinion between you and Captain

21    McVeigh?

22        A    As far as I know, no.

EXHIBIT 1
www.CapitalReportingCompany.com
Page 369 of 689
202-857-3376

Roysdon Fact Witness_000174

Page 175

1          Q    Okay.  Why --

2          A    I didn't have an interaction with

3     Captain McVeigh.

4          Q    Okay.  Do you know whether or not Dan

5     Brown adopted your opinion of Project B in his

6     communications with Captain McVeigh?

7          A    I don't know.

8          Q    Okay.  So it's possible, right, then,

9     that you did have a difference of opinion with

10    Captain McVeigh?

11         A    I did not have a difference of opinion

12    with Captain McVeigh.

13         Q    And you say that just because you did

14    not have a substantive interaction with him about

15    Project B?

16         A    That's correct.

17         Q    Okay.  Let's talk about the August 2020

18    meeting.  So how were you avoiding a conflict of

19    interest at that meeting?

20              MR. HENRY:  Objection to form.

21    BY MS. SEEMAN

22         Q    You can answer.

1          A    Again, my role was kind of a backseat

2     role or behind-the-scenes role.  The presentation

3     was Dan Brown's presentation to lead, to

4     introduce, to conclude.  I provided refining

5     elements of the presentation specifically related

6     to the mathematics.

7          Q    Okay.  I think earlier you said this,

8     but -- so you called it new math?

9          A    Yes, ma'am.

10         Q    Okay.  I'm not even going to ask you

11    what that means.  But was there a PowerPoint at

12    this meeting?

13         A    I think there was a PowerPoint at this

14    meeting.

15         Q    Did you prepare a PowerPoint for this

16    meeting?

17         A    I think I assisted Dan Brown in his

18    PowerPoint.

19         Q    Were you identified in the PowerPoint?

20         A    I don't recall.

21         Q    And I know you said you only remembered

22    the one presentation for sure.  At the other

 1      presentation, do you remember anything about it?

 2           A    No, I don't recall.

 3           Q    Okay.

 4           A    No.

 5           Q    Did GITI have any input into the

 6      presentation from August 2020?

 7           A    No.

 8           Q    Why not?

 9           A    They were not privy to the classified

10      information.

11           Q    And just to clarify, this was a

12      classified meeting?

13           A    Yes, ma'am.

14           Q    Okay.  Did this meeting have any effect

15      on funding for projects at the Air Force?

16           A    I don't know.

17           Q    And going back, same question for your

18      assessment of Project B.  Were you aware when you

19      gave that opinion whether or not it would have

20      any effect on funding for Project B?

21           A    Again, this is, you know, outside of

22      my -- my domain, so I don't know.

Paul Roysdon , Ph.D.                                              May 30, 2025

Page 178

```
 1              Q    Did you think that project -- you
 2         thought Project B needed to be shut down, though,
 3         correct?
 4              A    Yes.  From the standpoint of being an
 5         American citizen, it was a good example of fraud,
 6         waste and abuse.
 7              Q    Did you report -- that's a -- that's a
 8         term of art, correct, fraud --
 9              A    Yes, ma'am.
10              Q    -- waste and abuse?
11              Did you report anything about Project B
12         to, like, the Office of the Inspector General?
13              A    I did later, yes.
14              Q    Okay.  And you say later.  When was
15         that?
16              A    Late 2020, early '21.
17              Q    Was that the only --
18              A    I filed -- I filed a claim, a fraud
19         waste and abuse claim.
20              Q    Is that the only claim you submitted to
21         OIG?
22              A    Yes, ma'am.
```

EXHIBIT 1
www.CapitalReportingCompany.com
Page 89 of 63
202-857-3376

Roysdon Fact Witness_000178

Page 179

```
 1          Q    Okay.  If I told you that happened in

 2    2022, do you have any reason to doubt that?

 3          A    It's possible it was in '22.

 4          Q    Okay.

 5          A    Was it?

 6          Q    I'll clean it up later.  Don't worry.

 7    Okay.  Okay.  Can you -- I want to direct your

 8    attention back to paragraph 78.  All right.

 9               And once you've had a chance to reread

10    it, can you let me know?

11          A    Yes, ma'am.  Yes, ma'am.

12          Q    Is the substance of paragraph 78

13    factually accurate?

14          A    Yes, ma'am.

15          Q    Okay.  So is this 2020 briefing the

16    first time you met Captain McVeigh?

17          A    In person, yes, ma'am.

18          Q    And when you say in person, had you had

19    communications with him before then?

20          A    No.  In this meeting, I was merely

21    introduced to him in the foyer.

22          Q    Of HNCO?
```

EXHIBIT 1
www.CapitalReportingCompany.com
Page 399 of 639
202-857-3376

Roysdon Fact Witness_000179

Paul Roysdon , Ph.D.                    May 30, 2025

Page 180

```
 1         A    Of Aerospace Corporation.  They had a

 2    classified briefing room.  This was in the foyer.

 3    He introduced himself as Captain McVeigh.

 4         Q    Is that in Texas?

 5         A    It's in El Segundo, California.

 6         Q    Thank you.  When you introduced

 7    yourself to Captain McVeigh, did you tell him

 8    that you were a private consultant?

 9         A    No.

10         Q    Did you tell him that you were an NSA

11    employee?

12         A    No.

13         Q    What did you tell him?

14         A    I didn't tell him anything.  I said,

15    hi, I'm Dr. Roysdon.

16         Q    You didn't give him any affiliation --

17         A    There was no --

18         Q    -- that you had?

19         A    -- need to.

20         Q    After February 2020, when was your next

21    interaction with Captain McVeigh?

22         A    August 13th, 2020.
```

Page 181

```
 1           Q    All right.  And let's talk about that a

 2      little bit more.

 3                So, earlier, you said he aggressively

 4      approached you.  Where were you all at?

 5           A    In the briefing room.  This was after

 6      the briefings.

 7           Q    And briefing room at HNCO?

 8           A    HNCO Texas.

 9           Q    Okay.  What did he say to you when he

10      approached you?

11           A    I don't recall exactly.  He introduced

12      himself again as Captain McVeigh.  He gave me a

13      business card.  I don't recall the rest.

14           Q    Okay.  Earlier you said he aggressively

15      approached you.  So what made it aggressive?

16           A    He seemed very accusational about the

17      mathematics.

18           Q    What do you mean by that?

19           A    That -- it was more like questioning me

20      about the mathematics.  I took it as an

21      opportunity to -- to hear him out.  He has no

22      math background, so I was interested to hear his
```

Page 182

1    opinion.

2         Q    When you say it's accusational, is

3    there -- what about his -- we'll start with body

4    language -- did you see that would support being

5    accusational?

6         A    Just general body language was fairly

7    confrontational, and the conversation was

8    something like, you know, how do you know this to

9    be true?  And my response as a mathematician was

10    to say, well, it's provably so.

11              I mean, there's -- for me, it's black

12    and white.  I'm not -- it's difficult to question

13    -- you can question the mathematics if you want,

14    but if you have a proof that shows that it's

15    true, you can argue it, but it's foolish to argue

16    it.  So I took this as an opportunity to just

17    step him through the math and just say, okay,

18    well, we know this -- this conclusion based on --

19    on these things.  It's as simple as that.

20         Q    What was the volume of the

21    conversation?

22         A    I don't recall.  And he seemed -- he

1      seemed happy with my -- my response or my

2      description.

3           Q    Okay.

4           A    So it was accusational, you know, how

5      is this -- how can this be true.  Okay.  Here's

6      the conclusion.  This is how you arrive at this

7      conclusion.

8                It almost seemed to me at the time that

9      he just wanted to better understand how that math

10     could be applied to a specific problem, so, as a

11     mathematician, I obliged him.

12          Q    So is it fair to say that he did not

13     attack you?

14          A    No.  It was certainly an aggressive

15     form of communicating that idea.

16          Q    And it was aggressive based on his

17     questions?

18          A    Based on his questions, the tone of his

19     voice, maybe elevated voice.  There were other

20     people in the room, so -- yeah, it was just

21     generally unprofessional.

22          Q    And in your response, what was your

Page 184

1    demeanor like in this conversation?

2        A    Fairly calm.  I've -- I've dealt with

3    this many times before.  It's not unusual.

4        Q    Okay.  After you have that conversation

5    with Captain McVeigh, is it fair to say it

6    de-escalates?

7        A    I thought so, yes.

8        Q    Okay.  After that conversation, did you

9    talk to anybody about that conversation?

10        A    No.

11        Q    Okay.  Who, if anybody, witnessed that

12    conversation?

13        A    Dan Brown might have.

14        Q    Did you ever tell Major McVeigh that

15    you were a private consultant?

16        A    They promoted him.  Yes, he was

17    promoted.  He is now captain -- sorry.  He is now

18    Major --

19        Q    Sorry.

20        A    -- McVeigh.

21        Q    Yeah.

22        A    At the time, he was Captain McVeigh.

EXHIBIT 1
Page 403 of 639

www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000184

Paul Roysdon , Ph.D.                              May 30, 2025

                                          Page 185

 1          Q    Yeah.  But did you ever tell captain --
 2     then Captain McVeigh that you were a private
 3     consultant?
 4          A    I didn't say anything.
 5          Q    Did you ever tell Captain McVeigh that
 6     you were an NSA employee?
 7          A    I didn't say anything.
 8          Q    Sorry.  I didn't --
 9          A    I didn't, no.
10          Q    Okay.  Do you know Colonel Jared
11     Ekholm?
12          A    I do not.
13          Q    You're suing him, though, right?
14          A    Pardon?
15          Q    You're suing him, though, right?
16          A    He was in the chain of command.  Yes,
17     ma'am.
18          Q    Do you know where in the chain of
19     command he falls?
20          A    Both Captain McVeigh and Dan Brown
21     reported to him.  He oversaw the projects and
22     oversaw things like the classification guide,

EXHIBIT 1
Page 404 of 639
www.CapitalReportingCompany.com
202-857-3376
Roysdon Fact Witness_000185

Page 186

1      program management reviews, et cetera.

2            Q    Have you ever met Colonel Ekholm?

3            A    I have not.

4            Q    Do you have any opinion about him?

5            A    Does my opinion really matter?

6            Q    It might.

7            A    I think if there's friction in the

8      office, it is your job as a leader to resolve

9      that friction.  Otherwise, you are a poor leader.

10     There was obvious friction in that office,

11     especially between Captain McVeigh and nearly

12     everyone else, as I've been told, but in the

13     cases that I was privy to, only Dan Brown.

14            And it seems to me that as a leader who

15     is overseeing that office and is privy to all of

16     those programs and the friction in the office, it

17     was his job to try to mitigate -- reduce the

18     friction, try to help people get along.

19            Q    So is it fair to say you just might not

20     agree with his management style?

21            A    I think he allowed Captain McVeigh to

22     destroy other people's reputations before I came

Paul Roysdon , Ph.D.                                    May 30, 2025

Page 187

1        into view and then allowed Captain McVeigh to do

2        the same to me.

3            Q    All right.  And --

4            A    And I heard the same thing from Dan

5        Brown and Todd Jaspers, and they confirmed this

6        in their testimony during the depositions.

7            Q    So you keep mentioning destroying

8        reputations before you.  So whose reputations are

9        you referring to?

10           A    I don't know.  I was told on a few

11       occasions that Captain McVeigh had a reputation

12       of destroying people's -- of destroying

13       people's -- other people's reputations that would

14       potentially -- of destroying other people's

15       reputations.

16           Q    Okay.  You don't know anything about

17       the underlying substance of those situations,

18       though, correct?

19           A    I do not.

20           Q    Okay.  Did you believe that Captain

21       McVeigh was targeting you?

22           A    At the time, I did not know.  It clear

EXHIBIT 1
Page 406 of 639

Capital Reporting Company
www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000187

Paul Roysdon , Ph.D.                                May 30, 2025

Page 188

1    after reading all of the documents that we've

2    received in -- in discovery, the e-mails that

3    I've read of him authoring e-mails and responses,

4    it seemed that he was on a mission to destroy me.

5              Again, Todd Jaspers confirmed this in

6    his testimony.  Dan Brown confirmed this in his

7    testimony.  It was clear several times he reached

8    out to leadership, both at HNCO and Air Force

9    Research Laboratory, that he was trying to

10   destroy my reputation, and each time, they told

11   him to stop, that he had no grounds.

12       Q    Did Captain McVeigh ever share that he

13   had an issue with you personally?

14       A    No, ma'am.

15       Q    Okay.  Have you spoken with Captain

16   McVeigh since leaving your consulting role?

17       A    No, ma'am.

18       Q    Okay.  Do you know what his current

19   position is?

20       A    No, ma'am.

21       Q    Okay.  For Colonel Ekholm, did you ever

22   have any interactions with him?

EXHIBIT 1
Page 407 of 659

www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000188

Paul Roysdon , Ph.D.                                   May 30, 2025

Page 189

1          A    No, ma'am.

2          Q    And have you -- you haven't spoken with

3     him since leaving?

4          A    No, ma'am.

5          Q    Okay.  I guess since leaving your

6     consulting role.

7          A    No, ma'am.

8          Q    Thank you.  How about Danny Burghard?

9     Have you had any interactions with him since

10    leaving your consulting role?

11         A    No, ma'am.

12         Q    All right.  Let's -- do you -- before

13    you read discovery in this case, what was your

14    personal opinion of Captain McVeigh?

15         A    I was more or less indifferent, other

16    than being warned by Dan Brown to avoid him.

17         Q    Okay.

18         A    I'm not one to hold a grudge or try to

19    attack somebody.  I was indifferent.

20         Q    All right.  And same sort of question

21    for Mr. Burghard.  What was your opinion of him?

22         A    Indifferent.

EXHIBIT 1
Page 408 of 639

www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000189

Paul Roysdon , Ph.D.                                    May 30, 2025

Page 190

```
 1          Q    Okay.  Dan Brown.

 2          A    Yes, ma'am.

 3          Q    So you've -- is -- I guess Dan Brown

 4     and Todd Jaspers.  Are those two the only people

 5     who you talked to about Captain McVeigh's

 6     reputation?

 7          A    Aside from my attorney?

 8          Q    Yes.

 9          A    Yes.

10          Q    Okay.  And how frequently would you

11     interact with Mr. Brown while in your consulting

12     role?

13          A    We interacted as colleagues or friends

14     on frequent occasions.  As a consultant -- sorry.

15          Q    No, no.  I was just going to ask to

16     clarify.

17               So would you describe your relationship

18     with him as a friendly one?

19          A    At the time, yes.

20          Q    Okay.  Did you guys get together

21     outside of -- I hate to say the office because

22     you guys didn't work in the same office, correct?
```

Page 191

```
1           A    Correct.

2           Q    Did you guys ever get together after

3     work hours?

4           A    Only on one occasion.

5           Q    When was that?

6           A    I don't remember.  We went and had

7     Mexican food with Todd Jaspers.

8           Q    And how frequently would you interact

9     with Mr. Brown during work hours -- well, during

10    your consulting work hours?

11          A    Only on occasion.

12          Q    Did Dan Brown offer you any sort of

13    guidance on how to avoid the appearance of a

14    conflict of interest during your consulting work?

15          A    His guidance was to make sure I was

16    complying with OGC.

17          Q    From NSA, correct?

18          A    NSA, yes.

19          Q    Did you ever consult with anybody at

20    the Air Force Office of General Counsel?

21          A    No.

22          Q    How would you describe Dan Brown?
```

Paul Roysdon , Ph.D.                              May 30, 2025

Page 192

1          MR. HENRY:  Objection to form.

2          THE WITNESS:  Can you clarify your

3     question?

4     BY MS. SEEMAN

5          Q    Yeah.  How would -- I mean, how would

6     you describe him professionally?

7          A    Professionally?

8          Q    Yes.

9          A    Professionally, he is somebody that

10    takes great care to do a good job to make sure

11    everything is within the law.  He's very careful

12    about not talking about program things outside of

13    work, so as to not accidently leak classified

14    information.

15          He's also somebody who is very careful

16    with what he does, in that he won't -- he'll do

17    what he can to not cause conflict and he will

18    tend to avoid conflict.  So, if there is a

19    problem, he won't defend that individual.  If --

20    even if he believes that individual is being

21    harmed, he will not defend that individual.

22          My case was a great example.  He told

 1    me on several occasions -- and he told Todd

 2    Jaspers the same thing -- that he felt my

 3    reputation was being destroyed, and one time he

 4    said being dragged through the mud, but he was

 5    fearful of losing his job because, at that point,

 6    McVeigh had already moved him from his dream job,

 7    which was the special projects office in HNCO.

 8    He was worried about being terminated, so he, as

 9    much as he felt like I was being wronged, would

10    not defend me to his -- to his superiors.

11            He did on one or two occasions when

12    talking to Todd Jaspers -- I think Todd is the

13    one who relayed this to me -- said that he would

14    talk about these sorts of things if he was under

15    oath, but he otherwise would not do it in an

16    official capacity for fear of losing his job.

17            He feared retaliation by Captain

18    McVeigh or further retaliation.  He had already

19    been retaliated against once by having programs,

20    specifically the Fibonacci program, canceled and

21    then losing his position within special projects.

22    He feared further retaliation of losing his job.

EXHIBIT 1
www.CapitalReportingCompany.com
Page 41 of 689
202-857-3376

Roysdon Fact Witness_000193

Paul Roysdon , Ph.D.                                    May 30, 2025

Page 194

1    That's what he expressed to me personally.

2        Q    When did he express those things to

3    you?

4        A    So, apparently, there was an

5    investigation that was launched by Air Force OSI.

6        Q    I'll stop you there.  What do you have

7    to support that?  Why do you think that Air Force

8    OSI started an investigation?

9        A    Exhibit No. 7.  This is the readout in

10   the beginning of the Air Force investigation into

11   me --

12       Q    Are you --

13       A    -- based on false claims that I was an

14   insider threat or a crackpot or whatever other

15   adjectives Captain McVeigh used to describe me or

16   expressions used to describe me.

17       Q    Why do you say that Captain McVeigh

18   said those things about you?

19       A    Dan Brown told me this is what was

20   going on in the office.

21       Q    Did Dan Brown say specifically that

22   Captain McVeigh called you an insider threat?

Paul Roysdon , Ph.D.                                        May 30, 2025

Page 195

1          A    Yes, he did.

2          Q    Okay.  You mentioned --

3          A    He also said that Captain McVeigh had

4    access to a bunch of documents that he was not

5    privy to.  So this goes to my second amended

6    complaint on Privacy Act violations where,

7    somehow, the Air Force OSI agent was collecting

8    information about me and sharing that to -- or

9    sharing that with Captain McVeigh, and Captain

10   McVeigh was spreading that in the office.

11              Dan Brown confirmed this over the phone

12   by saying, Captain McVeigh's spreading your

13   personal information throughout the office --

14   that was his statement -- and that I need to be

15   careful.  We have e-mails showing that that's

16   exactly what's going on.

17         Q    Have you seen any e-mail where Captain

18   McVeigh called you an insider threat?

19         A    I have seen several e-mails where he is

20   being very disparaging about who I was and my

21   capabilities.

22         Q    When you say disparaging, what do you

EXHIBIT 1
Page 414 of 639
www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000195

1    mean?

2         A    Attacks on character, personal and

3    professional.

4         Q    Was there anything specific about that

5    other than the potential that there was a

6    conflict of interest that you're referring to?

7         A    I'm sorry.  Say that again.

8         Q    You're saying there were e-mails that

9    had disparaging information in them.  I'm just

10   trying to figure out what that disparaging

11   information is.  Now, I know because I've read

12   all the documents in the case, too, that there

13   are e-mail communications about a potential

14   conflict of interest.

15            Is that the only disparaging point of

16   those e-mails that you are referring to, or is

17   there something else?

18        A    In the e-mails, I -- I don't recall.  I

19   do recall phone conversations.

20        Q    With who?

21        A    Dan Brown.

22        Q    When were those phone conversations?

```
 1        A    Sometime between August 13th and maybe

 2   mid-September.

 3        Q    Of 2020?

 4        A    2020.

 5        Q    Okay.  You also said that Dan Brown

 6   told you that Captain McVeigh was spreading your

 7   information all around the office, correct?

 8        A    Correct.

 9        Q    Who was he specifically spreading your

10   information to?

11        A    I don't know.  At some point, my

12   security clearance documents, things like my

13   social security number, birth date, the documents

14   that -- or the e-mails that I exchanged between

15   Amy at NSA, the Office of General Counsel, those

16   documents were being given to several people, Dan

17   Brown included.  He said he had seen one of those

18   documents or something to the effect that Captain

19   McVeigh brought it into his office and put it on

20   his desk and said, you know, you need to read

21   this or something like that.

22        Q    Did -- did Dan Brown --
```

```
  1        A    You know --

  2        Q    -- ask you --

  3        A    -- the only way that --

  4        Q    Sorry.

  5        A    -- Captain McVeigh could have received

  6   those documents is through the Air Force OSI

  7   agent because he couldn't have received them

  8   otherwise at that point.

  9             Later, I had sent an e-mail that had

 10   the -- had part of the information from Office of

 11   General Counsel that Amy felt was okay to share

 12   via e-mail, but she requested at that time that

 13   not the entirety of our e-mails be shared.

 14             The entirety of the e-mails were

 15   eventually obtained by Air Force OSI, and that

 16   was somehow shared with Captain McVeigh.  I know

 17   this because the details he mentioned to Dan

 18   Brown, he could only have received through that

 19   channel.

 20        Q    Did Dan Brown ask you to provide

 21   information from NSA OGC?

 22        A    Yes.  That is one of the e-mails I was
```

EXHIBIT 1
Page 417 of 639

www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000198

Paul Roysdon , Ph.D.                                     May 30, 2025

Page 199

1    referencing.

2        Q    Okay.  Did Captain McVeigh ever ask you

3    to provide e-mails from NSA OGC about how you

4    were avoiding a conflict of interest?

5        A    I did not receive an e-mail from

6    Captain McVeigh.

7        Q    Okay.  Did you ever provide e-mails to

8    anybody at the Air Force, including Air Force

9    OSI?  Did you ever provide those e-mails to

10    anybody there?

11        A    To Air Force OSI?

12        Q    To anybody at the Air Force.

13        A    Air Force OSI, yes.

14        Q    Okay.

15        A    I had certain documents with me.  I --

16    during the exit interview with the Air Force OSI

17    agent, he threatened me several times that I

18    could not leave the building until I gave him

19    those documents.  And I repeated several times

20    that those documents are privileged information

21    between myself and NSA Office of General Counsel,

22    if he wanted a copy of them, he could request

Page 200

1    them, and I gave him the phone number.

2              He continued to threatened me, and I

3    eventually gave him those documents so I could

4    get out of the building.

5         Q    Okay.  Let's --

6         A    I tend not to argue with a man that has

7    a gun.

8         Q    Fair enough.  It is Texas, though,

9    so -- that is a joke, for the record.

10        A    It doesn't make me feel any better.

11        Q    Fair enough.  Let's back it up and talk

12   about -- in your initial disclosures, you

13   identify a man named Kevin Thomas.  And I can --

14   we can go back to Exhibit --

15        A    Kevin Thomas?

16        Q    -- 6.  I believe so.  Thompson.  Yeah,

17   Thomas.  I'm showing the witness Exhibit 6, No.

18   16.

19        A    Yes.  Okay.

20        Q    Who's that guy?

21        A    Had some sort of deputy director role

22   at HNCO.

Paul Roysdon, Ph.D.                                   May 30, 2025

                                                    Page 201

1         Q    Did you have any interactions with

2    Mr. Thomas?

3         A    No, ma'am.

4         Q    Okay.  So is it fair to say you're not

5    in contact with him?

6         A    Correct.  Yes, ma'am.

7         Q    Do you know what information, if any,

8    he has about your lawsuit?

9         A    If he was working in HNCO, it is my

10   assumption that he, being in the chain of command

11   at HNCO, would have had access to the documents

12   provided by Air Force OSI or the documents,

13   rather, that Captain McVeigh was spreading around

14   the office.

15        Q    You've never spoken to him about that,

16   though, correct?

17        A    I have not.

18        Q    Okay.  Did Dan Brown tell you that

19   Mr. Thomas had access to any of your documents?

20        A    I don't recall.

21        Q    Moving on to No. 17, William Bridges.

22        A    Same answer.

EXHIBIT 1
Page 422 of 639
www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000201

Page 202

1         Q    Who is that guy?

2         A    Same answer.  I don't know.

3         Q    You don't know?  Okay.

4         A    Deputy director role.

5         Q    Fair to say you have never had any

6    contact with him?

7         A    Yes, ma'am.

8         Q    Do you have any firsthand knowledge

9    about what information he might know about you?

10        A    Same answer as 16.

11        Q    Which is?

12        A    He had access to the same information.

13   He was in a deputy director role at HNCO.  If

14   information was being shared around the office

15   via Captain McVeigh, he would have seen it.

16        Q    You don't have any firsthand knowledge

17   of that, though, correct?

18        A    No, ma'am.

19        Q    Let's talk about Allen Rabayda.

20        A    Yes, ma'am.

21        Q    Who is he?

22        A    Allen Rabayda worked at the

EXHIBIT 1
Page 421 of 639
www.CapitalReportingCompany.com
Capital Reporting Company
202-857-3376

Roysdon Fact Witness_000202

Page 203

```
 1      division-level office at -- in Washington.

 2           Q    Have you had any interactions with

 3      Mr. Rabayda?

 4           A    I had maybe two.

 5           Q    When were they?

 6           A    They would have been during these --

 7      these meetings.

 8           Q    And when you say these meetings --

 9           A    Sorry.

10           Q    We talked about a lot of meetings

11      today, so --

12           A    Sure.  I don't recall whether or not he

13      was at the February meeting.  I'm fairly certain,

14      though not absolutely certain, he was at the

15      August meeting.

16           Q    The August 2020 meeting?

17           A    Yes, ma'am.

18           Q    Did you have any communication with him

19      on either of those occasions?

20           A    We might have exchanged pleasantries.

21           Q    Did you identify yourself as a private

22      contractor or a private consultant?
```

EXHIBIT 1
Page 422 of 659

www.CapitalReportingCompany.com
202-857-3376

1         A    I did not identify myself other than --

2    as anything other than Dr. Roysdon or Paul

3    Roysdon.

4         Q    And have you had any contact with

5    Mr. Rabayda since leaving your consulting role?

6         A    No, ma'am.

7         Q    Okay.  You can put that to the side for

8    now.  So let's go back to August 2020.

9         A    Yes, ma'am.

10        Q    Were you aware that, generally, until

11   this time, several Air Force employees were not

12   aware that you were a private consultant?

13        A    No, ma'am.

14        Q    Did you ever become aware of that?

15        A    Only after the fact.

16        Q    And when was that?

17        A    Sometime between August 14th, 2020 and

18   today, or the filing of this document, the second

19   amendment -- amended complaint.

20        Q    Okay.

21        A    Sorry.  Correct that.  I was not aware

22   until we received discovery and I was reading

```
 1    e-mails.

 2          Q    Okay.  So in this lawsuit is how you --

 3          A    Yes, ma'am.

 4          Q     -- became aware?  Okay.

 5               Is that concerning to you that most --

 6    a good amount of Air Force employees did not know

 7    how you were interact -- in what capacity you

 8    were interacting with them in?

 9          A    I think, in hindsight, that is

10    concerning.  That was really the duty of Dan

11    Brown to message that correctly.  Again, I was

12    brought in as a subject matter expert to talk

13    about certain topics.  Again, that is something

14    that Dan Brown should have done.

15               I think it would be odd for you to walk

16    into a room and say, hi, I'm Bob, I'm the

17    director of such and such, when everybody knows

18    that you are there to present on some topic.  You

19    just introduce yourself as, hi, I'm Bob.

20          Q    Is it your testimony you never

21    introduced yourself by any organizational

22    affiliation to HNCO employees?
```

 1          A    I did not introduce myself as any sort

 2     of affiliation.

 3          Q    And when I -- I guess let me clarify my

 4     question.

 5          A    Yes, ma'am.

 6          Q    When I say affiliation, I mean, did you

 7     ever identify yourself as either a consultant, a

 8     GITI consultant, or an NSA employee to any HNCO

 9     employee?

10          A    No.

11          Q    Okay.

12          A    Not to my recollection.  There were

13     times when Dan Brown wanted to use my -- loosely

14     use my affiliation with NSA, because NSA has, I

15     guess you could say, some gravitas, some impact,

16     that, you know, this is -- this information is

17     coming from an NSA-trained mathematician or an

18     NSA-trained exploit developer or something like

19     this.

20          Q    Did you have any concerns about him

21     using your NSA affiliation to throw -- throw some

22     weight around at HNCO?

EXHIBIT 1
www.CapitalReportingCompany.com
Page 425 of 639
202-857-3376

Roysdon Fact Witness_000206

1          A    Yes.  Because of the -- the definitions

2      and conversations I had with Amy, it was my

3      request to make sure that I was not introduced as

4      that person or representing that agency, because

5      I was not introduced -- I was not that person or

6      not representing that agency.

7                But that is no different than me being

8      introduced anywhere as, you know, Dr. Roysdon

9      versus Paul Roysdon.  If somebody wants to use my

10     education as some form of way to convey subject

11     matter expertise or intelligence or stuff like

12     that, that is often what's used instead of just

13     calling me Paul.

14         Q    I'm just using it out of respect,

15     but --

16         A    Thank you.

17         Q    So, you know, you said you requested

18     not to be introduced as an NSA employee.

19               Did I hear that correctly?

20         A    Yes, ma'am.

21         Q    When did you make that request?

22         A    On several occasions.

Paul Roysdon , Ph.D.                                    May 30, 2025

Page 208

1          Q    And who did you make that request to?

2          A    Dan Brown.

3          Q    Did he introduce you in meetings as an

4    NSA employee?

5          A    I don't recall.

6          Q    Okay.

7          A    I think he often introduced me, as I

8    recall, as Dr. Roysdon.  I'm fairly sensitive to

9    this because, in certain circles, especially for

10   leaders or program managers, it's kind of

11   bragging rights to say that you have some math

12   Ph.D. that works for you.  I've heard this kind

13   of off the cuff in conversations in halls and

14   that sort of thing.

15              Some people may be very proud of that.

16   I find that to be challenging because they're

17   proud of the title and not necessarily -- not

18   necessarily the accomplishments.

19         Q    In August of 2020, did you have any

20   communications with anybody about a potential

21   conflict of interest between your role as an NSA

22   employee and your consulting work?

EXHIBIT 1
Page 422 of 639

www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000208

 1          A    I -- as I testified earlier, I had

 2     frequent conversations with Amy.

 3          Q    In August of 2020?

 4          A    Yes.  I spoke with her again in August

 5     of 2020.

 6          Q    Okay.

 7          A    Absolutely.

 8          Q    What did you guys talk about?

 9          A    At that time -- at that time, my

10     position as a consultant was called into question

11     by Dan Brown and, subsequently, the Air Force OSI

12     agents, so I again had a conversation with Amy.

13               She at the time said, go ahead and

14     provide this part of the e-mails, but not this

15     other part -- at the moment, I don't remember

16     which parts those were -- and then to convey to

17     the Air Force OSI agent that if he wanted all of

18     the communications, he could request it from her.

19               I also asked and gave her full details

20     of the things that I'd been working on in the

21     last year, if I -- if there was any -- if I

22     should have any legal concerns, and she said

Page 210

1      based on the information that I provided her that

2      there -- there is, in her view, no legal

3      concerns.

4              Again, I was all throughout this trying

5      to make sure I was doing everything on the up and

6      up, doing things legally, within policy, et

7      cetera, because I very much did not want to -- to

8      do things, you know, below bar or do things

9      illegally.  So my communications with her were to

10     confirm that everything was still -- still

11     correct.

12          Q    In August of 2020, did you and Amy

13     discuss the behind-the-scenes piece again?

14          A    Probably.

15          Q    Was there -- was there any difference

16     in your understanding from March and April of

17     2019 to August of 2020 what was permissible?

18          A    No.  Everything remained the same.

19          Q    Okay.  And --

20          A    And I was, again, double-checking that

21     I was still conducting myself appropriately.  And

22     my job here was to try to develop new tools to

Page 211

1    protect the country -- being a loyal patriotic

2    American, that was my goal -- and to make sure

3    the country had the best tools available.

4         Q    And then this whole situation starts

5    blowing up a little bit, right?  Is that fair to

6    say?

7         A    Yes, ma'am.

8         Q    Okay.  We're going to kind of dig into

9    each -- there's a lot of things that start

10   happening all at the same time, so we're going to

11   start digging into that.

12        A    Sure.

13        Q    If at any point you're not following

14   where I'm going, just say so.

15        A    Okay.

16        Q    So let's -- let's go with your debrief,

17   your readout with the OSI agent.

18        A    Yes, ma'am.

19        Q    I'll hand that back to you.  Give me

20   one second.

21             So did the OSI agent contact you to do

22   your -- your readout?

Paul Roysdon , Ph.D.                                    May 30, 2025

                                              Page 212

1           A    Yes.  He called me and asked me to meet

2      him at Lackland for a debrief.

3           Q    Did you meet him that same day?

4           A    Probably within a day or two.  I don't

5      recall.

6           Q    By the time -- and is it fair to call

7      him Agent Beall?

8           A    Yes, ma'am.

9           Q    Okay.  Did you know who he was?

10          A    No, ma'am.

11          Q    Did you know who he was in August of

12     2020?

13          A    No, ma'am.  Sorry.

14          Q    And did you know -- did you have any

15     information about his name --

16          A    No, ma'am.

17          Q    -- following that?  Okay.

18          A    Sorry.

19          Q    No worries.  Okay.

20               So, before this debrief, which I

21     believe the debrief itself is in here

22     somewhere -- give me a second -- at 53 -- before

EXHIBIT 1
Page 431 of 639

www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000212

Page 213

1      then, had you told anybody at the Air Force that

2      you were planning on leaving your NSA employee --

3      employment?

4              A    No, ma'am.

5              Q    Okay.  In August of 2020, did you have

6      other career opportunities arise?

7              A    In August of 2020?

8              Q    Yes.

9              A    Yes.  I got a phone call from Leidos.

10             Q    And about when was that phone call?

11             A    As it happens, within a week of one of

12     these -- these conversations with this readout.

13             Q    All right.  So you're at the readout --

14             A    Yes, ma'am.

15             Q    -- at Lackland.  Are you seated?  What

16     room are you in?

17                  Let me start there.  What room are you

18     in at Lackland?

19             A    I was brought in to a SCIF.

20             Q    Okay.  Was it just you and Agent Beall?

21             A    Yes, ma'am.

22             Q    All right.  About how long was the

Paul Roysdon , Ph.D.                                May 30, 2025

Page 214

1     readout?

2          A    Between a half hour and an hour.

3          Q    Did you have any questions about the

4     parameters of being read out of the program?

5          A    Yes.

6          Q    What were those questions?

7          A    I wanted to know why I was being read

8     out of the program.

9          Q    And did Agent Beall give you an answer?

10         A    He said he couldn't say.

11         Q    Did you ask any other questions about

12    the parameters of your debrief?

13         A    I am sure I asked other questions,

14    though I don't recall which questions they were.

15         Q    Okay.  Did you have any concerns about

16    continuing to develop technology that was in any

17    way related to the Fibonacci series?

18         A    Can you refine your question?

19         Q    I can.  And here I can probably just

20    make it a little easier.  If you want to go to

21    page 46.

22         A    Okay.

1          Q     And read this paragraph and then let me

2     know when you're ready.

3          A     Which paragraph?

4          Q     The top paragraph.

5          A     Okay.  Oh, yeah.  So this is again

6     referencing unclassified mathematics.

7          Q     Okay.  So did you raise any concerns

8     about being able to continue working on

9     unclassified math?

10         A     I was questioning him because he was

11    making statements that are completely unfounded,

12    saying that I could never do that sort of math

13    anywhere ever again or something to that extent,

14    which is -- people often make statements like

15    this when they don't have any clue what they're

16    talking about.

17         Q     The SAP indoctrination, like,

18    debrief --

19         A     Yes, ma'am.

20         Q     -- usually has some pretty harsh

21    language about, you know, continuing to use

22    information or using it outside after you've been

Page 216

1    debriefed, correct?

2         A    Yes.

3         Q    So was the information that Agent Beall

4    provided you beyond the scope of what was in the

5    debrief?

6         A    Yes, ma'am.

7         Q    Okay.  How so?

8         A    Again, stating that I couldn't use any

9    of those mathematics for anything or any time for

10   any purpose anywhere outside of that.

11        Q    Okay.

12        A    The mathematics were unclassified.

13   What makes something classified, again, to

14   clarify, is leveraging something that is

15   unclassified for a specific purpose or a specific

16   target.  The readout was pertaining to the

17   program and the targets of that program.

18              So, for example, it has a program name.

19   The type of work they do in there is offensive or

20   defensive cyber, and they target specifically

21   China, Russia, Iran, whatever, whatever the

22   adversary is.  So, of course, you're not going to

Page 217

1    then go out -- the essence of that readout is

2    that you're not going to develop the same sort of

3    software that you developed on the inside or the

4    same sort of specific -- specific algorithms.

5    But, again, there's nuance.

6            So if you were to say, I want to

7    develop a tool that attacks a specific program on

8    Windows 7 that's only used in country X, you

9    know, that is what's considered dirty knowledge,

10   but if that program does addition, 2 plus 2

11   equals 4, this is unclassified.

12           It would be foolish to say, oh, you

13   can't use 2 plus 2 equals 4 anywhere else for any

14   time for any purpose.  The classification only

15   protects the fact that you use 2 plus 2 equals 4

16   as part of -- if you have to use it as part of

17   another program that seeks to gain access to or

18   leverage a vulnerability of a program specific to

19   a particular operating system.

20      Q    Okay.  In this paragraph, it says, "SA

21   Beall clarified that if there was precedent or

22   history from the NSA or his new employer, and his

Paul Roysdon , Ph.D.                    May 30, 2025

Page 218

1      continued work on some of these of topics were

2      reasonable extensions to previous work performed,

3      he would be allowed to continue those efforts."

4           A    Yes, this is his statement.

5           Q    Is that accurate?

6           A    That's what he wrote.  That's not what

7      he told me.

8           Q    Okay.  So he didn't provide that

9      clarification to you?

10          A    No.

11          Q    Did you understand that clarification,

12     though?

13          A    I did not.

14          Q    Okay.

15          A    I understood it after the fact, yes.

16          Q    Okay.

17          A    I knew the statements he was making

18     were incorrect at the time.

19          Q    Did you ask somebody else for

20     clarification on that issue?

21          A    I didn't have to because I know how

22     classification works.

Page 219

1          Q    Turning back to the first page, 45, the

2     bottom paragraph says, "Roysdon confirmed he had

3     accepted a position with a large government

4     contractor and has submitted his letter of

5     resignation to the NSA."

6               Is that accurate?

7          A    Yes, ma'am.

8          Q    Okay.  So, by the time of this debrief,

9     you had your new position lined up?

10         A    Yes, ma'am.

11         Q    Okay.  Moving up one paragraph -- I

12    don't know why I'm starting at the bottom, but

13    just go with it.

14              This talks about your program access

15    request, your PAR.  Is it accurate to say there's

16    no connection, communication or information flow

17    that was occurring between procurement Fibonacci

18    and NSA?

19         A    Correct.

20         Q    And had you ever seen the justification

21    language used in your program access request?

22         A    I don't recall.

Paul Roysdon , Ph.D.                                    May 30, 2025

Page 220

1          Q    Have you seen it at any point?

2          A    I don't recall.

3          Q    Okay.  Moving up two paragraphs to

4     that --

5          A    Yes, ma'am.

6          Q    -- one in the middle, this talks about

7     your communications with Amy from the NSA Office

8     of General Counsel, correct?

9          A    Yes.

10         Q    And it says you provided copies of your

11    e-mail correspondence, and you provided a printed

12    copy.  And then it has attached e-mails, and the

13    attached e-mails are at Bates US 47 through --

14         A    I think it's verbiage of provided -- he

15    threatened me and would not let me leave the

16    building.

17         Q    -- through 52.

18              But you -- you did provide the e-mails

19    attached to this?

20         A    He eventually obtained them, yes.

21         Q    Okay.  Okay.  And when you say he

22    threatened you, I know earlier we mentioned the

Paul Roysdon , Ph.D.                                    May 30, 2025

Page 221

1      gun.  He did not threaten to use his firearm on

2      you, though, correct?

3           A    No, but when somebody is standing there

4      very imposing with a firearm at their side, you

5      typically don't resist.

6           Q    Were you --

7           A    At least it's not my intuition to

8      resist.

9           Q    Were you sitting or standing during the

10     meeting?

11          A    At one point we were sitting, and

12     another point we were standing.

13          Q    Okay.  And you're in the SCIF, correct?

14          A    Yes, ma'am.

15          Q    Okay.  Had you ever had any interaction

16     with Agent Beall before your -- your readout?

17          A    No, ma'am.

18          Q    Is there any information in this Form

19     40 that is inaccurate?

20               And I'll give you a chance to read it

21     if you need to read the whole thing.

22          A    I've read it.  I think his description

EXHIBIT 1
www.CapitalReportingCompany.com
Page 440 of 639
202-857-3376

Roysdon Fact Witness_000221

Paul Roysdon , Ph.D.                                    May 30, 2025

                                               Page 222

1      of the events is his observation and his

2      description.

3            Q    Okay.  And when you say his description

4      of events, are you talking about the entire

5      document or a specific portion?

6            A    I think there's a slightly different

7      pretense to the description throughout the

8      document, saying he obtained things, that I had

9      been informed of certain things, et cetera, but

10     it's throughout the document.

11           Q    Is there any substantive inaccuracy in

12     the Form 40?

13           A    So we've already discussed the second

14     to the last paragraph as being substantively --

15     substantively inaccurate and that he had informed

16     me or I was informed in such ways.  That's not

17     entirely accurate.

18                I don't recall ever saying anything

19     about retaining my security clearance through

20     NSA.  I was leaving NSA, so there's no way I

21     could retain my security clearance through NSA.

22           Q    Okay.  So you don't recall saying that?

EXHIBIT 1
Page 441 of 639

Capital Reporting Company
www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000222

Paul Roysdon , Ph.D.                              May 30, 2025

Page 223

1            A     No.

2            Q     Okay.

3            A     And that would have been very clear to

4      me at the time.

5            Q     Anything else?

6            A     The next paragraph where I said --

7      where it says that I provided him copies of my

8      e-mail correspondence with Rivera, interpreted as

9      a tacit approval.  I did not provide those

10     copies.

11           Q     I'm sorry.  What do you mean by that?

12           A     I did not provide copies of my e-mail.

13     He took them away from me --

14           Q     Okay.  But --

15           A     -- physically took them away from me.

16           Q     You had -- just to be clear, you did

17     have printed copies of your e-mail correspondence

18     with Amy --

19           A     I brought them --

20           Q     -- Rivera?

21           A     -- with me, yes.

22           Q     Okay.  And Agent Beall obtained them?

1        A    Yes.

2        Q    Okay.  Anything else?

3        A    I knew at the time very clearly -- he

4   says I did not recall who within the U.S. Air

5   Force proposed continued involvement with the

6   project, but the arrangement proposed was that he

7   consult as an independent entity to GITI.

8             I knew exactly who it was.  It was Dan

9   Brown.  I'm not sure why that's not there.

10       Q    Did you tell him it was Dan Brown

11   that --

12       A    Of course.

13       Q    -- day?

14       A    Absolutely.

15       Q    All right.  Anything else?

16       A    The first paragraph.  "He stated he was

17   encouraged by NSA leadership to present the

18   product to USAF to see if there was any interest

19   in developing it on their part."

20             I was encouraged by Todd Jaspers.  Todd

21   Jaspers was not part of NSA leadership, and I

22   would have stated that at the time.  That was

Page 225

1    well known.  Todd Jaspers was actually still

2    involved with these projects at that time because

3    he was going to be the recipient in some sense.

4         Q    Would you -- did you tell Agent Beall

5    it was Todd Jaspers instead of NSA leadership?

6         A    I would have -- I would have said Todd

7    Jaspers, not NSA leadership.

8         Q    Okay.

9         A    I received approval from NSA

10   leadership, but, yeah, I guess I take issue with

11   that statement.

12        Q    Okay.  Anything else?

13        A    No, ma'am.

14        Q    Okay.  And, again, not to beat a dead

15   horse, but is it accurate to say you were not

16   working on Fibonacci as an NSA employee?

17        A    Yes, ma'am.

18        Q    Okay.

19        A    I was not.

20        Q    Do you have access to your JADE

21   profile?

22        A    My what?

1         Q    Your JADE profile, your Joint Access

2    Database Enterprise?

3         A    I do not have access to a JADE profile.

4         Q    Do you know whether or not you have a

5    JADE profile?

6         A    I do not know.

7         Q    Do you know what JADE is?

8         A    I don't.

9         Q    I guess I should have started with

10   that.  My bad.  Okay.  After your -- actually,

11   okay.  So you're in your debrief.  There's a

12   scuffle, it sounds like, over some -- some

13   papers.

14              How do you get out of the room?

15        A    I finally gave him the papers.

16        Q    And then you left?

17        A    And he escorted me out of the building.

18        Q    Okay.

19        A    But he would not let me leave until I

20   gave him the papers.

21        Q    Understood.  Did your consultant work

22   require you to have access to HNCO's building?

Paul Roysdon , Ph.D.                                    May 30, 2025

Page 227

1          A     No.

2          Q     Okay.  After the debrief, what do you

3     do next?

4          A     At the time, I went back to work.

5          Q     To NSA?

6          A     To NSA.

7          Q     Did you have any further contact with

8     Agent Beall after your debrief on the 26th of

9     August?

10         A     No, ma'am.

11               MS. SEEMAN:  Okay.  Okay.  We'll just

12    mark this as 9.  A copy for counsel.

13               (Deposition Exhibit Number 9 was

14               marked for identification.)

15               THE WITNESS:  I think it should be

16    noted that we tried to access information about

17    Beall and the information he had.  Apparently, he

18    died, and when he died, they deleted all of his

19    records.

20    BY MS. SEEMAN

21         Q     So I'm going to direct your attention

22    to the middle e-mail on Exhibit 9.  This is an

Paul Roysdon , Ph.D.                                    May 30, 2025

Page 228

1        e-mail from Agent Beall on Friday, August 28th,

2        2020 to Captain McVeigh, William Rowe and Richard

3        Ranft.  Do you know Mr. Rowe or Mr. Ranft?

4            A    I do not.

5            Q    Okay.  And in his e-mail, Agent Beall

6        says, "Roysdon sent me a message with another

7        person to talk to.  I don't a duplicate effort

8        that the official might do.  Can you please pass

9        this along to him or her?"

10               And then it says, "Guy's name is Todd

11       Jaspers."

12               So, based on this e-mail, do you recall

13       whether or not you had additional communications

14       with Agent Beall after your debrief?

15           A    I don't recall.

16           Q    Okay.  You can move that to the side,

17       then.

18               Did you talk to anybody about -- other

19       than your attorneys about what happened at the

20       debrief?

21           A    I talked with Todd about it, and I

22       talked with Dan Brown about it.

EXHIBIT 1
Page 447 of 639
www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000228

Page 229

1          Q    What did you tell -- let's start with

2    Todd Jaspers.

3          A    That I'd been read out of this program,

4    didn't yet know why.

5          Q    And Dan Brown?

6          A    Same.

7          Q    Read out and didn't know why?

8          A    Brown did.

9          Q    Brown knew why?

10         A    Yes.  He told me why.

11         Q    What did he tell you?

12         A    He told me that McVeigh got very upset

13    after the August 13th briefing -- he didn't say

14    who he was upset with -- that the programs, the

15    Fibonacci programs, were going to be canceled,

16    that he was apparently sharing a bunch of

17    information about me that only OSI Agent Beall

18    would have had access to.  So I'm not sure how

19    McVeigh got access to that.  And he was spreading

20    that around the office, and that is why I was

21    read out.

22         Q    In the Form 40 that we've discussed, it

EXHIBIT 1
www.CapitalReportingCompany.com
Page 448 of 689
202-857-3376

Roysdon Fact Witness_000229

Paul Roysdon , Ph.D.                                    May 30, 2025

Page 230

1      mentions that you were going to be resigning from

2      the NSA, correct?

3           A    Yes, ma'am.

4           Q    Would you still be able to work on the

5      Fibonacci projects after leaving the NSA?

6           A    Can you reask your question --

7           Q    Yes.  So --

8           A    -- refine it?

9           Q    So what I'm getting at is, you were

10     read into the program as an NSA employee,

11     correct?  NSA has your security clearance.

12          A    Okay.  That -- those are different

13     things.

14          Q    Okay.

15          A    I was read into the program because I

16     had a clearance, a Top Secret SCI clearance.  It

17     just so happened that NSA was the host, the

18     government agency that was hosting that

19     clearance.

20          Q    Okay.  Would you have -- you were going

21     to resign from NSA, correct?

22          A    At this point, yes.

EXHIBIT 1
www.CapitalReportingCompany.com
Page 449 of 639
202-857-3376

Roysdon Fact Witness_000230

Paul Roysdon , Ph.D.                                    May 30, 2025

Page 231

1          Q    Okay.

2          A    Not prior to this.

3          Q    At this point, so you are going to

4     resign -- let me back up.

5               What do you mean by that?  When did you

6     seek other employment?

7               MR. HENRY:  Objection to form.

8               THE WITNESS:  I didn't seek other

9     employment.  It sought me.

10    BY MS. SEEMAN

11         Q    Okay.  When did it seek you?

12         A    Sometime after August 13th.

13         Q    And both --

14         A    So the presentation was August 13th.

15    So, within a few days, I received a phone call

16    out of the blue.  I was not seeking employment.

17              Within a few days, I was also told that

18    this program was going to be canceled -- Dan

19    Brown told me that -- and that I was going to be

20    terminated, and it was going to be within a few

21    days that I'd have to be read out.  So, within

22    the span of a week, I had this information.  The

EXHIBIT 1
Page 451 of 639

Capital Reporting Company
www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000231

 1    program was going to be canceled or was canceled.

 2    I was going to be terminated.

 3              I had already spent several years

 4    working at NSA.  I got a phone call on a Monday,

 5    did two interviews throughout the week.  I had an

 6    offer on a Friday for a job at Leidos making

 7    three times more than I was making at NSA.  It

 8    was an easy decision.

 9        Q    When you say the projects were going to

10    be canceled, all six of them?

11        A    I don't think there were six at that

12    point.

13        Q    Okay.

14        A    I think there might have been three.

15        Q    Are you aware of whether or not any of

16    the projects were put into actual use?

17        A    No.

18        Q    You're not aware?

19        A    No, they were canceled.  I think

20    they -- there was some parts of the program, as I

21    was told by Dan Brown, that maybe because they

22    were on contract with Kudu or Def-Logix, they

Paul Roysdon , Ph.D.                                    May 30, 2025

Page 233

1    continued for a short period of time, but they

2    were all ultimately canceled as far as I know.

3         Q    Okay.  And your only source for that

4    information is Dan Brown, correct?

5         A    Yes, ma'am.

6         Q    Okay.  Did you ever request to meet

7    with anybody to discuss what happened at your OSI

8    debrief?

9         A    Yeah.  I requested to meet with Dan

10   Brown.  He was told that he could not -- at some

11   point, he was told that I was being investigated

12   and he could not talk with me.

13        Q    Did he tell you who he had spoken

14   with --

15        A    No.

16        Q    -- about you?

17        A    No.

18        Q    Is it fair to say you don't know if

19   that person was local to HNCO or a different

20   office?

21        A    I don't know.

22        Q    Okay.  What, if anything, do you know

EXHIBIT 1
Page 53 of 69
www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000233

Paul Roysdon, Ph.D.                                    May 30, 2025

Page 234

1      about HNCO's security inquiry?

2                At the time -- at the time, what did

3      you know about it?  Let me --

4           A    Okay.

5           Q    -- start there.

6           A    At the time, I had no information other

7      than Dan Brown saying I was -- I was being

8      investigated, and during the investigation, he

9      couldn't talk with me.  He did on a couple of

10     occasions talk to Todd Jaspers, and Todd Jaspers

11     talked to me.

12          Q    Okay.  Is it fair to say that only

13     through discovery you know about HNCO's security

14     inquiry?

15          A    Yes, ma'am.

16          Q    Okay.  As far as you are aware, no Air

17     Force inquiry determined you've committed any

18     misconduct, correct?

19          A    Correct.

20          Q    Okay.

21          A    They, in fact, cleared me of

22     misconduct.

**EXHIBIT 1**
www.CapitalReportingCompany.com
**Page 453 of 639**
202-857-3376

Roysdon Fact Witness_000234

Page 235

1          Q    Do you know the scope of those

2     inquiries or investigations?

3          A    I don't.  I know there's also an OPM

4     investigation into my clearance, and it came back

5     with no adverse findings.

6          Q    You know, I was going to ask you about

7     that later, but what can you tell me about this

8     OPM thing?

9               MR. HENRY:  Objection to form.

10              MS. SEEMAN:  Fair enough.

11              THE WITNESS:  I don't know much about

12     it --

13              MS. SEEMAN:  Okay.

14              THE WITNESS:  -- other than what I

15     found out through discovery.  It seems that

16     several times, as I stated earlier in this

17     testimony, Captain McVeigh reached out to people

18     in leadership to have me debarred, effectively de

19     facto debarred from any sort of service, and each

20     time he pushed to leadership, they found no

21     grounds for the accusations and pushed back.

22

Page 236

```
 1    BY MS. SEEMAN

 2         Q    Okay.  So, OPM, what is that?  Let's

 3    start there.

 4         A    Office of Personnel Management.

 5         Q    Okay.  Does OPM -- did they hold your

 6    security clearance?

 7         A    I think -- they more or less oversee

 8    the clearance.

 9         Q    Okay.  Why would -- how did you learn

10    about any investigation at OPM into your

11    clearance?

12         A    Sometime in 2022, we filed -- if I

13    recall correctly, we filed a FOIA, we meaning

14    Jason Wareham, my attorney, filed a FOIA for

15    information about the same time that we filed

16    the -- the whistleblower -- fraud, waste and

17    abuse whistleblower complaint.

18         Q    To OIG?

19         A    I believe so, yes.

20         Q    Okay.  Just a lot of offices --

21         A    Yes, ma'am.

22         Q    -- just to keep it straight.
```

Paul Roysdon , Ph.D.                    May 30, 2025

Page 237

 1            And to your knowledge, there was

 2    nothing derogatory about you in the OPM -- OPM

 3    investigation?

 4         A    Correct.

 5         Q    Okay.

 6         A    It was clear through discovery that

 7    Captain McVeigh had an agenda to destroy me.

 8         Q    Do you think he destroyed you?

 9         A    He absolutely destroyed my reputation,

10    yes, ma'am.

11         Q    How so?

12         A    So, in the example of HNCO, I cannot --

13    to this day, I still cannot present, like,

14    research with my name on it, as an example.

15            There are certain people at NSA that

16    got word through this investigation because they

17    were also involved in some of the projects or --

18    not the projects, but the people, and it has

19    destroyed my reputation as a subject matter

20    expert in this area with those members that -- at

21    NSA as well, up to and including things like --

22    and this is in the second amended complaint --

EXHIBIT 1
Page 156 of 63

www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000237

1    when I built a cyber AI team at Leidos, I was

2    told by Dan Brown and Dan Brown also told Todd

3    Jaspers on several occasions that he wanted to

4    see the technology that we were building at

5    Leidos, the cyber AI technology, but stated

6    unequivocally that my name could not be

7    associated with that technology and that I could

8    not present that technology back -- back to HNCO

9    because, as he stated, my name had been dragged

10   through the mud.  Then, if it would, it would, in

11   essence, void any project viability or contract

12   award.

13        Q    Earlier, we talked about the NSA

14   limitations.

15             Do you remember one of them being that

16   GITI could not submit anything to HNCO that had

17   your name on it?

18        A    Yes.

19        Q    Okay.  How is that different than the

20   situation you just described with Leidos?

21        A    As Leidos, I'm now a Leidos employee,

22   at the time, a Leidos employee.  Just having my

EXHIBIT 1
www.CapitalReportingCompany.com
Page 43 of 69
202-857-3376

Page 239

1      name affiliated with any sort of research, Dan

2      Brown said, would basically destroy the -- the

3      reputation of that -- that cyber capability

4      having potential for, like, a project award

5      within HNCO.

6              So we did present to HNCO on a couple

7      of occasions, and either Todd Jaspers presented

8      or one of my other subordinates presented.

9          Q    Okay.

10         A    And my name was removed from the slides

11     in the documentation.

12         Q    Okay.  We'll get into all of that a

13     little bit more, but I want to go back and talk

14     about your stop work order with GITI.

15         A    Okay.

16              MR. GONZALEZ:  Can we actually just

17     take a five-minute break real quick?

18              MS. SEEMAN:  Yeah, absolutely.

19              MR. GONZALEZ:  Is that okay?

20              THE WITNESS:  Sure.

21              MR. HENRY:  Sure.

22              MS. SEEMAN:  Go off record.

Page 240

1          (Recess 4:16 p.m. to 4:29 p.m.)

2     BY MS. SEEMAN

3          Q    So, Dr. Roysdon, earlier you testified

4     that McVeigh was spreading information about you

5     around the office.  Do you remember that?

6          A    Yes, ma'am.

7          Q    What office were you referring to?

8          A    HNCO.

9          Q    Are you aware of whether Captain

10    McVeigh spread your information outside of HNCO?

11         A    No, ma'am.

12         Q    Okay.  Am I correct that Captain

13    McVeigh's spreading of information about you is

14    the factual basis for one of your Privacy Act

15    claims?

16         A    Yes, ma'am.

17         Q    To your knowledge, did anyone else

18    spread information about you around HNCO?

19         A    No, ma'am.

20         Q    To your knowledge, what information did

21    McVeigh spread that you believe was in violation

22    of the Privacy Act?

EXHIBIT 1
Page 459 of 639
www.CapitalReportingCompany.com
202-857-3376
Roysdon Fact Witness_000240

Paul Roysdon , Ph.D.                                    May 30, 2025

Page 241

1          A     To my knowledge, the information that

2     he had, based on what Dan Brown told me, because

3     he had copies of the e-mails from Amy with the

4     NSA Office of General Counsel and other

5     privileged information that he had no business

6     having access to.

7          Q     Okay.  And when you say other

8     privileged information, what are you referring

9     to?

10         A     Like a read-in or readout of -- a

11    read-in for programs that include personal

12    information or personal identifiable information,

13    PII, like a birth date, social security number,

14    address, things like this.

15         Q     Are the documents you're referring to

16    the materials that were attached to the OSI Form

17    40 in Exhibit 7?

18         A     Yes.  Among others, yes.

19         Q     Okay.  What others that are not

20    attached?

21         A     I don't know.  This is information I

22    received from Dan Brown.

EXHIBIT 1
Page 460 of 639
www.CapitalRepor'ingCompany.com
202-857-3376

Roysdon Fact Witness_000241

1          Q    Okay.  I'll give you a chance to look

2     at that.  So you don't -- other than the

3     attachments on Exhibit 7, the OSI Form 40, are

4     you aware of any other documents that --

5          A    I --

6          Q    Actually, let me -- let me back up.

7               When you're saying McVeigh's spreading

8     information about you around the office, are you

9     referring to just word of mouth information, or

10    are you referring to documents?

11         A    Documents.

12         Q    Okay.  And your basis for that is Dan

13    Brown?

14         A    Yes, ma'am.

15         Q    Okay.  For your Privacy Act claim that

16    relates to OSI and Captain McVeigh, am I correct

17    in understanding that the basis for that claim is

18    the OSI agent providing information to Captain

19    McVeigh?

20         A    Yes, ma'am.

21         Q    Okay.  Is there anything else

22    factually -- I'm not asking for, like, a legal

1    conclusion, don't worry -- that you think

2    supports that Agent Beall sharing information

3    with Captain McVeigh is a violation of the

4    Privacy Act?

5         A    It's my understanding that Captain

6    McVeigh showed documents to Dan Brown that I had

7    only shared with the Air Force OSI agent.

8              If the Air Force OSI agent is

9    conducting an investigation, he should not be

10   sharing sensitive information with other people

11   in that office, specifically attorney-client

12   privileged information.

13        Q    And to be clear for the record, you're

14   referring to the NSA OGC e-mail correspondence,

15   correct?

16        A    Correct.

17        Q    Is there any other document you believe

18   was shared with Dan Brown about your -- your

19   debrief or an HNCO security inquiry or any other

20   situation?

21        A    That's the only one that I remember.

22        Q    Okay.

Page 244

1          A     I recall Dan Brown saying that there

2     were several other documents.  I don't know what

3     they are.

4          Q     Okay.

5          A     But that one stuck out because the only

6     way McVeigh could have had access to those

7     documents is if Air Force OSI shared those

8     documents with McVeigh.

9          Q     Okay.

10         A     It wasn't until later, so after -- that

11    is to say, after that phone call with Dan, Dan

12    Brown, that Dan asked me for a copy of those

13    documents because he wanted to compare them.  I

14    then sent an e-mail to Dan Brown with those

15    documents.

16         Q     Okay.  And, I guess, just for the

17    record -- I don't know if I actually asked this

18    earlier -- Dan Brown, Captain McVeigh, Danny

19    Burghard, Colonel Ekholm, they're all Air Force

20    employees, correct?

21         A     Yes, ma'am.

22         Q     Okay.  So --

Paul Roysdon , Ph.D.                                          May 30, 2025

Page 245

```
1         A    As far as I know.

2         Q    Okay.  At the time.  Good clarifier.

3    At the time, were those four individuals Air

4    Force employees?

5         A    Say again.

6         Q    Captain McVeigh --

7         A    Yes, ma'am.

8         Q    -- Dan Brown, Danny Burghard, Colonel

9    Ekholm.

10        A    Yes, ma'am.

11        Q    Okay.  So, earlier, you mentioned a

12   phone call with Dan Brown about Fibonacci being

13   canceled, and you also mentioned your contract

14   with GITI being canceled.

15             Do you remember that?

16        A    Yes, ma'am.

17        Q    Okay.  Did you get a stop work order

18   before you were aware that your contract was

19   canceled?

20        A    I got a stop work order at the same

21   time that I was informed that my contract was

22   canceled.
```

EXHIBIT 1
Page 464 of 639

www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000245

Paul Roysdon , Ph.D.                                    May 30, 2025

Page 246

1          Q    How --

2          A    That is to say, Ted Oakley -- Ted

3    Oakley said that he heard from Dan Brown that the

4    program was canceled and that they needed to

5    issue a stop work, and I was to provide my time

6    card up -- with the hours up to the point of the

7    stop work.

8          Q    Do you recall what date the stop work

9    order was issued?

10         A    I don't recall.

11         Q    Okay.  How was the stop work order and

12   contract cancellation communicated to you?

13         A    Phone call.

14         Q    From Ted Oakley?

15         A    Yes, ma'am.

16         Q    Approximately how much money do you

17   think you lost from the contract cancellation?

18   And just -- just to make my question clear,

19   through the end of 2020.

20         A    Yes, ma'am.  Roughly 60,000.

21         Q    And earlier you mentioned you were

22   making triple the salary at Leidos.  Is that

Paul Roysdon, Ph.D.                                    May 30, 2025

Page 247

```
 1      triple your NSA salary?

 2           A    Yes, ma'am.

 3           Q    Okay.  Approximately what was your

 4      combined total salary in 2020?  Or let's start in

 5      2019.

 6           A    2019.  I don't recall.

 7           Q    And then your -- your income sources in

 8      2019, though, just to be clear, were your NSA

 9      employment and your consulting work, correct?

10           A    Yes, ma'am.

11           Q    Okay.  And then, in 2020, your income

12      sources were the NSA employment?

13           A    Yes, ma'am.

14           Q    Consulting work?

15           A    Yes, ma'am.

16           Q    And then Leidos, correct?

17           A    And then later Leidos, yes.

18           Q    Okay.  Did you have any gap in

19      employment from NSA to your transition to Leidos?

20           A    No, ma'am.

21           Q    Okay.  Are you aware of whether or not

22      you made more money in 2020 than you did in 2019?
```

Paul Roysdon , Ph.D.                                    May 30, 2025

Page 248

1          A    I probably made more.

2          Q    Okay.  And then, in 2021, did you

3     continue to make more money?

4          A    Yes, ma'am.

5          Q    How about 2022?

6          A    Yes, ma'am.

7          Q    2023?

8          A    Yes, ma'am.

9          Q    2024?

10         A    Yes, ma'am.

11         Q    And I'm not going to ask 2025, because

12    I know you're back with the government, so -- and

13    we applaud your efforts.  But -- so the choice --

14         A    Efforts or dedication to service?

15         Q    Both.  Is it fair to say, in terms of

16    lost income, though, you were able to generally

17    recoup what you would have lost by taking the

18    Leidos position?

19         A    Yes, that is one way you can look at

20    it.  Yes.

21         Q    Okay.  All right.  Let's talk a little

22    bit more about your time at Leidos.  So, earlier,

EXHIBIT 1
Page 46 of 69

www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000248

Page 249

1      you mentioned -- sorry.

2           A    I think it's pertinent that I was no

3      longer able to do any of the consulting work that

4      I was previously doing.

5           Q    Yes.  And why is that?

6           A    Because I had a damaged reputation with

7      HNCO.

8           Q    Were you permitted as a Leidos employee

9      to bid on something that could have been

10     competitive with Leidos?

11               MR. HENRY:  Objection to form.

12               THE WITNESS:  First, I did not bid on

13     anything.  I was working as a consultant to GITI.

14               Second, there is a form that you have

15     to fill out -- most companies have this and

16     Leidos did too -- where if you were doing

17     consulting work, you declare this at the time of

18     your offer, and you can negotiate with your

19     future employer whether or not you would continue

20     that under very strict circumstances.

21               So, for example, if I was to continue

22     doing the offensive cyber work for Air Force ON-

EXHIBIT 1
Page 468 of 639

www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000249

Paul Roysdon , Ph.D.                                    May 30, 2025

Page 250

1      -- Air Force HNCO, it is most likely that would

2      have been authorized for me to continue that work

3      provided that I was not doing any similar work at

4      Leidos.  And at that time, I was not doing any

5      similar work.  I was brought in to do other work.

6              So, yes, had that contract continued, I

7      possibly could have continued doing that work.

8      However, there was also this issue of the

9      clearance.

10     BY MS. SEEMAN

11         Q    And when you resigned from NSA, did you

12     still retain a security clearance?

13         A    My clearance is essentially put on

14     hold.

15         Q    Okay.  What does that mean, briefly?

16         A    When you leave an agency like NSA or

17     CIA to go to industry, because you've been

18     granted a clearance -- and a clearance,

19     especially a clearance with a polygraph, is valid

20     for a certain period of time.  Polygraphs,

21     depending on the type of work you're doing, will

22     be valid for, say, five years.  I was working on

1    exceptionally sensitive stuff.  It's valid for

2    two years.  So you have to, essentially, go

3    through another polygraph and another background

4    investigation.

5           My clearance had been valid.  However,

6    you have a clearance at the -- by the pleasure of

7    the government.  So I left government service.

8        Q    So the government --

9        A    I no longer had a need --

10       Q    -- no longer --

11       A    -- for a clearance --

12       Q    -- pleased?

13       A    That's just how it's stated.

14       Q    Okay.

15       A    My clearance was effectively put on a

16   freeze status until it's needed again.

17           So, when you go to a company like

18   Leidos, if they are working on a contract where

19   your clearance is needed, they put in a request

20   for the agency to host your clearance or sponsor

21   your clearance with Leidos as the kind of hosting

22   of that.

Paul Roysdon , Ph.D.                    May 30, 2025

Page 252

1          Q    A couple follow-ups on that.  So, one,
2     GITI never hosted your security clearance,
3     correct?
4          A    No, ma'am.
5          Q    Okay.  And then did Leidos end up
6     hosting a security clearance?
7          A    Yes, ma'am.
8          Q    Okay.  Was it through a specific
9     agency?
10         A    Yes, ma'am.
11         Q    Which one?
12         A    There were a few.  DIA at one point.
13    NSA at another point.
14         Q    Okay.  After you were read out in
15    August of 2020, did you have any issues getting
16    read into other special access programs?
17         A    No, ma'am.
18         Q    Did -- so we talked a lot about Todd
19    Jaspers today, right?  He was an NSA employee
20    when you first met him?
21         A    Yes, ma'am.
22         Q    Okay.  Did he come over to Leidos?

1          A      He did.

2          Q      How did that happen?

3          A      I think he talked about this during his

4     testimony.  When I joined Leidos, soon after

5     joining, I was asked about some areas that I

6     thought Leidos could invest in that are emerging

7     areas.

8                 I, at the time, was brought into Leidos

9     to oversee, as the chief solutions architect, the

10    AI -- sorry -- chief AI solutions architect,

11    oversee the AI architecture for a variety of

12    different programs, which I discussed earlier,

13    things like imagery or health records.

14                I mentioned in a -- in a classified

15    briefing that I think Leidos should invest in an

16    emerging field of cyber AI, that there were

17    others that were starting to invest in this as

18    well, and it would be beneficial for them to do.

19                They asked me to build a team that I

20    titled the cyber AI team, and as colleagues of

21    mine from the agencies reached out to me asking

22    what I was doing, I said, hey, I'm doing cool new

Paul Roysdon, Ph.D.                    May 30, 2025

Page 254

1       stuff in cyber AI.  At one point, Todd Jaspers

2       asked if he could join my team.

3            Q    Were --

4            A    We scheduled an interview.  We made him

5       an offer.  He joined.

6            Q    Were you his supervisor?

7            A    Yes, ma'am.

8            Q    Okay.  Did --

9            A    At Leidos --

10           Q    Yes.

11           A    -- specifically.

12           Q    At Leidos.  Did you do any of his

13      performance evals at Leidos?

14           A    Yes, ma'am.

15           Q    Do you have a current relationship with

16      Todd Jaspers?

17           A    Not really, no.

18           Q    Okay.  Are you guys friends outside of

19      work?

20           A    Yes, and we talk occasionally.

21           Q    Okay.  On the phone?  Over e-mail?

22           A    I think the last exchange I had with

Paul Roysdon , Ph.D.                                    May 30, 2025

Page 255

1    him was via e-mail.

2         Q    Okay.  Did you talk about this lawsuit

3    with him?

4         A    We did talk about this early on.  He

5    actually encouraged me to file a lawsuit.

6         Q    And did he say why?

7         A    Yes, because this Captain McVeigh had

8    so thoroughly destroyed my reputation and made

9    false accusations that if I was ever to take a

10   political appointment, like Deputy Director of

11   National Intelligence, that it would be good to

12   clear my name or at least follow through with a

13   lawsuit, yes, to clear my name.

14        Q    Did you have any difficulties obtaining

15   your current political appointment?

16        A    No, ma'am.

17        Q    Do you like working with Todd -- did

18   you like working with Todd Jaspers at Leidos?

19        A    He's a good engineer.

20        Q    Okay.  Would you work with him again?

21        A    Yes.  He's a good engineer.

22        Q    Do you have the capacity to -- again,

Paul Roysdon , Ph.D.                                    May 30, 2025

Page 256

1      not an accusation.  Do you have the capacity to

2      steer any work to him?

3           A     No.

4           Q     Okay.

5           A     Well, refine your question.  What do

6      you mean by steer work to him?

7           Q     In your -- in your current role, are

8      you able to be like, hey, I know a guy at Leidos,

9      he'd be really great for that?

10          A     In my current role, no.

11          Q     Okay.  Are -- if Todd Jaspers called

12     you up and said, hey, I want to go work at ODNI

13     with you, do you have the capacity to offer him a

14     job?

15          A     I could interview him --

16          Q     Okay.

17          A     -- and if he's qualified, I would offer

18     him a job --

19          Q     Okay.

20          A     -- if there was an appropriate job

21     available.

22          Q     Overall, how would you describe your

EXHIBIT 1
www.CapitalReportingCompany.com
Page 473 of 639
202-857-3376

Roysdon Fact Witness_000256

1    time at Leidos?

2         A    It was excellent.

3         Q    You've mentioned a lot about your

4    reputation being dragged through the mud.

5         A    Yes, ma'am.

6         Q    When did you first think that there

7    was -- when did that first become an issue to

8    you?

9         A    So there was some knowledge of this in

10   August when all of this kind of blew up, and then

11   I largely ignored it until winter or spring of

12   '21.

13            There was some communication through

14   Todd from Dan Brown that there was an

15   investigation ongoing.  He still couldn't talk to

16   me.  At the time, I didn't understand why he

17   wasn't responding to my phone calls or e-mails.

18   And --

19        Q    Sorry to interrupt.  At that time, was

20   Todd Jaspers still at NSA, or was he at Leidos?

21        A    He was still at NSA.

22        Q    Okay.

Paul Roysdon , Ph.D.                    May 30, 2025

Page 258

1           A     I'm fairly certain.  Yeah, because he

2      didn't join until about 11 -- no, maybe 10 months

3      after I joined.

4           Q     Okay.  Earlier you also talked about

5      some presentations.  So, generally, at Leidos,

6      did you give presentations to government

7      agencies?

8           A     Often.

9           Q     Which government agencies?

10          A     We presented to Army, Army Futures

11     Command.  I was involved in presentations or

12     helped architect presentations to, gosh, a number

13     of agencies.  I think we presented to NGA at one

14     point.  We were asked to present to NSA at one

15     point, different office.  We were asked to

16     present to Air Force HNCO.  We also presented to

17     Air Force DCGS.

18          Q     Did you present to DARPA?

19          A     I didn't personally present to DARPA,

20     no.

21          Q     Okay.  You mentioned HNCO.

22          A     Uh-huh.

EXHIBIT 1
Page 477 of 639

www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000258

 1            Q    Let's talk about that.

 2            A    Sure.

 3            Q    So you presented to HNCO?

 4            A    No.

 5            Q    Okay.  Who did?

 6            A    My team did.

 7            Q    Okay.

 8            A    Todd Jaspers specifically and then

 9       other members of the team.  But I was told

10       that -- in advance that the presentation slides

11       that I had put together, my name had to be

12       removed from those slides and that any reference

13       to me could not be presented in that -- for

14       example, if they asked who the leadership was or

15       who was leading the research or et cetera, Todd

16       and my team members could not mention my name.

17            Q    Okay.  I'm going to go about this sort

18       of a roundabout way.

19                 Okay.  So you mentioned that you

20       believe you were debarred, correct?

21            A    Yes, ma'am.

22            Q    In what capacity do you believe you've

Page 260

1    been debarred, meaning contractor, subcontractor,

2    consultant?

3         A    I've been debarred as anything

4    pertaining to my name, Dr. Paul Roysdon, whether

5    it's contractor Dr. Paul Roysdon, consultant

6    Dr. Paul Roysdon, or otherwise.

7         Q    What date do you believe you were

8    constructively debarred?

9         A    August 14th, 2020.

10        Q    And why that date?

11        A    That's when all of this blew up.

12        Q    Okay.  In your second amended

13   complaint, you say you continually sought to be

14   restored to HNCO.

15        A    Yes, ma'am.

16        Q    How did you seek to be restored to

17   HNCO?

18        A    I asked Dan Brown a few times if -- if

19   I could present our new research at Leidos -- at

20   that time, I was at Leidos -- because the

21   capabilities we were developing would be very

22   interesting to his mission.  In their mission,

Paul Roysdon , Ph.D.                                    May 30, 2025

Page 261

1        they serve -- just a little bit of background,

2        they serve, like, the special forces community,

3        so like Seal Team 6, those kinds of people, and

4        they needed certain capabilities.  And we were

5        developing tools that would work kind of at the

6        front end of cyber offense and defense.  He said

7        he couldn't talk to me about that.

8                   Eventually, he reached out to Todd

9        Jaspers, eventually meaning a few months later,

10       saying that he had some money available, like

11       end-of-year money, and was interested in us

12       proposing projects, because he knew that I was

13       still involved and always appreciated the work

14       that I had done -- he's very complimentary -- but

15       again reminded him and reminded me that I could

16       not be present and it could not bear my name.

17            Q    Okay.

18            A    So I have been de facto debarred.

19            Q    Did you ever try to talk to anybody in

20       HNCO's contracting office about this issue?

21            A    I asked if I could present my case to

22       somebody else at HNCO, and Dan at one point

EXHIBIT 1
Page 480 of 639
www.CapitalReportingCompany.com
202-857-3376
Roysdon Fact Witness_000261

Paul Roysdon , Ph.D.                        May 30, 2025

                                                    Page 262

1        advised me, don't even bother.

2              Q    And you took that advice?

3              A    Yes, ma'am.

4              Q    Okay.  And so it's fair to say you've

5        never contracted -- never contacted a contracting

6        official?

7              A    Correct, ma'am.

8              Q    Okay.  Other than Dan Brown, did you

9        ever talk to anybody at HNCO about being

10       constructively debarred?

11             A    No, ma'am.

12             Q    In your complaint, it says you sought

13       to be restored.

14                  Did you seek to be restored as a

15       private consultant?

16             A    I sought to be restored in that I just

17       wanted to clear my name.  Whether or not I was

18       able to be a consultant didn't really matter.

19       Reputation in my -- my line of work is -- is very

20       important, and to have somebody continue to

21       perpetuate falsehoods will continue to damage my

22       reputation.

EXHIBIT 1
www.CapitalReportingCompany.com
Page 481 of 639
202-857-3376

Roysdon Fact Witness_000262

1            So, even though, for example, this has

2      happened five years ago, there's still people

3      that hear my name and still think that I am some

4      sort of fraud or crackpot, even though I have

5      many people from the scientific community that

6      have read my papers and my patents and my books

7      and applauded me for my work, including the U.S.

8      government, where they also have seen the

9      capabilities of the stuff that I've invented and

10     have asked for access to it.

11          Q    Okay.  Just to follow up, you said

12     people.  What people?

13          A    So there are certain individuals in the

14     Air Force and certain individuals that they

15     communicated with at NSA that still believe these

16     falsehoods about me.

17          Q    Okay.  And who are those people?

18          A    I can't remember names specifically.

19          Q    Okay.  And how do you -- how do you

20     know that they know anything about any of this?

21          A    Through communication by -- or from

22     Todd and Dan Brown.  There is a recent example in

Page 264

1      2023, during a presentation where I was

2      presenting.  Todd was in the audience, and he was

3      sitting next to several folks from NSA who were

4      at that time unrelated to all of this.  And they

5      were making derogatory remarks about my

6      presentation and who I was because of what they

7      had heard at NSA Texas through other people.  So,

8      again, not only de facto debarment, but a

9      destruction of reputation that continues to

10     evolve over time.

11          Q    You said derogatory remarks.  Well,

12     actually, let me back up.

13               Do you know who any of these NSA people

14     were?

15          A    Yes.  I mean, I don't know them

16     personally.  One of them oversees aspects of

17     operations.  Another one oversees aspects of

18     what's called capabilities directorate.  I can't

19     remember the names right now.

20          Q    And did you hear any of these

21     statements yourself?

22          A    No, but this was corroborated by other

1      colleagues of mine that were at the table.

2           Q    Who?

3           A    One of them was a subordinate that

4      worked for me at Leidos.  Another one was a

5      friend.

6           Q    Okay.  Names?

7           A    The individual at Leidos?  I can't

8      remember which team member.  I had several team

9      members.  I can't remember which team member

10     specifically.

11          Q    And then the friend?

12          A    Same.  It was another just kind of work

13     colleague.

14          Q    Okay.  So you don't remember either

15     person?

16          A    It was not a subordinate.

17          Q    Okay.

18          A    They were obviously very upset by this

19     and opposed the comment, because they worked for

20     me and they saw my work.

21          Q    Did they tell you whether or not they

22     said anything to your former colleagues?

 1          A     They both said they said something.

 2          Q     Okay.  And did they tell you what

 3     response they got?

 4          A     I don't recall.  Again, this

 5     demonstrates lasting damage by one Captain

 6     McVeigh, one person, with false allegations.

 7          Q     Is that your -- what's your basis for

 8     that statement?

 9          A     Can you ask the question again?

10          Q     Yeah.  What is the basis for your

11     statement -- what I just -- your statement that

12     your reputation has been ruined?

13          A     Or continues to be ruined?

14          Q     Yes.

15          A     Examples like this keep -- keep popping

16     up, where people that I don't know, have never

17     interacted with, somehow have heard through

18     someone else or this originated from Captain

19     McVeigh that I had -- or that I was some sort of

20     a crackpot or had unrealistic expectations or

21     capabilities or, you know, a number of things,

22     that I didn't know what I was talking about or

Page 267

1      couldn't prove the results or whatever.

2           Q    You keep using the phrase or the term

3      "crackpot."

4           A    Yes.

5           Q    Where did that come from?  Not -- I'm

6      not asking for the origin of the linguistic term,

7      just to be clear.  I'm asking, who -- who told

8      you that people were calling you a crackpot and

9      who was calling you a crackpot?

10          A    Dan Brown said that Captain McVeigh

11     called me this several times.

12          Q    Okay.  Did anybody else other than Dan

13     Brown tell you?

14          A    I have never heard this from anyone

15     else.

16          Q    Okay.  Has anybody told you that your

17     reputation is, in fact, ruined?

18          A    That is difficult to answer, in that my

19     reputation in certain communities at this point

20     is ruined.  I would not be able to -- without

21     some sort of restorative memo or something like

22     this from the U.S. government to HNCO, for

Paul Roysdon , Ph.D.                                    May 30, 2025

Page 268

1      example, would not have that reputation restored.

2      So, certainly, my reputation within HNCO is

3      ruined.

4              My reputation with certain individuals

5      at NSA is ruined as a result of this -- this

6      event with HNCO.

7              Outside of that community, I interact

8      with many communities in many disciplines.  I

9      have, in fact, a very good reputation.  I would

10     not be in the position I'm in now if I didn't

11     have a good reputation in many other communities.

12        Q    So I'm just going to drill down a

13     little bit more, so -- but has anybody told you

14     that your reputation is ruined?

15        A    Dan Brown told me this, yes.

16        Q    Okay.  Anybody other than Dan Brown?

17        A    Todd Jaspers told me the same.

18        Q    And Todd Jaspers knows because Dan

19     Brown told him?

20        A    Well, Todd Jaspers also worked with the

21     HNCO office as an NSA employee.

22        Q    You read his transcript, though, yeah?

EXHIBIT 1
Page 487 of 639
www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000268

Paul Roysdon , Ph.D.                          May 30, 2025

Page 269

```
 1          A    Yes, ma'am.

 2          Q    Did he say that he had any personal

 3     interaction with Captain McVeigh?

 4          A    I don't recall.

 5          Q    Okay.  Other than those two

 6     individuals --

 7          A    Yes, ma'am.

 8          Q    -- has anybody ever told you that your

 9     reputation is ruined because of the events that

10     happened at HNCO?

11          A    No, ma'am.

12          Q    Okay.  Has anybody told you that they

13     did not want to work with you because of the

14     events that happened at HNCO?

15          A    Told me face to face that they did not

16     want to work with me?

17          Q    Let's start with that.

18          A    No.

19          Q    Okay.  Face to face implies there's a

20     behind your back, so I'm going to ask:  Has

21     anybody said that they would not work with you to

22     somebody else, and you found out about it?
```

EXHIBIT 1
Page 488 of 659
www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000269

Paul Roysdon , Ph.D.                                    May 30, 2025

Page  270

1          A    Yes.  I've heard that through Dan Brown

2     and Todd Jaspers, but that has not prevented many

3     other people seeking to work with me because of

4     my --

5          Q    Okay.

6          A    -- otherwise good reputation in many

7     other areas.

8          Q    Okay.

9          A    When I say seeking, these people are

10    willing to leave their current jobs to go join me

11    in another job, because I treat people well.  I

12    elevate their ability professionally.  In many of

13    these people's lives, I've been able to grow them

14    as individuals and as professionals and teach

15    them things that they didn't know were possible,

16    and so they've trusted me with their livelihoods

17    to move from one organization to another because

18    they wanted to work with me.

19         Q    And --

20         A    It's only this unique circumstance

21    where there are people within HNCO or within Air

22    Force Cyber, specifically the cyber AI community,

EXHIBIT 1
Page 489 of 639
www.CapitalReportingCompany.com
202-857-3376
Roysdon Fact Witness_000270

Paul Roysdon , Ph.D.                    May 30, 2025

Page 271

1    that don't want to work with me.

2         Q    So who specifically at HNCO do you

3    think does not want to work with you?

4         A    I don't know.

5         Q    Okay.  Has anyone -- actually, I want

6    to ask this first:  You, at Leidos -- not to, you

7    know, gas you up, but you basically created an

8    entire cyber AI portfolio for them, correct?

9         A    Yes, ma'am.

10        Q    And you developed that entire -- you

11   were the leader of that, correct?

12        A    Yes, ma'am.

13        Q    Is it fair to call you an industry

14   leader in cyber AI?

15        A    Yes, ma'am.

16        Q    Okay.  Has anyone told you that they

17   couldn't work on a project because of the HNCO

18   security inquiry?

19        A    Can you refine that?

20        Q    What part don't you understand?

21        A    Has anybody told me that they couldn't

22   work on a project because of the HNCO --

Paul Roysdon , Ph.D.                                    May 30, 2025

                                              Page 272

1          Q    Yes.

2          A    -- security investigation?

3          Q    Yeah.

4               MR. GONZALEZ:  With you.

5               MS. SEEMAN:  Other --

6               MR. HENRY:  With you.

7     BY MS. SEEMAN

8          Q    With you.

9          A    I have not had anybody tell me that

10    they could not work with me because of the

11    investigation.

12         Q    Okay.  And --

13         A    Aside from Dan Brown.

14         Q    Naturally.  To your knowledge, did the

15    HNCO security inquiry cause anyone to view you

16    negatively?

17         A    Yes.  I mean, there's several people in

18    that office as well as several people that were

19    affiliated with that office at NSA.

20         Q    Okay.

21         A    Strictly because there was an

22    investigation, there's -- oddly enough, as soon

Page 273

1      as an investigation is launched, there's this

2      assumption of fault instead of assumption of

3      innocence.

4           Q    In this inquiry, though, you weren't

5      found to have done anything wrong, though,

6      correct?

7           A    That's correct.

8           Q    Okay.

9           A    Part of the request that I have as part

10     of this lawsuit is to have the government state

11     that there was an investigation, no fault was

12     found, and issue that to an office like HNCO so

13     that those people that made this assumption that

14     I -- because I was under investigation did

15     something wrong, they don't find out, as Dan

16     Brown did not find out, what the -- what the

17     conclusion of an investigation is.  They just

18     hear there's an investigation, so, therefore,

19     they assume there's fault.  I think it's probably

20     good practice by the U.S. government that if

21     other people are aware of this, they are later

22     told, yes, there was an investigation.  However,

Page 274

1      no fault was found.  There -- you know,

2      therefore, it would somewhat prevent the -- what

3      we call rumint, that, obviously, there was

4      something that I did wrong because there is an

5      investigation, or at least stop the rumint.

6            Q    Who, to your knowledge, believes you

7      have a bad reputation?

8            A    I don't know.  Outside of Dan Brown,

9      maybe Allen Rabayda.  The other people involved

10     in our document that are -- the second amended

11     complaint.  Danny Burghard, Allen Rabayda,

12     Captain McVeigh, certainly, et cetera.

13           Q    Did you -- I know you said you were

14     briefed on Danny Burghard's deposition testimony.

15     You didn't read it?

16           A    No.  I was briefed on it.

17           Q    Okay.  Would it surprise you --

18           A    I'm sorry.  I did read part of it.

19           Q    Okay.  Would it surprise you to learn

20     that he testified he would welcome the

21     opportunity to work with you again?

22           A    That does surprise me.

EXHIBIT 1
www.CapitalReportingCompany.com
Page 493 of 639
202-857-3376

Roysdon Fact Witness_000274

1          Q    Why?

2          A    Because that is not what I've heard

3     over and over again for many years, so, yes, it

4     surprises me.

5          Q    And when you say what you've heard over

6     and over again, the source of that information is

7     Dan Brown, correct?

8          A    Dan Brown or Todd Jaspers, yes --

9          Q    Okay.

10         A    -- based on what they heard in that

11    office in Texas.  I think -- I think most people

12    are reasonable, and if there's an investigation

13    and he was privy to the results of that

14    investigation and found that there were no -- no

15    derogatory findings, a reasonable person would,

16    of course, you know, welcome an opportunity to

17    work with somebody that's an expert in their

18    field and not hold anything against them and may

19    actually in some cases go out of their way to try

20    to, you know, broker a conversation.

21         Q    Do you -- what's your factual basis for

22    the belief that Danny Burghard thinks that you

1       have a bad reputation?

2           A    Because of the e-mails that I saw

3       from -- from our discovery process originating

4       from Captain McVeigh to Danny Burghard.

5           Q    Okay.  And is there anything else?

6           A    Aside from comments from the

7       individuals I've already mentioned, no.

8           Q    Okay.  What's the factual basis for

9       your belief that Allen Rabayda thinks you have a

10      bad reputation?

11          A    Same.

12          Q    Okay.  So was Allen Rabayda included in

13      any of the security inquiry?

14              MR. HENRY:  Objection.  Form.

15              THE WITNESS:  I don't know.

16              MS. SEEMAN:  Okay.

17              THE WITNESS:  I imagine he may have

18      been, since he was the deputy for Danny Burghard.

19      BY MS. SEEMAN

20          Q    But you don't have any personal,

21      independent knowledge?

22          A    I don't know.

1          Q    Okay.  Do you think that Colonel Ekholm

2      believes you have a bad reputation?

3          A    I don't know.

4          Q    Okay.  And how about --

5          A    Did he testify otherwise?

6          Q    Not to my knowledge.

7          A    Okay.

8          Q    And then, for Captain McVeigh, do you

9      think that he believes you have a bad reputation?

10         A    I think Captain McVeigh is the type of

11     person that holds a grudge against people, and

12     whether or not somebody has a bad reputation in

13     his view is kind of irrelevant to how he

14     operates.

15              His kind of MO, modus operandi, is

16     entirely self-seeking.  The document that he

17     filled out for Air Force OSI is replete with

18     examples of self-seeking behavior.  I don't think

19     he necessarily has the capacity to think

20     otherwise.

21         Q    And just to clarify for you, he didn't

22     fill out a document for OSI.  He filled one out

1    for HNCO, but --

2          A    Okay.

3          Q    -- just -- just to --

4          A    Thank you for the clarification.

5          Q    -- clean that up.

6               For the -- for the reputation piece,

7    though, with respect to McVeigh, is it that your

8    reputation as far as like your skills go is in

9    question, or is it your reputation with respect

10   to, like, security practices is in question?

11         A    With -- with regard to Captain McVeigh?

12         Q    Yes.

13         A    I don't know.

14         Q    Okay.  And I guess, generally, when you

15   say your repu- -- oh, my God -- reputation was

16   ruined, is it -- what part of your -- is it your

17   entire reputation, or is it like everybody knows

18   you've got the skills but there's something else

19   missing, or what part of your repu- -- what part

20   of your reputation was ruined?

21         A    Damage of reputation has a different

22   meaning to different people depending on their

Page 279

1    position.  In some cases, the damage to

2    reputation in folks that I've talked with is the

3    damage based on your ability to retain state

4    secrets and retain classified information and not

5    to disclose that or, you know, not get afoul of

6    security practices, et cetera.

7               Others, a damage of reputation really

8    comes down to the technical abilities of the

9    individual, that they can do what they say they

10   can do or they can derive, in my case, the

11   mathematics and prove that the mathematics work

12   on particular programs.  I've had people question

13   both.

14              And in the few opportunities where

15   people have questioned that and talked to me

16   about it, if it's a security issue, I've just

17   provide kind of evidence that I continue to be a,

18   you know, upstanding individual and patriotic

19   American that has a Top Secret SCI clearance.

20   I've never violated my -- my duties as somebody

21   with a clearance by disclosing classified

22   information or running afoul of any of the

Paul Roysdon , Ph.D.                                May 30, 2025

                                             Page 280

1      security policies.  And then, if I ever had any

2      concerns, I've always reached out to Office of

3      General Counsel to get guidance to make sure that

4      I didn't.

5              With regard to my technical acumen, if

6      somebody questioned whether or not something was

7      technically accurate, often it's as simple as

8      walking them through an example.  Maybe it's a

9      math derivation or proof to show them step by

10     step, here's what I believe, and this is why.

11     Yes, you can just look at the conclusion, or you

12     can go through the entire derivation and here's

13     all the supporting evidence.

14             Often what I'll say is, you know, you

15     don't have to believe Paul Roysdon.  Here are the

16     other references or citations that support this

17     theory or support elements of the derivations to

18     arrive at what is called new math.  You asked

19     about this question of new math earlier, and

20     often new math is something that is created from

21     derivations of prior known knowledge.

22     Q    Okay.

EXHIBIT 1
www.CapitalReportingCompany.com
Page 500 of 689
202-857-3376

Roysdon Fact Witness_000280

Paul Roysdon , Ph.D.                          May 30, 2025

Page 281

```
 1        A    And so, if somebody questions a

 2    technical reputation, it often comes down to that

 3    or -- or providing, you know, evidence that, you

 4    know, you have coding examples that actually

 5    work.

 6        Q    Okay.

 7        A    So things like this.

 8        Q    So when you say your reputation was

 9    ruined, are you referring to the security part of

10    your representation -- oh, my God, I cannot --

11    reputation or the technical aspect of your

12    reputation?

13        A    Again, I think it means something

14    different to different people.

15        Q    What does it mean to you, though?

16        A    To me, it means both.

17        Q    Okay.  And --

18        A    Some people viewed me as being a

19    potential security violation or a security

20    threat, as like an insider -- as in an insider

21    threat.  Other people viewed me as being

22    technically incompetent.  So this -- this comment
```

**EXHIBIT 1**
www.CapitalReportingCompany.com
**Page 500 of 639**
202-857-3376

Roysdon Fact Witness_000281

Page 282

1      from Captain McVeigh where he said both an

2      insider threat and a crackpot, his description of

3      a crackpot, at least to Dan Brown, was that,

4      technically, I had no idea what I was doing and

5      that I was an insider threat.

6            Q    Other than what Dan Brown relayed to

7      you about Captain McVeigh, who else do you

8      believe regarded you as having a ruined

9      reputation at HNCO?

10           A    Todd Jaspers.

11           Q    Okay.  And then in the wider community

12     outside of HNCO, did you believe your reputation

13     had been ruined?

14           A    Yes, within certain aspects of NSA.

15           Q    Okay.

16           A    I recognize that at the moment this

17     sounds like it is a very small community, and it

18     is indeed within cyber AI a very small community.

19     This is not like the car example that I gave

20     earlier, where most people know what cars are.

21     There are tens of thousands of car engineers or

22     automotive engineers.  It's a very large area.

Paul Roysdon , Ph.D.                    May 30, 2025

Page 283

1    This is a very nascent area, so to have your

2    reputation destroyed in a very small area is a

3    bigger deal, being kind of a big fish in a small

4    pond, than being a big fish in an ocean of big

5    fishes.  Big fish.

6         Q    So you've mentioned this presentation

7    issue at HNCO, correct?

8         A    Yes, ma'am.

9         Q    Okay.

10        A    Which one?

11        Q    I was -- we're going to get to that.

12   Thanks for asking.

13             So about when -- you said Dan Brown

14   contacted you.  How -- and you said, for a while,

15   he was sort of ducking your calls, correct?

16        A    Can you orient --

17             MR. HENRY:  Objection to form.

18             THE WITNESS:  Can you orient me,

19   timeline?

20   BY MS. SEEMAN

21        Q    Yes.  You leave HNCO -- or you leave

22   your consulting job.  You leave the NSA.  You're

EXHIBIT 1
Page 502 of 639
www.CapitalReportingCompany.com
202-857-3376
Roysdon Fact Witness_000283

Page 284

1     at Leidos.  When does Dan Brown reengage with

2     you?

3          A    He did not reengage with me directly.

4     He reengaged with Todd Jaspers, because at the

5     time, Todd Jaspers had come to work with Leidos.

6          Q    Okay.

7          A    Nice note.

8               MS. SEEMAN:  Thank you.  So I'm going

9     to just -- I'm going to just hand you -- I made a

10     list -- sorry -- what we'll mark as Exhibit 10

11     and 11.  So this will be 10.  A copy to counsel.

12               (Deposition Exhibit Number 10 was

13               marked for identification.)

14               THE WITNESS:  Thank you.  Oh, yes.

15               MS. SEEMAN:  And then I'll just go

16     ahead and just mark 11 before.  And a copy to

17     counsel.

18               (Deposition Exhibit Number 11 was

19               marked for identification.)

20     BY MS. SEEMAN

21          Q    All right.  So what -- let's start with

22     10.  What is Exhibit 10?  And for the record,

Page 285

1    it's US Bates 303.

2        A    Exhibit 10 is a Microsoft Teams

3    meeting.  This would be something like an

4    invitation with an agenda to introduce -- to talk

5    about certain topics that Leidos was doing

6    research on.

7        Q    Okay.  Are you -- you were listed as

8    one of the recipients of this invitation,

9    correct?

10       A    I was.

11       Q    Did you attend this meeting?

12       A    No.

13       Q    Why not?

14       A    I was asked not to attend.  So what my

15   subordinate did here, Todd Jaspers, is included

16   me for reference, just for my awareness, I guess

17   you could say, but I was asked by Dan Brown not

18   to attend.

19       Q    Okay.  To your knowledge, are the

20   people listed here the entire list of invitees to

21   the meeting?

22       A    I don't know.

```
 1              Q     Okay.

 2              A     Often what happens --

 3              Q     That's fine.

 4              A     -- with meetings like these is you

 5      start out with an initial Teams meeting

 6      announcement, and it is forwarded on to other

 7      people.

 8              Q     Okay.

 9              A     So I would have no knowledge of that

10      since I'm not the originator of this meeting

11      invite.

12              Q     Do -- there's a handful of Leidos

13      people on this e-mail.

14              A     Yes, ma'am.

15              Q     But for the Air Force Life Cycle

16      Management group, do you know Denise Berger?

17              A     I do not.

18              Q     How about Trevon Carter?

19              A     No, ma'am.

20              Q     And Duc Pham?

21              A     No, ma'am.

22              Q     Okay.  Do you have any reason to
```

1    believe that any of these three individuals knew

2    anything about any of your history at HNCO?

3         A    I have no idea.

4         Q    Okay.  And then looking at 11 --

5         A    I think most people that would have

6    seen this meeting announcement probably, as most

7    people do, they only see the first two or three

8    lines, because that's usually how it appears in

9    Microsoft Office.

10         Most people do not open the meeting

11    announcement and print out like you did here to

12    be able to see what is left on the announcement.

13    So, even if they did know me, they probably would

14    not have seen my name because it was buried down

15    at the bottom.

16         Q    They could always check the list of

17    attendees, though, correct?

18         A    They could have --

19         Q    Okay.

20         A    -- but most people don't do this.

21         Q    Okay.  All right.  So moving on to

22    11 --

Paul Roysdon , Ph.D.                                    May 30, 2025

Page 288

1          A     Yes, ma'am.

2          Q     -- this -- what is -- what is Exhibit

3     11?  And for the record, it's US Bates 331.

4          A     This is another presentation

5     announcement.

6          Q     And did you attend this presentation?

7          A     No, ma'am.

8          Q     Okay.  Do you recognize any of the HNCO

9     names in the to column?  Actually, let me back

10    up.  Let's just go Air Force, and we'll go one by

11    one.

12         A     Okay.

13         Q     So, Donald Francisco?

14         A     No, ma'am.

15         Q     Kevin Ratuiste?

16         A     No, ma'am.

17         Q     Brock Patnode?

18         A     No, ma'am.

19         Q     The next one looks like it might be an

20    NSA e-mail.  Brian Sheridan?

21         A     No, ma'am.

22         Q     Thomas Mendez?

EXHIBIT 1
Page 50 of 69

Paul Roysdon , Ph.D.                                    May 30, 2025

Page 289

```
 1        A    NCSC.  No, ma'am.

 2        Q    Tajh Smith?

 3        A    No, ma'am.

 4        Q    Steven Guitron?

 5        A    No, ma'am.

 6        Q    Julio Guerrero?

 7        A    No, ma'am.

 8        Q    Obviously, Dan Brown.

 9        A    Yes, ma'am.

10        Q    Captain James Gan?

11        A    No, ma'am.

12        Q    And then this looks like a civilian.

13   John Hollenbeck?

14        A    I know this name.  He's U.S. Army.

15        Q    Okay.

16        A    He's not Air Force.

17        Q    And I just want to go back to one name.

18   So you don't know who Julio Guerrero is?

19        A    No, ma'am.

20        Q    Okay.  And you said you -- you didn't

21   attend this meeting?

22        A    No, ma'am.
```

Paul Roysdon , Ph.D.                                    May 30, 2025

Page 290

1          Q    Okay.  You were at Dan Brown's

2     deposition?

3          A    Yes, ma'am.

4          Q    Okay.  He testified that you did attend

5     a meeting?

6          A    Yes, ma'am.

7          Q    Did you --

8          A    He did.

9          Q    -- attend a meeting that isn't one of

10    these two meetings?

11         A    No, I did not attend these meetings.

12         Q    Okay.

13         A    This question was also asked of Todd

14    Jaspers, and he confirmed in his testimony that I

15    was not at these meetings at the request of Dan

16    Brown.  It is my assessment that Dan Brown lied

17    during that --

18         Q    Okay.

19         A    -- part of the testimony.  Or let me

20    say it this way:  Dan Brown didn't correctly

21    remember who attended at that testimony.  I don't

22    want to make the indication that he lied.  I

 1     don't know that.

 2          Q    Fair enough.

 3          A    Or accusation.  I don't want to make

 4     that accusation.

 5          Q    That's fair.  Did Leidos end up getting

 6     a contract out of these presentations?

 7          A    No.

 8          Q    Okay.  Do you know why?

 9          A    It would be speculative.  No.

10          Q    Okay.  It wouldn't have anything to do

11     with your position at Leidos, though, correct?

12          A    No.  What Dan Brown testified to --

13          Q    I just want to know what you know,

14     though, right now.

15          A    I don't know.

16          Q    Okay.  Outside of these two

17     presentations, were there any other presentations

18     at HNCO that you did not attend that you wanted

19     to attend?

20          A    I don't recall.  There were several

21     communications, and there were several kind of

22     sprint exercises to put together, like, a bid

EXHIBIT 1
Page 51 of 639

www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000291

Paul Roysdon , Ph.D.                    May 30, 2025

Page 292

1      based on Dan Brown's requirements, but I don't

2      recall.

3          Q    Okay.

4          A    At this point, basically everything had

5      to be handled by Todd Jaspers.  I was -- I was

6      asked to not participate.  And my leadership

7      was -- was fine with that.  I informed them that

8      there was an ongoing litigation.

9              And they said that this actually does

10     happen.  It's not -- it's are not unusual to have

11     a situation where, in their case, like a Leidos

12     employee could not present in front of a

13     government employee for fear of, you know,

14     reputational harm to Leidos.

15             So they said, you know, no problem,

16     it's not going to look poorly on me as an

17     individual or leader at Leidos.  As long as Todd

18     Jaspers was equipped to do the presentation on my

19     behalf, they didn't see any issue with it.

20         Q    And do you believe Todd Jaspers was

21     equipped to do the presentations?

22         A    Mostly, yes.  Todd does not have the

EXHIBIT 1
Page 51 of 63

Capital Reporting Company
www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000292

1    background that I have, so he -- as I said

2    before, he is a -- he's a very good engineer.  He

3    is excellent when it comes to cyber operations,

4    and he has very good intuition.  His depth of

5    knowledge in AI is not as strong as mine is, but

6    I believe that he did a good job representing the

7    research.

8        Q    Part of your second amended complaint

9    says that you're not allowed to enter HNCO

10   spaces.  Is that accurate?

11       A    Yes, ma'am.

12       Q    What -- what need do you have to enter

13   HNCO spaces?

14       A    I currently have no need.

15            MS. SEEMAN:  Okay.  Let's mark this as

16   12.  A copy to counsel.  I don't know why this

17   doesn't have the Bates numbers, either, but it's

18   from your production.

19            (Deposition Exhibit Number 12 was

20            marked for identification.)

21   BY MS. SEEMAN

22       Q    So what is Exhibit 12, Dr. Roysdon?

1          A     This is a document that I presented

2     to -- first to the general counsel at Leidos,

3     asking for his -- his advice, and then I later

4     provided this to the CTO and then my -- my direct

5     superior at Leidos.

6                The -- the event that kind of

7     instigated this -- this is really part of an

8     e-mail -- was the possibility of doing some work

9     for HNCO, and I needed to somehow convey to my

10    leadership that I could not represent Leidos to

11    HNCO.  And they needed to have some details, so

12    my attorney helped me draft this -- this document

13    to present to them.

14         Q     And just for the record, your attorney

15    is Jason Wareham?

16         A     Yes, ma'am.

17         Q     Okay.

18         A     As well as the gentleman that's sitting

19    next to me, but it is Jason Wareham that helped

20    me.

21         Q     Mr. Lance Henry.

22                MR. HENRY:  His lesser looking

Page 295

1        attorney, Jason Wareham.

2        BY MS. SEEMAN

3            Q    So when did you sign this?

4            A    I don't recall the date.

5            Q    Okay.  Do you know if it would have

6        been -- actually, let me --

7            A    I'm guessing this would have been

8        around somewhere in 2023, because that -- the

9        last paragraph on the first page says that I'm

10       currently fighting a two-year legal battle, so

11       that would put it somewhere in 2022 to 2023 time

12       frame.

13           Q    Okay.  And you mentioned some people

14       you provided it to.  So is one Jim Carlini?

15           A    Yes, ma'am.  That's the CTO of Leidos,

16       chief technical officer at Leidos.

17           Q    How would you -- do you have a current

18       relationship with Mr. Carlini?

19           A    I do.

20           Q    How would you describe that

21       relationship?

22           A    He is now a colleague.  Since our --

EXHIBIT 1
Page 514 of 639

www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000295

```
 1      our relationship has changed now that I work for

 2      the government again.  He is a colleague.

 3           Q    Have you talked to him about your

 4      lawsuit other than in this memo?

 5           A    No, ma'am.

 6           Q    Did he say anything to you after

 7      receiving this memo?

 8           A    He said that I should provide this to

 9      my direct superior, Ron Keesing.

10           Q    Okay.  Let's go to Ron Keesing.

11           A    Okay.

12           Q    So he's your direct superior.  What was

13      his title?

14           A    At this time?  I don't -- his title

15      changed three or four times, so I can't quite

16      remember.

17           Q    Was he always your superior?

18           A    Yes, ma'am.

19           Q    Okay.

20           A    Well, for a short period, he was not.

21      Yeah, a very short period.

22           Q    Do you have a current relationship with
```

Page 297

```
 1      Mr. Keesing?

 2           A    Keesing, yes, ma'am.

 3           Q    How would you describe that

 4      relationship?

 5           A    Same as the relationship with Jim

 6      Carlini.  He's a colleague now.

 7           Q    Have you spoken with Mr. Keesing about

 8      your lawsuit?

 9           A    No, ma'am.  Aside from this document,

10      no.

11           Q    Did he have any questions for you after

12      he received this document?

13           A    No.  It was he that stated that these

14      sort of things are somewhat common and that it

15      was not going to be a problem.  It had no bearing

16      on my position at Leidos and that we would -- we,

17      meaning he and others, would help deconflict so

18      that Leidos and I could be successful.

19           Q    So --

20           A    He was, in fact, very supportive.

21           Q    He didn't have any issues?

22           A    No, ma'am.
```

EXHIBIT 1
Page 516 of 639
www.CapitalReportingCompany.com
202-857-3376
Roysdon Fact Witness_000297

1          Q    Okay.  Did you give this Exhibit 12

2     memo to Jerry Howe?

3          A    Yes, ma'am.

4          Q    Who is Jerry Howe?

5          A    General counsel at Leidos.

6          Q    Is that still his current position?

7          A    He is now retired.

8          Q    Okay.  Do you have any current

9     relationship with Mr. Howe?

10         A    Yes, ma'am.

11         Q    How would you describe it?

12         A    Just colleague.

13         Q    Do you interact with him at all?

14         A    Yes, ma'am.

15         Q    How frequently?

16         A    Maybe a text or a phone call every

17    couple of months.

18         Q    Have you talked to him about this

19    lawsuit?

20         A    Not since this document.

21         Q    Okay.  When you gave him this document,

22    did he have any questions for you?

Page 299

1          A    He might have had some -- some general

2     questions.  He asked how he could help.  In fact,

3     they all asked how they could help.  They're all

4     incredible professionals.  Like I said, my time

5     at Leidos was a great.  That was my comment

6     earlier.  It was great.  It was a great company

7     with many great individuals.  These three are

8     excellent individuals.

9               He offered to help, if there's any way

10    he could help, and I said, thank you, I have a

11    team of attorneys that I'm working with.

12         Q    I don't want to spend too, too much

13    time on this memo, but is it fair to say that

14    this memo came after you had filed your lawsuit

15    in federal court?

16         A    Yes, ma'am.

17         Q    Okay.  And in the second paragraph, it

18    says, "In 2018, by recommendation of a

19    high-ranking officer at NSA, I was hired as a

20    CyberAI consultant to AFCYBER HNCO."

21         A    Yes, ma'am.

22         Q    Is the 2018 date accurate?

1          A      Typo.

2          Q      Okay.  And it says by recommendation of

3    a high-ranking officer at NSA.  Who is that in

4    reference to?

5          A      Todd Jaspers.

6          Q      And just to be clear, you were not

7    hired to work at HNCO, correct?

8          A      Correct.  I --

9          Q      Okay.

10         A      -- could have been more careful with my

11   language here.

12         Q      No worries.  I'm just trying to make

13   sure that the record's clear.

14               This -- at the end of that paragraph,

15   it says, "With these initial results I proposed 4

16   projects to Danny Burghard, all of which were

17   subsequently funded, and I guided the

18   implementation using my code by Kudu,

19   Cynnovative, Def-Logix, and GITI."

20               So did you present your projects to

21   Danny?

22         A      No.  Again, this -- I could have been

Page 301

1     more careful here.  What I should have said is

2     Dan Brown.  I think the reason at the time they

3     were mentioning Danny Burghard is because he was

4     the HNCO chief, so if I was going to have

5     interactions as a vice president at Leidos, it

6     might be at that chief level.

7              So this is part of trying to convey

8     kind of a level to level, you know, equal or

9     peers, you know, outlining of potential issue, so

10    if I was asked by Leidos to go present again,

11    that the issue might be at that level and below.

12    That's the only reason this is mentioned here.

13        Q    Okay.  And then when you call

14    Mr. Burghard HNCO chief, do you know that to be

15    an accurate representation of his title?

16        A    I don't know his exact title.

17        Q    Okay.  And do you know --

18        A    I still don't know his exact title.

19        Q    Do you know what SAF/AQL is?

20        A    What?

21        Q    SAF, S-A-F, AQL?

22        A    No, I don't.

1          Q     Okay.  So you have no awareness of if

2     Danny Burghard works there?

3          A     I don't even know what it is.

4          Q     Okay.

5          A     No.

6          Q     Let's see.  Next paragraph starts with

7     "During my AFCYBER employment."

8                And, again, you were never employed by

9     the Air Force?

10         A     Yes, ma'am.

11         Q     Okay.

12         A     What I was trying to do with this

13    document is -- is convey a certain message

14    without getting into too many details.  The

15    details which I provided them in the complaint --

16    because they did want to see a copy of the

17    complaint.  Obviously, the complaint was 47

18    pages.  I wanted to convey in a fairly simple,

19    straightforward e-mail kind of the barebones

20    overview of what the complaint entails without

21    making it 47 pages.

22                So some of the details are, I would

Paul Roysdon , Ph.D.                                May 30, 2025

Page 303

1      say, kind of glossed over because they are more

2      or less irrelevant as far as the details go.

3           Q    Okay.

4           A    What was important is that there was an

5      ongoing lawsuit and my -- any sort of engagements

6      with HNCO might present some problems for me to

7      present Leidos tools to HNCO.  That's what I was

8      trying to convey with this document.

9           Q    On the second page of this document, at

10     the -- in the first paragraph, it says,

11     "Mr. Brown wants to fund my research at Leidos

12     and purchase our working prototypes, but demands

13     it not bear my name for fear of retaliation from

14     his superior, Mr. Burghard. "

15               Is it your understanding that Danny

16     Burghard was Dan Brown's superior at that time?

17          A    He was in his leadership chain, yes,

18     ma'am.

19          Q    Okay.  Did Dan Brown --

20          A    As far as I knew.

21          Q    Okay.  Did --

22          A    Sorry.

EXHIBIT 1
www.CapitalReportingCompany.com
Page 523 of 654
202-857-3376

Roysdon Fact Witness_000303

Page 304

```
1        Q    No, you're fine.  Did Dan Brown tell

2    you he feared retaliation from Danny Burghard?

3        A    He said he feared retaliation from his

4    leadership.

5        Q    Okay.  I just --

6        A    And to my knowledge, his leadership

7    still included Danny -- still included, yes,

8    Danny Burghard.

9        Q    He didn't specifically mention fear of

10   retaliation from Danny Burghard, though, correct?

11       A    Not specifically.  He said --

12       Q    Okay.

13       A    -- his leadership.

14       Q    I just want to be clear on that,

15   because, I mean, kind of the same thing for you

16   where people are -- you're saying people are

17   saying things about you that aren't true, I just

18   want to be sure that, you know, people aren't

19   also saying things about Mr. Burghard that may

20   not be accurate.

21       A    Understood.

22       Q    Okay.  Next paragraph, we sort of
```

EXHIBIT 1
Page 523 of 659
www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000304

Paul Roysdon , Ph.D.                                      May 30, 2025

                                                        Page 305

 1      talked about this.  It says you're being actively

 2      prevented from even entering the briefing room.

 3              Other than the two instances we talked

 4      about where they were virtual briefings, correct?

 5          A    Uh-huh.

 6          Q    Actually, did you -- did you attempt to

 7      join those meetings?

 8          A    I did not attempt.

 9          Q    Okay.

10          A    We were invited to present in person.

11      I was the only one in Texas at the time that

12      could present this.  Todd had talked about flying

13      out to Texas.  He had -- he had since moved -- he

14      previously was in Texas, had since moved to

15      Florida.  He talked about flying back for this

16      briefing.

17              We had discussed whether or not I could

18      or could not do the briefing in person.  He

19      talked about it with Dan Brown.  Dan Brown said

20      no, I could not enter the building to do this

21      briefing.  In fact, I could not even be on the

22      call.

EXHIBIT 1
Page 524 of 683

www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000305

1          Q    Are you aware of whether Leidos lost

2     out on any contracts because of your situation at

3     HNCO?

4          A    I am not aware.

5          Q    Great.  All right.  Next -- you can put

6     that to the side.

7               MS. SEEMAN:  Do you guys want to take a

8     little break?

9               MR. HENRY:  I guess not.  What -- what

10    is our time on the record?

11              THE REPORTER:  Five-and-a-half hours.

12              THE WITNESS:  Really?

13              MS. SEEMAN:  Time stops moving in

14    these.

15    BY MS. SEEMAN

16         Q    All right.  Let's -- all right.

17              So, when you're in 2020, other than

18    being fired from the GITI consulting contract,

19    were there any contract opportunities that you

20    lost out on?

21         A    I didn't apply for any other contracts.

22         Q    Okay.  Is that because you were at

EXHIBIT 1
Page 525 of 639

Roysdon Fact Witness_000306

Paul Roysdon , Ph.D.                                    May 30, 2025

Page 307

1      Leidos then?

2           A    Correct.

3           Q    How about in 2021?

4           A    Same answer.

5           Q    So you did not bid on any contracts in

6      2021 because of your employment at Leidos?

7           A    Yes, ma'am.

8           Q    Okay.  2022, I have to ask the same

9      question.

10          A    Same answer.

11          Q    What -- you did not bid on any

12     contracts in 2022 because of your employment at

13     Leidos, correct?

14          A    Yes, ma'am.

15          Q    How about in 2023?  Did you -- you did

16     not bid on any contracts in 2023 because of your

17     employment at Leidos?

18          A    Yes, ma'am.

19          Q    And, 2024, you did not bid on any

20     contracts because of your employment at Leidos?

21          A    Yes, ma'am.

22          Q    And then 2025 through when you left

Page 308

1       Leidos, you did not bid on any contracts because

2       of your employment at Leidos?

3            A    Yes, ma'am.

4            Q    And from when you started at ODNI to

5       date, you have not bid on any contracts because

6       of your employment at ODNI, correct?

7            A    Yes, ma'am.

8            Q    Okay.  Earlier we talked about StarNav

9       and your work for them while you were working at

10      Leidos.

11               Were there any consulting opportunities

12      you did not pursue from 2021 to 2025 during your

13      employment at Leidos?

14           A    No.

15           Q    Okay.  You've never bid on any

16      contracts as a prime contractor, correct?

17           A    Me as Paul Roysdon or me as Leidos?

18           Q    Let's start with you as Paul Roysdon.

19           A    No, ma'am.

20           Q    Okay.  And you as Leidos?

21           A    I assisted in several contracts that

22      were prime contracts at Leidos.

EXHIBIT 1
Page 527 of 639

Roysdon Fact Witness_000308

Paul Roysdon , Ph.D.                           May 30, 2025

Page 309

1          Q    And did Leidos receive any of those

2     contracts that they bid on?

3          A    Yes, ma'am.

4          Q    Okay.  Were any of those contracts with

5     Department of Defense agencies?

6          A    Yes, ma'am.

7          Q    Okay.  Which ones?  Just which

8     agencies, not which contracts.

9          A    I don't remember.

10         Q    Okay.

11         A    We had several.

12         Q    Were any of those contracts in the

13    cyber AI space?

14         A    Yes.

15         Q    Are you able to say with which

16    agencies?

17         A    There was one with DARPA.  I helped

18    write proposals, though my name was not on

19    them -- same thing with DARPA -- with IARPA.

20              (Reporter clarification.)

21              THE WITNESS:  IARPA, I-A-R-P-A.  Army

22    Futures Command.  There were several.  I can't

EXHIBIT 1
www.CapitalReportingCompany.com
Page 528 of 639
202-857-3376

Roysdon Fact Witness_000309

1      remember them all.  I'm sorry.

2      BY MS. SEEMAN

3          Q    That's fine.  If -- if I wanted to go

4      look and find those contracts, do you know where

5      I would look for that?

6          A    Yes.  You could look at

7      USASPENDING.gov.

8          Q    Okay.  Did -- you know, you mentioned

9      like your name being on or off of things.

10              For these contracts with other

11     agencies, was your name on or off of bids?

12         A    Only one some of them.

13         Q    Okay.  Which agencies was your name

14     left off of?

15         A    My name was not on a contract or a bid

16     at NSA and another one at DARPA.  However, there

17     were other -- other proposals in a different

18     office at DARPA where my name was on the

19     proposal.

20         Q    And did -- DARPA did, in fact, award

21     some of those contracts to Leidos, correct?

22         A    Yes, ma'am.

1          Q    Okay.  Including ones that had your

2     name on it?

3          A    Yes, ma'am.

4          Q    Okay.  How about NSA?  Did they award

5     any contracts to Leidos?

6          A    Yes, but my name was not on it.

7          Q    Okay.  As Paul Roysdon, would you in

8     your individual capacity qualify to be a prime

9     contractor on a cyber AI contract?

10         A    Would I qualify?

11         Q    Yes.  I can rephrase if you would like.

12         A    Sure.

13         Q    What qualifications, if any, are you

14    aware of that are required for prime contractors

15    in the cyber AI field?

16              MR. HENRY:  Objection to form.

17              THE WITNESS:  I don't know that there

18    are specific qualifications.  There's certain

19    requirements of a prime contractor.  If you're

20    doing classified work, you have to have a

21    security person.  If you're doing work that's

22    fairly technical, they expect you to have a

Page 312

1     technical person.  There might be things like

2     reporting requirements that might require another

3     person.

4             However, there's nothing that prevents

5     all three of those people to be the same person,

6     and, in fact, with a small company, this is often

7     the case.  The person that writes the contracts

8     or does all the contracting work is not, you

9     know, one of 20 people.  It's the same person who

10    is also doing the technical work.  It's the same

11    person's who's overseeing the security for the

12    program, et cetera.  I know people who do this.

13        Q    As -- if you, Paul Roysdon, were to be

14    a prime contractor on a program in a SAP

15    environment, would you be able to do that?

16        A    Yes, ma'am.

17        Q    Okay.  How would your -- let's start

18    with the security clearance, because earlier we

19    talked about how somebody has to sponsor, host.

20             How would that work if it's just you,

21    Paul Roysdon?

22        A    If it's just me, Paul Roysdon, I have

Paul Roysdon , Ph.D.                                May 30, 2025

Page 313

1    to -- there's certain training that you have to

2    go through to be certified as the security

3    personnel who is working on government contracts.

4    So I would take that course, which is rather

5    easy, get the certification, and then make sure

6    that anything that's going on in the contract

7    abides by those security protocols.  So that's

8    the security aspect of it.

9         Q    Okay.

10        A    Again, it's not unusual for the CEO of

11   a startup company to do all of these tasks

12   simultaneously.

13        Q    For work as a prime contractor, does it

14   also -- I know we mentioned a security person.

15   Do you also have to have a security facility do

16   the work?

17        A    Yes and no.

18        Q    Okay.

19        A    If you're doing cleared work, it might

20   be the case where a lot of the work can be done

21   unclassified and then brought into that cleared

22   facility.  This is very common.

Paul Roysdon , Ph.D.                              May 30, 2025

Page 314

1          You do not have to personally own or

2     manage a SCIF because there are places where you

3     can rent SCIFs, and then if you have like a

4     business relationship or you have a business

5     relationship with another company where you can

6     rent access to their SCIFs.  I know people who do

7     this.  So, yes, you can as a single person do

8     work in a SCIF, in a secure environment.

9          Q    You were mentioning a training that you

10    have to -- you would have to do as a security

11    person.

12              Do you know whether you have to have

13    that completed before -- not soliciting.  That's

14    the government -- before bidding on a contract?

15         A    You have to have that done before

16    starting work.

17         Q    Okay.

18         A    Unless the -- unless the proposal

19    itself is classified -- and there are some

20    classified proposals -- then, yes, you'd have to

21    have that beforehand.  You'd also have to have

22    access to a SCIF.

**EXHIBIT 1**
www.CapitalReportingCompany.com
**Page 532 of 639**
202-857-3376

Roysdon Fact Witness_000314

Paul Roysdon , Ph.D.                                    May 30, 2025

                                        Page 315

1              MS. SEEMAN:  Let's go off the record.

2              (Recess 5:47 p.m. to 5:55 p.m.)

3       BY MS. SEEMAN

4          Q    So, Dr. Roysdon, in your second amended

5       complaint, there's an allegation that says you

6       are barred from all interaction within the United

7       States Government on offensive cyber work

8       regardless of the agency.

9              Is that statement accurate?

10         A    At the time, yes, that was accurate.

11         Q    And when you say at the time, do you

12      mean at the time of the filing of the second

13      amended complaint?

14         A    At the time of the filing of the second

15      amended complaint.

16         Q    Okay.

17         A    Yes, ma'am.  This is not it.  I have

18      it.

19         Q    Okay.  What's the date of the filing at

20      the top?

21         A    At the top?

22         Q    Yeah.

EXHIBIT 1
Page 534 of 639
www.CapitalReportingCompany.com
202-857-3376
Roysdon Fact Witness_000315

Paul Roysdon , Ph.D.                                    May 30, 2025

Page 316

1          A    3/18/24.

2          Q    Was that statement accurate at the time

3     of your initial complaint filing?

4          A    Initial complaint, yes.

5          Q    Okay.  This statement is no longer

6     accurate, though, correct?

7          A    I don't know.  I haven't tried.

8          Q    You haven't tried to work on -- within

9     the United States Government on offensive cyber

10    work?

11         A    Not as Paul Roysdon, no.

12         Q    As Leidos, though, have you been able

13    to through Leidos?

14         A    Through Leidos, not as Paul Roysdon,

15    yes.

16         Q    Okay.  All right.  Moving on to --

17    well, I guess back sort of towards your position

18    in the cyber AI field, is it fair to say you're

19    still a key player in the cyber AI field?

20         A    I would -- I wouldn't say a key player.

21    I would say I'm probably one of the luminaries in

22    this field.  A key player to me implies that I am

EXHIBIT 1
Page 53 of 639

www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000316

 1      applying for contracts and winning contracts and

 2      demonstrating success in the field; whereas, a

 3      luminary is somebody who would be developing new

 4      ideas, performing research and development on

 5      those ideas and demonstrating maybe within a

 6      company, and then, on behalf of the company,

 7      those capabilities are presented to a customer

 8      for that company to then gain traction.

 9           Q    Is -- okay.  Let me ask it this way:

10      During your time at Leidos, was Leidos -- did

11      they establish themselves as a key player --

12           A    They did.

13           Q    -- in the cyber AI field?

14           A    They did.  I maintained my position as

15      a researcher by publishing papers and patents, so

16      among the scientific community, I maintain my

17      position as what I called a luminary.

18           Q    And you -- since leaving your

19      consulting role, you were still able to work in

20      the cyber AI field, correct?

21           A    Define work in the cyber AI field.

22           Q    At Leidos, you were doing cyber AI work

Paul Roysdon , Ph.D.                              May 30, 2025

                                              Page 318

1     at least as part of your job, correct?

2          A    That was part of my duties at Leidos,

3     yes.

4          Q    Okay.  So you were still able to work

5     in cyber AI?

6          A    Under the umbrella of Leidos without my

7     name attached to it, yes.

8          Q    Okay.  You mentioned you were

9     publishing papers and those sorts of things,

10    correct?

11         A    Yes, ma'am.

12         Q    Did those have your name on it?

13         A    Yes, ma'am.

14         Q    Were those in the cyber AI field?

15         A    They were in the cyber AI field within

16    the scientific community, not within the U.S.

17    government.

18         Q    Okay.  That was as Paul -- Paul

19    Roysdon?

20         A    Yes, ma'am.

21         Q    Okay.  Not as a Leidos employee?

22         A    It was also as a Leidos employee.  You

EXHIBIT 1
www.CapitalReportingCompany.com
Page 537 of 639
202-857-3376

Roysdon Fact Witness_000318

Paul Roysdon , Ph.D.                                        May 30, 2025

Page 319

```
 1     will see the documents that it does say some sort

 2     of Leidos e-mail address.

 3          Q    Okay.  Outside of potential

 4     contracts -- actually, yeah.  Outside of

 5     potential contracts, what if any interference

 6     have you experienced with your ability to work in

 7     the cyber AI field?

 8          A    Since 2020, I've not been able to

 9     regain a foothold into the dominant players in

10     offensive and defensive cyber, namely, Air Force

11     Cyber.  Of the -- the players in this field, they

12     are the most forward leaning in the field, and I

13     have not been able to kind of regain a foothold

14     as Dr. Paul Roysdon in -- in that arena.

15          Q    And when you say Air Force Cyber, is it

16     all of Air Force Cyber, or is it just

17     specifically HNCO?

18          A    In this case, specifically HNCO,

19     because they're the ones who do the acquisitions.

20     Air Force Cyber is rather large, and they do a

21     lot of different things.

22          Q    Which is why I asked.
```

EXHIBIT 1
www.CapitalReportingCompany.com
Page 539 of 659
202-857-3376

Roysdon Fact Witness_000319

 1          Have you -- do you believe you've been

 2     deprived of your ability to work in the cyber AI

 3     field generally?

 4          A    As a consultant, yes.  As a researcher,

 5     no.  So my ability to make a salary and some sort

 6     of wage to provide for my family, yes,

 7     absolutely.

 8          Q    But to be clear, you were still making

 9     a salary at Leidos?

10          A    Yes, but my -- my duties at Leidos were

11     varied.  Again, going back to earlier testimony,

12     when I first came to Leidos, I was working as a

13     chief AI solutions architect, which was doing AI

14     and ML for imagery, medical records, things like

15     this, not cyber.

16          Q    And then it turned into including

17     cyber, correct?

18          A    Later on, it did include cyber, again,

19     but that was under the umbrella of Leidos, and I

20     was not able to represent that work back to the

21     U.S. government.

22          Q    But you were to some agencies able to

1    represent yourself, correct, or to represent

2    yourself as associated?

3        A    I was able to represent Leidos, not

4    myself.  There was a huge difference.

5        Q    Yeah, I'm just trying to understand

6    that, because earlier we were talking about, you

7    know, contract proposals that had your name on

8    them versus didn't have your name on them, and

9    you said a few for part of -- a specific DARPA

10   office and then NSA.

11       A    Uh-huh.

12       Q    Were -- were those the only contracts

13   that were cyber AI?

14       A    Good question.  The ones that had my

15   name on them were not cyber AI.

16       Q    Okay.  Did they still deal with AI?  I

17   hate to make assumptions.

18       A    Some dealt with AI.  Some dealt with

19   cyber.

20       Q    Okay.

21       A    Some were just purely mathematics.

22       Q    Other than being excluded from the two

EXHIBIT 1
Page 540 of 639
www.CapitalReportingCompany.com
202-857-3376
Roysdon Fact Witness_000321

Page 322

1      presentations at HNCO, did you have any other

2      exclusions at HNCO?

3          A    I'm sorry.  Say that again.

4          Q    Yeah.  That's a bad question.

5               Other than the presentations at HNCO,

6      were you deprived of any other opportunities at

7      HNCO?

8          A    Those are the only opportunities that

9      were presented.

10         Q    Okay.  And no contracts came of that,

11     correct?

12         A    No, ma'am.

13         Q    Okay.  You've sort of alluded to this

14     throughout today, but what are you hoping to get

15     out of this lawsuit?

16         A    At a minimum, I'd like to clear my

17     name.  I've said a couple of times, damage to

18     reputation comes in two forms, and we talked

19     about those two forms.

20              I've also mentioned that when an

21     investigation is mentioned and that someone is

22     being investigated, the people that hear that

EXHIBIT 1
www.CapitalReportingCompany.com
Page 541 of 639
202-857-3376

Roysdon Fact Witness_000322

Paul Roysdon , Ph.D.                                May 30, 2025

Page 323

1        automatically assume that there is some sort of

2        reputational harm, that that person has done

3        something wrong.  It is rarely the case that when

4        an investigation is completed that those

5        individuals are informed of the result of that

6        investigation.

7                In order for me to continue to do work

8        in this field, specifically cyber AI, though I am

9        a subject matter expert in many fields, but in

10       this field in particular, it would be my goal

11       that my reputation is restored.

12               I'm not asking -- and I said that in

13       the amended complaint -- amended complaint -- I'm

14       not seeking to have my contracts renegotiated or

15       be restored to work at HNCO.  I am trying to

16       clear my name and the reputational damage that

17       it's caused.

18               And that could come in the form of a

19       letter by the U.S. government to HNCO and to

20       the -- several of the members in HNCO, similarly,

21       some of the members at NSA, stating that there

22       wasn't an investigation, there was a lawsuit, no

Paul Roysdon , Ph.D.                                    May 30, 2025

Page 324

1        fault was found, Dr. Paul Roysdon was cleared of

2        all alleged wrongdoing and is cleared to

3        represent his work to the U.S. government and

4        cleared to seek work if he so desires.

5               Clearly, at the moment, I cannot do

6        that as Deputy Director of National Intelligence,

7        but if there is an opportunity in the future or

8        if I was not in my current role, I would

9        certainly like to be able to seek opportunities

10       in the field in which I'm an expert in, in

11       particular, a field that I helped create.  Being

12       de facto debarred from a field that I created is

13       a somewhat extreme situation.

14          Q    In your second amended complaint, it

15       talks about damages --

16          A    I'm sorry.  If I may --

17          Q    Yeah.  Go ahead.

18          A    I think some mention of this to Captain

19       McVeigh is also appropriate, particularly the

20       violation of -- of privacy.  All of us as

21       government employees take privacy training

22       annually, and we are required to take this very

EXHIBIT 1
Page 543 of 639

www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000324

Page 325

1      seriously.  This was a violation of privacy and

2      the Privacy Act.

3           Q    Okay.  In --

4           A    That's --

5           Q    Sorry.  Continue.

6           A    I would say the same thing for the OSI

7      Agent Beall, but he's now deceased.

8           Q    Other than Agent Beall and Captain

9      McVeigh, do you believe any other members of the

10     Air Force violated the Privacy Act with respect

11     to you?

12          A    I don't know.

13          Q    Okay.  In your second amended

14     complaint -- do you have it in front of you?

15          A    Yes, ma'am.

16          Q    On page 27, it lists in paragraph 156 a

17     list of damages and severe emotional harm.

18               Are you seeking emotional damages as

19     part of this lawsuit?

20          A    Originally, yes.

21          Q    And now?

22          A    At this point, I would like to just

EXHIBIT 1
Page 544 of 639

www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000325

Paul Roysdon , Ph.D.                              May 30, 2025

Page 326

1       have my name cleared and seek a settlement just

2       for fees.

3            Q    Okay.  I'm still going to ask these

4       other questions just because I have to.  That's

5       my job.

6            A    Okay.  Do your job.

7            Q    Thank you.  That's what they pay me for

8       here, shockingly.  Okay.

9                 Other than the emotional damages listed

10      in paragraph 156, is there any other emotional

11      damage that you've experienced as a result of the

12      events described in your complaint?

13           A    Other than events described in the

14      complaint?

15           Q    Any other emotional damages related

16      to -- so, like, if -- if, you know, you stubbed

17      your toe and you were emotionally damaged, I

18      don't really care about that, but is there any

19      other emotional damage you experienced as a

20      result of the events in your complaint?

21           A    No.  I was very specific in the

22      complaint --

Paul Roysdon , Ph.D.                                    May 30, 2025

Page 327

1          Q    Okay.

2          A    -- on what those emotional damages

3    were.

4          Q    Okay.

5          A    Those begin on page 27, item --

6    paragraph 156.

7          Q    And I want to ask you just about one of

8    these questions.  So it says -- 156(f), it says,

9    "constant fear during the criminal investigation

10   that he would be indicted as an insider threat or

11   somehow violating espionage statutes."

12         A    Yes, ma'am.

13         Q    Did -- at any point, did you believe

14   that you had violated any espionage statutes?

15         A    Yes.  The OSI agent attempted to

16   convince me that I had violated some sort of

17   statutes like this and that my indictment was

18   imminent, which was terrifying.

19         Q    Did Agent Beall call you an insider

20   threat at any point during your meeting with him?

21         A    He said I was being accused of an -- as

22   an insider threat.

EXHIBIT 1
www.CapitalReportingCompany.com
Page 546 of 639
202-857-3376

Roysdon Fact Witness_000327

1         Q    Accused.  Okay.  And he didn't name who

2    was accusing you?

3         A    He would not answer.

4         Q    Okay.

5         A    So for more than a year, until I got a

6    phone call from Dan Brown saying that the

7    investigation was over, I spent a year under the

8    belief that I was imminently going to be indicted

9    for some false claim, which is why I then felt I

10   needed to file a lawsuit to clear my name,

11   because I knew that I had done nothing wrong.

12        Q    Okay.  For --

13        A    I take allegations like this very

14   seriously given the type of work that I do for

15   this country.

16        Q    And, also, they're serious allegations,

17   so I get it.

18        A    Not only are they serious allegations.

19   The type of work that I do is -- it carries with

20   it grave damage for this country.

21        Q    In section (e), just a quick question.

22   It talks about regular sleepless nights pondering

1    your future while under both criminal

2    investigation as well as OPM adjudication.

3            Did you -- you didn't know about the

4    OPM adjudication until after it was concluded,

5    though, correct?

6        A    Correct.

7        Q    Okay.  And then did -- did your Leidos

8    leadership -- you know, we talked about how you

9    informed them of the lawsuit.  They were like, no

10   big deal, this sort of stuff kind of happens and

11   we'll just plug other people in.

12           Is that a fair -- is that a fair

13   assessment in a very casual term?

14       A    Yes, ma'am.

15       Q    So was there any sort of loss of trust

16   from your Leidos leadership based on the events

17   at HNCO?

18       A    No.  By the time I presented that

19   information to them, I had already established

20   my -- my level of trust and expertise, and I

21   think each of them would say that they -- they

22   felt, based on everything that I demonstrated,

1     all of the obligations were false and had no

2     bearing on who they knew me to be as a person.

3     Todd testified on the same -- the same -- stating

4     the same things.

5         Q    Okay.  Other than the market analysis

6     that you performed in this case, did you do any

7     other computation for lost income?

8         A    Yes, ma'am.

9         Q    And what was the result of that

10    computation?

11        A    So there were several projects that

12    were proposed and I was asked to participate in,

13    again, providing oversight and guidance with the

14    mathematics.  Dan Brown had mentioned several

15    times, you know, this work could go on for the

16    next five years and we'd like you to be much more

17    involved.

18             At one point, he asked if I would

19    consider leaving NSA to do this work full time.

20    Full time in my world means 80 hours a week, not

21    40, so it would have been a significant change as

22    far as employment concerns and significant

1    financial change, because my salary at NSA was

2    about 94,000 a year or so.  At that point, I

3    indicated that I would have -- if that was going

4    to be the case, I was also going to increase my

5    rate to the standard industry rate, if that was

6    going to be my sole source of income.

7              He agreed that was fine, that that's

8    what he kind of expected and was kind of

9    surprised that I was giving the government a

10   deal, so to speak, by taking a lesser rate.

11             As we projected that out, it accounted

12   for several million dollars, I think somewhere on

13   the order of about $5 million.

14       Q    Do you remember what rate you would

15   have been at?

16       A    I don't recall.  Somewhere around

17   450 -- sorry.  Somewhere around $450 an hour is

18   about standard for this sort of work.

19       Q    And I know you mentioned 80 hours a

20   week, but would you have been permitted to

21   work -- not work.  Would you have been permitted

22   to bill for 80 hours a week under this contract?

EXHIBIT 1
www.CapitalReportingCompany.com
Page 551 of 639
202-857-3376

Roysdon Fact Witness_000331

Page 332

```
 1        A    Absolutely.  I mean, it depends on how

 2     the contract would have been written and who I

 3     would have been working for.  In this case, it

 4     would have been G-I-T-I, GITI, but it was my

 5     assumption based on the -- it was my

 6     understanding based on conversations with Dan

 7     Brown that that was the case.

 8        Q    How close in time was this conversation

 9     with Dan Brown about changing the scope of your

10     consulting work to the August 13th, 14th, 2020

11     situation?

12        A    The conversation happened early August

13     before these presentations.

14        Q    Okay.  So a week or two before?

15        A    Within a week or two, yes, ma'am.

16        Q    Okay.  And I believe earlier you said

17     you might -- you talked to Ted Oakley about this,

18     potentially?

19        A    Yes.  We -- we talked about change of

20     scope and contract, but that wasn't the only

21     occasion.  There were times where we flexed the

22     scope of contract, meaning working more hours one
```

Page 333

1    week and less another week.  He verified that

2    this was okay with Dan Brown, et cetera, or that

3    in order to meet certain deadlines that it would

4    require more work, so he had to adjust scope,

5    again, didn't have to change the work

6    authorization document, just had to negotiate

7    that with Dan Brown.  So there were many

8    conversations like this.

9         Q    Okay.  Other than Dan Brown and Ted

10   Oakley, did you discuss this five-year consulting

11   potential contract with anybody else?

12        A    Other than my attorney, Jason, no.

13        Q    Okay.  You're obviously represented by

14   attorneys in this lawsuit, correct?

15        A    Yes, ma'am.

16        Q    Okay.  Do you have a fee arrangement

17   with them?

18        A    Define a fee arrangement.

19        Q    Sure.  Do you have a retainer agreement

20   with them?  I'm not asking for the substance of

21   it.

22             MR. HENRY:  You mean like an engagement

Page 334

1      agreement with our firm?

2      BY MS. SEEMAN

3           Q    Yeah.  I'm just trying to figure out

4      like what -- let me ask it this way:  How much

5      have you personally spent on attorneys' fees to

6      date?

7                MR. HENRY:  It's not privileged.

8                THE WITNESS:  It's not privileged?

9                MR. HENRY:  It's not privileged.

10               THE WITNESS:  I think total cost is

11     around $269,000.

12     BY MS. SEEMAN

13          Q    Other than what we've talked about so

14     far, are there any other monetary damages you

15     have experienced as a result of the HNCO

16     situation?

17          A    You mean aside from potential future

18     work as a subject matter expert in this area of

19     cyber AI?

20          Q    Yes, I guess.

21          A    Good question.  Yes, there are many

22     contracts that I was not able to bid on that

Page 335

1      colleagues of mine did, and they did well based

2      on my recommendations.

3              I know several people that are now

4      doing well at this area, like folks at

5      Cynnovative, Def-Logix and Kudu.  While they also

6      do AI or cyber work, they also do cyber AI work,

7      and much of the work -- some of the work that

8      they've done over the years and been very

9      successful with multimillion-dollar contracts are

10     based on conversations that we've had.

11             I could have been the person that bid

12     on those contracts and won those contracts

13     because this is an area where I literally founded

14     the field, but I've been unable to do so.

15     Q    I'm blanking.  I really -- I had a good

16     one, and it really just ran out of my head.  Let

17     me see if I can find it.  I'll just ask you a few

18     other questions.

19             Do you know Ian Crone?

20     A    I do.

21     Q    Who is he?

22     A    He is a -- oh, I believe he's a

Page 336

1    director at DARPA.  I'm not sure of his exact

2    title.

3         Q    Have you ever spoken with him?

4         A    I have.

5         Q    Have you talked to him about this

6    lawsuit?

7         A    No.

8         Q    Have you talked to him about the

9    substance of this lawsuit?

10        A    No.

11        Q    What, if anything, to your knowledge,

12   would Mr. Crone know about your debarment?

13        A    Ian Crone was a contract that Dan Brown

14   had.  He was also the audience when I discussed

15   the update on the mathematics in February of 2020

16   at the Aerospace Corporation.

17              I believe Dan Brown often talked to him

18   about -- about these projects just to kind of

19   sanity check whether or not he believed -- you

20   know, as somebody at DARPA believed that the

21   technology was possible.  When the projects were

22   canceled, Dan Brown did mention that he had

EXHIBIT 1
www.CapitalReportingCompany.com
Page 553 of 639
202-857-3376

Roysdon Fact Witness_000336

Page 337

1       mentioned this to folks at DARPA.  I would assume

2       that it was Ian Crone.

3               I had a meeting with Jim Carlini and

4       Ian Crone, I believe sometime in the '22 or '23

5       time frame.  It would have been in the -- I don't

6       remember, actually, which -- which time of year

7       that was.

8               He mentioned at that meeting the Air

9       Force work that I had done.

10          Q    Ian mentioned, Ian --

11          A    Ian did.

12          Q    -- Crone?

13          A    Yeah.  And he mentioned it with some

14      skepticism.  I say that because Jim Carlini, who

15      was a former DARPA director and had seen the work

16      and seen it operate successfully, in essence,

17      came to my defense during that conversation.  I

18      forget the details of the conversation and the

19      goals of that conversation, but it was, in

20      essence, something where Ian had worked for Jim

21      Carlini many years ago, and it was a way to have

22      a conversation with an old colleague, introduce

EXHIBIT 1
www.CapitalReportingCompany.com
Page 558 of 689
202-857-3376

Roysdon Fact Witness_000337

Page 338

1       Jim Carlini's budding expert in cyber AI, and see

2       if Ian Crone wanted to be involved in it.  Ian

3       Crone at the time said he was not interested.

4              Q    Did the --

5              A    I don't know why.

6              Q    Okay.  Perfect.  That cuts out that

7       question.

8                   Who's Paul Rivera?  And if you want to

9       pull your initial --

10             A    CEO --

11             Q    -- disclosures, which is Exhibit 6,

12      back.

13             A    CEO at Def-Logix.

14             Q    Okay.  Do you -- are you still in

15      contact with Mr. Rivera?

16             A    No, ma'am.  He was the person that was

17      present when I first met Dan Brown.

18             Q    And you've not spoken with him about

19      this lawsuit?

20             A    No.  The last conversation he and I had

21      was sometime in late 2020, and he had mentioned

22      that the projects that he was involved in, the

Paul Roysdon , Ph.D.                                    May 30, 2025

Page 339

1       Fibonacci projects, had been canceled.  He said

2       he didn't know why.  I said I didn't know either.

3            Q    How about Matt Monte from Kudu?

4            A    What about him.

5            Q    Do you know him?

6            A    Yes, I do.

7            Q    I remember my question.  Do you know

8       that Leidos is acquiring Kudu?

9            A    Yes, ma'am.

10           Q    Is that going to expand Leidos' role in

11      the cyber AI field?

12           A    Yes, ma'am, it is.

13           Q    Did you have any role in helping to

14      facilitate that?

15           A    Before leaving Leidos?

16           Q    Yes.

17           A    I would say that I had some cursory

18      influence.

19           Q    And that means what?

20           A    They are experts in the field of

21      offensive cyber, and I've worked with them

22      previously.

EXHIBIT 1
Page 558 of 639
www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000339

Paul Roysdon , Ph.D.                                    May 30, 2025

Page 340

1          Q    And I'm assuming you liked working with

2     Kudu?

3          A    They are some of the best.

4          Q    Okay.

5          A    I like working with technically

6     excellent people.

7          Q    That makes sense.

8               Have you ever spoken to Matt Monte

9     about this lawsuit?

10         A    No, I don't -- I don't believe so.

11         Q    And have you ever spoken with him about

12    the substance of this lawsuit?

13         A    No, ma'am.

14         Q    Are you in contact with Matt Monte

15    today?

16         A    Yes, ma'am.

17         Q    In what capacity?

18         A    Colleagues.

19         Q    Okay.  Do you interact regularly with

20    him?

21         A    Not regularly, no.  He's -- he's a

22    brilliant person, and I like talking and

EXHIBIT 1
www.CapitalReportingCompany.com
Page 559 of 639
202-857-3376

Roysdon Fact Witness_000340

Paul Roysdon , Ph.D.                                    May 30, 2025

Page 341

1      collaborating with brilliant people.

2          Q    Peter Highnam.  I'm probably saying

3      that wrong.

4          A    Peter Highnam.

5              THE REPORTER:  Can you spell it?

6              MS. SEEMAN:  Yes.  H-I-G-H-N-A-M.  And

7      if you have your initial disclosures, he's No.

8      11.

9              MR. HENRY:  Exhibit 6.

10             MS. SEEMAN:  Exhibit 6, No. 11.

11             THE WITNESS:  Yes.

12     BY MS. SEEMAN

13         Q    Who is Mr. Highnam?

14         A    When I met him, I was introduced to

15     him -- let's see.  When I met him, he was the

16     director at DARPA or deputy director at DARPA.  I

17     can't recall.  Jim Carlini introduced me to him

18     in a phone call.  I never met him in person.

19             Jim introduced the research that I was

20     leading at Leidos.  Peter was very interested and

21     recommended that Jim and I talk to several of

22     Peter's colleagues.  Peter was on -- was actually

EXHIBIT 1
www.CapitalReportingCompany.com
Page 560 of 689
202-857-3376

Roysdon Fact Witness_000341

Paul Roysdon , Ph.D.                              May 30, 2025

Page 342

1    exiting DARPA at the time to take a new position

2    in the UK, basically as their -- as the director

3    of their DARPA, as I recall, and one of the names

4    that Peter recommended talking to was Ian Crone.

5    It's a small community.  Again, this is why

6    reputation matters in this community.  It is a

7    small community.

8         Q    Do -- are you aware of what reputation

9    Peter Highnam believes you have in the field?

10        A    I think, based on his high esteem for

11   Jim Carlini, he probably holds me in the same

12   esteem.

13        Q    And earlier you mentioned Ian Crone was

14   a little skeptical of the work that you did at

15   HNCO.

16        A    Yes, ma'am.

17        Q    You don't know what that skepticism is

18   based on, correct?

19        A    No.  I can only infer based on the

20   conversations I had with Dan Brown that it had

21   something to do with the Fibonacci projects.

22        Q    Okay.  You didn't talk about any issue

EXHIBIT 1
Page 561 of 639

www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000342

Page 343

1      with the Fibonacci projects with Mr. Crone,

2      though, did you?

3           A    No, ma'am.

4           Q    Christine Uptain, she's No. 19.

5               Who is Ms. Uptain?  And that's

6      U-P-T-A-I-N and Christine with a C.

7           A    Associate general counsel, National

8      Security Agency.  I believe -- I don't recall.

9      Well, she's associate general counsel at National

10     Security Agency.  That's who she is.

11          Q    Did you ever talk to her?

12          A    I don't recall.

13          Q    In your second amended complaint at,

14     for example, paragraph 238, it mentions her.

15     Page 41.

16          A    Uh-huh.

17          Q    So what is -- this is a terrible way to

18     ask this.  What's your knowledge of her knowledge

19     of this lawsuit?

20          A    My knowledge of her knowledge is that

21     someone at Air Force reached out to her and Amy

22     to gain some information about my employment at

Paul Roysdon, Ph.D.                                    May 30, 2025

                                                    Page 344

1       NSA.

2             Q     Okay.  Other than that -- or, I guess,

3       is that the extent of her involvement in this

4       case?

5             A     I don't know.

6             Q     Okay.  To your knowledge, is that the

7       extent of her involvement?

8             A     To the best of my knowledge, yes.

9             MS. SEEMAN:  Okay.  Let me just check

10      my notes quickly.  All right.  I don't think I

11      have anything else, so --

12            MR. HENRY:  Nothing from me.

13            THE REPORTER:  Would you like to read

14      and sign?

15            MR. HENRY:  Yes.

16            THE REPORTER:  Would you like a copy?

17            MR. HENRY:  Yes.

18            (Whereupon, at 6:30 p.m., the

19            deposition of PAUL ROYSDON, PH.D.

20            was concluded.)

21

22                        *  *  *  *  *


EXHIBIT 1
Page 562 of 639
www.CapitalReportingCompany.com
202-857-3376
Roysdon Fact Witness_000344

Paul Roysdon , Ph.D.                                           May 30, 2025

Page 345

1              CERTIFICATE OF NOTARY PUBLIC

2          I, ERICK M. THACKER, the officer before whom

3      the foregoing deposition was taken, do hereby

4      certify that the witness whose testimony appears

5      in the foregoing deposition was duly sworn by me;

6      that the testimony of said witness was taken by

7      me in stenotype and thereafter reduced to

8      typewriting under my direction; that said

9      deposition is a true record of the testimony

10     given by said witness; that I am neither counsel

11     for, related to, nor employed by any of the

12     parties to the action in which this deposition

13     was taken; and, further, that I am not a relative

14     or employee of any counsel or attorney employed

15     by the parties hereto, nor financially or

16     otherwise interested in the outcome of this

17     action.

18                   ERICK M. THACKER

19             Notary Public in and for the

20                 District of Columbia

21     My commission expires:

22     June 30, 2029

EXHIBIT 1
www.CapitalReportingCompany.com
Page 564 of 639
202-857-3376

Roysdon Fact Witness_000345

Page 346

1               ACKNOWLEDGMENT OF DEPONENT

2       I, PAUL ROYSDON, PH.D., do hereby acknowledge I

3       have read and examined the foregoing pages of

4       testimony, and the same is a true, correct and

5       complete transcription of the testimony given by

6       me, and any changes or corrections, if any, appear

7       in the attached errata sheet signed by me.

8

9

10

11

12

        ----------------              --------------------

13      Date                          PAUL ROYSDON, PH.D.

14

15

16

17

18

19

20

21

22      Job No. CS7396796

Page 347

1    Lance Henry, Esq.

2    lhenry@allen-vellone.com

3                          June 13, 2025

4    RE:    Roe, John v. United States Of America Et Al

5         5/30/2025, Paul Roysdon , Ph.D. (#7396796)

6         The above-referenced transcript is available for

7    review.

8         Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12        The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   erratas-cs@veritext.com

16    Return completed errata within 30 days from

17   receipt of testimony.

18     If the witness fails to do so within the time

19   allotted, the transcript may be used as if signed.

20

21

22                   Yours,

23                   Veritext Legal Solutions

24

25

Page 348

1   Roe, John v. United States Of America Et Al

2   Paul Roysdon , Ph.D. (#7396796)

3              E R R A T A   S H E E T

4   PAGE_____ LINE_____ CHANGE_____

5   _____

6   REASON_____

7   PAGE_____ LINE_____ CHANGE_____

8   _____

9   REASON_____

10  PAGE_____ LINE_____ CHANGE_____

11  _____

12  REASON_____

13  PAGE_____ LINE_____ CHANGE_____

14  _____

15  REASON_____

16  PAGE_____ LINE_____ CHANGE_____

17  _____

18  REASON_____

19  PAGE_____ LINE_____ CHANGE_____

20  _____

21  REASON_____

22

23  _____    _____

24  Paul Roysdon , Ph.D.                            Date

25

**&**

**&** 2:3

**0**

**00000015** 3:8
**00000100** 3:9
**00000108** 3:14
**00869** 1:5
**026** 3:8
**056** 3:18

**1**

**1** 3:7,12 64:12
  64:13 90:16
  121:10
**10** 4:4 128:22
  161:17 258:2
  284:10,11,12
  284:22,22
  285:2
**100** 114:16
**103** 128:22
**106** 3:9 114:16
**1099** 26:19
  34:10 36:19
  39:3,8 53:22
  57:9 70:13
  112:4 138:19
**10:43** 1:13
**10x** 103:12,13
**11** 4:5 258:2
  284:11,16,18
  287:4,22 288:3
  341:8,10
**114** 3:9
**116** 3:10
**12** 4:7 29:10
  132:19 293:16

293:19,22
298:1
**12/31/2020**
  124:11
**121** 3:12
**123** 3:13
**12:21** 90:13
**12:47** 90:13
**13** 118:18
  120:1,2 164:22
  347:3
**132** 3:15
**13397** 345:17
**134** 3:17
**13th** 82:9 133:8
  143:13 149:15
  149:17,20
  150:14 158:21
  167:12 170:9
  174:2 180:22
  197:1 229:13
  231:12,14
  332:10
**14** 9:22 29:15
  135:21
**14th** 133:8
  143:13 144:10
  149:20 158:21
  167:12 204:17
  260:9 332:10
**15** 10:10 64:20
**156** 325:16
  326:10 327:6,8
**159** 3:19
**15th** 92:19
**16** 136:10
  200:18 202:10

**1600** 2:4
**17** 82:5 201:21
**175** 1:14
**18** 10:18,19,20
  31:3,7,22 83:3
  84:17,19 92:4
  93:18 107:15
  120:11
**19** 64:20 84:19
  86:9 109:1
  121:12,15
  343:4
**1900** 2:4

**2**

**2** 3:9 53:20,20
  114:14,17,20
  117:3,6 123:1
  123:8,10 124:3
  128:22 138:6
  217:10,10,13
  217:13,15,15
**20** 64:20 84:19
  85:6 98:3
  118:17,20
  120:1,12 312:9
**200** 112:21
**2000** 161:16
  166:6
**20002** 1:15
**20044** 2:11
**2015** 29:5
**2017** 32:20
**2018** 45:8
  299:18,22
**2019** 3:10,11
  3:12,12 28:22
  30:6 32:20

34:2 45:8 65:7
73:1 74:13
79:19 82:9
88:6 90:1,20
92:19 115:6
117:21,21
118:8,8 121:10
121:11 124:2
134:9 135:17
136:20 137:2
137:21 142:15
142:20 158:10
158:16 210:17
247:5,6,8,22
**2019-003** 3:9
  3:14
**2020** 17:18
  19:13 28:22
  30:6 32:21
  33:16,20 34:3
  63:15 88:6
  90:1 124:14
  125:2,10 133:8
  133:16 139:8
  142:15,16,19
  143:13 144:12
  149:18 158:10
  158:16,20,21
  160:13 167:13
  174:12 175:17
  177:6 178:16
  179:15 180:20
  180:22 197:3,4
  203:16 204:8
  204:17 208:19
  209:3,5 210:12
  210:17 212:12
  213:5,7 228:2

**EXHIBIT 1**
**Page 568 of 639**
www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000349

246:19 247:4
247:11,22
252:15 260:9
306:17 319:8
332:10 336:15
338:21
**2021**  248:2
307:3,6 308:12
**2022**  56:17
179:2 236:12
248:5 295:11
307:8,12
**2023**  248:7
264:1 295:8,11
307:15,16
**2024**  131:18
248:9 307:19
**2025**  1:12
17:20 33:21
248:11 307:22
308:12 347:3
**2029**  345:22
**203**  107:15
**205**  93:18
**21**  19:14 65:7
73:15 118:13
121:20 178:16
257:12
**218**  118:2,22
119:8
**218's**  118:4
**21st**  74:13
**22**  79:17 90:18
118:20 120:9
179:3 337:4
**227**  3:20
**23**  72:18 337:4

**238**  343:14
**239**  3:21
**24**  65:3
**25**  65:20
**26**  3:16 64:20
132:17
**260**  118:18,22
119:5,5 120:2
**26710**  9:11
**269,000**  334:11
**26th**  227:8
**27**  325:16
327:5
**271**  19:7
**28**  135:17
**284**  4:4,5
**28th**  228:1
**293**  4:7
**2:02**  151:11
**2:03**  152:4
**2:43**  153:2

**3**

**3**  3:10 14:7,9
115:15 116:19
116:21 117:17
117:17 121:14
123:9 135:16
**3/10/81**  10:4
**3/18/24**  316:1
**30**  1:12 122:5
124:10 151:19
152:3 345:22
347:16
**302**  19:19
**303**  285:1
**304**  4:4

**31**  3:12 121:10
133:16
**331**  288:3
**332**  4:6
**390**  122:7
**3rd**  115:6

**4**

**4**  3:12 121:2,4
121:7 132:19
217:11,13,15
300:15
**40**  52:22
120:12 134:19
221:19 222:12
229:22 241:17
242:3 330:21
**41**  343:15
**44**  10:6
**4481**  10:2
**45**  134:20
219:1
**450**  331:17,17
**46**  214:21
**47**  220:13
302:17,21
**4:16**  240:1
**4:29**  240:1
**4th**  137:21

**5**

**5**  3:3,11,13
117:21 123:15
123:18,22
124:1 135:18
331:13
**5/30/2025**
347:5

**50,000**  19:12
**52**  220:17
**520,000**  19:18
**53**  137:9,10
212:22
**54**  137:10
**55**  134:18,21
**56**  134:20
**56,680**  118:22
**5:22**  1:5
**5:47**  315:2
**5:55**  315:2
**5th**  118:8

**6**

**6**  3:15 115:2,11
132:7,9 138:6
200:16,17
261:3 338:11
341:9,10
**6/3/19**  138:6
**6/3/2019**  115:4
**6/4**  137:18
**6/4/19**  137:20
**60,000**  246:20
**64**  3:7
**6:30**  344:18

**7**

**7**  3:10,17 117:3
117:21 134:12
134:13 145:9
149:1 194:9
217:8 241:17
242:3
**7146**  2:10
**7396796**  347:5
348:2

**78**  160:2,12
179:8,12
**78006**  9:11
**7th**  1:14 118:7

**8**

**8**  3:19 159:18
159:19 161:17
166:7
**80**  330:20
331:19,22
**80202**  2:5
**85,020**  122:10

**9**

**9**  3:20 73:1
227:12,13,22
**94,000**  29:18
331:2
**9th**  79:19 90:20

**a**

**a.m.**  1:13
**abides**  313:7
**abilities**  279:8
**ability**  7:22
14:21 270:12
279:3 319:6
320:2,5
**able**  8:3 33:8
71:11,13 72:12
84:20 105:6
109:7 215:8
230:4 248:16
249:3 256:8
262:18 267:20
270:13 287:12
309:15 312:15
316:12 317:19

318:4 319:8,13
320:20,22
321:3 324:9
334:22
**above**  53:10
71:1,18 347:6
**absolutely**
102:3 203:14
209:7 224:14
237:9 239:18
320:7 332:1
**abuse**  178:6,10
178:19 236:17
**academics**
143:2
**accelerator**
20:1,3,5,11
**acceptable**
79:10 86:7
**accepted**  219:3
**access**  72:8,9
127:16,20
135:4,9 136:17
137:6,12,13
148:21 195:4
201:11,19
202:12 217:17
219:14,21
225:20 226:1,3
226:22 227:16
229:18,19
241:6 244:6
252:16 263:10
314:6,22
**accidently**
192:13
**accomplishm...**
208:18

**account**  57:15
**accounted**
331:11
**accuracy**  347:9
**accurate**  97:14
118:4 179:13
218:5 219:6,15
222:17 225:15
280:7 293:10
299:22 301:15
304:20 315:9
315:10 316:2,6
**accusation**
256:1 291:3,4
**accusational**
181:16 182:2,5
183:4
**accusations**
235:21 255:9
**accused**  327:21
328:1
**accusing**  129:3
328:2
**achieve**  99:4
**acknowledge**
346:2
**acknowledging**
79:14
**acknowledg...**
346:1 347:12
**acquire**  142:11
142:17,22
**acquired**  129:8
**acquiring**
140:21 339:8
**acquisition**
139:7 141:22

**acquisitions**
14:16,17 16:19
140:14 319:19
**acronym**  40:2
113:20
**act**  53:20 123:8
123:9,10 195:6
240:14,22
242:15 243:4
325:2,10
**acting**  107:16
**action**  345:12
345:17
**actively**  305:1
**activity**  3:17
**actual**  232:16
**actually**  17:16
18:15 20:21
35:15 38:6
57:17 65:9
66:11 78:3
84:14,19,21
107:13 122:20
132:6 142:9
146:3 151:14
170:11 225:1
226:10 239:16
242:6 244:17
255:5 264:12
271:5 275:19
281:4 288:9
292:9 295:6
305:6 319:4
337:6 341:22
**acumen**  280:5
**add**  113:13
**addition**
217:10

**additional**
78:10 109:20
145:22 228:13
**additionally**
98:9
**address** 9:10
37:10 54:17,21
54:22 55:4
56:12 241:14
319:2
**adjectives**
194:15
**adjudication**
329:2,4
**adjust** 333:4
**admin** 65:4
**admission**
109:9
**adopted** 175:5
**advance**
259:10
**advanced**
62:15
**advancements**
104:10
**advancing**
57:16
**adversaries**
45:5,22 46:3
161:7
**adversary**
216:22
**adverse** 235:5
**advice** 52:11
83:14 102:20
104:4,6,8
110:11 161:20
262:2 294:3

**advise** 54:2
**advised** 39:13
39:14 40:9
262:1
**advising** 39:19
39:21 40:4
72:4,5 148:11
**advisor** 65:15
80:20,21
102:21,22
**aeroanalysis**
37:7 43:20
57:2
**aerospace**
63:16 180:1
336:16
**afcyber** 4:7
299:20 302:7
**affect** 7:22
**affecting** 92:14
**affiliated** 61:3
239:1 272:19
**affiliation**
180:16 205:22
206:2,6,14,21
**afoul** 110:6
279:5,22
**afrl** 53:18
**age** 10:22
**agencies** 22:15
31:3,14 32:1,2
63:6,19 142:10
142:17 143:2
154:13 253:21
258:7,9,13
309:5,8,16
310:11,13
320:22

**agency** 14:3
22:11 28:14
35:4 45:17
93:22 110:11
110:12 207:4,6
230:18 250:16
251:20 252:9
315:8 343:8,10
**agenda** 237:7
285:4
**agent** 107:17
195:7 198:7
199:17 209:17
211:17,21
212:7 213:20
214:9 216:3
221:16 223:22
225:4 227:8
228:1,5,14
229:17 242:18
243:2,7,8
325:7,8 327:15
327:19
**agents** 209:12
**ages** 10:17
**aggressive**
181:15 183:14
183:16
**aggressively**
150:6 181:3,14
**ago** 5:21 17:20
36:17 37:9
43:4 263:2
337:21
**agree** 186:20
**agreed** 115:21
331:7

**agreement** 3:9
3:14 112:15
114:21,22
115:5,8,9,12
115:17,22
116:6 117:6
122:22 123:1
124:2 129:9
135:6 137:14
137:15 333:19
334:1
**agreements**
38:22 146:20
**ahead** 28:10
30:17 64:11
106:18 113:11
113:12 137:19
209:13 284:16
324:17
**ai** 15:5 18:11
18:12,13 20:1
20:2,11,12,15
21:6,8,16,21
22:21 23:18
25:17,18,22
27:8,20 30:11
30:13,22 37:12
40:11 41:6
44:1,11,13
45:13,18,20
46:19 48:12
51:12 54:3
56:9,9 69:15
69:17,22 89:19
114:5 127:3
129:20 139:18
139:19 140:4,5
140:21 142:11

EXHIBIT 1
Page 571 of 638

Roysdon Fact Witness_000352

142:17 143:1
238:1,5 253:10
253:10,11,16
253:20 254:1
270:22 271:8
271:14 282:18
293:5 309:13
311:9,15
316:18,19
317:13,20,21
317:22 318:5
318:14,15
319:7 320:2,13
320:13 321:13
321:15,16,18
323:8 334:19
335:6,6 338:1
339:11
**aidednav** 55:6
55:9 57:6,9,10
57:11
**air** 39:21 40:4
40:13 48:7,8
48:22 49:3,6
51:14 52:21
53:17,18 54:2
54:8,11 57:20
59:19 60:2,12
62:20 63:4,8
65:14 67:19
72:16 74:16,19
77:6 80:3,11
80:19 82:10,13
82:14,19 83:5
84:2,13 87:4
87:20 88:7,8
90:22 91:14
95:8,14,20

97:3,20 98:20
99:4,9,16
100:17 101:6
101:11 102:9
103:17 104:6
105:1,20 106:5
113:4 125:2
128:10 138:22
139:7,10,15
141:21 142:1,5
145:3 146:20
147:9 154:9
156:5 162:17
162:22 164:20
168:22 171:21
177:15 188:8
191:20 194:5,7
194:10 195:7
198:6,15 199:8
199:8,11,12,13
199:16 201:12
204:11 205:6
209:11,17
213:1 224:4
234:16 243:7,8
244:7,19 245:3
249:22 250:1
258:16,17
263:14 270:21
277:17 286:15
288:10 289:16
302:9 319:10
319:15,16,20
325:10 337:8
343:21
**al** 1:6 347:4
348:1

**alerted** 96:4
**algorithm**
23:12,14 70:20
103:10,12
**algorithms**
27:2 39:19
45:10,11 51:13
68:6,17 69:7
72:1 77:8,10
81:20,22 91:6
99:14 101:13
102:18 217:4
**allegation**
315:5
**allegations**
266:6 328:13
328:16,18
**alleged** 324:2
**allen** 2:3,5
59:13 166:15
167:5 202:19
202:22 274:9
274:11 276:9
276:12 347:2
**allotted** 347:19
**allowed** 15:21
15:22 52:19
54:22 81:4,5
81:10 87:4
99:8 100:16
186:21 187:1
218:3 293:9
**alluded** 322:13
**amended** 3:19
12:8,8 150:17
150:18 159:13
159:17 195:5
204:19 237:22

260:12 274:10
293:8 315:4,13
315:15 323:13
323:13 324:14
325:13 343:13
**amendment**
204:19
**america** 347:4
348:1
**american**
114:9 178:5
211:2 279:19
**amount** 122:10
125:20 205:6
**amy** 52:7 53:7
71:8 72:19
74:17 80:8
83:17 85:2
89:4 94:17
95:1 97:10
100:15 102:4
102:17 105:15
106:20 108:1
111:1 197:15
198:11 207:2
209:2,12
210:12 220:7
223:18 241:3
343:21
**amy's** 85:7
90:19
**analogous**
110:1
**analogy** 81:18
95:18
**analysis** 14:16
68:13,14,18
330:5

**EXHIBIT 1**
**Page 572 of 638**
www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000353

analysts   68:16
analyze   103:12
analyzing
   103:11
angered   168:6
announcement
   22:12 286:6
   287:6,11,12
   288:5
annual   19:7
   29:16 114:3
annually
   324:22
answer   7:6,12
   7:18 26:8
   100:17 110:18
   111:3 172:11
   175:22 201:22
   202:2,10 214:9
   267:18 307:4
   307:10 328:3
answers   6:19
anticipate
   89:10
anticipated
   124:15
antonio   1:2
   32:19 40:7
   148:13 154:17
   169:12
anybody   48:2
   50:13 51:17
   53:11 54:11
   59:2 90:4
   98:20 125:12
   127:16 129:7
   143:7,12 145:3
   145:6 153:12

156:5 169:19
170:1 184:9,11
191:19 199:8
199:10,12
208:20 213:1
228:18 233:7
261:19 262:9
267:12,16
268:13,16
269:8,12,21
271:21 272:9
333:11
anymore   162:3
apparently
   161:11 164:8
   168:6 194:4
   227:17 229:16
appear   346:6
appearance
   191:13
appears   287:8
   345:4
applaud
   248:13
applauded
   263:7
applicable
   347:8
application
   70:19 71:1
   147:21
applied   183:10
apply   99:2
   306:21
applying   95:6
   317:1
appointment
   18:5 255:10,15

appreciated
   261:13
approach
   23:10
approached
   76:22 77:6
   94:9 150:6
   181:4,10,15
appropriate
   100:5 256:20
   324:19
appropriately
   107:2 210:21
approval   62:20
   76:6 78:4 85:1
   90:5,8 223:9
   225:9
approve   52:16
   52:17
approved   53:6
   76:8 136:17
   155:12 156:8,9
   156:12,20
   157:1
approximately
   148:17 246:16
   247:3
april   73:1
   79:19 90:20
   92:19 210:16
aql   301:19,21
architect   18:12
   253:9,10
   258:12 320:13
architecture
   20:12 253:11
area   27:14,15
   237:20 282:22

283:1,2 334:18
335:4,13
areas   56:7,8
   253:5,7 270:7
arena   319:14
argue   182:15
   182:15 200:6
argument   99:1
army   258:10
   258:10 289:14
   309:21
arranged   49:4
   53:13,15
arrangement
   80:2 85:8
   224:6 333:16
   333:18
arrangements
   75:13 111:22
   145:2 147:3,4
arrive   183:6
   280:18
art   104:19
   178:8
article   128:22
aside   190:7
   272:13 276:6
   297:9 334:17
asked   17:10
   49:5 50:9 52:2
   63:12,15,20
   70:4,7,9,12
   74:9 78:2 88:2
   91:13,21
   100:21 106:7
   108:13 112:3
   112:10 113:16
   133:11 143:11

Roysdon Fact Witness_000354

143:14,16,17
153:15 156:4
156:16 160:14
161:9,19,20
165:19 209:19
212:1 214:13
244:12,17
253:5,19 254:2
258:14,15
259:14 260:18
261:21 263:10
280:18 285:14
285:17 290:13
292:6 299:2,3
301:10 319:22
330:12,18
**asking** 46:11
71:4,15 79:13
87:21 89:15
118:21 119:4
131:8 142:7
155:22 160:22
242:22 253:21
267:6,7 283:12
294:3 323:12
333:20
**aspect** 281:11
313:8
**aspects** 71:22
264:16,17
282:14
**assessment**
161:21 162:8
165:14,15
167:4 172:18
173:8,21,22
174:18 177:18
290:16 329:13

**assigned**
116:13
**assignment**
14:20 15:1,2
28:18 30:6
32:13 89:2,11
154:17
**assist** 42:5
149:2
**assisted** 20:11
149:9,10
176:17 308:21
**assisting** 68:16
**associate** 343:7
343:9
**associated** 57:1
61:2 113:7
238:7 321:2
**assume** 7:12
273:19 323:1
337:1
**assuming**
124:12 340:1
**assumption**
201:10 273:2,2
273:13 332:5
**assumptions**
321:17
**attached** 4:22
220:12,13,19
241:16,20
318:7 346:7
347:11
**attachment**
124:6
**attachments**
134:19 242:3

**attack** 23:9
150:5,20
183:13 189:19
**attacked** 150:2
150:5
**attacking**
23:13
**attacks** 23:15
196:2 217:7
**attempt** 150:20
305:6,8
**attempted**
327:15
**attend** 50:11
99:16,18
285:11,14,18
288:6 289:21
290:4,9,11
291:18,19
**attended** 11:2
290:21
**attendees**
287:17
**attention** 65:3
72:18 79:17
86:9 90:16
93:16 107:13
109:1 118:13
128:21 132:18
159:22 179:8
227:21
**attorney** 5:13
107:17 153:13
190:7 236:14
243:11 294:12
294:14 295:1
333:12 345:14
347:13

**attorneys** 2:14
12:12,15
228:19 299:11
333:14 334:5
**audience** 63:13
264:2 336:14
**august** 133:8
133:17 143:13
144:10,12
149:15,17
150:14 158:20
158:21 165:17
166:11 167:12
167:18 170:9
174:2,11
175:17 177:6
180:22 197:1
203:15,16
204:8,17
208:19 209:3,4
210:12,17
212:11 213:5,7
227:9 228:1
229:13 231:12
231:14 252:15
257:10 260:9
332:10,12
**authoring**
155:16 188:3
**authorization**
333:6
**authorize**
129:6
**authorized**
85:3 250:2
**automatically**
323:1

**EXHIBIT 1**
www.CapitalReportingCompany.com
**Page 574 of 683**
202-857-3376

Roysdon Fact Witness_000355

**automation**
  47:18,19 51:12
  161:19
**automotive**
  282:22
**autonomous**
  81:21
**available**  26:2
  125:19 164:13
  211:3 256:21
  261:10 347:6
**average**  114:10
**avoid**  82:11
  148:5 150:13
  151:4,8 189:16
  191:13 192:18
**avoiding**
  175:18 199:4
**award**  3:10,12
  119:11,15,17
  120:3 121:8
  122:8,10
  238:12 239:4
  310:20 311:4
**awards**  14:18
**aware**  103:22
  107:14 113:3
  144:4,21 145:4
  145:9,22 147:8
  172:1 173:20
  177:18 204:10
  204:12,14,21
  205:4 232:15
  232:18 234:16
  240:9 242:4
  245:18 247:21
  273:21 306:1,4
  311:14 342:8

**awareness**  64:7
  285:16 302:1

**b**

**b**  3:5 4:2
  103:12 160:6
  160:16 162:16
  165:11 167:1,5
  170:14 171:2
  171:19 172:4
  172:17 173:3,9
  175:5,15
  177:18,20
  178:2,11
**baa**  22:11,19
**bachelor's**  11:8
**back**  6:21
  20:21 53:6
  54:7 56:11
  68:20 74:2
  82:7 84:14,21
  89:21 90:16,18
  92:6,16 95:17
  95:20 96:12
  97:11 105:4
  107:9 121:14
  122:21 123:16
  124:8 128:21
  130:2 134:17
  136:20 138:8
  154:17 168:19
  170:11 177:17
  179:8 200:11
  200:14 204:8
  211:19 219:1
  227:4 231:4
  235:4,21 238:8
  238:8 239:13

242:6 248:12
  264:12 269:20
  288:9 289:17
  305:15 316:17
  320:11,20
  338:12
**background**
  51:11 69:9
  181:22 251:3
  261:1 293:1
**backgrounds**
  110:3
**backseat**  176:1
**backwards**
  64:21
**bad**  226:10
  274:7 276:1,10
  277:2,9,12
  322:4
**banks**  13:10
**bar**  210:8
**barebones**
  302:19
**barred**  315:6
**base**  19:18
**based**  35:19
  48:19 57:3,6
  77:9 86:5 87:1
  99:7 102:15
  104:3,9 113:17
  124:16,20,20
  124:21 161:21
  164:3,18
  165:19 172:9
  174:17 182:18
  183:16,18
  194:13 210:1
  228:12 241:2

275:10 279:3
  292:1 329:16
  329:22 332:5,6
  335:1,10
  342:10,18,19
**basic**  67:6
**basically**  35:10
  52:12 239:2
  271:7 292:4
  342:2
**basis**  240:14
  242:12,17
  266:7,10
  275:21 276:8
**bates**  64:19
  65:3,20 72:18
  79:17 82:5
  85:6 86:9
  90:18 114:16
  122:14 128:22
  134:18,20,21
  137:9 220:13
  285:1 288:3
  293:17
**battle**  295:10
**beall**  212:7
  213:20 214:9
  216:3 217:21
  221:16 223:22
  225:4 227:8,17
  228:1,5,14
  229:17 243:2
  325:7,8 327:19
**bear**  261:16
  303:13
**bearing**  297:15
  330:2

Roysdon Fact Witness_000356

**beat** 45:22 225:14
**beginning** 194:10
**behalf** 2:2,7 39:21 40:3 94:2 96:13 114:11 161:1 292:19 317:6
**behavior** 277:18
**belief** 275:22 276:9 328:8
**believe** 17:8 53:20 58:7 63:14 64:20 65:18 115:9 123:6,7 133:8 160:1 163:2 170:9 187:20 200:16 212:21 236:19 240:21 243:17 259:20 259:22 260:7 263:15 280:10 280:15 282:8 282:12 287:1 292:20 293:6 320:1 325:9 327:13 332:16 335:22 336:17 337:4 340:10 343:8
**believed** 336:19,20
**believes** 192:20 274:6 277:2,9 342:9

**ben** 2:10
**beneficial** 253:18
**berger** 286:16
**best** 7:3 8:16 23:21,21 46:1 134:22 154:7 169:18 211:3 340:3 344:8
**better** 93:14 99:1 173:3 183:9 200:10
**beyond** 216:4
**bid** 35:22 36:4 41:17 249:9,12 291:22 307:5 307:11,16,19 308:1,5,15 309:2 310:15 334:22 335:11
**bidding** 314:14
**bids** 310:11
**big** 283:3,4,4,5 329:10
**bigger** 283:3
**bill** 331:22
**billing** 113:7
**birth** 10:3 197:13 241:13
**bit** 30:15,19 49:12 64:10 82:6 92:7 109:2 130:9 155:14 162:6 174:9 181:2 211:5 239:13 248:22 261:1 268:13

**black** 182:11
**blanking** 335:15
**blew** 257:10 260:11
**blowing** 211:5
**blue** 231:16
**blurring** 96:16 148:5
**board** 53:10
**boards** 15:21 16:5
**bob** 205:16,19
**body** 128:15 182:3,6
**boerne** 9:11
**bold** 85:6
**bonus** 19:7,10 19:12
**bonuses** 19:9
**book** 25:10,15 25:19
**books** 25:5,9 26:1 263:6
**bother** 262:1
**bottom** 79:18 84:17,18 86:10 86:12 129:1 219:2,12 287:15
**boundaries** 100:13
**bounds** 97:19
**box** 2:10 121:12,15 135:16,18 136:10,13

**bragging** 208:11
**brain** 120:15
**branch** 2:9 63:3 76:13,15 76:16,16,22 77:16 90:3
**branches** 107:19
**break** 7:16,19 23:2 52:20 54:5 151:19 152:3 153:12 162:5 239:17 306:8
**brian** 288:20
**bridges** 201:21
**brief** 64:4 84:7 139:3
**briefed** 157:14 157:16 274:14 274:16
**briefing** 81:9 83:12 160:13 167:17,18 179:15 180:2 181:5,7 229:13 253:15 305:2 305:16,18,21
**briefings** 81:3 181:6 305:4
**briefly** 250:15
**brilliant** 340:22 341:1
**bring** 11:22 75:13
**brings** 48:21

**broad**  22:11
**broader**  21:13
**broadly**  20:2
**brock**  288:17
**broker**  275:20
**brought**  30:11
  51:3 53:16,21
  58:8,12 74:5
  197:19 205:12
  213:19 223:19
  250:5 253:8
  313:21
**brown**  49:11
  49:14,19,21,21
  50:5 51:3,17
  52:2 54:8,15
  54:18 57:20,22
  58:1 59:2 61:4
  63:12 70:8
  74:15,21 75:9
  75:13 82:21
  99:13 105:3
  111:18,21,21
  125:1,11,18
  134:1 144:19
  144:21 147:2,8
  149:3,10
  150:13,16
  151:2,14 155:3
  155:4,15
  156:22 160:10
  160:14,22
  162:11 163:21
  163:21 164:1,6
  164:11,17,19
  165:6,9,10
  166:13,14
  167:3,19,22

  168:7 169:21
  169:21 173:22
  174:3,11 175:5
  176:17 184:13
  185:20 186:13
  187:5 188:6
  189:16 190:1,3
  190:11 191:9
  191:12,22
  194:19,21
  195:11 196:21
  197:5,17,22
  198:18,20
  201:18 205:11
  205:14 206:13
  208:2 209:11
  224:9,10
  228:22 229:5,8
  229:9 231:19
  232:21 233:4
  233:10 234:7
  238:2,2 239:2
  241:2,22
  242:13 243:6
  243:18 244:1
  244:12,14,18
  245:8,12 246:3
  257:14 260:18
  262:8 263:22
  267:10,13
  268:15,16,19
  270:1 272:13
  273:16 274:8
  275:7,8 282:3
  282:6 283:13
  284:1 285:17
  289:8 290:16
  290:16,20

  291:12 301:2
  303:11,19
  304:1 305:19
  305:19 328:6
  330:14 332:7,9
  333:2,7,9
  336:13,17,22
  338:17 342:20
**brown's**  95:22
  96:1,13 157:3
  164:6,10
  169:22 176:3
  290:1 292:1
  303:16
**budding**  338:1
**budget**  84:3
  161:22
**build**  68:6 77:7
  77:8 253:19
**building**  45:9
  68:17 199:18
  200:4 220:16
  226:17,22
  238:4 305:20
**built**  27:2,3
  56:10 69:13
  72:2 238:1
**bullet**  76:3,4
  109:4 110:22
  111:2,3
**bunch**  15:6
  195:4 229:16
**burghard**
  59:12 157:21
  158:5,6,16,18
  160:14 161:1
  162:8 166:15
  167:5 168:2,13

  169:7,15,20
  189:8,21
  244:19 245:8
  274:11 275:22
  276:4,18
  300:16 301:3
  301:14 302:2
  303:14,16
  304:2,8,10,19
**burghard's**
  274:14
**buried**  287:14
**business**  20:6,6
  20:14 37:19
  38:1,8,11,20
  42:21,21 56:20
  56:22 143:22
  144:2 181:13
  241:5 314:4,4
**businesses**  36:5
  36:6

**c**

**c**  2:1 3:1 4:1
  5:1 53:20
  343:6
**cage**  136:2,3,7
**calculation**
  119:6 120:3
**california**  9:17
  9:19 24:6 37:7
  37:8 43:20
  63:16 154:4
  180:5
**call**  22:15
  37:15 45:14
  49:22 53:14
  74:3 109:4

126:4 130:22
141:4 151:3
157:22 160:5
169:4 174:3
212:6 213:9,10
231:15 232:4
244:11 245:12
246:13 271:13
274:3 298:16
301:13 305:22
327:19 328:6
341:18
**called**   5:4 24:6
31:16 37:6
45:12 126:1
153:5 174:11
176:8 194:22
195:18 209:10
212:1 256:11
264:18 267:11
280:18 317:17
**calling**   45:18
165:11 207:13
267:8,9
**calls**   22:19
73:11 257:17
283:15
**calm**   184:2
**canceled**   133:7
193:20 229:15
231:18 232:1,1
232:10,19
233:2 245:13
245:14,19,22
246:4 336:22
339:1
**cancellation**
246:12,17

**capabilities**
44:18 66:19
82:3 140:18
142:18 166:6
195:21 260:21
261:4 263:9
264:18 266:21
317:7
**capability**
103:11 171:20
239:3
**capacity**   88:9
138:12 193:16
205:7 255:22
256:1,13
259:22 277:19
311:8 340:17
**captain**   143:14
150:13,19
151:6 160:6,16
161:3 163:4,16
164:17,22
165:5 168:4,6
169:13 171:22
172:2 173:18
173:20 174:4,6
174:7,15,20
175:3,6,10,12
179:16 180:3,7
180:21 181:12
184:5,17,22
185:1,2,5,20
186:11,21
187:1,11,20
188:12,15
189:14 190:5
193:17 194:15
194:17,22

195:3,9,9,12
195:17 197:6
197:18 198:5
198:16 199:2,6
201:13 202:15
228:2 235:17
237:7 240:9,12
242:16,18
243:3,5 244:18
245:6 255:7
266:5,18
267:10 269:3
274:12 276:4
277:8,10
278:11 282:1,7
289:10 324:18
325:8
**captured**
109:21
**car**   81:21 82:4
84:9,11 95:18
282:19,21
**card**   181:13
246:6
**cards**   42:21,22
112:12 130:18
143:22 144:2
**care**   192:10
326:18
**career**   213:6
**careful**   44:22
192:11,15
195:15 300:10
301:1
**carefully**   45:3
**carlini**   295:14
295:18 297:6
337:3,14,21

341:17 342:11
**carlini's**   338:1
**carries**   328:19
**cars**   282:20
**carter**   286:18
**case**   1:5 5:21
12:2 53:10
96:19 98:22
157:13 160:22
189:13 192:22
196:12 261:21
279:10 292:11
312:7 313:20
319:18 323:3
330:6 331:4
332:3,7 344:4
**cases**   108:10,10
108:11,12
186:13 275:19
279:1
**casual**   25:6
131:1,3,4
329:13
**categories**
113:6
**category**   114:5
114:6
**cause**   192:17
272:15
**caused**   323:17
**ceiling**   118:20
119:11,15,17
120:3,4,6
122:8,10
**cell**   68:15
**center**   88:8
**ceo**   313:10
338:10,13

**certain** 40:11
81:5 103:11
171:8 199:15
203:13,14
205:13 208:9
222:9 237:15
250:20 258:1
261:4 263:13
263:14 267:19
268:4 282:14
285:5 302:13
311:18 313:1
333:3
**certainly** 133:6
133:12 144:9
171:22 183:14
268:2 274:12
324:9
**certificate**
345:1
**certificates**
11:10
**certification**
313:5
**certified** 313:2
**certify** 345:4
**cetera** 68:10
160:17,17,17
161:7,8 186:1
210:7 222:9
259:15 274:12
279:6 312:12
333:2
**chain** 156:8
185:16,18
201:10 303:17
**challenged**
86:21

**challenging**
208:16
**chance** 7:5 65:9
73:3 79:20
179:9 221:20
242:1
**change** 89:6
330:21 331:1
332:19 333:5
348:4,7,10,13
348:16,19
**changed** 63:2
296:1,15
**changes** 346:6
347:10
**changing** 23:19
23:20 332:9
**channel** 198:19
**chantilly** 40:5
**character**
133:20 196:2
**characterize**
108:7
**charges** 120:6
**check** 52:4
287:16 336:19
344:9
**checking**
210:20
**chief** 18:12,12
18:13 29:22
63:3 66:9,10
68:5 76:11,15
76:16,22 77:16
90:4 158:7
253:9,10
295:16 301:4,6
301:14 320:13

**china** 148:1
161:6,6 216:21
**choice** 248:13
**christine** 343:4
343:6
**church** 40:6
**cia** 15:1 31:6
31:15 250:17
**circles** 208:9
**circumstance**
270:20
**circumstances**
81:5,8 95:7
249:20
**citations**
280:16
**citizen** 178:5
**civil** 2:9 3:16
11:12 20:7
21:20 132:17
**civilian** 135:20
289:12
**civilians** 142:1
**claim** 178:18
178:19,20
242:15,17
328:9
**claims** 132:1
133:2,3,5
194:13 240:15
**clarification**
24:7 55:8 74:8
74:20 75:1
84:5 92:11
94:7 105:17
108:14 109:16
109:18,20
218:9,11,20

278:4 309:20
**clarified** 91:8
94:20 105:15
217:21
**clarifier** 245:2
**clarify** 7:11
27:1 46:16
56:1 60:22
83:20 87:11,18
91:12,12,21
100:1 111:2
117:12 124:19
155:5 159:10
177:11 190:16
192:2 206:3
216:14 277:21
**clarifying**
67:11 94:18
100:19 110:20
110:22
**class** 155:16
**classification**
45:1 149:4
155:6,7,9
156:6,17
185:22 217:14
218:22
**classified** 33:11
46:11 49:9
54:21 63:20
117:2 127:12
135:7 147:20
154:6,8 155:10
160:13 177:9
177:12 180:2
192:13 216:13
253:14 279:4
279:21 311:20

314:19,20
**clean**  35:6
179:6 278:5
**clear**  13:3,21
22:8 26:16
44:21 45:4
62:18 66:5
81:15 83:4
84:12 108:19
109:17 110:2
129:2 138:10
138:17 187:22
188:7 223:3,16
237:6 243:13
246:18 247:8
255:12,13
262:17 267:7
300:6,13
304:14 320:8
322:16 323:16
328:10
**clearance**  71:2
71:6,9,10,10
71:11 72:12
145:11,17,18
145:21 146:22
147:5,5 197:12
222:19,21
230:11,16,16
230:19 235:4
236:6,8,11
250:9,12,13,18
250:18,19
251:5,6,11,15
251:19,20,21
252:2,6 279:19
279:21 312:18

**clearances**
35:13 76:1
**cleared**  35:9
70:18 108:17
234:21 313:19
313:21 324:1,2
324:4 326:1
**clearly**  224:3
324:5
**client**  243:11
**clock**  59:20
**close**  8:17
12:17,18 13:2
64:16 332:8
**closed**  23:14
37:8 56:20
**clue**  215:15
**cno**  68:19
**code**  126:6,7,13
126:13 127:1
136:2,3,7
300:18
**coding**  281:4
**collaborating**
341:1
**collaborations**
129:13
**collaborators**
72:3
**colleague**  8:9
27:6 265:13
295:22 296:2
297:6 298:12
337:22
**colleagues**
190:13 253:20
265:1,22 335:1
340:18 341:22

**collect**  68:9
**collecting**
195:7
**collection**  68:7
**college**  13:13
**colonel**  185:10
186:2 188:21
244:19 245:8
277:1
**colorado**  2:5
**columbia**
345:20
**column**  288:9
**combination**
56:9
**combined**
23:11 247:4
**come**  84:14
107:9 134:17
138:8 252:22
267:5 284:5
323:18
**comes**  46:5
85:14 279:8
281:2 293:3
322:18
**coming**  159:13
206:17
**command**
136:7 156:8
185:16,19
201:10 258:11
309:22
**comment**
265:19 281:22
299:5
**comments**
276:6

**commission**
345:21
**committed**
234:17
**common**  44:19
297:14 313:22
**commonly**
45:11
**communicate**
54:14,18 57:12
87:4 99:8,14
162:10
**communicated**
54:12 57:14
112:12 246:12
263:15
**communicati...**
95:13 183:15
**communicati...**
54:20,21 78:5
98:6,12,20
100:8 203:18
219:16 257:13
263:21
**communicati...**
73:6 86:18,19
87:2 95:8,16
97:17,20
100:15 130:3
166:17,22
175:6 179:19
196:13 208:20
209:18 210:9
220:7 228:13
291:21
**communities**
267:19 268:8
268:11

EXHIBIT 1
Page 580 of 680
www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000361

**community**
14:15 15:5
16:20 31:2
79:2,3,9 261:2
263:5 268:7
270:22 282:11
282:17,18
317:16 318:16
342:5,6,7
**companies**
36:22 37:1,3
39:11,17 40:4
93:20 249:15
**company**  18:14
20:9 21:7,17
22:2 24:6
36:10,15,21
37:2,6,7,11
63:18 74:10
75:3,5,10
106:10 135:22
251:17 299:6
312:6 313:11
314:5 317:6,6
317:8
**compare**
244:13
**compensation**
19:18 93:21
107:16
**compete**  16:14
16:15 35:17
**competitive**
40:10 45:4
249:10
**complaint**  3:19
12:9 150:18
159:13,18

195:6 204:19
236:17 237:22
260:13 262:12
274:11 293:8
302:15,17,17
302:20 315:5
315:13,15
316:3,4 323:13
323:13 324:14
325:14 326:12
326:14,20,22
343:13
**complete**  53:3
116:14 346:5
**completed**
314:13 323:4
347:16
**completely**  8:3
103:6 215:11
**complimentary**
261:14
**comply**  129:4
170:14
**complying**
191:16
**component**
21:21 40:16
**components**
64:8
**composite**
42:13 43:9,10
43:15
**comprehensive**
25:20,21
**computation**
330:7,10
**computer**  61:1

**concern**  66:17
67:1 96:14
111:5,6
**concerned**  66:3
**concerning**
110:13 205:5
205:10
**concerns**  65:21
70:4 79:12
92:21 94:16
111:10,11
112:15 206:20
209:22 210:3
214:15 215:7
280:2 330:22
**conclude**  176:4
**concluded**
329:4 344:20
**conclusion**
182:18 183:6,7
243:1 273:17
280:11
**conduct**  80:18
114:3
**conducting**
210:21 243:9
**conference**
63:20,21 80:19
81:2 91:20
154:6
**confident**  52:8
**confidential**
129:7
**confines**  80:19
**confirm**  127:11
138:4 210:10
**confirmed**
48:20 151:12

151:15 168:1
187:5 188:5,6
195:11 219:2
290:14
**confirming**
125:19
**conflict**  17:10
24:17 27:11,12
35:3 52:13
65:22 66:4
67:5 95:2
175:18 191:14
192:17,18
196:6,14 199:4
208:21
**confrontational**
182:7
**connected**
111:16,19
**connection**
31:8 107:20
219:16
**consequence**
31:21
**consider**  17:12
52:2 70:4
330:19
**considered**
90:21 155:17
217:9
**considering**
98:12 112:21
**consistent**
128:19
**constant**  327:9
**constructively**
260:8 262:10

EXHIBIT 1
Page 581 of 653

www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000362

**consult**  70:9,12
  74:10 191:19
  224:7
**consultant**
  26:17 34:7,10
  36:19 39:15
  41:21 42:4
  52:3 53:22
  58:13 60:8
  67:8 70:6,13
  70:15 71:19
  74:7 75:14
  83:7 87:15,18
  88:20 97:4
  99:10,20,22
  100:17 102:10
  104:7 109:19
  110:10,12,16
  112:1,19 113:2
  118:7 126:15
  127:21 129:5
  138:15,18,19
  144:22 145:5
  145:10 146:6
  146:15,17
  153:20 167:16
  168:17 180:8
  184:15 185:3
  190:14 203:22
  204:12 206:7,8
  209:10 226:21
  249:13 260:2,5
  262:15,18
  299:20 320:4
**consultants**
  36:18 114:4
  146:1

**consulting**  3:9
  3:13 17:5,7,8
  24:4 25:2,4
  27:7,13 28:6
  36:9,14,21
  37:13,15,17
  38:8,10,15,19
  38:22 40:18
  42:2,7 43:18
  72:13 74:16
  76:7,9 78:6,11
  83:15 85:12
  88:22 89:1,11
  90:5,9 92:21
  108:7 109:13
  111:7 112:15
  114:21,22
  115:5,21 116:3
  117:6 122:22
  123:1 124:2,14
  139:13,14
  140:10 144:15
  147:12 148:4
  188:16 189:6
  189:10 190:11
  191:10,14
  204:5 208:22
  247:9,14 249:3
  249:17 283:22
  306:18 308:11
  317:19 332:10
  333:10
**contact**  42:4
  54:9 80:3
  91:14 131:13
  201:5 202:6
  204:4 211:21
  227:7 338:15

  340:14
**contacted**
  262:5 283:14
**content**  52:15
  91:22
**contents**  93:15
**context**  39:22
  81:11 105:10
  105:14
**continually**
  260:13
**continue**
  124:16 125:3
  162:4 215:8
  218:3 248:3
  249:19,21
  250:2 262:20
  262:21 279:17
  323:7 325:5
**continued**  4:1
  30:9 96:14
  124:12 128:18
  153:5,9 160:15
  200:2 218:1
  224:5 233:1
  250:6,7
**continues**
  264:9 266:13
**continuing**
  96:12 128:16
  133:15 214:16
  215:21
**contract**  26:21
  34:8,14 35:2,8
  38:16 40:8,11
  41:18 42:5
  53:16,19,20
  91:19 95:10

  112:1,2 113:4
  123:5,8,9
  133:7,11,15
  136:5 146:17
  148:8 232:22
  238:11 245:13
  245:18,21
  246:12,17
  250:6 251:18
  291:6 306:18
  306:19 310:15
  311:9 313:6
  314:14 321:7
  331:22 332:2
  332:20,22
  333:11 336:13
**contracted**
  262:5
**contracting**
  108:3 261:20
  262:5 312:8
**contractor**
  39:9 41:14
  42:3 81:14
  86:16 98:10
  105:6,18
  110:10 116:13
  136:4 142:5
  145:12,20
  162:19 203:22
  219:4 260:1,5
  308:16 311:9
  311:19 312:14
  313:13
**contractors**
  80:15 85:18
  94:11 141:9
  143:1 311:14

EXHIBIT 1
www.CapitalReportingCompany.com
Page 583 of 650
202-857-3376

Roysdon Fact Witness_000363

| contracts 16:14 | 337:22 338:20 | 199:22 220:12 | 202:17 204:21 |
|---|---|---|---|
| 22:5,8,9 26:4 | **conversations** | 227:12 244:12 | 210:11 216:1 |
| 26:11 34:18 | 53:7,9 71:8 | 284:11,16 | 219:19 220:8 |
| 35:18,22 38:5 | 73:14,17,20 | 293:16 302:16 | 221:2,13 230:2 |
| 38:7,11,14,17 | 89:5 91:7 92:7 | 344:16 | 230:11,21 |
| 40:19 41:22 | 93:13 97:10 | **corporation** | 233:4 234:18 |
| 141:11 306:2 | 102:16 104:4 | 63:16 180:1 | 234:19 237:4 |
| 306:21 307:5 | 105:15 111:8 | 336:16 | 240:12 242:16 |
| 307:12,16,20 | 131:1,3,4 | **correct** 16:4 | 243:15,16 |
| 308:1,5,16,21 | 164:18 196:19 | 34:8 42:7,11 | 244:20 247:9 |
| 308:22 309:2,4 | 196:22 207:2 | 47:13 50:5,22 | 247:16 252:3 |
| 309:8,12 310:4 | 208:13 209:2 | 57:21 66:2 | 259:20 262:7 |
| 310:10,21 | 213:12 332:6 | 67:20,21 70:15 | 271:8,11 273:6 |
| 311:5 312:7 | 333:8 335:10 | 70:22 72:20 | 273:7 275:7 |
| 313:3 317:1,1 | 342:20 | 73:21 74:11 | 283:7,15 285:9 |
| 319:4,5 321:12 | **convey** 207:10 | 80:5 82:18 | 287:17 291:11 |
| 322:10 323:14 | 209:16 294:9 | 83:9,13 88:16 | 300:7,8 304:10 |
| 334:22 335:9 | 301:7 302:13 | 88:17 89:20 | 305:4 307:2,13 |
| 335:12,12 | 302:18 303:8 | 90:2 92:22 | 308:6,16 |
| **contractual** | **conveyed** | 93:5 95:3,16 | 310:21 316:6 |
| 137:1,22 | 166:14 172:2 | 97:15 100:6 | 317:20 318:1 |
| **conversation** | **convince** | 102:12 117:9 | 318:10 320:17 |
| 13:17 34:19,20 | 327:16 | 119:12 125:6 | 321:1 322:11 |
| 74:17 78:11 | **convoluted** | 125:10 134:10 | 329:5,6 333:14 |
| 83:16 86:6 | 54:4 | 136:21,22 | 342:18 346:4 |
| 89:3 94:17 | **cool** 253:22 | 137:3,4 138:13 | **corrections** |
| 96:5,8 97:18 | **coordinate** | 138:16,18 | 346:6 |
| 98:7 103:18 | 32:1 | 139:1 143:6 | **correctly** 44:13 |
| 110:5 111:1,21 | **coordinating** | 147:13 154:22 | 205:11 207:19 |
| 125:18 133:10 | 32:3,4,6 | 155:3,4 156:10 | 236:13 290:20 |
| 133:13 156:21 | **copies** 220:10 | 158:11 159:1,8 | **corresponden...** |
| 162:7 165:17 | 223:7,10,12,17 | 163:5,14 | 3:7,20 4:4,5 |
| 166:11,12 | 241:3 347:14 | 165:12,13 | 220:11 223:8 |
| 182:7,21 184:1 | **copy** 64:12 | 172:6 175:16 | 223:17 243:14 |
| 184:4,8,9,12 | 114:14 121:2 | 178:3,8 187:18 | **corroborated** |
| 209:12 275:20 | 123:16 132:8 | 190:22 191:1 | 264:22 |
| 332:8,12 | 134:12 159:16 | 191:17 197:7,8 | **cost** 26:1 |
| 337:17,18,19 | 159:18 160:1 | 201:6,16 | 334:10 |

**counsel**  3:3 5:6
  35:1 52:7
  64:12 65:5
  72:20 77:18
  87:3 101:9
  104:5 114:15
  116:20 121:3
  123:17 132:8
  134:12 153:8
  159:18 191:20
  197:15 198:11
  199:21 220:8
  227:12 241:4
  280:3 284:11
  284:17 293:16
  294:2 298:5
  343:7,9 345:10
  345:14 347:14
**counterparts**
  151:7
**countries**  47:7
**country**  46:2
  47:8 77:13
  211:1,3 217:8
  328:15,20
**couple**  5:21
  6:17 62:3
  73:16 93:13
  110:1 151:2
  160:4 234:9
  239:6 252:1
  298:17 322:17
**course**  33:11
  53:4 62:7
  63:11 129:8
  216:22 224:12
  275:16 313:4

**court**  1:1 6:7
  6:12,13,18
  8:20 132:16
  299:15
**covid**  25:14
**crackpot**
  194:14 263:4
  266:20 267:3,8
  267:9 282:2,3
**create**  17:9
  44:8 45:22
  61:4 98:8
  155:5 168:2
  171:20 324:11
**created**  44:13
  45:16 57:4,5
  67:17 142:20
  164:4 271:7
  280:20 324:12
**creating**  44:11
  104:14
**criminal**  93:18
  107:14 327:9
  329:1
**crone**  335:19
  336:12,13
  337:2,4,12
  338:2,3 342:4
  342:13 343:1
**crossing**  32:14
**crunching**  87:9
**cs**  347:15
**cs7396796**  1:22
  346:22
**cto**  294:4
  295:15
**cuff**  208:13

**current**  9:10
  13:22 14:6
  15:12,15,18
  16:13 45:5
  158:12 166:7
  188:18 254:15
  255:15 256:7
  256:10 270:10
  295:17 296:22
  298:6,8 324:8
**currently**  37:1
  42:6 67:2
  69:10 126:12
  171:14 293:14
  295:10
**cursory**  339:17
**customer**  134:1
  141:8,20 142:1
  142:6 317:7
**customers**
  141:5 142:21
  142:22
**cuts**  338:6
**cv**  1:5
**cyber**  15:6
  20:15 21:8,21
  22:21 23:3,18
  27:8,21,22
  37:12 41:6
  44:1,11,13,16
  45:18,20 46:1
  46:19 48:7,8
  48:12 54:3
  56:7,9,10
  62:16 66:16,20
  68:21 69:7,9
  69:17,22 89:19
  99:4 102:19

**114:5,6 127:3**
  129:20 139:6
  139:18,19,19
  139:20 140:4,5
  140:15,17,21
  140:21 142:11
  142:17 143:1
  216:20 238:1,5
  239:3 249:22
  253:16,20
  254:1 261:6
  270:22,22
  271:8,14
  282:18 293:3
  309:13 311:9
  311:15 315:7
  316:9,18,19
  317:13,20,21
  317:22 318:5
  318:14,15
  319:7,10,11,15
  319:16,20
  320:2,15,17,18
  321:13,15,19
  323:8 334:19
  335:6,6 338:1
  339:11,21
**cyberai**  299:20
**cybercom**  48:6
  70:6 71:2
  98:10,11,12
  105:6 106:15
**cycle**  39:21
  49:3 53:17
  88:7,8 286:15
**cynnovative**
  40:6 300:19
  335:5

| d | | | darpa   22:11,17 |
| --- | --- | --- | --- |
| **d**   5:1 55:10,10 | 155:4,15 | 245:8,12 246:3 | 64:1 258:18,19 |
| **d.c.**   1:15 2:11 | 156:22 157:3 | 257:14 260:18 | 309:17,19 |
| 59:11 | 157:21 160:10 | 261:22 262:8 | 310:16,18,20 |
| **damage**   262:21 | 160:14,22 | 263:22 267:10 | 321:9 336:1,20 |
| 266:5 278:21 | 162:11 163:21 | 267:12 268:15 | 337:1,15 |
| 279:1,3,7 | 163:21,22 | 268:16,18 | 341:16,16 |
| 322:17 323:16 | 164:6,10,11,17 | 270:1 272:13 | 342:1,3 |
| 326:11,19 | 164:18 165:6,9 | 273:15 274:8 | **data**   25:16,17 |
| 328:20 | 165:10 166:13 | 275:7,8 282:3 | 25:22 29:22 |
| **damaged**   249:6 | 166:14 167:3 | 282:6 283:13 | 66:9,10,14,15 |
| 326:17 | 167:19,22 | 284:1 285:17 | 68:6,7,9 |
| **damages**   133:3 | 168:7 169:21 | 289:8 290:1,15 | **database**   226:2 |
| 133:14 324:15 | 169:21,21 | 290:16,20 | **date**   1:12 10:3 |
| 325:17,18 | 173:22 174:3 | 291:12 292:1 | 65:6 72:22 |
| 326:9,15 327:2 | 174:11 175:4 | 301:2 303:16 | 73:10 115:3,7 |
| 334:14 | 176:3,17 | 303:19 304:1 | 115:20 117:19 |
| **dan**   49:11,14 | 184:13 185:20 | 305:19,19 | 135:16 137:16 |
| 49:19,21,21 | 186:13 187:4 | 328:6 330:14 | 138:1,5 170:7 |
| 50:5 51:2,17 | 188:6 189:16 | 332:6,9 333:2 | 197:13 241:13 |
| 52:1 53:13,15 | 190:1,3 191:12 | 333:7,9 336:13 | 246:8 260:7,10 |
| 54:8,15,18 | 191:22 194:19 | 336:17,22 | 295:4 299:22 |
| 57:20,22 58:1 | 194:21 195:11 | 338:17 342:20 | 308:5 315:19 |
| 59:2 61:4 | 196:21 197:5 | **dan's**   64:5 | 334:6 346:13 |
| 63:12 70:8 | 197:16,22 | 164:6 | 348:24 |
| 74:15,21 75:9 | 198:17,20 | **danny**   59:12 | **dated**   165:21 |
| 75:13 82:21 | 201:18 205:10 | 157:22 158:6 | **david**   51:3 |
| 94:9 95:22 | 205:14 206:13 | 158:17 161:1 | **day**   35:7 88:18 |
| 96:1,13 99:13 | 208:2 209:11 | 166:14 167:5 | 88:19 91:11 |
| 105:3 111:18 | 224:8,10 | 168:2,13 | 108:18 212:3,4 |
| 111:21,21 | 228:22 229:5 | 169:15 189:8 | 224:13 237:13 |
| 125:1,11,18 | 231:18 232:21 | 244:18 245:8 | **days**   73:16 |
| 134:1 144:19 | 233:4,9 234:7 | 274:11,14 | 143:20 231:15 |
| 144:21 147:2,8 | 238:2,2 239:1 | 275:22 276:4 | 231:17,21 |
| 149:3,10 | 241:2,22 | 276:18 300:16 | 347:16 |
| 150:12,16 | 242:12 243:6 | 300:21 301:3 | **dcgs**   258:17 |
| 151:2,14 155:2 | 243:18 244:1 | 302:2 303:15 | **dd254**   146:3,5 |
|  | 244:11,11,12 | 304:2,7,8,10 | 146:8,12,22 |
|  | 244:14,18 | | |

**de** 150:1 184:6
235:18 261:18
264:8 324:12
**dead** 225:14
**deadlines**
333:3
**deal** 12:2 283:3
321:16 329:10
331:10
**dealt** 184:2
321:18,18
**debarment**
150:1 264:8
336:12
**debarred**
235:18,19
259:20 260:1,3
260:8 261:18
262:10 324:12
**debrief** 211:16
212:2,20,21
214:12 215:18
216:5 219:8
226:11 227:2,8
228:14,20
233:8 243:19
**debriefed**
216:1
**deceased** 325:7
**december** 3:12
121:11 133:16
133:18
**decided** 101:14
103:14
**decision** 109:9
232:8
**decisionary**
158:8

**declare** 249:17
**declared**
113:16
**deconflict**
297:17
**decreased**
121:21
**dedication**
248:14
**deemed** 47:16
128:14
**def** 40:7 51:4
232:22 300:19
335:5 338:13
**defend** 46:2
192:19,21
193:10
**defendants** 1:7
2:7 3:3 5:6,18
153:8
**defense** 20:7,18
23:21 31:9
32:8 261:6
309:5 337:17
**defenses** 23:15
**defensive** 23:3
23:8 140:17,22
216:20 319:10
**define** 15:19
130:21 317:21
333:18
**defined** 20:8
**defines** 155:10
**defining** 97:19
**definition** 40:2
95:17 141:20
**definitions**
96:2 207:1

**degree** 11:7,8
**degrees** 11:5
**deleted** 55:5
56:14,15,19
227:18
**deliverable**
161:11
**deliverables**
161:13
**delivered**
161:13 165:22
**delivering**
161:22
**demands**
303:12
**demeanor**
184:1
**demo** 81:16
82:1 95:19
**demonstrated**
329:22
**demonstrates**
266:5
**demonstrating**
317:2,5
**demonstration**
80:14 81:17
**demos** 80:12,16
81:13 83:11
84:1 95:20
**denise** 286:16
**denver** 2:5
**deny** 109:9
**department**
1:14 2:9 5:13
31:9 63:22
93:21 309:5

**depending**
250:21 278:22
**depends** 332:1
**depo** 151:13
**deponent** 346:1
347:13
**deposed** 5:22
**deposing**
347:13
**deposition** 1:10
5:14,20 6:12
12:5,13 40:1
48:19 64:13
114:17 116:21
121:4 123:18
132:9 134:13
153:12 157:2,3
157:5 159:19
227:13 274:14
284:12,18
290:2 293:19
344:19 345:3,5
345:9,12
**depositions**
157:13,15
187:6
**deprived** 320:2
322:6
**depth** 293:4
**deputy** 14:1
32:8 51:4,16
77:11,17 90:4
200:21 202:4
202:13 255:10
276:18 324:6
341:16
**derivation**
280:9,12

EXHIBIT 1
Page 588 of 638

Case 5:22-cv-00869-JKP    Document 122    Filed 08/05/25    Page 588 of 1654
Paul Roysdon , Ph.D.                                                              May 30, 2025
[derivations - disclosing]                                                        Page 20

**derivations**
280:17,21
**derive** 279:10
**derived** 27:2
**derogatory**
237:2 264:5,11
275:15
**describe** 68:8
130:15 139:17
154:7 163:12
190:17 191:22
192:6 194:15
194:16 256:22
295:20 297:3
298:11
**described**
238:20 326:12
326:13
**describes**
106:20
**description** 3:6
4:3 183:2
221:22 222:2,3
222:7 282:2
**desired** 99:4
**desires** 324:4
**desk** 197:20
**destroy** 150:21
168:8,9 186:22
188:4,10 237:7
239:2
**destroyed**
193:3 237:8,9
237:19 255:8
283:2
**destroying**
168:11 187:7
187:12,12,14

**destruction**
264:9
**details** 13:13
13:14,18 61:16
79:13 117:1
118:13 198:17
209:19 294:11
302:14,15,22
303:2 337:18
**determined**
234:17
**develop** 44:20
68:12 210:22
214:16 217:2,7
**developed**
217:3 271:10
**developer**
68:21,22
206:18
**developers**
67:4
**developing**
45:19 46:7
68:11 69:6
161:15 166:5
224:19 260:21
261:5 317:3
**development**
20:10 44:16
63:18 66:20
69:10 70:20
85:17 86:1,3
91:4,6 94:10
125:3,5 317:4
**developments**
20:2 21:16
**dia** 31:6,19
252:12

**dialogue** 99:1
171:1
**died** 227:18,18
**difference**
21:10 97:2
103:21 104:11
104:16 123:12
155:18 170:19
171:20 173:17
174:5,15,20
175:9,11
210:15 321:4
**differences**
98:7 103:19
**different** 22:15
22:16 30:4,7
30:15,19,20
56:6 68:18
69:5 74:12
89:5 102:19
135:13 159:10
170:18 171:10
171:17 172:12
172:13,17,21
207:7 222:6
230:12 233:19
238:19 253:12
258:15 278:21
278:22 281:14
281:14 310:17
319:21
**difficult** 6:21
44:7 101:21
102:1 106:21
106:22 107:1,2
107:7 182:12
267:18

**difficulties**
255:14
**dig** 211:8
**digging** 211:11
**direct** 65:2
72:17 80:3,21
90:15,22 91:14
93:16 107:12
107:21 118:12
128:21 132:18
138:21 159:22
179:7 227:21
294:4 296:9,12
**direction** 345:8
**directly** 53:15
87:4,20 99:9
143:17 284:3
**director** 14:1,4
200:21 202:4
202:13 205:17
255:10 324:6
336:1 337:15
341:16,16
342:2
**directorate**
44:18,19 66:19
264:18
**dirty** 217:9
**discipline**
66:16
**disciplines**
268:8
**disclaimer**
46:10
**disclose** 129:6
279:5
**disclosing**
279:21

EXHIBIT 1
www.CapitalReportingCompany.com
Page 588 of 639
202-857-3376

Roysdon Fact Witness_000368

disclosure
137:15
disclosures
3:15 132:15
200:12 338:11
341:7
discoverable
133:2
discovery
66:12 156:11
156:13,14
188:2 189:13
204:22 234:13
235:15 237:6
276:3
discuss   12:13
13:18 96:8
144:11 153:11
153:14 169:5
210:13 233:7
333:10
discussed
12:16 60:6,6
76:5 127:7
144:10 153:13
222:13 229:22
253:12 305:17
336:14
discussion
109:8
discussions
86:22
disparaging
195:20,22
196:9,10,15
dispute   165:4
disputed   53:11

distinct   23:17
distinctly   69:5
district   1:1,1
345:20
divergent
110:14,17
division   1:2 2:9
20:9 76:11
203:1
document
97:17 106:3,11
132:12 135:1,5
135:10,13
137:11 145:8
146:13 155:6,7
155:9 156:15
204:18 222:5,8
222:10 243:17
274:10 277:16
277:22 294:1
294:12 297:9
297:12 298:20
298:21 302:13
303:8,9 333:6
documentation
239:11
documented
73:20 92:8
documents
11:22 12:4
34:20,22
119:21 188:1
195:4 196:12
197:12,13,16
197:18 198:6
199:15,19,20
200:3 201:11
201:12,19

241:15 242:4
242:10,11
243:6 244:2,7
244:8,13,15
319:1
dod   21:21
31:13,20 32:2
32:3 40:16
64:7 135:20
142:1
doing   7:2 13:20
21:19 26:20
27:22,22 40:3
42:6 43:18
44:14 45:7
53:10 63:11
66:7,7,8,13,19
67:2,3,7 68:5
68:17 69:11,17
79:4,11 81:20
85:16,22 91:5
92:11,12,15
94:8,9,18 95:1
108:19,21
110:15 112:22
125:3 126:19
126:21,22
128:13,15
129:11,15,16
129:22 133:21
134:2 210:5,6
249:4,16,22
250:3,4,7,21
253:22,22
282:4 285:5
294:8 311:20
311:21 312:10
313:19 317:22

320:13 335:4
dollar   122:10
335:9
dollars   331:12
domain   101:4
177:22
dominant
319:9
donald   288:13
double   210:20
doubt   179:2
dr   1:3 5:8 9:5
87:8 90:15
114:20 119:1
121:7 123:21
134:22 153:11
180:15 204:2
207:8 208:8
240:3 260:4,5
260:6 293:22
315:4 319:14
324:1
draft   294:12
drafts   82:22
dragged   193:4
238:9 257:4
dream   193:6
drill   268:12
drives   68:10
driving   82:2
84:11
dual   11:7,7
47:3 48:6
71:10
duc   286:20
ducking   283:15
due   70:18

EXHIBIT 1
Page 588 of 653
www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000369

| | | | |
|---|---|---|---|
| **duly** 5:4 153:6 345:5 | 100:14 102:15 109:15,21 | 245:11 246:21 248:22 253:12 | 339:2 |
| **duplicate** 228:7 | 111:9 120:20 | 258:4 280:19 | **ekholm** 185:11 186:2 188:21 |
| **duties** 17:11 | 130:22 153:1,1 | 282:20 299:6 | 244:19 245:9 |
| 19:20 20:1 | 188:2,3 195:15 | 308:8 312:18 | 277:1 |
| 21:5 27:16 | 195:17,19 | 320:11 321:6 | **el** 63:15 154:4 |
| 279:20 318:2 | 196:8,13,16,18 | 332:16 342:13 | 180:5 |
| 320:10 | 197:14 198:9 | **early** 45:4 | **electrical** 114:2 |
| **duty** 14:20 | 198:12,13,14 | 178:16 255:4 | **electronics** |
| 15:2 28:18 | 198:22 199:3,5 | 332:12 | 114:2 |
| 30:5 32:12 | 199:7,9 205:1 | **earned** 11:5,6 | **elementary** |
| 33:5 89:2,6,11 | 209:14 220:11 | **easier** 6:17 | 67:12 |
| 154:17 205:10 | 220:12,13,18 | 8:20 214:20 | **elements** 20:13 |
| **dynamics** 40:5 | 223:8,12,17 | **easiest** 68:7 | 176:5 280:17 |
| **e** | 227:22 228:1,5 | **easily** 69:1 | **elevate** 270:12 |
| | 228:12 241:3 | **easy** 8:18 120:1 | **elevated** |
| **e** 2:1,1 3:1,5,7 | 243:14 244:14 | 232:8 313:5 | 183:19 |
| 3:20 4:1,2,4,5 | 254:21 255:1 | **edo** 66:12 68:5 | **elizabeth** 10:12 |
| 5:1,1 34:21 | 257:17 276:2 | **education** | **else's** 90:4 |
| 37:10 52:14 | 286:13 288:20 | 207:10 | **emerging** |
| 53:8,12 54:17 | 294:8 302:19 | **ee** 114:3 | 23:18 253:6,16 |
| 54:20 55:1,2,3 | 319:2 328:21 | **effect** 177:14 | **emotional** |
| 55:4,10 56:12 | 348:3,3,3 | 177:20 197:18 | 325:17,18 |
| 56:22 64:10 | **e.g.** 107:17 | **effective** 69:15 | 326:9,10,15,19 |
| 65:4,6,8,13 | **earlier** 35:16 | 115:6 | 327:2 |
| 70:2 72:19,22 | 43:21 55:14 | **effectively** | **emotionally** |
| 73:7,18,21 | 56:2 59:17 | 235:18 251:15 | 326:17 |
| 74:4,6 79:18 | 73:19 76:11 | **effort** 118:14 | **emphasize** |
| 80:1 82:8 | 84:17 86:14 | 118:16,17 | 62:14 |
| 83:21 84:16,20 | 95:18 97:9 | 121:21 124:5 | **employed** |
| 85:5,7 90:17 | 100:2 105:5 | 228:7 | 28:12 40:12,15 |
| 90:19 91:11 | 118:3 126:1 | **efforts** 218:3 | 110:10 302:8 |
| 92:2,16,18,20 | 127:7 140:16 | 248:13,14 | 345:11,14 |
| 93:12,14,15 | 148:2 154:20 | **eight** 9:13 | **employee** 36:1 |
| 96:4,6,12 | 176:7 181:3,14 | **either** 18:17 | 39:9 58:20 |
| 97:11,17,22 | 209:1 220:22 | 39:2 203:19 | 60:3 70:10 |
| 98:5 99:15,17 | 235:16 238:13 | 206:7 239:7 | 88:10,14 93:22 |
| 99:19,21 | 240:3 244:18 | 265:14 293:17 | 109:5 143:5,8 |

Paul Roysdon , Ph.D.

May 30, 2025

143:10 144:5
147:9 168:14
180:11 185:6
206:8,9 207:18
208:4,22 213:2
225:16 230:10
238:21,22
249:8 252:19
268:21 292:12
292:13 318:21
318:22 345:14
**employees** 35:7
35:9 80:4 83:5
84:13 87:5
95:9 97:20
109:8 139:11
154:9,11
204:11 205:6
205:22 244:20
245:4 324:21
**employer**
217:22 249:19
**employment**
15:18,19,20
17:21 24:19
25:1 34:12
42:10 46:6
85:1 93:4,8
100:5 108:12
138:21 213:3
231:6,9,16
247:9,12,19
302:7 307:6,12
307:17,20
308:2,6,13
330:22 343:22
**empties** 145:20

**empty** 35:6,10
**emptying**
35:14
**encouraged**
224:17,20
255:5
**encouraging**
77:12
**ended** 36:9
50:18
**engage** 109:7
**engagement**
333:22
**engagements**
303:5
**engineer**
255:19,21
293:2
**engineering**
11:13 42:13
43:11,12,15
110:4
**engineers**
11:12 114:2
282:21,22
**ensure** 53:8
125:7
**entails** 302:20
**enter** 35:13
293:9,12
305:20
**entered** 18:21
18:22 116:5
**entering** 88:20
305:2
**enterprise**
66:11 226:2

**entire** 6:12
14:15,17 15:3
21:7 30:13,22
37:16 222:4
271:8,10
278:17 280:12
285:20
**entirely** 69:2
103:15 105:9
222:17 277:16
**entirety** 198:13
198:14
**entities** 94:3
**entity** 90:9
224:7
**environment**
49:9 141:3
312:15 314:8
**equal** 301:8
**equals** 118:22
120:2 217:11
217:13,15
**equipped**
292:18,21
**equivalent**
42:19
**erick** 1:17
345:2,18
**errata** 346:7
347:11,13,16
**erratas** 347:15
**es** 114:3
**escalates** 184:6
**escorted**
226:17
**especially** 71:9
186:11 208:9
250:19

**espionage**
327:11,14
**esq** 2:14 347:1
**esquire** 2:3,8,8
**essence** 80:17
171:3 217:1
238:11 337:16
337:20
**essentially** 27:4
44:13 45:6,16
45:17,22 51:5
63:20 92:20
137:15 142:20
162:1 250:13
251:2
**establish**
317:11
**established**
329:19
**esteem** 342:10
342:12
**estimate** 9:21
**et** 1:6 68:10
160:16,17,17
161:6,8 186:1
210:6 222:9
259:15 274:12
279:6 312:12
333:2 347:4
348:1
**ethical** 95:3
**ethics** 65:4
**evals** 254:13
**evening** 35:10
108:19
**evenings** 70:5
145:19

**EXHIBIT 1**
**Page 590 of 633**
www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000371

event  16:12
  150:3 268:6
  294:6
events  162:2
  166:2,3 171:4
  222:1,4 269:9
  269:14 326:12
  326:13,20
  329:16
eventually
  112:8,9 198:15
  200:3 220:20
  261:8,9
everybody
  205:17 278:17
evidence  53:9
  170:21 279:17
  280:13 281:3
evolve  128:16
  264:10
exact  301:16
  301:18 336:1
exactly  19:15
  19:19 25:21
  69:11 108:20
  108:20 181:11
  195:16 224:8
examination
  3:2 5:6 153:5,8
examined  5:5
  153:6 346:3
example  11:11
  11:12 35:5,20
  57:13 81:9,19
  84:9 103:10
  106:2 110:8
  120:1,8 161:10
  178:5 192:22

216:18 237:12
237:14 249:21
259:14 263:1
263:22 268:1
280:8 282:19
343:14
examples  35:11
  108:15 110:2
  266:15 277:18
  281:4
exceed  120:6
  122:6 124:10
excellent  257:2
  293:3 299:8
  340:6
except  72:5
exception
  22:17 31:15
exceptionally
  251:1
exchange  98:7
  254:22
exchanged
  197:14 203:20
excluded
  321:22
exclusions
  322:2
excuse  54:1
  133:16
executed  115:1
  123:2
execution
  115:3
executive  18:17
  107:18
exercises
  291:22

exhibit  3:7,9,10
  3:12,13,15,17
  3:19,20 4:4,5,7
  64:11,13 90:16
  114:14,17,20
  116:19,21
  117:3,6,17,17
  121:2,4,7,14
  123:1,15,18,22
  124:1,3 128:22
  132:7,9 134:12
  134:13 138:6
  145:9 149:1
  159:18,19
  194:9 200:14
  200:17 227:13
  227:22 241:17
  242:3 284:10
  284:12,18,22
  285:2 288:2
  293:19,22
  298:1 338:11
  341:9,10
exhibits  4:22
  138:2
exist  145:15,16
existed  164:5
exit  199:16
exiting  342:1
expand  339:10
expect  311:22
expectations
  266:20
expected  331:8
expense  154:2
experience
  42:2 66:18
  67:2

experienced
  319:6 326:11
  326:19 334:15
expert  58:9
  83:8 104:13
  160:15 161:20
  165:11 171:19
  205:12 237:20
  275:17 323:9
  324:10 334:18
  338:1
expertise  161:2
  207:11 329:20
experts  339:20
expiration
  115:12
expires  345:21
explain  67:22
  80:6 149:9,10
  174:8
exploit  206:18
express  160:15
  194:2
expressed
  167:20 194:1
expressions
  194:16
extensions
  218:2
extent  6:19
  46:12 215:13
  344:3,7
external  63:5
extreme  324:13

**f**

f  153:1 301:21
  327:8

Paul Roysdon , Ph.D.    May 30, 2025

[face - filing]    Page 25

face   269:15,15
  269:19,19
facilitate
  339:14
facilitated
  61:22 62:1
facility   85:9,13
  85:20,21 86:4
  106:20 109:7
  109:19 136:7
  148:15 313:15
  313:22
fact   13:20
  204:15 217:15
  218:15 234:21
  267:17 268:9
  297:20 299:2
  305:21 310:20
  312:6
facto   150:1
  235:19 261:18
  264:8 324:12
factor   2:3
facts   98:22
  103:9 172:14
  173:10,11
factual   98:6
  240:14 275:21
  276:8
factually
  179:13 242:22
fails   347:18
fair   7:14 22:20
  54:8 63:8 69:4
  69:4 88:12
  89:18 108:6
  134:8 146:16
  183:12 184:5

  186:19 200:8
  200:11 201:4
  202:5 211:5
  212:6 233:18
  234:12 235:10
  248:15 262:4
  271:13 291:2,5
  299:13 316:18
  329:12,12
fairly   12:18
  52:8 79:2,3
  110:4 182:6
  184:2 203:13
  208:8 258:1
  302:18 311:22
falls   40:6
  185:19
false   194:13
  255:9 266:6
  328:9 330:1
falsehoods
  262:21 263:16
family   320:6
fancy   61:8,11
far   8:6 38:13
  61:3 74:5
  133:14 141:4
  142:10 170:17
  174:22 233:2
  234:16 245:1
  278:8 303:2,20
  330:22 334:14
fast   9:1
fault   273:2,11
  273:19 274:1
  324:1
fbi   15:1

fear   193:16
  292:13 303:13
  304:9 327:9
feared   193:17
  193:22 304:2,3
fearful   193:5
february
  160:13 165:16
  180:20 203:13
  336:15
federal   3:16
  86:15,16 93:21
  94:1 95:9
  107:14,19
  109:5,6,8,19
  110:11,12
  132:16,16
  299:15
federally   63:17
fee   17:5 333:16
  333:18
feel   200:10
fees   326:2
  334:5
fellow   30:12
felt   164:7 193:2
  193:9 198:11
  328:9 329:22
ffrdc   63:17,18
fibonacci   55:19
  56:4 57:19
  58:12 60:1,20
  61:2,20,20
  62:4,5 64:6
  106:8 117:8
  125:5 127:6
  140:8 163:15
  169:6 171:12

  172:13 193:20
  214:17 219:17
  225:16 229:15
  230:5 245:12
  339:1 342:21
  343:1
field   22:21
  23:18 30:1
  44:1,8,11,14
  45:17 104:14
  104:18 139:18
  139:19,19,20
  142:19 162:2
  253:16 275:18
  311:15 316:18
  316:19,22
  317:2,13,20,21
  318:14,15
  319:7,11,12
  320:3 323:8,10
  324:10,11,12
  335:14 339:11
  339:20 342:9
fields   323:9
fifth   76:4
fighting   295:10
figure   101:18
  133:4 196:10
  334:3
file   255:5
  328:10
filed   6:2 178:18
  178:18 236:12
  236:13,14,15
  299:14
filing   204:18
  315:12,14,19
  316:3

EXHIBIT 1
Page 592 of 638
www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000373

fill   76:12,18
   120:18 249:15
   277:22
filled   277:17,22
final   158:8
finally   226:15
financial   331:1
financially
   345:15
find   208:16
   273:15,16
   310:4 335:17
findings   130:17
   235:5 275:15
fine   153:17
   286:3 292:7
   304:1 310:3
   331:7
finer   96:2
finish   166:19
finished   25:19
firearm   221:1
   221:4
fired   306:18
firm   334:1
first   5:4 7:18
   10:17 18:10,11
   19:3,10,21,22
   21:1,11 29:7,8
   32:21,22 43:22
   44:10 50:13
   51:1 52:8 60:1
   73:13,14 82:16
   94:4 98:17,18
   109:4 111:16
   134:16 139:10
   179:16 219:1
   224:16 249:12

252:20 257:6,7
   271:6 287:7
   294:2 295:9
   303:10 320:12
   338:17
firsthand   202:8
   202:16
fish   283:3,4,5
fishes   283:5
five   10:21 31:4
   53:2 76:4
   125:4 169:13
   170:3 239:17
   250:22 263:2
   306:11 330:16
   333:10
flexed   332:21
flexible   52:18
   59:18 119:18
   119:20
flip   82:6
floor   1:14
florida   305:15
flow   219:16
fluid   43:1
flying   305:12
   305:15
focused   61:8
foia   236:13,14
folks   99:13
   104:16 264:3
   279:2 335:4
   337:1
follow   26:7
   50:2,21 51:1
   78:4 123:9
   174:10 252:1
   255:12 263:11

followed   52:14
   73:17 85:4
   165:18
following   70:3
   120:11 211:13
   212:17
follows   5:5
   153:7
food   191:7
foolish   182:15
   217:12
foothold   319:9
   319:13
forbidden   17:1
   79:14
force   39:21
   40:4,13 48:7,8
   48:22 49:3,6
   51:14 52:21
   53:17,18 54:2
   54:8,11 57:20
   59:20 60:2,12
   62:20 63:4,8
   65:14 67:20
   72:16 74:17,19
   77:6 80:3,11
   80:19 82:10,13
   82:14,19 83:5
   84:2,13 87:4
   87:20 88:7,8
   91:1,15 95:8
   95:14,21 97:3
   97:20 98:20
   99:4,9,16
   100:17 101:6
   101:11 102:9
   103:17 104:6
   105:1,20 106:5

113:4 125:2
   128:10 138:22
   139:7,10,15
   141:21 142:1,6
   145:4 146:20
   147:9 154:9
   156:5 162:17
   162:22 164:21
   168:22 171:21
   177:15 188:8
   191:20 194:5,7
   194:10 195:7
   198:6,15 199:8
   199:8,11,12,13
   199:16 201:12
   204:11 205:6
   209:11,17
   213:1 224:5
   234:17 243:7,8
   244:7,19 245:4
   249:22 250:1
   258:16,17
   263:14 270:22
   277:17 286:15
   288:10 289:16
   302:9 319:10
   319:15,16,20
   325:10 337:9
   343:21
forces   261:2
foreboden
   16:22
foregoing
   345:3,5 346:3
foreign   71:17
   71:18
forget   16:10
   113:20 337:18

EXHIBIT 1
Page 593 of 638
www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000374

**forgetting** 16:9
**forgot** 33:14
**form** 41:1,11
  47:17 68:3
  87:16 97:5
  100:7 105:21
  134:19 144:16
  147:14 170:16
  172:19 173:4
  175:20 183:15
  192:1 207:10
  221:18 222:12
  229:22 231:7
  235:9 241:16
  242:3 249:11
  249:14 276:14
  283:17 311:16
  323:18
**formal** 6:10
  84:22
**former** 265:22
  337:15
**forms** 322:18
  322:19
**formula** 87:14
**forth** 92:6
**forths** 92:16
**forward** 48:9
  106:11 319:12
**forwarded**
  286:6
**found** 156:11
  235:15,20
  269:22 273:5
  273:12 274:1
  275:14 324:1
**foundation**
  41:12 44:2

75:11 103:20
**founded** 36:17
  335:13
**four** 10:1 60:21
  76:4 148:19
  154:21 245:3
  296:15
**foyer** 179:21
  180:2
**frame** 88:6,21
  295:12 337:5
**francisco**
  288:13
**franklin** 2:10
**fraud** 178:5,8
  178:18 236:16
  263:4
**free** 17:7,8 27:5
  49:8 130:1
**freeze** 251:16
**frequent**
  190:14 209:2
**frequently**
  96:11,18 102:3
  126:17 130:19
  133:22 190:10
  191:8 298:15
**friction** 186:7,9
  186:10,16,18
**friday** 1:12
  228:1 232:6
**friend** 12:17
  13:2,6 265:5
  265:11
**friend's** 12:19
  12:21
**friendly** 5:12
  190:18

**friends** 190:13
  254:18
**front** 123:16
  261:6 292:12
  325:14
**full** 7:6 84:19
  209:19 330:19
  330:20
**fun** 10:22
  62:10,12
**fund** 101:14
  103:14 168:3
  303:11
**fundamentally**
  56:10
**funded** 63:17
  103:6 300:17
**funding** 16:11
  31:16,16,17,18
  31:18,21 53:14
  53:17 103:4
  118:13,20
  119:6 123:12
  164:5,9 168:4
  177:15,20
**funds** 150:22
**funny** 120:3
**further** 91:12
  97:18 109:15
  153:7 174:9
  193:18,22
  227:7 345:13
**future** 53:11
  249:19 324:7
  329:1 334:17
**futures** 258:10
  309:22

## g

**g** 5:1 34:16
  332:4 341:6
**gain** 217:17
  317:8 343:22
**game** 23:10
**gan** 289:10
**gap** 17:21
  247:18
**gas** 271:7
**gathering**
  154:8
**gears** 142:9
**general** 19:20
  20:1 21:5
  34:22 52:6
  65:5 72:20
  77:18 87:2
  101:9 104:5
  178:12 182:6
  191:20 197:15
  198:11 199:21
  220:8 241:4
  280:3 294:2
  298:5 299:1
  343:7,9
**generally** 14:8
  14:12 29:1
  33:13 56:6
  78:17,20 79:9
  172:3 183:21
  204:10 248:16
  258:5 278:14
  320:3
**generate** 25:7
**gentleman**
  294:18

EXHIBIT 1
Page 594 of 638
www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000375

**getting**  131:17
  230:9 252:15
  291:5 302:14
**github**  72:3
  126:2,3,10,15
  126:17 127:10
  127:13 128:1,5
  129:4,11 130:1
  130:7
**giti**  34:6,14,15
  39:5,7,20 40:9
  53:16,19 57:8
  57:12 60:9
  75:6,7 88:22
  105:19 106:4
  106:10,15
  111:14 112:2,5
  112:16,19
  114:21 116:16
  123:2 125:21
  126:16,18,20
  126:22 127:2
  127:21 128:7
  128:15,17
  129:15,16,18
  130:11,13
  137:2,22
  138:18,19,20
  144:4 154:1,15
  177:5 206:8
  224:7 238:16
  239:14 245:14
  249:13 252:2
  300:19 306:18
  332:4
**giti's**  113:3
**give**  6:18 7:5,5
  31:3 35:5 64:7

  65:9 78:15
  79:20 81:18
  83:14 99:15,17
  99:19,21 102:9
  172:7 180:16
  211:19 212:22
  214:9 221:20
  242:1 258:6
  298:1
**given**  11:19
  95:3 102:11
  104:4 148:3
  161:4 170:15
  197:16 328:14
  345:10 346:5
**gives**  14:21
  78:3
**giving**  102:22
  331:9
**global**  34:4
  111:16
**glossed**  303:1
**gmail**  56:12
  57:11,15
**gmail.com**
  55:12
**go**  7:18 28:10
  30:17 41:5,20
  41:21 46:16
  52:20 63:15
  64:11 67:19
  82:6 83:10
  84:19 89:7
  90:11 92:1
  106:18 113:11
  113:12 115:10
  119:15 122:21
  135:15 137:19

  148:12,17
  151:21 170:12
  200:14 204:8
  209:13 211:16
  214:20 217:1
  219:13 239:13
  239:22 250:17
  251:2,17
  256:12 259:17
  270:10 275:19
  278:8 280:12
  284:15 288:10
  288:10 289:17
  296:10 301:10
  303:2 310:3
  313:2 315:1
  324:17 330:15
**goal**  211:2
  323:10
**goals**  99:4
  337:19
**god**  278:15
  281:10
**goes**  104:10
  108:1 195:5
**going**  6:10 7:12
  8:5 30:17
  35:15 40:8
  43:12 54:5
  56:11 62:14
  67:19 71:20,20
  74:16 78:15
  79:11 82:1
  92:1 94:8,9
  95:12,17 96:6
  96:21 105:4
  114:13 116:18
  121:1,14

  123:14 134:11
  140:10 143:3
  146:2 153:15
  161:12 164:6
  170:11 174:8
  176:10 177:17
  190:15 194:20
  195:16 211:8
  211:10,14
  216:22 217:2
  225:3 227:21
  229:15 230:1
  230:20 231:3
  231:18,19,20
  232:1,2,9
  235:6 248:11
  259:17 268:12
  269:20 283:11
  284:8,9 292:16
  297:15 301:4
  313:6 320:11
  326:3 328:8
  331:3,4,6
  339:10
**gonzalez**  2:8
  8:10 151:9,18
  152:2 239:16
  239:19 272:4
**good**  5:8,9 23:8
  23:9,12,21
  78:3 129:10
  133:20 140:16
  141:7,10 142:8
  148:7 178:5
  192:10 205:6
  245:2 255:11
  255:19,21
  268:9,11 270:6

**EXHIBIT 1**
**Page 95 of 139**
www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000376

273:20 293:2,4
293:6 321:14
334:21 335:15
**gosh** 258:12
**government**
5:18 16:14
22:8,9,15 26:4
26:10,21 34:17
35:2,8,18 38:5
38:7,11,14,17
41:22 43:13
70:10 75:22,22
83:6 85:9,13
85:19,20 86:4
106:20 107:19
135:20 136:5
141:5 142:4,10
142:17,22
143:2 154:11
219:3 230:18
248:12 251:7,7
251:8 258:6,9
263:8 267:22
273:10,20
292:13 296:2
313:3 314:14
315:7 316:9
318:17 320:21
323:19 324:3
324:21 331:9
**gpus** 46:5
**grade** 11:2
29:6,9,14
**granted** 250:18
**granting**
100:11
**granular** 102:6

**grave** 328:20
**gravitas** 206:15
**great** 7:2 8:14
9:5 28:3 31:5
37:19 94:15
192:10,22
256:9 299:5,6
299:6,7 306:5
**green** 2:14 8:10
**grounds**
188:11 235:21
**group** 90:16
163:13 286:16
**grow** 270:13
**grown** 142:21
**grudge** 189:18
277:11
**gs** 29:10,15
164:22
**guard** 109:6
**guard's** 109:9
**guerrero** 289:6
289:18
**guess** 8:5 44:6
49:22 52:1
96:3 106:7
117:5 119:19
124:22 136:6
137:10 139:2,8
148:22 151:20
159:15 168:19
174:17 189:5
190:3 206:3,15
225:10 226:9
244:16 278:14
285:16 306:9
316:17 334:20
344:2

**guessing** 295:7
**guidance** 85:10
101:8 102:10
104:9,15 125:6
148:3 155:15
155:22 170:14
172:9 191:13
191:15 280:3
330:13
**guide** 149:4
155:16 156:6
156:17 185:22
**guided** 300:17
**guides** 126:13
**guiding** 100:10
**guitron** 289:4
**gun** 200:7
221:1
**guru** 41:7
**guy** 77:14
200:20 202:1
256:8
**guy's** 228:10
**guys** 190:20,22
191:2 209:8
254:18 306:7

**h**

**h** 3:5 4:2 341:6
341:6 348:3
**half** 32:22
105:5 214:2
306:11
**halls** 208:13
**hand** 50:1
114:14 116:18
121:2 123:14
132:7 134:11

159:15 211:19
284:9
**handbook**
25:17
**handed** 117:16
**handful** 286:12
**handled** 292:5
**happen** 253:2
292:10
**happened** 13:5
13:17 33:1
124:13 179:1
228:19 230:17
233:7 263:2
269:10,14
332:12
**happening**
211:10
**happens** 51:20
165:2 213:11
286:2 329:10
**happy** 7:11
134:2 183:1
**hard** 68:10
**harm** 292:14
323:2 325:17
**harmed** 192:21
**harsh** 215:20
**hate** 39:8 75:9
190:21 321:17
**hatted** 47:3
48:6
**he'll** 192:16
**head** 335:16
**headquarters**
33:17
**health** 20:7
21:20 253:13

**EXHIBIT 1**
**Page 597 of 638**
www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000377

| | | | |
|---|---|---|---|
| **hear** 181:21,22 207:19 263:3 264:20 273:18 322:22 | 272:6 276:14 283:17 294:21 294:22 306:9 311:16 333:22 334:7,9 341:9 | 139:11 140:9 140:20 141:7 141:22 142:11 143:4,7 144:1 144:15,18 | **hnco's** 139:17 148:12 154:19 226:22 234:1 234:13 261:20 |
| **heard** 49:13 125:17 133:21 151:5 187:4 208:12 246:3 264:7 266:17 267:14 270:1 275:2,5,10 | 344:12,15,17 347:1 **hereto** 345:15 **hesitate** 126:7 141:1 172:8 **hey** 87:13 253:22 256:8 256:12 | 145:4 148:6 150:19 158:7 179:22 181:7,8 188:8 193:7 200:22 201:9 201:11 202:13 205:22 206:8 206:22 233:19 | **hold** 18:15 42:20,22 71:10 71:11 145:18 146:2 189:18 236:5 250:14 275:18 **holds** 145:21 277:11 342:11 |
| **held** 12:18 18:9 42:18 | **hi** 180:15 205:16,19 | 237:12 238:8 238:16 239:5,6 | **hollenbeck** 289:13 |
| **helfrich** 2:3 | **high** 299:19 | 240:8,10,18 | **home** 33:2,11 |
| **help** 54:1,2 82:10 93:14 186:18 297:17 299:2,3,9,10 | 300:3 342:10 **higher** 71:21 **highest** 11:2 **highlight** 94:15 | 243:19 249:7 250:1 258:16 258:21 259:3 260:14,17 | 33:18 **honest** 101:21 **hook** 75:9 **hoping** 322:14 |
| **helped** 44:7 258:12 294:12 294:19 309:17 324:11 | **highly** 132:3 **highnam** 341:2 341:4,13 342:9 **hindsight** | 261:22 262:9 267:22 268:2,6 268:21 269:10 269:14 270:21 271:2,17,22 | **horse** 225:15 **host** 230:17 251:20 312:19 **hosted** 252:2 **hosting** 230:18 |
| **helpful** 82:10 **helping** 68:12 339:13 | 205:9 **hired** 299:19 300:7 | 272:15 273:12 278:1 282:9,12 283:7,21 287:2 | 251:21 252:6 **hour** 112:21 118:22 119:9 |
| **henry** 2:3 8:12 8:12 41:1,11 44:2 68:3 75:11 87:16 97:5 100:7 103:20 105:21 122:13,18 136:8 144:16 147:14 170:16 172:19 173:4 175:20 192:1 231:7 235:9 239:21 249:11 | **history** 217:22 287:2 **hit** 143:3 **hjb** 1:5 **hmms** 6:21 **hnco** 4:7 39:22 40:1 49:3 53:18 57:20 59:10 88:8 107:4 134:6,9 138:9,14 139:3 | 288:8 291:18 293:9,13 294:9 294:11 299:20 300:7 301:4,14 303:6,7 306:3 319:17,18 322:1,2,5,7 323:15,19,20 329:17 334:15 342:15 | 214:2,2 331:17 **hourly** 112:18 117:22 121:17 **hours** 52:18,22 53:4 76:7 118:6,10,17,18 118:22 119:5,5 119:17,20 120:1,2,5,7,9 120:11,12,13 122:4,5,6,7 |

**EXHIBIT 1**
**Page 59 of 63**

Capital Reporting Company
www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000378

124:10 191:3,9
191:10 246:6
306:11 330:20
331:19,22
332:22
**howe** 298:2,4,9
**huge** 321:4
**huh** 86:13
108:5 124:9
136:11 140:19
174:13 258:22
305:5 321:11
343:16
**huhs** 6:20
**human** 21:18
45:7
**humans** 46:5
**hungry** 151:21
151:22
**hypothetical**
109:11

**i**

**ian** 335:19
336:13 337:2,4
337:10,10,11
337:20 338:2,2
342:4,13
**iarpa** 309:19
309:21
**ic** 14:17 30:13
30:22 31:13,20
31:20,22 64:7
**idea** 116:2
183:15 282:4
287:3
**ideas** 48:8 51:2
51:5,7,8,11

56:7 60:18
66:15 317:4,5
**identifiable**
241:12
**identification**
64:14 114:18
116:22 121:5
123:19 132:10
134:14 159:20
227:14 284:13
284:19 293:20
**identified**
58:21 89:6
108:9 112:1
133:1 135:19
135:22 136:13
176:19
**identify** 58:16
58:19 103:13
107:3,7 108:1
200:13 203:21
204:1 206:7
**identifying**
132:22
**identity** 109:10
**ieee** 113:18,19
114:1
**ignored** 257:11
**illegally** 210:9
**imagery** 21:18
68:13,14
253:13 320:14
**imagine** 35:19
276:17
**immediate** 47:1
62:21 63:2
**immediately**
44:21 96:22

**imminent**
327:18
**imminently**
328:8
**impact** 21:13
103:3,5 206:15
**impede** 46:13
**impetus** 150:1
**implementati...**
300:18
**implemented**
171:9
**implies** 269:19
316:22
**important** 6:18
138:11 167:20
262:20 303:4
**imposing** 221:4
**impossible**
86:15 108:12
**improve** 23:15
56:7
**inaccuracy**
222:11
**inaccurate**
221:19 222:15
**incident** 150:14
**include** 20:15
21:8 66:15,20
102:18 170:3
241:11 320:18
**included** 21:17
31:1 45:9
59:11,12 63:22
69:15 129:19
166:16,22
197:17 276:12
285:15 304:7,7

**includes** 14:15
15:5
**including** 33:3
40:11 93:12,20
111:9 145:7
199:8 237:21
263:7 311:1
320:16
**income** 15:15
24:2 33:22
43:14 247:7,11
248:16 330:7
331:6
**incompetent**
281:22
**incorporated**
42:13
**incorrect**
218:18
**increase** 331:4
**increased**
121:21 122:3
**incredible**
299:4
**independent**
39:9 224:7
276:21
**indicated** 331:3
**indication**
290:22
**indicted** 327:10
328:8
**indictment**
327:17
**indifferent**
189:15,19,22
**individual** 48:4
95:7,13,15

Case 5:22-cv-00869-JKP   Document 122   Filed 08/05/25   Page 600 of 1654
Paul Roysdon , Ph.D.                                    May 30, 2025
[individual - interpret]                                         Page 32

151:8 168:9
192:19,20,21
265:7 279:9,18
292:17 311:8
**individuals**
108:17 245:3
263:13,14
268:4 269:6
270:14 276:7
287:1 299:7,8
323:5
**indoc** 137:12
**indoctrination**
137:14 215:17
**industry** 23:17
76:1 143:1
250:17 271:13
331:5
**inexpensive**
112:21
**infer** 342:19
**influence**
339:18
**inform** 173:22
174:1
**information**
22:12 46:11
48:14 49:4
91:20 93:3
94:22 103:12
129:8 131:22
133:2,4,18
162:11 163:1
166:14 172:2
174:4 177:10
192:14 195:8
195:13 196:9
196:11 197:7

197:10 198:10
198:21 199:20
201:7 202:9,12
202:14 206:16
210:1 212:15
215:22 216:3
219:16 221:18
227:16,17
229:17 231:22
233:4 234:6
236:15 240:4
240:10,13,18
240:20 241:1,5
241:8,12,12,21
242:8,9,18
243:2,10,12
275:6 279:4,22
329:19 343:22
**informed** 88:13
222:9,15,16
245:21 292:7
323:5 329:9
**infotek** 34:5
111:17
**infrequent**
54:22
**initial** 3:15
60:5 111:20
132:15 165:15
200:12 286:5
300:15 316:3,4
338:9 341:7
**initially** 44:19
112:7,8
**innocence**
273:3
**input** 177:5

**inquiries** 235:2
**inquiry** 234:1
234:14,17
243:19 271:18
272:15 273:4
276:13
**inside** 217:3
**insider** 194:14
194:22 195:18
281:20,20
282:2,5 327:10
327:19,22
**insight** 109:12
161:5
**inspector**
178:12
**instances** 305:3
**instigated**
294:7
**integrated**
30:13
**intelligence**
14:2,5,15 15:4
16:20 20:7,18
21:22 31:1,17
31:18 68:9
207:11 255:11
324:6
**intelligent**
45:14
**intended** 67:8
110:16
**interact** 130:19
130:21 144:14
151:4 190:11
191:8 205:7
268:7 298:13
340:19

**interacted**
145:6 190:13
266:17
**interacting**
83:4 205:8
**interaction**
158:17,22
175:2,14
180:21 221:15
269:3 315:6
**interactions**
60:2 82:12
139:10 144:17
144:18 158:15
159:4 188:22
189:9 201:1
203:2 301:5
**interest** 17:10
24:17 27:11,13
66:1,4 67:5
95:2 107:22
175:19 191:14
196:6,14 199:4
208:21 224:18
**interested**
45:19 47:10,14
49:7 181:22
261:11 338:3
341:20 345:16
**interesting**
260:22
**interference**
319:5
**intern** 29:9,20
**international**
20:8 114:1
**interpret** 46:13

interpreted
  83:6 223:8
interrupt
  257:19
interview
  199:16 254:4
  256:15
interviews
  11:19 232:5
introduce  8:6
  49:10 50:11
  176:4 205:19
  206:1 208:3
  285:4 337:22
introduced
  49:2,21 77:7
  112:2 179:21
  180:3,6 181:11
  205:21 207:3,5
  207:8,18 208:7
  341:14,17,19
introduction
  50:1
intuition  221:7
  293:4
invented  263:9
invest  253:6,15
  253:17
investigated
  233:11 234:8
  322:22
investigation
  194:5,8,10
  234:8 235:4
  236:10 237:3
  237:16 243:9
  251:4 257:15
  272:2,11,22

273:1,11,14,17
273:18,22
274:5 275:12
275:14 322:21
323:4,6,22
327:9 328:7
329:2
investigations
  235:2
investigative
  3:17
invitation
  127:19,20
  285:4,8
invite  286:11
invited  305:10
invitees  285:20
invoicing
  120:16
involve  86:18
  86:18
involved  22:1,2
  40:9 44:10
  60:8 147:9
  225:2 237:17
  258:11 261:13
  274:9 330:17
  338:2,22
involvement
  90:22 224:5
  344:3,7
iran  148:1
  161:6 216:21
irrelevant
  277:13 303:2
issue  84:22
  94:19 120:10
  173:20 188:13

218:20 225:10
246:5 250:8
257:7 261:20
273:12 279:16
283:7 292:19
301:9,11
342:22
issued  246:9
issues  252:15
  297:21
item  118:20
  121:20 327:5

**j**

jade  225:20
  226:1,3,5,7
james  289:10
january  63:15
jared  185:10
jason  236:14
  294:15,19
  295:1 333:12
jaspers  48:5,11
  48:21 49:2,10
  50:5 77:7
  151:5,12
  157:10 167:22
  187:5 188:5
  190:4 191:7
  193:2,12
  224:20,21
  225:1,5,7
  228:11 229:2
  234:10,10
  238:3 239:7
  252:19 254:1
  254:16 255:18
  256:11 257:20

259:8 261:9
268:17,18,20
270:2 275:8
282:10 284:4,5
285:15 290:14
292:5,18,20
300:5
jda  14:19 28:16
jdas  14:18
jerry  298:2,4
jim  295:14
  297:5 337:3,14
  337:20 338:1
  341:17,19,21
  342:11
jkp  1:5
job  1:22 7:2
  11:17 13:22
  14:12 15:14
  27:16 35:10
  66:21 68:5
  83:15 89:11
  103:9 131:8
  172:14 186:8
  186:17 192:10
  193:5,6,16,22
  210:22 232:6
  256:14,18,20
  270:11 283:22
  293:6 318:1
  326:5,6 346:22
jobs  270:10
john  1:3
  289:13 347:4
  348:1
join  254:2
  258:2 270:10
  305:7

**joined** 8:9
253:4 254:5
258:3
**joining** 8:10
253:5
**joint** 14:20
15:1 28:18
30:5 32:12
89:1,11 154:16
226:1
**joke** 200:9
**joseph** 2:8 8:9
**journal** 98:1
**judicial** 107:19
**julio** 289:6,18
**june** 3:10 115:6
117:21 118:7
134:9 137:21
139:8 345:22
347:3
**justice** 1:14 2:9
5:14
**justification**
114:8 219:20

**k**

**katie** 122:13
**katrina** 2:8
5:12 8:8
**katrina.m.see...**
2:11
**keep** 8:19
25:13 187:7
236:22 266:15
266:15 267:2
**keesing** 296:9
296:10 297:1,2
297:7

**kept** 37:9
**kevin** 200:13
200:15 288:15
**key** 316:19,20
316:22 317:11
**keyboards** 47:6
**kids** 10:15
**kind** 20:12
23:11 30:2
32:10 36:9
44:7 47:5
53:22 61:5
62:16 64:6
71:16 75:21
77:14 89:6
91:7 96:7,7
104:2,10
164:12 176:1
208:10,12
211:8 251:21
257:10 261:5
265:12 277:13
277:15 279:17
283:3 291:21
294:6 301:8
302:19 303:1
304:15 319:13
329:10 331:8,8
336:18
**kinds** 261:3
**knew** 69:11
75:5 77:14
133:20 218:17
224:3,8 229:9
261:12 287:1
303:20 328:11
330:2

**know** 7:16 8:17
9:2 13:11 19:8
26:8 29:19
33:6 34:19
35:19,20 36:3
36:18 48:11,22
50:16 53:1
54:3 55:14
56:15,17,19
57:5 59:6 61:7
65:10 67:17
69:14 73:3,10
75:1,5,7 77:13
78:17 79:21
80:10 84:11
85:11 92:13
96:13 97:22
103:8 106:17
108:2 116:8
117:12 125:20
130:12 131:12
133:1,6,12,14
135:1 136:16
139:3 140:2,9
141:1,3,15
144:8,9 145:3
146:3 149:14
154:13 155:16
156:1,2,4
157:22 158:12
160:9 161:5
167:3,6,7,14
169:10,14
171:1 172:3
173:16 174:22
175:4,7 176:21
177:16,21,22
179:10 182:8,8

182:18 183:4
185:10,18
187:10,16,22
188:18 196:11
197:11,20
198:1,16 201:7
202:2,3,9
205:6 206:16
207:8,17 210:8
212:9,11,14
214:7 215:2,21
217:9 218:21
219:12 220:22
226:4,6,7
228:3 229:4,7
233:2,18,21,22
234:3,13 235:1
235:3,6,11
241:21 244:2
244:17 245:1
248:12 256:8
263:20,20
264:13,15
266:16,21,22
270:15 271:4,7
274:1,8,13
275:16,20
276:15,22
277:3 278:13
279:5,18
280:14 281:3,4
282:20 285:22
286:16 287:13
289:14,18
291:1,8,13,13
291:15 292:13
292:15 293:16
295:5 301:8,9

**EXHIBIT 1**
**Page 601 of 638**
www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000382

301:14,16,17
301:18,19
302:3 304:18
310:4,8 311:17
312:9,12
313:14 314:6
314:12 316:7
321:7 325:12
326:16 329:3,8
330:15 331:19
335:3,19
336:12,20
338:5 339:2,2
339:5,7 342:17
344:5
**knowledge**
58:10 75:20,22
106:14 113:1
119:14 131:22
144:7,21 145:6
145:9 146:11
146:21 169:18
202:8,16 217:9
237:1 240:17
240:20 241:1
257:9 272:14
274:6 276:21
277:6 280:21
285:19 286:9
293:5 304:6
336:11 343:18
343:18,20,20
344:6,8
**known**   13:12
150:19 225:1
280:21
**knows**   205:17
268:18 278:17

**kudu**   40:5
232:22 300:18
335:5 339:3,8
340:2

**l**

**label**   122:14
**labor**   113:6
**laboratory**
53:19 188:9
**lackland**   212:2
213:15,18
**lance**   2:3 8:12
294:21 347:1
**language**   21:18
141:10,16
182:4,6 215:21
219:21 300:11
**large**   14:14
129:17 219:3
282:22 319:20
**largely**   257:11
**larger**   21:22
63:13
**largest**   31:7
**lasting**   266:5
**late**   53:3
178:16 338:21
**launched**   194:5
273:1
**law**   82:11
93:18 192:11
**laws**   94:22
110:7
**lawsuit**   5:17
6:2,5 11:20
12:16 13:4
131:20 132:2

156:14 201:8
205:2 255:2,5
255:13 273:10
296:4 297:8
298:19 299:14
303:5 322:15
323:22 325:19
328:10 329:9
333:14 336:6,9
338:19 340:9
340:12 343:19
**lay**   113:6
**lead**   66:10 68:5
103:18 176:3
**leader**   63:2
186:8,9,14
271:11,14
292:17
**leaders**   84:2,2
208:10
**leadership**   46:8
47:1,4 49:5
52:15,16,16
53:6 58:3,5,7
58:11 59:6,9
59:11 60:13
61:6,7,12
62:21 74:19
76:6,8 94:21
174:1 188:8
224:17,21
225:5,7,10
235:18,20
259:14 292:6
294:10 303:17
304:4,6,13
329:8,16

**leading**   66:10
68:12 139:8
259:15 341:20
**leak**   192:13
**leaning**   48:10
319:12
**learn**   23:14
236:9 274:19
**learned**   173:17
**learning**   25:16
25:18,22 45:11
45:12,15,15
68:13,14 69:6
**leave**   17:19
18:4 28:15
110:9 199:18
220:15 226:19
250:16 270:10
283:21,21,22
**leaving**   188:16
189:3,5,10
204:5 213:2
222:20 230:5
317:18 330:19
339:15
**left**   18:13 19:1
19:16 20:21
21:2,4 28:17
29:14,21 37:8
43:3 226:16
251:7 287:12
307:22 310:14
**legal**   6:10
16:12 52:5,11
66:6 75:17
209:22 210:2
242:22 295:10
347:23

**legalese** 96:7
**legally** 92:13
  210:6
**legwork** 74:22
**leidos** 17:15,17
  17:19 18:2,4
  18:10,18 19:4
  19:16,21 20:1
  20:6 21:1,4
  22:21 24:3,19
  25:4 26:4,11
  27:14,17,18
  28:8,12,13
  33:15 69:2
  131:10,11,17
  213:9 232:6
  238:1,5,20,21
  238:21,22
  246:22 247:16
  247:17,19
  248:18,22
  249:8,10,16
  250:4 251:18
  251:21 252:5
  252:22 253:4,6
  253:8,15 254:9
  254:12,13
  255:18 256:8
  257:1,20 258:5
  260:19,20
  265:4,7 271:6
  284:1,5 285:5
  286:12 291:5
  291:11 292:11
  292:14,17
  294:2,5,10
  295:15,16
  297:16,18

  298:5 299:5
  301:5,10 303:7
  303:11 306:1
  307:1,6,13,17
  307:20 308:1,2
  308:10,13,17
  308:20,22
  309:1 310:21
  311:5 316:12
  316:13,14
  317:10,10,22
  318:2,6,21,22
  319:2 320:9,10
  320:12,19
  321:3 329:7,16
  339:8,10,15
  341:20
**lesser** 294:22
  331:10
**letter** 219:4
  323:19
**letters** 52:10
**level** 14:7,9
  18:17 32:4,10
  51:12 59:7
  71:21 72:8
  76:16 102:7
  118:14,16,17
  121:20 124:4
  155:11 203:1
  301:6,8,8,11
  329:20
**leverage**
  217:18
**leveraging** 27:1
  72:1 216:14
**lhenry** 2:5
  347:2

**liberty** 32:14
**license** 11:13
**licenses** 11:11
**licensures**
  11:10
**lied** 290:16,22
**life** 39:21 49:3
  53:17 88:7,8
  286:15
**liked** 62:4
  340:1
**likely** 250:1
**likewise** 5:11
**limitation**
  115:17
**limitations**
  107:3 109:12
  238:14
**limited** 81:12
  98:21 101:12
  144:18 148:10
**line** 11:18
  35:22 53:14
  86:10,12 90:19
  262:19 348:4,7
  348:10,13,16
  348:19
**lined** 219:9
**lines** 96:16
  101:19 104:3
  148:6 287:8
**lingering**
  111:11
**linguistic** 267:6
**links** 93:12
  130:7
**list** 284:10
  285:20 287:16

  325:17
**listed** 39:4
  118:16,20
  119:6,12 122:9
  124:5 148:22
  149:1 285:7,20
  326:9
**lists** 325:16
**literally** 119:1
  335:13
**litigation** 292:8
**little** 49:12
  64:10 82:6
  109:2 130:9
  155:13 162:5
  174:9 181:2
  211:5 214:20
  239:13 248:21
  261:1 268:13
  306:8 342:14
**live** 9:14,16,18
**lived** 9:12
**livelihoods**
  270:16
**lives** 270:13
**llc** 36:12,12,16
  36:17,19 37:7
  37:14,15,20,22
  38:13 39:1
  42:7 43:20
**local** 59:9
  233:19
**located** 15:7
  33:15
**location** 1:14
  32:15
**logix** 40:7 51:4
  232:22 300:19

335:5 338:13
**long**  9:12,18
  10:9 15:11
  23:13 36:14
  52:12,21 78:15
  84:16 92:2
  105:22 116:2
  213:22 292:17
**longer**  56:21
  249:3 251:9,10
  316:5
**look**  12:7 23:16
  68:14 96:5
  109:3 113:20
  134:16 242:1
  248:19 280:11
  292:16 310:4,5
  310:6
**looked**  42:21
**looking**  61:16
  74:2 104:14,19
  104:21 121:20
  136:9 287:4
  294:22
**looks**  288:19
  289:12
**loop**  23:14
**loosely**  206:13
**losing**  193:5,16
  193:21,22
**loss**  329:15
**lost**  133:17
  246:17 248:16
  248:17 306:1
  306:20 330:7
**lot**  9:20 21:17
  21:18 23:6
  52:11 69:14

79:4 92:6
97:10 162:13
203:10 211:9
236:20 252:18
257:3 313:20
319:21
**loyal**  211:1
**luminaries**
  316:21
**luminary**  317:3
  317:17
**lunch**  52:20,21
  78:15 151:19
  152:3
**luncheon**  152:5

### m

**m**  1:17 2:8
  341:6 345:2,18
**ma'am**  5:9,16
  5:19 6:1,3,6,8
  6:16 7:1,9,15
  7:20 8:1,4,22
  9:7,9 10:8,14
  10:16 12:3,6
  12:11,14 14:11
  15:10,16 17:4
  18:8,19 19:2
  21:3 23:1 24:1
  24:10 26:6,12
  28:7,11,20
  34:13 38:21
  39:12,16 40:14
  40:17,20 42:8
  42:11,14 44:9
  46:18 49:15,17
  50:19 51:19
  54:10,13,16

55:13,22 59:21
60:4,10 63:7
65:11 72:21
73:22 76:20
77:5 79:22
113:14 116:1,4
116:7 118:5
119:7,10,13
121:13,16,19
123:13 132:13
134:4 139:12
139:16 159:2
159:14 176:9
177:13 178:9
178:22 179:11
179:11,14,17
185:17 188:14
188:17,20
189:1,4,7,11
190:2 201:3,6
202:7,18,20
203:17 204:6,9
204:13 205:3
206:5 207:20
211:7,18 212:8
212:10,13,16
213:4,14,21
215:19 216:6
219:7,10 220:5
221:14,17
225:13,17
227:10 230:3
233:5 234:15
236:21 237:10
240:6,11,16,19
242:14,20
244:21 245:7
245:10,16

246:15,20
247:2,10,13,15
247:20 248:4,6
248:8,10 252:4
252:7,10,17,21
254:7,14
255:16 257:5
259:21 260:15
262:3,7,11
269:1,7,11
271:9,12,15
283:8 286:14
286:19,21
288:1,7,14,16
288:18,21
289:1,3,5,7,9
289:11,19,22
290:3,6 293:11
294:16 295:15
296:5,18 297:2
297:9,22 298:3
298:10,14
299:16,21
302:10 303:18
307:7,14,18,21
308:3,7,19
309:3,6 310:22
311:3 312:16
315:17 318:11
318:13,20
322:12 325:15
327:12 329:14
330:8 332:15
333:15 338:16
339:9,12
340:13,16
342:16 343:3

**EXHIBIT 1**
www.CapitalReportingCompany.com
**Page 604 of 659**
202-857-3376

Roysdon Fact Witness_000385

machine  25:16
25:17,22 45:12
45:15 68:13,14
69:6
machines  45:7
46:3,4 171:16
made  63:4
75:13 119:22
125:21 145:1
146:20 147:2,4
148:7 181:15
247:22 248:1
254:4 255:8
273:13 284:9
mail  3:7,20 4:4
4:5 37:10 53:8
54:17,20 55:1
55:2,3,4 56:12
56:22 65:4,6,8
65:13 70:2
72:19,22 73:7
73:21 74:4,6
82:8 83:21
84:16,20 85:5
85:7 90:19
91:11 92:2,16
92:18,20 93:12
93:14,15 96:4
96:6 97:11,17
97:22 98:5
99:15,17,19,21
100:14 109:15
130:22 195:17
196:13 198:9
198:12 199:5
220:11 223:8
223:12,17
227:22 228:1,5

228:12 243:14
244:14 254:21
255:1 286:13
288:20 294:8
302:19 319:2
mailed  120:20
mails  34:21
52:14 53:12
64:10 73:18
79:18 80:1
90:17 96:12
102:15 109:21
111:9 188:2,3
195:15,19
196:8,16,18
197:14 198:13
198:14,22
199:3,7,9
205:1 209:14
220:12,13,18
241:3 257:17
276:2
maintain
128:19 317:16
maintained
317:14
major  14:16
16:19 184:14
184:18
majority
129:17
make  6:17 7:8
8:19 16:1,2
24:16 26:1
52:22 53:12
57:17 65:22
66:16 67:5
73:20 80:22

83:3 92:9,13
93:22 94:21
95:1 96:15,16
96:18 101:10
110:6 111:22
123:12 141:10
191:15 192:10
200:10 207:3
207:21 208:1
210:5 211:2
214:20 215:14
246:18 248:3
280:3 290:22
291:3 300:12
313:5 320:5
321:17
makes  10:5
108:12 216:13
340:7
making  43:6,8
43:9 92:12
215:11 218:17
232:6,7 246:22
264:5 302:21
320:8
man  200:6,13
manage  314:2
management
39:22 49:3
53:18 88:8
167:8 186:1,20
236:4 286:16
manager  57:14
112:9 120:10
130:11 161:4
163:6,7
managers
208:10

manner  60:15
139:3 147:19
map  118:19
march  17:20
25:20 33:1,6
65:7 73:15
74:13 135:17
136:20 137:2
210:16
mark  64:11
114:14 116:19
121:2 123:15
132:7 134:12
159:17 227:12
284:10,16
293:15
marked  64:14
114:18 116:22
121:5 123:19
132:10 134:14
159:20 227:14
284:13,19
293:20
market  330:5
marriage  10:13
married  10:7,9
master's  11:7
material  127:9
materials
241:16
math  25:15,17
62:9,10,12
70:5 87:9 91:5
94:10 99:1
119:2,22 156:1
167:18,21
169:6 176:8
181:22 182:17

Roysdon Fact Witness_000386

183:9 208:11
215:9,12 280:9
280:18,19,20
**mathematical**
106:1
**mathematician**
182:9 183:11
206:17
**mathematics**
62:15 83:8
84:7,8 85:17
86:3 87:7,18
98:22 110:3
114:7 118:21
126:14 127:8
127:10 147:15
149:9,11 171:8
176:6 181:17
181:20 182:13
215:6 216:9,12
279:11,11
321:21 330:14
336:15
**mathing** 87:10
**maths** 81:9
99:3
**mathy** 62:3
**matt** 339:3
340:8,14
**matter** 23:5
58:9 76:5 83:7
104:13 107:20
110:13,13
161:2 186:5
205:12 207:11
237:19 262:18
323:9 334:18

**matters** 108:11
342:6
**maximum**
118:10 154:21
**mclean** 15:8
32:14
**mcveigh**
143:14 150:2
150:13,19
151:6 161:3
163:4,21 164:1
164:7,18 165:5
168:7 169:14
169:20 172:1,2
173:18,20
174:5,6,7,16
174:21 175:3,6
175:10,12
179:16 180:3,7
180:21 181:12
184:5,14,20,22
185:2,5,20
186:11,21
187:1,11,21
188:12,16
189:14 193:6
193:18 194:15
194:17,22
195:3,9,10,18
197:6,19 198:5
198:16 199:2,6
201:13 202:15
228:2 229:12
229:19 235:17
237:7 240:4,10
240:21 242:16
242:19 243:3,6
244:6,8,18

245:6 255:7
266:6,19
267:10 269:3
274:12 276:4
277:8,10 278:7
278:11 282:1,7
324:19 325:9
**mcveigh's**
160:7,16
163:16 164:8
164:10 168:4
190:5 195:12
240:13 242:7
**mean** 21:14
32:5 47:15
51:7 91:2,17
94:5 98:14,19
99:8 104:9,22
105:8,10,12
119:20 124:18
139:21 156:19
159:4 166:1,4
172:20 181:18
182:11 192:5
196:1 206:6
223:11 231:5
250:15 256:6
264:15 272:17
281:15 304:15
315:12 332:1
333:22 334:17
**meaning** 40:1
67:15 91:20
134:1 161:5,15
162:15 166:5
171:6 236:13
260:1 261:9
278:22 297:17

332:22
**means** 80:7
105:10 176:11
281:13,16
330:20 339:19
**meant** 83:21,22
105:13 159:11
**mechanisms**
146:1
**media** 11:15,20
**medical** 320:14
**medications**
7:21
**meet** 212:1,3
233:6,9 333:3
**meeting** 49:19
49:20 50:2,4,7
50:14,22 51:1
51:18,21 58:17
59:1,5,13,16
155:2,4,13,14
158:19,19
167:13 169:5,8
169:11,15
170:8,10
175:18,19
176:12,14,16
177:12,14
179:20 203:13
203:15,16
221:10 285:3
285:11,21
286:5,10 287:6
287:10 289:21
290:5,9 327:20
337:3,8
**meetings** 49:22
50:6 60:5,7

EXHIBIT 1
Page 600 of 639
www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000387

99:16,18 203:7
203:8,10 208:3
286:4 290:10
290:11,15
305:7
**member** 49:2
265:8,9
**members** 16:11
237:20 259:9
259:16 265:9
323:20,21
325:9
**memo** 4:7
267:21 296:4,7
298:2 299:13
299:14
**memorable**
150:3
**memorandum**
82:16
**memorialize**
97:1,18
**memorialized**
74:3
**mendez** 288:22
**mention**
115:15 259:16
304:9 324:18
336:22
**mentioned**
13:9 29:19
30:6 43:21
50:21 56:12
59:6,17 62:3
62:17 65:21
73:19 76:11
77:5 78:14
84:18 97:9

117:2 126:1
140:16 151:2
163:2,3 172:4
173:16 195:2
198:17 220:22
245:11,13
246:21 249:1
253:14 257:3
258:21 259:19
276:7 283:6
295:13 301:12
310:8 313:14
318:8 322:20
322:21 330:14
331:19 337:1,8
337:10,13
338:21 342:13
**mentioning**
187:7 301:3
314:9
**mentions** 230:1
343:14
**merely** 179:20
**merged** 114:7
**message**
205:11 228:6
302:13
**met** 49:16
179:16 186:2
252:20 338:17
341:14,15,18
**methods**
170:20
**mexican** 191:7
**microsoft**
285:2 287:9
**mid** 197:2

**middle** 86:9
220:6 227:22
**military** 16:11
31:18,20 108:3
110:9 142:1,2
**million** 331:12
331:13
**mind** 25:13
**mine** 13:6 27:6
253:21 265:1
293:5 335:1
**minimum**
133:15 322:16
**ministerial**
86:19
**minute** 151:19
152:3 239:17
**mip** 31:16,17
**misconduct**
234:18,22
**missing** 170:5
278:19
**mission** 48:9
68:8 188:4
260:22,22
**misunderstood**
74:7
**mitigate**
186:17
**mixing** 52:9
**ml** 320:14
**mm** 6:21
**mo** 277:15
**modern** 171:15
**modification**
3:13 124:1,2
**modus** 277:15

**moment** 36:8
61:15 209:15
282:16 324:5
**monday** 92:19
232:4
**monetary**
334:14
**money** 53:22
125:20 164:12
164:13 168:3
168:12 246:16
247:22 248:3
261:10,11
**monte** 339:3
340:8,14
**month** 33:19
**months** 150:15
165:20 258:2
261:9 298:17
**moonlight**
108:18 109:6
**moonlighting**
108:4,8
**morning** 5:8,9
**mou** 82:15,16
82:20,22 83:3
**mouth** 242:9
**move** 7:6
106:19 228:16
270:17
**moved** 9:20
193:6 305:13
305:14
**moving** 68:1,19
91:10 95:5
122:20 201:21
219:11 220:3
287:21 306:13

**EXHIBIT 1**
www.CapitalReportingCompany.com
**Page 60 of 68**
202-857-3376

Roysdon Fact Witness_000388

316:16
**mud**  193:4
238:10 257:4
**multimillion**
335:9

**n**

**n**  1:14 2:1 3:1,1
4:1,1 5:1 14:9
24:9 55:10
153:1,1,1
341:6 343:6
**n.e.**  1:14
**name**  5:12 8:8
9:6 10:11
12:19,21 13:6
13:8,21 16:9
16:10 36:4,11
37:9,13 42:4
48:5 51:5 52:9
52:9 55:19
61:3,4,20
62:10,12 75:14
75:14 98:11
105:7,19 106:3
106:8,8,16
117:14 135:22
167:4 212:15
216:18 228:10
237:14 238:6,9
238:17 239:1
239:10 255:12
255:13 259:11
259:16 260:4
261:16 262:17
263:3 287:14
289:14,17
303:13 309:18

310:9,11,13,15
310:18 311:2,6
318:7,12 321:7
321:8,15
322:17 323:16
326:1 328:1,10
**named**  200:13
**names**  10:17
61:11,13 62:3
263:18 264:19
265:6 288:9
342:3
**naming**  61:19
**nascent**  283:1
**national**  14:1,4
28:14 31:17
113:17 114:4
114:10 255:11
324:6 343:7,9
**naturally**
272:14
**nature**  78:16
106:2
**navigate**  47:6
**navigation**
28:1 81:21
84:10
**navy**  47:6
63:22
**ncsc**  289:1
**nda**  137:15
**nearly**  186:11
**necessarily**
15:22 53:2
92:8 126:22
129:14 208:17
208:18 277:19

**necessary**
146:1,15 162:2
171:7
**need**  7:16
16:12 41:22
46:16 56:21
74:20 91:12
128:3,9 174:8
180:19 195:14
197:20 221:21
251:9 293:12
293:14
**needed**  45:7
72:11 84:5
94:7 98:21
146:8 171:13
178:2 246:4
251:16,19
261:4 294:9,11
328:10
**needle**  101:21
102:2 141:17
141:19
**needs**  20:5
**negatively**
272:16
**negotiate**
249:18 333:6
**negotiations**
148:8
**neither**  345:10
**network**  44:16
46:1 56:8 61:1
66:21 68:21
69:7,9 171:6
**networks**  68:10
**never**  36:3
49:16 69:21

106:7 119:1
138:11 143:4
155:12 165:2
201:15 202:5
205:20 215:12
252:2 262:5,5
266:16 267:14
279:20 302:8
308:15 341:18
**new**  45:12,17
47:16,17
167:18,21
176:8 210:22
217:22 219:9
253:22 260:19
280:18,19,20
317:3 342:1
**nf**  71:1,17
**nga**  31:6,19
258:13
**nice**  5:10 284:7
**nicknames**  9:8
**nights**  53:4
328:22
**nine**  15:13
17:20 53:2
**nip**  31:16,16
**noes**  6:20
**nomination**
75:15
**non**  104:17
137:15
**noncompete**
115:14
**nondisclosure**
135:6
**nonprofit**  16:7

EXHIBIT 1
Page 600 of 683

www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000389

nope  88:4
notary  1:17
  345:1,19
note  64:17
  96:11 151:14
  284:7 347:10
noted  227:16
notes  126:14
  344:10
notice  92:5
notified  174:2
nro  31:6,19
nsa  14:22
  28:15 29:1,5
  29:11,11,14
  30:8,9 31:6,19
  32:18 33:5,5
  34:1,18,22
  35:7,18 36:1
  43:6,7 44:14
  44:15 46:6,8
  46:20 47:9
  48:2,5 52:7,18
  52:22 53:3
  54:22 56:3,5
  58:19,22 59:18
  59:20 60:2
  61:2 62:19
  64:10 65:4,13
  66:8 67:7,18
  68:2,8 69:16
  69:22 70:1
  71:9,11 72:20
  80:10 82:14
  84:22 88:9,13
  88:14 90:5,16
  92:14 94:2
  95:4 104:5

108:17 136:1
136:15 138:11
143:4,8,9,15
144:4 145:18
145:19,21
146:22 148:3
151:7 168:14
170:15 172:9
180:10 185:6
191:17,18
197:15 198:21
199:3,21 206:8
206:14,14,17
206:18,21
207:18 208:4
208:21 213:2
217:22 219:5
219:18 220:7
222:20,20,21
224:17,21
225:5,7,9,16
227:5,6 230:2
230:5,10,11,13
230:21 232:4,7
237:15,21
238:13 241:4
243:14 247:1,8
247:12,19
250:11,16
252:13,19
257:20,21
258:14 263:15
264:3,7,13
268:5,21
272:19 282:14
283:22 288:20
299:19 300:3
310:16 311:4

321:10 323:21
330:19 331:1
344:1
nuance  63:10
  64:3 85:14
  142:3 217:5
nuanced
  141:20
number  3:6 4:3
  63:12 64:13
  70:17 105:11
  114:17 116:21
  120:4,6 121:4
  123:18 132:9
  134:13 136:4
  159:19 161:9
  197:13 200:1
  227:13 241:13
  258:12 266:21
  284:12,18
  293:19
numbers  84:18
  87:9 293:17

**o**

o  3:1 4:1 5:1
  153:1,1,1
oakley  57:15
  112:6,13
  120:22 125:13
  125:14,15,16
  130:4,10
  131:11,14,20
  132:1,22 133:4
  144:6,11 246:2
  246:3,14
  332:17 333:10

oath  6:14
  193:15
obe  165:20
  166:1
objection  41:1
  41:11 44:2
  68:3 75:11
  87:16 97:5
  100:7 103:20
  105:21 144:16
  147:14 170:16
  172:19 173:4
  175:20 192:1
  231:7 235:9
  249:11 276:14
  283:17 311:16
obligations
  330:1
obliged  183:11
observation
  222:1
obtain  22:5
  127:22
obtained
  198:15 220:20
  222:8 223:22
obtaining
  255:14
obvious  79:2
  186:10
obviously
  115:6 265:18
  274:3 289:8
  302:17 333:13
occasion  40:8
  63:14 153:22
  191:4,11
  332:21

**occasionally**
80:18 94:11
254:20
**occasions**
63:12 78:13
127:2 148:19
150:12 151:3
154:21 164:7
168:10 187:11
190:14 193:1
193:11 203:19
207:22 234:10
238:3 239:7
**occur** 98:8
**occurred** 52:4
**occurring**
219:17
**ocean** 283:4
**october** 3:12
121:10
**odd** 205:15
**oddly** 272:22
**odni** 15:14,20
17:14 18:2,6
28:16,19 30:11
31:9 33:3,5
89:7,19 256:12
308:4,6
**offense** 23:10
23:21,22 261:6
**offensive** 23:3
139:6 140:13
140:15,17,21
140:22 142:18
216:19 249:22
315:7 316:9
319:10 339:21

**offer** 50:1
100:4 109:11
143:9,12
165:10,14
172:9,17 173:2
173:5,9 191:12
232:6 249:18
254:5 256:13
256:17
**offered** 82:19
165:15 172:16
299:9
**office** 2:14 14:4
15:7 33:15,17
34:22 48:13
52:6 59:10
65:5 72:20
77:18 79:5
87:2 88:7
101:9 104:5
139:5 141:21
148:12 151:3
163:22 164:5
178:12 186:8
186:10,15,16
190:21,22
191:20 193:7
194:20 195:10
195:13 197:7
197:15,19
198:10 199:21
201:14 202:14
203:1 220:7
229:20 233:20
236:4 240:5,7
241:4 242:8
243:11 258:15
261:20 268:21

272:18,19
273:12 275:11
280:2 287:9
310:18 321:10
**officer** 110:9
295:16 299:19
300:3 345:2
**officers** 108:3
**offices** 29:12
142:6 154:20
236:20
**official** 30:3
36:12 83:6
193:16 228:8
262:6
**officials** 80:11
84:2 94:1
148:9
**ogc** 52:7 65:4
65:13,19 77:22
84:22 88:13
90:3 100:4,9
170:15 191:16
198:21 199:3
243:14
**oh** 11:14 16:9
30:17 86:13
88:3 89:17
113:20 115:13
136:11 150:15
157:8 215:5
217:12 278:15
281:10 284:14
335:22
**oig** 178:21
236:18
**okay** 8:14 9:3,4
9:5,18 10:1,20

11:15,22 12:21
13:19,22 16:2
16:5 18:22
19:8 21:4 23:5
24:2 26:9,13
27:10,19 28:3
28:21 29:3
31:4,12 32:9
33:14,16 34:9
35:21 37:15,19
38:10,15,18
39:13,18 40:15
41:8 44:12
46:15,19 47:12
48:18 49:5,18
50:4,8,17,20
51:20 56:1
57:16 58:1,4
58:10,15 59:15
60:5,11,15,16
61:10,18 62:8
62:13 63:8
64:9 67:10,16
67:22 69:8,16
69:19,21 70:2
70:14,17 72:11
73:4 74:6 75:2
78:1,10 80:22
81:7,18 82:19
83:2,14,18
86:2,8 87:8,20
87:22 88:17
90:3 91:10
93:10,16 97:16
98:3 99:6,12
99:19 100:1,20
101:1,5,8,15
102:13 103:16

| | | | |
|---|---|---|---|
| 104:2 105:2,17 | 175:8,17 176:7 | 230:12,14,20 | 276:12,16 |
| 106:18 107:6 | 176:10 177:3 | 231:1,11 | 277:1,4,7 |
| 107:11 108:22 | 177:14 178:14 | 232:13 233:3,6 | 278:2,14 |
| 111:4,15 | 179:1,4,7,7,15 | 233:22 234:4 | 280:22 281:6 |
| 112:18 115:13 | 181:9,14 | 234:12,16,20 | 281:17 282:11 |
| 115:16 116:8 | 182:17 183:3,5 | 235:13 236:2,5 | 282:15 283:9 |
| 116:11,18 | 184:4,8,11 | 236:9,20 237:5 | 284:6 285:7,19 |
| 117:16 118:6 | 185:10 187:16 | 238:19 239:9 | 286:1,8,22 |
| 118:10,12,19 | 187:20 188:15 | 239:12,15,19 | 287:4,19,21 |
| 119:3,8,14,19 | 188:18,21 | 240:12 241:7 | 288:8,12 |
| 122:8,18 | 189:5,17 190:1 | 241:19 242:1 | 289:15,20 |
| 123:14 125:1 | 190:10,20 | 242:12,15,21 | 290:1,4,12,18 |
| 126:9 127:5,16 | 195:2 197:5 | 243:22 244:4,9 | 291:8,10,16 |
| 128:12 130:9 | 198:11 199:2,7 | 244:16,22 | 292:3 293:15 |
| 132:5,18 134:7 | 199:14 200:5 | 245:2,11,17 | 294:17 295:5 |
| 135:8,18,21 | 200:19 201:4 | 246:11 247:3 | 295:13 296:10 |
| 136:19 138:7 | 201:18 202:3 | 247:11,18,21 | 296:11,19 |
| 138:17,21 | 204:7,20 205:2 | 248:2,21 | 298:1,8,21 |
| 139:2 140:4,6 | 205:4 206:11 | 250:15 251:14 | 299:17 300:2,9 |
| 140:9 141:12 | 208:6 209:6 | 252:5,8,14,22 | 301:13,17 |
| 142:13,16 | 210:19 211:8 | 254:8,18,21 | 302:1,4,11 |
| 143:3,22 | 211:15 212:9 | 255:2,20 256:4 | 303:3,19,21 |
| 144:14 146:5 | 212:17,19 | 256:11,16,19 | 304:5,12,22 |
| 146:19 148:2 | 213:5,20 | 257:22 258:4 | 305:9 306:22 |
| 149:19,21 | 214:15,22 | 258:21 259:5,7 | 307:8 308:8,15 |
| 150:11 153:20 | 215:5,7 216:7 | 259:17,19 | 308:20 309:4,7 |
| 154:15 155:2,9 | 216:11 217:20 | 260:12 261:17 | 309:10 310:8 |
| 157:19,22 | 218:8,14,16 | 262:4,8 263:11 | 310:13 311:1,4 |
| 158:3,12,15 | 219:8,11 220:3 | 263:17,19 | 311:7 312:17 |
| 159:7,15 160:4 | 220:21,21 | 265:6,14,17 | 313:9,18 |
| 162:10,13,20 | 221:13,15 | 266:2 267:12 | 314:17 315:16 |
| 163:2 165:1,8 | 222:3,22 223:2 | 267:16 268:16 | 315:19 316:5 |
| 165:10 166:10 | 223:14,22 | 269:5,12,19 | 316:16 317:9 |
| 167:7 169:4,19 | 224:2 225:8,12 | 270:5,8 271:5 | 318:4,8,18,21 |
| 170:5,11 | 225:14,18 | 271:16 272:12 | 319:3 321:16 |
| 172:16 173:8 | 226:10,11,18 | 272:20 273:8 | 321:20 322:10 |
| 173:16 174:14 | 227:2,11,11 | 274:17,19 | 322:13 325:3 |
| 174:19 175:1,4 | 228:5,16 | 275:9 276:5,8 | 325:13 326:3,6 |

EXHIBIT 1
www.CapitalReportingCompany.com
Page 61 of 639
202-857-3376

Roysdon Fact Witness_000392

326:8 327:1,4
328:1,4,12
329:7 330:5
332:14,16
333:2,9,13,16
338:6,14 340:4
340:19 342:22
344:2,6,9
**old** 10:5,20
161:22 337:22
**once** 33:19
47:20 48:21
58:8 71:9 73:2
144:15 148:4
179:9 193:19
**ones** 20:17
31:14 56:3
61:14 77:17
309:7 311:1
319:19 321:14
**ongoing** 257:15
292:8 303:5
**online** 126:3
**open** 36:9
287:10
**operandi**
277:15
**operate** 27:14
337:16
**operated** 45:6
**operates**
277:14
**operating**
163:22 217:19
**operation** 69:7
69:10 102:19
**operations**
44:17,18 45:8

46:2 47:3 48:5
56:8 61:1
66:12,21 68:21
171:6,14
264:17 293:3
**operators** 47:5
47:5
**opinion** 98:8
100:4 103:8,19
103:22 104:12
104:16 155:19
156:1 160:15
161:2 165:11
167:1 170:13
171:19,21
172:9 173:8,17
174:6,15,20
175:5,9,11
177:19 182:1
186:4,5 189:14
189:21
**opm** 235:3,8
236:2,5,10
237:2,2 329:2
329:4
**opportunities**
213:6 279:14
306:19 308:11
322:6,8 324:9
**opportunity**
51:2 77:1
83:15 168:8
181:21 182:16
274:21 275:16
324:7
**opposed**
265:19

**opsec** 128:17
**options** 97:3
**order** 3:10,12
23:8 64:18
82:6 116:8,17
117:18 118:1
121:8,18 122:2
146:11 150:21
239:14 245:17
245:20 246:9
246:11 323:7
331:13 333:3
**orders** 116:16
**organization**
47:2,3 114:1
135:22 270:17
**organizational**
205:21
**organizations**
48:3
**orient** 283:16
283:18
**origin** 267:6
**originally**
325:20
**originated**
266:18
**originating**
276:3
**originator**
286:10
**osi** 194:5,8
195:7 198:6,15
199:9,11,13,16
201:12 209:11
209:17 211:17
211:21 229:17
233:7 241:16

242:3,16,18
243:7,8 244:7
277:17,22
325:6 327:15
**outcome**
345:16
**outdated**
161:15 162:1
166:8,9 171:2
171:13 173:12
173:14
**outlining** 92:21
301:9
**outside** 15:17
15:19 16:3
24:18 25:1
27:13 28:5
34:11 38:7
42:10 48:3
73:6 76:7 79:3
85:1,8 90:3
93:3,8 94:2
95:3 100:5
101:3 103:7
129:11,17
146:21 177:21
190:21 192:12
215:22 216:10
240:10 254:18
268:7 274:8
282:12 291:16
319:3,4
**outsiders**
128:19
**overall** 256:22
**overcome**
162:1 166:2,3
171:4

**EXHIBIT 1**
**Page 61 of 83**
www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000393

**overlap** 66:17
89:10,14,17
**oversaw** 20:12
21:6 185:21,22
**oversee** 14:14
15:3 20:2
236:7 253:9,11
**overseeing**
30:22 31:22,22
85:18 161:4
164:12,22
165:5 186:15
312:11
**oversees**
264:16,17
**oversight**
330:13
**overview**
302:20
**own** 77:19
168:12 314:1

**p**

**p** 2:1,1 5:1
309:21 343:6
**p.c.** 2:3
**p.m.** 90:13,13
152:4 153:2
240:1,1 315:2
315:2 344:18
**p.o.** 2:10
**page** 3:2,6 4:3
65:3,20 79:18
86:9 92:20
98:4 109:1
115:2,11,15
117:3 132:19
134:17 138:6

214:21 219:1
295:9 303:9
325:16 327:5
343:15 348:4,7
348:10,13,16
348:19
**pages** 64:18,20
123:16 302:18
302:21 346:3
**paid** 65:16
153:21 154:1
**papers** 106:12
129:20 226:13
226:15,20
263:6 317:15
318:9
**paperwork**
76:14,19 112:4
**par** 219:15
**paragraph**
93:17 94:5,14
95:5 160:1,12
160:19 179:8
179:12 215:1,3
215:4 217:20
219:2,11
222:14 223:6
224:16 295:9
299:17 300:14
302:6 303:10
304:22 325:16
326:10 327:6
343:14
**paragraphs**
220:3
**parameters**
214:4,12

**pardon** 76:17
185:14
**parenthesis**
70:20
**part** 32:21
55:16 56:4
60:20 62:15
70:5 81:1 94:4
98:13,15,17
105:5 107:18
135:5,6 147:19
198:10 209:14
209:15 217:16
217:16 224:19
224:21 271:20
273:9,9 274:18
278:16,19,19
281:9 290:19
293:8 294:7
301:7 318:1,2
321:9 325:19
**participate**
22:4 86:21
167:15 168:21
292:6 330:12
**participated**
58:16 167:17
169:5
**participating**
169:1,3
**particular**
40:10 63:14
81:10 94:14
99:3,5 107:20
108:16 110:13
217:19 279:12
323:10 324:11

**particularly**
21:19 324:19
**parties** 8:7
345:12,15
**partners** 38:1
**parts** 209:16
232:20
**party** 6:4
107:21
**pass** 147:6
228:8
**past** 37:3
126:11,12
**patents** 263:6
317:15
**patnode** 288:17
**patriotic** 114:9
211:1 279:18
**paul** 1:10 5:3
38:16 39:1,4,5
57:9 58:18,21
153:4 204:2
207:9,13 260:4
260:5,6 280:15
308:17,18
311:7 312:13
312:21,22
316:11,14
318:18,18
319:14 324:1
338:8 344:19
346:2,13 347:5
348:2,24
**pause** 83:14
**pay** 14:6 19:3,5
43:2,13 154:16
326:7

EXHIBIT 1
Page 53 of 89

Roysdon Fact Witness_000394

paying  123:7
peers  48:17
  163:21 301:9
pending  7:17
people  32:5
  35:5,7,12
  50:15,17 79:2
  108:18 145:7
  150:20 151:20
  159:9 169:10
  169:13 183:20
  186:18 190:4
  197:16 208:15
  215:14 235:17
  237:15,18
  243:10 261:3
  263:2,5,12,12
  263:17 264:7
  264:13 266:16
  267:8 270:3,9
  270:11,21
  272:17,18
  273:13,21
  274:9 275:11
  277:11 278:22
  279:12,15
  281:14,18,21
  282:20 285:20
  286:7,13 287:5
  287:7,10,20
  295:13 304:16
  304:16,18
  312:5,9,12
  314:6 322:22
  329:11 335:3
  340:6 341:1
people's  168:11
  186:22 187:12

187:13,13,14
  270:13
perfect  117:16
  338:6
perform  72:12
  86:17 116:15
performance
  117:20 121:9
  167:7 254:13
performed
  85:22 218:2
  330:6
performers
  162:15,18
performing
  17:11 27:16
  129:8 317:4
period  34:2
  115:11 117:19
  119:16 121:9
  233:1 250:20
  296:20,21
permissible
  35:1,11 210:17
permission
  24:12 99:15,17
  99:20,21
  100:11 127:22
  128:3,6,9
permitted
  15:17 16:2,13
  16:15 17:2,9
  24:18 26:3
  34:17 35:17,22
  101:10 104:5
  249:8 331:20
  331:21

perpetuate
  262:21
person  75:18
  75:19,21 76:10
  93:19 143:18
  143:21 145:19
  148:8 154:19
  154:21 157:6
  169:11,12,15
  179:17,18
  207:4,5 228:7
  233:19 265:15
  266:6 275:15
  277:11 305:10
  305:18 311:21
  312:1,3,5,7,9
  313:14 314:7
  314:11 323:2
  330:2 335:11
  338:16 340:22
  341:18
person's
  312:11
personal  55:2,3
  84:1 189:14
  195:13 196:2
  241:11,12
  269:2 276:20
personally  23:2
  26:5 93:19
  188:13 194:1
  258:19 264:16
  314:1 334:5
personnel
  86:15 94:2
  99:9,16 100:18
  101:6,11 102:9
  103:17 104:6

107:14 108:4
  142:2 236:4
  313:3
pertaining
  169:6 216:16
  260:4
pertinent  249:2
peter  341:2,4
  341:20,22
  342:4,9
peter's  341:22
ph.d.  1:10 5:3
  11:3,4,6,7 27:3
  29:9 57:3,7
  153:4 208:12
  344:19 346:2
  346:13 347:5
  348:2,24
pham  286:20
phone  53:7
  68:15 71:7
  73:8,13,15,17
  85:4,15 91:7
  92:17 94:16
  96:5 109:16
  110:5 151:3
  174:3 195:11
  196:19,22
  200:1 213:9,10
  231:15 232:4
  244:11 245:12
  246:13 254:21
  257:17 298:16
  328:6 341:18
phrase  267:2
physically
  150:8 223:15

EXHIBIT 1
Page 61 of 199
www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000395

Paul Roysdon , Ph.D.                                      May 30, 2025

[pictures - present]                                                Page 48

| | | | |
|---|---|---|---|
| pictures 12:1 | pms 163:9 | poorly 292:16 | posted 72:2 |
| piece 210:13 | point 33:2 | popping | 126:17 |
| 278:6 | 49:13 50:20 | 266:15 | posting 127:22 |
| pii 241:13 | 53:1,13 54:9 | portfolio 14:14 | 128:4 129:4,11 |
| pitch 64:2,4,8 | 60:19,21 62:16 | 15:4 21:7 | 130:1 |
| pitches 63:5 | 66:18 73:5 | 271:8 | potential 51:13 |
| pizazz 61:5 | 75:3,7,8 76:3,4 | portion 222:5 | 82:11 92:21 |
| place 43:3 | 93:7,11 106:14 | portions 128:4 | 97:3 103:2 |
| 145:17 | 110:22 111:2 | position 17:13 | 109:12 110:14 |
| places 314:2 | 193:5 196:15 | 20:22 21:1,1 | 110:17 196:5 |
| plaintiff 1:4 | 197:11 198:8 | 21:12,15 31:22 | 196:13 208:20 |
| 2:2 3:8,9,14 | 211:13 220:1 | 32:7 59:7 | 239:4 281:19 |
| 8:13 64:19 | 221:11,12 | 65:17 92:14 | 301:9 319:3,5 |
| 90:18 114:16 | 230:22 231:3 | 100:10 102:20 | 333:11 334:17 |
| 132:21 | 232:12 233:11 | 131:17 188:19 | potentially |
| plaintiff's 3:15 | 246:6 252:12 | 193:21 209:10 | 103:18 187:14 |
| 3:19 132:15 | 252:13 254:1 | 219:3,9 248:18 | 332:18 |
| planning 213:2 | 258:14,15 | 268:10 279:1 | powerpoint |
| player 316:19 | 261:22 267:19 | 291:11 297:16 | 176:11,13,15 |
| 316:20,22 | 292:4 325:22 | 298:6 316:17 | 176:18,19 |
| 317:11 | 327:13,20 | 317:14,17 | practice 106:22 |
| players 319:9 | 330:18 331:2 | 342:1 | 273:20 |
| 319:11 | points 111:3 | positioned | practices 44:20 |
| pleasantries | policies 110:7 | 114:10 | 278:10 279:6 |
| 203:20 | 280:1 | positions 15:22 | precedent |
| please 7:11 9:2 | policy 14:17 | 18:18 | 217:21 |
| 46:17 73:3 | 210:6 | positive 25:7 | precise 110:4,6 |
| 85:9 124:19 | political 18:5 | possibility | precursor |
| 228:8 | 255:10,15 | 294:8 | 25:12 |
| pleased 251:12 | polygraph | possible 6:19 | prefer 141:4 |
| pleasure 251:6 | 250:19 251:3 | 26:2 73:22 | preference |
| plug 329:11 | polygraphs | 104:19 159:6 | 29:12 |
| plus 217:10,13 | 250:20 | 175:8 179:3 | preparation |
| 217:15 | pond 283:4 | 270:15 336:21 | 12:5 |
| pmr 167:9 | pondering | possibly 250:7 | prepare 82:20 |
| 169:1,3 | 328:22 | post 126:7,9,12 | 176:15 |
| pmrs 167:15 | poor 186:9 | 127:10,13 | present 2:13 |
| 168:19,21 | | 128:18 | 8:13 46:7,20 |

46:22 48:7
49:4,6 51:2
57:19 58:9
62:20 63:13,19
63:21 80:9
81:6,11 91:19
97:3 148:9
154:5 157:5
158:18 169:8
169:17 172:14
205:18 224:17
237:13 238:8
239:6 258:14
258:16,18,19
260:19 261:16
261:21 292:12
294:13 300:20
301:10 303:6,7
305:10,12
338:17
**presentation**
58:4 60:12
78:16 85:21
91:22 149:8,22
150:3,7 155:3
158:20 167:21
176:2,3,5,22
177:1,6 231:14
259:10 264:1,6
283:6 288:4,6
292:18
**presentations**
22:3 58:6,11
59:22 60:6
81:3 83:12
98:21 149:7,13
258:5,6,11,12
291:6,17,17

292:21 322:1,5
332:13
**presented**   47:1
47:4 56:5 58:2
58:7 60:11,18
60:21,22 61:7
61:12 81:14
88:1 112:14
170:19,21
171:3,4,11,12
172:12 173:10
239:7,8 258:10
258:13,16
259:3,13 294:1
317:7 322:9
329:18
**presenting**
48:14,22 56:2
59:19 60:14,17
80:18 94:12,12
149:10 264:2
**president**
20:10 301:5
**pretense**   222:7
**pretext**   99:11
**pretty**   215:20
**prevent**   274:2
**prevented**
270:2 305:2
**prevents**   312:4
**previous**
104:11 111:3
121:22 218:2
**previously**
69:13 72:2
108:16 153:6
249:4 305:14
339:22

**primarily**
20:18 77:12
112:6 126:4
139:6 140:13
140:14 144:18
**primary**
116:13 148:8
**prime**   40:19
41:13 42:3
98:10 105:6,18
113:4 141:9
146:14,17
308:16,22
311:8,14,19
312:14 313:13
**print**   134:22
287:11
**printed**   122:15
123:16 220:11
223:17
**prior**   14:16
17:13 36:20
66:18 67:2
68:20 74:12
83:21 128:16
138:2 150:15
164:7 168:10
231:2 280:21
**privacy**   195:6
240:14,22
242:15 243:4
324:20,21
325:1,2,10
**private**   70:14
74:10 75:3
99:20,22
127:14,17,18
144:22 145:4

168:17 180:8
184:15 185:2
203:21,22
204:12 262:15
**privileged**
199:20 241:5,8
243:12 334:7,8
334:9
**privy**   162:22
177:9 186:13
186:15 195:5
275:13
**probably**   55:7
59:10 73:15
129:19 210:14
212:4 214:19
248:1 273:19
287:6,13
316:21 341:2
342:11
**problem**   74:18
170:20,22
171:5,9 183:10
192:19 292:15
297:15
**problems**   70:5
82:11 98:8
171:12 172:13
172:15 303:6
**procedure**   3:16
132:17
**proceeded**
111:10,12
**proceeding**
6:11
**process**   141:14
147:10 276:3

EXHIBIT 1
Page 616 of 653
www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000397

**procurement**
   219:17
**produce**   103:9
   106:10 156:18
**product**   98:10
   105:7,19
   106:15 224:18
**production**
   293:18
**products**
   140:21,22
   142:11
**professional**
   11:10,11 196:3
**professionally**
   192:6,7,9
   270:12
**professionals**
   114:4 270:14
   299:4
**profile**   225:21
   226:1,3,5
**program**   31:17
   31:18 57:14
   71:13 72:6,8,9
   72:9 79:13,14
   81:13 92:10
   95:21,22 96:14
   99:5 112:9
   120:10 127:12
   130:11 135:4,7
   135:9 136:17
   137:5,13,14
   141:21 147:7
   147:21 148:22
   150:21,22
   151:1 158:7
   161:3,4,11,21

163:7 168:3,5
168:9,12
169:22 170:17
170:18 171:2
186:1 192:12
193:20 208:10
214:4,8 216:17
216:17,18
217:7,10,17,18
219:14,21
229:3 230:10
230:15 231:18
232:1,20 246:4
312:12,14
**program's**
   148:22
**programs**   32:2
   94:10 101:13
   102:19 125:7
   168:12 186:16
   193:19 229:14
   229:15 241:11
   252:16 253:12
   279:12
**progress**   64:5,6
   81:13 165:19
**progressed**
   96:14
**progressing**
   80:13
**prohibit**   82:12
**prohibits**   93:18
   107:15
**project**   68:1
   80:13 117:2
   129:12 160:5,6
   160:7,8,16
   162:15 163:3,6

163:12 165:11
167:1,5,19
170:14 171:19
172:4,17 173:3
173:9 175:5,15
177:18,20
178:1,2,11
224:6 238:11
239:4 271:17
271:22
**projected**
   331:11
**projects**   20:3
   20:11 32:2
   46:8,19 47:9
   47:21 48:3,12
   54:3 55:15,16
   55:20 56:2,4
   57:19 58:12
   60:1,21 61:3,5
   61:14,20 63:5
   64:6 67:18,19
   103:4,6 117:8
   125:5 127:4
   129:12 140:8
   160:10 163:13
   163:16,22
   164:1,2,6,9,10
   164:11,11,13
   165:6 177:15
   185:21 193:7
   193:21 225:2
   230:5 232:9,16
   237:17,18
   261:12 300:16
   300:20 330:11
   336:18,21
   338:22 339:1

342:21 343:1
**promise**   159:16
**promoted**
   184:16,17
**prone**   9:2
**proof**   182:14
   280:9
**proposal**   22:13
   310:19 314:18
**proposals**   22:2
   22:6,7,7,14
   309:18 310:17
   314:20 321:7
**proposed**   77:8
   77:9 171:15
   224:5,6 300:15
   330:12
**proposing**   51:6
   51:8 66:13,14
   68:19 69:20,21
   261:12
**protect**   211:1
**protects**   217:15
**protocols**   313:7
**prototypes**
   303:12
**proud**   208:15
   208:17
**provably**
   182:10
**prove**   267:1
   279:11
**provide**   16:11
   104:6 106:15
   110:11 149:3
   173:13,15
   198:20 199:3,7
   199:9 209:14

EXHIBIT 1
Page 51 of 63
www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000398

218:8 220:18
223:9,12 246:5
279:17 296:8
320:6
**provided**  31:14
35:2 49:8
52:14 87:6
101:8 110:1
120:9 176:4
201:12 210:1
216:4 220:10
220:11,14
223:7 250:3
294:4 295:14
302:15
**provides**
115:17
**providing**  27:3
95:10 104:8,9
129:20 155:15
167:4 242:18
281:3 330:13
**public**  127:14
127:15,17
345:1,19
**publish**  25:9
106:11 126:6,8
129:6,7
**published**  25:5
25:10,15
106:13 129:17
**publishing**
26:1 317:15
318:9
**pull**  338:9
**pulled**  106:12
168:4

**purchase**
303:12
**purely**  321:21
**purpose**  16:10
216:10,15
217:14
**purposes**
123:11 128:17
**pursuant**  3:16
132:16
**pursue**  48:2
51:15 308:12
**pursued**  93:7
109:13
**pursuing**  43:22
44:11 45:20
47:10 93:3
111:6
**pushed**  235:20
235:21
**put**  46:10
52:22 97:10,11
111:13 122:11
134:5 197:19
204:7 232:16
250:13 251:15
251:19 259:11
291:22 295:11
306:5

**q**

**qualifications**
311:13,18
**qualified**
256:17
**qualify**  311:8
311:10

**quality**  86:20
134:22
**quantity**  86:20
103:11,13
**question**  7:5,7
7:10,13,17
35:16,21 41:3
44:4,7 46:12
71:16 87:11,21
91:2,4 97:7,16
101:17 104:11
107:5 109:10
115:19 128:2
129:10 132:22
141:7 142:8
148:7 166:20
177:17 182:12
182:13 189:20
192:3 206:4
209:10 214:18
230:6 246:18
256:5 266:9
278:9,10
279:12 280:19
290:13 307:9
321:14 322:4
328:21 334:21
338:7 339:7
**questioned**
279:15 280:6
**questioning**
181:19 215:10
**questions**  50:3
78:20 88:2
100:17,19,21
101:1,5 161:9
183:17,18
214:3,6,11,13

214:14 281:1
297:11 298:22
299:2 326:4
327:8 335:18
**quick**  239:17
328:21
**quickly**  344:10
**quite**  71:5 92:7
101:21 106:20
296:15
**quiz**  159:16
**quote**  80:2
90:21 91:13,13

**r**

**r**  2:1 5:1 24:9
153:1 309:21
348:3,3
**rabayda**  59:13
166:15 167:5
202:19,22
203:3 204:5
274:9,11 276:9
276:12
**raise**  215:7
**ran**  120:14
335:16
**ranft**  228:3,3
**range**  73:10
**ranking**  299:19
300:3
**rarely**  323:3
**rate**  14:6 19:3
19:5 43:2
112:19 113:1,2
113:15,16,17
113:17 114:8
114:10 117:22

EXHIBIT 1
Page 618 of 638
www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000399

119:8 121:17
331:5,5,10,14
**rates**  113:7
**rather**  31:20
83:7 201:13
313:4 319:20
**ratuiste**  288:15
**reach**  77:17
**reached**  52:2,6
96:18 112:3
131:7,16 188:7
235:17 253:21
261:8 280:2
343:21
**reaching**  65:19
**read**  6:21
71:13 79:5,20
88:18,19 93:2
93:11 96:9
105:5 135:6
137:16 147:6
148:21 149:1
155:2 157:3,11
157:12,16,18
157:20 188:3
189:13 196:11
197:20 214:4,7
215:1 221:20
221:21,22
229:3,7,21
230:10,15
231:21 241:10
241:11 252:14
252:16 263:6
268:22 274:15
274:18 344:13
346:3 347:9

**reading**  111:4
129:19 145:8
188:1 204:22
**readout**  194:9
211:17,22
213:12,13
214:1 216:16
217:1 221:16
241:10
**ready**  65:10
79:21 215:2
**real**  239:17
**really**  23:9
42:20 45:7,13
81:11 115:18
186:5 205:10
254:17 256:9
262:18 279:7
294:7 306:12
326:18 335:15
335:16
**reask**  230:6
**reason**  8:2 79:1
120:2 163:11
165:4 179:2
286:22 301:2
301:12 347:11
348:6,9,12,15
348:18,21
**reasonable**
218:2 275:12
275:15
**recall**  9:20
12:20 13:1
19:15,19 43:4
51:4,22 56:18
57:6 59:4,5,9
59:14,16 75:4

75:4 78:14
85:5 89:5
97:22 104:15
106:9 116:17
118:4,11 123:3
123:6,10
125:22 130:8
131:16 135:14
136:18 137:7
138:1 144:2,13
146:7 149:14
156:16 158:18
159:1,3,9
160:18 168:15
168:18 169:1,3
169:9 176:20
177:2 181:11
181:13 182:22
196:18,19
201:20 203:12
208:5,8 212:5
214:14 219:22
220:2 222:18
222:22 224:4
228:12,15
236:13 244:1
246:8,10 247:6
266:4 269:4
291:20 292:2
295:4 331:16
341:17 342:3
343:8,12
**receipt**  347:17
**receive**  19:11
109:21 199:5
309:1
**received**  18:5
19:14 74:8

94:22 103:4
109:16 172:10
174:3 188:2
198:5,7,18
204:22 225:9
231:15 241:22
297:12
**receiving**
107:16 296:7
**recent**  263:22
**recently**  25:19
**recess**  90:13
152:5 240:1
315:2
**recipient**  225:3
**recipients**
285:8
**recognize**
282:16 288:8
**recognizing**
134:21
**recollection**
119:15 206:12
**recommenda...**
75:15 99:2
299:18 300:2
**recommenda...**
101:11,12
102:9,17 103:1
103:3,16,17
106:1 129:21
149:3 335:2
**recommended**
77:17 93:13
341:21 342:4
**recommending**
67:3 80:10
100:10

record  34:15
  64:19 90:11
  97:12 110:21
  114:15 134:19
  152:1 155:10
  200:9 239:22
  243:13 244:17
  284:22 288:3
  294:14 306:10
  315:1 345:9
record's  81:15
  300:13
recorded  6:13
recording  8:20
records  227:19
  253:13 320:14
recoup  248:17
reduce  186:17
reduced  345:7
reduction
  43:13
reengage  284:1
  284:3
reengaged
  284:4
reevaluate
  88:22
refer  97:12
  142:5 160:5,6
reference
  115:17 124:4
  133:20 136:3
  138:3 259:12
  285:16 300:4
referenced
  347:6
references
  57:10 280:16

referencing
  117:5 128:15
  199:1 215:6
referred  96:11
referring
  162:14 187:9
  196:6,16 240:7
  241:8,15 242:9
  242:10 243:14
  281:9
refine  35:16
  44:3 97:6
  128:2 214:18
  230:8 256:5
  271:19
refined  96:9
refining  176:4
reframe  41:2
refresher  25:16
regain  319:9
  319:13
regard  278:11
  280:5
regarded  282:8
regardless
  120:4 315:8
regular  78:22
  328:22
regularly  54:12
  54:14 340:19
  340:21
related  27:20
  27:21 31:11,13
  55:21 127:3,4
  127:5,11
  129:14 176:5
  214:17 326:15
  345:11

relates  242:16
relating  146:13
relationship
  48:16 130:16
  137:2,22
  138:22 164:17
  190:17 254:15
  295:18,21
  296:1,22 297:4
  297:5 298:9
  314:4,5
relative  345:13
relayed  133:22
  167:1 174:4
  193:13 282:6
relevance
  108:2
reliability
  81:22
remained  49:9
  210:18
remarks  264:5
  264:11
remember  13:4
  13:14 25:20
  29:16 43:5
  55:4 59:2
  61:14 112:7
  149:5,12,21
  159:5,6 169:19
  170:2 177:1
  191:6 209:15
  238:15 240:5
  243:21 245:15
  263:18 264:19
  265:8,9,14
  290:21 296:16
  309:9 310:1

  331:14 337:6
  339:7
remembered
  176:21
reminded
  261:15,15
reminder  5:12
remotely  25:13
  33:9
removed
  239:10 259:12
rendering
  129:9
renegotiated
  323:14
rent  314:3,6
repeated
  199:19
rephrase  18:16
  164:15 311:11
replete  277:17
report  3:17
  154:2 178:7,11
reported  1:17
  130:17 185:21
reporter  1:17
  6:13,18 8:20
  24:7 55:8
  306:11 309:20
  341:5 344:13
  344:16
reporting  33:4
  120:5 312:2
reports  57:14
repositories
  127:18,18
  128:18

Paul Roysdon , Ph.D.                                      May 30, 2025

**represent**
74:18 294:10
320:20 321:1,1
321:3 324:3
**representation**
84:1 98:9
281:10 301:15
**representations**
94:1
**representatives**
82:13 91:1
95:9
**represented**
333:13
**representing**
93:19 95:20
107:17 207:4,6
293:6
**repu** 278:15,19
**reputation**
42:5 140:1,3
150:18,21
151:7 168:10
187:11 188:10
190:6 193:3
237:9,19 239:3
249:6 255:8
257:4 262:19
262:22 264:9
266:12 267:17
267:19 268:1,2
268:4,9,11,14
269:9 270:6
274:7 276:1,10
277:2,9,12
278:6,8,9,15
278:17,20,21
279:2,7 281:2

281:8,11,12
282:9,12 283:2
322:18 323:11
342:6,8
**reputational**
292:14 323:2
323:16
**reputations**
168:11 186:22
187:8,8,13,15
**request** 22:12
22:13 64:5
135:4,9 136:17
137:6 199:22
207:3,21 208:1
209:18 219:15
219:21 233:6
251:19 273:9
290:15
**requested** 36:4
48:7 135:16
198:12 207:17
233:9
**require** 35:12
85:12 226:22
312:2 333:4
**required** 72:14
90:10 91:13,15
91:17 109:15
311:14 324:22
**requirement**
129:5 146:12
**requirements**
292:1 311:19
312:2
**requires** 85:8
**requiring**
90:22

**reread** 179:9
**research** 20:3
20:10 25:11,11
25:12 53:18
57:3,7,7 63:17
128:16 129:18
130:17 147:16
188:9 237:14
239:1 259:15
260:19 285:6
293:7 303:11
317:4 341:19
**researcher**
42:20 317:15
320:4
**researchers**
129:13
**resign** 230:21
231:4
**resignation**
219:5
**resigned** 33:7
250:11
**resigning** 230:1
**resist** 221:5,8
**resolve** 186:8
**respect** 109:18
124:14 207:14
278:7,9 325:10
**respond** 87:10
87:14 100:22
101:2
**responding**
257:17
**response** 22:10
91:11 182:9
183:1,22 266:3

**responses**
188:3
**responsibilities**
14:13 21:11
22:1 30:8,10
43:1 103:7
**responsibility**
95:4 96:1
**responsible**
21:16 95:8,13
95:15,19,21
**rest** 181:13
**reston** 33:18,20
**restorative**
267:21
**restored**
260:14,16
262:13,14,16
268:1 323:11
323:15
**restrictions**
75:17
**result** 268:5
323:5 326:11
326:20 330:9
334:15
**results** 94:12
126:13 267:1
275:13 300:15
**retain** 222:21
250:12 279:3,4
**retainer** 333:19
**retaining**
222:19
**retaliated**
193:19
**retaliation**
193:17,18,22

**EXHIBIT 1**
**Page 621 of 638**
www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000402

303:13 304:2,3
304:10
**retired** 298:7
**return** 347:13
347:16
**revenue** 25:7
**review** 12:4
25:21 65:10
73:3 85:9
167:8 347:7
**reviewed**
159:12
**reviews** 186:1
**revolutionary**
51:9
**rf** 68:15
**rfi** 22:12,16
**rfp** 22:13,17
**richard** 228:2
**right** 6:9 14:8
16:5 17:13
19:11 20:20
23:2 27:17
36:5 39:10
42:12 55:14
56:11 61:17
65:2,8,12
69:19 72:17
73:2,5 77:20
80:1 82:5 83:2
92:1,18 96:17
100:13 101:19
105:4 106:18
108:22 111:14
114:13 121:1
122:11,20
123:21 130:15
132:6 134:5,6

135:15 136:2
136:16 137:9
160:12 170:7
175:8 179:8
181:1 185:13
185:15 187:3
189:12,20
211:5 213:13
213:22 224:15
248:21 252:19
264:19 284:21
287:21 291:14
306:5,16,16
316:16 344:10
**rights** 208:11
**risk** 47:14,17
48:10
**rivera** 51:3,16
64:15 72:20
73:6 82:8
92:19 223:8,20
338:8,15
**riviera** 52:8
**road** 6:10
**robert** 2:14
8:10
**roe** 1:3 347:4
348:1
**role** 15:12,18
16:13 30:10,21
39:14 40:18
42:15,17 44:17
65:14 66:22
87:15,17 148:4
155:14 158:9
158:13 163:6
176:1,2,2
188:16 189:6

189:10 190:12
200:21 202:4
202:13 204:5
208:21 256:7
256:10 317:19
324:8 339:10
339:13
**roles** 42:16,22
86:17 103:7
**ron** 296:9,10
**room** 8:7 51:10
80:20 91:21
157:9 169:13
180:2 181:5,7
183:20 205:16
213:16,17
226:14 305:2
**rooms** 35:6
81:3
**roughly** 33:20
46:21 246:20
**roundabout**
259:18
**routed** 54:1
**rowe** 228:2,3
**roysdon** 1:10
5:3,8 9:5 36:12
36:16,16,17,18
37:14,15,20,22
38:13,15,16,19
39:1,1,4,6 57:9
58:18,21 87:8
90:15 114:20
119:1 121:7
123:21 135:1
153:4,11
180:15 204:2,3
207:8,9 208:8

219:2 228:6
240:3 260:4,5
260:6 280:15
293:22 308:17
308:18 311:7
312:13,21,22
315:4 316:11
316:14 318:19
319:14 324:1
344:19 346:2
346:13 347:5
348:2,24
**ruined** 266:12
266:13 267:17
267:20 268:3,5
268:14 269:9
278:16,20
281:9 282:8,13
**rule** 3:16 95:6
98:9 132:16
**rules** 6:9
**rumint** 274:3,5
**run** 9:11
**running** 110:6
279:22
**russia** 216:21

|  s  |
|---|

**s** 2:1 3:1,5 4:1,2
5:1 14:9,9 24:9
71:1,17 153:1
153:1,1 301:21
348:3
**sa** 217:20
**saf** 301:19,21
**salary** 16:1,3
19:6,17,19
29:6,16 43:2

246:22 247:1,4
320:5,9 331:1
**sales**  62:16
**salesperson**
82:2
**san**  1:2 32:18
40:7 148:12
154:17 169:12
**sanity**  336:19
**sap**  72:8,10
79:7,8 147:6
148:21 215:17
312:14
**saw**  265:20
276:2
**saying**  8:21
27:12 69:13
91:16 102:8
174:3 195:12
196:8 215:12
222:8,18,22
234:7 242:7
244:1 261:10
304:16,17,19
328:6 341:2
**says**  70:3,18
74:6,9 76:5
82:9 85:8
86:14 90:20
93:2,17 95:6
98:5 107:13
109:5 110:9
119:5 136:6
217:20 219:2
220:10 223:7
224:4 228:6,10
262:12 293:9
295:9 299:18

300:2,15
303:10 305:1
315:5 327:8,8
**scale**  46:3,4
171:16
**scenario**
109:22
**scenarios**  109:2
**scenes**  80:2,15
80:20 84:4,5
90:21 91:6,9
148:11 176:2
210:13
**schedule**  59:18
**scheduled**
254:4
**school**  11:2
13:13
**sci**  230:16
279:19
**science**  15:3
21:6 25:16,17
25:22 66:15
**scientific**
128:19 263:5
317:16 318:16
**scientist**  18:13
29:22 66:10,10
66:14 68:6
**scif**  213:19
221:13 314:2,8
314:22
**scifs**  314:3,6
**scope**  216:4
235:1 332:9,20
332:22 333:4
**scuffle**  226:12

**seal**  261:3
**seals**  47:6
**seated**  213:15
**second**  3:19
12:8,8 21:12
51:20 70:17
90:12 93:17
98:17 105:4
110:8 143:19
150:17 159:13
159:17 195:5
204:18 211:20
212:22 222:13
237:22 249:14
260:12 274:10
293:8 299:17
303:9 315:4,12
315:14 324:14
325:13 343:13
**secret**  71:17,18
72:9 155:11,11
230:16 279:19
**secretary**  32:8
**secrets**  279:4
**section**  93:18
106:19 107:15
328:21
**sector**  21:20,20
21:22 74:10
**sectors**  20:6,7,8
20:15,19
**secure**  148:15
314:8
**security**  28:14
109:6 146:1,12
197:12,13
222:19,21
230:11 234:1

234:13 236:6
241:13 243:19
250:12 252:2,6
271:18 272:2
272:15 276:13
278:10 279:6
279:16 280:1
281:9,19,19
311:21 312:11
312:18 313:2,7
313:8,14,15
314:10 343:8
343:10
**see**  5:10 77:12
94:19 103:2
107:13 115:20
117:22 120:15
143:18 146:2
157:8 182:4
224:18 238:4
287:7,12
292:19 302:6
302:16 319:1
335:17 338:1
341:15
**seek**  90:4,8
142:22 231:6,8
231:11 260:16
262:14 324:4,9
326:1
**seeking**  231:16
270:3,9 277:16
277:18 323:14
325:18
**seeks**  217:17
**seeman**  2:8 5:7
5:13 8:8,14,15
24:9,11 41:4

41:16 44:5
55:11 64:9,17
65:1 76:2
87:19 90:11,14
97:8 100:12
104:1 106:6
114:13,19
116:18 117:4
121:1,6 122:15
122:19 123:14
123:20 132:5
132:11 134:11
134:15 136:10
136:12 144:20
147:18 151:11
151:16,20
152:1 153:10
159:15,21
171:18 173:1,7
175:21 192:4
227:11,20
231:10 235:10
235:13 236:1
239:18,22
240:2 250:10
272:5,7 276:16
276:19 283:20
284:8,15,20
293:15,21
295:2 306:7,13
306:15 310:2
315:1,3 334:2
334:12 341:6
341:10,12
344:9
**seemed** 181:16
182:22 183:1,8
188:4

**seems** 101:20
101:20 102:1
186:14 235:15
**seen** 132:12
137:5,7 143:21
195:17,19
197:17 202:15
219:20 220:1
263:8 287:6,14
337:15,16
**segundo** 63:16
154:4 180:5
**select** 41:14
**self** 277:16,18
**send** 96:6
130:4,7
**senior** 42:19
61:6,7 74:19
80:11 84:2
148:9
**sense** 7:8 32:17
85:22 171:10
225:3 340:7
**sensitive**
155:11,17
156:2 208:8
243:10 251:1
**sensitivity**
70:19
**sent** 33:2 65:12
96:4 130:2
198:9 228:6
244:14 347:14
**sentence** 82:9
85:7 95:6
**separate** 35:8
56:3 145:11

**separately**
129:22
**september** 3:11
17:18 33:7
117:21 118:8
197:2
**sequence** 62:6
98:4
**series** 60:20
106:8 169:6
171:12 172:13
214:17
**serious** 328:16
328:18
**seriously** 325:1
328:14
**serve** 15:21,22
16:5,7 18:6
77:13 261:1,2
**served** 20:5
**service** 16:11
235:19 248:14
251:7
**services** 95:11
110:12 129:9
**set** 45:5 99:3
100:14 115:7
138:7 164:1,2
**sets** 75:20
113:1,2
**settlement**
326:1
**seven** 165:20
**several** 11:6
25:8 31:14
47:4 50:15
53:7 60:18
68:20 73:8,13

92:16 105:16
111:8 124:16
127:1,4 137:7
157:20 161:13
188:7 193:1
195:19 197:16
199:17,19
204:11 207:22
232:3 235:16
238:3 244:2
264:3 265:8
267:11 272:17
272:18 291:20
291:21 308:21
309:11,22
323:20 330:11
330:14 331:12
335:3 341:21
**severe** 325:17
**share** 188:12
198:11
**shared** 198:13
198:16 202:14
243:7,18 244:7
**sharing** 195:8
195:9 229:16
243:2,10
**sheet** 346:7
347:11
**sheridan**
288:20
**shifted** 150:22
**shockingly**
326:8
**short** 14:22
233:1 296:20
296:21

show  171:3
  280:9
showed  243:6
showing
  195:15 200:17
shows  182:14
shut  178:2
shutdown  33:1
  33:8
side  96:17
  111:13 122:12
  124:8 134:6
  138:7 204:7
  221:4 228:16
  306:6
sigint  68:9
sign  112:3
  135:5,8,10,12
  295:3 344:14
  347:12
signals  68:8,16
  68:18
signature
  115:2 121:12
  121:15 345:17
signed  115:21
  135:13 138:5
  346:7 347:19
significant
  330:21,22
signs  82:14
siloed  79:3
similar  66:7
  250:3,5
similarly  79:7
  323:20
simple  182:19
  280:7 302:18

simply  35:12
simultaneously
  313:12
single  314:7
site  30:1
sitting  8:17
  221:9,11 264:3
  294:18
situation  84:12
  108:6 211:4
  238:20 243:20
  292:11 306:2
  324:13 332:11
  334:16
situations
  108:2 187:17
six  46:21 47:12
  47:13 55:15,20
  56:3,6 232:10
  232:11
skeptical
  342:14
skepticism
  337:14 342:17
skill  75:19
skills  278:8,18
skipped  71:17
slash  136:7
sleepless
  328:22
slides  239:10
  259:10,12
slightly  222:6
slow  9:3
small  19:11
  282:17,18
  283:2,3 312:6
  342:5,7

smart  51:10
smith  289:2
snis  14:7,9
social  10:1
  11:15 197:13
  241:13
soft  50:1
softly  8:18
software  27:2,4
  27:5 44:19
  68:17 86:1
  126:5 161:16
  217:3
sold  25:8,22
sole  331:6
soliciting
  314:13
solution  171:4
  172:17,21
  173:6,13,15
solutions  18:12
  104:20,22
  171:13,13,15
  253:9,10
  320:13 347:23
solve  170:20,20
  170:21 171:5,9
  172:14
somebody
  14:21 41:20
  51:9 77:6
  79:10 80:10
  120:8 129:21
  151:4 189:19
  192:9,15 207:9
  218:19 221:3
  261:22 262:20
  269:22 275:17

277:12 279:20
  280:6 281:1
  312:19 317:3
  336:20
somewhat
  274:2 297:14
  324:13
soon  92:10
  253:4 272:22
sorry  16:22
  28:9 30:16
  37:21 44:22
  50:2 69:1
  76:15 86:11
  97:1 113:11
  115:13 120:1
  122:3,17
  125:14 161:6
  166:21 184:17
  184:19 185:8
  190:14 196:7
  198:4 203:9
  204:21 212:13
  212:18 223:11
  249:1 253:10
  257:19 274:18
  284:10 303:22
  310:1 322:3
  324:16 325:5
  331:17
sort  8:18 17:11
  21:10 44:6
  47:20 54:7
  67:17 75:20
  77:13 80:2
  97:13 99:6
  100:14 101:19
  109:2 130:4

141:11 148:2,9
156:21 189:20
191:12 200:21
206:1 208:14
215:12 217:2,4
235:19 239:1
259:17 263:4
266:19 267:21
283:15 297:14
303:5 304:22
316:17 319:1
320:5 322:13
323:1 327:16
329:10,15
331:18
**sorts**  193:14
318:9
**sought**  231:9
260:13 262:12
262:16
**sounds**  54:3
226:12 282:17
**source**  123:11
233:3 275:6
331:6
**sources**  15:15
24:3 33:22
43:14,17 247:7
247:12
**space**  85:19
309:13
**spaces**  35:13
88:20 108:20
293:10,13
**span**  165:19
231:22
**speak**  7:3 8:18
331:10

**speaking**  33:13
56:6 78:17
141:15 172:3
**special**  72:8,9
137:12,13
163:22 193:7
193:21 252:16
261:2
**specific**  72:6
109:22 147:21
147:22 183:10
196:4 216:15
216:15 217:4,4
217:7,18 222:5
252:8 311:18
321:9 326:21
**specifically**
48:6 78:14
105:3 140:2
143:14 165:3
176:5 193:20
194:21 197:9
216:20 243:11
254:11 259:8
263:18 265:10
270:22 271:2
304:9,11
319:17,18
323:8
**speculative**
132:4 291:9
**speed**  46:2,4
171:16
**spell**  341:5
**spend**  299:12
**spent**  232:3
328:7 334:5

**spoke**  52:7
73:15 111:1
209:4
**spoken**  131:19
188:15 189:2
201:15 233:13
297:7 336:3
338:18 340:8
340:11
**sponsor**  71:2
251:20 312:19
**sponsoring**
71:6
**spouse's**  10:11
**spread**  240:10
240:18,21
**spreading**
195:10,12
197:6,9 201:13
229:19 240:4
240:13 242:7
**spreadsheet**
120:18
**spring**  131:18
257:11
**sprint**  291:22
**staff**  38:3 57:20
**stand**  139:4
**standard**  331:5
331:18
**standing**
139:17,21
221:3,9,12
**standpoint**
178:4
**starnav**  24:6,8
24:13 25:3
26:13,16,20

27:7 28:1,4
38:17 39:5,8
39:19,19 308:8
**stars**  28:3
**start**  9:1 17:17
19:21 29:1,4
43:22 46:13
78:8 92:11
98:5,18 128:7
133:5 139:20
182:3 211:9,11
213:17 229:1
234:5 236:3
247:4 269:17
284:21 286:5
308:18 312:17
**started**  18:10
18:11 19:4,21
19:22 29:5,7
29:20 43:6,19
45:9 57:3,4
89:1 138:9
139:9 144:15
194:8 226:9
308:4
**starting**  44:14
90:5,9 219:12
253:17 314:16
**starts**  84:17
86:10,12 92:4
211:4 302:6
**startup**  313:11
**state**  44:15
273:10 279:3
**stated**  44:12
86:14 117:10
150:17 224:16
224:22 235:16

238:5,9 251:13
297:13
**statement**
  115:14 195:14
  218:4 225:11
  266:8,11,11
  315:9 316:2,5
**statements**
  11:20 96:3
  105:16,16
  215:11,14
  218:17 264:21
**states**   1:1,6 2:9
  2:14 107:21
  115:9 118:17
  315:7 316:9
  347:4 348:1
**stating**   216:8
  323:21 330:3
**station**   2:10
  32:12 89:7
**statistical**
  45:10,10,15
**status**   78:22
  251:16
**statute**   107:15
**statutes**   66:6
  327:11,14,17
**stay**   53:3
**steer**   256:2,6
**stenotype**
  345:7
**step**   182:17
  280:9,10
**steps**   148:5
**steven**   13:7,8
  13:11 289:4

**sticking**   99:6
**stop**   7:17 96:21
  188:11 194:6
  239:14 245:17
  245:20 246:5,7
  246:8,11 274:5
**stops**   306:13
**storage**   126:4
**stout**   2:4
**straight**   236:22
**straightforwa...**
  302:19
**street**   1:14 2:4
**strict**   249:20
**strictly**   16:22
  17:1 98:21
  99:2 103:9
  104:9 106:1
  272:21
**strong**   293:5
**stubbed**   326:16
**stuck**   244:5
**studies**   14:16
**stuff**   28:2 47:7
  69:2 71:12
  96:7 97:13
  103:8 207:11
  251:1 254:1
  263:9 329:10
**style**   186:20
**subcontract**
  40:21 41:6,10
**subcontractor**
  26:18 42:3
  116:14 146:14
  260:1
**subcontractors**
  39:14 41:14

**subcontracts**
  17:3 26:14
  38:19
**subject**   4:7
  58:9 83:7
  104:13 155:18
  161:1 205:12
  207:10 237:19
  323:9 334:18
**submit**   105:7
  105:19 154:1
  238:16
**submits**   98:10
**submitted**
  136:19 178:20
  219:4
**subordinate**
  48:15 265:3,16
  285:15
**subordinates**
  239:8
**subsequent**
  105:14
**subsequently**
  209:11 300:17
**substance**   87:7
  89:16 179:12
  187:17 333:20
  336:9 340:12
**substantial**
  107:22
**substantive**
  82:12 83:20,21
  84:3 175:14
  222:11
**substantively**
  222:14,15

**subvert**   46:3
**success**   317:2
**successful**
  78:18,19 125:8
  297:18 335:9
**successfully**
  337:16
**suggest**   48:2
**suing**   185:13
  185:15
**suite**   2:4
**summer**   29:10
  125:2,9,10
**super**   138:10
**superior**   294:5
  296:9,12,17
  303:14,16
**superiors**
  193:10
**supervisor**
  254:6
**supervisory**
  48:15
**support**   182:4
  194:7 280:16
  280:17
**supporting**
  280:13
**supportive**
  297:20
**supports**   243:2
**sure**   8:19 13:9
  24:16 37:18
  52:22 53:12
  57:17 65:22
  66:17 67:5
  73:20 80:22
  83:3 92:9,12

**EXHIBIT 1**
**Page 62 of 63**

92:14 94:21
95:1 96:15,17
96:18 100:3
105:9,13 110:6
132:3 141:10
148:7 176:22
191:15 192:10
203:12 207:3
210:5 211:2,12
214:13 224:9
229:18 239:20
239:21 259:2
280:3 300:13
304:18 311:12
313:5 333:19
336:1
**surprise** 79:15
274:17,19,22
**surprised**
331:9
**surprises** 275:4
**survey** 113:18
114:4
**sway** 103:8
**switch** 142:9
**sworn** 5:5
153:6 345:5
**system** 23:9
28:2 84:10
217:19

**t**

**t** 3:1,1,5 4:1,1,2
24:9 34:16
53:20 153:1
332:4 343:6
348:3,3

**t&m** 118:13
**table** 265:1
**tacit** 223:9
**taiwan** 161:6
**tajh** 289:2
**take** 14:22 18:7
35:10 52:21
78:15 148:5
151:18 152:2
156:19 168:12
172:7 225:10
239:17 255:9
306:7 313:4
324:21,22
328:13 342:1
**taken** 7:21
152:5 156:7
345:3,6,13
**takes** 192:10
**talk** 13:5 30:5
60:12 69:1
80:1 84:6
85:15 111:14
125:11 130:9
134:6 141:11
155:13 157:21
175:17 181:1
184:9 193:14
200:11 202:19
205:12 209:8
228:7,18
233:12 234:9
234:10 239:13
248:21 254:20
255:2,4 257:15
259:1 261:7,19
262:9 285:4
341:21 342:22

343:11
**talked** 13:4
56:13 64:10
72:6 73:8 74:3
74:15,21 77:21
85:3 95:18
102:4 125:13
190:5 203:10
228:21,22
234:11 238:13
252:18 253:3
258:4 279:2,15
296:3 298:18
305:1,3,12,15
305:19 308:8
312:19 322:18
329:8 332:17
332:19 334:13
336:5,8,17
**talking** 9:1
37:16 82:3
83:11 111:5
142:14 158:1
160:19 192:12
193:12 215:16
222:4 266:22
321:6 340:22
342:4
**talks** 83:3 84:3
109:2 219:14
220:6 324:15
328:22
**target** 147:22
147:22 171:7
216:16,20
**targeting**
187:21

**targets** 161:5
216:17
**task** 3:10,12
116:8,16,17
117:18 118:1
121:8,18,22
**tasks** 116:14
130:5 313:11
**taxpayer**
114:11
**teach** 270:14
**team** 66:11
238:1 253:19
253:20 254:2
259:6,9,16
261:3 265:8,8
265:9 299:11
**teams** 285:2
286:5
**technical** 30:12
65:15 81:17
101:4 102:21
102:22 104:17
126:14 129:7
279:8 280:5
281:2,11
295:16 311:22
312:1,10
**technically**
33:16 280:7
281:22 282:4
340:5
**technique**
81:10
**techniques**
46:1
**technology**
15:4 21:6 61:9

161:7,14,22
162:1 165:21
171:2 173:12
173:14 214:16
238:4,5,7,8
336:21
**ted** 57:15 112:6
112:12 120:22
125:14,15,16
130:3,10
131:11,13,19
132:22 133:4
144:6,11 246:2
246:2,14
332:17 333:9
**telemetry**
68:15
**tell** 20:17 77:1
77:21 83:18
84:20 125:16
143:7 150:4,16
160:21 168:13
168:16 180:7
180:10,13,14
184:14 185:1,5
201:18 224:10
225:4 229:1,11
233:13 235:7
265:21 266:2
267:13 272:9
304:1
**ten** 37:3,9
115:15 161:12
172:4
**tend** 48:9
192:18 200:6
**tens** 282:21

**tension** 164:4
**term** 45:12
57:6 67:6
178:8 267:2,6
329:13
**terminal** 110:9
**terminated**
193:8 231:20
232:2
**termination**
115:12 133:11
**terms** 67:12
248:15
**terrible** 343:17
**terrifying**
327:18
**tesla** 81:22
**test** 82:1
**testified** 5:5 6:7
100:2 153:7
157:1 209:1
240:3 274:20
290:4 291:12
330:3
**testify** 7:22 8:3
277:5
**testifying** 6:12
6:14
**testimony**
151:13,15,17
153:12 157:4
157:11,12
168:1 187:6
188:6,7 205:20
235:17 253:4
274:14 290:14
290:19,21
320:11 345:4,6

345:9 346:4,5
347:9,17
**texas** 1:1 9:11
9:14 29:11
30:1 33:5
36:13 59:10
180:4 181:8
200:8 264:7
275:11 305:11
305:13,14
**text** 298:16
**thacker** 1:17
345:2,18
**thank** 14:10
37:22 44:12
55:13 67:11
77:4 131:19
180:6 189:8
207:16 278:4
284:8,14
299:10 326:7
**thanks** 283:12
**theory** 23:10
86:17 280:17
**thereabouts**
149:17
**thing** 125:17
187:4 193:2
208:14 221:21
235:8 304:15
309:19 325:6
**things** 6:17
15:5,6 22:16
46:7 47:16
66:15 67:3
72:6 78:18
79:11,12 80:10
81:13 82:7

92:13 96:10,17
105:11 116:14
126:17 127:13
153:15 160:4
161:19 182:19
185:22 192:12
193:14 194:2
194:18 197:12
209:20 210:6,8
210:8 211:9
222:8,9 230:13
237:21 241:14
253:13 266:21
270:15 281:7
297:14 304:17
304:19 310:9
312:1 318:9
319:21 320:14
330:4
**think** 40:6 45:3
46:12 52:8
57:4 60:20
64:17 72:11
74:2,14 75:6
85:4 87:13
91:12 92:5
94:14 100:2
102:14 105:10
106:9 108:11
115:16 118:4
132:3 133:4,19
144:3 145:16
146:8,9 147:1
149:7 156:16
157:1 164:3
176:7,13,17
178:1 186:7,21
193:12 194:7

Case 5:22-cv-00869-JKP   Document 122   Filed 08/05/25   Page 631 of 1654
Paul Roysdon , Ph.D.                                        May 30, 2025
[think - today's]                                                  Page 63

205:9,15 208:7
220:14 221:22
222:6 227:15
232:11,14,19
236:7 237:8
243:1 246:17
249:2 253:3,15
254:22 257:6
258:13 263:3
271:3 273:19
275:11,11
277:1,9,10,18
277:19 281:13
287:5 301:2
324:18 329:21
331:12 334:10
342:10 344:10
**thinking**   110:4
**thinks**   275:22
276:9
**thomas**   200:13
200:15,17
201:2,19
288:22
**thompson**
200:16
**thoroughly**
255:8
**thought**   178:2
184:7 253:6
**thousands**
129:19 282:21
**thread**   101:21
102:2
**threading**
141:17,19
**threat**   194:14
194:22 195:18

281:20,21
282:2,5 327:10
327:20,22
**threaten**   221:1
**threatened**
199:17 200:2
220:15,22
**three**   11:7
14:22 60:21
61:13 76:4
92:20 114:3
232:7,14 287:1
287:7 296:15
299:7 312:5
**throw**   206:21
206:21
**tight**   23:13
**time**   1:13 8:20
19:1 20:20
24:19 25:4,13
25:18 26:4,11
28:8 29:8
32:17 33:4,17
33:20 34:18
35:18 43:19
45:16,18 49:4
52:3 61:11
63:1,2 66:5,9
66:22 68:11
70:5 71:5,14
74:14 75:6,21
78:7,8,9 85:20
88:5,6,21
89:15 91:3
93:7,11 99:7
112:12 130:18
131:5 133:7,9
133:13 136:19

139:9 140:5
142:12,14,14
143:4,21 144:3
149:2 151:3,9
163:17,20
170:12 172:5
173:18 179:16
183:8 184:22
187:22 188:10
190:19 193:3
198:12 204:11
209:9,9,13
211:10 212:6
216:9 217:14
218:18 219:8
223:4 224:3,22
225:2 227:4
233:1 234:2,2
234:6 235:20
236:15 238:22
245:2,3,21
246:5 248:22
249:17 250:4
250:20 253:8
257:1,16,19
260:20 264:4
264:10 284:5
295:11 296:14
299:4,13 301:2
303:16 305:11
306:10,13
315:10,11,12
315:14 316:2
317:10 329:18
330:19,20
332:8 337:5,6
338:3 342:1
347:18

**timeframe**
347:8
**timeline**   51:22
283:19
**timeliness**
86:20
**times**   73:8 88:1
118:22 148:17
160:11 184:3
188:7 199:17
199:19 206:13
232:7 235:16
260:18 267:11
296:15 322:17
330:15 332:21
**title**   18:9 25:21
28:1 29:21
30:2,12 61:8
68:5 208:17
296:13,14
301:15,16,18
336:2
**titled**   25:11,15
25:20 55:19
60:19 137:13
253:20
**titles**   30:3
42:20,22 62:22
63:1
**today**   5:15 6:19
7:21 8:3 10:5
12:1 41:6
45:12 46:12
151:17 203:11
204:18 252:19
322:14 340:15
**today's**   12:5

EXHIBIT 1
Page 630 of 639
www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000411

todd   48:5,11,21
  49:2,10 50:5
  77:7 125:13
  151:5,12
  157:10 167:22
  187:5 188:5
  190:4 191:7
  193:1,12,12
  224:20,20
  225:1,5,6
  228:10,21
  229:2 234:10
  234:10 238:2
  239:7 252:18
  254:1,16
  255:17,18
  256:11 257:14
  257:20 259:8
  259:15 261:8
  263:22 264:2
  268:17,18,20
  270:2 275:8
  282:10 284:4,5
  285:15 290:13
  292:5,17,20,22
  300:5 305:12
  330:3
toe   326:17
together
  112:13 190:20
  191:2 259:11
  291:22
told   77:3
  124:17,21,21
  125:1,15
  150:12,15
  160:10 165:7
  168:7,7 174:14

179:1 186:12
  187:10 188:10
  192:22 193:1
  194:19 197:6
  213:1 218:7
  229:10,12
  231:17,19
  232:21 233:10
  233:11 238:2,2
  241:2 259:9
  267:7,16
  268:13,15,17
  268:19 269:8
  269:12,15
  271:16,21
  273:22
tolerant   48:10
tone   183:18
took   23:10
  181:20 182:16
  223:13,15
  262:2
tool   44:16
  66:20 67:4
  68:20 69:10
  139:6 217:7
tools   44:20
  45:6,9 46:1
  56:9,10 62:16
  66:21 68:12,21
  69:7,11,13,14
  69:15 77:9
  140:15,17
  141:22 142:3
  143:1 210:22
  211:3 261:5
  303:7

top   31:4 70:3
  72:9 155:11
  215:4 230:16
  279:19 315:20
  315:21
topic   205:18
topics   61:1
  205:13 218:1
  285:5
torts   2:9
total   19:18
  118:18 120:12
  125:20 247:4
  334:10
touch   150:8
tours   29:10
towards   316:17
tracking   53:8
traction   317:8
trained   206:17
  206:18
training   313:1
  314:9 324:21
transcript   4:22
  6:22 268:22
  347:6,19
transcription
  346:5
transcripts
  157:17,18
transition
  247:19
transitions
  98:6
translation
  21:18
transmits
  68:16

transmitted
  106:4
trash   35:6,11
  108:19 145:20
trashes   35:14
travel   153:21
  154:1,3,16
traveled   33:19
  153:22
treat   270:11
trevon   286:18
trial   5:13
trick   115:18
tried   53:8
  227:16 316:7,8
triple   246:22
  247:1
true   182:9,15
  183:5 304:17
  345:9 346:4
trust   329:15,20
trusted   270:16
truthfully   8:3
try   30:13 92:9
  151:8 186:17
  186:18 189:18
  210:22 261:19
  275:19
trying   32:16
  45:3 101:18
  102:5 129:3
  133:3 168:11
  188:9 196:10
  210:4 300:12
  301:7 302:12
  303:8 321:5
  323:15 334:3

EXHIBIT 1
www.CapitalReportingCompany.com
Page 631 of 639
202-857-3376

Roysdon Fact Witness_000412

ts   72:8
tuesday   79:19
turkey   9:11
turn   86:8 90:18
  109:1 134:18
  137:9
turned   320:16
turning   77:20
  79:17 82:5
  83:2 98:3
  134:21 219:1
twice   58:8
two   14:22
  23:11 29:10
  36:17 48:16
  52:1 64:18
  65:21 76:4
  79:18 108:2
  114:7 115:10
  115:11 120:12
  123:15 149:6,7
  149:13 155:3
  190:4 193:11
  203:4 212:4
  220:3 232:5
  251:2 269:5
  287:7 290:10
  291:16 295:10
  305:3 321:22
  322:18,19
  332:14,15
type   47:18
  101:1 216:19
  250:21 277:10
  328:14,19
types   40:11
  102:18 167:11

typewriting
  345:8
typically   11:12
  119:21 162:18
  221:5
typo   300:1

**u**

u   70:20 343:6
u.s.   136:5
  224:4 263:7
  267:22 273:20
  289:14 318:16
  320:21 323:19
  324:3
u.s.c.   93:18
  107:15
uh   6:20 86:13
  108:5 124:9
  136:11 140:19
  174:13 258:22
  305:5 321:11
  343:16
uk   342:2
ultimately
  233:2
umbrella   55:17
  55:18 318:6
  320:19
unable   335:14
unclassified
  33:12 44:15
  54:19,20 55:1
  55:18 60:15
  69:2,3 70:21
  71:20 72:1,5
  81:19 85:17,19
  127:9,10 128:4

128:14 139:3
  141:2,2 147:13
  147:16,17,19
  215:6,9 216:12
  216:15 217:11
  313:21
under   6:14
  10:19,20 37:13
  81:5 98:9,11
  99:11 100:13
  101:8 102:10
  105:7,14
  106:15 129:9
  163:4,13
  193:14 249:20
  273:14 318:6
  320:19 328:7
  329:1 331:22
  345:8
underlined
  85:7
underlying
  99:14 187:17
underneath
  146:17
understand
  6:15 7:10
  37:16 45:2
  51:10,12 57:17
  65:16 71:5
  75:8 93:14
  100:16 101:17
  102:6,8,13
  104:18,18
  107:5 129:4
  155:6 183:9
  218:11 257:16
  271:20 321:5

understanding
  23:20 36:2
  40:22 65:13
  71:14 74:13,15
  75:12 82:17
  83:22 86:5,7
  87:3 94:8 97:2
  99:7 101:10,16
  104:3 140:20
  141:14 158:6,9
  163:18,19,20
  164:4,14,16,20
  166:13 210:16
  242:17 243:5
  303:15 332:6
understood
  7:13 80:8,22
  91:3 94:21
  98:19 102:21
  120:14 218:15
  226:21 304:21
unequivocally
  238:6
unethical   92:15
unfounded
  215:11
unh   6:20
unhs   6:20
unique   133:21
  270:20
united   1:1,6
  2:9,14 107:21
  315:6 316:9
  347:4 348:1
unofficial   30:2
unprofessional
  183:21

EXHIBIT 1
Page 632 of 638

| | | | |
|---|---|---|---|
| **unquote**  90:21 | 217:15,16 | **verified**  333:1 | 89:8 |
| **unrealistic** | 221:1 232:16 | **verify**  347:9 | **virtual**  157:8 |
| 266:20 | **used**  54:20 | **veritext**  347:14 | 305:4 |
| **unrelated** | 84:9,9 102:19 | 347:23 | **virtually**  8:11 |
| 264:4 | 126:11,12 | **veritext.com** | 169:16 |
| **unusual**  106:10 | 161:8 167:4,19 | 347:15 | **visiting**  107:4 |
| 164:21 184:3 | 168:8 171:14 | **version**  166:7 | **visitor**  109:9 |
| 292:10 313:10 | 194:15,16 | **versus**  80:3 | **voice**  183:19,19 |
| **update**  336:15 | 207:12 217:8 | 83:11,12 207:9 | **voices**  8:19 |
| **updates**  27:4 | 219:21 347:19 | 321:8 | **void**  238:11 |
| 78:22 94:12 | **user**  126:13 | **vet**  51:5 | **volume**  182:20 |
| 95:22 112:11 | **using**  44:19 | **vetting**  51:7 | **vs**  1:5 |
| 112:12 130:4 | 56:8 68:13,14 | **viability** | **vulnerability** |
| 130:18 | 69:12 161:14 | 160:16 161:2 | 217:18 |
| **uploaded**  127:1 | 161:22 171:2 | 238:11 | |
| **ups**  252:1 | 173:12 206:21 | **vice**  301:5 | **w** |
| **upset**  229:12 | 207:14 215:22 | **videoconfere...** | **wage**  320:6 |
| 229:14 265:18 | 267:2 300:18 | 2:14 | **wages**  133:17 |
| **upstanding** | **usually**  22:16 | **view**  171:2 | **walk**  141:13 |
| 279:18 | 41:13 116:12 | 187:1 210:2 | 205:15 |
| **uptain**  343:4,5 | 215:20 287:8 | 272:15 277:13 | **walking**  280:8 |
| **us0000045**  3:18 | | **viewed**  281:18 | **want**  13:3 |
| **us0000238**  3:21 | **v** | 281:21 | 35:16 41:15 |
| **us0000303**  4:4 | **v**  24:9 55:10 | **views**  110:14 | 56:1 57:17 |
| **us0000331**  4:6 | 347:4 348:1 | 110:17 | 62:18 75:18,19 |
| **usaf**  224:18 | **valid**  250:19,22 | **violated**  279:20 | 80:22 86:8 |
| **usaspending....** | 251:1,5 | 325:10 327:14 | 90:15 93:16 |
| 310:7 | **varied**  54:19 | 327:16 | 100:1,3 102:13 |
| **usdoj.gov**  2:11 | 118:9 320:11 | **violating** | 107:12 108:22 |
| **use**  54:17,22 | **variety**  128:18 | 327:11 | 109:17 128:21 |
| 57:11 62:15 | 253:11 | **violation** | 129:2 134:16 |
| 75:9 126:9,15 | **vehicle**  82:2,4 | 240:21 243:3 | 134:18 138:3 |
| 129:21 130:1 | **vellone**  2:3 | 281:19 324:20 | 138:10 141:9 |
| 142:2 146:21 | **vellone.com** | 325:1 | 141:10,13 |
| 159:9 171:8 | 2:5 347:2 | **violations** | 142:8 151:18 |
| 206:13,14 | **verbal**  6:19 | 195:6 | 159:22 162:5 |
| 207:9 215:21 | **verbiage** | **virginia**  15:9 | 169:4 179:7 |
| 216:8 217:13 | 108:11 220:14 | 33:18 40:5,7 | 182:13 210:7 |

EXHIBIT 1
Page 633 of 639

www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000414

214:20 217:6
239:13 256:12
269:13,16
271:1,3,5
289:17 290:22
291:3,13
299:12 302:16
304:14,18
306:7 327:7
338:8
**wanted** 18:7
41:5,20 49:8
51:9 53:11
61:4 62:2,10
62:12 65:22
66:16 67:4
73:19 77:7,12
78:17 96:15,16
109:22 125:3,6
129:21 155:16
159:10 168:2
183:9 199:22
206:13 209:17
214:7 238:3
244:13 262:17
270:18 291:18
302:18 310:3
338:2
**wants** 82:10
207:9 303:11
**war** 23:11
**wareham**
236:14 294:15
294:19 295:1
**warned** 189:16
**washington**
1:15 2:11
29:11 59:11

203:1
**waste** 178:6,10
178:19 236:16
**way** 7:4 33:20
38:6 45:21
46:14 68:7
80:8 91:3
102:21 119:21
123:7 132:6,6
154:7 171:11
198:3 207:10
214:17 222:20
244:6 248:19
259:18 275:19
290:20 299:9
317:9 334:4
337:21 343:17
**ways** 31:12
159:10 222:16
**we've** 13:12
64:9 188:1
222:13 229:22
334:13 335:10
**website** 37:10
57:4,5
**week** 33:19
52:1 53:1 74:8
118:6,18 120:9
120:11,13
122:5 124:10
133:9 213:11
231:22 232:5
330:20 331:20
331:22 332:14
332:15 333:1,1
**weekends** 53:4
70:6

**weekly** 49:22
50:4,7 57:13
112:11,12
**weeks** 5:21
15:13 17:20
111:20 118:18
120:2,12
**weight** 206:22
**welcome**
274:20 275:16
**went** 53:6,17
96:9 148:2
191:6 227:4
**western** 1:1
**whistleblower**
236:16,17
**white** 182:12
**widely** 26:2
**wider** 282:11
**wife** 12:17
**william** 201:21
228:2
**willing** 270:10
**windows**
161:16,17
166:6,7,7
217:8
**winning** 317:1
**winter** 257:11
**witness** 5:4
24:8,10 41:2
41:13 44:3
55:9 64:15
68:4 75:12
87:17 97:6
100:8 103:21
105:22 117:1
133:1 136:11

144:17 147:15
151:10,12,22
170:17 172:20
173:5 192:2
200:17 227:15
231:8 235:11
235:14 239:20
249:12 276:15
276:17 283:18
284:14 306:12
309:21 311:17
334:8,10
341:11 345:4,6
345:10 347:8
347:10,12,18
**witnessed**
184:11
**wolf** 2:3
**won** 335:12
**word** 237:16
242:9
**words** 45:1
**work** 11:18
14:21 17:2,14
21:19 22:4,21
23:8 25:4
26:13,20,22
27:22,22 29:5
32:11 33:9,10
33:12 35:1,8
36:18 39:4,18
39:20 40:3
41:15 42:7,12
44:1,14,16
47:6 52:13,18
52:19 53:5,14
57:8 59:18
63:11 66:7,8

**EXHIBIT 1**
**Page 635 of 639**

www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000415

Paul Roysdon, Ph.D.

May 30, 2025

| | | | |
|---|---|---|---|
| 66:13 67:7,7 | 191:10,14 | 334:18 335:6,6 | 250:22 251:18 |
| 67:19 68:4,19 | 192:13 208:22 | 335:7,7 337:9 | 255:17,18 |
| 69:17 70:18 | 216:19 218:1,2 | 337:15 342:14 | 299:11 303:12 |
| 71:3,12,16,19 | 226:21 227:4 | **worked**  19:22 | 308:9 313:3 |
| 71:22 72:13 | 230:4 239:14 | 28:13 33:18 | 320:12 332:3 |
| 74:7 75:3 76:7 | 245:17,20 | 34:1 38:7,12 | 332:22 340:1,5 |
| 76:9 77:13 | 246:5,7,8,11 | 38:14,16 44:17 | **workplace** |
| 78:6,12,19 | 247:9,14 249:3 | 48:5 52:18 | 86:16 110:17 |
| 79:4,6,7 80:11 | 249:17,22 | 58:22 69:22 | **works**  208:12 |
| 80:12,14,18 | 250:2,3,5,5,7 | 71:6 83:22 | 218:22 302:2 |
| 81:19 82:20 | 250:21 254:19 | 108:14 112:6,7 | **workspaces** |
| 85:9,12,12,16 | 255:20 256:2,6 | 112:9,13 | 107:4 |
| 85:16,22 86:15 | 256:12 261:5 | 120:11 143:12 | **world**  330:20 |
| 86:20 88:22 | 261:13 262:19 | 143:15 202:22 | **worried**  47:14 |
| 89:1,7,12 90:6 | 263:7 265:12 | 265:4,19 | 151:16 193:8 |
| 90:9,20 91:5,6 | 265:20 269:13 | 268:20 337:20 | **worries**  212:19 |
| 91:8 92:11,22 | 269:16,21 | 339:21 | 300:12 |
| 94:18 96:13 | 270:3,18 271:1 | **working**  20:4 | **worry**  54:6 |
| 99:20,22 108:7 | 271:3,17,22 | 24:3,13 25:19 | 179:6 243:1 |
| 108:17,21 | 272:10 274:21 | 26:17,19 29:4 | **write**  22:14 |
| 109:13 110:15 | 275:17 279:11 | 35:3 43:15 | 309:18 |
| 111:7,11,12,22 | 281:5 284:5 | 48:12 50:18 | **writes**  108:9 |
| 112:4,5,10,22 | 294:8 296:1 | 52:3 66:19 | 312:7 |
| 117:8 120:5,9 | 300:7 308:9 | 70:5 72:3 | **writing**  97:22 |
| 124:12,15 | 311:20,21 | 82:14 87:14 | **written**  119:22 |
| 126:19,21,22 | 312:8,10,20 | 88:14,19 89:19 | 332:2 |
| 128:13,14,14 | 313:13,16,19 | 94:10 106:19 | **wrong**  87:13 |
| 128:17,20 | 313:20 314:8 | 108:20 109:18 | 273:5,15 274:4 |
| 129:9,10,14,16 | 314:16 315:7 | 112:16 118:7 | 323:3 328:11 |
| 129:18,22 | 316:8,10 | 126:18 127:2,8 | 341:3 |
| 131:11 133:21 | 317:19,21,22 | 127:21 128:5 | **wrongdoing** |
| 134:2 136:4 | 318:4 319:6 | 130:5,12 134:9 | 324:2 |
| 139:13,14 | 320:2,20 323:7 | 138:9,14 139:9 | **wronged**  193:9 |
| 140:5,10 | 323:15 324:3,4 | 146:13,14 | **wrote**  218:6 |
| 141:11 145:19 | 328:14,19 | 164:16 165:6 | **x** |
| 147:12 148:10 | 330:15,19 | 201:9 209:20 | **x**  3:5 4:2 217:8 |
| 158:7 171:15 | 331:18,21,21 | 215:8 225:16 | |
| 190:22 191:3,9 | 332:10 333:4,5 | 232:4 249:13 | |

EXHIBIT 1
Page 63 of 68
www.CapitalReportingCompany.com
202-857-3376

Roysdon Fact Witness_000416

| xyz   61:20 | 68:20 115:10 |
|---|---|
| **y** | 115:11,15 |
| **yeah**   22:10 | 124:16 125:4 |
| 32:7,22 41:5 | 161:12,13 |
| 43:12 44:6 | 172:4 232:3 |
| 64:15 73:9,12 | 250:22 251:2 |
| 74:1 78:3 92:3 | 263:2 275:3 |
| 94:6 97:21 | 330:16 335:8 |
| 101:18 103:17 | 337:21 |
| 110:22 115:10 | **yeses**   6:20 |
| 117:5,7 136:10 | **z** |
| 140:7 141:18 | **zero**   18:1,3 |
| 141:19 151:20 | 89:17 |
| 152:2 156:15 | |
| 158:4,19 | |
| 172:15 174:9 | |
| 183:20 184:21 | |
| 185:1 192:5 | |
| 200:16 215:5 | |
| 225:10 233:9 | |
| 239:18 258:1 | |
| 266:10 268:22 | |
| 272:3 296:21 | |
| 315:22 319:4 | |
| 321:5 322:4 | |
| 324:17 334:3 | |
| 337:13 | |
| **year**   15:1 19:10 | |
| 28:17 33:1 | |
| 131:18 209:21 | |
| 261:11 295:10 | |
| 328:5,7 331:2 | |
| 333:10 337:6 | |
| **years**   9:13,22 | |
| 10:10 13:12 | |
| 14:22 36:17,20 | |
| 37:3,9 43:4 | |

Roysdon Fact Witness_000417

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

**EXHIBIT 1**
**Page 637 of 639**

Roysdon Fact Witness_000418

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

**EXHIBIT 1**
**Page 638 of 639**

Roysdon Fact Witness_000419

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

**EXHIBIT 1**
**Page 639 of 639**

**From:**     MCVEIGH, WILLIAM M Capt USAF AFMC AFLCMC/HNCO [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=3A8E2838CD0C414A98AF11275B8C4A18-MCVEIGH.WIL]
**Sent:**     8/18/2020 3:34:27 AM
**To:**     PARISI, THOMAS J CIV USAF AFMC AFRL/RIGA [thomas.parisi.1@us.af.mil];BROWN, DANIEL D GG-13 USAF AFMC AFLCMC/HNCYD [daniel.brown.5@us.af.mil];MARX, JOHN T CIV USAF ACC 16 AF/AFRL/RIG/OL-SATX [john.marx.2@us.af.mil];MACRINA, TANYA M CIV USAF AFMC AFRL/RIGA [tanya.macrina@us.af.mil]
**CC:**     SCHILLING, NICHOLAS A GG-12 USAF AFMC AFLCMC/HNCF [nicholas.schilling.2@us.af.mil];HERN, GREGORY L GG-13 USAF AFMC AFLCMC/HNCF [gregory.hern@us.af.mil]; ROCHE, ANTHONY J GG-12 USAF AFMC AFLCMC/HNCFY [anthony.roche.1@us.af.mil];GUERRERO, JULIO GG-13 USAF AFMC AFLCMC/HNCO [julio.guerrero.2@us.af.mil]; SPEARS, MAJOR W CTR USAF AFMC AFRL/RIGA [major.spears.3.ctr@us.af.mil]
**Subject:**     RE: Tech SME
**Attachments:**     smime.p7s

All,

I was corrected by Dan. This is for a Tech SME and not a SETA. It's on the PEM books as a SETA, but it's being used as an in house Tech SME. Dan would like to put the funding on the Excalibur vehicle to pay for Roysdon and support to Fib.

Tom,

Are we good to send to the below?

-Will

---

**From:** PARISI, THOMAS J CIV USAF AFMC AFRL/RIGA <thomas.parisi.1@us.af.mil>
**Sent:** Monday, August 17, 2020 5:57 PM
**To:** BROWN, DANIEL D GG-13 USAF AFMC AFLCMC/HNCYD <daniel.brown.5@us.af.mil>; MARX, JOHN T CIV USAF ACC 16 AF/AFRL/RIG/OL-SATX <john.marx.2@us.af.mil>; MACRINA, TANYA M CIV USAF AFMC AFRL/RIGA <tanya.macrina@us.af.mil>; MCVEIGH, WILLIAM M Capt USAF AFMC AFLCMC/HNCO <william.mcveigh.1@us.af.mil>
**Cc:** SCHILLING, NICHOLAS A GG-12 USAF AFMC AFLCMC/HNCFY <nicholas.schilling.2@us.af.mil>; HERN, GREGORY L GG-13 USAF AFMC AFLCMC/HNCF <gregory.hern@us.af.mil>; ROCHE, ANTHONY J GG-12 USAF AFMC AFLCMC/HNCFY <anthony.roche.1@us.af.mil>; GUERRERO, JULIO GG-13 USAF AFMC AFLCMC/HNCO <julio.guerrero.2@us.af.mil>; SPEARS, MAJOR W CTR USAF AFMC AFRL/RIGA <major.spears.3.ctr@us.af.mil>
**Subject:** RE: Tech SME

Sounds like John has this under control.   We're gonna stand down on it.

Thanks,
Tom

---

**From:** "BROWN, DANIEL D GG-13 USAF AFMC AFLCMC/HNCYD" <daniel.brown.5@us.af.mil>
**Sent:** Aug 17, 2020 5:19 PM
**To:** "MARX,  JOHN T CIV USAF ACC 16 AF/AFRL/RIG/OL-SATX"  <john.marx.2@us.af.mil>;
"MACRINA, TANYA M CIV USAF AFMC AFRL/RIGA" <tanya.macrina@us.af.mil>;  "PARISI, THOMAS J
CIV USAF AFMC AFRL/RIGA" <thomas.parisi.1@us.af.mil>;  "MCVEIGH,  WILLIAM M Capt USAF
AFMC AFLCMC/HNCO" <william.mcveigh.1@us.af.mil>
**Cc:** "SCHILLING,  NICHOLAS A GG-12 USAF AFMC AFLCMC/HNCFY"
<nicholas.schilling.2@us.af.mil>;  "HERN, GREGORY L GG-13 USAF AFMC AFLCMC/HNCF"
<gregory.hern@us.af.mil>;  "ROCHE,  ANTHONY J GG-12 USAF AFMC AFLCMC/HNCFY"
<anthony.roche.1@us.af.mil>;  "GUERRERO,  JULIO GG-13 USAF AFMC AFLCMC/HNCO"

**EXHIBIT 2**
**Page 1 of 5**
Confidential - Subject to Protective Order

<julio.guerrero.2@us.af.mil>;  "SPEARS,  MAJOR W CTR USAF AFMC AFRL/RIGA"
<major.spears.3.ctr@us.af.mil>
**Subject:** Tech SME

Please do not reject the MIPR. Funding is for a Tech SME under one of the GITI contracts – Excalibur or CPAC-C – I forget which.


V/r,
-Dan

Desk: 210-925-6208  (DSN: 945) , STE equipped
TS VOIP: 981-5267
Mobile: 210-884-0106
SIPR: daniel.d.brown8.civ@mail.smil.mil
JWICS: daniel.d.brown@af.ic.gov

---

**From:** MARX, JOHN T CIV USAF ACC 16 AF/AFRL/RIG/OL-SATX <john.marx.2@us.af.mil>
**Sent:** Monday, August 17, 2020 1:09 PM
**To:** MACRINA, TANYA M CIV USAF AFMC AFRL/RIGA <tanya.macrina@us.af.mil>; PARISI, THOMAS J CIV USAF AFMC AFRL/RIGA <thomas.parisi.1@us.af.mil>; MCVEIGH, WILLIAM M Capt USAF AFMC AFLCMC/HNCO <william.mcveigh.1@us.af.mil>
**Cc:** SCHILLING, NICHOLAS A GG-12 USAF AFMC AFLCMC/HNCFY <nicholas.schilling.2@us.af.mil>; BROWN, DANIEL D GG-13 USAF AFMC AFLCMC/HNCYD <daniel.brown.5@us.af.mil>; HERN, GREGORY L GG-13 USAF AFMC AFLCMC/HNCF <gregory.hern@us.af.mil>; ROCHE, ANTHONY J GG-12 USAF AFMC AFLCMC/HNCFY <anthony.roche.1@us.af.mil>; GUERRERO, JULIO GG-13 USAF AFMC AFLCMC/HNCO <julio.guerrero.2@us.af.mil>; SPEARS, MAJOR W CTR USAF AFMC AFRL/RIGA <major.spears.3.ctr@us.af.mil>
**Subject:** RE: SETA Funding

Tanya, I just spoke to Capt McVeigh. This funding is to meet an on-site SETA requirement for HNCO in San Antonio. As per my note, it seems that there was some confusion as to who was doing the contracting action – Capt McVeigh was under the impression it was previously executed through ACT 2, but clearly that is not the case.

I have introduced Capt McVeigh to the appropriate POC for this action and no further action or response is needed from Team AFRL.

Thanks.

John

---

**From:** MACRINA, TANYA M CIV USAF AFMC AFRL/RIGA <tanya.macrina@us.af.mil>
**Sent:** Monday, August 17, 2020 2:04 PM
**To:** MARX, JOHN T CIV USAF ACC 16 AF/AFRL/RIG/OL-SATX <john.marx.2@us.af.mil>; PARISI, THOMAS J CIV USAF AFMC AFRL/RIGA <thomas.parisi.1@us.af.mil>; MCVEIGH, WILLIAM M Capt USAF AFMC AFLCMC/HNCO <william.mcveigh.1@us.af.mil>
**Cc:** SCHILLING, NICHOLAS A GG-12 USAF AFMC AFLCMC/HNCFY <nicholas.schilling.2@us.af.mil>; BROWN, DANIEL D GG-13 USAF AFMC AFLCMC/HNCYD <daniel.brown.5@us.af.mil>; HERN, GREGORY L GG-13 USAF AFMC AFLCMC/HNCF <gregory.hern@us.af.mil>; ROCHE, ANTHONY J GG-12 USAF AFMC AFLCMC/HNCFY <anthony.roche.1@us.af.mil>; GUERRERO, JULIO GG-13 USAF AFMC AFLCMC/HNCO <julio.guerrero.2@us.af.mil>; SPEARS, MAJOR W CTR USAF AFMC AFRL/RIGA <major.spears.3.ctr@us.af.mil>
**Subject:** RE: SETA Funding

John,

**EXHIBIT 2**
**Page 2 of 5**
Confidential - Subject to Protective Order                                    US0000666

We have received MIPRs, rejected MIPRs and received MORE MIPRs.

Including $300K mentioned below – for the 2nd time.

Please make sure you are absolutely SURE – because we would be rejecting another MIPR again….

Thanks,
Tanya

---

**From:** MARX, JOHN T CIV USAF ACC 16 AF/AFRL/RIG/OL-SATX <john.marx.2@us.af.mil>
**Sent:** Monday, August 17, 2020 2:00 PM
**To:** PARISI, THOMAS J CIV USAF AFMC AFRL/RIGA <thomas.parisi.1@us.af.mil>; MCVEIGH, WILLIAM M Capt USAF AFMC AFLCMC/HNCO <william.mcveigh.1@us.af.mil>; MACRINA, TANYA M CIV USAF AFMC AFRL/RIGA <tanya.macrina@us.af.mil>
**Cc:** SCHILLING, NICHOLAS A GG-12 USAF AFMC AFLCMC/HNCFY <nicholas.schilling.2@us.af.mil>; BROWN, DANIEL D GG-13 USAF AFMC AFLCMC/HNCYD <daniel.brown.5@us.af.mil>; HERN, GREGORY L GG-13 USAF AFMC AFLCMC/HNCF <gregory.hern@us.af.mil>; ROCHE, ANTHONY J GG-12 USAF AFMC AFLCMC/HNCFY <anthony.roche.1@us.af.mil>; GUERRERO, JULIO GG-13 USAF AFMC AFLCMC/HNCO <julio.guerrero.2@us.af.mil>
**Subject:** RE: SETA Funding

Whoops, looks like lines got crossed!

Totally different contract, different agency, different performer base…

No response required on this thread, will connect with the appropriate POCs.

Thanks, John

---

**From:** PARISI, THOMAS J CIV USAF AFMC AFRL/RIGA <thomas.parisi.1@us.af.mil>
**Sent:** Monday, August 17, 2020 1:57 PM
**To:** MCVEIGH, WILLIAM M Capt USAF AFMC AFLCMC/HNCO <william.mcveigh.1@us.af.mil>; MACRINA, TANYA M CIV USAF AFMC AFRL/RIGA <tanya.macrina@us.af.mil>
**Cc:** SCHILLING, NICHOLAS A GG-12 USAF AFMC AFLCMC/HNCFY <nicholas.schilling.2@us.af.mil>; BROWN, DANIEL D GG-13 USAF AFMC AFLCMC/HNCYD <daniel.brown.5@us.af.mil>; HERN, GREGORY L GG-13 USAF AFMC AFLCMC/HNCF <gregory.hern@us.af.mil>; ROCHE, ANTHONY J GG-12 USAF AFMC AFLCMC/HNCFY <anthony.roche.1@us.af.mil>; MARX, JOHN T CIV USAF ACC 16 AF/AFRL/RIG/OL-SATX <john.marx.2@us.af.mil>; GUERRERO, JULIO GG-13 USAF AFMC AFLCMC/HNCO <julio.guerrero.2@us.af.mil>
**Subject:** RE: SETA Funding

Will,

SETA work is not within scope of ACT2.


Respectfully,
Tom


_____

Thomas J. Parisi
DR-III (GS-14), DAF

**EXHIBIT 2**
**Page 3 of 5**

Firestarter Program Manager
AFRL/RIGA
Information Directorate
Rome, NY 315 330 2282; DSN 587
NIPR: Thomas.Parisi.1@us.af.mil
JWICS: Thomas.Parisi@af.ic.gov

NOTE: Due to the COVID-19 telework situation, I have limited access to classified communication systems.  I attempt to check JWICS emails once per week, situation permitting.

---

**From:** MCVEIGH, WILLIAM M Capt USAF AFMC AFLCMC/HNCO <william.mcveigh.1@us.af.mil>
**Sent:** Monday, August 17, 2020 1:18 PM
**To:** PARISI, THOMAS J CIV USAF AFMC AFRL/RIGA <thomas.parisi.1@us.af.mil>; MACRINA, TANYA M CIV USAF AFMC AFRL/RIGA <tanya.macrina@us.af.mil>
**Cc:** SCHILLING, NICHOLAS A GG-12 USAF AFMC AFLCMC/HNCFY <nicholas.schilling.2@us.af.mil>; BROWN, DANIEL D GG-13 USAF AFMC AFLCMC/HNCYD <daniel.brown.5@us.af.mil>; HERN, GREGORY L GG-13 USAF AFMC AFLCMC/HNCF <gregory.hern@us.af.mil>; ROCHE, ANTHONY J GG-12 USAF AFMC AFLCMC/HNCFY <anthony.roche.1@us.af.mil>; MARX, JOHN T CIV USAF ACC 16 AF/AFRL/RIG/OL-SATX <john.marx.2@us.af.mil>; GUERRERO, JULIO GG-13 USAF AFMC AFLCMC/HNCO <julio.guerrero.2@us.af.mil>
**Subject:** SETA Funding

Tom/Tanya,

Just want to confirm, I'm sending $300k FY20 3600 for SETA support to ACT2 Excalibur/Mercury. Is that the best contract vehicle for SETA support?

Also, what's the latest MIPR instructions for ACT2. Is it this?

CAT1 - $10,500
CAT2 - $289,500

Contract #: FA8750-18-F-0013
For support costs, please use: FA8750-19-C-0013

Period of Performance: 31 Aug 2020 – 31 Aug 2021

Contract is Severable

EEIC Code: 82100

Performing Agency Financial POC: Jamie Jordan, afrl.rifb@us.af.mil, (315) 330-7287
Performing Agency Tech POCs: Tom Parisi, Thomas.parisi.1@us.af.mil, (315) 330-7287
Tanya Macrina, Tanya.macrina@us.af.mil, (315) 330-4715

Thanks,
-Will

William McVeigh, Capt, USAF
AFLCMC/HNCO
DSN: (312) 945-1974
COMM: (210) 925-1974

**EXHIBIT 2**
**Page 4 of 5**
Confidential - Subject to Protective Order

CELL: (540) 840-9899
NIPR: william.mcveigh.1@us.af.mil

**EXHIBIT 2**
**Page 5 of 5**

Confidential - Subject to Protective Order

US0000669

CUI



**DEPARTMENT OF THE AIR FORCE**
AIR FORCE LIFE CYCLE MANAGEMENT CENTER
CRYPTOLOGIC & CYBER SYSTEMS DIVISION
**JOINT BASE SAN ANTONIO-LACKLAND, TEXAS 78243**

21 August 2020

MEMORANDUM FOR RECORD

FROM: AFLCMC/HNCO

SUBJECT: (U) AFLCMC/HNCO Update on DD254 Status for Fibonacci

1. (CUI) In FY19, Dr. Paul Roysdon briefed the Fibonacci program at the TOP SECRET level to AFLCMC/HNCO and SAF/AQL. The National Security Agency (NSA) decided not to fund this program, and the program was funded by SAF/AQL as a ▉▉▉ project with unclassified components. At the time, Dr. Roysdon was a Government employee providing advice and guidance under the Government.

2. (U) Starting in FY19, Mr. Dan Brown brought Dr. Paul Roysdon to support the Fibonnaci program as a Technical Subject Matter Expert (contractor) as a subcontractor under Global Info Tech Inc (GITI). GITI holds an Air Force Research Laboratory (AFRL) ACT2 prime contract. Dr. Roysdon maintained his Government position at the NSA. Dr. Roysdon stated on 18 Aug 20 he obtained an Office of General Council (OGC) letter providing agreement for the project to be worked. AFLCMC/HNCO has received the NSA's legal guidance and believes there is likely a conflict of interest based off of the email on JWICS dated 20 Aug 20.

3. (CUI) Dr. Roysdon was cleared as a Government employee to ▉▉▉ but not as a contractor. While the GITI contract has ▉▉▉ on their DD254, Dr. Roysdon's LLC does not have a Field Security Officer (FSO), DD254, and cage code that would allow him contractor SCI and program access. Dr. Roysdon's subcontractor work was solely unclassified. Dr. Roysdon's work as a Government employee included ▉▉▉ discussions about Fibonacci. Dr. Roysdon has been notified to stop work as a contractor. He may continue supporting the project as a Government employee under the NSA. However, Dr. Roysdon informed ALFCMC/HNCO on 20 Aug that he is planning to resign from NSA.

4. (CUI) Within AFLCMC/HNCO three other contractors require DD254 modification to allow ▉▉▉ Kudu Dynamics, X8, and Crystal Clear. X8 and Crystal Clear, as a technical Subject Matter Expert (SME) are not doing any program work currently, but are expected to do ▉▉▉ work in FY21. No additional ALFCMC/HNCO contractors require DD254 SAP modifications. The Kudu Dynamics DD254 is expected to be completed by 23 Oct 20 pending signatures.

5. (U) Please direct any further questions to Capt William McVeigh at DSN: 945-1974 and william.mcveigh.1@us.af.mil.

JARED EKHOLM, Lt Col, USAF
Materiel Leader

CUI
**EXHIBIT 3**
**Page 1 of 1**

US0000059

**AIR FORCE OFFICE OF SPECIAL INVESTIGATION**
**REPORT OF INVESTIGATIVE ACTIVITY**

PRIVACY ACT NOTICE: WHEN FILLED IN, THIS FORM CONTAINS INFORMATION THAT MUST BE PROTECTED UNDER THE PRIVACY ACT OF 1974.

| 1. DATE OF INVESTIGATIVE ACTIVITY | 2. PLACE | 3. ACTIVITY NUMBER |
|---|---|---|
| 26 Aug 2020 | OSI PJ Det 8 OL-B, JBSA-Lackland, TX | N/A |

**4. REMARKS**

(U⬛⬛⬛) On 26 Aug 2020, SA ALLEN T. BEALL, OSI PJ Det 8 OL-B, JBSA-Lackland, TX interviewed Dr. PAUL F. ROYSDON, NSA-Texas, Google phone 530-400-2257, regarding his involvement in the USAF Special Access Program ⬛⬛⬛ ROYSDON stated he proposed a project to National Security Agency (NSA) leadership in the January to March 2019 timeframe. The response he received was that the project was too advanced for the NSA and that they would not pursue it or fund it. He stated he was encouraged by NSA leadership to present the project to the USAF to see if there was any interest in developing it on their part. In or around March, 2019, ROYSDON conducted two briefings to USAF delegations on his proposed project. ROYSDON recalled DANIEL BROWN, AFLCMC/HNCO, was present during the at least one of the briefings he provided.

(U⬛⬛⬛) ROYSDON's project and expertise was deemed worthy of further development by the USAF and was placed under project Fibonacci within ⬛⬛⬛ ROYSDON continued his involvement as a subject matter expert consultant to the prime contractor of the project, Global Info Tech, Inc. (GITI). ROYSDON did not recall who within the USAF proposed he continue involvement with the project, but the arrangement proposed was that he consult as an independent entity to GITI and not become a GITI employee. He submitted all timesheets and invoices to GITI who then compensated him and provided an IRS Form 1099 at the end of the tax year.

(U⬛⬛⬛) At no time did ROYSDON claim or purport that the services he was providing to GITI for his work on the ⬛⬛⬛ project had any connection to his position at the NSA. In April, 2019, before accepting the consulting agreement with GITI, he contacted AMY R⬛⬛⬛ of the NSA's Office of General Counsel, Administrative Law and Ethics to discuss any potential conflicts of interest between his employment with the NSA and consulting with GITI who was performing work on a USAF contract. ROYSDON believed that as long he was not performing work for GITI during the business hours he was spending at the NSA, and he was not developing a tool or capability which would be presented back for purchase or use at the NSA, he would be permitted to perform "behind the scenes" consulting services to GITI. ROYSDON provided copies of his email correspondence with R⬛⬛⬛ which he interpreted as tacit approval from the NSA to consult with GITI. ROYSDON provided a printed copy of his correspondence with R⬛⬛⬛ (see attached emails)

(U⬛⬛⬛) Agent Note: ROYSDON was approved for ⬛⬛⬛ access and indoctrinated into the program on 4 Jun 2020. The justification used on his Program Access Request (PAR) for ⬛⬛⬛ stated ⬛⬛⬛ ⬛⬛⬛ (see attached PAR)

(U⬛⬛⬛) SA BEALL showed ROYSDON his approved PAR and the justification language used. ROYSDON stated the justification was not correct as he was providing subject matter expert consultation to GITI and ⬛⬛⬛ No connection, communication or information flow was occurring between project Fibonacci and the NSA, and none ever had been envisioned. He had never seen the justification language used on the PAR and did not provide input for the PAR.

(U⬛⬛⬛) ROYSDON confirmed he had accepted a position with large government contactor and has submitted his letter of resignation to the NSA. ROYSDON preferred not to name his new employer until all of the paperwork was finalized (NFI). He said he may also retain his security clearance through the NSA as he could consult on continuing NSA projects and may return to a senior leadership position with the NSA in the future. ROYSDON claimed his resignation from the NSA had nothing to do with his involvement with project Fibonacci or ⬛⬛⬛.

| 5. PREPARED BY: | 6. APPROVED BY: | 7. DATE |
|---|---|---|
| SA ALLEN T. BEALL, OSI PJ Det 8 OL-B | | 27 Aug 2020 |

SPECIAL HANDLING REQUIRED: DOCUMENT IS SUBJECT TO A CLAIM OF PRIVILEGE UNDER MILITARY LAW. HANDLE IN ACCORDANCE WITH AFI 71-101, VOLUME 1, AND APPLICABLE INSTRUCTIONS TO INCLUDE PRIVACY ACTT (5 USC 522a) RESTRICTIONS. THIS DOCUMENT IS NOT TO BE RELEASED OUTSIDE YOUR AGENCY WITHOUT THE EXPRESSED PERMISSSION OF AFOSI.

RELEASABILITY: Access to this form is restricted. This form is FOR OFFICIAL USE ONLY-LAW ENFORCEMENT SENSITIVE (FOUO-LES) when filled in. Submit requests for access to completed forms in accordance with the Freedom of Information Act.

UNCLASSIFIED/⬛⬛⬛     EXHIBIT 4     Page 1 of 2
Page 1 of 12
Confidential - Subject to Protective Order     US0000045

UNCLASSIFIED/

## AIR FORCE OFFICE OF SPECIAL INVESTIGATION
### REPORT OF INVESTIGATIVE ACTIVITY

**PRIVACY ACT NOTICE: WHEN FILLED IN, THIS FORM CONTAINS INFORMATION THAT MUST BE PROTECTED UNDER THE PRIVACY ACT OF 1974.**

(U███) SA BEALL performed an ███ de-briefing with ROYSDON and ROYSDON signed the debriefing portion of his ███ Program Indoctrination Agreement (PIA). SA BEALL allowed ROYSDON to review the Critical Program Information (CPI) from the ███ Security Classification Guide dated ███████ and reminded him he was no longer allowed to discuss any of those topics. ROYSDON expressed concern that some of his ongoing work with the NSA or his new employer may also involve some of the ███ CPI topics. SA BEALL clarified that if there was precedent or history from the NSA or his new employer, and his continued work on some of these topics were reasonable extensions to previous work performed, he would be allowed to continue those efforts. However, SA BEALL reiterated any work related to project Fibonacci or ███ or work based on knowledge gained from project Fibonacci or ███ must cease. SA BEALL told ROYSDON if wanted to continue his work under ███ he would need to be submitted for access again with proper justification and may require a DD254 listing him or his limited liability corporation as part of the access request.

(U███) Agent Note: Program Security Representative JASON OLIVEIRA, OSI PJ Det 8 OL-B de-briefed ROYSDON from ███ in the Joint Access Database Environment (JADE) and uploaded his signed de-brief PIA on 27 Aug 2020. (see attached PIA)

---------Nothing Follows---------

UNCLASSIFIED/     **EXHIBIT 4**     PAGE 2 OF 2 PAGES
Page 2 of 12
Confidential - Subject to Protective Order     US0000046

**Roysdon Paul F NSA FTX12 USA GOV**

| | |
|---|---|
| **From:** | ▆▆ Amy ▆ NSA ▆▆ USA GOV |
| **Sent:** | Thursday, August 20, 2020 2:12 PM |
| **To:** | ▆▆▆▆▆ NSA ▆▆ USA GOV |
| **Subject:** | RE: (U) Consulting Question |

Classification: UNCLASSIFIED//▆▆▆▆▆▆▆▆▆

▆▆▆, following up on our conversation today, the primary ethics laws and regulations that we have discussed in connection with your outside contracting work for GiTi are:

- 18 U.S.C. § 208 and 5 C.F.R. § 2635.502: Pursuant to this statute and regulation, you may not participate personally and substantially in any official NSA matter that affects the financial interests of your outside employer or to which an entity that you provide consulting services is a party. According to the information you have provided, you are not an employee of Giti, and you do not work on NSA matters affecting GiTi's financial interests or to which GiTi is a party. Based on the facts provided, I previously advised that your participation in this outside employment would not require your disqualification from any NSA matters to which you were assigned.
- 18 U.S.C. § 205: This law prohibits you from personally representing anyone before a Federal department, agency, or employee in a covered matter in which the United States is a party or has a direct and substantial interest. As discussed in my previous email, this law would prohibit you from representing GiTi to the Air Force (or any other Federal agency) on contract matters between GiTi and the Air Force. Providing "behind-the-scenes" services to GiTi in connection with its contract with the Air Force would not violate this law.
- 5 C.F.R. § 2635.703(a): This regulation prohibits you from allowing the use of nonpublic information to further your own financial interests or the financial interests of another. This regulation would prohibit you from using non-public information gained through the course of your employment with NSA the further your private work for GiTi.

I hope the above is helpful.

(U//▆▆▆▆)
Amy ▆. ▆▆▆▆
Attorney
Office of the General Counsel
Administrative Law & Ethics

▆▆▆▆▆▆▆▆▆▆▆▆▆▆

1

**EXHIBIT 4**
**Page 3 of 12**
Confidential - Subject to Protective Order

**From:** ███████████ NSA ████ USA GOV <███████████████>
**Sent:** Thursday, August 20, 2020 11:29 AM
**To:** ██████ Amy ███ NSA D23 USA GOV <████████████████>
**Subject:** RE: (U) Consulting Question

Classification: UNCLASSIFIED//████████████████████████

Amy,

Below is my response to the Air Force program office official that is requesting clarification.  Our (you and I) prior communication regarding this matter is at the end of this email.

Dan,

In April 2019 I contacted National Security Agency (NSA) Office of General Council (OGC) regarding outside work.  OGC did not identify a conflict of interest because of the following:

1.  I am employed by NSA as a Data Scientist, tasked with <u>academic engagement (AE) and work-force development (WFD)</u>.
    a.  This means that I am a liaison to academia on matters related to data science, and I am tasked at NSA to build, train, and mentor a data science team.
    b.  I do not implement data science or machine learning algorithms, but rather advise on their use and application.
    c.  During my assignment at Office of the Director of National Intelligence (ODNI), my duties were exactly the same (AE and WFD), but at the IC level.  However, at ODNI I was tasked with advising IC partners (not just NSA) on machine learning algorithms and their possible application in a variety of IC mission problems.
2.  The proposed work (in April 2019) is a consultant for Global InfoTech (GiTi), not the US Government (USG), and my work is very specific: <u>implement applied mathematics for cyber-physical systems</u>.  For nearly 20 years I have performed research, and published both papers and textbooks on this topic.
    a.  As a consultant for GiTi, I perform unclassified machine learning research, and provide white papers and implement numerical prototypes for adoption into cyber-physical applications.  To my knowledge, GiTi has several sub-contractors that use the result of my work, or provides these results to other USG contractors.
    b.  My work for GiTi is "behind the scenes" and strictly task-oriented, and, to my knowledge, any interaction I have had with the USG is a factual presentation of progress updates on research or numerical prototypes.
    c.  I have never represented GiTi to the USG for current or future contracts, nor do I have a vested interest in GiTi nor influence in the company or its leadership.  Furthermore, to my knowledge, the math solutions that I provide GiTi is not for any contract with NSA.
    d.  I have discussed this matter with my NSA leadership, and I have their approval to do this consulting outside of work hours.

Important notes:
*   Item 1 and item 2.a are important as they ensure that I do not violate the USG financial conflict of interest statute.  If my work at NSA ever includes providing mathematics for cyber-physical systems, I am required to disqualify myself from any consulting work whatsoever.
*   Item 2.b & 2.c are important as they ensure that I do not violate criminal law (18 U.S.C. § 205).  I can only perform "behind-the-scenes" tasks, and any interaction with the USG must be a factual exchange of information

2

**EXHIBIT 4**
**Page 4 of 12**
Confidential - Subject to Protective Order

US0000048

regarding the tasks assigned to me from GiTi (not the USG). I am not allowed to represent GiTi or influence a USG official.

- Item 2.c is also important as it ensures that I do not violate criminal law (18 U.S.C. § 203). I cannot, and do not participate in any GiTi profit sharing program. I can only accept a pre-set salary or pre-established contractual fee for tasks performed. Furthermore I have not, and will not, assist GiTi in preparing a response to a Federal RFP.

---

Very Respectfully,
Dr. ████

**From:** ████ Amy ██ NSA-██ USA CIV <████████>
**Sent:** Monday, May 13, 2019 7:19 AM
**To:** ████ NSA-██ USA CIV <████████>
**Subject:** RE: (U) Consulting Question

Classification: UNCLASSIFIED// ████████

Good morning, ████. Apologies for my delayed response. Unfortunately, there is no way to sign an agreement that takes away your responsibility under federal law, particularly 18 U.S.C. § 205. While it is helpful that the Air Force wants to help you avoid potential problems, the law would still prohibit you from having substantive interactions with Air Force representatives while you are working for NSA, even if the Air Force signs an MOU.

(U// ████ )
Amy ██ ████
Attorney
Office of the General Counsel
Administrative Law & Ethics

████████

████████

**From:** ████ NSA-██ USA CIV <████████>
**Sent:** Monday, May 6, 2019 12:59 PM
**To:** ████ Amy ██ NSA-██ USA CIV <████████>
**Subject:** RE: (U) Consulting Question

Classification: UNCLASSIFIED// ████████

3

**EXHIBIT 4**
**Page 5 of 12**
Confidential - Subject to Protective Order

Hello,

Thank you for the response. I will adhere to the guidelines below.

I have another question: The Air Force representative has offered to write and sign a Memorandum of Understanding (MOU) that any interaction (between them and I) would not be interpreted as official from the government, but rather as a consultant and a subject matter expert in mathematics. Would this be useful or appropriate to avoid misunderstandings, and help me to remain compliant with the guidelines below?

Very Respectfully,
Dr. █████████

**From:** ████ Amy ██ NSA-██ USA CIV < ████████████ >
**Sent:** Monday, April 15, 2019 10:45 AM
**To:** ████████ NSA-██ USA CIV < ████████████ >
**Subject:** RE: (U) Consulting Question

## Classification: UNCLASSIFIED//FOR OFFICIAL USE ONLY

,

I am following up our emails and telephone conversation last week regarding your offer of employment outside your position with the NSA. As you indicated last week, you are the Chief/Lead Data Scientist for NSA-Texas in ████. In that capacity, you are tasked with building a data science team, training and equipping them with the tools they need to solve mission problems in ████████████████. You further indicated that you have recently received an opportunity from Air Force CyberCom ("CyberCom") to assist with mathematical calculations in furtherance of its cyber-related mission. In this capacity, you would serve as a sub-contractor to the prime CyberCom contractor. You have indicated that your official responsibilities with the NSA are not related to the work that you would be doing for CyberCom. Further, the prime CyberCom contractor is not a business whose interests you could affect in the performance of your official duties with the NSA.

With respect to your outside employment, there are a few areas of concern you should be aware of. Conflict of interest statutes, as well as other criminal statutes, affect your outside employment while you are an Agency employee (and even after you leave the Agency). Below, I have provided much of the pertinent information from our website; however, you should read over all of the <u>information</u> before pursuing any outside employment.

The first statute is the financial conflict of interest statute, which would prohibit you from personally and substantially participating in your official Government duties on any particular matter that may affect an entity with which you have an outside business relationship, such as the CyberCom prime contractor. You have indicated that you do not have current responsibilities with the Agency that would affect the CyberCom prime contractor, but if you did, either now or in the future, you would be required to disqualify yourself in writing from taking any official actions affecting that company. The disqualification requirement would continue as long as you remain in a business relationship with that outside company or seeking employment with that company. You can find the Disqualification Template here: ████████████████████████████████████████

A second criminal law (18 U.S.C. § 205) prohibits you from personally representing any other person (including companies) -- with or without compensation -- before a Federal department, agency or employee. You may not make representations to any federal officials (not just NSA personnel) on behalf of outside entities. Representation includes any oral or written communications that are intended to influence the official on a specific matter. Working "behind-the-scenes" on matters or strictly task-oriented activities do not violate this rule. Applying this rule to your circumstances, you may not be the individual responsible for communications with Air Force representatives (or any other federal employees) on the contract for which you are providing services. This includes oral or written

4

**EXHIBIT 4**
**Page 6 of 12**
Confidential - Subject to Protective Order

communications. It does not include ministerial communications, such as requests for factual information. However, if a communication transitions from a factual exchange to a conversation in which differences of opinion may occur, this can create problems under the representation rule. Additionally, if the CyberCom prime contractor submits a product to CyberCom under your name, this would be considered a communication by you to CyberCom. Note that this rule does not prohibit you from identifying yourself as being associated with the CyberCom prime contractor for such things as being able to gain admittance to the facility where the work is to be performed.

In addition to the representation rule discussed immediately above, you are also prohibited by another rule (18 U.S.C. § 203) from receiving compensation that comes from the representation by others before a government department or agency on any matter in which the United States is a party or has a substantial interest. For example, you may not accept part of the profits in a profit-sharing arrangement if those profits come from representations to the Federal Government. Also, you may not work on a contingency fee basis for a private employer on a government contract (i.e., assist in preparing a response to a Federal RFP and receive a fee or payment only if the contractor is the successful bidder). You may accept a pre-set salary or a pre-established contractual fee (such as payment at an hourly rate) in connection with this outside engagement as long as there are no other benefits such as stock options, contingency fees, or profit sharing.

**If this outside arrangement requires you to work in a government facility, please review the below guidance.**

The DoD Standards of Conduct Office (SOCO) provided guidance in 2015 that indicates it is quite difficult, but not necessarily impossible, for a Federal employee to work for a contractor in the federal workplace. The relevant DoD SOCO guidance states:

Few federal personnel are aware that a criminal statute, 18 U.S.C. § 203, prohibits them from:

- -receiving compensation for acting as an agent or attorney (e.g. "representing");
- -for anyone;
- -before any part of the Executive or Judicial branches of the Federal Government;
- -in connection with a particular matter;
- -in which the United States is a party or has a direct and substantial interest.

While the statute applies to personnel throughout their federal careers, it has particular relevance in two situations: (1) military officers who desire to work in the Federal workplace for a contractor while on terminal leave and (2) personnel who desire to work in the Federal workplace for a contractor during their off-duty time ("moonlighting"). This statute will, in most cases, make such employment impossible. However, because the statute does not bar "communications that are merely ministerial in nature," such as seeking information that is routinely made available to the public or providing purely factual information, some such employment may be possible.

"Section 203 has historically been interpreted by the Department of Justice as prohibiting compensation only for representational services. Such representation must involve communications made with the intent to influence and must concern an issue or controversy. The provision of purely factual information or the submission of documents not intended to influence are not representational acts." Consequently, where communications do not involve a potential for divergent views, or where the employee's actions do not constitute communication, the prohibition does not apply. [See OGE Informal Advisory Memorandum 99 x 25 ███████████████]

███████████████████████████████████

While this opens the door for some employment of federal personnel as contractors in the federal workplace, it also places these personnel in positions to inadvertently violate the prohibition. The examples below illustrate application of the statute.

--A federal employee who moonlights as a custodian working for a contractor in a federal agency, may, in theory, perform his or her contractor duties without violating the statute since the employee's contractor duties do not

5

**EXHIBIT 4**
**Page 7 of 12**

Confidential - Subject to Protective Order

primarily involve communications and most communications by the employee will be ministerial. However, if the employee was accused of not cleaning satisfactorily, the employee is prohibited by the statute from defending the contractor's performance in a discussion with a federal official. Contractor employees who are not government personnel must handle the complaint.

--A federal employee could moonlight as a security guard at a federal facility but would not be able to engage in a discussion with federal employees about the guard's decision to deny admission to a visitor whose identity was in question.

--A military officer on terminal leave, who is employed by a contractor as a consultant for a Federal agency, could not provide advice or consultant services to the federal agency concerning a particular matter if the matter has potential for divergent views.

18 U.S.C. § 205 parallels §203 except that even uncompensated representation is prohibited. Neither § 203 nor § 205 applies to enlisted personnel.

Bottom line: As stated earlier, it is almost impossible for federal personnel to work for a contractor in the federal workplace. In theory, they could perform roles that do not involve communications or that involve only ministerial communications. However, if the quality, quantity, or timeliness of their work is challenged, they may not participate in such discussions. As the Office of Government Ethics warned, "As a general matter, [the employee] should take great care in avoiding any situation in which he may argue a position on behalf of [the organization] in a covered matter before any Federal employee in which there are potentially differing views of conflicting interest." [See OGE Advisory Opinion 96 x 6 ████]

As you can see from the DoD SOCO guidance, even in situations for which it may be possible to avoid violating the representational restrictions, there always remains the possibility that an employee moonlighting for a contractor in federal spaces could inadvertently violate this criminal prohibition.

In addition to the above considerations, please note that the federal law generally prohibits a contracting officer from awarding a contract to a government employee or to a business concern or other organization owned or controlled by a federal employee. This rule would not affect you if you would be joining, as a sub-contractor, an existing contract between CyberCom and the prime contractor. However, if the plan is for the prime contractor to submit a proposal for a new contract with you as a team member, this may create concerns. If that is the case, please follow up with my office for additional guidance.

Once again, please remember that, if you do accept this outside engagement, you must avoid taking any action that creates the appearance that you have lost impartiality in the performance of your official duties, or that even creates the appearance that you are using your public office for the private gain of yourself or others.

Finally, you asked in your original email whether CyberCom would have to sponsor your clearance for any classified work in connection with that engagement. If the level of clearance that you currently have with NSA is a high enough clearance for your work with CyberCom, it would be CyberCOm's responsibility to confirm your active clearance. If the work requires something further, such as a higher level of clearance, it would be CyberCom's responsibility to address.

I hope the above guidance helps you in navigating this offer, but please do not hesitate to contact me anytime with questions.

(U//████
Amy ████
Attorney



6

UNCLASSIFIED

(CLASSIFY AS APPROPRIATE WHEN FILLED IN)

JA-20190530-2-448567

# SPECIAL ACCESS PROGRAM INDOCTRINATION AGREEMENT

## Roysdon, Paul Franklin

An Agreement between

(Name – Printed or Typed) (Last, First, Middle Initial)

and the United States

1. I hereby accept the obligations contained in this Agreement in consideration of my being granted access to information referred to in this Agreement as Special Access Program (SAP) information. I have been advised that the SAP involves or derives from intelligence, operations or support activities, and is classified or is in the process of a classification determination by the standards of Executive Order 12958 or other Executive Order or statute. I understand and accept that by being granted access to SAP, special confidence and trust shall be placed in me by the United States Government.

2. I hereby acknowledge that I have received a security indoctrination concerning the nature and protection of SAP, including the procedures to be followed in ascertaining whether other persons to whom I contemplate disclosing this information or material have been approved for access to it, and I understand these procedures. I understand that I may be required to sign subsequent agreements upon being granted access to different categories of SAP. I further understand that all my obligations under this Agreement continue to exist whether or not I am required to sign such subsequent agreements.

3. I have been advised that the unauthorized disclosure, unauthorized retention, or negligent handling of SAP by me could cause irreparable injury to the United States or be used to advantage by a foreign nation. I hereby agree that I will never divulge anything marked as SAP or that I know to be SAP to anyone who is not authorized to receive it without prior written authorization from the United States Government department or agency (hereinafter Department or Agency) that last authorized my access.

UNCLASSIFIED

(CLASSIFY AS APPROPRIATE WHEN FILLED IN)

## 18a. SIGNATURE

| | b. DATE (YYYYMMDD) |
|---|---|
| | 06/01/19 |

## 19. WITNESS AND ACCEPTANCE. The execution of this Agreement was witnessed by the undersigned who accepted it on behalf of the United States Government as a prior condition of access to Special Access Program information.

| b. SIGNATURE | b. DATE (YYYYMMDD) |
|---|---|
| | 2019.06.04 |

SAP Format 2, JAFAN Edition "Special Access Program Indoctrination Agreement," December 2007 PREVIOUS EDITIONS ARE OBSOLETE

Page 1 of 2

Confidential - Subject to Protective Order

US0000053

**EXHIBIT 4**
**Page 9 of 12**

UNCLASSIFIED/████████

JA-20190530-2-446567                    *(CLASSIFY AS APPROPRIATE WHEN FILLED IN)*

## SECURITY BRIEFING / DEBRIEFING ACKNOWLEDGMENT

| ████ | N/A | N/A | N/A | N/A |
|---|---|---|---|---|
| N/A | N/A | N/A | N/A | N/A |

(Special Access Programs by Initials Only)

████                    Roysdon, Paul Franklin                    ████

SSN (See Notice Below)         Printed or Typed Name                    Organization

| BRIEF | DEBRIEF |
|---|---|
| Date  06/04/19 | Date 2020 08 26 |
| I hereby acknowledge that I was briefed on the above SAP(s): | Having been reminded of my continuing obligation to comply with the terms of this Agreement, I hereby acknowledge that I was debriefed on the above SAP(s): |
| *[signature]* | *[signature]* |
| Signature of Individual Briefed | Signature of Individual Debriefed |

I certify that the briefing presented by me on the above date was in accordance with relevant SAP procedures.

*[signature]*                                      *[signature]*

Signature of Briefing Officer                     Signature of Debriefing Officer

JOSEPH SOLOMON                                 Allen T. Beall

Printed or Typed Name                            Printed or Typed Name

████                                          ████

SSN (See Notice Below)                           SSN (See Notice Below)

AFLCMC/HNC-DOS                                DS2 PJ Det 8 OL-B JBSA-Lackland, TX

Organization (Name and Address)                  Organization (Name and Address)

### PRIVACY ACT STATEMENT

**AUTHORITY:** 5 U.S.C. §7311 and applicable DoD Directives / Executive Orders
**PRINCIPAL PURPOSE(S):** To obtain accountability information for managing employee access to special access program (SAP) information and to document individual SAP access briefings and debriefings.
**ROUTINE USE(S):** None
**DISCLOSURE:** Disclosure of the information is voluntary for the individual being briefed or debriefed and the official performing the briefing or debriefing. However, failure of the aforementioned individuals to provide the requested information may delay the briefing or debriefing. In addition, failure of the individual being briefed to provide the requested information may result in his or her being declared ineligible for access to SAP information.

SAP Format 2, JAFAN Edition "Special Access Program Indoctrination Agreement," December 2007 PREVIOUS EDITIONS ARE OBSOLETE

*(CLASSIFY AS APPROPRIATE WHEN FILLED IN)*

UNCLASSIFIED/████████

Page 2 of 2

UNCLASSIFIED/██████████

JA-20190326-2-401918

Classify as Appropriate When Filled-in

## PROGRAM ACCESS REQUEST

| 1. Program Name ██████████ | | 2. Access Level ██████████ | 3. Date Requested (YYMMDD) 26-Mar-2019 |
|---|---|---|---|

| 4. Last Name, First Name, Middle Initial Roysdon, Paul F. | | 5. Rank/Grade Gov't Civilian (DoD | 6. U.S. Citizen ☑Yes ☐No | 7. SSAN 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 |
|---|---|---|---|---|

| 8. Date of Birth (YYMMDD) 10-Mar-1981 | 9. City/State/Country of Birth Mission Viejo/California/United States | 10. ☐Military ☑Civilian ☐Contractor ☐Consultant | 11. SAP DD-254 / Consultant Agreement ☐Yes ☐No ☑N/A |
|---|---|---|---|

| 12. Job Title PhD | 13. ☑Full Time ☐Temporary (Period of access) ☐Part Time (From: ____ To: ____ ) |
|---|---|

| 14. Organization/Company Name NSA DO | 15. Assignment/Job Location (City & State) San Antonio | 16. Command/Facility/CAGE Code (if any) NSA | 17. PSG Date 19-Mar-2019 (Some Yes) |
|---|---|---|---|

| 18. Security Clearance SCI-DCID 6/4 | 19. Granted By NSA | 20. Date Granted (YYMMDD) 21-Mar-2017 | 21. Investigation Type SSBI | 22. Conducted By NSA | 23. Date Completed (YYMMDD) 20-May-2015 |
|---|---|---|---|---|---|

| 24. Prior Investigation Status (Joint Personnel Adjudication System (JPAS) or Scattered Castles (SC) check) | 25. Security Clearance Database Check Conducted By: Rivay Keely     Date Checked: 27-Mar-2019     (YYMMDD) |
|---|---|
| ☐In Progress (Date Initiated/Submitted: _____) (YYMMDD) (include additional information in the "Remarks" section below as needed) | ☐Acceptable JPAS results   ☑Acceptable Scattered Castles results |
| ☐Out-of-Scope (Approval: _____) Date ____ (YYMMDD) | ☐Unacceptable JPAS results  ☐Unacceptable Scattered Castles results (include additional information in the "Remarks" section below as needed) |
| ☑Current | |

| 26. Justification ( UNCLASSIFIED    include detailed justification as to how this candidate will materially contribute to the program)    (Continue on separate sheet if necessary) |
|---|
| Dr. Roysdon is ██████████ |

| 27. Billet Number (if any): | |
|---|---|

| 28. Requester (Government/Contractor) (Mandatory) | | | |
|---|---|---|---|
| Typed Name/Title/Organization       SAF/AQLE | Signature Signed By ███████ | Telephone Number 2027673992 | Date (YYMMDD) 26-Mar-2019 |

| 29. SAP Personnel Security Official (SPO) (Mandatory) | | | |
|---|---|---|---|
| Typed Name/Title/Organization       SAF/AQLPJ | Signature Signed By ███████ | ☐Eligible ☑Needs Additional Review | Date (YYMMDD) 27-Mar-2019 |

| 30. Additional Coordination (As Necessary) | | | |
|---|---|---|---|
| Typed Name/Title/Organization ███       SAF/AAZ | Signature Signed By ███████ | ☑Concur ☐Non-Concur | Date (YYMMDD) 08-May-2019 |

| 31. Additional Coordination (As Necessary) | | | |
|---|---|---|---|
| Typed Name/Title/Organization ███       OUSD(I) SAPCO | Signature Signed By ███████ | ☑Concur ☐Non-Concur | Date (YYMMDD) 23-Apr-2019 |

| 32. Government SAP Security Officer/Contractor Program Security Officer (GSSO/CPSO) (As Necessary) | | | |
|---|---|---|---|
| Typed Name/Title/Organization | Signature | ☐Concur ☐Non-Concur | Date (YYMMDD) |

| 33. Government/Contractor Program Manager (GPM/CPM) (As Necessary) | | | |
|---|---|---|---|
| Typed Name/Title/Organization       SAF/AQLE | Signature Verified By ███████ | ☑Concur ☐Non-Concur | Date (YYMMDD) 03-Apr-2019 |

| 34. Program Security Officer (PSO) (Mandatory) | | | |
|---|---|---|---|
| Typed Name/Title/Organization       AFOSI PJ DET 8/OL-B | Signature Signed By ███████ | ☑Concur ☐Non-Concur | Date (YYMMDD) 28-Mar-2019 |

| 35. SAP Central Office (SAPCO) (Government Only) (As Necessary) | | | |
|---|---|---|---|
| Typed Name/Title/Organization | Signature | ☐Approved ☐Disapproved | Date (YYMMDD) |

| 36. Access Approval Authority (AAA) (Government Only) | | | |
|---|---|---|---|
| Typed Name/Title/Organization       SAF/AAZ | Signature Signed By ███████ | ☑Access Approved ☐Access Disapproved | Date (YYMMDD) 08-May-2019 |

| 37. Remarks/Restrictions    (CONTINUE ON SEPARATE SHEET IF NECESSARY) RBAN: NSA DO, (Continued in Comments) | Classified By: Derived From: Declassify On:    (per PBS dated 20060330) |
|---|---|

Program Access Request (PAR) – November 20, 2014 (Previous Editions are Obsolete)

Privacy Sensitive (when filled-in) – Any misuse or unauthorized disclosure may result in either civil or criminal penalties. Information contained is protected by the Privacy Act of 1974, U.S.C.

JA-20190326-2-401918

Classify as Appropriate When Filled-in

UNCLASSIFIED/██████████

Page 1 of 2

**EXHIBIT 4**
**Page 11 of 12**

Confidential - Subject to Protective Order

UNCLASSIFIED/██████████████████

(CLASSIFY AS APPROPRIATE WHEN FILLED IN)

JA-20190326-2-401918

---

CONTINUATION OF PAR FOR:  Roysdon, Paul Franklin

PROGRAM NAME / ACCESS LEVEL: ████████████

---

Additional Reviewers -
Additional Coordination: ████████ SAF/AQLPJ   Date: 03-Apr-2019   Concur: [X] Non-Concur:
[ ]
Signed By: ████████

Additional Remarks -

U████: On 28-Mar-2019 ████████ said:
  JPAS valid; Justification for SAP access suitable; DCII favorable; PSR concurs. ████████
PSR, AFOSI PJ Det 8 OL-B, 28 Mar 19.

U████ On 27-Mar-2019 ████████ said:
  PSQ 3/19/19 w/Fm Trvl to France, Switzerland

JA-20190326-2-401918

*NOTICE: The Privacy Act 5, U.S.C. 552a, requires that federal agencies inform individuals, at the time information is solicited from them, whether the disclosure is mandatory or voluntary, by what authority such information is solicited, and what uses will be made of the information. You are hereby advised that authority for soliciting your Social Security Account Number (SSN) ████████████████ ████████████████ or if disclosure that your access to the information indicated has been ████████████

UNCLASSIFIED/██████████████████

(CLASSIFY AS APPROPRIATE WHEN FILLED IN)

Page 2 of 2

**EXHIBIT 4**
**Page 12 of 12**
Confidential - Subject to Protective Order

US0000056



**DEPARTMENT OF THE AIR FORCE**
OFFICE OF SPECIAL INVESTIGATIONS

23 Sep 22

MEMORANDUM FOR RECORD

FROM: HQ OSI/IG
        27130 Telegraph Road
        Quantico, VA 22134

SUBJECT: Hotline Completion Report

1. DoD Hotline case number: ████████████████

2. ACTS case number: ████████████████

3. Allegation(s)

    a. Allegation:

        (1) (1) Name, rank, and organization of subject: Maj WILIAM MCVIEGH, Secretary of the Air Force for Acquisition, Technology, and Logistics (SAF/AQL), Pentagon, VA

        (2) Description of the violation: Retaliation

        (3) Date when the violation occurred: 14 Aug 20

        (4) Where the violation occurred: JBSA-Lackland, TX

        (5) Law, rule, or regulation violated: 10 US Code § 932 Article 132. Retaliation

        (6) Finding: Not Substantiated

        (7) Analysis: In FYI 19, Dr. PAUL ROYSDON, National Security Agency (NSA), JBSA- Lackland, TX, briefed the Fibonacci program at the TOP SECRET level to AFLCMC/HNCO and SAF/AQL, while employed by the NSA. The NSA decided not to fund this program, and the program was then funded by SAF/AQL as a ██████ project with unclassified components. At the time, ROYSDON was a government employee providing advice and guidance under the government.

        Starting in FYI 19, Civ DAN BROWN, JBSA-Lackland, TX brought ROYSDON on board to support the Fibonnaci program as a Technical Subject Matter Expert (contractor) and as a subcontractor under Global Info Tech Inc. (GITI). GITI held an Air Force Research Laboratory (AFRL) ACT2 prime contract. ROYSDON maintained his government position at the NSA. ROYSDON stated on 18 Aug 20, he obtained an Office

*"Eyes of the Eagle"*

**EXHIBIT 5**
**Page 1 of 3**
Confidential - Subject to Protective Order

## DEPARTMENT OF THE AIR FORCE
### OFFICE OF SPECIAL INVESTIGATIONS

of General Council (OGC) letter providing agreement for the project to be worked. ROYSDON was cleared as a government employee to ▮▮▮▮, but not as a contractor. ROYSDON's Limited Liability Company (LLC) did not have a Field Security Officer (FSO), DD254, and cage code that would allow him contractor SCI and program access. ROYSDON's work as a government employee included ▮▮▮▮ discussions about the Fibonacci program.

ROYSDON was notified to stop work as an independent contractor since he was a government employee with the NSA. ROYSDON was informed he was allowed to continue supporting the project as a government employee under the NSA. However, ROYSDON informed ALFCMC/HNCO on 20 Aug 20 that he is was planning to resign from NSA.

ROYSDON completed a DoD IG complaint on 6 May 22. ROYSDON believed he was dismissed and debriefed from the program due to negligent conduct of Maj WILLIAM MCVEIGH, SAF/AG, Pentagon, DC and SA ALLEN BEALL, HAF, PSO, Pentagon, VA. ROYSDON believed SA BEALL and MCVEIGH reported ROYSDON as an insider threat and opened an unauthorized OSI investigation.

A review of the Investigative Information Management System (I2MS) and Classified Investigative Information Management System (CI2MS) revealed no records on file for ROYSDON.

MCVEIGH was the PM for the Fibonacci program while he was stationed at JBSA-Lackland, TX. Based on financial records, ROYSDON was paid $750,000.00 for his services as an independent contractor. Although ROYSDON was brought on to work on the Fibonacci program as a contractor, he would work on the program during normal work hours while he was employed by the NSA. ROYSDON was removed from the program due to his affiliation as a government employee and his contractor status. MCVEIGH instructed SA BEALL to debrief ROYSDON from the program (Agent Note: SA BEALL was not interviewed due to his untimely passing in August 2022). MCVEIGH only had ROYSDON removed and debriefed from the program but did not report him as an insider threat. MCVEIGH provided all documentation and email correspondence related to ROYSDON being removed from the program due to his misrepresentation as a contractor and NSA employee.

(8)  Corrective actions: N/A

4.  Security clearance actions: None

5.  Location of report of inquiry or working papers: OSI PJ Detachment 9, Joint Base Anacostia-Bolling, DC

*"Eyes of the Eagle"*

**EXHIBIT 5**
**Page 2 of 3**

Confidential - Subject to Protective Order

**DEPARTMENT OF THE AIR FORCE**
OFFICE OF SPECIAL INVESTIGATIONS

6. Investigation officer identification data:

    a. Rank & Name: SA CHRISTOPHER WEBB
    b. Organization: OSI PJ Detachment 9
    c. Duty location: JBAB, DC
    d. Telephone number: ███████
    e. Email address: ███████

7. I certify that I complied with the Quality Standards for Hotline Inquiries in DOD Instruction 7050.01.

WEBB.CHRISTOP   Digitally signed by
HER.RYAN.12972   WEBB.CHRISTOPHER.RYAN.12
31371   97231371
    Date: 2022.09.23 10:00:04
    -04'00'

    Christopher Webb, Special Agent
    OSI PJ Det 9, JBAB, DC

DoD Hotline Coordinator's identification data:

    a. Rank & Name: ███████
    b. Organization: AFOSI/IGQ
    c. Duty location: 27130 Telegraph Road, Quantico VA, 22134
    d. Telephone number: ███████
    e. Email address: ███████

*"Eyes of the Eagle"*

**EXHIBIT 5**
**Page 3 of 3**



**DEPARTMENT OF THE AIR FORCE**
AIR FORCE LIFE CYCLE MANAGEMENT CENTER (AFLCMC)
CRYPTOLOGIC AND CYBER SYSTEMS DIVISION
JOINT BASE SAN ANTONIO-LACKLAND, TEXAS  78243-7081

22 September 2020

MEMORANDUM FOR  AFLCMC/HNCO
                              Attn: Lt Col Jared M. Ekholm

FROM:  AFLCMC/HNCKC
             3133 General Hudnell Dr., Suite 210
             San Antonio, TX 78226-1885

SUBJECT:  Inquiry of Security Incident


1.  Authority. An inquiry was conducted under the authority of your letter, DoDM 5205.07V1, DoD Special Access Program (SAP) Security Manual; DoDM 5200.1V3, DoD Information Security Program; AFI 16-1404, Air Force Information Security Program and Unauthorized Disclosure of Classified Information or Controlled Unclassified Information on DoD Information Systems.

2.  Matters Investigated. The basis of this inquiry entails the alleged failure to follow proper industrial security procedures and guidelines for the reporting of and obtaining the required acknowledgement of a sub contractual relationship. The scope of my inquiry was limited to Dr. Paul Roysdon's access to classified information while performing as a subcontractor to Global InfoTeck (GITI) on the FB project under the Air Force Research Laboratory's (AFRL) Excalibur contract.

3. Personnel Interviewed.
             a. GG-14, Mr. Daniel D. Brown, AFLCMC/HNCYD
             b. GG-12, Mr. Richard A. Ranft, AFLCMC/HNC-DOS
             c. Major William M. McVeigh, AFLCMC/HNCO

4. Findings. Testimony provided to and observations of the inquiring official revealed:

         a. Maj McVeigh indicated  that Dr. Roysdon was the Chief/Lead Data Scientist for National Security Agency (NSA)-Texas, prior to his resignation. I obtained email traffic from Ms. Tanya Marcina, Cyber Assurance Branch, AFRL that describes Dr. Roysdon's NSA duties as building a data science team, training and equipping them with the tools they need to solve mission problems in Enterprise Discovery Operations.

         b. Moreover, Maj McVeigh mentioned that Dr. Roysdon was/is also a subcontractor to the prime contractor GITI for FB, an effort funded by AFLCMC/HNCO. In this capacity, Dr. Roysdon performed as a sub-contractor to GITI for unclassified mathematics consultant services. Because Dr. Roysdon's work was unclassified, there was no DD Form 254/SCI nomination for Dr. Roysdon under the GITI prime contract for FB.

**EXHIBIT 6**
**Page 1 of 2**
Confidential - Subject to Protective Order                    US0000175

c. Mr. Dan Brown, Cyber Engineer, stated that Dr. Roysdon briefed the FB concepts to the Air Force due to NSA lack of interest. Sometime in Fiscal Year 2019, after the AF funded FB, Dr. Roysdon began work as a sub-contractor consultant to GITI while maintaining his position with NSA-Texas as Chief/Lead Data Scientist. On multiple occasions, as an NSA official, Dr. Roysdon has given/attended classified briefings on the status of FB which is the same effort that he performs mathematics consultant services as a sub-contractor to GITI. However, as a NSA official, Dr. Roysdon maintained the proper security clearance for access to the above mentioned program.

d. Finally, discussion with Mr. Richard Ranft, Government SAP Security Officer, revealed that Dr. Roysdon had visited the Cyber Warfare Mission Systems Program Office on multiple occasions. However, each occasion was as an official NSA government employee with the proper security clearance for access to the above mentioned program.

5. Conclusion. As a result of the testimony and personal observations, it is concluded that:

a. Pursuant to DoDM 5200.01-V3, DoD Information Security Program: Protection of Classified Information, dated July 28, 2020 and Standard Operating Procedures, AFLCMC/HNCO: AF-19-005, dated April 2, 2019 security incidents are a failure to comply with security regulations that could result in a security violation of security infraction. Furthermore, a security violation is defined as any incident that involves the loss or suspected compromise of classified material or probable disclosure of such material to an unauthorized person. While a security infraction is any other incident that is not in the best interest of security, which does not involve loss, compromise, or suspected compromise of classified material.

a. Dr. Roysdon when accessing classified program information was acting in an official capacity as an NSA employee with the proper clearances. Conversely, when acting in the capacity as a sub-contractor Dr. Roysdon did not need nor have access to classified information as indicated by AFRL. Therefore, no compromise of classified information occurred.

6. Recommendations. No corrective actions recommended to prevent future incidents as no incident occurred. This inquiry met the criteria of neither a security violation nor security infraction and should not be classified as such.

BREMER.RICHARD .R.1093571386   Digitally signed by BREMER.RICHARD.R.1093571386
Date: 2020.09.22 10:19:52 -05'00'

RICHARD R. BREMER, GG-14, DAF
Inquiry Official

**EXHIBIT 6**
**Page 2 of 2**
Confidential - Subject to Protective Order

1

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

DR. JOHN ROE,                    )
                                 )
          Plaintiff,             )
                                 )
VS.                              )          CIVIL ACTION
                                 ) NO. 5:22-CV-00869-JKP-HJB
UNITED STATES OF AMERICA,        )
et al.,                          )
                                 )
          Defendant.             )


------------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF DANIEL D.S. BROWN

MARCH 24, 2025

VOLUME 1

CONFIDENTIAL
------------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF DANIEL D.S.

BROWN, produced as a witness at the instance of the

PLAINTIFF, and duly sworn, was taken in the above-styled

and numbered cause on March 24, 2025, from 10:02 a.m. to

5:11 p.m., before Marta M. Johnson, CSR No. 10743, in

and for the State of Texas, reported by machine

shorthand, at the law offices of Hendley & Hodges Law

PLLC, 4594 US Highway 281 N, Spring Branch, Texas 78070,

pursuant to the Federal Rules of Civil Procedure, and

the provisions stated on the record or attached hereto.

EXHIBIT 7
Page 1 of 218

2

```
 1                        APPEARANCES
 2   FOR THE PLAINTIFF DR. JOHN ROE:
 3        MR. JASON R. WAREHAM, ESQ.
          MR. LANCE HENRY, ESQ.
 4        ALLEN VELLONE WOLF HELFRICH & FACTOR P.C.
          1600 Stout Street
 5        Suite 1900
          Denver, Colorado  80202
 6        (303) 534-4499
          (303) 534-4499  Fax
 7        Jwareham@allen-vellone.com
          Lhenry@allen-vellone.com
 8        -and-
          MR. JOHN W. HODGES, JR., ESQ.
 9        HENDLEY & HODGES LAW PLLC
          4594 US Highway 281 N
10        Spring Branch, Texas  78070
          (210) 714-0924
11        (210) 640-3398  Fax
12   FOR THE DEFENDANT UNITED STATES OF AMERICA, et al.:
13        MR. REGINALD M. SKINNER, ESQ.
          Senior Trial Attorney
14        U.S. DEPARTMENT OF JUSTICE
          Civil Division, Torts Branch
15        175 N Street, NE
          7th Floor
16        Washington, D.C.  20002
          (202) 616-3111
17        (202) 616-4314  Fax
          Reginald.m.skinner@usdoj.gov
18        -and-
          MS. KATRINA (KATI) SEEMAN, ESQ.
19        U.S. DEPARTMENT OF JUSTICE, Civil Division
          Constitutional & Specialized Tort Litigation
20        (202) 616-0674
          Katrina.m.seeman@usdoj.gov
21        -and-
          MR. ROBERT D. GREEN, ESQ.
22        U.S. DEPARTMENT OF JUSTICE
          Assistant United States Attorney
23        601 NW Loop 410
          Suite 600
24        San Antonio, Texas  78216
          (210) 384-7362
25        robert.green3@usdoj.gov
```

Daniel D.S. Brown                                    **CONFIDENTIAL TRANSCRIPT**
March 24, 2025

3

1                          APPEARANCES CONTINUED

2    FOR DANIEL D.S. BROWN:

3          MR. ROBERT J. BARRERA, ESQ.
           ROBERT J. BARRERA, P.C.
4          424 East Nueva
           San Antonio, Texas   78205
5          (210) 224-5811
           (210) 224-5890   Fax
6          Bobbybarreralaw@gmail.com

7    ALSO PRESENT:

8          Mario Koole - Videographer

9          Paul Roysdon - Plaintiff

10         Rebecca Bradshaw - Paralegal

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                                                         4
1                         INDEX

2

3  DANIEL D.S. BROWN                              PAGE

4        Appearances ...............................    2

5        Examination By Mr. Wareham ................    6

6        Examination By Mr. Skinner ................  209

7        Further Examination By Mr. Wareham ........  215

8        Reporter's Certificate ....................  217

9

10                       EXHIBITS

11 NO.            DESCRIPTION                      PAGE

12 Exhibit 1      Plaintiff's Second Amended Complaint   63

13 Exhibit 2      Plaintiff's Original Complaint .....  166

14 Exhibit 3      String of emails ..................  175

15 Exhibit 4      Email dated August 19, 2020 .......  181

16 Exhibit 5      String of emails ..................  182

17 Exhibit 6      Memorandum dated September 22, 2020  184

18 Exhibit 7      Email dated 3/23/2023 .............  187

19 Exhibit 8      Email dated 8/25/2020 .............  188

20 Exhibit 9      Emails ............................  194

21 Exhibit 10     Subpoena to Testify at a Deposition
                  in a Civil Action ................  205
22

23

24

25
```

Koole Court Reporters of Texas
myreportingfirm@gmail.com

(210) 558-9484  Fax

210-558-9484

EXHIBIT 7
Page 4 of 218

Daniel D.S. Brown
March 24, 2025

CONFIDENTIAL TRANSCRIPT

5

 1        THE VIDEOGRAPHER:  This is the start of the
 2   deposition of Daniel Brown.  Today's date is March 24,
 3   2025.  The time on record is 10:02 a.m.
 4             We're here in the case of Dr. John Roe
 5   versus the United States of American, et al., in the
 6   U.S. District Court, Civil Action Number
 7   522-CV-00869-JKP-HJB.
 8             We're located at the offices of Hendley &
 9   Hodges, 2594 U.S. Highway 281 North in Spring Branch,
10   Texas.
11             The court reporter is Marta Johnson.  I'm
12   the videographer, Mario Koole, both on behalf of Koole
13   Court Reporters of Texas.
14             Will counsel please state your appearances
15   and then the court reporter will swear in the witness?
16             MR. WAREHAM:  Starting with Plaintiff,
17   Jason Wareham, W-a-r-e-h-a-m, lead counsel.
18             MR. HODGES:  John Hodges, also appearing on
19   behalf of the plaintiff.
20             MR. HENRY:  Lance Henry.
21        (Brief interruption.)
22             MR. WAREHAM:  Oh, okay.  Okay.  AI.  What
23   in the world?  Pardon me.  That's great.  Thanks for
24   sharing.
25             MR. GREEN:  Siri would also like to

6

1    introduce themselves.

2              MR. WAREHAM:  Yeah.  Apparently, AI wants

3    us to know they're here.

4              MR. HODGES:  Siri entering their

5    appearance.

6              MR. WAREHAM:  Exactly.  All right.  Lance,

7    do you want to do that again?

8              MR. HENRY:  Lance Henry.

9              MR. SKINNER:  Good Afternoon,

10   Reginald Skinner, U.S. Department of Justice, for the

11   defendants.

12             MS. SEEMAN:  And Katrina Seeman, same.

13             MR. GREEN:  And Robert Green for the

14   defendants.

15             MR. BARRERA:  I'm Bobby Barrera for

16   Mr. Dan Brown individually, not a party to the

17   litigation.

18                     DANIEL D.S. BROWN,

19   having been first duly sworn, testified as follows:

20                       EXAMINATION

21   BY MR. WAREHAM:

22       Q.  All right.  Now, I'm not usually in this chair,

23   so do you guys usually give the long form instruction?

24   Like -- or is that -- where you guys are good?  Kind of

25   leave it up to me?  Okay.  Great.

Daniel D.S. Brown                                    CONFIDENTIAL TRANSCRIPT
March 24, 2025

7

1              Well, Mr. Dan Brown, I introduced myself.
2     My name is Jason Wareham.  I'm the lead counsel for
3     Plaintiff.  We -- we're going to go through a deposition
4     today.  Have you ever sat for a deposition before?
5          A.  No.
6          Q.  All right.  Well --
7              MR. BARRERA:  You need to speak loudly and
8     clearly so --
9              THE WITNESS:  Oh.
10             MR. WAREHAM:  Yeah.
11             MR. BARRERA:  -- she can take down your
12    words.
13             THE WITNESS:  No.
14         Q.  (BY MR. WAREHAM)  Okay.  That -- a deposition
15    is a set of, essentially, formal questions and
16    interviews under oath where we attempt to develop
17    information relevant to our case or that might lead to
18    relevant information.
19             It's important that as I'm asking you
20    questions, if you don't understand the question I'm
21    asking, please ask me to clarify.  Okay?  And please,
22    you know, express how I can reshape the question so you
23    can better understand.
24             The big, I think, elephant in the room for
25    you is that some of the information that is -- that is

8

1    relevant to us that's part of your job may tread into or

2    close to classified information.

3              To give you very clear instructions on

4    that, this is an unclassified, obviously, environment.

5    I actually carry a clearance as well.  I do clearance

6    litigation.  We are not intending to get close to or

7    evoke classified information whatsoever.

8              So in the event that you feel on your

9    estimation and your understanding of the classification

10   guides as you've read them, that we're getting anywhere

11   close to that, you know, please -- please indicate that

12   if you can, either -- or if it's such a way that you

13   need to neither confirm nor deny, right, the phrasing --

14   that -- that is appropriate, that is completely fine.

15   But we're not trying to elicit any form of classified

16   information.

17              Do you understand that?

18        A.   Yeah.

19        Q.   Okay.  As far as the rest of it, if -- you may

20   experience throughout this process that if I ask a

21   question the -- the fine Department of Justice lawyers

22   here may enter an objection.  If they do object, wait

23   until we kind of record that for the record so we're not

24   stepping on each other so that the record is very clear.

25   Unless -- for most objections, the objection will be

Daniel D.S. Brown                           CONFIDENTIAL TRANSCRIPT
March 24, 2025

                                                                      9

1    lodged and then we'll just continue with the

2    questioning.

3                Does that make sense?

4        A.  (Witness nods affirmatively.)

5        Q.  Okay.  Any questions before I continue?

6        A.  (Witness nods negatively.)

7        Q.  All right.  And that's a "no"?

8        A.  No.

9        Q.  Sorry.

10               MR. SKINNER:  Jason --

11       Q.  (BY MR. WAREHAM)  For today's --

12               MR. SKINNER:  -- Jason --

13               MR. WAREHAM:  Go ahead.

14               MR. SKINNER:  -- Jason this is

15   Reggie Skinner.

16               MR. WAREHAM:  Yeah.  Go ahead, Reggie.

17               MR. SKINNER:  Just -- just a quick

18   housekeeping issue.  So we cannot see you on our video

19   feed.  I'm assuming that the witness can see you?

20               MR. WAREHAM:  Yes.  The witness can see me.

21   And if you'd like, I could join the Zoom call and -- and

22   you guys could see my -- my participation in that, if

23   you'd like.

24               MR. SKINNER:  Yes.  That would be

25   helpful --

10

1          MR. WAREHAM:  Okay.

2          MR. SKINNER:  -- just so that there's no

3  crosstalk, that -- that would be helpful.

4          MR. WAREHAM:  Sure.  Give me a second.  And

5  while I'm doing that, just to note, I do plan to take

6  plenty of breaks.  If you do need to take a break,

7  please let us know.  I plan about -- a break about an

8  hour or so.  Just give me a second.  Let me find --

9  calendar entry.

10          MR. SKINNER:  Jason, while you do that --

11          MR. WAREHAM:  Yeah.

12          MR. SKINNER:  -- I just want to clarify one

13  point that you very helpfully -- helpfully made with

14  respect to any question from any counsel, Mr. Brown,

15  today, that could potentially in your mind call for the

16  disclosure of classified information, if you are asked a

17  question that in your mind calls for the divulging --

18  the disclosure of classified information, we're going to

19  rely on you to give us a signal, whether it's raising

20  your hand or -- or just simp- -- simply audibly telling

21  us that question potentially calls for the disclosure of

22  protected national security information.

23          In that event, counsel for the government

24  will lodge an appropriate objection.  I see that you are

25  represented by counsel today.  Your counsel may also put

11

1  an objection on the record just so the record is clear.

2  Do you have any questions about that or is that clear?

3              THE WITNESS:  That's clear.

4              MR. BARRERA:  Do you want to make that

5  statement now?

6              THE WITNESS:  No, that's okay.

7              MR. BARRERA:  Okay.

8              MR. WAREHAM:  All right.  All right.

9  Reggie, you should be able to see me now.

10             MR. SKINNER:  Yes, I can see you.  Thank

11  you very much.

12             MR. WAREHAM:  No problem.

13             Let's see.  Is there anything else we have

14  to cover?  No.

15      Q.  (BY MR. WAREHAM)  So we'll just start with some

16  introductory, kind of background for the record.  Who

17  you are, current title, you know, past employment, that

18  kind of thing.  And then we'll -- we'll eventually move

19  into discussions more germane to the case.  And I think

20  we're otherwise ready to go.  Anything else we should --

21  no.

22             All right.  So could you please state your

23  full name for the record, spelling your last name?

24      A.  Daniel D.S. Brown, B-r-o-w-n.

25      Q.  All right.  And what is your current title and

Daniel D.S. Brown
March 24, 2025

CONFIDENTIAL TRANSCRIPT

12

1    employment?

2        A.  I'm an engineer -- or lead engineer for the

3    section in Air -- AFLCMC, Air Force Life Cycle

4    Management Center.

5        Q.  Okay.  And there's a term --

6                MR. SKINNER:  I want to --

7                MR. WAREHAM:  Go ahead.

8                MR. SKINNER:  I want to object.  But I just

9    need to ask the witness to -- he has hands covering his

10   mouth.

11               THE WITNESS:  Oh.

12               MR. SKINNER:  So it makes it a little bit

13   difficult to make out everything he's saying.  So, you

14   know -- thank you, Mr. Brown.  I understand this is not

15   the most comfortable thing to be doing on a Monday

16   morning.  But, yeah, if you could just make sure that we

17   can hear everything that you're saying.  Thank you.

18               MR. WAREHAM:  Yeah.

19               MR. HODGES:  Reggie, are you having any --

20   this is John Hodges.  Are you having any trouble hearing

21   the witness?

22               MR. SKINNER:  Not volumewise, you know.  I

23   can -- we can definitely hear him.

24               MR. HODGES:  Okay.  Thank you.

25               MR. SKINNER:  The volume is good.

Daniel D.S. Brown
March 24, 2025

CONFIDENTIAL TRANSCRIPT

13

1          MR. HODGES:  Okay.  Thank you.

2          MR. SKINNER:  But the audio is slightly --

3  is slightly horrible.

4          MR. WAREHAM:  Okay.

5      Q.  (BY MR. WAREHAM)  To the best degree you can,

6  speak slowly and loudly.  Make sure that everybody gets

7  to hear.  I know we've got some remote people, so I

8  appreciate that.

9          So you said your current title -- or your

10  current title is engineer with the Air Force Life Cycle

11  Management Center?

12      A.  Yeah.  Or it could be lead engineer --

13      Q.  Okay.

14      A.  -- for life cycle.  Yeah.

15      Q.  And just so I understand the terms a little

16  better.  There's -- there's an acronym going around,

17  HNCO, along with the Air Force Life Cycle Management

18  Center.  Can you tell me what HNCO means?

19      A.  I don't think it stands for anything.

20      Q.  Okay.  It's just -- what -- what does it

21  represent?

22      A.  A unit, organization.

23      Q.  Okay.  And is HNCO within the Air Force Life

24  Cycle Management?

25      A.  Yeah.

(210) 558-9484  Fax

**Koole Court Reporters of Texas**
myreportingfirm@gmail.com
EXHIBIT 7
Page 13 of 218

210-558-9484

Daniel D.S. Brown                          CONFIDENTIAL TRANSCRIPT
March 24, 2025

14

1        Q.  Okay.  And -- and --

2        A.  It's a branch.

3        Q.  It's a branch.

4            Do you know what their role is or what

5   their --

6        A.  I can't talk about that.

7        Q.  Okay.  So have you discussed -- besides with

8   your counsel, have you discussed this deposition with

9   anyone else?

10       A.  No.

11       Q.  All right.  You haven't discussed -- have you

12  discussed the facts kind of at issue with respect to

13  Dr. Roysdon with anyone else?

14       A.  No.

15       Q.  Do you have any medication or memory-affecting

16  issues that -- that you might be under the influence of

17  right now?

18       A.  I mean, I have sleep apnea.

19       Q.  Okay.

20       A.  Yeah.  And that's --

21       Q.  And is there anything that would actually

22  actively impact your ability to, like, fairly recall

23  things or just...

24       A.  I mean, I don't sleep well sometimes, but -- so

25  I don't like talking about things in this environment.

Daniel D.S. Brown                                    CONFIDENTIAL TRANSCRIPT
March 24, 2025

                                                                    15

1       Q.   Yeah.

2       A.   Threading the needle, this isn't a good way to

3    do this.

4       Q.   Yeah.  Let me -- let me just --

5       A.   Threading the needle isn't good for us to do.

6    We're taught not to thread the needle, so...

7       Q.   Yeah.

8            Well, let me acknowledge that -- that no

9    one finds this comfortable.  I've been in your situation

10   before.  I didn't find it comfortable.  I will try to

11   make this as painless as possible and -- and ensure that

12   your -- that you leave here without concerns that you --

13   you didn't thread the needle; right?  Okay?

14            And to that -- that -- that point -- so to

15   go back to the memory impairments.  Nothing right now is

16   impairing your ability to remember or -- or --

17      A.   I mean, I have sleep apnea so this -- you know,

18   it's a cumulative effect.

19      Q.   Okay.  Do you think you're impacted by that in

20   this --

21      A.   I don't know.  It's hard to say.

22      Q.   Okay.

23      A.   I've never had to thread the needle like this.

24      Q.   Okay.  Are you prepared, as best as you can, to

25   give truthful testimony?

Daniel D.S. Brown                          CONFIDENTIAL TRANSCRIPT
March 24, 2025

                                                              16

1        A.  Of course.

2        Q.  Okay.  Well, on that front, it was shared with

3   us that you have some concerns around potential

4   retaliation against you at the Air Force Life Cycle

5   Management Center for what you share with us today.  Can

6   you describe what that is?

7        A.  Not retaliation, just --

8             MR. SKINNER:  Object to form.

9             THE WITNESS:  Not retaliation --

10             MR. SKINNER:  Object to form.

11             MR. BARRERA:  Go ahead.

12        Q.  (BY MR. WAREHAM)  Okay.  Go ahead.

13        A.  Not retaliation, but just having to talk about

14   information like this, because I'm not supposed to

15   thread the needle.

16        Q.  Okay.

17        A.  Yeah.

18        Q.  And can you expound on that?

19        A.  We're not supposed to talk about classified

20   information or talk around classified information.  So

21   you're putting me in a very difficult situation asking

22   questions that -- about my job.  So, I mean, I -- I

23   shouldn't even have to talk about this stuff in an

24   unclassified setting.

25        Q.  Okay.  Are you concerned that any communication

CONFIDENTIAL TRANSCRIPT

17

1    about your job would tread into classified information?

2        A.  Well, it can.  I mean, it depends on what the

3    question is.

4        Q.  Uh-huh.

5            Okay.  So can you describe, as best you

6    can, in an unclassified way your duties and

7    responsibilities at Air Force Life Cycle Management

8    Center?

9        A.  I provide technical advice on how projects are

10   going --

11       Q.  Okay.

12       A.  -- or technologies we're exposed to.

13       Q.  All right.  And how long have you done that?

14       A.  I mean, roughly 2003.

15       Q.  All at the Air Force Life Cycle Management

16   Center?

17       A.  Different parts of the Air Force.

18       Q.  Okay.  What were the other parts of the Air

19   Force?

20       A.  90th.

21       Q.  Excuse me?

22       A.  90th IOS.

23       Q.  Okay.  And can you describe kind of inf- --

24       A.  Pretty much the same -- same capacity.

25       Q.  All right.  What was the unit, like, full name

18

1    for 90th?

2         A.   90th IOS, Information Operation Center.

3         Q.   Okay.  And how long did you do that?

4         A.   Oh, just what are -- I -- from -- ah, geez.

5    I'm not going to get the dates right.  2003 to 2013 or

6    so.  I'm not -- I'm not going to get the dates right.

7    And then I worked at AFCERT for about a year and then I

8    went to Life Cycle Management Center.

9         Q.   Okay.  And in the Air Force Life Cycle

10   Management Center, what -- did you have any role with

11   respect to hiring or contracting?

12        A.   At what?

13        Q.   Hiring or contracting.

14        A.   I'm an engineer, so I provide technical advice.

15        Q.   All right.  Have you ever been involved in

16   retaining contractors as part of that role?

17        A.   What do you mean?

18        Q.   Have you ever suggested that somebody present a

19   contract for contracting to Air Force Life Cycle

20   Management Center?

21             MR. SKINNER:  Object -- object to form.

22        Q.   (BY MR. WAREHAM)  Go ahead.

23        A.   Say it again.

24        Q.   Have you ever suggested that someone present a

25   contract to Air Force Life Cycle Management Center?

19

1      A.  Present a contract?

2              MR. SKINNER:  Object to form.

3              THE WITNESS:  We don't ask people to

4  present contracts.

5      Q.  (BY MR. WAREHAM)  All right.  How would you

6  describe it?

7      A.  The government releases RFPs.  At -- we --

8  people don't present a contract to the government.

9      Q.  Okay.

10      A.  I don't know.  That's just a weird -- I've

11  never heard of that -- phrased that way.

12      Q.  Okay.  Have you been involved in creating --

13  actually, can you define what an RFP is?

14      A.  Request for proposal.

15      Q.  Okay.  Have you been involved in drafting a

16  request for proposal with Air Force Life Cycle

17  Management Center?

18      A.  Yeah.

19      Q.  All right.  And -- and what has been your role

20  in drafting RFPs?

21      A.  Providing technical input.

22      Q.  And when you say "technical input," can you

23  expound on that, what that looks like?

24      A.  Oh, just like technical aspects of a contract.

25      Q.  All right.  Would that be setting the education

Daniel D.S. Brown
March 24, 2025

CONFIDENTIAL TRANSCRIPT

20

```
1   standards required for a contractor or what specifics

2   would be technical aspects?

3        A.  Scope.

4        Q.  Okay.

5        A.  Like, technical type of work sometimes.

6        Q.  All right.  So outlining a project, what a

7   project requires for a contractor?

8        A.  I would -- I would assist in that -- in that

9   capacity.

10       Q.  Okay.  Where do you --

11            MR. SKINNER:  Jason, I'm --

12            MR. WAREHAM:  Go ahead.

13            MR. SKINNER:  Jason, I'm sorry.  I -- I

14   really don't want to interrupt your flow.  But,

15   Mr. Brown, if I could please ask you to not speak with

16   your hand covering your mouth.

17            THE WITNESS:  Oh.

18            MR. WAREHAM:  And I'll try to remember

19   that, too, Reggie.  Sorry.  Yeah.

20            MR. SKINNER:  It's okay.  We're -- we're

21   remote, so --

22            MR. WAREHAM:  Yeah.

23            MR. SKINNER:  -- it's doubly hard for us

24   to -- to hear, especially when your hand's over your

25   mouth, Mr. Brown.
```

Daniel D.S. Brown
March 24, 2025

CONFIDENTIAL TRANSCRIPT

21

1          MR. WAREHAM:  Yeah.

2          MR. SKINNER:  Thank you.

3          MR. WAREHAM:  Yeah.

4     Q.  (BY MR. WAREHAM)  If possible, keeping the

5  hands away from the mouth would be -- would be, I'm

6  sure, an assistance to those watching.  Okay?

7     A.  (Witness nods affirmatively.)

8     Q.  So going back to contracts.  What other

9  involvement did you have in the contracting process?

10    A.  That's the main one.

11    Q.  Okay.  So you would draft RFPs, you draft the

12 specifics within RFPs?

13    A.  I -- I would help.

14    Q.  Okay.  You would draft the scope of work?

15    A.  I would only assist.

16    Q.  Okay.  And were you ever in the decision

17 process of who should -- who should bid to those RFPs?

18    A.  That's a long, convoluted process.

19    Q.  Okay.  Do you want to describe that process?

20    A.  Gosh.  You send an RFI out, request for

21 information.

22    Q.  I think we're getting to where the hands are

23 blocking the mouth again.  I apologize.

24    A.  I -- you send a request for information to

25 vendors, they send data back, that helps perform the

Daniel D.S. Brown
March 24, 2025

CONFIDENTIAL TRANSCRIPT

22

1   market research.  And then that helps, like, let you

2   know what's out there for the market research.  And then

3   there's an RFP.  That's the main stuff, yeah.

4        Q.  Okay.  And after the RFP, if I'm not mistaken,

5   then contractors bid on that RFP by submitting a

6   proposal --

7        A.  Yeah.

8        Q.  -- is that the correct process?

9        A.  Yeah.

10        Q.  Okay.  Were you ever involved in evaluating

11   bids that were made?

12        A.  In my whole career?

13        Q.  Yeah.

14        A.  Yeah.

15        Q.  Okay.

16        A.  I guess.  I -- yeah.  I would think so.  I...

17        Q.  How about for Air Force Life Cycle Management

18   Center?

19        A.  I don't believe in an RFP.

20        Q.  Sorry.

21        A.  I do not believe so in an RFP.

22        Q.  Okay.  You didn't evaluate any --

23        A.  I'm not --

24        Q.  -- proposals, to your recollection?

25        A.  I don't -- I don't believe so.  I can't talk

23

1    about some certain things, though.

2         Q.   Sure.  I'm not asking --

3         A.   There's some -- there's some things I can't

4    discuss.

5         Q.   Okay.  I'm not asking for specifics of

6    contracts, just your involvement in the process.

7         A.   I don't think so.

8         Q.   Okay.  Were you involved -- well, actually,

9    let's -- yeah.

10             Did you have any involvement in -- now, for

11   the record I'm going to say Dr. Roe, as this transcript

12   may end up being used later in some court process.

13   Okay?  And we've -- we've filed what's called pseudo

14   anonymously in court to protect Dr. Roe's identity.

15             Now, for this moment, Dr. Roe is

16   Dr. Roysdon.  Do you know who that is?

17        A.   (Witness nods affirmatively.)

18        Q.   Okay.

19        A.   Yeah.

20        Q.   How do you know Dr. Roe?

21             MR. SKINNER:  The witness nodded.  I didn't

22   hear a verbal answer.

23        Q.   (BY MR. WAREHAM)  All right.  Could you please

24   answer that question again?  Do you know Dr. Roe?

25        A.   Yes.

Koole Court Reporters of Texas
myreportingfirm@gmail.com
(210) 558-9484  Fax
EXHIBIT 7
210-558-9484
Page 23 of 218

Daniel D.S. Brown                          CONFIDENTIAL TRANSCRIPT
March 24, 2025

                                                                      24

1        Q.   Okay.   How do you know him?

2        A.   He was introduced at a meeting for work --

3        Q.   Okay.   When was that?

4        A.   -- by Todd Jaspers.

5        Q.   Okay.   Do you remember when that was?

6        A.   2019.   2018.   I'm not sure.

7        Q.   Okay.   And what was -- do you -- what do you

8   remember about the introduction?

9        A.   That he presented his ideas.

10       Q.   All right.   And do you know what role he was

11  filling when he presented those ideas?

12       A.   I don't know the official title.   I'm...

13       Q.   What did you understand it to be?

14       A.   He's an AI guy, like, specialist.

15       Q.   Okay.   Did you understand him to be a member of

16  the government or --

17       A.   Yeah.

18       Q.   -- private person?

19       A.   Government.

20       Q.   Specifically, can you explain what you

21  understood?

22       A.   NSA.   He worked for NSA.

23       Q.   Okay.   And what was -- without disclosing any

24  classified material, in general, what was the purpose of

25  that meeting?

Daniel D.S. Brown                                    CONFIDENTIAL TRANSCRIPT
March 24, 2025

25

1          A.  To -- he presented his ideas.
2          Q.  All right.  Was it just about Dr. Roysdon or
3     were multiple people presenting ideas?
4          A.  He presented his ideas.
5          Q.  Okay.  Okay.
6          A.  It was just about his ideas.
7          Q.  Okay.  And who was in the room, to your
8     recollection?
9          A.  I don't know.  Just a ton of people.
10         Q.  Can you name any of them?
11         A.  Todd Jaspers.
12         Q.  All right.  Who else?
13         A.  I don't know.
14         Q.  Okay.  You were, obviously, in the room?
15         A.  Yeah.
16         Q.  How long was the meeting, to your recollection?
17         A.  Maybe an hour.  I don't know.
18         Q.  And do you remember how he was presented?
19     Like, "Hey, this is Dr. Roe who is going to share with
20     us X or Y thing"?
21         A.  It was his ideas.  I -- I don't want to talk
22     about what the ideas were.
23         Q.  Sure.
24             But how was Dr. Roe presented?  Was
25     somebody else presenting him or did he just stand up and

Daniel D.S. Brown
March 24, 2025

CONFIDENTIAL TRANSCRIPT

26

```
1   start talking?
2        A.  He was --
3                  MR. SKINNER:  Object to form.
4                  THE WITNESS:  -- probably introduced as an
5   AI expert.  He was probably introduced as an AI expert,
6   I'm assuming.
7                  MR. WAREHAM:  And, Reggie, I'm not sure
8   that was recorded for the record.  Did you have an
9   objection?
10                 MR. SKINNER:  Yes.  I objected to the form
11  of the question.
12                 MR. WAREHAM:  Okay.  Thank you.
13                 MR. SKINNER:  Can you guys hear us okay?  I
14  do want to make sure that any objection is being...
15                 MR. WAREHAM:  Yeah.  We can -- we can hear
16  you, but sometimes when we step on each other it -- it
17  doesn't quite come through until later.
18                 MR. SKINNER:  Got it.
19                 And I'm going to ask again, Mr. Brown, if
20  you can speak clearly without the hands on the face.
21  And, you know, if you can maintain, you know, a level of
22  volume where we can hear you.
23                 MR. WAREHAM:  All right.
24                 MR. SKINNER:  I don't know, Mr. Wareham, if
25  you can help.  I mean, that would be helpful.  I don't
```

27

```
 1   know if we need to adjust his microphone or whatever,
 2   but it's -- it's becoming an issue.
 3                   MR. WAREHAM:  Okay.  So you're having
 4   trouble with volume?
 5                   MR. SKINNER:  We're having trouble with
 6   volume.  Sometimes he'll start to mumble --
 7                   MR. WAREHAM:  Okay.
 8                   MR. SKINNER:  -- and talk inside himself.
 9   So if he speaks up, we're going to be okay.  But if the
10   hands are covering the mouth and he's mumbling, then
11   that's going to be an issue.
12                   MR. HODGES:  Reggie, we're going to move
13   the microphone that's connected to the Zoom, so maybe
14   that helps -- helps you with audio there in DC.
15                   MR. WAREHAM:  Okay.
16                   MR. SKINNER:  Thank you.  Thank you, John.
17                   MR. WAREHAM:  Yeah.  Let us know if we need
18   to make other changes.  Let's see.
19        Q.  (BY MR. WAREHAM)  So going back to that
20   meeting.  Not talking about what he presented, do you
21   remember somebody -- did he just stand up and start
22   talking or did somebody in the room introduce him?
23        A.  Todd probably introduced him as an AI expert.
24        Q.  Okay.  And from 2019 forward to 2020, what was
25   your involvement with Dr. Roe?
```

Daniel D.S. Brown                                CONFIDENTIAL TRANSCRIPT
March 24, 2025

                                                                    28
1          A.  Golly, how do I say this?  I don't -- I don't

2    know how to say it.  Like -- I -- I don't know how to

3    say it.  Like, is -- hmm.  I -- I guess I -- I don't

4    know how to say that in a -- in an unclassified setting.

5          Q.  Okay.  Did you work with Dr. Roe?

6          A.  Yeah.

7          Q.  From 2019 to 2020?

8          A.  Yeah.

9          Q.  What role were you filling while working in

10   the -- with Dr. Roe during that time period?

11         A.  I provided technical oversight for projects,

12   government projects.

13         Q.  Okay.  And what was Dr. Roe's role during that

14   time period?

15         A.  He was -- originally he was the NSA rep for his

16   ideas.

17         Q.  All right.  And did that change?  Did that --

18         A.  Yes.

19         Q.  Okay.  How did that change?

20         A.  He wanted to be a contractor under the Air

21   Force.

22         Q.  Okay.  And what was your knowledge about his

23   desire to be a contractor?  How did you learn that?

24         A.  He asked.

25         Q.  Asked who?

CONFIDENTIAL TRANSCRIPT

29

1      A.  Me.

2      Q.  All right.  And why did he ask you?

3      A.  I guess because I engaged with him the most.

4      Q.  Okay.  And --

5              MR. SKINNER:  I'm sorry.  I'm sorry.

6              THE WITNESS:  I guess because I --

7              MR. SKINNER:  Can you repeat your answer?

8              THE WITNESS:  -- I engaged with him the

9  most.

10      Q.  (BY MR. WAREHAM)  All right.  And --

11      A.  I --

12      Q.  Go ahead.

13      A.  -- I said it wasn't my role to decide if he can

14  work as an Air Force contractor.

15      Q.  Okay.

16      A.  I said it's between his employer and the

17  contractor.

18      Q.  Okay.  And --

19      A.  We're -- we're told not to direct -- we are

20  told in our -- in -- I don't -- I don't know exactly

21  what this is, but we're not supposed to ever direct a

22  contract -- a contract company on who to hire.

23      Q.  Okay.  Do you roughly recall when this

24  conversation was had?

25      A.  2020 I'm guessing.  I -- I don't remember.

Daniel D.S. Brown                          CONFIDENTIAL TRANSCRIPT
March 24, 2025

                                                                      30

1        Q.   Okay.  And do you know, did he -- do you know

2   why he wanted to be a contractor, according to you?

3        A.   He wanted to work his projects.

4        Q.   Okay.  And were those --

5        A.   And that's -- that's understandable.

6        Q.   Were those projects -- again, not discussing

7   what they are -- were they projects that other

8   government areas were developing?

9        A.   They were the -- his ideas that he presented.

10       Q.   Okay.  And do you know if anyone besides the

11  Air Force Life Cycle Management Center was interested in

12  his ideas?

13       A.   I don't know.

14       Q.   All right.  Do you know -- do you have any

15  reason to know why he wanted his projects at Air Force

16  Life Cycle Management Center?

17       A.   I guess because he wanted them pursued.

18       Q.   Okay.  Implying that they weren't being

19  pursued?

20       A.   Yeah.  I think, yeah, he did say --

21            MR. SKINNER:  Form.

22            THE WITNESS:  I -- I think he did say his

23  -- his current employer wasn't interested in it -- in

24  it.

25       Q.   (BY MR. WAREHAM)  Okay.

Daniel D.S. Brown
March 24, 2025

CONFIDENTIAL TRANSCRIPT

31

1      A.   Yeah.

2      Q.   And so he comes to you and says "I want to

3  develop these at Air Force Life Cycle Management Center

4  as a contractor."  What was -- what, if any, steps did

5  you take after that conversation?

6      A.   Say -- say it again.

7      Q.   So he has this conversation where he comes and

8  says "I want to be a contractor for Air Force Life Cycle

9  Management Center"; right?

10     A.   (Witness nods affirmatively.)

11     Q.   Okay.  What, if any, steps did you take on that

12 desire?

13     A.   I didn't do anything.

14     Q.   You didn't do anything?

15     A.   I -- I just said, "It's not my role."

16     Q.   Okay.

17     A.   It's the role between his employer, which was

18 NSA at the time, his government employer, and the

19 contract company.

20     Q.   Okay.

21     A.   It's not my role.

22     Q.   All right.  Did you want to work with Dr. Roe?

23     A.   I -- I -- it didn't matter to me.

24     Q.   It didn't matter to you whether or not Dr. Roe

25 was on the team or not?

Daniel D.S. Brown                                    CONFIDENTIAL TRANSCRIPT
March 24, 2025

                                                                    32

1        A.   It's not my place to say.

2        Q.   Okay.  But you, personally, did you want to

3   work with him?

4        A.   It's not my place to say.  I -- like, it's not

5   like -- we're not -- we don't get involved with

6   contracting -- contractors' decisions and vendors'

7   decisions.

8        Q.   Well, less to do with contract approval, did

9   you want Dr. Roe to work with you?

10       A.   I'm ambivalent.

11       Q.   Okay.  Who were the -- to your knowledge, the

12  deciders or the decision-makers at Air Force Life Cycle

13  Management with respect to Dr. Roe's contract?

14       A.   Are you talking --

15            MR. SKINNER:  Object to form.

16            THE WITNESS:  -- about hiring?  Are you

17  talking about hiring?

18       Q.   (BY MR. WAREHAM)  Yeah.

19            The -- executing the contract, getting the

20  contract on board and him coming to work there?

21            MR. SKINNER:  Object to form.

22       Q.   (BY MR. WAREHAM)  Go ahead.

23       A.   I -- I don't -- I -- it wasn't --

24            MR. SKINNER:  I have to object, Jason,

25  because the witness has just testified that there was

Daniel D.S. Brown                                    CONFIDENTIAL TRANSCRIPT
March 24, 2025

33

1    not a contract.  Maybe I'm misunderstanding your

2    question.  If you can rephrase it.

3                    MR. WAREHAM:  Sure.

4         Q.  (BY MR. WAREHAM)  Did you ever -- did -- to

5    your knowledge, did Dr. Roe ever get a contract at Air

6    Force Life Cycle Management Center?

7         A.  No.

8         Q.  No?  He was never contracted to work there?

9         A.  It was an AFRL contract.

10        Q.  Say that again.

11        A.  It was an AFRL contract.

12        Q.  What is that?

13        A.  It's another agency in the Air Force.  It's not

14   a Life Cycle Management Center contract.

15        Q.  Okay.  Did he ever work at Air Force Life Cycle

16   Management Center?

17        A.  I -- I don't know.  That's, like, a loaded --

18   like, he didn't have a contract with -- I -- I don't

19   believe he had a contract with Life Cycle Management

20   Center.

21        Q.  Was he present in the spaces of Air Force Life

22   Cycle Management Center?

23        A.  He did have access to the building.

24        Q.  Okay.  Did you see him at Air Force Life Cycle

25   Management Center?

Daniel D.S. Brown                          CONFIDENTIAL TRANSCRIPT
March 24, 2025

34

1        A.  Yes.

2        Q.  Did -- do you communicate with him as part of

3   Air Force Life Cycle Management Center?

4        A.  Yes.

5        Q.  Did he attend meetings as part of Air Force

6   Life Cycle Management Center?

7        A.  As part of -- I mean, he did attend meetings

8   for the project.

9        Q.  As part of Air Force Life Cycle Management

10  Center?

11       A.  I guess so.  I -- it's just, like, because his

12  contract's not with us, so --

13       Q.  Sure.

14       A.  -- I don't know how to phrase -- answer the

15  question.

16       Q.  So regardless of whose contract it was with,

17  like, the enabling agency, he -- he attended Air Force

18  Life Cycle Management Center meetings as a contractor?

19       A.  Yes.

20       Q.  And same with working in the spaces for Air

21  Force Life Cycle Management Center as a contractor?

22       A.  Yeah.

23       Q.  Did he ever at any point hold himself out to be

24  present in any of those spaces as an NSA employee?

25       A.  Yes.

Daniel D.S. Brown                                CONFIDENTIAL TRANSCRIPT
March 24, 2025

35

1       Q.   When?

2       A.   I -- I don't know.

3       Q.   Before --

4       A.   In a lot of meetings.

5       Q.   All right.  And what do you recollect about

6   that specifically?

7       A.   I don't remember.

8       Q.   Okay.

9       A.   He -- he would -- yeah.

10      Q.   So you just answered rather conclusively --

11      A.   He was -- yeah.

12      Q.   -- yes, and then couldn't remember.  So can you

13  help me --

14      A.   You're asking me to remember each time that he

15  represented himself.  Like, how am I going to remember

16  that?

17      Q.   Do you remember a time when he did so?

18      A.   I guess the main date that's in the dep- -- in

19  the thing -- in the complaint or whatever it's called.

20  I don't know what it's called.

21      Q.   Okay.  The main date, do you know what date

22  that was?

23      A.   He was dual-hatted.  He had, like, a -- I don't

24  know.  He would -- he would go to some high-level

25  meetings as an NSA employee.

36

1      Q.   Within Air Force Life Cycle Management Center?

2      A.   I don't even know what that means.  He was an

3  NSA employee.  He went to high-level meetings as an NSA

4  employee.

5      Q.   Were these the same meetings that the Air Force

6  Life Cycle Management Center was attending?

7      A.   No.

8      Q.   Okay.  So he would attend meetings as an NSA

9  employee, but not the Air Force Life Cycle Management

10  Center meetings?

11          MR. SKINNER:  Object to form.

12          THE WITNESS:  No.  He did -- he had

13  introduced himself as an NSA employee at some Life Cycle

14  Management Center meetings.

15      Q.   (BY MR. WAREHAM)  Okay.  So just referring to

16  the, quote, high-level meetings that you just referred

17  to, he was not --

18      A.   I wasn't at the high-level meetings.

19      Q.   Okay.  So you weren't -- didn't attend that?

20      A.   I was just told of the high-level meetings.

21      Q.   You were told about them?

22      A.   Yes.

23      Q.   Who were you told about them from?

24      A.   Roysdon.  These are Roysdon -- these are

25  meetings he attended in his NSA capacity.

1    Q.  Okay.  Focusing on Air Force Life Cycle

2  Management Center meetings.  Did he attend those as an

3  NSA employee?

4    A.  Yes.  Because he had, like -- he had, like,

5  connections in the community.

6    Q.  Can you explain what that means?

7    A.  He knew a lot of, like, things, other

8  affiliated things that might help.

9    Q.  Okay.  Did he get up in meetings and say "I am

10  here from NSA to say" --

11    A.  I don't remember the exact, like -- I don't

12  remember exact, like, each time his verbiage when he

13  would present himself.

14    Q.  Okay.  But there were times where he attended

15  those meetings as a contractor; right?

16         MR. SKINNER:  Object to form.

17    Q.  (BY MR. WAREHAM)  Go ahead.

18         MR. SKINNER:  Object to form.

19         THE WITNESS:  I -- I don't think there were

20  that many meetings that were, like, a lot of people.  It

21  was -- I don't remember.  There weren't a lot of

22  meetings where there were a lot of people where he would

23  need to present himself.

24    Q.  (BY MR. WAREHAM)  Okay.  Do you ever remember

25  him attending a meeting in the contract position that

Daniel D.S. Brown
March 24, 2025

CONFIDENTIAL TRANSCRIPT

38

1  had him affiliated with Air Force Life -- Life Cycle

2  Management Center?

3       A.  I mean, just -- just with me, I guess, or other

4  people.  Like, just mainly when I talked to him, I

5  guess.

6       Q.  Okay.  In those meetings?

7       A.  I mean, like, it wasn't like -- it -- it was --

8  it was very, like -- it was very -- it wasn't very -- it

9  wasn't separated.  It was, like, because he had

10 knowledge in his NSA capacity.  So it was never, like --

11 I don't know.  I just didn't think about it, like --

12 because it was all jumbled together.

13      Q.  Okay.  And I -- I just want to be very clear on

14 a few points; right?  So there's a difference between

15 having cross knowledge, right, from -- from multiple

16 positions, and holding yourself out in a meeting as

17 being a representative of NSA in an Air Force Life Cycle

18 Management Center.

19      A.  I don't remember exactly how he represented

20 himself.

21      Q.  Yeah.

22      A.  I know people in the office thought he was

23 desti- -- like, in the meeting that -- of question --

24 the main one that they thought he was an NSA employee.

25      Q.  Okay.  And who were those people?

EXHIBIT 7

39

1      A.   McVeigh.

2      Q.   Anyone else?

3      A.   I mean, that's the main one.  I -- I don't know

4 if the other ones were there.

5      Q.   And how do you know that's McVeigh -- McVeigh,

6 though?

7      A.   Because he got upset when he found out that

8 Roysdon was a contractor.

9      Q.   All right.  And did he talk to you about it?

10      A.   Yes.

11      Q.   What did he say?

12      A.   I don't remember exactly.  He was just upset

13 that he was also a contractor.

14      Q.   Okay.  And can you try to place in time when

15 that upset thing happened?

16      A.   Sometime in August.

17           MR. SKINNER:  Object.

18           THE WITNESS:  What?

19      Q.   (BY MR. WAREHAM)  Go ahead.

20      A.   Sometime in August.

21           MR. SKINNER:  Objection.

22      Q.   (BY MR. WAREHAM)  August of what year?

23      A.   I think 2020.

24      Q.   Okay.

25      A.   It's in the -- the date -- the main date in the

40

1  deposition -- or the --

2      Q.  Okay.

3      A.  -- complaint.  What -- what's that -- what's

4  that called?

5      Q.  It's called the complaint.

6      A.  Okay.

7      Q.  Yeah.

8          MR. SKINNER:  I'm going to object to form.

9  And -- and, Jason, you know, just to clarify the record,

10 maybe it would help if you explain what you mean by the

11 "upset thing."

12         MR. WAREHAM:  Say that one more time.

13         MR. SKINNER:  Yeah.  I'm object -- I'm

14 objecting to form.  But I wanted to give you an

15 opportunity to clarify the record by clarifying what you

16 mean about, quote, "the upset thing."

17         MR. WAREHAM:  Oh, okay.

18     Q.  (BY MR. WAREHAM)  So after the August date that

19 you just described contained in the complaint, it is --

20 to -- to be clear, you recall McVeigh becoming upset --

21     A.  Yeah.

22     Q.  -- is that right?

23     A.  Yeah.

24     Q.  Okay.  And he became upset, if I want to be

25 clear on your testimony, because -- well, actually, I'll

Daniel D.S. Brown                          CONFIDENTIAL TRANSCRIPT
March 24, 2025

41

1    have you answer.  Why, again, did he become upset?

2         A.  He didn't know that Roysdon was a contractor.

3         Q.  And did he express to you why that mattered to

4    him?

5         A.  He didn't believe he should be working in both

6    capacities.  He thought it was a conflict of interest.

7         Q.  Okay.  Did he say anything more in detail about

8    that?

9         A.  I don't remember.  That was the main thing.

10        Q.  All right.  Did he know anything about the

11   details of Dr. Roe's contract?

12             MR. SKINNER:  Object to form.

13             THE WITNESS:  I mean, not at the time.

14   That -- he just found out.

15        Q.  (BY MR. WAREHAM)  Did you know anything at the

16   time about the details of Dr. Roe's contract?

17             MR. SKINNER:  Object to form.

18             THE WITNESS:  I just know that he was

19   working for the contractor.

20        Q.  (BY MR. WAREHAM)  Okay.  You knew he had a

21   contract?

22        A.  Yeah.

23        Q.  All right.

24        A.  I -- I know he was working for the contractor.

25        Q.  Okay.  I want to ask a little bit more about

Daniel D.S. Brown
March 24, 2025

CONFIDENTIAL TRANSCRIPT

42

1    the interaction, as best as you can recall.  Where were

2    you and then Captain McVeigh located when you had this

3    conversation?

4        A.  I have to look up the address.  I don't

5    remember the address.

6        Q.  Can you roughly describe --

7        A.  In our old building.

8        Q.  The old building?

9        A.  Yeah.

10        Q.  And when you say "the old building," do you

11    mean the old Air Force Life Cycle Management Center

12    building?

13        A.  Yes.

14        Q.  All right.  What office were you in?

15        A.  HNCO.

16        Q.  Okay.

17        A.  I don't know.  You mean the room number?  I

18    don't know.

19        Q.  Was it in your office?

20        A.  Yes.

21        Q.  All right.  And he came to your office?

22        A.  Yeah.

23        Q.  And can you describe, like, his physical

24    characteristics when he walked in?

25        A.  I don't know.  I -- I was -- he just looked

Daniel D.S. Brown
March 24, 2025

CONFIDENTIAL TRANSCRIPT

43

1   normal.  I don't know.

2        Q.  All right.

3        A.  I don't know.

4        Q.  Did -- had you ever seen him upset before?

5              MR. SKINNER:  Object to form.  Are we --

6   are we talking about McVeigh or are we talking about

7   Roysdon?  There's a lot of use of pronouns here.

8              MR. WAREHAM:  Thank you for your help, but

9   we're starting to get on walking objections here, so

10  let's not do that.

11       Q.  (BY MR. WAREHAM)  Did Captain McVeigh appear

12  upset?

13       A.  Yes.

14       Q.  All right.  How did he physically appear upset?

15       A.  Oh, I don't know.  He looked normal.  He looked

16  normal.

17       Q.  Okay.  So how did you know he was upset?

18       A.  Because he was -- because his tone of voice and

19  he kept saying it's a conflict of interest.

20       Q.  All right.  And he just walked in and said,

21  "It's a conflict of interest," or did he say something

22  else?

23       A.  I -- I don't know.  I don't remember exact

24  words.  All I know is, like, he was upset and he said it

25  was a conflict of interest.

44

1      Q.  All right.  And do you remember if that was

2  after a meeting specifically that he did this?

3      A.  I don't remember.

4      Q.  Do you remember how he --

5      A.  I think it was -- it was that same day, I

6  think.  I forget.

7      Q.  Same day as what?

8      A.  That main meeting that is on the complaint.

9      Q.  It was the same day as the --

10     A.  I'm not sure.  I'm not sure.

11     Q.  Okay.  But you think it was the same day as the

12 meeting as on the complaint?

13     A.  It could be.

14     Q.  All right.

15     A.  I think so.  Yeah.  I would think so.

16     Q.  All right.

17     A.  I don't -- I don't remember exactly, though.

18     Q.  All right.  And, normally, when somebody comes

19 in my office and they're upset, I -- I remember kind of

20 how it starts.

21            Do you remember how, like, he walked in and

22 he just started spewing things upset or -- or do you

23 recollect --

24     A.  I don't remember.

25     Q.  -- how that conversation was?

CONFIDENTIAL TRANSCRIPT

45

1      A.   I don't remember.

2      Q.   Okay.  What did you do to respond to that?

3      A.   I told him it's -- wasn't my place to say.

4  It's between the NSA -- his NSA employer and the

5  contractor company.

6      Q.   Okay.

7      A.   I said they are -- like, as an -- I'm not

8  trained in the -- in this type of stuff as an engineer.

9  But my understanding was you can't direct the

10 contractor -- you're not supposed to direct the

11 contractor to hire or -- like, that's -- that's --

12 that's their problem, that -- not the government's.

13     Q.   Okay.  And did Captain McVeigh describe what he

14 was going to do about this --

15     A.   He wanted to know if he got -- if there was any

16 written trail that said that NSA was okay with it.

17     Q.   And why was that Captain McVeigh's business?

18     A.   He was in charge of the program.

19     Q.   Which program?

20     A.   That Roysdon worked on.

21     Q.   All right.  Do you know if he was involved in

22 contracting?

23     A.   I don't know.

24     Q.   Speaking only about the authorities managing

25 the program, it -- it's -- are you saying that

46

1    Captain McVeigh managed Dr. Roe?

2                    MR. SKINNER:  Object to form.

3                    THE WITNESS:  It's really com- --  I mean,

4    I don't know.  It's so complicated.  He -- he was in

5    charge of the project.

6        Q.  (BY MR. WAREHAM)  Okay.  And what does that

7    mean as far as authorities in the project when you say

8    "he is in charge"?

9        A.  I don't know.  It's so complicated.  And you're

10   getting into, like, other areas that I probably can't

11   talk about.

12       Q.  Okay.  I'm just talking about the authorities.

13   When you say the authorities --

14       A.  Authority -- I can't say exactly what

15   authority.

16       Q.  When you say "authorities under the contract,"

17   like, the -- it's complicated, are you referring to

18   authorities when you say it's complicated?

19                    MR. SKINNER:  Object to form.

20                    THE WITNESS:  Which -- which authorities?

21   He -- like -- its just, like, everything's fragmented.

22   Like, he's -- he was in charge of this project.  He

23   wasn't -- like, it got -- it got pulled out of this

24   section and he was now in charge of it.

25       Q.  (BY MR. WAREHAM)  Okay.  And when you say

47

1   this --

2        A.  From, like, a PM perspective.

3        Q.  Okay.  So he was the project manager on the

4   project?

5        A.  I think that would be the closest thing.

6        Q.  Okay.  And when you say "the project," do you

7   mean Dr. Roe's project?

8        A.  Yes, that he was associated with.

9        Q.  All right.  And just for clarity and to avoid

10  any classification issues, we are describing that

11  project, both in the complaint and here, Dr. Roe's

12  project as Project A.

13       A.  No.

14       Q.  That's --

15       A.  I'm not referring to Project A.

16       Q.  No.

17            You're not referring to Project A?

18       A.  Yes.

19       Q.  You've read the complaint?

20       A.  Yes.

21       Q.  All right.  What project are you referring to

22  compared to the complaint?

23       A.  The projects he presented to NSA that --

24  what -- his ideas that he wanted to work on.

25       Q.  All right.  And so there was a project that

48

1    Captain McVeigh was project manager for; right?

2                    MR. SKINNER:  Object to form.

3                    THE WITNESS:  Yes.

4        Q.  (BY MR. WAREHAM)  And I have described that in

5    the complaint for classification reasons as --

6        A.  I did not know you were referring to Project A.

7        Q.  Okay.

8        A.  I'm not allowed to talk about Project A.

9        Q.  I understand.  I'm not asking --

10       A.  And I -- and I did not know you were

11   referring -- you were referring to Project A, because I

12   was not referring to Project A.

13       Q.  Okay.  What were you referring to as compared

14   to the complaint?

15       A.  I was referring to the projects, the ideas that

16   Roysdon worked on.

17       Q.  Okay.  Are you familiar with the term from the

18   complaint Project B?

19       A.  I don't remember Project B.

20       Q.  All right.

21       A.  Where is that on the complaint?

22       Q.  So in the complaint I've described two

23   projects.  And the -- and one is Project A that is

24   Dr. Roe's project he was working on.  And then Project B

25   was a project that Captain McVeigh was responsible for.

49

1      A.  I don't remember.  What -- can you give me the

2  line number?

3      Q.  Sure.  Go ahead and present it on his screen,

4  if you would.

5              MR. SKINNER:  All right.  So here's the

6  thing, let me see if I can help.  So it is my

7  understanding that the name of the project at issue, the

8  special access pro- -- program that Dr. Roysdon was read

9  into is not classified.  That is unclassified

10 information.

11              If the witness is comfortable with

12 disclosing the name of that project, I think that would

13 clarify the record and allow us to have a meaningful

14 deposition today.

15              MR. WAREHAM:  Yeah.  That -- that would be

16 great.

17              MR. SKINNER:  Mr. Brown -- Mr. Brown, is it

18 your understanding as well that the name of the special

19 access program that Dr. Roysdon was read into is

20 unclassified?

21              THE WITNESS:  One of them you can say the

22 name and one of them you can't.

23              MR. SKINNER:  Okay.  So I'm going to say

24 the name because I've been read in and it -- it is

25 unclassified.  The name is Fibonacci.

50

1                    THE WITNESS:  Yes.  That's unclassified,
2    the name.
3                    MR. SKINNER:  Fibonacci is unclassified?
4                    THE WITNESS:  Correct.
5                    MR. SKINNER:  Okay.  All right.
6                    MR. WAREHAM:  All right.  Thanks for your
7    help there.
8                    THE WITNESS:  Can I see the dep- -- the
9    deposition -- or the complaint?
10                   MR. WAREHAM:  The complaint.
11                   MS. BRADSHAW:  I'm getting it.
12                   MR. WAREHAM:  So prob- -- so I -- yeah.
13   We're going to get it for you, but I want to just be
14   clear delineated -- are we at an hour?
15                   MR. HENRY:  Fifty-one minutes.
16                   MR. WAREHAM:  All right.  Is it worth
17   taking a break?
18                   MR. HENRY:  Sure.
19                   MR. WAREHAM:  All right.  My --
20                   THE WITNESS:  Do you have a printout?
21                   MR. WAREHAM:  My co-counsel has suggested
22   it might be appropriate for our first break.  And we can
23   get this material up and that way we can -- it's more to
24   stay organized, just to state the room here, on -- on
25   which projects we're talking about, so maybe a

Daniel D.S. Brown                                    CONFIDENTIAL TRANSCRIPT
March 24, 2025

                                                                    51

1  ten-minute break.

2                  MR. HODGES:  Sure.

3                  MR. WAREHAM:  Great.

4                  MR. SKINNER:  That's fine.

5                  THE VIDEOGRAPHER:  Time off record is

6  10:49.

7          (Recess taken from 10:49 a.m. to 11:08 a.m.)

8                  THE VIDEOGRAPHER:  We are now back on the

9  record at 11:08.

10                 MR. WAREHAM:  All right.  This is Jason

11 Wareham.

12                 MR. BARRERA:  We -- I think we lost the

13 screen up there.

14                 MR. HODGES:  I think he's sharing.

15                 MS. BRADSHAW:  Yeah.

16                 MR. WAREHAM:  Oh, we're screen sharing.

17 Yeah, I see Reggie.  You still see us, right, Reggie?

18                 MR. SKINNER:  I do not see the witness.

19                 MR. WAREHAM:  Okay.

20                 MS. BRADSHAW:  You don't?

21                 MR. WAREHAM:  We are going to present --

22 well, we're going to present a document to him, I think,

23 in the --

24                 MR. SKINNER:  Oh, okay.  Okay.  Okay.  Got

25 you.

52

1    MR. WAREHAM:  Yeah.  In the interim you'll

2  see the --

3    MR. SKINNER:  I see what you're doing.

4    MR. WAREHAM:  -- you'll see the --

5    MR. SKINNER:  Okay.  Sorry.

6    MR. WAREHAM:  Yeah.  Yeah.

7    Okay.  So, actually, before we go any

8  further, I want to -- I want to be clear.  Like, none of

9  the questions we're seeking to, like, ask, we're not --

10  we are not wanting to see you get in trouble.

11    And, in fact, Reggie, unless there's an

12  objection, we're fully willing to stipulate this

13  transcript confidential to keep it inside our -- our

14  protective order basis.  Do you have any objection to

15  that?

16    MR. SKINNER:  So couple of things.  I'm not

17  sure what you're referring to when you just made the

18  comment to the witness about "We don't want to see you

19  get in trouble."  Did you want to --

20    MR. WAREHAM:  Yeah.

21    MR. SKINNER:  -- explain what you mean by

22  that?

23    MR. WAREHAM:  Yeah.  Sure.  I'll explain

24  more.  So --

25    THE COURT REPORTER:  One at a time.

Daniel D.S. Brown
March 24, 2025

CONFIDENTIAL TRANSCRIPT

53

1          MR. WAREHAM:  Yeah.  Sorry.

2      Q.  (BY MR. WAREHAM)  So, you know, I understand

3  there's some -- you have some concerns about getting in

4  trouble at work.  Yes?

5      A.  I mean, like, I don't want to -- you're asking

6  me all these questions, and my work is generally

7  classified; so I don't want to divulge things accidently

8  or -- you know, because I'm being asked all these

9  questions that normally I wouldn't -- we wouldn't be

10  discussing in this environment.

11      Q.  Okay.  And in part because you're worried that

12  if you say the wrong thing you could get in trouble at

13  work; is that correct?

14      A.  Well --

15          MR. SKINNER:  And -- and, Jason, I --

16          THE WITNESS:  -- because I'm --

17          MR. SKINNER:  One second, Mr. Brown.  One

18  second.

19          MR. WAREHAM:  Yeah.

20          MR. SKINNER:  I have an issue with you

21  putting words in his mouth --

22          MR. WAREHAM:  Sure.  I'm not meaning to.

23          MR. SKINNER:  -- with -- with respect to

24  what he just clarified he understands about his concerns

25  vis-a-vis trouble.  The witness just indicated that he

Daniel D.S. Brown                          CONFIDENTIAL TRANSCRIPT
March 24, 2025

54

1   has a potential con- -- he has a concern about

2   potentially inadvertently disclosing classified

3   information.  And I think it is inappropriate to suggest

4   that there is any concern beyond that without any

5   foundation.

6               So, you know, I -- I want to be clear that

7   that's not appropriate.  With that said, if it will

8   satisfy Plaintiff and the witness that we mark the

9   transcript of his deposition as confidential, and

10  subject to the existing protective order, Defendants

11  have no objection to that.

12              MR. WAREHAM:  Great.

13              THE WITNESS:  So what does that mean to me?

14  Like, I don't -- I don't understand what this -- that

15  means.

16              MR. WAREHAM:  Sure.  So --

17              MR. SKINNER:  Mr. Brown --

18              MR. WAREHAM:  -- do you want to explain it?

19              MR. SKINNER:  -- Mr. Brown, you have

20  counsel and your counsel can explain that for you.

21              MR. BARRERA:  Okay.  Yeah.  Can you pick me

22  up on audio?

23              MR. SKINNER:  Yes, sir.

24              MR. BARRERA:  Okay.  So this is

25  Bobby Barrera for purposes of the record.  And Jason's

55

1    line of questioning is predicated on a conversation that

2    I had with him previous to the deposition that my

3    client, Mr. Brown, had indicated reservations in this

4    deposition and providing testimony that inadvertently

5    may divulge classified information.

6              He quoted to me that, quote, talking around

7    classified information is also prohibited.  And that he

8    had concerns that by giving this deposition and by his

9    divulging information that someone determined he should

10   not have talked about or around could cost him his job.

11             So when we're using the term "get in

12   trouble," that term was clarified earlier, not in your

13   presence.  But for the record that getting in trouble

14   meant divulging -- inadvertently divulging classified

15   information would cost him his job potentially.

16             So that's -- so the record is clear, that's

17   his hesitation.  It didn't -- has been his hesitation.

18   So I don't think that the -- his testimony is being

19   improperly classified.  I'm just making you aware -- of

20   course, I'm looking at you.  You can't see me, Reggie.

21   That that's what was being referred to, so that the

22   record is clear.

23             THE WITNESS:  What does that mean this

24   confidentiality...

25             MR. WAREHAM:  Do you want to explain what a

Daniel D.S. Brown                                    CONFIDENTIAL TRANSCRIPT
March 24, 2025

56

1   confidential designation means?  We don't want to give

2   him, like, necessarily advice or --

3                 MR. BARRERA:  Well, we -- we had talked

4   about the fact that the -- there is allegedly --

5                 MR. WAREHAM:  Yeah.

6                 MR. BARRERA:  -- and I was not familiar

7   with it prior to this morning in --

8                 MR. WAREHAM:  Sure.

9                 MR. BARRERA:  -- your and my conversation

10  that this case is covered under a confidentiality

11  agreement.  That means the information cannot be

12  publicly divulged.  And with the defense attorneys

13  stipulating that your communications in this deposition

14  will be covered by the confidentiality agreement,

15  therefore, it cannot be divulged, I'm assuming, except

16  by court order or agreement of the parties.

17                 MR. WAREHAM:  Or for use within the case

18  itself.  Yeah.

19                 MR. BARRERA:  Yes.  For -- for purposes of

20  the litigation expressly.  So that's what the

21  confidentiality agreement covers.

22                 THE WITNESS:  Okay.

23                 MR. WAREHAM:  Yeah.

24                 MR. BARRERA:  Okay.  But, again, if you

25  have any hesitation in discussing an issue that you

Daniel D.S. Brown
March 24, 2025

CONFIDENTIAL TRANSCRIPT

57

1    believe enters into an area of confidential information

2    and you're uncertain whether divulging that information

3    breaches that confidentiality, then you need to state so

4    on the record so everyone is familiar.  Okay?

5                    THE WITNESS:  Okay.

6                    MR. WAREHAM:  All right.

7                    THE WITNESS:  And also the -- the -- it's,

8    like, a compilation effect where different pieces of

9    unclassified information could become classified if you

10   say too many unclassified pieces of information.

11                   MR. WAREHAM:  Yeah.

12       Q.  (BY MR. WAREHAM)  And are you -- when you

13   describe that, are you referring to mosaic

14   classification?

15       A.  Yes.  Yes.

16       Q.  If we are treading into areas just like with

17   direct classification that you believe that the mosaic

18   classification is becoming an issue, please let me know.

19   Okay?

20       A.  (Witness nods affirmatively.)

21                   Can you please let me know where Project B

22   is referenced in the complaint?

23       Q.  Sure.

24                   MR. WAREHAM:  Actually, did we pull it up?

25                   MS. BRADSHAW:  Yeah.

Daniel D.S. Brown                                    CONFIDENTIAL TRANSCRIPT
March 24, 2025

                                                                    58

 1                MR. WAREHAM:  All right.  Can we search it?

 2                MS. BRADSHAW:  Yeah.

 3      Q.  (BY MR. WAREHAM)  All right.  So it's on line

 4  71 of the complaint -- of the second amended complaint

 5  where it starts.

 6      A.  What page?

 7                MS. BRADSHAW:  15.

 8      Q.  (BY MR. WAREHAM)  Page 15.

 9      A.  What bullet?  There's 65, 66.

10      Q.  Okay.  Go to the next page.  Do you see

11  Paragraph 71?

12      A.  Yeah.

13      Q.  Okay.  That's where it begins its description.

14      A.  But where does it say Project B?

15                MR. WAREHAM:  If you can go back to it,

16  please.

17      Q.  (BY MR. WAREHAM)  All right.  Do you see

18  Paragraph 71?

19      A.  Yes.

20      Q.  Do you see where it says "One each -- one such

21  military officer is Defendant, Captain William McVeigh,

22  U.S. Air Force, who was charged with the management and

23  development of classified, quote, "Project B" within the

24  Air Force" --

25      A.  I think you have a different -- maybe I have a

CONFIDENTIAL TRANSCRIPT

                                                                    59

1    different complaint.

2          Q.  Is that the --

3                    MR. HENRY:  Second amended.

4          Q.  (BY MR. WAREHAM)  -- is that the second amended

5    complaint?

6          A.  Maybe I have a different version.

7          Q.  Okay.  I'm not sure that -- why that would be

8    the case, but...

9          A.  I have the one that Marvel Butler sent me.

10         Q.  Would you mind handing it to me so I can just

11   direct you to it and keep this organized?

12                   Well, I can see why you're confused.  So

13   let's just display where we were.  And can you see the

14   display to your right?

15                   MR. BARRERA:  This?  Can you see this?

16                   THE WITNESS:  There's nothing there.

17                   MR. WAREHAM:  Okay.  In just a moment.

18                   THE WITNESS:  Can I have that back?

19                   MR. WAREHAM:  Sure.

20         (Discussion off the written record.)

21                   THE WITNESS:  And what version is this?

22                   MR. WAREHAM:  I'm not sure where you

23   received this.

24                   THE WITNESS:  I received this was

25   Marvel Butler.

CONFIDENTIAL TRANSCRIPT

60

1      Q.   (BY MR. WAREHAM)   From who?

2      A.   Marvel Butler.

3      Q.   Okay.  We'll go back to that in a second.

4      A.   Yeah.  He's an Air Force lawyer.

5           (Discussion off the written record.)

6      Q.   (BY MR. WAREHAM)   All right.  Do you see a

7  complaint on the screen?

8      A.   Yeah.

9      Q.   Do you see Paragraph 71?

10     A.   Yeah.

11     Q.   Are you able to read that?

12              MR. SKINNER:  Are you -- are you sharing

13  your screen so we can also see what the witness is

14  seeing?

15              MR. WAREHAM:  We should be.

16              THE WITNESS:  I mean, this is like...

17              MR. WAREHAM:  Hold on.  Let me make sure we

18  are.

19              THE WITNESS:  Is Project A still changed?

20  Like, I don't know what else changed in this.  Geez.

21     Q.   (BY MR. WAREHAM)  So, actually, while she's

22  working on that and she's working on sharing the screen,

23  can you tell me where you got the complaint that's in

24  your hand?

25     A.   Marvel Butler.

CONFIDENTIAL TRANSCRIPT

61

1      Q.   Who is Marvel Butler?

2            MR. SKINNER:  Again -- again, I have -- I

3  have to object, because the witness has a document in

4  front of him.  The document --

5            (Multiple crosstalk.)

6            MR. WAREHAM:  We -- we --

7            MR. SKINNER:  -- in front of him --

8            MR. WAREHAM:  -- we are querying on the

9  document yet.  As soon as it gets shared we'll start

10 working through the document.  He has a document in his

11 hands that I did not provide him, and I'm trying to find

12 out the information about that.

13           MR. SKINNER:  I understand.  But -- but,

14 Jason, you know, obviously, in order to query the

15 witness about a document that's in front of him, all

16 counsel participating in this deposition have to have

17 that document as well.

18           MR. WAREHAM:  I will -- I mean, do you want

19 me to stop and scan what he has in front of him and send

20 it to you?  I don't know what it is.

21           THE WITNESS:  So I don't know what document

22 you have.

23           MR. WAREHAM:  Is that what you would

24 prefer, Reggie?

25           MR. SKINNER:  Yes.  I mean, I -- I just

Daniel D.S. Brown                                    CONFIDENTIAL TRANSCRIPT
March 24, 2025

                                                                          62
1   want to conduct the -- the deposition --

2               MR. WAREHAM:  Yeah.  I have not -- I have

3   not handed him this document.  He came to the deposition

4   with this document in hand.  It was, apparently, handed

5   to him by an Air Force personnel; right?

6               MR. SKINNER:  I -- I think I know what the

7   document is, so I just want --

8               MR. WAREHAM:  Okay.

9               MR. SKINNER:  -- to conduct the deposition

10  consistent with the rules.

11              MR. WAREHAM:  Sure.

12              MR. SKINNER:  So --

13              MR. WAREHAM:  Yeah.

14              MR. SKINNER:  -- if you have somebody who

15  can make copies of what the witness has --

16              MR. WAREHAM:  Yes.  I will --

17              MR. SKINNER:  -- in --

18              MR. WAREHAM:  -- have somebody scan it in

19  right now --

20              MR. SKINNER:  Okay.

21              MR. WAREHAM:  -- and send it over to you.

22              MR. SKINNER:  All right.

23              MR. WAREHAM:  Great.

24              Would you please, Mr. Brown, hand the

25  entire document that you have in front of you to

63

1    Mr. Hodges.

2                    MR. BARRERA:  All right.  These are yours.

3                    MR. HODGES:  Perfect.  No sweat.  For the

4    record, this is John Hodges, also co-counsel for the

5    plaintiff.  I have a document that's labeled -- it

6    appears to be a -- the Plaintiff's Original Complaint.

7    And it does list pages 1 through 31, ending with the

8    signature page from -- of myself and Jason Wareham.

9                    MR. WAREHAM:  Okay.

10                   MR. HODGES:  So I'm going to step out and

11   go scan a copy of this.

12                   MR. WAREHAM:  Great.  I'll come back to

13   questions about that after you have it, Reggie.  Can we

14   just email it to you?

15                   MR. SKINNER:  That's fine.

16                   MR. WAREHAM:  Okay.  All right.  So do you

17   see a document on your screen right now, Reggie?

18                   MR. SKINNER:  Yes, I do.

19                   MR. WAREHAM:  Okay.  I'm going to query on

20   that one.  And this is the Plaintiff's Second Amended

21   Complaint.  And we will make this Exhibit 1 to this

22   deposition for reference.

23          (Exhibit 1 was marked for identification.)

24                   MR. WAREHAM:  All right.  So can you go

25   back down to...

Daniel D.S. Brown
March 24, 2025

CONFIDENTIAL TRANSCRIPT

64

1    Q.  (BY MR. WAREHAM)  I'm directing your attention

2  to page 15, Mr. Brown.  Paragraph 79, so that we can get

3  organized about the different project references.

4    A.  Is that bullet 73?

5        MR. WAREHAM:  Actually, next page after

6  that.  Or is it 71?  Okay.  Seventy-one.

7    Q.  (BY MR. WAREHAM)  Are you able to read

8  Paragraph 71?

9    A.  Yes.

10    Q.  All right.  Would you please --

11    A.  I -- again, I just say that, like, I haven't

12  read this document before.  So it changes, like, what

13  things referenced to.  Like, am I allowed --

14    Q.  We'll just work --

15    A.  -- to read this document --

16    Q.  -- we'll just work through it --

17    A.  -- first?

18    Q.  -- right now.  If you prefer, I --

19    A.  Am I allowed to read the document before we

20  continue?

21    Q.  That's fine with me.  No problem there.  Yeah.

22  We'll get it printed out and you can read through it.

23  Your counsel, too, we'll get you a copy.

24        MR. WAREHAM:  Do you want a copy?

25        MR. GREEN:  I'm all right.  Thank you.

Daniel D.S. Brown
March 24, 2025

CONFIDENTIAL TRANSCRIPT

65

1              MR. WAREHAM:  All right.  Great.

2              I think we should take another brief recess

3  here.  We'll get -- we'll -- ten minutes, about, the

4  amount of time you think?  Great.  We'll get you two

5  copies of this and you can read through it.

6              THE VIDEOGRAPHER:  Time off record is

7  11:23.

8          (Recess taken from 11:23 a.m. to 11:49 a.m.)

9              THE VIDEOGRAPHER:  We are now back on the

10 record at 11:49.

11             THE WITNESS:  I just want to note that I

12 wasn't able to read the -- it's 47 pages.  And I wasn't

13 given this in advance, so...

14             MR. WAREHAM:  I understand.

15     Q.  (BY MR. WAREHAM)  Having reviewed what you have

16 reviewed, do you have a better understanding of what we

17 are referring to when we say the term Project A versus

18 Project B?

19     A.  Project B was not referenced in the -- in the

20 complaint that I received.

21     Q.  Based on what you just --

22     A.  Project -- Project A is now called Project B in

23 the updated complaint.

24     Q.  Okay.  So based on what you just reviewed, do

25 you have an understanding of what Project A and

Daniel D.S. Brown
March 24, 2025

CONFIDENTIAL TRANSCRIPT

66

1    Project B refers to?

2        A.  Yes.

3        Q.  Okay.  And is it correct that Project A, as

4    described in the complaint, is the Fibonacci project?

5        A.  Yes.

6        Q.  And Project B is the one that we cannot say the

7    name of?

8        A.  Correct.

9        Q.  What was your understanding as to Dr. Roe's

10   role with respect to Project A?

11       A.  To help the project along from a technical

12   perspective since he knows AIML.

13       Q.  Okay.  Did Dr. Roe have any involvement, to

14   your knowledge, in Project B?

15       A.  No.

16       Q.  Do you recall whether or not he was ever asked

17   to review Project B?

18       A.  I don't recall.

19       Q.  Do you recall whether or not Danny Burghard and

20   Alan Rabada asked him to review Project B?

21       A.  I don't know because --

22               MR. SKINNER:  Object to form.

23               THE WITNESS:  I -- I don't know, because I

24   was in that day that -- the big pivotal day, I was -- he

25   was in some meetings that I wasn't in.

Daniel D.S. Brown
March 24, 2025

CONFIDENTIAL TRANSCRIPT

67

1      Q.  (BY MR. WAREHAM)  Okay.  And when you say that

2   day, are you -- are you referring to on or about

3   August 13, 2020?

4      A.  Yeah.  Somewhere around there.

5      Q.  And was that a "yes"?  I'm sorry.  We kind of

6   stepped on --

7      A.  Yes.

8      Q.  Great.

9           Did Dr. Roe ever work on projects that you

10   represented?

11      A.  He worked on Fibonacci.

12      Q.  And is that a project you represented?

13      A.  That's where I was technically involved.

14      Q.  Okay.  Were you the project manager for --

15      A.  No.

16      Q.  -- Project A?

17           Were you ever the project manager for

18   Project A?

19      A.  No.  I'm not a project manager; I'm an

20   engineer.

21      Q.  Did you ever fill a project manager role for

22   any Air Force Life Cycle Management Center?

23      A.  I don't believe so.

24      Q.  Okay.

25      A.  It's not in my position description.

Daniel D.S. Brown                                    CONFIDENTIAL TRANSCRIPT
March 24, 2025

                                                                          68

1        Q.   All right.   Did you -- are you familiar with a

2   company with the initials GITI?

3        A.   Yes.

4        Q.   What is that company?

5        A.   Global InfoTek.

6        Q.   All right.   What is -- what to your knowledge

7   is Global InfoTek?

8        A.   It's a contractor.

9        Q.   All right.   And what kind of contractor is

10  Global InfoTek?

11       A.   I don't know.   They work for the DOD sometimes.

12  They have contracts with the DOD.   I...

13       Q.   All right.   Did you have any knowledge of the

14  persons at Global InfoTek?

15       A.   I mean some, yeah.

16       Q.   Who?

17       A.   Ted Oakley.

18       Q.   Okay.   Did you communicate with Ted Oakley?

19            MR. SKINNER:   Are you -- sorry, Jason.   The

20  witness has his hands over his mouth again.

21            THE WITNESS:   Sorry.

22            MR. SKINNER:   He's mumbling.   So if we

23  could --

24            MR. WAREHAM:   If you could.

25            THE WITNESS:   Ted Oakley.

Daniel D.S. Brown                                CONFIDENTIAL TRANSCRIPT
March 24, 2025

                                                                    69
1                    MR. WAREHAM:  Ted Oakley.

2                    MR. SKINNER:  -- just keep an eye...

3                    MR. WAREHAM:  Yeah.  I'll -- I'll try to

4    remember that, Reggie.  I will.

5         Q.  (BY MR. WAREHAM)  Did you communicate with

6    Ted Oakley?

7         A.  Sometimes.

8         Q.  Via what form?

9         A.  Phones or email.

10        Q.  Do you know how Dr. Roe was introduced to

11   Global InfoTek?

12        A.  I don't recall.

13        Q.  Do you recall whether --

14        A.  I don't know.

15        Q.  Go ahead.

16        A.  I don't recall.

17        Q.  Okay.  Do you recall whether or not you

18   introduced Dr. Roe to Global InfoTek?

19        A.  I don't recall.

20        Q.  What is the Air Force Research Laboratory?

21        A.  They do research work.

22        Q.  All right.  What else do they do?

23        A.  Research work.

24        Q.  Do you know if they're involved in the

25   contracting process?

Daniel D.S. Brown
March 24, 2025

CONFIDENTIAL TRANSCRIPT

70

1      A.  They have contracts.

2      Q.  All right.  Have you been -- ever been involved

3   in contracts that were -- that were related to the Air

4   Force Research Laboratory?

5      A.  I mean, the Air Force would utilize some of

6   them.

7      Q.  Okay.  Do you know if Air Force Life Cycle

8   Management Center used Air Force Research Laboratory

9   contracts?

10     A.  Yes.

11     Q.  Do you know if they used them in Dr. Roe's

12  case?

13     A.  I believe so.

14     Q.  Do you have any recollection of Dr. Roe being

15  asked to review a project of Captain McVeigh's?

16     A.  I mean, not -- just -- just the Fibonacci

17  stuff.

18     Q.  Not Project B?

19     A.  Correct.

20     Q.  Going to roughly February 2020, do you recall a

21  conversation with Dr. Roe relative to Project B?

22     A.  No.

23     Q.  Do you recall a conversation with Dr. Roe

24  relative to Captain McVeigh?

25     A.  The Fibonacci.

71

1      Q.  Well, do you recall discussing Captain McVeigh
2   with --
3      A.  Not really.
4      Q.  -- Dr. Roe?
5      A.  Not -- in February, I -- I don't know.  I don't
6   know.
7      Q.  Do you recall at any time discussing
8   Captain McVeigh with Dr. Roe?
9      A.  Say it again.
10      Q.  Do you remember -- do you recall any time where
11   you discussed Captain McVeigh with Dr. Roe?
12      A.  I mean, he asked about his conflict of -- I --
13   I don't know.  Just gave -- I -- I don't know all the
14   instances, but the main one was when McVeigh found out
15   that Roe was working in a dual capacity.
16      Q.  And that is in August of 2020?
17      A.  Yeah.
18      Q.  Do you recall any time prior to August 2020 --
19   or August 13, 2020, discussing Captain McVeigh with
20   Dr. Roe?
21      A.  Not really.  I -- I don't remember.  It's so --
22   it's so long ago.
23      Q.  Okay.  Do you recall a meeting in February of
24   2020 where Dr. Roe would have been asked to review
25   Project B?

Daniel D.S. Brown
March 24, 2025

CONFIDENTIAL TRANSCRIPT

72

1      A.  I can't really talk about Project B.  But, I
2 mean, like, in reading the complaint, like, I don't
3 remember anyone complaining about Roysdon's assessment
4 of any projects.
5      Q.  Okay.  And so you are aware that he assessed
6 projects?
7      A.  I believe --
8              MR. SKINNER:  Object to form.
9              THE WITNESS:  -- I'm aware what this says.
10 I'm aware what this says.  And I don't remember him -- I
11 don't remember anyone complaining about his assessment
12 of any projects.
13      Q.  (BY MR. WAREHAM)  All right.  So not what the
14 complaint said, but you are -- are you aware that he
15 assessed projects, you, personally?
16              MR. SKINNER:  Object to form.
17              THE WITNESS:  Fibonacci.
18      Q.  (BY MR. WAREHAM)  All right.  Are you
19 withholding any information around that out of concern
20 for classification?
21      A.  No.  I'm -- I'm saying -- I'm saying it in a
22 way that I think -- I don't think -- I think -- he
23 hasn't -- I'm not aware -- I'm not aware of any
24 assessment outside of Project -- I don't remember -- I
25 don't know -- I don't -- let's see.  How do I say this?

CONFIDENTIAL TRANSCRIPT

73

1    No one ever complained about his assessments.

2        Q.   Were you present for any of the assessments?

3        A.   There was -- there was in that -- on that date,

4    I wasn't present in some of the meetings.

5        Q.   Were you present on August 13, 2020, for any

6    meeting wherein --

7        A.   Some meetings I was not present for.

8        Q.   Were you present for any meetings on that date

9    where Dr. Roe assessed projects?

10       A.   I was there when he gave the Fibonacci brief --

11       Q.   Okay.

12       A.   -- if I remember correctly.

13       Q.   What do you recall in an unclassified manner

14   his assessment of Fibonacci from that day?

15       A.   I mean, I -- he would just give a recap of

16   things that have happened.

17       Q.   Okay.  Do you recall at any time Dr. Roe

18   describing Project B negatively?

19                MR. SKINNER:  Object to form.

20                THE WITNESS:  I don't recall anything.  I'm

21   not even supposed to talk about Project B, so I -- but I

22   don't recall anything -- I -- I don't know.  This --

23   I -- what -- what am I -- I'm not even supposed to talk

24   about Project B.

25       Q.   (BY MR. WAREHAM)  I am not asking for you to

(210) 558-9484  Fax
Koole Court Reporters of Texas
myreportingfirm@gmail.com
EXHIBIT 7
Page 73 of 218
210-558-9484

74

1    discuss the project.  I am asking you whether or not --

2    or -- and I'm not asking you for the content of the

3    assessment.  I'm asking --

4          A.  I don't recall anything about Project B with

5    Roysdon.

6          Q.  What is your personal assessment of Dr. Roe's

7    skills and competence?

8          A.  He's -- he's smart.

9          Q.  All right.  Did he add value to Air Force Life

10   Cycle Management, in your opinion?

11         A.  For Fibonacci, yes.

12         Q.  Were there any things with which he did not add

13   value?

14         A.  I mean, I -- I don't know.  It's like a

15   negative.  I -- I don't know -- I don't know how to say

16   that.  Like, I think he's smart and I think he added

17   value to Fibonacci.  I can't answer that negative

18   question.

19         Q.  Okay.  Did you hold any personal opinions about

20   the projects that he proposed?

21         A.  Yeah.

22         Q.  What were those?

23         A.  I thought they were good.

24         Q.  Were you aware of any funding or budget

25   constraints for Project A, Fibonacci?

75

1      A.  I'm not supposed to talk about that.

2      Q.  Okay.  Were you aware of any project or any

3  funding constraints on Project B?

4      A.  I can't talk about that.

5      Q.  Do you recall an interaction in February 2020,

6  at or near the Aerospace Corporation in El Segundo,

7  California?

8                  MR. SKINNER:  Object to form.

9                  THE WITNESS:  No.

10     Q.  (BY MR. WAREHAM)  Do you recall having a

11  conversation with Dr. Roe regarding Air Force Life Cycle

12  Management Center at that time in that place?

13     A.  No.

14                 MS. SEEMAN:  I'm sorry.  I didn't catch

15  that answer.

16                 THE WITNESS:  What?

17     Q.  (BY MR. WAREHAM)  Will you repeat your answer,

18  please?

19     A.  No.  No.

20                 MS. SEEMAN:  Thank you.

21     Q.  (BY MR. WAREHAM)  Are you -- have you ever been

22  aware of whether or not Project B's funding was

23  interrupted?

24     A.  I'm not supposed to talk about --

25                 MR. SKINNER:  Object to form.

CONFIDENTIAL TRANSCRIPT

76

1          THE WITNESS:  -- Project B.

2      Q.  (BY MR. WAREHAM)  Have you ever had a

3  conversation where you advised Dr. Roe to stay away from

4  Captain McVeigh?

5          MR. SKINNER:  Object to form.

6          THE WITNESS:  No.  I wouldn't -- I don't

7  think so.

8      Q.  (BY MR. WAREHAM)  To your recollection, have

9  you ever described Captain McVeigh negatively?

10          MR. SKINNER:  Object to form.

11          THE WITNESS:  I don't remember, but it's

12  possible.

13      Q.  (BY MR. WAREHAM)  All right.  And why would

14  that be possible?

15      A.  Let's see.  He -- he had a bad rep for just

16  being worried about his projects, like, that he started.

17      Q.  Okay.  And can you please expand on bad rep --

18      A.  He would just --

19      Q.  -- as you described it?

20      A.  -- he would just do whatever he needed to make

21  sure his projects got funded that he started.

22      Q.  When you say "do whatever he" -- what is

23  that --

24      A.  I mean, he -- I mean, I don't -- like, he

25  wouldn't break the law or anything.  But, I mean, like,

77

1    he just, you know, was -- wanted to make sure his

2    projects get funded.

3         Q.   Okay.  And why did you describe that as a bad

4    rep?  Did you mean bad reputation?

5         A.   Yeah.

6         Q.   And why did he have a bad reputation?

7         A.   I -- I don't know.  That's just his reputation.

8         Q.   All right.  How did you learn of the bad

9    reputation?

10        A.   Just talking in the hallways.  I -- that was

11   his reputation.

12        Q.   Do you recall a conversation talking in the

13   hallways with respect to his bad reputation?

14        A.   Not -- not specifically.

15        Q.   Do you recall anyone besides Dr. Roe that you

16   would have had a conversation about his bad reputation?

17        A.   I mean, I don't --

18              MR. SKINNER:  Object to form, and

19   mischaracterizes --

20              THE WITNESS:  -- I don't know.

21              MR. SKINNER:  -- the witness's testimony.

22              THE WITNESS:  I don't know.  I don't know.

23              MR. SKINNER:  And, Mr. Brown, just to make

24   sure the record is clear, so when counsel interposes an

25   objection, if we could just make sure we can avoid

78

1    crosstalk.  So object to form.  Objection,

2    mischaracterizes the witness's testimony.

3              MR. WAREHAM:  Mischaracterize is not an

4    appropriate objection.  I understand your objection to

5    form.

6              THE WITNESS:  So what's the question?

7        Q.  (BY MR. WAREHAM)  Was there ever a time --

8    well, do you recall anyone having -- or having a

9    conversation with anyone in the hallway, as you just

10   described, about Captain McVeigh's bad reputation?

11       A.  No.  It's just a memory I have that he had a

12   bad reputation.

13       Q.  Okay.  Did do you have an opinion as to his

14   reputation?

15       A.  I mean, it -- it sounded like him.

16       Q.  And why do you say it sounded like him?

17       A.  Just the way he -- I don't know.  Just -- it's

18   just -- I -- I don't know.  Just -- just with the things

19   he's done.  I -- I don't really remember specifically.

20       Q.  What are the things he's done that you just

21   referred to?

22       A.  I -- I don't remember.  I just -- I have a

23   memory that he does have a -- like, a reputation for --

24   for doing that.

25       Q.  All right.  Have -- do you recall ever

79

1  describing to Dr. Roe that Captain McVeigh had tried to

2  adversely affect other people's projects before?

3           MR. SKINNER:  Objection, form.

4           THE WITNESS:  All I -- all I can -- all I

5  remember is -- I don't remember that.  All I remember

6  about McVeigh is that he has a bad reputation.

7      Q.  (BY MR. WAREHAM)  Was there ever a time where

8  you interacted with Captain McVeigh where -- that

9  supported your opinion about his bad reputation?

10     A.  He wanted to get one of his projects funded and

11 we weren't supportive of it.  That's about it.

12     Q.  And what did he do in that instance?

13     A.  I don't know.  I don't -- I mean, nothing

14 really exactly.  Nothing really that -- it just feels a

15 little -- I guess.  Yeah.

16     Q.  Did he appear upset that you didn't want to

17 fund?

18     A.  Yeah.

19     Q.  What did he say?

20     A.  Or the -- the office didn't want to fund it,

21 the section.  I don't remember.

22     Q.  Did he yell?  Was his voice elevated?

23     A.  No.

24     Q.  Okay.  Did he call names?

25     A.  No.

80

1      Q.  Did he threaten anyone?

2      A.  No.

3      Q.  What fact of any kind led you to understand or

4  relate to your opinion in that instance as to his bad

5  reputation?

6      A.  I don't remember specifics.

7      Q.  Was -- are you describing a general feeling,

8  then?

9      A.  Yeah.  It's just -- it's been, what, five

10  years.

11      Q.  Can you tell me if Project A and B were

12  competitors?

13      A.  I can't talk about that type of stuff.

14      Q.  Do you ever recall making a phrase to Dr. Roe,

15  "McVeigh has a history of targeting people or projects

16  that compete with his"?

17      A.  No.  I would just -- it would just be the bad

18  rep if I said something, but I don't remember that.  I

19  don't recall any of that.

20      Q.  Would there be anyone else that would hold, to

21  your knowledge, this opinion about Captain McVeigh's bad

22  reputation?

23      A.  I don't -- I don't know.  I don't remember.  A

24  lot of people have been in and out of the office.

25      Q.  Have you ever discussed Captain McVeigh in a

(210) 558-9484  Fax

**Koole Court Reporters of Texas**
myreportingfirm@gmail.com

210-558-9484

EXHIBIT 7
Page 80 of 218

Daniel D.S. Brown                                    CONFIDENTIAL TRANSCRIPT
March 24, 2025

                                                                        81

1    negative way with any person?

2                   MR. SKINNER:  Object to form.

3                   THE WITNESS:  Have I ever?  Maybe.  I don't

4    know.

5         Q.  (BY MR. WAREHAM)  Do you recall anyone you

6    would have spoken with?

7         A.  No.

8         Q.  During the 2020, 2021 time frame -- or excuse

9    me -- the 2019, 2020 time period --

10        A.  Say it again.  What time period?

11        Q.  2019 to 2020.

12        A.  Okay.

13        Q.  Can you please give me the names of the

14   individuals you recall working at Air Force Life Cycle

15   Management Center?

16        A.  Major Gaglio.

17        Q.  All right.

18        A.  Major Williams.

19                   MR. SKINNER:  Sorry.

20                   MR. WAREHAM:  Did you hear that?

21                   MR. SKINNER:  I couldn't hear.

22        Q.  (BY MR. WAREHAM)  Would you repeat your answer

23   for those two so --

24        A.  Major Gaglio and Major Williams.

25        Q.  Anyone else?

Daniel D.S. Brown                           CONFIDENTIAL TRANSCRIPT
March 24, 2025

                                                                    82
1        A.  Those are the main people I associated with.

2        Q.  Was there anyone else in the office at that

3   time?

4        A.  Anyone else?  I mean, there's tons of people in

5   the office.

6        Q.  Who do you recall being in the office?

7        A.  Oh, there's a lot.  I mean, that -- that would

8   be associated with this, like, in any way?

9        Q.  Yes.

10       A.  I mean, it's -- it's all compartmentalized, so

11  those would be the two people.

12       Q.  Would the names of the individuals be --

13       A.  No.

14       Q.  -- compartmentalized?

15               MR. SKINNER:  Object.

16               THE WITNESS:  No.  I'm just saying, like,

17  you don't -- like, most offices --

18               MR. SKINNER:  I'm sorry, Jason.  I couldn't

19  hear your question.

20       Q.  (BY MR. WAREHAM)  Would the names of the --

21               MR. SKINNER:  I did -- I did not hear your

22  question.

23               MR. WAREHAM:  Yes.

24       Q.  (BY MR. WAREHAM)  Would the names of the

25  individuals --

83

1      A.   I'm just saying, like, most people wouldn't be
2  associated with the project --
3      Q.   Okay.
4      A.   -- because they're not working the projects.
5      Q.   Can you list anybody who was associated with
6  Project A?
7      A.   Those are the -- those would be the only people
8  that would have -- and McVeigh.
9      Q.   Can you list anyone associated with Project B?
10     A.   I -- I can't.  I'm not supposed to talk about
11 Project B.
12     Q.   Can you list anyone that was in administration
13 within HNCO?
14     A.   What do you mean by "administration"?
15              MR. SKINNER:  Object to form.
16     Q.   (BY MR. WAREHAM)  Administration meaning
17 management of the office or personnel.
18     A.   Eckholm.
19              MR. SKINNER:  Object to form.
20              THE WITNESS:  Eckholm.
21     Q.   (BY MR. WAREHAM)  Eckholm.
22              Anyone else?
23     A.   I don't even know who is at -- Mark Fantasia.
24     Q.   Did you say Fantasia?
25     A.   Yeah.

84

1          MR. WAREHAM:  Did you hear that answer,

2   Reggie?

3          MR. SKINNER:  Yes.

4          THE WITNESS:  Mark Fantasia.

5      Q.  (BY MR. WAREHAM)  Let's back up and talk about

6   when you first met Captain McVeigh.  Do you recall that?

7      A.  No.

8      Q.  How long have you worked with Captain McVeigh?

9      A.  I don't know.  A couple years.

10     Q.  From what time period to what time?

11     A.  I don't know.  I don't remember.

12     Q.  Would it have been before 2019?

13     A.  I -- yeah.

14     Q.  Was it before Dr. Roe arrived?

15     A.  Probably.

16     Q.  What work did you do with Captain McVeigh?

17     A.  I think just the Fibonacci.

18         MR. SKINNER:  Didn't hear it.  Hands on the

19   mouth.

20         THE WITNESS:  I think -- I think just the

21   Fibonacci.

22     Q.  (BY MR. WAREHAM)  Did you work on any other

23   projects besides Fibonacci with Captain McVeigh?

24     A.  I think that's the only one.

25     Q.  In the -- not relative to other's people's

85

1  reputation, have you formed an opinion as to

2  Captain McVeigh?

3              MR. SKINNER:  Object to form.

4              THE WITNESS:  Yeah.  I think the

5  reputation's probably right.

6      Q.  (BY MR. WAREHAM)  And why do you say that?

7      A.  Just -- I -- I don't remember, but it's just

8  the feeling I have right now.  I'm not -- and I'm not

9  going to remember everything that ever happened to me.

10 Like -- like, this wasn't, like -- I don't know.

11 This -- this is, like, five years ago.  So I'm not -- I

12 don't remember exactly the specifics for me to recite

13 here.  Like, I -- I don't remember the exact specifics

14 for me to recite.

15     Q.  Okay.  Would you want to work with

16 Captain McVeigh again?

17     A.  No.

18     Q.  Why not?

19     A.  Because he just -- he's just -- he does seem

20 cutthroat.

21     Q.  And what are you basing that on?

22     A.  Just -- oh, what else did he do?  He tried to

23 get me off a project because of this incident, another

24 project.

25     Q.  Can you please tell me more about that?

Daniel D.S. Brown                                    CONFIDENTIAL TRANSCRIPT
March 24, 2025

86

1        A.  I don't remember.

2               MR. SKINNER:  I can't -- I'm sorry.  I

3  couldn't hear the witness's response.

4               THE WITNESS:  He tried to get me off a

5  project unrelated to this because of this, but -- but it

6  was because of this.

7        Q.  (BY MR. WAREHAM)  Okay.  I want to unpack that

8  a bit.  What was the project that was unrelated to this

9  that he tried to take you --

10       A.  I can't talk about it.  I can't talk about it.

11       Q.  All right.  I'm going to, for the purposes of

12  this, call that Project C.  Okay?

13              Relative to Project C, how did he try to

14  remove you?

15       A.  I -- I mean, I might be over-blowing it.  He

16  just -- I -- he just made one comment.  And if -- I

17  forget -- I -- I forget how it was.  He just made one

18  comment.  And then, like, I knew if it was -- if -- if

19  it was answered in one way, he'd -- he tried to take

20  me -- take me off of it, but it was -- it -- it resolved

21  quickly.

22       Q.  What was the comment?

23       A.  I don't remember.

24       Q.  If I'm understanding you correctly, if you --

25  you felt that if you made a comment that he didn't like,

CONFIDENTIAL TRANSCRIPT

87

1   he would try to take you off Project C?

2        A.   No.  I forget -- I forget what it was.  It was

3   just a -- a comment -- it was right around the time that

4   this happened.  Like, the same day.

5        Q.   August 13, 2020?

6        A.   Or the day after.  Something.  I don't know.

7   It was around that same time.

8        Q.   Uh-huh.

9        A.   I don't remember what it was.  But I -- it was

10  just, like -- I don't remember the -- I -- I can't

11  remember all these things.  Like, what did he say?  I --

12  like, how am I going to remember all these things that

13  happened on all these different days five years ago?

14  It's, like -- this is nuts.  I -- I don't remember

15  exactly what he said, but I just have this memory that

16  if it was answered in a certain way, like, I -- I didn't

17  have to worry about it, because what I -- everything was

18  true with -- I know if it was answered in some way he

19  would try to get me off the project.

20       Q.   Okay.  And when you say "try to get you off the

21  project," what kind of things could he do or did he do

22  for those -- that purpose?  Not specifically, but what

23  could he do?

24       A.   He could just --

25            MR. SKINNER:  Object to form.

Daniel D.S. Brown
March 24, 2025

CONFIDENTIAL TRANSCRIPT

88

 1          THE WITNESS:  -- make a recommendation.
 2     Q.  (BY MR. WAREHAM)  A recommendation to whom?
 3     A.  To Eckholm I would suppose.
 4     Q.  And when you said earlier that it was because
 5 of this, what do you mean by "because of this"?
 6     A.  Just because of that memory I have where he
 7 tried -- where I thought -- I think he was trying to get
 8 me off the project.
 9     Q.  Well, you -- if I recall your testimony, it was
10 he would try to get you off the project that was
11 unrelated to this --
12     A.  Yeah.
13     Q.  -- because of this.
14     A.  Correct.
15     Q.  And I want to -- that second part of the
16 phrase, is that because of Dr. Roe and --
17     A.  Yeah.
18     Q.  Okay.  And why would he try to target you
19 because of Dr. Roe's August 13, 2020 --
20     A.  I -- I don't know.  I'm just speculate --
21          MR. SKINNER:  Object to form.
22          THE WITNESS:  -- I'm just speculating.
23     Q.  (BY MR. WAREHAM)  Okay.
24     A.  I assume because if we weren't supportive of
25 his other project.

89

1      Q.  And so you were not supportive of his other

2  project?

3      A.  Of the -- of the -- like, it wasn't -- it's

4  not -- nothing -- no project reference here.  It's just

5  he wanted to fund one of his other projects and we

6  weren't supportive of it.

7      Q.  And did he blame Dr. Roe for that?

8      A.  No.

9              MR. SKINNER:  Object to form.

10             THE WITNESS:  That's just the only thing I

11  can think of why he would be mad at me.

12     Q.  (BY MR. WAREHAM)  Was he mad at you at any

13  point?

14     A.  I -- I don't know.  But he -- he made that

15  comment.  It just made me kind of like -- like, it

16  was...

17     Q.  And what was the comment?

18     A.  I -- I don't remember.

19     Q.  Okay.  Where was the comment?

20     A.  In the office.

21     Q.  In the hallway?  In your office?

22     A.  In my office.

23     Q.  He came to your office?

24     A.  Yeah.

25     Q.  Was -- to your recollection, was the nature of

90

1    the comment threatening?

2        A.  No.

3                MR. SKINNER:  Object to form.

4        Q.  (BY MR. WAREHAM)  How would you describe the

5    feelings around the comment?

6        A.  I -- I don't know.  It's just, like, I know he

7    was just trying to, like -- I felt like he was just

8    trying to, like, get me off the project because of

9    this -- because of what happened with Roysdon.

10       Q.  And I want to be clear.  In that conversation

11   that -- when you say "what happened to Roysdon," define

12   what that means, please.

13       A.  He was surprised that Roysdon was working as a

14   contractor while he was working for NSA.

15       Q.  And why --

16       A.  He felt it was a conflict of interest.

17       Q.  Did he hold that against you?

18       A.  Maybe.  I guess so, yeah.

19       Q.  Why?

20       A.  Because I was working on the program.

21       Q.  Did you introduce Roysdon to GITI?

22       A.  I -- I don't remember how GITI and Roysdon met.

23       Q.  Okay.  So he thought it -- did he communicate

24   to you that he thought you knew about the contractor

25   status?

91

1          MR. SKINNER:  Object to form.

2          THE WITNESS:  It -- it was in all the

3    documents.  Like, it's not a secret.

4        Q.  (BY MR. WAREHAM)  Right.

5            But why was he upset with you?

6        A.  I guess because I hadn't told him.

7        Q.  And he thought it was your job to tell him that

8    Dr. Roe was a contractor?

9        A.  Yeah.  I guess so.  So he said to -- he said,

10   "Do you have an email -- do you have an email from his

11   employer, NSA, that says he can do this?"

12           And I said, "no."

13           And then we asked Roysdon to provide that

14   email.  And then, if I remember correctly, the email was

15   provided, but it was summarized.  It wasn't -- I

16   don't -- I don't believe it was the original unredacted

17   email.  It was, like, summarized with certain port- --

18   portions taken out, so that made McVeigh more upset.

19       Q.  Why?

20       A.  Because it wasn't the original email, I

21   believe.

22       Q.  And he was upset with you over that?

23       A.  I mean, I don't know with me or what, but just

24   he was upset.

25       Q.  Was Captain McVeigh a contracting

1    representative for Air Force Life Cycle Management

2    Center?

3        A.  I -- I don't know.

4        Q.  So I'm struggling this entire time with how a

5    captain in the Air Force -- you've been around the Air

6    Force for a while?

7        A.  Uh-huh.

8        Q.  I'm struggling this entire time about how a

9    captain in the Air Force has any authority at the level

10   that you've represented that he has authority.  Can you

11   help me understand that?

12       A.  He was in charge of that area.

13               MR. SKINNER:  Object to form.  And --

14       Q.  (BY MR. WAREHAM)  What is that area?

15               MR. SKINNER:  And, Jason, I -- Jason, I

16   didn't hear your question, so -- you kind of turned away

17   from the microphone.

18               MR. WAREHAM:  I'm sorry.  Yeah.  I

19   didn't -- where is the mic that --

20               MR. SKINNER:  Do you want to summarize your

21   question?

22               MR. WAREHAM:  Okay.  The mic's over there.

23               MR. SKINNER:  Jason?

24               MR. WAREHAM:  Yeah.  I'll summarize.

25       Q.  (BY MR. WAREHAM)  So I've struggled with

(210) 558-9484  Fax

Koole Court Reporters of Texas
myreportingfirm@gmail.com
EXHIBIT 7
Page 92 of 218

210-558-9484

Daniel D.S. Brown
March 24, 2025

CONFIDENTIAL TRANSCRIPT

93

1   understanding how much Captain McVeigh's authority has

2   been in this as a captain in the Air Force; right?

3              And I -- if you can help me understand.

4       A.   Captains are in charge of a lot of things.

5       Q.   What -- what specifically was he in charge of?

6       A.   He was in charge of special projects.

7       Q.   Okay.  And when we say "special projects" --

8       A.   That was the name of the section.

9       Q.   Okay.  So he was the officer in charge of

10  special projects?

11      A.   Yeah.

12      Q.   Did he oversee contracts for special projects?

13      A.   I don't know.

14      Q.   Did he approve or disapprove funding for

15  special projects?

16      A.   I can't talk about that.

17      Q.   Okay.  Did he write performance evaluations for

18  special projects?

19      A.   I don't know.

20      Q.   Did he write your performance evaluation?

21      A.   No.

22      Q.   Did he write Dr. Roe's performance evaluation?

23      A.   Not that I'm aware of.

24      Q.   Did he have direct command authority over any

25  person in Air Force Life Cycle Management Center?

Daniel D.S. Brown
March 24, 2025

CONFIDENTIAL TRANSCRIPT

94

1    A.   Probably.

2    Q.   Who?

3    A.   I don't remember.  People in his section.

4  That's the way it works.

5    Q.   Do you know the names of the people in his

6  section?

7    A.   I don't remember.

8    Q.   Do you recall the ranks of the people in his

9  section?

10   A.   I don't remember.

11   Q.   Do you recall if there's --

12   A.   I mean, I'm sure there's 13s and 12s.

13   Q.   13s and 12s.

14        Were there any active duty in his section

15  besides him?

16   A.   I don't remember.

17   Q.   Were you aware of an OSI investigation being

18  launched relative to Dr. Roe?

19        MR. SKINNER:  Object to form.

20        THE WITNESS:  Not an investigation.

21   Q.   (BY MR. WAREHAM)  What -- what were you aware

22  of?

23   A.   I wasn't --

24        That they want to talk to him.  That's all

25  I knew.

Daniel D.S. Brown                                    CONFIDENTIAL TRANSCRIPT
March 24, 2025

95

1        Q.  How did you learn that?

2        A.  In one of the meetings.

3        Q.  What meeting?

4        A.  I -- I don't know.  Around this time frame

5    there were discussions about this.

6        Q.  Who was discussing it?

7        A.  McVeigh.  I -- I'm -- yeah.

8        Q.  McVeigh?

9        A.  I -- I don't remember exactly, like -- I just

10   -- I know that OSI wanted to talk to him.  I mean, it's

11   not like a formal meeting.  It's just, like -- yeah.

12       Q.  So informal or not, what was the meeting that

13   you recollect?

14       A.  All I remember is that OSI wanted to talk to

15   him.

16       Q.  All right.  And you learned that from

17   Captain McVeigh?

18       A.  I don't remember where I learned it from.

19       Q.  Okay.  Were you aware of anyone besides

20   Captain McVeigh that knew about that information?

21       A.  I would imagine the commander would know.

22       Q.  Who is the commander?

23       A.  Eckholm.

24       Q.  Do you ever recall any conversation where you

25   discussed OSI with Captain McVeigh?

Daniel D.S. Brown
March 24, 2025

CONFIDENTIAL TRANSCRIPT

96

1        A.  No.

2                   MR. SKINNER:  Hey, Jason?

3                   MR. WAREHAM:  Yeah.

4                   MR. SKINNER:  We're having the same issue

5    with -- like, when you put your glasses in your mouth,

6    it's kind of hard to hear your question.

7                   MR. WAREHAM:  Sorry about that.  I saw it

8    in a movie.

9        Q.  (BY MR. WAREHAM)  All right.  Did you ever

10   observe anyone identified as OSI, belonging to OSI,

11   enter the Air Force Life Cycle Management Center spaces?

12                  THE COURT REPORTER:  Spaces?

13                  MR. WAREHAM:  Spaces.  Excuse me.

14                  THE WITNESS:  Yes.

15       Q.  (BY MR. WAREHAM)  What did you observe?

16       A.  I observed OSI entering the building.

17       Q.  Say that again.

18       A.  I observed OSI entering the spaces.

19       Q.  Okay.  And where were you?

20       A.  In the hallway.

21       Q.  All right.  And what -- where did the OSI agent

22   go?

23       A.  I don't remember.  Maybe the security office.

24   I don't know.

25       Q.  Okay.  Did the OSI -- did OSI ever interview

97

1    you with respect to Dr. Roe?

2        A.   I don't remember.

3        Q.   Did you ever meet the agent that you observed

4    entering the spaces?

5        A.   Yeah.

6        Q.   Where did you meet him?

7        A.   When we talked about -- in my office when we

8    talked about Fibonacci.

9        Q.   And when did you talk about Fibonacci with that

10   agent?

11       A.   I -- multiple times.

12       Q.   All right.  Why did you talk about Fibonacci

13   with that agent?

14       A.   I don't know if I'm allowed to discuss it.

15       Q.   Because it's a project or because of the

16   investigation?

17       A.   Not related to the investigation.

18       Q.   Okay.  Was it at all related to Dr. Roe?

19       A.   No, not that I remember.

20       Q.   Was it after the August 13, 2020, meeting?

21       A.   It was probably beforehand.

22       Q.   Was the agent -- do you know why the agent was

23   investigating that -- the Fibonacci project prior --

24       A.   He wasn't investigating it.

25       Q.   Okay.  Do you know why he was asking questions

98

1    of it?

2         A.  No.  We asked him to come.  You don't

3    understand the way OSI works.  And I don't know what I

4    can say about it.  It was not related to the -- what

5    I'm -- like, it's not related to any investigation.

6         Q.  Besides that instance, did you communicate with

7    the -- do you remember the OSI agent's name?

8         A.  I think it's Alan Beal.

9         Q.  Besides that instance, did -- do you recall

10   communicating any subsequent time with Agent Alan Beal?

11        A.  I don't remember.

12        Q.  Okay.  Do you recall when you were talking to

13   him if he took notes?

14        A.  I would --

15             THE COURT REPORTER:  "He took notes"?

16             THE WITNESS:  -- I would imagine --

17             MR. WAREHAM:  He took notes.

18             THE WITNESS:  -- I would imagine he

19   wouldn't.

20        Q.  (BY MR. WAREHAM)  What's that?

21        A.  I would imagine he would not, but I don't

22   remember.

23        Q.  Okay.  Are you aware of any allegations that

24   were made to OSI regarding Dr. Roe?

25        A.  No.

99

1      Q.  Did McVeigh ever discuss engaging OSI with

2  respect to Dr. Roe?

3      A.  I don't know McVeigh's discussion with OSI.

4      Q.  Did you ever observe McVeigh interact with

5  Agent Beal?

6      A.  Ever, I don't know.  But not about Roe.

7      Q.  Do you recall ever informing Dr. Roe that

8  Captain McVeigh was sharing his information all over the

9  office?

10     A.  No.

11     Q.  Do you recall --

12     A.  I --

13     Q.  -- any conversation --

14             Go ahead.

15     A.  No.  No.  No.

16             MR. SKINNER:  I -- if we can --

17             THE WITNESS:  No.

18             MR. SKINNER:  -- just try to keep it --

19  yeah.  Thank you.  But if we can keep the question and

20  answer format for our benefit, as well as the court

21  reporter's.

22             THE WITNESS:  I was not involved in that

23  investigation.  Like -- I'm, like -- I don't know

24  anything about the investigation.

25     Q.  (BY MR. WAREHAM)  Do you recall ever -- well --

100

1    and this isn't relative to the investigation, so let me

2    clarify.

3                    Do you ever recall saying anything to

4    Dr. Roe regarding McVeigh communicating his information

5    to others --

6        A.   No.

7        Q.   -- in the office?

8        A.   No.

9        Q.   Do you recall a phone call in August 2020 where

10   you told Dr. Roe "You can never work at HNCO again"?

11       A.   No.

12       Q.   Do you recall a conversation in September 2021

13   with Dr. Roe where you said the same thing?

14       A.   No.

15       Q.   Right now in this moment, are you aware if

16   Dr. Roe would be able to work at HNCO again?

17                    MR. SKINNER:   Form.

18                    THE WITNESS:   The -- the contracting

19   process is a -- I don't see why he wouldn't be able to

20   work.

21       Q.   (BY MR. WAREHAM)   Okay.   Do you know why

22   Dr. Roe was read out of those programs?

23       A.   I can speculate, but I don't know why.

24                    MR. SKINNER:   Form.

25       Q.   (BY MR. WAREHAM)   Well, let's hear your

Daniel D.S. Brown
March 24, 2025

CONFIDENTIAL TRANSCRIPT

                                                      101

1    speculation and then we'll unpack it.

2                 MR. SKINNER:  Object to form.

3                 THE WITNESS:  I -- that he was working in a

4    dual capacity.  They -- they just thought it was -- I

5    think they just overreacted because he was working in a

6    dual capacity.  Like, it's not uncommon for someone that

7    starts an idea to want to work on it.  I don't know,

8    like, why that was considered so bad.

9        Q.  (BY MR. WAREHAM)  And when you say "they

10   overreacted," who was that?

11       A.  I think McVeigh.

12       Q.  All right.  Were you ever instructed not to

13   talk to Dr. Roe?

14       A.  I don't -- I don't know.  I don't think so.

15       Q.  Were you ever instructed not to talk to Dr. Roe

16   for a year?

17       A.  I don't believe so.

18       Q.  What do you recall about any comments about

19   Dr. Roe after he was read out?

20       A.  They were -- they were mainly mistrusting of

21   him because he was working in a dual capacity.  And then

22   it got worse because they asked for, like -- they --

23   they wanted to get proof from his employer, his NSA

24   employer, that NSA had sanctioned him working in the

25   dual capacity.  And when they did not get -- I believe

Daniel D.S. Brown
March 24, 2025

CONFIDENTIAL TRANSCRIPT

102

1   they did not get -- they were not -- we were -- they did

2   not get the complete unredacted email, that made them

3   even more suspicious.  And then I think he -- around

4   this time he quit NSA, and that made it even worse.

5        Q.  Why did that make it worse?

6        A.  Because it was just the timing of it.  I -- I

7   don't remember exactly when he quit, though.

8        Q.  What do you recollect people saying about...

9        A.  It just -- I mean, it just put him in a bad

10  light.

11       Q.  According to who?

12       A.  I mean, I just -- I mean -- I mean, to everyone

13  it would look bad.  I mean, like -- I don't know.  I

14  just -- I just thought it didn't look good either.

15       Q.  Are you aware if Dr. Roe was ever given a

16  debarment order?

17       A.  No.

18       Q.  You're not aware or he wasn't?

19       A.  I'm not aware of that.

20       Q.  Are you aware if Dr. Roe was ever given a

21  hearing on --

22       A.  I have no --

23       Q.  -- a debarment?

24       A.  -- I have no idea.

25       Q.  Were you ever informed of why -- did anybody

CONFIDENTIAL TRANSCRIPT

103

1    ever tell you why they wanted to exclude Dr. Roe from

2    HNCO?

3                    MR. SKINNER:  Object to -- object to form.

4                    THE WITNESS:  I don't remember, like, them

5    saying anything about excluding him specifically.  They

6    just were mistrusting of him because of what I just

7    described.

8        Q.  (BY MR. WAREHAM)  But he was eventually read

9    out; right?  It wasn't just a mistrust?

10       A.  That's OSI's jurisdiction.

11       Q.  OSI has jurisdiction over who is read in and

12   who is read out?

13       A.  I mean, like, they're one of the key people.

14       Q.  Are they classification authorities for these

15   projects?

16       A.  I don't know.  I mean, I -- maybe.  I don't

17   know.  I don't know.

18       Q.  Do you recall having a conversation with

19   Dr. Roe in January of 2023 relevant to his work at

20   Leidos?

21       A.  He presented -- he presented -- I'm not sure of

22   the specifics, but he did provide a demo.

23       Q.  In January 2023?

24       A.  I think it was later in April.

25       Q.  In April 2023?

104

1    A.  Around there somewhere.  I -- I don't remember
2   the exact dates, but there was a demo that he provided.
3    Q.  Between January and April 2023, do you recall
4   ever informing members of Leidos that, quote, "Dr. Roe
5   could not be present at Leidos Cyber AI briefings due to
6   events at HNCO"?
7    A.  I -- I wouldn't characterize it like that.
8    Q.  How would you characterize it?
9    A.  That it probably wouldn't be, like -- I don't
10  know.  I don't remember exactly, but I wouldn't
11  characterize it like that.  It probably wouldn't be,
12  like, maybe good optically, I guess.
13   Q.  Why?
14   A.  Because of everything that happened.
15   Q.  Do you recall ever having conversation with a
16  Mr. Todd Jasper saying that --
17   A.  I -- I've talked to him.
18   Q.  Okay.
19          -- saying that Dr. Roe can't be in the room
20  when he -- when presenting on Leidos topics?
21   A.  I don't -- I don't recall that, but he was in
22  the room presenting Leidos stuff in --
23   Q.  What?
24   A.  -- demo in April.
25   Q.  Was he in the room --

(210) 558-9484  Fax

**Koole Court Reporters of Texas**
myreportingfirm@gmail.com
EXHIBIT 7
Page 104 of 218

210-558-9484

Daniel D.S. Brown
March 24, 2025

CONFIDENTIAL TRANSCRIPT

1    A.   He provided -- he provided the demo on telcon.

2    Q.   Was he in the room in the January 2023 meeting?

3    A.   I don't remember a meeting in January 2023.

4    Q.   Do you remember a meeting in March 2023?

5    A.   There might have been a meet -- a demo

6  possibly, in March.

7    Q.   Do you recall him presenting?

8    A.   No.  But he did present in April of -- I -- I

9  believe.  He did present a -- I'm pretty sure he

10  presented, but I believe it's in April of 2023.

11    Q.   Do you recall ever informing --

12    A.   And that -- that did not garner any attention.

13    Q.   Okay.

14    A.   And it -- and I was -- I -- I -- it was -- it

15  was described to me earlier by, I believe, Todd about

16  the technologies.  And when it was presented, it did not

17  live up to its claims.

18    Q.   Do you recall ever making the statement

19  "Dr. Roe cannot associate his name with Leidos Cyber AI

20  products"?

21    A.   No.

22    Q.   Do you ever remember --

23    A.   He -- he actually presented, though.

24    Q.   Do you ever recall making a communication that

25  was similar in substance?

Daniel D.S. Brown
March 24, 2025

106

1      A.  No.

2      Q.  Did you ever describe Dr. Roe -- Dr. Roe's

3  impact at HNCO after he was removed from the program?

4      A.  Say it again.

5              MR. SKINNER:  Object to form.

6              THE WITNESS:  Say it again.

7      Q.  (BY MR. WAREHAM)  Do you recall any

8  conversations where you discussed Dr. Roe's prior

9  experience with HNCO after he was separated from the

10  program?

11              MR. SKINNER:  Objection.  Objection, form.

12              THE WITNESS:  The main thing I remember is

13  that he demoed the projects.  It did not garner any

14  attention.  The projects were nowhere near to what it

15  was described to me by Todd Jaspers and there was no

16  interest garnered.  And I was very vocal that this is

17  not -- it did not live up to expectations or the way it

18  was previously described.

19      Q.  (BY MR. WAREHAM)  Have you ever emailed about

20  Dr. Roe in any form?

21      A.  About him?

22      Q.  Uh-huh.

23      A.  I don't remember.

24      Q.  Have you ever sent emails, to your

25  recollection, where he was in the "to" line?

1      A.   Probably.

2      Q.   Can you estimate the number of times?

3      A.   I don't know.  This is, like, a catch-22.

4  Like, how am I going to remember all my emails?  I mean,

5  he worked on the project, so I'd have to send him

6  emails.

7      Q.   And what systems would those emails have been

8  on?

9      A.   NIPR.

10     Q.   All right.  Any other systems?

11          MR. SKINNER:  Sorry.  What was the

12  question?

13     Q.   (BY MR. WAREHAM)  Any other systems?

14     A.   Yeah.  When he worked at NSA.

15     Q.   What other systems?

16     A.   JWICS.

17          MR. SKINNER:  Was the answer JWICS?

18          THE WITNESS:  Yes.

19     Q.   (BY MR. WAREHAM)  Okay.  Any other systems?

20          MR. SKINNER:  And --

21          MR. WAREHAM:  Oh, go ahead.

22          MR. SKINNER:  Hands.  Hands over the mouth.

23     Q.   (BY MR. WAREHAM)  Okay.  Any other systems?

24     A.   I don't believe so.

25     Q.   Were you ever aware of an inspector general's

Daniel D.S. Brown                                    CONFIDENTIAL TRANSCRIPT
March 24, 2025

108

1    inv- --

2          A.  No.

3          Q.  Okay.  I'll finish the question and then you

4    answer it.  Okay?

5          A.  Okay.

6          Q.  Were you ever aware of an inspector general's

7    investigation related to Dr. Roe?

8          A.  No.

9          Q.  Were you ever asked to produce emails relevant

10   to that investigation?

11         A.  No.  I wasn't aware of the investigation.

12         Q.  All right.  It goes without saying that you

13   weren't interviewed, then, for that investigation?

14         A.  About Dr. Roe, no.  I don't remember any -- I

15   don't remember being interviewed about Dr. Roe.

16         Q.  Do you recall an OSI agent emailing you in an

17   attempt to discuss Dr. Roe?

18         A.  I don't recall that.

19         Q.  Do you recall ever advising Dr. Roe to avoid

20   conversations with -- with Captain McVeigh?

21         A.  I don't recall.

22              MR. SKINNER:  Objection.

23              THE WITNESS:  I don't recall.

24              MR. SKINNER:  Object to form.

25         Q.  (BY MR. WAREHAM)  Do you ever recall

109

1 conversations with Dr. Roe where you described

2 Captain McVeigh as having an extensive history of

3 targeting competitors?

4      A.  Not like that, no.  The most I would have said

5 is his reputation, if I said that.

6      Q.  Do you think that you communicated about his

7 reputation to Dr. Roe?

8      A.  I don't -- I don't know.  I don't remember.

9      Q.  Would you ever engage in any email

10 communication discussing Captain McVeigh's reputation?

11      A.  I don't think so.

12      Q.  Can you describe what systems Air Force Life

13 Cycle Management Center used regarding these projects

14 that we described?

15                MR. SKINNER:  Objection, form.

16                THE WITNESS:  I don't know what systems I

17 can describe in this setting.

18      Q.  (BY MR. WAREHAM)  Do you believe the existence

19 of the systems are themselves classified?

20      A.  It's possible.

21      Q.  What number of systems would exist?

22      A.  Oh, God, I don't know.

23                MR. SKINNER:  Objection, form.

24                THE WITNESS:  I -- I can't -- I don't want

25 to say.  It just changes constantly.  I -- I can't --

Daniel D.S. Brown                                CONFIDENTIAL TRANSCRIPT
March 24, 2025

                                                                    110

1   yeah.

2        Q.  (BY MR. WAREHAM)  What number of systems --

3        A.  I --

4        Q.  -- were in place --

5        A.  -- I don't know if I can say.

6        Q.  -- in August of 2020?

7        A.  What?

8        Q.  What number of systems were being used by Air

9   Force Life Cycle Management Center --

10                  MR. SKINNER:  Objection.  Objection, form.

11       Q.  (BY MR. WAREHAM)  -- in August 2020?

12       A.  Number of systems?  I -- maybe four.  I don't

13  -- I don't know.

14       Q.  Did you ever have a conversation with

15  Todd Jasper where you said, "I just need to be put under

16  oath so I can have protection for what I say"?

17       A.  No.  No.  Absolutely not.

18       Q.  Did you ever communicate that in sum or

19  substance?

20       A.  No.

21       Q.  You seemed upset by that question.  Can you

22  help me --

23       A.  Yes.

24       Q.  Why are you upset?

25       A.  Because.  It's outrageous.

Daniel D.S. Brown                                    CONFIDENTIAL TRANSCRIPT
March 24, 2025

111

1      Q.  Why?

2      A.  Because it's not accurate.  I've never

3 communicated like -- something like that.  No way.  A

4 lot of these statements are -- are exaggerated or lies.

5      Q.  All right.  Would you identify which ones those

6 are?

7      A.  I -- I don't -- I'm not -- I don't have time to

8 go through every single one.  But, I mean, I think it

9 will come out when these -- in this fricking deposition.

10 I don't know anything about OSI investigation.  I don't

11 know about -- I don't know.  I'm not a part of any of

12 that stuff.

13      Q.  Would you please take Exhibit 1, go through and

14 identify any statements you believe to be lies.

15      A.  Oh, God.

16              MR. SKINNER:  What exhibit is Exhibit 1?

17              THE WITNESS:  What's Exhibit 1?  This one?

18      Q.  (BY MR. WAREHAM)  Exhibit 1 is the second

19 amended complaint.

20      A.  They're out -- they're either exaggerated or

21 lies.

22      Q.  Will you please identify each statement you

23 think is an exaggeration or lies.

24      A.  I don't have -- I mean, what if I miss one?

25              MR. SKINNER:  All right.  So -- so you're

Daniel D.S. Brown                                          CONFIDENTIAL TRANSCRIPT
March 24, 2025

                                                                              112

 1   asking the witness, for the record, to go through --

 2                   THE WITNESS:  To go --

 3                   MR. SKINNER:  -- a 47-page complaint that

 4   is 255 paragraphs long.  So I'm happy for the witness to

 5   go through that exercise.  My proposal is that we break

 6   for lunch, let the witness have the opportunity to

 7   review the second amended complaint with his counsel,

 8   and then we can reconvene after he's had an opportunity

 9   to -- to perform that exercise.

10                   MR. WAREHAM:  Sounds like a great idea,

11   Reggie.  Thanks.  Yeah, let's do that.

12                   THE VIDEOGRAPHER:  Time off record is

13   12:46.

14                   MR. SKINNER:  All right.  Is that -- I'll

15   ask Mr. -- is that -- well, let's -- we're still on the

16   record.  Are -- are we still on the record?

17                   THE VIDEOGRAPHER:  We're back on the record

18   at 12:46.

19                   MR. SKINNER:  Okay.  Thank you.

20                   Mr. Barrera, you're --

21                   MR. BARRERA:  Yes, sir.

22                   MR. SKINNER:  -- you're counsel for

23   Mr. Brown.  Is that suitable to you, sir?

24                   MR. BARRERA:  I will discuss that with my

25   client, but that's suitable to me.

Daniel D.S. Brown
March 24, 2025

CONFIDENTIAL TRANSCRIPT

113

1          MR. SKINNER:  Thank you, sir.

2          Now we can go off the record.

3          THE VIDEOGRAPHER:  Time off record is

4    12:46.

5          (Recess taken from 12:46 p.m. to 2:14 p.m.)

6          THE VIDEOGRAPHER:  We are now back on the

7    record at 2:14.

8      Q.  (BY MR. WAREHAM)  All right.  Mr. Brown, if you

9    would turn with me -- we'll just kind of go page by page

10   here.  Starting on page 2 of 47.  At the top it says --

11   of Exhibit 1, it says "Jurisdiction and Venue" at the

12   top.  Have you identified anything on that page that is,

13   as you described it, a lie or exaggeration?

14     A.  I -- I don't know.  I haven't -- I haven't read

15   this page.  This was, like...

16     Q.  Okay.  Were you able to review the whole thing

17   or did you just review select portions?

18     A.  I mean, like, I -- I reviewed, like, what I

19   thought were more relevant sections.

20     Q.  Okay.

21     A.  But, like, asking me to go line by line without

22   making a mistake is -- is -- I mean, I think that's,

23   like, completely unfair.

24     Q.  All right.  So where would you start?

25     A.  I mean, like, I'm more focused on things

114

1    that -- that you're accusing me of knowing or things

2    that you're saying I said.  There are a lot of things in

3    this document that are just statements.  And I'm --

4    I'm -- it doesn't really, like, call me out, so I didn't

5    focus on those areas --

6         Q.   Okay.

7         A.   -- because there's a lot of, like,

8    grandioseness in this document and a lot of

9    exaggerations.  And, like, I'm more focused on the ones

10   that you're saying that I would know or that I was a

11   part of in some way.

12        Q.   Okay.  So let's go to the first statement you

13   identify, as you described it, as grandiose,

14   exaggerative.

15        A.   I mean, Number 9 -- oh, sorry -- bullet 9, page

16   4.

17        Q.   Bullet 9, page 4.  Okay.

18        A.   So I don't know -- I -- I was removed from

19   the -- from Fibonacci.  I was removed from special

20   projects, so I don't know the -- the funding -- I'm not

21   allowed to even talk about it, but I wouldn't know what

22   the fundings were.

23        Q.   Okay.  And why were you removed from Fibonacci?

24        A.   Because -- because of -- of McVeigh and his

25   awareness that Roysdon was working in a dual-hat

Daniel D.S. Brown
March 24, 2025

CONFIDENTIAL TRANSCRIPT

                                                           115

1   capacity.

2        Q.  All right.  And you were also removed for

3   special projects for that reason?

4        A.  Yes.

5        Q.  And help me understand what impact that had on

6   your career.

7        A.  I'm --

8                MR. SKINNER:  Object to form.

9                THE WITNESS:  -- I mean, a negative one, I

10  would think.

11       Q.  (BY MR. WAREHAM)  Okay.

12       A.  Yeah.

13       Q.  Can you describe in detail?  I don't know your

14  career well enough to understand.

15       A.  I mean, I -- I don't know for sure, but I would

16  think that 14 -- a 14 position was -- it might have been

17  denied from me.  I don't really know.

18       Q.  Okay.  And so you were removed not only from a

19  project, Fibonacci, but you were also removed from all

20  special projects?

21       A.  Yeah.  Yeah.  Yes.

22       Q.  You were removed from all special projects that

23  were under -- if I recall your testimony, under

24  Captain McVeigh?

25       A.  Yes.

116

1    Q.  And the reason for this that you were given

2  was?

3    A.  I don't know if I was given an exact reason.  I

4  was just removed.  But, I mean, it's because -- I mean,

5  it's not like someone's going to send me an email that

6  says you're removed because of this reason.  It's

7  just -- it's because of Roysdon working in a dual-hatted

8  capacity.

9    Q.  All right.  Did you have some understanding

10  that they blamed you for that?

11    A.  Yeah.  Yeah.

12    Q.  And where did you gain that understanding?

13    A.  In talking to McVeigh.  I don't know.

14    Q.  And what did McVeigh tell you?

15    A.  I don't remember.  I was just -- I was removed

16  from it.

17    Q.  And what time were you removed from it?

18    A.  Maybe a month later.  I'm not sure.

19    Q.  And as you estimated, what -- what impacts did

20  that have to your ability to be promoted?

21          MR. SKINNER:  Object to form.

22          THE WITNESS:  I -- I'm just speculating.  I

23  don't know.  I would -- I would think it would reduce my

24  likelihood of getting a 14.

25    Q.  (BY MR. WAREHAM)  Okay.  Did it impact your,

**Koole Court Reporters of Texas**
**myreportingfirm@gmail.com**

(210) 558-9484  Fax

210-558-9484

EXHIBIT 7
**Page 116 of 218**

Daniel D.S. Brown
March 24, 2025

CONFIDENTIAL TRANSCRIPT

117

1   like, bonuses or anything like that?

2       A.  No.

3       Q.  Did it impact your ability to, like, grow in

4   your career?

5       A.  No.

6               MR. SKINNER:  Object to form.

7       Q.  (BY MR. WAREHAM)  Besides impacting your

8   ability to seek a promotion to 14, what other impacts do

9   you think may have occurred?

10      A.  I don't think there are any other impacts.

11              MR. SKINNER:  Object to form.

12      Q.  (BY MR. WAREHAM)  How did you feel about that?

13      A.  I mean, I didn't like it.  But, I mean, it's,

14  like, just move on.

15      Q.  Did you communicate about your removal to

16  anyone?

17      A.  No.  Because I was, like -- I had too much work

18  anyways, so I was actually -- it was fine with me not to

19  be on that project.

20      Q.  Okay.

21      A.  It was just a lot of work.

22      Q.  Have you since been let back into special

23  projects?

24      A.  No.

25      Q.  Have you attempted to gain access --

Daniel D.S. Brown
March 24, 2025

CONFIDENTIAL TRANSCRIPT

118

```
1        A.  No.

2        Q.  -- back?

3        A.  No.

4        Q.  Who runs special projects now?

5        A.  Oh, I don't know.  Ryan Colizar [PHONETIC], I

6  think.  Major Ryan Colizar.

7        Q.  Do you know when, then, Captain McVeigh

8  departed?

9        A.  I don't remember.  Like, within a year.

10       Q.  Do you have any knowledge if Captain McVeigh is

11 still involved in any --

12       A.  I doubt it.

13       Q.  -- position that would impact --

14       A.  I doubt it.

15       Q.  All right.  And to be clear, impact Air Force

16 Life Cycle Management?

17       A.  Oh, he's still -- he's, like, the

18 PEM [PHONETIC].

19       Q.  He's -- excuse me?

20       A.  He's -- he's not real involved directly.

21       Q.  And when you say he's, like, the PEM, what does

22 that mean?

23       A.  I don't -- I don't -- I don't know exactly all

24 the stuff, but it's, like, big Air Force.  He's not

25 really associated with it.
```

Daniel D.S. Brown
March 24, 2025

CONFIDENTIAL TRANSCRIPT

119

1    Q.  Okay.  All right.  So from Paragraph 9, what

2  was downward into the complaint, Exhibit 1, what other

3  areas did you identify as exaggerative in nature?

4    A.  I mean, a lot of this is just, like -- a lot of

5  this is just, like, hyperbole.  But, like, I'm just

6  focusing on the stuff that's related to me --

7    Q.  Sure.

8    A.  -- or what you're saying that I know.

9    Q.  So to be clear, I'm not saying you know

10  anything.  I'm -- this is an inquiry to understand what

11  you do know.  And so there's not really a wrong answer

12  here.

13    A.  I mean, some of them in here you're saying I'm

14  -- I've said something.  Like, later on it goes into it.

15    Q.  All right.  What is the next area you can

16  identify as something, as you've described, exaggerated

17  or lies or whatever words you used to describe it?

18    A.  Page 14, it's 61.  I don't know of any

19  permanent bar from ever acting as a contract consultant.

20    Q.  Okay.  Meaning, have you ever seen any

21  documentation related to a debarment?

22    A.  I haven't -- I don't know of any bar in any way

23  from him permanently being barred.

24    Q.  Okay.  What is the next area?

25    A.  Page 16, bullet 78.  I don't remember asking

120

1   him to assess something.  McVeigh may have asked him to

2   assess something.

3       Q.  So to be clear, you don't recall him -- you

4   don't recall asking Dr. Roe to assess Captain McVeigh's

5   Project B?

6       A.  Yes.  But it's possible McVeigh asked him, but

7   I don't remember asking this.

8       Q.  Do you recall the February 2020 meeting?

9       A.  No.

10      Q.  All right.  Next?

11      A.  I don't remember anyone complaining about his

12  assessment of Project B on 79.  I don't -- I don't

13  remember anyone complaining about him assessing a

14  project and...

15      Q.  Were you -- do you ever recall a criticism of

16  Dr. Roe of Project B of any kind?

17      A.  No.

18      Q.  Not of Dr. Roe, but Dr. Roe himself criticizing

19  Project B?

20      A.  No.

21      Q.  Okay.  The next one?

22      A.  Eighty-two.  Captain McVeigh was in charge of

23  special projects.

24      Q.  All right.  And just to clarify, because I --

25  my recollection earlier is that he didn't have contract

Daniel D.S. Brown                                    CONFIDENTIAL TRANSCRIPT
March 24, 2025

                                                                    121

1    oversight.  Are you saying in -- as -- in his role as

2    special projects he had supervisory control?

3         A.   Yeah.  I -- I guess it's supervisory control.

4         Q.   All right.  Did he have contract oversight?

5         A.   I -- I don't know.  Like, when you're a

6    supervisor you can do -- I -- I don't know.  It was,

7    like -- yeah.

8         Q.   But you were unaware of whether or not he had

9    leadership responsibilities relative to Dr. Roe?

10        A.   I mean, when you're -- it was under his

11   section, so he has leadership responsibilities.

12        Q.   All right.  Do you know -- okay.  What's the

13   next one?

14        A.   Like, I don't -- 84, nefarious action, that

15   sounds like a personal action.  I wasn't aware of that.

16   Well, until -- until, like -- the only thing, like --

17   the only thing is, like, McVeigh was concerned -- was

18   concerned about the dual-hatted nature of him being

19   employed.  I -- I don't know.  This nefarious action, it

20   just seems like an overloaded term.

21        Q.   Well, you had previously provided that he had a

22   bad reputation for --

23        A.   Yeah.  But, like --

24        Q.   -- for being cutthroat?

25        A.   Yeah.

Daniel D.S. Brown                                    CONFIDENTIAL TRANSCRIPT
March 24, 2025

                                                                    122

1         Q.  And you -- you never communicated that to

2    anyone?

3                   MR. SKINNER:  Object to form.

4                   THE WITNESS:  All -- all I know is his

5    reputation.  His reputation was like that.  That he

6    wanted to make sure his projects got funded.

7         Q.  (BY MR. WAREHAM)  All right.  Next one.

8         A.  What is this, 84, 85?  Again, I -- I don't

9    remember saying that.  All I would -- if I conveyed

10   anything, it would only have been that he had a bad

11   reputation.  I don't remember any of this -- I don't

12   remember this -- to avoid conversations with McVeigh.

13        Q.  Okay.  Would you have any reason to doubt

14   Dr. Roe's recollection that you had that conversation?

15                  MR. SKINNER:  Object to form.

16                  THE WITNESS:  I -- I don't think I would

17   say that.

18        Q.  (BY MR. WAREHAM)  Okay.  What's the next one?

19        A.  It's 86.  I don't think he would falsely

20   discredit personnel.  I -- I don't think McVeigh would

21   falsely discredit someone.  Like -- I mean, like -- I

22   mean, like -- I -- I don't think he -- I -- I don't

23   remember saying this.  I don't think -- and I don't

24   think he would do it.

25        Q.  So I want to be clear.  You don't believe that

123

1  Captain McVeigh would falsely discredit someone, but you

2  would consider him having a bad reputation --

3       A.  Yeah.

4       Q.  -- for being cutthroat?

5       A.  For, like, budget.  Not, like -- like, this is,

6  like, another level.

7       Q.  All right.  And you believe that even though he

8  had you removed from his projects?

9       A.  Well --

10                MR. SKINNER:  Object to form.

11                THE WITNESS:  Yeah.  I don't know.  I don't

12  think he would -- he was mad because -- he -- because of

13  the dual-hatted nature.  But I don't -- I don't know.

14  He just -- I feel like it was an overreaction from him.

15                Like, I -- like, I don't know the -- like,

16  I -- I just feel, like, it was an overreaction.  That he

17  shouldn't have been so concerned about the dual-hatted

18  nature.

19       Q.  (BY MR. WAREHAM)  And in his overreaction, you

20  still believe that he did not --

21       A.  I don't remember saying that he would falsely

22  discredit someone.

23       Q.  Okay.

24       A.  "According to Dan Brown," I don't remember ever

25  saying that.

124

1    Q.  Do you recall saying he might target somebody?

2    A.  No.  Not -- like, he would just want to get his

3  projects funded.  But he wouldn't be, like, doing,

4  like -- like, all these -- these underhanded things,

5  like, discrediting personnel.  I don't -- I don't think

6  he would do that.

7    Q.  All right.  What's the next one?

8    A.  Eighty-seven.  According to Dan Brown, nearly

9  everyone, it was false acc- -- I don't -- I don't --

10  I -- I would never say something like that, false

11  accusations.  I -- that's just -- no.  I don't believe

12  that's true.

13    Q.  All right.  Next one?

14    A.  Eighty-eight.  False accusing personnel to

15  harm -- I -- I don't think I would say that.  I -- I

16  don't -- well, this -- oh, 88 talks -- "were all

17  aware..."  I mean, I don't -- I -- I can't speak to

18  this, I guess, because I don't know the state of these

19  people -- personnel.  I guess I can't speak to 88,

20  because I don't know what people think.

21    Q.  Okay.  Has anyone ever communicated anything to

22  that effect to you?

23    A.  Not to that extent, no.

24    Q.  Well, less than that extent.  To what extent?

25    A.  Just the false reputation like I -- I mentioned

Daniel D.S. Brown
March 24, 2025

CONFIDENTIAL TRANSCRIPT

125

1    earlier.

2         Q.   Would --

3         A.   That's -- that's the reputation of being

4    cutthroat.  That's it.

5         Q.   Would Danny Burghard have communicated that to

6    you?

7         A.   No.

8         Q.   Alan Rabada?

9         A.   No.  No.  I barely talk to them.

10        Q.   Okay.  Do you recall who would have

11   communicated that to you?

12        A.   I -- I don't recall.

13        Q.   All right.  Next one?

14        A.   I don't remember 91.

15        Q.   All right.  And what don't you recall about

16   that?  Or what...

17        A.   I don't remember asking about or getting an

18   expert opinion on Project B.

19        Q.   Okay.

20        A.   Ninety-three, I don't remember anyone

21   complaining about Roe's assessment of Project B.

22        Q.   Do you recall Dr. Roe ever discussing Project

23   B, good or bad?

24        A.   I -- I don't remember.

25        Q.   Okay.

Daniel D.S. Brown
March 24, 2025

CONFIDENTIAL TRANSCRIPT

126

1    A.  Ninety-four, I don't know about any of this --

2  this stuff.  "...to engineer a knowingly specious and

3  unsupported..."  I don't know about that stuff.

4    Q.  Okay.  Next.

5    A.  Ninety-five, I don't know about McVeigh trying

6  to approach Defendant OSI Agent and convince him to open

7  a knowingly false investigation in bad faith.  I don't

8  know anything about that.

9    Q.  All right.  Next.

10    A.  I don't know about 96.  I don't know about 97.

11  I don't know about 98.  Again, his main concern was that

12  he was a dual hat.  And then -- and then his concern was

13  further compounded because when we got the email from --

14  from NSA legal it wasn't -- if I remember correctly, it

15  wasn't the complete original email.

16    Q.  All right.

17    A.  I don't know about 99.

18    Q.  How about after that?

19    A.  I don't know about this criminal investigation.

20  I don't know about that stuff.

21    Q.  Okay.

22    A.  And that's a hundred.  I don't know about any

23  debarring -- debarring, 102.

24    Q.  Okay.  What do you understand debarring to

25  mean?

(210) 558-9484  Fax

**Koole Court Reporters of Texas**
myreportingfirm@gmail.com

210-558-9484

EXHIBIT 7
**Page 126 of 218**

CONFIDENTIAL TRANSCRIPT

127

1    A.  I don't know of any, like, official way to

2    remove him from being contracts.

3    Q.  You don't know of -- that as existing, a

4    process or...

5    A.  Of it occurring --

6    Q.  Okay.

7    A.  -- in this situation.

8    Q.  All right.  So you're unaware that any official

9    process was taken --

10   A.  Correct.

11   Q.  -- on behalf of Dr. Roe?

12   A.  Correct.

13   Q.  Okay.  Who might know about that?

14   A.  I don't know.  McVeigh.  I -- I don't even

15   think that happened.  Like, I -- I would find it highly

16   unlikely that anyone ever put that in an email.

17   Q.  All right.  You -- so you don't think that it

18   happened that any official process with respect to his

19   debarment occurred?

20   A.  No, I don't think so.

21   Q.  Okay.  Next.

22   A.  I don't know.  All that stuff doesn't deal with

23   me, so -- OSI.  I don't know.

24   Q.  Okay.  Would --

25            MR. SKINNER:  I'm sorry.  I'm sorry.  The

1  audio's getting kind of muffled.  We didn't hear that

2  statement.

3       Q.  (BY MR. WAREHAM)  Can you repeat your last

4  statement, please.

5       A.  107 to 110 deals with OSI mainly.  I don't

6  really know about that stuff.

7       Q.  All right.  What about 104?

8       A.  I mean, he was let go from the contract.

9       Q.  Say again.

10      A.  He was let go from the contract.

11      Q.  Uh-huh.

12           All right.  So then you said 1 -- 107 --

13      A.  I said, like --

14      Q.  Go ahead.

15      A.  -- like, the -- the government's not supposed

16  to get involved with who -- per -- contractors hire or

17  fire.

18      Q.  Sure.

19           Did you get --

20      A.  Like --

21      Q.  -- involved in any way with Dr. Roe's hiring

22  GITI?

23      A.  I -- I'm --

24           MR. SKINNER:  We didn't get the question?

25      Q.  (BY MR. WAREHAM)  Did you get involved in any

Daniel D.S. Brown
March 24, 2025

CONFIDENTIAL TRANSCRIPT

129

1  way with Dr. Roe's hiring of GI- -- by GITI?

2      A.  I don't remember.

3      Q.  Okay.  Did you get involved in any way in the

4  Air Force Research Laboratory's funding of Dr. Roe's

5  contract?

6      A.  I'm not allowed to talk about funding.

7      Q.  Okay.  Are you maintaining that the funding

8  itself is classified?

9      A.  I'm not allowed to say.

10     Q.  Okay.  Just curious, if you know, do you know

11 what a classification review process is?

12     A.  I mean, there's a lot of -- that sounds like a

13 generic term.

14     Q.  Have you ever heard of a classification review?

15     A.  Yes.

16     Q.  What is it?

17     A.  Reviewing information, like, to see if it

18 contains classified material.

19     Q.  If we were to obtain a classification review on

20 these issues that you identified that you can't speak of

21 and it were cleared, would you be willing to discuss it

22 upon that clearance?

23             MR. SKINNER:  Object to form.

24             THE WITNESS:  If I remember it, yeah.

25     Q.  (BY MR. WAREHAM)  Okay.  Great.

CONFIDENTIAL TRANSCRIPT

130

1            Next paragraph set.

2        A.   113, I don't even know why I would be

3    involved -- like, OSI wouldn't tell me if they conclude

4    something or not, so I don't know how I could say this

5    information.

6        Q.   Did you ever have a conversation with Dr. Roe

7    that the clearance investigation that was opened had

8    concluded favorably?

9        A.   Not that I remember.  I don't remember any of

10   that stuff.  And I don't even know how I would know

11   this.  OSI doesn't tell me, you know, what they've done.

12       Q.   Are you aware that a security manager conducted

13   an investigation within Air Force Life Cycle Management

14   Center?

15            MR. SKINNER:  Object to form.  Objection to

16   form.

17            THE WITNESS:  Possibly.

18       Q.   (BY MR. WAREHAM)  All right.  What does that

19   mean?

20       A.   I don't remember, though, the specifics.

21       Q.   What is a security manager?

22       A.   Are you talking about, like, a security

23   incident?

24       Q.   Yeah.

25       A.   They would look to see if there's a security

Daniel D.S. Brown
March 24, 2025

CONFIDENTIAL TRANSCRIPT

131

1    incident.  I think that's what you're referring to.
2    Like, it's not -- a security manager just could be
3    anything.  That's a broad role.
4         Q.  All right.  What is the broad role of a
5    security manager?
6         A.  To go over security.  I don't know.
7         Q.  With respect --
8         A.  It could mean anything.  It could mean
9    anything.
10        Q.  What is the role of a security manager with
11   respect to classification management?
12        A.  That make sure -- to review security protocol.
13        Q.  All right.  And do you know what the role of a
14   security manager is if they consider there to be a
15   security incident?
16        A.  I don't know.  I -- say it again.
17        Q.  Are you aware of what the role is for a
18   security manager if they consider there to be a
19   classified security incident?
20        A.  They would probably assign someone to
21   investigate it.
22        Q.  Okay.  Are you aware of whether or not a
23   security incident investigation occurred involving
24   Dr. Roe?
25        A.  Yeah.  I think so, yeah.

Daniel D.S. Brown                                    CONFIDENTIAL TRANSCRIPT
March 24, 2025

132

1      Q.  Are you aware of the outcome of that security

2  incident determination?

3      A.  It was just -- no.

4      Q.  How did you become aware of the security

5  incident investigation?

6      A.  I don't remember.  But it wasn't the OSI thing.

7  Like, it's -- it wasn't that.

8      Q.  I agree.

9            But --

10     A.  Okay.

11     Q.  -- referencing the security incident

12  investigation, how did you know there was one?

13     A.  I don't remember.

14     Q.  And to be clear, do you have -- do you know the

15  outcome of that incident investigation?

16     A.  No.

17     Q.  Would you have common reason to know when a

18  security incident investigation occurred with somebody

19  within HNCO?

20     A.  No.

21            MR. SKINNER:  Object to form.

22            THE WITNESS:  Unless it's -- no.  Unless

23  I'm involved in it.

24     Q.  (BY MR. WAREHAM)  Were you involved in this

25  one?

133

1       A.  I don't believe so.

2       Q.  Then how did you know about it?

3       A.  I don't remember.

4       Q.  Okay.  Would it be fair, based on what you just

5  said, to characterize your knowledge of a security

6  incident investigation that you weren't a part of as

7  variance from the norm?

8               MR. SKINNER:  Object to form.

9               THE WITNESS:  I -- I guess.  I -- I didn't

10  know about any OSI conclusion, which is -- I'm saying on

11  113.

12      Q.  (BY MR. WAREHAM)  All right.  But outside of

13  the OSI, are you aware of a conclusion?

14      A.  No.

15      Q.  What is the next paragraph?

16      A.  116.  I -- I wouldn't know that stuff.

17  Disclosed by OSI agent unauthorized -- I don't know what

18  all this stuff is.  I have no idea what this is.

19      Q.  Okay.  But you would agree that 116, that what

20  I just described to you is related to the variance from

21  the norm of you knowing a --

22      A.  No.  That's -- no.  I --

23               MR. SKINNER:  Object to form.

24               THE WITNESS:  -- I -- I don't know about

25  any of this stuff, the OPM investigation.  I don't know

Daniel D.S. Brown                                    CONFIDENTIAL TRANSCRIPT
March 24, 2025

134

1    about the OSI details.  I don't know about the

2    disclosure of information.  I don't know that stuff.

3         Q.  (BY MR. WAREHAM)  All right.  Next one.

4         A.  I mean, I don't know about 117.  I don't know

5    what that is.  Like, I -- I have no idea to know that.

6         Q.  Okay.  Next one.

7              Do you recall Captain McVeigh ever

8    discussing the OSI?

9         A.  No.  He wouldn't talk with me about that stuff.

10        Q.  Okay.

11        A.  I didn't even work in the section anymore.

12        Q.  Because he removed you?

13        A.  Yeah.

14        Q.  All right.  What's the next one?

15        A.  I mean, these are just a lot of statements.  I

16   have no idea.  Like, these are just assertions.  I have

17   no idea about this stuff.

18        Q.  Okay.  So what's the next one that you -- well,

19   less concerned about what you don't know, but more about

20   what you consider to be exaggerations or --

21        A.  125, "Dr. Roe was immediately debarred from

22   HNCO."  I don't -- I don't believe that's true.

23        Q.  Did he return after August --

24        A.  No.

25        Q.  -- 2020?

135

1       A.  No.  Not that I'm aware of.

2       Q.  Okay.  So you wouldn't -- you -- you know he

3  didn't return.  You just don't know the why?

4                MR. SKINNER:  Object to form,

5  mischaracterizes the witness's testimony.

6                THE WITNESS:  Again, it's for the

7  contractors -- it's for the contractors to decide who to

8  hire.

9       Q.  (BY MR. WAREHAM)  All right.  And who would be

10  those contractors?

11      A.  GITI.

12      Q.  All right.  And have you ever suggested to GITI

13  who to hire?

14      A.  I -- no.  Not by -- not by -- no.  We -- the --

15  the most things -- I do not believe so.  The most that

16  we normally do -- the most we would do is, like, if it

17  is the -- describing the project and the technical

18  skills needed for the project.

19      Q.  Okay.  You -- so if I'm understanding, do you

20  know the term "by-name recommendation"?

21      A.  Yeah.  Yes.

22      Q.  What does that mean?

23      A.  Hiring someone by name.

24      Q.  Have you ever made a by-name recommendation?

25      A.  I don't believe so.

Daniel D.S. Brown                          CONFIDENTIAL TRANSCRIPT
March 24, 2025

136

1      Q.  Have you ever made a by-name recommendation of

2  Dr. Roe to contracting?

3      A.  I don't believe so.

4      Q.  Okay.  What's the next paragraph?

5      A.  128, I don't know anything about -- I -- I

6  wouldn't know the status of the OSI investigation.

7      Q.  Okay.  And the next one?

8      A.  129, I don't recall this.

9      Q.  You don't recall Dr. Roe asking to be restored

10  to HNCO?

11      A.  Correct.  I don't -- I don't remember -- I

12  don't remember this stuff.

13      Q.  Okay.  Could it have happened?

14      A.  It's possible.

15      Q.  All right.  What's next?

16      A.  130.

17      Q.  All right.

18      A.  I would -- you can never -- I would never say

19  something like that.  I don't -- I don't recall any -- I

20  don't recall this 130.

21      Q.  Okay.

22      A.  I wouldn't know about an OSI investigation.  I

23  wouldn't know about OPM adjudication.

24      Q.  Is it possible that you would have said

25  something to those effects?

137

1        A.   No.

2                MR. SKINNER:   Object to form.

3                THE WITNESS:   I wouldn't know that stuff.

4   I wouldn't know it.

5        Q.   (BY MR. WAREHAM)   All right.   Next.

6        A.   I wouldn't know 131 because I was out of his

7   special projects.

8        Q.   All right.   Do you have any awareness of -- of

9   funding relative to those projects?

10       A.   No.   I don't believe so.

11       Q.   All right.   Next.

12       A.   132, all I -- I don't know about this stuff.

13  All I know is that I -- I think they overreacted in --

14  in learning that he was dual-hatted.   I -- I don't know

15  about -- what -- geez.   I was never threatened by OSI.

16  I did not fear retaliation by OSI.

17       Q.   Did you fear retaliation by any person?

18       A.   In what way -- because of what?

19       Q.   The question stands.   Did you fear retaliation

20  by any person associated to Air Force --

21       A.   Because of what?

22       Q.   -- Life Cycle Management?

23       A.   I -- McVeigh was upset that Roe was working

24  dual hat.   That's the only thing that -- and that's why

25  I got -- took me out of his program.

Koole Court Reporters of Texas
myreportingfirm@gmail.com

EXHIBIT 7
Page 137 of 218

Daniel D.S. Brown                                    CONFIDENTIAL TRANSCRIPT
March 24, 2025

                                                                    138

1        Q.  So when I ask whether or not you fear

2   retaliation, your answer is to bring up Captain McVeigh.

3   Did you fear retaliation by Captain McVeigh?

4                    MR. SKINNER:  Object to form.

5                    THE WITNESS:  No.  Because I -- I mean,

6   like -- because of what?  Like, because if he were to

7   raise the unlawfulness of Dr. Roe's debarment, no.

8   Because I -- I didn't even know about -- there was no

9   debarment.

10       Q.  (BY MR. WAREHAM)  So the question I'm asking is

11  broader than you're trying to answer it.  And I think

12  it's for a reason.

13                   Did you fear retaliation by Captain McVeigh

14  for any reason?

15                   MR. SKINNER:  Object to form.

16                   THE WITNESS:  I don't know.  I thought we

17  were going line by line, but -- but you're saying --

18  I -- I need to know retaliation from what?

19       Q.  (BY MR. WAREHAM)  Did you fear --

20                   MR. SKINNER:  Okay.

21       Q.  (BY MR. WAREHAM)  -- retaliation --

22                   MR. SKINNER:  Objection.

23                   I think this is --

24                   THE WITNESS:  Retaliation for what?

25                   THE COURT REPORTER:  Hold on.

139

```
1              MR. SKINNER:  Objection.  This is the
2  fourth straight time you've asked the exact same
3  verbatim question.  And he's given you the exact same
4  answer in four successive instances.
5              MR. WAREHAM:  He has not given me an
6  answer, Reggie.  Not even close.  He needs to answer the
7  question.
8              MR. SKINNER:  He --
9              MR. WAREHAM:  It is a "yes" or "no"
10 question.  He needs to answer the question and you need
11 to not be involved.
12             MR. SKINNER:  Objection.  Objection.
13 Objection, form.
14             THE WITNESS:  Retaliation for what?
15     Q.  (BY MR. WAREHAM)  Any reason.
16             MR. SKINNER:  Same objection.
17             THE WITNESS:  I mean, I think he was mad at
18 me.  But I don't think he could do anything besides that
19 and letting me out of his section.
20     Q.  (BY MR. WAREHAM)  Is that a "no"?
21     A.  I mean, other --
22             MR. SKINNER:  Object to form.
23             THE WITNESS:  -- other than that, no, I
24 didn't feel -- I didn't fear a retaliation other than
25 that.  You know, he could just -- he would get me out of
```

Daniel D.S. Brown
March 24, 2025

CONFIDENTIAL TRANSCRIPT

140

1    his section, but I don't think he had any other power

2    besides that.

3        Q.  (BY MR. WAREHAM)  So --

4        A.  He's in the military chain of command.

5        Q.  So what I just understood your answer to be was

6    you did fear retaliation for what you described as other

7    than that, that is, removing you from his programs --

8                MR. SKINNER:  Object to form.

9        Q.  (BY MR. WAREHAM)  -- is that accurate?

10       A.  No.  Be- -- No.  I was -- no.  Because he had

11   already -- oh, gosh.  I -- I don't know.  I don't know.

12   I -- I wasn't -- I didn't fear retaliation.  I -- but --

13   but it's, like, re- -- this -- this -- this says "Fear

14   of retaliation if he were to raise the unlawfulness of

15   Dr. Roe's debarment."

16       Q.  I am not asking about the complaint.  I am

17   asking a different question.  Stop misconstruing the

18   question.  The question is, did you --

19               MR. SKINNER:  Objection.

20       Q.  (BY MR. WAREHAM)  -- fear --

21               MR. SKINNER:  Objection.

22               THE WITNESS:  No.

23               MR. SKINNER:  Objection, form.

24               THE WITNESS:  I did not.

25               MR. SKINNER:  Objection.  Objection.  I

Daniel D.S. Brown
March 24, 2025

CONFIDENTIAL TRANSCRIPT

141

1    don't think taking that tone with the witness is

2    appropriate.

3                    MR. WAREHAM:  Okay.

4                    MR. BARRERA:  Let them finish their

5    objection --

6                    THE WITNESS:  Okay.

7                    MR. BARRERA:  -- before you answer, please.

8                    MR. WAREHAM:  Are you instructing the

9    witness not to answer?  Do you have standing to do that?

10                    MR. SKINNER:  Clearly I didn't.

11                    I said, taking that tone with the witness

12    is inappropriate and unprofessional --

13                    MR. WAREHAM:  It is not.

14                    MR. SKINNER:  -- and I maintain the

15    objection.

16                    MR. WAREHAM:  It is a direct -- look, if we

17    need to get the judge on this question, I'm happy to do

18    so.  All right?

19                    MR. SKINNER:  And the question has been

20    asked, by my count, six times in a row.

21                    MR. WAREHAM:  Yeah.  And he's misconstrued

22    and avoided answering every time.

23                    THE WITNESS:  Because we're going on 132.

24                    MR. BARRERA:  Let them finish their legal

25    argument.

Daniel D.S. Brown
March 24, 2025

CONFIDENTIAL TRANSCRIPT

142

 1              MR. SKINNER:  The record doesn't support

 2    that, but counsel may proceed.

 3              MR. WAREHAM:  You have made your objection.

 4    You're now stepping all over me.  I'm trying to get an

 5    answer.

 6              MR. SKINNER:  Couns- -- counsel may

 7    proceed.

 8              MR. WAREHAM:  I will proceed on my own

 9    right.  Thank you.

10              MR. SKINNER:  Counsel may proceed.

11    Q.  (BY MR. WAREHAM)  Not dealing with paragraph --

12    with the paragraph, you keep going back to the

13    paragraph.

14    A.  Well, that's where the original -- that's where

15    the conversation started.

16    Q.  I understand.  We're going to go away from the

17    paragraph.

18    A.  Okay.

19    Q.  Is it fair to say you feared retaliation for

20    being kicked out of his programs?

21    A.  No.

22    Q.  Is it fair to characterize that you were afraid

23    that he would be upset at you and that he would

24    adversely affect your career?

25    A.  No.

143

1      Q.   Then what -- did you consider him removing you

2   retaliation for any issue?

3      A.   I don't know.   I -- I don't know.

4      Q.   How would you characterize that step?

5      A.   He probably thought I wasn't paying enough

6   attention to that fact.

7      Q.   So how would you characterize the removal?

8      A.   That --

9           MR. SKINNER:   Object to form.

10          THE WITNESS:   -- that maybe I didn't do due

11  diligence.   That he would have -- I mean, I -- I did

12  make a mistake.   I didn't -- I should have -- I should

13  have had the email from NSA legal counsel before.   And I

14  should have let him know.   I didn't -- but I just

15  didn't -- I just forgot about it.

16     Q.   When you say you should have had the email, my

17  understanding of your prior testimony is that you had no

18  role in his contract?

19     A.   The email from NSA saying that he could work in

20  a dual capacity.

21     Q.   Why would you be required to have that email?

22          MR. SKINNER:   Object to form.

23          THE WITNESS:   I -- I -- I don't know.   I

24  can see his perspective, though.   I don't -- I don't --

25     Q.   (BY MR. WAREHAM)   What is his perspective?

Daniel D.S. Brown
March 24, 2025

CONFIDENTIAL TRANSCRIPT

144

1      A.  His perspective --

2              MR. SKINNER:  Object to form.

3              THE WITNESS:  -- is he shouldn't have been

4  working in a dual-hat capacity.

5      Q.  (BY MR. WAREHAM)  So help me understand because

6  I'm getting confused.  When you say you understand his

7  perspective because you should have had this email about

8  the NSA justification, why should you have had it if you

9  didn't have involvement in his contract?

10              MR. SKINNER:  Objection to form.

11              THE WITNESS:  That's true.  I mean, that --

12  that was my -- that was my -- that was my position.

13      Q.  (BY MR. WAREHAM)  Your position to him was

14  that?

15      A.  My position is it's between the contractor and

16  the NSA employer.

17      Q.  Did you ever tell Captain McVeigh that?

18      A.  I told him that several times.  But his

19  position was, you have to check it.

20      Q.  Given that you had that position, that it was

21  not within your scope of responsibilities, did you

22  consider his actions retaliation?

23              MR. SKINNER:  Objection to form.

24              THE WITNESS:  No.  I -- I just think that

25  he wouldn't want me on the project.  And I was fine with

(210) 558-9484  Fax

**Koole Court Reporters of Texas**
myreportingfirm@gmail.com
EXHIBIT 7
Page 144 of 218

210-558-9484

Daniel D.S. Brown
March 24, 2025

CONFIDENTIAL TRANSCRIPT

145

1    it because I had too much work.

2        Q.  (BY MR. WAREHAM)  Why did Captain McVeigh

3    suggest that it was your responsibility to have that

4    email?

5                MR. SKINNER:  Objection.  Object to form.

6    Objection, speculation.

7                THE WITNESS:  Because he was working in a

8    dual-hat capacity.

9        Q.  (BY MR. WAREHAM)  But why did -- you just said

10   Captain McVeigh thought you needed to have that due

11   diligence done.  Do you remember saying that?

12       A.  (Witness nods affirmatively.)

13       Q.  Why did Captain McVeigh tell you that you

14   needed to have that?

15                MR. SKINNER:  Objection to form.

16                THE WITNESS:  Because I guess I was on the

17   project longer than he was.

18       Q.  (BY MR. WAREHAM)  Did you have authority over

19   the project?

20       A.  I'm only an engineer.  I don't have PM

21   responsibilities or authority.

22       Q.  So did you have any authority on the project

23   whatsoever?

24       A.  Again, I'm an engineer.  I've -- I offer

25   technical advice.  That's my position description.

Daniel D.S. Brown                          CONFIDENTIAL TRANSCRIPT
March 24, 2025

146

1      Q.  Is your answer, then, "no" to that question?

2      A.  What was the question?

3      Q.  Did you have authority over the projects as an

4  engineer?

5      A.  I don't know.  It's, like, a broad term.  Like,

6  I have to answer precisely.

7      Q.  Did you supervise personnel?

8      A.  No.

9      Q.  Did you write fitness reports?

10      A.  No.

11      Q.  Did you write evaluation reports for civilians?

12      A.  No.

13      Q.  Did you sign contracts?

14      A.  No.

15      Q.  Did you vet contractors?

16      A.  Did I vet contractors?  No.

17      Q.  Did you recommend contractors to positions?

18      A.  No.

19      Q.  So when you say it is confusing to you when I

20  asked, did you have authority over the projects, what

21  authorities did you have, if not those?

22      A.  I just -- I provided technical advice, I guess,

23  so that wouldn't be an authority.

24      Q.  So why would a technical advisor need to have

25  the NSA email?

CONFIDENTIAL TRANSCRIPT

147

1      A.   That's my position.  I -- that was my position;
2  his position was different.
3      Q.   When you say it was different, what was his
4  position?
5      A.   His position was that I should have made sure
6  from NSA that he could work in a dual-hat capacity.
7      Q.   Because you'd been around longer?
8      A.   I guess, yeah.  I mean, that was his position.
9  Like, I don't know how many times -- his position was
10  that I should have done due diligence.  My position was,
11  it wasn't -- it's not my role to do that.
12      Q.   And when was this conversation?
13      A.   Around that day, August 13, I think.
14      Q.   All right.  What is the next paragraph that you
15  take umbrage with?
16      A.   Oh, my gosh.  What were we on, 132?
17      Q.   I believe so, or around there.
18      A.   136, I don't remember saying this.
19      Q.   You don't remember that conversation?
20      A.   Correct.
21           137, I don't remember this.  I remember
22  that Todd said that they were doing cool work.  Like,
23  this -- this next -- this next set of -- page 25, I
24  remember Todd saying that they were doing -- they were
25  doing cool work because -- but then when it was demoed

148

1    in April, it did not live up to expectations and it was

2    not -- it was not considered that great.

3         Q.  So you do recall making the statement "Let me

4    know when the tools are ready"?

5         A.  No.

6         Q.  Okay.  What was the next paragraph?

7         A.  139.

8         Q.  And what is the issue with that paragraph?

9         A.  I thought it was bad optics if -- if Roe were

10   to present it, I guess.

11        Q.  All right.  And because you don't remember

12   making that statement --

13        A.  What?

14        Q.  -- or you did not make that statement?

15        A.  I don't remember.  I just -- I would think -- I

16   would think it would be bad optics if he presented.

17        Q.  Would it be possible that you made that

18   statement?

19                MR. SKINNER:  Object -- objection, form.

20                THE WITNESS:  I don't remember making that

21   statement.

22        Q.  (BY MR. WAREHAM)  But you can't conclusively

23   say you did not?

24                MR. SKINNER:  Objection to form.

25                THE WITNESS:  I -- I -- yeah.  I don't

Daniel D.S. Brown
March 24, 2025

CONFIDENTIAL TRANSCRIPT

149

1    think I did, but I -- I can't remember.

2        Q.  (BY MR. WAREHAM)  Okay.  The next part.

3              MR. SKINNER:  Sorry.  What was the

4    question?  You mumbled.

5        Q.  (BY MR. WAREHAM)  I said, the next part.

6        A.  Same thing for 140.

7        Q.  You don't remember making that statement or you

8    did not make?

9        A.  I don't remember making that statement.

10       Q.  Okay.

11       A.  And I -- I would just think it would be bad

12   optics.  I don't think I would make that statement.

13       Q.  Okay.  The next one.

14       A.  141, same thing.

15       Q.  You don't remember?

16       A.  I just want to point out, like -- like, Todd

17   kept describing that these tools were cool, but it

18   would -- did -- did not go anywhere near what his claims

19   were.

20       Q.  So usefulness of the tools is not really my

21   focus.  My focus is, did you ever show -- did you make

22   that statement, one -- in 141?

23       A.  I don't -- I don't remember making that

24   statement.

25       Q.  Okay.  And to be clear, you -- you don't

Daniel D.S. Brown                              CONFIDENTIAL TRANSCRIPT
March 24, 2025

                                                                     150
1    remember, not that you didn't make that statement?

2         A.  I -- I mean, I -- how can I say I didn't make

3    the statement if I don't remember?

4         Q.  Are you uncertain or are you sure you didn't

5    make that statement?

6         A.  I don't remember making the statement.

7         Q.  Okay.  Next one.

8         A.  142.

9         Q.  And what -- what about that one?

10        A.  I would never say it like -- I would never say

11   this stuff.  For classified TS -- I would never say that

12   stuff.

13        Q.  Okay.  And, like, which part wouldn't you have

14   said?

15        A.  Talking about classified stuff.  I would never

16   say that.

17        Q.  Well, you do agree that you can label something

18   classified to --

19        A.  I would never -- I would never say something

20   the way it's phrased here.

21        Q.  How would you have said it?

22        A.  I -- I would -- I wouldn't have said any --

23   like, the most I would have asked for is a demo.

24   Because people say stuff all the time that aren't true.

25   Like, it's the number one thing with contractors.  They

CONFIDENTIAL TRANSCRIPT

151

1  say a lot of stuff, and a lot of times it's not true,

2  which is what happened.

3      Q.  Okay.  Did you have any conversation that was

4  even close to a conversation around an offensive cyber

5  mission in that type of --

6                  MR. SKINNER:  Object to form.  Objection,

7  form.

8                  THE WITNESS:  I do not believe so.

9      Q.  (BY MR. WAREHAM)  Okay.  Next.

10     A.  But I wouldn't say any classified -- I wouldn't

11  say any of this classified TS -- I wouldn't say any of

12  that stuff.

13     Q.  Do you recall discussing Dr. Roe's research

14  projects at all in February of 2023?

15     A.  I don't remember the dates.  Todd Jaspers said

16  that they had cool stuff.  Again, Todd Jaspers said they

17  had cool stuff.  Contractors say they have a lot of cool

18  stuff.  But when it came to the demo, it wasn't cool

19  stuff.

20     Q.  So you do recall having a conversation, as you

21  described, cool stuff, which would include Dr. Roe's

22  research projects?

23     A.  At some point between, like, up until April, I

24  probably did talk to Todd or Todd probably did mention

25  his technologies; but I would never characterize it like

152

1   142.

2        Q.  Okay.  So let's be clear.  In a complaint,

3   these are mere allegations, often written by me.  I

4   wasn't there with you.  They're meant to describe

5   general ideas and theories.

6        A.  I -- I -- you're -- you're saying -- you're

7   saying -- you're saying -- you're asking me to go on the

8   record and go line by line about stuff.  So I'm telling

9   you, I wouldn't say 142.

10        Q.  Okay.  Duly noted.

11        A.  Okay.

12        Q.  Did you have discussions about Dr. Roe's

13   research projects in February of 2023?

14        A.  I don't know if it's February 2023.  I'm sure

15   Todd mentioned his projects.  And Todd would say that

16   Roe was a leader of those projects.

17        Q.  All right.  And would it be fair to say that

18   this occurred somewhere between January 2023 and

19   April 2023?

20        A.  Yeah.

21        Q.  And where would those have -- conversations

22   have taken place?

23        A.  I don't know.

24        Q.  Were they over the phone?

25        A.  Yeah.

Daniel D.S. Brown                                    CONFIDENTIAL TRANSCRIPT
March 24, 2025

153

1       Q.  Were you in your office?

2       A.  I don't remember.

3       Q.  Were they at work?

4       A.  Probably.  I don't remember.

5       Q.  All right.  Would -- where would you normally

6   take phone calls about work?

7       A.  At -- for the most part at work.  Sometimes

8   there might be a phone call on my cell phone.

9       Q.  And is that your personal cell phone or

10  government cell phone?

11      A.  My personal cell phone.

12      Q.  Okay.  Do you recollect Todd Jaspers ever

13  calling you on your personal cell phone?

14      A.  I don't remember, but he might have.

15      Q.  Do you recall Todd Jaspers ever calling you at

16  work?

17      A.  I don't remember, but he might have.

18      Q.  Would -- if someone called you at work, where

19  would you normally take that call?

20      A.  At my desk.

21      Q.  And your desk is located where?

22      A.  I don't remember the address.

23      Q.  Is it in -- I think there's a new location;

24  right?

25      A.  Yeah.

154

1      Q.  Were you in the new location in 2023?

2      A.  No.

3      Q.  It was the old location?

4      A.  Yeah.

5      Q.  And what was your extension?

6      A.  I don't know.

7      Q.  You don't recall your phone extension?

8      A.  No.

9      Q.  All right.  What next portion of the complaint

10  do you take exception with?

11      A.  I don't remember 143, but it could happen.  I

12  don't remember 144.

13      Q.  But could it have happened?

14          MR. SKINNER:  Object to form.

15          THE WITNESS:  It's just -- again, it's the

16  bad light.

17      Q.  (BY MR. WAREHAM)  What do you mean by bad

18  light?

19      A.  I mean, just bad optics.

20      Q.  When you say "bad optics," you mean your

21  communications that Dr. Roe being involved was bad

22  optics.  Is that what you mean?

23      A.  I mean, like -- it's just -- it would be bad

24  optics if he was, like, demonstrating the stuff.

25      Q.  All right.  And what's next?

Daniel D.S. Brown
March 24, 2025

CONFIDENTIAL TRANSCRIPT

155

1        A.  I don't know about any debarment.

2        Q.  All right.  That's 145?

3        A.  Yeah.

4        Q.  Okay.  How about after that?

5        A.  146, I don't know anything about debarment.

6        Q.  Do you know if whether -- whether or not at

7   this moment Dr. Roe is allowed to enter HNCO?

8        A.  I'm sure he's allowed to enter HNCO.

9        Q.  Okay.  And he's -- have you seen him do so

10  since August of 2020?

11       A.  No.

12       Q.  All right.  How about the next part?

13       A.  149, I don't think that's true.  I don't know

14  if it's true.  I don't think it is.

15       Q.  Okay.  How about the next?

16       A.  150, I don't think he was permanently

17  prohibited at all.

18       Q.  All right.  How about after that?

19       A.  152, I don't think he's debared from any work.

20       Q.  Would you be involved in a debarment process at

21  Air Force Life Cycle Management Center?

22       A.  No.

23       Q.  So you wouldn't have reason to know if one had

24  been started or not?

25       A.  I'm sure someone would have said something, but

Daniel D.S. Brown                              CONFIDENTIAL TRANSCRIPT
March 24, 2025

156

1    I -- that's just -- this is, like, I would find that

2    very, very unlikely.  Like, this is -- I -- yeah.  I

3    would just find it very unlikely.

4         Q.   Okay.  Next.

5         A.   153, that doesn't sound right.

6         Q.   What doesn't sound right about it?

7         A.   "But is not allowed to walk across the street

8    and enter another office."  Again, he was -- he briefed

9    their -- he briefed their technology in April.

10        Q.   Is it accurate that they're somewhat co-located

11   physically?

12        A.   What?

13        Q.   The two offices.

14        A.   I guess Leidos is across the street.

15        Q.   Yeah.

16             To be clear, when you say "there," you

17   meant Leidos?

18        A.   Their offices, I thought you meant HNCO

19   offices.  "But is not allowed to walk across the street

20   and enter their offices."

21        Q.   Just when you said just now "their tech, they

22   briefed their tech" --

23        A.   Oh.

24        Q.   -- you meant Leidos?

25        A.   Yeah.

Daniel D.S. Brown                          CONFIDENTIAL TRANSCRIPT
March 24, 2025

                                                              157

1      Q.  Yeah.

2              And Leidos and HNCO are co-located?

3      A.  I mean, the one's across the street from the

4  other.

5      Q.  Yeah.  Okay.  Next part.

6      A.  I don't know about any of this debarment stuff,

7  again.

8      Q.  Okay.

9              MR. SKINNER:  What paragraph are we looking

10  at?

11             MR. WAREHAM:  Say again, Reggie?  Sorry.  I

12  didn't hear you.

13             MR. SKINNER:  I didn't hear him refer to a

14  specific paragraph.  Did he mention a specific

15  paragraph?

16             MR. WAREHAM:  No, he didn't.

17             THE WITNESS:  I was --

18             MR. WAREHAM:  He said he didn't know

19  anything about this debarment stuff.

20             THE WITNESS:  Page 29.

21             MR. WAREHAM:  Yeah.

22             THE WITNESS:  172, I don't think that he

23  was characterized as a scam or fraudulent.

24     Q.  (BY MR. WAREHAM)  Okay.

25     A.  173, I don't know about debarment.  175, I

158

1    don't know about any scam or scam artist or fraud.  They

2    were, again, worried about him being dual hat.

3        Q.  Do you know what the core offense of somebody

4    being dual hat is called under the statutes?

5        A.  No.  They were worried about a conflict of

6    interest.

7        Q.  All right.  What's next?

8        A.  I never said 180.  Bro- -- I do not remember.

9    I do not think I would ever say this, "Dr. Roe is barred

10   from HNCO permanently."

11       Q.  Did you express anything regarding Dr. Roe's

12   absence from HNCO, to your recollection?

13       A.  To Roe?

14       Q.  To anyone.

15       A.  I mean, it's just, again, a bad light, bad

16   optics.

17       Q.  Okay.

18       A.  I don't know about 181.  I'm not part of this

19   project.  Again, I was out of special projects, like, a

20   month after all this happened.

21       Q.  Okay.  Was there any paperwork with --

22       A.  No.

23       Q.  -- that was produced from your exclusion from

24   the project?

25       A.  I don't -- I don't know.

(210) 558-9484  Fax
**Koole Court Reporters of Texas**
myreportingfirm@gmail.com
EXHIBIT 7°
Page 158 of 218
210-558-9484

Daniel D.S. Brown
March 24, 2025

CONFIDENTIAL TRANSCRIPT

159

1      Q.  Did you ever read out of the projects?

2      A.  Yeah.

3      Q.  Who did the read-out?

4      A.  I don't remember.  The security office.

5      Q.  Okay.  Did you receive a negative counseling of

6  any kind?

7      A.  No.

8      Q.  Was there --

9              MR. SKINNER:  Was there --

10             MR. WAREHAM:  Go ahead.

11             MR. SKINNER:  -- was there an audible

12  response?

13             MR. WAREHAM:  He said "No."

14             MR. SKINNER:  Was there an audible

15  response?

16             MR. WAREHAM:  He said, "No."  Yeah.

17             MR. SKINNER:  Okay.

18             MR. WAREHAM:  Where was I?

19     Q.  (BY MR. WAREHAM)  Did -- was there any written

20  communication about your removal?

21     A.  No, not that I'm aware of.

22     Q.  How did you learn of your removal?

23     A.  When I was read out.

24     Q.  Just somebody told you to show up for a read

25  out?

160

1      A.  I don't remember exactly, but that was the main

2  thing.

3      Q.  Okay.  You were never told by even McVeigh

4  directly that you're out?

5      A.  I -- I don't remember.  I'm sure I was told I'm

6  out of the thing.  I...

7      Q.  Okay.  All right.  Any other portions?

8      A.  I don't know about -- anything about 211.  I

9  don't know about any release of OSI and release of

10  information.  I don't know anything about that.

11      Q.  Okay.

12      A.  I don't know anything about 212.

13      Q.  What else?

14      A.  I don't know anything about this Privacy Act

15  stuff.  I don't know 215.  I don't know 216.

16      Q.  All right.  Do you know -- but you do know that

17  at some point you learned about the OSI investigation;

18  right?  That it existed?

19              MR. SKINNER:  Object --

20              THE WITNESS:  No.

21              MR. SKINNER:  -- objection, form.

22              THE WITNESS:  I don't remember any OSI

23  investigation.  I -- I don't know, like -- I -- I don't

24  remember any OSI investigation.

25      Q.  (BY MR. WAREHAM)  Okay.  But do you -- do you

Daniel D.S. Brown
March 24, 2025

CONFIDENTIAL TRANSCRIPT

161

1  remember -- like, to be clear, do you remember learning

2  about the security incident investigation?

3      A.  I have, like, a faint recollection, but I don't

4  remember the details.

5      Q.  Were you a security manager at the time?

6      A.  Me?

7      Q.  Yeah.

8      A.  No.

9      Q.  All right.  Next.

10     A.  I don't know about 211.  Oh, wait.  I already

11 did that.  Did we already do 211?  Golly.  I don't know

12 about 212.  I don't know about 215.  Yeah, we did that.

13 I -- these are just general statements.  I don't know

14 about...

15     Q.  That's fine.

16             Any factual basis that you object to or

17 find -- or -- or --

18     A.  223, I never said that [as read] "...learned of

19 these Privacy Act from Dan Brown on 'all your stuff' is

20 being sent around to everyone..."  I would -- I don't

21 even know that stuff.

22     Q.  Okay.  Do you recall any rumors about Dr. Roe

23 after he left?

24     A.  No.

25     Q.  Do you recall HNCO personnel discussing Dr. Roe

Daniel D.S. Brown
March 24, 2025

CONFIDENTIAL TRANSCRIPT

162

1    between September and October 2020?

2        A.   September and October 2020?

3               MR. SKINNER:  Object to form.

4               THE WITNESS:  I don't recall, other than

5    what I've already said about McVeigh.

6        Q.  (BY MR. WAREHAM)  Okay.

7        A.   Yeah.  So I don't know about 223.  I don't

8    remember.  I don't -- I wouldn't know about Privacy Act

9    violations.

10       Q.   Okay.

11       A.   I don't know about 234, "protected records

12   without authority," I don't know what this stuff is.

13       Q.   Okay.  Next.

14       A.   239, I don't know about what this stuff is.

15   I -- I wouldn't have any of his privacy information.  I

16   was off the program.

17       Q.   All right.  Are there any additional --

18       A.   242 --

19       Q.   Okay.

20       A.   -- I don't know about this stuff.  More Privacy

21   Act.  I wouldn't be involved in that.  I don't know

22   about any of this -- I don't know about any of the

23   Privacy Act -- 243, Privacy Act violations.  244,

24   Privacy Act.  I don't know about Privacy Act violations.

25       Q.   Okay.  Have you ever received Privacy Act

163

1   training as part of records training?

2       A.  I mean, we're taught to put -- like, encrypt

3   our email for PII.

4       Q.  Do you -- do you receive semi-annual records

5   training?

6       A.  We receive a lot of training.  I don't remember

7   every single training I have.

8               MR. SKINNER:  I'm having some difficulty

9   hearing your questions, Jason.

10              MR. WAREHAM:  Do you -- sorry about that.

11      Q.  (BY MR. WAREHAM)  Do you -- what did I ask?

12              Do you receive semi-annual Privacy Act --

13  or records training as part of your job?

14      A.  We receive a lot of training.  That's -- might

15  be one of them.

16      Q.  You don't recall?

17      A.  Like, if you were to tell me what does records

18  management training consist of, I'm not going to

19  remember.

20      Q.  Okay.  But do you receive records management

21  training?

22      A.  Probably.  I don't know about any Privacy Act

23  stuff, though.

24      Q.  I understand.

25      A.  Like, this --

Daniel D.S. Brown
March 24, 2025

CONFIDENTIAL TRANSCRIPT

164

1    Q.  I'm asking --

2    A.  Okay.

3    Q.  -- if you receive records management training?

4    A.  Probably.

5    Q.  Okay.  Are there other portions here that you

6  would call out that are actual --

7    A.  I'm sure there are, but I -- I'm -- yeah.  In

8  the amount of time I was given, I think those are the

9  areas, but I'm sure I've probably missed something.

10    Q.  Okay.

11        (Discussion off the written record.)

12            MR. WAREHAM:  Any objection to taking ten?

13  We've been going for about an hour and ten.

14            MR. SKINNER:  No objection at all.

15            MR. WAREHAM:  All right.

16            THE VIDEOGRAPHER:  Time off record is 3:21.

17        (Recess taken from 3:21 p.m. to 3:41 p.m.)

18            THE VIDEOGRAPHER:  We are now back on the

19  record at 3:41.

20            THE WITNESS:  Where did you say that --

21  where -- where was the statement that "put me under

22  oath," where -- where -- I don't remember seeing that

23  here.  Where is that?  Because you're saying I said

24  that.

25    Q.  (BY MR. WAREHAM)  Well, I'm not sure if it made

Daniel D.S. Brown                    CONFIDENTIAL TRANSCRIPT
March 24, 2025

                                                              165
1   the complaint, but did you ever make that statement

2   to --

3        A.  No.

4        Q.  -- Todd Jaspers?

5        A.  No.

6        Q.  Did you ever make that statement to Dr. Roe?

7        A.  To put me under oath, no.

8        Q.  All right.  Did you ever make a statement with

9   regard to any sort of legal process to be able to

10  share --

11       A.  No.

12       Q.  -- details?

13              No?

14              I want to discuss that first complaint that

15  you brought with you to the deposition.  Where did you

16  get that from again?

17       A.  The --

18              MR. SKINNER:  All right.  So --

19              THE WITNESS:  -- PDF?

20              MR. SKINNER:  -- so what document are we

21  looking at now?  Is this the document that John Hodges

22  emailed us?

23              MR. WAREHAM:  Yes.

24              MR. SKINNER:  All right.  So do you -- do

25  you want to introduce that as a deposition exhibit?

166

1              MR. WAREHAM:  Sure.  We'll make that an
2    Exhibit 2.  Why not?
3              THE WITNESS:  Marvel Butler.
4         (Exhibit 2 was marked for identification.)
5      Q.  (BY MR. WAREHAM)  And who is that?
6              THE WITNESS:  Can -- can you say who it is?
7    I...
8              MR. BARRERA:  That's the document.
9              THE WITNESS:  Yeah.  I'm asking Reggie to
10   say who it is.  I don't remember his official title.
11             MR. SKINNER:  So I'm -- I'm not a witness.
12   I'm not permitted to testify.  But you can testify to
13   the best of your recollection.
14             THE WITNESS:  Some lawyer in the Air Force.
15   I -- I don't remember his exact -- his exact role.
16     Q.  (BY MR. WAREHAM)  All right.  And how did this
17   lawyer in the Air Force contact you?
18     A.  He contacted me around June through August of
19   last year to supply him data.
20     Q.  And what data did you provide him?
21     A.  Relevant emails to the case.  There was a --
22   there was a notice of how to collect information.
23     Q.  And how did you collect that information?
24     A.  On NIPR.
25     Q.  Okay.

Daniel D.S. Brown                          CONFIDENTIAL TRANSCRIPT
March 24, 2025

167

1        A.   Just with a cue -- according to the

2   instructions.

3        Q.   What were the instructions?

4        A.   I don't remember.  You -- don't you have it

5   here?

6        Q.   Did you do a -- did you, like, go to Outlook?

7        A.   Yeah.

8        Q.   And did you just put in a search name?

9        A.   Yeah.  I did -- well, I did what the

10  instructions said.

11       Q.   Do you recollect what those are?

12       A.   No.  I don't remember all the -- I don't

13  remember all the details of the instructions --

14       Q.   All right.

15       A.   -- but I did it according to the instructions.

16       Q.   Do you recall any portion of the instructions?

17       A.   Like, specific key words, type it in.

18       Q.   What key words?

19       A.   I don't remember.  Roysdon was one of the

20  words.

21       Q.   All right.

22       A.   Fibonacci, whatever.

23       Q.   But they had you type that in?

24       A.   Yeah.

25       Q.   All right.  And when you say "type that in,"

168

1    you typed it into Outlook?

2         A.   Yes.

3         Q.   And you conducted that search on NIPR?

4         A.   Yes.

5         Q.   Did you conduct that search on any other

6    system?

7         A.   No.

8         Q.   Were you asked to conduct that search on any

9    other system?

10        A.   No.

11        Q.   What did you do with the materials that you

12   were asked to search for?

13        A.   I sent it to Marvel.

14        Q.   In what form?

15        A.   DOD safe.

16        Q.   Okay.  And were they .MSJ files -- or MSG

17   files?

18        A.   I don't remember.

19        Q.   Were they PDFs?

20        A.   They were mostly emails, because I moved

21   systems, so there's nothing left on the -- on the NIPR

22   drive.

23        Q.   Are you familiar with the file types associated

24   with Outlook?

25        A.   Yeah.  But I don't remember -- I don't remember

169

1    the -- the extension.

2        Q.  Okay.

3        A.  It's not something you look at every day.

4        Q.  Okay.  Do you recall doing it as an Outlook

5    email file or as a PDF?

6        A.  They were mostly email files with attachments

7    in it.

8        Q.  Okay.  And you transmitted that via DOD safe to

9    this Air Force lawyer?

10       A.  (Witness nods affirmatively.)

11       Q.  And that's a "yes"?

12       A.  Yes.

13       Q.  And you might want to watch the hands for

14   Reggie's sake.

15       A.  Oh.

16       Q.  Yeah, I know.

17           To your knowledge, has anybody searched any

18   system other than NIPR?

19       A.  I don't know.

20       Q.  Have you discussed anyone else's searches for

21   information related --

22       A.  No.

23       Q.  -- to this case?

24       A.  No.

25       Q.  Have you conducted a search of any location

Daniel D.S. Brown
March 24, 2025

CONFIDENTIAL TRANSCRIPT

170

1    other than Outlook?

2        A.  I moved -- I moved systems.  I moved desks, so

3    all the old information would be gone.  The only thing

4    left would be Outlook.

5        Q.  Did anyone ever ask you to preserve the data on

6    your old system?

7        A.  No.  Because it had already been gone.

8        Q.  When was it gone?

9        A.  When we moved buildings.

10       Q.  When was that?

11       A.  '22, '23.  I don't remember when --

12       Q.  All right.

13       A.  -- exactly.

14       Q.  But anything that would have been contained on

15   that old system you believe to be gone?

16       A.  It would have been on the emails anyways.

17       Q.  All right.  Was there any other data on your

18   system that would have been searchable?

19       A.  No.

20       Q.  Did you conduct a search on your old system?

21       A.  On my old computer?

22       Q.  Uh-huh.

23       A.  No.  But, I mean, everything would be on the

24   emails.

25       Q.  All right.  When you just said "it wouldn't be

Daniel D.S. Brown                                CONFIDENTIAL TRANSCRIPT
March 24, 2025

171

1    there anyways because we switched systems," what

2    wouldn't be there if it was only --

3         A.   My old NIPR box.

4         Q.   Okay.

5         A.   I moved desks.

6         Q.   All right.  Was the NIPR box a cloud email

7    system?

8         A.   Not -- for Outlook, but not for, like, the

9    desktop.

10        Q.   Not for the desk- -- can you explain that

11   better?

12        A.   All the files are saved locally to the desktop.

13        Q.   All right.  And do you know if those local

14   files were preserved?

15        A.   I don't think so.

16        Q.   Are --

17        A.   But, again, like, everything would have been on

18   the email.  I don't keep good records.

19        Q.   Okay.  Would -- did you have any -- well,

20   actually, do you know why the Air Force lawyer provided

21   you a copy of the complaint?

22        A.   I don't know.  I've -- I don't know.  I just

23   got -- I just got this notice and I was told to do it.

24        Q.   Okay.  And the notice included the complaint?

25        A.   Yes.

172

1    Q.  Have you received any updated complaint from

2  that time period?

3    A.  No.

4    Q.  Have you had any more interaction with an Air

5  Force lawyer in regards to this case since then?

6    A.  Yeah.  He was told to -- he told me to talk to

7  him.

8    Q.  When?

9    A.  Wednesday of last week.

10   Q.  All right.  And how did they contact you?

11   A.  By phone.  They called my phone.

12   Q.  And what exactly was said?

13   A.  I don't remember everything that was said.

14  Let's see.  They want to know my work role.  They wanted

15  to know if I'd talked to, like -- they're alluding that

16  I'm, like, colluding with Roysdon.  I don't know if

17  "colluding's" the right word, but they were, like -- how

18  were they -- how would they say it?  They're just asking

19  if I talked to Roysdon about this case.  And I'm, like,

20  no, I haven't talked -- I don't know -- I didn't talk to

21  Roysdon about this case.

22   Q.  And when you said "colluding" just now, that's

23  just talking to him?

24   A.  Like, that's what they made it sound like.

25  Maybe I'm inferring too much.  But that's what they made

EXHIBIT 7
Page 172 of 218

1  it sound like.  That I was colluding with him.  I'm not

2  colluding.

3      Q.  Okay.  What other parts of the conversation do

4  you recall?

5      A.  That was the main thing that -- that was the

6  main thing.

7      Q.  Okay.  Have you provided any more documents

8  since that first search?

9      A.  No.

10      Q.  How long was that interview with...

11      A.  About 30 minutes.

12      Q.  Did you feel that you could decline the

13  interview?

14      A.  Yeah.  They -- they told me later.

15      Q.  Later?

16      A.  Yeah.

17      Q.  What does that mean?

18      A.  They said it towards the middle or towards the

19  end that I could -- that it was voluntary.

20      Q.  But they didn't tell you at the beginning?

21      A.  I don't believe so.  I didn't -- I didn't feel

22  like I had to, but, yeah.

23      Q.  Have you ever used the phrase with respect to

24  Dr. Roe, quote, "dragged through the mud"?

25      A.  No.  I don't remember saying that.

Daniel D.S. Brown
March 24, 2025

CONFIDENTIAL TRANSCRIPT

174

1          Q.   All right.

2                    MR. WAREHAM:  Reggie, to orient you, I'm

3     going to start working with some Bates numbers here.  We

4     will drop the documents in the Zoom chat so you guys can

5     access directly, and they'll be displayed on the screen.

6     Any questions on that?

7                    MR. SKINNER:  No.

8                    MR. WAREHAM:  Okay.  So starting with...

9                    MR. BARRERA:  You're going to probably need

10    to look here.

11                   MR. WAREHAM:  Yeah.  We're going to display

12    it right there.

13                   THE WITNESS:  Oh, gosh.

14                   MR. BARRERA:  They're going to show you

15    some documents.

16                   MR. WAREHAM:  And can you just pull up the

17    first one, whenever you're ready?  And then drop that in

18    the thing so he can look at it so Reggie has it.

19                   MS. BRADSHAW:  Yeah.  I have it just...

20                   MR. WAREHAM:  Okay.  Great.  Reggie, is it

21    okay if we display right now and -- and then drop them

22    in?  Or would you rather have them dropped in first?

23                   MR. SKINNER:  It doesn't matter.

24                   MR. WAREHAM:  Okay.  We'll display and then

25    drop them in.

Daniel D.S. Brown                                    CONFIDENTIAL TRANSCRIPT
March 24, 2025

175

1       Q.  (BY MR. WAREHAM)  All right.  Are you able to

2  see this email?

3       A.  Yeah.

4       Q.  All right.  Can you identify -- let's --

5                  MR. SKINNER:  We can't see -- maybe the --

6  the --

7                  MS. SEEMAN:  If you look at the screen

8  behind your head, you can see it how we see it.  And so

9  it's not --

10                 MR. WAREHAM:  Oh, yeah.  That's not ideal.

11                 MS. SEEMAN:  Okay.

12                 MR. WAREHAM:  All right.

13          (Discussion off the written record.)

14                 MR. WAREHAM:  Are you able to review that

15  better?

16                 MR. SKINNER:  Yes, we are.  Uh-huh.

17                 MR. WAREHAM:  All right.  We're dealing

18  with Bates numbers starting at 60.  We're going to make

19  this Exhibit 3 for this -- this deposition.  It goes 60

20  through 66.

21          (Exhibit 3 was marked for identification.)

22       Q.  (BY MR. WAREHAM)  Looking at page 4, otherwise

23  known as Bates stamp 66, do you recognize that email?

24       A.  Yeah.

25       Q.  What is that email?

Daniel D.S. Brown
March 24, 2025

CONFIDENTIAL TRANSCRIPT

176

1      A.   I'm requesting Roysdon to get paperwork from
2  NSA saying he could work as a contractor outside of NSA
3  hours.
4      Q.   All right.   And who was requesting that?
5      A.   McVeigh.
6      Q.   All right.   And was that email in follow-up to
7  a request by Captain McVeigh?
8      A.   Yes.   As it says -- it says this; right?
9      Q.   Yeah.
10          And the August 13th date, was that when he
11  first made that request of you?
12      A.   I don't remember.   I would have sent it, I
13  would think, right when he sent the request.
14      Q.   All right.   And were you still involved in the
15  program at that time, August 19, 2020?
16      A.   I think so.
17      Q.   All right.   And do you know why he was asking
18  you to get that from Paul?
19          MR. SKINNER:   Object to form.
20          THE WITNESS:   I guess because I dealt with
21  him more.
22      Q.   (BY MR. WAREHAM)   All right.   Scrolling up to
23  65 in that same document, Bates number 65.   Do you
24  recognize this email?
25      A.   What is this?   Can you go up?

CONFIDENTIAL TRANSCRIPT

177

1       Q.   Sure.

2                MR. HENRY:  Keep going.

3                THE WITNESS:  Can you go up?

4                MR. HENRY:  There you go.

5                THE WITNESS:  I guess this is a -- wait.

6    Where -- what -- what system was this taken from?

7       Q.  (BY MR. WAREHAM)  Well, I'm not sure.  It

8    appears to be NIPR from what I can tell, because it says

9    "Unclassified FOUO."

10               Do you recognize that email?

11      A.   I think so.  Can you go down?

12      Q.   Uh-huh.

13      A.   Can you go down?

14      Q.   Uh-huh.

15      A.   Hold on.  Can you go down?

16      Q.   Uh-huh.

17      A.   This is a -- this looks -- can you go up?

18      Q.   Sure.  Tell me when to stop.

19      A.   Okay.  Yeah.  Okay.  Yeah.  That's the email

20   that -- saying if -- if he could work dual hat or

21   something or if there's a conflict of interest.

22      Q.   All right.  Now, was this the email you were

23   referencing when you described, like, Captain McVeigh's

24   disfavor in the email that was sent forward?

25               MR. SKINNER:  Object to form.

CONFIDENTIAL TRANSCRIPT

178

1          THE WITNESS:  Yeah.  I mean, this is the

2    email that he wanted to get ahold of to see if he

3    could -- if he had authority to work in a dual capacity.

4          Q.  (BY MR. WAREHAM)  All right.  And to be

5    clear --

6          A.  I believe so.  It's been a long time since I've

7    seen this.

8          Q.  So earlier in -- today you had said something

9    about the email being incomplete and that it made it

10   worse for Dr. Roe.  Is this the incomplete email?

11         A.  I believe so, but I can't guarantee it.

12         Q.  Okay.  And who were you forwarding it to?

13         A.  McVeigh, I would think.

14         Q.  All right.  Do you recognize -- do you

15   recognize who Captain McVeigh forwarded it to after you,

16   this Tanya --

17         A.  Yeah.

18         Q.  Who is that?

19         A.  They're the -- they're the people in charge of

20   AFL contract.

21         Q.  All right.  So this was an AFL contract

22   involving Dr. Roe?

23         A.  It was an AF- -- I mean, I said -- I believe I

24   said that, an AFRL contract.  Yeah.

25         Q.  Okay.

179

1    A.   They -- they didn't see any issue with it.

2    Q.   Excuse me.  Can you say more about that?

3    A.   They did not see any issue with it.

4    Q.   And when you say "they," who do you mean?

5    A.   Tom and Tanya, if I remember correctly.

6    Q.   All right.  And do you know what their role is

7  at Air Force?

8    A.   They're in charge of the contracts.

9    Q.   So they are contracting, like, representatives?

10   A.   Yeah.

11   Q.   Okay.  And they didn't see any problem with --

12   A.   If I remember correctly, they didn't see an

13 issue with it.

14   Q.   All right.  Did you ever discuss --

15   A.   What are they saying here?  Oh, okay.  Oh,

16 yeah.  See, it was -- it was based on his -- it says

17 "Roysdon had given notice of his resignation from NSA.

18 I will debrief him."  That just made it worse when he

19 resigned from NSA during this period.

20   Q.   All right.  Now, how would you regard Tanya and

21 Thomas Parisi's knowledge of contracting?

22   A.   Very high.

23        MR. SKINNER:  Object to form.

24   Q.   (BY MR. WAREHAM)  All right.  Are they the

25 people that you -- that ultimately provide, like, the

Daniel D.S. Brown
March 24, 2025

CONFIDENTIAL TRANSCRIPT

180

1  contract oversight for Air Force Life Cycle Management

2  Center?

3      A.  No.

4      Q.  Who does?

5      A.  They provide oversight for their contracts.

6      Q.  All right.  And the contracts that Air Force

7  Life Cycle Management obtains through them, do they

8  provide --

9      A.  It's still their contract.

10     Q.  Okay.  So they provide oversight over their

11 contracts?

12     A.  Tom and Tanya provide oversight on their

13 contracts.

14     Q.  Okay.  Next one will be Bates number 162.  Do

15 you recognize this email?

16     A.  Yeah.

17     Q.  What is this email?

18     A.  He wants "assigned MFR on SIC stating what role

19 Roysdon is doing in his Government and contractor tech

20 SME roles and how he is avoiding a conflict of

21 interest."

22     Q.  All right.  And was this a follow-up to the

23 oral conversation you had in your office?

24     A.  I would assume so, yes.

25     Q.  Okay.  And what's the date on this one?

Daniel D.S. Brown
March 24, 2025

CONFIDENTIAL TRANSCRIPT

181

1      A.  August 19th.

2      Q.  Any reason to discount that date?

3      A.  No.

4      Q.  All right.  Next one.

5              MS. SEEMAN:  Sorry.  Are we going to mark

6  that for the record?

7              MR. WAREHAM:  Oh, yeah, sorry.  Thanks.

8  Exhibit 4, please, on that one.

9          (Exhibit 4 was marked for identification.)

10     Q.  (BY MR. WAREHAM)  So I know all of the

11 abbreviations in there except for "SIC."  Can you tell

12 me what SIC means?

13     A.  I -- I think I can, but I'm not sure if I can.

14     Q.  All right.  What do you think it means?

15     A.  No.  I -- I mean, like, from a security's

16 perspective.

17     Q.  Oh, you believe that that might be classified?

18     A.  It's possible, but I want to err on the side of

19 caution.

20     Q.  Okay.  If a classification review determined

21 that to be unclassified, would you be willing to answer

22 that question?

23     A.  Yeah.  It's not complicated.

24     Q.  Okay.  So next one we got that's going to be

25 Exhibit 5 will be Bates number 229.

1          (Exhibit 5 was marked for identification.)

2     Q.  (BY MR. WAREHAM)  All right.  Scrolling down to

3  the bottom.

4     A.  Geez.

5     Q.  I'm going to scroll up to where you are

6  involved in this.  Let's see.  Actually, this one's --

7  oh, sorry.  Just a sec.  Okay.  Oh, so here we have Ted.

8  I'm not going to ask you to, like, verify the

9  authenticity of this email because you're not on it.

10  But in this email purporting to be from Ted Oakley, do

11  you know who Ted Oakley is?

12     A.  Yeah.

13     Q.  All right.  Who is Ted Oakley?

14     A.  He's the PM on the contractor side.

15     Q.  All right.  He recounts hearing from you about

16  your dissatisfaction with an Andy Pennington.  Do you

17  recall that conversation?

18     A.  Oh, I don't -- with -- with Ted, no, not

19  specifically.  But, I mean, that's -- I was -- I did

20  think he was incomp- -- not -- not very good.

21     Q.  All right.  And --

22          MR. SKINNER:  So I'm going to ask the

23  witness to remove the hands from his face.  And it's

24  getting hard to --

25          THE WITNESS:  I thought he was not very

183

1  good.

2      Q.  (BY MR. WAREHAM)  And did you -- did you

3  discuss Roysdon in any way during that conversation, or

4  Dr. Roe?

5      A.  I don't remember.  But, I mean, like I think he

6  was, like -- I believe they hired him to replace

7  Roysdon, but I'm not part of the program, so they had to

8  find other work for him of -- this Pennington guy.  And

9  he ended up doing, like, just busy work, I guess.

10     Q.  Do you not recall discussing Dr. Roe during the

11  conversation with --

12     A.  No.

13     Q.  -- Mr. Oakley?

14     A.  No.  But, I mean, I just -- I just thought that

15  Pennington was not very good.

16     Q.  All right.  Given your knowledge of HNCO and

17  its programs, do you have any knowledge as to what

18  program -- what program Major McV- -- then Major McVeigh

19  was referencing when he says in that email "I'm looking

20  forward to see that project go forward"?

21     A.  I -- I don't know.  But -- but I believe Andy

22  was hired to replace Roe.  But he had nowhere near the

23  technical qualifications.

24     Q.  All right.

25     A.  And he ended up -- he ended up doing work -- we

Daniel D.S. Brown
March 24, 2025

CONFIDENTIAL TRANSCRIPT

184

1   just gave him -- they just gave him crap work.  It was

2   just so bad.  That's...

3       Q.  So Mr. Pennington was so bad at the job they

4   gave him scut work; is that fair?

5       A.  I -- yeah.  It's -- yeah.

6       Q.  Yeah.

7       A.  Yeah.  I mean, he wasn't very good.

8       Q.  And so Dr. Roe was actually more skilled than

9   Mr. Pennington?

10      A.  I mean, I would think so.

11      Q.  In your estimation?

12      A.  Yeah.  Yeah.  Just -- yeah.  He was like a --

13  he's a former O5 or O6, I think.  And this -- I mean,

14  this -- you know, you make command decisions, you don't

15  do research at that grade.

16      Q.  All right.  Next one we're going to do,

17  Exhibit 6.

18          (Exhibit 6 was marked for identification.)

19              MR. WAREHAM:  And, what, is that 229?

20              MS. BRADSHAW:  Uh-huh.

21              MR. WAREHAM:  Yeah.  So Bates number 233.

22      Q.  (BY MR. WAREHAM)  Have you ever -- actually,

23  I'm going to give you time to review that one.  That's

24  pretty dense.

25      A.  Can you go down?

Daniel D.S. Brown                                    CONFIDENTIAL TRANSCRIPT
March 24, 2025

                                                                    185

1        Q.  Sure.

2        A.  Okay.  Yeah.  Yeah.  This isn't OSI.

3        Q.  Right.

4            It's not OSI, but it is a security manager

5   incident investigation; right?

6        A.  Yeah.

7        Q.  All right.  Do you remember participating in

8   this investigation?

9        A.  I remember he asked me some questions.

10       Q.  And what questions did he ask you?

11       A.  I don't remember.  I mean, it says there

12  nothing happened about it, so...

13       Q.  But do you recall -- you do recall being part

14  of this?

15       A.  I remember I was asked some questions.

16       Q.  Okay.  And did he take notes, to your

17  knowledge?

18       A.  Probably.

19       Q.  Do you agree with the position at the end of

20  the determination --

21       A.  Yeah.

22       Q.  -- that no security violation --

23       A.  There was -- there was no security violation.

24            MR. BARRERA:  Yeah.  Let him finish his

25  question.

Daniel D.S. Brown                          CONFIDENTIAL TRANSCRIPT
March 24, 2025

                                                                186

1              THE WITNESS:  Okay.

2              MR. WAREHAM:  Yeah.

3         Q.  (BY MR. WAREHAM)  Do you agree with the

4    position that no security violation occurred?

5         A.  Yeah.  I agree with that.  It was like -- it

6    was, like, splicing hairs that they were -- they were

7    saying -- yeah.  I agree with that.

8         Q.  And who were they saying when --

9         A.  Well, I agree with this thing here.

10        Q.  Yeah.

11             When you say "they" were splicing hairs,

12   who is that?

13        A.  I think McVeigh was saying, like -- I forget.

14   But it was, like, he was in a billet, not as a

15   contractor, but as NSA so, therefore, he was a security

16   violation.  I'm, like, that's ridiculous.  It's the same

17   person.  But he was saying, like, no, it's got to be in

18   the same capacity.  I'm, like, well, it's not a security

19   violation.  It might be, like, improper procedure, but

20   it's not a security violation.

21        Q.  So, to your recollection, it was McVeigh

22   pushing that position?

23        A.  I believe so.  Yeah.

24        Q.  All right.  Next one.  Actually, a real quick

25   question before we go into the next one.  Do you think

CONFIDENTIAL TRANSCRIPT

187

```
 1   that losing Dr. Roe adversely affected the HNCO mission?
 2        A.   Probably.
 3        Q.   Sorry.  Could you say that again?
 4        A.   Probably.
 5        Q.   Okay.  Next one, it's going to be Exhibit 7,
 6   Bates number 333.
 7             (Exhibit 7 was marked for identification.)
 8        Q.   (BY MR. WAREHAM)  All right.  Do you recognize
 9   this?
10        A.   Yeah.
11        Q.   What is it?
12        A.   I think it's like an addendum for a demo.
13        Q.   Okay.  And agenda for demo from what entity to
14   what entity?
15        A.   I really don't want to go into those details.
16        Q.   Was this from Leidos?
17        A.   Yes.
18        Q.   To HNCO?
19        A.   And other people.
20        Q.   All right.  Is -- to your recollection -- are
21   you listed on this invite?
22        A.   Yes.
23        Q.   Did you attend this meeting?
24        A.   I believe so.
25        Q.   Is Dr. Roysdon listed on this memo?
```

Daniel D.S. Brown
March 24, 2025

CONFIDENTIAL TRANSCRIPT

188

1      A.  I -- I don't know.  Is he?  I don't think so.

2  Maybe.  I don't -- I don't think so.  Let me see.  Yeah,

3  he's there.

4      Q.  All right.  Looking at the agenda, do you see

5  anywhere where Dr. Roe was listed as a presenter?

6      A.  No.

7      Q.  Do you recall him presenting at this meeting?

8      A.  I recall him presenting at the April meeting.

9      Q.  But not this meeting?

10      A.  I don't remember that, him presenting here.

11      Q.  Next one I have is Exhibit 8, and it is Bates

12  388.

13          (Exhibit 8 was marked for identification.)

14      Q.  (BY MR. WAREHAM)  So this one, have you seen

15  this email before?

16      A.  Yeah.  I mean, it says I'm on there, but I

17  don't remember it.  Hold on.

18      Q.  Go ahead and review it in full.  It's -- it's

19  only one page.

20      A.  I don't remember this email.

21      Q.  Okay.  Any reason to -- is your email incorrect

22  from what you view it as there?  Is -- or is that your

23  correct email?

24      A.  Yeah.  I just -- I just don't remember this.

25      Q.  Okay.  Go ahead and keep reviewing it and let

1    me know when you're done.

2         A.   Oh, maybe.  Oh, yeah.  Maybe.  Yeah.  See,

3    like, Tom said it's not a big deal.  Like, just to let

4    the investigation do it.  I see no reason to believe

5    that this is what happened here.  Yeah.  Tom is -- yeah.

6    I don't think he had an issue with it.

7         Q.   All right.  So I want to be clear about a few

8    things.  So it was McVeigh, to your recollection, that

9    accused Dr. Roe as a security violation.  Yes?

10        A.   Yeah.

11             MR. SKINNER:  Object to form.

12        Q.   (BY MR. WAREHAM)  And that was determined to be

13   unsupported?

14             MR. SKINNER:  Objection, form.

15             THE WITNESS:  Yeah.  It was more -- it was,

16   like, he was doing a technicality because he was

17   processed with an NSA billet and not his contractor

18   billet.  And that -- like, that wasn't a security

19   violation; it was a protocol violation.

20        Q.   (BY MR. WAREHAM)  And then it --

21        A.   That's my understanding of it.

22        Q.   -- was Captain McVeigh, again, that was

23   accusing Dr. Roe of having committed some amount of

24   contractor impropriety; right?

25             MR. SKINNER:  Objection, form.

190

1              THE WITNESS:  I mean, he -- it's in his --
2  it's in the email here.
3       Q.  (BY MR. WAREHAM)  I'm talking about
4  interactions with you.
5       A.  Oh, I mean, he was -- yeah.  Yeah.  I -- I do
6  remember the billet thing now.  I didn't remember it
7  before.
8       Q.  And it was Captain McVeigh that was upset about
9  the dual-hat position issue --
10      A.  Yes.
11      Q.  -- right?
12      A.  Yeah.
13      Q.  And Thomas Parisi, in this email you were
14  included on, said it wasn't an issue; right?
15      A.  Yeah.  Well, it says "I see no reason to
16  believe this is what happened.  We should report it to
17  the proper authorities and stay out the investigation."
18      Q.  So Captain McVeigh was wrong on both accounts?
19              MR. SKINNER:  Objection to form.
20              THE WITNESS:  I mean, I think so.
21      Q.  (BY MR. WAREHAM)  From your observation of
22  Captain McVeigh, did you consider him an intelligent
23  man?
24      A.  Yeah.
25      Q.  Did -- did he appear knowledgeable on issues of

191

1    security clearance?

2         A.  I think so.

3         Q.  Did he appear knowledgeable on issues around

4    contracting?

5         A.  I didn't associate with him on contracts that

6    much.

7         Q.  Well, he was managing the special projects;

8    right?

9         A.  Yeah.

10        Q.  I mean, you have to have some understanding of

11   contracting?

12        A.  I don't know.  I -- I'm -- I -- I don't know.

13   I mean, I would think he's smart enough to understand

14   contracting.

15        Q.  And when he was --

16        A.  He -- he seems like a smart person.

17        Q.  And when he was talking to you about

18   contracting, he was -- he was telling you Dr. Roe was in

19   the wrong; right?

20                 MR. SKINNER:  Object to form.

21                 THE WITNESS:  I -- I don't think he talked

22   to me about contracting.

23        Q.  (BY MR. WAREHAM)  He didn't talk to you about

24   the dual-hatting problem?

25        A.  Well, the dual-hatting, yes.

192

1      Q.  Yeah.

2              So that's a contract issue?

3      A.  Well, I mean, it's several issues.  It could be

4  characterized in several different ways.

5      Q.  All right.  So when he discussed dual-hatting,

6  in whatever way you characterize that, he represented

7  that as a violation by Dr. Roe, did he not?

8              MR. SKINNER:  I'm sorry.  Violation of

9  what?  You're trailing off with the questions.

10             MR. WAREHAM:  Sorry.  I'll try to speak up

11  and remember my question.

12             Can you read back my question?

13         (Record read.)

14             THE WITNESS:  Sorry.  I'm tired.

15     Q.  (BY MR. WAREHAM)  Yeah, I understand.

16     A.  Can you read it again?

17     Q.  Did he -- when this -- did he, that is,

18  Captain McVeigh, discuss the dual-hatting problem you've

19  referenced with you he represented --

20     A.  Yeah.  He told me that he shouldn't be

21  dual-hatted.

22     Q.  Okay.

23     A.  And said it's a conflict of interest.

24     Q.  And --

25     A.  I told him it's between the contractor and the

Daniel D.S. Brown                    CONFIDENTIAL TRANSCRIPT
March 24, 2025

193

1   NSA.

2        Q.   And he was incorrect on that front, too?

3        A.   I think so.

4        Q.   Moving on to what will be Exhibit 9.  Oh,

5   actually, before we move off Exhibit 8, one more

6   question.  Sorry.

7               So in the bottom portion of the

8   Captain McVeigh email that you're -- that's displayed on

9   the screen on Bates 388 --

10       A.   Bates 388?

11       Q.   -- Captain McVeigh -- yeah.  Bates number --

12  it's in the bottom right-hand corner.  Just a way to

13  reference it.

14       A.   Oh.

15       Q.   Captain McVeigh describes Dr. Roe being a

16  subcontractor to GITI on behalf of Dan Brown for one of

17  his projects.  Do you see that?

18       A.   Yeah.

19       Q.   Why is he describing Dr. Roe's subcontractor

20  work as one of your projects?

21               MR. SKINNER:  Object to form.

22               THE WITNESS:  I don't know.  It's his

23  project.  He's in charge of special projects.

24       Q.   (BY MR. WAREHAM)  So this was not your project?

25       A.   He is in charge of special projects.  I'm

194

1    involved in it from a technical capacity.

2        Q.  Do you know why he described it that way?

3        A.  I don't know.

4        Q.  Had he ever --

5            MR. SKINNER:  Object to form.

6        Q.  (BY MR. WAREHAM)  Had he described projects in

7    your, like, Dan Brown possessive before like it was your

8    project?

9        A.  I don't know.  Maybe.

10       Q.  Do you have any explanation for that

11   whatsoever?

12       A.  I don't know.

13           MR. SKINNER:  Same objection.

14       (Exhibit 9 was marked for identification.)

15       Q.  (BY MR. WAREHAM)  All right.  Moving on to

16   Exhibit 9, Bates 395.  So this is another portion of the

17   chain involving Tanya and Mr. Parisi, Thomas Parisi.  Do

18   you recognize these -- this email?

19       A.  Can you go up?

20       Q.  Uh-huh.

21       A.  Can you go up again?

22       Q.  Uh-huh.

23       A.  Can you go up?

24       Q.  I'm all the way up.

25       A.  Oh.  Can you go down?

195

1      Q.  Uh-huh.

2      A.  So the bottom is different.

3      Q.  The bottom kind of starts the same and then it

4 diverts off into another chain.

5      A.  What date is this?  24.  Okay.  Okay.  What was

6 the question?

7      Q.  Do you recognize this email?

8      A.  Not really.

9      Q.  What's that?

10     A.  Not really.

11     Q.  Okay.  But --

12     A.  I know I'm on the email chain, but I don't

13 remember it.

14     Q.  Is your email correct on that chain?

15     A.  Yeah.

16     Q.  Any reason to think you didn't receive this?

17     A.  No.  I don't think it's forged.  It's, like --

18 in the bottom -- on the top, I'm not on there.

19     Q.  Okay.  But the ones that you're included with,

20 you would have received likely?

21     A.  Yeah.  But it doesn't really say a whole lot.

22     Q.  Okay.

23     A.  Does it?  There's nothing to make it can stand

24 out, is there?

25     Q.  All right.  But do you recall receiving it?

Daniel D.S. Brown
March 24, 2025

CONFIDENTIAL TRANSCRIPT

196

1      A.   No.   I just -- I wouldn't recall it because

2  there's nothing, like, really substantive.

3      Q.   Okay.   I think that's all of our things.   Yeah.

4  Okay.

5            Have you -- in your time with HNCO or Air

6  Force Life Cycle Management Center, have you ever

7  observed anyone else being removed from a project for

8  punishment?

9      A.   I've never --

10           MR. SKINNER:   Object to form.

11           THE WITNESS:   -- I've never seen one, like,

12  an individual contractor removed, other than lack of

13  performance.

14      Q.   (BY MR. WAREHAM)   All right.   How about people,

15  like, in your position similar to what happened to you

16  with respect to Captain McVeigh's projects?

17      A.   Like, being read-out?

18      Q.   Yeah.

19           Being removed from a project?

20      A.   No, not really.

21      Q.   So, to your recollection, you're the only one?

22      A.   I mean, people get moved out of sections all

23  the time.   I don't really know why.   I don't really go

24  into it.

25      Q.   Okay.   So you have seen it before?

CONFIDENTIAL TRANSCRIPT

197

1      A.  Getting people moved to different sections,

2  yeah.

3      Q.  Have you ever seen it as part of some sort of

4  disciplinary?

5      A.  No.

6      Q.  Okay.

7           MR. SKINNER:  Object to form.

8      Q.  (BY MR. WAREHAM)  To your knowledge, has

9  Captain McVeigh ever been investigated for misconduct?

10     A.  I don't know.  I don't know.

11     Q.  To your knowledge, has anybody made any

12 whistleblower complaints --

13     A.  I don't know.

14     Q.  -- against HNCO?

15     A.  I don't know of any.

16     Q.  Okay.  Has anyone ever described to you being

17 -- using the word "retaliation" with respect to HNCO?

18     A.  No, not that I recall.

19           MR. SKINNER:  Can you -- I'm sorry.

20           THE WITNESS:  Not that I recall.

21           MR. SKINNER:  I didn't hear the end of that

22 question because you put your hand over your mouth.

23           THE WITNESS:  Oh, not that I recall.

24           MR. WAREHAM:  I'll re-ask the question.

25     Q.  (BY MR. WAREHAM)  Has anyone ever used the word

Daniel D.S. Brown                                    **CONFIDENTIAL TRANSCRIPT**
March 24, 2025

                                                                        198

1   "retaliation" or "retaliatory" --

2          A.   Not that I recall.

3          Q.   -- with respect to HNCO with you?

4          A.   Not that I recall.

5          Q.   All right.  Have you ever observed unethical

6   behaviors within HNCO?

7          A.   I mean, I think the -- the dual-hatting stuff,

8   I would think that's not good.  Yeah.

9          Q.   All right.  When you say the "dual-hatting

10  stuff," you're saying --

11         A.   I mean, all this stuff I don't --

12         Q.   -- Dr. Roe?

13         A.   -- I don't agree with the way we handled the

14  situation.

15         Q.   Why not?

16         A.   Because it's between the contractor and NSA.

17         Q.   So you don't agree with the way that HNCO

18  handled Dr. Roe's dual-hatting issue?

19         A.   Yeah.  I don't agree with it.

20         Q.   All right.  Can you say more about that?

21         A.   They should have contacted the agency directly.

22              MR. SKINNER:  I'm going to ask the witness,

23  again, remove his hands from his mouth and repeat the

24  answer.

25              THE WITNESS:  They should have contacted

199

1   NSA directly and worked it out with them.

2       Q.  (BY MR. WAREHAM)  Can you describe while

3   Captain McVeigh was working at HN- -- HNCO how -- let's

4   say -- let me rephrase that.

5               While Captain McVeigh was working at HNCO,

6   how would you describe the culture of working there?

7               MR. SKINNER:  Object to form.

8               THE WITNESS:  Are you talking about, like,

9   McVeigh or just the general culture?

10      Q.  (BY MR. WAREHAM)  Both.

11      A.  Laid back.

12      Q.  Laid back for HNCO?

13      A.  (Witness nods affirmatively.)

14      Q.  And how -- what about Captain McVeigh?

15      A.  I mean, I really didn't work with him except

16  for this, like, brief period with Fibonacci.  I...

17      Q.  And what, if any, opinion are you left with

18  about Captain McVeigh?

19      A.  I just -- I think he's -- I think he's

20  cutthroat to get his projects funded.

21      Q.  Do you know if anybody has successfully

22  replaced Dr. Roe's contributions to HNCO since 2020?

23      A.  I would doubt it.

24      Q.  And why would you doubt that?

25      A.  Because he's got, like, a Ph.D. and three

Daniel D.S. Brown
March 24, 2025

CONFIDENTIAL TRANSCRIPT

200

1  masters, something like that.

2    Q.  Did you ever observe any behavior by Dr. Roe

3  you would classify as fraudulent or dishonest?

4    A.  No.  Well, I mean, except for what's written in

5  here, some things that I don't agree with.

6    Q.  Well, presuming that I wrote some of that stuff

7  and not Dr. Roe.

8    A.  I mean, before this incident, I -- there was

9  nothing that -- that I felt was fraudulent.

10    Q.  Okay.  Or dishonest?

11    A.  Yeah.  I don't -- I wouldn't consider it

12  dishonest.

13    Q.  Okay.  Do you happen to know what the

14  difference in pay would have been from being a GS13 to

15  being promoted to GS14?

16    A.  I don't know.

17    Q.  No?  You don't know?

18    A.  I -- I don't remember.

19    Q.  Were there ever any instructions given with

20  respect to whether or not to support Dr. Roe in this?

21    A.  No.

22    Q.  Do you know who administratively manages the

23  information systems for Air Force Life Cycle Management?

24    A.  There's so many organizations, like, I -- I

25  don't know.

CONFIDENTIAL TRANSCRIPT

201

1    Q.  Is there, like, an -- to your knowledge, is

2  there, like, a -- a G6-level IT management?

3    A.  I -- I don't know.  I -- I -- I don't know.

4  Like, that's, like, so -- that's so convoluted.

5    Q.  What do you have knowledge about the

6  information technology management at Air Force Life

7  Cycle Management?

8    A.  I -- I don't know.

9    Q.  Do you have your calendar entries from that

10  time period 2020 --

11              MR. SKINNER:  Objection.

12    Q.  (BY MR. WAREHAM)  -- 2019?

13    A.  Possibly.

14    Q.  Have you been asked to provide those?

15    A.  They might have been on the -- the -- the

16  request for information that I was sent by Marvel.  I --

17  I don't remember.

18    Q.  Do you recall if you exported that material to

19  a PST file?

20    A.  There was some entries I exported, but I don't

21  remember what came up in the search.

22    Q.  What was the morale of people involved in

23  Dr. Roe's projects after he left?

24              MR. SKINNER:  Object to form.

25              THE WITNESS:  I -- I don't know.  I was

CONFIDENTIAL TRANSCRIPT

202

1   taken -- removed from it.

2        Q.  (BY MR. WAREHAM)  Did you observe any

3   meaningful change in morale?

4        A.  No.

5             MR. SKINNER:  Object to form.

6             THE WITNESS:  I was removed from it.

7        Q.  (BY MR. WAREHAM)  Do you believe that there

8   were any impacts to operational efficiency for HNCO with

9   Dr. Roe's --

10       A.  No.

11       Q.  -- removal?

12       A.  Not operational efficiency.

13       Q.  Do you believe that there were any impacts

14  relative to projected advancement with Dr. Roe's --

15       A.  Probably.

16       Q.  All right.  Can you think of any?

17       A.  I -- I can't describe that here.

18       Q.  Okay.

19       A.  But, I mean, like, his caliber is hard to

20  replace.

21       Q.  Do you recollect any discussions around FOIA

22  requests being filed relative to Dr. Roe?

23       A.  I mean, the -- the information they asked to

24  get from my computer.

25       Q.  Do you know if that was part of a FOIA request?

CONFIDENTIAL TRANSCRIPT

203

1       A.   I don't know.

2       Q.   Did you have any observation on how the

3    inspector general complaint regarding Dr. Roe was

4    treated?

5       A.   I have no idea about that.

6       Q.   Do you recollect the first time you were asked

7    to preserve emails?  Like, roughly what time period?

8       A.   It was from the Marvel email.

9       Q.   All right.  And do you still have the Marvel

10   email?

11      A.   Yeah.

12           MR. WAREHAM:  One moment.

13      (Discussion off the written record.)

14           MR. WAREHAM:  Okay.  So we're going to

15   briefly take another break, unless there's an objection,

16   to finalize some of our materials.  We are getting to

17   the end of this.  So we're just going to take a quick

18   ten-minute huddle, come back and finalize, and we should

19   be done with your portion.

20           Any objection to that, Reggie?

21           MR. SKINNER:  No objection.

22           MR. WAREHAM:  Great.

23           THE VIDEOGRAPHER:  Time off record is 4:33.

24      (Recess taken from 4:33 p.m. to 4:50 p.m.)

25           THE VIDEOGRAPHER:  We are now back on the

Daniel D.S. Brown
March 24, 2025

CONFIDENTIAL TRANSCRIPT

204

1   record at 4:50.

2       Q.  (BY MR. WAREHAM)  So you seem to be rather tied

3   into the reputation around Captain McVeigh.  Are you

4   aware of --

5               MR. HODGES:  Hey, Jason, can you give me

6   just a second?

7               MR. WAREHAM:  Yeah.  Sure.

8          (Discussion off the written record.)

9               THE VIDEOGRAPHER:  We're still on the

10  record.

11      Q.  (BY MR. WAREHAM)  All right.  Back to -- back

12  to my question.  You seem to be pretty tied in with the

13  understanding of Captain McVeigh's reputation.  Do you

14  know how Dr. Roe's reputation has been affected in this

15  process?

16              MR. SKINNER:  Object to form.

17              THE WITNESS:  No.

18      Q.  (BY MR. WAREHAM)  No, you're not aware of

19  Dr. Roe's reputation?

20              MR. SKINNER:  Same objection.

21              THE WITNESS:  I mean, like, I know -- I

22  mean -- I mean, McVeigh didn't like him, I guess, after

23  this.

24      Q.  (BY MR. WAREHAM)  Excuse me?

25      A.  McVeigh didn't -- didn't trust him, I guess.

205

1     Q.   Uh-huh.

2          Do you know how he's regarded in the

3 industry?

4     A.   No.  I have no idea.

5     Q.   All right.  Did you ever know how he was

6 regarded in the industry, even before this?

7     A.   Just from Todd, I guess.

8     Q.   All right.  And what did Todd tell you?

9     A.   Thought -- thought he was pretty good.

10    Q.   Okay.

11         (Exhibit 10 was marked for identification.)

12    Q.   (BY MR. WAREHAM)  So going to what will be

13 Exhibit 10.  This is the subpoena for a deposition to

14 include production of documents.

15         I want to be clear, do you believe you have

16 anything in your possession regarding -- in your

17 personal possession, not belonging to the federal

18 government --

19    A.   No.

20    Q.   -- or stored on government devices related to

21 the plaintiff, any defendant, or any Fibonacci program?

22    A.   I -- I don't have any stuff on my -- on my

23 personal things.

24    Q.   All right.  Did you ever take phone calls on

25 your personal cell phone relative to any of these

206

1    issues?

2         A.   Relative to what issues?  Any -- everything

3    we've discussed?

4         Q.   Yeah.

5         A.   It's possible.

6         Q.   All right.  Would you be in possession of those

7    phone records?

8         A.   No.  I -- I -- maybe.  Yeah, I guess so.

9         Q.   All right.  So potentially those phone records

10   could give information around the phone calls you had,

11   say, with Todd Jasper?

12             MR. SKINNER:  Objection, form.

13             THE WITNESS:  I mean, it would give a date

14   and time --

15        Q.   (BY MR. WAREHAM)  All right.

16        A.   -- but that's it.

17        Q.   And duration of the phone call?

18        A.   Sure.

19             MR. SKINNER:  Same objections.

20        Q.   (BY MR. WAREHAM)  Would you be willing to

21   produce those phone records for those time periods to

22   us?

23        A.   Do I have to?

24             MR. SKINNER:  Same objection.

25        Q.   (BY MR. WAREHAM)  Well, they -- they've been

CONFIDENTIAL TRANSCRIPT

207

1  subpoenaed.  Would you agree that those are related to

2  the issues we've discussed?

3                 MR. SKINNER:  Objection, form.

4                 THE WITNESS:  Oh, gosh.  I didn't see it

5  would be with my phone records.

6      Q.  (BY MR. WAREHAM)  All right.  Would you be able

7  to produce those to us?

8                 MR. SKINNER:  Same objection.

9                 THE WITNESS:  Can I -- can I talk to my

10 lawyer?  Do I have to --

11                 MR. WAREHAM:  Sure.

12                 MR. BARRERA:  Yeah.  We'll -- we'll visit

13 on that.

14                 MR. WAREHAM:  Sure.

15     Q.  (BY MR. WAREHAM)  Would you have any emails not

16 contained within a government system similarly related?

17     A.  Like, when -- when I called Todd -- never mind.

18 What did you say?

19     Q.  Would you -- well, go ahead.  What were you

20 going to say?

21     A.  Nothing.

22     Q.  All right.  Would you have any personal emails

23 not contained on a government system relevant to these

24 issues we've discussed?

25     A.  I don't think so.

Daniel D.S. Brown
March 24, 2025

CONFIDENTIAL TRANSCRIPT

208

1      Q.   Okay.  Would you be willing to do a search?

2                MR. SKINNER:  Objection.  Object to form.

3                THE WITNESS:  Do I have to?

4                MR. WAREHAM:  Well, as part of -- yes.  So

5      as part of this -- but I'll leave that to your counsel

6      to discuss.

7                MR. BARRERA:  We'll talk about it.

8                THE WITNESS:  I -- I don't think I have any

9      on my personal system about this Fibonacci this or

10     whatever.

11     Q.   (BY MR. WAREHAM)  All right.  Have you

12     conducted a search of your personal items?

13     A.   I mean, no, because I don't remember doing it

14     on any -- I wouldn't put it on personal stuff.

15     Q.   Okay.  Would you have any text messages?

16     A.   Related -- it says "related to the plaintiff."

17     Q.   Oh.

18     A.   You're saying a phone call is related to the

19     plaintiff?  Like, a phone call record?

20     Q.   Related to programs he's working on.

21               MR. BARRERA:  We'll visit on that.

22               THE WITNESS:  Okay.

23     Q.   (BY MR. WAREHAM)  Would you -- would you have

24     text messaged, meaning, used your -- either, like, iChat

25     or SMS --

Daniel D.S. Brown
March 24, 2025

CONFIDENTIAL TRANSCRIPT

209

1     A.  You mean for, like -- I -- I don't remember.  I

2 mean, like, nothing substantive, I don't think.

3     Q.  Okay.

4         (Discussion off the written record.)

5             MR. WAREHAM:  All right.  I think that

6 reaches our conclusion here for our side today.

7             MR. SKINNER:  All right.  I appreciate the

8 witness's patience.  We're just going to come -- we're

9 just going to break for about five minutes just so that

10 government counsel can speak, and we'll be back on the

11 record in five minutes.

12             THE VIDEOGRAPHER:  Time off record is 4:56.

13         (Recess taken from 4:56 p.m. to 5:03 p.m.)

14             THE VIDEOGRAPHER:  We are now back on the

15 record at 5:03.

16             MR. SKINNER:  Great.

17                     EXAMINATION

18 BY MR. SKINNER:

19     Q.  Thank you very much Mr. Brown for your

20 testimony.  Let's go back to Plaintiff's Deposition

21 Exhibit Number 1.  Plaintiff's Second Amended Complaint.

22 Do you have that on the table in front of you?

23     A.  The -- the most recent one?

24             MR. BARRERA:  Yes.  The second.

25             THE WITNESS:  That's the second.  Yeah.

Daniel D.S. Brown                                    CONFIDENTIAL TRANSCRIPT
March 24, 2025

                                                                      210

1        Q.  (BY MR. SKINNER)   Okay.   You meticulously went

2    through many of the paragraphs in Plaintiff's Second

3    Amended Complaint, but I want to draw your attention to

4    Paragraph 118 on page 22.

5        A.  Yeah.  Okay.

6        Q.  I don't recall that you addressed this

7    paragraph.

8        A.  Yeah.  I don't know anything about it.

9        Q.  If you can read this paragraph.  I'm sorry.

10       A.  I don't know anything about this verbiage.

11             MR. WAREHAM:  Objection, form.

12       Q.  (BY MR. SKINNER)   Okay.  All right.  Thank you

13   very much.  We're done with the complaint.

14             You testified earlier that you had a

15   conversation with the Department of Justice attorneys on

16   March 19, 2025, including myself --

17       A.  Yeah.  Was that on a Wednesday?

18       Q.  -- is that correct?

19       A.  Was that on a Wednesday?  I think we talked on

20   Wednesday.

21       Q.  I think that's correct.

22             There were other government attorneys on

23   the call; is that right?

24             MR. WAREHAM:  Objection, form.

25             THE WITNESS:  Yes.

Daniel D.S. Brown                          CONFIDENTIAL TRANSCRIPT
March 24, 2025

211

1      Q.  (BY MR. SKINNER)  And do you remember telling
2  us that this lawsuit is, quote, "a waste of time,"
3  closed quote?
4      A.  Yeah.  I said something to the effect, like,
5  this -- I don't know if it was this call or this --
6  waste -- or this lawsuit.
7      Q.  Did you want to explain what you meant in terms
8  of something being a waste of time?
9      A.  Me having to go through all this stuff.
10     Q.  You also mentioned that you were surprised to
11 see your name mentioned in Dr. Roysdon's complaint so
12 much; is that correct?
13     A.  Yes.
14     Q.  And can you explain now why you were so
15 surprised?
16     A.  Because I went through all these statements
17 saying which ones are not true, exaggerated, or false.
18     Q.  You testified earlier that Major McVeigh
19 overreacted when he found out that Dr. Roysdon was
20 operating in a dual capacity.  Do you remember that?
21     A.  Yes.
22     Q.  Was -- was there a specific -- specific action
23 that Major McVeigh took that was, in your mind, an
24 overreaction?
25     A.  He wanted to -- he wanted him to be fired.

212

1      Q.   And by "him" you're referring to?

2      A.   Roysdon.

3      Q.   And did Major McVeigh communicate that desire

4  to you?

5      A.   He -- I -- I believe -- I'm pretty sure he did.

6      Q.   And did he communicate that desire to you in

7  writing?

8      A.   No.

9      Q.   Did he communicate it to you verbally?

10     A.   I don't remember exactly, but I -- I believe he

11  did, but I can't remember it.

12     Q.   Got it.

13          And do you remember what he said?

14     A.   I -- again, I don't remember the exact words

15  that were used.  I believe it was him that wanted -- I

16  mean -- I don't remember exactly what was spoken, but he

17  did -- I -- I -- I remember -- I -- I believe he did

18  want him to be fired.

19     Q.   Got it.

20          So it's your testimony that McVeigh

21  believed -- that you believed McVeigh wanted Dr. Roysdon

22  fired?

23     A.   Yes.

24          MR. WAREHAM:  Object to form.

25          THE WITNESS:  Yes.  I -- I don't remember

(210) 558-9484  Fax

**Koole Court Reporters of Texas**
myreportingfirm@gmail.com
EXHIBIT 7
**Page 212 of 218**

210-558-9484

Daniel D.S. Brown
March 24, 2025

CONFIDENTIAL TRANSCRIPT

213

1   the exact words or, like, a -- a direct order given.

2   There was a lot of things going on that day.

3       Q.  (BY MR. SKINNER)  And what made you believe

4   that McVeigh wanted Dr. Roysdon fired?

5       A.  The -- the conflict of interest.

6       Q.  What did McVeigh say to you that made you

7   believe he wanted Dr. Roysdon fired?

8       A.  I don't remember.

9               MR. WAREHAM:  Objection, form.

10              THE WITNESS:  I don't remember.

11      Q.  (BY MR. SKINNER)  You testified about it not

12  being, quote, "good optically if Roysdon was present for

13  presentations by Leidos to HNCO."  Do you remember that?

14      A.  I remember saying that today.

15      Q.  And by saying it wouldn't be good optically,

16  was that your personal opinion?

17              MR. WAREHAM:  Objection, form.

18              THE WITNESS:  Yes.  That was a personal

19  opinion.

20      Q.  (BY MR. SKINNER)  In other words, you were not

21  telling Roysdon that he could not present; is that

22  correct?

23              MR. WAREHAM:  Objection, form.

24              THE WITNESS:  Ultimately he did present.

25      Q.  (BY MR. SKINNER)  So you were not telling

Daniel D.S. Brown                                CONFIDENTIAL TRANSCRIPT
March 24, 2025

                                                                    214

1   him --

2        A.  He did -- I --

3        Q.  You were not --

4        A.  -- I just remember it -- it looked bad

5   optically, and he was able -- he did present in April.

6        Q.  Got it.  Understood.

7                So here's my question, you were not

8   directing Roysdon not to be present for the

9   presentation?

10       A.  I don't believe --

11               MR. WAREHAM:  Objection, form.

12               THE WITNESS:  -- I don't believe so.

13       Q.  (BY MR. SKINNER)  Were you telling Dr. Roysdon

14  that others did not want him to present?

15               MR. WAREHAM:  Objection, form.

16               THE WITNESS:  I don't believe so.

17       Q.  (BY MR. SKINNER)  Were you telling Leidos that

18  Roysdon cannot present?

19               MR. WAREHAM:  Objection, form.

20               THE WITNESS:  I -- I don't believe so.  All

21  I remember is that I thought it would look bad

22  optically.

23               MR. SKINNER:  No further questions.  We're

24  done.

25               MR. WAREHAM:  Just a moment, please.

215

1                        FURTHER EXAMINATION

2    BY MR. WAREHAM:

3         Q.   I want to clarify your phrasing that you

4    testified to with respect to the phone call with DOJ.

5    When you said "waste of time," to clarify, you meant a

6    waste of your time?

7         A.   (Witness nods affirmatively.)

8         Q.   Is that a "yes"?

9         A.   Yes.  And I thought that many of these aspects

10   in the -- in this were not -- were inaccurate and not

11   substantive.

12        Q.   Okay.  When you stated that Captain McVeigh

13   wanted Dr. Roe to be fired, are you fair -- aware of any

14   formal process of termination that Dr. Roe was given to

15   be fired?

16        A.   No.

17                  MR. WAREHAM:  That's all I have.  Thank

18   you.

19                  MR. BARRERA:  I've got about two hours of

20   questions.

21                  MR. WAREHAM:  Great.  Perfect.  Too soon.

22   Too soon.

23                  THE VIDEOGRAPHER:  Nobody else?

24                  MR. WAREHAM:  I think that's it.

25                  THE VIDEOGRAPHER:  Sir, on Zoom, would you

Daniel D.S. Brown                                    CONFIDENTIAL TRANSCRIPT
March 24, 2025

216

1   like to order a copy of the transcript?

2               MR. SKINNER:  Yes.

3               THE VIDEOGRAPHER:  And would you also like

4   to order a copy of the video?

5               MR. SKINNER:  Yes, please.

6               THE VIDEOGRAPHER:  Would y'all like to

7   order a copy of the transcript?

8               MR. GREEN:  I don't separately need an

9   order.

10              MR. WAREHAM:  He's with them.  And we will,

11  yes.

12              THE VIDEOGRAPHER:  Time off record is 5:11.

13          (Deposition concluded at 5:11 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

217

```
 1           IN THE UNITED STATES DISTRICT COURT FOR THE
                     WESTERN DISTRICT OF TEXAS
 2                     SAN ANTONIO DIVISION
 3   DR. JOHN ROE,              )
                                )
 4           Plaintiff,         )
                                )
 5   VS.                        )         CIVIL ACTION
                                ) NO. 5:22-CV-00869-JKP-HJB
 6                              )
     UNITED STATES OF AMERICA,  )
 7   et al.,                    )
                                )
 8           Defendant.         )
 9

10                    REPORTER'S CERTIFICATION

11           ORAL DEPOSITION OF DANIEL D.S. BROWN

12                       MARCH 24, 2025

13

14       I, Marta M. Johnson, Certified Shorthand Reporter

15   No. 10743, in and for the State of Texas, hereby certify

16   to the following:

17       That the witness, DANIEL D.S. BROWN, was duly sworn

18   by the officer and that the transcript of the deposition

19   is a true record of the testimony given by the witness;

20       That pursuant to FCRP Rule 30(f)(1), request to

21   review the transcript was not made by either deponent or

22   party before the deposition was completed.

23       That pursuant to information given to the

24   deposition officer at the time said testimony was taken,

25   the following includes all parties of record and the
```

Daniel D.S. Brown                                    CONFIDENTIAL TRANSCRIPT
March 24, 2025

218

1   amount of time used by each party at the time of the

2   deposition:

3        MR. JASON R. WAREHAM, ESQ. - 03 HOURS:50 MINUTE(S)
              Attorney for Plaintiff

4        MR. REGINALD M. SKINNER, ESQ. - 00 HOURS:06
     MINUTE(S)

5             Attorney for Defendant

6        MR. ROBERT J. BARRERA, ESQ. - 00 HOURS:00 MINUTE(S)
              Attorney for Dan D.S. Brown

7

8        I further certify that I am neither counsel for,

9   related to, nor employed by any of the parties or

10  attorneys in the action in which this proceeding was

11  taken, and further that I am not financially or

12  otherwise interested in the outcome of the action.

13       Certified to by me this 9th day of April, 2025.

14

15                        /s/ Marta M. Johnson

16                        _____

17                        Marta M. Johnson, Texas CSR 10743
                          Expiration Date:  10/31/26
                          Firm Registration No. 413

18                        Koole Court Reporters of Texas
                          8000 IH-10 West, Suite 600

19                        San Antonio, Texas  78230
                          210.558.9484   210.558.3129 fax

20

21

22

23

24

25



# DEPARTMENT OF THE AIR FORCE
## OFFICE OF SPECIAL INVESTIGATIONS

29 Aug 22

MEMORANDUM FOR RECORD

FROM:  HQ OSI/IG
      27130 Telegraph Road
      Quantico, VA  22134

SUBJECT:  Hotline Completion Report

1. DoD Hotline case number: ███████████████

2. ACTS case number:  ███████████████

3. Allegation(s)

    a.  Allegation:

        (1)  Maj WILIAM MCVIEGH, Secretary of the Air Force for Acquisition, Technology, and Logistics (SAF/AQL), Pentagon, DC

        (2)  Retaliation

        (3)  14 Aug 20

        (4)  JBSA-Lackland, TX

        (5)  10 US Code § 932 – Article 132. Retaliation

        (6)  Finding:  Not Substantiated

        (7)  Analysis: In FY 19, Dr. PAUL ROYSDON, National Security Agency (NSA), JBSA-Lackland, TX, briefed the Fibonacci program at the TOP SECRET level to AFLCMC/HNCO and SAF/AQL, while employed by the NSA. The NSA decided not to fund this program, and the program was then funded by SAF/AQL as an ██████ project with unclassified components. At the time, ROYSDON was a government employee providing advice and guidance under the government.

Starting in FY 19, Civ DAN BROWN, JBSA-Lackland, TX, brought ROYSDON on board to support the Fibonacci program as a Technical Subject Matter Expert (contractor) and as a subcontractor under Global Info Tech Inc. (GITI). GITI held an Air Force Research Laboratory (AFRL) ACT2 prime contract. ROYSDON maintained his government position at the NSA. ROYSDON stated on 18 Aug 20, he obtained an Office

*"Eyes of the Eagle"*

**EXHIBIT 8**
**Page 1 of 3**

Confidential - Subject to Protective Order

## DEPARTMENT OF THE AIR FORCE
### OFFICE OF SPECIAL INVESTIGATIONS

of General Council (OGC) letter providing agreement for the project to be worked. ROYSDON was cleared as a government employee to ████, but not as a contractor. ROYSDON's Limited Liability Company (LLC) did not have a Field Security Officer (FSO), DD254, and cage code that would allow him contractor SCI and program access. ROYSDON's work as a government employee included ████ discussions about the Fibonacci program.

ROYSDON was notified to stop work as an independent contractor since he was a government employee with the NSA. ROYSDON was informed he was allowed to continue supporting the project as a government employee under the NSA. However, ROYSDON informed ALFCMC/HNCO on 20 Aug 20 that he was planning to resign from the NSA.

ROYSDON completed a DoD IG complaint on 6 May 22. ROYSDON believed he was dismissed and debriefed from the program due to negligent conduct of Maj WILLIAM MCVEIGH, SAF/AG, Pentagon, DC, and SA ALLEN BEALL, HAF, PSO, Pentagon, DC. ROYSDON believed SA BEALL and MCVEIGH reported ROYSDON as an insider threat and opened an unauthorized OSI investigation.

A review of the Investigative Information Management System (I2MS) and Classified Investigative Information Management System (CI2MS) revealed no records on file for ROYSDON.

MCVEIGH was the PM for the Fibonacci program while he was stationed at JBSA-Lackland, TX. Based on financial records, ROYSDON was paid $750,000.00 for his services as an independent contractor. Although ROYSDON was brought on to work on the Fibonacci program as a contractor, he would work on the program during normal work hours while he was employed by the NSA. ROYSDON was removed from the program due to his affiliation as a government employee and his contractor status. MCVEIGH instructed SA BEALL to debrief ROYSDON from the program (Agent Note: SA BEALL was not interviewed due to his untimely passing in August 2022). MCVEIGH only had ROYSDON removed and debriefed from the program, but did not report him as an insider threat. MCVEIGH provided all documentation and email correspondence related to ROYSDON being removed from the program due to his misrepresentation as a contractor and NSA employee.

(8)  Corrective actions: Recommend opening a fraud investigation and referring the case to OSI Office of Procurement Fraud (PF)

4.  Security clearance actions: None

5.  Location of report of inquiry or working papers: OSI PJ Detachment 9, Joint Base Anacostia-Bolling, DC

*"Eyes of the Eagle"*

**EXHIBIT 8**
**Page 2 of 3**

Confidential - Subject to Protective Order

# DEPARTMENT OF THE AIR FORCE
## OFFICE OF SPECIAL INVESTIGATIONS

6.  Investigation officer identification data:

    a.  Rank & Name: SA CHRISTOPHER WEBB
    b.  Organization: OSI PJ Detachment 9
    c.  Duty location: JBAB, DC
    d.  Telephone number: ██████████
    e.  Email address: ████████████████████

7.  I certify that I complied with the Quality Standards for Hotline Inquiries in DOD Instruction 7050.01.

WEBB.CHRISTOPHER.RYAN.1297231371
Digitally signed by WEBB.CHRISTOPHER.RYAN.1297231371
Date: 2022.08.29 10:55:05 -04'00'

CHRISTOPHER WEBB, Special Agent
OSI PJ Det 9, JBAB, DC

DoD Hotline Coordinator's identification data:

    a.  Rank & Name: ██████████
    b.  Organization:  AFOSI/IGQ
    c.  Duty location:  27130 Telegraph Road, Quantico VA, 22134
    d.  Telephone number: ██████████
    e.  Email address: ████████████████████

*"Eyes of the Eagle"*

**EXHIBIT 8**
**Page 3 of 3**

Confidential - Subject to Protective Order

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

Civil Action No. 5:22-CV-00869-JKP-HJB
_____

VIDEOCONFERENCE DEPOSITION OF TODD JASPERS

April 11, 2025

_____

Plaintiff,

DR. JOHN ROE,

v.

Defendant,

UNITED STATES OF AMERICA, et al.

_____

APPEARANCES:

        ALLEN VELLONE WOLF HELFRICH & FACTOR, PC
            By Jason R. Wareham, Esq.
                1600 Stout Street, Suite 1900
                Denver, Colorado 80202
                    Appearing on behalf of Plaintiff.

        HENDLEY & HODGES LAW, PLLC
            By John W. Hodges Jr., Esq.
                4594 US Highway 281 North
                Spring Branch, Texas 78070

                    Appearing on behalf of Plaintiff.

**EXHIBIT 9**
**Page 1 of 135**

```
 1    APPEARANCES: (Continued)

 2
           UNITED STATES ATTORNEY'S OFFICE - DENVER
 3             By Robert D. Green, Esq.
                   1801 California Street, Suite 1600
 4                 Denver, Colorado 80202
                       Appearing on behalf of Defendant.
 5
          U.S. DEPARTMENT OF JUSTICE - CONSTITUTIONAL TORTS
 6             By Joseph Gonzalez, Esq.
                   Katrina Seeman, Esq.
 7                 175 N Street Northeast
                   Washington, DC 20002
 8                     Appearing on behalf of Defendant.

 9

10    Also Present:  Rebecca Bradshaw, Lance Henry,

11                   Maryvonne Tompkins (videographer).

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**EXHIBIT 9**
**Page 2 of 135**

```
 1              Pursuant to Notice and the Federal Rules
 2    of Civil Procedure, the deposition of
 3    TODD JASPERS, called by Plaintiff, was taken on
 4    Friday, April 11, 2025, commencing at 10:04 a.m.,
 5    via Zoom videoconference, before Marcus K. Boyer,
 6    Shorthand Reporter and Notary Public for the State
 7    of Colorado.
 8
 9                    I N D E X
10    EXAMINATION BY                          PAGE
11    Mr. Wareham                           5, 105
12    Mr. Gonzalez                         63, 109
13
14    EXHIBITS                               PAGE
15    1   Resume                              62
16    2   E-mail to Todd Jaspers              65
17    (Counsel to provide exhibits.)
18
19    PORTION MARKED AS CONFIDENTIAL
20    Pages 96 - 98
21
22
23
24
25
```

EXHIBIT 9
Page 3 of 135

```
1                    P R O C E E D I N G S

2                    THE VIDEOGRAPHER:  The time is 10:04.  We

3       are on the record.  Today is April 11, 2025.  This

4       begins the recorded deposition of Todd Jaspers in

5       the matter of Dr. John Roe versus The United States

6       of America, et al.  This deposition is being

7       recorded via Zoom videoconferencing.  The court

8       reporter is Marcus Boyer.  The videographer is

9       Maryvonne Tomkins.

10                   The attorneys would introduce themselves,

11      starting with the plaintiff, please.

12                   MR. WAREHAM:  Jason Wareham on behalf of

13      Plaintiff, lead counsel, along with John Hodges,

14      Lance Henry, and Rebecca Bradshaw is on my team,

15      paralegal.

16                   MR. GONZALEZ:  Joseph Gonzalez and I'm

17      joined with my colleague, Kati Seeman, and we

18      represent the government defendants in this matter

19      with the Department of Justice.

20                   THE VIDEOGRAPHER:  Our court reporter

21      will please swear in the witness and we can proceed.

22                        TODD JASPERS,

23      being first duly sworn in the above cause, was

24      examined and testified as follows:

25                        EXAMINATION
```

EXHIBIT 9
Page 4 of 135

1    BY MR. WAREHAM:

2        Q    Great.  Mr. Jaspers, hi.  This is Jason

3    Wareham.  Would you please state your full name for

4    the record, spelling your last name?

5        A    Sure.  My name is Todd Matthew Jaspers.

6    Last name is spelled J-a-s-p-e-r-s.

7        Q    All right.  I just have a few -- I

8    understand you've been through some depositions

9    before, but I like to just kind of clarify as best

10   as possible some -- some preliminary instructions.

11   And, so, I'm just going to kind of run through those

12   and if you have any questions, please let me know.

13       A    Roger.

14       Q    So you've just been placed under oath.

15   This is a deposition.  It means that your testimony

16   today has -- has some legal weight, veracity, you

17   know, similar to that of -- of testifying in court.

18            Everything you say is being transcribed

19   and may be used later in a -- in a specific

20   transcript.  You know, when it comes to questions

21   that I'm asking today, you know, they're not trying

22   to get -- be "gotcha" questions, they're not trying

23   to trip you up, they're just seeking what facts and

24   information that you know, to the best of your

25   recollection and your ability.

EXHIBIT 9
Page 5 of 135

1           Today, if I ask you a question about what

2    somebody has said or previously has said, you know,

3    if you don't recall the exact quote, that's totally

4    understandable.  To the best of your ability, just

5    give as much of your understanding or recollection

6    about what they were trying to say or what you

7    recollect them saying and that's perfectly --

8    perfectly fine.

9           Feel free to take our time today.  I --

10   being that we've got a couple of -- of video, you

11   know, linkages here today, the -- the Department of

12   Justice is allowed to object to any of my questions,

13   and, in fact, I expect that they will.

14          Given that we have -- there may be a

15   little delay in -- in that objection, and then

16   moving on -- if you hear any sort of objection or

17   comment, just pause your answer, we'll record the

18   objection for the record, and then we'll move on

19   from that.

20          Okay.  If there's anything that you don't

21   understand, what I've asked, if you need me to

22   clarify, please, you know, indicate that.  You may

23   be shown documents.  Our plan today is for our

24   technology to work wonderfully and we'll present

25   some documents to you through screen sharing as best

EXHIBIT 9
Page 6 of 135

1    as we can.

2             If you need to see the -- the document

3    closer or if, you know, the -- you know of a related

4    document that would inform your information on that

5    document, feel free to bring that up.

6             But, overall, later, if you need to

7    correct any testimony or if you need to clarify

8    something at a later date, there's no -- there's no

9    issue there.  You just need to, you know, be like,

10   "Oh.  You know what, I need to correct that," or you

11   could contact us later to -- to make any

12   corrections.

13            Any questions about anything that I've

14   said to you?

15        A    No, understand completely.  The only

16   thing I did want to mention is I just came back from

17   a trip and I got sick.

18        Q    Oh.  No.

19        A    I'm actually doing really well right now,

20   but if I start coughing, I'm probably going to just

21   mute so I don't offend anybody.  I've got a drink

22   here, not alcohol, just -- but just -- I just want

23   you to know that I may start coughing.

24        Q    Roger.  If we need to take a break to let

25   the coughs kind of happen and -- and, you know,

EXHIBIT 9
Page 7 of 135

1    knock that out, there's no problem.  We can do that,

2    we can come back to it, you know, if you need to get

3    another drink or anything.  Just let us know.  Okay?

4         A     Roger.  I'm good to go, though.

5         Q     All right.  Great.  And on that front,

6    you know, before we start formal questioning, yeah,

7    do you -- are you under the influence of any drugs

8    or alcohol that might like influence your testimony

9    in any way?

10        A     No, sir, I am not.

11        Q     Great.  Then we'll just launch into it.

12              MR. GONZALEZ:  And, Jason --

13              MR. WAREHAM:  Yeah.

14              MR. GONZALEZ:  Sorry -- sorry I

15    interrupted.

16              MR. WAREHAM:  No worries.

17              MR. GONZALEZ:  Thank you for -- thank

18    you.  You know, we -- we generally agree with your

19    instructions and, you know, we appreciate you

20    getting that out of the way for us.

21              The -- the stuff about correcting

22    testimony, I -- I don't know that like we a

23    100 percent agree with how -- how that works, but I

24    just wanted to preserve that, but, you know,

25    overall, we -- we agree and we thank you for putting

EXHIBIT 9
Page 8 of 135

1   those --

2            MR. WAREHAM:  Yeah, I -- I was -- that if

3   he thinks of some later correction, he reaches out

4   to one of us, and we'll -- we can conference at that

5   point to talk about which form of correction might

6   occur.  Does that work, sir?

7            THE DEPONENT:  If -- I just wanted to

8   add -- and I -- I apologize.  From the DOJ, I'm

9   having a little bit of a hard time hearing you guys.

10  If you don't mind sitting closer to the microphone.

11  I apologize.  It's just -- it's very echoey.

12           MR. GONZALEZ:  So this sounds very echoey

13  right now to you?

14           THE DEPONENT:  It sounds a lot better.

15           MR. GONZALEZ:  Okay.  So if I -- if I

16  speak up like this, can you hear me fine?

17           THE DEPONENT:  Yes.

18           MR. GONZALEZ:  Okay.  Thank you.  I -- I

19  appreciate you letting me know that.  Got it.

20           MR. WAREHAM:  So, Mr. Gonzalez, does that

21  approach work for you?

22           MR. GONZALEZ:  I -- I think that'll be

23  fine.

24           MR. WAREHAM:  Okay.  Great.

25      Q    (By Mr. Wareham)  All right.  So,

EXHIBIT 9
Page 9 of 135

1    Mr. Jaspers, you're generally aware of the action

2    that brings us here today, right?

3         A    Yes, yes, I am.

4         Q    And it specifically involves a man named

5    Dr. Paul Roysdon?

6         A    Yes.

7         Q    If you kind of start with how you know

8    Dr. Roysdon and, you know, how long you've known

9    him?

10        A    Sure.  So I worked at the NSA for about a

11   decade.  My last position was at SOCOM.  Prior to

12   that, I worked at -- at NSA Texas and I supported

13   AFCYBER.  Now, I was in what's called a joint-duty

14   assignment -- and I -- I promise I'll try and make

15   this quick.

16        Q    You're fine.

17        A    I was in a joint-duty assignment that

18   supported AFCYBER as an NSA employee.  I was chief

19   of capabilities.  We sat in the space that was

20   called TAO.  We do offense cyber operations.

21   Dr. Roysdon sat in the front, main office, and his

22   responsibility was to provide resources to the rest

23   of TAO relating to things like mathematics and AI.

24             Excuse me.  I was introduced to him by a

25   gentleman by the name of Michael Kelly [phonetic],

EXHIBIT 9
Page 10 of 135

1    who also supported TAO and NSA and CYBERCOM, and we
2    got to talking and there was a bunch of things that
3    I needed to have really accomplished.
4           There were -- there were certain
5    challenges in my -- and I won't go into details for
6    obvious reasons, but there was -- there were
7    several --
8    Q    Well -- and, actually -- not to break you
9    up, but when you say "obvious reasons," you mean
10   because that is classified information?
11   A    Yes, I don't want to get into too much
12   detail about -- about what we do, but I can go into
13   a little bit of the unclassified level.  I was a
14   former CAO security, so I can -- I can kind of dance
15   around some of that, but --
16   Q    Great.  So, at any point, if any of my
17   questions tread into classified information, yeah,
18   you'll know based on your prior position, but please
19   indicate that, you know, in whatever fashion you
20   can, that -- that we're treading into that -- that
21   location.  This is meant to be unclassified, of
22   course.
23   A    Roger.  Roger.  So Michael Kelly
24   introduced me to Dr. Roysdon and I got to talking
25   with him about some of the challenges that we had on

EXHIBIT 9
Page 11 of 135

1    our team.  I was chief of capabilities and my

2    weapons and tactics director, Mark Brasher

3    [phonetic], the two of us met and we kind of talked

4    about what sort of our top five issues were.

5              I then met with Dr. Roysdon and I sort of

6    laid those out on the whiteboard and he kind of told

7    me, "Okay.  Well, this algorithm can solve this

8    challenge," and -- and by "algorithm," I mean sort

9    of an AI-based algorithm.  "This can solve this

10   problem.  This can solve this problem."  And stop me

11   if I'm going too far down, otherwise I'll just tell

12   the whole story.

13        Q    You're okay.  Go ahead.

14        A    Okay.  So, at -- at -- at that point, I

15   was pretty interested because he was able to solve

16   at least some of the top five issues that I had.

17   I'm sorry.  Phone.  The top five issues that I had.

18   So I talked to Dan Brown -- and I'd just like to

19   reference too, for this, I'm friends with both Dan

20   Brown and Dr. Roysdon, so I'm kind of in a difficult

21   situation here, but I will -- as you know, I will do

22   everything ethically as I know that I'm supposed to.

23   So I won't hold anything back regardless of which

24   friend hates me more after this.

25        Q    I hope that doesn't happen, but I thank

EXHIBIT 9
Page 12 of 135

1    you for that clarification.  I appreciate it.

2        A      Roger.  So -- sorry.  I got myself off

3    track.  So I talked to Dan Brown and eventually got

4    him in touch with Dr. Roysdon.  Dan Brown had

5    this -- and, again, this is like over five years

6    ago, so I'm trying to recreate it as quickly as --

7    as best as I can.

8              Dan Brown was working with another

9    individual from higher up in HNCO AFLCMC, I think,

10   from somewhere in Virginia, and he had some -- some

11   funding that could solve these challenges for me.

12   So Mr. Roysdon put together a proposal for Dan Brown

13   with some of the -- based off the requirements

14   that -- that I initiated.

15             And for -- for reference, Dan Brown -- as

16   chief of capabilities for AFCYBER, Dan Brown was my

17   go-to guy.  He was awesome for getting all of the

18   different things that I needed to accomplish a

19   mission.  It was also the -- the -- the 90 Cyber

20   Operations Squadron, we also got some from CYBERCOM

21   J9, but Dan was the one who would -- who could

22   procure new development, large projects, 90th cost

23   of the smaller things.

24             And, so, he put together a proposal.  We

25   all liked it.  It -- it met, at least, the top three

EXHIBIT 9
Page 13 of 135

1    of my requirements and it put together a -- they

2    agreed to set up sort of a contract that Paul could

3    still work on.  He got this cleared by NSA's legal

4    team that he could manage a project while still

5    working at the NSA and -- and -- and provide

6    capability development for me on these three

7    projects.

8        Q    Okay.  And I'd like to unpack that a bit

9    more, kind of at the --

10       A    Sure.

11       Q    -- start of the contract, how the

12   contract was done, you know, who -- what parties

13   were involved in the contract as far as knowing his

14   status between NSA.  So I'm going to start -- you

15   know, I'm not going to do a compound question there,

16   but I'm just kind of highlighting what I'd like to

17   go into.

18           So can you say more about just,

19   specifically, the contract, where the contract came

20   from?

21       A    Excuse me.  I can try.  It -- I'm really

22   separated from those things.  I basically put in

23   what's called a requirement and those reqs go to Dan

24   Brown directly and then they start going to the A8,

25   which is Air Force 8 group, and those would then go

EXHIBIT 9
Page 14 of 135

1    to Dan Brown.  It would turn those into -- well, I

2    guess, into a proposal.  So what essentially has to

3    happen --

4             MR. GONZALEZ:  Don't guess.  Don't guess.

5    You're not supposed to guess.

6        A    Okay.  I --

7             MR. WAREHAM:  So if you could object,

8    that'd be great.  Please don't give instructions to

9    the witness.  I appreciate that, but, yes, I agree.

10   You should not guess.

11       A    I -- I apologize.  I don't know the

12   process, once I send the req that Dan Brown does.

13   You guys should probably ask him, but, essentially,

14   it goes from the requirement that I submit to a

15   finalized contract that then goes to, I guess, the

16   contractors.

17       Q    Okay.  And in this particular case, once

18   you release the requirement, okay, you understood

19   that it went to Dan Brown first?

20       A    Yes.

21       Q    All right.  And what are you familiar

22   with that Dan Brown did with it from there?

23       A    So I -- I would say that prior to that,

24   he had worked it with myself and Dr. Roysdon and

25   this individual, whose name I don't remember that

EXHIBIT 9
Page 15 of 135

1    was much higher up in Virginia, that made sure that

2    it solved sort of the requirement.

3            There were some funds that were being

4    allocated for AI-based projects and he was able to

5    acquire those for this specific requirement.  After

6    that point, I have, unfortunately, no idea what --

7    what Dan does with the contract.

8        Q    And does the name Tom Parisi sound

9    familiar at all?

10       A    It -- it -- it does not.  If I've heard

11   that name at some point, I -- I apologize.  I'm --

12   I'm not -- I'm not aware.

13       Q    No worries.  All right.  And, so, it has

14   come up kind of in development of facts that -- that

15   others at Air Force Cyber did not understand the

16   relationship that Roysdon had as a contractor versus

17   NSA.  Are you familiar with who was aware of his

18   statuses?

19           MR. GONZALEZ:  Objection to form and

20   calls -- calls -- calls for speculation.

21           MR. WAREHAM:  Yeah, Mr. Gonzales, I'm

22   going to be pretty tight on form objections and

23   privilege being the only ones in here.  So, yeah, if

24   you would, please.

25       Q    So do you have knowledge of who knew of

EXHIBIT 9
Page 16 of 135

1    Mr. Roysdon -- or Dr. Roysdon's statuses?

2        A    I know that Dan Brown was aware.  I

3    became aware of the fact that he'd be doing it as a

4    contractor because I talked to both Paul and Dan and

5    I also know that there were several within the Air

6    Force that also knew of this too.

7        Q    All right.  And who did you know within

8    the Air Force that was aware of this?

9        A    I don't remember the individual's name,

10    but it would have been Dan Brown's boss.  I think it

11    was lieutenant colonel, but it would have been his

12    boss.

13        Q    Do you recognize the name Lieutenant

14    Colonel Ekholm [phonetic]?

15        A    I do recognize that name, but, for the

16    life of me, I don't know if that was his boss.  I --

17    I apologize.

18        Q    No worries.  Do you recognize the name

19    Danny Burgard [phonetic]?

20        A    I want to say yes, but I -- I'm sorry.

21        Q    No, you're okay.  Don't worry about it.

22             Do you -- do you recognize the name

23    Captain McVay?

24        A    Yes, I definitely do.

25        Q    All right.  We'll come back to that.

EXHIBIT 9
Page 17 of 135

1        A      Okay.

2        Q      So once you put in the requirement and it

3   went to -- it went up through Dan Brown to the

4   senior person that you're describing, were you at

5   all aware of like the contract finalization or any

6   other phases related to bringing Dr. Roysdon on?

7        A      No, I am not involved in that at all.

8        Q      Okay.  What was -- you -- you gave a

9   little bit of perspective, but what was your

10  estimation of Dr. Roysdon's qualifications and

11  expertise?

12       A      Particularly, at that time -- keep in

13  mind, this was 2019, 2020 -- AI had not had the big

14  explosion that it had.  He was pretty much the only

15  one, along with him and Dr. Kelly, that I was aware

16  of that could even do anything like this.  They're

17  the only ones that I was aware of that were even

18  talking about trying to solve certain challenges.

19             My idea in bringing some of my challenges

20  to him were based purely on scientific -- you know,

21  just -- just sci-fi, if you will, and Dr. Roysdon

22  said, "Yeah, we can do it this way if we use" -- I

23  don't remember.  He'd say -- he would say something

24  like, "We would use a vector algorithm for this.

25  This would be a knowledge graph," something like

EXHIBIT 9
Page 18 of 135

1    that.  Did that answer your question?  I -- I --

2        Q    It did, yeah.  And -- and as you

3    understood the topic, to the best of your

4    recollection, did you find him to be qualified in --

5        A    Yes, yes, he -- he -- he definitely is

6    qualified.  He has a PhD in mathematics and I have

7    also since worked with him, which I know will come

8    up, and he has helped guide a lot of research in

9    that area.

10       Q    Okay.  And, so, following his emergence

11   of -- excuse me.  If anybody is hearing those beeps,

12   I'm trying to get it to stop.  I'm getting

13   reminders.  But as far as the day-to-day after he

14   started working on that contract, in that time

15   period that you just described, how often did you

16   work with him?

17       A    So he sat up front.  It was a pretty busy

18   schedule.  I think I probably saw him -- after he

19   started working on that, I saw him less in the

20   office, but I probably saw him maybe at least twice

21   a week.  We would still talk, he'd come by my desk

22   in what was called CTOC, the Cyber Technical

23   Operation Center.

24            That's our sort of enclave of -- of

25   senior leadership for offensive -- I'm -- I'm sorry.

EXHIBIT 9
Page 19 of 135

1    My computer just locked.  I do apologize.

2        Q    No worries.  No, take your time.

3        A    I've got to just keep moving my mouse.

4    So he would come visit within that enclave of -- of

5    research and he would brief myself and occasionally

6    Mark Brasher, but as the capabilities chief, I was

7    pretty much the one he came to.

8            Sometimes, Dan Brown would also provide

9    me feedback as well.  And from everything that I

10   could tell early on, it was it was going very well.

11       Q    And over -- I mean, total time in your

12   role at NSA, what -- how long did you work together

13   with Dr. Roysdon?

14       A    So I worked for NSA for a decade, but I

15   worked at that -- that particular position, excuse

16   me, from 2018 through early 2021, with a small stint

17   where I deployed to Afghanistan as a civilian for

18   six months, from 2019 to 2020, and then regained

19   my -- my position when -- when I returned from

20   deployment.

21           So it would be over the period of three

22   years.  I prefer not to stay in a position because I

23   like new people to take on the responsibilities.  I

24   try and do my part and then leave.  But I'd say

25   minus the six months, it'd be about two and a half

EXHIBIT 9
Page 20 of 135

1    years that I worked with him in that position.  I

2    then transitioned to SOCOM in 2021 and then no

3    longer worked with him at NSA during that time.

4         Q     Okay.  And from your observations,

5    limited to Air Force -- like the Air Force Cyber

6    piece, did it ever appear to you that there was any

7    confusion between him as a contractor or him as an

8    NSA member?

9         A     And -- and you're saying outside of Air

10   Force?

11        Q     No, inside the Air Force Life Cycle

12   Management Center, did there ever --

13        A     Yeah.

14              MR. GONZALEZ:  Object to form.

15        A     I'm sorry.  I heard somebody else say

16   something.

17              MR. GONZALEZ:  Objection to form.  You

18   can answer.

19        A     Okay.  So the -- what I did get from Dan

20   is that -- well -- so -- so this would go into

21   the -- the -- the Captain McVay discussion, but my

22   understanding is that they brought up some

23   confusion -- and let me know if you want me to get

24   into the whole thing with McVay, but they --

25        Q     We'll get there.  I just want to talk

EXHIBIT 9
Page 21 of 135

1    about what you observed leading up to that point.

2         A    Okay.

3         Q    Did you interact with -- with Air Force

4    personnel on this like contract thing that he was

5    working on?

6         A    So, no, rarely did I actually go to HNCO.

7    I probably went there maybe a total of eight times

8    just to meet with Dan Brown, but there was -- there

9    was some confusion that -- that came from Air Force.

10        Dan Brown knew everything was already

11   okay.  Dr. Roysdon had already gotten it cleared

12   beforehand, which is a requirement for us as NSA

13   employees, to make sure that any -- any external

14   stuff that we do or tangential stuff that we do has

15   to be discussed with legal and OGC at -- at NSA.

16        And Dr. Roysdon got a letter from NSA

17   just reconfirming that everything was okay and sent

18   it to Air Force and my understanding is that that

19   solved the problem and it never became an issue

20   again.

21        Q    Okay.  So let's -- let's start stepping

22   into what you do know about the -- the Captain McVay

23   issue.  So, first off, who is Captain McVay, as you

24   understand?

25        A    So as I understand, he was an additional

EXHIBIT 9
Page 22 of 135

1    person, sort of like what Dan Brown does; assigns

2    projects, sort of manages projects and manages

3    capabilities.  I've probably only met him once or

4    twice.  I never really interacted with him because I

5    think his stuff was -- I -- I think, right -- I -- I

6    hate to guess here, but I think his stuff was mostly

7    defensive in nature.

8           Dan Brown's is almost exclusively

9    offensive.  He provides capabilities to us, CIA,

10    other organizations as well, Space Force, and stuff

11    like that.  And let me know if you want me to stop.

12    But I had routine discussions with Dan Brown and

13    like this is where it gets into the friend thing,

14    where I'm probably not helping my friendship, but

15    Dan Brown was very frustrated with -- with --

16    with -- with William McVay.

17    Q    All right.  Let's unpack that, to kind of

18    take it in -- in smaller chunks.

19    A    Roger.

20    Q    Can you describe the frustration that

21    Mr. Brown had with Captain McVay?

22    A    So my understanding is that -- what I

23    remember having a discussion with -- with Dan over

24    multiple phone calls was that Captain McVay was

25    working on some projects that weren't

EXHIBIT 9
Page 23 of 135

1    well-appreciated by other groups within the Air

2    Force.  They didn't seem to lead to anything, they

3    weren't -- they weren't solving a solution.

4           It was kind of OBE.  McVay was very

5    frustrated that he wasn't getting the support that

6    he wanted and was routinely doing everything he

7    could to hurt Dan Brown, including trying to take

8    his resources away from his projects so that he

9    could fund his own projects.

10    Q    All right.  And do you remember any

11   additional specifics around that specific portion,

12   where you're saying and do anything he could to,

13   quote, "hurt Dan Brown"?  Do you remember --

14    A    Yes.

15    Q    -- discussions?  Can you describe those?

16    A    So, again, it's -- it's about five years

17   ago, but one of them, of course, is -- is

18   Dr. Roysdon's projects.  He had received a sizable

19   amount of money for those projects, Dr. Roysdon and

20   Dan Brown had.

21           And from what Dan Brown had told me

22   repeatedly, was that McVay was trying to hurt Paul

23   and him so that he could get that funding for his

24   own line of projects and, so, all the different

25   things that he was doing was to -- to change that

EXHIBIT 9
Page 24 of 135

1    result.

2         Q     Okay.  And when you say you had these

3    conversations several times, I know we're reaching

4    back over some years --

5         A     Yes.

6         Q     -- but do you have any estimation around

7    how many times you talked about this?

8         A     Yeah, so, I --

9               MR. GONZALEZ:  Object to form.  Who --

10   who are we talking about here?

11              MR. WAREHAM:  The conversation with Dan

12   Brown.

13        A     Yes.

14        Q     Go -- yeah, go ahead and state what you

15   recollect.

16        A     Sure.  So I talked to Dan Brown probably

17   anywhere from every day after work to maybe once a

18   week at -- at -- at a minimum.  Sometimes we'd

19   actually talk, you know, during the day also.  I

20   mean, we talked about other things; politics,

21   whatever it was, right, you know, conspiracy

22   theories, you know, whatever it is.

23              But it -- when we talked about those

24   things, it was probably -- probably at least once a

25   week.  And I would say that it would -- I can't give

EXHIBIT 9
Page 25 of 135

1    you an exact time, but it would've been near the end

2    of my tour there, probably closer to -- so I got

3    back from Afghanistan in -- in February of 2020 and

4    then I took -- I took the required month off and I

5    reengage at that time and it would have been

6    probably near the end of 2020, I -- I -- I presume.

7        Q    Okay.  And you said you kind of merged

8    Dan Brown/Dr. Roysdon products -- or projects.  I

9    want to -- I want to be clear.

10            Were Dan Brown and Dr. Roysdon working on

11   the same project?

12       A    Well, so, Dan Brown is -- his position is

13   that he connects contractors to requirements and

14   helps -- helps bind those proposals to the reqs that

15   like I would send out, for example, and I probably

16   did hundreds of reqs every year.  And, so, Dan Brown

17   would help to solve most of those.

18            So Dan Brown wouldn't be working on it,

19   per se, hands on keyboard; he would be facilitating

20   the -- the product manager, if you will, sort of the

21   one who would receive the results of whatever the

22   contract is.  That would then -- I guess I'd be the

23   product manager; he would be the one that would help

24   facilitate that, if that makes sense.

25       Q    Well -- and forgive me.  I do want to

**EXHIBIT 9**

**Page 26 of 135**

1    kind of unpack that so I have some better

2    understanding.

3         A    Sure.

4         Q    Was he like the project manager to your

5    product manager or was it -- what -- what --

6         A    So -- so, see, Dr. Roysdon really is the

7    project manager for that, as the contractor.  So

8    I'd -- I'd have to say -- and maybe I'm using the

9    wrong terms, but Dan Brown probably would've been

10   the core for it.  Is that the right term?  The

11   civilian lead for ensuring that that gets done.

12             And, to -- to the best of my

13   understanding, basically, he's accountable for the

14   money that was given to this contract to make sure

15   it gets done and he would ultimately then provide

16   that back to me.  So he was accountable to me to

17   make sure that I would get what was on my req.

18        Q    Got it.  So when he would talk about

19   money and -- and Captain McVay wanting money, he was

20   in a position to know about the fiscal issues with

21   projects?

22        A    Yes, because -- I -- I mean, I don't know

23   the intricacies of -- of how, but I -- I know just

24   like with any organization, we have like a hot wash,

25   you know, a stand up.  So they would know the status

EXHIBIT 9
Page 27 of 135

1    of all the projects.

2              He certainly manages -- you know, I say

3    manages -- he has several reqs that are given to

4    him, not just for me, but from CIA, Space Force,

5    even Army Cyber, and -- and other organizations.

6    And, so, he manages -- he manages those to make sure

7    that they come through to fruition and then end up

8    going to the people who requested them.

9         Q    Okay.

10        A    If that -- if that answers your question.

11        Q    It did.  Thank you.  So let me see how --

12   how to ask this.  So do you -- I -- I want to drill

13   down to as much specifics as possible.  When you

14   made the statement earlier that Dan Brown told you

15   that Captain McVay was trying to take the

16   finances --

17        A    Yes.

18        Q    -- from Dr. Roysdon's products -- or

19   projects, what, to the best of your recollection,

20   around the specific statements, do you recall him

21   saying?

22              MR. GONZALEZ:  Objection to form.  You

23   can answer.

24        A    Okay.  I'm not really sure how -- well,

25   actually, can you ask the question again?  I

EXHIBIT 9
Page 28 of 135

1    apologize.

2        Q    Sure.  I'm just trying to drill down and

3    see if you have any specific recollection as to what

4    Dan Brown specifically stated about Captain McVay

5    and the -- and the attempt to take funds?

6            MR. GONZALEZ:  Objection to form.  You

7    can answer.

8        A    Other than like expletives like, "The guy

9    was a jerk," I -- dare I say people dislike him --

10   other people dislike him in the organization, that

11   he was very much the kind of person that would do

12   whatever it took to make sure that he succeeded,

13   regardless of how many others would, I guess, be

14   screwed, if you will.  And -- and this isn't

15   verbatim, to be clear.

16       Q    I understand it's not verbatim.  And that

17   was all Dan Brown discussing Captain McVay?

18       A    Yes, yes, the -- the only discussions I

19   ever had about Captain McVay were from Dan Brown and

20   Dr. Roysdon.

21       Q    Okay.  I want to specifically get into an

22   area -- and -- and I acknowledge your friendship,

23   for sure, and concerns there, but, you know, we've

24   already deposed Dan Brown and, you know, he

25   disclaimed a lot of the sum and substance of what

EXHIBIT 9
Page 29 of 135

1    you've just described.

2              Do you have any insight into Dan Brown's

3    character for honesty?

4              MR. GONZALEZ:  Objection to form.

5    A    Can -- can I answer?

6    Q    Yes.

7    A    Okay.

8    Q    So unless you're instructed not to

9    answer, which -- in -- in today, you know, the

10   government has some privileges around classified

11   information, but you're not represented by the

12   government; you're a third party witness.

13             So unless either of us instruct you not

14   to answer, once an objection is lodged on the

15   record, you can just go ahead and answer.  Okay?

16   A    Okay.  Roger.  I think Dan Brown truly is

17   an honest and ethical person.  That's one of the

18   reasons why I like him.  He works very hard.  I

19   think he does not get the credit, honestly -- I -- I

20   think he was a GG-13.  He does not get the credit

21   that he deserves for the amount of effort that he

22   puts through.

23             And -- and I will say, too, some of the

24   things that he was able to provide to my team

25   were -- were -- you know, and I hate to be super

EXHIBIT 9
Page 30 of 135

1    dramatic, but they were -- they were critical in

2    solving some things that in 25 years people will

3    hear about and it was -- it was pretty significant.

4              What I will say is Dan Brown is the type

5    of person who is extremely skittish.  He is

6    terrified of losing his job for absolutely no

7    reason.  He's always been like this and I don't

8    think he would lie, in my personal opinion.  This is

9    just Todd Jaspers' opinion of Dan Brown.  I don't

10   think he would lie, but I think he would potentially

11   withhold, omit certain things because he fears

12   reprisal.

13      Q    All right.  And are you aware of any

14   reprisal against Mr. Dan Brown?

15      A    Well, what I would say is -- is, one,

16   I -- you know, it's been so long ago, right, that

17   it's -- it's really hard for me to say, but I -- I

18   know that he's been successful with the team

19   since -- my old team at -- at Air Force.

20             So I -- I don't think it's been too bad,

21   but I know that at the time, with Captain McVay, he

22   was really kind of pushed to the side and -- and I

23   think that his -- and I -- I hope this does not

24   sound arrogant, but our team was really significant

25   for Air Force Cyber.

EXHIBIT 9
Page 31 of 135

1            There were some direct presidential

2    requirements that -- that we were engaging in and I

3    think that because of that direct relationship

4    with -- with my team, myself, and Dan Brown, was how

5    he was able to stay relevant for a while during the

6    time that he -- I got the impression from him that

7    he was kind of being side-stepped at that time.

8        Q    Are you aware --

9            MR. GONZALEZ:  Counsel, before you ask

10   the question, I'm going to object to this entire

11   line of questioning.  You're asking for impressions.

12   You're asking for opinions.  It's devoid of any type

13   of foundation and you're asking for speculation.

14   So --

15           MR. WAREHAM:  I mean, you're absolutely

16   allowed to lodge foundation and -- and -- foundation

17   and form questions.  You're not allowed to tacitly

18   go into walking objections.  So I got it.

19   Foundation.  Moving on.  But please do not do

20   walking objections or I'm going to have to suspend

21   this.

22           MR. GONZALEZ:  I'm going to make a

23   objection for the remainder of this questioning on

24   this topic.

25           MR. WAREHAM:  Understood.  Thank you.

EXHIBIT 9
Page 32 of 135

1      Q      (By Mr. Wareham)  So going back to the --
2  let's see.  Where were we?  So we were at --
3      A      Talking about Dan --
4      Q      -- Dan Brown being self-protective.
5  Okay.  So -- so were you ever aware of Dan Brown
6  being removed from what he described as special
7  projects?
8      A      I -- I -- I -- I can't confidently say
9  yes.  It does ring a bell, but -- but I -- I don't
10  want to be put on record as saying yes because I'm
11  not confident in that.
12      Q      Thank you.  That -- thank you.  Do you
13  recall him ever describing any adverse actions taken
14  by Captain McVay against him?
15      A      I want to say yes, but I honestly can't
16  remember.
17      Q      Okay.
18      A      Because I -- I transitioned out around
19  that time, so...
20      Q      Okay.  And just to follow that line,
21  where did you go when you transitioned out?
22      A      So I transitioned to USSOCOM.  I was then
23  the -- the Command's cyber security -- senior cyber
24  security advisor for J-6, J-2, J-3, and I was there
25  from -- oh.  Gosh.  Let's see.  2020, 2021.  You

EXHIBIT 9
Page 33 of 135

1    know, I have to look at my resume.  I apologize.

2    But I -- I was there for about nine -- nine,

3    ten months.

4        Q    Okay.  And did that have any interaction

5    with any of the Air Force folks that you previously

6    worked with?

7        A    None, other than just, you know, saying

8    hi and stuff like that and maybe the occasional

9    follow-up, like, "Hey, where's this" -- from my

10   replacement, Brian, asking like, "Hey, how do I

11   access this?"  You know, "Is there this?"  And I'll

12   be like, "Yeah, just go there."  But, no, I -- I no

13   longer had any association with that organization

14   nor the caveats needed to discuss those topics.

15       Q    Okay.  Was there ever a point where you

16   reengaged with Air Force Cyber?

17       A    I did as a contractor, if -- if that's

18   what you're asking.  I -- I did, yeah.  Yeah, so --

19   my computer just locked.  I am so sorry.  I'll try

20   and be --

21       Q    You're fine.

22       A    -- better about moving my mouse.

23       Q    We're dealing with tech here.  It's not a

24   problem.

25       A    Yes, so, in November of 2021, and, again,

EXHIBIT 9
Page 34 of 135

```
 1    I have to look at my resume, but I know I sent it
 2    to -- to both the -- the Plaintiff lawyers and the
 3    Defendant lawyers.  I went to Leidos.
 4    Dr. Roysdon -- he didn't reach out to me, but I
 5    asked him if there was any -- if there was any
 6    opportunities at Leidos.
 7              I was actually very unhappy at NSA.
 8    Sorry.  Give me a second.  I apologize.  Let me -- I
 9    have a landline.  Don't judge me.
10        Q    Yeah, I'm surprised.  I haven't seen one
11    of those in a while.
12        A    I know.  So I don't know how much of this
13    you need to know, but I was -- I -- I did not take
14    the pull-out of Afghanistan very well.  It hit me
15    really hard.  I kind of just hit all the things
16    that -- that I saw when I was there, but when it
17    actually happened, when we pulled out, like it --
18    I -- I wasn't doing well --
19        Q    Yeah --
20        A    -- and I just --
21        Q    -- if it makes you feel any better --
22        A    Yeah, and -- and -- and I just like --
23    I'm just going to share this.  It sounds ridiculous
24    I'm even saying this, but my colleague at NSA and my
25    subordinate, he was an avowed communist, which was
```

EXHIBIT 9

Page 35 of 135

1    something I'd just never heard of before in my life

2    and that was completely acceptable to NSA, he had an

3    English major, and I was like completely a waste of

4    my time.  NSA had gone from 44,000 employees down to

5    8,000, which is unclassified now, by the way.

6           And, so, all I was doing was writing

7    papers.  I was miserable.  Like I -- I -- I just --

8    I wanted to like get back to actually doing some

9    good and -- and something.  And, so, Dr. Roysdon, he

10   said, "Well" -- you know, he was very clear that he

11   wasn't going to ask me unless I asked him because I

12   guess there's some laws as contractors; you can't

13   ask federal employees.

14          So I -- I -- I had reached out to him and

15   asked if there were any opportunities and he got me

16   a position as a researcher at Leidos.  Now, fast

17   forward about -- I want to say maybe five,

18   six months, we're probably into -- we're now into

19   2022 and Dan Brown called me on the phone, asked if

20   there was anything that we had that might help his

21   team.  So he actually did reach out to me first.

22          And I said, "Yeah, absolutely.  We're

23   working on three types of technologies."  Excuse me.

24   And I can go into one.  It focuses on endpoint, in

25   the middle, and then -- gosh.  I'm drawing a blank.

EXHIBIT 9
Page 36 of 135

1    Well, a parameter, endpoint, and then the network

2    traffic in the middle.

3              And, so, we all -- our -- our --

4    Dr. Roysdon's thought was always offense first,

5    defense second.  I won't get into why that matters,

6    but it has to do with how you train models

7    offensively and then how you develop them

8    defensively.  And these -- these were -- these were

9    new capabilities, barely tangential to the things

10   that I kind of asked for, not really, but they were

11   trying to solve some of the other problems that we

12   had.

13             And -- and Dan was interested in enough

14   that we put together some slide decks and we

15   presented -- I think I probably -- I don't remember

16   the exact number, but we -- we presented to him a

17   couple times.  And stop me if you want to break this

18   up.

19        Q    Oh.  Yeah, let's break this up.  Exactly.

20        A    Okay.

21        Q    All right.  So let's get to a timeline

22   around August of 2020, which, in the complaint, is

23   when we've described Dr. Roysdon leaving Air Force

24   Cyber.  All right.  What -- what do you recollect

25   from that time period relevant to this?

EXHIBIT 9

Page 37 of 135

1             MR. GONZALEZ:  Objection to form.

2      Q     That was a bad question.  Did that make

3 sense?

4      A     It -- it -- it -- it -- it did.  I'm not

5 sure I really remember.  Paul had moved on to

6 Leidos -- which I now know as Leidos and things are

7 good for him.  And he -- I didn't really hear much

8 about it.  He was just talking about all the great

9 things that he was doing at Leidos and -- and how

10 Leidos had started a whole new research

11 organization.

12             You know, Leidos has separate arms that

13 they do, there's defense, whatever, health, civil,

14 and they've created a research arm and how he was

15 helping to stand that up and he was pretty excited

16 about it.

17      Q     All right.  Specifically focusing on any

18 conversations with Dan Brown, did Dan Brown ever

19 describe to you --

20      A     Excuse me.  I'm sorry.

21      Q     Go ahead.

22      A     I'm sorry.  Any discussions with Dan

23 Brown -- can you repeat that?  I'm sorry.

24      Q     Yeah, Dan Brown -- did -- to your

25 recollection, did he ever discuss anything with you

EXHIBIT 9
Page 38 of 135

1    about Dr. Roysdon's exit from the Air Force?

2        A    The only thing I ever heard from Dan

3    Brown that was -- now you're saying during 2020?

4        Q    Yeah, like August 2020.

5        A    At that point, no.

6        Q    No?  Did you ever -- do you need to take

7    a sec?  We can take some time if you want to take

8    some drinks and -- yeah, please go ahead.

9        A    I'm sorry.

10        Q    No, you're fine.  Don't apologize.

11            Do you recollect any point where you had

12    any discussions with Dan Brown about the reasons for

13    Dr. Roysdon's exit?

14        A    No, I -- I -- my assumption always just

15    was that Paul got frustrated, the project was taken

16    away, and Dr. Roysdon left NSA.  That's really the

17    only one that I kind of really thought of because I

18    kind of viewed that as the more important one.

19            He left NSA because he -- he wanted to, I

20    guess, move up a little quicker and wanted to do

21    certain things.  NSA -- like I said, my frustrations

22    with NSA, they viewed all the things that we wanted

23    to do as too sci-fi, which is ridiculous because

24    that is really antithetical to how NSA has always

25    traditionally been, right.

EXHIBIT 9
Page 39 of 135

1            You see it on TV, it's like the most

2     advanced organization in the world, and it's not the

3     case anymore.  It's -- we've fallen so far behind.

4     So he left because he got a better opportunity at

5     Leidos to actually do a lot of the things that we

6     couldn't do at NSA.

7         Q    Okay.  And when you say "he left," are

8     you talking about he left NSA?

9         A    He did, yeah.  Yeah, that's -- that's

10    really the only one I kind of track --

11        Q    Yeah.

12        A    -- because I would see him at work.

13        Q    Okay.  Let's see.  So going from there,

14    in -- from that time period in August 2020, into the

15    Leidos role --

16        A    His -- his role in Leidos?

17        Q    Yeah, yeah -- well, let me shape the

18    question here.  So, yeah, let's talk about

19    Dr. Roysdon's role at Leidos.  Sure.  Okay.  What

20    was his role there?

21        A    So, initially, he was what was called a

22    principal investigator.  And, internally, that was a

23    rank of what I think is called a T-5.  And then he

24    was promoted to a T-6 after he had set up what was a

25    pretty good suite of foundational new development

EXHIBIT 9
Page 40 of 135

1    capabilities in -- in AI.  Excuse me.

2              And then he was promoted to chief AI

3    officer and made vice president and I think it was

4    like a double-promotion.  He got to T-7.  I don't

5    know if that means anything to you guys, but it

6    would be sort of the equivalent, I guess, to GG-15

7    or an 06, something like that.

8              And then he continued to -- to work

9    directly with the company CTO for the remainder of

10   the organization, helping to sort of shape different

11   areas of research as the chief AI officer.

12   Q    Okay.  And what was your observation

13   regarding Dr. Roysdon's ability to work with Air

14   Force Cyber from Leidos?

15             MR. GONZALEZ:  Objection.  Form.

16   Q    Go ahead.

17   A    So I -- I think what -- what you are

18   trying to -- I think what you're asking me is -- is

19   what -- when -- when we worked -- tried to work with

20   AFCYBER -- well -- okay.  So, specifically, it's not

21   AFCYBER, right.  It's HNCO.  Dan Brown worked for

22   HNCO.  AFCYBER was where I worked and I wouldn't

23   necessarily have had a need to go to AFCYBER, so

24   much as I knew that I would go to HNCO.

25             Now, Dan Brown reached out to me from

EXHIBIT 9
Page 41 of 135

1    HNCO and he asked me if there was anything that we

2    had.  So that's now going to the -- the end of the

3    conversation we had where we -- said we were going

4    to break it down.

5              So I had had those discussions with Dan

6    Brown.  I talked to -- to Dr. Roysdon --

7    Dr. Roysdon.  So he would, normally -- in any of

8    these customer presentations, he would always have

9    his name on the slides and things like that.  And I

10   can't remember if we sent it to him first or if he

11   told me on the phone specifically first, which he

12   very much did at a later time, say that, "I can't

13   have Dr. Roysdon's name on any of these slides."

14             And, so, we put my name on the slides

15   intentionally instead of -- instead of Dr. Roysdon's

16   because it was made clear to me from Dan Brown that

17   it would be an absolute no-go if any of these

18   documents had Dr. Roysdon's name on it because he

19   was to use the term "persona non grata."

20   Q     Okay.  And we are going to try to unpack

21   that in -- in a --

22   A     Oh.  Sure.

23   Q     -- timeline and from there, you know, to

24   the best of your ability, to remember specifics

25   because this is a key point.

EXHIBIT 9
Page 42 of 135

1      A      Yes.

2      Q      So around the first conversation that you

3   had with Dan Brown where he said something to the

4   effect of, "He's persona non grata," do you

5   recollect roughly what time period that --

6              MR. GONZALEZ:  Objection to form.  Who's

7   testifying here?  "Persona non grata" is in your

8   complaint, but who's testifying here?

9              MR. WAREHAM:  I can go ahead and give any

10  leading question I'd like and then ask him to

11  comment on it.

12             MR. GONZALEZ:  You're -- you're -- you're

13  mischaracterizing what he said and you're

14  mischaracterizing his testimony.  So just ask the

15  question.  You know, we are going to have a problem

16  if you're going to ask questions that way.

17             MR. WAREHAM:  Okay.  Do you want to

18  suspend and go have a conversation?  I'm fine with

19  that.  All right.  You know, good or bad questions,

20  I'm allowed to ask them.  I'm not testifying.  I'm

21  not trying to admit my deposition testimony, right?

22  It only matters what he answers.

23             Okay.  So object to the question and stop

24  stepping on the question or we're going to have a

25  conference.

EXHIBIT 9
Page 43 of 135

1            MR. GONZALEZ:  Okay.  Well, you're

2    having -- you're asking improper questions.  Go

3    ahead.

4            MR. WAREHAM:  Well, that's why objections

5    exist.

6        A    I'd just like to say, in a former life, I

7    really would love to be a lawyer because I love this

8    stuff.  But -- but I'm sorry.  Would -- would you

9    repeat the question?  I apologize.

10       Q    Yeah, let's repeat the question.  So

11   there's a time period -- you know, what do you

12   recollect is the first time period where Mr. Brown

13   commented on Dr. Roysdon being excluded from Air

14   Force Cyber?

15           MR. GONZALEZ:  Objection to form.  Go

16   ahead.

17       A    I -- I wish -- I -- I can't give you

18   the -- well, I probably could, actually, if I went

19   through my e-mails, but there was -- there was a

20   discussion that I had with Dan Brown and Rick Lipsey

21   responded to it and -- and confirmed to Dan Brown

22   that my name was on the slides.

23           Now, I want to be very clear that there

24   was nothing from Dan Brown in those e-mails saying

25   that Dr. Roysdon could not be, right.  Those were

EXHIBIT 9
Page 44 of 135

1    all conversations I had on the phone.  I just want

2    to be real clear about that because I'm not trying

3    to lead or anything with that, but I believe that

4    had to have been either late 2022 or early 2023.

5            I -- I really can't -- I mean, I guess

6    that's only a couple of years ago, but, you know,

7    until just like a little more than a week ago, I had

8    completely forgotten about all this --

9        Q    I understand.

10       A    -- so...

11       Q    So just do the best that you can.  All

12   right.  And -- and, again, whatever your truthful

13   recollection is, that's what we're looking for.

14           So when you say look back at your

15   e-mails, can you describe what e-mails those are?

16       A    Yes, there was a bunch of e-mails back

17   and forth to Dan Brown at his HNCO NIPR e-mail where

18   we're basically passing slides and I think Dan is

19   kind of helping us define what he wants in that for

20   us to present our capabilities to -- sort of like a

21   read-ahead.  You know, as a contractor, we give a

22   read-ahead for a presentation and then he can circle

23   that so that Dan Brown could get the right people in

24   the room.

25       Q    All right.

EXHIBIT 9
Page 45 of 135

```
1          A     And the only thing was from an e-mail
2    from Rick Lipsey where he confirmed -- he said,
3    "Todd Jaspers is the project manager.  His name will
4    be on the slides."
5          Q     Okay.  And was there a point where
6    Dr. Roysdon's name was on the slides?
7          A     I do not -- I -- I know he wanted them
8    on, but Dan Brown told me that they could not be.  I
9    don't know if they ever were.  I -- I can't -- I
10   can't remember, but I know that Dan Brown said that
11   they can't be.
12         Q     And who was the individual you just
13   mentioned that said only your name would be on the
14   slides or -- or --
15         A     Yep, Rick Lipsey is our Air Force
16   business development lead.  He's a former colonel.
17   He works out of our San Antonio office.  I don't
18   know if he's with Leidos still.  I think he's very
19   part-time.  He's retired and has some health issues.
20         Q     Do you have any idea how to spell his
21   last name?
22         A     Let me just type it up and see.
23   L-i-p-s-e-y.
24         Q     Okay.  And do you happen to know where he
25   might be located currently?
```

EXHIBIT 9
Page 46 of 135

1          A    Let me see.  Do you want to see if I can

2    find his e-mail address?  I'm on my work computer.

3    They allowed me to use it because it involves Leidos

4    stuff.  Give me a second.  I can put it in the chat,

5    if that works for everyone.

6          Q    Why don't you just say it on the record

7    so we have a clear record.

8          A    Okay.  It's Rick Lipsey and his e-mail

9    address is -- so he's a consulting employee.  So

10   he -- it looks like he's actually out until

11   September.  His e-mail is

12   richard.a.lipsey@leidos.com and it says that he

13   is -- he is out on sabbatical through the end of

14   September.

15         Q    Okay.  And what is he in Leidos?

16         A    It says consulting employee, but at the

17   time, he was business development lead for Air Force

18   in San Antonio.

19         Q    Okay.  And what does "at the time" --

20   what does "business development lead" mean?

21         A    Those -- those are the individuals that

22   have constant communications with civilian and

23   military to try and meet up with them on a regular

24   basis, trying to find -- I've never been BD, but

25   those are the people that kind of reach out and

EXHIBIT 9
Page 47 of 135

1    are -- are trying to see what challenges there

2    are -- basically to see if we can try and sell you

3    something.

4        Q    Okay.  And when you described the e-mail

5    that said only your name would be on the --

6    the slides from Mr. Lipsey, do you know what that

7    was in reference to?

8        A    Yes, that's the slide deck that we sent

9    to Dan Brown.  He was just confirming to Dan Brown

10   that only -- that only my name was going to be on

11   the slides.  But, again, I want to be very clear,

12   there was nothing in the e-mail from Dan Brown that

13   says, you know, you can't have Dr. Roysdon --

14       Q    I understand that.  Are you aware of any

15   reason why Rick would tell you that?

16       A    It -- it could be maybe that --

17            MR. GONZALEZ:  I'm going to object to

18   this question.  Form.

19       A    Yeah, I -- I -- I'm -- I'm not -- I'm not

20   really sure.  It could be that maybe Dr. Roysdon --

21   because I would've -- I would've had that

22   conversation with Dan Brown.  So I would have talked

23   to Dr. Roysdon and said, "Hey, you can't have your

24   name on there."  Maybe he then mentioned it to Rick

25   Lipsey.  I'm -- I'm not really sure.  It -- yeah.

EXHIBIT 9
Page 48 of 135

1        Q      So let's go back to Dan Brown --

2        A      Roger.

3        Q      -- specifically on this issue.  What, if

4    anything, did Dan Brown say on this issue about

5    removing Dr. Roysdon's name from the slides?

6        A      So he said -- the term was used, "persona

7    non grata," and he said multiple -- you know, any

8    time that we would interact with them, he said that

9    we can't have Dr. Roysdon on any of the

10   documentation.

11           As a matter of fact, I -- I don't think

12   he even wanted Dr. Roysdon on the -- the meeting --

13   on the Teams call while we were doing the

14   presentation, but, you know, Dr. Roysdon was like,

15   "It's my research, so I'm going to be on it anyway,"

16   and, so, he still went on the Teams call.

17       Q      Okay.  Did Dan Brown ever give you

18   insight into why he didn't want Dr. Roysdon on the

19   call?

20       A      Well, I -- I think -- it was pretty clear

21   to me that it was probably because of the lawsuit.

22   The only thing I ever heard from him was, "I don't

23   think you know what he did," referring to the

24   lawsuit.  And I said, "Look," you know, "I don't

25   really want to get involved in that.  I'm friends

EXHIBIT 9
Page 49 of 135

1   with both of you guys.  This is not" -- you know --

2   you know, it's...

3       Q    So I want to focus on a time period

4   before the lawsuit.  So between 2020 and 2022, were

5   you working with Dr. Roysdon in Leidos at that time?

6       A    No, I did not come to Leidos until 2021.

7       Q    Okay.  So in 2021, did you ever have a

8   conversation with Dan Brown with respect to

9   Dr. Roysdon, to your recollection?

10      A    Yeah, we -- we were still amicable.

11  We'd -- we'd often talk about, you know, the

12  election and -- and, you know, conspiracy theories

13  and, yeah.  I mean, I think -- I -- I don't remember

14  the time frame, but -- but I know that -- I know

15  that Dan Brown talked to Dr. Roysdon and I talked to

16  Dan Brown.

17           I mean, we never had like a party line or

18  anything like that, but, you know, we would all talk

19  to each other on a regular basis.

20      Q    Okay.  And was there anything negative

21  said by Dan Brown about Dr. Roysdon in that time

22  period?

23      A    I don't remember him saying -- actually,

24  I think -- I think Dan Brown was very -- I think he

25  really looked up to Dr. Roysdon a lot.  I think he

EXHIBIT 9
Page 50 of 135

1    actually viewed him as -- and -- and -- and he is.

2    I mean, he'll let you know it, but he is.  You know,

3    Dr. Roysdon is very intelligent and he's got like

4    seven degrees or something like that and -- and, you

5    know, he is -- he is a very smart guy.

6              And Dan Brown kind of viewed him as like,

7    you know, this person that's going to change the

8    world or -- or whatever it is.  So that's -- I -- I

9    never heard anything negative from him other than

10   that, I guess, things were not going well for him

11   with the lawsuit.  "Well for him" being Dan Brown.

12        Q    And when you say "well for him," what was

13   not going well for him?

14        A    So that was -- that's referring to the

15   conversation as, "I don't think you know what he

16   did," and then that's referring to the lawsuit, to

17   which point I kind of told him I really don't want

18   to be involved in that, I want nothing to really do

19   with that at all.

20              I didn't really -- I don't really have

21   anything to do with that.  I mean, I guess I do

22   because I'm being deposed, but that's not really --

23   you know, I'm just the one that's supposed to --

24   that was supposed to receive the capability, so...

25        Q    Okay.  All right.  Was there -- besides

EXHIBIT 9
Page 51 of 135

1    being on Teams calls, was there ever a time where

2    your -- in the Leidos role, you presented physically

3    to Air Force Cyber, HNCO folks?

4         A    In person?

5         Q    Yeah.

6         A    No, I -- I have not.

7         Q    Are you aware of any time Dr. Roysdon

8    presented in person?

9         A    You know, that's a good question.  I --

10   I -- I don't know.  I -- I know that they may have

11   presented to -- to AFCYBER -- or, no, to NSA Texas

12   TAO -- or CNO.  I'm sorry.  TAO is the old name.

13   CNO, Computer Network Operations, is the new name.

14              I think he did go directly to CNO, which

15   included some of the AFCYBER people, and that was

16   with Mark Brasher and Robert Allen in -- in San

17   Antonio, but -- but I was not there, as I'm in

18   Tampa, so -- and then we're talking about -- we're

19   talking about like fairly -- like post 2021, right?

20        Q    Correct, in that time --

21        A    Yes, yes, but I don't think -- I'm not

22   aware of him actually briefing in person to HNCO.  I

23   mean, I'd imagine that -- like it was pretty obvious

24   to me that that wasn't going to happen.

25        Q    And why is that?

EXHIBIT 9
Page 52 of 135

1          A      Well, that's like -- like what I said,

2     any -- any mention of Dr. Roysdon being at all

3     involved with anything that we were doing was

4     considered a red flag for -- for Dan Brown.

5          Q      Okay.  Besides Teams calls and -- what

6     was the other -- were there any other forms of

7     presentation that the Leidos folks put on for HNCO?

8          A      No, it was -- it was just Teams.

9          Q      Okay.

10         A      That I'm personally aware of.

11         Q      Okay.  And are you aware of whether or

12    not HNCO contracted for any of those projects that

13    was involved -- involving Dr. Roysdon?

14         A      No.

15         Q      They did not or you're not aware?

16         A      They -- oh.  I am aware that they did not

17    take on any of our capabilities.  And -- and I would

18    actually add too, that Dan Brown was actually

19    uniquely aggressive in -- in the last presentation

20    that I gave to him.  Again, he's -- he's awesome,

21    right.  Dan Brown is an awesome guy.

22                When I was kind of the person telling him

23    what I needed, I loved the dynamic that he often had

24    with the contractors because he got them done.  It's

25    a totally different thing when you then become a

EXHIBIT 9
Page 53 of 135

1    contractor.  I didn't take it personally, but, man,

2    he was aggressive.

3              I got the impression that it was -- it

4    was -- and this is just my personal opinion, right,

5    that I got the impression was that he was -- he was

6    a little bit of grandstanding for the individuals

7    that were also on the call.

8              And those names, I -- I don't remember

9    and McVay was not on there, to be clear, but he

10   later called to apologize because -- because he said

11   that he had just been like -- he was -- he was like

12   really trying to beat me down like -- he didn't use

13   any expletives, but like, "Who would want this," you

14   know, and -- and we're actually implementing it

15   across all the IEPs soon.  So somebody clearly wants

16   it, but...

17        Q    So around what time period was the

18   unique -- unique aggression issue, as you described

19   it?

20        A    So that slide deck that I was referring

21   to where it had my name on the slides, I believe

22   that was the one that we ended up presenting to the

23   customer, to -- to HNCO, and that would have

24   happened maybe a couple weeks or maybe a week after

25   that -- that e-mail with the -- about the slides.

EXHIBIT 9
Page 54 of 135

1           So it would have been around that time,

2    which, I mean, I -- I -- I tried to go through my --

3    I think -- you guys probably have those or maybe

4    from Dan Brown, from his NIPR, but I want to recall

5    that it was maybe early 2023.

6        Q    Okay.  And, actually, you make a really

7    good point.  So let's talk a little bit about e-mail

8    communications from Dan Brown to you.

9        A    Mm-hmm.

10       Q    Would he e-mail you?

11       A    Yes, yes, he would from his HNCO work

12   e-mail to my -- my todd.m.jaspers@leidos.com e-mail

13   for strictly work things.  Again, there was nothing

14   that was -- that references anything that we're

15   talking about here in a negative connotation,

16   "Dr. Roysdon can't be here, can't do that," you

17   know, there was none of that.

18           It was just -- Dan Brown is very good

19   about keeping work stuff separate.  We would also

20   e-mail back and forth privately for just, you know,

21   politics and whatever else and that was from his

22   lakeside@hotmail, I think, .com e-mail to my --

23   excuse me -- toddjasp@protonmail.com e-mail.

24       Q    Okay.  And while I understand that

25   there -- you're describing there's nothing negative

EXHIBIT 9
Page 55 of 135

1    in the e-mails from -- from Leidos -- or to Leidos

2    from -- from his official account --

3        A    Right.

4        Q    -- would those e-mail like dates and

5    times help you with the timeline around some of

6    these conversations?

7        A    Do you want to give me a minute?  I -- I

8    hate to -- to do this while you guys are on here,

9    but if -- I -- I'm -- I'm -- I'm on my work --

10            MR. WAREHAM:  This is actually an

11    excellent -- we've been going about an hour.

12    Usually I try to give everybody a chance to -- to,

13    you know, get water or take a second.  I wouldn't

14    object to taking 10 minutes right now, or longer, if

15    anybody else wants.  Any objections?

16            MR. GONZALEZ:  None from us.  10 minutes

17    is fine, if that's okay with the court reporter.

18            MR. WAREHAM:  All right.  We'll -- we'll

19    reconvene --

20            THE VIDEOGRAPHER:  Hold on.

21            MR. WAREHAM:  -- my time at 1:17 p.m.

22    would be when we come back.

23            THE VIDEOGRAPHER:  Can you guys hold on?

24    The time is 11:08.  We are going off the record.

25                (A break was held off the record from

EXHIBIT 9
Page 56 of 135

1    11:08 a.m. to 11:19 a.m.)

2              THE VIDEOGRAPHER:  Time is 11:19.  We are

3    back on the record.

4        Q    (By Mr. Wareham)  So you were taking a

5    look at some e-mails for timeline purposes.

6              Did that refresh your recollection?

7        A    It looks like it was -- all my

8    discussions with Dan Brown and Rick Lipsey occurred

9    between late March and -- and up through mid-April

10    of 2023.  And then I have another set of e-mails

11    where -- and that was just briefing to HNCO.

12              I have another bunch of e-mails that were

13    a briefing with Mark Brasher, who -- who was the

14    weapons and tactics director, that I also brought

15    onto Leidos, and that was in July -- late July, in

16    San Antonio.  I was uninvolved in that because I'm

17    in Tampa and, so, there's no need for me to fly out

18    there.

19        Q    And when you say late July, that's 2023?

20        A    Yes, yes, it is.

21              MR. GONZALEZ:  So before you ask your

22    question, Jason, I -- I -- I'm fine with the witness

23    like taking a look at his e-mails to kind of refresh

24    his recollection, where we are with the timeline.

25    I'm -- I'm not okay with questions being asked about

EXHIBIT 9
Page 57 of 135

```
 1   documents that aren't in front of me that are

 2   from -- you know, they're Leidos documents that

 3   probably their general counsel might want to be

 4   involved in if they're going on a record.  I will --

 5             MR. WAREHAM:  I actually totally agree

 6   with you.  We don't have a disagreement there.

 7             MR. GONZALEZ:  Okay.

 8             MR. WAREHAM:  What I think I'm going to

 9   do is we'll just issue a 45 and we'll produce it in

10   discovery and -- you know, yes, but I get it, yeah.

11             MR. GONZALEZ:  So, you know, Mr. Jaspers,

12   it's fine that you refresh your recollection and did

13   all that, I have no I have no objection to that,

14   but, you know, my -- my request is that you, you

15   know, close that down right now --

16             THE DEPONENT:  I just did.

17             MR. GONZALEZ:  Okay.

18             THE DEPONENT:  I understand.

19             MR. GONZALEZ:  Okay.  All right.

20       Q    (By Mr. Wareham)  So, anyway, focusing on

21   the e-mail collection.  That's all -- just to

22   confirm, that's all on the Leidos servers, all those

23   e-mails that you just reviewed?

24       A    Yes.

25       Q    Okay.  All right.  Easy enough.  And,
```

EXHIBIT 9
Page 58 of 135

1    actually, would you just state your e-mail for

2    Leidos full out so that we can -- we can track what

3    account that is?

4         A    Sure.  It's todd.m.jaspers@leidos.com.

5         Q    Okay.  So are you aware of, in general,

6    Dr. Roysdon's reputation among HNCO?

7         A    Only from my conversations on the phone

8    with Dan Brown, that post the whole Captain McVay

9    thing, that it's quite bad.

10        Q    Okay.  And when you say "quite bad," what

11   do you mean?

12        A    Basically not really allowed back.  They

13   don't want to have anything to do with him, anything

14   involving him would be considered like a

15   show-stopper.

16        Q    Okay.  In general, how long have you

17   worked in the government contract space?

18        A    I've been a government contractor for

19   exactly three years.

20        Q    Okay.

21        A    And I was a federal employer for a

22   decade.

23        Q    Okay.  Oh.  Yeah, and as a federal

24   employee for a decade, how often did you work with

25   contractors?  Not just afterwards.

EXHIBIT 9
Page 59 of 135

1          A      Quite a lot, actually.  I -- so if you

2     look at my resume, which -- which everyone should

3     have a copy of, I -- I was stationed around

4     different places.  I was stationed at US SOUTHCOM

5     and I worked with contractors.  I know there's

6     certain things like, you know, you can't give them a

7     coin, even if they've done an awesome job.

8               You know, there's -- you have to be very

9     careful with how things are said because it can be

10    interpreted as -- "Well," you know, "you said my

11    performance was great this one time, but now the

12    contract you're saying isn't" -- you know, stuff

13    like that.  So to -- to that extent, I'm -- I'm

14    aware with it.

15              When I was at NSA, we had a lot of

16    contractors as well.  I was the development manager

17    for some capabilities that we were developing for

18    the defensive side and most of my team members were

19    contractors and, you know, they had to follow

20    certain guidelines for certain things.  Does that --

21    does that answer your question?

22         Q      Yeah, it does.  In that time, either

23    working with contractors or being a contractor, are

24    you aware of the role of individual reputation and

25    its impacts on contract work?

EXHIBIT 9
Page 60 of 135

1         A      Now, I think if it's -- and I'm using a

2    term that I think is not appreciated as a

3    contractor, but when -- when it's a butts in seats

4    kind of thing, I don't think it really matters so

5    much.  I -- I know that like I'm not allowed to

6    say -- so let me give you an example.

7              When I was working at SOUTHCOM, they had

8    me review a contract and there were some contractors

9    that I know I just really did not want there.  They

10   did not get work done.  They were -- they were just

11   not good employees.  And I was told that I can't ask

12   those things when I'm reviewing the -- the proposals

13   for the final contract.

14             We can ask for contractors to not be put

15   in positions of authority under other contractors,

16   but that we can -- but that we can't specify to the

17   government who they can and cannot include in

18   contracts.  I don't know if that's answering your

19   question.  Sorry.

20             MR. WAREHAM:  Not really, but that's

21   okay.  You know what, I think that's actually the

22   conclusion of my questions.  As I was thinking about

23   it, since you referenced it a few times, and for --

24   for DOJ, I'm going to mark his resume as Exhibit 1,

25   just since he referenced it a few times, to keep the

EXHIBIT 9
Page 61 of 135

```
1    record clear, but, really, that's my only exhibit at
2    this time and we'll make sure that gets marked.
3    Otherwise, I think I'm done with my questions.
4              (Exhibit 1 was marked.)
5              THE DEPONENT:  I know the DOJ and the --
6    the -- the plaintiff's lawyers have a copy of it.  I
7    don't know if I need to send it anywhere else.
8              MR. WAREHAM:  Do you guys have a copy?
9              MR. GONZALEZ:  Yep, yep.
10             MR. WAREHAM:  All right.  Great.  Then
11   other than that, yeah, we're concluded, but there --
12   the DOJ may have some follow-up questions here for
13   you and then I might have --
14             THE DEPONENT:  Sure.
15             MR. WAREHAM:  -- some follow-up on their
16   follow-up.  So I defer.
17             MR. GONZALEZ:  Okay.
18             THE DEPONENT:  And -- and if you don't
19   mind -- I apologize.  If you don't mind just
20   speaking up because sometimes it's -- it's not clear
21   and -- and I won't take it personally if you get
22   aggressive with me, so...
23             MR. GONZALEZ:  Mr. Jaspers, you're --
24   you're a nice guy and you're a very willing witness.
25   I don't think that that'll happen, so don't --
```

EXHIBIT 9
Page 62 of 135

1              THE DEPONENT:  Although it makes it more

2    exciting.

3              MR. GONZALEZ:  Okay.

4              THE DEPONENT:  Only a little bit.  It'll

5    make it more fun.

6              MR. GONZALEZ:  Jason and I might give you

7    a show.  I don't know.

8              MR. WAREHAM:  All right.  If that's what

9    he wanted there, Mr. Gonzalez, let's party.

10                        EXAMINATION

11    BY MR. GONZALEZ:

12         Q    Okay.  So let's start off talking about

13    Dan Brown.  Okay?

14         A    Yes.

15         Q    All right.  Can you hear me okay?

16         A    Yeah, I'm trying to zoom in on you just

17    so I can see you better.  I'm sorry.  Let me move

18    you to the center.  I can't do it.  I just see

19    myself.  That's fine.  I don't -- I guess I'll look

20    at myself.  Go ahead.  I -- I apologize.

21         Q    Okay.  You're -- you're good?

22         A    I'm good.

23         Q    Okay.  All right.  How long have you

24    known Dan Brown?

25         A    So I first met Dan Brown when he was

EXHIBIT 9
Page 63 of 135

1    revealed to me as the HNCO -- basically the person
2    that I could reach out to from -- from AFLCMC to get
3    capabilities.  So that would have been 2018 -- some
4    point in 2018.  I think my resume says around April.
5    I'm not sure, but it would have been when I started
6    with AFCYBER CTOC, under CYBERCOM.
7         Q    When is the last time you talked with
8    him?
9         A    Probably an e-mail and it would have been
10   maybe -- well, he actually called me, but I -- I --
11   I wasn't able to pick up.  That probably would have
12   been maybe four months ago and I probably had an
13   e-mail conversation with him about three months ago,
14   but it was -- it was definitely different.  The
15   relationship was strained.
16        Q    Why was it straining?
17        A    Well, I -- I think whatever is going --
18   my opinion is whatever's going on, it's -- it's not
19   good for him, this -- this lawsuit, and as a result,
20   he's probably nervous to -- to talk with me.  I -- I
21   can only guess.  He -- he didn't say.  It's just --
22   it's clearly different.
23        Q    I want to show you an e-mail
24   conversation, which I guess we will mark as
25   Exhibit 2.

EXHIBIT 9
Page 64 of 135

```
1                (Exhibit 2 was marked.)

2      A     Okay.  Is it -- is it going to be shown

3  on the screen?  Will I be able to see it?

4      Q     Yeah, you're -- you're going to be able

5  to see it.  Okay.  Can you see it?

6      A     Yes.

7      Q     Okay.  Do you recognize this?

8      A     Yes, I do.  This would've been what I

9  just sent in -- in response.  Yeah, so, I guess you

10  would have gotten this under -- if I -- if I

11  understand correctly, where you would share the --

12  the -- the plaintiff would share the information.

13              Yeah, so, I wanted to clarify,

14  specifically, some of the things that were said

15  from -- from Jason, yeah.

16      Q     So this is an e-mail from Jason to you

17  about your conversation that you had with Roysdon's

18  attorneys, correct?

19      A     Yes.

20      Q     Was this your first time talking to them?

21      A     I -- I think so, yeah.  I hadn't had

22  any -- I mean, within the past couple of days, I

23  think I had two calls with them, but I had not ever

24  spoken to them before.

25      Q     Okay.  The -- the first bullet point
```

EXHIBIT 9

Page 65 of 135

1    there is a summary that they have provided of their

2    conversation with you -- or at least part of it.

3            Do you see that?

4    A       Mm-hmm.  Yeah, that -- that, "Dan Brown

5    has communicated on a number of occasions that he's

6    fearful around keeping his HNCO job."  And that, "In

7    your personal opinion, he would be willing to

8    withhold pertinent testimony?"  Yes, and then so

9    that is still my response there, that I think he is

10   a very honest and ethical person, but I think that

11   he -- unfortunately, I hate to say it.

12           He is very fearful of losing his job and

13   I think he would withhold certain things.  I don't

14   think he would lie, but I think he would withhold

15   certain things.

16   Q       Okay.  Are you under the impression -- or

17   were you under the impression when you wrote this

18   that Dan Brown had testified?

19   A       Yes, I -- I think I already knew that he

20   had, yeah.

21   Q       And -- and how did you know that?

22   A       I think their lawyers told me that he

23   already had.

24   Q       Okay.

25   A       I mean, that's -- that's -- and I

EXHIBIT 9
Page 66 of 135

1    apologize for interrupting, but -- but -- but that's

2    why this came up.

3        Q    Okay.

4        A    So, yes, it's -- it's pretty clear to me

5    that he had already been deposed.

6        Q    Okay.  Were you under the impression when

7    you wrote this e-mail that Dan Brown had withheld

8    testimony?

9        A    I think -- so I don't know.  They --

10   the -- the -- Dr. Roysdon's lawyers did not tell me

11   a whole lot, but they did tell me that he had

12   testified and I think they asked me if I felt that

13   he was -- I mean, it was just like a couple of days

14   ago, so I apologize, but I think they asked me

15   whether or not he would lie or what his -- what his

16   stature of a person is and that's -- that's why I

17   wrote what I did.

18       Q    Okay.  And why do you think that he would

19   withhold things?

20       A    He is a very nervous person.  I think

21   that when it comes down to it, he is very fearful of

22   losing his job, which, you know, we can get into.  I

23   mean, I know the stuff with DOJ, but prior to this,

24   right, you know, a civilian employee, it would take

25   an act of God to fire a civilian employee and they

EXHIBIT 9
Page 67 of 135

1    can just practically commit murder and still be

2    allowed until they're -- whatever.

3            But he was always so fearful and I told

4    him he never -- he didn't have to be.  He was always

5    worried about -- about losing his job or -- or

6    something like that.  I -- I think I'm getting off

7    track.  I -- I -- I apologize.

8            But that's -- that -- that -- and -- and

9    I hate to say it, right, like I -- I really do

10   because I like Dan a lot, but -- but, again, I don't

11   think he would ever lie, but I think that, if

12   convenient, he would pull sort of the "I cannot

13   recall."

14        Q    Are you aware of any instance of him ever

15   doing that?

16        A    I am not, but I know that from his

17   fearfulness in talking with his superiors at work

18   and just having known him for several years, that I

19   feel like that is something that he would do.  It's

20   just -- personal opinion.

21        Q    And that opinion is primarily based on

22   your conversations with Dan, correct?

23        A    Yes, and -- and -- and my knowing his

24   personality and -- and who he is and sort of his --

25   just his stature.  He is an honest person.  Like I

EXHIBIT 9
Page 68 of 135

1    don't think he would ever steal or anything like

2    that, but I think to kind of save his skin, he

3    would -- I do think he would be willing to withhold

4    certain things.

5        Q    Okay.  And are you aware of any

6    circumstance where he has withheld material or

7    pertinent information?

8        A    I am not.

9        Q    Okay.  So let's talk a little about

10   Leidos.  You've been working there since 2021,

11   right?

12       A    Yes -- no -- yes, yes, I have.  November

13   2021.  It should say it on my resume.

14       Q    And you worked with -- at some point with

15   Dr. Roysdon at Leidos; is that correct?

16       A    Yes.

17       Q    What were the approximate dates?

18       A    Well, I -- I would say that I worked with

19   him the entire time that he worked at Leidos.  So it

20   was during my entire tenure.  He actually just left.

21   I think he was given a political appointment a

22   couple weeks ago, pretty high up, actually, but I

23   think -- he was my boss for the first year and then

24   he moved off to go do sort of like next level

25   things.

EXHIBIT 9
Page 69 of 135

1            So he became the chief AI officer for the

2    company and he started working directly with the CTO

3    and, so, I kind of assumed his old role.  And then

4    I -- I had less and less communications with him at

5    work -- work-related, just he had moved on to bigger

6    and different projects.  Does that answer your

7    question?  I -- I apologize.

8        Q    It does.  It does.  No need to apologize.

9    You said he -- he moved to a pretty high up

10   political appointment.  What -- what appointment?

11       A    He -- I think he's like -- he's like

12   three under -- I think he's like two steps under

13   Tulsi Gabbard at ODNI.

14       Q    ODNI and --

15       A    Yeah, officer of -- I -- I don't know his

16   title, but I know that -- that she has like six

17   direct reports and I think he's one of them.

18       Q    Okay.  So he's a direct report to Tulsi

19   Gabbard at ODNI?

20       A    Yes, that's -- that's how I understand it

21   right now, yes.

22       Q    For the year that you worked directly

23   with Dr. Roysdon, what was the nature of your work

24   together, just generally?

25       A    So he was kind of the one that guided the

EXHIBIT 9
Page 70 of 135

1    research -- part of being a principal

2    investigator -- which is what he was originally and

3    then I was directly under him as his project

4    manager.

5              The principal investigator goes out and

6    does trade shows, gives conferences, speeches,

7    things like that, talks to customers, stuff like

8    that, normal routine stuff for a principal

9    investigator, along with directing and guiding the

10   research.  When he moved up to vice president, he

11   started working with the CTO.

12             I stopped dealing with him at that point

13   just because he was working on projects that were at

14   sort of a different echelon than mine.  There's

15   still some concentric circles of certain projects

16   where he would reach back to me or I would forward

17   him some -- some information that related to things

18   that he was doing at a higher level.

19             I assumed his old role as principal

20   investigator and continued some of the research and

21   created some of my own and I -- I think that answers

22   your question.  Let me know --

23        Q    It does.  It does.

24        A    Okay.

25        Q    So you're a principal investigator now;

EXHIBIT 9
Page 71 of 135

1    is that correct?

2        A      Yes, I was a principal investigator and

3    then I did something else all of last year.  I don't

4    know.  I do so many things.  I'm on a bunch of

5    contracts.  I'm also a principal investigator now

6    for two things; one for critical infrastructure and

7    also on a DARPA contract that we won on -- on one of

8    our technologies that we produced, which is really

9    cool.

10       Q      And, so, I guess as a principal

11   investigator, part of what you do is you either like

12   solicit business or provide presentations of some

13   kind for business; is that correct?

14              MR. WAREHAM:  Objection --

15       A      Yes, that -- that is -- that is exactly

16   something that -- that I would do.  I try to do less

17   of it because the -- you know, I -- I realize that

18   working with customers, that's what brings in the

19   money, so to speak.  But my better focus is on

20   guiding and steering the research and working

21   technically with sort of our partners.  Excuse me.

22              Since then, our company has kind of put

23   together product owners, product support to help

24   with these BD things.  It's sort of an internal

25   frustration thing, like we help BD sell; BD doesn't

EXHIBIT 9
Page 72 of 135

1    help us engineer.  So it's kind of, you know, sort

2    of a struggle that we have.  I -- I still will do a

3    trade show or two and give customer presentations

4    at -- at all times, but it's not the thing I enjoy.

5         Q    So when you worked directly for

6    Dr. Roysdon and he was the principal investigator,

7    did you ever observe him provide any presentations

8    for business development?

9         A    Yes, it was actually -- oh.  You just

10   took the e-mail away.  I guess that's okay.  Yeah,

11   that consumed almost all of his time.  That was

12   basically what he did.  It was actually very

13   frustrating too because he did almost -- it's kind

14   of required of him to do all of those customer

15   presentations.

16        Q    Okay.  Did you participate in any of

17   those presentations?

18        A    Some of them.  Most of them he kind of

19   did by himself.  There were a couple of times where

20   he wanted me in there, like if it had something to

21   do with critical infrastructure.  He doesn't have a

22   lot of experience with critical infrastructure, so

23   he'd invite me on or if there was competing

24   schedules, which is not often, but if there was one

25   where he had something where he had to be somewhere

EXHIBIT 9
Page 73 of 135

1    and there's no one else to -- you know, so he

2    couldn't do it, then I might do it, but it was --

3    I'd say like 90, 95 percent of them were -- were

4    him.

5        Q    what are some of the -- the entities or

6    the organizations for which you provided

7    presentations -- for which you saw that Dr. Roysdon

8    provided presentations?

9        A    Sure.  Gosh.  So we dealt with DARPA a

10   lot, NSA quite a bit.  We had some reach back to NSA

11   in -- in like -- in -- in Maryland -- NSA -- like

12   NSA Texas, stuff like that.  I do stuff now with

13   curricular infrastructure, so I'm working with a

14   bunch of power plants.

15           Leidos has like 200-plus power plants

16   that we manage, but a lot of defense stuff,

17   sometimes even health.  It -- it just runs the

18   gambit of -- of DoD -- honestly, anyone that will

19   listen.  AI is sort of a unique -- everyone has

20   cyber and everyone is interested in AI.

21           And, so, our -- our IRADs, right, our

22   area, our accelerator, sort of the confluence of AI

23   and cyber security.  So that's something that

24   everyone can use.  So it -- there is really no

25   defined group between just defense or civil or

EXHIBIT 9
Page 74 of 135

```
 1   health.  So we do -- we do all of that.  It's one of

 2   the few things that has -- like in addition to IT,

 3   right, where it spans sort of across the board.

 4       Q    Okay.  So you mentioned DARPA, NSA.  Any

 5   other cyber organizations for which you can recall

 6   that you've provided --

 7       A    Sure.  I -- I know that they gave one to

 8   MARFORCYBER.  I wasn't involved in that.  I -- they

 9   gave a couple to Fleet Cyber.  I think there was

10   someone with CIA but under a different -- different

11   name.  I mean -- how it goes.  Tons.

12            I'm trying to think if we ever -- we've

13   planned some for SOUTHCOM because I still have

14   friends there, but I really don't like to reach back

15   to my friends, you know, so -- it feels kind of

16   dirty.  So I -- I really address it as like, "Hey,

17   this is Todd.  This is my goofy hat off and now I'm

18   a Leidos employee, so you can tell me to shove off,

19   if you'd like," but, you know, just a lot of those

20   different organizations.

21       Q    Okay.  And, to -- to your knowledge,

22   Dr. Roysdon was primarily providing presentations to

23   those organizations; is that correct?

24       A    Yes, that is correct.  He -- he -- for --

25   for the ones where he -- when he was principal
```

EXHIBIT 9

Page 75 of 135

1    investigator, for our research, he was the one

2    that -- that performed the majority of -- of those.

3        Q    Was he pretty good --

4        A    Yeah, I -- I -- I think he was.  Like

5    he -- he's -- he's very -- like if you -- if you

6    listen to him speak, he has a very calm way that he

7    approaches things and he understands -- he

8    understands the problems and the challenges.  So

9    he -- he does a good job.  He -- he is definitely a

10   good presenter.  I'd say I'm a bit more erratic, I

11   make a lot of jokes, but, you know...

12       Q    So he -- he did that for a year and then

13   he got double-promoted, I think is what you said; is

14   that correct?

15       A    I think so, but he -- he -- he didn't

16   really talk about that stuff.  I just knew that one

17   day he was -- he was VP and -- and he was made chief

18   AI scientist for the company.

19       Q    For the presentations that he provided,

20   did any of that business ever come in?

21       A    So not -- not at that time.  It's been

22   really hard, right, and -- and I'll just caveat by

23   saying that people -- especially in those early

24   years when AI was really taking off, people are

25   scared of AI.  It's -- it's ridiculous.

EXHIBIT 9
Page 76 of 135

1          There's -- there's the thought that, "Oh.

2    Well, it's going to take jobs away," which it won't,

3    or that it's going to somehow do its own thing.

4    People just don't understand that it's math and that

5    it's confined to just learning models, right,

6    whatever it is.  You guys don't need me to go into

7    that.

8          Since I've taken it on, I've managed

9    to -- and it's hard.  These are very cutting edge

10   things.  Everything that we do is to augment

11   existing capabilities, it's to fill niche markets,

12   right.  Our first huge win was this one for

13   something called Network Path Traversal that we sold

14   to DARPA as part of the DARPA INGOTS.

15         Paul didn't have anything to do with

16   that, but that was one of our first big wins.  More

17   than anything, right -- the reason why we exist at

18   Leidos under what's called the accelerator is it's

19   paid for with IRAD money and we are experts in the

20   field and they also use us for marketing.

21         So when we give our presentations, it

22   looks good for -- you know, if we're selling to

23   like -- which I always find to be sort of

24   frustrating and -- and stop me if I'm just kind of

25   going off track, but if we advertise to DLA, Defense

EXHIBIT 9
Page 77 of 135

1    Logistics Agency, they don't care that we've got

2    some super advanced cyber security tools because

3    they really just don't care.

4           But if we -- you know, business

5    development at Leidos wants us there, to go spend

6    30 minutes and present this really fantastic thing

7    because then they figure -- it's like the race on

8    Sunday, buy on Monday.

9           Well, okay, if in formula one, this car

10   just won, maybe if I go buy a Mercedes at the

11   dealership, it's going to have some of that in it,

12   right, and, so, that's kind of the concept.  Even

13   though we're not a profitable aspect of Leidos, it

14   is the research arm and the reach back for other

15   contracts that we have.

16       Q    Thank you.  I want to talk about Will

17   McVay.

18       A    Mm-hmm.

19       Q    I think I heard you say that you may have

20   spoken with him twice, to your recollection; is that

21   correct?

22       A    Yeah, I -- I think on one of the times

23   that Dan Brown has invited me there in person, I may

24   have shaken hands with him.  I know I've seen him in

25   person at least once.  He wasn't really involved in

EXHIBIT 9
Page 78 of 135

1    anything that I was doing and it was -- it was

2    amicable at -- at that time, like I didn't know him

3    from anyone else.

4            It didn't really matter to me one way or

5    another, just another person to say, "Hey, how's it

6    going?"  You know, this is when I was in my chief of

7    capabilities role in AFCYBER.  So, yes, I had met

8    him once or twice.

9    Q    But Dan Brown told you that McVay was, I

10    guess, trying to redirect or siphon funding; is that

11    right?

12    A    Yeah, so, that would have been a

13    different time from when I met him, right.  So under

14    the time that I was on tour there, early on, like I

15    guess when he would have just come on, they would

16    have run me around the room because I was the new

17    chief of capabilities, which is where a lot of the

18    requirements come from and, so, I would have met

19    him.

20            But then further on, at a different time,

21    once the whole contract with Dr. Roysdon had gone

22    through, that was when all those things started

23    happening.  I never met William McVay nor did I ever

24    really have any conversations with him that I'm

25    aware of -- or at least that I can even remember.

EXHIBIT 9
Page 79 of 135

1          Q      Did you ever do anything to look into or

2    independently investigate whether he was, in fact,

3    trying to siphon or reallocate funding?

4          A      No, it really wouldn't have been my -- my

5    job.  I mean, I -- I'm -- I -- I hate to use the

6    term "it's not my job," right, but I have so many

7    other requirements.  The things that I levied to Dan

8    Brown were supposed to be revolutionary,

9    game-changing, but I've got my day-to-day mission of

10   providing exploits and -- and capabilities to -- to

11   the Air Force people.  So I would not -- it would

12   have not been my position to even be involved in

13   that.

14         Q      So you only know what Roysdon and Dan

15   Brown told you; is that correct?

16         A      That -- that is correct.  My -- my

17   understanding of the situation comes from Dan Brown

18   and Dr. Roysdon.

19         Q      I want to talk to you about, I guess,

20   the -- the presentation to HNCO that occurred in

21   sometime early 2023.  Do you know what I'm talking

22   about?

23         A      Yes, yes.

24         Q      You testified that Brown told you not to

25   include Roysdon on -- on the pitch to HNCO; is that

EXHIBIT 9
Page 80 of 135

```
1    right?

2         A      That is correct in -- in a phone call.

3         Q      In a phone call.  Okay.  In one phone

4    call?

5         A      No, we've had multiple discussions about

6    that from Dan Brown where he basically said he's not

7    well-liked there because of a bunch of things, you

8    know, the -- the lawsuit, William McVay, all -- all

9    that stuff, that, "He cannot be on any of these

10   slides.  We really don't want him in the" -- "in the

11   Teams call.  We don't want him involved" -- "try

12   to" -- "to just have you be the one that does all

13   this stuff because they all love you," et cetera.

14        Q      Before Dan spoke with you about Roysdon's

15   involvement, did Dr. Roysdon tell you he had any

16   concerns about making the pitch to HNCO?

17        A      I don't think so.  No, I -- I can't

18   remember.  I think it was -- I'm -- I'm pretty sure,

19   best of my recollection, it was Dan Brown that told

20   me first because I think we just would have put

21   Dr. Roysdon's name on there by default and then sent

22   it to Dan Brown and probably, at that point, he

23   called me and said, "Hey, we can't have him on

24   there," and -- and Dan -- or Dr. Roysdon was pretty

25   upset about that.
```

EXHIBIT 9
Page 81 of 135

1          He -- he was not happy because, you know,

2    he -- he kind of views like the research as like --

3    as sort of his pride and joy and he's like -- and he

4    told me a couple of times, "This is my research.  I

5    deserve to be on those slides.  I deserve to be the

6    one presenting it."  So he was pretty upset about

7    that.

8          Q     So you said that Roysdon was upset.  I

9    take it --

10         A     Yes.

11         Q     -- you went back to Roysdon and told him

12   about the conversation?

13         A     Yes, because he's my boss.

14         Q     Okay.

15         A     At that time, he was my boss.

16         Q     Okay.  Is -- is this conversation in

17   person?

18         A     It probably would have been on a phone

19   call.  I -- I didn't even think to check my e-mail.

20   I -- I could try to look, but, best I know, I

21   probably had that conversation with him over the

22   phone.  There might be an e-mail of me saying

23   something like that.

24         But, you know, I just would call

25   Dr. Roysdon on the phone pretty -- pretty quickly.

EXHIBIT 9
Page 82 of 135

1    So we -- we talked at least -- at least 30 minutes

2    every day, as my boss, and -- and we're remote.

3    Like I -- I -- I hate working from home, but it's

4    what it is.  My daughter's in school and I don't

5    want to -- I don't want to move until she's out of

6    high school, so...

7        Q    Do you not specifically remember having

8    that conversation with Dr. Roysdon then?

9            MR. WAREHAM:  Objection to form.

10       A    I -- I did -- did certainly have a

11   conversation with Dr. Roysdon, whether -- whether it

12   started in e-mail or whether we had it on the phone,

13   we had those conversations over the phone as well,

14   multiple times.  Dr. Roysdon was not happy about it.

15       Q    I want to talk with you about the -- the

16   presentation itself.  You were, I guess, pitching

17   services or capabilities to HNCO; is that correct?

18       A    Yes, yes, capabilities.

19       Q    Okay.

20       A    So the three that I can remember at the

21   time was a midpoint one called SIM Search, I think

22   it was, and then a parameter-based one, which we now

23   call Automated Parameter Service -- excuse me -- we

24   were pitching the offensive version, so we would --

25   we would have just called them Endpoint, Parameter,

EXHIBIT 9
Page 83 of 135

1   and Midpoint and we had certain capabilities and

2   things that we -- excuse me -- that we knew the

3   science behind, but hadn't yet developed, and we

4   were pitching those to Dan Brown because, again, his

5   focus is on primarily providing offensive cyber

6   tools to his various customers, which are all

7   government.

8       Q    Did you think that the services that you

9   were pitching at that time were necessarily what Dan

10  Brown was looking for?

11           MR. WAREHAM:  Objection.  Form and

12  foundation.

13      A    I can still respond?

14           MR. WAREHAM:  Yeah.

15      A    So at least two of them, I definitely

16  felt that they would -- so let me explain a little

17  bit about sort of the capabilities that I had,

18  right.  We have a suite of capabilities at CNO.

19  And, so, it runs the gambit from, I mean, NSA,

20  right -- NSA, CYBERCOM.  We've got tens of thousands

21  of exploits and capabilities and things to meet any

22  different kinds of numerous needs.

23           And we kind of filled the gap for at

24  least two pretty big ones.  And I -- now, again, I

25  won't go into why because that focuses on the

EXHIBIT 9
Page 84 of 135

1    country -- I'm sorry.  My computer locked.  I'm

2    sorry.  Give me a second.  I won't lose my place.

3              Let's see.  Okay.  So because it focuses

4    on the country and the specific thing that that

5    country is targeting.  But I will say that one of

6    them, Parameter, would have -- our offensive

7    parameter tool would have definitely met several of

8    the needs, in my opinion, as a former capabilities

9    chief.

10             It's one of the reasons why we -- why we

11   created them because these were challenges that we

12   had -- that we knew that we had within CNO.  Now,

13   I'll caveat by saying that most of the exploiters,

14   they think very in-the-now.  They don't think long

15   term.  That was my responsibility as chief

16   capabilities to think long term.

17             They would much rather be in a -- and,

18   no, this does not happen, right, just to be clear,

19   but they would much rather be in like a Starbucks

20   using Kali Linux to go take down a power plant

21   somewhere in a -- in -- in -- in a bad country,

22   right, as an example, as opposed to using some large

23   Cadillac tool to -- to -- to do this grandiose

24   thing.

25             But that was sort of the direction

EXHIBIT 9
Page 85 of 135

1    that -- CYBERCOM -- that we were looking to go to.

2    Some of the other capabilities that Dan Brown was

3    providing to me were what we called foundational

4    tool suites and those eventually did end up getting

5    done.  Dr. Roysdon had nothing to do with those, but

6    it was through another contract doing another thing.

7            Very similar situation to -- to

8    Dr. Roysdon's set up, but at a different time and

9    with a different pot of money.  That was CYBERCOM

10   money and the goal was to really focus on more

11   foundational, larger capabilities that solved bigger

12   needs rather than the one-and-done kind of thing

13   that we do all the time, and, unfortunately, we

14   still do.  Did -- sorry.  I kind of rambled.

15       Q    No, no, that's -- that's -- thank you.

16   So am I correct in that you were -- at least one of

17   the capabilities that you were pitching --

18       A    Two --

19       Q    -- at least two of the capabilities that

20   you were pitching were broader in scope than what

21   they wanted because they wanted like a "now" type of

22   thing and weren't thinking of --

23       A    I -- I -- I think they're always looking

24   for a "now" kind of thing.  And, of course, they

25   can't tell me in unclass channels like, "We need a

EXHIBIT 9
Page 86 of 135

1    thing that exploits this one firewall for this one
2    customer and this one customer" -- "target in one
3    place," but I knew, personally, that it would solve
4    this larger broad need that while it may require
5    this little thing to get there, right, it still
6    solves and improves the mission requirements.
7              I -- I don't know why it didn't work out.
8    I would've been -- I -- I was really surprised,
9    quite honestly, because it -- it would have been
10   something -- I mean, it's something that we wanted,
11   that that was -- you know, they're -- they're sort
12   of tangentially related.
13             The things that I asked Dr. Roysdon to do
14   originally under his contract, when I was still at
15   NSA, that was different, right.  That was trying to
16   solve -- like creating kill chains, things like
17   that, that I found to be very tedious and
18   frustrating that I do manually and I wanted AI to do
19   that for me.
20             When we went to Leidos, he had a slew of
21   things that solved more of the -- the target --
22   the -- the country target specific solution.  I'm
23   trying to talk around certain things, but like
24   AFCYBER deals with one country, Fleet Cyber deals
25   with another country and MARFORCYBER -- ARCYBER

EXHIBIT 9
Page 87 of 135

1    deals with another country, right.

2              And each of those different countries

3    that are adversaries have like one particular big

4    thing that is a challenge for us to exploit them, if

5    you will.  And, so, we sought to solve those

6    challenges for -- you know, there's like three

7    big -- big needs.

8        Q    Dan Brown told you to not include Roysdon

9    in the presentation.  Had anybody else ever told you

10   that before?

11       A    No.

12       Q    Okay.  Has anyone else you've ever worked

13   with told you that since?

14       A    I'm sorry.  What --

15       Q    Has -- has anyone ever told you not to

16   include Dr. Roysdon in a presentation since that

17   time that Dan Brown told you?

18       A    Yes, but also Dan Brown and also the same

19   customer because we did it -- I think we did it

20   again -- like -- and it was just understood that,

21   "From here on out, you don't have Dr. Roysdon on

22   these things," but no other customer anywhere else

23   did we ever have that issue.

24       Q    Okay.  And by "other customer," are you

25   referring to like Space Force, DARPA, CIA?

EXHIBIT 9

Page 88 of 135

1          A      Yeah, exactly, yeah.

2          Q      Okay.  None -- none of them ever

3    expressed any reservations about Dr. Roysdon?

4          A      No.

5                 MR. WAREHAM:  Objection as to form.

6          Q      Okay.  Do you have any sense of

7    Dr. Roysdon's reputation in the field of cyber

8    operations?

9                 MR. WAREHAM:  Objection.  Form and

10   foundation.

11         A      So not cyber operations, right, but AI.

12   That's his strong suit.  That's what he brought us

13   on because like my whole federal career has been

14   cyber.  His has been math, research, AI.  So he's

15   not -- you know, he used us to help fill the gaps

16   that he has for cyber.  So, for him, he's an AI

17   solution architect, if you will.

18                I -- I don't know if that was the

19   question you were asking, but his -- he's,

20   generally, as far as I know, very well-known from

21   an -- from an AI perspective.  That's why Leidos

22   made him the chief AI scientist and they kind of

23   just would parade him around at different

24   conferences and stuff.  He was on -- he was on the

25   road quite a bit.

EXHIBIT 9
Page 89 of 135

1      Q     What do you mean they would parade him

2      around?

3      A     Well, like I said, he's a good speaker

4      and, so, they would try to send him to conferences,

5      try to get -- get him to have -- give speeches at

6      conferences, things like that, roundtables, stuff

7      like that, sometimes talk to the board of directors,

8      things like that.

9      Q     And this was in an effort to generate

10     business?

11     A     Yeah, I -- I assume almost everything we

12     do is to generate business.  I mean, it's a company,

13     so -- I -- I will say sometimes Dr. Roysdon would do

14     things that were maybe funded by Leidos, where we

15     were sort of trying to give back to the community,

16     if you will.  There were some situations of that.

17     So I -- I do take back a little bit of what I just

18     said.

19     Q     You have a copy of this complaint, right?

20     A     I don't have it printed out, but I -- I

21     did -- I did go through it a little bit.

22     Q     Other than Dan Brown and Dr. Roysdon,

23     have you ever talked about the subject matter of

24     this complaint with anybody else?

25     A     I mean, other than the fact that like

EXHIBIT 9
Page 90 of 135

```
 1    I -- I was subpoenaed -- so within the past like

 2    two weeks -- like I had to tell my boss about it,

 3    stuff like that.  But outside of two weeks ago, no,

 4    I didn't -- I -- I just -- I just assumed this was

 5    like a dead issue and that it was done and gone.

 6              I just -- it really kind of came out of

 7    the blue.  I mean, I -- I had to reread and skim

 8    through that because I honestly barely remembered a

 9    lot of the stuff.  Yeah, I wish I could have been

10    deposed like three years ago.

11       Q    These lawsuits move slow.  Don't hold it

12    against us.

13       A    That's fine.

14              MR. GONZALEZ:  I think I'm done, but

15    can -- can you give me five minutes just to look at

16    my notes?

17              MR. WAREHAM:  No objection.

18              MR. GONZALEZ:  Okay.  Thanks.  Let's just

19    take a quick five-minute break.

20              THE VIDEOGRAPHER:  The time is 12:03.  We

21    are going off the record.

22              (A break was held off the record from

23    12:03 p.m. to 12:13 p.m.)

24              THE VIDEOGRAPHER:  The time is 12:13.  We

25    are back on the record.
```

EXHIBIT 9
Page 91 of 135

1      Q      (By Mr. Gonzalez)  Just a few more

2   questions for you, Mr. Jaspers.

3      A      Sure.

4      Q      So you -- you -- you started at Leidos in

5   November 2021; is that correct?

6      A      Yes, whatever it says in my resume, but

7   that's the best I can remember, yeah.

8      Q      And when you started, did -- is that when

9   you worked for Dr. Roysdon?

10      A      Yes, he was the one that -- that brought

11   me on.  I -- I reached out to him.  I -- I expressed

12   sort of frustration.  You know, I still kept in

13   touch with him because sometimes there were things

14   where like I'd be working on a project and he -- he

15   understands signals, the electromagnetic spectrum a

16   little bit better than I do, so I reached out to him

17   on a regular basis.

18            We talked -- we would talk like every

19   other day or so anyway and I reached out to him and

20   just asked him if there was any opportunities.

21      Q      And then he got promoted.  Is that when

22   you took over as principal investigator?

23      A      Yes.

24      Q      Okay.  And, so, how long did you work

25   with Dr. Roysdon directly?

EXHIBIT 9
Page 92 of 135

1         A       Probably -- I want to say at least

2    through -- through like -- well, I mean, so he

3    was -- just to be clear, we were both at the company

4    the entire time and he just left like maybe -- I

5    guess less than a month ago, but I worked -- he was

6    my direct supervisor for at least a year and a half,

7    maybe two years that I was there -- first two years,

8    I want to say.  Maybe a little less than that.

9              And then I took over -- over as principal

10   investigator.  He -- he was mostly dealing with

11   things with the CTO that Jim Carlini would start to

12   task him with.  Of course, he still considered this

13   stuff valuable.  People would often still reach out

14   to him regardless.

15             So he would you -- you know, because he

16   was the prior principal investigator.  Like I'm not

17   the principal investigator of like that segment

18   stuff.  I do critical infrastructure stuff now.

19             I still get e-mails for like that old

20   role and then I just forward them on, but, you know,

21   Paul would -- would still kind of field some of

22   those because he kind of viewed himself as

23   like this -- this technology was sort of his baby,

24   so to speak.  So he just wanted to see it grow up,

25   if that makes sense.

EXHIBIT 9
Page 93 of 135

1      Q      The presentation that you provided to
2  HNCO, was that the first presentation that you had
3  ever provided?
4      A      I don't remember.  I -- I want to say
5  maybe there was something in 2022, but I don't think
6  it went anywhere.  I think it was just me talking
7  to -- to -- to Dan.  Again, I'd have to look at my
8  e-mails.  But the big one -- the one where we
9  actually presented to them, where Dan said that he
10 had money and he -- and he wanted some -- some
11 AI-based projects, that was in March of 2023.
12     Q      Right.  Before March of 2023, had you
13 ever made a big presentation to another potential
14 client before?
15     A      To another potential client before?  Yes,
16 yes, we had.  We had done -- well, so, the stuff was
17 still pretty in its -- pretty much in its infancy.
18 I -- I would say that was probably one of our more
19 detailed -- certainly one of our more detailed
20 presentations.  We had given a lot of internal
21 presentations within Leidos, what's called the
22 sector leads.
23             I'm trying to think.  Dr. Roysdon did
24 most of those, honestly.  So like I was -- 2023 was
25 the year that I ended up transitioning halfway

EXHIBIT 9
Page 94 of 135

1   through.  Like I think in -- by July of -- of 2023,

2   I -- I became the PI and -- and Paul sort of stepped

3   aside from there.  So he was doing them all before

4   then.  I know he had given presentations to other

5   organizations before then.

6          The capabilities -- that capability,

7   specifically the parameter one, didn't really come

8   to any kind of real fruition until December of 2022.

9   So it was pretty significant and it is -- still is

10  too.

11     Q    Let's -- let's break that down a little

12  bit.  So we'll start -- we'll start with the

13  principal investigator.  So -- and you're telling me

14  you transitioned completely to principal

15  investigator in mid-2023; is that correct?

16     A    Yeah, I -- I want to say about -- about

17  July.  Paul was still my boss at that point, but he

18  was now being tasked to do other things.  He was a

19  VP now.  He was tasked to do other things, but still

20  tried to stay involved, even though he probably

21  didn't have the time to.

22          And he was still helping me because it

23  was the first time I'd ever been a PI for a research

24  project -- or for a research group.  So he was kind

25  of trying to help me along.  So he stayed involved

EXHIBIT 9
Page 95 of 135

*** MARKED AS CONFIDENTIAL ***

1    at least through -- through the end of that year.

2         Q    I -- I heard you say that a lot of that

3    stuff was in its infancy and I think --

4         A    The research was.

5         Q    The research was in the infancy.  What do

6    you mean by that?

7         A    So all the capabilities that -- that we

8    have, they start off as fundamental research where

9    we have a challenge and then it's like kind of

10   throwing ideas on -- on how to solve that and it can

11   be any number of -- of different ways that we want

12   to try and solve that.

13             There's a couple of different leads for

14   like the three main projects.  We called them the --

15   the subversion capabilities [phonetic].  Again,

16   those are all based on trying to solve specific

17   target challenges, right.  Like I had talked about

18   before; AFCYBER, ARCYBER, Fleet Cyber had very

19   specific challenges for their target and, so, we

20   were looking to solve that.

21             We would take what we call an offense

22   first, a defense second approach.  Offensive is --

23   is -- we would basically -- stop me if this like

24   just doesn't really mean anything.  But like on the

25   defensive side, we would use reinforcement learning

EXHIBIT 9
Page 96 of 135

*** MARKED AS CONFIDENTIAL ***

1    to attack a firewall, which is essentially AI coming

2    up with a near -- I know you can't say near

3    infinite, but almost like just billions and billions

4    of types of attacks driven by AI to attack the

5    firewall and -- and that was our -- our offensive

6    tool.  We would then take that learning model and

7    build what's called a classifier model where --

8         Q     Keep it general.  Keep it -- keep it

9    general.

10        A     Okay.

11        Q     Go on.  Keep it general.

12        A     Sure.  So we use the offensive learning

13   model to build a defensive learning model so that we

14   come up with billions of attacks and now we know,

15   comprehensively, how to defend against those things.

16             And then, so, now, we end up with an

17   offensive tool that we can -- we can sell to our

18   offensive customers and a defensive tool that we can

19   sell to our defensive customers.

20        Q     So what did you mean by that research was

21   in its infancy in, I guess, the end of 2022?

22        A     No, actually, at the end of 2022 was the

23   first time it was no longer in its infancy.  It was

24   in its infancy up until the point -- that was the

25   first time we had a functional prototype of a

EXHIBIT 9
Page 97 of 135

*** MARKED AS CONFIDENTIAL ***

1    working offensive capability and we were able to --

2    and I'll just say it because it's not -- we've --

3    we've patented it since and Dr. Roysdon's on it, but

4    we can -- we can bypass any firewall at any time

5    just without -- I mean, nothing can stop it.  We can

6    just bypass any firewall.

7         Q    You can keep it general, though.

8         A    We -- we can send attacks through a

9    firewall.

10              MR. WAREHAM:  DOJ, you know, I still

11   carry a clearance.  I know about obligations there.

12   I would suggest we mark that portion confidential.

13              MR. GONZALEZ:  Okay.

14        A    But it's -- yeah, just -- I mean, it's

15   not technically classified because we developed it

16   from -- but -- but, yeah.

17              MR. WAREHAM:  Any objection, DOJ?

18              MR. GONZALEZ:  No objection.

19        Q    (By Mr. Gonzalez)  And, you know, feel

20   free to err on the side of caution, Mr. Jaspers, in

21   any of these responses.  Okay?

22        A    Yeah, and -- and -- and just to be

23   clear -- and I don't want to be disrespectful to

24   anybody, but we have since patented it.  So you can

25   look it up in the -- in the patent office.  So,

EXHIBIT 9
Page 98 of 135

1    unfortunately, China can get it too.

2        Q    Okay.  So -- all right.  Let's move on

3    from that.  Generally speaking, what is cyber

4    offensive or cyber defensive?

5        A    So offensive cyber, right -- I'm

6    trying -- I'm going to try not to get into too much

7    detail.  True offensive cyber operations, which is

8    what we -- which is what I manage the capabilities

9    for at AFCYBER, that's attacking our adversaries.

10   That is our -- our military and civilian ordained

11   people attacking what -- what we consider and I very

12   much consider to be our bad guys, right, and

13   leveraging capabilities that we build to get into

14   their systems, compromise them, and then --

15       Q    Okay.  I understand.

16       A    Yep.

17       Q    I understand.  So -- and defensive, yes.

18       A    Yeah, and then defensive is where we're

19   billing capabilities to help defend the industrial

20   base, commercial, anything, right, from Leidos'

21   perspective and -- and that could even include

22   red -- red teaming, right.  Red teaming is still

23   defensive in nature.  That's not offensive, as we

24   view it, right.  So --

25       Q    Okay.

EXHIBIT 9
Page 99 of 135

1          A       -- does that answer your question?

2          Q       Yep, that -- that answers my question.

3                  Have you made any defensive capability

4    pitches?

5          A       Yes, those are the ones that have been

6    mostly successful.  We are going to be -- and --

7    and, so, this is -- I -- I don't want -- so I -- I

8    guess I'm not going to talk -- do -- do you want me

9    to say who or is this something that we can mark

10   confidential, not from a --

11         Q       Don't say who.  Don't say who.  Don't say

12   who.

13         A       Okay.

14         Q       It's fine.

15         A       So there's a -- there's a -- sorry.

16   Okay.

17         Q       That's fine.  Okay.

18         A       Okay.

19         Q       You said the defensive ones have mostly

20   been successful; more successful than the offensive

21   capabilities?

22         A       Yes, AFCYBER was our primary customer for

23   at least two of those; one definitively.  I won't

24   get into the detail why.  And then the other one,

25   about half so.  That was really sort of our target.

**EXHIBIT 9**
**Page 100 of 135**

1    Also, our cyber offensive team, again, two, and

2    Fleet Cyber offensive team.

3        Q    Why, in your view, is the defensive

4    capability more successful than the offensive

5    capability?

6        A    Well, I think there's a lot -- there's a

7    much larger number -- more people have -- well,

8    there's more companies that want to buy defensive

9    capabilities.  Like I'm just going to say like

10   Walmart is not going to buy an offensive tool.

11           I should hope not, right, but, you know,

12   they might buy a defensive tool to -- to help

13   protect against those types of attacks.

14       Q    And does that mean defensive capabilities

15   are more lucrative?

16       A    I don't want to say they're more

17   lucrative.  Actually, I -- I find the offensive

18   capabilities to be more lucrative as they stand on

19   their own, but there are more customers for

20   defensive tools.  Does that make sense?

21       Q    That does make sense.

22       A    Yeah, offensive tools usually command a

23   higher value because there are fewer people making

24   them, fewer people asking for them.  Defensive

25   tools, it's such a watered-down market.  There are

EXHIBIT 9
Page 101 of 135

1    more people buying.  You have to really

2    differentiate yourself.

3        Q    Can you give me a sense of the market for

4    offensive tools?

5            MR. WAREHAM:  Objection to form and

6    foundation.

7        A    I -- I would say -- if I had to put it

8    into percentages, I'd say there's probably -- sorry.

9    My computer locked.  I would say probably 5 percent,

10   compared to 95 percent.  Give me a second.  You

11   know, because there -- there are only a certain

12   number of -- like we're not going to sell to Canada

13   or the UK or something.

14           I mean -- I mean, I -- I don't think it'd

15   be allowed, but, you know, the federal government is

16   really going to be our only customer for offensive

17   tools.  It's going to be NSA and CYBERCOM, period.

18       Q    What about CIA?

19       A    Yes, it -- it -- it could also be CIA.

20       Q    And what about -- what about DARPA?

21       A    So DARPA is one of the ones where --

22   okay.  If you know DARPA, you know that they pitch

23   things as they buy defensively, but, really, they

24   want it offensively.  I don't really want to get

25   into it too much, but -- but that's pretty much your

EXHIBIT 9
Page 102 of 135

1    limited number of customers.

2        Q    Are there customers in the Navy?

3        A    Yeah, so, you've got -- well, that's

4    CYBERCOM, right.

5        Q    Okay.

6        A    And they all -- whether it's Fleet Cyber,

7    AFCYBER, they all go through the same process in

8    CYBERCOM -- they all go through the same approval

9    process.

10       Q    Are -- are there customers in the Army?

11       A    Yeah, so -- so army is ARCYBER.  You've

12   got Fleet Cyber, which is Navy.  You've got

13   MARFORCYBER, which is Marines.  You've got Space

14   Force.  They've got their own CTOC now.  I guess

15   they call it Space Force Cyber.  And then there's

16   AFCYBER.  And they all funnel up to going through

17   the approval process.

18            Dan Brown would handle stuff for ARCYBER,

19   AFCYBER, CIA usually also, and just through HNCO.

20   I -- I don't know why that is.  Maybe just because

21   Dan was really good, but it seems like a lot of

22   organizations go through HNCO, which is a -- you

23   know, which doesn't stand for anything, by the way.

24            I don't know why they call it HNCO, but

25   that's Air Force -- you know, AFLCMC.  A lot of

EXHIBIT 9
Page 103 of 135

1    organizations would go through Dan Brown.

2        Q    I want to go back to something that

3    you -- you said earlier.  You were talking about,

4    you know, after the presentation in 2023 and you

5    used the phrase, "Generally understood that Roysdon

6    shouldn't be involved going forward," is that

7    correct?

8        A    Yes, it was -- it was Dan Brown that said

9    to me that Dr. Roysdon should not be -- I -- I --

10   I'm not sure exactly how you're wording it, but Dan

11   Brown made it clear to me that -- that Dr. Roysdon

12   should not be on any presentations going forward.

13   Dr. Roysdon would still put himself on those Teams

14   calls, even though Dan Brown didn't want it.

15       Q    And Dan Brown is the only person that

16   told you that; is that correct?

17       A    That's correct.  And he told me over the

18   phone, he said, "Look," you know -- and I'm just

19   kind of reiterating what I've said.  He said that,

20   "If these slides get sent around or they see him on

21   there, they're" -- "they're" -- "they're not going

22   to support this because," you know, everything else

23   I've said so far.

24       Q    Okay.  Did Dan Brown tell you that

25   anybody at HNCO had specifically told him that?

EXHIBIT 9
Page 104 of 135

1       A     I don't know that I would word it exactly

2    like that, but there were at least two individuals

3    that he mentioned whose names I cannot recall

4    that -- and I don't mean that in the Hillary way.  I

5    just -- I literally don't remember their names.

6              But it was like two other additional

7    people that -- that he had mentioned that if they

8    saw his name, that would be a bad thing.

9       Q     But, to be clear, he didn't tell you that

10    they specifically told Roysdon not to include his

11    name; is that correct?

12              MR. WAREHAM:  Objection.  Form.

13       A     Yeah, I -- I -- I can't remember if -- if

14    he did or not.  I don't think so.  I don't want to

15    go on record as saying "yes" because I just know

16    that it was -- he was very adamant about it.

17              MR. GONZALEZ:  No more questions from me.

18    Thank you, Mr. Jaspers.

19              THE DEPONENT:  Yeah, no -- no problem.

20              MR. WAREHAM:  Mr. Jaspers, this is Jason

21    Wareham again.  One second.  I'm getting a little

22    organized here.

23              THE DEPONENT:  No problem.

24                        EXAMINATION

25    BY MR. WAREHAM:

EXHIBIT 9
Page 105 of 135

1    Q    So I guess, really, the question I have

2    is when you talked to Dan Brown on the phone, do you

3    recall what phone number he was calling from?

4    A    Yeah.  Let's see.  It's -- I'm going to

5    have to go a ways back, but it was like a -- gosh.

6    Maybe a 242-or-something number.  It was his

7    personal one, if that's what you're asking.  It

8    wasn't his work one.

9         He called me from his cell phone number,

10   maybe 844.  It's been a while since I've talked to

11   him because, like I said, it's been months since

12   I've had a phone call with him, but it was his

13   personal number.  He would call me on his cell phone

14   and we'd talk on his ride home or something like

15   that.  Do you want me to try and look it up?

16   Q    Yeah, if you -- if you wouldn't mind,

17   just so I have it.

18   A    All right.  Yeah.  I'm sorry.  Give me a

19   few minutes here.  I don't really have a contact

20   list.  I know I'm weird about that.  Everyone gets

21   mad at me.  I have my wife and my daughter because

22   they put it in here, otherwise I hate cell phones.

23   I told my wife that if she doesn't pay for the cell

24   phone, I'm not getting one.  So that's -- that's

25   what she pays for.  Let's see.  I wonder if I have a

EXHIBIT 9
Page 106 of 135

1    text from him maybe.  No, that's -- I'm sorry.

2    Let's see.  Yes.  Okay.  It's 210-884-0106.

3         Q     Great.

4         A     And that's -- that's -- that's Dan --

5    that's Dan Brown.

6         Q     Okay.  And, as far as your knowledge, do

7    you know who is in charge of procurement for

8    offensive cyber weapons in the United States

9    government?

10        A     For procurement?  So I'd say for -- well,

11   in AFCYBER, I got -- I would submit a req and I

12   get -- I get sort of the off-the-shelf stuff or --

13   like, for example, if I had to get things from --

14   and I can say the company names, but if I had to get

15   something from ManTech or Peraton or something like

16   that, Dan Brown would facilitate that.

17             He would usually send me things like list

18   of exploits that I could purchase from -- you know,

19   which came from somebody in their basement, you

20   know, but if it was something we developed

21   ourselves, it was the 90th Cyber Operation Squadron

22   who would do that.

23             But where it was being done by a

24   contract, that came through HNCO, which Dan Brown

25   was my go-to for that.  He was specifically assigned

EXHIBIT 9
Page 107 of 135

1    as one of his duties to -- to support AFCYBER's OCO.

2              He also supported ARCYBER -- and, you

3    know, because he was very good, like -- you know,

4    like I said, he's -- he's a really good guy on these

5    things and he would keep the lines of communication

6    separate for the different requirements, the

7    different communities, if you will.

8              So if he was dealing with ARCYBER, he

9    rarely told me about it, or if he was dealing with

10   Space Force, which, you know, is related, obviously,

11   to Air Force.  So he would deal with a lot of those

12   things.  He almost never told me about CIA, but I

13   know that he would because occasionally he'd mention

14   it.  So a lot of them would come through him.

15             ARCYBER also had their own type of Dan

16   Brown, which they get through -- through the -- the

17   Army.  I don't know if that answers the question.

18   There's a -- there's a couple different ways that

19   the US government can get exploits.  NSA tended to

20   do sort of their own thing too.

21             They would just develop them or buy them

22   through -- sometimes you get something like

23   In-Q-Tel, which was -- the CIA designed COTs to --

24   to government -- I don't really know how to explain

25   it, but are you aware of In-Q-Tel?

EXHIBIT 9
Page 108 of 135

1        Q      I am.

2        A      Okay.

3        Q      Yeah, you answered the question.

4        A      Okay.  Thank you.  Sorry.

5               MR. WAREHAM:  Yeah, no worries.  And, in

6    fact, that's the end of my questions.

7               MR. GONZALEZ:  Okay.

8               MR. WAREHAM:  Any other things for you,

9    DOJ?

10                        EXAMINATION

11   BY MR. GONZALEZ:

12       Q      Dr. Roysdon supervised you.  Did he ever

13   talk to you about his problems at HNCO?

14       A      So -- so -- so, yes, but I don't know

15   that he really went into too much detail and -- and

16   it depends on -- on -- on when we're talking about,

17   like when -- I -- I was a GG-14 at NSA at the time

18   he was a 13.  He didn't really talk too much about

19   it.  I got most of the stuff from -- from Dan Brown

20   at that time.

21              But when we were both at Leidos -- it

22   wasn't even something that really came up.  Like I

23   said, I thought it was something that was done and

24   gone and that I'd never hear about again.

25              So I just stopped thinking about it.  And

EXHIBIT 9
Page 109 of 135

1    then when we talked about in 2023, you know, that

2    that whole thing where he can't be on the slides, he

3    did tell me that, "Yeah, there's an ongoing lawsuit

4    because I was trying to figure out," you know,

5    "what" -- "what was going on," and that's when Dan

6    Brown said -- what were the exact words?

7                   Something like, "You don't know what he

8    did," and that's referencing the -- the -- the

9    lawsuit, but we didn't really talk about it.  I'm so

10   overwhelmed with work, like as a civilian.  You

11   know, I'm not allowed to work more than 40 hours,

12   but as a contractor -- I mean, I'm not really a

13   contractor.  I'm just a researcher.

14                  I'm -- I'm pushing like 60 hours.  It's

15   frustrating.  So, you know, the least amount of time

16   I can spend possible talking about work when I'm not

17   at work, I'd prefer it, you know.

18       Q     You knew Dr. Roysdon was going to file

19   the lawsuit before he filed, though; is that

20   correct?

21       A     I actually --

22                  MR. WAREHAM:  Objection to form.

23       A     -- encouraged him to.  It was -- it

24   was -- he asked me -- he had actually filed it

25   before, I think.  I -- I think I encouraged him

EXHIBIT 9
Page 110 of 135

1    to -- to keep going with it because I think that

2    there was something where it required a little bit

3    more money to get to the next step.

4              I don't know.  And -- and, yes, I did

5    encourage him.  I said, "Well," you know, "based on

6    what I know, it sounds like this McVay guy" -- and

7    I'm sorry.  This is my opinion here, but the -- the

8    guy was a complete jerk.  I mean, Dan Brown

9    complained about him constantly.

10             The guy was awful.  I mean, just a --

11   just a horrible person.  There should -- again, this

12   is my opinion, right, and, so, I -- I apologize for

13   just being so forward.  But, you know, when -- when

14   you're in government, especially with the taxpayer

15   funds, it's not about you, you know.

16             It's not about you.  It's about the

17   requirements, it's about getting the mission done,

18   and this guy -- it was all about him just trying --

19   from my impression, it seemed like it was just about

20   him trying to further himself so he'd get promoted.

21   I found it very frustrating.

22        Q    Did you ever follow up with Will McVay to

23   get his side of the story?

24        A    No, because, honestly, it's not my

25   problem.  As they say, not my pig, not my farm.

EXHIBIT 9
Page 111 of 135

1   I've got my -- my own issues I'm dealing with.  I

2   don't really have any issues.  Things are pretty

3   good, but you know what I mean.

4        Q    But have you ever been concerned that

5   you -- your opinion is formed just off of Roysdon's

6   discussions and Dan Brown's discussions with you?

7             MR. WAREHAM:  Objection to form and

8   foundation.

9        A    No, because -- because Dan -- Dan Brown's

10  comments were -- were pretty obvious to me.  It --

11  it was during the entire time -- it was during the

12  time I was working for AFCYBER, including, you know,

13  discussions later on -- well, he didn't really talk

14  about -- he didn't -- when I was now working at

15  Leidos, he didn't really talk about McVay at all

16  because I think the lawsuit had already been filed

17  at that point and he was like -- you know, probably

18  didn't want to say anything that would be bad.

19            But he complained about the guy all the

20  time.  And -- and, like I said, I do not think that

21  Dan Brown would lie and he was very frustrated with

22  this -- this McVay guy.  He made his life a living

23  hell at -- at HNCO and everything that Dan Brown had

24  told me, this guy is -- is -- is a jerk.

25       Q    Did you have any concerns that Dan Brown

EXHIBIT 9
Page 112 of 135

```
1    was not providing you full information about McVay?

2              MR. WAREHAM:  Objection.

3         A    I -- I -- I did not.  I -- I -- I -- I

4    got -- I -- I got a pretty good picture of -- of --

5    of what this guy -- of what this guy is about.

6              MR. GONZALEZ:  That's it for me.  Thank

7    you, Mr. Jaspers.

8              THE DEPONENT:  Yep.

9              MR. WAREHAM:  That's it for me.  We've

10   concluded.

11             THE VIDEOGRAPHER:  The time is 12:41.  We

12   are going off the record.  This will conclude the

13   deposition for this witness.

14             (The deposition concluded at 12:41 p.m.,

15              April 11, 2025.)

16

17

18

19

20

21

22

23

24

25
```

EXHIBIT 9
Page 113 of 135

```
 1              I, TODD JASPERS, do hereby certify that I

 2    have read the foregoing transcript and that the same

 3    and accompanying amendment sheets, if any,

 4    constitute a true and complete record of my

 5    testimony.

 6

 7                        _____
                                Signature of Deponent
 8
                                ( ) No Amendments
 9                              ( ) Amendments Attached

10

11              Acknowledged before me this _____ day

12    of _____, 2025.

13

14              Notary Public:_____

15              My commission expires_____

16              Seal:

17

18

19

20

21

22

23

24

25
```

**EXHIBIT 9**
**Page 114 of 135**

```
 1    STATE OF COLORADO)
                       ) ss.         REPORTER'S CERTIFICATE
 2    COUNTY OF DENVER )

 3

 4            I, Marcus K. Boyer, do hereby certify that

 5    I am a Shorthand Reporter and Notary Public for the

 6    State of Colorado; that previous to the commencement

 7    of the examination, the deponent was duly sworn to

 8    testify to the truth.

 9            I further certify that this deposition was

10    taken in shorthand by me at the time and place

11    herein set forth, that it was thereafter reduced to

12    typewritten form, and that the foregoing constitutes

13    a true and correct transcript.

14            I further certify that I am not related

15    to, employed by, nor of counsel for any of the

16    parties or attorneys herein, nor otherwise

17    interested in the result of the within action.

18            In witness whereof, I have affixed my

19    signature this 23rd day of April, 2025.

20            My commission expires April 30, 2027.

21

22

23            Marcus K. Boyer

24

25
```

EXHIBIT 9
Page 115 of 135

1  AB LITIGATION
   216 - 16th Street, Suite 600
2  Denver, Colorado  80202

3  April 23, 2025

4  Robert D. Green, Esq.
   1801 California Street, Suite 1600
5  Denver, Colorado 80202

6  Re:  Deposition of TODD JASPERS
        Roe v. United States of America
7       Civil Action No. 5:22-CV-00869-JKP-HJB

8  The aforementioned deposition is ready for
   reading and signing.  Please attend to this
9  matter by following BOTH of the items indicated
   below:

10
   _____ Call 303-296-0017 and arrange with us
11        to read and sign the deposition in our
          office
12
   _XXX_ Have the deponent read your copy and sign
13        the signature page and amendment sheets, if
          applicable; the signature page is attached
14
   _____ Read the enclosed copy of the deposition
15        and sign the signature page and amendment
          sheets, if applicable; the signature page
16        is attached

17  _XXX_ WITHIN 30 DAYS OF THE DATE OF THIS LETTER

18  _____ By _____ due to a trial date of _____

19  Please be sure the original signature page and
    amendment sheets, if any, are SIGNED BEFORE A
20  NOTARY PUBLIC and returned to AB Litigation for
    filing with the original deposition.  A copy
21  of these changes should also be forwarded to
    counsel of record.  Thank you.
22
    AB LITIGATION
23
    cc:  All Counsel
24

25

EXHIBIT 9
Page 116 of 135

```
 1    AB LITIGATION
      216 - 16th Street, Suite 600
 2    Denver, Colorado  80202

 3

 4
                      TODD JASPERS
 5                   April 11, 2025
             Roe v. United States of America
 6         Civil Action No. 5:22-CV-00869-JKP-HJB

 7

 8    The original deposition was filed with

 9    Jason R. Wareham, Esq., on approximately

10    the 23rd day of April, 2025.

11    _____ Signature waived

12    _____ Signature not requested

13    _____ Unsigned; signed signature page and amendment
             sheets, if any, to be filed at trial
14
      _XXX_ Unsigned; amendment sheets and/or
15           signature pages should be forwarded to
             AB Litigation to be filed in the
16           envelope attached to the sealed original.

17

18
      Thank you.
19
      AB LITIGATION
20
      cc:  All Counsel
21

22

23

24

25
```

EXHIBIT 9
Page 117 of 135

- AMENDMENT SHEET -

Deposition of TODD JASPERS
April 11, 2025
Roe v. United States of America
Civil Action No. 5:22-CV-00869-JKP-HJB

The deponent wishes to make the following changes in
the testimony as originally given:

Page    Line                    Should Read              Reason
_____   _____   _____   _____

_____   _____   _____   _____

_____   _____   _____   _____

_____   _____   _____   _____

_____   _____   _____   _____

_____   _____   _____   _____

_____   _____   _____   _____

_____   _____   _____   _____

_____   _____   _____   _____

_____   _____   _____   _____

_____   _____   _____   _____

_____   _____   _____   _____

_____   _____   _____   _____

Signature of Deponent: _____

Acknowledged before me this _____ day of _____,
2025.

(seal)    Notary's signature _____

          My commission expires _____.

**EXHIBIT 9**
**Page 118 of 135**

**EXHIBIT 9**
**Page 119 of 135**

**EXHIBIT 9**
**Page 120 of 135**

**EXHIBIT 9**
**Page 121 of 135**

**EXHIBIT 9**
**Page 122 of 135**

**EXHIBIT 9**
**Page 123 of 135**

**EXHIBIT 9**
**Page 124 of 135**

**EXHIBIT 9**
**Page 125 of 135**

**EXHIBIT 9**
**Page 126 of 135**

**EXHIBIT 9**
**Page 127 of 135**

**EXHIBIT 9**
**Page 128 of 135**

**EXHIBIT 9**
**Page 129 of 135**

**EXHIBIT 9**
**Page 130 of 135**

**EXHIBIT 9**
**Page 131 of 135**

**EXHIBIT 9**
**Page 132 of 135**

**EXHIBIT 9**
**Page 133 of 135**

**EXHIBIT 9**
**Page 134 of 135**

**EXHIBIT 9**
**Page 135 of 135**

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

Civil Action No. 5:22-CV-00869-JKP-HJB

_____

VIDEOCONFERENCE DEPOSITION OF THOMAS PARISI

April 16, 2025

_____

Plaintiff,

DR. JOHN ROE,

v.

Defendant,

UNITED STATES OF AMERICA, et al.

_____

APPEARANCES:

    ALLEN VELLONE WOLF HELFRICH & FACTOR, PC
        By Jason R. Wareham, Esq.
           1600 Stout Street, Suite 1900
           Denver, Colorado 80202Denver, Colorado 80202
             Appearing on behalf of Plaintiff.


    HENDLEY & HODGES LAW, PLLC
        By John W. Hodges Jr., Esq.
           4594 US Highway 281 North
           Spring Branch, Texas 78070
             Appearing on behalf of Plaintiff.

**EXHIBIT 10**
**Page 1 of 113**

```
 1    APPEARANCES: (Continued)

 2
          UNITED STATES ATTORNEY'S OFFICE - DENVER
 3            By Robert D. Green, Esq.
                 1801 California Street, Suite 1600
 4               Denver, Colorado 80202
                   Appearing on behalf of Defendant.
 5
          U.S. DEPARTMENT OF JUSTICE - CONSTITUTIONAL TORTS
 6            By Joseph Gonzalez, Esq.
                 Katrina Seeman, Esq.
 7               175 N Street, Northeast
                 Washington, DC 20002
 8                 Appearing on behalf of Defendant.

 9

10    Also Present:  Rebecca Bradshaw, Lance Henry,

11                   Brian Noble, John Fuentes,

12                   Maryvonne Tompkins (videographer).

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**EXHIBIT 10**
**Page 2 of 113**

```
 1              Pursuant to Notice and the Federal Rules

 2    of Civil Procedure, the deposition of

 3    THOMAS PARISI, called by Plaintiff, was taken on

 4    Wednesday, April 16, 2025, commencing at 10:04 a.m.,

 5    via Zoom videoconference, before Marcus K. Boyer,

 6    Shorthand Reporter and Notary Public for the State

 7    of Colorado.

 8

 9                    I N D E X

10    EXAMINATION BY                              PAGE

11    Mr. Wareham                                    5

12

13    EXHIBITS                                    PAGE

14    1   US0000327 - US0000330                     25

15    2   US0000374 - US0000376                     33

16    3   US0000385 - US0000387                     43

17    4   US0000424                                 60

18    5   US0000388                                 62

19    6   US0000395                                 68

20    7   US0000400                                 69

21    8   US0000409                                 72

22    9   US0000418                                 72

23    10  US0000706 - US0000707                     74

24    11  US0000581                                 76

25    (Exhibits to be provided by counsel.)
```

**EXHIBIT 10**
**Page 3 of 113**

```
1                    P R O C E E D I N G S
2                    THE VIDEOGRAPHER:  The time is 10:04.  We
3    are on the record.  Today is April the 16th, 2025.
4    This begin the recorded deposition of Thomas Parisi
5    in the matter of Dr. John Roe versus United States
6    of America, et al.  This deposition is being
7    recorded via Zoom videoconferencing.  The court
8    reporter is Marcus Boyer.  The videographer is
9    Maryvonne Tompkins.
10                   The attorney will introduce themselves
11   starting with the plaintiff, please.
12                   MR. WAREHAM:  Hi, good afternoon or good
13   morning, wherever you're at.  This is Jason Wareham,
14   lead counsel for the plaintiff.  Along with me is
15   John Hodges, Lance Henry, and Rebecca Bradshaw on
16   our -- on our team.
17                   MR. GREEN:  Good morning.  This is Robert
18   Green for Defendants.  Also with me are lead counsel
19   Joseph Gonzalez and Katrina Seeman from the
20   Constitutional Torts Branch of DOJ and we also have
21   John Fuentes and Brian Noble with the Air Force.
22                   THE VIDEOGRAPHER:  Our court reporter
23   will please swear in the witness and we can proceed.
24                        THOMAS PARISI,
25   being first duly sworn in the above cause, was
```

EXHIBIT 10
Page 4 of 113

1    examined and testified as follows:

2            MR. WAREHAM:  All right.  Good morning.

3    Before we go much further, Mr. Green, if you

4    wouldn't mind telling me the role of the Air Force

5    attendees today, just so I'm clear?

6            MR. GREEN:  They're here with the agency.

7            MR. WAREHAM:  Okay.  Do they intend to --

8    to be another source of objection or anything like

9    that today or any sort of information guidance?

10           MR. GREEN:  I don't believe so, no.

11           MR. WAREHAM:  Okay.  Great.

12                        EXAMINATION

13   BY MR. WAREHAM:

14       Q    Mr. Parisi, hi.  My name is Jason, as I

15   said.  I -- I thank you for making time, although I

16   know it's not optional today for -- for this kind of

17   thing.  I'm going to go over a few instructions with

18   you, just to make sure that as we kind of work

19   through the questions today, that as best as we can,

20   especially given the virtual platform, we're able to

21   ensure that -- that -- that the record is clear.

22           Have you ever been deposed before?

23       A    Not as an adult.

24       Q    Okay.  Well, I won't peel that particular

25   onion.  That's an interesting response.

EXHIBIT 10
Page 5 of 113

1       A       Ironically, there was -- when I was in

2  grade school, two kids got in a fight and their

3  parents were suing each other, and I was -- I was a

4  witness.  So I was -- I was probably seven or eight

5  years old, so, yeah.

6       Q       Wow.  Okay.  That is interesting.  Okay.

7  So, look, today we're here to talk about, you know,

8  the Dr. Roe case with -- Dr. Roe is actually

9  Dr. Paul Roysdon.  In that, we just seek for you to

10  tell the truth, just like you would imagine, being

11  placed under oath.

12              If there's something that you don't know

13  or don't recall -- you know, it's not usually useful

14  for us to have speculation.  It's fine to say "I

15  don't know," or if I ask a question that's unclear,

16  to ask me to clarify any questions that are unclear

17  so that we can make sure that the -- the record and

18  your understanding is as clear as possible.

19              If you're answering "yes" or "no" or --

20  or something, you know, while it is a video

21  deposition -- you know, shaking your head or -- or

22  nodding, it's not going to be captured on the

23  record.  So we need verbal "yes" or "no"s.  Other

24  than that, let's just take our time.  We'll work

25  through it.

EXHIBIT 10
Page 6 of 113

```
1              If there's a need to take a break at any
2    point -- usually I take a break -- about a 10-minute
3    break about every hour, but if there's a need for
4    another break or something else going on, we can --
5    we can just do that, that's not a problem, and go
6    off the record.
7              And, at times, you may be shown some
8    documents.  We'll -- we'll note them as different
9    exhibits in the deposition that'll be displayed on
10   your screen.  If you have any difficulty seeing
11   them, we'll do what we can to -- to zoom in or make
12   sure that they're clear.
13             Overall, this isn't a memory test.  It's
14   not a quiz.  If -- you know, if -- if you can't
15   recall something or specifics, that's fine.  And if,
16   through the questioning, we have to go back and do
17   some corrections, that's also fine too.
18             So any questions about what I just
19   described for you?
20        A    No.
21        Q    Okay.  We'll just continue then.  Oh.
22   One other note is the other side does get to and
23   should likely lodge objections to my -- my
24   questions.  If that occurs, you'll hear something
25   like "objection" and the basis.  If you're talking
```

EXHIBIT 10
Page 7 of 113

1    at the time, the best thing to do is just pause

2    briefly and allow that objection to be clearly

3    recorded on the record and then we'll move on from

4    that.  It's a little difficult on video sometimes or

5    a little delayed.  So sometimes we've just got to

6    kind of work through that at the moment.

7            Okay.  All right.  Probably one last

8    final thing because it's come up a few times.  We

9    are not, obviously, in a classified space.  We are

10   not trying to elicit classified information.

11   There's been some materials produced to us that it

12   looks like there's some unclassified identity or

13   verifiers within those e-mails, we'll show those to

14   you, but if anything gets close to -- to classified

15   information in your mind, please just note that

16   and -- and -- and, you know, we'll move on from

17   there.  Does that make sense?

18       A    Yes.

19       Q    Okay.  So, Mr. Parisi, would you mind

20   stating your full name for the record and spelling

21   your last?

22       A    My full name is Thomas Joseph Parisi.

23   Last name spelled P-a-r-i-s-i.

24       Q    All right.  And what is your current role

25   and employment?

EXHIBIT 10
Page 8 of 113

1     A    I'm a GS-1550 DR-4, principal computer

2  scientist with the Air Force Research Laboratory.

3     Q    All right.  And, in general, what does

4  the Research Laboratory do?

5     A    The Research Laboratory performs research

6  for warfighters, to get them the latest and greatest

7  technology; sometimes that we know exists, sometimes

8  that we don't know exists through -- through

9  exploratory-type research.

10     Q    Okay.  How long have you been in this

11  role?

12     A    It will be 24 years in June.  So

13  23 years.

14     Q    All as a GS employee?

15     A    Yes.

16     Q    Okay.  So directing us to this case --

17  well, in general, what are your roles specifically

18  within the Research Laboratory -- your specific

19  roles?

20     A    I manage a portfolio of programs that

21  have numerous contracts underneath them and I

22  monitor the progress of the contracts, I work with

23  the customer, who, many times, is a funding agency

24  outside of AFRL because we work a lot of joint

25  projects, to ensure that the funding is flowing,

**EXHIBIT 10**
**Page 9 of 113**

1    get signed contract, there's enough money to do what

2    it is the customer wants to do, and then verify back

3    to the customer that things are on schedule and

4    budget, or should they not be, what the get-well

5    plan is.  So a lot of contract management.

6         Q    Are you often in the role of the

7    contracting official, like a COTR or a COR?

8         A    Yes.

9         Q    Okay.  And can you say what a COTR means

10   in -- in full on the record?  I -- I don't always

11   remember right off the top of my head.

12        A    A COTR is a contracting officer technical

13   representative.  A COR is a contracting officer

14   representative.  Many times, we use the terms

15   interchangeably here at AFRL.

16        Q    And, in general, what is a COR -- I'm

17   just going to use COR because it's easier -- easier

18   than saying COTR.  In general -- but I mean both

19   roles.  What is a COR responsible for?

20        A    COR is responsible for ensuring that the

21   work occurring under the contract is within scope,

22   that progress is being made on the work being

23   executed under the contract, and that funds are --

24   are flowing to the contract officer in a manner in

25   which the -- the effort will continue to push

EXHIBIT 10
Page 10 of 113

1    forward without any gaps.

2              The COR also works with -- directly with

3    the prime contractor to ensure technical expertise

4    and ensure that the technical approach that they're

5    taking is what we would consider to be technically

6    sound.  So that's why, typically, computer

7    scientists, computer engineers are -- would be the

8    CORs for a contract involving computer software.

9        Q    And just so we kind of get some context,

10   what is, in general, the contracting or acquisitions

11   process that a COR is a part of, well, let's just

12   say within the Research Laboratory?

13       A    Typically, and not always, but a COR,

14   many times, is the one that initiates solicitation

15   or contract procurement with our contracting branch.

16   We usually explain that we've gotten a requirement

17   and we have funds to execute that requirement, and

18   then our contracting branch puts out a solicitation

19   of some form.  We then get back in proposals.

20             And, usually, the COR and a team of a few

21   other people evaluate the proposals during the

22   source selection and then make a recommendation to

23   the source selection authority as to who the -- the

24   most qualified, best value for the government

25   proposer -- you know, proposal is.  That's how --

EXHIBIT 10
Page 11 of 113

1    that's how we start out.

2              And then as -- when we award the

3    contract, then we have a relationship -- a direct

4    relationship with the prime contractor, typically

5    somebody with a similar job; an engineering or

6    science background, who is the manager on the

7    contractor side of that effort, and we have regular

8    interactions, some more than others, but, usually,

9    once a week, maybe once every other week to ensure

10   everything is -- is going smoothly.

11        Q    Okay.  And is it the COR that actually

12   executes the contract or is somebody else involved

13   in like final contract execution?

14        A    Well, the performer executes the

15   contract.  I mean, they're -- they're the --

16        Q    That's true.  When I say "execute," I

17   mean like who signs on the dotted line, such that

18   there's a binding contract?

19        A    A warranted contract officer has to sign

20   the contract.  They are the ones that make the

21   ultimate decision to push forward with the source

22   selection authority's, again, recommendation on who

23   to award the contract to.  I am not a warranted

24   contract officer.  I have several that work with me

25   to help facilitate my tasking.

**EXHIBIT 10**
**Page 12 of 113**

```
 1        Q     Moving to -- well, actually, in general,

 2   in the contracting world, have you ever heard the

 3   term "debarment"?

 4        A     Yes, I have.

 5        Q     What is that?

 6        A     Well, typically, debarment happens, in my

 7   understanding -- it probably has more than one

 8   definition, but that typically happens when a

 9   company has somehow either violated the

10   regulations -- federal regulations required for

11   being a contractor, there's some kind of security

12   issue perhaps, they've received inside information

13   regarding a source selection, like, for instance, if

14   they were to hire somebody that was on one of those

15   source selection teams.

16              We did -- to fresh off, there -- there

17   would probably be a chance that they would be

18   debarred from being able -- or at least not be

19   allowed to bid on that.  So I'm not trying to go on

20   too long, but debarment basically means that they

21   can't bid on the government contracts for a certain

22   amount of time.

23        Q     Okay.  And is there any process

24   associated with debarment normally?

25        A     I don't know.  I -- I believe that
```

EXHIBIT 10
Page 13 of 113

1    there -- it's a process.  The process, as far as I'm

2    concerned, is if I were to find out that there was

3    impropriety going on with the performer --

4                THE REPORTER:  Mr. Parisi -- Mr. Parisi,

5    you're breaking up.

6        A        -- I would report that --

7                THE REPORTER:  Mr. Parisi, you're --

8        A        -- to our legal staff, who is on the call

9    today, while it was contracting and let them take

10   care of it from there.  I don't know what the

11   process is from that point forward.

12       Q    All right.  So shifting to the contract

13   that kind of -- or the interaction that brings us to

14   this deposition, do you recall a Dr. Paul Roysdon?

15       A    I have never met Dr. Paul Roysdon and the

16   first -- yeah, the answer is no.  I don't recall.

17   I've never met him.  Obviously, I've seen his name a

18   lot recently in paperwork, but I've -- I've never

19   met the man in person, that I recall.

20       Q    All right.  And outside of personal

21   meeting, were you involved in any way in

22   Dr. Roysdon's contract with the US government?

23       A    No.  As far as I know, again going back

24   through the records, he didn't have a contract, at

25   least as far as I was involved, with the US

EXHIBIT 10
Page 14 of 113

1    government.  He had a -- my organization had a

2    contract with a company called Global InfoTek and

3    then Global InfoTek issued -- and, again, this is

4    from what I've read recently, going back on this,

5    they issued a subcontract to Dr. Roysdon.

6              So that contract was between Dr. Roysdon

7    and Global InfoTek.  Government -- CORs, typically,

8    are not supposed to be getting involved with

9    subcontractors.  We're supposed to work with the

10   prime because the prime is on the hook for delivery,

11   therefore, it would -- it would be out of the

12   ordinary for me to have had any interaction

13   with them and I did not have any interaction with

14   them.

15        Q    Okay.  And, so I have sufficient context,

16   what -- what, normally, is the process, on average,

17   with how subcontractors are obtained by prime

18   contractors?

19        A    So, typically, if a prime contractor

20   needs -- feels that they need specialized help that

21   doesn't currently exist within their -- their

22   company, they contact the defense contract

23   management agency, that is typically what we call

24   the administrative contract officer, who is

25   completely different from the procurement

EXHIBIT 10
Page 15 of 113

```
 1    contracting officer that sits here at AFRL.

 2              They then request to write -- write a

 3    subcontract under the -- the prime contract and DCMA

 4    is typically the authority that approves it.  Now,

 5    we tend to find out -- we ask to be notified at a

 6    time, as a courtesy.

 7              Sometimes we find out after the fact in a

 8    status report, but as long as the work is getting

 9    done and it's not affecting the budget, usually we

10    don't have an issue with -- with subcontracting --

11    prime subcontracting.

12        Q    Okay.  Well, based on -- you mentioned

13    reviewing a few documents, actually, of late,

14    probably after you got this subpoena.

15              Can you go through what documents you've

16    reviewed?

17        A    I logged onto PACER and I downloaded the

18    case.  The original case was sealed and then,

19    apparently, the case was unsealed, so -- the -- the

20    amended version and I did read through that.  So

21    I -- I understand what the complaint is.

22              I've also gone back through some e-mails,

23    along with the Justice Department, what we could

24    find that has anything to do with Dr. Roysdon.  And

25    those are pretty much the -- the documents that I've
```

**EXHIBIT 10**
Page 16 of 113

1    read.

2        Q     Okay.  And did -- that review of e-mails

3    with the justice Department and in your preparation

4    for that, did that somewhat refresh your

5    recollection as to issues with respect to

6    Dr. Roysdon?

7        A     It did slightly.  However, the issues

8    were so run-of-the-mill and we deal with -- with

9    primes and customers asking us about whether or not

10   they can have a subcontractor perform a certain kind

11   of task and us saying, "Yes, they can," or, "no,

12   that's outside the scope of your contract."

13           That probably occurs on a weekly basis.

14   So that was the extent of pretty much the e-mails

15   that we had and we were just trying to determine if

16   the -- if what he was doing was within scope.

17       Q     So from your seat and -- and with

18   whatever refreshed recollection that you have, can

19   you just describe kind of your understanding of the

20   start of the contract and the end of the contract

21   with respect to Dr. Roysdon?

22           MR. GREEN:  Object to form.

23       Q     Go ahead.

24       A     Did you want me to go -- to ahead, sir,

25   Mr. Green?

EXHIBIT 10
Page 17 of 113

1     Q     Yeah, yeah.  So once an objection is

2     lodged, unless somebody injects and tries to

3     instruct you not to answer, once the objection is on

4     the record, then you can just go ahead and answer

5     the question or I can repeat the question if you

6     didn't hear it the first time.

7               MR. GREEN:  Yeah, you can go ahead,

8     Mr. Parisi.

9     A     Can you repeat the question, please?

10    Q     Sure.  So it wasn't a terribly artful

11    question, but just to your recollection, you know,

12    can you describe the start of Dr. Roysdon's contract

13    at issue here and the circumstances of ending it,

14    just kind of a narrative, as best you can.

15              MR. GREEN:  Same objection.  Go ahead,

16    Mr. Parisi.

17    A     No, I can't do either.  I was not part of

18    the contract award and if the -- if the contract was

19    terminated -- I don't know for a fact that it was.

20    I -- I had no part of that either and I don't know

21    when it occurred and what happened between two

22    companies that -- we usually, on the government

23    side, don't get involved in -- in issues between

24    companies, especially if it involves terminating

25    subcontracts or anything like that.

EXHIBIT 10
Page 18 of 113

1        Q     Sure.  Okay.  Well, we're going to work

2   through some documents and -- that you were included

3   on, here shortly, and just see what information that

4   you might be able to provide.

5             Before doing that, are you familiar with

6   the name Captain William McVay?

7        A     I am.

8        Q     And how are you familiar with that name?

9        A     I've worked with Captain -- who is now

10  Major McVay in a few different capacities.  I -- I

11  met him when he was working as a -- in a program

12  management type job for an organization call Air

13  Force Life Cycle Management Center.  He's since

14  then -- it's PCS, permanent change of station, to

15  the Pentagon and is -- was then a program element

16  monitor, which we refer to as a PEM, for a budget

17  line that I -- that falls directly within my

18  program.

19            So I actually ended up working -- I met

20  him when he was with LCMC.  I ended up working with

21  him much closer when he was with -- at the Pentagon,

22  Secretary of the Air Force Acquisition Office for

23  Information Dominance.  Subsequently, he is PCS to

24  another -- or to -- to another job at the Pentagon

25  and I've heard from him a couple times.

EXHIBIT 10
Page 19 of 113

1     Q     Okay.  What, in general, has been your

2  experience in working with Captain McVay -- or I'm

3  going to use Captain McVay just for clarity of the

4  record since, you know, the timing involved his rank

5  as captain.  So no disrespect to him, but just to --

6  to keep it all kind of consistent.  Okay?

7     A     Very intelligent.  Very technically

8  capable.  Very professional.  He was always very

9  polite with -- to me.  And we -- we were to the

10  point where we would -- you know, I -- I -- I would,

11  personally, you know, send him a text message and

12  say, "Hey, I'm going to be in San Antonio or

13  Washington, if you wanted to go out and grab some

14  dinner or something, we can catch up."  So like I

15  said, I know him -- I know him very well and I have

16  a lot of respect for him.

17     Q     Do you -- focusing more specifically on

18  his role during Air Force Life Cycle Management --

19  also a term used is -- that I've heard is HNCO.

20          What, specifically, was his role there?

21     A     I'm not sure exactly what his role was

22  there.  It -- it had to do with program management.

23  Whether or not that was actually his title, I don't

24  know.  But he was managing programs there.

25     Q     Okay.  And when you describe "program

EXHIBIT 10
Page 20 of 113

1    manager" or "program management," can you define

2    that?

3        A    Basically given a requirement, given

4    resources, usually funding, given a timeline, given

5    access to performers and also access to leadership,

6    and using all of those resources along with the

7    requirements together to derive a solution to solve

8    what the -- the requirement that you've been given.

9        Q    In general, with your experience with

10   program managers, what is their supervisory

11   authority over contract personnel on their projects?

12       A    So the answer is none because you used a

13   very specific term, "supervisory."  We are not

14   supervisors of contractors.

15       Q    Well, what are the roles of program

16   managers then vis-à-vis contractors?

17       A    So a government program manager,

18   typically, will work together with the contractor

19   that is developing the solution.  That's usually,

20   and I've been doing this for many years, a very

21   cordial, very professional relationship.

22            The government program manager, if they

23   identify something that is maybe not -- not going to

24   work or a better way to do things, a conversation

25   can ensue between the -- the government program

EXHIBIT 10
Page 21 of 113

1    manager and the contractor manager about potentially

2    working the -- the project in a slightly different

3    way or integrating another piece or another piece of

4    functionality into it.

5            This is all assuming that it doesn't --

6    we're not talking about something that's significant

7    enough that would be considered a material change to

8    the contract.  If it was that significant, we would

9    have to go to the contracting officer and they would

10   have to do a bilateral contract modification.

11           But, typically, it's along the lines of,

12   "Hey, we developed this user interface and," you

13   know, "do you think that the blue background or the

14   green background is" -- something along those lines

15   where it's not -- it's not significantly changing

16   the contract.

17       Q    Okay.  Do you have -- did you have any

18   awareness of any of the projects for which he was

19   program manager at Air Force Life Cycle Management?

20       A    Yes, I'm aware of a couple programs that

21   he was involved with managing.

22       Q    As -- in an unclassified way, can you

23   describe what those are?

24       A    No, sir.

25       Q    Was there any sort of like letter

EXHIBIT 10
Page 22 of 113

1    reference to any of his projects that was

2    unclassified -- like a way to describe them

3    unclassified?

4        A    Not that I'm aware of.

5        Q    Okay.  So the implication being then, the

6    descriptions I'm asking for would tread into

7    classified information?

8        A    That is correct.

9        Q    Okay.

10       A    It is my understanding, that is correct.

11   Now, things do change and sometimes there are bits

12   and pieces of things that are declassified and, you

13   know, a paragraph or a blurb could come out saying,

14   you know, "The country can rest easy at night

15   knowing that we're working on this particular

16   capability."  I don't know if that's happened or not

17   in the last five years with the -- the things

18   that -- that McVay was working [sic].

19       Q    Okay.  To your recollection, have you

20   ever discussed Dr. Roysdon with Captain McVay?

21       A    Only one time -- twice, maybe.  So the

22   first time, I got a call, it was this summer, around

23   July timeframe, from Captain McVay and he notified

24   me that the attorney at the Justice Department

25   wanted to speak with me and I asked what it was

EXHIBIT 10
Page 23 of 113

1   about because it's not every day that the Justice

2   Department lawyers want to speak with me.

3           And he said it's about a subcontractor

4   from 2020, that there's -- there's some kind of a

5   situation with.  And I said, "Who was the

6   subcontractor?"  And he said, "Paul Roysdon," to

7   which I responded, "I've never heard of him."  That

8   also came up two -- just -- I think it was last week

9   or two weeks ago.

10           I had a phone call with Major McVay about

11  a completely different -- nothing to do with this,

12  completely different Air Force effort and I did

13  mention that, "Hey, I was subpoenaed for this whole

14  Roysdon thing.  Do you know anything about that," to

15  which he responded, "I can't talk about that," and

16  that was the end of that conversation.

17      Q    Are those the only times, to your

18  recollection, you've discussed this case with

19  Captain McVay?

20      A    Those are the only two times, correct.

21      Q    All right.  Well, we will start working

22  through a few documents here.  And if you're

23  wondering how we got your name, this is -- this is

24  how.  So I'm going to ask my paralegal -- and this

25  might get just a little clunky, but I'm going to do

EXHIBIT 10
Page 24 of 113

1   my best to record the identity of the document for

2   the DOJ counsel and then the exhibit that we're

3   going to -- that we're going to mark it.

4              MR. WAREHAM:  So, Rebecca, if we could

5   just go in order of those -- those lists of

6   documents, that would be helpful.

7              Would you mind displaying the first one?

8   Let's see if the share screen thing works.  All

9   right.  So let's actually go to the next one,

10  please, Rebecca.  All right.  Go ahead and go down

11  to the bottom.  All right.  This is Bates -- Bates

12  number -- excuse me.  I'm trying to see the bottom

13  of it.  It is 320 -- 330 to, I believe, 328.  We're

14  going to mark this as Exhibit 1 -- or 327.  Excuse

15  me.

16             (Exhibit 1 was marked.)

17       Q    (By Mr. Wareham)  And, really, this --

18  Mr. Parisi, this is just to confirm any

19  understanding you have around these e-mails and help

20  us understand, you know, what they were discussing.

21  And I'm going to try to just show you e-mails in

22  which you were only involved.

23             So can you briefly review what is on the

24  screen and tell me, first off, who is Tanya Macrina?

25       A    Tanya Macrina is a coworker of mine.  She

EXHIBIT 10
Page 25 of 113

1    is pretty much a co-program manager.  We work

2    somewhat interchangeably on most of the efforts

3    under our portfolio so there's coverage if one of us

4    isn't in the office.  Tanya is also a GS-1550 DR-3,

5    a senior computer scientist.

6        Q    Okay.  And do you know who Tracy is, as

7    mentioned on this e-mail on -- on 330?

8        A    Tracy Winterton is a systems engineering

9    and technical advisory contractor that assists us

10   with acquisition and procurement type matters like

11   this.

12       Q    Okay.  And can you tell me what a -- what

13   GITI is?

14       A    GITI is an abbreviation for Global

15   InfoTek, Incorporated, I believe.

16       Q    And what is your understanding of what

17   Global InfoTek is?

18       A    Global InfoTek is a cyber -- a computer

19   cyber development company down in the -- in Reston,

20   Virginia.

21       Q    And do you know what -- I'm going to just

22   call them GITI for Global InfoTek for ease of

23   phrase.  Do you know what GITI's role was with

24   respect to Dr. Roysdon?

25       A    I -- after going through the e-mails, it

**EXHIBIT 10**
**Page 26 of 113**

1    appeared as though -- and, again, at the time, I was

2    not aware of this, but it -- it appears as though

3    Global InfoTek issued a subcontract to a -- a

4    company or a person involving Dr. Paul Roysdon.

5        Q    Going to the -- the next chain of

6    information in the next e-mail, above it, can you

7    describe who Dan Brown is -- Daniel Brown is?

8        A    Daniel Brown is a program manager with

9    the Air Force Life Cycle Management Center in San

10   Antonio.  He is another -- he -- he -- he's -- he's

11   another, basically, COR, COTR, just like we are and

12   manages the -- the progression of technology

13   development.

14       Q    And do you happen to have any specific

15   knowledge what -- what his oversight and role was as

16   the COR for Air Force Life Cycle Management Center?

17       A    He was working several -- several

18   different efforts having to do with cyber

19   operations.  Also, we, at AFRL, were funding Global

20   InfoTek to support one of Mr. Brown's cyber defense

21   efforts at the time.

22            So he was the boots on the ground that

23   was providing day-to-day feedback to the contractor

24   and reporting back to us on that particular matter.

25       Q    Do you know of any information related to

EXHIBIT 10
Page 27 of 113

1    Mr. Brown being the source of the contract for

2    Dr. Roysdon?

3         A    No, that wouldn't have -- the source of

4    the contract would be Global InfoTek.

5         Q    Okay.  Are you aware of any information

6    with respect to Mr. Brown and Dr. Roysdon

7    collectively?

8         A    No.

9         Q    Okay.  And can you tell me who Julio

10   Oraro [phonetic] is?

11        A    Oh.  I do want to clarify my last answer.

12        Q    Go ahead.

13        A    You asked me if I knew of any

14   interactions or relations or something between Dan

15   Brown and Paul Roysdon and the answer is I've

16   recently gone back through some e-mails and have

17   seen that there was some questions as to which role

18   Dr. Roysdon was playing down in San Antonio, whether

19   he was acting as a developer or as a technical

20   program adviser.

21             So in that matter, yes, there -- there

22   was some -- some back and forth between myself, Dan

23   Brown, Tanya, regarding Dr. Roysdon.

24        Q    Okay.  Thank you for clarifying.  Back to

25   identifying Julio Oraro, do you know who that is?

EXHIBIT 10
Page 28 of 113

1      A      I do.  I don't know him well.  I've met

2    him a couple of times.  I'm not sure if he's still

3    with Life Cycle Management Center, but at the time,

4    he was.

5      Q      And do you know what his role was at the

6    Air Force Life Cycle Management Center at the time?

7      A      Pretty much the same thing as the rest of

8    us.  He's an engineering-type program manager,

9    working Life Cycle Management matters.

10     Q      Okay.  Had you worked with -- how --

11   well, let me rephrase this.  How well do you know

12   Mr. Brown -- Dan Brown?

13     A      I know Mr. Brown very well.  He's a

14   personal friend of mine.  We've been working

15   together for -- when I say "together" -- he's always

16   worked out of Texas and I've always worked out of

17   Rome, New York.  However, our portfolios are very

18   closely aligned.

19            So we've been working together for over

20   20 years now, a lot of times just transitioning --

21   doing basic research in the laboratory and then

22   transitioning it over to his more mature program so

23   that he can integrate it into larger systems and

24   transition it into the warfighter.  So, yes, I

25   know -- I know him very well.

EXHIBIT 10
Page 29 of 113

```
 1       Q     All right.  And what is your opinion of

 2   Mr. Brown?

 3       A     Very high, very intelligent and he's got

 4   a lot of great ideas and he's willing to -- he's

 5   willing to take his own personal time a lot of

 6   times.  He's one of those guys that, you know, you

 7   work at all hours of the night if he thinks he has a

 8   great idea that's going to help move things along.

 9             So I have a lot of respect for him and,

10   you know, he always -- he always gives it his all,

11   regardless of what his position is, and he's had a

12   couple different positions over the years.

13       Q     Have you discussed this case with

14   Mr. Brown at all, to your recollection?

15       A     No, not to my recollection.

16       Q     Have -- have you and Mr. Brown ever

17   discussed Captain McVay?

18       A     I'm sure we have.

19       Q     Do you --

20       A     I -- I don't -- I don't --

21       Q     Oh.  Sorry.  I didn't mean to interrupt

22   you.  Go ahead.  Sorry.

23       A     I don't know in what context.  I mean,

24   you know -- I -- I'm -- I'm sure at some point, you

25   know, Dan probably told me that, "Hey, did you hear
```

EXHIBIT 10
Page 30 of 113

```
 1    that Captain McVay is going to PCS over to SAF/AQ
 2    and work at the Pentagon now?"  I'm sure that
 3    that -- you know, comments like that have -- have
 4    come up, but I don't think anything of -- of
 5    substance.
 6         Q     Yeah.  Fair.  So just to clarify, as to
 7    your recollection, have you ever discussed anything
 8    negative about Captain McVay with Mr. Brown?
 9         A     Absolutely not.
10         Q     Have you ever discussed any concerns of
11    Mr. Brown that he might lose project funding because
12    of Captain McVay?
13         A     With regard to Captain McVay, no.  Now,
14    every single government program manager across the
15    government is concerned that we're going to lose
16    program funding for various reasons, but your
17    specific question was with regard to McVay, no.
18         Q     Okay.  Can you briefly describe what a
19    DD 254 is?
20         A     Department of Defense Form 254 is a
21    security document that becomes part of the contract
22    and it authorizes the contractor to perform and/or
23    retain information that is classified at a multitude
24    of different levels.
25               It's also typically required for a
```

EXHIBIT 10
Page 31 of 113

1    contractor to be able to get a -- what they call an

2    FCL facility clearance, which is required before

3    they can start giving their own employees clearances

4    to work on things.

5              So because of the classified nature of

6    most of the work that we do, almost all of our

7    contracts have DD 254 as part of the contract and,

8    usually, many revisions because as programs

9    progress, different requirements with regard to

10   classified information tend to pop up.

11             MR. WAREHAM:  Okay.  Rebecca, would you

12   mind scrolling up to the top of this?  So -- all

13   right.  Actually, I think we're done with Exhibit 1.

14             Rebecca, would you mind going to the next

15   one?

16        Q    Oh.  Actually, let me ask you who Ted

17   Oakley is -- Theodor Oakley?

18        A    Theodor Oakley is a direct employee of

19   Global InfoTek and he was down in San Antonio.  So

20   there is -- if -- if everybody was doing their jobs,

21   Mr. Oakley probably had some kind of a relationship

22   with Dr. Roysdon because he would have basically

23   been the prime contractor who was overseeing that

24   subcontract down in San Antonio.

25             MR. WAREHAM:  All right.  Thanks.  You

EXHIBIT 10
Page 32 of 113

1    can go to the next one, Rebecca.  If you wouldn't

2    mind scrolling up to the header.  This is Bates 373

3    through Bates 372.

4              Actually, you're not on this one.  Can

5    you go to the next one, please?  Forgive me.  There

6    may be a little bit of a document move-around here

7    as we coordinate some of these things.

8              All right.  Can you confirm, Mr. Parisi

9    is on this one, please?  All right.  Great.  So this

10   one is 376 through 374.  We'll make this Exhibit 2

11   to this deposition.  All right.  Rebecca, if you'll

12   just go to where we can see the full conversation,

13   please, so that Mr. Parisi can review it.

14             (Exhibit 2 was marked.)

15      Q    (By Mr. Wareham)  All right.  That might

16   be too small on your screen.  I'm not sure.  Are you

17   able to review that?

18      A    Let me see if I have it in printout here.

19      Q    Sure.  Or if you've got -- yeah, 375, or

20   this e-mail, that's fine to review where you're at

21   too.

22      A    Okay.  I have one.  It's a government

23   contractor role excalibur.  Okay.  I've got one

24   from --

25      Q    August 24 of 2020, 2:06 p.m.?

EXHIBIT 10
Page 33 of 113

1       A     Yep.  Actually, this one is a thread that

2   goes even further than that.  So we're going back

3   to -- what's the date?  August 24th?

4       Q     Yep, August 24.

5       A     Okay.  I'll read --

6             MR. GREEN:  Mr. Parisi, does the version

7   that you have have a Bates label on it, a little

8   number on the bottom right-and corner that starts

9   with "US"?

10            THE DEPONENT:  Yes.

11            MR. GREEN:  Okay.

12            THE DEPONENT:  It's US, four zeros, and

13  then it says 378.

14            MR. WAREHAM:  All right.  So -- well --

15  so let's -- let's work through this a little bit.

16            Rebecca, can you zoom out so I can see

17  the actual Bates label we're working with here?  I

18  just make sure we're all on the same page, for the

19  record.  So I've got 376 and 375.  Let's see.

20            Are you able to pull up 378 so we can be

21  on -- Rebecca, so we can be on the exact same page

22  as what he has in his hands?  Just a Sec, guys.

23  She's going to pull that up in just a moment.

24            Yeah, actually, probably -- Rebecca

25  pointed out probably a better thing to do is let's

EXHIBIT 10
Page 34 of 113

1    drop this 374 in the chat so that we're referencing

2    the actual exhibit and -- and the Bates number so

3    you can pull it up right there, locally.

4            Does that work for you, Mr. Parisi?

5            THE DEPONENT:  Yeah.

6            MR. WAREHAM:  Great.  Let's do that,

7    Rebecca.  Let me find the chat here.  Chat.  Here we

8    go.

9            THE DEPONENT:  Okay.  I'm in the -- I'm

10   in the chat.  I don't see any documents.

11           MR. WAREHAM:  Okay.

12           THE DEPONENT:  Okay.  Now I do.

13           MR. WAREHAM:  Okay.  Great.

14           THE DEPONENT:  374.

15   Q    (By Mr. Wareham)  All right.  Are you

16   able to review that now, Mr. Parisi?

17   A    I'm still opening it.

18   Q    Okay.  No worries.  No worries.  No rush.

19   A    Okay.  Finally, it opened.

20   Q    All right.

21   A    Okay.  I now have it up on my screen

22   here.

23   Q    Okay.  Great.

24   A    So which part did you want --

25   Q    Yeah, would you just remind -- mind

EXHIBIT 10
Page 35 of 113

1   reviewing the first e-mail and -- chain there at the

2   bottom, working from the bottom to the top, and let

3   me know when you're -- when you're done reviewing

4   that.

5          A    Okay.  Okay.

6          Q    So can you describe, generally, what the

7   issue is that -- that Tanya is describing here?

8          A    Well, it appears that Tanya is concerned

9   that Dr. Roysdon is using -- basically has -- has

10  two hats that he's wearing.  It appears that he is a

11  government official for the National Security Agency

12  and, at the same time, he is a subcontractor.

13              And from what it says in the e-mail --

14  and it's starting to jog my memory too.  The

15  question was whether or not he could use the

16  security clearance that was furnished to him from

17  the National Security Agency to do National Security

18  Agency work on -- with -- with his other hat, on as

19  a subcontractor, you know, in -- in a -- in a

20  for-profit-type gig.

21              This is not an uncommon situation.  We

22  see it all the time with reservists.  So we have --

23  it's -- it's not uncommon to -- to see -- like if I

24  were a reservist, I might have a top secret SCI

25  clearance as a civilian, but as a -- as a reservist,

EXHIBIT 10
Page 36 of 113

```
1    I'd only have the secret and I wouldn't be able to

2    use my civilian SCI clearance to go into our SCIF

3    here.

4              So I know there's -- there's some

5    flexibility.  Different agencies look at that

6    different ways, but in Rome, pretty much your

7    clearance sticks with your role and it seems like

8    Tanya was a little bit concerned that maybe a

9    clearance that was issued for -- for reasons other

10   than work on this subcontract was being used for

11   work on this subcontract.

12             And, moreover, the DD 254 did not have --

13   did not authorize whatever level that particular

14   clearance was, which, from what I understand, I

15   think was a very specific clearance, program level

16   clearance that you -- not just your general

17   secret -- top secret stuff.

18   Q    Okay.  So kind of taking one step back on

19   this issue, can you describe like in the -- in the

20   hypothetical you described about like the reservist

21   having a clearance or somebody else having a

22   clearance to their government role and then as a

23   contractor, how is it supposed to work?

24             How is the process supposed to play out?

25             MR. GREEN:  Object to form.
```

EXHIBIT 10
Page 37 of 113

1        A       I'm not a security person.  The way that

2    the process works out from my standpoint is if we

3    see something that we've been told is a shade of

4    grey or out of the ordinary, we contact a

5    professional.  And in -- in regards to security, we

6    would contact one of our -- our special security

7    officer, likely, or we would contact our -- if -- if

8    we thought there was -- there was an issue of

9    double-dipping or something like that going on, our

10   acquisition attorney.

11            So that's the -- what happens from there,

12   you know, we're not a part of.  That -- that gets

13   taken care of by the lawyers, the security people,

14   et cetera.  We just -- we just raise the flag and

15   have them look into it.

16       Q       So just what you've observed, you know,

17   for example, in the hypothetical, you said it

18   happens all the time.

19            Do -- using your hypothetical, in the

20   reservist-to-contractor scenario, do -- are there

21   two clearances issued?

22            MR. GREEN:  Object to form.

23       A       As far as I know, here in Rome, yes.  If

24   somebody is a -- or if somebody is a civilian or a

25   contractor and is also a reservist, I believe that

EXHIBIT 10
Page 38 of 113

1    they are -- and I'm not 100 percent sure on this,

2    but I believe that they are issued security

3    clearances in both of their forms and they're not

4    always the same levels.

5        Q    Okay.  And I'm just asking for your

6    recollection or what you've seen.  No worries there.

7             Have you ever seen it where one clearance

8    has been used in both roles?

9        A    I don't think so.

10       Q    Okay.  Can you -- go ahead.

11       A    I don't think so.  I have heard the staff

12   in our special security office, though, you know,

13   making a point to people that come in in their

14   reservist uniform that -- "Hey," you know, "when

15   you're wearing that hat, you need to have" -- you

16   know, "we need to make sure that we get you right

17   into the right ticket so that you can be in here as

18   a military person versus as your contractor role,"

19   so...

20       Q    And for an issue like what is described

21   in this August 24 e-mail, what would be Tanya's role

22   with respect to an issue like this?

23       A    So Tanya is the COR.  Based on the

24   verbiage in the e-mail, it looks to me like somebody

25   from the Life Cycle Management Center contacted her,

EXHIBIT 10
Page 39 of 113

1    probably on the telephone because I don't see an

2    e-mail under it, saying, "Hey, we've got" -- "we

3    have concerns.  We're working a very sensitive

4    program down here, which one of your subcontractors

5    has access to as a government employee, and,

6    however, he's" -- "he's using that access now as a

7    for-profit contractor to pretty much come into these

8    these" -- "to" -- "to meetings that are very highly

9    classified and we're not sure if that's" -- "number

10   one, if that's okay from a security standpoint, and,

11   number two, if that's the intention behind why NSA

12   wanted him to have this clearance."

13           So I -- I think that that's likely the

14   conversation that -- that occurred.  And then Tanya,

15   as the COR -- I was probably on travel that week --

16   took all -- took -- took the notes as necessary and

17   forwarded them over to it looks like our acquisition

18   attorney and said, "Hey, Bill, what do" -- you know,

19   "what do we do with this?  This is all the notes

20   that I have.  Do you see a problem or don't you see

21   a problem," so...

22       Q    And on this e-mail, who is John Marks?

23       A    John Marks is -- his role on this

24   particular e-mail is liaison -- we call them -- all

25   I know is liaison officers for the Air Force

EXHIBIT 10
Page 40 of 113

```
 1    Research Lab information director in Rome, down in
 2    San Antonio.
 3              So he -- and he ironically worked for the
 4    same organization, Life Cycle Management Center,
 5    when he was active duty, but we -- AFRL specifically
 6    hired him because he was active in the community.
 7    He was a -- and we decided we needed, you know,
 8    boots on the ground, somebody that actually lives
 9    down there that works for us to help transition our
10    technology.  So he was the liaison down in San
11    Antonio at the time, AFRL.
12    Q      And do you know why -- do you know why
13    Captain McVay would be included in this e-mail?
14              MR. GREEN:  Object to form.
15    A      I don't know.  I would -- I would -- I
16    would have to speculate and I'd prefer not to.
17    Q      That's okay.  Yeah, if you don't know,
18    you don't know.  To your recollection, was it common
19    to see Captain McVay included on e-mails with COR
20    discussions?
21    A      Yes.
22    Q      And why is that?
23    A      Because we're -- we work in the same
24    area.  So it's -- and the programs that we work on,
25    a lot of times, the intention is for them to
```

**EXHIBIT 10**
**Page 41 of 113**

1    converge, to be integrated together to make a larger

2    system.  So it's usually -- there's usually a lot of

3    discussion between CORs and different agencies that

4    are working complementary projects or different

5    parts of the same project.

6        Q    Can you tell me towards the top of 374

7    who Richard Bremer is?

8        A    Richard Bremer at -- is a contracting

9    officer, as far as I know.  He was a -- he was

10   active duty contracting officer at the Life Cycle

11   Management Center as a major, then he retired and

12   retained the job as a contracting officer, civilian.

13       Q    And are you familiar, generally, with

14   what his role specifically was at Air Force Life

15   Cycle Management Center?

16       A    As far as I know, he was -- he was a

17   warranted contracting officer and the branch -- I

18   believe the branch chief of their contracting

19   branch.  So I did not -- I did not have very much

20   interactions [sic] with him because we tend to work

21   off of our own contracts.

22           So the -- the only interactions I think

23   I've had was when he called asking for advice on

24   putting out solicitations, things of that nature.

25       Q    Do you know if he had any

EXHIBIT 10
Page 42 of 113

1   responsibilities vis-à-vis security clearances?

2       A       That, I don't know.  So it's not uncommon

3   for personnel to have additional roles.  So he may

4   have been what we call a SASM in addition to being a

5   contracting officer, security agency -- staff agency

6   security manager.  He may have done something like

7   that.  I don't know.

8               MR. WAREHAM:  Okay.  All right.  Let's --

9   Rebecca, let's move to 383.  Actually, this is

10  another one in that chain.  Let's just go ahead and

11  go to 385.  All right.  Let's -- if you wouldn't

12  mind, sir, this will be Exhibit 3, for the record,

13  Bates 385 through -- when -- does it end at the top,

14  Rebecca?  385 through -- I'm sorry.  I can't read

15  that on the screen.  Let me pull it up here so I can

16  be a little more accurate.

17              Great.  So that's going to be -- for the

18  record, Exhibit 3 is 385 through 387.  Let's --

19  let's just start at the bottom.

20              (Exhibit 3 was marked.)

21      Q       (By Mr. Wareham)  Are you able to

22  download that, sir, and do a similar local review?

23      A       Yes, so we're on -- what -- 386?

24      Q       Sir, just let us know when you're --

25  whenever you're done reviewing that.  No rush.

**EXHIBIT 10**
**Page 43 of 113**

```
 1        A     Do you want me to review the whole thing
 2   or just a --
 3        Q     You know, just for --
 4              (Simultaneous speaking.)
 5        Q     -- sake, let's take a minute and you
 6   can -- can review the whole thing and --
 7        A     I'm reading the --
 8        Q     Yeah, just go ahead and review 385
 9   through 386.  387 is on there, but it's just a
10   signature.
11        A     Excuse me.  Okay.  I read through the
12   whole thing.
13        Q     So just starting at the bottom, regarding
14   the e-mail that says, "Here's a copy of the letter
15   on NIPR."  Do you recall what letter Captain McVay
16   is referencing?
17        A     No.
18        Q     All right.  We'll get that to you here
19   shortly, just to see.  So looking at the e-mail
20   above it -- the e-mail chain above it, in which
21   you're included, date/time group around August 24,
22   2:25 p.m.  Actually, let me make this a little
23   easier.  Let's just go to your response here around
24   August 25, 2020, at 1:00 p.m.
25              Was that -- do you recall giving that
```

EXHIBIT 10
Page 44 of 113

1    response?

2        A    No, I don't recall giving the response,

3    but --

4        Q    Fair.  Fair.

5        A    -- I'm sure I -- and it's written in my

6    vernacular, so, yes.

7        Q    All right.  That's the next question and

8    that's a totally fair answer.

9             Do you have any -- do you -- do you

10   believe that this is something that you wrote?

11       A    Yes.

12       Q    Okay.  So I understand -- well, what do

13   you understand the -- the conflict of interest that

14   you're referencing to Tanya Macrina, what do you

15   understand that conflict of interest to be, as she's

16   describing it?

17       A    So, this one -- and -- and I think, as we

18   dug into this, again, going back through e-mails --

19   and -- and, again, this is not an uncommon

20   situation.  We see this from time to time.

21   Contractors can play different roles.  They can be

22   SETA contractors, like I mentioned, system

23   engineering technical advisory.

24             That's where they're actually advising

25   the government how to -- how to pursue programs,

EXHIBIT 10
Page 45 of 113

1    what -- what technical solutions to pursue, one over

2    the other.  They -- they can even be involved in

3    source selections.  So that's -- that's a SETA

4    contractor.

5              Then you have your development

6    contractor.  They're like the vendor.  They're the

7    ones that are bidding on things.  So we always have

8    to make sure that when we -- when a -- when an

9    external agency asks us to fund a -- asks -- asks if

10   they can fund a contractor or a subcontractor under

11   one of our contracts, we ask them what they're going

12   to be performing and it's -- many times, they say,

13   "Well, they're going to be giving us day-to-day

14   advice," and we say, "No, you can't do that because

15   they would be basically giving advice to you to fund

16   the contract that they're on."

17             Now, this takes it to a next level.  This

18   is -- this individual appeared to be a US government

19   official at the National Security Agency who had --

20   according to what I'm reading here, if he had -- if

21   he had influence over how money was being allocated

22   to specific cyber solutions, he was working as a

23   subcontractor under one of the contracts that was

24   building one of the solutions, that would be a

25   really big problem.

EXHIBIT 10
Page 46 of 113

1          I mean, that -- we can't -- we can't have

2     government people funding themselves or even in a

3     position where they can fund themselves with a

4     contractor hat on.  So it looks like I was digging

5     into this, saying, "Is that the situation here?"

6          It did not appear as though it was, based

7     on the information that I was given.  If you scroll

8     up, then we ended up getting a -- the response back

9     saying that, "We do believe that that is happening,"

10    so...

11    Q     Sure.  So let's unpack that a little bit.

12          Can you help me understand what AQL means

13    in your e-mail on 385?

14    A     That's the Secretary of the Air Force

15    Office of Acquisitions for Special Programs.

16    Q     Okay.  And what information within this

17    e-mail chain led to you analyzing Dr. R's opinion

18    around advising AQL?

19    A     I don't remember.  There was probably a

20    phone call because I don't see -- I don't see AQL

21    earlier in the thread.

22    Q     Okay.  Do you -- can you tell us what

23    ACT 2 -- ACT 2 is?

24    A     That's an IDIQ contract, indefinite

25    deliverable indefinite quantity contract, that AFRL

EXHIBIT 10
Page 47 of 113

1    issued and was executing at the time.  The -- the

2    task order at-hand was awarded to Global InfoTek.

3    And then it turns out that this -- this -- it looks

4    like this was subcontracted under that, but ACT 2 is

5    the name of the overarching IDIQ contract.

6        Q    Okay.  And do you recollect what

7    information you were operating on that indicated

8    that Dr. R may be related to the ACT 2 contract?

9        A    Yes, I believe it was because we were

10    contacted by HNC and basically notifying us that,

11    "There might be something fishy going on here.  I'm

12    not sure if you're aware of it," but -- and -- and

13    this is kind of weird to have a civilian government

14    employee also working as a contractor.

15            That is -- we see it with the reservists

16    all the time, but that's something that we've never

17    seen before.  So I'm fairly certain that they called

18    us and notified us and we said, "Okay.  We'll get

19    the professionals involved over here because we're

20    not experts."

21            So we have a general understanding of the

22    rules and regulations, as is provided to us in our

23    training and yearly refresher training, so that we

24    can pick out situations that look like, "Okay.  We

25    might have an issue here," but, at that point, we

EXHIBIT 10
Page 48 of 113

1    pushed them up the line to -- to legal office or the

2    policy office.

3        Q    Okay.  Do you recollect who contacted you

4    from HNC with respect to that information?

5        A    I do not.

6        Q    Okay.  Let's see.  So help me kind of,

7    in -- in maybe more plain language, understand why

8    you didn't see a conflict of interest in what is

9    described in this e-mail chain?

10       A    Based on what I saw in the e-mail chain,

11   it did not appear as though Dr. Roysdon was in a

12   position at NSA where he had influence over funding

13   that could go to the specific project that he was

14   working as a subcontractor on.

15           My understanding, by looking at this

16   e-mail, is that -- yeah, my understanding by looking

17   at this e-mail was he was working in some complete

18   different area at the National Security Agency as

19   a -- as a civilian and he was -- he was wearing a

20   different hat in his subcontractor role.

21           So that's why I specifically wrote, I

22   think, "I'm still not seeing where a conflict of

23   interest lies on this one," but then I clarified

24   that, you know, if he's in the position to advise

25   AQL as -- as a government employee -- an NSA

EXHIBIT 10
Page 49 of 113

1    employee to fund a program he's working as a

2    contractor on, that would be a conflict of interest.

3            So up to this point, I was -- it did not

4    appear to me that that was happening.  Now, that

5    whole thing changed with the next e-mail that

6    Captain McVay said.

7        Q    And how did it change?

8        A    Well, the e-mail basically said -- well,

9    it does say, it says, "Tom, he was in multiple

10   meetings over the last year to influence the PEMs

11   funding decision where he stated that he was an" --

12   "an NSA employee, not a contractor."  That's another

13   issue too because he'd be misrepresenting himself if

14   he's there as a contractor saying that he's there as

15   an NSA employee.

16           So that wasn't the concern, though.  The

17   specific concern was that Captain McVay led me to

18   believe that he's personally seen this individual,

19   sitting in meetings, giving advice to PEMs, who are

20   the ones who move funding from the Pentagon onto

21   projects, you know, and it's with a subcontractor

22   hat on and claiming that he was -- he was doing it

23   as an NSA employee, specifically related to the

24   tasking that he was doing.  So that -- that is what

25   caused an issue.

EXHIBIT 10
Page 50 of 113

1          Q      Okay.  And what is a PEM?

2          A      Program element monitor.  They sit above

3    the program managers.  Program managers usually sit

4    in an agency.  PEMs, at least in the Air Force, sit

5    at the Pentagon.  They are in charge of advocating

6    the program to the -- to the higher-ups, the Office

7    of the Secretary of Defense, the -- also the

8    other -- other personnel within -- within the Air

9    Force, Secretary of the Air Force, and it's their

10   job to monitor expenditures, things of that nature.

11          In this particular case, I believe that

12   the PEM at AQL also had some program management

13   responsibilities.  So, typically, the PEMs that I

14   work with, they just make sure that the money moves

15   and that we get the congressional justifications

16   that we need in on time.

17          My understanding is, like I said, I -- I

18   think this particular PEM is a little bit more

19   hands-on, working with different agencies to

20   determine how the funds are going to get doled out.

21          Q      Okay.  And do you know who this PEM was

22   that he's referencing?

23          A      If -- I -- I think it was Danny Burgard

24   [phonetic], but it's five years ago.  So I don't

25   know if he was in that position at the time or not.

**EXHIBIT 10**
**Page 51 of 113**

1    Q    Would you happen to know any other names

2    in that time period if it's not Danny Burgard, who

3    would have been the PEM?

4    A    No, I didn't -- I never worked very

5    closely with AQL.  I worked closely with AQI, which

6    is the Acquisition Office for Information Dominance.

7    So the AQL was -- was kind of a whole 'nother group

8    of people outside of my purview.

9    Q    Okay.  In the event of a hypothetical

10    where Dr. Roysdon advises on funding decisions

11    around other programs not including ACT 2, would you

12    see a conflict of interest?

13         MR. GREEN:  Objection to form.

14    A    Yeah, I'm not going to -- I -- I don't

15    want to -- I can give you an answer.  I'm not going

16    to answer a hypothetical, but I still can answer

17    your question.  If Dr. Roysdon was doing any kind of

18    advising underneath our ACT 2 contract as a

19    subcontractor, he should not have been because

20    that's outside of scope of the contract.

21         The scope of that contract is to develop

22    technology, it's to write code and things of that

23    nature.  It's not what we call A&AS, administrative

24    and advisory services contract.  That's outside the

25    scope of the contract.  So, again, it's not a

EXHIBIT 10
Page 52 of 113

1    hypothetical.  That's just the rule.

2         Q    So I just want to understand the limits

3    of the -- the conflict of interest and, you know, as

4    you viewed it and how it changed.  So as I'm

5    understanding this e-mail, the -- it's the -- the

6    problem is that Dr. Roysdon was under the AC 2 --

7    ACT 2 contract; is that right?

8         A    The problem -- the problem that we were

9    trying to -- what we were trying to discover,

10   whether or not it was a problem, was threefold.  It

11   was, A, he's an NSA employee and is he using his

12   government influence as an NSA employee to steer

13   money over to basically his own LLC through --

14   through a subcontract.  That was the first thing

15   that we wanted to make sure was not happening.

16             The second thing we wanted to make sure

17   was not happening is if he is providing advice to

18   PEMs in this -- in these meetings, like Captain

19   McVay said, he should not have been because that's

20   outside of scope of the contract.  We pay them to

21   develop software, not to attend meetings and try to

22   influence Pentagon level officials.  So that would

23   have been outside of scope and, also, would have had

24   the conflict of interest of him, once again,

25   providing advice to somebody outside of -- outside

EXHIBIT 10
Page 53 of 113

```
 1    the scope of his contract to basically further his
 2    own contract.  So that -- that's the concern that we
 3    were trying to uncover.
 4             And, initially, from going through this
 5    e-mail, it didn't look like there was -- it looked
 6    like that there were enough barriers in between that
 7    it wasn't too much of an issue until, you now,
 8    Captain McVay chimed in and said what he -- what he
 9    said in the e-mail, that this -- this, in fact, is
10    happening, there's advisory services being -- being
11    provided.
12        Q    Okay.  So help me understand then why are
13    we referencing -- or why are you referencing ACT 2
14    specifically?
15        A    Let's see what -- in his job with NSA,
16    was he ever in a position to fund or influence
17    funding that could be obligated to the ACT 2
18    contract -- that -- I -- I -- I don't know how to
19    explain it more clearly than -- that what I have,
20    but the question is, you know, verbatim, what I
21    wrote.  In his job with NSA, was he ever in a
22    position to [audio disruption] ACT 2 contract -- he
23    was a [audio disruption] -- the answer was yes to
24    that.  Then we got -- we have a conflict of interest
25    [audio disruption] --
```

EXHIBIT 10
Page 54 of 113

1               THE VIDEOGRAPHER:  Guys, I'm losing the

2     witness.  I think he's --

3               MR. WAREHAM:  So am I.

4               THE VIDEOGRAPHER:  Okay.  It looks like,

5     from what I see, that he's missing bandwidth

6     sometime and I'm not sure why.

7               MR. WAREHAM:  Okay.  Mr. Parisi,

8     you're -- you're occasionally dropping out on -- on

9     some bandwidth that's affecting your transmission

10    here.  I don't know if there's anything you can do

11    that would improve it?

12              THE DEPONENT:  Yeah, I can try to see if

13    I can get on the visitor net here.

14              MR. WAREHAM:  Here, I think we should --

15    we're -- we're past an hour anyway.  Let's briefly

16    take a 10-minute, if there's no objection, and we

17    can figure that piece out.

18              MR. GREEN:  No objection.  I think that's

19    fine.

20              MR. WAREHAM:  Great.

21              THE VIDEOGRAPHER:  The time is 11:26.  We

22    are going off the record.

23              (A break was held off the record from

24    11:26 a.m. to 11:40 a.m.)

25              THE VIDEOGRAPHER:  The time is 11:40.  We

EXHIBIT 10
Page 55 of 113

1    are back on the record.

2         Q    (By Mr. Wareham)  So you were giving --

3    the answer that we lost is essentially related to,

4    you know, why were you describing ACT 2 here.

5              Can you give that answer again?

6         A    So, yeah, I said -- I -- I was trying to

7    whittle down the situation and determine what

8    situation we were in and what the repercussions

9    would be or the results of ways forward.  So,

10   specifically, I wrote, "In his job with NSA, was he

11   ever in a position to be" -- or, "to fund or

12   influence funding that could be obligated to the

13   ACT 2 contract?"

14             He was working as a subcontractor under

15   the ACT 2 contract.  So if, in any capacity,

16   whatsoever, government, contractor, whomever, if he

17   was in a position where he could influence the --

18   and control the obligation of money to that

19   contract, he would be funding himself.

20             So that -- that is why -- I said he --

21   you know, he shouldn't be on the ACT 2 contract at

22   all if he's in a position as a government person

23   where he can send us money for that contract.

24        Q    Understood.  Do you happen to know what

25   projects at Air Force Life Cycle Management Center

EXHIBIT 10
Page 56 of 113

1    specifically related to the ACT 2 contract?

2              MR. GREEN:  Object to the extent that

3    calls for a discussion of national security

4    information.

5              MR. WAREHAM:  Mr. Green, we haven't

6    really had this record before.  Are you asserting

7    the state secrets privilege?

8              MR. GREEN:  To the extent the question

9    would implicate classified information.  I'm not

10   sure it does and I don't think you intended it to.

11       Q    (By Mr. Wareham)  Okay.  All right.

12   Great.  To the extent that it doesn't involve state

13   secret privilege, could you answer that question?

14       A    What was the question again?

15       Q    Do you know what projects at Air Force

16   Life Cycle Management Center, at the time, related

17   to the ACT 2 contract?

18       A    No, not off the top -- not anything that

19   I can discuss.

20       Q    Okay.

21       A    No, and --

22       Q    Go ahead.

23       A    -- I'm not 100 percent sure.  There could

24   have been one or two unclassified contracts that

25   were being worked, but for the most part, the -- the

EXHIBIT 10
Page 57 of 113

1    work being done was classified.

2        Q    Thank you.  So the phrase in that e-mail

3    on -- that we've been discussing, which is

4    Bates 385, "Who he identified as has no bearing on

5    this whatsoever."  What does that mean?

6        A    Okay.  I don't see it -- where I said

7    that.  I'm not seeing where it says that.

8        Q    Oh.  Sorry.  At the top on -- of -- of

9    385, e-mail from you at 6:23:27 p.m., the time of

10   the e-mail, the final sentence --

11       A    Okay.

12       Q    -- "Who he identified as has no bearing

13   on this whatsoever."

14       A    "If he was in a position as a government

15   person to influence funding for obligation to ACT 2,

16   he should not have been working under ACT 2 at all.

17   Who he identified as has no bearing on this

18   whatsoever."  So the point that I was making there

19   is this started as a concern amongst some coworkers

20   about where he got his security clearance from and

21   whether he should have been using his security

22   clearance for one role versus the other.

23            And I said, "We've got a more serious

24   issue here, if it's" -- "if it's indeed the case."

25   So we got into the conflict of interest thing and

EXHIBIT 10
Page 58 of 113

1    that's basically when I said it doesn't matter if --

2    if he's in a position, as a government employee, to

3    influence funding that's going to the contract that

4    he's a sub under, he should not be working under

5    that contract.  It doesn't matter if he says that

6    he's identifying as a contractor that's -- that's

7    providing some kind of advisory services.  And let

8    me rephrase that.

9              Again, if he -- if he was in a position

10   as a government person to fund the contract that

11   he's working on with his own government authority,

12   to put money into his own pocket is what I meant by

13   that, we don't even need to have the discussion of

14   who he's identifying as at any particular moment.

15   You can't be in a situation where he is a government

16   employee, you use your federal authority to

17   basically give yourself money.

18      Q     And to your recollection, did you have

19   any facts besides this e-mail that led you to

20   believe that he was -- that Dr. Roysdon was

21   impacting funding improperly?

22      A     I don't know.  There could've been other

23   e-mails.  However, this -- at this point, and I

24   think that you've seen in other e-mails, we got to

25   the point where it's, "Okay.  Well, we're getting a

EXHIBIT 10
Page 59 of 113

1  couple of different stories here and there's a shade

2  of grey and it's time now for our procurement

3  attorney to" -- "to get involved and to take a look

4  at this," because it's -- it's risen to the point

5  where it's outside of our -- our level of expertise

6  as program managers to -- to jump into.

7          So -- and I believe the other e-mails you

8  see, that's exactly what we did, is we ended up

9  going to Mr. Bill Whitman, our acquisition attorney,

10  and he -- he took it over from there.

11  Q    Okay.  And we'll get to that next step in

12  a second.  I wanted to go back.  So at the bottom of

13  this e-mail chain, starting at, "All," is --

14  specifically, the text is on 386, Captain McVay

15  says, "Here's a copy of letter on NIPR."

16          Do you see that?

17  A    Yes, I did see that.

18  Q    Okay.  I'm going to be dropping -- or

19  Rebecca will drop what has been previously provided

20  to us as Bates 424 into the chat window here and

21  that will be the next exhibit in order, which is

22  Exhibit 4, I believe.

23          (Exhibit 4 was marked.)

24  Q    All right.  Would you mind downloading

25  that and reviewing it locally, like we've done

EXHIBIT 10
Page 60 of 113

1   previously, so we can talk about it?

2       A    Sure.  Okay.  Let's see here.  Okay.

3   I've read it.

4       Q    All right.  Do you recollect whether or

5   not this letter was the letter that was forwarded as

6   the start of that chain?

7       A    I don't.

8       Q    Do you recall ever seeing this letter

9   before?

10      A    I don't recall seeing this letter, no.

11      Q    Okay.  Did the information contained in

12  that letter inform anything that you were just

13  discussing with respect to the conflict of interest

14  you described?

15      A    Well, it certainly appears as though

16  within -- within the opinion of the Life Cycle

17  Management Center, that a conflict of interest

18  existed.  That didn't influence anything that -- at

19  this point, I believe, this was all forwarded up to

20  our -- to our legal office to -- to take a look at.

21  So other -- other than passing it along to legal,

22  this -- this didn't result in any action on our

23  behalf.

24           MR. WAREHAM:  Okay.  Rebecca, going to

25  388, e-mail set, if we could drop that in for him to

EXHIBIT 10
Page 61 of 113

1    be able to review, and this will be Exhibit 5.

2              (Exhibit 5 was marked.)

3        Q     All right.  And if you wouldn't mind

4    downloading that, sir, and reviewing it locally and

5    letting us know when you're done.

6        A     Yep.  Okay.  I read this and I've...

7        Q     Do you recall -- do you recall receiving

8    this?

9        A     I don't recall receiving it, but I have

10   written many e-mails to this extent where a -- one

11   of our government customers, employees, et cetera,

12   you know, they're not happy with something and they

13   come across and, you know, go overboard by saying

14   things along the lines of, you know, "They're" --

15   "they're not working the amount of hours they're

16   charging," or, "They're working for two different

17   organizations at the same time, one of them being a

18   government."

19              And I always tell them, "Whoa.  Back up a

20   minute because I don't think you realize the

21   seriousness of what you're saying.  So, basically,

22   you're accusing them of felony fraud and, at this

23   point, if we think that's true, I have to go over to

24   our Office of Special Investigations and report it

25   to one of our special agents to investigate.  So

EXHIBIT 10
Page 62 of 113

1    you'd better be darn sure that you really mean what

2    you're saying if that's" -- and most of the time,

3    they come back and say, "Well, I guess we didn't

4    really know for sure.  We were just assuming that."

5    So that is the reason for my tone in the e-mail.

6        Q    Okay.  And -- well, help me understand a

7    little more common language.  What is -- what is the

8    problem that Captain McVay is explaining to you with

9    respect to receiving government pay while acting as

10   a subcontractor?

11       A    Well, my understanding is he is -- the --

12   the insinuation, the way that I interpreted it, was

13   he was basically charging time to the government for

14   work that he was not doing to the government for the

15   government because he was working as a subcontractor

16   and for his own personal company.  That's the way

17   that I interpreted what he was saying.

18            And, again, I told him, "You'd better

19   make darn sure this is true because if it is, an

20   investigation is going to pursue.  We don't take

21   fraud lightly."  So that was my understanding of --

22   of what he said in the e-mail below.

23       Q    And do you know this to be your e-mail

24   response that you sent?

25       A    Yes.

**EXHIBIT 10**
**Page 63 of 113**

1      Q     When he is discussing in his -- in his

2   middle portion of his e-mail that, "I'll have to

3   tell you about on another network."

4           What networks is -- are -- is he

5   describing?

6      A     He's describing a classified network.   It

7   could be one of many.

8      Q     So long as the answer is unclassified,

9   can you please describe what networks were involved

10  in your communications with Captain McVay?

11     A     Probably -- most likely JWICS, Joint

12  Worldwide Intelligence Communication System, and/or

13  top secret VoIP phone, voiceover IP.   Those are

14  typically -- unless we have to go even higher than

15  that, those are typically the easiest for everybody

16  to access and we -- that -- that's usually what --

17  what we tend to -- when we go to the high-side,

18  those are usually the networks that we use.

19     Q     Are there any other networks besides

20  those that you interacted with Captain McVay on?

21     A     I don't believe so.

22     Q     Do you -- do you know the term SIPR?

23     A     I do.

24     Q     All right.  Did you ever, to your

25  recollection, interact with Captain McVay on SIPR?

EXHIBIT 10
Page 64 of 113

```
1       A       No.

2       Q       Okay.

3       A       I'm not -- I don't have a SIPR account.

4       Q       Okay.

5       A       I find that anything -- anything I can do

6   on SIPR, I can do on JWICS and JWICS is much more

7   user-friendly.  So that's why we tend to just go

8   straight to the TS/SCI level.

9       Q       Not disclosing what those communications

10  are, when you say anything you can do on SIPR, you

11  can do on JWICS, what does that mean?

12      A       The information that is -- the -- the

13  highest level -- security level of information that

14  you can -- you can put on a SIPRNet is secret.  With

15  JWICS, you -- you can put -- you can still

16  communicate at the secret level, but you can also

17  communicate at the top secret level, as well as

18  several different special compartmented information

19  compartments.

20              So, typically, again, if we're going to

21  have a classified discussion, even if it's at the

22  secret level, we'll usually take it to JWICS.  It's

23  easier to use, it's more user-friendly, and if

24  somebody needs to respond with something that is a

25  higher level, that's not an issue.
```

**EXHIBIT 10**
**Page 65 of 113**

1    Q    Okay.  If I'm understanding you

2    correctly, and correct me if I'm wrong, you will --

3    you would communicate secret level information on a

4    higher level JWICS network; is that right?

5    A    I have done that, that -- that is

6    correct.

7    Q    Did you ever include any unclassified

8    information on a JWICS network?

9    A    Well, yes, there is -- we -- we portion

10   mark e-mails on -- on JWICS.  So every single

11   paragraph has a letter in parentheses before it

12   which says what the classification level of that

13   specific paragraph is and there is usually a couple

14   of them that have a "U" in front of them.  Sometimes

15   it's, "Long time," you know, "need to catch up

16   sometime.  Hope everything is well," with "U" --

17   with a "U."

18        And then the next one will have, you

19   know, a "TS" or an "S" and, "I need to know the

20   specific information about this effort you're

21   working because we've run into a roadblock here."

22        So, yes, there's -- there's always

23   unclassified information intermixed with classified,

24   but usually it's not relevant because it's much

25   easier to access unclassified information on what we

EXHIBIT 10
Page 66 of 113

1    call the low side, the NIPRNet network.

2              So if we're going to get into -- usually

3    specifics about funding, about forms, about

4    schedules, things of that nature that are not

5    classified, we usually do that on -- on NIPR.  So

6    if -- if we're on JWICS, we're on there for a

7    reason.

8       Q    All right.  And, so, if I'm

9    understanding, kind of what you just said, is -- is,

10   at times, on JWICS, there will even be informal

11   communications, like, "We should hang out

12   sometime" -- or -- or I don't want to put words in

13   your mouth, but how you were describing that, just

14   informal communications?

15             MR. GREEN:  Object to form.

16      A    So just, again, a salutation, you know,

17   making small talk.  We all work together in the same

18   community and sometimes, you know, we haven't seen

19   each other in months and rather than just jump in

20   and say, "I want something from you," the polite

21   thing to do is say, "Hey, hope all is well," you

22   know, wherever, "all is" -- "all is going great

23   here.  I've got a question for you," and then the

24   next paragraph will start with the -- with the

25   actual classified information.  I mean, it's just

EXHIBIT 10
Page 67 of 113

1    common courtesy, in my mind.

2        Q    Yeah, of course.  To your recollection,

3    with respect to this case, have you been asked to

4    search any of your communications on JWICS?

5        A    I have not specifically been asked to --

6    to search communications on JWICS, no.

7            MR. WAREHAM:  Okay.  Let's go to 395,

8    Rebecca, if you'll drop that in, please.  This will

9    be Exhibit 6.

10            (Exhibit 6 was marked.)

11       Q    All right.  Would you mind downloading

12   that again and reviewing and let me know when you're

13   done.

14       A    Okay.  So I already read that one.  Well,

15   I can try to get into the SSO to see if there's a

16   phone available before -- I'll leave today or

17   tomorrow.  Okay.  So it looks like Tanya had a phone

18   call with him.  Tanya, yeah, if you could, that

19   would be great.  Hi, Will.  Did you send along the

20   memo?  Okay.

21       Q    Do you have any recollection of what memo

22   Tanya is discussing here?

23       A    I don't have any recollection, no.

24       Q    All right.

25       A    I'm -- I'm -- I'm assuming that -- that

EXHIBIT 10
Page 68 of 113

1    he -- he's referring to the memo for record that --

2    that you just showed me as one of the exhibits.

3         Q    But you don't have any actual knowledge

4    of that?

5         A    No, I don't.

6              MR. WAREHAM:  Going to 400, Rebecca, if

7    you can do the same process.  This will be

8    Exhibit 7.

9              (Exhibit 7 was marked.)

10        Q    So if I'm not -- oh.  Sorry.  I don't

11   mean to jump the gun if you're not done.

12        A    I'm reading Bill's response right now.

13        Q    Okay.  Go ahead.

14        A    An employee has an official

15   responsibility to a program to -- okay.  I read it.

16        Q    All right.  So who is Mr. Whitman?

17        A    Mr. Whitman was our Acquisition Attorney

18   for Air Force Research Lab Information Director at

19   the time.

20        Q    Did you recall -- well, actually, is your

21   name on any of the e-mails on 401 or 402?

22        A    Yes.

23        Q    Do you recall receiving these?

24        A    No, no, in fairness, I -- I receive about

25   300 e-mails a day and respond to usually about 100

EXHIBIT 10
Page 69 of 113

1    of them.  This was five years ago.  So, I mean,

2    it's -- I -- I couldn't tell you some of the

3    e-mails, you know, from -- from a week ago, you

4    know, after I -- because I -- I did more than a

5    1,000, so...

6        Q    Completely understand.  I -- I live that

7    life as well.  So to be clear, when you've

8    discussed, "We need" -- previously -- and -- and --

9    and I'm not putting words in your mouth, but when we

10   discussed previously in this deposition, you said,

11   "We need to elevate this to our attorney," is this

12   Mr. Whitman that you were referring to?

13       A    Yes.

14       Q    Okay.  And if I'm not mistaken, he takes

15   the position that, while ugly, that it's not a

16   problem contractually?

17       A    That -- that's the way that I read it

18   too --

19       Q    Okay.

20       A    -- which is why AFRL took no action on

21   this.

22       Q    All right.  And to be clear, "no action,"

23   can you describe that a bit more, like what you mean

24   by that phrase?

25       A    Well, we did not involve the -- we did

EXHIBIT 10
Page 70 of 113

1    not involve the contracting officer, we did not

2    request any kind of formal correspondence to be

3    contractually sent to the company, and we did not

4    request any reprimand.

5              We certainly did not insinuate that the

6    company, either directly or indirectly, that they

7    should terminate the subcontract.  We took our

8    attorney's advice and we said, "Okay.  We'll keep

9    you up to date with what's going on and, in the

10   meantime, we're going to tell our colleagues at LCMC

11   that things appear to be on the up and up here,

12   according to our acquisition attorney."

13   Q    And to your recollection, did you take --

14   did Air Force Research Laboratory recommend any

15   actions to debar Dr. Roysdon?

16   A    Absolutely not.

17             MR. WAREHAM:  All right.  Let's --

18   Rebecca, let's go to 409, which will be Exhibit 7.

19   Same process, if you will.

20             MR. GREEN:  Jason, would it be Exhibit 7

21   or would it be Exhibit 8?

22             MR. WAREHAM:  Oh.  It might be 8.  Did I

23   say 7 last time, Mr. Green?

24             MR. GREEN:  I was tracking the -- this

25   document, 400, was Exhibit 7.

EXHIBIT 10
Page 71 of 113

1              MR. WAREHAM:  Okay.  Great.  Then next in
2    order -- so Exhibit 8.  Thanks for catching that.
3              (Exhibit 8 was marked.)
4        A    Okay.  I read through it.
5        Q    (By Mr. Wareham)  All right.  And we --
6    we probably know why, but do you recollect receiving
7    any of these e-mails?
8        A    No.
9        Q    All right.  Your name is on them, though?
10       A    Yes, my name is on them.
11       Q    Okay.  So in the top of this e-mail, from
12   Captain McVay, can you help me understand what
13   "split his time card" would mean?
14             MR. GREEN:  Object to form.
15       Q    Or, actually, do you know what "split his
16   time card" means?
17       A    No, I don't.  It would be conjecture.
18   I -- I would have to make an assumption.
19             MR. WAREHAM:  All right.  Fair enough.
20   All right.  All right.  Go to 418, if you would,
21   Rebecca, please.  This would be Exhibit 9.  Same
22   process, please.
23             (Exhibit 9 was marked.)
24       A    Okay.  I just -- I read through it.  I --
25   I think that this is the same one we already read

EXHIBIT 10
Page 72 of 113

1    through, but...

2        Q    Yeah, some of it's duplicated, and I

3    apologize, but then they -- they split off to other

4    chains.  So I'm just -- on 418, Tanya is describing

5    going into the SSO.  Can you describe what that is?

6        A    Special Security Office.  It's a SCIF,

7    which SCIF stands for -- S-C-I-F -- stands for

8    Sensitive Compartmented Information Facility.

9    You -- we've been hearing about them on the news a

10   lot lately.  We -- we refer to ours as our Special

11   Security Office.

12       Q    Okay.  And can you tell me why Tanya

13   would go in there to discuss this?

14       A    Because Captain McVay specifically asked

15   her below, "If you're available to talk on a

16   high-side phone today, that'd be preferred."  A

17   high-side phone means a classified -- the phone we

18   can talk classified on.  So that's why she would go

19   into the -- the SSO to talk on the phone because he

20   specifically requested her to and I was on leave,

21   apparently.

22           MR. WAREHAM:  Okay.  Let's go to -- or,

23   Rebecca, let's go to the one we are identifying as

24   non-DoD source in our list.  Rebecca, I don't know

25   that it has a Bates stamp.  All right.  And can we

EXHIBIT 10
Page 73 of 113

1    go through -- this will be -- so I apologize for a

2    lack of Bates number, Mr. Green.  I can identify it

3    as -- for -- for our record as a Monday, August 24,

4    2020, e-mail at 1:52 p.m.  This would be Exhibit 10.

5    If there is one, we couldn't find one with a Bates

6    stamp.  If there is a Bates stamp to substitute

7    later, to clarify on the record, then I'm happy to

8    figure that out, but --

9            MR. GREEN:  Yeah, I believe there is.  I

10   don't know it offhand.

11           (Exhibit 10 was marked.)

12       Q    (By Mr. Wareham)  Okay.  If you wouldn't

13   mind reviewing Exhibit 10, please.

14       A    Okay.

15       Q    Do you -- is your name on this e-mail?

16       A    Yes.

17       Q    Do you recollect receiving this e-mail?

18       A    No.

19       Q    Can you help me understand what T&M and

20   FFP means?

21       A    Time and materials or firm fixed price.

22       Q    All right.  Can you describe the

23   differences of those terms?

24       A    Typically -- so time and materials is

25   exactly what it sounds like; the government and a

EXHIBIT 10
Page 74 of 113

1    performer agree ahead of time that the government

2    will pay for the number of hours that a contractor

3    puts into the work, as well as any materials that

4    the -- that the contractor has to purchase in order

5    to make that happen or as a firm fixed price is more

6    like you or me going out and buying a car.

7              We go -- when we buy a car, they tell us

8    the car is $50,000; the car is $50,000.  You get the

9    car.  It doesn't matter how many hours went into it.

10   So that's -- that's the difference, is are we --

11   were we buying a set -- almost like item, even if

12   that item is -- is some kind of a service or are

13   we -- or are we paying per hour for him.  That's

14   what she's asking.

15        Q    And can you -- do you know why she was

16   requesting the amount of funding that was submitted

17   under the T&M or FFP?

18        A    I do not.

19        Q    And do you know who -- and I'm going to

20   be terrible with his name -- Jayachandran is?

21        A    I know Jayachandran, yes.

22        Q    And how do you know him?

23        A    He was the chief operating officer of

24   Global InfoTek at the time and was my main POC there

25   whenever I had any issues with -- well, I shouldn't

EXHIBIT 10
Page 75 of 113

1    say issues -- for matters dealing with the contract.

2        Q    Okay.  All right.  Thanks for that.

3    Let's go --

4            MR. GREEN:  And just, for the record,

5    Exhibit 10 can also be identified with Bates number

6    US 706 to 07.  I can drop a Bates-numbered version

7    in the chat if we want to just use that one?

8            MR. WAREHAM:  Yeah, that's great.  That's

9    fantastic.  Thank you very much.

10       Q    (By Mr. Wareham)  And just to close the

11   loop on the record, Mr. Parisi, when he drops it

12   into chat, if you'll just confirm that this is the

13   same document we were just referencing so we can

14   close that -- that loop?

15       A    Okay.  Yes, it's the same document.

16           MR. WAREHAM:  Okay.  Great.  All right.

17   Rebecca, moving to 581, which will be our

18   Exhibit 11.

19           (Exhibit 11 was marked.)

20       Q    If you'd please review that, sir.  I

21   appreciate it.

22       A    Okay.

23       Q    All right.  So I apologize in advance.

24   There's a lot of kind of dense information in here

25   that I'm hoping you can help me understand.  Going

EXHIBIT 10
Page 76 of 113

1    to Bates 588, an e-mail from Captain McVay to you

2    and to Tanya, subject is SETA Funding.

3              Can you tell me what SETA funding is?

4         A    A SETA contractor is a systems

5    engineering and technical advisory contractor that

6    would be performing under what we would call an A&AS

7    contract, which is administrative and advisory

8    support.  That's -- basically, they're -- they're

9    there to help the government do a job.

10             In fact, in the -- to make a comparison,

11   in the legal world, I would compare them to a

12   paralegal where the government program manager is

13   out making the decisions, working with people,

14   coming up with strategy, but everything is being

15   documented and filed and taken care of by the SETA,

16   back in -- back in the office.  So that's what a

17   SETA is.  And it's outside of scope of the ACT 2

18   contract, which we went through in this e-mail

19   chain.

20        Q    Okay.  So can you -- and you're kind of

21   on your way there -- help me understand what it

22   means when Captain McVay says, "I'm sending 300k,

23   FY 20 funds for SETA support to ACT 2 excalibur and

24   mercury."  Do you know what that means?

25        A    Yes, ACT 2 is the umbrella IDIQ contract.

EXHIBIT 10
Page 77 of 113

1    There were two task orders under it; one named

2    excalibur and another called -- named mercury.  It

3    sounds like he wanted to fund both of those task

4    orders and he specifically said for SETA support,

5    which I came back with one sentence and said, "It's

6    not within scope."  So that started up the whole

7    rest of the conversation there.

8        Q    And are you able to say further what

9    excalibur or mercury was?

10       A    Yeah, they were both -- their task order

11   is more on the cyber defensive side to help protect

12   military networks from incoming hacking attacks,

13   also to bring together multiple different --

14   different tools that -- that have been developed by

15   AFRL and some of our research partners into the

16   overall systems, basically.  That -- that would --

17   that's the gist of -- of those -- those two.

18       Q    Do you know -- happen to know who was

19   working on excalibur?

20       A    What do you mean "working on"?  Do you

21   mean as a contractor/performer or --

22       Q    Like who was managing that program?

23       A    Myself and Tanya were split duties,

24   managing all task orders under ACT 2.

25       Q    Was Captain McVay involved with either of

EXHIBIT 10
Page 78 of 113

1    those programs, inside of this e-mail, but like

2    in -- in its execution?

3         A    No, other than sending money and saying

4    that he needed some support.  He was not -- now, we

5    may have considered him a technical point of contact

6    or a local point of contact.  Sometimes in San

7    Antonio, particularly with security people, when a

8    contractor shows up and they say, "Who is your

9    government point of contact," and it turns out that

10   we're on the other side of the country, they're

11   like, "No, you need to have somebody here that's

12   your point of contact."

13            So there may -- we may have issued him a

14   letter saying that he was -- he was the on-site

15   technical point of contact for, you know, this 300k.

16   we may have issued that.  We may have not.  I'm not

17   sure.

18        Q    Do you happen to know if excalibur or

19   mercury involved any of Dr. Roysdon's work as a

20   contractor?

21        A    I do not.

22        Q    Can you tell me what MIPRs mean on

23   Page 587?

24        A    MIPR stands for a military

25   interdepartmental purchase request.  It's similar to

EXHIBIT 10
Page 79 of 113

1    you or I writing a check.  Basically an agency that

2    wants -- that wants services from AFRL, typically

3    under one of our contracts, we'll send a form with

4    an accounting code on it and also some other

5    information regarding the dates it's to be expended

6    and what it's to be expended for, and we'll receive

7    that, and then we go ahead and withdraw those funds.

8              My -- my finance shop withdraws those

9    funds from the appropriate account that's -- that's

10   annotated on the -- on the MIPR so that we can put

11   them against the contract.  And when I say withdraw

12   the funds, I don't literally mean take out, you

13   know, dollar bills.  They reserve -- they reserve

14   funds out of that account for obligation.

15             So -- but anytime money changes hands,

16   some kind of documentation -- between agencies, some

17   kind of documentation has to happen and the most

18   common type is the MIPR, military interdepartmental

19   purchase request.

20        Q    So let's go to another portion.  On --

21   I'm just trying to have a clear understanding.  On

22   586, you know, in the phrase with Dan Brown, "Do not

23   reject the MIPR.  Funding is for SME."

24             Can -- can you give me a higher level

25   understanding of -- of to what they're really

EXHIBIT 10
Page 80 of 113

1    discussing here, what this means?

2        A    So a technical SME, or subject matter

3    expert, is within scope of a development project.

4    That would typically be like the chief engineer on a

5    project or the chief scientist or somebody who is

6    brought in that is a highly special -- specialized

7    in the area to help guide the research or to provide

8    advice about the research and development that's

9    being done.

10            That is considered within scope and

11    that's best practice when doing research and

12    development versus, like I said, SETA, which is

13    pretty much doing contracting type paperwork usually

14    and -- and -- and coming up with acquisition plans

15    and advising as to which direction programs should

16    go.  So they're -- they're two totally different

17    things and it looks -- it looks like here they were

18    using the terms interchangeably and -- and we, at

19    AFRL, we're not -- we're not having that, so...

20        Q    Okay.  So taking what you just described

21    up to 585, the e-mail from Captain McVay that starts

22    with, "I was corrected by Dan," can you help me

23    understand what this e-mail means?

24            MR. GREEN:  Object to form.

25        A    The way that I interpreted it was it

EXHIBIT 10
Page 81 of 113

1    looks like Captain McVay was working the

2    administrative side of this and Dan Brown was

3    working the technical side of this.

4            So in whatever book Will McVay was

5    reading, somebody had mislabeled this as SETA.  So

6    then he went to Dan and said, you know, "What's

7    going on with this?"  And Dan, being more of the --

8    on the technical side, explained to him that it's

9    not a SETA, it's a SME.  That's my understanding of

10   what happened in this e-mail.

11   Q     As to this sentence, "Dan would like to

12   put the funding on the excalibur vehicle to pay for

13   Roysdon and support to FIB."

14           Do you know what that sentence means?

15   A     At the time, I think the excalibur task

16   order was the only one that was available for use to

17   them and there's a program called -- there's a

18   classified program named Fibonacci that it looks

19   like Dan wanted to -- Dr. Roysdon to work under the

20   excalibur effort.

21           So it's just asking, "Hey, can you get

22   funds on the contract so that we could try to make

23   this happen?"  Now, I'm assuming, again, that there

24   was a conversation between Dan and Global InfoTek

25   that -- that they were looking to bring on

EXHIBIT 10
Page 82 of 113

1    Dr. Roysdon as a subcontractor, otherwise I'm not

2    sure why he would automatically jump to the

3    conclusion that that's who Global InfoTek is going

4    to hire as SME for him -- or subcontract, I should

5    say, not hire.

6          Q    And I want to understand that last phrase

7    you just gave a little better.  When you say, "I'm

8    not" -- and I don't mean to put words in your mouth,

9    but as I heard it, "I'm not sure why if Dr. Roysdon

10   wasn't already identified, he would be talking about

11   Dr. Roysdon."

12              Can you understand -- or can you explain

13   to me what you mean -- meant by what you said

14   related to that?

15              MR. GREEN:  I'll -- I'll object to

16   form --

17              MR. WAREHAM:  Yeah, it's not a great

18   question.

19              MR. GREEN:  -- calling for speculation or

20   calling him to testify about --

21              MR. WAREHAM:  Speculation is improper,

22   but I'm asking him to explain his -- his -- his

23   statement related to that.

24          Q    (By Mr. Wareham)  So can you -- the last

25   sentence that you said, can you explain that?

EXHIBIT 10
Page 83 of 113

1      A      Dr. Roysdon was not an employee of Global

2    InfoTek and the contract that Dan requested the

3    money be put onto was Global InfoTek.  So in order

4    for Dr. Roysdon to be in the picture at all, either

5    Global InfoTek had already issued a subcontract to

6    him, which they very well may have, or there was a

7    discussion between Dan and Global InfoTek regarding

8    this particular subject matter expert and whether or

9    not Global InfoTek had intended on subcontracting to

10   him.

11            Otherwise, Dr. Roysdon has nothing to do

12   with excalibur, unless, somehow, there was

13   already -- there was already either a subcontract

14   relationship in place or there was a sub -- a

15   planned subcontracting relationship to be put in

16   place.

17      Q      Okay.  So going to the top of 584,

18   leading from the bottom of 583, it appears to be an

19   e-mail from John Marks.

20            Can you help me understand better what

21   the second paragraph starting with, "Captain McVay

22   assured me," means?

23            MR. GREEN:  Object to form.

24      A      That is -- John Marks, I believe -- John

25   Marks, being our AFRL boots on the ground there, it

EXHIBIT 10
Page 84 of 113

```
 1    looks like he went over to try to figure out the
 2    ground -- truth of what was actually going on.  And
 3    in Paragraph Number 2, he's describing all of the
 4    things that SETA contractors do and assuring Tanya
 5    and I that those will not be executed under the
 6    ACT 2 contract.
 7            So it will be a SME position, which is
 8    appropriate, versus a SETA position, which is not
 9    appropriate.  And, also, there's verbiage in there
10    about developing program plans and things of that
11    nature, basically having influence over funding and
12    projects.
13            So that's why we decided to -- after we
14    had our own AFRL person dig into it, it looks like,
15    as I'm going back up through these e-mails, we said,
16    "Okay," you know, "our guy said" -- "said he looked
17    into it.  It's all good.  They were using the wrong
18    word.  That happens all the time.  So I think from
19    that point forward, we just move forward with it."
20       Q    Okay.  Do you know who the individual
21    mentioned in this e-mail was?
22       A    And --
23       Q    -- on-site individual won't perform.
24       A    I -- I don't know.
25       Q    Okay.
```

EXHIBIT 10
Page 85 of 113

```
 1        A      So, obviously, I have a feeling I know,
 2   but I don't know.
 3        Q      All right.  Let's see if there's any
 4   other portion of this.  At the very, very top, your
 5   e-mail kind of closes it out, as of -- on Page 581.
 6               Do you know what the phrase "all CAT 2"
 7   means?
 8        A      Yeah, that's, again, slang for military
 9   interdepartmental purchase requests forms format.
10   CAT 2 stands for Category 2.  There's a couple of
11   different categories that you -- that -- that
12   agencies can send each other funding with; one is
13   considered reimbursable, another is considered
14   non-reimbursable.
15               But for the purposes of this contract,
16   Category 2 funds go directly on a contract, whereas
17   Category 1 funds go to -- can be used for other
18   things around the agency, for government employee
19   salary, for travel, for purchasing materials that --
20   that may need be needed for the project.
21               So this particular one, probably because
22   of the time of the fiscal year it was, we just -- we
23   said, "All right.  We'll just put your whole" --
24   "the whole chunk on" --
25        Q      Okay.
```

**EXHIBIT 10**
**Page 86 of 113**

1        A       -- "on contract."  Yeah, and I see that

2    there was two different contracts that we -- we put

3    it on.  So the first contract is the excalibur,

4    the -- the -- the umbrella -- umbrella contract for

5    excalibur.

6               And then the second, which should have

7    been about 3 percent or so, is for our SETA contract

8    because we need to pay the people that we have here

9    in the office that are managing all the paperwork

10   behind the scenes.  So AFRL tends to recalculate a

11   cost of doing business support --

12       Q       Understood.

13       A       -- basically, yeah.

14       Q       Okay.  So believe it or not, we've --

15   we've come to the end of these e-mails.

16               Were all of those e-mails kept in your

17   regular course of conducting business for the Air

18   Force?

19       A       Can you rephrase the question?

20       Q       Sure.  So those e-mails, were they

21   business records?

22       A       My understanding is all e-mails are

23   business records, so I would say yes.

24       Q       All right.  And --

25       A       Oh.  Government -- all -- all e-mails

EXHIBIT 10
Page 87 of 113

1    originating from a government account --

2    particularly if they're originating from a

3    government account, being sent to a government

4    account, so, yes, and they are stored on servers.

5         Q    And did they reasonably describe the --

6    like business you conducted for Air Force Research

7    Laboratories?

8              MR. GREEN:  Object to form.

9         A    I -- I don't -- didn't -- I don't

10   understand the --

11        Q    Yeah, it's a lawyer question.  So, you

12   know, the e-mails, those regarded your work duties

13   at the -- at your agency, yes?

14        A    Yes.

15        Q    Okay.  One clarification.  Early on in

16   this, you said you had a number of personal text

17   messages with, now, Major McVay.

18              Do you recall describing that?

19        A    Yes, I -- as I -- as I mentioned, we

20   were -- we were friends.  I mean, we still -- we

21   still are friends and for -- if I was in the

22   neighborhood in San Antonio or in Washington or

23   wherever he happened to be stationed, you know, I

24   text him and say, "Hey, do you want to grab a bite

25   to eat tonight or something?  I haven't seen you in

EXHIBIT 10
Page 88 of 113

1    a while."

2             Those are -- I would not consider those

3    records and they're long gone, three or four phones

4    ago now.  So -- but there's nothing of any value

5    when it comes to -- we don't talk about contract,

6    money, or performers or anything like that if we're

7    sending personal texts.

8        Q    All right.  Did you conduct a search to

9    see if there are any texts between January 1, 2020,

10   and December 31, 2024?

11            MR. GREEN:  Jason, I think that this line

12   of questioning was addressed by our response to the

13   subpoena and --

14            MR. WAREHAM:  And I get to -- I get to

15   press behind the response, given his answer.

16            So go ahead and answer the question.

17       A    Did I search my text messages for any

18   correspondence with Will McVay?  I did, but I just

19   recently -- I just recently got a new phone.  So

20   I -- I -- there were no -- there were no messages in

21   there, so...

22       Q    Just to clarify, no messages between

23   January 1, 2020, and December 31, 2024?

24       A    That I have access to now.  I don't

25   archive my -- my personal phones when I get new

EXHIBIT 10
Page 89 of 113

1    ones.

2        Q      Did anyone from the government ever send

3    you a notice at any time relative to preserving any

4    evidence related to this case?

5        A      I was contacted by Mr. Reginald Skinner,

6    who was, at the time, DOJ counsel assigned to this

7    and he did ask me to go through my records and

8    find --

9              MR. GREEN:  I'll -- I'll object to -- to

10   the content of any discussions between counsel and

11   Mr. Parisi.

12             MR. WAREHAM:  Are you asserting a

13   privilege, sir?

14             MR. GREEN:  To the extent there's a

15   question or information that's relevant to the

16   content of communications between counsel for the

17   government and Mr. Parisi, then, yes, I am.

18             I don't think there's been that question

19   yet.  I just want to make clear that we object to

20   that being discussed.

21             MR. WAREHAM:  Okay.  And what would be

22   the privilege assertion, if -- if that were the

23   case?

24             MR. GREEN:  It would be within the scope

25   of attorney-client privilege, to the -- you know, to

EXHIBIT 10
Page 90 of 113

1    the extent of Mr. Parisi's involvement as someone

2    within the scope of that relationship.

3        Q    (By Mr. Wareham)  Okay.  Go ahead and

4    answer what you were about to answer.

5             MR. GREEN:  Mr. Parisi, I'm -- I'm not

6    going to instruct you not to answer, but I am going

7    to instruct you not to discuss information and the

8    content of discussions between DOJ and -- lawyers

9    and yourself.

10       A    Okay.  The answer to the question is

11   that, yes, I was -- I was asked by DOJ counsel to

12   look for the records and -- and send them forward.

13   I was not asked by anybody else here.  I don't think

14   that anybody at AFRL was aware that this was

15   happening until I was served a subpoena and brought

16   it into our JAG office here.

17            And then -- then -- actually, yes, again,

18   another lawyer told me to, you know, "Make sure you

19   don't delete any evidence," basically.

20       Q    Okay.  And do you know, roughly, the time

21   period in which that first preservation notice went

22   out?

23       A    July.

24       Q    July of which year?

25       A    '24, this past July.

EXHIBIT 10
Page 91 of 113

1      Q    Okay.  Is there anything -- do you have

2    any other information that I have not asked you,

3    relevant to this case?

4      A    I don't think so.  As I mentioned, I

5    was -- I was not nearly as involved with this as I

6    would have been, had it been a prime contractor.

7    The relationship was between the subcontractor and

8    the prime contractor.

9            I had never even met the man.  So I --

10   there's very little I know, other than explaining

11   what I meant in these e-mails that I didn't even

12   remember sending, to be honest.

13           MR. WAREHAM:  And I do appreciate your

14   time on that.  Thanks very much.  I don't have any

15   further questions at this time, Mr. Green.

16           MR. GREEN:  Let's take another break.

17   Let's go off the record for about five minutes.  I

18   may or may not have some follow-up.

19           THE VIDEOGRAPHER:  The time is 12:52.  We

20   are going off the record.

21           (A break was held off the record from

22   12:52 p.m. to 12:57 p.m.)

23           THE VIDEOGRAPHER:  The time is 12:57.  We

24   are back on the record.

25           MR. GREEN:  And this is Robert Green for

EXHIBIT 10
Page 92 of 113

1    Defendant.  I don't have any follow-up.

2              Mr. Parisi, thank you for your time

3    today.

4              THE DEPONENT:  No problem.

5              THE VIDEOGRAPHER:  The time -- the time

6    is 12:57.  We are going off the record.  This will

7    complete the deposition for this witness.

8              (The deposition concluded at 12:57 p.m.,

9              April 16, 2025.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**EXHIBIT 10**
**Page 93 of 113**

1              I, THOMAS PARISI, do hereby certify that

2    I have read the foregoing transcript and that the

3    same and accompanying amendment sheets, if any,

4    constitute a true and complete record of my

5    testimony.

6

7                      _____
                                Signature of Deponent
8
                            ( ) No Amendments
9                           ( ) Amendments Attached

10

11             Acknowledged before me this _____ day

12   of _____, 2025.

13

14             Notary Public:_____

15             My commission expires_____

16             Seal:

17

18

19

20

21

22

23

24

25

**EXHIBIT 10**
**Page 94 of 113**

```
 1   STATE OF COLORADO)
                     ) ss.        REPORTER'S CERTIFICATE
 2   COUNTY OF DENVER )

 3

 4          I, Marcus K. Boyer, do hereby certify that

 5   I am a Shorthand Reporter and Notary Public for the

 6   State of Colorado; that previous to the commencement

 7   of the examination, the deponent was duly sworn to

 8   testify to the truth.

 9          I further certify that this deposition was

10   taken in shorthand by me at the time and place

11   herein set forth, that it was thereafter reduced to

12   typewritten form, and that the foregoing constitutes

13   a true and correct transcript.

14          I further certify that I am not related

15   to, employed by, nor of counsel for any of the

16   parties or attorneys herein, nor otherwise

17   interested in the result of the within action.

18          In witness whereof, I have affixed my

19   signature this 29th day of April, 2025.

20          My commission expires April 30, 2027.

21

22

23                 Marcus K. Boyer

24

25
```

**EXHIBIT 10**
**Page 95 of 113**

```
 1   AB LITIGATION
     216 - 16th Street, Suite 600
 2   Denver, Colorado  80202

 3   April 29, 2025

 4   Robert D. Green, Esq.
     1801 California Street, Suite 1600
 5   Denver, Colorado 80202

 6   Re:  Deposition of THOMAS PARISI
          ROE v. UNITED STATES OF AMERICA
 7        Civil Action No. 5:22-CV-00869-JKP-HJB

 8   The aforementioned deposition is ready for
     reading and signing.  Please attend to this
 9   matter by following BOTH of the items indicated
     below:
10
     _____ Call 303-296-0017 and arrange with us
11          to read and sign the deposition in our
            office
12
     _XXX_ Have the deponent read your copy and sign
13         the signature page and amendment sheets, if
           applicable; the signature page is attached
14
     _____ Read the enclosed copy of the deposition
15          and sign the signature page and amendment
            sheets, if applicable; the signature page
16          is attached

17   _XXX_ WITHIN 30 DAYS OF THE DATE OF THIS LETTER

18   _____ By _____ due to a trial date of _____

19   Please be sure the original signature page and
     amendment sheets, if any, are SIGNED BEFORE A
20   NOTARY PUBLIC and returned to AB Litigation for
     filing with the original deposition.  A copy
21   of these changes should also be forwarded to
     counsel of record.  Thank you.
22
     AB LITIGATION
23
     cc:  All Counsel
24

25
```

EXHIBIT 10
Page 96 of 113

```
 1   AB LITIGATION
     216 - 16th Street, Suite 600
 2   Denver, Colorado  80202

 3

 4
                     THOMAS PARISI
 5                   April 16, 2025
           ROE v. UNITED STATES OF AMERICA
 6         Civil Action No. 5:22-CV-00869-JKP-HJB

 7

 8
     The original deposition was filed with
 9
     Jason R. Wareham, Esq., on approximately
10
     the 29th day of April, 2025.
11
     _____ Signature waived
12
     _____ Signature not requested
13
     _____ Unsigned; signed signature page and amendment
14          sheets, if any, to be filed at trial

15   _XXX_ Unsigned; amendment sheets and/or
           signature pages should be forwarded to
16         AB Litigation to be filed in the
           envelope attached to the sealed original.
17

18

19   Thank you.

20   AB LITIGATION

21   cc:  All Counsel

22

23

24

25
```

**EXHIBIT 10**
**Page 97 of 113**

- AMENDMENT SHEET -

Deposition of THOMAS PARISI
April 16, 2025
ROE v. UNITED STATES OF AMERICA
Civil Action No. 5:22-CV-00869-JKP-HJB

The deponent wishes to make the following changes in the testimony as originally given:

| Page | Line | Should Read | Reason |
|------|------|-------------|--------|
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |

Signature of Deponent: _____

Acknowledged before me this _____ day of _____, 2025.

(seal)    Notary's signature _____

          My commission expires _____.

**EXHIBIT 10**
**Page 98 of 113**

**EXHIBIT 10**
**Page 99 of 113**

**EXHIBIT 10**
**Page 100 of 113**

**EXHIBIT 10**
**Page 101 of 113**

**EXHIBIT 10**
**Page 102 of 113**

**EXHIBIT 10**
**Page 103 of 113**

**EXHIBIT 10**
**Page 104 of 113**

**EXHIBIT 10**
**Page 105 of 113**

**EXHIBIT 10**
**Page 106 of 113**

**EXHIBIT 10**
**Page 107 of 113**

**EXHIBIT 10**
**Page 108 of 113**

**EXHIBIT 10**
**Page 109 of 113**

**EXHIBIT 10**
**Page 110 of 113**

**EXHIBIT 10**
**Page 111 of 113**

**EXHIBIT 10**
**Page 112 of 113**

**EXHIBIT 10**
**Page 113 of 113**

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

_____

DR. JOHN ROE,                          |
       Plaintiff,                     |CIVIL ACTION NO.
                              |5:22-CV-00869-HJB
v.                                     |
                              |
UNITED STATES OF AMERICA, et al|(Jury Demanded)
       Defendants.                    |

_____

VIDEO 30(b)(6) DEPOSITION OF AIR FORCE LIFE
CYCLE MANAGEMENT CENTER REPRESENTATIVE BY RICHARD
BREMER
April 21, 2025

_____

APPEARANCES:

        JASON WAREHAM, ESQ.
        and
        LANCE HENRY, ESQ.
        ALLEN VELLONE WOLF HEINRICH & FACTOR, PC
        1600 Stout Street, Suite 1900
        Denver, CO 80202
        Phone: 303-534-4499
        E-mail:  Jwareham@allen-vellone.com
        appearing on behalf of Plaintiff


        JOHN W. HODGES, JR., ESQ.
        HENDLEY & HODGES LAW, PLLC.
        4594 US Hwy 281 N
        Spring Bach, TX 78070
        Phone:  210-640-3398
        E-mail:  John@hhtx.law
        appearing on behalf of Plaintiff

        KATRINA SEEMAN, ESQ.
        US DEPARTMENT OF JUSTICE, CIVIL DIVISION
        950 Pennsylvania Avenue NW
        Washington, DC 20530
        Phone: 202-724-6604
        E-mail:  Katrina.seeman@dc.gov
        appearing on behalf of Defendants

**EXHIBIT 11**
**Page 1 of 35**

```
 1

 2
     APPEARANCES continued:
 3
                ROBERT D. GREEN, ESQ.
 4              UNITED STATES ATTORNEY'S OFFICE
                WESTERN DIVISION OF TEXAS
 5              601 NW Loop 410, Suite 600
                San Antonio, TX 78216
 6              Phone:  210-384-7100
                E-mail:  Robert.Green3@usdoj.gov
 7              appearing of behalf of Defendants

 8              JOSEPH A. GONZALEZ, ESQ.
                US DEPARTMENT OF JUSTICE, CIVIL DIVISION
 9              950 Pennsylvania Avenue, NW
                Washington, DC 20530
10              Phone:  202-598-3888
                E-mail joseph.a.gonzalez@usdoj.gov
11              appearing on behalf of Defendants

12
     ALSO PRESENT:  Maryvonne Tompkins, videographer
13                   Rebecca Bradshaw, paralegal

14

15

16

17              PURSUANT TO NOTICE, the Video 30(b)(6)

18   deposition of Air Force Life Cycle Management Center

19   Representative by Richard Bremer was taken by

20   Plaintiff via Zoom video conference, beginning at

21   11:38 a.m., on April 21, 2025, under the Federal

22   Rules of Civil Procedure, before LINNEA BUSBY,

23   Professional Court Reporter and Notary Public for the

24   State of Colorado.

25
```

EXHIBIT 11
Page 2 of 35

1                          I N D E X

2    EXAMINATION                                    PAGE

3
            EXAMINATION BY MR. WAREHAM              5
4

5
                    E X H I B I T S
6                                              INITIAL
                                               REFERENCE
7    No.    Description                         Page
            None marked.
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT 11
Page 3 of 35

```
 1                 P R O C E E D I N G S

 2            THE VIDEOGRAPHER:  The time is 11:38.  We

 3   are on the record.  Today is April 21, 2025.

 4            This begins the recorded deposition 30(b)(6)

 5   of Air Force Life Cycle Management represented by

 6   Richard Bremer in the matter of Dr. John Roe versus

 7   United States of America, et al.

 8            This deposition is being recorded via Zoom

 9   videoconferencing.  The court reporter is Linnea

10   Busby.  The videographer is Maryvonne Tompkins.

11            The attorneys will introduce themselves

12   please.

13            MR. WAREHAM:  Hi.  This is Jason Wareham,

14   lead counsel on the case, along with John Hodges,

15   Lance Henry, and then our paralegal, Rebecca

16   Bradshaw.

17            MS. SEEMAN:  And good afternoon.  This is

18   Katrina Seeman.  I am joined today by my colleagues

19   and co-counsel Robert Green and Joseph Gonzalez.

20            THE VIDEOGRAPHER:  The court reporter will

21   please swear in the witness, and we can proceed.

22            COURT REPORTER:  Could you please raise your

23   right hand.

24                      RICHARD BREMER,

25   being first duly sworn in the above cause, was
```

**EXHIBIT 11**
**Page 4 of 35**

1    examined and testified as follows:

2                        EXAMINATION

3    BY MR. WAREHAM:

4        Q.  Hi, Mr. Bremer.  Jason Wareham here again.

5    Long time no see.

6        A.  Yes, sir.

7        Q.  So just to cover a few differences between

8    the last time, to be clear, you were previously

9    deposed in this case in your personal capacity,

10   right?

11       A.  Okay.

12       Q.  Well, okay.

13       A.  That's correct.

14       Q.  Yeah.  So to clarify, you're testifying

15   today as a corporate representative.  Do you

16   understand the difference between the two roles?

17       A.  I do.

18       Q.  You understand that the answers that you

19   give today will actually bind Air Force Life Cycle

20   Management Center, also known as HNCO?

21       A.  Yes.

22       Q.  And to clarify, we are going to be limiting

23   your questions to specific noticed questions we are

24   told you were prepared to answer which in the notice

25   is our number 8, 15, and 16; and I will read those to

EXHIBIT 11
Page 5 of 35

1    you and confirm your understanding.

2          So number 8 is all comprehensive details

3    Major or Captain McVeigh's complaint or referral

4    against Dr. Roe, including:  Precise dates, method of

5    submission, content, and intended recipients,

6    internal actions taken upon receipt, including

7    forwarding, initial assessments, or inquires.

8          Are you prepared to answer that question

9    today?

10    A.  Yes.

11    Q.  All right.  And then 15 is a detailed

12    explanations of general and specific procedures for

13    initiating, conducting, or recommending contractor

14    debarment or suspensions including procedural rights

15    afforded to those subjects.  Are you prepared to

16    answer that question today?

17    A.  Yes.

18    Q.  Number 16 is detailed account of any of

19    formal or informal processes or recommendations

20    related to Dr. Roe's potential or actual debarment,

21    identifying responsible decision-makers and

22    documented justifications.  Are you prepared to

23    answer that question?

24    A.  Yes.

25    Q.  All right.  Not disclosing any specific

EXHIBIT 11
Page 6 of 35

1    communications from the DOJ counsel, could you please

2    describe your preparation that you took in

3    preparation for today's testimony?

4        A.  Yes.  I reviewed all of the documentation

5    that was shared, discussed during our previous

6    session to, you know, get an understanding again

7    because it's been four years of what actually took

8    place, and then looked at federal acquisition

9    regulations and supplements regarding debarments,

10   suspension or exclusion.

11       Q.  All right.  Was there any information that

12   you needed to review to prepare for those questions

13   that you were unable to review?

14       A.  No.

15       Q.  Okay.  Well, then, we'll just get started

16   with the substance of it.  If you could -- we

17   previously have it on the prior record -- but for the

18   most part I'm going to ignore the prior record

19   exists.

20           Would you please give your title and

21   background that qualifies you to be the 30(b)(6)

22   witness today?

23       A.  Sure.  Name's Richard Bremer.  Been doing

24   acquisitions since 2000.  Currently on dual habit.  I

25   was supporting the Cyber systems group as the

EXHIBIT 11
Page 7 of 35

1    contracting functional to the O-6 equivalent who is

2    the senior material leader, and also I am responsible

3    for the cyber web and systems branch that I directly

4    supervise approximately 22 personnel there.  So....

5         Q.  And the first -- so there's two conceptual

6    areas, one covered by number 8, the details of the

7    appointment, 15 and 16 which cover debarment

8    proceedings.

9             I'm just going to start with 8.  We're going

10   to focus there, and then we'll make the conceptual

11   shift downward, okay?

12            So what -- what do you know of the details

13   regarding then Captain McVeigh's complaint against

14   Dr. Roe at the time or Dr. Roysdon?

15        A.  Are we talking about the statement that

16   Captain McVeigh provided in response to my request

17   for the inquiry?

18        Q.  So we just learned in the other deposition

19   the initial complaint was done orally to a Mr. Ranft.

20   Do you have any knowledge of that?

21        A.  I do not.

22        Q.  Okay.  Do you know the dates that your --

23   the investigation regarding Mr. -- or Captain

24   McVeigh's complaint was opened?

25        A.  As far as my inquiry, or was there another

EXHIBIT 11
Page 8 of 35

1  investigation that I'm not aware of?

2      Q.  Your inquiry.

3      A.  Sure.  I was appointed in August -- I'd have

4  to look at the date -- but finished within 15, 20

5  days with my report I thought.  So I believe so.

6  I've got the dates written down if you'd like

7  specifics.

8      Q.  Yeah.  Go ahead and give the specifics.

9      A.  Yeah, absolutely.  Started my investigation

10  on the 25th of August 2020.  That was my appointment.

11  Provided my inquiry report on the 22nd of

12  September 2020.

13      Q.  And in that can you describe the -- can you

14  describe the nature of the submission that Captain

15  McVeigh made in support of your investigation?

16      A.  Yeah.  So the nature of the submission was

17  based on my request, right.  So I asked him to

18  provide his witness statement in regards to the

19  security incident or potential security incident that

20  I was appointed to be the inquiry official on.

21      Q.  And did he actually submit the requested

22  statement?

23      A.  He did.  He did.

24      Q.  Did he do so on time?

25      A.  I know I had to follow up with him several

EXHIBIT 11
Page 9 of 35

1    times.  So I couldn't say it was upon the initial

2    date of my request but he eventually provided it.

3         Q.  Do you have his report in front of you?

4         A.  I have a copy of it if you would like me --

5         Q.  Sure.  If refer to the number in the bottom

6    right-hand corner.

7              MS. SEEMAN:  Counsel, sorry, just for the

8    record, when you say his report, are you now talking

9    about now Major McVeigh's statement?

10             MR. WAREHAM:  Correct.  That was a -- sorry.

11   I used report when I meant statement.

12        A.  Just bear me with me while I find that

13   unless you have a quicker, if you want to pull it up,

14   but I'm looking for it.  No, I have it.  Okay.

15        Q.  (By Mr. Wareham)  And what is the number in

16   the bottom right just for reference?

17        A.  The bottom right US 0000703.

18        Q.  And if you could, as I know you've done this

19   individually on the record before, but as the

20   representative, could you review that statement

21   please?

22        A.  Which statement are we referencing, sir?

23        Q.  Captain McVeigh's statement that you just

24   read the number of.

25        A.  Okay.  Yeah, I have it.  What would you like

EXHIBIT 11
Page 10 of 35

1    me to read specifically?

2         Q.  Just review the entire statement briefly,

3    and tell me when you're done.

4         A.  Okay.  Yeah.  We went -- we went point by

5    point on this statement during our last session, so

6    I'm pretty familiar with it.  Is there specifically

7    something you want me to --

8         Q.  No.  You are familiar with the contents of

9    that statement?

10        A.  Yes, sir.

11        Q.  As the representative, were you familiar

12   with the nature of the information that you were

13   asked to investigate --

14        A.  Yeah.

15        Q.  -- as part of the -- the security

16   investigation?

17        A.  Yes.  Specifically I was looking to see if

18   Dr. Roysdon had access as he was performing services

19   for two different agencies at the time, whether or

20   not he had access to classified information that he

21   should not have.

22        Q.  And, again, I'm asking this as the

23   representative.  I know I've asked this before.  But

24   reviewing the content of that statement, was any

25   portion of Captain McVeigh's statement relevant to

EXHIBIT 11
Page 11 of 35

1    the inquiry that was going conducted?

2         A.  For me it was not.  There was no information

3    that I considered to be relevant in this statement

4    for my specific inquiry.

5         Q.  All right.  And what actions were taken upon

6    receipt of this statement?

7         A.  My statement was provided to security at the

8    time.  It may have been Mr. Rowe and Lieutenant

9    Colonel Ekholm.  After that I did not have any

10   additional follow up as to what the status of that

11   inquiry was report was.

12        Q.  You just said my statement.  Did you mean my

13   report?

14        A.  My report, yes, sir.  Yeah.

15        Q.  Okay.  That should conclude -- let's see,

16   yep.  All right.  That should conclude the set of

17   questions under number 8.

18             Moving to 15 and 16, could you please detail

19   in as much detail as you the general procedures for

20   initiating, conducting, or recommending contractor

21   debarments or suspension.

22        A.  Sure.  So the procedures for debarment,

23   suspension, or exclusion are found in the final

24   acquisition regulation 9.4 or the supplements which

25   would be the Defense Federal acquisition regulation

EXHIBIT 11
Page 12 of 35

1   of the Air Force federal acquisition regulation

2   supplement.

3            So within that, any Government official --

4   doesn't have to be a contracting officer, it can be

5   any Government official -- can propose a contractor

6   for debarment, suspension, right.

7            The -- for the Air Force in particular, the

8   suspension and debarment official is the Air Force

9   General Counsel for contractor responsibility which

10  is second to the Air Force GRC.  They are the

11  decision authority.

12           Essentially any official would have to

13  gather the information and provide that to SASS GRC

14  for review, and they actually would make the

15  decision.  But the process looks like -- essentially

16  the process is investigation and referral.  Whoever

17  the individual who is making the referral.  There

18  would a decision, you know, or actually -- if I

19  might, could I refer really quickly to --

20      Q.  Please do.

21      A.  -- to my notes, if you don't mind.  Make

22  sure I get this right.

23      Q.  Yeah.

24      A.  Just to jog my memory.  Yes.  Decision

25  making process, right.  So after the inquiry or the

EXHIBIT 11
Page 13 of 35

1    investigation referral, there's a decision making

2    process where the information would be considered by

3    general counsel, as well as a opportunity from the --

4    I will refer to any contractor -- I'll just use the

5    term "contractor," right.  They would have an

6    opportunity to provide additional information at

7    general counsel's request.

8         From there, there would be a notice of

9    potential debarment sent to the contractor.  The

10   contractor would then have 30 days to respond to that

11   notice with additional information at the request of

12   general counsel.

13        And there there would be a notice of final

14   decision of general counsel on whether or not they

15   were going to actually pursue the debarment or the

16   suspension.

17        Q.  Do you know what happens if they decide to

18   pursue the debarment or suspension?

19        A.  Sure.  It would be codified or captured in

20   sam.gov that there decision was to say, yes, we are

21   debarring or suspending this particular contractor.

22   It would be the agency would actually take the action

23   to process that debarment or suspension in sam.gov

24   which is the system for award management.

25        Q.  All right.  Are you aware whether or not the

EXHIBIT 11
Page 14 of 35

1    process includes after notice the ability to have a

2    hearing?

3         A.  I believe -- I'd have to look at the reg, if

4    you give me a second --

5         Q.  Yeah, go ahead.

6         A.  -- too look at that.  There's a lot of

7    information in there.

8         Q.  I imagine.

9         A.  Says -- you were asking specifically, sir,

10   after the notification of suspension or debarring

11   official's decision?  Is that what you were asking?

12        Q.  Correct.

13        A.  Here is verbatim out of the regulation, If

14   the suspending and debarring official decides to

15   impose debarment, contractor and any affiliates

16   involved shall be given prompt notice using the

17   procedures in (c)(1) and (2) -- which is C 1 and 2

18   which is referring to the notice of proposed

19   debarment, specifying the reasons for debarment,

20   specifying the reasons for debarment, stating the

21   period of debarment, including effective dates; and

22   advising that the debarment is effective throughout

23   the executive branch of the Government unless the

24   head of an agency or designee makes a statement

25   called for by 9.406-1(d).

EXHIBIT 11
Page 15 of 35

1            If debarment is not imposed, the suspending

2    and debarring official shall promptly notify the

3    contractor and any affiliates involved, using the

4    procedures in paragraphs (c)(1) and (2) of this

5    section.

6            So specifically here in this regulation it

7    does not talk about a hearing.

8        Q.  Does it -- but it does discuss a

9    contractor's ability to try to rebut any notice of

10   debarment --

11       A.  Yeah.

12       Q.  -- raised --

13       A.  Which I think I referred to in the steps two

14   and three, right, where I said the -- you know, the

15   decision making process, the contractor does have an

16   opportunity to provide additional information.  And

17   then as well as after the notice of proposed

18   debarment which they have 30 days to respond once

19   they receive that notice, that's correct.  You --

20   let's see, so there's actually several opportunities,

21   right, for a contractor to find additional

22   information.

23       Q.  Can you describe a few more opportunities

24   there besides the normal notice?

25       A.  Within the regs, it doesn't -- it doesn't

**EXHIBIT 11**
**Page 16 of 35**

1    list any additional opportunities, right?

2         Q.  Do you have any knowledge of any additional

3    times where a contractor can engage that process

4    aside from the regulation?

5         A.  I assume -- again, I'm not a decision

6    authority, right.  So whether it be general counsel.

7    I assume that their legal team or a contractor's

8    legal team could engage Secretary Air Force, general

9    counsel at any point along the entire process.

10        Q.  And the process is the same for suspensions

11   as well as debarments; is that right?

12        A.  Slightly different.  There's -- if I can,

13   again, refer to my notes, I thought this question

14   would come up.

15            The only difference there is that there --

16   there is not a notice of proposed suspension because

17   the difference in -- between the suspension and a

18   debarment is that immediate action needs to be take

19   place to protect the public's interest and the

20   Government's interests.  So a suspension is a quicker

21   method.  But it's same as steps less the notice of

22   proposed suspension.

23        Q.  And what sort of grounds are grounds for

24   debarment or suspensions?

25        A.  You want specific or generalities?  So I can

EXHIBIT 11
Page 17 of 35

1    --

2        Q.  Go general to specific would be great.

3    Yeah.

4        A.  If I can, can I refer to the -- typically,

5    right, so it's fraud, it's theft, it's embezzlement,

6    it's failure to pay taxes, and there's plenty more

7    within the reg which I could read it to you if you

8    would like.

9        Q.  How about fraud?  Is fraud included?

10       A.  Oh, yes.  Absolutely, fraud is concluded.

11       Q.  What are some of the more frequent ones that

12   you've seen?

13       A.  I personally have not processed a debarment

14   or a suspension.  So I have not seen one that I've

15   processed directly.

16       Q.  Then I'm going to ask you to give me the reg

17   and read out of the grounds, if you would please.

18       A.  Yes, sir.  Absolutely.

19           COURT REPORTER:  This is the court reporter.

20   I'm going to ask you to read a little bit slower this

21   time.

22           THE DEPONENT:  Sorry.

23           COURT REPORTER:  That's okay.

24           THE DEPONENT:  I have a tendency to talk

25   pretty quickly.

EXHIBIT 11
Page 18 of 35

1      A.   Okay.   This is found in FAR 9.406-2 causes

2    for disbarments.   The suspending and debarring

3    official may debar a contractor for a conviction of

4    or civil judgment for commission of fraud or criminal

5    offense in connection with obtaining, attempting to

6    obtain, or performing a public contract or

7    subcontract, for violation of Federal or State

8    antitrust statutes relating to the submission of

9    offers, for commission of embezzlement, theft,

10   forgery, bribery, falsification, or destruction of

11   records, making false statements, tax evasion,

12   violating Federal criminal tax laws, or receiving

13   stolen property, intentionally affixing a label

14   bearing a made in America inscription to a product

15   sold or shipped to the United States or its outlying

16   areas when the product was not made in the United

17   States or its outlying areas, for commission of any

18   other offense indicating a lack of business

19   integrity, or business honestly that seriously and

20   directly affects the present responsibility of a

21   Government contractor or subcontractor.

22      Q.  And to clarify the phrase "debarring

23   official, that is the Air Force GC that you

24   described?

25      A.   That's correct.   GC, yeah.

EXHIBIT 11
Page 19 of 35

1          Q.  Are any other officials below that level

2     able to debar a contractor?

3          A.  No.  Before -- there is a statement within

4     the regulation that requires us to notify our local

5     legal team before it goes to general counsel, as well

6     as our senior contracting official.

7          Q.  And have you -- within your review did the

8     phrase "de facto debarment" come up?

9          A.  I'm familiar with what it means but there is

10    no process or any existence of a de facto debarment.

11         Q.  All right.  What does it mean?

12         A.  It means to essentially blackball an

13    individual from receiving a contract.

14         Q.  All right.  Is that done with any form of

15    process?

16         A.  No.

17         Q.  Do you know if de facto debarment is in

18    keeping with the regulations that you just describes?

19         A.  No, it absolutely would not be.

20         Q.  All right.  Why not?

21         A.  It's unethical process in my opinion.

22    Doesn't exist as far as I'm concerned.  At least I

23    have never witnessed it during my 20-plus years in

24    contracting.

25         Q.  Suffice it to say the controlling process is

EXHIBIT 11
Page 20 of 35

1    the one you just read and not a de facto process?

2         A.   That's correct.   That is the process as

3    outlined in the FAR and supplements.

4         Q.   Okay.   Are you aware of in your review,

5    again in terms of the agency, of any formal or

6    informal processes executed against Dr. Roysdon with

7    regards to his contract?

8         A.   No, I am not.

9         Q.   So that would include as far as you're

10   concerned that no process as described in the

11   regulation was initiated against Dr. Roe or his

12   prime?

13        A.   So just for clarification, I think I

14   mentioned during our last session, the contracts that

15   he had in place that he was operating under were not

16   my responsibility.

17             I did, however, during the course of

18   prepping for these depositions, I was asked, right,

19   at one point to confirm whether or not he was

20   debarred or suspended at which time I queried the

21   sam.gov site to see if he was debarred or suspended.

22   At that time I did not find any suspension or

23   debarment or pending -- you know, pending actual or

24   otherwise in the sam.gov.

25        Q.   Did you see any presence of any historical

**EXHIBIT 11**
**Page 21 of 35**

1    actions of any kind within debarment related to Dr.

2    Roysdon?

3        A.  No, sir, I did not.

4        Q.  In your preparation for this, did you

5    discuss a de facto debarment with of Dr. Roysdon with

6    any person?

7        A.  When I was initially contacted by the DOJ

8    team, I just asked about the nature of this

9    particular case, and they stated that de facto

10   debarment came up through the conversation.  That was

11   the only conversation I've ever had.

12       Q.  With any Air Force personnel?

13       A.  No.

14       Q.  All right.  Well, believe it or not, I'm

15   already at the point where I need to check with my

16   team on anything further.  So if we can go off the

17   record, I'll do that; and I'll come right back.  All

18   right?

19       A.  Yes, sir.

20           MR. WAREHAM:  Thank you much.

21           THE VIDEOGRAPHER:  The time is 12:03.  We're

22   going off the record.

23           (A recess was taken from 12:03 to 12:14

24   p.m.)

25           THE VIDEOGRAPHER:  The time is 12:14.  We

EXHIBIT 11
Page 22 of 35

1    are back on the record.

2        Q.  (By Mr. Wareham)  So, Mr. Bremer, again,

3    this is asked as representative of entity, the Air

4    Force Life Cycle Management Center agency, what is

5    the role of an agency if they discover their members

6    are conducting de facto debarments?

7        A.  Yeah.  So the role of the agency, right,

8    again, there's -- this is an ethical thing, right.

9    So it would be addressed; and they would, you know,

10   take administrative action or whatever else necessary

11   against that particular individual.

12       Q.  And what do you mean by administrative

13   action?

14       A.  Could be reprimand, you know, more severe

15   punishments maybe potentially.

16       Q.  Again --

17       A.  I don't know.  I'm speaking from what my own

18   personal opinion would be on that, right.  I'm not

19   aware of any procedures or any particular action that

20   they should or should not take against an individual.

21   Again, this is opinion.

22       Q.  Yeah, it's a little tricky but you're

23   technically here as part of the agency.  Is it fair

24   to say that the agency would have a duty to correct a

25   de facto debarment?

**EXHIBIT 11**
**Page 23 of 35**

1        A.  Yes.

2            MR. WAREHAM:  Okay.  That's all the

3   questions I have.  Thank you very much.  At least at

4   this point.  The DOJ may have some questions for you.

5            THE DEPONENT:  Yes, sir.

6            MS. SEEMAN:  No.  I don't think we do today.

7   Thank you.

8            MR. WAREHAM:  All right.  Then that was much

9   shorter and simpler than last time, sir.  Thank you

10  for your time.

11       A.  Thank you.  Appreciate it.

12            THE VIDEOGRAPHER:  The time is 12:15.  We

13  are going off the record.  This will complete the

14  deposition for this witness.

15            MR. WAREHAM:  Same order for us as last time

16  for the reporters.

17            MS. SEEMAN:  We will not order the videos

18  but we will order the transcripts.

19

20            WHEREUPON, the within proceedings were

21  concluded at the approximate hour of 12:15 p.m. on

22  the 21st day of April, 2025.

23

24

25

EXHIBIT 11
Page 24 of 35

```
 1            *      *      *      *      *      *

 2            I, RICHARD BREMER, do hereby certify that I

 3   have read the foregoing transcript and that the same

 4   and accompanying amendment sheets, if any, constitute

 5   a true and complete record of my testimony.

 6

 7                   _____
                     Signature of Deponent
 8
                     ( ) No amendments
 9                   ( ) Amendments attached

10

11            Acknowledged before me this _____ day of

12   _____, 20____.

13

14
              Notary Public:   _____
15
                    My Commission Expires:   _____
16

17
         Seal:
18

19

20

21

22

23

24

25
```

**EXHIBIT 11**
**Page 25 of 35**

```
 1                    REPORTER'S CERTIFICATE
       STATE OF COLORADO      )
 2                            )      ss.
       CITY AND COUNTY OF DENVER )
 3

 4     I, LINNEA BUSBY, Professional Reporter and Notary

 5     Public, State of Colorado, do hereby certify that

 6     previous to the commencement of the examination, the

 7     said RICHARD BREMER was duly sworn by me to testify

 8     to the truth in relation to the matters in

 9     controversy between the parties hereto; that the said

10     deposition was taken in machine shorthand by me at

11     the time and place aforesaid and was thereafter

12     reduced to typewritten form, consisting of 28 pages

13     herein; that the foregoing is a true transcript of

14     the questions asked, testimony given, and proceedings

15     had.  I further certify that I am not employed by,

16     related to, nor of counsel for any of the parties

17     herein, nor otherwise interested in the outcome of

18     this litigation.

19            IN WITNESS WHEREOF, I have affixed my

20     signature this 8th day of May, 2025.

21            My commission expires October 28, 2028.

22

23            Linnea Busby
              Professional Court Reporter
24

25
```

EXHIBIT 11
Page 26 of 35

```
1   AB LITIGATION SERVICES
    216 - 16th Street, Suite 600
2   Denver, Colorado  80202

3   May 8, 2025

4   KATRINA SEEMAN, ESQ.
    US DEPARTMENT OF JUSTICE, CIVIL DIVISION
5   950 Pennsylvania Avenue NW
    Washington, DC 20530
6
    Re:  VIDEO 30(b)(6) DEPOSITION OF AIR FORCE LIFE
7        CYCLE MANAGEMENT CENTER REPRESENTATIVE BY RICHARD
         BREMER
8        ROE v. UNITED STATES OF AMERICA, et al
         Civil Action No:  5:22-CV-00869-JKP-HJB
9
    The aforementioned deposition is ready for
10  reading and signing.  Please attend to this
    matter by following BOTH of the items indicated
11  below:

12  _____ Call 303-296-0017 and arrange with us
          to read and sign the deposition in our
13        office

14  _XXX_ Have the deponent read your copy and sign
          the signature page and amendment sheets, if
15        applicable; the signature page is attached

16  _____ Read the enclosed copy of the deposition
          and sign the signature page and amendment
17        sheets, if applicable; the signature page
          is attached
18
    _XXX_ WITHIN 30 DAYS OF THE DATE OF THIS LETTER
19
    _____ By _____ due to a trial date of_____
20
    Please be sure the original signature page and
21  amendment sheets, if any, are SIGNED BEFORE A
    NOTARY PUBLIC and returned to AB Litigation Services
22  for filing with the original deposition.  A copy of
    these changes should also be forwarded to
23  counsel of record.  Thank you.

24  AB LITIGATION SERVICES

25  cc:  All Counsel
```

**EXHIBIT 11**
**Page 27 of 35**

1    AB LITIGATION SERVICES
     216 - 16th Street, Suite 600
2    Denver, Colorado  80202

3

4
         VIDEO 30(b)(6) DEPOSITION OF AIR FORCE LIFE
5    CYCLE MANAGEMENT CENTER REPRESENTATIVE BY RICHARD BREMER
                     April 21, 2025
6         ROE v. UNITED STATES OF AMERICA, et al
          Civil Action No:  5:22-CV-00869-JKP-HJB
7

8
     The original deposition was filed with Jason Wareham,
9
     Esq. on approximately the 8th day of May, 2025.
10

11   _____ Signature waived

12   _____ Signature not requested

13   _____ Unsigned; signed signature page and
           amendment sheets, if any, to be filed at
14         trial

15   _XXX_ Unsigned; original amendment sheets and/or
           signature pages should be forwarded to AB Litigation
16         Services to be filed in the envelope attached to the
           sealed original
17

18
     Thank you.
19
     AB LITIGATION SERVICES
20
     cc:  All Counsel
21

22

23

24

25

**EXHIBIT 11**
**Page 28 of 35**

- AMENDMENT SHEET -

VIDEO 30(b)(6) DEPOSITION OF AIR FORCE LIFE
CYCLE MANAGEMENT CENTER REPRESENTATIVE BY RICHARD BREMER
April 21, 2025
ROE v. UNITED STATES OF AMERICA, et al
Civil Action No:  5:22-CV-00869-JKP-HJB

The deponent wishes to make the following changes
in the testimony as originally given:

| Page | Line | Should Read | Reason |
|------|------|-------------|--------|
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |

Signature of Deponent: _____

Acknowledged before me this ____ day of _____,
20___.

(Seal)      Notary's signature _____

My commission expires_____

**EXHIBIT 11**
**Page 29 of 35**

**EXHIBIT 11**
**Page 30 of 35**

**EXHIBIT 11**
**Page 31 of 35**

**EXHIBIT 11**
**Page 32 of 35**

**EXHIBIT 11**
**Page 33 of 35**

**EXHIBIT 11**
**Page 34 of 35**

**EXHIBIT 11**
**Page 35 of 35**

| STATEMENT OF SUSPECT/WITNESS/COMPLAINANT | ☐ SUSPECT |
|---|---|
| | ☒ WITNESS/COMPLAINANT |

**PRIVACY ACT STATEMENT**

**AUTHORITY:** 10 U.S.C. 9013, Secretary of the Air Force; 18 U.S.C. 922 note, Unlawful Acts note referring to the Brady Handgun Violence Prevention Act; 28 U.S.C. 534 note, Judiciary and Judicial Procedures, note referring to the Uniform Federal Crime Reporting Act; 34 U.S.C. 20101 et seq., Crime Victims Fund; and Amendment to Lautenberg, 18 U.S.C. 922(d) (9) Unlawful Acts; DoD Directive 7730.47, Defense Incident-Based Reporting System (DIBRS); SORN F031 AF SF B; and E.O. 9397 (SSN), as amended.

**PRINCIPAL PURPOSES:** Used to record information and details of criminal activity which may require investigative action by commanders, supervisors, AF entities conducting law enforcement functions; and to provide information to appropriate individuals within DoD organizations who ensure proper legal and administrative action is taken.

**ROUTINE USES:** Information may be disclosed to local, county, state, and federal law enforcement/investigative authorities for investigation and possible criminal prosecution or civil court action. Information extracted from this form may be used in other related criminal and/or civil proceedings.

**DISCLOSURE IS VOLUNTARY:** SSN is used to positively identify the individual making the statement.

**I. STATEMENT INFORMATION**

| DATE (YYYYMMDD) | TIME | LOCATION AND INSTALLATION (Bldg/Room No) 3133 General Hudnell Dr, Suite 200 San Antonio, TX, 78226 | UNIT TAKING STATEMENT AFLCMC/HNCO | REPEAT (If known) |
|---|---|---|---|---|
| 20200910 | 11:33 | | | ☐ OFFENSE |
| | | | | ☐ COMPLAINT |

**II. PERSONAL IDENTIFICATION** (Print or Type)

| NAME (Last, First, Middle Initial) McVeigh, William, M. | SSN 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 | STATUS/GRADE O4 |
|---|---|---|

| LOCAL ADDRESS (Include Zip Code) 11020 Huebner Oaks, Apt 1824 San Antonio, TX, 78230 | DATE AND PLACE OF BIRTH (If required) 10/17/87 Minneapolis, MN | TELEPHONE | |
|---|---|---|---|
| | | HOME 5408409899 | DUTY 2109251974 |

| PERMANENT ADDRESS OR HOME OF RECORD (Include Zip Code) 120 Springwood Dr Fredericksburg, VA, 22401 | MILITARY ORGANIZATION/EMPLOYER USAF | DEROS 20171209 |
|---|---|---|

**SPONSOR INFORMATION**

| NAME (Last, First, Middle Initial) | GRADE | SSN | ORGANIZATION | DUTY PHONE |
|---|---|---|---|---|
| | | | | |

**III. ACKNOWLEDGEMENT OF OFFENSES AND 5TH AMENDMENT/ARTICLE 31 RIGHTS ADVISEMENT**    (Suspect Only)

*I have been advised that I am suspected of the following offenses:*

| ADVISED BY (Full Name and Rank) | INDIVIDUAL IDENTIFIED HIMSELF/HERSELF AS A (SF, special agent, etc.) |
|---|---|
| | |

| SUSPECT INITIALS | *and advised me that I have the following rights according to the 5th Amendment of the U.S. Constitution/Article 31 of the Uniform Code of Military Justice.* |
|---|---|
| | I have the right to remain silent - that is to say nothing at all. |
| | Any statement I make, oral or written, may be used as evidence against me in a trial or in other judicial, non-judicial, or administrative proceedings. |
| | I have the right to consult with a lawyer. |
| | I have the right to have a lawyer present during this interview. |
| | I may obtain a civilian lawyer of my own choice at no expense to the government. |
| | I may request a lawyer any time during this interview. |
| | If I decide to answer questions with or without a lawyer present, I may stop the questioning at any time. |
| | MILITARY ONLY: If I want a military lawyer, one will be appointed for me free of charge. |
| | CIVILIANS ONLY: If I cannot afford a lawyer and want one, a lawyer will be appointed for me by civilian authorities. |

| SUSPECT INITIALS | *I have read my rights as listed above and I fully understand my rights. No promises, threats, or inducements of any kind have been made to me. No pressure or coercion has been used against me.* *I make the following choice. (Initial One)* |
|---|---|
| | I do not want a lawyer. I am willing to answer questions or make a statement or both, about the offense(s) under investigation. |
| | I do not want a lawyer and I do not wish to make a statement or answer any questions. |
| | I want a lawyer. I will not make any statement or answer any questions until I talk to a lawyer. |

*I fully understand my rights and that my signature does not constitute an admission of guilt.*

| SIGNATURE OF SUSPECT | SIGNATURE OF WITNESS/INTERVIEWER |
|---|---|
| | |

| **AF IMT 1168, 19980401, V2** | PREVIOUS EDITIONS ARE OBSOLETE. | PAGE 1 OF      PAGES |
|---|---|---|

**EXHIBIT 12**
**Page 1 of 2**

Confidential - Subject to Protective Order

US0000703

## IV. STATEMENT

- On 22 July 20, SAF/AQL visited Kudu Dynamics for a demo. They requested a meeting and told us to update documentation for the DD254 for the contractor on 23 July 20 with HNCO. Mr. Daniel Brown stated at this time to SAF/AQL, the ML, AFRL, the PSO, and I that he had requested AFRL process a DD254. However, AFRL (Mr. John Marx and Ms. Amanda Ozanam) told me that they received no such request from Mr. Brown.
- On ~4 Aug 20, I was notified by SAF/AQL that $300k for SETA support had not been obligated on the AFRL ACT2 (Excalibur/ Mercury) contract. From there, I asked Daniel Brown what the funding was used for to ensure it was used for SAF/AQL projects. I was informed it was for Dr. Paul Roysdon as contractor support. During discussions between AFRL and Mr. Brown, it was further stated that although informed to SAF/AQL as SETA funds it was really for Technical Subject Matter Experts (SME).
- On 18 Aug 20, after the SAF/AQL Program Management Review (PMR), Dr. Roysdon told me he was a contractor, but he was acting and representing himself as a Government employee during the PMRs. He used his Government ID to access HNCO facilities.
- On 19 Aug 20, Richard Ranft and I learned that Dr. Roysdon only had a Government clearance and no contractor clearance.
- On roughly 20 Aug 20, I learned that Dr. Roysdon was being paid as both a contractor and Government employee. Talking with Dan Brown, Dr. Roysdon was only doing unclassified work, however, no DD254 was ever created or submitted for the project.
- I asked SAF/AQL, Joseph "Danny" Burghard if he knew that Dr. Roysdon was a contractor. He told me his entire team did not know that information. Mr. Brown told me that he informed Mr. Burghard once of this fact during a POM discussion in 2019.
- On 24 Aug 20, I notified AFRL/RIGA (Thomas "Tom" Parisi and Tanya Macrina) of a possible conflict of interest or fraud.
- In early Sep, I learned that Dr. Roysdon was being paid ~$215 per hour and that Dr. Roysdon was working between 20 hours a week starting in approximately Apr 19. Mr. Oakley told me that Mr. Brown authorized 40 hours a week sometime within the last year.
- Dr. Roysdon informed Mr. Brown on roughly 20-21 Aug that he was going to depart the NSA for another position. This statement was made after Mr. Brown requested the legal letter from Dr. Roysdon.
- The legal reading from NSA stated that Dr. Roysdon could not represent himself to the Government as a GITI employee or work on a program he worked on in a Government capacity. However, he did that on multiple occasions while Mr. Brown was witing of that activity. It also did not have any dates or signatures on the email.
- During discussions with Lt Col Jared Ekholm, Daniel Brown, and Richard Ranft, there were multiple DD254s identified that have not been processed. Lt Col Ekholm tasked me to provide him a report with the status of all payloads projects and their DD254s.
- Lt Col Ekholm decided that Daniel Brown would be replaced on the project with Julio Guerrero and Ben Arnold.
- On roughly 27 Aug, the Program Manager at Global Info Tek Inc (GITI), Theodore "Ted" Oakley, informed me that Dr. Roysdon had pushed code to a public password protected GitHub repository. This code was not security reviewed. Previously, all code was identified as being offline and not on any internet connected repository. Mr. Oakley told me that Mr. Brown reviewed and approved the monthly status report from Dr. Roysdon that contained the GitHub addresses. Mr. Oakley also informed me that GITI issued a stop work for Dr. Roysdon after these issues emerged.
- During and after these events, Mr. Brown did show me several emails back in March that identified some work on classified systems to start DD254s, but nothing for Dr. Roysdon.
- Richard Ranft also told me that Mr. Brown was told not to reuse clearances in 2019 by Maj Perez-Castle for another project.

- I believe Mr. Daniel Brown repeatedly violates security practices and processes that he believes slows things down or to avoid work. He claims that everything is unclassified and appears to avoid ensuring program protection is in place. He claims program managers within his section were tasked, but rarely follows up to ensure documents are completed. If anyone else had done what Mr. Brown did, they would have been removed from the vault.

## V. OATH/SIGNATURE

*"I hereby voluntarily and of my own free will make this statement without having been subjected to any coercion, unlawful influence, or unlawful inducement. I swear (or affirm) I have read this statement, initialed all pages and corrections, and it is true and correct to the best of my knowledge."*

| SIGNATURE OF PERSON MAKING STATEMENT | SIGNATURE OF WITNESS/INTERVIEWER |
|---|---|
| | |

*Subscribed and sworn to before me, a person authorized by law to administer oaths, this* _____ *day*

*of* _____ , _____ *(year).*

SIGNATURE OF PERSON ADMINISTERING OATH

## VI. INSTRUCTIONS FOR CONTINUATION PAGE(S)

*Use plain bond paper (both sides optional). At the top right of each page, print or type "(Last name of individual making the Statement) on (Date)." At the bottom of each page, print or type: "Page ____ of ____Pages." The individual must initial the top and bottom entries and sign his/her name at the bottom of each page.*

**AF IMT 1168, 19980401, V2**    *(REVERSE)*

PAGE 2 OF _____    PAGES

**EXHIBIT 12**
**Page 2 of 2**

Confidential - Subject to Protective Order

US0000704

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

_____

DR. JOHN ROE,                    |
        Plaintiff,             |CIVIL ACTION NO.
                    |5:22-CV-00869-HJB
v.                               |
                    |
UNITED STATES OF AMERICA, et al|(Jury Demanded)
        Defendants.            |

_____

VIDEO 30(b)(6) DEPOSITION OF AIR FORCE LIFE CYCLE
MANAGEMENT CENTER REPRESENTATIVE BY WILLIAM ROWE
April 21, 2025

_____

APPEARANCES:

       JASON WAREHAM, ESQ.
       and
       LANCE HENRY, ESQ.
       ALLEN VELLONE WOLF HEINRICH & FACTOR, PC
       1600 Stout Street, Suite 1900
       Denver, CO 80202
       Phone: 303-534-4499
       E-mail:  Jwareham@allen-vellone.com
       appearing on behalf of Plaintiff

       JOHN W. HODGES, JR., ESQ.
       HENDLEY & HODGES LAW, PLLC.
       4594 US Hwy 281 N
       Spring Bach, TX 78070
       Phone:  210-640-3398
       E-mail:  John@hhtx.law
       appearing on behalf of Plaintiff

       KATRINA SEEMAN, ESQ.
       US DEPARTMENT OF JUSTICE, CIVIL DIVISION
       950 Pennsylvania Avenue NW
       Washington, DC 20530
       Phone: 202-724-6604
       E-mail:  Katrina.seeman@dc.gov
       appearing on behalf of Defendants

**EXHIBIT 13**
**Page 1 of 64**

```
 1   APPEARANCES continued:

 2              ROBERT D. GREEN, ESQ.
               UNITED STATES ATTORNEY'S OFFICE
 3             WESTERN DIVISION OF TEXAS
               601 NW Loop 410, Suite 600
 4             San Antonio, TX 78216
               Phone:  210-384-7100
 5             E-mail:  Robert.Green3@usdoj.gov
               appearing of behalf of Defendants
 6
               JOSEPH A. GONZALEZ, ESQ.
 7             US DEPARTMENT OF JUSTICE, CIVIL DIVISION
               950 Pennsylvania Avenue, NW
 8             Washington, DC 20530
               Phone:  20,2-598-3888
 9             E-mail joseph.a.gonzalez@usdoj.gov
               appearing on behalf of Defendants
10

11   ALSO PRESENT:  Maryvonne Tompkins, videographer
                     Rebecca Bradshaw, paralegal
12

13

14

15

16             PURSUANT TO NOTICE, the Video 30(b)(6)

17   deposition of Air Force Life Cycle Management Center

18   Representative by William Rowe was taken by Plaintiff

19   via Zoom video conference, beginning at 10:04 a.m.,

20   on April 21, 2025, under the Federal Rules of Civil

21   Procedure, before LINNEA BUSBY, Professional Court

22   Reporter and Notary Public for the State of Colorado.

23

24

25
```

**EXHIBIT 13**
**Page 2 of 64**

1                          I N D E X
       EXAMINATION                                    PAGE
2

3            EXAMINATION BY MR. WAREHAM          5
             EXAMINATION BY MS. SEEMAN          48
4            FURTHER EXAMINATION BY MR. WAREHAM  49

5

6                      E X H I B I T S
                                              INITIAL
7                                            REFERENCE
     No.    Description                        Page
8           None marked.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**EXHIBIT 13**
**Page 3 of 64**

```
 1                   P R O C E E D I N G S

 2              THE VIDEOGRAPHER:  The time is 10:04.  We

 3   are on the record.  Today is April the 21, 2025.

 4   This begins the recorded deposition 30(b)(6) of Air

 5   Force Life Cycle Management represented by William

 6   Rowe in the matter of Dr. John Roe versus United

 7   States of American, et al.

 8              This deposition is being recorded via Zoom

 9   videoconferencing.  The court reporter is Linnea

10   Busby.  The videographer is Maryvonne Tompkins.

11              The attorneys will introduce themselves

12   please.

13              MR. WAREHAM:  Hi.  It's Jason Wareham for

14   the Plaintiff.  Also on my team is John Hodges, Lance

15   Henry, and our paralegal, Rebecca Bradshaw.

16              MS. SEEMAN:  Good morning.  Katrina Seeman

17   on behalf of the Defendants.  I'm joined by my

18   co-counsel Mr. Joseph Gonzalez and Mr. Robert Green.

19              THE VIDEOGRAPHER:  Our court reporter will

20   please swear in the witness, and we can proceed.

21              COURT REPORTER:  Could you please raise your

22   right hand.

23                   WILLIAM ROWE,

24   being first duly sworn in the above cause, was

25   examined and testified as follows:
```

**EXHIBIT 13**
**Page 4 of 64**

1        MS. SEEMAN:  And, Counsel, just so we have a

2    clean record, Mr. Rowe has been designated to testify

3    on topics 4 through 6 and 17 and 18.

4        MR. WAREHAM:  4 through 6, 17 and 18, okay.

5    We'll clarify that on the record as well just to make

6    sure.

7        Anything else before I commence?

8        MS. SEEMAN:  No.

9                    EXAMINATION

10   BY MR. WAREHAM:

11      Q.  Okay.  All right.  Good morning, Mr. Rowe.

12   My name is Jason Wareham.

13      A.  Good morning.

14      Q.  I'm lead counsel for this particular case

15   Roe v US, et al.  I heard you -- had you been deposed

16   before?  Have you ever had any experience with this?

17      A.  No, sir, I have not.

18      Q.  All right.  Well, congratulations I guess is

19   in order.  Have you -- I mean, it follows from then

20   you've never been deposed as a company representative

21   before, right?

22      A.  That is correct.

23      Q.  All right.  So just a few things to cover

24   before we go into, you know, the actual examination.

25   First off is we're just looking for the truth today.

**EXHIBIT 13**
**Page 5 of 64**

1    You know, you probably noted that you were placed

2    under oath.  We're just looking for -- which has the

3    like similar weight of testimony as in trial.  So as

4    I ask you questions today, we're just looking for

5    what you know, what you understand, what you can --

6    you know, where your knowledge extends to.  And we

7    don't want you to speculate or make anything up.

8    Okay?

9         A.  Understood.

10        Q.  All right.  To that end, you're not just a

11   fact witness like a normal, you know, individual

12   answering these questions.  But today you're actually

13   able to for the scope of your questions and responses

14   bind Air Force Life Cycle Management Center.  Do you

15   understand that?

16            THE DEPONENT:  Ms. Seeman, is that correct?

17            MS. SEEMAN:  Yes, that's correct.

18            THE DEPONENT:  Thank you.

19        A.  Yes, I do understand that.

20        Q.  (By Mr. Wareham)  Great.  And actually just

21   for shorthand, I tend to use HNCO to also mean Air

22   Force Life Cycle Management Center just because it's

23   a little faster when --

24        A.  Understood.

25        Q.  HNCO is going to mean the same thing today.

**EXHIBIT 13**
**Page 6 of 64**

1          Of the topics -- I just want to be sure for

2    the record.  I'm going to go through them since

3    they're not very voluminous, and I want to make sure

4    I'm getting the right ones that you have prepared to

5    answer today.

6          So the first one on our notice of deposition

7    that I understand that you're here to testimony on is

8    number 4 which is all actions related to Dr. Roe's

9    security clearance transfers between Air Force Life

10   Cycle Management Center and NSA, including records,

11   communications, decisions and responsible personnel.

12   Are you prepared to answer that question today?

13        A.  Yes, I am.

14        Q.  Great.  And then also number 5,

15   Comprehensive description of all measures taken by

16   HNCO concerning alleged security violations involving

17   Dr. Roe, including detailed timelines and

18   decision-making documentation, notifications to and

19   coordination with OSI, NSA, and other entities.  Are

20   you prepared to answer that question today?

21        A.  Yes, I am.

22        Q.  Great.  Number 6, SOPs, guidelines, and

23   policies governing how HNCO accesses and investigates

24   allegations of security violations or insider

25   threats, including:  Roles, duties, investigative

**EXHIBIT 13**
**Page 7 of 64**

1    steps, and reporting requirements of the security

2    manager, application of these SOPs specifically to

3    Dr. Roe's allegations, including deviations from

4    standard practices.  Are you prepared to answer that

5    question today?

6         A.  Yes, I am.

7         Q.  Great.  And then 18, Detailed account of the

8    security managers specific investigative activities

9    regarding Dr. Roe, including:  Specific steps taken,

10   documentation reviewed, and conclusions reached

11   production of all related reports, notes, and

12   communications.  Are you prepared to answer those

13   questions?

14        A.  Yes, I am.

15        Q.  Great.  Thank you for bearing with me on

16   that specific detail.

17            The other thing to note today is unless

18   instructed not to answer once they object for the

19   record, give a little bit of pause so that their

20   objection can be fulling recorded for the record.

21   But then unless somebody instructs you not to answer

22   the question, you can just commence and answer the

23   question.

24            If you need me to repeat it at any time, I

25   can certainly do that as well, and we can go from

**EXHIBIT 13**
**Page 8 of 64**

1    there.  But honestly nothing here is to trip you up

2    today.  It's just to record certain facts for the

3    case.

4         So what will also certainly occur is I will

5    ask inartful questions or perhaps confusing questions

6    at times.  If whatever question I ask you're unable

7    to understand the question, it's perfectly okay to

8    say can you repeat that question; and I'll try to do

9    it in a way that makes sense.  Okay.

10        A.  Appreciate it.

11        Q.  Any questions for me before we continue?

12        A.  No, sir.

13        Q.  Great.  Then we'll just kick it off.  I

14   think what I'm going to -- or can you just give me a

15   brief background of your job title and

16   responsibilities at HNCO?

17        A.  My job title is chief of security.

18   Basically I oversee all the security processes to

19   include personnel, information security, industrial

20   security, physical security for the branch at that

21   time and to monitor and set policy and enforce policy

22   for the HNCO personnel and for any visitors coming

23   into our space.

24        Q.  When you say security, what does that

25   involve?  The clearance side?  Physical security?

**EXHIBIT 13**
**Page 9 of 64**

1    The whole gamut?

2        A.  It's the whole gamut.  It's physical

3    security.  It's personnel security with clearances.

4    It's information security.  It is industrial

5    security.  And some op sec, operational security.

6        Q.  Understood.  Can you please describe the

7    preparation you took to get ready for the deposition

8    today?

9            MS. SEEMAN:  I'll step in just to clarify

10    for the record.  So I'll object to the extent that

11    the question calls for any attorney-client privileged

12    communications.  But, Mr. Rowe, you can still answer

13    as to what documents and sources you looked at.  I

14    would just instruct you not to divulge the substance

15    of our communications.  Does that make sense?

16            THE DEPONENT:  Yes.

17            MS. SEEMAN:  Great.

18        A.  I do have several documents that I've

19    reviewed.  They are all logged in as far as the

20    number on the bottom.  So I reviewed all of those and

21    asked to -- several general questions about the case

22    in preparation for this and review of the documents,

23    sir.

24        Q.  (By Mr. Wareham)  All right.  Is there any

25    information that you wanted to review but you were

EXHIBIT 13
Page 10 of 64

1  unable to review, like that you felt you need to

2  review to fully understand to prepare for your

3  testimony?

4      A.  No, sir.

5      Q.  All right.  Well, I think I'm going to start

6  conceptually in reverse with 17 and 18 first because

7  they start kind of general, okay?  So can you explain

8  in general before we get to specifically this case

9  the responsibilities of a security manager?

10     A.  A security manager itself is responsible

11  for, like I stated before, all disciplines and

12  aspects of security enforcement and knowing the

13  policies and procedures that are established in

14  general.

15     Q.  Okay.  And, yeah, just keep it in general.

16  We'll go general, and then we'll go specific and

17  apply it just so you can track the conception there.

18          What in general are the investigative steps

19  if somebody alleges a security violation?

20     A.  In general it's noted and reported to our

21  office.  We look at initial facts, notify our chain

22  of command.  Something just came on up on my screen

23  now.

24     Q.  No.  You're fine.

25     A.  Notify the branch material leader, and we

EXHIBIT 13
Page 11 of 64

1    also notify Air Force OSI PJ which is the program

2    security officer who has jurisdiction over the top

3    material we're there to protect.

4         Q.  And what -- where are the sources of

5    complaints usually from in general?

6         A.  They can come from any number of clearance

7    sources.  Anybody who is cleared to be in the spaces

8    or have access to that type of material if they note

9    a suspected violation, they -- each individual has an

10   obligation to report to the security office, and then

11   we take it from there.

12        Q.  And is there any sort of training at the it

13   institutional level on what should be reported and

14   when and to whom?

15        A.  Every cleared --

16             MS. SEEMAN:  Objection.  Hold on.  Objection

17   to form.  You can go ahead and answer, Mr. Rowe.

18             THE DEPONENT:  Okay.  Thank you.

19        A.  Every cleared individual goes through

20   initial and annual training in all aspects of all the

21   security disciplines to include how to report a

22   potential violation.

23        Q.  (By Mr. Wareham)  And in general for someone

24   not part of the security team, you know, your average

25   HNCO personnel, where do they submit complaints?

**EXHIBIT 13**
**Page 12 of 64**

1      A.   They submit it directly to the security

2    office.

3      Q.   And are any records kept as part of the

4    security office complaint?

5      A.   A lot of it comes from memorandums, a

6    record, or e-mails.

7      Q.   And is there like an e-mail box, like an

8    e-mail group box that receives these complaints?

9      A.   Yes.

10          MS. SEEMAN:   Objection to form.   You can

11    answer.

12     A.   Yes.

13     Q.   (By Mr. Wareham)   All right.   Well, I

14    noticed you were somewhat waiting on answering that

15    question.   Can you explain what was going on there?

16     A.   Since it's in my first one, I just want to

17    be careful of what level of detail I give as to not

18    to go outside the lines of testimony.

19     Q.   Okay.   So can you -- can you clarify?   The

20    objection kind of stepped on your answer.   Is there

21    an actual box, like a group box, that those

22    complaints are submitted to, or is it an individual

23    e-mail address?

24     A.   There is both.

25     Q.   Okay.   And most commonly where do you see

EXHIBIT 13
Page 13 of 64

1  complaints come in in general?

2      A.  To the security office inbox.

3      Q.  Online submission sources like a web portal

4  or anything like that?

5      A.  Not to my knowledge, no, not as such.

6      Q.  Okay.  And once you get this -- this

7  complaint, this initial complaint, can you describe

8  the staffing that your -- that your department does

9  to staff up on a complaint?

10      MS. SEEMAN:  Objection to form.  You can

11  answer, Mr. Rowe.

12      THE DEPONENT:  Thank you.

13      A.  We -- like I said stated, before we inform

14  the material leader or the head of that branch and

15  Air Force OSI PJ.

16      Q.  (By Mr. Wareham) Okay.  Is there any form of

17  like initial qualitative assessment of the complaint,

18  or does every complaint get forwarded in that manner?

19      A.  Every alleged has to be forwarded, and we

20  then take MFRs.  So we have something written that

21  states, you know, what the complaint's about or what

22  the suspected incident is about.

23      Q.  Okay.  And once it gets reported to the

24  material leader or OSI, are you familiar with what

25  they do with it?

**EXHIBIT 13**
**Page 14 of 64**

1           THE DEPONENT:  May I answer?

2           MS. SEEMAN:  Yes.

3      A.   Okay.  At OSI we do what's called a security

4  incident report, and we give as much facts of what

5  has been reported to us in a form on a separate

6  network to OSI PJ.  And we also inform the material

7  leader.  And together it's made a determination

8  whether there should be a preliminary inquiry

9  conducted.

10     Q.  (By Mr. Wareham)  And you kind of

11 presupposed my next set of questions.  So that's

12 great.

13          When you meet together like that, is there

14 any term for that kind of initial meeting when you

15 initially coordinate on a complaint?

16     A.   Not specific term, no.

17     Q.   What are the different options available to

18 the progression of a complaint arising from that

19 meeting?

20          MS. SEEMAN:  Objection to form.  You can

21 answer, Mr. Rowe.

22     A.   Sir, can I have you clarify your question

23 please?

24     Q.  (By Mr. Wareham)  Sure.  So you mentioned

25 that a preliminary inquiry is one option, right, in

**EXHIBIT 13**
**Page 15 of 64**

1    your last answer?  Do you recall that?

2        A.  Yes, I do.

3        Q.  What are the other options besides a

4    preliminary inquiry?

5        A.  The other options could be a minor security

6    infraction where there's just statements or MFRs

7    gathered, and possibly -- depends on the

8    determination of OSI PJ and the material leader to

9    whether it's retraining or documented as an

10   infraction as such.

11           I very rarely see those.  Most -- 99 percent

12   of the time they do an inquiry just to gather

13   complete facts.

14       Q.  And can you describe what the preliminary

15   inquiry process is in general?

16       A.  There is -- once a material leader makes a

17   determination for a preliminary inquiry, they choose

18   that inquiry official.  They are formally appointed

19   by memorandum, by letter which I do have copies of

20   with me.

21           And then that individual is briefed by our

22   office on the basic information or synopsis of the

23   inquire and is given a continuity book as far as how

24   to write the template for a report, points of contact

25   to reach out to do the inquiry.  And then they look

EXHIBIT 13
Page 16 of 64

1    into the matter with all possible personnel they need

2    to talk to or interview or take statements from to

3    gather all the facts.

4        Q.  And once that -- the facts have been

5    gathered, do you what, if any, document or product

6    they produce after a preliminary inquiry?

7        A.  They do produce a preliminary inquiry report

8    that is reviewed just for technical by our office to

9    make sure it meets the template standard.  And then

10   it goes to material leader for his review or her

11   review.  And then off to AFOSI PJ for final.  And

12   then any recommendations between material leader and

13   AFOSI is made part of that entire report.

14       Q.  All right.  So I want to the drill down a

15   little bit on that process.  It sounds to me like a

16   draft report is initially generated and sent to your

17   office for review, as well as OSI; is that correct?

18       A.  Those go to -- sometimes it goes to OSI for

19   a draft review.  Sometimes it doesn't.  It depends on

20   the agent.  We do a draft initial review, and the

21   material leader also does a draft initial review.

22       Q.  All right.  So how are those draft reviews

23   usually submitted?

24       A.  Usually based on the level of the case on

25   the appropriate network.

**EXHIBIT 13**
**Page 17 of 64**

1          Q.  And when you say appropriate network, can
2    you describe what networks those may be?
3          A.  I cannot in detail, sir.  I do apologize.
4          Q.  What is restraining you from describing
5    those in detail?
6          A.  Those are special access program cleared
7    networks.
8          Q.  Okay.  Are the -- can I use the term SAP to
9    mean special access program?
10         A.  You can.
11         Q.  Okay.  Are those SAP networks themselves
12   unacknowledged?
13              THE DEPONENT:  Ms. Seeman?
14              MS. SEEMAN:  I -- can we put the witness in
15   just a different room?
16              MR. WAREHAM:  Sure.
17              MS. SEEMAN:  So the attorneys can discuss
18   this?
19              MR. WAREHAM:  We'll go off record.
20              MS. SEEMAN:  Okay.  Thank you.
21              THE VIDEOGRAPHER:  The time is 10:23.  We
22   are going off the record.
23              (A recess was taken from 10:23 to 10:33
24   a.m.)
25              THE VIDEOGRAPHER:  The time is 10:33.  We

**EXHIBIT 13**
**Page 18 of 64**

1    are back on the record.

2            MS. SEEMAN:  So, Counsel, before you start

3    asking questions I just want to make a statement for

4    the record.

5            So it's our position that this sort of

6    questioning about networks and stuff exceeds the

7    scope of topic 17.  However, to the extent that it's

8    implicated in another topic, Air Force Life Cycle

9    Management Center is prepared to designate another

10   witness to answer questions about these networks.

11   But based upon a security concern, Mr. Rowe cannot

12   answer those questions today.

13           And I'm not sure if you're speaking, but I

14   cannot hear you.

15           MR. WAREHAM:  I believe the current state of

16   the questions are where is the reports generate --

17   where are the reports generated submitted, the draft

18   reports submitted.

19           And so it's your position that from there,

20   the Government will designate a supplemental to

21   answer where the draft reports are submitted, what

22   networks they're submitted on?

23           MS. SEEMAN:  No.  To the extent you're

24   asking this witness to identify special access

25   program networks, based on a security concern, he's

**EXHIBIT 13**
**Page 19 of 64**

1    not able to do that.

2          But to the extent that that is implicated by

3    another topic or if we want to be discreet moving

4    forward on this topic about which network was used

5    specifically or what networks are available to submit

6    draft reports on, we are happy to designate another

7    witness to testify about that.

8          MR. WAREHAM:  Okay.

9          MS. SEEMAN:  But this witness cannot do so

10   today.

11         MR. WAREHAM:  So specifically I will reserve

12   the question what networks are draft reports eligible

13   to be submitted on for a later 30(b)(6) designee then

14   for the record.

15         MS. SEEMAN:  Yes.

16     Q.  (By Mr. Wareham)  Okay.  So let's go back to

17   just the draft process.  They're submitted on one of

18   many networks at which point what happens with the

19   drafts normally?

20     A.  So they're reviewed for technical competence

21   and formatting and then forwarded to the material

22   leader, OSI for review and approved.

23     Q.  And can you tell me who does these reviews?

24   Like specifically who is doing the reviews on this

25   that you describe?

**EXHIBIT 13**
**Page 20 of 64**

1        A.   Normally it's anyone in our security office

2   to include myself.  I did not review this particular

3   one.  Two other staff members did review this and

4   forwarded it over per my direction.

5        Q.  And are you familiar with what happens with

6   the draft reports after your office has conducted the

7   review and it's forwarded to the material leader?

8        A.  The material leader does do a review and

9   recommends any corrections.  And that's where he

10  works directly with the inquiry official to go to --

11  go final with the report based on what he requires of

12  it and OSI requires of it.  And then it is signed by

13  the inquiry official and by the material leader.

14            I'm going to look -- if you don't mind, I'm

15  going to look at a report.  Do I need to state the

16  number at the bottom right?

17       Q.  When you're saying you're going to look at a

18  report, you're going to look at this specific report

19  for this case?

20       A.  Yes.

21       Q.  Okay.  Let's get to that in a second.  Help

22  me keep my train of thought around just the general

23  process.

24       A.  Okay.

25       Q.  We'll downshift to that in a moment.  So

**EXHIBIT 13**
**Page 21 of 64**

1    during the draft submission technical review,

2    material leader review are there normally documents

3    like going back and forth via e-mail networks during

4    those reviews; or is it just like a -- is it back and

5    forth; or is it kind of unilateral?  What's going on?

6         A.  It's kind of unilateral.  There are

7    supporting documents with statement taken or memos

8    for record.  Anybody the inquiry official discusses

9    the case with.

10        Q.  And does anyone in that process use like the

11   Microsoft Word red line approach or some edits or

12   comments in the draft reports?

13        A.  Honestly I'm not sure if they do or not.

14        Q.  Okay.  All right.  And then after in general

15   the material leader gets the final report with the

16   investigating officer, what occurs then?

17        A.  It's forwarded to AFOSI, and AFOSI PJ makes

18   the final determination of the outcome of the inquiry

19   and any corrective action that needs to be taken in

20   concurrence with the material leader.

21        Q.  Okay.  And just to clarify, when you say PJ,

22   what does that stand for?

23        A.  Oh, boy.  I looked it up one time.  It's

24   just an office symbol for the section of Air Force

25   office of special investigations which is -- which

**EXHIBIT 13**
**Page 22 of 64**

1    handles special programs enforcement.  So we call

2    them the PSO or program security official.

3        Q.  Okay.  Help me understand a little bit

4    because this digresses from my understanding.  Are

5    you saying that Air Force OSI is the kind of final

6    adjudicator of the preliminary inquiry?

7        A.  They're the final determinator, yes, as far

8    as we know, yes.

9        Q.  Okay.  And what are those determinations --

10   what are the eligible determinations that they can

11   make?

12       A.  It's -- sir, it's based case by case.  I

13   don't -- I can't speculate on all of their processes

14   on making a final adjudication or determination.

15       Q.  Okay.  Do they send any sort of

16   documentation back to your office following whatever

17   determination they make?

18       A.  Again, it is case by case.  Sometimes they

19   do.  Sometimes they don't.  We are notified of a --

20   of when the case is closed.  They've made their final

21   determination.  And if any of the recommendations or

22   any actions taken as they determine requires our

23   office, then we're notified at that time case by

24   case.

25       Q.  Are there any other databases that are being

EXHIBIT 13
Page 23 of 64

1    updated to your knowledge during this process?

2        A.  Not to my knowledge.

3        Q.  Have you heard of the system called JPAS?

4        A.  It used to be a system.  They now DISS.

5        Q.  What are those systems, and do you know what

6    those two acronyms stand for, JPAS and DISS?

7            THE DEPONENT:  JPAS -- Ms. Seeman, I can

8    answer this?

9            MS. SEEMAN:  Yes.  I'll just -- I'm not sure

10   how this fits into the scope, but you can go ahead

11   and answer, Mr. Rowe.

12       A.  Oh, just for the record, I'm a bit old.

13   I've been doing this a long time.  So I hope I get

14   these right.

15           JPAS was the Joint Personnel Adjudication

16   System where we looked up clearances, and now it's

17   replaced with Defense Investigative Security System

18   which is DISS.

19       Q.  (By Mr. Wareham)  All right.  Are those

20   databases updated during any of those security

21   processes?

22       A.  I will say by policy they should be

23   annotated whenever an individual in those databases

24   had been pointed out as having a security incident or

25   inquiry looked into.  But it also depends on, you

**EXHIBIT 13**
**Page 24 of 64**

1    know, the special security office that's maintains --

2    owns their records.

3        Q.  All right.  And when you say by policy they

4    are annotated, what kind of annotations are you

5    saying -- are you talking about?

6        A.  There is just a specific annotation as a

7    drop down or a field you put in to note that there is

8    a security incident initiated on that date.

9        Q.  Okay.  Are any -- like is the report or any

10   documents uploaded into that annotation?

11       A.  Most times, no, sir.

12       Q.  Okay.  By policy, should there be?

13       A.  Give me a second.  I will try to go over in

14   my head.  I don't believe so.  I'm having a hard time

15   recalling.  I know just the incident itself is

16   reported.  Normally anything related to an inquiry is

17   outside of those databases.

18       Q.  And for your office, who is the person

19   charged with updating the annotations?

20       A.  I did have somebody on staff who did ran

21   personnel security.

22       Q.  Okay.  And was that person used in Dr.

23   Roysdon's case?

24       A.  Yes.

25       Q.  What was the name of that person?

**EXHIBIT 13**
**Page 25 of 64**

1            THE DEPONENT:  Ms. Seeman, am I allowed?

2            MS. SEEMAN:  Yes.  Mr. Rowe, you'll know

3    when I instruct you not to answer.

4        A.  Th individual's name is Richard Ranft.  He's

5    no longer with the Government right now.

6        Q.  (By Mr. Wareham)  Okay.  So I think --

7    anything else occur in the general process following

8    OSI action on final determination?  Does anything

9    else happen in that process?

10       A.  No, that that I can be aware of.

11       Q.  Is there ever a point where based on their

12   determination the clearance is suspended or revoked?

13       A.  Not by our determination.  They are, like I

14   said, case by case if there could be made a

15   determination.  Then the appropriate authority will

16   make any suspension or revocation of the clearance or

17   access.

18       Q.  And who is the appropriate authority that

19   you're describing?

20       A.  Sir, honestly it's case by case.  It depends

21   on what accesses are being revoked or suspended.

22       Q.  Okay.  Have you ever heard the term "OPM."

23       A.  Office of Personnel Management, yes, sir.

24       Q.  What is their role in post security incident

25   reporting or determinations?

EXHIBIT 13
Page 26 of 64

1          A.  I'm not aware --

2               MS. SEEMAN:  Objection to form.  You can

3     answer.

4               MR. WAREHAM:  To be clear, that was an

5     objection on the record for form?

6               MS. SEEMAN:  Yes.

7          Q.  (By Mr. Wareham)  Okay.  You're not aware of

8     that?

9          A.  No.

10         Q.  Okay.  Are you aware whether or not security

11    violations are forwarded to OPM for action?

12         A.  No.

13         Q.  All right.  So let's go then -- I think that

14    is the extent of the general.  So let's go to Dr.

15    Roysdon, who is also known in the complaint as Dr.

16    Roe, and the specific process employed there.  In

17    general was the process that you described employed

18    with respect to Dr. Roysdon?

19         A.  Yes.

20         Q.  Can you please describe the steps that were

21    taken in Dr. Roysdon's case?

22         A.  Yes.  We -- our office was notified by HNCO

23    personnel of a potential incident.  So we then

24    immediately informed the material leader and AFOSI

25    PJ.  And then a security incident report was

EXHIBIT 13
Page 27 of 64

1    generated by our office to OSI PJ on those

2    circumstances, on the general circumstances of that

3    as required on their form.

4         Q.  Okay.  And when you said reported by HNCO --

5    personnel at HNCO, do you know who made this report?

6         A.  To the best of my knowledge, yes.

7         Q.  Who was that?

8         A.  At the time it was Captain William McVeigh.

9         Q.  Okay.  Do you know how this report was made?

10        A.  Initially verbally.

11        Q.  Do you know who received the report?

12        A.  Mr. Richard Ranft who then disseminated it

13    over to me to make -- just for awareness.

14        Q.  All right.  And how did Mr. -- and I

15    mispronounced his name before -- Mr. Ranft --

16        A.  Ranft.

17        Q.  Ranft, how did he report it over to you?

18        A.  He told me verbally.

19        Q.  Okay.  Do you recall what he told you?

20        A.  No, sir, I do not exactly.

21        Q.  All right.  And so following the verbal

22    report, what was your department's actions after the

23    verbal report?

24        A.  To notify -- excuse me, to notify the

25    material leader and to notify AFOSI PJ.

**EXHIBIT 13**
**Page 28 of 64**

1       Q.  And do you know what the nature of the

2  report was?  What was reported as a security

3  violation?

4       A.  From my recollection, the nature of it is

5  there was an individual who was cleared as an NSA

6  employee and was attending a briefing on a program as

7  an industry contractor where he was not cleared.

8       Q.  Okay.  And can you describe that process --

9  or not process.  But if, say, somebody was cleared on

10  one thing but not cleared on another, can you

11  describe some more detail around that?

12          MS. SEEMAN:  I'm going to object just about

13  being outside of the scope of topic 18.  The witness

14  can answer in his personal capacity.

15       A.  Can you repeat the question please?

16       Q.  (By Mr. Wareham)  Yeah.  Just one moment.

17          MR. WAREHAM:  So, just to be clear, I'm not

18  just limiting all questions to 18.  I believe that is

19  in scope within 6.  So would you -- do you revise

20  your objection on that basis?

21          MS. SEEMAN:  Counsel, yes.  However, just to

22  keep things straight on our end, especially because

23  we do have additional designees for things, if you're

24  going to switch between topics, it would be helpful

25  to me keeping track of all of these to note that

EXHIBIT 13
Page 29 of 64

1    before you flop around.  Is that fair?

2              MR. WAREHAM:  That's fine.  I'll do my best.

3              MS. SEEMAN:  Thank you.

4         Q.  (By Mr. Wareham)  So briefly going under 6

5    to understand the restrictions or the nature of the

6    security violation, can you describe what the --

7    what, if any, guidelines or policies exist around the

8    issue of one person having -- a person having a

9    clearance on one issue versus a clearance on another

10   issue, that issue that you -- this is terrible.  Let

11   me rephrase.  See, I told you it was going to happen.

12             So, look, in your testimony you described

13   that the security violation involved Dr. Roysdon or

14   an individual having access to spaces under one

15   clearance level and not other clearance reason to

16   access.  Can you describe what that means in general

17   and what guidelines or SOPs govern that problem?

18   Does that make sense what I said?

19        A.  Yes.

20        Q.  Okay.  Are you able to answer that question?

21             MS. SEEMAN:  I'm still going to object to

22   form.  But, Mr. Rowe, you can answer.

23        A.  In general we follow a DOD 5205.07, which is

24   the security guideline, and the JADE SOP, standard

25   operating procedure.  That's the database that has

**EXHIBIT 13**
**Page 30 of 64**

1     those clearances.

2           When visit requests are sent, they're

3     validated for the visitor who cleared them and who

4     they're cleared under, what agency, if they're

5     industry or Government or military.  And that's how

6     we validate the clearance.

7           So then we validate the clearance for the

8     visit.  And then if they then gain access and they

9     are -- it is determined that they are engaging in

10    level of access classified conversations not as they

11    were sent for their clearance, then there's where a

12    violation occurs.

13    Q.  (By Mr. Wareham)  Okay.  So if I'm

14    understanding your testimony -- I just want for

15    clarity of the record -- if somebody is employed in

16    one capacity and has a clearance in that capacity,

17    the guidelines and SOPs restrict that same individual

18    having the same access on their original capacity for

19    a second job; is that right?  Is that what you're

20    saying?

21    A.  No, sir.

22    Q.  Yeah.  Please clarify -- try to simplify it

23    for somebody as simple as I am.

24    A.  Okay.  If -- if you're -- in general if

25    you're cleared for special access as a Government

EXHIBIT 13
Page 31 of 64

1    employee --

2        Q.  Yeah.

3        A.  -- and you gain access as a Government

4    employee, and you engage in discussions or

5    conversations at those clearance levels but you are

6    not in the capacity as a Government employee but as,

7    let's say, an industry employee where you don't have

8    those accesses, you're not cleared for that, as an

9    industry employee, that's where the incident occurs.

10       Q.  Okay.  And, again, where do those -- where

11   are those rules kept?  What SOPs and guidelines

12   control that?

13       A.  So we have the DOD 5205.07 which is the

14   Department of Defense guidelines for SOP operations,

15   and we have our own standard operating procedure for

16   our facility which reiterates a lot of those

17   guidelines for our facility, and then the database

18   where those accesses are passed have its own SOP on

19   how we -- how we work the database.

20       Q.  And in any of those resources that you

21   described, is it clearly defined this Government

22   employee versus industry employee problem?

23       A.  I will take a pause just to gather my

24   thoughts on this.

25       Q.  Yeah.  Do you what you need.

**EXHIBIT 13**
**Page 32 of 64**

1      A.  Specifically it would be the JADE SOP

2  because the JADE SOP states looking the folks up in

3  the JADE and validating what category they're in for

4  those accesses.

5      Q.  Okay.  And the JADE SOP is held by what

6  agency or at what level?

7      A.  I'm trying to remember.  Whoever -- I'll

8  apologize.  I don't recall specifically who manages

9  or runs the JADE database itself.  It might be what

10  we call the SAPCO, which is the high level of office

11  on the East Coast.

12      Q.  Okay.  All right.  Well, let's -- for now

13  let's go back to the 16 question, the one

14  specifically dealing with the specific processes

15  employed for Dr. Roysdon.

16         So I think we're at the point where a

17  security violation is alleged.  From there, you have

18  some coordination with Mr. Ranft.  What happens after

19  that.

20      A.  The inquiry official is appointed, and he

21  runs his inquiry and drafts a memorandum -- or a

22  report itself based on the personnel he had talked

23  to, and he makes a recommended conclusion from the

24  facts and a recommendation to the material leader and

25  OSI on the case.

**EXHIBIT 13**
**Page 33 of 64**

1      Q.  And if I'm understanding your answer, that's

2  the process that was followed in this particular

3  case?

4      A.  Yes, sir.

5      Q.  Are you aware of the outcomes and

6  determinations made in this process?

7      A.  Only from what I can read from the report

8  itself.

9      Q.  That's fine.  Go ahead.  Are you able to

10  answer that having reviewed the report?

11     A.  The last statement note, the inquiry

12  official's report?

13     Q.  Yeah.  What determination -- what was final

14  determination made in this case?

15     A.  This is his conclusion, and I said he's

16  gathering facts, he or she would be gathering facts

17  and making a recommended conclusion to material

18  leader and OSI.

19     Q.  And what was the conclusion made?

20         THE DEPONENT:  Counsel, can I confirm

21  that --

22         MS. SEEMAN:  Yeah, Mr. Rowe, you can read

23  the conclusion from the document that's in front of

24  you.  Just for the record, what are the numbers down

25  in the corner of the document that you're looking at?

EXHIBIT 13
Page 34 of 64

1          THE DEPONENT:  I'll state US 000176.

2          MS. SEEMAN:  Thank you.

3      A.  So I will read from paragraph 5A.  Dr.

4  Roysdon when accessing -- accessing classified

5  program information was acting in an official

6  capacity as an industry employee with proper

7  clearances.  Conversely, when acting in the capacity

8  as a subcontractor, Dr. Roysdon did not have or have

9  access to classified information as indicated.

10  Therefore, no compromise of classified information

11  occurred.

12      Q.  (By Mr. Wareham)  Okay.  And as the security

13  manager 30(b)(6) person, did this necessitate any

14  further action against Dr. Roysdon?

15      A.  Sir, the best answer I can give you is we

16  reviewed that, and it's forwarded to AFOSI cases, and

17  they make any -- to close the case or they make it

18  their own determination as far as any further

19  actions, sir.

20      Q.  Okay.  Do you know if any further actions --

21  well, do you know if there were any endorsements by

22  your office or any forwarding related for this

23  report?

24          MS. SEEMAN:  Objection to form.  You can

25  answer, Mr. Rowe.

EXHIBIT 13
Page 35 of 64

1           THE DEPONENT:  Thank you.

2      A.  The report itself when it was filed, it is

3  forwarded over to AFOSI PJ.

4      Q.  (By Mr. Wareham)  Are you aware of whether

5  or not the complaint process was closed out at your

6  level with respect to Dr. Roysdon?

7      A.  I am not aware, sir.

8      Q.  Are you aware of any further information

9  relevant to this particular investigation?

10          MS. SEEMAN:  Objection to form.  You can

11  answer.

12          THE DEPONENT:  I can answer?  Thank you.

13          MS. SEEMAN:  Yes.

14      A.  I know that in August of 2020, that same

15  year, Dr. Roysdon was debriefed from program accesses

16  by AFOSI PJ.

17      Q.  (By Mr. Wareham)  Do you know why?

18      A.  I do not know, sir.  Only that he was

19  debriefed.

20      Q.  Okay.  Anything else -- any other details

21  that I have failed to ask with respect to this

22  specific investigation?

23          MS. SEEMAN:  Objection to form.  You can

24  answer, Mr. Rowe.

25      A.  Not to my knowledge, sir.

**EXHIBIT 13**
**Page 36 of 64**

1          Q.  (By Mr. Wareham) Could you please list all

2     documents that were created as part of this specific

3     process?

4          MS. SEEMAN:  Go ahead, Mr. Rowe.

5          A.  As of the documents that I have printed in

6     front of me that I was made aware of, the inquiry of

7     security incident, there is a memo for record from

8     Colonel Jared Ekholm, update on the D254 status of

9     Fibonacci, some e-mails back and forth between

10    Special Agent Alan Beal and Captain McVeigh and

11    myself and Mr. Richard Ranft, an e-mail setting up

12    the initial brief for the inquiry official by Mr.

13    Jose Morin, another one of my staff members.

14          The appointment of the inquiry official.

15    There's some e-mails from Colonel Ekholm to Mr.

16    Robert Brown, the head of our contracting department.

17    I do have a redacted version of the SOP format two

18    which is the briefing and debriefing Dr. Roysdon.

19    Communication between Richard Bremer, the inquiry

20    official, and Colonel Ekholm I was cc'd, requesting

21    an extension for his report, and there's an

22    unclassified e-mail track between SAP AQL and AFOSI.

23          Q.  (By Mr. Wareham)  All right.  And can you

24    tell me of those documents that you just recited,

25    what are the numbers on the bottom --

EXHIBIT 13
Page 37 of 64

1    A.  Right.

2    Q.  -- bottom right for each of those documents?

3    A.  The one I just mentioned was US 000266.

4  This is the e-mails between SAP AQL and Special

5  Agency Beal.  US 000106 is the memo for record from

6  Colonel Ekholm on the 254 status.  US 0000739 e-mail

7  trail between Colonel Ekholm and Mr. Robert Brown.

8  US 0000745 request for extension e-mail from Richard

9  Bremer to Colonel Ekholm.  US 000057 and 58 which is

10  the SOP format two briefing and debriefing form.  US

11  0000742 e-mail trail, again, to Mr. Brown from

12  Colonel Ekholm.  US 000741 appointment of inquiry

13  official.

14         See if this is right page.  I apologize.

15    Q.  No problem.

16    A.  Inquiry security incident report US 0000175.

17  E-mail between Special Agent Beal and Captain McVeigh

18  acknowledging the e-mail was sent on the system

19  that's US 0000251.  And between Joseph Morin, from my

20  staff, to inquiry official Richard Bremer setting up

21  a time for his initial brief that's US 0000756.

22    Q.  All right.  Thanks for doing that.  All

23  right.

24         We'll go back now -- oh, actually as related

25  to -- well, I want to make sure I'm detailing this

**EXHIBIT 13**
**Page 38 of 64**

1    right.  So it's a little bit of overlap between 18

2    with specific steps taken and then number 5 the

3    timeline of the specific steps taken.

4         Do you recall -- do you know the timeline --

5    do you know when Captain McVeigh's oral complaint

6    came in, what date that was?

7         A.  I do not recall the date, sir.  I apologize.

8         Q.  Okay.  Is there any sort of documentation or

9    communication with the person who received the

10   complaint as to what date might have occurred?

11        A.  Not to my knowledge, sir.

12        Q.  Can you -- do you know if whether it was in

13   August of 2020 or not?

14        A.  I could speculate, sir, but I don't know the

15   exact date.

16        Q.  You don't recall, okay.

17        A.  My I expand on my answer?

18        Q.  Sure.  Go ahead.  Absolutely.

19        MS. SEEMAN:  Yes.  Yes.

20        A.  Just from all the documentation we have

21   already gone over, most of these occurred in August

22   of 2020.  So I would assume all of this initiated in

23   August of 2020.

24        Q.  (By Mr. Wareham)  All right.  What are the

25   normal timelines that you seek to adhere to in these

**EXHIBIT 13**
**Page 39 of 64**

1    kind of situations?

2        A.  The normal timeline when an incident is

3    reported, right, there is usually a two- to three-day

4    timeline to have that -- to report that to the proper

5    authority.  In this case the material leader and

6    appointed inquiry official.

7        Q.  Have you reviewed any documentation that

8    would lead you to believe that this timeline wasn't

9    followed?

10       A.  No, sir, I have not.

11       Q.  All right.  So to clarify, would the

12   remainder dates and times regarding the timeline of

13   Dr. Roe's specific incident, would that be contained

14   in those documents that you just listed?

15       A.  For the most part, yes, sir, I think it

16   would be.

17       Q.  Is there anything that you can think of that

18   wouldn't be included in those documents relevant to

19   the timeline?

20       A.  Not to my knowledge, sir.

21       Q.  Okay.  So let's -- let's go to -- back to

22   number 6.  I want to make sure that we are maximally

23   capturing the different SOPs, guidelines, and

24   policies that exist relevant to this issue.

25           So you would previously listed a DOD

EXHIBIT 13
Page 40 of 64

1  instruction, and then the instruction you described

2  as JADE, and then some other SOPs.

3         Would you just briefly list again as much as

4  you can the specific title of each regulation or SOP

5  or guidelines that's relevant to this -- this issue?

6     A.  So as best I can the titles -- like I said,

7  I am aging.  So I apologize.

8     Q.  Don't worry.

9     A.  The DOD 5205.7 which contains four volumes

10  which is the DOD special access program guidelines.

11  I don't know if that's the exact title, but that's

12  pretty much what it is.

13        JADE is a database used for passing and

14  validating and gathering special access program

15  clearance and accesses.  Like I said, I believe the

16  SAPCO they came out with a JADE standard operating

17  procedure, SOP, on how to operate that database and

18  the rules thereof.

19        We have our own standard operating procedure

20  or SOP for our facility.  We're no longer at that

21  facility but for that facility and every facility we

22  have standard SOP which kind of expounds on the DOD

23  guidance on how we specifically execute and conduct

24  business under those guidelines for any particular

25  facility.

**EXHIBIT 13**
**Page 41 of 64**

1          Q.  All right.  Are there any others that you

2     can think of either by general or specific

3     description that would control the Dr. Roysdon case?

4          A.  No, sir.

5          Q.  Do each of those that you listed, do those

6     lay out the roles, duties, investigative steps, and

7     reporting requirements of a security manager?

8          A.  It does.

9          Q.  Are you aware of any variance from those

10    guidelines, SOPs, or regulations with respect to how

11    Dr. Roysdon's case was handled?

12         A.  No, sir.

13         Q.  So to your knowledge, it was all handled as

14    it should have been?

15         A.  To the best of my knowledge, yes, sir.

16         Q.  All right.  Do you know if any of those

17    SOPs, guidelines, or policies are public facing

18    documents or if they're internal documents?

19         A.  Standard operating procedures are usually

20    what used to be for official use only or now as

21    controlled unclassified information.  The DOD

22    regulations pretty much are public.

23         Q.  And just to clarity for the record, was

24    there a point where in this timeline that something

25    you would have labeled FOUO or for official use only

EXHIBIT 13
Page 42 of 64

1    and then changed to CUI or controlled unclassified

2    information; or did that occur before this?

3        A.  I'm trying to think back on when CUI

4    officially replaced FOUO.

5        Q.  I'm trying to too.  But for the record I'm

6    wondering if you know.

7        A.  I don't know off the top of my head, sir.  I

8    would be speculating.

9        Q.  All right.  Okay.  So let's move over to

10   number 4, all actions related to Dr. Roe's security

11   clearance transfers between HNCO and NSA, including

12   records, communications.

13            Are you familiar with the process of

14   bringing Dr. Roysdon in as a contractor with respect

15   to his clearance at NSA?

16       A.  Could I ask for the statement or the

17   question to be reframed because --

18       Q.  Sure.

19       A.  -- it's kind of crossing lines there.

20       Q.  Okay.  So that I can frame the question

21   right, what lines are we crossing there?

22            THE DEPONENT:  May I repeat, Ms. Seeman?

23            MS. SEEMAN:  Yes.

24       A.  You said -- your question was to the process

25   to -- for NSA passing over the clearances for Dr.

EXHIBIT 13
Page 43 of 64

1   Roysdon as a contractor.

2        Q.  (By Mr. Wareham)  Yes.  I can see why maybe

3   that was a confusing question.

4        So, I mean, brass tax, at some level here

5   the analysis of this was that he was accessing

6   classified information as -- that Dr. Roysdon was

7   accessing classified information as an NSA employee

8   and not a contractor.  That's the core issue, right?

9        A.  If I may clarify from what I know of the

10  case, he was cleared through the proper database for

11  programs as a visit access request, or VAR, from NSA

12  as a Government employee.

13       Q.  Okay.  Perfect.  So that's the process I

14  want to describe -- specifically address is is how

15  did that visitor access request process -- how did

16  that go down in this particular case, or how was it

17  processed?

18       A.  It is send via JADE, and our personnel

19  security person see that, validate that, make sure

20  everything is correct, and the promote accesses.  It

21  is validated every visit has a point of contract.

22  And the Government point of contact then says, yes,

23  I'm expecting this visitor, and then it's validated

24  by them.  And then it's put on a roster that we keep.

25       So when the visitor shows up, we look it up

EXHIBIT 13
Page 44 of 64

1    on the roster that has clearance.  And there's no

2    prohibited item and stuff like there, and they're

3    given the appropriate guidance for access.

4         Q.  Okay.  So were there parts -- were there

5    points in this timeline where Dr. Roysdon was

6    submitted as a visitor to HNCO with attached

7    clearances from NSA versus a contractor?  Is that how

8    that worked?

9         A.  From what I understand, like I said, I let

10   my staff, you know, do their -- they're the subject

11   matter experts.

12        Q.  Of course?

13        A.  His visit came across for Dr. Roysdon as an

14   NSA Government employee, and that's how he was

15   cleared for access to those programs.

16        Q.  I understand.  Was that an appropriate way

17   to clear him given his status at HNCO?

18             MS. SEEMAN:  Objection to form.  You can

19   answer.

20             THE DEPONENT:  I can answer, ma'am?

21             MS. SEEMAN:  Yes.

22        A.  When we see a visit come across and he meets

23   all the criteria, the visit was sent, he's Government

24   employee, he's cleared for these things, and we know

25   that Government entity owns those accesses, and we

EXHIBIT 13
Page 45 of 64

1    validate that, and then check with the POC, to our

2    knowledge, that is cleared and vetted visit, yes.

3         Q.  (By Mr. Wareham)  So I understand that's

4    like the normal situation.  But if I'm understanding

5    problem here is do you know if that visit request was

6    submitted when he was actually working as a

7    contractor and not for NSA?

8         A.  As far as we can tell and as far as what we

9    see in there, he was a Government NSA employee.

10        Q.  Okay.

11        A.  His contractor status did not come into

12   question.  It wasn't a factor.  He was -- the visit

13   was sent as an NSA employee.

14        Q.  Okay.  And it's the nature of the visit

15   request that kind of governs his access, is that what

16   I'm understanding?

17        A.  Yes, sir.

18        Q.  Do you know who submitted the visit request?

19        A.  No, sir, I do not.

20        Q.  Would there be a record in JADE who

21   submitted the visit request?

22        A.  It's possible, but I'm not 100 percent sure

23   the records go back that far.

24        Q.  And when you say go back that far, how far

25   do they go back to?

**EXHIBIT 13**
**Page 46 of 64**

1        A.  I'm not exactly sure.  I know a lot of the

2   visits that are in there once they're vetted, they

3   fall off over a certain period.  I think it's 30

4   days, but I can't be completely sure.

5        Q.  Okay.  And in far as you've reviewed the

6   documents, the visit request for him as an NSA

7   employee was properly requested and approved?

8        A.  Yes.

9        Q.  And -- okay.  Was there any other relevant

10   information related to that visit request process

11   that you know about but I haven't asked?

12        A.  No, sir.

13            MR. WAREHAM:  All right.  If you will

14   indulge me ever so for a moment please, I'd like to

15   go off the record here for about 5, 10 minutes,

16   confer with my team; and then I'll come back on.

17   Okay?

18            MS. SEEMAN:  No objection.

19            THE VIDEOGRAPHER:  The time is 11:16.  We're

20   going off the record.

21            (A recess was taken from 11:16 to 11:21

22   a.m.)

23            THE VIDEOGRAPHER:  The time is 11:21.  We

24   are back on the record.

25        Q.  (By Mr. Wareham)  All right.  I have one

EXHIBIT 13
Page 47 of 64

1    final question or set of questions around JADE.  Who

2    is able to put in visitor requests into JADE?

3         A.  Normally it would be an array depending on

4    if it's industry security professionals, Government

5    security professionals, could be a program manager,

6    it would be a SPO, which is a special program

7    official, personnel security specialist.  It could be

8    an array of folks based on their specific duties.

9         Q.  All right.  Would an individual be able to

10   put in their own visitor request?

11        A.  No, sir.

12        Q.  And so it has to come from someone else?

13        A.  Yes, sir.

14             MR. WAREHAM:  That's the end of my questions

15   for you at this time.  DOJ may have some follow ups.

16                     EXAMINATION

17   BY MS. SEEMAN:

18        Q.  I just have one question for you, Mr. Rowe,

19   earlier you testified about VARs in JADE, and you

20   said that every visit has a point of contact, a POC.

21   Do you know who was the POC for Dr. Roysdon's visit?

22        A.  I believe for this visit was Dan Brown,

23   Daniel Brown.

24             MS. SEEMAN:  Okay.  Nothing further from the

25   Defendants.

EXHIBIT 13
Page 48 of 64

1            MR. WAREHAM:  All right.  Quick follow up on

2    that.

3                      FURTHER EXAMINATION

4    BY MR. WAREHAM:

5        Q.  So the POC for a visitor request would that

6    likely be the same as the submitter?

7        A.  No, sir.

8        Q.  Okay.  Can you describe how that's

9    different, how those can be different?

10        A.  So if someone is in point A where they work

11    and they're going to visit point B, so whoever it at

12    point A who holds access to the clearances, a

13    security official, a POC, whoever would submit the

14    request over to point B, and there is a Government

15    point of contact at point B who will receive a

16    visitor for whatever specific meeting, discussion,

17    project, whatever they're doing at point B.

18            MR. WAREHAM: Okay.  All right.  I think

19    that's all I have.  Thank you very much.

20            THE VIDEOGRAPHER:  The time is 11:24.  We

21    are going off the record.  This will conclude the

22    deposition for this witness.

23

24

25

EXHIBIT 13
Page 49 of 64

1            WHEREUPON, the within proceedings were

2    concluded at the approximate hour of 11:24 a.m. on

3    the 21st day of April, 2025.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**EXHIBIT 13**
**Page 50 of 64**

```
 1              *      *      *      *      *      *

 2              I, WILLIAM ROWE, do hereby certify that I

 3     have read the foregoing transcript and that the same

 4     and accompanying amendment sheets, if any, constitute

 5     a true and complete record of my testimony.

 6

 7                    _____

                     Signature of Deponent

 8                   ( ) No amendments

 9                   ( ) Amendments attached

10

11              Acknowledged before me this _____ day of

12     _____, 20___.

13

14

               Notary Public:  _____

15                   My Commission Expires:  _____

16

17

           Seal:

18

19

20

21

22

23

24

25
```

**EXHIBIT 13**
**Page 51 of 64**

1                    REPORTER'S CERTIFICATE
     STATE OF COLORADO        )
2                             )      ss.
     CITY AND COUNTY OF DENVER )
3

4    I, LINNEA BUSBY, Professional Reporter and Notary

5    Public, State of Colorado, do hereby certify that

6    previous to the commencement of the examination, the

7    said WILLIAM ROWE was duly sworn by me to testify to

8    the truth in relation to the matters in controversy

9    between the parties hereto; that the said deposition

10   was taken in machine shorthand by me at the time and

11   place aforesaid and was thereafter reduced to

12   typewritten form, consisting of 54 pages herein; that

13   the foregoing is a true transcript of the questions

14   asked, testimony given, and proceedings had.  I

15   further certify that I am not employed by, related

16   to, nor of counsel for any of the parties herein, nor

17   otherwise interested in the outcome of this

18   litigation.

19            IN WITNESS WHEREOF, I have affixed my

20   signature this 8th day of May, 2025.

21            My commission expires October 28, 2028.

22

23            *Linnea Busby*

24            Linnea Busby
              Professional Court Reporter

25

EXHIBIT 13
Page 52 of 64

```
 1   AB LITIGATION SERVICES
     216 - 16th Street, Suite 600
 2   Denver, Colorado  80202

 3   May 8, 2025

 4   KATRINA SEEMAN, ESQ.
     US DEPARTMENT OF JUSTICE, CIVIL DIVISION
 5   950 Pennsylvania Avenue NW
     Washington, DC 20530
 6
     Re:  VIDEO 30(b)(6) DEPOSITION OF AIR FORCE LIFE CYCLE
 7        MANAGEMENT CENTER REPRESENTATIVE BY WILLIAM ROWE
          ROE v. UNITED STATES OF AMERICA, et al
 8        Civil Action No:  5:22-CV-00869-JKP-HJB

 9   The aforementioned deposition is ready for
     reading and signing.  Please attend to this
10   matter by following BOTH of the items indicated
     below:
11
     _____ Call 303-296-0017 and arrange with us
12          to read and sign the deposition in our
            office
13
     _XXX_ Have the deponent read your copy and sign
14         the signature page and amendment sheets, if
           applicable; the signature page is attached
15
     _____ Read the enclosed copy of the deposition
16          and sign the signature page and amendment
            sheets, if applicable; the signature page
17          is attached

18   _XXX_ WITHIN 30 DAYS OF THE DATE OF THIS LETTER

19   _____ By _____ due to a trial date of_____

20   Please be sure the original signature page and
     amendment sheets, if any, are SIGNED BEFORE A
21   NOTARY PUBLIC and returned to AB Litigation Services
     for filing with the original deposition.  A copy of
22   these changes should also be forwarded to
     counsel of record.  Thank you.
23
     AB LITIGATION SERVICES
24
     cc:  All Counsel
25
```

**EXHIBIT 13**
**Page 53 of 64**

1    AB LITIGATION SERVICES
     216 - 16th Street, Suite 600
2    Denver, Colorado  80202

3

4

        VIDEO 30(b)(6) DEPOSITION OF AIR FORCE LIFE CYCLE
5      MANAGEMENT CENTER REPRESENTATIVE BY WILLIAM ROWE
                     April 21, 2025
6         ROE v. UNITED STATES OF AMERICA, et al
          Civil Action No:  5:22-CV-00869-JKP-HJB

7

8    The original deposition was filed with Jason Wareham,

9    Esq. on approximately the 8th day of May, 2025.

10
     _____ Signature waived
11
     _____ Signature not requested
12
     _____ Unsigned; signed signature page and
13          amendment sheets, if any, to be filed at
            trial
14
     _XXX_ Unsigned; original amendment sheets and/or
15          signature pages should be forwarded to AB Litigation
            Services to be filed in the envelope attached to the
16          sealed original

17

18   Thank you.

19   AB LITIGATION SERVICES

20   cc:  All Counsel

21

22

23

24

25

**EXHIBIT 13**
**Page 54 of 64**

- AMENDMENT SHEET -

VIDEO 30(b)(6) DEPOSITION OF AIR FORCE LIFE CYCLE
MANAGEMENT CENTER REPRESENTATIVE BY WILLIAM ROWE
April 21, 2025
ROE v. UNITED STATES OF AMERICAN, et al
Civil Action No:  5:22-CV-00869-JKP-HJB

The deponent wishes to make the following changes
in the testimony as originally given:
Page  Line                Should Read              Reason

_____  _____   _____   _____

_____  _____   _____   _____

_____  _____   _____   _____

_____  _____   _____   _____

_____  _____   _____   _____

_____  _____   _____   _____

_____  _____   _____   _____

_____  _____   _____   _____

_____  _____   _____   _____

_____  _____   _____   _____

_____  _____   _____   _____

_____  _____   _____   _____

Signature of Deponent: _____

Acknowledged before me this _____ day of _____,
20___.

(Seal)        Notary's signature _____

              My commission expires_____

EXHIBIT 13
Page 55 of 64

**EXHIBIT 13**
**Page 56 of 64**

**EXHIBIT 13**
**Page 57 of 64**

**EXHIBIT 13**
**Page 58 of 64**

**EXHIBIT 13**
**Page 59 of 64**

**EXHIBIT 13**
**Page 60 of 64**

**EXHIBIT 13**
**Page 61 of 64**

**EXHIBIT 13**
**Page 62 of 64**

**EXHIBIT 13**
**Page 63 of 64**

EXHIBIT 13
Page 64 of 64

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

CIVIL ACTION NO. 5:22-CV-00869-JKP-HJB

----------------------------------------------------

30(b)(6) VIDEOCONFERENCE AND VIDEO DEPOSITION OF
SECRETARY OF THE US AIR FORCE SPECIAL PROGRAMS
BY JOSEPH BURGHARD - 04/24/2025

----------------------------------------------------

DR. JOHN ROE,

Plaintiff,

V.

UNITED STATES OF AMERICA, et. Al.,

Defendant.

----------------------------------------------------


        The 30(b)(6) VIDEOCONFERENCE AND VIDEO

DEPOSITION OF SECRETARY OF THE US AIR FORCE SPECIAL

PROGRAMS BY JOSEPH BURGHARD was taken by the Plaintiff on

April 24, 2025, commencing at the hour of 10:11 a.m., before

ROSIE STAHL, Shorthand Reporter and Notary Public within

and for the State of Colorado.

**EXHIBIT 14**
**Page 1 of 207**

```
 1                R E M O T E

 2              A P P E A R A N C E S

 3
    For the Plaintiff:
 4
         JASON R. WAREHAM, ESQ.
 5       LANCE HENRY, ESQ.
         ALLEN VELLONE WOLF HELFRICH & FACTOR P.C.
 6       1600 Stout Street, Suite 1900
         Denver, Colorado 80202
 7       Ph. 303-534-4499
         Jwareham@allen-vellone.com
 8
         JOHN W. HODGES JR., ESQ.
 9       HENDLEY & HODGES LAW PLLC
         4594 US Hwy 281 N
10       Spring Branch, Texas 78070
         Ph.  210-714-0924
11       John@hhtx.law

12
    For the Defendant:
13
         KATRINA M. SEEMAN, ESQ.
14       JOSEPH GONZALEZ, ESQ.
         U.S. DEPARTMENT OF JUSTICE, CIVIL
15       DIVISION, TORTS BRANCH CONSTITUTIONAL
         & SPECIALIZED TORT LITIGATION
16       950 Pennsylvania Avenue NW
         Washington DC 20530-0001
17       Ph. 202-616-3111
         Katrina.M.Seeman@usdoj.gov
18

19   For the Air Force:

20       DARRIN GILCHRIST, ESQ.
         ASSOCIATE GENERAL COUNSEL, SAF/GCI
21       1740 Air Force Pentagon, Suite 4C756
         Washington, D.C. 20330-1740
22       Ph. 703-697 4406
         Darrin.gilchrist@us.af.mil
23

24   Also Present:

25       Dwayne Beuthel - Videographer
```

EXHIBIT 14
Page 2 of 207

```
 1                    I N D E X

 2   EXAMINATION                              PAGE

 3   By Mr. Wareham                           5

 4

 5

 6   DEPOSITION EXHIBITS:                     INITIAL
                                              REFERENCE
 7

 8   Exhibit 1    08/21/20 Memo, from Air     Page 24
                  Force/Jared Ekholm, Re:
 9                SUBJECT: (U) AFLCMC/HNCO
                  Update on DO254 Status
10                for Fibonacci (Bates
                  US0000106)
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**EXHIBIT 14**
**Page 3 of 207**

Burghard 30(b)(6)_000003

```
 1            APRIL 25, 2025, 10:11 A.M. MT
 2                 P R O C E E D I N G S
 3
 4            THE VIDEOGRAPHER:  All right.  We
 5    are on the record at 10:11 Mountain Time.  Today is
 6    April 24th, 2025.  This is begins the 30(b)(6)
 7    video deposition of the Secretary of the Air Force
 8    Special Programs given my Joseph Burghard taken in
 9    the matter of Dr. John Roe versus United States of
10    America, et al.
11            This deposition is being taken via
12    videoconferencing.  The court reporter today is
13    Rosie Stahl.  The videographer is Dwayne Beuthel.
14            Counsel, please introduce yourselves
15    and the parties you represent beginning with the
16    plaintiffs' counsel first.
17            MR. WAREHAM:  Yeah, this is Jason
18    Wareham.  I'm lead counsel for Plaintiff Dr. Roe.
19    I'm here along with John Hodges, cocounsel, and
20    Lance Henry.
21            MS. SEEMAN:  And good morning or
22    afternoon, depending on where you are.  I'm Katrina
23    Seeman.  I'm joined by my cocounsel Joseph
24    Gonzalez, and we represent the government
25    defendants.
```

**EXHIBIT 14**
**Page 4 of 207**

Burghard 30(b)(6)_000004

```
 1                    JOSEPH BURGHARD,

 2   Being first duly sworn, was examined and testified

 3   as follows:

 4                    EXAMINATION

 5   BY MR. WAREHAM:

 6             Q.    All right.  Hi, Mr. Burghard.  This

 7   is Jason Wareham, lead counsel for Plaintiff.  I'm

 8   going to just go through a few instructions and

 9   clarifications.

10             First up, have you ever been deposed

11   before?

12             A.    I have not.

13             Q.    Oh, well, welcome to this

14   experience.  It would follow then that you've never

15   been deposed specifically as a 30(b)(6) entity

16   witness, right?

17             A.    That's correct.

18             Q.    Okay.  So today, a deposition is

19   a -- is a set of questions under oath like you just

20   took your oath similar to the degree of testimony

21   you need to tell the truth as in trial.  There will

22   be questions by me.  Some of them will be good

23   questions, some of them will be confusing questions

24   or unclear questions or questions that your counsel

25   sitting next to you there would -- will find
```

**EXHIBIT 14**
**Page 5 of 207**

Burghard 30(b)(6)_000005

```
 1    objectionable.

 2                    I'm sure that they will object at

 3    times.  That is part of the process.  If they

 4    object, just briefly pause so that we can be sure,

 5    especially in a virtual deposition, that we record

 6    for the record the objection.

 7                    Unless instructed not to answer by

 8    any person, after an objection is given and

 9    recorded on the record, you can still then answer

10    the question.

11                    Is that clear as mud?

12         A.     Yes, sir.

13         Q.     Okay.  Specifically, also today you

14    represent -- you're what's called a 30(b)(6)

15    witness.  Has that been explained to you what that

16    is?

17         A.     It has.

18         Q.     Okay.  What it essentially means is

19    that any answer that you give today has the

20    capability of binding the entity for whom you're

21    testifying.  Can you clarify what entity you are

22    testifying for today?

23         A.     Sure.  I'm with the Secretary of Air

24    Force Special Programs or SAF/AQL.

25         Q.     And just a little bit of
```

**EXHIBIT 14**
**Page 6 of 207**

1    description, what are they responsible for?  What's

2    their areas of influence and command?

3            A.    SAF/AQL is responsible for special

4    programs within the Air Force.  So we're an

5    acquisitional organization that manages those

6    services.

7            Q.    So today as well given that some of

8    these topics may overlap with or move towards

9    classified information, I carry clearance.  I have

10   responsibility to run classified information just

11   like you to do.  I am not attempting to elicit any

12   classified response today.

13            So if any -- you know, obviously

14   we're in a nonsecure environment.  If any question

15   that I ask tends to need an answer that is

16   classified or that you cannot answer, then please

17   just state for the record that that is the case and

18   we will move on from that.  I may ask some more

19   questions around it, but -- and I'll only be

20   looking for what unclassified commentary you can

21   give specifically.

22            Does that make sense what I'm saying

23   there?

24            A.    Sure thing.

25            Q.    Okay.  This is really not an attempt

EXHIBIT 14
Page 7 of 207

Burghard 30(b)(6)_000007

1    to memory test you, to like trip you up, or

2    otherwise, you know, confuse -- confuse you.  If

3    there's any question today that I -- that doesn't

4    make sense to you, feel free to say, "Hey, can you

5    repeat that," or "I didn't totally understand," and

6    I'll do my best to try to ask a better question.

7                    And let's see, what else do we need

8    cover on there?  I think that's -- I think that's

9    it.  I want to cover just a little bit of

10   background getting into the substance now about

11   what you did to prepare.

12                    Can you describe -- without

13   disclosing any particular communication between you

14   and any counsel, but can you describe what you did

15   to prepare for this deposition today?

16           A.    Sure, happy to.  Since I'm on -- in

17   the scope of this is the classification of the

18   Fibonnacci programs, I reviewed the requisite

19   security classification guides.  I've gone through

20   historical documentation for the lit holds that I

21   have access to and I've spoken with counsel.

22           Q.    And are you -- we have specifically

23   two questions that were part of the 30(b)(6) notice

24   that brings us here today, specifically Question

25   No. 13 which is comprehensive details regarding

EXHIBIT 14
Page 8 of 207

Burghard 30(b)(6)_000008

1    classification guidelines related to the Fibonnacci

2    programs, including historical or contemporaneous

3    changes to these guidelines perfecting documents

4    associated with Dr. Roe.

5                    Are you prepared to answer questions

6    on that?

7            A.    I am.

8            Q.    Okay.  And for the -- for filings

9    and for the complaint, we have a pseudonym or

10   anonymously named Dr. Roe.  He is -- it actually

11   refers to Dr. Roysdon.  Are you familiar with who

12   that is?

13           A.    Yes, sir.

14           Q.    Okay.  Are you familiar with who

15   that is?

16           A.    He's personally briefed me in his

17   NSA capacity on the Fibonnacci efforts.

18           Q.    Okay.  So the next question that we

19   will be covering today is No. 14, explanation of

20   the impact of Fibonnacci classifications on

21   documents related to Dr. Roe, including specific

22   documentation of any reclassification efforts.

23                    Are you prepared to answer questions

24   on that as well?

25           A.    Yes.

**EXHIBIT 14**
**Page 9 of 207**

```
 1              Q.    Okay.  All right.  So I'm going to
 2    try to start a little broadly around No. 13, ask
 3    some general questions around classification,
 4    classification guides, and then we'll drill down
 5    into Fibonnacci program and then the impact of
 6    Fibonnacci going into No. 14 on Dr. Roe.  Does that
 7    make sense?
 8              A.    It does.
 9              Q.    I'm just trying to give you -- all
10    right.
11                    So can you describe generally what
12    classification is?
13              A.    Sure.  In general, classification is
14    the protection of sensitive information so that
15    it's not exposed to our adversaries and gives an
16    advantage to the U.S.
17              Q.    And what are the varying -- now, I
18    understand there's a million tickets out there, but
19    what are the varying levels of classification
20    generally?
21              A.    In general, you have your collateral
22    clearances that go from secret to top secret.
23    Within those, you have more restrictive caveats
24    like SITTING and HGS.  And beyond that, you have
25    even more sensitive programs, specifically SAP
```

**EXHIBIT 14**
**Page 10 of 207**

Burghard 30(b)(6)_000010

1    programs or Special Access Programs.

2         Q.    All right.  And does your entity,

3    Special Programs, does it have that name because

4    it's dealing with SAP programs or are those -- is

5    the word special not synonymous necessarily there?

6         A.    No.  It is because we do Special

7    Access Programs.

8         Q.    Okay.  And as much as you can, what

9    does a SAP program mean in the context of

10   classification?

11        A.    A SAP program means that an

12   individual needs to have security background

13   investigation.  Then you doubled at least top

14   secret clearance, any data verifiable need to know

15   and they need to make a material contribution to be

16   read into the program.

17              Once read into the program, you

18   handle the material in that program in accordance

19   with the security classification guide, or SCG, in

20   order to execute the program.

21        Q.    And can you describe what it means,

22   material contribution?

23        A.    Sure.  It means you are actively

24   engaged and contributing to the program, whether

25   that's -- you know, it can be a range of things,

EXHIBIT 14
Page 11 of 207

Burghard 30(b)(6)_000011

1    whether you're a program manager doing program

2    management things, if you're an actual developer

3    writing code, or security personnel doing your

4    day-to-day security checks.

5            Q.    Have you ever heard the term

6    read-in?

7            A.    Yes.

8            Q.    What does that mean?

9            A.    Read-in is the official

10   indoctrination to a special access program.  It's

11   the initial, A, you're being read into a program,

12   you sign a nondisclosure agreement, and you get

13   introduced into what the critical program

14   information is that's protected in that program.

15   And then from there on, you have -- you're allowed

16   to have access to the information within that SAP.

17           Q.    Similarly, are you familiar with the

18   term read-out?

19           A.    I am.

20           Q.    What does that mean?

21           A.    It's a standard practice that when

22   someone no longer is making that material

23   contribution or they no longer have a valid need to

24   know, then they are read out of the program because

25   they're no longer contributing to it.

**EXHIBIT 14**
**Page 12 of 207**

Burghard 30(b)(6)_000012

```
1              Q.    And is it fair to say that
2    practically, the read-in/read-out program is how
3    you have access to a specific classification set or
4    then lose access to that same set through the
5    read-out process?
6                   MS. SEEMAN:  Objection to form.  You
7    can answer.
8    BY MR. WAREHAM:
9              Q.    That was probably my first bad
10   question.  Did that make sense?
11             A.    It would be great if you could
12   rephrase it.
13             Q.    Yeah, sure.
14                  What is the practical effect of
15   read-in/read-out with respect to SAP programs?
16                  MS. SEEMAN:  Objection to form.  You
17   can answer.
18                  THE DEPONENT:  The reason you read
19   in someone to a program is so that they can
20   participate in a program, contribute to it and they
21   have access to it.
22                  The reason you read them out is
23   because they no longer have a need to be part of
24   that program.
25   BY MR. WAREHAM:
```

EXHIBIT 14
Page 13 of 207

Burghard 30(b)(6)_000013

```
 1            Q.    And so once somebody is read out,
 2    can they access any materials under that
 3    classification program anymore?
 4            A.    No, they cannot.
 5            Q.    All right.  So going into
 6    specifically Fibonnacci, to the degree that you
 7    can, what is the Fibonnacci program?
 8            A.    The details of that program are
 9    classified.
10            Q.    Okay.  Is it a SAP program?
11            A.    It is a program conducted within a
12    SAP.
13            Q.    Okay.  Is there a classification
14    guide for Fibonnacci?
15            A.    There's a classification guide for
16    the program that governs the security for the
17    development of Fibonnacci.
18            Q.    Who has published that
19    classification guide?
20            A.    That guide comes from an original
21    classification authority.  That is the director of
22    SAF/AQL.  And yes, there was a published
23    classification guide and still is.
24            Q.    Okay.  And what -- when you say
25    classification authority -- I should have asked
```

**EXHIBIT 14**
**Page 14 of 207**

1    this in the general questions.  When you say

2    classification authority, what does that mean?

3                A.    There's only a very limited subset

4    of people in the government that have -- well, let

5    me back up.

6                      There's two types of classification

7    authorities.  There's original classification and

8    there's derivative classification.

9                      A derivative classification is how

10   you classify a document derivatively from an

11   existing security classification guide.  In the

12   absence of an SCG, you're required to get an

13   original classification made.  There's only certain

14   people in the government that have that authority

15   inherent in their position, and it's positional

16   based, not personnel based.

17                     That's the president, vice

18   president, the Secretary of Defense, the chief and

19   the secretaries of services, and they can further

20   delegate that authority to very limited

21   organizations within the services.

22                     For the Air Force, that's SAF/AQL

23   and that's who publishes the security

24   classification guidelines.

25                Q.    And are original classification

**EXHIBIT 14**
**Page 15 of 207**

Burghard 30(b)(6)_000015

1    authorities often referred to as OCAs?

2        A.    Yes.

3        Q.    Besides the entity who -- acting as

4    OCA, who specifically is the OCA that signed the

5    classification guide in this program?

6        A.    It depends on which version of the

7    guide.  We're required -- we're required to make

8    five-year updates to those guides, and so it

9    depends on if you're asking for the most recent

10   one, which was Colonel Richard McGlamory.

11             Or if you're asking about the 2016

12   version for at the time of this -- you know, this

13   incident spanned two versions of the SCG, and, you

14   know, our director is a military personnel so they

15   rotate regularly.  So it depends on the timeframe

16   you're asking.

17       Q.    Okay.  So, yeah, let's subdivide

18   that a little bit.  So there were two -- there were

19   two classification guides from 2016 to present with

20   respect to Fibonnacci?

21       A.    Correct.  It's the same program,

22   just an updated guide.

23       Q.    So the first classification 2016 --

24   I'm sorry, I don't know if I remember your answer,

25   was signed by whom?

EXHIBIT 14
Page 16 of 207

Burghard 30(b)(6)_000016

1          A.    Really it's positional based.  At

2     the end of the day, it's always the director of

3     SAF/AQL.

4          Q.    Sure.  Do you know who it was in

5     this instance?

6          A.    I can look it up.  We have that

7     information.

8          Q.    Okay.  And then it was -- the

9     classification guide was updated when, the second,

10    the updated version the current version?

11         A.    The current version was updated as

12    of 9 February of 2021.

13         Q.    All right.  Is that classification

14    guide itself classified?

15         A.    Yes.

16         Q.    Is there material within that

17    classification guide that are identified as being

18    unclassified with respect to Fibonnacci?

19         A.    No.

20         Q.    If -- has any point of the

21    Fibonnacci program been submitted for

22    classification review to your knowledge?

23         A.    It has not.

24         Q.    What is a classification review?

25         A.    If you look into most security

**EXHIBIT 14**
**Page 17 of 207**

Burghard 30(b)(6)_000017

1    classification guides, there's actually a section

2    in there that's called a challenge, and a review is

3    basically that, it's a challenge that anyone

4    cleared to that program can provide a written

5    request and make a challenge to see is this

6    classification valid in accordance to this guide,

7    or is there an update that is necessary or is there

8    reason for a downgrade for any reason.  And that

9    goes into review.

10            Q.    Are you familiar with any -- if any

11    materials or information related to the Fibonnacci

12    program have been submitted for classification

13    review or challenge?

14            MS. SEEMAN:  Objection to form.  You

15    can answer.

16            THE DEPONENT:  I'm familiar with

17    some information that has been requested to remove

18    redactions, but there's not been an official

19    request to downgrade the program.

20    BY MR. WAREHAM:

21            Q.    All right.  And what are the

22    materials that have been submitted for specific

23    consideration?

24            A.    To my knowledge, it's only been one

25    MFR, memorandum for the record.

EXHIBIT 14
Page 18 of 207

Burghard 30(b)(6)_000018

```
1              Q.    Okay.  And do you know when that
2    was?
3              A.    That's outside the scope of my
4    preparation.
5              Q.    Okay.  Do you know whether or not
6    the MFR was approved for declassification?
7              A.    It was.
8              Q.    And do you know whether it was fully
9    declassified or if it was just downgraded?
10             A.    It was actually deemed unclassified
11   the way it was written.  It was originally over
12   classified.
13             Q.    And you do not know what that MFR is
14   currently?
15             A.    I have personally seen it, yes.
16             Q.    Okay.  What is it?
17             A.    It's an MFR written by Lieutenant
18   Colonel Jared Ekholm.
19             Q.    Do you know the specific topic?
20             A.    I do.  It was regarding Dr.
21   Roysdon's employment status when he was a
22   contractor or government civilian.
23             Q.    Okay.  I am going to --
24                   MR. WAREHAM:  Lance, if you would,
25   could you find -- I'll go into some other
```

**EXHIBIT 14**
**Page 19 of 207**

1     questions, but could you find the Ekholm memo that

2     was signed that we had a copy of and throw it in

3     the chat for me?

4                    MR. HENRY:  Yes.

5     BY MR. WAREHAM:

6          Q.    All right.  So -- and just to be

7     complete, is there any other portions -- or are

8     there any other portions in the Fibonnacci program

9     that are unclassified or have been declassified?

10         A.    Not to my knowledge.

11         Q.    Was there ever a point where the

12    Fibonnacci program was unclassified?

13         A.    I should explain the way cyber

14    programs work.  There are certain instances when

15    you are required to go apply and acquire things

16    like software variance system or even just a

17    computer.  And there's no other way to acquire

18    those other than unclassified.  So at a certain

19    point, you have to go get those things and then

20    bring them into the facility and then do cyber work

21    in a classified setting.  And so given that, yes, I

22    mean, you have to acquire things unclassified.

23                    The development, however,

24    specifically the Fibonnacci program, had to have

25    been conducted within a classified environment.

**EXHIBIT 14**
**Page 20 of 207**

Burghard 30(b)(6)_000020

1           Q.    Okay.  Would the financing related

2    to Fibonnacci be classified or unclassified?

3           A.    Classified.

4           Q.    And are all the classifications

5    related to Fibonnacci at the same level?

6                 MS. SEEMAN:  Objection to form.  You

7    can answer.

8                 THE DEPONENT:  Okay.  It depends on

9    your definition of classified.  If you're asking if

10   it's at SAP, they're all at the same SAP.  If

11   you're asking does it range from secret to TS, that

12   does range, but it's always the same SAP.

13   BY MR. WAREHAM:

14          Q.    So the SAP covers both secret as

15   well as top secret information?

16          A.    That's correct.

17          Q.    And to be clear, what systems are

18   used to deal with the secret versus top secret

19   information related to Fibonnacci?

20          A.    The systems that are accredited to

21   that level.

22          Q.    Do you know the names of them?

23                MS. SEEMAN:  I'm going to object to

24   this being outside the scope of 13 or 14, but the

25   witness can answer if he knows in his personal

**EXHIBIT 14**
**Page 21 of 207**

Burghard 30(b)(6)_000021

1    capacity.

2                    MR. WAREHAM:  Yeah, for the record,

3    I would say that Fibonnacci classification and its

4    impact on systems would be under 14.

5                    MS. SEEMAN:  I see -- I don't see

6    anything saying systems in No. 14.

7                    MR. WAREHAM:  Documents are

8    contained on systems.

9                    MS. SEEMAN:  Yeah, I don't see

10   anything about systems in 14, though, so I'm going

11   to stand on my objection, but he can still answer

12   in his personal capacity if he knows.

13                    THE DEPONENT:  Yeah, our

14   coordination is largely handled via SIC.  That is

15   the SAP system we do most of the -- at least the

16   coordination emails and the like on.  There are

17   other development systems also at those levels

18   depending on the location you're in.

19   BY MR. WAREHAM:

20        Q.   All right.  And where are -- and are

21   all of the documents contained on the system that

22   you just described?

23        A.   They are.

24        Q.   All right.

25                    MR. WAREHAM:  Lance, were you able

**EXHIBIT 14**
**Page 22 of 207**

Burghard 30(b)(6)_000022

1    to locate the Ekholm memo?  Sorry, give us one

2    second here.  Let me load it up here.

3    BY MR. WAREHAM:

4            Q.    Going back to some of my

5    foundational questions, was there ever a point

6    where the Fibonnacci classification guide was

7    rejected or denied?

8                 Sorry, I didn't get you on that one.

9            A.    That answer is no.

10           Q.    No?  Thank you.

11                So I'm going to share with you here

12   a -- I'm trying to share my screen and do this the

13   right way.  One moment.  If you're able to access

14   Bates number 59, which will be Exhibit 1 to this

15   deposition that we just put in the chat, are you

16   able to grab that and review it locally?

17                MS. SEEMAN:  We're working on it,

18   counsel.  Just give us a moment.

19                MR. WAREHAM:  Sure.

20                MR. HENRY:  This is Lance.  Do you

21   want me to share screen or are you working on?

22                MR. WAREHAM:  Oh, you can go for it.

23   Go for it.  Great.  That will let me move around a

24   little bit more.

25                Wherever you're at, are you able to

EXHIBIT 14
Page 23 of 207

Burghard 30(b)(6)_000023

1  review that effectively or do we need to zoom in?

2            MS. SEEMAN:  Counsel, if I may, we

3  have a local copy, but the Bates -- the version

4  that I here is at our table is US106.  It looks

5  identical to what's being shown on the screen.  Are

6  you okay if I provide this --

7            MR. WAREHAM:  We've done that a few

8  times, too.  So 106 --

9            MR. HENRY:  I'll share 1 -- 126 you

10  said?

11            MS. SEEMAN:  106.

12            MR. HENRY:  Okay.  I'll share that

13  one instead.

14            MR. WAREHAM:  Thank you.  So for the

15  clarity of the record, 106 will become Exhibit 1.

16            (Exhibit 1 marked for

17  identification.)

18  BY MR. WAREHAM:

19       Q.    Is this the memo that you responded

20  to that you believed was declassified?

21       A.    That's correct.

22       Q.    Okay.  Tell me what CUI at the top

23  means.

24       A.    Controlled unclassified information.

25       Q.    And what does that mean with respect

**EXHIBIT 14**
**Page 24 of 207**

Burghard 30(b)(6)_000024

1    to the subject of classification?

2            A.    It means it's limited and not

3    available for public consumption.

4            Q.    Okay.  Is it itself a

5    classification?

6            A.    Yes.

7            Q.    Is the classification unclassified

8    or higher?

9            A.    This is unclassified.

10           Q.    Can you tell me -- and these are

11   very basic questions just so you know, but I have

12   to go through it kind of for the record purposes.

13   Can you tell me what the (U) is next to the Subject

14   line and what it means?

15           A.    It means it's unclassified.

16           Q.    Okay.  How about the (CUI) next to

17   the first and third paragraphs and fourth?

18           A.    It means the same thing, controlled

19   unclassified information.

20           Q.    Okay.  What are -- what are

21   paragraph markings and when are they required?

22           A.    They're required when you're making

23   a derivative classification so that a reader

24   understands the level that paragraph is that it's

25   protecting.

**EXHIBIT 14**
**Page 25 of 207**

Burghard 30(b)(6)_000025

1          Q.    Okay.  And if something is

2     classified within a document, let's just say at the

3     secret level, let's say Secret//NOFORN level, what

4     kind of markings would you expect to see as a

5     paragraph marking?

6               MS. SEEMAN:  Objection to form.  You

7     can answer.

8               THE DEPONENT:  Specifically it would

9     be a paren, an S, two slashes, and then NF, and

10    then another close paren.  The abbreviation is

11    Secret//NOFORN.

12    BY MR. WAREHAM:

13         Q.    And to the degree that it would

14    unclassified, what would you normally see as the

15    classification level for the Fibonnacci program as

16    a paragraph marking?

17         A.    It is classified information when

18    you -- that's handled at a different level.

19         Q.    Okay.  So the paragraph marking

20    itself is classified?

21         A.    That's correct.

22         Q.    All right.  Can you, in reviewing

23    this memo, tell me if any portion based on the

24    paragraph markings appear to ever be classified?

25         A.    Can you rephrase the question?

EXHIBIT 14
Page 26 of 207

Burghard 30(b)(6)_000026

1          Q.     Sure.

2                 Looking at the paragraph markings,

3    is there anything that indicated -- that indicates

4    within that document that any paragraph has been

5    declassified?

6          A.     These markings indicate that

7    information is controlled unclassified information.

8          Q.     So is there any paragraph that was

9    subject to declassification?

10         A.     Not the way it's currently marked.

11         Q.     Can you answer then why this memo

12   was submitted for classification review?

13         A.     Yes.  Because it was written on a

14   SAP information -- SAP network, and so whenever you

15   move information from a secure network, it has to

16   go through a classification check to make sure

17   there is positively no classified information once

18   it comes off that network.

19         Q.     All right.  So the review occurred

20   on this memo, if I understand you right, because it

21   was stored on that higher classification network,

22   not that it was classified itself?

23         A.     Correct.

24         Q.     Is unclassified information normally

25   found on higher classification networks?

**EXHIBIT 14**
**Page 27 of 207**

Burghard 30(b)(6)_000027

```
1              A.    Yes.

2              Q.    Can you say more about that?

3              A.    Sure.

4                    MS. SEEMAN:  Counsel, can you

5      identify which of the topics we're talking about

6      right now?

7                    MR. WAREHAM:  Sure.

8      BY MR. WAREHAM:

9              Q.    It has to do with classification on

10     documents related to Dr. Roe.

11                   MS. SEEMAN:  I'm sorry, can you

12     repeat your question?

13     BY MR. WAREHAM:

14             Q.    That would be No. 14.

15                   Yeah, so my question was -- well,

16     honestly, I'm not remembering my question.

17                   MR. WAREHAM:  Court reporter, would

18     you mind reading back my question?

19                   (Record read back as requested.)

20     BY MR. WAREHAM:

21             Q.    Would you say more about that,

22     please?

23                   MS. SEEMAN:  I'm just going to

24     object to this being outside the scope because 14

25     talks about Fibonnacci classifications on documents
```

**EXHIBIT 14**
**Page 28 of 207**

Burghard 30(b)(6)_000028

1    specifically and not necessarily Air Force Life

2    Cycle Management or Air Force SAF/AQL.  But the

3    witness can answer to the extent he knows in his

4    personal capacity.

5                    THE DEPONENT:  Yes, unclassified

6    information is available on those networks because

7    think of it as a normal -- as a normal email.  You

8    can email and coordinate at the appropriate SAP

9    level, but you can also just send it in an email

10   maker, which is, you know, needed time 0900 on this

11   day which would be unclassified, right.

12   BY MR. WAREHAM:

13           Q.    So going back to this memo, do you

14   know why there are redactions on this unclassified

15   memo?

16           A.    I do.

17           Q.    Why?

18           A.    That is controlled unclassified

19   information, and it's identifying things that are

20   protected in the program.

21           Q.    Okay.  Controlled unclassified

22   information can be released to the public, right?

23                    MS. SEEMAN:  Objection to form.  You

24   can answer.

25                    THE DEPONENT:  So it depends.

**EXHIBIT 14**
**Page 29 of 207**

1    BY MR. WAREHAM:

2              Q.    And what does it depend on?

3              A.    Well, I think it's a submit a

4    written request.  We haven't seen any of that, but

5    this information specifically is protection of the

6    program and very identifiable.

7              Q.    What is Mosaic classification?

8              A.    That's outside the scope of my

9    preparation.

10             Q.    Have you ever heard of that term

11   before?

12             A.    I have not.

13                   MR. WAREHAM:  All right.  Well, I

14   believe we are at a brief pause point where I'm

15   going to check in with my team, and we might be

16   able to wrap this up.  So if we could just go off

17   the record, I'll be back in ten minutes.

18                   THE VIDEOGRAPHER:  All right.  The

19   time is 10:47.  We're off the record.

20                   (A break was taken from 10:47 a.m.

21   to 10:59 a.m.)

22                   THE VIDEOGRAPHER:  The time is

23   10:59.  We're back on the record.

24   BY MR. WAREHAM:

25             Q.    Going back to the document that's

**EXHIBIT 14**
**Page 30 of 207**

Burghard 30(b)(6)_000030

1    about to be put back on the screen that we've

2    identified as Exhibit 1 for this deposition, do you

3    know who redacted this document?

4         A.    I do not.  I think -- I know Will

5    McVeigh was involved with the staffing of this.  As

6    far as who originally did it, I do not.

7         Q.    Do you know what the term -- the

8    unclassified CUI term is that is being redacted?

9         A.    I do.

10        Q.    What is it?

11              MS. SEEMAN:  Objection.  I'm also

12   going to object to the extent that this is calling

13   for information that hasn't been approved for

14   release by the United States Air Force.

15              MR. WAREHAM:  Are you directing him

16   not to answer?

17              MS. SEEMAN:  If the information that

18   you are requesting by your question is information

19   that the Air Force has not approved to be released,

20   then he will answer whether or not he can answer

21   that question.  So go ahead.

22              MR. WAREHAM:  Actually, you answer

23   my question unless you assert privilege.  So are

24   you asserting a privilege?

25              MS. SEEMAN:  I'm instructing the

**EXHIBIT 14**
**Page 31 of 207**

Burghard 30(b)(6)_000031

1    witness not to answer as to any classified

2    information that has not been approved for release

3    by the United States Air Force.

4                    MR. WAREHAM:  He has said that this

5    is not classified information.  He's testified to

6    that.

7                    MS. SEEMAN:  He has not said that

8    the redacted information -- you just asked him what

9    the information in this memo that is redacted says.

10                   MR. WAREHAM:  Let me break that

11   down.

12   BY MR. WAREHAM:

13            Q.    So, Mr. Burghard, is -- based on the

14   paragraph marking on paragraph 1, can you discern

15   whether or not that redacted portion is classified?

16            A.    Based on the paragraph marking, it's

17   not classified.

18            Q.    All right.  What is that term being

19   redacted?

20            A.    That has not been approved for

21   release.

22            Q.    You need to answer my question

23   unless they assert a privilege and instruct you not

24   to answer.

25                   MS. SEEMAN:  He did answer.  He said

EXHIBIT 14
Page 32 of 207

Burghard 30(b)(6)_000032

```
 1    that information has not been approved to release.
 2    BY MR. WAREHAM:
 3            Q.    What is that term?
 4                  MR. GONZALEZ:  Can we ask the
 5    witness to leave the room and continue this
 6    discussion without the witness in the room?
 7                  MR. WAREHAM:  Yeah, as long as we
 8    stay on the record, that's fine.
 9                  (The witness left the room.)
10                  MR. GONZALEZ:  Okay.  The witness
11    has left the room.
12                  MS. SEEMAN:  So you are asking the
13    witness to give you information that is redacted in
14    this document that has not been approved for
15    release.  That is not appropriate.
16                  MR. WAREHAM:  Yeah, so tell me --
17    tell me if this is not the process we're operating
18    under.  For unclassified information, there is
19    either privileges in civil depositions with
20    instructions not to answer or there is not.  Right?
21    There's not any such thing as not approved for
22    release by the Air Force.
23                  If that is a synonym for "we are
24    asserting state secrets privilege," then that's the
25    privilege that needs to be asserted.  Okay?
```

**EXHIBIT 14**
**Page 33 of 207**

Burghard 30(b)(6)_000033

1                    MS. SEEMAN:  Counsel, at the start

2      of your deposition, you informed the witness that

3      you were not going to ask him questions that --

4                    MR. WAREHAM:  This is not

5      classified, counsel.  Let's be very clear, this

6      is --

7                    (Simultaneous speakers)

8                    MR. WAREHAM:  This is not

9      classified.

10                    MS. SEEMAN:  He has said at this

11      time he cannot testify to that information.  That

12      is his answer.

13                    MR. WAREHAM:  Are you instructing

14      him not to answer further?

15                    MR. GONZALEZ:  Jason, do you mind if

16      I join the conversation?

17                    MR. WAREHAM:  Sure, feel free.  I

18      mean, I'm -- honestly, it's a very clear like civil

19      lane here, right?  And I don't know if you guys do

20      a lot of national security litigation, it's fine,

21      but either things are classified or they are not,

22      right?

23                    CUI is not a classification.  It is

24      a control.  In order to refrain from disclosing

25      information, either CUI or classified information,

**EXHIBIT 14**
**Page 34 of 207**

Burghard 30(b)(6)_000034

```
 1    a privilege must be asserted, right?

 2                 So I just need to know what

 3    privilege we're asserting over this unclassified

 4    controlled unclassified information.

 5                 MS. SEEMAN:  And which topic does

 6    that relate to?

 7                 MR. WAREHAM:  It relates to the

 8    impact of classification, No. 14, on documents.

 9                 MR. GONZALEZ:  Would you mind if we

10    spoke with the witness and got a better

11    understanding of his statement that he was unable

12    to provide the information?

13                 MR. WAREHAM:  Absolutely, for sure.

14    I am not trying to get classified information.

15    Let's be very clear.  I am not trying to elicit

16    classified information, but I'll just tell you, me

17    to you, CUI is not classified, period.  It is a

18    control that states that how -- where it cannot be

19    published to the media, right, and where it has to

20    reside on government systems.

21                 So as that paragraph is marked and

22    as he has testified, it is unclassified.  So that

23    is the question I'm asking.  And as far as I know,

24    no privilege has been asserted or applies to CUI

25    information.
```

**EXHIBIT 14**
**Page 35 of 207**

Burghard 30(b)(6)_000035

```
 1                    MR. GONZALEZ:  Okay.  So we're going
 2    to speak with the witness.  We'll be back in a
 3    moment.  Okay?
 4                    MR. WAREHAM:  Great.  I'll be
 5    waiting.  Thanks.  I appreciate it.
 6                    THE VIDEOGRAPHER:  Do you want to go
 7    off the record?
 8                    MR. WAREHAM:  Yes, please.
 9                    THE VIDEOGRAPHER:  The time is
10    11:05.  We're off the record.
11                    (A break was taken from 11:05 a.m.
12    to 11:23 a.m.)
13                    THE VIDEOGRAPHER:  The time is 11:23
14    Mountain Time.  We're back on the record.
15                    MR. WAREHAM:  All right.  In keeping
16    with our agreement, I ask to mark this portion
17    confidential moving forward.
18                    MS. SEEMAN:  No objection.  And just
19    for the record, Air Force counsel Darrin Gilchrist
20    has been on the deposition and has provided the
21    witness with express authorization to identify the
22    substance of the redactions on Exhibit 1.
23                    MR. WAREHAM:  Great.
24                    Lance, would you put it back up for
25    me?  This is going back to Exhibit 1.
```

**EXHIBIT 14**
**Page 36 of 207**

Burghard 30(b)(6)_000036

1    BY MR. WAREHAM:

2            Q.    On Exhibit 1, paragraph marked 1,

3    are you familiar with -- well, I've already asked

4    you this.  What is the redaction that that -- that

5    word redaction is covering?

6            A.    That's covering what's called a

7    program identifier.  Specifically what's under that

8    redaction is the term RBAN, Romeo, Bravo, Alpha,

9    November.

10            Q.    All right.  And do you know whether

11    that's the same word that's being redacted in

12    subsequent portions of that letter?

13            A.    It is the same.

14            Q.    All right.  And to your knowledge,

15    there is no redaction that doesn't include RBAN,

16    R-B-A-N?

17            A.    To my knowledge, that's correct.

18            Q.    All right.  Great.  Then one thing I

19    missed before at the very beginning was what your

20    title and role is for the entity.

21            A.    Is that for my present role or the

22    role I was in at the time of this case?

23            Q.    Great distinction.  So what was it

24    at the time of this case?

25            A.    This case at the time I was known as

**EXHIBIT 14**
**Page 37 of 207**

Burghard 30(b)(6)_000037

1    a PEM.  It's a program element monitor.

2              Q.    Okay.  And what is it now?

3              A.    I'm the division chief for the AQLQ

4    division within AQL.

5                    MR. WAREHAM:  Great.  Then I think

6    that's all my questions.  Thank you very much.

7                    MS. SEEMAN:  And nothing from

8    defendants.

9                    MR. WAREHAM:  Great.  Then we can go

10   off record.  I appreciate it.

11                   THE VIDEOGRAPHER:  Okay.  This

12   concludes this portion of today's proceedings.  The

13   time is 11:25 Mountain Time.  We're off the record.

14                   (The deposition concluded at 11:28

15   a.m.)

16

17

18

19

20

21

22

23

24

25

EXHIBIT 14
Page 38 of 207

Burghard 30(b)(6)_000038

1          I, JOSEPH BURGHARD, do hereby certify that I have

2    read the foregoing transcript and that the same and

3    accompanying amendment sheets, if any, constitute a true and

4    complete record of my testimony.

5

6

7

                    _____
8                   Signature of Deponent
                    ( ) No Amendments
9                   ( ) Amendments Attached

10         Acknowledged before me this

11   _____ day of _____, 2025.

12

13         Notary Public: _____

14         My commission expires _____

15         Seal:

16

17

18

19

20

21

22

23

24

25

**EXHIBIT 14**
**Page 39 of 207**

```
 1                    REPORTER CERTIFICATE

 2
                       I, ROSANNE M. STAHL, Shorthand
 3    Reporter and Notary Public within and for the State
      of Colorado, do hereby certify that previous to the
 4    commencement of the testimony, the said JOSEPH
      BURGHARD was sworn by me to testify to the truth in
 5    relation to the matters in controversy between the
      said parties so far as he should be interrogated
 6    concerning the same; that the said deposition was
      taken in stenograph by me at the time and place
 7    aforesaid and was thereafter reduced to typewritten
      form; that the foregoing is a true and correct
 8    transcript of my stenographic notes thereof; and
      that Deposition Exhibit 1 was marked and used in
 9    the interrogation.
                       I further certify that I am not
10    employed by, related to, nor counsel for any of the
      parties herein, nor otherwise interested in the
11    event of this action.
                       IN WITNESS WHEREOF, I have affixed
12    my signature and seal this 7th day of May, 2025.

13

14

15
                            Rosanne M. Stahl
16                          Notary Public

17

18    MY COMMISSION EXPIRES:  04/13/26.

19

20

21

22

23

24

25
```

EXHIBIT 14
Page 40 of 207

Burghard 30(b)(6)_000040

1  AB LITIGATION SERVICES
   216 - 16th Street, Suite 600
2  Denver, Colorado  80202

3

   May 7, 2025
4

   Katrina M. Seeman, Esq.
5  950 Pennsylvania Avenue NW
   Washington DC 20530-0001

6

Re:  30(b)(6) VIDEOCONFERENCE AND VIDEO DEPOSITION OF
7       SECRETARY OF THE US AIR FORCE SPECIAL PROGRAMS
        BY JOSEPH BURGHARD
8       Roe v. United States of America
        Case No. 5:22-CV-00869-JKP-HJB

9

   The aforementioned deposition is ready for reading and
10 signing.  Please attend to this matter by following BOTH of
   the items indicated below:

11
   _____ Call 303-296-0017 and arrange with us to read and
12        sign the deposition in our office.

13 _XXX_ Have the deponent read your copy and sign
         the signature page and amendment sheets, if
14       applicable; the signature page is attached.

15 _____ Read the enclosed copy of the deposition and
         sign the signature page and amendment
16       sheets, if applicable; the signature page is
         attached.

17
   _XXX_ WITHIN 30 DAYS OF THE DATE OF THIS LETTER
18
   _____ By _____ due to a trial date of _____
19
   Please be sure the original signature page and amendment
20 sheets, if any, are SIGNED BEFORE A NOTARY PUBLIC and
   returned to AB Litigation Services for filing with the
21 original deposition.  A copy of these changes should also be
   forwarded to counsel of record.  Thank you.

22
   AB LITIGATION SERVICES
23

24 cc:  All Counsel

25

**EXHIBIT 14**
**Page 41 of 207**

Burghard 30(b)(6)_000041

```
 1   AB LITIGATION SERVICES
     216 - 16th Street, Suite 600
 2   Denver, Colorado  80202

 3

 4

 5            30(b)(6) VIDEOCONFERENCE AND VIDEO DEPOSITION OF
              SECRETARY OF THE US AIR FORCE SPECIAL PROGRAMS
 6                         BY JOSEPH BURGHARD
                             April 24, 2025
 7                  Roe v. United States of America
               Civil Action No. 5:22-CV-00869-JKP-HJB
 8

 9
     The original deposition was filed with
10
     Jason R. Wareham, Esq., on approximately the
11
     7th day of May, 2025.
12
     _____ Signature waived.
13
     _____ Signature not requested
14
     _____ Unsigned; signed signature page and
15          amendment sheets, if any, to be filed at
            trial.
16
     _XXX_ Unsigned; original amendment sheets and/or
17          signature pages should be forwarded to AB
            Litigation Services to be filed in the envelope
18          attached to the sealed original.

19

20
     Thank you.
21
     AB LITIGATION SERVICES
22
     cc:  All Counsel
23

24

25
```

**EXHIBIT 14**
**Page 42 of 207**

- AMENDMENT SHEET -

30(b)(6) VIDEOCONFERENCE AND VIDEO DEPOSITION OF
SECRETARY OF THE US AIR FORCE SPECIAL PROGRAMS
BY JOSEPH BURGHARD
April 24, 2025
Roe v. United States of America
Civil Action No. 5:22-CV-00869-JKP-HJB

The deponent wishes to make the following changes in the
testimony as originally given:

Page    Line                 Should Read              Reason

_____   _____   _____   _____

_____   _____   _____   _____

_____   _____   _____   _____

_____   _____   _____   _____

_____   _____   _____   _____

_____   _____   _____   _____

_____   _____   _____   _____

_____   _____   _____   _____

_____   _____   _____   _____

_____   _____   _____   _____

_____   _____   _____   _____

_____   _____   _____   _____

_____   _____   _____   _____

Signature of Deponent: _____

Acknowledged before me this _____ day of

_____, 2025.

(seal)       Notary's signature _____

             My commission expires _____.

**EXHIBIT 14**
**Page 43 of 207**

**EXHIBIT 14**
**Page 44 of 207**

Burghard 30(b)(6)_000044

**EXHIBIT 14**
**Page 45 of 207**

Burghard 30(b)(6)_000045

**EXHIBIT 14**
**Page 46 of 207**

Burghard 30(b)(6)_000046

**EXHIBIT 14**
**Page 47 of 207**

Burghard 30(b)(6)_000047

**EXHIBIT 14**
**Page 48 of 207**

Burghard 30(b)(6)_000048

**EXHIBIT 14**
**Page 49 of 207**

Burghard 30(b)(6)_000049

**EXHIBIT 14**
**Page 50 of 207**

Burghard 30(b)(6)_000050

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

Civil Action No. 5:22-CV-00869-JKP-HJB

_____

DEPOSITION OF JOSEPH DANIEL BURGHARD

May 15, 2025

_____

Plaintiff:

DR. JOHN ROE,

v.

Defendants:

UNITED STATES OF AMERICA, et al.

_____

APPEARANCES:

        Hendley & Hodges Law PLLC
             By John W. Hodges, Jr., Esq.
                4594 US Hwy. 281 N
                Spring Branch, Texas 78070
                210-714-0924
                john@hhtx.law

             and

        Allen Vellone Wolf Helfrich & Factor P.C.
             By Lance Henry, Esq.
                1600 Stout Street, Suite 1900
                Denver, Colorado 80202
                303-534-4499
                lhenry@allen-vellone.com
                   Appearing on behalf of Plaintiff.

**EXHIBIT 14**
**Page 51 of 207**

```
 1          U.S. Department of Justice, Civil Division
                By Katrina Seeman, Esq.
 2                 Joseph A. Gonzalez, Esq.
                   950 Pennsylvania Avenue, NW
 3                 Washington, D.C. 20530
                   202-616-0674
 4                 katrina.m.seeman@usdoj.gov
                   joseph.a.gonzalez@usdoj.gov
 5
                and
 6
            U.S. Attorney's Office, Western District of
 7          Texas
                By Robert D. Green, Esq.
 8                 601 NW Loop 410, Suite 600
                   San Antonio, Texas 78216
 9                 210-384-7100
                   robert.green3@usdoj.gov
10                  Appearing on behalf of the Government
                    Defendants.
11

12    Also present:  Rebecca Bradshaw, paralegal
                      Maryvonne Tompkins, videographer
13

14

15

16

17

18

19

20

21

22

23

24

25
```

**EXHIBIT 14**
**Page 52 of 207**

Burghard_000002

```
 1                    Pursuant to Amended Notice and the Federal

 2    Rules of Civil Procedure, the deposition of JOSEPH

 3    DANIEL BURGHARD, called by Plaintiff, was taken on

 4    Thursday, May 15, 2025, commencing at 10 a.m., via

 5    Zoom videoconference, before Sheila R. Schiesser,

 6    Registered Professional Reporter, Certified Realtime

 7    Reporter, and Notary Public within and for the State

 8    of Colorado.

 9

10                          I N D E X

11    DEPOSITION OF JOSEPH DANIEL BURGHARD

12    EXAMINATION BY:                               PAGE

13      MR. HODGES                                  6
        MS. SEEMAN                                  129
14

15

16    EXHIBITS                          INITIAL REFERENCE

17    1        E-mail thread between Danny          64
               Burghard and William McVeigh,
18             cc'ing others re:  MFR for Dr.
               Roysdon Please, Bates-labeled
19             US0000477-0000480

20    2        E-mail thread between Danny          78
               Burghard, Brian Bohenek, Dan
21             Brown, William McVeigh, and others
               re:  Need To Talk Security dated
22             7/22/20, Bates-labeled
               US0000632-0000633
23
      3        IG Complaint-Investigative Notes,    88
24             Bates-labeled US0000724-0000738

25
```

EXHIBIT 14
Page 53 of 207

Burghard_000003

| 1 | 4 | E-mail thread between Daniel Brown, Dr. Roysdon, Allen Rabayda, William McVeigh, Danny Burghard, and others re: (U) paperwork dated August 2020, Bates-labeled US0000060-0000066 | 97 |
| 2 | | | |
| 3 | | | |
| 4 | | | |
| 5 | 5 | Memorandum from AFLCMC/HNCKC re: Inquiry of Security Incident dated 9/22/20, Bates-labeled US0000233-0000234 | 105 |
| 6 | | | |
| 7 | 6 | E-mail thread between Christopher Webb and Danny Burghard re: Follow-up dated 8/12/22, Bates-labeled US0000088 | 126 |
| 8 | | | |
| 9 | | | |
| 10 | | | |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

**EXHIBIT 14**
**Page 54 of 207**

Burghard_000004

```
1                   P R O C E E D I N G S
2              THE VIDEOGRAPHER:  The time is 10 a.m.  We
3    are on the record.  Today is May 15, 2025.  This
4    begins the recorded deposition of Daniel Burghard in
5    the matter of Dr. John Roe versus United States of
6    America, et al.
7              This deposition is being recorded via Zoom
8    videoconferencing.  The court reporter is Sheila
9    Schiesser.  The videographer is Maryvonne Tompkins.
10             The attorneys will introduce themselves
11   starting with the Plaintiff, please.
12             MR. HODGES:  Yes.  Good morning.  This is
13   John Hodges on behalf of the Plaintiff.  I'm joined
14   by co-counsel, Lance Henry, and we also have our
15   paralegal on this conference.  She's here with us.
16   Her name is Rebecca Bradshaw.
17             MS. SEEMAN:  Katrina Seeman on behalf of
18   the Government Defendants along with my co-counsel
19   Joseph Gonzalez and Robert Green.
20             THE VIDEOGRAPHER:  Our court reporter will
21   please swear in the witness, and we can proceed.
22             THE COURT REPORTER:  Mr. Burghard, would
23   you raise your right hand, please.
24
25
```

**EXHIBIT 14**
**Page 55 of 207**

Burghard_000005

```
 1                    JOSEPH DANIEL BURGHARD,

 2    called as a witness by the Plaintiff, having been

 3    duly sworn, testified as follows:

 4                         EXAMINATION

 5    BY MR. HODGES:

 6        Q.    Good morning, Mr. Burghard.  My name is

 7    John Hodges.  I'm one of the attorneys that

 8    represents Dr. Roe.  I think -- I think it's kind of

 9    out in the open now he goes by Dr. Roysdon.

10               And so I know that people call you "Danny"

11    or "Daniel."  Would you mind, for the record, giving

12    us your full name, please, here.

13        A.    It's Joseph Daniel Burghard.  I go by the

14    name of Danny.

15        Q.    Yes, sir.  I know -- Mr. Burghard, I know

16    you gave your deposition testimony on behalf of a

17    government witness -- or as a government witness a

18    few weeks ago, but I also understand that was your

19    first deposition.

20               So I'm going to go through a few rules

21    just as a refresher to keep this moving along

22    smoothly, okay?

23        A.    Sounds great.

24        Q.    Yes, sir.  So you're aware that the oath

25    that you just took is the same oath that you would
```

**EXHIBIT 14**
**Page 56 of 207**

Burghard_000006

1    take in the trial of this case, right?

2        A.    That's right.

3        Q.    Yes, sir, and so you're aware that your

4    testimony today carries the same weight as it would

5    in front of a judge or a jury?

6        A.    That's correct.

7        Q.    Yes, sir.  And then -- and in fact, we

8    could use the transcript from today's deposition --

9    we could use that in front of a judge or jury as

10   well.

11       A.    Okay.

12       Q.    Yes, sir.  Okay.  And so the same thing

13   applies as before.  We've got our court reporter who

14   is making the transcript of everything that you and I

15   say -- everyone says today.  Ordinary nonverbal cues

16   that you and I might ordinarily use, we can't do that

17   today, and so if I -- if I ask you, Is that a "yes,"

18   is that a "no," I'm not being rude.

19            The court reporter may chime in and do the

20   same thing and ask you, Is that a "yes?"  Is that a

21   "no?"  She's not being rude either.  She's just

22   protecting the work we're asking her to do, okay?

23       A.    Sounds good.

24       Q.    Same thing for -- in ordinary conversation

25   you and I might understand and start talking over one

**EXHIBIT 14**
**Page 57 of 207**

Burghard_000007

1    another, and I saw it when I was looking over the

2    transcript from before Mr. Wareham may have spoke

3    over you a few times.  I'm going to do my best not to

4    ask my next question until you're done with your

5    answer, okay?  But if you would, let me get it out

6    even though you probably know where I'm going, okay?

7        A.    Sounds great.  I appreciate that.

8        Q.    Yes, sir.  And same -- along the same

9    lines, the court reporter may chime in and tell both

10   of us to ceasefire for a moment because we're talking

11   over one another.  She may give us that instruction

12   again.  We ask her to do that because we ask her to

13   protect the record that she's creating, okay?

14       A.    Great.

15       Q.    Yes, sir.  I want to -- so just to

16   confirm, though, this is only the second time you've

17   been deposed?

18       A.    That's correct.

19       Q.    Yes, sir.  Okay.  And the other time was

20   in this case a few weeks ago?

21       A.    Yes, sir.

22       Q.    Okay.  Well, we're here to talk about

23   Dr. Roe and his role at HNCO.  Just so I get

24   terminology right and so it's clear for our judge or

25   jury, when we say "HNCO" or "Air Force Life Cycle

**EXHIBIT 14**
**Page 58 of 207**

Burghard_000008

1    Management Center," are we talking about the same

2    organization?

3        A.    Yes, we are.  And by slang, we typically

4    refer to it as AFLCMC/HNCO.

5        Q.    Okay.  But HNCO or Air Force Life Cycle

6    Management, same thing?

7        A.    Same thing, absolutely.

8        Q.    For my own edification, are you able to

9    tell us what "HNCO" stands for?

10       A.    No.  It actually doesn't stand for

11   anything.  It's just a subpart of the entire Air

12   Force Life Cycle Management director or organization,

13   if you will.

14       Q.    Okay.  All right.  But for today, if I'm

15   using those terms interchangeably, there's no

16   confusion about what we're talking about, right?

17       A.    Not at all.

18       Q.    Yes, sir.  Okay.  Okay.  I want to ask you

19   a little bit about -- about your background because

20   truthfully I don't know who you are or what -- how

21   you landed in this position that you're in.

22             I understand that your current position is

23   the AQLQ?

24       A.    That's right.  I'm the -- so I'm part of

25   an organization called AQL, which is the Air Force

**EXHIBIT 14**
**Page 59 of 207**

Burghard_000009

1    Special Programs.  Within AQL, I run the AQLQ

2    Division, which is the Advanced Cyber Intelligence

3    Division there.

4        Q.    Okay.  Yes, sir.  And can you tell us --

5    can you tell us what role you had before then -- what

6    position you had before this one?

7        A.    Sure.  Before being a division chief

8    there, I was in the same division, but as a PEM, the

9    Program Element Monitor.

10       Q.    Yes, sir.  Okay.  So as the -- as the

11   AQ -- as the division chief, AQLQ, can you tell us

12   how long you've been there?

13       A.    Sure.  I've been there since 2017 both in

14   my PEM and chief capacity.

15       Q.    Okay.  Okay.  And then, so how long did

16   you have that -- how long were you in that PEM

17   capacity?

18       A.    I only have become a division chief within

19   the last year and a half or so, so the PEM the rest

20   of the time.

21       Q.    Okay.  So you've been with AQL since 2017,

22   but only the division chief for about the last year

23   and a half or so?

24       A.    That's right.

25       Q.    Okay.  I see.  And so can you tell us how

**EXHIBIT 14**
**Page 60 of 207**

Burghard_000010

1   you got into -- into this position.  I mean, you

2   mentioned it was since 2017.  Do you have an Air

3   Force background before you landed in this role?

4        A.    I do not.  So I'm actually prior Army, so

5   I did five years in the Army as a signals

6   intelligence analyst back in the early 2000s, got out

7   of the Army, worked for the Navy for roughly a decade

8   or so, left there --

9        Q.    As a civilian?

10       A.    As a civilian, yes.

11       Q.    Yes, sir.  Okay.  Sorry.  Go ahead.

12       A.    From there, I went to an organization

13  called OSD-SCO, or the Strategic Capabilities Office.

14  I was a program manager there for about a year and

15  some change, and then I landed here after that

16  position.

17       Q.    Yes, sir.  Do you have any DoD connection

18  outside of your role as a civilian within the Air

19  Force?

20       A.    I do not.

21       Q.    I'm just asking, are you a reservist?

22       A.    Nope.

23       Q.    Okay.  All right.  I just -- I just want

24  to understand some of that background.  Okay.  So can

25  you tell us some of your duties and responsibilities

**EXHIBIT 14**
**Page 61 of 207**

Burghard_000011

1    there at AQL?

2        A.    Sure.  Like I said, I'm the division chief

3    there, so I manage both our cyber team and our intel

4    team.  And really what that means is we run several

5    portfolios that span the entire Air Force.  So we'll

6    do primarily offensive cyber development there --

7    development does not happen there.  It happens in

8    program offices across the country.  So we basically

9    manage the security and funding that supports all of

10   those organizations across the Air Force.

11       Q.    Yes, sir.  Okay.  So what I'm trying to

12   understand -- and I appreciate you giving us that.

13   Are you -- as the division chief, are you in the

14   business of developing some of these programs or

15   implementing these programs?

16       A.    So we -- we basically see over -- we

17   oversee the execution of funds and kind of the

18   security classification governance that applies to

19   special access programs like the ones we're talking

20   about today.

21       Q.    Yes, sir.  And so are you procuring these

22   programs for implementation within the Air Force and

23   other DoD, or are you --

24       A.    Correct.

25       Q.    I'm sorry.  Go ahead.

**EXHIBIT 14**
**Page 62 of 207**

Burghard_000012

1     A.     That's correct.  So if it helps, we're an

2  acquisition element of the Air Force.  That's what

3  the "AQ" stands for, acquisition.

4     Q.     Yes.

5     A.     And so we're the ones responsible for

6  starting the programs, developing capabilities, and

7  then seeing those through to the fields that support

8  warfighters.

9     Q.     I see.  Okay.  And so in this role do

10  you -- do you have subordinates that report to you?

11     A.     I do.

12     Q.     Yes, sir.  About how many do you have --

13  let's start with direct reports right now.  How many

14  direct reports do you have?

15     A.     So I have two military, two civilian, and

16  roughly 10 to 12 HNCO support contractors.

17     Q.     Okay.  All right.  And do you have a role

18  in the hiring and terminating of contractors?

19     A.     I can make recommendations to our folks

20  that do the hiring, but that's as far as my role

21  extends.

22     Q.     Okay.

23     A.     I come up with a legitimate need to hire

24  those folks, and then I have to pass it on to the

25  people that can complete those positions and hire

**EXHIBIT 14**
**Page 63 of 207**

Burghard_000013

1    appropriately to the best performer.

2        Q.    Okay.  And so you would -- if there was a

3    contractor that wasn't performing or maybe had some

4    behavior out of line, your role would be make a

5    recommendation in either discipline or termination?

6        A.    Correct.

7        Q.    Okay.  But you wouldn't actually be the

8    decision-maker on whether or not someone is

9    terminated?

10       A.    True.

11       Q.    Okay.  And the same would hold true, then,

12   for a contract, whether or not a contract is

13   terminated or extended?

14       A.    So that decision is made at the program

15   offices, so I'm responsible for the execution of the

16   funds.  AQL does not have contract authority, which

17   is where the AFLCMC/HNCO comes in.  They're our

18   program office, so they're the ones that actually

19   award contracts, terminate contracts, close out

20   contracts, that kind of thing.

21       Q.    Okay.  And so -- but you're in the role of

22   making recommendations at that point, right?

23       A.    Correct.

24       Q.    Okay.  And so do you mind telling us

25   what -- what office you report to?

**EXHIBIT 14**
**Page 64 of 207**

Burghard_000014

1          A.    So I report to SAF/AQ and the Pentagon.

2          Q.    And do you mind telling, for the judge or

3    jury, what "SAF/AQ" means?

4          A.    Sure.  The Secondary Air Force

5    Acquisitions, so it's the Office of the Pentagon

6    specifically for the Air Force that runs all

7    acquisitions for the Air Force.

8          Q.    I see.  Okay.  Okay.  I want to ask you

9    about some folks whose names have been brought up in

10   this lawsuit.  You're not going to be surprised to

11   hear a few of them.

12               Let's start with Captain McVeigh.  I

13   understand he's been promoted.  Maybe he's Major

14   McVeigh now.  Is it okay if we call him Captain

15   McVeigh for today?

16         A.    That's fine with me.

17         Q.    Yes, sir.  And we're talking about Captain

18   William McVeigh; is that right?

19         A.    Yes, sir.

20         Q.    Okay.  Can you tell us when you first met

21   Captain McVeigh?

22         A.    Sure.  It probably would have been about

23   five or six years ago.

24         Q.    Okay.  And what was -- what was your

25   position when you met him?

**EXHIBIT 14**
**Page 65 of 207**

Burghard_000015

1          A.    I was the PEM at the time.

2          Q.    And what position was Captain McVeigh?

3          A.    He was program manager at AFLCMC/HNCO.

4          Q.    I'm sorry.  The speaker broke up a little

5     bit.  He's the program manager where?

6          A.    At HNCO.

7          Q.    HNCO?  And that's -- HNCO, can you tell

8     the jury where that is?

9          A.    Sure.  It's in San Antonio, Texas.

10         Q.    And your role as the PEM, where were you

11    stationed at the time?

12         A.    So AQL technically has two office

13    locations.  One is in the Pentagon, and the other is

14    at Joint Bolling-Anacostia Base, referred to as JBAB.

15    I primarily stay at JBAB, but I spend time at the

16    Pentagon as well.

17         Q.    I'm sorry.  That joint base, what was the

18    name of that again?

19         A.    Joint Base Anacostia-Bolling.

20              THE COURT REPORTER:  Can you spell that?

21              THE DEPONENT:  Sure.  Joint, just like it

22    sounds, J-o-i-n-t; Base, B-a-s-e; Anacostia; that's

23    A-n-a-c-o-s-t-i-a; Bolling, B-o-l-l-i-n-g.

24         Q.    (BY MR. HODGES)  And, Mr. Burghard, that

25    joint base, is that where your -- where you office

**EXHIBIT 14**
**Page 66 of 207**

Burghard_000016

1    out of now as well?

2         A.    It is, yes.

3         Q.    Okay.  And so approximately -- you

4    mentioned it was approximately five years ago that

5    you first met Captain McVeigh?

6         A.    Roughly five or six years; yes, sir.

7         Q.    Yes, sir.  Okay.  And can you tell us --

8    he was a program manager.  Can you tell us what you

9    understand that to mean?

10        A.    Sure.  That means he runs a subset of

11   projects for that organization, and "by run

12   projects," I mean he -- he oversees contract award,

13   contractor performance, whoever the vendor might be

14   for that effort.  He oversees cost, schedule, and

15   delivery of products associated with those contracts

16   and then ensures that we're meeting proper milestones

17   to eventually deliver capability.

18        Q.    Okay.  And can you tell us what your role

19   is as between your role then as a PEM and Captain

20   McVeigh?

21        A.    Sure.  So as a PEM, your role is to ensure

22   that funding is being spent appropriately in terms of

23   the scope of the program and that you're meeting OSD

24   standards, those standards referred to as obligation

25   and expenditures, and that we're eventually making

**EXHIBIT 14**
**Page 67 of 207**

Burghard_000017

1    sure the funds get us through that capability that we

2    need at the end of the day for the warfighter.

3           So basically, we're the ones that issue

4    funds to HNCO.  They're the ones that would award to

5    a vendor pursuant to executed, specific, identified

6    projects, and they oversee the project there locally

7    to completion.

8        Q.    Yes, sir.  Okay.  And so in your role as

9    the PEM and you mentioned that you're releasing

10   funds, you would have been releasing funds to Captain

11   McVeigh for his project; is that fair?

12       A.    That's correct.

13       Q.    And would you -- would you be receiving

14   information from Captain McVeigh before you're

15   releasing funds?

16       A.    Regularly.  We had weekly syncs, if you

17   will, and then they're required to submit a monthly

18   activity brief to us in terms of the status of the

19   efforts.

20       Q.    Okay.  And so he's sending you information

21   about the progress of certain projects; is that fair?

22       A.    Yes.

23       Q.    Yes, sir.  The relationship between you as

24   the PEM and Captain McVeigh, would it be fair to say

25   that you're his supervisor?

**EXHIBIT 14**
**Page 68 of 207**

Burghard_000018

1      A.    No, not at all.

2      Q.    Okay.

3      A.    So he's -- he would have, at the time,

4  reported to Lieutenant Colonel Jared Ekholm, who

5  would have been his direct military supervisor.

6      Q.    Yes, sir.  And so he reports directly to

7  Colonel Ekholm, and so Colonel Ekholm is supervising

8  the performance of his duties?

9      A.    Correct.

10      Q.    And Colonel Ekholm is writing evaluations

11  about his performance then?

12      A.    That's right.

13      Q.    That is not your role?

14      A.    Not at all.

15      Q.    Right.  Okay.  And so -- okay.  Do you

16  have any idea maybe if he had subordinates at the

17  time?

18      A.    If --

19            MS. SEEMAN:  Objection to form.

20            You can answer.

21      A.    I'm sorry.  Just for clarity, you're

22  referring to Will McVeigh and not Jared Ekholm,

23  right?

24      Q.    (BY MR. HODGES)  Correct, yes, Captain

25  McVeigh.

**EXHIBIT 14**
**Page 69 of 207**

Burghard_000019

```
1          A.     Yes, he would have had subordinates

2    working for him, both civilian and contractors.

3          Q.     Okay.  And were they also providing

4    information to you?

5          A.     We typically like to interface directly

6    with the program manager or the material leader or

7    the senior material leader as the government

8    representatives for those programs.

9          Q.     Yes, sir.

10          A.     But occasionally, if it's a specific

11    technical thing that comes up, they do bring in their

12    experts to discuss some of those things.

13          Q.     I see.  Okay.  Okay.  Are you familiar

14    with this project that's called Fibonacci?

15          A.     Yes.

16          Q.     Yes, sir.  Was that a program that fell

17    under your scope as the PEM?

18          A.     It is.

19          Q.     Yes, sir.  Do you mind -- just for

20    clarification, can you give us a little bit of a time

21    frame of when you were -- or Fibonacci was under your

22    scope?

23          A.     Sure.  So it would have started back in

24    probably summer or August time frame of 2019 is

25    probably when we would have kicked that off.
```

**EXHIBIT 14**
**Page 70 of 207**

Burghard_000020

1     Q.     Yes, sir.  Is it still?

2     A.     It is not, no longer.

3     Q.     Okay.  Can you tell us approximately when

4  it was terminated?

5     A.     Sure.  It would have been about a year and

6  a half to two years into it.

7     Q.     Okay.

8     A.     And we should be clear here that there's

9  actually several Fibonaccis, so it depends on which

10  one you're referring to.

11     Q.     Okay.  How are those -- how are those --

12  how would we know the difference between one

13  Fibonacci and another?

14     A.     They have other names with them.  So there

15  should have been, like, Fibonacci Replicare,

16  Fibonacci Lattice, Fibonacci Blur, and then there's

17  two others.  It's just been five years.  I can't

18  remember the names of them all, but those are the

19  ones I do remember.

20     Q.     So is -- and I saw that in some of these

21  e-mails:  Blur, I believe, and a couple of others.

22  Would it be fair to say that Fibonacci is more of an

23  umbrella name for these projects; is that right?

24     A.     That's accurate.

25     Q.     Okay.  And so you mentioned several

**EXHIBIT 14**
**Page 71 of 207**

Burghard_000021

1    subprojects under Fibonacci?

2        A.    Correct.

3        Q.    Are those also closed when -- you

4    mentioned a minute ago that Fibonacci was closed

5    about a year and a half or so after it was opened.

6        A.    So roughly when we closed them, I want to

7    say we closed two of them, like, a year and a half

8    into it, one after that; and then maybe, like, the

9    year after that we closed the rest.

10       Q.    Okay.  But they're all closed now?

11       A.    Yeah, that's right.

12       Q.    And in fact, I think you said some of them

13   about 18 months, maybe two years.  Would it be fair

14   to say that they were all closed at about -- at about

15   the two-year mark, there were none of them open?

16       A.    I would say it was more like three --

17   three years.

18       Q.    Okay.  Okay.  Can you tell us -- so I'm

19   asking about Fibonacci and these other programs

20   because I want to understand what role Captain

21   McVeigh had on Fibonacci and other programs.

22             Was he involved in Fibonacci?

23       A.    He was.  He was the program manager for

24   that.  If you want to call it the umbrella of those

25   programs, he was.

**EXHIBIT 14**
**Page 72 of 207**

Burghard_000022

1       Q.    Okay.  And so if he was the program

2    manager for Fibonacci, is it fair to say that he was

3    also program manager for all of the subprograms?

4       A.    Yes.

5       Q.    Okay.  So the entire Fibonacci project?

6       A.    Correct.

7       Q.    Okay.  And so have you ever heard this

8    term that we talked about, Project B?

9       A.    No.

10       Q.    Okay.  Well, we'll get back to that in

11    just a moment.  So the Fibonacci project, can you

12    tell us, was there -- was there ever a conflict

13    between your office and Captain McVeigh about whether

14    or not the Fibonacci programs would continue?

15       A.    I wouldn't say a conflict.  I mean, I

16    would say it's -- it's normal program management, you

17    know.  We -- you know, Fibonacci is one thing, but

18    there's several programs that are being run out of

19    HNCO.  And across the board, they were

20    underexecuting.

21            So I wouldn't call it a conflict per se.

22    I would call it just a program under execution that

23    we were trying to help them get back on schedule, on

24    time, on cost, that kind of thing.

25       Q.    Okay.  Does it happen sometimes that maybe

**EXHIBIT 14**
**Page 73 of 207**

Burghard_000023

1    a project manager like Captain McVeigh wants to

2    continue and push a project along, but maybe your

3    office is -- we've got to cut it.  We've got to stop

4    the bleeding?

5         A.    Absolutely.

6         Q.    And are there ever occasions where --

7    where there's a disagreement about whether or not a

8    project should be terminated or cut?

9              MS. SEEMAN:  Objection to form.

10             You can answer.

11        A.    I mean, there's professional discussions

12   on what are the risks associated with doing that for

13   sure.

14        Q.    (BY MR. HODGES)  Okay.  Okay.  I want to

15   ask -- I want to move further now and ask about a

16   gentleman Dan Brown.

17        A.    Okay.

18        Q.    Can you tell the jury, do you know Dan

19   Brown?

20        A.    I do.

21        Q.    Yes, sir.  Can you tell us who he is?

22        A.    Sure.  At the time Dan Brown would have

23   been one of the civilians on Captain Will McVeigh's

24   team.  His function -- he served as basically a

25   technical advisor, and he's an engineer by trade.

**EXHIBIT 14**
**Page 74 of 207**

Burghard_000024

1       Q.    When you say "engineer," what type of

2  engineer?

3       A.    I would say a computer engineer.

4       Q.    Yes, sir.  Okay.  And so -- so he works

5  with -- or at the time he worked under Captain

6  McVeigh's supervision?

7       A.    That's correct.

8       Q.    Okay.  Does he -- do you know if he has a

9  different position now?

10      A.    I've been told he's moved on.  I'm not

11  sure what he's doing in his current role.

12      Q.    So from AQL down to HNCO, you don't

13  have -- you don't deal with Dan Brown anymore?

14      A.    I do not.

15      Q.    When was the last time that you estimate

16  that you worked with Mr. Brown?

17      A.    Geez, it's been years.

18      Q.    Okay.  So --

19      A.    Four years, maybe longer.

20      Q.    Yes, sir.  Approximately -- or

21  approximately when was the first time that you began

22  working with Dan Brown?

23      A.    It probably would have been my very first

24  time getting to AQL, so 2017, 2018.

25      Q.    He was already there when you came into

**EXHIBIT 14**
**Page 75 of 207**

Burghard_000025

1    AQL?

2         A.    Right.

3         Q.    Yes, sir.  Okay.  And -- okay.  And so

4    while you were working with Mr. Brown, were you ever

5    aware that he was promoted?

6         A.    I was not.

7         Q.    I'm asking, did he ever -- did he ever

8    pick up additional responsibilities?

9         A.    No, not that I'm aware of.

10        Q.    Yes, sir.  Do you know whether or not he

11   had any subordinates?

12        A.    I'm not sure, to be honest with you.

13        Q.    And to your understanding, his direct

14   supervisor was Captain McVeigh?

15        A.    That's what I remember.

16        Q.    Yes, sir.  Okay.  Can you tell us what his

17   role was on the Fibonacci projects?

18        A.    Sure.  He was kind of the technical expert

19   or subject matter expert, however you want to refer

20   to it.

21        Q.    Yes, sir.

22        A.    So he was the one who had daily

23   interaction with the vendors in development of the

24   effort.

25        Q.    And just to be clear for the judge or our

**EXHIBIT 14**
**Page 76 of 207**

Burghard_000026

1    jury, Dan Brown, he wasn't doing the programming, was

2    he?

3              MR. GONZALEZ:  Hey, John.  I'm sorry.  He

4    can answer that.  I've heard you say "judge or jury,"

5    I think this is the third time.  This isn't a de bene

6    esse deposition, is it?

7              MR. HODGES:  I'm sorry.  Can you say that

8    again?

9              MR. GONZALEZ:  Sure.  I've heard you say

10   "jury," I think this is the third time, "to be clear

11   for the jury."  This isn't a de bene esse deposition,

12   is it?  I just want to make sure we're on the same

13   page here.

14             MR. HODGES:  No, sorry.  You'll have to

15   excuse the bad habit.  I may continue to say that.

16   It's not -- that's just out of habit.

17             MR. GONZALEZ:  Okay.  I just want to make

18   sure.  That's what I thought the first time, but it's

19   the third time, and so I wanted to make sure we're on

20   the same page.  Thanks.

21             MR. HODGES:  Sure.  Yeah, sure.

22        Q.   (BY MR. HODGES)  Okay.  So that -- I'm

23   going to try and remember my question.  Do you happen

24   to know where we are, Mr. Burghard?

25        A.   I do.  You asked, is Dan Brown the one

**EXHIBIT 14**
**Page 77 of 207**

Burghard_000027

1    doing the programming?

2        Q.    Yes, there we go.  Thank you.

3        A.    And can I get a clarification on that?

4        Q.    Yes.

5        A.    By "programming," do you mean, like, doing

6    program management, or are you talking hands-on

7    keyboarding, coding, write software?

8        Q.    Yes, coding and software.

9        A.    He would not have been the one to do that.

10   Typically HNCO would contract that work out, and it

11   would be a vendor that would be getting paid to do

12   that work.

13       Q.    Right.  And so Dan Brown's role was to

14   interface with the vendor, and they're the ones doing

15   the programming, the software development, that kind

16   of thing?

17       A.    Correct.

18       Q.    Okay.  I just want to make sure that --

19   that I understood that, and so -- and so within that

20   role, would Dan Brown be assisting with the sourcing

21   of vendors?

22       A.    He would.  I would imagine he would be

23   looking at the proposals, white papers, doing source

24   evaluations, and absolutely making recommendations on

25   which vendors to on-ramp.  He is our local contract

**EXHIBIT 14**
**Page 78 of 207**

Burghard_000028

1    officer.

2        Q.    Okay.  Okay.  Thank you.  So you mentioned

3    that -- that HNCO and specifically Captain McVeigh

4    would be providing kind of weekly information to you

5    and AQL, right?

6        A.    (Nodded head up and down.)

7        Q.    You mentioned that the Fibonacci program

8    was kind of underperforming.  That would seem to

9    maybe beg for some additional conversation and

10   additional information; is that fair?

11       A.    Yes.

12       Q.    And so when you're having some of this

13   additional information as you're trying to check on

14   this program, do you have any communication with Dan

15   Brown?

16       A.    On a rare occasion, yes, but it's

17   primarily going through Jared Ekholm and Will

18   McVeigh.

19       Q.    Okay.  Why would you on occasion have to

20   confer with Dan Brown?

21       A.    Sometimes it's schedules.  You know,

22   they're military guys.  They travel a lot.  They

23   might be out of the office.  Dan might be the only

24   one available that can answer the question then and

25   there.

**EXHIBIT 14**
**Page 79 of 207**

Burghard_000029

```
 1              Other occasions it might be he's more
 2    involved and knows more about the ins and outs and is
 3    in the weeds of what's actually happening with the
 4    program, and you might be deferred to by one of
 5    those.
 6         Q.    Okay.  And so maybe on occasion you've got
 7    a specific question that maybe they can't answer, but
 8    they've got somebody like Dan Brown who has a little
 9    bit more technical knowledge?
10         A.    Correct.
11         Q.    Okay.  All right.  So did you have
12    personal interactions with Dan Brown, like, on the
13    phone or in person?
14         A.    Absolutely.
15         Q.    Okay.  And would you say that that was --
16    was it somewhat routine for you to have personal
17    interaction with him?
18              MS. SEEMAN:  Objection to form.
19              You can answer.
20         A.    I would say it's occasion -- occasional.
21         Q.    (BY MR. HODGES)  Okay.  So during that
22    time, did you ever have any reason to doubt that --
23    to doubt his honesty?
24              MS. SEEMAN:  Objection to form.
25              You can answer.
```

**EXHIBIT 14**
**Page 80 of 207**

Burghard_000030

1      A.     I don't think so.

2      Q.     (BY MR. HODGES)  Never had any reason to

3   call some statements of fact into question?

4             MS. SEEMAN:  Same objection.

5             You can answer.

6      A.     I wouldn't say that.  I would say there

7   would be occasional, you know, questions about his

8   judgment in some circumstances.  But, you know, I'm

9   not going to question his honesty.

10     Q.     (BY MR. HODGES)  That's what I'm asking.

11  So, yeah, sure.  Maybe you guys have a professional

12  disagreement about a certain program or something

13  like that, but you didn't have any reason to think he

14  was ever being dishonest?

15     A.     No.

16     Q.     Do you have an opinion about his character

17  for honesty?

18            MS. SEEMAN:  Objection to form.

19            You can answer.

20     A.     Not really.  I mean, as far as I know,

21  he's a talented engineer.  He really knows his stuff

22  inside and out.  But like I said, occasionally there

23  could be questions about his judgment in terms of,

24  like, best security practices, you know.

25            Sometimes he would, you know, maybe not

**EXHIBIT 14**
**Page 81 of 207**

Burghard_000031

1    fully understand security and the requirements for

2    doing, like, SAF work in a certified, accredited

3    facility, top secret facility.

4        Q.    (BY MR. HODGES)  Did you say --

5        A.    And I'm sorry.  And that's just because

6    he's an engineer versus a professional security

7    person.

8        Q.    I see.  And so you said SAF security or

9    staff security?

10       A.    SAF, F, which is a SAF-accredited

11   facility.

12       Q.    I see.  Okay.  So can you tell us, did Dan

13   Brown have any -- did he have any involvement in the

14   Fibonacci project?

15       A.    Yes.  He was the technical expert running

16   the day-to-day efforts.

17       Q.    Okay.  Okay.  Do you know if Dan Brown

18   ever received a demotion?

19       A.    That wouldn't have been something I would

20   have heard about.  That's a -- like I said, he

21   administratively reports to other military at our

22   agency.  I wouldn't have visibility into that.

23       Q.    Do you have any information as to whether

24   or not he was ever removed from special programs?

25       A.    I am aware that he was moved internally in

**EXHIBIT 14**
**Page 82 of 207**

Burghard_000032

1    HNCO to some other team.  I'm unaware of what that

2    team was or what the reason was for moving him.

3         Q.    Okay.  You've heard that term "special

4    programs" before?

5         A.    Yes.

6         Q.    Can you tell our judge, what's that mean,

7    special programs?

8         A.    So special programs referred to a program

9    that requires additional protections.  Typically it's

10   called SAP, or Special Access Program.  When you

11   think of a security classification of critical data,

12   national security, you have different classification

13   levels.  You know, I'm classified all the way up to

14   top secret.

15         And you have -- even further means to

16   protect that information like SITK and others, and

17   then it goes beyond that to the most critical things,

18   which are in SAPs, or Special Access Programs is what

19   we're referring to here.

20         Q.    Was Fibonacci a Special Access Program?

21         A.    It was a project within a Special Access

22   Program.

23         Q.    Okay.  So fair to say if it's a project

24   within a Special Access Program, it would also

25   qualify for whatever protections are afforded a

EXHIBIT 14
Page 83 of 207

Burghard_000033

1    Special Access Program?

2        A.    That's correct.

3        Q.    Okay.  Okay.  I want to ask you now about

4    Dr. Paul Roysdon.  Can you tell us when you first --

5    when you first met Dr. Roysdon?

6        A.    Sure.  That was probably also in that 2019

7    time frame.

8        Q.    It would have been about late summer,

9    2019?

10       A.    Probably, yeah, summertime of some sort,

11   then.

12       Q.    Okay.  In the summer, yes, sir.  And when

13   you met him, had someone already discussed him before

14   you met him?

15       A.    Dan Brown had before, yes.

16       Q.    Yes.  So he -- he maybe -- can you tell us

17   what Dan Brown said or suggested with regard to

18   Dr. Roysdon?

19       A.    Sure.  I guess Dan had close ties to some

20   people at the National Security Agency, also known as

21   NSA, in San Antonio, Texas.  At the time I think he

22   had this connection with Dr. Roysdon.

23            He introduced us to Dr. Roysdon because of

24   the field Dr. Roysdon was working in at the time.  He

25   was the chief data scientist for NSA, and they had

**EXHIBIT 14**
**Page 84 of 207**

Burghard_000034

1    some ideas that he thought would be applicable to

2    kick-starting a new program, which turned into

3    Fibonacci.

4        Q.    I see.  And so Dan Brown presented

5    Dr. Roysdon to you or suggested Dr. Roysdon.  Was

6    that communication that Dan Brown had directly to

7    you, or was that only through Captain McVeigh?

8        A.    It's one that he made sure McVeigh was

9    tracking it and aware of and then was recommended to

10   come talk, you know, to us directly.

11       Q.    Yes, sir.  Okay.  So about how long after

12   that proposal did you first interact with

13   Dr. Roysdon?

14       A.    It would have been a pretty short time

15   frame.  Maybe a month or two.

16       Q.    Okay.  And how did you first interact with

17   Dr. Roysdon?

18       A.    I believe he actually flew up and came and

19   saw saw us in person there at the Joint

20   Bolling-Anacostia Base.

21       Q.    Okay.  And when he came, was he by

22   himself, or were others with him?

23       A.    It's been a long time.  I don't remember,

24   to be honest with you.

25       Q.    Sorry.  Let me ask a better question.

**EXHIBIT 14**
**Page 85 of 207**

Burghard_000035

1    When he came -- he came up to Anacostia.  Did Dan

2    Brown and/or Captain McVeigh come with him?

3              MS. SEEMAN:  Objection to form.

4              You can answer.

5         A.    Like I mentioned, it's been five,

6    six years.  I don't remember, to be honest with you.

7         Q.    (BY MR. HODGES)  Okay.  Can you -- can you

8    tell us what the substance of that meeting was?

9         A.    Sure.  At the time there was the concept

10   that he wanted to propose to be, you know, performed

11   out of HNCO.  It's his projects that he named the

12   Fibonacci series, and he wanted to come tell us and

13   provide a technical, kind of deep dive on what is

14   this concept.  How does it work?  Is it something

15   that we should, as the government, fund and go do?

16        Q.    Okay.  And so when he made that -- when he

17   had that discussion with you, was it -- did you have

18   another conversation with Mr. Brown or Captain

19   McVeigh about it?

20        A.    Absolutely.

21        Q.    Did it -- were they already suggesting

22   that this program be approved?

23        A.    Yes.

24        Q.    Okay.  And so after that meeting with

25   Dr. Roysdon, was it approved?

EXHIBIT 14
Page 86 of 207

Burghard_000036

```
1       A.    It was.

2       Q.    Okay.  And so who was that project awarded

3   to?

4       A.    It was awarded to HNCO --

5       Q.    Okay.  And --

6       A.    -- as far as I'm concerned.  I'm sorry.  I

7   would have dedicated some base funding to HNCO, and

8   then it's up to them to go find a formal contractor

9   to actually award a contract and execute the effort.

10      Q.    I see.  So were you the approval authority

11  for the Fibonacci program?

12      A.    For the funding, yes.

13      Q.    For the funding, yes, okay.  And so you

14  awarded it to HNCO, and it was HNCO's responsibility

15  to go find a contractor to do that program?

16      A.    Correct.

17      Q.    What's your understanding of who they

18  found?

19      A.    As far as I know, the biggest one that

20  rings a bell is Kudu Dynamics.

21      Q.    And what role did Dr. Roysdon have once

22  this -- once the Fibonacci programs were approved for

23  funding?

24      A.    When they started, he was an NSA, a

25  government employee.  He was the chief data scientist
```

EXHIBIT 14
Page 87 of 207

Burghard_000037

1   there at NSA-Texas.

2       Q.    Yes, sir.

3       A.    We kept him in the role of a technical

4   advisor to those efforts.

5       Q.    Okay.  And how was he kept in that role as

6   a technical advisor?  Was he paid separately?

7       A.    No.  He -- as an NSA employee, he has a

8   special skill set.  He's a very good mathematician,

9   to be honest with you, and so he's there locally to

10  San Antonio.  As far as I understand it, he had just

11  kind of that direct advisory, regular communication

12  from his NSA capacity to HNCO.

13      Q.    Yes, sir.  Okay.  So I want to ask about

14  that.  You mentioned that he was -- he was a very

15  good mathematician and things like that.  Can you

16  tell us generally your observations or evaluations of

17  the work that he was -- that he was presenting?

18      A.    Sure.  It was a very novel concept.  To be

19  honest with you, there is nothing quite like it, as

20  far as I'm aware of in the current industry.  So the

21  concept was pretty game-changing, pretty state of the

22  art, and there's no question it would have been a

23  phenomenal capability.

24           So it's -- and his concept was very

25  technically sound.  You know, at the time I was -- I

EXHIBIT 14
Page 88 of 207

Burghard_000038

1    still am a pretty huge fan of what that could have

2    been, rightly.

3         Q.    But what happened?

4         A.    At the end of the day, programs get

5    measured in terms of cost, schedule, and performance.

6    And so when you get behind on those metrics, then you

7    have to make tough decisions on whether you should

8    continue an effort or not.

9              And so I would say it's not just

10   Fibonacci.  All of HNCO really fell behind the power

11   curve in terms of being able to execute the funding

12   they had allocated to them.  So cuts had to be made

13   to get them back on track in terms of obligations

14   and expenditures.

15        Q.    Was there anything -- from what you saw,

16   was there anything specific to Dr. Roe that led to

17   Fibonacci being an underperforming project?

18        A.    No.

19        Q.    Are you able to tell us, from your

20   perspective, why Fibonacci was an underperforming

21   project?

22        A.    Sure.  In my opinion, it was kind of

23   either a misunderstanding or an inability to get

24   paperwork lined up at the end of the day.  There were

25   challenges in getting things like DD254s in place to

**EXHIBIT 14**
**Page 89 of 207**

Burghard_000039

1    make sure Kudu had the appropriately cleared

2    facilities to do the work.

3              They were challenged by getting the right

4    talent to perform the work at Kudu.  I think there

5    were delays in contract award and contract actions

6    between HNCO and Kudu.  So there was just a mixed

7    series of events that kind of led to that.

8              THE COURT REPORTER:  Sir, could you spell

9    Kudu.

10             THE DEPONENT:  Sure.  It's K-u-d-u.

11        Q.   (BY MR. HODGES)  So from your perspective,

12   I know that we can see that Fibonacci kind of fizzled

13   out, didn't complete, and I think you mentioned --

14        A.   I'd like to correct that statement, if you

15   don't mind.

16        Q.   Sure, sure.

17        A.   I just want to say that not all of

18   Fibonacci fizzled out.  We did actually complete one

19   of them.  It did transfer and is actually being used

20   in operations today, so there is some that did go to

21   live on.

22        Q.   Yes, sir.  Are you able to tell us which

23   one that was?

24        A.   I believe it was either Fire or Blur.

25   Like I say, it's been a long time, but it was at

**EXHIBIT 14**
**Page 90 of 207**

Burghard_000040

1    least one of them.

2         Q.    Okay.  At least one.  So it could have

3    been more?

4         A.    Correct.

5         Q.    Okay.  And was it Kudu that got that

6    program all the way through?

7         A.    Eventually, yes.

8         Q.    Okay.  All right.  I want to make sure

9    that I understand your evaluation of Dr. Roe and his

10   advice and the program, so what was his role as these

11   Fibonacci programs were trying to progress?

12        A.    He's just a technical advisor to make sure

13   Kudu kind of understood the concept of where he

14   was -- what he had in his own mind and just to make

15   sure things were staying on track from a technical

16   perspective.

17        Q.    Who -- you mentioned he was an advisor.

18   Who was he advising?

19        A.    He was advising HNCO, to my knowledge.

20        Q.    Okay.  Was he advising you?

21        A.    He was not.

22        Q.    Okay.  Did you -- from your perspective,

23   did you see any problems with the advising work that

24   he was doing?

25        A.    I did not.

**EXHIBIT 14**
**Page 91 of 207**

Burghard_000041

1    Q.    Okay.

2    A.    There was one issue, up and to the point,

3    I was notified maybe a year into the effort that he

4    took on some type of contractor role and started

5    being paid for that, which, you know, was perceived

6    it could have been a potential conflict of interest

7    there.

8    Q.    Yes, sir.  We'll talk about that in a few

9    moments, yes, sir.  I appreciate you bringing that

10   up.  Did Dr. Roe work on any other projects at HNCO?

11   A.    Not that I'm aware of.

12   Q.    Okay.  Are you aware of whether or not he

13   presented any other projects at HNCO?

14   A.    If he did, I was not aware.

15   Q.    Yes, sir.  You've heard this term being

16   "read in" to programs and projects; is that right?

17   A.    Yes.

18   Q.    Yes, sir.  Can you tell us what that

19   means, to be "read in"?

20   A.    Sure.  I'm happy to.  That just means

21   you're getting clearance to that Special Access

22   Program, and what that means, once you're cleared, it

23   means you're able to talk about that program,

24   contribute to the program, access to the data and the

25   files for that program, and as long as you're treated

**EXHIBIT 14**
**Page 92 of 207**

Burghard_000042

1    within those SAP-protected channels.

2        Q.    Yes, sir.  And can we do the reverse for

3    being read out?

4        A.    Sure.  When you're read off of a program,

5    you know, all's that really means is that you no

6    longer have a need to know.  You're no longer

7    materially contributing to the effort.  And then your

8    access to everything that's protected in there, it's

9    cut off at that time.

10        Q.    Okay.  And so any permissions that you had

11    to access information, that's withdrawn?

12        A.    That's correct.

13        Q.    All right.  Okay.  Do you know if Dr. Roe

14    was ever read into Special Access Programs?

15        A.    He was, yes.

16        Q.    And was he -- was he ever read out of

17    Special Access Programs?

18        A.    He was, but to my knowledge, he was

19    actually cleared to some currently still today.

20        Q.    Okay.  When you say that he's cleared to

21    some, can you tell us, first, how do you know that?

22        A.    So part of my job is actually approving

23    people to get cleared, and so I have access to the

24    database called Jade, so as soon as someone is

25    submitted to become cleared to Special Access

EXHIBIT 14
Page 93 of 207

Burghard_000043

1   Programs, you know, you put what's called a PAR,

2   P-A-R, and that goes into Jade.  It gets adjudicated

3   through many different security checks and eventually

4   approved so someone can get read in, and then the

5   reverse is true to get read out.

6       Q.    And it's -- you mentioned in your role you

7   have access, but you are -- are you an approving

8   authority for people being read in?

9       A.    Yes.  I had the authority delegated down

10  to me.

11      Q.    Okay.  And so for Dr. Roysdon, were you

12  the approving authority that read him in?

13      A.    Most likely, yes, because at the time as a

14  PEM, I only got -- it's called triple A authority.  I

15  didn't get triple A authority until kind of half my

16  tenure into being a PEM.  And so I'm not sure if I

17  would have been at the initial onset of him being

18  read in.  Definitely was by the time he got read out,

19  though.

20      Q.    Okay.  And so is the reverse true, then,

21  that you're the authority, and you have the authority

22  to revoke someone's access?

23      A.    I can do that, but we typically also allow

24  our program offices to do that locally so they can --

25  you know, they have firsthand knowledge and need an

EXHIBIT 14
Page 94 of 207

Burghard_000044

1    understanding of the security requirements for their

2    people; and so, typically, we like it to be done

3    locally at the program offices.  But, yes, I can do

4    that also.

5         Q.    Yes, sir.  And so HNCO has the authority

6    to read someone out?

7         A.    Correct.  That's a routine thing.  I mean,

8    if you think about it, military people, PCS people

9    move on all the time.  People quit and go to other

10   jobs, and so those are pretty routine actions, yes.

11        Q.    Yes, sir.  But did HNCO have the authority

12   read someone in?

13        A.    They do.  They can conduct the read-in

14   once the approval has been granted.

15        Q.    So fair to say that they can't

16   unilaterally do a full read-in?

17        A.    Correct.

18        Q.    And so they would need access from someone

19   like you to do the full access?

20        A.    Correct.

21        Q.    Okay.  They can do the full read-out

22   without your permission?

23        A.    They can, yes.

24        Q.    Okay.  All right.  Okay.  And so you

25   mentioned that he is still in some programs.  Can you

**EXHIBIT 14**
**Page 95 of 207**

Burghard_000045

1    tell us, when was the last time you searched for

2    Dr. Roysdon's access?

3        A.    Sure.  I did that this morning to see so I

4    had firsthand knowledge coming into this.

5        Q.    Yes, sir.  And so you mentioned that he's

6    still read into certain programs.  Is there a chance

7    that that's an administrative anomaly, or is it -- it

8    must be intentional?

9            MS. SEEMAN:  Objection to form.

10            You can answer.

11        A.    I obviously have not talked to him or

12    understand the requirements for his current job.  The

13    only thing I can see is what's entered into the Jade

14    database, and that's the most accurate record for

15    people getting read in and read out.

16        Q.    (BY MR. HODGES)  Yes, sir.

17        A.    So he obviously has a requirement for his

18    new job to be cleared for those programs.

19        Q.    When you looked, were you able to see what

20    his new job was?

21        A.    His name is listed as working for ODNI,

22    Office of Director of National Intelligence.

23        Q.    Yes, sir.  Were you aware -- are you aware

24    of his position at ODNI?

25        A.    I am not.

EXHIBIT 14
Page 96 of 207

Burghard_000046

1        Q.    Okay.  I want to ask a question out of

2    just pure ignorance here.  Jade, does it -- does it

3    track access across multiple departments?

4        A.    Yes.

5        Q.    Okay.  And so if, say, someone has access

6    at HNCO, certainly you can see that, but it's not

7    because they're in HNCO's because you can see it in

8    Jade?

9        A.    Correct.  And I can see all of DoD.

10       Q.    Okay.  And so if there was a Marine in

11   Japan that had access to a program, you could see it

12   even though you have no supervisory responsibility

13   over it?

14             MS. SEEMAN:  Objection to form.

15             You can answer.

16       A.    That's correct.

17       Q.    (BY MR. HODGES)  Okay.  All right.  Thank

18   you for that education there.

19             Okay.  Was Dr. Roe involved in any other

20   program other than Fibonacci?

21             MS. SEEMAN:  Objection to form.

22             You can answer.

23       A.    No, not that I'm aware of.  And you're

24   referring to specifically his time in San Antonio at

25   the time --

**EXHIBIT 14**
**Page 97 of 207**

Burghard_000047

1          Q.    (BY MR. HODGES)  Yes.

2          A.    -- supporting HNCO?  At that time, not

3    that I know of.

4          Q.    Okay.  All right.  Thank you.  Okay.  So I

5    want to ask you about, did he ever have -- were you

6    ever aware that he had a role as a contractor?

7          A.    I was notified of that, like I said

8    before, about a year into the Fibonacci efforts.

9          Q.    Okay.  And what did you become aware of?

10          A.    That he, I guess, became a contractor and

11    was providing support to the Fibonacci programs in a

12    similar capacity that he was advising as a government

13    civilian NSA employee.

14          Q.    Okay.  Who brought that information to

15    your attention?

16          A.    That would have been Will McVeigh.

17          Q.    Okay.  Did -- was Dr. Roysdon ever asked

18    to review some of the programs that Captain McVeigh

19    was responsible for?

20          A.    Not to my knowledge.

21          Q.    Okay.  Did you ever ask Dr. Roysdon to

22    review any programs that Captain McVeigh was

23    responsible for?

24          A.    I did not.

25          Q.    Okay.  Have you ever heard any of

**EXHIBIT 14**
**Page 98 of 207**

Burghard_000048

1    Dr. Roysdon's statements that certain programs were

2    obsolete or overcome by events?

3         A.    I've heard those comments, yes.

4         Q.    Yes, sir.  Do you know which programs

5    those comments were directed to?

6         A.    I do, yes.

7         Q.    Okay.  Are you able to tell us?

8         A.    I am not.

9         Q.    Are they classified?

10        A.    Yes, sir.

11        Q.    Okay.  Those -- who told you that he had

12   made those comments about those programs?

13        A.    That probably would have come from him

14   directly.  You know, we go down to San Antonio

15   occasionally and visit them.  He probably would have

16   been there locally at the time or potentially at what

17   we call our PMRs, our Program Management Reviews.

18   It's when we host all of our program offices to one

19   location, and we conduct a review biannually of their

20   efforts.  He attended at least one or two of those,

21   and there's also sidebars at those.

22        Q.    Okay.  Okay.

23        A.    He probably would have just offered his

24   opinion, unwarranted.

25        Q.    Yes, sir.  Okay.  So can you tell us

**EXHIBIT 14**
**Page 99 of 207**

Burghard_000049

1    really quick, I believe you called them program

2    something reviews?

3        A.    Yes, PMR, Program Management Review.

4        Q.    Yes, sir.  Can you just describe generally

5    what those are and how they go?

6        A.    Happy to.  So twice a year, you know, like

7    I mentioned before, all of our efforts span across

8    many program offices in the Air Force across the

9    country, and then -- so we invite them all to one

10   location, and it's -- we put a requirement in our

11   program offices to basically present a current status

12   of their efforts.

13           And the important thing about those events

14   is it's a chance at not us just at the headquarters

15   level, we bring in operators, testing evaluators, and

16   different people involved in the whole life cycle of

17   a program to get a full, in-depth understanding on

18   where they're going, where they're headed.  Are they

19   behind?  Are they doing well?  Are there things

20   needed to get, you know, through different key

21   milestone checks?

22           But that's the type of audience that you

23   can have at that event, and so someone like Will

24   McVeigh or Jared Ekholm would present their current

25   status, in HNCO's example.

**EXHIBIT 14**
**Page 100 of 207**

Burghard_000050

1      Q.    And so -- yeah, so Captain McVeigh or

2    Colonel Ekholm would be presenting to, would it be

3    fair to say, you and several members on your team?

4      A.    That's correct, yes.

5      Q.    Yes, sir.  And so when they present, are

6    there other people in the room who are also asking

7    questions about status and viability of the program?

8      A.    Absolutely.  I mean, you have everything

9    from COCOMs, or Combatant Commanders, to MAJCOMs to

10    requirements owners from joint staff to super

11    technical testers or operators that just want to know

12    how to use the thing at the end of the day.

13      Q.    Yes, sir.  Okay.  So it's a fairly large

14    audience; is that fair?

15      A.    There's usually about 150 to 200 people.

16      Q.    Yes, sir.  Would it be fair to say that

17    since Dr. Roysdon was read in, he could have attended

18    some of those briefings as well?

19            MS. SEEMAN:  Objection to form.

20            You can answer.

21      A.    Yes.

22      Q.    (BY MR. HODGES)  And do you recall

23    Dr. Roysdon maybe commenting during a briefing on

24    Fibonacci?

25      A.    He actually presented at least one that I

**EXHIBIT 14**
**Page 101 of 207**

Burghard_000051

1    can remember.  There was a request, since he's one of

2    the technical experts, to present on Fibonacci

3    itself.

4        Q.    Okay.

5        A.    So, yes, he would have made comments at

6    that point.

7        Q.    He would have made comments because he was

8    presenting at the PMR?

9        A.    Exactly.

10        Q.    Okay.  And he would have been present when

11    Captain McVeigh was presenting some of his projects?

12            MS. SEEMAN:  Objection; leading.

13            You can answer.

14        A.    Most likely.

15            MR. HODGES:  I'm sorry, Ms. Seeman.  It

16    did break up.  Did you say, "Objection; leading"?

17            MS. SEEMAN:  Yes.  That's one of the two

18    permissible deposition objections under the local

19    rules.

20            MR. HODGES:  No, I'm not disputing it.  I

21    just didn't hear it.  It broke up a little bit.

22    Sorry.

23        Q.    (BY MR. HODGES)  Okay.  So when Captain

24    McVeigh was presenting, was there -- was there an

25    occasion where Dr. Roysdon maybe said to a larger

**EXHIBIT 14**
**Page 102 of 207**

Burghard_000052

1    group that the program appeared to be overcome by

2    events?

3         A.    I don't think he would have said that to a

4    larger group.  I don't remember exactly when the

5    comments were, but it would have come up at some

6    time.

7         Q.    Yes, sir.  During this larger PMR

8    occasion?

9         A.    Most likely.

10        Q.    Would he have said things about -- that

11   the program was obsolete?

12        A.    Yes, but to be honest with you, this is a

13   regular thing.  You know, think of us like a venture

14   capitalist making investments across a portfolio.  A

15   lot of times we'll invest in maybe three or four

16   similar technology development efforts, understanding

17   that they're all high risk, and it's basically a

18   bake-off to see which one is going to get chuted to

19   that interstate that you're driving towards,

20   understanding there's probably going to be failures.

21   Some are going to have more challenges than others.

22             And so that's something that at the time

23   Dr. Roysdon wouldn't have the purview across the

24   entire series of things that were being invested in,

25   and so him being a key thing and his only project

EXHIBIT 14
Page 103 of 207

Burghard_000053

1   being the Fibonacci, I'm sure he's going to say that

2   about other projects.

3       Q.    Would it be fair to say that some of these

4   projects, that they compete for funding against other

5   projects?

6           MS. SEEMAN:  Objection to form.

7           You can answer.

8       A.    Sometimes.  It's not always the case.

9       Q.    (BY MR. HODGES)  I mean, it's not a

10  bottomless pit, is it, with the money?

11      A.    No.

12      Q.    Limited resources, at least theoretically,

13  at the government level, right?

14      A.    Absolutely.

15      Q.    Sure.  And so for Dr. Roysdon to evaluate

16  a program and call it obsolete, is that something

17  that your office would have considered?

18      A.    We take input like that all day every day.

19  Whether or not it's considered to be for evaluation

20  of something else, you know, it's just regular

21  feedback that we get.

22      Q.    Yes, sir.  So I'm asking you, though, in

23  your capacity at AQ -- in quality review, when you

24  hear someone like Dr. Roysdon say, "That program is

25  obsolete," do you think he has -- do you think he has

EXHIBIT 14
Page 104 of 207

Burghard_000054

1    the information and the intelligence to make that

2    type of evaluation?

3               MS. SEEMAN:  Objection to form.

4               You can answer.

5         A.    I think Dr. Roysdon is a very intelligent

6    individual.  But I do think he's limited in -- in

7    other projects.  He had only been involved in HNCO's.

8    He wouldn't have been involved in it regularly, and

9    someone else like AFRL, he would not have had that at

10   that time or probably regularity to information of

11   what's available there.

12        Q.    (BY MR. HODGES)  Yes, sir.  Okay.  But I

13   mean, when you hear someone like Dr. Roysdon speak,

14   who, like you mentioned, very intelligent individual,

15   he has some -- some very forward-thinking projects

16   that he's proposing.  I mean, you'd agree with me

17   that his advice is something that you want to

18   consider, right?

19              MS. SEEMAN:  Objection to form.

20              You can answer.

21        A.    I take in all feedback.  I don't

22   discriminate.

23        Q.    (BY MR. HODGES)  Okay.  But you do

24   evaluate feedback, right?  I mean, someone who

25   doesn't know anything about cybersecurity programs

EXHIBIT 14
Page 105 of 207

Burghard_000055

```
 1    offering advice, you'd be able to quickly dismiss
 2    that as ignorant advice, right?
 3              MS. SEEMAN:  Objection to form.
 4              You can answer.
 5         A.   Sure.
 6         Q.   (BY MR. HODGES)  I mean, you do evaluate
 7    the source of advice, don't you?
 8         A.   I do, yes.
 9         Q.   And would you evaluate -- when you hear
10    Dr. Roysdon giving you advice, you'd agree with me
11    that that's probably something you should at least
12    hear, fair?
13              MS. SEEMAN:  Objection to form.
14              You can answer.
15         A.   Sure.
16         Q.   (BY MR. HODGES)  And within this scope, if
17    Dr. Roysdon is telling you that a program is
18    obsolete, is that some advice that you would need to
19    look -- that you would choose to look into?  Maybe
20    he's right; is that fair?
21              MS. SEEMAN:  Objection to form.
22              You can answer.
23         A.   Sure.  I mean, we evaluate these programs
24    all the time.
25         Q.   (BY MR. HODGES)  Okay.  I'm not going to
```

**EXHIBIT 14**
**Page 106 of 207**

Burghard_000056

1    ask you about the name of the program, but when

2    Dr. Roysdon said that that program -- Captain

3    McVeigh's program was obsolete, did you reach the

4    conclusion that he was right?

5         A.    I actually make the argument that, you

6    know, it's completely unrelated to his program.  It's

7    a fundamentally different technology that he's

8    evaluating, and even if obsolete compared to other

9    things, it still was a capability at the time that

10   the Air Force did not have in its arsenal.

11        Q.    Do you mean that he was wrong?

12              MS. SEEMAN:  Objection to form.

13              You can answer.

14        A.    No, I'm saying that it was a capability

15   that was not available to the Air Force at the time.

16   There's other organizations like NSA, for instance,

17   where he worked that might have had a more

18   sophisticated capability, but would have held that

19   for their own Title 50 reasons and not made it

20   available for the Title 10 customers like the Air

21   Force; and therefore, we had to go develop our own

22   similar capability.

23        Q.    (BY MR. HODGES)  Yes, sir.  After

24   Dr. Roysdon made comments about Captain McVeigh's

25   program being obsolete or overcome by events, was

**EXHIBIT 14**
**Page 107 of 207**

Burghard_000057

1    Captain McVeigh's program funding cut?

2        A.    It's been a long time.  I don't remember,

3    to be honest with you.

4        Q.    Well, you seem to have -- you seem to know

5    which project it was we were talking about because

6    you mentioned it was classified.

7        A.    Correct.

8        Q.    Is that project still being funded?

9        A.    No.  And I should give a clarification

10   here, if it helps at all.

11       Q.    Sure.

12       A.    We run an S&T portfolio.  It's cyber, and

13   so it's not like building an airplane.  When you

14   build an airplane, you gotta hire an assembly line.

15   You build bombs.  You build runways.  And that's --

16   you're decades in the making of eventually fielding

17   one, cranking out planes, having people fly it, and

18   it lives on for years and years and years, right?

19           What we do is not like that whatsoever.

20   It's very short-time-frame stuff.  It's a regular

21   project in our portfolio.  It really only has a life

22   span of a year and a half to three years at the most.

23   So it's pretty regular that these things only go to

24   that time frame.

25       Q.    Yes, sir.  But if a program becomes

**EXHIBIT 14**
**Page 108 of 207**

Burghard_000058

1    obsolete by virtue of other program developments and

2    other software developments, if a program that's

3    being funded by AQL becomes obsolete, you'd agree

4    it's probably appropriate to cut the funding, right?

5            MS. SEEMAN:  Objection to form.

6            You can answer.

7        A.    It depends.  It depends on the

8    requirements that are levied upon us and if we still

9    have to satisfy those and if there's other options to

10   satisfy them.  But, yeah, most likely if it is

11   obsolete, then it's obsolete.

12       Q.    (BY MR. HODGES)  Right.  If it's obsolete,

13   there's no point in funding it?

14       A.    Right.

15       Q.    Right.  Was -- so this project that I'm

16   referencing -- or that Dr. Roysdon was referencing

17   that he said was obsolete and overcome by events, was

18   it competitive with Fibonacci for funding?

19       A.    No.

20       Q.    I'm sorry?

21       A.    That's a no.

22       Q.    Okay.  Sorry.  Y'all, I'm sorry, I don't

23   know what my speaker is doing today, but that's why

24   I'm asking you to repeat that.  Anyway, okay, I got

25   the answer.  Thank you, sir.

**EXHIBIT 14**
**Page 109 of 207**

Burghard_000059

1           Was Dan Brown -- do you know if Dan Brown

2    would have been at that -- at that larger meeting

3    where Dr. Roysdon would have presented his thoughts

4    about obsolete and overcome by events?

5           MS. SEEMAN:  Objection to form.

6           You can answer.

7      A.    I don't remember, to be honest with you.

8      Q.    (BY MR. HODGES)  Okay.  Are you aware of

9    whether or not Dan Brown cautioned Dr. Roysdon about

10   saying bad things -- or making derogatory comments of

11   Captain McVeigh's programs?

12     A.    I'm not aware of that.

13     Q.    Okay.  Are you aware of Dan Brown saying

14   that Captain McVeigh has a history of targeting

15   people or projects that compete with Captain

16   McVeigh's projects?

17     A.    I don't remember, to be honest with you.

18   It's been a long time.

19     Q.    You don't remember whether or not that's

20   ever come up?

21     A.    No, I don't.

22     Q.    Do you -- do you have a personal -- or do

23   you have an opinion as to whether or not Captain

24   McVeigh had targeted other programs that were

25   competitive with his?

**EXHIBIT 14**
**Page 110 of 207**

Burghard_000060

1          MS. SEEMAN:  Objection to form.

2          You can answer.

3     A.    No.

4          MR. HODGES:  Okay.  We've been going for

5     about an hour, and I apologize, y'all.  I probably

6     had a little too much water before we got started.

7     Do you mind if we take ten?

8          MS. SEEMAN:  That's fine.

9          MR. HODGES:  Yeah, maybe -- 12:03.  I

10    guess come back at 13.

11         THE VIDEOGRAPHER:  Let's go off the

12    record.  The time is 11:03.  We are going off the

13    record.

14         (Break was taken from 11:03 a.m. to

15    11:15 a.m.)

16         THE VIDEOGRAPHER:  The time is 11:15.  We

17    are back on the record.

18    Q.    (BY MR. HODGES)  Okay.  Mr. Burghard, I

19    want to ask you a little bit now about you mentioned

20    that you became aware of this -- that there was an

21    issue with Dr. Roysdon in his NSA capacity and a

22    contractor capacity.

23         Can you tell us -- you may have already

24    said it, and I apologize if this is a repeated

25    question.  Can you tell us how you became aware of

**EXHIBIT 14**
**Page 111 of 207**

Burghard_000061

1   that allegation?

2       A.   Sure.  It would have been a phone call

3   from Will McVeigh.

4       Q.   Okay.  And can you tell us why that would

5   have come from Captain McVeigh instead of Colonel

6   Ekholm?

7       A.   I mean, I think it's just because he's --

8   it's one of McVeigh's programs involving somebody

9   from one of his programs, so he would have had the

10  first exposure, first chance to report, you know.

11      Q.   Okay.  And so you say he would have given

12  you a phone call.  Can you tell us what he said?

13      A.   You know, I don't remember to the tee, but

14  it would have been something, you know, to the extent

15  of, Hey, I think we have a potential conflict of

16  interest here.  We just found out that Dr. Roysdon

17  was basically performing the same work in a

18  contractor capacity that he was in his government

19  capacity.

20      Q.   Okay.  And did he explain to you why he

21  felt that was a conflict of interest?

22      A.   He did.  And, you know, his take on it at

23  the time is, you know, he's getting paid from the

24  government for the same thing twice.  I mean, that --

25  and what I mean by that is he's providing technical

**EXHIBIT 14**
**Page 112 of 207**

Burghard_000062

1    advice in his NSA role while he's also providing

2    technical advice in his contractor role for the exact

3    same project.

4        Q.    Okay.  And can you tell us, what did you

5    do after you got this information or this allegation

6    from Captain McVeigh?

7        A.    Sure.  I told him to document it and to

8    kind of start looking into the facts to see, is that

9    really truly a conflict of interest.

10              MR. HODGES:  Okay.  And so I'll ask

11    Rebecca -- Rebecca, would you pull up 477.  Looks

12    like 477 to 480.

13        Q.    (BY MR. HODGES)  So, Mr. Burghard, are you

14    able to see the screen?  It's changed, of course, and

15    I believe we've got a document -- we've got a

16    document up on the screen.  Do you mind reading the

17    bottom right-hand corner?  I just want to confirm

18    that you and I are looking at the same thing.

19              MS. SEEMAN:  Are we able to zoom in?

20        A.    Yeah, I was going to say it's pretty

21    small.

22              MR. GONZALEZ:  I have a copy of it here

23    that's unmarked that I'm going to put in front of the

24    witness.  You said 477 to 480?

25              MR. HODGES:  Yes, sir, we're going 477

EXHIBIT 14
Page 113 of 207

Burghard_000063

1    to 480.

2              MR. GONZALEZ:  Okay.  I'm going to put a

3    copy that's unmarked in front of him.

4        A.    Sure.  And to your question, John, the

5    lower right-hand corner says, "US," a bunch of zeros,

6    "477."

7              (Deposition Exhibit 1 was marked for

8    identification.)

9        Q.    (BY MR. HODGES)  Okay.  Thank you, sir. So

10   I'm going to offer this as Exhibit 1 to your

11   deposition.  So Exhibit 1, for the record, is a

12   four-page document starting at US_477, ending at

13   US_480.

14             Okay.  And so I've asked Rebecca to kind

15   of show us --

16             MR. HODGES:  If you would, Rebecca, show

17   us maybe the last -- the bottom of the third and the

18   top of the last.  Okay.  So thank you, Rebecca.

19       Q.    (BY MR. HODGES)  So, Mr. Burghard, when we

20   look at this document here -- I know you've got 480

21   in front of you in print -- do you recognize this

22   document?

23       A.    I do, yes.

24       Q.    Yes, sir.  Can you tell us what we're

25   looking at here?

**EXHIBIT 14**
**Page 114 of 207**

Burghard_000064

1      A.     Sure.  This would have been an e-mail from
2   me to, at the time, Captain Will McVeigh and probably
3   would have followed our phone call that we just
4   discussed.
5      Q.     Yes, sir.  And so do you see the date on
6   this e-mail that you sent Captain McVeigh?
7      A.     I do, yes.
8      Q.     Yes, sir.  It says, April 19th, 2020.
9   Does that fit your recollection of approximately when
10   you would have become aware of Captain McVeigh's
11   allegations?
12      A.     Yes.
13          MR. GONZALEZ:  Did you say April or
14   August?
15      A.     It's August on the document.
16          MR. HODGES:  Yeah, Joseph, it sounds like
17   you might know better about what I said.  Sorry,
18   y'all.
19      Q.     (BY MR. HODGES)  The document says what it
20   says, right, Mr. Burghard?
21          MS. SEEMAN:  Just to interject quickly.
22   If we could stop with the highlighting.  It's a
23   little difficult to track, and I think the witness,
24   because he has the print copy, can look for the
25   information without prompting from the screen?

**EXHIBIT 14**
**Page 115 of 207**

Burghard_000065

1              MR. HODGES:  Sure.  Okay.  And so I think

2    we were trying to make it zoom in, but I do

3    appreciate that y'all have the print version

4    available so we don't lose anything there.

5         Q.    (BY MR. HODGES)  Okay.  So, Mr. Burghard,

6    do you mind telling us -- okay.  We see the "To"

7    line.  That's from you to Mr. -- or Captain McVeigh,

8    right?

9         A.    Yes.

10        Q.    Can you tell us who -- you cc'd some

11   folks.  Now, can you tell us whether or not you were

12   the initiator of this e-mail thread?

13        A.    Yes, I am the initiator.

14        Q.    Okay.  And so you chose to copy certain

15   people on this e-mail thread.  Can you tell us who

16   you copied?

17        A.    Sure, I'd be happy to.  Starting from top

18   to bottom, left to right, I copied Michael Crunk,

19   Allen Beall, Brian Bohenek, Bill Bridges, Allen

20   Rabayda, Angela Ivey, and Christine Laning.

21        Q.    Yes, sir.  Who -- some of those names I

22   recognize and I've seen in this case, but some,

23   admittedly, I have not.

24              Mr. Crunk, can you tell us who he is?

25        A.    Sure.  He would have been been the

**EXHIBIT 14**
**Page 116 of 207**

Burghard_000066

1    incoming and program security officer.

2        Q.    When you say, "program security officer,"

3    what does that mean?  Is it a general term, or was he

4    a security officer for a certain program?

5        A.    Sure.  I'll refer to him from now on as a

6    PSO, short for Program Security Officer.

7        Q.    Yes, sir.

8        A.    So for every SAP program, there's a

9    designated security person in charge of all security

10   matters that are involved in that SAP program.  So at

11   the time that would have been a security PSO for this

12   particular SAP program.

13       Q.    Okay.  And so he was assigned to this SAP

14   program?

15       A.    Correct.

16       Q.    And Mr. Bridges, it looks like you copied

17   Mr. William Bridges?

18       A.    Correct, that's right.

19       Q.    Who is he?

20       A.    He is a SETA support contractor in my

21   office, provides direct SETA support to me as the PEM

22   at the time.

23       Q.    Okay.  And then the last, Angela Ivey, who

24   is Angela Ivey?

25       A.    She is an OSI, another program security

**EXHIBIT 14**
**Page 117 of 207**

Burghard_000067

1    officer, the difference being I'm not familiar -- I'm

2    not sure you're experienced with OSI/PJ.  They run

3    all security for the Air Force, investigations,

4    program security, facility accreditation, all that

5    stuff.

6            But the way they're broken up is by

7    detachments in geographical areas, so where Mike

8    Crunk and Allen Beall would have been located in San

9    Antonio under District, I think 7 or 8; I forget

10   which one exactly.  They cover those areas.

11           But I have included Angela Ivey because at

12   the time she was the program security officer for all

13   of AQL, and she resides in the OSI/PJ headquarters.

14   So she would basically be kind of the boss of the

15   boss of Mike Crunk and Allen Beall, if you will.

16       Q.    I see.  Okay.  And so -- and so you've

17   copied these security officers.  Did you believe that

18   these allegations were an issue of security?

19       A.    No.  I just like to involve my security

20   folks in pretty much anything that, you know, doesn't

21   look or feel right that is going on in the program

22   for their awareness.

23       Q.    Okay.  But you didn't have any reason to

24   suspect that he was -- that there was a classified

25   information leak, did you?

EXHIBIT 14
Page 118 of 207

Burghard_000068

1        A.    No, no.  This was purely about a potential

2    conflict of interest.

3        Q.    Okay.  And you said "potential," but at

4    this point did you have any -- had you reached any

5    conclusion as to whether or not there was a conflict

6    of interest?

7        A.    No.  At this time this was the initial

8    notification.

9        Q.    And what was your goal in sending this

10   e-mail?

11       A.    To document it, right?  I mean, we're

12   talking military folks here, right?  So any kind of

13   potential matter that comes up, I just want to have a

14   record of it for things like today, for future

15   reference even beyond when military people rotate in

16   and out.

17       Q.    Yes, sir.  Okay.  And so I want to move on

18   to -- let's move up, I believe, two pages to 478.

19       A.    Okay.

20       Q.    So by this point, we're looking at

21   August 24th of 2020, right?

22       A.    That's correct.

23       Q.    Yes, sir.  And so at this point you have

24   the MFR from Captain McVeigh?

25       A.    That's right.

**EXHIBIT 14**
**Page 119 of 207**

Burghard_000069

1      Q.    Yes, sir.  And so you ask a couple of
2    questions.  You ask, Why did he -- or, "When did he
3    become a contractor?"  Can you tell us why that was
4    important?
5      A.    I mean, because that's basically what
6    stimulated the potential conflict of interest mainly
7    because he was -- from my understanding at that time,
8    he was a contractor of one and only of himself,
9    right, his own kind of company, if you will.
10             So that was really the concern.  I mean,
11   there's no concern after that time that he was
12   providing an advisory role as a government employee,
13   no questions asked, right?  And that was fine.
14     Q.    Okay.  And when you say that he was -- he
15   was a contractor by himself, do you mean that he was
16   a contractor or he was an employee of a company that
17   was a contractor?
18     A.    It was my understanding that he was either
19   part of a small company or his own company.  At that
20   point it was kind of still unclear as we were trying
21   to find out the information.
22     Q.    Okay.  And so the MFR that you're
23   responding to here, did it tell you whether or not he
24   was an individual or an employee of a contractor?
25     A.    Yeah.  I mean, I'll have to reference the

EXHIBIT 14
Page 120 of 207

Burghard_000070

1    MFR.  I don't have that in front of me, but, yes,

2    that was laid out in there.

3         Q.    Okay.  Okay.  And so your second question

4    here, "Who awarded the contract without a DD254?"

5    Did you ever get an answer to that question?

6         A.    I believe so at some point.

7         Q.    Do you know who it was now?

8         A.    I don't remember off the top of my head,

9    but it was probably either Dan Brown, Will McVeigh,

10   one of the usual folks that are on this effort.

11        Q.    And so one of the folks who is making the

12   allegation would have awarded the contract without

13   the form?

14             MS. SEEMAN:  Objection to form.

15             You can answer.

16        A.    Potentially.  Like I said, I don't

17   remember.

18        Q.    (BY MR. HODGES)  Well, I mean, you

19   mentioned that it would have been Dan Brown or

20   Captain McVeigh.

21        A.    I'm just referring to someone from their

22   team.  Like, I mean, that's the team responsible for

23   the Fibonacci efforts at the end of the day.

24        Q.    Okay.  And if you would join me on -- if

25   you would join me on the first page of this exhibit,

**EXHIBIT 14**
**Page 121 of 207**

Burghard_000071

1    that's 477.  Okay.  And so here we have Captain

2    McVeigh's response to you.  Do you mind joining me at

3    the end of that -- the first sentence?  It says,

4    "However, the legal" team [sic]?

5         A.    Okay.

6         Q.    Yes, sir.  It says, "However, the legal"

7    team "appears to have been around" -- excuse me, "the

8    legal e-mail appears to have been around April

9    of 2019.  I forwarded you and Allen a copy on JWICS."

10   Do you see that line?

11        A.    I do, yes.

12        Q.    Yes, sir.  Very briefly, can you tell us

13   what JWICS is?

14        A.    Sure.  It's an ITE network, if you will,

15   that's used to communicate classified information.

16        Q.    Yes, sir.  Are you able to tell us whether

17   or not you actually received a copy of that legal

18   e-mail on JWICS?

19        A.    Still to this day, I don't think I

20   actually saw that.

21        Q.    Did you receive any information about

22   Dr. Roysdon as it relates to these allegations on

23   JWICS?

24        A.    To be honest with you, I don't check JWICS

25   that often.  I'm primarily on SIC, which is the IT

**EXHIBIT 14**
**Page 122 of 207**

Burghard_000072

```
 1   network that we use for SAP information.
 2        Q.    Yes, sir.
 3              MR. HODGES:  So, Rebecca, you can take
 4   that down, please.  Thank you, Rebecca.
 5        Q.    (BY MR. HODGES)  So, Mr. Burghard, this
 6   reference to JWICS caught my attention because --
 7   because I don't think that we've been produced some
 8   of the -- some of your e-mails from JWICS that relate
 9   to this.
10              Did you ever conduct a search on JWICS for
11   e-mails related to Dr. Roysdon and the allegations
12   that Captain McVeigh made?
13        A.    Yes, I've searched all systems related to
14   this.
15        Q.    Yes, sir.  And was one of those systems
16   JWICS?
17        A.    It was, yes.
18        Q.    And did you turn those over to the Justice
19   Department attorneys?
20        A.    I have.
21        Q.    Yes, sir.  Can you give me an estimate as
22   to how many e-mails you found?
23        A.    Yeah.  So I have -- the primary means of
24   communication for me for these is honestly SIC, and
25   I've turned over that inventory of about 20 e-mails
```

**EXHIBIT 14**
**Page 123 of 207**

Burghard_000073

1    or so.

2         Q.    Yes, sir.  That was on SIC, but on JWICS

3    did you find any?

4         A.    I'll go back and check.

5         Q.    Do you recall doing a search on JWICS?

6         A.    Yes.

7         Q.    Can you -- do you recall what search or

8    how you conducted that search?  Can you tell us?

9         A.    Absolutely.  So it was just a search

10   through e-mails on the key search terms that I was

11   provided relevant to this case.

12        Q.    Okay.  And once you -- if you got a hit,

13   so if you did a search term and you got a hit, can

14   you tell us what you did with that finding?

15        A.    Sure.  I stored them off to a local

16   folder.

17        Q.    "Local," like on the hard drive on the

18   computer you were using?

19        A.    Yeah, but we don't have storage on our

20   JWICS machine, so it's all based in an Outlook web

21   app.

22        Q.    Okay.  And what did you do after that,

23   like, after you put them in that Outlook web folder?

24              MR. GONZALEZ:  So, John?

25              MR. HODGES:  Yes.

EXHIBIT 14
Page 124 of 207

Burghard_000074

 1          MR. GONZALEZ:  We've allowed you some

 2    leeway on this questioning so that you can assure

 3    yourselves that the search occurred and that there

 4    was a thorough meeting of our obligations, but we're

 5    not going to let you get into every single detail

 6    about how documents were collected, how they were

 7    stored and reviewed.

 8          So, you know, you're getting into that

 9    territory.  You know, that -- that's between

10    Mr. Burghard and his attorneys, which is us, who we

11    represent.  And so, you know, I'm going to ask you to

12    be a little careful with some of these questions

13    you're getting into because at a certain point we're

14    not going to allow it, okay?

15          MR. HODGES:  Sure.  So -- okay.

16      Q.   (BY MR. HODGES)  So, Mr. Burghard, I'm not

17    going to ask you anything that you may have told the

18    Justice Department lawyers.  I'm not going to ask

19    about any of that communication, but I am going to

20    ask you about some of your -- your actions that you

21    took to search for these things.  You say --

22          MR. GONZALEZ:  And some of his actions,

23    though, John, are happening in direct coordination

24    with Counsel, and so we have allowed some leeway

25    because we want you to be assured that we have met

EXHIBIT 14
Page 125 of 207

Burghard_000075

1  our obligations, and we think that, you know, given

2  the issues that you've raised, we'll allow that.

3          But you're getting into territory that it

4  is happening at the direct -- at the direction of

5  Counsel -- communications involving Counsel, and

6  that's a problem.

7          So, you know, I understand you're about to

8  give him some instructions, but I'm telling you

9  that's the limitation.  So if your instructions are

10  conflicting with that, we'll take it from there, but

11  I'm letting you know our position.

12          MR. HODGES:  Sure.  No, I understand that

13  if you guys gave him certain instructions, that

14  that's privileged.  I don't think his keystrokes and

15  use of a mouse is going to be privileged.  That's

16  certainly witness activity, and that's what I'm

17  asking him about.

18      Q.    (BY MR. HODGES)  So, Mr. Burghard, let's

19  backtrack a little bit further.  Are you able to say

20  how many e-mail -- responsive e-mails you found in

21  your searches on JWICS?

22      A.    I don't know that off the top of my head.

23      Q.    Right, yeah.  And sorry.  That was -- I

24  should have -- I should have sugarcoated that a

25  little bit.  Do you have an estimate?  Was it more

EXHIBIT 14
Page 126 of 207

Burghard_000076

1    than five?

2          A.    I don't remember, to be honest with you.

3    It's been a long time.

4          Q.    Was there at least one?

5          A.    I'm sure there was at least one, sure.

6          Q.    Right.  On JWICS?

7          A.    (Nodded head up and down.)

8          Q.    Right.  Okay.  And to your understanding,

9    you have turned those over to the Justice Department

10   lawyers?

11         A.    I have turned everything that I have over.

12         Q.    To the Justice Department lawyers, is that

13   who you would have given it to?

14         A.    Yes.

15         Q.    Okay.  I want to --

16               MR. HODGES:  Rebecca, let's pull up 686.

17               So, Joseph, and -- Joseph, I'm going to do

18   686 and the one on top of that, 685, so just the two.

19               MR. GONZALEZ:  Okay.  Let me see if I can

20   find that.

21               MR. HODGES:  Sure.

22               MR. GONZALEZ:  What's the date?

23               MR. HODGES:  Sorry.  Looks like July 22nd,

24   2020.

25               MR. GONZALEZ:  Okay.

**EXHIBIT 14**
**Page 127 of 207**

Burghard_000077

```
1              MR. HODGES:  The first -- yeah, all of
2    them are July 22nd.
3              MR. GONZALEZ:  I'm handing him 633, which
4    I think is the same information, 633 and 632.
5              MR. HODGES:  Yeah, I think you're right.
6    I've got it -- I've got it in a couple of spots.
7              MR. GONZALEZ:  So it's the same stuff.
8              THE DEPONENT:  Okay.
9              MR. HODGES:  Yeah, okay.  So, in fact,
10   Rebecca, let's all be on the same page.  I'll get to
11   633.  Let's go to 633 and 632.
12             (Deposition Exhibit 2 was marked for
13   identification.)
14        Q.   (BY MR. HODGES)  Okay.  So, Mr. Burghard,
15   I'd like to start here at the bottom.  Oh, 633,
16   excuse me, at the bottom of 633.  Okay.
17   Mr. Burghard, have you seen -- have you seen this
18   e-mail thread before?
19        A.   Yes, sir.
20        Q.   Can you tell -- can you tell us who
21   initiated this e-mail thread?
22        A.   Yes, I did.
23        Q.   Yes, sir.  And it looks like -- it looks
24   like again you copied Michael Crunk?
25        A.   That's --
```

EXHIBIT 14
Page 128 of 207

Burghard_000078

1     Q.    I'm sorry.  I was wrong.  Sorry.  You sent
2  it to Mr. Crunk?
3     A.    Correct, yes.
4     Q.    And again, he's the -- you said -- I'm
5  sorry.  You said PSO?
6     A.    That's correct, PSO.
7     Q.    Okay.  So can you tell us what the purpose
8  of this e-mail was?
9     A.    Yeah, happy to.  This e-mail took place
10 after I attended a technical demonstration of the
11 Fibonacci project at Kudu Dynamics.  At the time I
12 went there to see a demo that -- which is the normal
13 thing for us just to kind of see how is the
14 development coming along.
15           And so I attended the demo.  At the time
16 the Kudu Corporation was out in the Reston area of
17 Virginia.  Got there.  Saw the demo.  The demo
18 occurred in a completely unclassified environment, so
19 that caught me a little bit off guard since we're
20 funding with SAP dollars or a SAP-classified program.
21 So it obviously raises some concerns on how we're
22 actually protecting this effort.
23           And so that's what initiated this e-mail
24 as to basically notify our security folks that we had
25 an issue at that time.

**EXHIBIT 14**
**Page 129 of 207**

Burghard_000079

1      Q.    Yes, sir.  So it was a demo of one of the

2   Fibonacci programs.  That demo, can you tell us, was

3   Dr. Roysdon there?

4      A.    It's been a long time.  I don't remember,

5   to be honest with you.

6      Q.    Do you remember who presented the demo?

7      A.    It would have been the Kudu Dynamics

8   employees.  I don't remember.

9      Q.    Sure, okay.  But it wasn't -- it wasn't

10  Captain McVeigh or Dan Brown presenting that demo?

11     A.    No.  It was definitely the folks at Kudu.

12     Q.    Yes, sir.  And it also just -- I just want

13  to make sure I'm excluding the people it wasn't for a

14  moment.  Are you able to say that it was not

15  Dr. Roysdon?

16     A.    Yeah, he would not have presented it that

17  day.

18     Q.    Yes, sir.  Okay.  And so the security

19  concerns that you had, it looks like you're calling

20  for a phone call?

21     A.    That's correct.

22     Q.    Yes, sir.  Did that phone call occur?

23     A.    It did.

24     Q.    And can you tell us, was everybody on this

25  distribution list, were they in attendance on that

**EXHIBIT 14**
**Page 130 of 207**

Burghard_000080

1    phone call?

2          A.    I believe most were, yeah.

3          Q.    The PSO was on the call?

4          A.    He was, yeah.

5          Q.    Yes, sir.  Can you tell us -- can you tell

6    us, your security concerns, did they have anything to

7    do with Dr. Roysdon?

8          A.    No, they did not.

9          Q.    Right.  And so it had nothing to do with

10   any of the allegations related to him being a

11   contractor versus an NSA employee?

12         A.    No.  This was completely around the

13   security for how the program was being handled at

14   Kudu Dynamics.

15         Q.    Right, right.  Okay.  So it had to do with

16   how -- that relationship between HNCO and Kudu, how

17   they were managing the project?

18         A.    Absolutely.

19         Q.    Okay.  And I just want to make sure

20   because -- I just want to make sure this had

21   absolutely nothing to do with -- there was no

22   allegation that Dr. Roysdon had caused you security

23   concerns?

24         A.    That's correct.

25         Q.    Has he ever caused you security concerns?

**EXHIBIT 14**
**Page 131 of 207**

1       A.      Honestly, there was -- there was mention

2    that he possibly did, you know, work unclassified at

3    his house or something like that.  So, yes, those

4    comments did cause some concern.

5       Q.      When was that?

6       A.      Probably shortly after this event, not,

7    like, weeks or so.  Probably, like, months or so.  It

8    was just a comment.  I don't know the results of

9    that, to be honest with you.

10      Q.      Did you -- did you call for a conference

11   like this one?

12      A.      I did.  I called together Will McVeigh,

13   Jared Ekholm, and the PSOs to figure out what's going

14   on.

15      Q.      Did you ask for Dr. Roysdon to attend that

16   conference?

17      A.      I did not, no.

18      Q.      Why not?

19      A.      At the time I wanted to have a direct

20   interaction with my program offices responsible for

21   the effort to have them verify.

22      Q.      Did you -- was there any action taken

23   after that conference about Dr. Roysdon -- about the

24   allegation or the concern that Dr. Roysdon was doing

25   work from home?

**EXHIBIT 14**
**Page 132 of 207**

Burghard_000082

1            MS. SEEMAN:  Objection to form.

2            You can answer.

3      A.    I thought we were talking about this

4  e-mail here for Kudu.

5      Q.    (BY MR. HODGES)  I'm sorry.  Sorry.

6            MR. HODGES:  Rebecca, do you mind taking

7  that down.

8      Q.    (BY MR. HODGES)  Yeah, sorry,

9  Mr. Burghard.  I did blur the lines there a bit.  So

10 I think -- yeah, I think I understand what I needed

11 to from the exhibit that we just looked at, but while

12 I was talking to you about that, I did blur the line,

13 and I asked you, Hey, did you ever have any concern

14 about Dr. Roysdon?

15           And I believe you responded that you had

16 some concern -- a security concern because you --

17 because of an allegation that he had done work from

18 home.  Did I characterize that right?

19     A.    That's right.  It was based on a comment

20 that was made.  You know, at the time I didn't have

21 the facts, so I did call to figure out what was going

22 on, which gets us back to that memorandum for the

23 record that we've talked about.

24     Q.    Oh.  Wait, so the memorandum for the

25 record, was that a security concern?

EXHIBIT 14
Page 133 of 207

Burghard_000083

1          A.     Sorry.  I think we are talking past each

2     other here.  I'll break it up.  So we're done here

3     with Kudu, right?

4          Q.     Yes, sir.

5          A.     Okay.  So in terms of -- can you ask your

6     question again?  I'm sorry.

7          Q.     Yeah, so -- okay.

8                 MR. HODGES:  Rebecca, do you mind taking

9     us off of the exhibit view.  Thank you.

10         Q.     (BY MR. HODGES)  Okay.  So, Mr. Burghard,

11    I'm sorry.  You and I have never spoken before today,

12    right?

13         A.     That's right.

14         Q.     And so this is -- this is my only time to

15    talk to you before trial, and so some of the

16    questions that I ask is me trying to understand some

17    of the things that you'll say at trial.

18                And a minute ago I asked you about if you

19    ever had any security concerns related to

20    Dr. Roysdon, and your response was about Dr. Roysdon

21    working from home and that that kind of raised some

22    security concerns for you.

23                Can you tell me what you did after that

24    security concern was raised in your mind?

25         A.     Sure.  At that time I would have notified

**EXHIBIT 14**
**Page 134 of 207**

Burghard_000084

1    the PSO.

2         Q.    Yes, sir.  And what happened after that?

3         A.    The OSI would have done what they always

4    do in those situations.  They would have either

5    conducted an interview, started an investigation, or

6    something along those lines.

7         Q.    Yes, sir.  Okay.  And did you take any

8    further action with regard to that security concern

9    that he was working from home?

10        A.    I did not, but that's not my job.  That's

11   OSI/PJ's job.  It's my job to note it.

12        Q.    Yes, sir.  Did you ever -- were you ever

13   made aware of any action that was taken in response

14   to you letting them know about that security concern?

15             MS. SEEMAN:  Objection to form.

16             You can answer.

17        A.    I was not.

18        Q.    (BY MR. HODGES)  Okay.  So you're not able

19   to say whether or not there was any security concern

20   that had been founded?

21        A.    I'm not able to.  I would defer to OSI/PJ

22   for that.

23        Q.    Okay.  Yes, sir.  Thank you.  Sorry.  When

24   you said that, I needed to ask about it because I'm

25   not going to get to talk to you again after today

**EXHIBIT 14**
**Page 135 of 207**

Burghard_000085

1    until we get to trial.

2         A.    No worries.

3         Q.    Okay.  So I want to ask you, so we've got

4    Captain McVeigh who has done this MFR.  Are you aware

5    of whether or not that turned into an OSI

6    investigation about Dr. Roysdon's capacity as a

7    contractor and as an NSA employee?

8         A.    I heard mention that it might have been an

9    investigation or an interview with Dr. Roysdon, but

10   that's about the extent.  I was reapproached by folks

11   in OSI/PJ later with questions about this.  I think

12   at the time Special Agent Christopher Webb -- it

13   wasn't really about Roysdon directly, but it was

14   questions about the Fibonacci programs.

15        Q.    Okay.  Did -- were you ever interviewed by

16   OSI with regard to the allegations that Captain

17   McVeigh made?

18             MS. SEEMAN:  Objection to form.

19             You can answer.

20        A.    I was only interviewed by Chris Webb,

21   Special Agent Webb, and he never said what the

22   interview was about.  He said, Hey, I'm here about a

23   matter for HNCO, and they need to know a historical

24   record for what's the -- what's the funding history

25   that was applied for the Fibonacci efforts, and we

EXHIBIT 14
Page 136 of 207

Burghard_000086

1    supplied that.

2        Q.    (BY MR. HODGES)  Okay.

3        A.    But it was not -- it was not

4    security-related, or what I was interviewed for

5    anyways.

6        Q.    Were you ever interviewed by any other

7    organizations with regard to this allegation of him

8    being somewhat dual-headed?

9        A.    I was not.

10       Q.    What about in the inquiry by Colonel

11   Rebecca Welch?  Sorry.  I'll just pull up the

12   document and not leave you in a lurch, okay?  Sorry.

13       A.    Thank you.

14       Q.    Yeah, sorry.

15            MR. HODGES:  So, Rebecca, do you mind

16   pulling up -- and, Joseph, I'm looking at 724 to 738.

17            MR. GONZALEZ:  What's the date?

18            MR. HODGES:  Looks like June of '22.

19            MR. GONZALEZ:  I don't have that one in

20   this binder, so we'll have to work from the screen.

21            MR. HODGES:  Okay.

22            THE DEPONENT:  Is there a way to zoom in a

23   little bit, by any chance?

24            MR. HENRY:  Rebecca, is it not possible to

25   make it -- not to use that zoom function, but to just

**EXHIBIT 14**
**Page 137 of 207**

Burghard_000087

1    make it screen width?  Give us just one second.

2    We'll blow it up for you.

3        Q.    (BY MR. HODGES)  While she's working on

4    that, for the record, this Exhibit 3 is a -- I

5    believe a -- shoot, I had it; excuse me -- 15-page

6    document from US_724 to US_738.

7                (Deposition Exhibit 3 was marked for

8    identification.)

9                MR. HENRY:  Rebecca, if you can release

10   share, I can pull it up.  Oh, you did it.

11               THE DEPONENT:  There we go.

12               MR. HODGES:  Thank you, Rebecca.  Okay.

13   So -- okay.  So, Rebecca, if you would, take us to

14   732.  Let's go to the bottom half of that document.

15   There we go.  Thank you.

16       Q.    (BY MR. HODGES)  Okay.  So, Mr. Burghard,

17   I'm showing you -- I'll represent to you that this is

18   a document that was produced from the government

19   related to an IG complaint, and these are the

20   internal -- the investigative notes.  Do you remember

21   speaking with Colonel Rebecca Welch?

22       A.    Very vaguely.  It might have just been a

23   quick conversation.  But, you know, it was a long

24   time ago.  I don't really remember much.

25       Q.    Okay.  Well, let's take a look here at the

EXHIBIT 14
Page 138 of 207

Burghard_000088

1    bottom half of 732.  So she's archived this e-mail

2    from her Inspector General e-mail account.  Do you

3    see the "To" line?  Do you see the "Burghard, Joseph

4    D. NH-04"?

5        A.    I do, yes.

6        Q.    Yes, sir.  Do you recognize that as your

7    e-mail account?

8        A.    It is, yes.

9        Q.    Okay.  Do you recall that she reached out

10   to you as she was conducting that IG -- that

11   investigation into the IG complaint?

12       A.    Like I said, just -- just really vaguely.

13       Q.    Okay.  Well, she's calling for a phone

14   call.  Do you recall whether or not y'all had a phone

15   call?

16       A.    I don't remember.  It seems like maybe, to

17   be honest with you.  It's been a while.

18       Q.    Yes, sir.  Let's --

19              MR. HODGES:  Rebecca, if you'll scroll to

20   the top half of the page.

21       Q.    (BY MR. HODGES)  So I'll represent to you

22   that this appears to be where Colonel Welch put her

23   notes into the IG investigative system.  I'll give

24   you a moment to review this.  Are you able to see it

25   okay?

EXHIBIT 14
Page 139 of 207

Burghard_000089

1       A.    Yeah, yeah, I can read it.  Thanks.

2       Q.    Yes, sir.

3             (A pause occurred in the proceedings.)

4       Q.    (BY MR. HODGES)  Mr. Burghard, have you

5    had a chance to review Colonel Welch's notes?

6       A.    Yeah, I'm good when you are.

7       Q.    Yes, sir.  So I wanted to ask you about

8    her notes.  So it says here that, "Mr. Burghard did

9    not know anything about Captain McVeigh allegedly

10   turning in Dr. Roysdon for being an insider threat

11   and thereby getting him removed from the classified

12   program."

13            Do you have any information or are you

14   aware of an allegation that Dr. Roysdon was an

15   insider threat?

16      A.    I'm not.  I'm sorry.

17      Q.    You don't have any information about that

18   whatsoever?

19      A.    I don't.

20      Q.    Yes, sir.  It says, "Mr. Burghard said

21   that Dr. Roysdon misrepresented himself as working

22   for NSA, but he actually had his own personal side

23   business."

24            Is that something that you would have said

25   to Colonel Welch?

**EXHIBIT 14**
**Page 140 of 207**

Burghard_000090

1    A.    Most likely, and I would have been

2    referring to this conflict of interest that we've

3    been talking about.

4    Q.    I'm sorry, this "what" that we've been

5    talking about?

6    A.    The potential conflict of interest.

7    Q.    I see.  Okay.  And so -- but did you know

8    whether or not he had his own business?

9    A.    I think we talked about that about an hour

10   ago; but, you know, at the time I was notified he was

11   in some contractor status.  And, yeah, it had been

12   mentioned that he was either in his own company or as

13   a subcontractor.

14   Q.    Had he ever represented to you that --

15   that he was working in it as an NSA employee when, in

16   fact, he was working as a -- as a contractor?

17   A.    He only represented to me that he was an

18   NSA employee.

19   Q.    Okay.  And how often did he -- you

20   mentioned that you didn't deal with him directly as

21   often as you would have dealt with Captain McVeigh or

22   Colonel Ekholm?

23   A.    That's right.

24   Q.    And so would it be fair to say that he

25   could have represented to them that he was working in

**EXHIBIT 14**
**Page 141 of 207**

Burghard_000091

1    a contractor capacity?

2            MS. SEEMAN:  Objection to form.

3       A.    Yeah, I don't want to speak on behalf of

4    them.  That's what they would seem to be saying.

5       Q.    (BY MR. HODGES)  Right.  I mean, so there

6    is a possibility that he did that, and you just

7    didn't know about it?

8       A.    Yes.

9            MS. SEEMAN:  Objection to form.

10      A.    Yeah.  I mean, I wouldn't have known.

11      Q.    (BY MR. HODGES)  Right.  Okay.  Okay.  It

12   says here, "This side business created a significant

13   conflict of interest."

14           Is that your understanding, that him

15   working as a contractor created a significant

16   conflict of interest?

17      A.    My understanding, that it was a potential

18   conflict of interest.

19      Q.    Okay.  And so, Mr. Burghard, I'm asking

20   you to read through notes of someone else who is

21   trying to memorialize something they think you said,

22   and I don't know if -- I don't know if the words that

23   you said have correctly made it onto this page, and

24   so that's the only reason I'm asking you about this.

25      A.    Okay.

**EXHIBIT 14**
**Page 142 of 207**

Burghard_000092

1      Q.    And so you just added a clarification that

2    it's a "potential conflict of interest."  She says

3    that you said "significant."

4              MS. SEEMAN:  Is that a question?

5              MR. HODGES:  Well, yes, I'm going to get

6    there.

7      Q.    (BY MR. HODGES)  So do you know if you

8    said "significant conflict of interest"?

9      A.    I mean, that's a long time ago.  I don't

10   recall, to be honest with you.

11     Q.    As you sit here today, are you able to say

12   whether or not you believed it to be a significant

13   conflict of interest?

14     A.    I still don't know.  It's my understanding

15   that there was a legal finding that was run through

16   some NSA legal office that, you know, determined one

17   way or the other.  But like I said, I've never seen

18   that one.  So I still to this day don't know, to be

19   honest with you.

20     Q.    Yes, sir.  And that's all I'm asking.  Do

21   you have any -- did you form your own opinion as to

22   whether or not it was a conflict of interest?

23     A.    My opinion that it has an appearance of a

24   conflict of interest, for sure.

25     Q.    And so from your perspective, it was

**EXHIBIT 14**
**Page 143 of 207**

Burghard_000093

1   worthy of reporting, but you didn't form your own

2   opinion?

3       A.   Right.

4       Q.   Okay.  All right.  And so here at the end

5   of this, the last sentence of Colonel Welch's

6   narrative, it says, "Dr. Roysdon's contract was

7   either terminated or allowed to expire in order to

8   remove the conflict of interest."

9            Is that something that you would have

10  said?

11      A.   That's something that HNCO would have done

12  and been aware of.

13      Q.   Right.  Well, she's quoting an interview

14  that she had with you.

15           MS. SEEMAN:  Well, I'm going to object.

16  That's not what this document is.  It doesn't have

17  any direct quotes from Mr. Burghard in what we're

18  looking at.

19           So, I mean, to the extent that you're

20  mischaracterizing what the document is, that's not

21  accurate.  So I'm going to ask you to rephrase.

22           MR. HODGES:  Sure.

23      Q.   (BY MR. HODGES)  So, Mr. Burghard, the

24  opening line in this -- in this entry here.  It says,

25  "I spoke with Mr. Joseph D. (Danny) Burghard today."

**EXHIBIT 14**
**Page 144 of 207**

Burghard_000094

1    And so the representation here is that she is

2    memorializing in her own words the conversation that

3    y'all had.

4            And so I'm asking you about this last

5    sentence here, because I don't know if you said it or

6    not, but that's why I'm asking.  I'm asking you -- it

7    says, "Dr. Roysdon's contract has been terminated or

8    allowed to expire in order to remove the conflict of

9    interest."

10           Let's ask it first, is that your

11   understanding?

12       A.   I don't remember, to be honest with you.

13       Q.   Yes, sir.  But as you sit here today, is

14   that your understanding, that his contract was

15   terminated or allowed to expire?

16           MS. SEEMAN:  Objection; asked and

17   answered.

18           You can answer again.

19       A.   Yeah.  I mean, I don't remember, to be

20   honest with you.

21       Q.   (BY MR. HODGES)  Right.  So -- sorry,

22   Mr. Burghard.  I want to clarify my question.  So I'm

23   not asking you if you remember it right now.  I'm

24   asking you your understanding as you sit here today.

25   Was Dr. Roysdon's contract terminated or expired to

**EXHIBIT 14**
**Page 145 of 207**

Burghard_000095

1    remove the conflict -- the alleged conflict of

2    interest?

3         A.    Yeah, I would defer --

4               MS. SEEMAN:  Objection; form.

5               You can answer.

6         A.    I would defer to HNCO as far as the reason

7    for that contract action.

8         Q.    (BY MR. HODGES)  Would it be fair to say

9    that you don't know one way or another whether or not

10   it was allowed to expire or terminate?

11        A.    Yeah, that's right.

12        Q.    Okay.  And so you don't have any personal

13   knowledge; we need to address that question to HNCO?

14        A.    Yes.

15        Q.    Okay.  And I want to -- I think you

16   answered this question that I wasn't asking, so I'm

17   going to ask this one directly.  Do you recall making

18   that representation to Colonel Welch?

19        A.    It's been a long time, to be honest with

20   you.  I'm not sure.

21        Q.    Okay.  Fair to say you don't remember

22   whether you made that representation or not?

23        A.    Yeah, I don't remember.

24        Q.    Okay.  Okay.

25               MR. HODGES:  Rebecca, you can pull that

**EXHIBIT 14**
**Page 146 of 207**

Burghard_000096

1    one down, please.

2              THE VIDEOGRAPHER:  Rebecca, you're still

3    on black.  Thank you.

4              MR. HODGES:  Okay.  All right.  Rebecca,

5    let's get 60 to 66, please.

6              Joseph, do you think y'all have 60 to 66,

7    or do we need to work off the screen?

8         Q.   (BY MR. HODGES)  Mr. Burghard, do you want

9    to just work off the screen?

10        A.    That's fine.  It's large enough.

11        Q.    Okay.  Okay.

12             MR. HODGES:  Rebecca, if you'd get us down

13   to 66.

14             (Deposition Exhibit 4 was marked for

15   identification.)

16        Q.    (BY MR. HODGES)  Okay.  So, Mr. Burghard,

17   we've got -- I'm representing -- okay.  So for the

18   record, Exhibit 4 is an e-mail thread beginning at

19   US_60 continuing to US_66, which is on the screen

20   here.  Mr. Burghard, so I'll represent to you that

21   this is an e-mail presented -- or produced to us from

22   the Justice Department attorneys.

23             Do you recognize Mr. Brown's e-mail here

24   at the top of this -- top of this thread?

25        A.    No, but I can see it fine.

**EXHIBIT 14**
**Page 147 of 207**

Burghard_000097

1          Q.    Okay.  I mean, but you recognize Mr. Brown

2    as a civilian contractor for the -- or civilian

3    employee at the Air Force?

4          A.    Sure, yeah.

5          Q.    Sure, and so you see where he's asking for

6    paperwork from the NSA saying that he can work as a

7    contractor outside of NSA hours?

8          A.    Sure.

9          Q.    Did you know that -- did you know that Dan

10   Brown was asking for that information from

11   Dr. Roysdon?

12         A.    I knew when we were notified about a

13   potential conflict of interest that, yeah, we asked

14   for paperwork to support the reason he was doing

15   contracting work.

16         Q.    Yes, sir.  And so you're not surprised to

17   see Dan Brown asking for it and citing that Captain

18   McVeigh is asking for it too?

19         A.    Correct, sure.

20         Q.    Okay.  And so let's go --

21               MR. HODGES:  Rebecca, if you'll scroll

22   past 65 -- well, yeah, let's just go to 63, excuse

23   me.  And, yeah, let's just go to the middle of it,

24   please.

25               MS. SEEMAN:  Can you scroll to the bottom

EXHIBIT 14
Page 148 of 207

Burghard_000098

1   just so we can see what Bates number we're at.  Thank

2   you.

3        Q.   (BY MR. HODGES)  Okay.  So, Mr. Burghard,

4   you see that here on August 20th of 2020, that

5   Dr. Roysdon responded to Mr. Brown's request for that

6   paperwork?

7        A.   Okay.

8        Q.   Yes, sir.  Were you aware that he had

9   received a legal opinion from the NSA Office of

10  General Counsel in April of 2019?

11       A.   Yeah, I don't remember the date, but I was

12  made aware that the NSA OGC did make a determination,

13  yes.

14       Q.   Yes.  And so he had reached out in 2019 to

15  ask about this potential conflict issue?

16       A.   Yeah.  Like I say, I don't remember the

17  time frame like that, but I was aware that he did

18  reach out to OGC.

19       Q.   Yes, sir.  And so you would agree with me

20  that he responded within one day of Dan Brown's

21  request, Hey, give us the paperwork that allows you

22  to serve in an NSA capacity and a contractor

23  capacity?

24            MS. SEEMAN:  Objection to form.

25            You can answer.

**EXHIBIT 14**
**Page 149 of 207**

Burghard_000099

1          A.    Sure.  That's what the e-mail says.

2          Q.    (BY MR. HODGES)  Right.  And in fact, he

3    didn't ask for -- he didn't ask for an OGC opinion in

4    response to that.  In fact, he already had it here,

5    right?

6                MS. SEEMAN:  Objection to form.

7                You can answer.

8          A.    It is, yeah, but I don't know if this is

9    applicable if it's in reference to the same efforts,

10   yeah.

11         Q.    (BY MR. HODGES)  Right.  Okay.  And so --

12               MR. HODGES:  And so if you would, Rebecca,

13   scroll down to 64.  Looks like it will be in the top

14   half of 64.

15         Q.    (BY MR. HODGES)  So this is still

16   Dr. Roysdon providing that, "OGC summarized the 2019

17   guidance in an e-mail received this afternoon."  And

18   then had you seen this e-mail thread before?

19         A.    I don't recall.

20               MR. HODGES:  Okay.  Rebecca, do you mind

21   scrolling down just a little bit to the bottom of 64.

22         Q.    (BY MR. HODGES)  And so we've got

23   Dr. Roysdon presenting to Dan Brown, it says, "OGC

24   provided the following guidance in April of 2019."

25   Did you know that he provided that to Dan Brown?

**EXHIBIT 14**
**Page 150 of 207**

Burghard_000100

1                MS. SEEMAN:  Objection; misstates the

2      document.

3                You can answer.

4      A.    Like I said, I had heard it had all been

5      done with OGC.  That's just the extent of what I

6      knew.

7      Q.    (BY MR. HODGES)  Yes, sir.

8                MR. HODGES:  And, Rebecca, do you mind

9      zooming out just a little bit.  There we go.

10     Q.    (BY MR. HODGES)  And then so if you

11     would -- so, Mr. Burghard, do you see where, at the

12     bottom of 64, he's providing the OGC's analysis?

13               MR. HODGES:  If you'd scroll down a little

14     bit, Rebecca, to 63.

15     Q.    (BY MR. HODGES)  And so, Mr. Burghard, you

16     see the analysis that OGC provided -- or that he's

17     representing was provided in April of 2019?

18               MR. GONZALEZ:  Hey, John, I can't read

19     that.  I don't know if the witness can read it when

20     it's, like, paragraphs and paragraphs of -- I guess

21     you're representing legal analysis.  If you want, I

22     can go print it out and put it in front of him and

23     give him an opportunity to read it if you have

24     questions.

25               But, you know, to put a legal document in

**EXHIBIT 14**
**Page 151 of 207**

Burghard_000101

1    front of a witness who doesn't ever recall seeing it

2    and asking him questions, like, I'd at least like to

3    print it out for him if that's what we're going to

4    do.

5            MR. HODGES:  Yeah, what do you think?

6    Yeah, if you don't mind doing that, Joseph.  I know

7    that's an accommodation.  If you don't mind doing it,

8    you want to take five?

9            MR. GONZALEZ:  Sure, sure.  We can go

10   ahead and do that, yeah.

11           MR. HODGES:  Thanks, Joseph.

12           THE VIDEOGRAPHER:  The time is 12:08.  We

13   are going off the record.

14           (Break was taken from 12:08 p.m. to

15   12:17 p.m.)

16           THE VIDEOGRAPHER:  The time is 12:17.  We

17   are back on the record.

18       Q.    (BY MR. HODGES)  Okay.  All right.

19   Mr. Burghard, so -- sorry, I hit a button here, and

20   my computer locked.

21           So do you have -- do you have the e-mail

22   from OGC in front of you now?

23       A.    Yes, I have it right here.

24       Q.    Yes, sir.  Do you mind reading the -- I

25   just need to understand what range of pages you have

**EXHIBIT 14**
**Page 152 of 207**

1    in front of you.  What's the bottom right?

2        A.    Starting, I have US_60.  It goes all the

3    way to US_66.

4        Q.    Okay.  Thank you, sir.  I appreciate it.

5            MR. HODGES:  Thank you, Joseph, and your

6    team for printing that off for us.

7        Q.    (BY MR. HODGES)  Okay.  So, Mr. Burghard,

8    you see several pages of legal analysis there

9    beginning at 64 to -- well, the entirety of 65, and

10   then it looks like it was somewhat re -- or

11   summarized there in 64.

12       A.    Okay.

13       Q.    Yes, sir.  You see that.  And at the front

14   of this on Bates 60, the first page, we've got at the

15   bottom -- do you see at the bottom there where the

16   e-mail from Mr. McVeigh -- or Captain McVeigh, excuse

17   me, to you and Allen Rabayda?

18       A.    Yes, I see that.

19       Q.    Right.  I mean, you don't have any reason

20   to dispute this representation that he had forwarded

21   that stuff to you?

22       A.    Of course.  It's right here.

23       Q.    And I mean, this is -- you would expect

24   that from Captain McVeigh to kind of follow up, Hey,

25   here's some additional information to the allegation

EXHIBIT 14
Page 153 of 207

Burghard_000103

1    that he made earlier?

2        A.    Sure.

3        Q.    Right.  And you don't -- at this point you

4    don't have any reason to dispute the legal analysis

5    that was provided by the OGC?

6            MS. SEEMAN:  Well, objection.  He's not an

7    attorney, so it's not proper to ask him for his legal

8    opinion on advice given by a different agency.

9            MR. HODGES:  Sure.

10       Q.    (BY MR. HODGES)  So I'm not --

11   Mr. Burghard, I'm not going to ask you for a legal

12   opinion.  I'm asking you if you had any reason to

13   dispute that they had that analysis?

14           MR. GONZALEZ:  What do you mean, "they had

15   that analysis"?  Because he just testified that he

16   wasn't -- he didn't recall getting this analysis, so

17   now he has it in front of him.  Do you want him to

18   review the analysis?  Is that what's going on here?

19           MR. HODGES:  Sorry, sorry.  I didn't

20   realize that he said he didn't know -- or he didn't

21   recall seeing it.  I'll backtrack, Joseph, based on

22   that comment.

23       Q.    (BY MR. HODGES)  So, Mr. Burghard, do you

24   recall getting forwarded Dr. Roysdon's representation

25   of the legal analysis from the OGC?

EXHIBIT 14
Page 154 of 207

Burghard_000104

```
 1        A.    I mean, it shows it here, right?  So. . .
 2        Q.    Yes, sir.  And I don't think you're
 3   disputing that you got it.  I'm asking if you recall
 4   getting it.
 5        A.    No, I don't, actually.  It's been -- like
 6   I said, it's been a long time.  I just can't
 7   remember.
 8        Q.    Well, at this point -- okay.  Well, at
 9   this point on August 24th, you hadn't formed an
10   opinion as to whether or not there was actually a
11   legal conflict?
12        A.    Correct.
13        Q.    Right.  Okay.
14              MR. HODGES:  Okay.  I think we can be done
15   with that Exhibit 4.  So, Rebecca, can we get to 233
16   through 234, please.
17              (Deposition Exhibit 5 was marked for
18   identification.)
19        Q.    (BY MR. HODGES)  So --
20              MR. GONZALEZ:  I just gave him a copy of
21   it.  Just to be clear for the record, I highlighted a
22   sentence.  There's no writing on it, but these are my
23   records.  So one of the sentences is highlighted.  It
24   has nothing to do with this, but as long as you don't
25   object, I'll provide it to him.
```

**EXHIBIT 14**
**Page 155 of 207**

Burghard_000105

1           MR. HODGES:  No, I appreciate you

2    providing it, and I'll even go a step further in

3    extending an olive branch.  I'm not going to ask

4    which sentence was highlighted.  So, yeah.

5           Q.    (BY MR. HODGES)  So if you would,

6    Mr. Burghard, if you'd join me on the back -- or on

7    the second page, excuse me.  It should be Bates 234.

8           A.    Just for the record, it looks the same.  I

9    just have a different number on mine.

10          Q.    Okay.

11          A.    It's US_176.

12          Q.    Okay.  Just so we're clear and we're

13   looking at the same document, what's the number of

14   the last numbered paragraph of the document you're

15   looking at?

16          A.    It's 6.

17          Q.    Yes, sir.  And whose electronic signature

18   appears to be at the bottom?

19          A.    Richard Bremer.

20          Q.    Thank you.  I just wanted to confirm we're

21   looking at the same document, that's all.

22          A.    Sure.

23          Q.    So, Mr. Burghard, were you aware that

24   Mr. Bremer had been appointed to conduct an inquiry

25   into this -- into this matter?

**EXHIBIT 14**
**Page 156 of 207**

Burghard_000106

1          A.    I knew there was an inquiry being done,

2    and I had heard the name Richard Bremer, but that's

3    about the extent of what I knew.

4          Q.    Do you recall ever having seen this

5    Exhibit 5 before?

6          A.    I do not.

7          Q.    Okay.  And so then at the bottom there,

8    paragraph 6, where it says, "No corrective actions

9    recommended to prevent future incidents as no

10   incident occurred," you hadn't seen that before then

11   either?

12         A.    That's -- that's correct.

13               MR. HODGES:  Okay.  Let's take that one

14   down, Rebecca.

15         Q.    (BY MR. HODGES)  So, Mr. Burghard, at some

16   point you had a representation of legal analysis.

17   You were aware that there was an investigation or an

18   inquiry that was being conducted, but those are two

19   things.

20               Were you aware of any other -- and we

21   talked about the -- the DoD IG complaint, so I guess

22   there were three different sets of eyes that had

23   looked at this allegation that came from Captain

24   McVeigh.

25               Are you aware of any other investigative

**EXHIBIT 14**
**Page 157 of 207**

Burghard_000107

1    action that took place with regard to this alleged

2    conflict of interest?

3             MS. SEEMAN:  I'm going to object, and also

4    to the extent that the 2022 OIG investigation was

5    prompt by Plaintiff in this action and not Captain

6    McVeigh.

7             But you can answer.

8             MR. HODGES:  Okay.

9        A.   I'm not aware.

10       Q.   (BY MR. HODGES)  Okay.  So are you aware

11   of any investigation that -- that reached a

12   conclusion that there was a conflict of interest with

13   Dr. Roysdon in his contractual capacity and

14   Dr. Roysdon in an NSA capacity?

15       A.   I'm not.

16       Q.   Okay.  As you sit here today, do you have

17   any opinion as to whether that was a conflict of

18   interest?

19       A.   I think it's undetermined.

20       Q.   I missed that.

21       A.   I think it's undetermined.

22       Q.   Your opinion is undetermined?

23       A.   No.  I mean, it's unknown on -- you know,

24   if you look at the OGC from NSA, then I guess that's

25   the record on what it is.  But, you know, I don't

**EXHIBIT 14**
**Page 158 of 207**

Burghard_000108

1    know.

2        Q.    And so my question is a little bit

3    different.  So I'm asking you, in your personal

4    capacity, do you have an opinion as to whether or

5    not -- Dr. Roysdon acting as a contractor and acting

6    as an NSA employee, do you have an opinion as to

7    whether or not that creates a conflict of interest?

8        A.    I don't.

9        Q.    Okay.  Thank you.  Okay.  And so I want to

10   ask you now about -- you mentioned that Dr. Roysdon

11   was still read into certain programs that you were

12   able to see in Jade, right?

13       A.    Yes, sir.

14       Q.    Are you able to tell us whether or not

15   he's been read out of the Fibonacci programs?

16       A.    It gets close to the security line, but

17   I'll tell you what I can say --

18       Q.    Okay.  Yes, sir.

19       A.    -- that at least I think is relevant in

20   this matter, is that, you know, he was read out when

21   he left his job at that point many years ago for the

22   Fibonacci stuff.  According to the Jade lookup that I

23   did this morning, he is currently cleared to the same

24   SAP program that the Fibonacci efforts were

25   developing here.

EXHIBIT 14
Page 159 of 207

Burghard_000109

1              So technically, he is reread into the
2      program that he was read out of.  Does that make
3      sense?
4          Q.    Yes, sir.  Are you able to tell -- and I
5      appreciate that additional detail.  Are you able to
6      tell us when he was read back in?
7          A.    I didn't take note of that, but that's
8      notable.  It's documented in Jade for sure.  I just
9      didn't see that.
10         Q.    Okay.  Right, right.  And so Jade does
11     provide that information?
12         A.    It does, yes.
13         Q.    Okay.  Now, is that classified when
14     someone -- with the date of somebody being read in?
15         A.    I don't think so, no.
16         Q.    And so if we were to confer with -- okay.
17     We'll talk to the Justice Department lawyers about
18     that, then.
19             Can you -- can you tell us why -- or your
20     understanding of why Dr. Roysdon was read out of
21     Fibonacci?
22         A.    Sure.  He no longer had a need to know
23     because he left his current position.
24         Q.    When you say "current position," you mean
25     at NSA?

**EXHIBIT 14**
**Page 160 of 207**

Burghard_000110

1       A.    That's right, yep.  He was read in as an

2    NSA employee.  He left that position; and therefore,

3    he no longer had the need to know.

4       Q.    Okay.  Were you able to -- does Jade

5    provide a date that they're read out?

6       A.    It does, yes.

7       Q.    Did you -- did you take note of that when

8    you were looking?

9       A.    I did not.  But again, it's documented,

10   yeah.

11      Q.    Yes, sir.  Okay.

12      A.    And for what it's worth, it's documented

13   in multiple places.  It would have been documented in

14   Jade, and as long as a person is read out, and they

15   sign the read-out documentation known as AFIA.  It

16   will be documented the date that he signed that he

17   was read out as well.

18      Q.    Someone can be read out -- can someone be

19   read out involuntarily?

20           MS. SEEMAN:  Objection to form.

21           You can answer.

22      A.    People can be read out for cause if

23   there's a security incident, for instance.

24      Q.    (BY MR. HODGES)  Right.  If -- when

25   Dr. Roysdon was read out of Fibonacci, was -- did he

**EXHIBIT 14**
**Page 161 of 207**

Burghard_000111

1    sign the forms?

2       A.    He did, yes.

3       Q.    Okay.  I want to ask you about Dan Brown's

4    testimony.  He testified that he could not present

5    programs that had Dr. Roysdon's name on them.  Is

6    that the first time that you've heard of that?

7             MS. SEEMAN:  John, can you be a little

8    more specific about what portion of testimony you're

9    talking about?

10            MR. HODGES:  Yeah, I think I can.

11            MS. SEEMAN:  Or at least a time frame.

12            MR. HODGES:  Sure.  You know what?  I'm

13   sorry.  I took notes of various spots in his

14   deposition that I wanted to ask about.  I don't have

15   that note on my -- so I don't know exactly the time

16   hack.

17            I've got two or three other questions that

18   I want to ask about Dan Brown's deposition, but I

19   don't have that time hack note here.  I don't know

20   why I don't have that in my notes, but I didn't

21   create it.  I wasn't creative with that question.

22            MR. HENRY:  I can try and pull it up while

23   you ask the other questions, John, if you want.

24            MR. HODGES:  Yeah, if you don't mind.

25   Thanks, Lance.

**EXHIBIT 14**
**Page 162 of 207**

Burghard_000112

1    Q.   (BY MR. HODGES)  Okay.  So I'll ask you

2    some different stuff while we work on that,

3    Mr. Burghard.

4         So Dan Brown testified about Dr. Roysdon's

5    work on the Fibonacci programs and other things.  If

6    Dan Brown testified that Dr. Roysdon added value to

7    HNCO through his work -- through his work, do you

8    have any reason to dispute that assessment?

9    A.   No.

10    Q.   Would you actually agree with that

11    assessment, that Dr. Roysdon added value to HNCO?

12    A.   Yeah, he did.

13    Q.   Yes, sir.  Okay.  And I think you

14    testified earlier about this, but I want to ask you

15    about Dan Brown's opinions.

16         He testified his opinions were that the

17    products and the work that -- excuse me, the work

18    product that Dr. Roysdon provided HNCO, that it was

19    good work product.

20    A.   Yep, I'd agree with that.

21    Q.   Okay.  And you agree with -- you agree

22    that the products that he was working on, those were

23    valuable products for HNCO?

24    A.   Yes.

25    Q.   Have you ever heard Captain McVeigh

EXHIBIT 14
Page 163 of 207

Burghard_000113

1    described as cutthroat when it comes to defending his

2    projects?

3        A.    No.

4        Q.    Okay.  And so if Dan Brown said that, do

5    you disagree with his assessment?

6            MS. SEEMAN:  Objection to form.

7            You can answer.

8        A.    I mean, maybe that's an internal HNCO

9    thing, to be honest with you.  I've never had that

10   issue with Will McVeigh.

11       Q.    (BY MR. HODGES)  Okay.  And would it be

12   fair to -- I want to make sure I understand your

13   response, then.

14           (Interruption by Ms. Seeman coughing.)

15           MS. SEEMAN:  Sorry.

16       Q.    (BY MR. HODGES)  I want to make sure I

17   understand your response to that question.  Is it

18   fair to say, then, that you don't have an opinion one

19   direction or another?

20       A.    That's accurate, yeah.

21       Q.    Okay.  All right.  If Dan Brown was passed

22   over for a promotion because of animosity between

23   Dr. Roysdon and Captain McVeigh, do you think that

24   would be appropriate?

25           MS. SEEMAN:  Objection to form, and also

**EXHIBIT 14**
**Page 164 of 207**

Burghard_000114

1    lacks any record evidence to support that.

2          But you can go ahead and answer.

3    A.    I mean, I don't really want to make a

4    comment on that one.  I would just be theorizing,

5    honestly.  It sounds like a local HNCO thing that I

6    wouldn't be cognizant of.

7    Q.    (BY MR. HODGES)  Yes, sir.  So I want to

8    ask you about HNCO.  You mentioned that there were

9    several HNCO programs that were underperforming.

10   Would you say that -- is that common to have as many

11   programs as they had underperforming?

12   A.    At the time, yeah, they were probably our

13   worst program office in our entire portfolio, so that

14   was a reflection of how they were performing at that

15   time frame across the board.

16   Q.    At HNCO you mean, right?

17   A.    Yes.

18   Q.    Okay.  You mentioned -- you mentioned that

19   some of the programs that -- some of the Fibonacci

20   programs they failed or they didn't get the

21   funding -- excuse me -- that they failed because they

22   didn't get the funding, or they weren't

23   administratively as tight as they needed to be; is

24   that what you said earlier?

25         MS. SEEMAN:  Objection to form.

**EXHIBIT 14**
**Page 165 of 207**

Burghard_000115

```
 1              You can answer.

 2       A.    That's not what I said earlier.

 3       Q.    (BY MR. HODGES)  Okay.

 4       A.    What I said earlier is on the

 5  administrative piece, they didn't have

 6  accreditations, contracts in order, 254s.  It was all

 7  on the administration and program management side.

 8  They always had adequate funding.

 9       Q.    Sorry.  It was cutting out there.  You

10  said that it was because of some of the

11  administrative things that were not being done?

12       A.    That's correct.

13       Q.    Right.  And so it had nothing to do with

14  the value of the programs, like, whether or not they

15  were needed?

16       A.    Not at all.

17       Q.    In fact, I think you testified earlier

18  that these programs were kind of one-of-a-kind-type

19  programs?

20       A.    That's right.

21       Q.    And would you say that they were valuable?

22       A.    Yeah, 100 percent, absolutely.

23       Q.    Are they still viable?  Like, they haven't

24  been over -- or swallowed up by new technology?

25       A.    I think that would have to be reassessed.
```

**EXHIBIT 14**
**Page 166 of 207**

Burghard_000116

1    I think technology has come a long way in the last

2    five years, especially in the AI machine learning

3    area.  So I don't think it would be fair to assess

4    that right now without that comparison.

5        Q.    Okay.  Gotcha.  But you mentioned that it

6    was some of the administrative shortcomings that led

7    to those programs not going through to completion?

8        A.    That's right.

9        Q.    Do you have any -- do you have any opinion

10    as to why some of these administrative things were

11    not being done correctly?

12        A.    I mean, like I said, HNCO was having their

13    own internal struggles with being able to do basic

14    program management of SAP programs.  So, I mean,

15    thankfully, there's actually been a lot of change in

16    HNCO over the last three, four years.  They're

17    actually in a good place right now in terms of being

18    able to do that, but it took a lot of lessons to

19    learn, unfortunately, like in this scenario.

20        Q.    Is Captain McVeigh still -- Captain

21    McVeigh still work at HNCO?

22        A.    He does not, no.

23        Q.    Okay.

24              MR. HENRY:  John, if you have -- this is

25    Lance.  If you have the transcript of Dan Brown's

**EXHIBIT 14**
**Page 167 of 207**

Burghard_000117

1    deposition in front of you, it's at page 213 that he

2    talks about -- he testified that Roysdon couldn't

3    have his name on materials that Roysdon was

4    submitting as a contractor to HNCO.

5              MR. HODGES:  Okay.  So -- thank you for

6    that reminder, Lance.

7         Q.   (BY MR. HODGES)  So, Mr. Burghard, my

8    question earlier was about if Dan Brown testified

9    that Dr. Roysdon couldn't present his products and he

10   couldn't have his name on certain products, do you

11   have any reason to dispute what Dan Brown was saying?

12             MS. SEEMAN:  Objection to form.  And just

13   for the record, I believe Mr. Brown's testimony was

14   that those presentations or questions about them

15   happened in March and April of 2023, just so the

16   record is clear.

17             MR. GONZALEZ:  And when you say, "do you

18   have any reason to dispute," dispute precisely what,

19   John?  That he said that or that -- like, that Dan

20   said that or that it's true or something else?

21             MR. HODGES:  Well, I asked the question

22   broadly to give the witness an opportunity to respond

23   as broadly as he thinks is appropriate, and that's

24   why I said "any reason to dispute it."  And so the

25   intent behind that question is to allow him to say, I

EXHIBIT 14
Page 168 of 207

Burghard_000118

1    dispute that he said it because I don't think Dan

2    Brown would have said something like that, or I

3    dispute that it's factual if he said that.  So that's

4    why I asked it that way.

5              MR. GONZALEZ:  Well, that's an

6    inappropriate question.

7              MR. HODGES:  Okay.

8        Q.   (BY MR. HODGES)  So, Mr. Burghard, do you

9    have any response?  I understand the Justice

10   attorneys have just made their objection, but do you

11   have a response to that question?

12             THE DEPONENT:  Am I allowed to respond?

13             MS. SEEMAN:  Yeah, you can answer.

14             THE DEPONENT:  Okay.

15       A.   Yeah, I guess my response is that sounds

16   odd, to be honest with you.  I don't understand why

17   he wouldn't be able to have his name on a product.

18       Q.   (BY MR. HODGES)  Right.  Well, and so --

19   so have you ever heard the term "blacklisted"?

20       A.   I have.

21       Q.   Okay.  Can you provide us what you

22   understand that common term to mean?

23       A.   It's someone's name is on a list to be

24   considered for exclusion into certain things, right?

25       Q.   Right.  And of course, someone being

**EXHIBIT 14**
**Page 169 of 207**

Burghard_000119

1    blacklisted isn't something that's written down in

2    some -- in some book somewhere, right?

3              MS. SEEMAN:  Objection to form.

4              You can answer.

5         A.    Maybe.

6         Q.    (BY MR. HODGES)  Maybe, but the common --

7    your understanding of the common use of that term is

8    just this person's name, we don't want them around;

9    we can't work with them?

10        A.    For the common definition, true.

11        Q.    Yes, sir.  And so was Dr. Roysdon ever

12   blacklisted from HNCO?

13        A.    Not to my knowledge.

14        Q.    Okay.  From your perspective at AQL, if

15   Dr. Roysdon's name or products come across your desk,

16   is he blacklisted?

17        A.    No, not at all.  I would --

18        Q.    And so --

19             THE COURT REPORTER:  You what?

20        Q.    (BY MR. HODGES)  I'm sorry.  I cut you

21   off.

22        A.    I said I would welcome that, actually.

23        Q.    In fact, you would prefer Dr. Roysdon's

24   products because you know that he presents a good

25   product and he's got novel ideas; is that fair?

**EXHIBIT 14**
**Page 170 of 207**

Burghard_000120

1          A.    Sure, absolutely.

2          Q.    Okay.  And so if Dan Brown says that

3    Dr. Roysdon within HNCO, he was blacklisted, do you

4    have any reason to disagree with that?

5                MS. SEEMAN:  Objection; misstates the

6    record testimony.  The witness can answer.

7          A.    Yeah.  I wouldn't know anything about

8    that, to be honest with you.

9          Q.    (BY MR. HODGES)  In fact, you would agree

10   with me that that would be improper if he were

11   blacklisted at HNCO?

12               MS. SEEMAN:  Same objection.

13               You can answer.

14         A.    Sure.

15         Q.    (BY MR. HODGES)  I mean, he provides a

16   valuable product in the defense of our nation.  I

17   mean, we need him; is that fair?

18               MS. SEEMAN:  Objection to form.

19               Go ahead.

20               THE DEPONENT:  Okay.

21         A.    I mean, yeah, there's no doubt he has

22   great products.

23         Q.    (BY MR. HODGES)  And so for him to be

24   blacklisted and prevented from presenting some of his

25   products to the United States, that would not be good

**EXHIBIT 14**
**Page 171 of 207**

Burghard_000121

1    for us; is that fair?

2              MS. SEEMAN:  Objection.  Counsel is

3    testifying at this point.  Is there something you

4    want to point the witness to?  He's already testified

5    he's not aware of any blacklisting.  So are you

6    saying -- are you saying did it happen?  Is it

7    possible?  I just -- it's not clear to me what the

8    purpose of this is other than you testifying.

9              MR. HODGES:  So the objection is

10   relevance, then, right?

11             MS. SEEMAN:  No, it's also form.

12        Q.   (BY MR. HODGES)  Okay.  So did you

13   understand the question, Mr. Burghard?

14        A.   I could reiterate the question was --

15        Q.   Yeah, sure.

16        A.   -- whether or not --

17        Q.   So you'd agree with me -- I'm sorry.  Go

18   ahead.  Finish your question.

19        A.   No, no.  Please go ahead and restate.

20        Q.   All right.  So you'd agree with me that it

21   would be inappropriate for someone like Dr. Roysdon

22   to be blacklisted or prevented from presenting his

23   products to HNCO?

24             MS. SEEMAN:  Objection to form.

25        A.   Yeah.  I mean, that would be -- that would

EXHIBIT 14
Page 172 of 207

Burghard_000122

1    be bad, for sure.

2         Q.    (BY MR. HODGES)  You're not aware of any

3    reason that he should be prevented from presenting

4    his products?

5         A.    No.

6              MR. HODGES:  Okay.  Y'all, I think I'm

7    nearly done.  If you would, give me five minutes to

8    confer with co-counsel.  I'll be back in about five.

9              THE VIDEOGRAPHER:  The time is 12:42.  We

10   are going off the record.

11             (Break was taken from 12:42 p.m. to

12   12:49 p.m.)

13             THE VIDEOGRAPHER:  The time is 12:49.  We

14   are back on the record.

15             MR. HODGES:  Okay.  Mr. Burghard, we are

16   close.

17             Rebecca, do you mind pulling up -- sorry,

18   y'all.  I don't remember what exhibit number it was,

19   but I'm in -- Rebecca, let's pull up 724 to 738,

20   please.

21             Sheila, do you remember which exhibit

22   number this is?

23             THE COURT REPORTER:  I was just going to

24   look.

25             MS. SEEMAN:  It's 3.

**EXHIBIT 14**
**Page 173 of 207**

```
 1                  THE COURT REPORTER:  Yes, that's correct.
 2                  MR. HODGES:  Thank you.  Mr. Burghard, I
 3   think that this was one that we had to look at on the
 4   screen.
 5                  And so, Rebecca, if you'd join us on 729.
 6                  Just a couple of loose ends here,
 7   Mr. Burghard.
 8                  And, Rebecca, if you'd get us to the
 9   bottom half of that page.  Thank you.
10       Q.    (BY MR. HODGES)  Okay.  So, Mr. Burghard,
11   we've been through this document a little bit already
12   today.  Again, we're on page 7 -- or Bates-labeled
13   729 right now, and so I'll represent to you that this
14   is another entry, a copied e-mail from Colonel Welch
15   responding to Special Agent Williams, and she's
16   recommending that this complaint be closed out.
17                  She lists three reasons.  The first one --
18   do you see where I'm at with the three reasons,
19   Mr. Burghard?
20       A.    I do, yes.
21       Q.    Yes, sir.  And so one is timeliness.  The
22   second is nonresponsiveness, and then the third one
23   here says, "When I did reach out to one of the
24   witnesses identified on the DoD Form 1, the witness
25   told me the" allegations -- "the allegation was
```

**EXHIBIT 14**
**Page 174 of 207**

Burghard_000124

1    erroneous."

2              So, Mr. Burghard, I'll tell you that I

3    don't believe that there was another witness that was

4    contacted by -- by Colonel Welch.  I believe in these

5    pages it's very clear that you were the only witness

6    that she contacted.

7              So I'll ask the question.  The question

8    I'm asking here is, do you remember -- do you recall

9    making this statement that the allegation was

10   erroneous?

11             MS. SEEMAN:  I'm going to object to form

12   and also to the extent that this mischaracterizes the

13   document and the OIG investigation, but the witness

14   can answer.

15             MR. HODGES:  Sure.

16        A.   Yeah, I don't recall.

17        Q.   (BY MR. HODGES)  You don't recall whether

18   you made that statement or not?

19        A.   That's right.

20        Q.   Okay.  Thank you.

21             MR. HODGES:  Rebecca, if you would pull --

22   we're done with this one, and so if you would pull 88

23   up on the screen.

24             So for the Justice attorneys, it's just

25   going to be one page, 88.

**EXHIBIT 14**
**Page 175 of 207**

Burghard_000125

1          (Deposition Exhibit 6 was marked for

2     identification.)

3          Q.   (BY MR. HODGES)  Okay.  So, Mr. Burghard,

4     you testified earlier that you did -- that you do a

5     lot of your work on SIC, and so I wanted to ask you

6     about this page here.  You mentioned that --

7               MR. GONZALEZ:  We can't see it.

8          A.   Yeah, this is really hard to read.  I'm

9     sorry.  There we go.  Thank you.

10         Q.   (BY MR. HODGES)  Okay.  So I wanted to ask

11    you about this document.

12              MR. HODGES:  If you would, Rebecca, would

13    you start at the bottom so that Mr. Burghard can take

14    a look from the bottom up.

15         A.   Yep, I'm familiar.  This is great.

16         Q.   (BY MR. HODGES)  Okay.  All right.  So you

17    see here where you say that you can't put information

18    but happy to provide it on SIC.  Can you tell us what

19    Special Agent Webb was asking for?

20         A.   Sure.  He was asking for the historical

21    funding that was allocated to the Fibonacci programs

22    and how much, by what year, and what type of money

23    was it.

24         Q.   Is that information you had available?

25         A.   It is, and I did provide that.

**EXHIBIT 14**
**Page 176 of 207**

Burghard_000126

1          Q.    Yes, sir.  That's what I was going to ask.

2    And so you provided that over SIC?

3          A.    That's correct.

4          Q.    Yes, sir.  Is this -- now, SIC is a

5    separate system from JWICS?

6          A.    It is; yes, sir.

7          Q.    Yes, sir.  And so this information is

8    something that you would have been able to find

9    through your search on SIC?

10         A.    Absolutely.

11         Q.    Okay.  And this is one of the documents

12   that you pulled?

13         A.    It is, yes.

14         Q.    Okay.  Okay.  That was what I was going to

15   ask.  And so, separately, did you search for this

16   document?  Sorry.

17         A.    Yes.

18         Q.    You mentioned that you did provide the

19   information to Special Agent Webb?

20         A.    Yes.

21         Q.    And you did that on SIC?

22         A.    Correct.

23         Q.    Did you pull the transmission of that

24   information from SIC and give it to the Justice

25   attorneys?

**EXHIBIT 14**
**Page 177 of 207**

Burghard_000127

1          A.    I showed the Justice attorneys that on SIC

2     since they did not have access to that at the time,

3     but they have seen it.

4          Q.    I'm sorry.  I missed that when you said

5     they did not have access at the time?

6          A.    So -- I mean, I don't know if I'm -- so

7     there's only one attorney here that cleared the SAP

8     program that this is involved with.  That attorney

9     did not have access to SIC himself, so he came and

10    laid his own eyes on the document on SIC through my

11    account, so he has seen it.

12         Q.    Okay.  Has it been preserved?  Did you

13    preserve it in any manner?

14         A.    Yes, I did.

15         Q.    Okay.  And so is it still preserved

16    today --

17         A.    Yes.

18         Q.    -- that you're aware of?

19         A.    It is, yeah.

20              MR. HODGES:  Okay.  All right.  I don't

21    think I have any further questions for you,

22    Mr. Burghard.  I appreciate your time, and I'll pass

23    the witness.

24              MS. SEEMAN:  Yes, we'll have a couple.

25    And Miss -- Madam Court Reporter, if I need to speak

EXHIBIT 14
Page 178 of 207

Burghard_000128

1    up at any point, please just let me know, okay?

2                THE COURT REPORTER:  Okay.

3                        EXAMINATION

4    BY MS. SEEMAN:

5        Q.    So, Mr. Burghard, when Dr. Roysdon came

6    over to HNCO, what capacity were you aware that he

7    was working in?

8        A.    In his NSA capacity as the chief data

9    scientist at NSA-San Antonio, Texas.

10        Q.    Earlier we talked about PARs, or Program

11    Access Requests.  Who did Dr. Roysdon's Program

12    Access Requests to the HNCO special programs?

13        A.    As far as who submitted it, it would have

14    been someone at HNCO, and then I would have likely

15    approved it.

16        Q.    What was the basis for his access to the

17    HNCO SAP?

18        A.    He was providing technical guidance and

19    advice in his government capacity to the program.

20        Q.    And that's through his employment with the

21    NSA, correct?

22        A.    That's right.

23        Q.    Did Dr. Roysdon ever tell you that NSA was

24    no longer interested in the technology or project?

25        A.    No.

EXHIBIT 14
Page 179 of 207

Burghard_000129

1      Q.     Did anyone at NSA ever tell you that the

2   agency was no longer interested?

3      A.     They -- he did mention that NSA is not

4   investing in this area, and so it was available to be

5   invested in, yes.

6      Q.     Did anyone at NSA ever tell you personally

7   that Dr. Roysdon's work at HNCO was not done in his

8   capacity as a government employee?

9      A.     No.

10      Q.     Earlier we also talked about PMRs, or

11   Program Management Reviews.  Just briefly, what is

12   the purpose of those?

13      A.     Those are events held twice a year to

14   assess the programmatic status of the programs we

15   invest in.

16      Q.     Who is allowed in the room?

17      A.     Only folks that are appropriately cleared.

18      Q.     Do you have to be read in to attend the

19   PMR?

20      A.     You do, yes.

21      Q.     Did Dr. Roysdon ever attend any PMRs?

22      A.     He did.

23      Q.     In what capacity?

24      A.     In his NSA government capacity.

25      Q.     How do you know?

**EXHIBIT 14**
**Page 180 of 207**

Burghard_000130

1      A.    I have slides he presented that say he was

2    an NSA data scientist.

3      Q.    Are contractors permitted to attend PMRs?

4      A.    Very rarely.

5      Q.    Under what circumstances would they be

6    allowed?

7      A.    Typically, they would present at a PMR if

8    there's reason that a program office wants to go to a

9    certain level of technical details that that

10   contractor or vendor can speak better to.

11           And typically, vendors won't be as broadly

12   cleared to people that are allowed to be at a PMR, so

13   we'll bring the security level down, have those

14   people present -- those people being the vendors --

15   present at that lower classification level and then

16   leave, and the security level is brought back up at a

17   higher level after they're gone.

18     Q.    When Dr. Roysdon attended and presented at

19   a PMR, were you aware he was also working as a Global

20   InfoTek consultant or subcontractor?

21     A.    I was not.

22     Q.    Do PMRs have any influence on funding?

23     A.    It can.  It -- I mean, it gives a

24   record-check on where is the program actually in it's

25   status based on the schedules, cost, and performance.

**EXHIBIT 14**
**Page 181 of 207**

Burghard_000131

1      Q.    Is it concerning to you when a government

2  employee does not disclose their subcontractor role?

3      A.    It is.

4            MR. HODGES:  Object to form.

5      Q.    (BY MS. SEEMAN)  If you can repeat your

6  answer.

7      A.    It is, yeah.

8      Q.    Why?

9      A.    Even if there's an appearance of a

10  conflict of interest, it's concerning, you know, just

11  from appearances, if nothing else.

12     Q.    Earlier we also talked about being read

13  out and debriefed.  When you found out that

14  Dr. Roysdon was leaving NSA, what did you do?

15     A.    I administratively read him out.

16     Q.    What does that mean?

17     A.    It basically means I go into Jade.  I

18  click the button to read him out, and that's -- it's

19  pretty routine.  For example, we have military folks

20  that PCS all the time or people that are -- they quit

21  in a short time span when people are out of the

22  office to do an official read-in.

23           But it doesn't mean that people can't also

24  still have them sign and understand what he's signing

25  for it to be read out.

**EXHIBIT 14**
**Page 182 of 207**

Burghard_000132

1     Q.    What are the consequences of an

2  administrative debrief?

3     A.    It means you basically lose access to

4  information protected by the -- that SAP program.

5  You lose information.  You lose the ability to access

6  the information.  You essentially lose access.

7     Q.    Do you also lose access to the facilities?

8     A.    You do.

9     Q.    Why?

10    A.    Typically there's a common level to the

11 facility to enter, and if you're not read into that,

12 are you not allowed to enter the facility.

13    Q.    So if Dr. Roysdon as a contractor did

14 not -- was not read in, in that respect, would he be

15 able to access the facility after his administrative

16 debriefing?

17    A.    He would not be able to.

18          MS. SEEMAN:  Nothing further.

19          THE VIDEOGRAPHER:  Okay.  The time -- oh,

20 sorry.  I need my glasses.  The time is 1 o'clock.

21 We are going off the record.  This will complete the

22 deposition for today.

23          THE COURT REPORTER:  Mr. Hodges, do you

24 want a transcript?

25          MR. HODGES:  Yes, please, E-tran.

**EXHIBIT 14**
**Page 183 of 207**

Burghard_000133

```
1              THE COURT REPORTER:  Okay.  Ms. Seeman, do

2    you want a copy?

3              MS. SEEMAN:  Sure do.

4              THE COURT REPORTER:  Okay.  Thank you.

5              (The deposition concluded at 1:01 p.m. on

6    May 15, 2025.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**EXHIBIT 14**
**Page 184 of 207**

Burghard_000134

```
 1              I, JOSEPH DANIEL BURGHARD, do hereby

 2   certify that I have read the foregoing transcript and

 3   that the same and accompanying amendment sheets, if

 4   any, constitute a true and complete record of my

 5   testimony.

 6

 7                   _____
                     Signature of Deponent
 8

 9                   (  ) No amendments

10                   (  ) Amendments attached

11              Acknowledged before me this _____ day

12   of _____, 20___.

13                   Notary Public: _____

14                   My commission expires _____

15                   Seal:

16

17

18

19

20
     SRS
21

22

23

24

25
```

**EXHIBIT 14**
**Page 185 of 207**

Burghard_000135

1    STATE OF COLORADO        )

2                             )  ss.      REPORTER'S CERTIFICATE

3    COUNTY OF DENVER         )

4              I, Sheila R. Schiesser, do hereby certify

5    that I am a Registered Professional Reporter,

6    Certified Realtime Reporter, and Notary Public within

7    the State of Colorado; that previous to the

8    commencement of the examination, the deponent was

9    duly sworn to testify to the truth.

10             I further certify that this deposition was

11   taken in shorthand by me via Zoom videoconferencing

12   and was thereafter reduced to typewritten form, and

13   that the foregoing constitutes a true and correct

14   transcript.

15             I further certify that I am not related to,

16   employed by, nor of counsel for any of the parties or

17   attorneys herein, nor otherwise interested in the

18   result of the within action.

19             In witness whereof, I have affixed my

20   signature this 27th day of May, 2025.

21             My commission expires January 11, 2027.

22

23                    _Sheila Schiesser_
                      Sheila R. Schiesser, RPR, CRR
24                    216 - 16th Street, Suite 600
                      Denver, Colorado  80202
25

**EXHIBIT 14**
**Page 186 of 207**

Burghard_000136

```
 1   AB LITIGATION SERVICES
     216 - 16th Street, Suite 600
 2   Denver, Colorado  80202


 3
     May 27, 2025
 4


 5   U.S. Department of Justice, Civil Division
     Katrina Seeman, Esq.
 6   950 Pennsylvania Avenue, NW
     Washington, D.C. 20530
 7
     Re:  Deposition of JOSEPH DANIEL BURGHARD
 8        Dr. John Roe v. United States of America, et al.
          Civil Action No. 5:22-CV-00869-JKP-HJB
 9
     The aforementioned deposition is ready for reading
10   and signing.  Please attend to this matter by
     following BOTH of the items indicated below:
11
     _____ Call 303-296-0017 and arrange with us to read
12          and sign the deposition in our office

13   _XXX_ Have the deponent read your copy and sign the
           signature page and amendment sheets, if
14         applicable; the signature page is attached

15   _____ Read the enclosed copy of the deposition and
            sign the signature page and amendment sheets, if
16          applicable; the signature page is attached

17   _XXX_ WITHIN 30 DAYS OF THE DATE OF THIS LETTER

18   _____ By _____ due to a trial date of _____

19   Please be sure the original signature page and
     amendment sheets, if any, are SIGNED BEFORE A NOTARY
20   PUBLIC and returned to AB Litigation Services for
     filing with the original deposition.  A copy of these
21   changes should also be forwarded to counsel of
     record.  Thank you.
22
     AB LITIGATION SERVICES
23
     cc:  All Counsel
24


25
```

EXHIBIT 14
Page 187 of 207

Burghard_000137

1    AB LITIGATION SERVICES
     216 - 16th Street, Suite 600
2    Denver, Colorado  80202

3

4

5                 JOSEPH DANIEL BURGHARD
                    May 15, 2025
6      Dr. John Roe v. United States of America, et al.
          Civil Action No. 5:22-CV-00869-JKP-HJB
7
     The original deposition was filed with
8
     Lance Henry, Esq. on approximately the
9
     27th day of May, 2025.
10

11   _____  Signature waived

12   _____  Signature not required

13   _____  Unsigned; signed signature page and amendment
            sheets, if any, to be filed at trial
14
     _XXX_ Unsigned; original amendment sheets and/or
15          signature pages should be forwarded to AB
            Litigation Services to be filed in the envelope
16          attached to the sealed original

17   Thank you.

18
     AB LITIGATION SERVICES
19
     cc:  All Counsel
20

21

22

23

24

25

**EXHIBIT 14**
**Page 188 of 207**

```
                    - AMENDMENT SHEET -

          Deposition of JOSEPH DANIEL BURGHARD
                     May 15, 2025
      Dr. John Roe v. United States of America, et al.
            Civil Action No. 5:22-CV-00869-JKP-HJB
```

**The deponent wishes to make the following changes in the testimony as originally given:**

```
Page   Line          Should Read              Reason

_____  _____   _____   _____

_____  _____   _____   _____

_____  _____   _____   _____

_____  _____   _____   _____

_____  _____   _____   _____

_____  _____   _____   _____

_____  _____   _____   _____

_____  _____   _____   _____

_____  _____   _____   _____

_____  _____   _____   _____

_____  _____   _____   _____

_____  _____   _____   _____
```

**Signature of Deponent:** _____

**Acknowledged before me this _____ day of _____,**

**20__.**

**(seal)          Notary's signature_____**

**My commission expires_____**

**EXHIBIT 14**
**Page 189 of 207**

**EXHIBIT 14**
**Page 190 of 207**

Burghard_000140

**EXHIBIT 14**
**Page 191 of 207**

Burghard_000141

**EXHIBIT 14**
**Page 192 of 207**

Burghard_000142

**EXHIBIT 14**
**Page 193 of 207**

Burghard_000143

**EXHIBIT 14**
**Page 194 of 207**

Burghard_000144

**EXHIBIT 14**
**Page 195 of 207**

Burghard_000145

**EXHIBIT 14**
**Page 196 of 207**

Burghard_000146

**EXHIBIT 14**
**Page 197 of 207**

Burghard_000147

**EXHIBIT 14**
**Page 198 of 207**

Burghard_000148

**EXHIBIT 14**
**Page 199 of 207**

Burghard_000149

**EXHIBIT 14**
**Page 200 of 207**

Burghard_000150

**EXHIBIT 14**
**Page 201 of 207**

Burghard_000151

**EXHIBIT 14**
**Page 202 of 207**

Burghard_000152

**EXHIBIT 14**
**Page 203 of 207**

Burghard_000153

**EXHIBIT 14**
**Page 204 of 207**

Burghard_000154

**EXHIBIT 14**
**Page 205 of 207**

Burghard_000155

**EXHIBIT 14**
**Page 206 of 207**

Burghard_000156

**EXHIBIT 14**
**Page 207 of 207**

Burghard_000157

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

CIVIL ACTION NO. 5:22-CV-00869-JKP-HJB

-----------------------------------------------------

30(b)(6) VIDEOCONFERENCE AND VIDEO DEPOSITION
OF UNITED STATES AIR FORCE OFFICE OF SPECIAL
INVESTIGATIONS BY ALEXANDRA McDONALD - 04/24/2025

-----------------------------------------------------

DR. JOHN ROE,

Plaintiff,

V.

UNITED STATES OF AMERICA, et. al.,

Defendant.

-----------------------------------------------------


                The 30(b)(6) VIDEOCONFERENCE AND VIDEO

DEPOSITION OF UNITED STATES AIR FORCE OFFICE OF

SPECIAL INVESTIGATIONS BY ALEXANDRA MCDONALD was taken by

the Plaintiff on April 24, 2025,commencing at the

hour of 12:40 P.m., before ROSIE STAHL, Shorthand

Reporter and Notary Public within and for the State

of Colorado.

**EXHIBIT 15**
**Page 1 of 38**

```
 1              R E M O T E

 2          A P P E A R A N C E S

 3
    For the Plaintiff:
 4
            JASON R. WAREHAM, ESQ.
 5          LANCE HENRY, ESQ.
            ALLEN VELLONE WOLF HELFRICH & FACTOR P.C.
 6          1600 Stout Street, Suite 1900
            Denver, Colorado 80202
 7          Ph. 303-534-4499
            Jwareham@allen-vellone.com
 8
            JOHN W. HODGES JR., ESQ.
 9          HENDLEY & HODGES LAW PLLC
            4594 US Hwy 281 N
10          Spring Branch, Texas 78070
            Ph.  210-714-0924
11          John@hhtx.law

12
    For the Defendant:
13
            KATRINA M. SEEMAN, ESQ.
14          JOSEPH GONZALEZ, ESQ.
            U.S. DEPARTMENT OF JUSTICE, CIVIL
15          DIVISION, TORTS BRANCH CONSTITUTIONAL
            & SPECIALIZED TORT LITIGATION
16          950 Pennsylvania Avenue NW
            Washington DC 20530-0001
17          Ph. 202-616-3111
            Katrina.M.Seeman@usdoj.gov
18

19  Also Present:

20          Dwayne Beuthel - Videographer

21

22

23

24

25
```

EXHIBIT 15
Page 2 of 38

```
1                            I N D E X

2    EXAMINATION                                    PAGE

3    By Mr. Wareham                                 5

4

5    DEPOSITION EXHIBITS:                           INITIAL
                                                    REFERENCE
6

7    Exhibit 1      04/18/25 Email, from            Page 7
                    Gonzalez, to Wareham,
8                   Re: Objections to Pl.'s
                    Rule 30(b)(6) Notices -
9                   Roe v. U.S., No.
                    5:22-cv-00869 (W.D.
10                  Tex.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

EXHIBIT 15
Page 3 of 38

```
1                    APRIL 25, 2025, 12:40 P.M. MT

2                    P R O C E E D I N G S

3

4                    THE VIDEOGRAPHER:  We are on the

5    record at 12:40 Mountain Time, and today is

6    April 24, 2024.  This begins the video-recorded

7    deposition 30(b)(6) of United States Air Force

8    Office of Special Investigations given by Alexandra

9    McDonald in the matter of Dr. John Roe versus

10   United States of America, et al.  This deposition

11   is being taken via videoconferencing.

12                    The court reporter today is Rosie

13   Stahl.  The videographer is Dwayne Beuthel.

14                    Counsel, please introduce yourselves

15   and the parties you represent beginning with the

16   plaintiff's counsel first.

17                    MR. WAREHAM:  This is Jason Wareham.

18   I'm lead counsel for Dr. Roe, plaintiff, along with

19   cocounsel John Hodges and Lance Henry.

20                    MS. SEEMAN:  Katrina Seeman on

21   behalf the government defendants along with my

22   cocounsel Joseph Gonzalez.

23                    THE VIDEOGRAPHER:  Will our court

24   reporter please swear in the deponent.

25                    ALEXANDRA MCDONALD,
```

EXHIBIT 15
Page 4 of 38

```
1     Being first duly sworn, was examined and testified

2     as follows:

3                     THE VIDEOGRAPHER:  You may begin.

4                          EXAMINATION

5     BY MR. WAREHAM:

6            Q     All right.  Greetings.  As I said,

7     my name is Jason Wareham.  I'm lead counsel for

8     plaintiff here.  Have you ever been deposed before?

9            A     I have not.

10           Q     Well, welcome to this experience.

11    It would follow then you've never been deposed as a

12    30(b)(6) entity witness before, right?

13           A     That is correct.

14           Q     Well, I've got a few instructions

15    for you.  I give it to everybody to just make sure

16    that we're all on the same page.

17                 One, the purpose of a deposition is

18    to gather facts relevant to the case.  We're not

19    trying to play games or test your memory or, you

20    know, anything like that.  We're just looking for

21    the truth of what you know and what you recollect.

22    So we don't want you to speculate.  If you don't

23    know something, it's fine to say "I don't know."

24                 If at any point I ask a question,

25    and it's almost assured to happen, where it is a
```

**EXHIBIT 15**
**Page 5 of 38**

1    bad question, you don't understand it, it's

2    confusing, feel free to say, "I'm sorry, I don't

3    understand what you're asking," and I'll try to

4    rephrase.

5                As specific to this case, in the

6    event that anything that I ask invites an answer

7    that is classified, I am not trying to elicit

8    classified information in this environment.  It's

9    obviously an unclassified environment.  So if I ask

10   a question and it invites an answer that is

11   classified, just go ahead and state that and we can

12   move on.

13               Other than that, do you understand

14   that you are here on behalf of an entity today?

15        A     Yes, I do.

16        Q     All right.  And what is that entity?

17        A     Air Force Office of Special

18   Investigations.

19        Q     Do you understand that the answers

20   you give today can actually bind that entity?

21        A     Yes.

22        Q     All right.  What -- and it's a

23   little tricky because normally we have this

24   numbered notice that looks like a legal document,

25   but your testimony actually came out of some

**EXHIBIT 15**
**Page 6 of 38**

1    conversations in delineations with counsel.  So I'm

2    going to be referring to an email that we will

3    eventually issue as a notice in this case of the

4    information that we're going to cover today.

5              And I'm just going to make sure and

6    ask you questions that you are prepared to discuss

7    the issues delineated in the email.  Okay?

8         A    Yes.

9         Q    All right.  So in the email of

10   April 18, 2025, counsel delineated three areas that

11   you would be willing to testify and able to testify

12   to.  It actually started with No. 2, No. 2 being

13   the databases and repositories for documents.  And

14   actually just for the purposes of this deposition,

15   I am going to mark this as Exhibit 1 and it's right

16   there in front of you so you can follow along with

17   me.

18              (Exhibit 1 was marked for

19   identification.)

20   BY MR. WAREHAM:

21         Q    And it doesn't have a Bates number,

22   but we will designate it as Exhibit 1.  It's sub

23   No. 2 that you're willing to testify to all

24   databases and repositories for documents as a

25   general matter, you know, applying to this case.

**EXHIBIT 15**
**Page 7 of 38**

```
 1                    Are you prepared to discuss No. 2?

 2          A     Yes.

 3          Q     And then No. 3, date that the

 4    litigation hold letter went out in this case.  Are

 5    you prepared to discuss that?

 6          A     Yes.

 7          Q     All right.  No. 4, that you will

 8    identify databases searched and be prepared to

 9    answer questions regarding retention of Agent

10    Beall's documents.

11                    Are you prepared to discuss that?

12          A     Yes.

13          Q     Great.

14                    Can you briefly give a full

15    background of -- well, not a full background.  Can

16    you briefly give a background of what it is you

17    currently do in your title?

18          A     Sure.  Right now I am the Acting

19    Chief of Investigations and Operations at Air Force

20    Office of Special Investigations Office of Special

21    Projects, also known as PJ.  And as part of that,

22    it is my job to provide general field oversight to

23    our detachments and geographically separated field

24    units on matters involving investigations and

25    operations.
```

EXHIBIT 15
Page 8 of 38

1          Q       And dealing with No. 2, what

2     databases are used in the PJ program?

3          A       So there is the databases that we

4     use as part of OSI, and then there are separate

5     databases that we use for SAPs.

6          Q       Okay.  Can you cover so much as

7     they're unclassified and as best as you can the

8     name and the databases that you just described?

9          A       So on the OSI side, we have I2MS,

10    which stands for Investigative Information

11    Management System, and that is our case management

12    system on NIPR so on your unclassified network.

13                 And then we have CI2MS, which stands

14    for Classified Investigative Information Management

15    System, and that is on SIPR, which is

16    Secret//NOFORN, and that is our classified case

17    management system.

18                 We also now have a third case

19    management system called ORION, but that was not

20    fielded at the time that all of this took place.

21         Q       Okay.  So only those databases you

22    mentioned were employed during the time period of

23    this case specifically?

24         A       On the OSI side.

25         Q       Okay.  And what are -- what are the

EXHIBIT 15
Page 9 of 38

1    other databases potentially not on the OSI side?

2          A    So not on the OSI side but relevant

3    to the SAPs are JADE, which is the Joint Access

4    Database Environment; SIC, which stands for Secure

5    Integration Cloud; COE, which to my understanding

6    stands for Common Operating Environment, and then

7    we also have one called Cross-link that deals with

8    security incident reports, and then a separate

9    system called Casenet, which is where -- I guess

10   that is an OSI system where PJ archives its SAP

11   cases because we can't go through the normal

12   archiving process because of the classification

13   level.

14               There are other onsie-twosies in

15   there, but those are the main ones that we use.

16         Q    Okay.  And when a -- now, just to be

17   clear, sorry I'm using the right terminology, the

18   PJ side of the house, is that the side that deals

19   with like classified management and special access

20   program stuff?

21         A    PJ works with Special Access

22   Programs.

23         Q    And what -- do you know the term

24   like personal or like security -- well, what was

25   the one you just said?  Program security officer,

EXHIBIT 15
Page 10 of 38

1    do you know that term?

2              A      Yes, I do.

3              Q      Okay.  Are program security officers

4    within that PJ chain?

5              A      Yes.  We have program security

6    officers within PJ.

7              Q      And what databases are program or

8    repositories of any kind are program security

9    officers utilizing primarily in their roles?

10             A      So I am not a program security

11   officer, but with the ones that I work with, the

12   ones that I'm aware of that they use most often

13   would be SIC, COE and JADE.

14             Q      Are you aware of -- besides

15   databases, are you aware of any other file

16   repositories or shared drive systems or the like

17   that are used within the PJ scope of work.

18             A      Yes, we have shared drives as well.

19             Q      Okay.  And in general, can you

20   describe the organization of those shared drives?

21   Are they like something that everyone connects to

22   or do you know if they go down to the office level

23   or how they're organized?

24             A      I can only speak to the organization

25   that I have access to.  As far as like general

EXHIBIT 15
Page 11 of 38

1    overall organization of share drives, that's

2    information that I'm not prepared to discuss.

3              Q    Okay.  All right.  So with the

4    repositories of information that you're aware of,

5    are people -- and this is a very basic question,

6    but basic questions have to be asked for the

7    record.  Are people saving like documents, PDFs?

8    What kind of files are being saved to these shared

9    drives?

10             A    All of the above.  Microsoft Word,

11   PowerPoint, Excel, PDFs, any kind of document you

12   can imagine creating as part of the regular course

13   of business.

14             Q    And what kind of information or

15   documents are inputted to the PJ databases you

16   described, like JADE or COE?

17             A    So to be clear, we don't own -- PJ

18   does not own JADE, COE or SIC.  Those are owned by

19   other entities and PJ uses them, but we don't own

20   them and we don't administrate them.

21             Q    Do you know who owns them and who

22   administrates them?

23             A    That information was not part of my

24   preparation.

25             Q    Okay.  Still, regardless of

**EXHIBIT 15**
**Page 12 of 38**

1   ownership, what kind of information or documents or

2   file types are saved within those databases?

3              MS. SEEMAN:  Objection to form.  You

4   can answer.

5   BY MR. WAREHAM:

6      Q    Yeah, it was a compound question.

7   That was the problem with it, but let's just break

8   it down?

9              What kind of documents -- like you

10  described Word, PDFs, are those saved to those

11  systems?

12     A    Yes, they are.

13     Q    Okay.  Do those systems contain any

14  communication vehicle like email or chat?

15     A    SIC and COE do.  JADE does not, to

16  my knowledge.

17     Q    All right.  What kind of inputted

18  information -- so for something like JADE, what

19  kind of inputted information is put into JADE?  Is

20  it -- and let me just give you an example.  I'm not

21  suggesting the answer but just to clarify.

22             Is it a database where you're just

23  putting in a record with information like names and

24  such or, you know, what kind of information -- how

25  does one update JADE?

EXHIBIT 15
Page 13 of 38

1                    MS. SEEMAN:  Objection to form.  You

2    can answer.

3                    THE DEPONENT:  So JADE is a --

4    functionally a list of everyone who is SAP briefed

5    and what they are briefed to.  So if you are going

6    to -- you can do a couple of things with JADE.  You

7    can look up individuals, and for an individual it

8    will give you their basic personally identifible

9    information, their security clearance, things of

10   that nature.

11                   And then it will also tell you what

12   programs they're briefed to or have been briefed to

13   in the past.  And then there's a files tab where it

14   will upload relevant files for that individual, for

15   example, your indoctrination forms or your

16   debriefing forms when you are briefed or debriefed

17   from a program, things like that.

18        Q    Perfect.

19        A    And the program access requests.

20        Q    Say that last part again.  I stepped

21   on you.  I'm sorry.

22        A    Your program access requests.

23        Q    Okay.

24                   MR. WAREHAM:  And, counsel, I'm --

25   actually, as she's saying all of this, I'm somewhat

**EXHIBIT 15**
**Page 14 of 38**

1    aware that usually this stuff is CUI.  I have no

2    objection to marking this whole transcript

3    confidential.

4                    MS. SEEMAN:  That's fine with us.

5    BY MR. WAREHAM:

6        Q    All right.  So similar question but

7    as to COE, can you describe the nature of updates

8    and inputs that are put into that database?

9        A    So I would -- the best way that I

10   can describe COE is almost like gmail.  So you log

11   into a system, right, and then you get into a web

12   browser and you log into COE.  And COE has, at

13   minimum, talk about the things I know about, an

14   email client so you can send emails.  And it has a

15   file share client so you can upload and download

16   documents, and then it also has an email side.

17       Q    Does it -- do both of these systems

18   generally look like Windows when you log in or do

19   they look like something else?

20                   MS. SEEMAN:  Objection to form.  You

21   can answer.

22                   THE DEPONENT:  I don't think I

23   understand the question.  You mean Windows like the

24   operating system or --

25   BY MR. WAREHAM:

**EXHIBIT 15**
**Page 15 of 38**

1          Q     Yeah.  What do they look like when

2   you're accessing them?

3          A     No.  I would say gmail is probably

4   my best comparison like --

5          Q     So there's no real operating system

6   underneath that gmail description?

7          A     So if you're going to log into COE,

8   right, you're going to log into a system first.  So

9   if you have a gmail account, right, you have to log

10  into -- log into your Apple account or log into

11  your Windows account, get on your computer, open a

12  browser and then type www.gmail.com and then log in

13  and then it pops up with your inbox and, you know,

14  your folders and things like that.  That is my best

15  analogy for COE.

16              So it looks similar to what you

17  would see gmail on the email side, and then File

18  Share side the best way to think about it is is

19  like Google Drive.

20          Q     Got it.  Got it.  Okay.  Are files

21  able to be moved between these systems or is there

22  like a classification like level -- well, let me

23  back up.

24              Are the classification levels of

25  these systems the same?

EXHIBIT 15
Page 16 of 38

```
1                          MS. SEEMAN:  Objection to form.  You
2    can answer.
3                          THE DEPONENT:  What systems?
4    BY MR. WAREHAM:
5              Q      JADE and COE, the PJ systems?
6              A      It doesn't really work like that.
7              Q      Okay.
8              A      So the classification is based off
9    of the data that's in there, and the data that's in
10   there is based off of what -- the data that you can
11   see is based off of the read-ons that you have.  So
12   I cannot see things in COE that include programs
13   I'm not briefed to.
14             Q      Okay.
15             A      And same in JADE.
16             Q      Got it.
17                    Do you know -- I guess then my
18   question more is do you know what those systems are
19   certified to handle with respect to classified
20   information, like how far they go up?
21             A      That information was not part of my
22   preparation.
23             Q      Okay.  Okay.  I think I have what I
24   need then.
25                    Any other databases or repositories
```

**EXHIBIT 15**
**Page 17 of 38**

1    I haven't asked about in the right way that exist?

2           A      That exist, yes, but I think are

3    relevant to this, no.  Like we have law enforcement

4    databases that we use, like NCIC or DCII.  We don't

5    own those.  We just check those.  So there are

6    other databases that we use.  They're just not --

7    they're not places that I would think we would be

8    storing information.

9           Q      Okay.

10          A      Or that are relevant to this.

11          Q      Got it.  All right.  So with respect

12   to this particular case, you are familiar with the

13   date of a litigation hold letter; is that right?

14          A      Yes.

15          Q      All right.  And what is the date

16   that a litigation hold letter was sent or

17   preservation, however you call it, was sent in this

18   case?

19          A      I received mine on or about

20   April 29th of 2024.

21          Q      And where did it come from?

22          A      I received it from Marvelle Butler.

23          Q      Who was Marvelle Butler?

24          A      Marvelle Butler is an Air Force

25   attorney.

EXHIBIT 15
Page 18 of 38

1          Q      Okay.  Are you aware of -- you say

2    you received yours.  Are you aware of any other

3    hold letters being sent besides the one you

4    described as yours?

5          A      I'm aware that other people received

6    hold letters.  I don't know on what date though.

7          Q      Okay.  Well, going to the next

8    question with respect to identified databases

9    searched, are you answering that question only with

10   respect to the hold letter you received or what

11   everyone received?

12         A      Was that for me?

13         Q      Yeah.

14         A      Oh, can you repeat that?

15         Q      Sure.

16                With respect to No. 4, specifically

17   the segment that says that you will identify

18   databases searched, are you identifying databases

19   only with respect to the hold letter that you

20   received or the hold letters that everyone

21   received?

22         A      So I can generally talk about the

23   databases that were -- that were searched in

24   response to the hold letter.

25                MS. SEEMAN:  And just to clarify for

EXHIBIT 15
Page 19 of 38

1    the record, on behalf of OSI.

2                    MR. WAREHAM:  Yeah, okay.  Got it.

3    Yes.

4    BY MR. WAREHAM:

5            Q    Okay.  Great.  So what were the

6    databases searched in this case?

7            A    So we went through ORION, I2MS,

8    CI2MS, COE, SIC, Cross-link, JADE, Casenet and the

9    share drives.

10            Q    And what searches were conducted on

11    those?

12            A    Oh, and also NIPR, NIPR email.  So

13    everybody searched their email as well.  NIPR,

14    SIPR.  Sorry, could you repeat the question?

15            Q    What searches were conducted on

16    those?

17                    MS. SEEMAN:  Counsel, we do not

18    agree to identify what and how OSI conducted their

19    searches.

20                    MR. WAREHAM:  Okay.  I thought, and

21    correct me if I'm wrong, going back to the oral

22    conversation that we were willing to get into that

23    with respect to Agent Beall and the data set

24    affecting Agent Beall's absence.

25                    Was I incorrect in that

EXHIBIT 15
Page 20 of 38

```
1    understanding?

2                    MR. GONZALEZ:  Can you give us a

3    moment, Jason?

4                    MR. WAREHAM:  Sure, absolutely.

5    Take your time.  Let's go off the record.

6                    THE VIDEOGRAPHER:  The time is 1:01

7    Mountain Time.  We're off the record.

8                    (A break was taken from 1:01 p.m. to

9    1:05 p.m.)

10                   THE VIDEOGRAPHER:  The time is 1:05

11   Mountain Time.  We're back on the record.

12   BY MR. WAREHAM:

13        Q    So I am going to clarify and ask

14   with respect -- well, let's back up.  So going to

15   Sub 2 --

16                   MS. SEEMAN:  Actually, counsel,

17   sorry to interrupt.  The witness I believe also has

18   something to correct from her earlier testimony

19   too.

20                   MR. WAREHAM:  Oh, go right ahead.

21                   THE DEPONENT:  Yes.  So not

22   databases, but you asked what was searched.  So

23   these aren't databases, but I go to our FOIA office

24   and asked whether they had any information, our

25   Inspector General's Office within OSI, asked if
```

EXHIBIT 15
Page 21 of 38

1    they had information, and then also was trying to

2    locate documents for this wound up speaking with

3    the IG's office at the Pentagon.

4                (Discussion held off the record.)

5    BY MR. WAREHAM:

6        Q    Okay.  So what -- narrowing to -- go

7    to No. 2 to get where we're at here -- oh,

8    actually, going back to No. 1 before we do that, in

9    your list of databases searched for this case, I

10   didn't hear that JADE and COE were searched.  Can

11   you confirm whether or not those were searched?

12       A    Yes, they were.

13       Q    Okay.  So going to No. 2, with

14   respect to the search conducted -- well, let's

15   actually start a little further back.

16                So Agent Beall is no longer living;

17   is that correct?

18       A    Correct.

19       Q    And if you knew him, I'm sorry about

20   that.

21                The -- can you tell me what data

22   relative to Agent Beall's work was retained?

23       A    So anything that he did in I2MS or

24   CI2MS would be retained because that's how those

25   systems work.  As I said, ORION wasn't online, but

**EXHIBIT 15**

**Page 22 of 38**

1   if he had been using ORION at that point in time,

2   that also would have been retained.

3              Per general Air Force policies, my

4   understanding is that his NIPR, SIPR and JWICS

5   accounts would have been deleted within a certain

6   number of days of him no longer being in the Air

7   Force system.

8              Any work he would have done in JADE

9   because of how JADE functions is still in that

10  system.  I am actively trying to recover his

11  accounts on SIC and COE.

12       Q    Okay.  And are you familiar with --

13  and this falls under the retention question.  Are

14  you familiar with the Air Force records retention

15  rules that are --

16              MS. SEEMAN:  Counsel, she's not

17  testifying about document retention policies.

18  That's -- that's out of little i in the email and

19  she's not designated for that topic.

20              MR. WAREHAM:  I'm asking with

21  respect to Agent Beall.  And the No. 2 says, "Be

22  prepared to answer questions regarding retention of

23  Beall's documents."

24              So what rules apply to retention of

25  Beall's documents would necessarily be involved in

**EXHIBIT 15**
**Page 23 of 38**

1    that set; would it not?

2                    MS. SEEMAN:  Was that not

3    duplicative of 1 then?

4                    MR. WAREHAM:  Well, I don't think it

5    is.  I think it's narrowly scoped to Agent Beall.

6    So, look, I'll just take this up on a different

7    notice.  Fine.

8    BY MR. WAREHAM:

9            Q    What -- do you know when Agent

10   Beall's materials were searched?

11           A    So as I mentioned, his -- based on

12   my understanding and actually trying to go back and

13   get this data, his NIPR, SIPR and JWICS accounts

14   did not exist anymore at the time we received the

15   litigation hold.

16           Q    Okay.

17           A    I am -- as I said, I am actively

18   working to retrieve the data from his SIC and COE

19   accounts.  So that is going on as we speak.

20   NIPR -- sorry, excuse me.  I2MS and CI2MS, his data

21   would have been searched when we ran the searches

22   to try to find data for the litigation hold that

23   was relevant to this case.

24           Q    Okay.  Okay.  When did you begin

25   trying to recover Agent Beall's materials?

EXHIBIT 15
Page 24 of 38

```
 1            A      I don't have an exact date off the
 2    top of my head, but I know we started discussing --
 3    I started discussing this with government counsel
 4    several weeks ago, and as of today, provided one of
 5    the platforms with the litigation hold letter to
 6    say that this is the data that we would like you to
 7    try to recover.
 8            Q      Okay.  Let's see, forgive me.  I'm
 9    trying to discern now what this email may mean for
10    further questions.
11                   Are you aware -- going back to No.
12    3, to be totally clear, are you aware of the
13    receipt of any other hold letters prior to the one
14    you described on April 2024?
15            A      I'm not aware of any, no.
16                   MR. WAREHAM:  All right.  We may be
17    at a point just briefly where I need to check in
18    with my team.  I'll be back in about ten minutes.
19    Okay?  We can go off record, and I'll be right
20    back.
21                   THE VIDEOGRAPHER:  Okay.  The time
22    1:12 Mountain Time.  We're off the record.
23                   (A break was taken from 1:12 p.m. to
24    1:23 p.m.)
25                   THE VIDEOGRAPHER:  The time is 1:23
```

**EXHIBIT 15**
**Page 25 of 38**

1   Mountain Time.  We're back on the record.

2   BY MR. WAREHAM:

3        Q     So I only have one more question for

4   you, and it's under No. 4.  Are you able to tell us

5   what steps were taken to retain Agent Beall's

6   records when he passed?

7        A     That information was not part of my

8   preparation.

9             MR. WAREHAM:  Okay.  Then I have no

10  further questions at this time.

11            MS. SEEMAN:  Can you give us just a

12  minute?

13            MR. WAREHAM:  Sure.

14            THE VIDEOGRAPHER:  Go off the

15  record?

16            MR. WAREHAM:  That means yes, go off

17  the record.

18            THE VIDEOGRAPHER:  All right.  Thank

19  you.  The time is 1:24.  We're off the record.

20            (A break was taken from 1:24 p.m. to

21  1:25 p.m.)

22            THE VIDEOGRAPHER:  The time is,

23  1:25.  We're back on the record.

24            MS. SEEMAN:  And the defendants do

25  not have any questions for this witness.

EXHIBIT 15
Page 26 of 38

1                    MR. WAREHAM:  Okay.  And thank you

2      for your time, Ms. McDonald.  I appreciate it.

3                    THE DEPONENT:  Thank you.

4                    THE VIDEOGRAPHER:  The time is 1:25.

5      This concludes today's proceedings.  We are off the

6      record.

7                    (The deposition concluded at 1:25

8      p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**EXHIBIT 15**
**Page 27 of 38**

```
 1              I, ALEXANDRA MCDONALD, do hereby certify that I have

 2    read the foregoing transcript and that the same and

 3    accompanying amendment sheets, if any, constitute a true

 4    and complete record of my testimony.

 5

 6

 7
                     _____
 8                   Signature of Deponent
                     ( ) No Amendments
 9                   ( ) Amendments Attached

10              Acknowledged before me this

11    _____ day of _____, 2025.

12

13              Notary Public: _____

14              My commission expires _____

15              Seal:

16

17

18

19

20

21

22

23

24

25
```

**EXHIBIT 15**
**Page 28 of 38**

1                          REPORTER CERTIFICATE

2

                              I, ROSANNE M. STAHL, Shorthand
3      Reporter and Notary Public within and for the State
       Of Colorado, do hereby certify that previous to the
4      Commencement of the testimony, the said JOSEPH
       BURGHARD was sworn by me to testify to the truth in
5      Relation to the matters in controversy between the
       Said parties so far as he should be interrogated
6      Concerning the same; that the said deposition was
       Taken in stenograph by me at the time and place
7      Aforesaid and was thereafter reduced to typewritten
       Form; that the foregoing is a true and correct
8      Transcript of my stenographic notes thereof; and
       That Deposition Exhibit 1 was marked and used in
9      The interrogation.
                              I further certify that I am not
10     Employed by, related to, nor counsel for any of the
       Parties herein, nor otherwise interested in the
11     Event of this action.
                              IN WITNESS WHEREOF, I have affixed
12     My signature and seal this 7th day of May, 2025.

13

14

15                                     _Rosie Stahl_
                                       Rosanne M. Stahl
16                                     Notary Public

17

18     MY COMMISSION EXPIRES:  04/13/26.

19

20

21

22

23

24

25

**EXHIBIT 15**
**Page 29 of 38**

1    AB LITIGATION SERVICES
     216 - 16th Street, Suite 600
2    Denver, Colorado  80202

3
     May 7, 2025
4
     Katrina M. Seeman, Esq.
5    950 Pennsylvania Avenue NW
     Washington, DC 20530

6
     Re:  30(b)(6) VIDEOCONFERENCE AND VIDEO DEPOSITION
7         OF UNITED STATES AIR FORCE OFFICE OF SPECIAL
          INVESTIGATIONS BY ALEXANDRA MCDONALD
8         Roe v. United States of America
          Civil Action No. 5:22-CV-00869-JKP-HJB

9
     The aforementioned deposition is ready for reading and
10   signing.  Please attend to this matter by following BOTH
     of the items indicated below:

11
     _____ Call 303-296-0017 and arrange with us to read
12          and sign the deposition in our office.

13   _XXX_ Have the deponent read your copy and sign
           the signature page and amendment sheets, if
14         applicable; the signature page is attached.

15   _____ Read the enclosed copy of the deposition and
            sign the signature page and amendment
16          sheets, if applicable; the signature page is
            attached.

17
     _XXX_ WITHIN 30 DAYS OF THE DATE OF THIS LETTER
18
     _____ By _____ due to a trial date of _____
19
     Please be sure the original signature page and amendment
20   sheets, if any, are SIGNED BEFORE A NOTARY PUBLIC and
     returned to AB Litigation Services for filing with the
21   original deposition.  A copy of these changes should also
     be forwarded to counsel of record.  Thank you.

22
     AB LITIGATION SERVICES

23

24   cc:  All Counsel

25

**EXHIBIT 15**
**Page 30 of 38**

```
 1   AB LITIGATION SERVICES
     216 - 16th Street, Suite 600
 2   Denver, Colorado  80202

 3

 4

 5
            30(b)(6) VIDEOCONFERENCE AND VIDEO DEPOSITION
 6          OF UNITED STATES AIR FORCE OFFICE OF SPECIAL
                 INVESTIGATIONS BY ALEXANDRA MCDONALD
 7                        April 24, 2025
                   Roe v. United States of America
 8           Civil Action No. 5:22-CV-00869-JKP-HJB

 9

10   The original deposition was filed with

11   Jason R. Wareham, Esq., on approximately the

12   7th day of May, 2025.

13   _____ Signature waived.

14   _____ Signature not requested

15   _____ Unsigned; signed signature page and
            amendment sheets, if any, to be filed at
16          trial.

17   _XXX_ Unsigned; original amendment sheets and/or
            signature pages should be forwarded to AB
18          Litigation Services to be filed in the envelope
            attached to the sealed original.
19

20

21   Thank you.

22   AB LITIGATION SERVICES

23   cc:  All Counsel

24

25
```

EXHIBIT 15
Page 31 of 38

- AMENDMENT SHEET -

30(b)(6) VIDEOCONFERENCE AND VIDEO DEPOSITION
OF UNITED STATES AIR FORCE OFFICE OF SPECIAL
INVESTIGATIONS BY ALEXANDRA MCDONALAD
April 24, 2025
Roe v. United States of America
Civil Action No. 5:22-CV-00869-JKP-HJB

The deponent wishes to make the following changes in the testimony as originally given:

Page    Line                Should Read                Reason

_____   _____   _____   _____

_____   _____   _____   _____

_____   _____   _____   _____

_____   _____   _____   _____

_____   _____   _____   _____

_____   _____   _____   _____

_____   _____   _____   _____

_____   _____   _____   _____

_____   _____   _____   _____

_____   _____   _____   _____

_____   _____   _____   _____

_____   _____   _____   _____

_____   _____   _____   _____

Signature of Deponent: _____

Acknowledged before me this _____ day of

_____, 2025.

(seal)        Notary's signature _____

              My commission expires _____.

**EXHIBIT 15**
**Page 32 of 38**

**EXHIBIT 15**
**Page 33 of 38**

**EXHIBIT 15**
**Page 34 of 38**

**EXHIBIT 15**
**Page 35 of 38**

**EXHIBIT 15**
**Page 36 of 38**

**EXHIBIT 15**
**Page 37 of 38**

**EXHIBIT 15**
**Page 38 of 38**

| From: | Gonzalez, Joseph A. (CIV) <Joseph.A.Gonzalez@usdoj.gov> |
| Sent time: | 07/16/2025 03:13:47 PM |
| To: | Jason R. Wareham; Lance Henry; John Hodges <john@hhtx.law> |
| Cc: | Seeman, Katrina M (CIV) <Katrina.M.Seeman@usdoj.gov>; Green, Robert (USATXW) <Robert.Green3@usdoj.gov> |
| Subject: | Roe v. United States, et al. 5:22-cv-00869-JKP-HJB |
| Attachments: | US0000802.pdf |

Counsel,

As you know, prior to the filing of the Complaint, Special Agent Allen Beall died, and as a result, his accounts were deleted pursuant to the routine operation of the Air Force's electronic information system. However, as we have also discussed, the Air Force was ultimately able to implement a complicated process to retrieve and review SA Beall's accounts. This review required a manual re-population of many of SA Beall's emails, identification of someone with appropriate clearances to review the emails, and a page-by-page review of all the emails in question. Before the close of discovery, we made a production of the responsive documents obtained from the Beall review.

On Monday evening, July 14, 2025, the attached email came to our attention for the first time. We have since learned that it was identified during the review of SA Beall's emails but not immediately released to us because the email was undergoing a classification review. Although the subject and focus of the email is Dan Brown (not Plaintiff), we have made the judgment, out of an abundance of caution, to promptly disclose the email to you. Further, we have received confirmation from the Air Force Office of Special Investigations that the review and production of any potentially responsive material from SA Beall's recovered accounts is fully complete, and that there are no other ongoing declassification reviews that might yield potentially responsive documents. Thank you.

Best,

Joseph

**Joseph A. Gonzalez**
Trial Attorney
Constitutional & Specialized Torts Litigation
Civil Division
U.S. Department of Justice
(202) 598-3888
joseph.a.gonzalez@usdoj.gov

**EXHIBIT 16**
**Page 1 of 3**

BEALL-DanBrown Possible De-Brief for Dan Brown @ HNCO

CONTROLLED UNCLASSIFIED INFORMATION

Subject: FWD: BEALL-DanBrown Possible De-Brief for Dan Brown @ HNCO

To: ALLEN.BEALL,BRIAN.BOHENEK,JOSEPH.BURGHARD,MICHAEL.CRUNK
From: JOSEPH.BURGHARD
Sent Date of Message: 2020-AUG-21 17:22

Allen,

I think we should definitely discuss. I see we are getting together on Thursday next week with ACC at 1000 (EST). Any chance you're available immediately after that? I think it would be good to discuss this as well as the issue with Dr. Paul Roysdon and have that as a separate conversation than the one Mike wanted to have which was to go into more details in the portfolio.

As far as specific violations for Dan Brown, honestly he's just been sloppy with security as I think you saw with the ▓▓▓▓stuff. He really just seems ignorant to what's required for execution of SAP programs which is weird since he's been doing this for a long time. You should talk to Mcveigh about the conflict of interest situation for Dr. Roysdon. Dan really doesn't see a potential conflict there and to me it's extremely obvious which is why it's starting to raise flags for me. Anyways, I really can't point to a specific violation, just poor judgement on a number of things recently.

V/R
Danny Burghard

Program Element Monitor & Deputy Division Chief

Advanced Cyberspace Systems Division, SAF/AQLC

DSN(STE): 297-3974

COMM: 202-767-3974

TSVOIP: 982-9192

JWICS: joseph.burghard@af.ic.gov

Marking: U//▓▓▓▓

Date: 8/20/20 10:11 AM

From: Beall, Allen Ting <CIV>, AFOSI PJ DET 8/OL-B

To: Burghard, Joseph D <CIV>, SAF/AQLC

Cc: Crunk, Michael D <CIV>, AFOSI PJ DET 8; Bohenek, Brian J <MIL>, SAF/AQLC

Subject: Possible De-Brief for Dan Brown @ HNCO

Thanks for the heads up. Does it make sense to get us together to discuss? I know Mr. Crunk wanted to get on your schedule to discuss the details of your portfolio more in depth after listening in on portions of the PMR. We could chat about this then as well. I will reach out to Capt Mcveigh to get his opinion first hand too.

CONTROLLED UNCLASSIFIED INFORMATION

**Page 2 of 3**

Confidential - Subject to Protective Order

CONTROLLED UNCLASSIFIED INFORMATION

Any specific potential violations that you can think of that might reach the level of needing further investigation or reporting on our part? I think that if you can make a case that he is debriefed from all other programs, he should by default be debriefed from ▮▮▮▮ as well. If he's not debriefed from ▮▮▮▮ , there should be some really strong compelling need to retain it.

FYI, he requesting a meeting with me to go over more ▮▮▮▮▮ security concerns/actions this coming Monday.

Allen

---

**Marking:** U//▮▮▮▮▮

**Date:** 8/19/20 3:56 PM

**From:** Burghard, Joseph D <CIV>, SAF/AQLC

**To:** Beall, Allen Ting <CIV>, AFOSI PJ DET 8/OL-B

**Cc:** Crunk, Michael D <CIV>, AFOSI PJ DET 8; Bohenek, Brian J <MIL>, SAF/AQLC

**Subject:** Possible De-Brief for Dan Brown @ HNCO

Allen,

Just a heads up, I have concern on how Dan Brown is handling SAP protections down at HNCO. I'm not the only one either, Capt Will Mcveigh called today and mentioned that he is going to recommend to his leadership that Dan be debriefed from everything except ▮▮▮▮ for similar concerns. If that is going to be the recommendation, I think we need to have a conversation about whether or not it makes sense for him to even keep ▮▮▮▮ . Anyways, might be something for you to look into or put on your radar.

V/R
Danny Burghard

Program Element Monitor & Deputy Division Chief

Advanced Cyberspace Systems Division, SAF/AQLC

DSN(STE): 297-3974

COMM: 202-767-3974

TSVOIP: 982-9192

JWICS: joseph.burghard@af.ic.gov

---

CONTROLLED UNCLASSIFIED INFORMATION

**EXHIBIT 16**
**Page 3 of 3**
Confidential - Subject to Protective Order

US0000803

| **From:** | Gonzalez, Joseph A. (CIV) <Joseph.A.Gonzalez@usdoj.gov> |
| **Sent time:** | 05/22/2025 01:11:51 PM |
| **To:** | Lance Henry; Seeman, Katrina M (CIV) <Katrina.M.Seeman@usdoj.gov> |
| **Cc:** | john@hhtx.law; Jason R. Wareham; Rebecca H. Bradshaw; Green, Robert (USATXW) <Robert.Green3@usdoj.gov> |
| **Subject:** | RE: 22-cv-00869 USDC W. TX |
| **Attachments:** | 5.22.2025_Privilege Log - Roe.pdf    Defs Priv Log.pdf |

Lance,

We accept the May 30 reschedule date and will send out a revised notice shortly.  Additionally, attached please find Defendants' privilege log.  Thank you.

Best,

Joseph

**Joseph A. Gonzalez**
Trial Attorney
Constitutional & Specialized Torts Litigation
Civil Division
U.S. Department of Justice
(202) 598-3888
joseph.a.gonzalez@usdoj.gov

---

**From:** Lance Henry <lhenry@allen-vellone.com>
**Sent:** Thursday, May 22, 2025 2:24 PM
**To:** Seeman, Katrina M (CIV) <Katrina.M.Seeman@usdoj.gov>; Gonzalez, Joseph A. (CIV) <Joseph.A.Gonzalez@usdoj.gov>
**Cc:** john@hhtx.law; Jason R. Wareham <jwareham@allen-vellone.com>; Rebecca H. Bradshaw <rbradshaw@allen-vellone.com>; Green, Robert (USATXW) <Robert.Green3@usdoj.gov>
**Subject:** [EXTERNAL] RE: 22-cv-00869 USDC W. TX

Joseph and Kati,

The only date next week that Dr. Roysdon could potentially do is Friday, May 30, 2025. It is my understanding that he and Jason are doing what they can to clear his calendar that day and that they will use their best efforts to do so.

I am still drafting a comprehensive letter to you regarding all discovery issues in this case. As I said on the phone, this is not a gamesmanship tactic. It will be in the same spirit of good faith conferrals that counsel on both sides have modeled since you two recently joined the case. The contents in the letter are not new, but contains issues that have all been previously raised with you or your predecessors, but there are responses or production that remain outstanding. We thought it would be most helpful for you if we compiled these lingering discovery issues into one correspondence.

Sincerely,
Lance

# Lance Henry
**Attorney at Law**
Allen Vellone Wolf Helfrich & Factor P.C.
1600 Stout Street, Suite 1900, Denver, Colorado 80202
Direct (720) 245-2418 | Main (303) 534-4499
LHenry@allen-vellone.com
Pronouns he, him, & his

The contents of this email and any attachments are confidential or privileged and shall not be disseminated. Please notify the sender immediately if this email is received in error. Emails are not a secure method of communication and could be intercepted by an unintended third party. Allen Vellone Wolf Helfrich & Factor P.C.'s clients consent to receive emails from the law firm unless that consent is withdrawn in writing. Any tax advice in this communication shall not be used to avoid penalties imposed under the Internal Revenue Code or by a non-client for any tax-related matter.

---

**From:** Seeman, Katrina M (CIV) <Katrina.M.Seeman@usdoj.gov>
**Sent:** Wednesday, May 21, 2025 3:10 PM
**To:** Lance Henry <lhenry@allen-vellone.com>; Gonzalez, Joseph A. (CIV) <Joseph.A.Gonzalez@usdoj.gov>; Rebecca H. Bradshaw <rbradshaw@allen-vellone.com>; Green, Robert (USATXW) <Robert.Green3@usdoj.gov>
**Cc:** john@hhtx.law; Jason R. Wareham <jwareham@allen-vellone.com>

EXHIBIT 17
Page 1 of 37

Subject: Case 5:22-cv-00869-JKP

John and Lance,

Thank you for speaking with us this afternoon.  This email confirms that Dr. Roysdon does not need to appear for his deposition tomorrow.  Per our conversation, please provide us suggested alternative dates by COB tomorrow.

Thanks,

Katrina (Kati) Seeman
Trial Attorney
U.S. Department of Justice, Civil Division
Constitutional & Specialized Tort Litigation
202-616-0674 | katrina.m.seeman@usdoj.gov

**CONFIDENTIALITY NOTICE:**  This email may contain confidential, legally privileged information intended only for the named recipient.  If you are not the intended recipient, note that disclosure, copying, distribution or taking any action in reliance on the contents of this information, except its delivery to the intended recipient, is strictly prohibited.  If you have received this email in error, please contact the sender immediately and delete this message.

**From:** Lance Henry <lhenry@allen-vellone.com>
**Sent:** Wednesday, May 21, 2025 3:04 PM
**To:** Gonzalez, Joseph A. (CIV) <Joseph.A.Gonzalez@usdoj.gov>; Rebecca H. Bradshaw <rbradshaw@allen-vellone.com>; Seeman, Katrina M (CIV) <Katrina.M.Seeman@usdoj.gov>; Green, Robert (USATXW) <Robert.Green3@usdoj.gov>
**Cc:** john@hhtx.law; Jason R. Wareham <jwareham@allen-vellone.com>
**Subject:** [EXTERNAL] Re: 22-cv-00869 USDC W. TX

Joseph,

I am unavailable for another hour or so. Will you be available to discuss this around 4:30 your time?

Sincerely,
Lance

Lance Henry
Attorney at Law
Allen Vellone Wolf Helfrich & Factor P.C.
1600 Stout Street, Suite 1900, Denver, Colorado 80202
Direct (720) 245-2418 | Main (303) 534-4499
LHenry@allen-vellone.com

The contents of this email and any attachments are confidential or privileged and shall not be disseminated. Please notify the sender immediately if this email is received in error. Emails are not a secure method of communication and could be intercepted by an unintended third party. Allen Vellone Wolf Helfrich & Factor P.C.'s clients consent to receive emails from the law firm unless that consent is withdrawn in writing. Any tax advice in this communication shall not be used to avoid penalties imposed under the Internal Revenue Code or used by a non-client for any tax-related matter.

**From:** Gonzalez, Joseph A. (CIV) <Joseph.A.Gonzalez@usdoj.gov>
**Sent:** Wednesday, May 21, 2025 10:33:26 AM
**To:** Rebecca H. Bradshaw <rbradshaw@allen-vellone.com>; Seeman, Katrina M (CIV) <Katrina.M.Seeman@usdoj.gov>; Green, Robert (USATXW) <Robert.Green3@usdoj.gov>
**Cc:** Lance Henry <lhenry@allen-vellone.com>; john@hhtx.law <john@hhtx.law>; Jason R. Wareham <jwareham@allen-vellone.com>
**Subject:** RE: 22-cv-00869 USDC W. TX

Counsel,

Yesterday evening you attempted to unilaterally cancel Plaintiff's deposition set for tomorrow.  The only reason provided was "Plaintiff has a conflict."  June 9 was the only suggested reschedule date provided.  This date is not only *after* the close of discovery (June 6), but also *after* mediation (June 4).  We need you to address the following two questions as we consider your request to reschedule:

1.  What is the specific reason for the request to reschedule?  We appreciate that unforeseen circumstances arise and normally we would not press for an additional explanation.  However, this is the fifth time you have created problems with deposition scheduling.  On May 6 you cancelled a deposition of a government witness with only one hour notice.  On May 7 you showed up one hour late to a deposition of a government witness.  And then you cancelled two additional depositions, citing concerns over document production.  Now you want to cancel yet

EXHIBIT 17
Page 2 of 30

another scheduled deposition even though we proposed May 21 over a month ago and you confirmed in writing almost three weeks ago (May 2).  "Plaintiff has a conflict" is not acceptable given this backdrop.

2. What is Plaintiff and counsel's availability next week?  If we agree to withdraw our deposition notice for May 22, we insist that the deposition go forward next week.

If you are unwilling to provide the requested information, we should set up a call to discuss for this afternoon so that we can better understand the basis for your position.  We are generally available.  Thank you.

Best,

Joseph

**Joseph A. Gonzalez**
Trial Attorney
Constitutional & Specialized Torts Litigation
Civil Division
U.S. Department of Justice
(202) 598-3888
joseph.a.gonzalez@usdoj.gov

**From:** Rebecca H. Bradshaw <rbradshaw@allen-vellone.com>
**Sent:** Tuesday, May 20, 2025 6:40 PM
**To:** Seeman, Katrina M (CIV) <Katrina.M.Seeman@usdoj.gov>; Gonzalez, Joseph A. (CIV) <Joseph.A.Gonzalez@usdoj.gov>; Green, Robert (USATXW) <Robert.Green3@usdoj.gov>
**Cc:** Lance Henry <lhenry@allen-vellone.com>; john@hhtx.law; Jason R. Wareham <jwareham@allen-vellone.com>
**Subject:** [EXTERNAL] 22-cv-00869 USDC W. TX

Good afternoon,

The Plaintiff has a conflict with the fact witness deposition scheduled for Thursday, May 22, 2025. He has cleared June 9, 2025 to reschedule his deposition. Please advise whether this date works and if not, please provide new dates for our office. I apologize for the inconvenience. Thank you.

Very truly,
*Rebecca H. Bradshaw*
Paralegal
Allen Vellone Wolf Helfrich & Factor P.C.
1600 Stout Street, Suite 1900
Denver, Colorado  80202
rbradshaw@allen-vellone.com
www.allen-vellone.com
(720) 245-2445 | Direct
(303) 534-4499 | Main
(303) 893-8332 | Fax

The contents of this electronic mail (email), including attachments, are confidential and/or privileged and may not be disseminated without permission. Please notify the sender immediately if this email is received in error.  PLEASE NOTE:  Emails are not a secure method of communication and could be intercepted improperly by an unintended third-party.  Allen Vellone Wolf Helfrich & Factor P.C. is sending an email as a result of your consent.  If you no longer wish for communications to be sent in this manner, please notify Allen Vellone Wolf Helfrich & Factor P.C. or me immediately.  IRS CIRCULAR 230 DISCLOSURE:  Pursuant to requirements imposed by the Internal Revenue Service, any tax advice contained in this communication, including any attachments, is not intended to be used, and cannot be used, for purposes of avoiding penalties imposed under the United States Internal Revenue Code or promoting, marketing or recommending to another person any tax-related matter.  Contact Allen Vellone Wolf Helfrich & Factor P.C. for formal written advice on this matter.

🌐 Please consider the environment before printing this email.

**EXHIBIT 17**
**Page 3 of 37**

5.22.2025_Privilege Log - Roe.pdf



**U.S. Department of Justice**

Civil Division, Torts Branch
Constitutional and Specialized Torts

Telephone: (202) 616-4140

*P.O. Box 7146, Washington, D.C. 20044-7146*

May 22, 2025

**VIA EMAIL**
John W. Hodges, Jr., Esq.
HENDLEY & HODGES LAW PLLC
29710 US Hwy 281 North, Ste. 300
Bulverde, Texas 78163
john@hhtx.law

Jason R. Wareham, Esq.
Lance Henry, Esq.
ALLEN VELLONE WOLF HELFRICH & FACTOR P.C.
1600 Stout Street, Suite 1900
Denver, Colorado 80202
jwareham@allen-vellone.com
lhenry@allen-vellone.com

      **Re:**    **Defendants' Privilege Log**
              *Roe v. United States of America, et al.*, No. 5:22-cv-00869 (W.D. Tex.)

Dear Counsel:

      Attached to this letter please find Defendants' privilege log for Defendants' document production in this matter. Relatedly, per Mr. Wareham's request, I can confirm that Defendants' document production includes documents that were subject to a classification review, declassified, and produced. Thank you and please let us know if you would like to discuss.

                            Respectfully,

                            */s/ Joseph A. Gonzalez*
                            Joseph A. Gonzalez
                            Trial Attorney
                            D.C. Bar No. 995057
                            United States Department of Justice
                            Torts Branch, Civil Division
                            P.O. Box 7146, Ben Franklin Station
                            Washington, D.C. 20044
                            Tel: (202) 616-3111
                            Fax: (202) 616-4314

**EXHIBIT 17**
**Page 4 of 37**

Email: joseph.a.gonzalez@usdoj.gov

KATRINA M. SEEMAN
Trial Attorney
D.C. Bar No. 1671729
United States Department of Justice
Torts Branch, Civil Division
P.O. Box 7146, Ben Franklin Station
Washington, D.C. 20044
(202) 616-0674
katrina.m.seeman@usdoj.gov

ROBERT D. GREEN
Assistant United States Attorney
Texas Bar No. 24087626
601 NW Loop 410, Suite 600
San Antonio, Texas 78216
Tel: (210) 384-7362
Fax: (210) 384-7312
Email: robert.green3@usdoj.gov

*Counsel for Defendants*

2

**EXHIBIT 17**
**Page 5 of 37**

| # | Date | Author(s) | Recipient(s) | Document Description | Redacted or Withheld | Privilege/Justification |
|---|------|-----------|--------------|----------------------|----------------------|-------------------------|
| 1 | 8/24/2020 | Christine Uptain | Joseph Burghard, Col Brian Bohenek, Kevin Thomas and Allen Rabayda | Classified forwarded email. Email has PowerPoint attached from Dr. Roysdon. PowerPoint is Dr. Roysdon's classified proposed concepts for development that were awarded funding. PowerPoint has Dr. Roysdon represented as Chief Data Scientist for NSA-Texas and not as a Contractor. | Withheld | State Secrets - Classified SAP Information |
| 2 | 4/22/2024 | Joseph Burghard | Many from OSI/PJ and SAF/AQL | Classified email chain beginning in 8/12/2022 to present. Christopher Webb from OSI/PJ beginning investigation into Dr. Roysdon's projects. Email chain provides funding history for those efforts over to OSI/PJ to support investigation | Redacted | State Secrets - Classified SAP Information |
| 3 | 12/12/2022 | John Trauernicht | Many (50+) | Email call for inputs into ACC's Rosetta Stone that's used to track Cyber efforts across the community. Email has draft copy of Rosetta Stone with Dr. Roysdon's projects listed | Withheld | State Secrets - Classified SAP Information |
| 4 | 12/16/2022 | Stephanie Billingsley | John Trauernicht and others from ACC and SAF/AQL | Inputs into ACC's Rosetta Stone | Withheld | State Secrets - Classified SAP Information |
| 5 | 12/2/2022 | John Trauernicht | Many (50+) | Email call for input into ACC's Rosetta Stone. Dr. Roysdon's projects are represented | Withheld | State Secrets - Classified SAP Information |
| 6 | 11/18/2022 | Maj Dan Casey | Many (30+) | Email from Maj Dan Casey with inputs to ACC's Rosetta Stone. Dr. Roysdon's projects are listed | Withheld | State Secrets - Classified SAP Information |

**EXHIBIT 17**
**Page 6 of 37**

| # | Date | Author(s) | Recipient(s) | Document Description | Redacted or Withheld | Privilege/Justification |
|---|------|-----------|--------------|---------------------|---------------------|------------------------|
| 7 | 9/12/2022 | Eric Cook | Chris Webb, Joseph Burghard, Brian McKenzie, Maj Dan Casey, Allen Rabayda | Funding history for Dr. Roysdon's projects sent to OSI/PJ | Withheld | State Secrets - Classified SAP Information |
| 8 | 3/16/2022 | Anthony Bean | Kevin Thomas, Brian McKenzie, Joseph Burghard, Timoteo Flores, Lori Rambo, Michael Perry, Christine Priest | AFLCMC/HNCO Monthly Activity Brief. Shows status of obligations and expenditures | Withheld | State Secrets - Classified SAP Information |
| 9 | 1/31/2022 | Christine Uptain | Phillip McDaniel, Harold Wilson, Ayla Reed | Email sending AO Murder Board Slides to AFSPC. Slides are classified providing overview of SAF/AQLQ portfolio and POM inputs/requests across the FYDP. Dr. Roysdon's projects are mentioned in some of the schedule slides | Withheld | State Secrets - Classified SAP Information |
| 10 | 1/27/2022 | Kevin Thomas | Joseph Burghard, Christine Uptain, Brian McKenzie, William Bridges, Maj Dan Casey | Draft copy of AO Murder Board slides for internal review. Previous version of line above. | Withheld | State Secrets - Classified SAP Information |
| 11 | 12/6/2021 | Christine Uptain | Joseph Burghard, Brian McKenzie, Maj Dan Casey, Kevin Thomas | Classified email containing funding request from AFLCMC/HNCO and attached project deep dive slides. Funding and slides involve Dr. Roysdon's projects | Withheld | State Secrets - Classified SAP Information |
| 12 | 12/7/2021 | Christine Uptain | Joseph Burghard, Maj Dan Casey | Classified email with slides attached. Slides are technical deep dive charts on AFLCMC/HNCO projects which include Dr. Roysdon's projects | Withheld | State Secrets - Classified SAP Information |

**EXHIBIT 17**
**Page 7 of 37**

| # | Date | Author(s) | Recipient(s) | Document Description | Redacted or Withheld | Privilege/Justification |
|---|---|---|---|---|---|---|
| 13 | 11/4/2021 | Christine Uptain | SAF/AQLA Team | Classified email with slides attached. Email is coordinating technical deep dive briefs across SSC/AFCMC/HNCO and DARPA. Dr. Roysdon's projects are referenced in AFLCMC/HNCO slides | Withheld | State Secrets - Classified SAP Information |
| 14 | 11/2/2021 | Anthony Bean | Joseph Burghard, Brian McKenzie, Maj Dan Casey, Kevin Thomas | Classified email from AFLCMC/HNCO providing programmatic impact of budget cuts. Also has funding execution and distribution plan as attachment | Withheld | State Secrets - Classified SAP Information |
| 15 | 10/18/2021 | Christine Uptain | Joseph Burghard, Brian McKenzie, Maj Dan Casey, Kevin Thomas | Update to classified budget document used to track funding across all SAF/AQLQ projects | Withheld | State Secrets - Classified SAP Information |
| 16 | 7/14/2021 | Anthony Bean | Kevin Thomas, Christine Uptain, Joseph Burghard, Timoteo Flores | Classified email with AFLCMC/HNCO Monthly Activity Brief | Withheld | State Secrets - Classified SAP Information |
| 17 | 7/8/2021 | Christine Uptain | Leah Andrews, Joseph Burghard, Kevin Thomas | Classified email providing SAF/AQLQ budget execution update. Budget update spans across many organizations | Withheld | State Secrets - Classified SAP Information |
| 18 | 7/1/2021 | Timoteo Flores | Christine Uptain, Kevin Thomas, Greg Hern, Anthony Bean, Jared Ekholm, Julio Guerrero, Joseph Burghard | Classified email providing AFLCMC/HNCO funding execution and distribution plan | Withheld | State Secrets - Classified SAP Information |
| US0000001 | 6/7/2019 | Redacted | Redacted | Email re (U) Consulting Question | Redacted | 50 U.S.C. § 3605 |
| US0000002 | 8/20/2020 | Amy R. | Redacted | Conversation | Redacted | 50 U.S.C. § 3605 |
| US0000003-6 | 6/7/2019 | Redacted | Amy R. | Email re (U) Consulting Question | Redacted | 50 U.S.C. § 3605 |
| US000007-20 | 8/20/2020 | Redacted | Amy R. | Email re (U) Consulting Question | Redacted | 50 U.S.C. § 3605 |
| US000021-22 | 4/8/2019 | Redacted | OGC AdminEthics | Email re (U) Consulting Question | Redacted | 50 U.S.C. § 3605 |

**EXHIBIT 17**
**Page 8 of 37**

| # | Date | Author(s) | Recipient(s) | Document Description | Redacted or Withheld | Privilege/Justification |
|---|---|---|---|---|---|---|
| US0000023 | 9/21/2020 | N/A | N/A | Notification of Resignation by Proxy | Redacted | 50 U.S.C. § 3605 |
| US0000024 | Undated | N/A | N/A | Resume | Redacted | 50 U.S.C. § 3605 |
| US0000025 | Undated | N/A | N/A | Applicant Resume As Of December 16, 2014 | Redacted | 50 U.S.C. § 3605 |
| US0000026 | Undated | N/A | N/A | Resume | Redacted | 50 U.S.C. § 3605 |
| US0000027 | 8/30/2020 | N/A | N/A | Notification of Personnel Action | Redacted | 50 U.S.C. § 3605 |
| US0000028 | 7/1/2020 | N/A | N/A | Notification of Personnel Action | Redacted | 50 U.S.C. § 3605 |
| US0000029 | 6/7/2019 | N/A | N/A | Notification of Personnel Action | Redacted | 50 U.S.C. § 3605 |
| US0000030 | 8/3/2018 | N/A | N/A | Notification of Personnel Action | Redacted | 50 U.S.C. § 3605 |
| US0000031 | 6/1/2015 | N/A | N/A | Notification of Personnel Action | Redacted | 50 U.S.C. § 3605 |
| US0000032 | 6/1/2015 | N/A | N/A | Notification of Personnel Action | Redacted | 50 U.S.C. § 3605 |
| US0000033 | 7/24/2015 | N/A | N/A | Notification of Personnel Action | Redacted | 50 U.S.C. § 3605 |
| US0000034 | 6/13/2016 | N/A | N/A | Notification of Personnel Action | Redacted | 50 U.S.C. § 3605 |
| US0000035 | 7/29/2016 | N/A | N/A | Notification of Personnel Action | Redacted | 50 U.S.C. § 3605 |
| US0000036 | 9/18/2017 | N/A | N/A | Notification of Personnel Action | Redacted | 50 U.S.C. § 3605 |
| US0000037 | 9/18/2017 | N/A | N/A | Notification of Personnel Action | Redacted | 50 U.S.C. § 3605 |
| US0000038 | 12/23/2018 | N/A | N/A | Notification of Personnel Action | Redacted | 50 U.S.C. § 3605 |
| US0000039 | 3/17/2019 | N/A | N/A | Notification of Personnel Action | Redacted | 50 U.S.C. § 3605 |
| US0000040 | 3/31/2019 | N/A | N/A | Notification of Personnel Action | Redacted | 50 U.S.C. § 3605 |
| US0000041 | 9/21/2020 | N/A | N/A | Notification of Personnel Action | Redacted | 50 U.S.C. § 3605 |
| US0000436 | 6/7/2019 | Redacted | Redacted | Email re (U) Consulting Question | Redacted | 50 U.S.C. § 3605 |
| US0000069-74 | 9/2/2020 | Redacted | Redacted | Notification of Resignation Forms and Emails | Redacted | 50 U.S.C. § 3605 |
| US0000437 | 8/20/2020 | Amy R. | Redacted | Conversation | Redacted | 50 U.S.C. § 3605 |
| US0000438-441 | 6/7/2019 | Redacted | Amy R. | Email re (U) Consulting Question | Redacted | 50 U.S.C. § 3605 |
| US0000442-454 | 8/20/2020 | Redacted | Amy R. | Email re (U) Consulting Question | Redacted | 50 U.S.C. § 3605 |
| US0000456-457 | 4/8/2019 | Redacted | OGC AdminEthics | Email re (U) Consulting Question | Redacted | 50 U.S.C. § 3605 |
| US0000458 | 9/21/2020 | N/A | N/A | Notification of Resignation by Proxy | Redacted | 50 U.S.C. § 3605 |
| US0000459 | Undated | N/A | N/A | Resume | Redacted | 50 U.S.C. § 3605 |

**EXHIBIT 17**
**Page 9 of 37**

Defs Priv Log.pdf

| # | Date | Author(s) | Recipient(s) | Document Description | Redacted or Withheld | Privilege/Justification |
|---|---|---|---|---|---|---|
| US0000460 | Undated | N/A | N/A | Applicant Resume As Of December 16, 2014 | Redacted | 50 U.S.C. § 3605 |
| US0000461 | Undated | N/A | N/A | Resume | Redacted | 50 U.S.C. § 3605 |
| US0000462 | 8/30/2020 | N/A | N/A | Notification of Personnel Action | Redacted | 50 U.S.C. § 3605 |
| US0000463 | 7/1/2020 | N/A | N/A | Notification of Personnel Action | Redacted | 50 U.S.C. § 3605 |
| US0000464 | 6/7/2019 | N/A | N/A | Notification of Personnel Action | Redacted | 50 U.S.C. § 3605 |
| US0000465 | 8/3/2018 | N/A | N/A | Notification of Personnel Action | Redacted | 50 U.S.C. § 3605 |
| US0000466 | 6/1/2015 | N/A | N/A | Notification of Personnel Action | Redacted | 50 U.S.C. § 3605 |
| US0000467 | 6/1/2015 | N/A | N/A | Notification of Personnel Action | Redacted | 50 U.S.C. § 3605 |
| US0000468 | 7/24/2015 | N/A | N/A | Notification of Personnel Action | Redacted | 50 U.S.C. § 3605 |
| US0000469 | 6/13/2016 | N/A | N/A | Notification of Personnel Action | Redacted | 50 U.S.C. § 3605 |
| US0000470 | 7/29/2016 | N/A | N/A | Notification of Personnel Action | Redacted | 50 U.S.C. § 3605 |
| US0000471 | 9/18/2017 | N/A | N/A | Notification of Personnel Action | Redacted | 50 U.S.C. § 3605 |
| US0000472 | 9/18/2017 | N/A | N/A | Notification of Personnel Action | Redacted | 50 U.S.C. § 3605 |
| US0000473 | 12/23/2018 | N/A | N/A | Notification of Personnel Action | Redacted | 50 U.S.C. § 3605 |
| US0000474 | 3/17/2019 | N/A | N/A | Notification of Personnel Action | Redacted | 50 U.S.C. § 3605 |
| US0000475 | 3/31/2019 | N/A | N/A | Notification of Personnel Action | Redacted | 50 U.S.C. § 3605 |
| US0000476 | 9/21/2020 | N/A | N/A | Notification of Personnel Action | Redacted | 50 U.S.C. § 3605 |
| US0000187-201 | N/A | N/A | N/A | Automated Case Tracking System | Reproduced without redaction at US0000708-723 | N/A |
| US0000202-217 | N/A | Roysdon | DCATSEEmail@dcatse.mil | DoD OIG Hotline Case Action Referral | Reproduced without redaction at US0000724-738 | N/A |
| US0000045-56 | 8/26/2020 | Beall | N/A | OSI Form 40 with attachments | Redacted | Justification for PAR and project name |
| US0000760 | 8/27/2020 | MAGALONG, KENNETH V CIV USAF AFMC AFLCMC/HNC-DOS <kenneth.magalong@us.af.mil> | ROWE, WILLIAM O CIV USAF AFMC AFLCMC/HNC-DOS <william.rowe.1@us.af.mil> | FW: Inquiry Official Letter_Bremer | Withheld | Link to SAPCO Portal redacted |

**EXHIBIT 17**
**Page 10 of 37**

Defs Priv Log.pdf

| # | Date | Author(s) | Recipient(s) | Document Description | Redacted or Withheld | Privilege/Justification |
|---|---|---|---|---|---|---|
| ROE00578258 | 4/29/2024 | BURGHARD, JOSEPH D NH-04 USAF HAF SAF/SAF/AQL <joseph.burghard@us.af.mil> | BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | RE: Dr. John Roe v. United States of America, et. al., Case No. 5:22-CV-00869 (W.D. Tex.) Lit Hold Notice | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation, representation request 28 C.F.R. § 50.15; Work Product Doctrine - contains mental impressions |
| ROE00190775 | 10/3/2022 | BUTLER, MARVELLE L GS-14 USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQI <william.mcveigh.1@us.af.mil> | Automatic reply: Summons Copy | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation, representation request 28 C.F.R. § 50.15; Work Product Doctrine - contains mental impressions |
| ROE00226948 | 10/3/2022 | MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQI <william.mcveigh.1@us.af.mil> | BUTLER, MARVELLE L GS-14 USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | [Redacted] | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation, representation request 28 C.F.R. § 50.15; Work Product Doctrine - contains mental impressions |
| ROE00548098 | 10/3/2022 | MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQI <william.mcveigh.1@us.af.mil> | BUTLER, MARVELLE L GS-14 USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | RE: Summons Copy | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation, representation request 28 C.F.R. § 50.15; Work Product Doctrine - contains mental impressions |
| ROE00617844 | 10/3/2022 | MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQI <william.mcveigh.1@us.af.mil> | BUTLER, MARVELLE L GS-14 USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | RE: Summons Copy | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation, representation request 28 C.F.R. § 50.15; Work Product Doctrine - contains mental impressions |
| ROE00190706 | 10/4/2022 | BUTLER, MARVELLE L GS-14 USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQI <william.mcveigh.1@us.af.mil> | [Redacted] | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation, representation request 28 C.F.R. § 50.15; Work Product Doctrine - contains mental impressions |
| ROE00190729 | 10/4/2022 | BUTLER, MARVELLE L GS-14 USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | COLLIER, RENEE M GS-15 USAF HAF AFLOA/JAC <renee.collier@us.af.mil>; SANDERS, CHRISTIN N GS-14 USAF AFLOA AF LEGAL OP AGENCY FO/AF/JAC Civil Law and Litigation <christin.sanders@us.af.mil> | [Redacted] | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation, representation request 28 C.F.R. § 50.15; Work Product Doctrine - contains mental impressions |

**EXHIBIT 17**
**Page 11 of 37**

Defs Priv Log.pdf

| # | Date | Author(s) | Recipient(s) | Document Description | Redacted or Withheld | Privilege/Justification |
|---|------|-----------|--------------|---------------------|---------------------|------------------------|
| ROE00190732 | 10/4/2022 | COLLIER, RENEE M GS-15 USAF HAF AFLOA/JAC <renee.collier@us.af.mil> | BUTLER, MARVELLE L GS-14 USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil>; SANDERS, CHRISTIN N GS-14 USAF AFLOA AF LEGAL OP AGENCY FO/AF/JAC Civil Law and Litigation <christin.sanders@us.af.mil> | [Redacted] | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation, representation request 28 C.F.R. § 50.15; Work Product Doctrine - contains mental impressions |
| ROE00190733 | 10/4/2022 | BUTLER, MARVELLE L GS-14 USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | COLLIER, RENEE M GS-15 USAF HAF AFLOA/JAC <renee.collier@us.af.mil>; SANDERS, CHRISTIN N GS-14 USAF AFLOA AF LEGAL OP AGENCY FO/AF/JAC Civil Law and Litigation <christin.sanders@us.af.mil> | [Redacted] | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation, representation request 28 C.F.R. § 50.15; Work Product Doctrine - contains mental impressions |
| ROE00190734 | 10/4/2022 | COLLIER, RENEE M GS-15 USAF HAF AFLOA/JAC <renee.collier@us.af.mil> | BUTLER, MARVELLE L GS-14 USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil>; SANDERS, CHRISTIN N GS-14 USAF AFLOA AF LEGAL OP AGENCY FO/AF/JAC Civil Law and Litigation <christin.sanders@us.af.mil> | [Redacted] | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation, representation request 28 C.F.R. § 50.15; Work Product Doctrine - contains mental impressions |
| ROE00226933 | 10/4/2022 | MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQI <william.mcveigh.1@us.af.mil> | BUTLER, MARVELLE L GS-14 USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | RE: Summons Copy | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation, representation request 28 C.F.R. § 50.15; Work Product Doctrine - contains mental impressions |
| ROE00548808 | 10/4/2022 | MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQI <william.mcveigh.1@us.af.mil> | BUTLER, MARVELLE L GS-14 USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | [Redacted] | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation, representation request 28 C.F.R. § 50.15; Work Product Doctrine - contains mental impressions |

**EXHIBIT 17**
**Page 12 of 37**

| # | Date | Author(s) | Recipient(s) | Document Description | Redacted or Withheld | Privilege/Justification |
|---|---|---|---|---|---|---|
| ROE00617842 | 10/4/2022 | MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQI <william.mcveigh.1@us.af.mil> | BUTLER, MARVELLE L GS-14 USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | [Redacted] | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation, representation request 28 C.F.R. § 50.15; Work Product Doctrine - contains mental impressions |
| ROE00226916 | 10/5/2022 | MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQI <william.mcveigh.1@us.af.mil> | BUTLER, MARVELLE L GS-14 USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | [Redacted] | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation, representation request 28 C.F.R. § 50.15; Work Product Doctrine - contains mental impressions |
| ROE00226894 | 10/6/2022 | MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQI <william.mcveigh.1@us.af.mil> | BUTLER, MARVELLE L GS-14 USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | [Redacted] | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation, representation request 28 C.F.R. § 50.15; Work Product Doctrine - contains mental impressions |
| ROE00090386 | 10/11/2022 | BUTLER, MARVELLE L GS-14 USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQI <william.mcveigh.1@us.af.mil> | RE: Summons Copy | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation, representation request 28 C.F.R. § 50.15; Work Product Doctrine - contains mental impressions |
| ROE00226851 | 10/12/2022 | MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQI <william.mcveigh.1@us.af.mil> | BUTLER, MARVELLE L GS-14 USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil>; WILLIAMS, CHERYL A GS-11 USAF AF/JAC Information Litigation Branch <cheryl.williams.13@us.af.mil> | RE: Summons Copy | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation, representation request 28 C.F.R. § 50.15; Work Product Doctrine - contains mental impressions |
| ROE00354411 | 10/12/2022 | BUTLER, MARVELLE L GS-14 USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | EKHOLM, JARED M Lt Col USAF AFMC AFRL/RYM <jared.ekholm@us.af.mil> | Automatic reply: Roe vs US Litigation (Civil Action: SA22-CV0869) | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation, representation request 28 C.F.R. § 50.15; Work Product Doctrine - contains mental impressions |
| ROE00356260 | 10/12/2022 | EKHOLM, JARED M Lt Col USAF AFMC AFRL/RYM <jared.ekholm@us.af.mil> | BUTLER, MARVELLE L GS-14 USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil>; WILLIAMS, CHERYL A GS-11 USAF AF/JAC Information Litigation Branch <cheryl.williams.13@us.af.mil> | Roe vs US Litigation (Civil Action: SA22-CV0869) | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation, representation request 28 C.F.R. § 50.15; Work Product Doctrine - contains mental impressions |

**EXHIBIT 17**
**Page 13 of 37**

| # | Date | Author(s) | Recipient(s) | Document Description | Redacted or Withheld | Privilege/Justification |
|---|---|---|---|---|---|---|
| ROE00226847 | 10/13/2022 | MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQI <william.mcveigh.1@us.af.mil> | BUTLER, MARVELLE L GS-14 USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil>; WILLIAMS, CHERYL A GS-11 USAF AF/JAC Information Litigation Branch <cheryl.williams.13@us.af.mil> | RE: Summons Copy | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation, representation request 28 C.F.R. § 50.15; Work Product Doctrine - contains mental impressions |
| ROE00547938 | 10/13/2022 | EKHOLM, JARED M Col USAF AFDW AF/A26 <jared.ekholm@us.af.mil> | WILLIAMS, CHERYL A CIV USAF AF/JAC Information Litigation Branch <cheryl.williams.13@us.af.mil>; BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | RE: Litigation with Dr. Roe | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation, representation request 28 C.F.R. § 50.15; Work Product Doctrine - contains mental impressions |
| ROE00321462 | 10/13/2022 | EKHOLM, JARED M Lt Col USAF AFMC AFRL/RYM <jared.ekholm@us.af.mil> | WILLIAMS, CHERYL A GS-11 USAF AF/JAC Information Litigation Branch <cheryl.williams.13@us.af.mil>; BUTLER, MARVELLE L GS-14 USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | [Redacted] | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation, representation request 28 C.F.R. § 50.15; Work Product Doctrine - contains mental impressions |
| ROE00354407 | 10/13/2022 | BUTLER, MARVELLE L GS-14 USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | EKHOLM, JARED M Lt Col USAF AFMC AFRL/RYM <jared.ekholm@us.af.mil>; CRONIN, PAUL E DO-04 USAF AFMC AFRL/JA <paul.cronin.3@us.af.mil> | RE: Litigation with Dr. Roe | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation, representation request 28 C.F.R. § 50.15; Work Product Doctrine - contains mental impressions |

**EXHIBIT 17**
**Page 14 of 37**

| # | Date | Author(s) | Recipient(s) | Document Description | Redacted or Withheld | Privilege/Justification |
|---|------|-----------|--------------|---------------------|---------------------|------------------------|
| ROE00356231 | 10/13/2022 | EKHOLM, JARED M Lt Col USAF AFMC AFRL/RYM <jared.ekholm@us.af.mil> | WILLIAMS, CHERYL A GS-11 USAF AF/JAC Information Litigation Branch <cheryl.williams.13@us.af.mil>; BUTLER, MARVELLE L GS-14 USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | RE: Litigation with Dr. Roe | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation, representation request 28 C.F.R. § 50.15; Work Product Doctrine - contains mental impressions |
| ROE00354401 | 10/14/2022 | BUTLER, MARVELLE L GS-14 USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | EKHOLM, JARED M Lt Col USAF AFMC AFRL/RYM <jared.ekholm@us.af.mil>; WILLIAMS, CHERYL A GS-11 USAF AF/JAC Information Litigation Branch <cheryl.williams.13@us.af.mil> | RE: Litigation with Dr. Roe | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation, representation request 28 C.F.R. § 50.15; Work Product Doctrine - contains mental impressions |
| ROE00356228 | 10/14/2022 | EKHOLM, JARED M Lt Col USAF AFMC AFRL/RYM <jared.ekholm@us.af.mil> | BUTLER, MARVELLE L GS-14 USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil>; WILLIAMS, CHERYL A GS-11 USAF AF/JAC Information Litigation Branch <cheryl.williams.13@us.af.mil> | RE: Litigation with Dr. Roe | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation, representation request 28 C.F.R. § 50.15; Work Product Doctrine - contains mental impressions |
| ROE00226816 | 10/17/2022 | MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQI <william.mcveigh.1@us.af.mil> | BUTLER, MARVELLE L GS-14 USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil>; WILLIAMS, CHERYL A GS-11 USAF AF/JAC Information Litigation Branch <cheryl.williams.13@us.af.mil> | Status Update | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation, representation request 28 C.F.R. § 50.15; Work Product Doctrine - contains mental impressions |

**EXHIBIT 17**
**Page 15 of 37**

| # | Date | Author(s) | Recipient(s) | Document Description | Redacted or Withheld | Privilege/Justification |
|---|---|---|---|---|---|---|
| ROE00226810 | 10/18/2022 | MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQI <william.mcveigh.1@us.af.mil> | BUTLER, MARVELLE L GS-14 USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil>; WILLIAMS, CHERYL A GS-11 USAF AF/JAC Information Litigation Branch <cheryl.williams.13@us.af.mil> | RE: Status Update | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation, representation request 28 C.F.R. § 50.15; Work Product Doctrine - contains mental impressions |
| ROE00598767 | 10/18/2022 | BUTLER, MARVELLE L GS-14 USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQI <william.mcveigh.1@us.af.mil>; WILLIAMS, CHERYL A GS-11 USAF AF/JAC Information Litigation Branch <cheryl.williams.13@us.af.mil> | RE: Status Update | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation, representation request 28 C.F.R. § 50.15; Work Product Doctrine - contains mental impressions |
| ROE00090174 | 10/28/2022 | BUTLER, MARVELLE L GS-14 USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQI <william.mcveigh.1@us.af.mil> | Automatic reply: Status Update | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation, representation request 28 C.F.R. § 50.15; Work Product Doctrine - contains mental impressions |
| ROE00226614 | 10/28/2022 | MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQI <william.mcveigh.1@us.af.mil> | BUTLER, MARVELLE L GS-14 USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil>; WILLIAMS, CHERYL A GS-11 USAF AF/JAC Information Litigation Branch <cheryl.williams.13@us.af.mil> | RE: Status Update | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation, representation request 28 C.F.R. § 50.15; Work Product Doctrine - contains mental impressions |
| ROE00089733 | 11/14/2022 | BUTLER, MARVELLE L GS-14 USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQI <william.mcveigh.1@us.af.mil> | Automatic reply: Status Update | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation, representation request 28 C.F.R. § 50.15; Work Product Doctrine - contains mental impressions |

**EXHIBIT 17**
**Page 16 of 37**

| # | Date | Author(s) | Recipient(s) | Document Description | Redacted or Withheld | Privilege/Justification |
|---|---|---|---|---|---|---|
| ROE00226437 | 11/14/2022 | MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQI <william.mcveigh.1@us.af.mil> | BUTLER, MARVELLE L GS-14 USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil>; WILLIAMS, CHERYL A GS-11 USAF AF/JAC Information Litigation Branch <cheryl.williams.13@us.af.mil> | RE: Status Update | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation, representation request 28 C.F.R. § 50.15; Work Product Doctrine - contains mental impressions |
| ROE00259403 | 11/17/2022 | BUTLER, MARVELLE L GS-14 USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | BURGHARD, JOSEPH D NH-04 USAF HAF SAF/SAF/AQL <joseph.burghard@us.af.mil> | Automatic reply: [Redacted] | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation, representation request 28 C.F.R. § 50.15; Work Product Doctrine - contains mental impressions |
| ROE00089606 | 11/17/2022 | BUTLER, MARVELLE L GS-14 USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQI <william.mcveigh.1@us.af.mil> | Automatic reply: Representation Request (Dr. John Roe Lawsuit) | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation, representation request 28 C.F.R. § 50.15; Work Product Doctrine - contains mental impressions |
| ROE00354400 | 11/17/2022 | BUTLER, MARVELLE L GS-14 USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | EKHOLM, JARED M Lt Col USAF AFMC AFRL/RYM <jared.ekholm@us.af.mil>; WILLIAMS, CHERYL A GS-11 USAF AF/JAC Information Litigation Branch <cheryl.williams.13@us.af.mil> | RE: Litigation with Dr. Roe | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation, representation request 28 C.F.R. § 50.15; Work Product Doctrine - contains mental impressions |
| ROE00356022 | 11/17/2022 | EKHOLM, JARED M Lt Col USAF AFMC AFRL/RYM <jared.ekholm@us.af.mil> | BUTLER, MARVELLE L GS-14 USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil>; WILLIAMS, CHERYL A GS-11 USAF AF/JAC Information Litigation Branch <cheryl.williams.13@us.af.mil> | RE: Litigation with Dr. Roe | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation, representation request 28 C.F.R. § 50.15; Work Product Doctrine - contains mental impressions |

**EXHIBIT 17**
**Page 17 of 37**

| # | Date | Author(s) | Recipient(s) | Document Description | Redacted or Withheld | Privilege/Justification |
|---|---|---|---|---|---|---|
| ROE00373475 | 11/17/2022 | BUTLER, MARVELLE L GS-14 USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | EKHOLM, JARED M Lt Col USAF AFMC AFRL/RYM <jared.ekholm@us.af.mil> | Automatic reply: Litigation with Dr. Roe | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation, representation request 28 C.F.R. § 50.15; Work Product Doctrine - contains mental impressions |
| ROE00259375 | 11/18/2022 | BUTLER, MARVELLE L GS-14 USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | BURGHARD, JOSEPH D NH-04 USAF HAF SAF/SAF/AQL <joseph.burghard@us.af.mil> | DOJ Representation AUTHORIZED in Roe v. United States et al., No. 5:22-CV-869 (W.D. Tex.) - DJ # 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 | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00089582 | 11/18/2022 | BUTLER, MARVELLE L GS-14 USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQI <william.mcveigh.1@us.af.mil> | RE: DOJ Representation AUTHORIZED in Roe v. United States et al., No. 5:22-CV-869 (W.D. Tex.) - DJ # 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 | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00089583 | 11/18/2022 | BUTLER, MARVELLE L GS-14 USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQI <william.mcveigh.1@us.af.mil> | Automatic reply: DOJ Representation AUTHORIZED in Roe v. United States et al., No. 5:22-CV-869 (W.D. Tex.) - DJ # 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 | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00089585 | 11/18/2022 | BUTLER, MARVELLE L GS-14 USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQI <william.mcveigh.1@us.af.mil> | FW: DOJ Representation AUTHORIZED in Roe v. United States et al., No. 5:22-CV-869 (W.D. Tex.) - DJ # 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 | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00226370 | 11/18/2022 | MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQI <william.mcveigh.1@us.af.mil> | BUTLER, MARVELLE L GS-14 USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | RE: DOJ Representation AUTHORIZED in Roe v. United States et al., No. 5:22-CV-869 (W.D. Tex.) - DJ # 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 | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00354397 | 11/18/2022 | BUTLER, MARVELLE L GS-14 USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | EKHOLM, JARED M Lt Col USAF AFMC AFRL/RYM <jared.ekholm@us.af.mil> | RE: DOJ Representation AUTHORIZED in Roe v. United States et al., No. 5:22-CV-869 (W.D. Tex.) - DJ # 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 | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00354398 | 11/18/2022 | BUTLER, MARVELLE L GS-14 USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | EKHOLM, JARED M Lt Col USAF AFMC AFRL/RYM <jared.ekholm@us.af.mil> | DOJ Representation AUTHORIZED in Roe v. United States et al., No. 5:22-CV-869 (W.D. Tex.) - DJ # 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 | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |

**EXHIBIT 17**
**Page 18 of 37**

Defs Priv Log.pdf

| # | Date | Author(s) | Recipient(s) | Document Description | Redacted or Withheld | Privilege/Justification |
|---|---|---|---|---|---|---|
| ROE00356016 | 11/18/2022 | EKHOLM, JARED M Lt Col USAF AFMC AFRL/RYM <jared.ekholm@us.af.mil> | BUTLER, MARVELLE L GS-14 USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | RE: DOJ Representation AUTHORIZED in Roe v. United States et al., 5:22-CV-869 (W.D. Tex.) - DJ # 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 | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00373441 | 11/18/2022 | BUTLER, MARVELLE L GS-14 USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | EKHOLM, JARED M Lt Col USAF AFRL/RYM <jared.ekholm@us.af.mil> | Automatic reply: DOJ Representation AUTHORIZED in Roe v. United States et al., No. 5:22-CV-869 (W.D. Tex.) - DJ # 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 | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00259349 | 11/23/2022 | BUTLER, MARVELLE L GS-14 USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | BURGHARD, JOSEPH D NH-04 USAF HAF SAF/SAF/AQL <joseph.burghard@us.af.mil> | FW: DOJ Representation AUTHORIZED in Roe v. United States et al., No. 5:22-CV-869 (W.D. Tex.) - DJ # 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 | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00089392 | 11/23/2022 | BUTLER, MARVELLE L GS-14 USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQI <william.mcveigh.1@us.af.mil>; HYNES, KENNETH M Maj USAF AFLOA/AF/JAC Information Litigation <kenneth.hynes@us.af.mil> | [Redacted] | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00226312 | 11/23/2022 | MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQI | BUTLER, MARVELLE L GS-14 USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil>; HYNES, KENNETH M Maj USAF AFLOA/AF/JAC Information Litigation <kenneth.hynes@us.af.mil> | [Redacted] | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |

**EXHIBIT 17**
**Page 19 of 37**

| # | Date | Author(s) | Recipient(s) | Document Description | Redacted or Withheld | Privilege/Justification |
|---|------|-----------|--------------|---------------------|---------------------|------------------------|
| ROE00226335 | 11/23/2022 | MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQI <william.mcveigh.1@us.af.mil> | HYNES, KENNETH M Maj USAF AFLOA/AF/JAC Information Litigation <kenneth.hynes@us.af.mil>; BUTLER, MARVELLE L GS-14 USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil>; WILLIAMS, CHERYL A GS-11 USAF AF/JAC Information Litigation Branch <cheryl.williams.13@us.af.mil> | [Redacted] | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00259342 | 11/28/2022 | BUTLER, MARVELLE L GS-14 USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | BURGHARD, JOSEPH D NH-04 USAF HAF SAF/SAF/AQL <joseph.burghard@us.af.mil> | Automatic reply: DOJ Representation AUTHORIZED in Roe v. United States et al., No. 5:22-CV-869 (W.D. Tex.) - DJ # 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 | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00287964 | 11/28/2022 | BURGHARD, JOSEPH D NH-04 USAF HAF SAF/SAF/AQL <joseph.burghard@us.af.mil> | BUTLER, MARVELLE L GS-14 USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | RE: DOJ Representation AUTHORIZED in Roe v. United States et al., 5:22-CV-869 (W.D. Tex.) - DJ # 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 | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00089302 | 11/30/2022 | BUTLER, MARVELLE L GS-14 USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQI <william.mcveigh.1@us.af.mil> | Automatic reply: [Redacted] | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00226278 | 11/30/2022 | MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQI <william.mcveigh.1@us.af.mil> | BUTLER, MARVELLE L GS-14 USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil>; HYNES, KENNETH M Maj USAF AFLOA/AF/JAC Information Litigation <kenneth.hynes@us.af.mil> | [Redacted] | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |

**EXHIBIT 17**
**Page 20 of 37**

Defs Priv Log.pdf

| # | Date | Author(s) | Recipient(s) | Document Description | Redacted or Withheld | Privilege/Justification |
|---|---|---|---|---|---|---|
| ROE00089273 | 12/1/2022 | BUTLER, MARVELLE L GS-14 USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQI <william.mcveigh.1@us.af.mil>; HYNES, KENNETH M Maj USAF AFLOA/AF/JAC Information Litigation <kenneth.hynes@us.af.mil> | [Redacted] | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00226272 | 12/1/2022 | MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQI <william.mcveigh.1@us.af.mil> | BUTLER, MARVELLE L GS-14 USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil>; HYNES, KENNETH M Maj USAF AFLOA/AF/JAC Information Litigation <kenneth.hynes@us.af.mil> | [Redacted] | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00089120 | 12/6/2022 | BUTLER, MARVELLE L GS-14 USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQI <william.mcveigh.1@us.af.mil>; WILLIAMS, CHERYL A GS-11 USAF AF/JAC Information Litigation Branch <cheryl.williams.13@us.af.mil> | RE: Update | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00089121 | 12/6/2022 | BUTLER, MARVELLE L GS-14 USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQI <william.mcveigh.1@us.af.mil>; WILLIAMS, CHERYL A GS-11 USAF AF/JAC Information Litigation Branch <cheryl.williams.13@us.af.mil> | RE: Update | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00089122 | 12/6/2022 | BUTLER, MARVELLE L GS-14 USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQI <william.mcveigh.1@us.af.mil> | Automatic reply: Update | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |

**EXHIBIT 17**
**Page 21 of 37**

| # | Date | Author(s) | Recipient(s) | Document Description | Redacted or Withheld | Privilege/Justification |
|---|---|---|---|---|---|---|
| ROE00226177 | 12/6/2022 | MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQI <william.mcveigh.1@us.af.mil> | BUTLER, MARVELLE L GS-14 USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil>; WILLIAMS, CHERYL A GS-11 AF/JAC Information Litigation Branch <cheryl.williams.13@us.af.mil> | RE: Update | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00226178 | 12/6/2022 | MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQI <william.mcveigh.1@us.af.mil> | BUTLER, MARVELLE L GS-14 USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil>; WILLIAMS, CHERYL A GS-11 AF/JAC Information Litigation Branch <cheryl.williams.13@us.af.mil> | Update | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00088671 | 1/3/2023 | BUTLER, MARVELLE L GS-14 USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQI <william.mcveigh.1@us.af.mil> | Automatic reply: [Redacted] | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00225995 | 1/3/2023 | MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQI <william.mcveigh.1@us.af.mil> | BUTLER, MARVELLE L GS-14 USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil>; HYNES, KENNETH M Maj USAF AFLOA/AF/JAC Information Litigation <kenneth.hynes@us.af.mil> | [Redacted] | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00225996 | 1/3/2023 | MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQI <william.mcveigh.1@us.af.mil> | BUTLER, MARVELLE L GS-14 USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil>; HYNES, KENNETH M Maj USAF AFLOA/AF/JAC Information Litigation <kenneth.hynes@us.af.mil> | [Redacted] | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |

**EXHIBIT 17**
**Page 22 of 37**

| # | Date | Author(s) | Recipient(s) | Document Description | Redacted or Withheld | Privilege/Justification |
|---|------|-----------|--------------|----------------------|----------------------|-------------------------|
| ROE00598527 | 1/3/2023 | BUTLER, MARVELLE L GS-14 USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQI <william.mcveigh.1@us.af.mil>; HYNES, KENNETH M Maj USAF AFLOA/AF/JAC Information Litigation <kenneth.hynes@us.af.mil> | [Redacted] | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00088606 | 1/4/2023 | BUTLER, MARVELLE L GS-14 USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQI <william.mcveigh.1@us.af.mil> | [Redacted] | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00088615 | 1/4/2023 | BUTLER, MARVELLE L GS-14 USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQI <william.mcveigh.1@us.af.mil>; HYNES, KENNETH M Maj USAF AFLOA/AF/JAC Information Litigation <kenneth.hynes@us.af.mil> | [Redacted] | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00225977 | 1/4/2023 | MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQI <william.mcveigh.1@us.af.mil> | BUTLER, MARVELLE L GS-14 USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil>; HYNES, KENNETH M Maj USAF AFLOA/AF/JAC Information Litigation <kenneth.hynes@us.af.mil> | [Redacted] | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00258492 | 1/13/2023 | BUTLER, MARVELLE L GS-14 USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | BURGHARD, JOSEPH D NH-04 USAF HAF SAF/SAF/AQL <joseph.burghard@us.af.mil> | RE: DOJ Representation AUTHORIZED in Roe v. United States et al., No. 5:22-CV-869 (W.D. Tex.) - DJ # 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 | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00258496 | 1/13/2023 | BUTLER, MARVELLE L GS-14 USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | BURGHARD, JOSEPH D NH-04 USAF HAF SAF/SAF/AQL <joseph.burghard@us.af.mil> | Automatic reply: DOJ Representation AUTHORIZED in Roe v. United States et al., No. 5:22-CV-869 (W.D. Tex.) - DJ # 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 | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |

**EXHIBIT 17**
**Page 23 of 37**

Defs Priv Log.pdf

| # | Date | Author(s) | Recipient(s) | Document Description | Redacted or Withheld | Privilege/Justification |
|---|---|---|---|---|---|---|
| ROE00287664 | 1/13/2023 | BURGHARD, JOSEPH D CIV USAF HAF SAF/SAF/AQL <joseph.burghard@us.af.mil>; HYNES, KENNETH M Maj USAF AFLOA/SAF/MRBL <kenneth.hynes@us.af.mil> | BUTLER, MARVELLE L GS-14 USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | RE: DOJ Representation AUTHORIZED in Roe v. United States et al., No. 5:22-CV-869 (W.D. Tex.) - DJ # 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 | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00258462 | 1/17/2023 | BUTLER, MARVELLE L GS-14 USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | BURGHARD, JOSEPH D CIV USAF HAF SAF/SAF/AQL <joseph.burghard@us.af.mil> | RE: DOJ Representation AUTHORIZED in Roe v. United States et al., No. 5:22-CV-869 (W.D. Tex.) - DJ # 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 | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00287644 | 1/17/2023 | BURGHARD, JOSEPH D CIV USAF HAF SAF/SAF/AQL <joseph.burghard@us.af.mil>; HYNES, KENNETH M Maj USAF AFLOA/SAF/MRBL <kenneth.hynes@us.af.mil> | BUTLER, MARVELLE L GS-14 USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | RE: DOJ Representation AUTHORIZED in Roe v. United States et al., No. 5:22-CV-869 (W.D. Tex.) - DJ # 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 | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00088042 | 1/24/2023 | BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQI <william.mcveigh.1@us.af.mil> | [Redacted] | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00088055 | 1/24/2023 | BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQI <william.mcveigh.1@us.af.mil> | Automatic reply: [Redacted] | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |

**EXHIBIT 17**
**Page 24 of 37**

| # | Date | Author(s) | Recipient(s) | Document Description | Redacted or Withheld | Privilege/Justification |
|---|---|---|---|---|---|---|
| ROE00225816 | 1/24/2023 | MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQI <william.mcveigh.1@us.af.mil> | BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil>; HYNES, KENNETH M Maj USAF AFLOA/AF/JAC Information Litigation <kenneth.hynes@us.af.mil> | [Redacted] | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00087752 | 1/30/2023 | BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQI <william.mcveigh.1@us.af.mil> | [Redacted] | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00225722 | 1/30/2023 | MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQI <william.mcveigh.1@us.af.mil> | BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | [Redacted] | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00087693 | 1/31/2023 | BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQI <william.mcveigh.1@us.af.mil> | [Redacted] | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00225701 | 1/31/2023 | MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQI <william.mcveigh.1@us.af.mil> | BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | [Redacted] | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00225626 | 2/2/2023 | MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQI <william.mcveigh.1@us.af.mil> | BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | [Redacted] | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00255466 | 6/15/2023 | BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | BURGHARD, JOSEPH D CIV USAF HAF SAF/SAF/AQL <joseph.burghard@us.af.mil> | Automatic reply: DOJ Representation AUTHORIZED in Roe v. United States et al., No. 5:22-CV-869 (W.D. Tex.) - DJ # 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 | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |

**EXHIBIT 17**
**Page 25 of 37**

| # | Date | Author(s) | Recipient(s) | Document Description | Redacted or Withheld | Privilege/Justification |
|---|---|---|---|---|---|---|
| ROE00286346 | 6/15/2023 | BURGHARD, JOSEPH D CIV USAF HAF SAF/SAF/AQL <joseph.burghard@us.af.mil>; HYNES, KENNETH M Maj USAF AFLOA/SAF/MRBL <kenneth.hynes@us.af.mil> | BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | RE: DOJ Representation AUTHORIZED in Roe v. United States et al., No. 5:22-CV-869 (W.D. Tex.) - DJ # 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 | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00250141 | 4/11/2024 | BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | BURGHARD, JOSEPH D CIV USAF HAF SAF/SAF/AQL <joseph.burghard@us.af.mil> | [Redacted] | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00250154 | 4/11/2024 | BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | BURGHARD, JOSEPH D CIV USAF HAF SAF/SAF/AQL <joseph.burghard@us.af.mil>; HYNES, KENNETH M Maj USAF AFLOA/SAF/MRBL <kenneth.hynes@us.af.mil> | [Redacted] | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00283931 | 4/11/2024 | BURGHARD, JOSEPH D CIV USAF HAF SAF/SAF/AQL <joseph.burghard@us.af.mil> | BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil>; HYNES, KENNETH M Maj USAF AFLOA/SAF/MRBL <kenneth.hynes@us.af.mil> | [Redacted] | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00283932 | 4/11/2024 | BURGHARD, JOSEPH D CIV USAF HAF SAF/SAF/AQL <joseph.burghard@us.af.mil> | HYNES, KENNETH M Maj USAF AFLOA/SAF/MRBL <kenneth.hynes@us.af.mil>; BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | [Redacted] | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |

**EXHIBIT 17**
**Page 26 of 37**

| # | Date | Author(s) | Recipient(s) | Document Description | Redacted or Withheld | Privilege/Justification |
|---|---|---|---|---|---|---|
| ROE00047733 | 4/24/2024 | BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQIT <william.mcveigh.1@us.af.mil> | [Redacted] | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00047738 | 4/24/2024 | BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQIT <william.mcveigh.1@us.af.mil> | [Redacted] | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00047741 | 4/24/2024 | BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQIT <william.mcveigh.1@us.af.mil> | [Redacted] | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00210336 | 4/24/2024 | MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQI <william.mcveigh.1@us.af.mil> | BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | [Redacted] | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00210337 | 4/24/2024 | MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQI <william.mcveigh.1@us.af.mil> | BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | [Redacted] | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00409513 | 4/24/2024 | BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | OLIVEIRA, JASON CIV USAF AFOSI AFOSI/PJ DET 8/OL-B <jason.oliveira.3@us.af.mil> | [Redacted] | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00414902 | 4/24/2024 | BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | OLIVEIRA, JASON CIV USAF AFOSI AFOSI/PJ DET 8/OL-B <jason.oliveira.3@us.af.mil> | [Redacted] | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00414906 | 4/24/2024 | BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | OLIVEIRA, JASON CIV USAF AFOSI AFOSI/PJ DET 8/OL-B <jason.oliveira.3@us.af.mil> | [Redacted] | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |

**EXHIBIT 17**
**Page 27 of 37**

| # | Date | Author(s) | Recipient(s) | Document Description | Redacted or Withheld | Privilege/Justification |
|---|------|-----------|--------------|---------------------|---------------------|------------------------|
| ROE00419114 | 4/24/2024 | OLIVEIRA, JASON CIV USAF AFOSI AFOSI/PJ DET 8/OL-B <jason.oliveira.3@us.af.mil> | BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | [Redacted] | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00419115 | 4/24/2024 | OLIVEIRA, JASON CIV USAF AFOSI AFOSI/PJ DET 8/OL-B <jason.oliveira.3@us.af.mil> | BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | [Redacted] | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00548383 | 4/24/2024 | BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | MCVEIGH, WILLIAM M Maj USAF HAF AF/A3CX <william.mcveigh.1@us.af.mil> | [Redacted] | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00548384 | 4/24/2024 | BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | MCVEIGH, WILLIAM M Maj USAF HAF AF/A3CX <william.mcveigh.1@us.af.mil> | [Redacted] | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00003998 | 4/29/2024 | BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | Dr. John Roe v. United States of America, et. al., Case No. 5:22-CV-00869 (W.D. Tex.) Lit Hold Notice | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00003989 | 4/30/2024 | BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | RANFT, RICHARD A CTR USAF AFMC AFLCMC/HNCO <richard.ranft.3.ctr@us.af.mil> | RE: Dr. John Roe v. United States of America, et. al., Case No. 5:22-CV-00869 (W.D. Tex.) Lit Hold Notice | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00005026 | 4/30/2024 | RANFT, RICHARD A CTR USAF AFMC AFLCMC/HNCO | BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | RE: Dr. John Roe v. United States of America, et. al., Case No. 5:22-CV-00869 (W.D. Tex.) Lit Hold Notice | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00419074 | 4/30/2024 | OLIVEIRA, JASON CIV USAF AFOSI AFOSI/PJ DET 8/OL-B <jason.oliveira.3@us.af.mil> | BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | RE: Dr. John Roe v. United States of America, et. al., Case No. 5:22-CV-00869 (W.D. Tex.) Lit Hold Notice | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |

**EXHIBIT 17**
**Page 28 of 37**

| # | Date | Author(s) | Recipient(s) | Document Description | Redacted or Withheld | Privilege/Justification |
|---|---|---|---|---|---|---|
| ROE00631946 | 4/30/2024 | RANFT, RICHARD A CTR USAF AFMC AFLCMC/HNCO | BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | RE: Dr. John Roe v. United States of America, et. al., Case No. 5:22-CV-00869 (W.D. Tex.) Lit Hold Notice | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00328688 | 5/1/2024 | EKHOLM, JARED M Lt Col USAF AFMC AFRL/RYM <jared.ekholm@us.af.mil> | BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | Fw: [DoD SAFE] Confirmation of Completed Drop-off 7JuE75oY7axphtqR | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00354884 | 5/1/2024 | EKHOLM, JARED M Lt Col USAF AFMC AFRL/RYM <jared.ekholm@us.af.mil> | BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | Re: Dr. John Roe v. United States of America, et. al., Case No. 5:22-CV-00869 (W.D. Tex.) Lit Hold Notice | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00047426 | 5/6/2024 | BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQIT <william.mcveigh.1@us.af.mil> | Automatic reply: File | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00210280 | 5/6/2024 | MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQI <william.mcveigh.1@usaf.mil> | BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | File | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00414719 | 5/6/2024 | BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | OLIVEIRA, JASON CIV USAF AFOSI AFOSI/PJ DET 8/OL-B <jason.oliveira.3@us.af.mil> | Automatic reply: Dr. John Roe v. United States of America, et. al., Case No. 5:22-CV-00869 (W.D. Tex.) Lit Hold Notice | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00419005 | 5/6/2024 | OLIVEIRA, JASON CIV USAF AFOSI AFOSI/PJ DET 8/OL-B <jason.oliveira.3@us.af.mil> | BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | RE: Dr. John Roe v. United States of America, et. al., Case No. 5:22-CV-00869 (W.D. Tex.) Lit Hold Notice | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00354389 | 5/9/2024 | BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | EKHOLM, JARED M Col USAF AFMC AFRL <jared.ekholm@us.af.mil> | Automatic reply: Roe v. United States, Case No. 5:22-CV-00869 (W.D. Tex.) | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |

**EXHIBIT 17**
**Page 29 of 37**

Defs Priv Log.pdf

| # | Date | Author(s) | Recipient(s) | Document Description | Redacted or Withheld | Privilege/Justification |
|---|---|---|---|---|---|---|
| ROE00047268 | 5/13/2024 | BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQIT <william.mcveigh.1@us.af.mil> | Automatic reply: Dr. John Roe v. United States of America, et. al., Case No. 5:22-CV-00869 (W.D. Tex.) Lit Hold Notice | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00210254 | 5/13/2024 | MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQI <william.mcveigh.1@u s.af.mil> | BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | RE: Dr. John Roe v. United States of America, et. al., Case No. 5:22-CV-00869 (W.D. Tex.) Lit Hold Notice | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00046964 | 5/21/2024 | BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQIT <william.mcveigh.1@us.af.mil> | Automatic reply: Dr. John Roe v. United States of America, et. al., Case No. 5:22-CV-00869 (W.D. Tex.) Lit Hold Notice | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00210221 | 5/21/2024 | MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQI <william.mcveigh.1@u s.af.mil> | BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | RE: Dr. John Roe v. United States of America, et. al., Case No. 5:22-CV-00869 (W.D. Tex.) Lit Hold Notice | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00042425 | 5/30/2024 | MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQI <william.mcveigh.1@u s.af.mil> | BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil>; OLIVEIRA, JASON CIV USAF AFOSI AFOSI/PJ DET 8/OL-B <jason.oliveira.3@us.af.mil> | RE: Classified Info | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation |
| ROE00046724 | 5/30/2024 | BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | Dr. John Roe v. United States of America, et. al., Case No. 5:22-CV-00869 (W.D. Tex.) Lit Hold Notice | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00210165 | 5/30/2024 | MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQI <william.mcveigh.1@u s.af.mil> | BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil>; OLIVEIRA, JASON CIV USAF AFOSI AFOSI/PJ DET 8/OL-B <jason.oliveira.3@us.af.mil> | RE: Classified Info | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation |

**EXHIBIT 17**
**Page 30 of 37**

Defs Priv Log.pdf

| # | Date | Author(s) | Recipient(s) | Document Description | Redacted or Withheld | Privilege/Justification |
|---|------|-----------|--------------|---------------------|---------------------|------------------------|
| ROE00405565 | 5/30/2024 | OLIVEIRA, JASON CIV USAF AFOSI AFOSI/PJ DET 8/OL-B <jason.oliveira.3@us.af.mil> | MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQIT <william.mcveigh.1@us.af.mil>; BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | RE: Classified Info | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation |
| ROE00405569 | 5/30/2024 | OLIVEIRA, JASON CIV USAF AFOSI AFOSI/PJ DET 8/OL-B <jason.oliveira.3@us.af.mil> | BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | RE: Classified Info | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation |
| ROE00414331 | 5/30/2024 | MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQIT <william.mcveigh.1@us.af.mil> | BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil>; OLIVEIRA, JASON CIV USAF AFOSI AFOSI/PJ DET 8/OL-B <jason.oliveira.3@us.af.mil> | RE: Classified Info | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation |
| ROE00414338 | 5/30/2024 | OLIVEIRA, JASON CIV USAF AFOSI AFOSI/PJ DET 8/OL-B <jason.oliveira.3@us.af.mil> | BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | RE: Classified Info | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation |
| ROE00414340 | 5/30/2024 | BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | OLIVEIRA, JASON CIV USAF AFOSI AFOSI/PJ DET 8/OL-B <jason.oliveira.3@us.af.mil>; MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQIT <william.mcveigh.1@us.af.mil> | FW: Classified Info | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation |

**EXHIBIT 17**
**Page 31 of 37**

Defs Priv Log.pdf

| # | Date | Author(s) | Recipient(s) | Document Description | Redacted or Withheld | Privilege/Justification |
|---|------|-----------|--------------|----------------------|----------------------|-------------------------|
| ROE00418497 | 5/30/2024 | OLIVEIRA, JASON CIV USAF AFOSI AFOSI/PJ DET 8/OL-B <jason.oliveira.3@us.af.mil> | MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQIT <william.mcveigh.1@us.af.mil>; BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | RE: Classified Info | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation |
| ROE00418806 | 5/30/2024 | OLIVEIRA, JASON CIV USAF AFOSI AFOSI/PJ DET 8/OL-B <jason.oliveira.3@us.af.mil> | MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQIT <william.mcveigh.1@us.af.mil>; BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | RE: Classified Info | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation |
| ROE00418815 | 5/30/2024 | OLIVEIRA, JASON CIV USAF AFOSI AFOSI/PJ DET 8/OL-B <jason.oliveira.3@us.af.mil> | BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | RE: Classified Info | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation |
| ROE00583844 | 5/30/2024 | BURGHARD, JOSEPH D CIV USAF HAF SAF/SAF/AQL <joseph.burghard@us.af.mil> | BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil | RE: Dr. John Roe v. United States of America, et. al., Case No. 5:22-CV-00869 (W.D. Tex.) Lit Hold Notice | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00418496 | 5/31/2024 | MCDONALD, ALEXANDRA K SA USAF AFOSI AFOSI/PJ HQ <alexandra.mcdonald@us.af.mil> | OLIVEIRA, JASON CIV USAF AFOSI AFOSI/PJ DET 8/OL-B <jason.oliveira.3@us.af.mil>; MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQIT <william.mcveigh.1@us.af.mil>; BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | RE: Classified Info | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation |

**EXHIBIT 17**

**Page 32 of 37**

| # | Date | Author(s) | Recipient(s) | Document Description | Redacted or Withheld | Privilege/Justification |
|---|---|---|---|---|---|---|
| ROE00042366 | 6/4/2024 | BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQIT <william.mcveigh.1@us.af.mil> | Automatic reply: Dr. John Roe v. United States of America, et. al., Case No. 5:22-CV-00869 (W.D. Tex.) Lit Hold Notice | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00042368 | 6/4/2024 | MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQIT <william.mcveigh.1@us.af.mil> | BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | RE: Dr. John Roe v. United States of America, et. al., Case No. 5:22-CV-00869 (W.D. Tex.) Lit Hold Notice | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00046623 | 6/4/2024 | BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | RE: Dr. John Roe v. United States of America, et. al., Case No. 5:22-CV-00869 (W.D. Tex.) Lit Hold Notice | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00614338 | 6/4/2024 | MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQIT <william.mcveigh.1@us.af.mil> | BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | RE: Dr. John Roe v. United States of America, et. al., Case No. 5:22-CV-00869 (W.D. Tex.) Lit Hold Notice | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00074027 | 6/13/2024 | Skinner, Reginald M. (DOJ CIV) <Reginald.M.Skinner@usdoj.gov> | MCVEIGH, WILLIAM M Maj USAF HAF AF/A3CX <william.mcveigh.1@us.af.mil>; BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | [Redacted] | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler and DOJ Senior Trial Attorney Reginald Skinner about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00042152 | 6/14/2024 | BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | MCVEIGH, WILLIAM M Maj USAF HAF AF/A3CX <william.mcveigh.1@us.af.mil> | [Redacted] | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation |

**EXHIBIT 17**
**Page 33 of 37**

| # | Date | Author(s) | Recipient(s) | Document Description | Redacted or Withheld | Privilege/Justification |
|---|---|---|---|---|---|---|
| ROE00042154 | 6/14/2024 | MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQIT <william.mcveigh.1@us.af.mil> | Skinner, Reginald M. (CIV) <Reginald.M.Skinner@usdoj.gov>; BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil>; OLIVEIRA, JASON CIV USAF AFOSI AFOSI/PJ DET 8/OL-B <jason.oliveira.3@us.af.mil> | Automatic reply: [Redacted] | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler and DOJ Senior Trial Attorney Reginald Skinner about Roysdon litigation |
| ROE00074014 | 6/14/2024 | OLIVEIRA, JASON CIV USAF AFOSI AFOSI/PJ DET 8/OL-B <jason.oliveira.3@us.af.mil> | MCVEIGH, WILLIAM M Maj USAF HAF AF/A3CX <william.mcveigh.1@us.af.mil>; Skinner, Reginald M. (CIV) <Reginald.M.Skinner@usdoj.gov>; BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | [Redacted] | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler and DOJ Senior Trial Attorney Reginald Skinner about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00220484 | 6/14/2024 | MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQIT <william.mcveigh.1@us.af.mil> | Skinner, Reginald M. (CIV) <Reginald.M.Skinner@usdoj.gov>; BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil>; OLIVEIRA, JASON CIV USAF AFOSI AFOSI/PJ DET 8/OL-B <jason.oliveira.3@us.af.mil> | [Redacted] | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler and DOJ Senior Trial Attorney Reginald Skinner about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00414075 | 6/14/2024 | BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | OLIVEIRA, JASON CIV USAF AFOSI AFOSI/PJ DET 8/OL-B <jason.oliveira.3@us.af.mil> | Automatic reply: [Redacted] | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |

**EXHIBIT 17**
**Page 34 of 37**

| # | Date | Author(s) | Recipient(s) | Document Description | Redacted or Withheld | Privilege/Justification |
|---|---|---|---|---|---|---|
| ROE00418492 | 6/14/2024 | MCVEIGH, WILLIAM M Maj USAF HAF AF/A3CX <william.mcveigh.1@us.af.mil> | Skinner, Reginald M. (CIV) <Reginald.M.Skinner@usdoj.gov>; BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil>; OLIVEIRA, JASON CIV USAF AFOSI AFOSI/PJ DET 8/OL-B <jason.oliveira.3@us.af.mil> | [Redacted] | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler and DOJ Senior Trial Attorney Reginald Skinner about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00418710 | 6/14/2024 | OLIVEIRA, JASON CIV USAF AFOSI AFOSI/PJ DET 8/OL-B <jason.oliveira.3@us.af.mil> | MCVEIGH, WILLIAM M Maj USAF HAF AF/A3CX <william.mcveigh.1@us.af.mil>; Skinner, Reginald M. (CIV) <Reginald.M.Skinner@usdoj.gov>; BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | [Redacted] | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler and DOJ Senior Trial Attorney Reginald Skinner about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00073636 | 7/3/2024 | BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | MCVEIGH, WILLIAM M Maj USAF HAF AF/A3CX <william.mcveigh.1@us.af.mil> | [Redacted] | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00073641 | 7/3/2024 | BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | MCVEIGH, WILLIAM M Maj USAF HAF AF/A3CX <william.mcveigh.1@us.af.mil> | RE: Dr. John Roe v. United States of America, et. al., Case No. 5:22-CV-00869 (W.D. Tex.) Acknowledgment Notice | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00199068 | 7/3/2024 | BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | MCVEIGH, WILLIAM M Maj USAF HAF AF/A3CX <william.mcveigh.1@us.af.mil> | Roe v. DAF - Settlement demand | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |

**EXHIBIT 17**
**Page 35 of 37**

| # | Date | Author(s) | Recipient(s) | Document Description | Redacted or Withheld | Privilege/Justification |
|---|---|---|---|---|---|---|
| ROE00199070 | 7/3/2024 | BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | MCVEIGH, WILLIAM M Maj USAF HAF AF/A3CX <william.mcveigh.1@us.af.mil> | [Redacted] | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00220304 | 7/3/2024 | MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQIT <william.mcveigh.1@us.af.mil> | BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | [Redacted] | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00220320 | 7/3/2024 | MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQIT <william.mcveigh.1@us.af.mil> | BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | [Redacted] | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00220321 | 7/3/2024 | MCVEIGH, WILLIAM M Maj USAF HAF SAF/AQIT <william.mcveigh.1@us.af.mil> | BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | RE: Dr. John Roe v. United States of America, et. al., Case No. 5:22-CV-00869 (W.D. Tex.) Acknowledgment Notice | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00328524 | 7/3/2024 | BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | Dr. John Roe v. United States, et. al., Case No. 5:22-CV-00869 (W.D. Tex.) Acknowledgment Notice | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00578358 | 7/3/2024 | BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | BURGHARD, JOSEPH D CIV USAF HAF SAF/SAF/AQL <joseph.burghard@us.af.mil> | RE: Dr. John Roe v. United States of America, et. al., Case No. 5:22-CV-00869 (W.D. Tex.) Lit Hold Notice | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00627851 | 7/3/2024 | BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | OLIVEIRA, JASON CIV USAF AFOSI AFOSI/PJ DET 8/OL-B <jason.oliveira.3@us.af.mil> | RE: Dr. John Roe v. United States of America, et. al., Case No. 5:22-CV-00869 (W.D. Tex.) Acknowledgment Notice | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00630658 | 7/3/2024 | OLIVEIRA, JASON CIV USAF AFOSI AFOSI/PJ DET 8/OL-B | BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | RE: Dr. John Roe v. United States of America, et. al., Case No. 5:22-CV-00869 (W.D. Tex.) Acknowledgment Notice | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |

**EXHIBIT 17**
**Page 36 of 37**

| # | Date | Author(s) | Recipient(s) | Document Description | Redacted or Withheld | Privilege/Justification |
|---|---|---|---|---|---|---|
| ROE00631349 | 7/3/2024 | RANFT, RICHARD A CTR USAF AFMC AFLCMC/HNCO | BUTLER, MARVELLE L CIV USAF AFLOA/JACL <marvelle.butler@us.af> | RE: Dr. John Roe v. United States of America, et. al., Case No. 5:22-CV-00869 (W.D. Tex.) Acknowledgment Notice | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00631815 | 7/3/2024 | RANFT, RICHARD A CTR USAF AFMC AFLCMC/HNCO | BUTLER, MARVELLE L CIV USAF AFLOA/JACL <marvelle.butler@us.af.mil> | RE: Dr. John Roe v. United States of America, et. al., Case No. 5:22-CV-00869 (W.D. Tex.) Acknowledgment Notice | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00578355 | 7/5/2024 | BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | BURGHARD, JOSEPH D CIV USAF HAF SAF/SAF/AQL <joseph.burghard@us.af.mil> | RE: Dr. John Roe v. United States of America, et. al., Case No. 5:22-CV-00869 (W.D. Tex.) Lit Hold Notice | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00583834 | 7/5/2024 | BURGHARD, JOSEPH D CIV USAF HAF SAF/SAF/AQL <joseph.burghard@us.af.mil> | BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | RE: Dr. John Roe v. United States of America, et. al., Case No. 5:22-CV-00869 (W.D. Tex.) Lit Hold Notice | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00578255 | 7/8/2024 | BURGHARD, JOSEPH D CIV USAF HAF SAF/SAF/AQL <joseph.burghard@us.af.mil> | BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | RE: Dr. John Roe v. United States of America, et. al., Case No. 5:22-CV-00869 (W.D. Tex.) Lit Hold Notice | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00578256 | 7/8/2024 | BURGHARD, JOSEPH D CIV USAF HAF SAF/SAF/AQL <joseph.burghard@us.af.mil> | BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | RE: Dr. John Roe v. United States of America, et. al., Case No. 5:22-CV-00869 (W.D. Tex.) Lit Hold Notice | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00583830 | 7/8/2024 | BURGHARD, JOSEPH D CIV USAF HAF SAF/SAF/AQL <joseph.burghard@us.af.mil> | BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | RE: Dr. John Roe v. United States of America, et. al., Case No. 5:22-CV-00869 (W.D. Tex.) Lit Hold Notice | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |
| ROE00583831 | 7/8/2024 | BURGHARD, JOSEPH D CIV USAF HAF SAF/SAF/AQL <joseph.burghard@us.af.mil> | BUTLER, MARVELLE L CIV USAF AFDW AFLOA/JACL <marvelle.butler@us.af.mil> | RE: Dr. John Roe v. United States of America, et. al., Case No. 5:22-CV-00869 (W.D. Tex.) Lit Hold Notice | Withheld | Attorney/Client Privilege - communications with Air Force Attorney Marvelle Butler about Roysdon litigation; Work Product Doctrine - contains mental impressions |

**EXHIBIT 17**
**Page 37 of 37**

| **From:** | Seeman, Katrina M (CIV) <Katrina.M.Seeman@usdoj.gov> |
| **Sent time:** | 06/05/2025 02:55:35 PM |
| **To:** | Jason R. Wareham; Lance Henry; John Hodges <john@hhtx.law> |
| **Cc:** | Gonzalez, Joseph A. (CIV) <Joseph.A.Gonzalez@usdoj.gov>; Green, Robert (USATXW) <Robert.Green3@usdoj.gov> |
| **Subject:** | Beall Document Recovery |
| **Attachments:** | US0000784.pdf    US0000786.pdf |

Counsel:

The recovery of Air Force Office of Special Investigation Agent Allen Beall's SIC and CORE accounts is complete. Responsive documents are attached to this email; no responsive documents have been withheld.

Thanks,

Katrina (Kati) Seeman
Trial Attorney
U.S. Department of Justice, Civil Division
Constitutional & Specialized Tort Litigation
202-616-0674 | katrina.m.seeman@usdoj.gov

**CONFIDENTIALITY NOTICE:** This email may contain confidential, legally privileged information intended only for the named recipient. If you are not the intended recipient, note that disclosure, copying, distribution or taking any action in reliance on the contents of this information, except its delivery to the intended recipient, is strictly prohibited. If you have received this email in error, please contact the sender immediately and delete this message.

**EXHIBIT 18**
**Page 1 of 13**

US0000786.pdf

UNCLASSIFIED//FOR OFFICIAL USE ONLY

ID: 8316004
Marking: U//FOUO
From: Automated, System <UNK>
To: McDonald, Alexandra Kane <CIV>, AFOSI PJ HQ
Date: 5/7/25, 1:41 PM
Subject: FWD: BEALL-ConflictOfInterest MFR for Dr. Roysdon Please

To:
ALLEN.BEALL,ALLEN.RABAYDA,ANGELA.IVEY,BRIAN.BOHENEK,CHRISTINE.UPTAIN,JOSEPH.BURGHARD,MICHAEL.CRUNK,WILLIAM.BRIDGES,WILLIAM.MCVEIGH
From: WILLIAM.MCVEIGH
Sent Date of Message: 2020-AUG-24 13:21

Sir,

Attached is the latest MFR. We found out some additional information.

Dr. Roysdon will be leaving NSA within the next two weeks and looking at the email from his legal team, we believe that there is likely at a minimum conflict of interest.

Let me know if you have any questions or need us to research anything else.

-Will

William McVeigh, Capt, USAF
AFLCMC/HNCO
COMM: (210) 925-1974
DSN: (312) 945-1974
VoIP: 981-5265
NIPR: william.mcveigh.1@us.af.mil
JWICS: william.m.mcveigh@af.ic.gov

---

Marking: U//FOUO

Date: 8/19/20 12:21 PM

From: Burghard, Joseph D <CIV>, SAF/AQLC

To: McVeigh, William M <MIL>, AFLCMC/HNCO

Cc: Crunk, Michael D <CIV>, AFOSI PJ DET 8; Beall, Allen Ting <CIV>, AFOSI PJ DET 8/OL-B; Bohenek, Brian J <MIL>, SAF/AQLC; Bridges, William P <CTR>, SAF/AQLC; Rabayda, Allen C <CTR>, SAF/AQLC; Ivey, Angela M <CIV>, AFOSI PJ HQ; Uptain, Christine Lanin <CTR>, SAF/AQLC

Subject: MFR for Dr. Roysdon Please

Will,

Thank you for notifying us about Dr. Roysdon's possible conflict of interest situation. Since this was a first heard for all of us and since we'll likely need to find out more information, could you please draft up a quick MFR to document what we know now about his contractor v.s. NSA government civilian status and how that relates to work he supports in the portfolio? Please also cc all those on distro when you get a chance to send it out.

Thank you again for bringing this to our attention,

V/R
Danny Burghard

Program Element Monitor & Deputy Division Chief

Advanced Cyberspace Systems Division, SAF/AQLC

DSN(STE): 297-3974

COMM: 202-767-3974

TSVOIP: 982-9192

JWICS: joseph.burghard@af.ic.gov

---

| Attachments | |
|---|---|
| **Attachment** | Dr. Roysdon Letter Signed.pdf |
| **Marking** | U//FOUO |
| **Size** | 659615 KB |

---

UNCLASSIFIED//FOR OFFICIAL USE ONLY

**EXHIBIT 18**

**Page 2 of 13**

Confidential - Subject to Protective Order                                    US0000786

UNCLASSIFIED//FOR OFFICIAL USE ONLY

UNCLASSIFIED//FOR OFFICIAL USE ONLY

**EXHIBIT 18**
**Page 3 of 13**

Confidential - Subject to Protective Order                    US0000787

US000786.pdf

CUI



**DEPARTMENT OF THE AIR FORCE**
AIR FORCE LIFE CYCLE MANAGEMENT CENTER
CRYPTOLOGIC & CYBER SYSTEMS DIVISION
**JOINT BASE SAN ANTONIO-LACKLAND, TEXAS 78243**

21 August 2020

MEMORANDUM FOR RECORD

FROM: AFLCMC/HNCO

SUBJECT: (U) AFLCMC/HNCO Update on DD254 Status for Fibonacci

1. (CUI) In FY19, Dr. Paul Roysdon briefed the Fibonacci program at the TOP SECRET level to AFLCMC/HNCO and SAF/AQL. The National Security Agency (NSA) decided not to fund this program, and the program was funded by SAF/AQL as a RBAN project with unclassified components. At the time, Dr. Roysdon was a Government employee providing advice and guidance under the Government.

2. (U) Starting in FY19, Mr. Dan Brown brought Dr. Paul Roysdon to support the Fibonnaci program as a Technical Subject Matter Expert (contractor) as a subcontractor under Global Info Tech Inc (GITI). GITI holds an Air Force Research Laboratory (AFRL) ACT2 prime contract. Dr. Roysdon maintained his Government position at the NSA. Dr. Roysdon stated on 18 Aug 20 he obtained an Office of General Council (OGC) letter providing agreement for the project to be worked. AFLCMC/HNCO has received the NSA's legal guidance and believes there is likely a conflict of interest based off of the email on JWICS dated 20 Aug 20.

3. (CUI) Dr. Roysdon was cleared as a Government employee to RBAN, but not as a contractor. While the GITI contract has RBAN on their DD254, Dr. Roysdon's LLC does not have a Field Security Officer (FSO), DD254, and cage code that would allow him contractor SCI and program access. Dr. Roysdon's subcontractor work was solely unclassified. Dr. Roysdon's work as a Government employee included RBAN discussions about Fibonacci. Dr. Roysdon has been notified to stop work as a contractor. He may continue supporting the project as a Government employee under the NSA. However, Dr. Roysdon informed ALFCMC/HNCO on 20 Aug that he is planning to resign from NSA.

4. (CUI) Within AFLCMC/HNCO three other contractors require DD254 modification to allow RBAN: Kudu Dynamics, X8, and Crystal Clear. X8 and Crystal Clear, as a technical Subject Matter Expert (SME) are not doing any program work currently, but are expected to do RBAN work in FY21. No additional ALFCMC/HNCO contractors require DD254 SAP modifications. The Kudu Dynamics DD254 is expected to be completed by 23 Oct 20 pending signatures.

5. (U) Please direct any further questions to Capt William McVeigh at DSN: 945-1974 and william.mcveigh.1@us.af.mil.

JARED EKHOLM, Lt Col, USAF
Materiel Leader

CUI

**EXHIBIT 18**
**Page 4 of 13**

Confidential - Subject to Protective Order

**EXHIBIT 18**
**Page 5 of 13**
Confidential - Subject to Protective Order                    US0000789

US0000786.pdf

UNCLASSIFIED//FOR OFFICIAL USE ONLY

ID: 8316036
Marking: U//FOUO
From: Automated, System <UNK>
To: McDonald, Alexandra Kane <CIV>, AFOSI PJ HQ
Date: 5/7/25, 1:42 PM
Subject: FWD: BEALL-DanBrown Dr. Paul Roysdon.... Need to talk sooner than Thurs

To: ALLEN.BEALL,BRIAN.BOHENEK,JOSEPH.BURGHARD,MICHAEL.CRUNK
From: JOSEPH.BURGHARD
Sent Date of Message: 2020-AUG-24 14:45

Copy, sounds good.  Standing by.

V/R
Danny Burghard

Program Element Monitor & Deputy Division Chief

Advanced Cyberspace Systems Division, SAF/AQLC

DSN(STE): 297-3974

COMM: 202-767-3974

TSVOIP: 982-9192

JWICS: joseph.burghard@af.ic.gov

---

**Marking:** U//FOUO

**Date:** 8/24/20 9:31 AM

**From:** Beall, Allen Ting <CIV>, AFOSI PJ DET 8/OL-B

**To:** Burghard, Joseph D <CIV>, SAF/AQLC

**Cc:** Crunk, Michael D <CIV>, AFOSI PJ DET 8; Bohenek, Brian J <MIL>, SAF/AQLC

**Subject:** Dr. Paul Roysdon.... Need to talk sooner than Thurs

OK, I'm playing catch-up here, but I will talk to Will today about Dan Brown and Mr. Roysdon.  We're (Jason Oliveira and I) leaving for the SPO in like 15 min.  I will try to call you when we get back.

Allen

---

**Marking:** U//FOUO

**Date:** 8/21/20 2:42 PM

**From:** Burghard, Joseph D <CIV>, SAF/AQLC

---

UNCLASSIFIED//FOR OFFICIAL USE ONLY

**EXHIBIT 18**

**Page 6 of 13**

Confidential - Subject to Protective Order    US0000790

UNCLASSIFIED//FOR OFFICIAL USE ONLY

**To:** Beall, Allen Ting <CIV>, AFOSI PJ DET 8/OL-B; Crunk, Michael D <CIV>, AFOSI PJ DET 8

**Cc:** Bohenek, Brian J <MIL>, SAF/AQLC

**Subject:** Dr. Paul Roysdon.... Need to talk sooner than Thurs

Hey Allen,

Just found out Dr. Roysdon put in his two weeks with NSA. We really need to talk about his conflict of interest situation soonest while he is still a government civilian. You are talking with Mcveigh on Monday so please let us know if there is a good time we can talk on Monday after you meet with Mcveigh.

Thank you,

V/R
Danny Burghard

Program Element Monitor & Deputy Division Chief

Advanced Cyberspace Systems Division, SAF/AQLC

DSN(STE): 297-3974

COMM: 202-767-3974

TSVOIP: 982-9192

JWICS: joseph.burghard@af.ic.gov

UNCLASSIFIED//FOR OFFICIAL USE ONLY

**EXHIBIT 18**
**Page 7 of 13**

Confidential - Subject to Protective Order

US0000791

UNCLASSIFIED//█████████████████

ID: 8315131
Marking: U/█████████
From: Automated, System <UNK>
To: McDonald, Alexandra Kane <CIV>, AFOSI PJ HQ
Date: 5/7/25, 12:28 PM
Subject: FWD: BEALL-Roysdon

To: ALLEN.BEALL,JOSEPH.BURGHARD,MICHAEL.CRUNK
From: ALLEN.BEALL
Sent Date of Message: 2020-AUG-28 18:30

Danny, here's what I learned from Dr. Paul Roysdon when I de-briefed him. I forwarded it to Capt Mcveigh and the HNCO security office so they can give it to the security incident inquiry officer they are appointing.

Allen

| Attachments | |
| --- | --- |
| Attachment | ROYSDON FM40 with attachments, 20200826.pdf |
| Marking | U/█████████ |
| Size | 1332452 KB |

UNCLASSIFIED//█████████████████

**EXHIBIT 18**
**Page 8 of 13**
Confidential - Subject to Protective Order

**EXHIBIT 18**
**Page 9 of 13**
Confidential - Subject to Protective Order

US0000793

US0000786.pdf

UNCLASSIFIED// ███████████████████████

ID: 8315128
Marking: U//████████
From: Automated, System <UNK>
To: McDonald, Alexandra Kane <CIV>, AFOSI PJ HQ
Date: 5/7/25, 12:28 PM
Subject: FWD: BEALL-Roysdon

> To: ALLEN.BEALL,JOSEPH.BURGHARD,MICHAEL.CRUNK
> From: JOSEPH.BURGHARD
> Sent Date of Message: 2020-AUG-28 19:30
>
> Thank you!
>
> V/R
> Danny Burghard
>
> Program Element Monitor & Deputy Division Chief
>
> Advanced Cyberspace Systems Division, SAF/AQLC
>
> DSN(STE): 297-3974
>
> COMM: 202-767-3974
>
> TSVOIP: 982-9192
>
> JWICS: joseph.burghard@af.ic.gov

**Marking:** U//████████

**Date:** 8/28/20 2:30 PM

**From:** Beall, Allen Ting <CIV>, AFOSI PJ DET 8/OL-B

**To:** Burghard, Joseph D <CIV>, SAF/AQLC

**Cc:** Crunk, Michael D <CIV>, AFOSI PJ DET 8

**Subject:** No Subject

Danny, here's what I learned from Dr. Paul Roysdon when I de-briefed him. I forwarded it to Capt Mcveigh and the HNCO security office so they can give it to the security incident inquiry officer they are appointing.

Allen

UNCLASSIFIED// ███████████████████████

**EXHIBIT 18**
**Page 10 of 13**

Confidential - Subject to Protective Order                                    US0000794

UNCLASSIFIED//███████████████████████

**EXHIBIT 18**
**Page 11 of 13**

Confidential - Subject to Protective Order

US0000795

UNCLASSIFIED/███████████████████████████

ROYSDON interview and debrief

| From: | Beall, Allen Ting <CTR> | | | | 27-Aug-2020 15:22 |
|---|---|---|---|---|---|

To: McVeigh, William M <MIL>; Rowe, William O "Bulldog" <CIV>; Ranft, Richard Alan "CaddyShack" <EMB CTR>

Cc: Oliveira, Jason Nmn <EMB CTR>

Bcc:

| CWS Attachment ID | CFS File ID | CFS File Version ID | File Name | File Marking | File Size |
|---|---|---|---|---|---|
| 485396 | 999497 | 1017198 | ROYSDON FM40 with attachments 20200826.pdf | UNCLASSIFIED//████████ | 1 MB |

UNCLASSIFIED/██████████████████████

Hi, guys,

   Attached you will find my write-up of the chat and debrief I had with Dr. Roysdon yesterday. Please pass this on to your inquiry official when appointed.

Allen

UNCLASSIFIED/███████████████████████

UNCLASSIFIED/███████████████████████

Document is UNCLASSIFIED with Attachment Removed
**EXHIBIT 18**
**Page 12 of 13**
Confidential - Subject to Protective Order

**EXHIBIT 18**
**Page 13 of 13**
Confidential - Subject to Protective Order                    US0000785

| **From:** | Seeman, Katrina M (CIV) <Katrina.M.Seeman@usdoj.gov> |
|---|---|
| **Sent time:** | 06/12/2025 09:10:15 AM |
| **To:** | Gonzalez, Joseph A. (CIV) <Joseph.A.Gonzalez@usdoj.gov>; Lance Henry |
| **Cc:** | john@hhtx.law; Jason R. Wareham; Rebecca H. Bradshaw; Green, Robert (USATXW) <Robert.Green3@usdoj.gov> |
| **Subject:** | RE: 22-cv-00869 USDC W. TX |
| **Attachments:** | US0000796.pdf    US0000797.pdf |

Good morning:

Two more documents underwent review for release as we were finalizing Defendant's privilege log, and are now approved for release. Bates No. 797-801 is the document referenced in the log as Number 2.

Thanks,

Katrina (Kati) Seeman
Trial Attorney
U.S. Department of Justice, Civil Division
Constitutional & Specialized Tort Litigation
202-616-0674 | katrina.m.seeman@usdoj.gov

**CONFIDENTIALITY NOTICE:** This email may contain confidential, legally privileged information intended only for the named recipient. If you are not the intended recipient, note that disclosure, copying, distribution or taking any action in reliance on the contents of this information, except its delivery to the intended recipient, is strictly prohibited. If you have received this email in error, please contact the sender immediately and delete this message.

**From:** Gonzalez, Joseph A. (CIV) <Joseph.A.Gonzalez@usdoj.gov>
**Sent:** Thursday, May 22, 2025 3:12 PM
**To:** Lance Henry <lhenry@allen-vellone.com>; Seeman, Katrina M (CIV) <Katrina.M.Seeman@usdoj.gov>
**Cc:** john@hhtx.law; Jason R. Wareham <jwareham@allen-vellone.com>; Rebecca H. Bradshaw <rbradshaw@allen-vellone.com>; Green, Robert (USATXW) <Robert.Green3@usdoj.gov>
**Subject:** RE: 22-cv-00869 USDC W. TX

Lance,

We accept the May 30 reschedule date and will send out a revised notice shortly. Additionally, attached please find Defendants' privilege log. Thank you.

Best,

Joseph

**Joseph A. Gonzalez**
Trial Attorney
Constitutional & Specialized Torts Litigation
Civil Division
U.S. Department of Justice
(202) 598-3888
joseph.a.gonzalez@usdoj.gov

**From:** Lance Henry <lhenry@allen-vellone.com>
**Sent:** Thursday, May 22, 2025 2:24 PM
**To:** Seeman, Katrina M (CIV) <Katrina.M.Seeman@usdoj.gov>; Gonzalez, Joseph A. (CIV) <Joseph.A.Gonzalez@usdoj.gov>
**Cc:** john@hhtx.law; Jason R. Wareham <jwareham@allen-vellone.com>; Rebecca H. Bradshaw <rbradshaw@allen-vellone.com>; Green, Robert (USATXW) <Robert.Green3@usdoj.gov>
**Subject:** [EXTERNAL] RE: 22-cv-00869 USDC W. TX

Joseph and Kati,

The only date next week that Dr. Roysdon could potentially do is Friday, May 30, 2025. It is my understanding that he and Jason are doing what they can to clear his calendar that day and that they will use their best efforts to do so.

I am still drafting a comprehensive letter to you regarding all discovery issues in this case. As I said on the phone, this is not a gamesmanship tactic. It will be in the same spirit of good faith conferrals that counsel on both sides have modeled since you two recently entered this case. The contents in the letter are not new, but contains issues that have all been previously raised with you or your predecessors, but there are

**EXHIBIT 19**
**Page 1 of 10**

responses or production that remain outstanding. We thought it would be most helpful for you if we compiled these lingering discovery issues into one correspondence.

Sincerely,
Lance

## Lance Henry
Attorney at Law
Allen Vellone Wolf Helfrich & Factor P.C.
1600 Stout Street, Suite 1900, Denver, Colorado 80202
Direct (720) 245-2418 | Main (303) 534-4499
LHenry@allen-vellone.com
Pronouns he, him, & his

The contents of this email and any attachments are confidential or privileged and shall not be disseminated. Please notify the sender immediately if this email is received in error. Emails are not a secure method of communication and could be intercepted by an unintended third party. Allen Vellone Wolf Helfrich & Factor P.C.'s clients consent to receive emails from the law firm unless that consent is withdrawn in writing. Any tax advice in this communication shall not be used to avoid penalties imposed under the Internal Revenue Code or by a non-client for any tax-related matter.

**From:** Seeman, Katrina M (CIV) <Katrina.M.Seeman@usdoj.gov>
**Sent:** Wednesday, May 21, 2025 3:10 PM
**To:** Lance Henry <lhenry@allen-vellone.com>; Gonzalez, Joseph A. (CIV) <Joseph.A.Gonzalez@usdoj.gov>; Rebecca H. Bradshaw <rbradshaw@allen-vellone.com>; Green, Robert (USATXW) <Robert.Green3@usdoj.gov>
**Cc:** john@hhtx.law; Jason R. Wareham <jwareham@allen-vellone.com>
**Subject:** RE: 22-cv-00869 USDC W. TX

John and Lance,

Thank you for speaking with us this afternoon. This email confirms that Dr. Roysdon does not need to appear for his deposition tomorrow. Per our conversation, please provide us suggested alternative dates by COB tomorrow.

Thanks,

Katrina (Kati) Seeman
Trial Attorney
U.S. Department of Justice, Civil Division
Constitutional & Specialized Tort Litigation
202-616-0674 | katrina.m.seeman@usdoj.gov

**CONFIDENTIALITY NOTICE:** This email may contain confidential, legally privileged information intended only for the named recipient. If you are not the intended recipient, note that disclosure, copying, distribution or taking any action in reliance on the contents of this information, except its delivery to the intended recipient, is strictly prohibited. If you have received this email in error, please contact the sender immediately and delete this message.

**From:** Lance Henry <lhenry@allen-vellone.com>
**Sent:** Wednesday, May 21, 2025 3:04 PM
**To:** Gonzalez, Joseph A. (CIV) <Joseph.A.Gonzalez@usdoj.gov>; Rebecca H. Bradshaw <rbradshaw@allen-vellone.com>; Seeman, Katrina M (CIV) <Katrina.M.Seeman@usdoj.gov>; Green, Robert (USATXW) <Robert.Green3@usdoj.gov>
**Cc:** john@hhtx.law; Jason R. Wareham <jwareham@allen-vellone.com>
**Subject:** [EXTERNAL] Re: 22-cv-00869 USDC W. TX

Joseph,

I am unavailable for another hour or so. Will you be available to discuss this around 4:30 your time?

Sincerely,
Lance

Lance Henry
Attorney at Law
Allen Vellone Wolf Helfrich & Factor P.C.
1600 Stout Street, Suite 1900, Denver, Colorado 80202
Direct (720) 245-2418 | Main (303) 534-4499
LHenry@allen-vellone.com

The contents of this email and any attachments are confidential or privileged and shall not be disseminated. Please notify the sender immediately if this email is received in error. Emails are not a secure method of communication and could be intercepted by an

**EXHIBIT 19**
Page 2 of 10

unintended third-party. While we have met with Helfrich & Factor P.C. clients under below to cc'd emails from the law firm unless that consent is withdrawn in writing. Any tax advice in this communication shall not be used to avoid penalties imposed under the Internal Revenue Code or used by a non-client for any tax-related matter.

---

**From:** Gonzalez, Joseph A. (CIV) <Joseph.A.Gonzalez@usdoj.gov>
**Sent:** Wednesday, May 21, 2025 10:33:26 AM
**To:** Rebecca H. Bradshaw <rbradshaw@allen-vellone.com>; Seeman, Katrina M (CIV) <Katrina.M.Seeman@usdoj.gov>; Green, Robert (USATXW) <Robert.Green3@usdoj.gov>
**Cc:** Lance Henry <lhenry@allen-vellone.com>; john@hhtx.law <john@hhtx.law>; Jason R. Wareham <jwareham@allen-vellone.com>
**Subject:** RE: 22-cv-00869 USDC W. TX

Counsel,

Yesterday evening you attempted to unilaterally cancel Plaintiff's deposition set for tomorrow. The only reason provided was "Plaintiff has a conflict." June 9 was the only suggested reschedule date provided. This date is not only *after* the close of discovery (June 6), but also *after* mediation (June 4). We need you to address the following two questions as we consider your request to reschedule:

1. What is the specific reason for the request to reschedule? We appreciate that unforeseen circumstances arise and normally we would not press for an additional explanation. However, this is the fifth time you have created problems with deposition scheduling. On May 6 you cancelled a deposition of a government witness with only one hour notice. On May 7 you showed up one hour late to a deposition of a government witness. And then you cancelled two additional depositions, citing concerns about our document production. Now you want to cancel yet another scheduled deposition even though we proposed May 22 over a month ago and you confirmed in writing almost three weeks ago (May 2). "Plaintiff has a conflict" is not acceptable given this backdrop.

2. What is Plaintiff and counsel's availability next week? If we agree to withdraw our deposition notice for May 22, we insist that the deposition go forward next week.

If you are unwilling to provide the requested information, we should set up a call to discuss for this afternoon so that we can better understand the basis for your position. We are generally available. Thank you.

Best,

Joseph

**Joseph A. Gonzalez**
Trial Attorney
Constitutional & Specialized Torts Litigation
Civil Division
U.S. Department of Justice
(202) 598-3888
joseph.a.gonzalez@usdoj.gov

---

**From:** Rebecca H. Bradshaw <rbradshaw@allen-vellone.com>
**Sent:** Tuesday, May 20, 2025 6:40 PM
**To:** Seeman, Katrina M (CIV) <Katrina.M.Seeman@usdoj.gov>; Gonzalez, Joseph A. (CIV) <Joseph.A.Gonzalez@usdoj.gov>; Green, Robert (USATXW) <Robert.Green3@usdoj.gov>
**Cc:** Lance Henry <lhenry@allen-vellone.com>; john@hhtx.law; Jason R. Wareham <jwareham@allen-vellone.com>
**Subject:** [EXTERNAL] 22-cv-00869 USDC W. TX

Good afternoon,

The Plaintiff has a conflict with the fact witness deposition scheduled for Thursday, May 22, 2025. He has cleared June 9, 2025 to reschedule his deposition. Please advise whether this date works and if not, please provide new dates for our office. I apologize for the inconvenience. Thank you.

Very truly,

**Rebecca H. Bradshaw**
Paralegal
Allen Vellone Wolf Helfrich & Factor P.C.
1600 Stout Street, Suite 1900
Denver, Colorado 80202
rbradshaw@allen-vellone.com

**EXHIBIT 19**
**Page 3 of 10**

www.allenvellone.com

(720) 245-2445 | Direct

(303) 534-4499 | Main

(303) 893-8332 | Fax

The contents of this electronic mail (email), including attachments, are confidential and/or privileged and may not be disseminated without permission. Please notify the sender immediately if this email is received in error.  PLEASE NOTE:  Emails are not a secure method of communication and could be intercepted improperly by an unintended third-party.  Allen Vellone Wolf Helfrich & Factor P.C. is sending an email as a result of your consent.  If you no longer wish for communications to be sent in this manner, please notify Allen Vellone Wolf Helfrich & Factor P.C.  or me immediately.  IRS CIRCULAR 230 DISCLOSURE:  Pursuant to requirements imposed by the Internal Revenue Service, any tax advice contained in this communication, including any attachments, is not intended to be used, and cannot be used, for purposes of avoiding penalties imposed under the United States Internal Revenue Code or promoting, marketing or recommending to another person any tax-related matter.  Contact Allen Vellone Wolf Helfrich & Factor P.C. for formal written advice on this matter.

🌍 **Please consider the environment before printing this email.**

**EXHIBIT 19**

**Page 4 of 10**

UNCLASSIFIED//FOR OFFICIAL USE ONLY

**Marking: U//FOUO**
**Date: 5/26/21 5:47 PM**
**From: McVeigh, William M <MIL>, SAF/AQI**
**To: Bohenek, Brian J <MIL>, SAF/AQL; Burghard, Joseph Daniel <CIV>, SAF/AQLQ**
**Subject: MFRs**
Sir,

Here's the MFR that Lt Col Ekholm signed about the Dr. Roysdon incident. I know there was an OSI investigation that SA Beall did, but I never received the output of it. I did submit my witness report to the investigator, Rich Bremer. I hope this helps out.

-Will
William McVeigh, Maj, USAF
AFLCMC/HNCO
COMM: (210) 925-1974
DSN: (312) 945-1974
NIPR: william.mcveigh.1@us.af.mil
JWICS: william.m.mcveigh@af.ic.gov

| Attachment | Size | Marking | Description |
|---|---|---|---|
| Dr. Roysdon Letter Signed.pdf | 644kB | U//FOUO | |

2

UNCLASSIFIED//FOR OFFICIAL USE ONLY

**EXHIBIT 19**
**Page 5 of 10**

US0000796



CONTROLLED UNCLASSIFIED INFORMATION

----------
**Marking:** ▮▮▮▮▮
Date: 8/17/22 12:47 PM
From: Webb, Christopher Ryan <UNK>
To: Burghard, Joseph Daniel <CIV>, SAF/AQLQ
Cc: Cook, Eric W <CTR>, SAF/AQLQ; McKenzie, Brian M <CIV>, SAF/AQLM; Casey, Daniel James <MIL>, ANG/601AOG; Rabayda, Allen C <CTR>, SAF/AQLQ
Subject: Funding History for Fibonacci
Danny,

I just called up to explain that to Eric. I guess I should have been a little more specific in the breakdown timeframe!

Chris

----------
**Marking:** ▮▮▮▮▮
Date: 8/17/22 12:37 PM
From: Burghard, Joseph D <CIV>, SAF/AQLC
To: Cook, Eric W <CTR>, SAF/AQLC
Cc: Webb, Christopher Ryan <MIL>, AFOSI PJ DET 9; McKenzie, Brian M <CIV>, SAF/AQLM; Casey, Daniel J <MIL>, SAF/AQLC; Rabayda, Allen C <CTR>, SAF/AQLC
Subject: Funding History for Fibonacci
S.A. Webb,

Just to clarify a couple things, there were several Fibonacci projects that we funded for ▮▮▮▮▮ Dr. Roysdon kick-started all of them.  The three projects were as follows:

Fibonacci Fire
Fibonacci Lattice
Fibonacci Replicator

CONTROLLED UNCLASSIFIED INFORMATION                                    2

CONTROLLED UNCLASSIFIED INFORMATION

Shortly before Dr. Roysdon's departure, we cancelled Lattice and Replicator like we discussed and continue to fund Fire which is what the FY22/32 funding is for like Eric laid out below.

Eric,

I think S.A. Webb is really asking for the historic funding (FY21 and earlier) for Lattice and Replicator. Any chance you can find that breakout?

V/R
Danny Burghard
Chief, Advanced Cyberspace Systems Division, SAF/AQLC
COMM: 202-767-4063
TS VOIP: 987-1153

---------

Marking: ▮
Date: 8/17/22 12:12 PM
From: Cook, Eric W <CTR>, SAF/AQLC
To: Cook, Eric W <CTR>, SAF/AQLC
Cc: Webb, Christopher Ryan <MIL>, AFOSI PJ DET 9; Burghard, Joseph D <CIV>, SAF/AQLC; McKenzie, Brian M <CIV>, SAF/AQLM; Casey, Daniel J <MIL>, SAF/AQLC; Rabayda, Allen C <CTR>, SAF/AQLC
Subject: Funding History for Fibonacci
SA Webb,
I meant FY22 we sent $▮

For FY23, the current plan is to send $▮ for equipment), but could end up being less.

3

CONTROLLED UNCLASSIFIED INFORMATION

EXHIBIT 19
Page 7 of 10
Confidential - Subject to Protective Order

CONTROLLED UNCLASSIFIED INFORMATION

Also, we expected to send $▓▓▓▓▓▓ for sustainment.


V/R


Eric W. Cook
AF/AQLC (Advanced Cyberspace Systems Division)
Program Management/Budget Support
(U) 202-767-3975 (sharing Dan's phone at the moment)
(NSTS) 987-1238


----------

**Marking:** ▓▓▓▓▓▓▓
**Date: 8/17/22 12:10 PM**
**From: Cook, Eric W <CTR>, SAF/AQLC**
**To: Webb, Christopher Ryan <MIL>, AFOSI PJ DET 9**
**Cc: Burghard, Joseph D <CIV>, SAF/AQLC; McKenzie, Brian M <CIV>, SAF/AQLM; Casey,
Daniel J <MIL>, SAF/AQLC; Rabayda, Allen C <CTR>, SAF/AQLC**
**Subject: Funding History for Fibonacci**
SA Webb,
For FY23, it appears we sent ▓▓▓▓▓▓▓▓▓▓▓▓▓ of it was for equipment.
Does this answer the question or do you need anything else?
V/R


Eric W. Cook
AF/AQLC (Advanced Cyberspace Systems Division)
Program Management/Budget Support
(U) 202-767-3975 (sharing Dan's phone at the moment)
(NSTS) 987-1238


4

CONTROLLED UNCLASSIFIED INFORMATION

**EXHIBIT 19**
**Page 8 of 10**
Confidential - Subject to Protective Order

US000799

CONTROLLED UNCLASSIFIED INFORMATION

----------
**Marking:** ▮▮▮▮▮▮

**Date:** 8/17/22 10:17 AM

**From:** Webb, Christopher Ryan <MIL>, AFOSI PJ DET 9

**To:** Burghard, Joseph D <CIV>, SAF/AQLC

**Cc:** McKenzie, Brian M <CIV>, SAF/AQLM; Cook, Eric W <CTR>, SAF/AQLC; Casey, Daniel J <MIL>, SAF/AQLC; Rabayda, Allen C <CTR>, SAF/AQLC

**Subject:** Funding History for Fibonacci

Good morning Brian and Eric,

Were you guys able to get the the breakout for funding on the Fibonacci projects?

V/R,

SA Webb

----------
**Marking:** ▮▮▮▮▮▮

**Date:** 8/12/22 3:19 PM

**From:** Burghard, Joseph D <CIV>, SAF/AQLC

**To:** McKenzie, Brian M <CIV>, SAF/AQLM; Cook, Eric W <CTR>, SAF/AQLC

**Cc:** Webb, Christopher Ryan <MIL>, AFOSI PJ DET 9; Casey, Daniel J <MIL>, SAF/AQLC; Rabayda, Allen C <CTR>, SAF/AQLC

**Subject:** Funding History for Fibonacci

Brian, Eric,

Please meet Christopher Webb (cc'd). Chris needs to know the total amount of funding sent ▮▮▮▮▮ for the Fibonacci projects. Can you please help get that breakout to him next week sometime?

5

CONTROLLED UNCLASSIFIED INFORMATION

**EXHIBIT 19**
**Page 9 of 10**

Confidential - Subject to Protective Order

CONTROLLED UNCLASSIFIED INFORMATION

If you have any questions, please let me know.

Thank you,
V/R
Danny Burghard
Chief, Advanced Cyberspace Systems Division, SAF/AQLC
COMM: 202-767-4063
TS VOIP: 987-1153

No attachments

CONTROLLED UNCLASSIFIED INFORMATION                    6

**EXHIBIT 19**
**Page 10 of 10**
Confidential - Subject to Protective Order                    US0000801

CONTROLLED UNCLASSIFIED INFORMATION

Subject: FWD: BEALL-DanBrown Possible De-Brief for Dan Brown @ HNCO

To: ALLEN.BEALL,BRIAN.BOHENEK,JOSEPH.BURGHARD,MICHAEL.CRUNK
From: JOSEPH.BURGHARD
Sent Date of Message: 2020-AUG-21 17:22

Allen,

I think we should definitely discuss.  I see we are getting together on Thursday next week with ACC at 1000 (EST). Any chance you're available immediately after that?  I think it would be good to discuss this as well as the issue with Dr. Paul Roysdon and have that as a separate conversation than the one Mike wanted to have which was to go into more details in the portfolio.

As far as specific violations for Dan Brown, honestly he's just been sloppy with security as I think you saw with the ▓▓▓▓▓stuff.  He really just seems ignorant to what's required for execution of SAP programs which is weird since he's been doing this for a long time.  You should talk to Mcveigh about the conflict of interest situation for Dr. Roysdon.  Dan really doesn't see a potential conflict there and to me it's extremely obvious which is why it's starting to raise flags for me.  Anyways, I really can't point to a specific violation, just poor judgement on a number of things recently.

V/R
Danny Burghard

Program Element Monitor & Deputy Division Chief

Advanced Cyberspace Systems Division, SAF/AQLC

DSN(STE): 297-3974

COMM: 202-767-3974

TSVOIP: 982-9192

JWICS: joseph.burghard@af.ic.gov

Marking: U//▓▓▓▓▓

Date: 8/20/20 10:11 AM

From: Beall, Allen Ting <CIV>, AFOSI PJ DET 8/OL-B

To: Burghard, Joseph D <CIV>, SAF/AQLC

Cc: Crunk, Michael D <CIV>, AFOSI PJ DET 8; Bohenek, Brian J <MIL>, SAF/AQLC

Subject: Possible De-Brief for Dan Brown @ HNCO

Thanks for the heads up.  Does it make sense to get us together to discuss?  I know Mr. Crunk wanted to get on your schedule to discuss the details of your portfolio more in depth after listening in on portions of the PMR.  We could chat about this then as well.  I will reach out to Capt Mcveigh to get his opinion first hand too.

CONTROLLED UNCLASSIFIED INFORMATION

**EXHIBIT 20**

**Page 1 of 2**

CONTROLLED UNCLASSIFIED INFORMATION

███████████████

Any specific potential violations that you can think of that might reach the level of needing further investigation or reporting on our part? I think that if you can make a case that he is debriefed from all other programs, he should by default be debriefed from ██████ as well. If he's not debriefed from ██████, there should be some really strong compelling need to retain it.

FYI, he requesting a meeting with me to go over more ██████ security concerns/actions this coming Monday.

Allen

---

**Marking:** U// ██████

**Date:** 8/19/20 3:56 PM

**From:** Burghard, Joseph D <CIV>, SAF/AQLC

**To:** Beall, Allen Ting <CIV>, AFOSI PJ DET 8/OL-B

**Cc:** Crunk, Michael D <CIV>, AFOSI PJ DET 8; Bohenek, Brian J <MIL>, SAF/AQLC

**Subject:** Possible De-Brief for Dan Brown @ HNCO

Allen,

Just a heads up, I have concern on how Dan Brown is handling SAP protections down at HNCO. I'm not the only one either, Capt Will Mcveigh called today and mentioned that he is going to recommend to his leadership that Dan be de-briefed from everything except ██████ for similar concerns. If that is going to be the recommendation, I think we need to have a conversation about whether or not it makes sense for him to even keep ██████. Anyways, might be something for you to look into or put on your radar.

V/R
Danny Burghard

Program Element Monitor & Deputy Division Chief

Advanced Cyberspace Systems Division, SAF/AQLC

DSN(STE): 297-3974

COMM: 202-767-3974

TSVOIP: 982-9192

JWICS: joseph.burghard@af.ic.gov

---

CONTROLLED UNCLASSIFIED INFORMATION

**EXHIBIT 20**
**Page 2 of 2**
Confidential - Subject to Protective Order

US0000803

| From: | Jason R. Wareham |
|---|---|
| Sent time: | 02/13/2023 12:57:36 PM |
| To: | Skinner, Reginald M. \(CIV\) <Reginald.M.Skinner@usdoj.gov> |
| Cc: | Green, Robert \(USATXW\) <Robert.Green3@usdoj.gov> |
| Subject: | RE: Classified Information in Civil Cases |
| Attachments: | Ltr to Classification Authorities RE Access to Classified Information ICO Roe v. US.pdf |

Greetings, Reggie,

Please see the attached request letter for forwarding and action.

Additionally, we will have our extension motion on file today and get you a copy thereafter.

Best,

Jason

**Please keep my law clerk, Natalie Lamy, c/c'd on all emails to ensure prompt action: nlamy@thelawcenterpc.com
Click Here to Book Meeting with Jason Wareham









| t: | (303) 991-5255 |
|---|---|
| m: | (720) 819-6483 (After Hours) |
| e: | jrwareham@thelawcenterpc.com |
| a: | The Law Center, P.C., 300 Plaza Dr, Suite 200 |
| | thelawcenterpc.com |

This message is intended only for the use of the individual or entity to which it is addressed, and may contain information that is PRIVILEGED, CONFIDENTIAL and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone, at (866) 927-3426 and return the original to us by mail without making a copy. Thank you.

**From:** Jason R. Wareham
**Sent:** Monday, November 28, 2022 4:34 PM
**To:** Skinner, Reginald M. (CIV) <Reginald.M.Skinner@usdoj.gov>
**Cc:** Natalie Lamy <nlamy@thelawcenterpc.com>; John Hodges (john@hhtx.law) <john@hhtx.law>
**Subject:** Classified Information in Civil Cases

Reggie,

Following up on our CIPA discussion. I agree that CIPA itself applies to Criminal cases. However, I find nothing in CIPA that prohibits the "CIPA-like" procedures in a civil matter. To the contrary, I have found a DOJ regulation that basically applies the CIPA-like procedures to civil cases. Also, I have found a number of cases approving of this approach in civil cases. An excerpt from a good examination of the topic from Judge Lamberth in the USDC for DC is below.

28 CFR § 17.17 - Judicial proceedings. | Electronic Code of Federal Regulations (e-CFR) | US Law | LII / Legal Information Institute (cornell.edu)

**EXHIBIT 21**
**Page 1 of 2**

"The Court understands the implementation of CIPA-like procedures in civil cases is unusual. However, the Court of Appeals foresaw the problems that could arise in this case, and therefore conspicuously stated in [**23] 2007 that "nothing in this opinion forecloses a determination by the district court that some of the protective measures in CIPA, 18 U.S.C. app. III, which applies in criminal cases, would be appropriate, as Horn urges, so that this case could proceed." **11** *In re Sealed Case*, 494 F.3d at 154. **12** Indeed, the Court believes that the **CIPA**-like procedures and the associated rulings are the best way to prevent unauthorized disclosures of **classified** information and allow Horn to pursue his claim using non-**classified** materials."

[Horn v. Huddle, 636 F. Supp. 2d 10, 19 (D.D.C. 2009)](#)

See Also,

"**CIPA** only applies to criminal cases, but courts and the government follow similar procedures in **civil cases**. Robert Timothy Reagan, Keeping Government Secrets: A Pocket Guide on the State-Secrets Privilege, the Classified Information Procedures Act, and Classified Information Security Officers 9 (2d ed. 2013); see 28 C.F.R. § 17.17(c)."

[Halliwell v. A-T Sols., No. 13-CV-2014-H (KSC), 2014 U.S. Dist. LEXIS 126919, at *15 (S.D. Cal. Sep. 10, 2014)](#)

"The government correctly points out that, by statute, **CIPA** applies only in criminal cases. *See, e.g.*, 18 U.S.C. app. 3, §§ 3, 5; *Sedaghaty*, 728 F.3d at 903. Nevertheless, we have looked to **CIPA** for guidance on handling **classified** materials in **civil cases**. *See Latif II*, 686 F.3d at 1130; *Al Haramain II*, 686 F.3d at 983. Where **CIPA**-like procedures are appropriate, courts should not hesitate to employ them.**15**"

[Faisal Nabin Kashem v. Barr, 941 F.3d 358, 390 (9th Cir. 2019)](#)

I suggest we set a meeting after you satisfy your own research where we enter into a proposed approach to classified information in this case. Moreover, I found some discussion involving counsel with clearances themselves being able to review classified material. In fact, subsection (d) of the cited regulation seems to envision this as well. I believe that I still carry a TS/SCI eligibility and I believe John Hodges either still carries one or has in the past. If you agree with my analysis, then as an initial matter, if classified discovery is involved, we would request that we be appropriately read-in for the limited purposes of this case to review that discovery. Also, I think it prudent that we enter into a stipulated process (if we can) on the employment, use, and production of classified information, if necessary. We could then file that proposed stipulation with the Court for approval.

Best,

Jason

**Please keep my law clerk, Natalie Lamy, c/c'd on all emails to ensure prompt action: [nlamy@thelawcenterpc.com](mailto:nlamy@thelawcenterpc.com)

## Jason Wareham
### Managing Attorney





| | |
|---|---|
| **t:** | (303) 991-5255 |
| **m:** | (720) 819-6483 (After Hours) |
| **e:** | [jrwareham@thelawcenterpc.com](mailto:jrwareham@thelawcenterpc.com) |
| **a:** | The Law Center, P.C., 300 Plaza Dr, Suite 200 |
| | [thelawcenterpc.com](http://thelawcenterpc.com) |



This message is intended only for the use of the individual or entity to which it is addressed, and may contain information that is PRIVILEGED, CONFIDENTIAL and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone, at (866) 927-3426 and return the original to us by mail without making a copy. Thank you.

**EXHIBIT 21**
**Page 2 of 2**

CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking links, especially from unknown senders.

| | |
|---|---|
| **From:** | Skinner, Reginald M. (CIV) <Reginald.M.Skinner@usdoj.gov> |
| **Sent time:** | 04/04/2023 11:23:11 AM |
| **To:** | Jason R. Wareham |
| **Cc:** | John Hodges <john@hhtx.law>; Green, Robert \(USATXW\) <Robert.Green3@usdoj.gov> |
| **Subject:** | RE: [EXTERNAL]RE: Extension and Rule 26F |

Jason,

My co-counsel and I have been authorized to notify plaintiff of the agencies' decision, as counsel of record for the United States in this suit.

Thanks,
Reggie

_____
Reginald M. Skinner
Senior Trial Attorney
U.S. Department of Justice, Civil Division, Torts Branch
Constitutional & Specialized Tort Litigation
Tel: 202-616-3111
Fax: 202-616-4314
E-mail: reginald.m.skinner@usdoj.gov
*For mail delivery:*
P.O. Box 7146, Ben Franklin Station, Washington DC 20044
*For courier or overnight mail:*
175 N Street, NE, 7th Fl., Washington DC 20002

---

**From:** Jason R. Wareham <jrwareham@thelawcenterpc.com>
**Sent:** Tuesday, April 04, 2023 12:54 PM
**To:** Skinner, Reginald M. (CIV) <Reginald.M.Skinner@usdoj.gov>
**Cc:** John Hodges <john@hhtx.law>; Green, Robert (USATXW) <RGreen@usa.doj.gov>; Natalie Lamy <nlamy@thelawcenterpc.com>
**Subject:** RE: [EXTERNAL]RE: Extension and Rule 26F

Reggie,

Thanks on all.

Possible to get the denial letter?

Best,


**Please keep my law clerk, Natalie Lamy, c/c'd on all emails to ensure prompt action: nlamy@thelawcenterpc.com
Book Teams Meeting with Jason Wareham



**EXHIBIT 22**
**Page 1 of 12**



**t:**  (303) 991-5255
**m:**  (720) 819-6483 (After Hours)
**e:**  jrwareham@thelawcenterpc.com
**a:**  The Law Center, P.C., 300 Plaza Dr, Suite 200
    thelawcenterpc.com

---

**From:** Skinner, Reginald M. (CIV) <Reginald.M.Skinner@usdoj.gov>
**Sent:** Tuesday, April 4, 2023 10:47 AM
**To:** Jason R. Wareham <jrwareham@thelawcenterpc.com>
**Cc:** John Hodges <john@hhtx.law>; Green, Robert (USATXW) <Robert.Green3@usdoj.gov>; Natalie Lamy <nlamy@thelawcenterpc.com>
**Subject:** RE: [EXTERNAL]RE: Extension and Rule 26F

CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking links, especially from unknown senders.

Jason,

1.  Thanks for sending the revised 26(f) with plaintiff's ~~ons~~. There is a lot of redlining in the document. It might help if we could all look at a clean copy to make sure things are properly formatted and easy for the Court to follow. I'm happy to circulate a clean copy later this afternoon.

2.  The defendants do not object to your request for an additional 30-day extension to file plaintiff's opposition brief. Plaintiff's opposition is currently due by April 18, so the extension would extend the deadline for plaintiff's filing to May 18.

3.  The relevant federal agencies have reviewed your letter dated February 13, 2023, requesting "that counsel and Plaintiff be authorized access to and the ability to discuss and submit classified facts in this proceeding." The request for such access has been denied.

Thank you,
Reggie

_____
Reginald M. Skinner
Senior Trial Attorney
U.S. Department of Justice, Civil Division, Torts Branch
Constitutional & Specialized Tort Litigation
Tel: 202-616-3111
Fax: 202-616-4314
E-mail: reginald.m.skinner@usdoj.gov
*For mail delivery:*
P.O. Box 7146, Ben Franklin Station, Washington DC 20044
*For courier or overnight mail:*
175 N Street, NE, 7th Fl., Washington DC 20002

---

**From:** Jason R. Wareham <jrwareham@thelawcenterpc.com>
**Sent:** Monday, April 03, 2023 5:35 PM
**To:** Skinner, Reginald M. (CIV) <Reginald.M.Skinner@usdoj.gov>
**Cc:** John Hodges <john@hhtx.law>; Green, Robert (USATXW) <RGreen@usa.doj.gov>; Natalie Lamy <nlamy@thelawcenterpc.com>
**Subject:** RE: [EXTERNAL]RE: Extension and Rule 26F

Hey Reggie,

Made some tweaks to the 26f. Red (or Green as the case may be) line Attached.

Do you have a proposed timeline on the Classification Authority request?

Given the timetable around that request, Plaintiff requests additional 30 day extension from the current MTD deadline to

**EXHIBIT 22**
**Page 2 of 12**

receive an answer to that request (and assumedly mitigate any potential issues) will you consent, agree, or believe due considerations will be granted in return.

Best,

Jason

**Please keep my law clerk, Natalie Lamy, c/c'd on all emails to ensure prompt action: nlamy@thelawcenterpc.com
Book Teams Meeting with Jason Wareham







| t: | (303) 991-5255 |
| m: | (720) 819-6483 (After Hours) |
| e: | jrwareham@thelawcenterpc.com |
| a: | The Law Center, P.C., 300 Plaza Dr, Suite 200 |
| | thelawcenterpc.com |

**From:** Skinner, Reginald M. (CIV) <Reginald.M.Skinner@usdoj.gov>
**Sent:** Tuesday, March 28, 2023 11:59 PM
**To:** Jason R. Wareham <jrwareham@thelawcenterpc.com>
**Cc:** John Hodges <john@hhtx.law>; Green, Robert (USATXW) <Robert.Green3@usdoj.gov>; Natalie Lamy <nlamy@thelawcenterpc.com>
**Subject:** RE: [EXTERNAL]RE: Extension and Rule 26F

CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking links, especially from unknown senders.

Jason and John,

Please see the attached redline with defendants' edits to the 26(f) report.

Thanks,
Reggie

_____
Reginald M. Skinner
Senior Trial Attorney
U.S. Department of Justice, Civil Division, Torts Branch
Constitutional & Specialized Tort Litigation
Tel: 202-616-3111
Fax: 202-616-4314
E-mail: reginald.m.skinner@usdoj.gov
*For mail delivery:*
P.O. Box 7146, Ben Franklin Station, Washington DC 20044
*For courier or overnight mail:*
175 N Street, NE, 7th Fl., Washington DC 20002

**EXHIBIT 22**
**Page 3 of 12**

**From:** Jason R. Wareham <jrwareham@thelawcenterpc.com>
**Sent:** Monday, March 20, 2023 2:52 PM
**To:** Skinner, Reginald M. (CIV) <Reginald.M.Skinner@usdoj.gov>
**Cc:** John Hodges <john@hhtx.law>; Green, Robert (USATXW) <RGreen@usa.doj.gov>; Natalie Lamy <nlamy@thelawcenterpc.com>
**Subject:** Re: [EXTERNAL]RE: Extension and Rule 26F

Natalie will you please provide the copy he requests below?

**\*\*Please keep my law clerk, Natalie Lamy, c/c'd on all emails to ensure prompt action: nlamy@thelawcenterpc.com**

## Jason Wareham
### Managing Attorney

| t: | 3039915202 |
| m: | (720) 819-6483 (After Hours) |
| e: | jrwareham@thelawcenterpc.com |
| a: | The Law Center, P.C., 300 Plaza Dr, Suite 200 |
|   | thelawcenterpc.com |

TO AVOID THE POTENTIAL OF IMPROPERLY COMMUNICATING WITH OPPOSING PARTIES, OUR



This message is intended only for the use of the individual or entity to which it is addressed, and may contain information that is PRIVILEGED, CONFIDENTIAL and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone, at (866) 927-3426 and return the original to us by mail without making a copy. Thank you.

**From:** Skinner, Reginald M. (CIV) <Reginald.M.Skinner@usdoj.gov>
**Sent:** Monday, March 20, 2023 12:49:55 PM
**To:** Jason R. Wareham <jrwareham@thelawcenterpc.com>
**Cc:** John Hodges <john@hhtx.law>; Green, Robert (USATXW) <Robert.Green3@usdoj.gov>
**Subject:** RE: [EXTERNAL]RE: Extension and Rule 26F

CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking links, especially from unknown senders.

Thanks Jason. We have been in touch with the relevant agencies and hope to provide a formal response to your request for access to classified information in the coming days.

I clicked the link in your email below, and the working draft of the 26(f) report you've originated appears to already include track changes. I think it would be useful if you could please send over a clean copy that does not already include redlining—so that we can better keep track of who's proposing what edits. Also, please let me know if you don't mind sending the attachment as a stand-alone MS Word attachment, as

EXHIBIT 22
Page 4 of 12

opposed to emailing to the SharePoint cloud.

Thanks,
Reggie
_____

Reginald M. Skinner
Senior Trial Attorney
U.S. Department of Justice, Civil Division, Torts Branch
Constitutional & Specialized Tort Litigation
Tel: 202-616-3111
Fax: 202-616-4314
E-mail: reginald.m.skinner@usdoj.gov
*For mail delivery:*
P.O. Box 7146, Ben Franklin Station, Washington DC 20044
*For courier or overnight mail:*
175 N Street, NE, 7th Fl., Washington DC 20002

---

**From:** Jason R. Wareham <jrwareham@thelawcenterpc.com>
**Sent:** Monday, March 20, 2023 2:33 PM
**To:** Skinner, Reginald M. (CIV) <Reginald.M.Skinner@usdoj.gov>
**Cc:** John Hodges <john@hhtx.law>; Green, Robert (USATXW) <RGreen@usa.doj.gov>
**Subject:** RE: [EXTERNAL]RE: Extension and Rule 26F

Greetings, Reggie:

I waited a bit as I was hoping to have some resolution on our request to the Classification Authorities, but with the time it is taking, I though it best we get this on file. Please see a draft 26(f) report here:  2023 02-11 DRAFT 26.F Report.docx  Feel free to make proposed edits. I would ask that we keep the redline going for easy tracking.

Best,

Jason

**Please keep my law clerk, Natalie Lamy, c/c'd on all emails to ensure prompt action: nlamy@thelawcenterpc.com







t:                          (303) 991-5255
m:          (720) 819-6483 (After Hours)
e:          jrwareham@thelawcenterpc.com
a:          The Law Center, P.C., 300 Plaza Dr, Suite 200
            thelawcenterpc.com

**EXHIBIT 22**
**Page 5 of 12**

**From:** Jason R. Wareham <jrwareham@thelawcenterpc.com>
**Sent:** Wednesday, February 15, 2023 12:04 PM
**To:** Skinner, Reginald M. (CIV) <Reginald.M.Skinner@usdoj.gov>
**Cc:** John Hodges <john@hhtx.law>; Green, Robert (USATXW) <Robert.Green3@usdoj.gov>
**Subject:** RE: [EXTERNAL]RE: Extension and Rule 26F

Ok, understood. I am not allowed know what is in my client's head as "discovery."

Procedurally, have you submitted the letter sent this week to the Classification Authorities or are you refusing to forward given your position?

If refusing to forward, please consider this a conference on a motion to compel access to classified information in my client's own knowledge base as well as the relief contained in the letter.

Best,

Jason

**\*\*Please keep my law clerk, Natalie Lamy, c/c'd on all emails to ensure prompt action:** nlamy@thelawcenterpc.com
Click Here to Book Meeting with Jason Wareham







| | |
|---|---|
| **t:** | (303) 991-5255 |
| **m:** | (720) 819-6483 (After Hours) |
| **e:** | jrwareham@thelawcenterpc.com |
| **a:** | The Law Center, P.C., 300 Plaza Dr, Suite 200 |
| | thelawcenterpc.com |



This message is intended only for the use of the individual or entity to which it is addressed, and may contain information that is PRIVILEGED, CONFIDENTIAL and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone, at (866) 927-3426 and return the original to us by mail without making a copy. Thank you.

**From:** Skinner, Reginald M. (CIV) <Reginald.M.Skinner@usdoj.gov>
**Sent:** Wednesday, February 15, 2023 11:54 AM
**To:** Jason R. Wareham <jrwareham@thelawcenterpc.com>
**Cc:** John Hodges <john@hhtx.law>; Green, Robert (USATXW) <Robert.Green3@usdoj.gov>
**Subject:** RE: [EXTERNAL]RE: Extension and Rule 26F

I'm not sure how to state it any differently than below.

We do not agree that Dr. Roe is entitled to discovery for purposes of gathering facts to amend the complaint. Nor do we agree that there needs to be a "solution" for amending the complaint with classified information that Dr. Roe claims to possess.

So yes, the fact that Dr. Roe claims to currently possess classified information does not change the fundamental point that the pending dismissal motion raises several jurisdictional and substantive legal

**EXHIBIT 22**
**Page 6 of 12**

barriers that have nothing to do with the factual specificity of the complaint.

And again, unless and until the Court rejects those threshold defenses, it is premature to try to resolve the side issues you've raised about discovery or a "solution" for accessing/presenting classified information.

_____

Reginald M. Skinner
Senior Trial Attorney
U.S. Department of Justice, Civil Division, Torts Branch
Constitutional & Specialized Tort Litigation
Tel: 202-616-3111
Fax: 202-616-4314
E-mail: reginald.m.skinner@usdoj.gov
*For mail delivery:*
P.O. Box 7146, Ben Franklin Station, Washington DC 20044
*For courier or overnight mail:*
175 N Street, NE, 7th Fl., Washington DC 20002

---

**From:** Jason R. Wareham <jrwareham@thelawcenterpc.com>
**Sent:** Wednesday, February 15, 2023 1:43 PM
**To:** Skinner, Reginald M. (CIV) <Reginald.M.Skinner@usdoj.gov>
**Cc:** John Hodges <john@hhtx.law>; Green, Robert (USATXW) <RGreen@usa.doj.gov>
**Subject:** RE: [EXTERNAL]RE: Extension and Rule 26F

Ok, are you stating that discovery = speaking to my client about information he already knows?

**Please keep my law clerk, Natalie Lamy, c/c'd on all emails to ensure prompt action:** nlamy@thelawcenterpc.com
Click Here to Book Meeting with Jason Wareham







| | |
|---|---|
| **t:** | (303) 991-5255 |
| **m:** | (720) 819-6483 (After Hours) |
| **e:** | jrwareham@thelawcenterpc.com |
| **a:** | The Law Center, P.C., 300 Plaza Dr, Suite 200 |
| | thelawcenterpc.com |



This message is intended only for the use of the individual or entity to which it is addressed, and may contain information that is PRIVILEGED, CONFIDENTIAL and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone, at (866) 927-3426 and return the original to us by mail without making a copy. Thank you.

---

**From:** Skinner, Reginald M. (CIV) <Reginald.M.Skinner@usdoj.gov>
**Sent:** Wednesday, February 15, 2023 11:29 AM
**To:** Jason R. Wareham <jrwareham@thelawcenterpc.com>
**Cc:** John Hodges <john@hhtx.law>; Green, Robert (USATXW) <Robert.Green3@usdoj.gov>
**Subject:** RE: [EXTERNAL]RE: Extension and Rule 26F

**EXHIBIT 22**
**Page 7 of 12**

Thank you for elaborating, and sorry I missed your call this morning.

We do not agree that Dr. Roe is entitled to discovery for purposes of gathering facts to amend the complaint. Nor do we agree that there needs to be a "solution" for amending the complaint with classified information that Dr. Roe claims to possess.

As detailed in the Defendants' Response, the pending motion to dismiss raises several jurisdictional and substantive legal barriers that have nothing to do with the factual specificity of the complaint. For example, whether Dr. Roe has any Bivens remedy at all for the alleged retaliation or deprivation of his due process rights is a threshold question that does not turn on the content of any classified information. As for Dr. Roe's request for equitable relief (including reinstatement), the Court lacks jurisdiction to review Executive Branch security determinations or otherwise restore Dr. Roe's access to classified programs. Likewise, the jurisdictional bar that Section 2680 presents to Dr. Roe's FTCA claims raises an abstract legal question that has nothing to do with any classified facts Dr. Roe might possess. Ultimately, the motion to dismiss raises several pure questions of law—indeed, fundamental questions of subject matter jurisdiction and immunity. Unless and until the Court rejects those threshold defenses, it is premature to try to resolve the side issues you've raised about discovery or a "solution" for accessing/presenting classified information.

You should also be aware that in the event adjudication of your Dr. Roe's claims genuinely would require consideration of classified information, the government would have to consider invoking the state secrets privilege. But for the reasons I just mentioned, that too would be premature at this point.

Thanks,
Reggie
_____

Reginald M. Skinner
Senior Trial Attorney
U.S. Department of Justice, Civil Division, Torts Branch
Constitutional & Specialized Tort Litigation
Tel: 202-616-3111
Fax: 202-616-4314
E-mail: reginald.m.skinner@usdoj.gov
*For mail delivery:*
P.O. Box 7146, Ben Franklin Station, Washington DC 20044
*For courier or overnight mail:*
175 N Street, NE, 7th Fl., Washington DC 20002

**From:** Jason R. Wareham <jrwareham@thelawcenterpc.com>
**Sent:** Wednesday, February 15, 2023 9:37 AM
**To:** Skinner, Reginald M. (CIV) <Reginald.M.Skinner@usdoj.gov>
**Cc:** John Hodges <john@hhtx.law>; Green, Robert (USATXW) <RGreen@usa.doj.gov>
**Subject:** Re: [EXTERNAL]RE: Extension and Rule 26F

Reggie,

Tried to call. I'm not sure if we are talking past each other but I want to clarify. Assuming arguendo no discovery continues, this does not resolve the need for a classified information solution. Let me break it down.

1. I believe we all would agree that a remedy in a Rule 12b motion is amending a complaint.
2. You have made a number of arguments that we have failed to state a claim based on specificity or failure to allege sufficient facts on which relief could be granted.
3. We have notified the government that additional facts are available but classified; therefore unavailable to even discuss with our client outside a SCIF let alone write on an unclassified computer and submit (even under seal) to the court.
4. A solution to this is absolutely necessary or we are blocked from a rule 12 remedy.
5. This has zero to do with discovery even if you're correct that immunity arguments block discovery (not conceding).

The overarching issue that seems to be missed here is that classified information, even if contained within someone's head, cannot be verbalized or written down unless the others who hear it are approved and read in as well and are sitting in a SCIF. The ability to submit under seal to the court is secondary. Before that can even happen, Roe must be authorized to tell me and I must be authorized to hear it or it violates the national security acts.

Does the government still maintain the position that we don't need a solution for how we amend the complaint with classified information? Just amend. Not talking discovery.

**EXHIBIT 22**
**Page 8 of 12**

Please let me know your position on just that narrow issue before I reply to your response.

Best,

Jason

**\*\*Please keep my law clerk, Natalie Lamy, c/c'd on all emails to ensure prompt action: nlamy@thelawcenterpc.com**

## Jason Wareham
Managing Attorney

| | |
|---|---|
| **t:** | 3039915202 |
| **m:** | (720) 819-6483 (After Hours) |
| **e:** | jrwareham@thelawcenterpc.com |
| **a:** | The Law Center, P.C., 300 Plaza Dr, Suite 200 |
| | thelawcenterpc.com |

TO AVOID THE POTENTIAL OF IMPROPERLY COMMUNICATING WITH OPPOSING PARTIES, OUR



This message is intended only for the use of the individual or entity to which it is addressed, and may contain information that is PRIVILEGED, CONFIDENTIAL and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone, at (866) 927-3426 and return the original to us by mail without making a copy. Thank you.

**From:** Skinner, Reginald M. (CIV) <Reginald.M.Skinner@usdoj.gov>
**Sent:** Wednesday, February 15, 2023 7:05:36 AM
**To:** Jason R. Wareham <jrwareham@thelawcenterpc.com>
**Cc:** John Hodges <john@hhtx.law>; Green, Robert (USATXW) <Robert.Green3@usdoj.gov>
**Subject:** RE: [EXTERNAL]RE: Extension and Rule 26F

Good morning,

The Defendants' response is attached. We will forward the file-stamped copy when it becomes available.

Thank you.

Reggie

Reginald M. Skinner
Senior Trial Attorney
U.S. Department of Justice, Civil Division, Torts Branch
Constitutional & Specialized Tort Litigation
Tel: 202-616-3111

**EXHIBIT 22**
**Page 9 of 12**

Fax: 202-616-8470
E-mail: reginald.m.skinner@usdoj.gov
*For mail delivery:*
P.O. Box 7146, Ben Franklin Station, Washington DC 20044
*For courier or overnight mail:*
175 N Street, NE, 7th Fl., Washington DC 20002

---

**From:** Jason R. Wareham <jrwareham@thelawcenterpc.com>
**Sent:** Tuesday, February 14, 2023 1:29 PM
**To:** Skinner, Reginald M. (CIV) Reginald.M.Skinner@usdoj.gov
**Cc:** John Hodges john@hhtx.law; Green, Robert (USATXW) RGreen@usa.doj.gov
**Subject:** RE: [EXTERNAL]RE: Extension and Rule 26F

Reggie,

This was just filed. I will have a stamped copy for you in due course.

Best,

**\*\*Please keep my law clerk, Natalie Lamy, c/c'd on all emails to ensure prompt action:** nlamy@thelawcenterpc.com
Click Here to Book Meeting with Jason Wareham







| | |
|---|---|
| **t:** | (303) 991-5255 |
| **m:** | (720) 819-6483 (After Hours) |
| **e:** | jrwareham@thelawcenterpc.com |
| **a:** | The Law Center, P.C., 300 Plaza Dr, Suite 200 |
| | thelawcenterpc.com |



This message is intended only for the use of the individual or entity to which it is addressed, and may contain information that is PRIVILEGED, CONFIDENTIAL and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone, at (866) 927-3426 and return the original to us by mail without making a copy. Thank you.

---

**From:** Skinner, Reginald M. (CIV) <Reginald.M.Skinner@usdoj.gov>
**Sent:** Monday, February 6, 2023 2:22 PM
**To:** Jason R. Wareham <jrwareham@thelawcenterpc.com>
**Cc:** John Hodges <john@hhtx.law>; Green, Robert (USATXW) <Robert.Green3@usdoj.gov>
**Subject:** [EXTERNAL]RE: Extension and Rule 26F

**EXTERNAL EMAIL. Use caution accessing links or attachments.**

Hi Jason,

I was just about to email you. As previously mentioned, I do not object to an extension on your opposition to

**EXHIBIT 22**
**Page 10 of 12**

the defendants' first two business? You seem to be accommodating to my earlier extension request and I am very happy to extend the same courtesy to you.

My co-counsel, AUSA Robert Green, and I are available to meet and confer tomorrow. How's 2:00 p.m. EST? I can circulate a conference line, if this time works.

We should also close the loop on the motion to unseal. The defendants will be prepared to move to unseal the case before the end of this week.

Thanks,
Reggie

_____

Reginald M. Skinner
Senior Trial Attorney
U.S. Department of Justice, Civil Division, Torts Branch
Constitutional & Specialized Tort Litigation
Tel: 202-616-3111
Fax: 202-616-4314
E-mail: reginald.m.skinner@usdoj.gov
*For mail delivery:*
P.O. Box 7146, Ben Franklin Station, Washington DC 20044
*For courier or overnight mail:*
175 N Street, NE, 7th Fl., Washington DC 20002

---

**From:** Jason R. Wareham <jrwareham@thelawcenterpc.com>
**Sent:** Monday, February 06, 2023 4:04 PM
**To:** Skinner, Reginald M. (CIV) <Reginald.M.Skinner@usdoj.gov>
**Cc:** John Hodges <john@hhtx.law>
**Subject:** [EXTERNAL] Extension and Rule 26F

Reggie,

While we already discussed a first extension, I'd like to discuss a bit more detail with you as well as execute the 26f conference.

Would you have time tomorrow for this call?

Best,


**Please keep my law clerk, Natalie Lamy, c/c'd on all emails to ensure prompt action: nlamy@thelawcenterpc.com
Click Here to Book Meeting with Jason Wareham







| **t:** | (303) 991-5255 |
| **m:** | (720) 819-6483 (After Hours) |
| **e:** | jrwareham@thelawcenterpc.com |
| **a:** | The Law Center, P.C., 300 Plaza Dr, Suite 200 |
| | thelawcenterpc.com |

**EXHIBIT 22**
**Page 11 of 12**

This message is intended only for the use of the individual or entity to which it is addressed, and may contain information that is

PRIVILEGED AND CONFIDENTIAL and are exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone, at (866) 927-3426 and return the original to us by mail without making a copy. Thank you.

**EXHIBIT 22**
**Page 12 of 12**

**IN THE UNITED STATES DISTRICT COURT FOR**
**THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

|                               |   |                                     |
|-------------------------------|---|-------------------------------------|
| DR. JOHN ROE,                 | ) |                                     |
|                 Plaintiff,    | ) |                                     |
|           vs.                 | ) | **Civil Action No**. 1:25-CV-00000  |
| UNITED STATES OF AMERICA,     | ) |                                     |
| _____Defendant._____ | ) |                                  |

**DECLARATION OF DR. JOHN ROE IN SUPPORT OF PLAINTIFF'S**

**OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

1.    I, Dr. Paul Franklin Roysdon (also known in this litigation as "Dr. John Roe"), declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following statements are true and correct to the best of my knowledge, information, and belief.

**I.    INTRODUCTORY MATTERS**

2.    **Identity and Background:** My full legal name is Paul Franklin Roysdon, and I am the Plaintiff in this action. From 2015 until 2020, I served as a senior cyber-capabilities engineer and data scientist at the National Security Agency (NSA), holding a Top Secret/SCI clearance with Special Access Program (SAP) read-ons. In addition to my NSA duties, from February 2019 through August 2020 I worked as a subject-matter expert consultant for Global InfoTek, Inc. (GITI) on a U.S. Air Force SAP known as Project "Fibonacci," under task order HNCO-2019-113. This consulting was after-hours (not during my NSA work time) and was cleared through NSA's ethics office in advance. I did not use my NSA position to influence the Air Force project, and I kept the two roles separate.

3.  **Purpose of Affidavit:** I make this affidavit based on my personal knowledge and on my review of authenticated records. It is provided in support of my Opposition to Defendants' Motion for Summary Judgment, addressing both substantive facts and procedural issues. References to exhibits herein correspond to exhibits filed with the Opposition brief.

## II.    RETALIATORY MOTIVE & PRETEXT

4.  I have personal knowledge of events suggesting that the actions taken against me were motivated by retaliation and pretext, rather than any legitimate security concern:

5.  In January 2020, my colleague Dan Brown warned me that Captain William McVeigh (the Air Force officer managing Project Fibonacci) had a history of targeting people or projects that threatened his program funding. Brown conveyed that Capt. McVeigh had a "bad reputation" in this regard. I understood this as a caution that engaging or disagreeing with Capt. McVeigh could provoke adverse reactions. Indeed, Brown recounted that McVeigh became visibly upset when a project of his was not supported for funding, reinforcing the impression that McVeigh would retaliate to protect his programs.

6.  On 13 August 2020, during a private technical interchange at HNCO, I discussed with Dan Brown some critical flaws we both recognized in one of Capt. McVeigh's projects (referred to at that time as "Project B"). I agreed with Brown's professional assessment that the approach McVeigh was taking had serious problems. I was not aware that Brown later shared my candid technical concerns with Danny Burghard, who shared them with Capt. McVeigh. Brown invoked my name as a Subject Matter Expert (SME) and my comments to Burghard, who had just increased funding for the Fibonacci program. According to an email chain we obtained in discovery, Capt. McVeigh reacted

immediately and negatively upon learning of my comments, confirming the retaliatory tendency Brown had warned me about.

7.    On 14 August 2020, unbeknownst to me at the time, Capt. McVeigh escalated the situation after hearing my critique. Following a program review meeting on 13 August where the Fibonacci project's budget was increased, McVeigh learned of my private remarks. He expressed anger and initiated steps that very next day to remove me from the project. I later learned that McVeigh contacted his chain of command and others, portraying my dual role (as NSA employee and contractor) as a problem. His emails on 14 August 2020 reflect a hostile reaction and set in motion a chain of events to cut me out of the program (despite the fact that my NSA supervisors had approved my after-hours work).

8.    On 18 August 2020, Lt. Col. Jared Ekholm (the HNCO division chief and McVeigh's superior) issued an abrupt stop-work order directing that I be removed from all tasks on the SAP. This effectively terminated my role in Project Fibonacci effective immediately. No performance issues were cited; I was simply told to stop work. This timing—coming just days after I concurred with Dan Brown's critique of Capt. McVeigh's project—strongly suggests the stop-work order was retaliatory. Indeed, Ekholm testified that Capt. McVeigh was his "single focal point" on these programs and had brought forward information about me that Ekholm instructed him to write up for "later adjudication." In short, McVeigh reported me for purported issues only after I agreed with criticisms of his project, which points to a retaliatory motive.

9.    In summary, by mid-August 2020 I was removed from the Air Force project under sudden and suspicious circumstances. The pretext given was a purported security concern about my dual roles, but I contend that this was a false pretense. All my NSA supervisors had approved my outside work, and there was no actual conflict—only Capt.

McVeigh's anger that I had validated technical criticism of his work. The context and timing show a retaliatory animus which is relevant to my claims.

### III.    IRREGULAR OSI INVESTIGATION

10.    Immediately following my removal, I was subjected to an atypical and irregular inquiry by Air Force Office of Special Investigations (OSI) that further evidences pretext and procedural violations:

11.    From 24 to 26 August 2020, I was summoned by OSI Special Agent Allen Beall. Over the course of these days, SA Beall labeled me an "insider threat" suspect and aggressively interrogated me. He confronted me with a Program Access Request (PAR) justification memo (which had been used to grant me access to the SAP earlier) containing language suggesting a conflict of interest. I had never seen that justification before SA Beall showed it to me, and I told him it was incorrect—there had never been any improper information flow between the Air Force project and NSA. SA Beall's demeanor was hostile; he even threatened me with incarceration at one point, despite my cooperation. He demanded that I hand over copies of my 2019 email correspondence with the NSA Office of General Counsel (OGC)—emails which documented that I had ethics clearance for my consulting work. These emails were attorney-client privileged communications between me and the NSA's ethics attorney. I told SA Beall that he should request those directly from NSA OGC rather than from me, due to their privileged nature.

12.    Despite SA Beall's accusatory approach, his own notes and actions demonstrate there was no real security incident. During discovery in this case, we obtained SA Beall's contemporaneous notes and the OSI report index. They acknowledge that no compromise of classified information occurred and characterize the matter as

"administrative." In fact, the Air Force's follow-up Inquiry of Security Incident report (by Major Tom Bremer on 22 September 2020) concluded that "no compromise of classified information occurred" and that my actions "should not be classified as [a violation]." The OSI inquiry was closed on 22 September 2020 (the day after I started at Leidos) with a "No compromise" finding, and no full field investigation was ever opened (OSI did not even assign an I2MS case number). SA Beall himself debriefed me from the SAP on 27 August 2020, stating this was "merely an administrative measure (since I was no longer on the project due to my NSA resignation)," even though I do not notify NSA of my resignation until 28 August 2020 (the next day) and I continued to work for NSA until 21 September 2020 (nearly a month later). He indicated my Air Force access was terminated but not "for cause"—essentially, my clearance eligibility remained intact. This aligns with Lt. Col. Ekholm's testimony that after I resigned from NSA and was read out of the program, "no further actions would have been done" by HNCO because I no longer had a contract.

13. Notably, SA Beall nonetheless treated me as if I were under serious investigation during the August 2020 interview. He pressured me, with a threat of immediate incarceration, to provide privileged communications, which is highly irregular. And although the outcome was favorable (no compromise found), I was not given any formal memorandum clearing my name. I was debriefed from the program under a cloud of suspicion, and SA Beall even told me my NSA clearance "would be suspended"— something that did not actually occur, as NSA never suspended my clearance (I left NSA on my own accord for a private-sector job). The entire OSI inquiry process departed from normal protocols and suggests that the "insider threat" investigation was a pretext to justify my removal. In reality, as the Bremer report confirms, there was no security violation on my part.

14.    Dan Brown stated in August 2020 that he could not talk to me until the investigation was finished and that the investigation would take at least one year. He later confirmed to Todd Jaspers in December 2020 that he could not talk to me while I was being investigated. It was not until 21 May 2021 that Dan Brown finally called me, stating that the investigation had concluded and that contract funds had been reallocated to McVeigh's program (which I will discuss later). He made no mention of findings other than my "name had been dragged through the mud," and that "McVeigh shared my personal information with folks throughout the office as evidence of wrongdoing," and that I "could never again work for HNCO" because my "reputation was destroyed" and my "security clearance was flagged." Again, this information is from my personal notes.

15.    In summary, OSI's involvement was used as a pretextual tool. The Air Force never charged me with any wrongdoing, and by late September 2020 its own inquiry officially cleared me of compromising classified info. Yet, the stigma of being treated as an "insider threat" was allowed to linger, which paved the way for further adverse actions described below.

## IV.    AGENCY    CONDUCT    DEMONSTRATING    DE-FACTO DEBARMENT

16.    Following the OSI episode, Air Force personnel took a series of actions (and made statements) that effectively blacklisted me from future work—a de facto debarment from my field of offensive cyber contracting with the Air Force. I recount the key incidents demonstrating this ongoing exclusion:

17.    On 1 September 2020, Dan Brown (HNCO's technical director and my former colleague) relayed to me that HNCO leadership had decided I would "never work in HNCO

again." He told me, in substance, that he had been present for discussions with leadership and the message was clear that I was not to be allowed back on any HNCO project. This news was devastating and marked the start of my exclusion. During his deposition, Brown was asked if he made such statements; he did not recall the exact words. Nonetheless, I distinctly remember him conveying this to me on September 1st because I kept notes in the event that I needed to seek legal counsel.

18.    On 18 August 2020, my consulting firm GITI terminated my subcontract at the Air Force's direction. GITI's leadership (Ted Oakley) informed me that they had been told by the Air Force that I was under an investigation and ineligible for future work. As a result, the task order with HNCO was abruptly ended. This termination cost me approximately $950,000 in anticipated earnings (the remaining value of the contract), and $5 million on the new programs that Dan Brown requested I work on in August 2020. Dan even suggested that I start a Cyber-AI company because this new field was so transformative for the Air Force and that these programs would continue for the next 5-10 years at roughly $5M a year.  In fact, this field has exploded in the last 5 years with contracts that exceed $20M per year and continue to increase as AI adoption has increased in this market.  Clearly, the termination and debarment from a transformative field and its contracts sent a clear signal to others in the industry that I was effectively persona non grata for Air Force cyber projects.

19.    On 6 October 2020, Capt. McVeigh took steps to formally replace me on Project Fibonacci. He submitted a request to reallocate program funding in order to hire another contractor in my stead. Internal HNCO records (obtained in discovery) show that McVeigh justified a funding realignment on the basis that I was no longer performing the work, and another person was needed. HNCO did attempt to bring in a replacement for my

role; however, according to Dan Brown, the individual hired to replace me was "nowhere near the technical qualifications" that I had. Brown testified that this replacement (Mr. Pennington) ended up doing "busy work" because they could not utilize him the way they had used me. In other words, my unique expertise could not be readily replaced, yet HNCO preferred to leave the position effectively unfilled (or filled in name only) rather than allow me to return. This underscores that the effort to exclude me overrode the Air Force's own program interests.

20.    In February 2023, more than two years later, the blacklisting persisted. Dan Brown emailed his colleague Todd Jaspers—now working at Leidos—instructing that my name must not appear on any deliverable to HNCO. At that time I was employed at Leidos, and Jaspers was aware of my past issues with HNCO. Brown's email (produced in discovery) explicitly barred even mentioning me in HNCO contract work, which effectively prevented Leidos from proposing me or crediting my contributions on any HNCO-related project. This is extraordinary and demonstrates an ongoing effort within the Air Force community to keep me out. When I learned of this, it confirmed that my de facto ban was not just a one-time event in 2020, but an enduring stigma.

21.    **Ongoing Exclusion (2020–Present):** Since August 2020, I have been excluded from all SAP or offensive-cyber contract work with the Air Force. I have been proposed as key personnel on at least a dozen contract proposals for Leidos in the offensive cyber/AI field—and none have been awarded when my involvement was disclosed. While correlation is not causation, it is highly suspicious that every such opportunity evaporated. The only consistent factor was my name and the knowledge (within the Air Force circles) that I was "the person who had a problem at HNCO." In practical terms, I have been prevented from working in the very niche field (AI for offensive cyber operations) that I

specialize in, and in fact created, due to an informal blackball. HNCO was, at the time of my ouster, the only division funding AI-based offensive cyber tools in the government at that time. Being banned from HNCO effectively meant a ban from my primary field of expertise across the entire Department of Defense.

22.    In sum, through a combination of direct orders (the stop-work and funding reallocation), internal communications (e.g., "never work here again"), and behind-the-scenes directives (telling agencies and departments not to use me), the Defendants have "effectively foreclosed" me from practicing my chosen profession in the Air Force community. This pattern of exclusion began immediately after I was labeled an insider threat in 2020 and has continued for years. It is tantamount to a de facto debarment without due process.

## V.   COMMUNITY   DISSEMINATION   OF   STIGMATIZING ALLEGATIONS

23.    My professional reputation has been severely damaged by the spread of false and stigmatizing allegations emanating from the Air Force. I was made aware of several instances in which Defendants' agents or representatives disseminated information that I was under investigation or had committed wrongdoing, which was untrue (and validated since the inquiry found no compromise):

24.    **Disclosures to Contractor (GITI):** Mr. Ted Oakley of GITI told me that Air Force officials had informed him I was "under investigation" and not eligible for future work. This statement was given to my employer at the time (GITI) and directly led to my removal from the contract. Being labeled as "under investigation" in government contracting circles is highly damaging—it implies serious misconduct. The fact that this

was communicated outward, beyond those with a need to know, stigmatized me in the eyes of a third-party employer, and later followed me to Leidos.

25.    **Disclosures via OSI:** Dan Brown informed me that an OSI agent (or someone acting on OSI's behalf) had mentioned in the HNCO office that I was under an investigation and ineligible to return. Brown's understanding, which he relayed to me, was that OSI had essentially blacklisted me pending some undefined investigation. This further spread the notion among my colleagues that I had done something wrong. Notably, OSI never charged me and formally closed the matter as "no compromise," but those facts were not made known—instead the cloud of "investigation" lingered.

26.    **Rumors at NSA:** My NSA and CYBERCOM colleagues even heard damaging rumors. Todd Jaspers, who worked with me at NSA and later at Leidos, told me that NSA leadership had heard I "lost my clearance due to ethics issues." This is a completely false narrative—I never lost my clearance; I resigned from NSA on good terms and my security clearance was intact. The only "ethics" matter was the pre-approved consulting, which I had cleared with NSA OGC and which was found not to be a conflict. Yet, someone in the Air Force or OSI apparently communicated to NSA that I had an ethics or clearance problem. Having such an accusation reach my home agency (NSA) was extremely harmful: it tarnished my name among those who had been my professional community for years, further damaging my reputation and ability to return to NSA, and continued to my employment at ODNI.

27.    Each of these instances demonstrates how the Defendants (through their agents) publicly disseminated a false, stigmatizing charge against me—namely, that I was under investigation for a security or ethics violation—at the very time they removed me from the project. These statements were made to parties outside the investigative chain

(such as contractors and other agencies) and had no legitimate purpose other than to justify my exclusion. They have had the effect of seriously damaging my standing and good name in the community. To this day, I encounter the fallout: for example, when interviewing for positions or joining proposals, I have to address why I left NSA and HNCO—and the shadow of these allegations inevitably looms. This stigmatization is a core aspect of my "stigma-plus" due process claim, as it has foreclosed opportunities and was coupled with the alteration of my legal status (the de facto exclusion from my field).

28.     I recently resigned as Deputy Director of National Intelligence at ODNI to return to the private sector, and I have zero confidence that I will be able to obtain CyberAI contracts from the Air Force because I believe that my contractor debarment continues.

## VI.   DENIAL OF NAME-CLEARING OPPORTUNITY

29.     I was never given any avenue to clear my name or rebut the accusations made against me, despite my repeated efforts:

30.     On 2 September 2020, I called Dan Brown, requesting an audience or meeting with HNCO leadership so that I could address and refute the allegations that had been swirling (specifically, the conflict-of-interest narrative and any suggestion I mishandled information). I was very anxious to set the record straight and preserve my ability to work in the Intelligence Community and DoD. Brown responded that "no avenue is available" for me to present my side of the story. In other words, HNCO leadership refused to even meet with me or hear any explanation. I effectively begged for a chance to clear my name, and I was flatly denied. This conversation is documented in an email exchange produced in discovery, where Brown tells me there was nothing I could do to challenge the decision internally.

31.    **No Formal Process Provided:** Beyond that email, no one in the Air Force or DoD ever offered me any form of a hearing, appeal, or other name-clearing procedure. I was not given a chance to speak on my own behalf before being removed, nor after the OSI inquiry concluded in my favor. The usual processes (for example, if someone's security clearance is revoked, they get a Statement of Reasons and a chance to respond) were never triggered in my case, because nominally my clearance wasn't adjudicated—I was just removed and blacklisted informally. This left me with no internal remedy.

32.    In 2022, out of desperation, I filed a DoD Inspector General "Hotline" complaint laying out how I was retaliated against and excluded without due process. The DoD IG declined to take up the matter, dismissing my complaint on procedural or jurisdictional grounds (they did not investigate the merits). Essentially, I was told this was not the appropriate channel. Thus, even the IG route failed to provide any review of my allegations.

33.    In short, I proactively sought any path to clear the stigma from my name—both informally through HNCO and formally through the DoD IG—and I was shut out at every turn. I was left with the stark reality that the defendants had decided to ruin my career and reputation, and I had no means within the system to correct the record. This lawsuit has become the only avenue for me to obtain a name-clearing hearing, effectively.

## VII.    PRIVACY ACT VIOLATIONS

34.    In the course of removing me and discussing my case, the Defendants violated the Privacy Act, 5 U.S.C. § 552a, by mishandling my personal information in multiple ways:

35.    **Improper Disclosure of OSI Report:** The Air Force Report of Investigation (ROI) prepared by OSI—which contains detailed personal information about me, including my name, birth date, social security number, employment history, and the allegations—was disseminated via email to individuals who had no "need to know." In particular, Capt. McVeigh (who was the program manager, not a security officer) received a copy of the OSI ROI in or around late 2020, and even contractor personnel (who were not government employees) were copied on that email. This is apparent from the metadata of the OSI ROI production and admissions in discovery. Such dissemination of my protected personal and investigative file without my consent, and not pursuant to a routine use, is unlawful under the Privacy Act. The ROI should have been tightly held within OSI and security channels, yet it was shared broadly, effectively branding me as an "insider threat" to people far and wide.

36.    **Misleading Records in Security Databases:** An Air Force security office generated a clearance action memorandum or entry for me in the Joint Personnel Adjudication System (JPAS) / Defense Information Security System (DISS)—the databases that track clearance status. That entry, placed in late 2020, flags an "incident" or issue with my clearance. However, it failed to include the crucial fact that the inquiry concluded with no compromise and that I was not at fault. In other words, my clearance record in JPAS was annotated in a negative way (which can be seen by any other agency that checks my clearance) with a misleading narrative of a conflict of interest. No correction or amendment was made to reflect that the issue was baseless. I consider this a violation of the Privacy Act's accuracy requirement. Through counsel, I have requested the accounting of disclosures for my JPAS record (as allowed by 5 U.S.C. § 552a(c)), and no accounting was provided that shows who accessed or amended my record. The absence of a § 552a(c) disclosure accounting itself suggests that proper procedures were not followed

when my info was shared or modified. This continues to affect my TS//SCI clearance, full-scope polygraphs, and employment.

37.    **Spoliation of Relevant Records:** After this lawsuit was filed, I learned that SA Beall's government email accounts (on both unclassified NIPR and classified SIPR networks) were deleted following his untimely death—despite a litigation hold being in place. Beall passed away during the pendency of this case, and instead of preserving his correspondence (which almost certainly contained discussions about me and the OSI inquiry), the Air Force allowed his accounts and all their contents to be purged. This occurred while my discovery requests were outstanding, thereby destroying evidence that I had specifically sought (such as the full August 2020 email titled "Roysdon write-up" that SA Beall sent to Capt. McVeigh and others). The deletion of SA Beall's accounts violated not only common preservation duties but arguably the Privacy Act as well, since it involved the disposal of records about me that should have been preserved for this dispute.

38.    In summary, the Defendants did not handle my personal information in accordance with the law. They spread it improperly, failed to ensure its accuracy, and even deleted key records during litigation. These actions form the basis of my Privacy Act claims and further show a disregard for my rights in Defendants' rush to marginalize me.

## VIII.    RESULTING PROFESSIONAL AND PERSONAL HARM

39.    The retaliatory and unlawful actions against me have caused severe damages, both economically and personally:

40.    **Lost Income and Career Opportunities:** I estimate that I have lost roughly $20 million (roughly $5 million per year) in present and future earnings as a direct result

of these events. This figure includes the approximately $950,000 in income I was slated to earn from the GITI subcontract that was terminated, and the $5M in new projects for the coming year, as well as the loss of multiple promotions or higher-paying opportunities I would have accessed had I remained in my field. After being ousted from HNCO in 2020, I did secure other employment (for example, I joined Leidos, where I initially made about three times my NSA salary). However, my career trajectory was fundamentally altered: instead of continuing on a rising path in offensive cyber programs (with increasing leadership and innovation roles), I had to pivot to more generalized research and oversight roles. I was essentially forced out of the cutting-edge offensive cyber AI work that I had been passionate about, I created in the DoD and IC, and was uniquely skilled in. Not being able to participate in the handful of projects across DoD that involve that specialized field has stunted my professional growth, particularly in a field where AI adoption has increased ten-fold in just a few years and nearly every new cybersecurity contract requires AI.

41.    **Reputation and Networking Harm:** My professional reputation has been severely tarnished. In a field like cybersecurity—especially within the cleared defense contractor community—one's name is everything. The stigma of being seen as a "security risk" or "ethically tainted" has caused colleagues and potential employers to keep me at arm's length. I have missed out on at least a dozen teaming opportunities where I was slated to be key personnel, only to be quietly dropped once the client (or prime contractor) learned that "Dr. Roysdon had an issue with the Air Force." I have also been disinvited from certain industry consortiums and conferences that I used to attend as an expert, presumably because the government personnel involved are uncomfortable with my participation now. This black mark on my name is directly attributable to Defendants' actions and statements.

42.    **Emotional Distress:** The ordeal has taken a serious toll on my mental and emotional well-being. I have experienced significant anxiety, stress, and depression symptoms. The sudden end of my NSA career (which I loved), the financial instability that followed, and the ongoing exclusion from my professional community have all been extremely difficult to cope with. I have suffered from insomnia and a loss of self-confidence. In late 2020 and again in 2021, I sought counseling support through a church-affiliated ministry, because I was struggling with feelings of betrayal and hopelessness. It is not an exaggeration to say that this experience shattered my trust in the institutions I once served. While I have been working to rebuild my career and confidence, the emotional scars are still there, and I continue to have anxiety about whether I will ever fully restore my professional standing—especially in a field I helped create and that is now the dominant field in cybersecurity contracts for the entire U.S. Government.

43.    **Professional Redirection and Loss of Purpose:** Perhaps most painful, I have effectively had to abandon the specialized vocation that I spent years developing. Offensive Cyber Operations with AI was a niche I helped pioneer. HNCO was (in 2020) the only place funding that kind of work in the government. After being blacklisted, I had no choice but to pivot to other areas. I now work in roles that, while still technical, do not have the same level of impact or alignment with my passions. I have become more of an advisor and overseer, rather than the hands-on innovator I was at NSA and HNCO. In sum, my career has been derailed—not due to lack of ability or effort, but due to Defendants' unlawful actions.

44.    In legal terms, I have suffered both "tangible" harms (financial losses) and intangible harms (reputational damage and emotional pain). These damages are directly linked to the retaliatory and stigmatizing conduct described above. I assert that I would not

have experienced any of this harm but for the Defendants branding me as a security/ethics risk and barring me from the community without due process.

### IX.    OUTSTANDING DISCOVERY NECESSARY UNDER RULE 56(D)

45.    I want to emphasize that, as of the date of this affidavit, there remain key pieces of outstanding discovery that I have not been able to obtain, despite diligent efforts. These items are crucial for fully opposing the Defendants' summary judgment motion, and I understand my legal team is moving under Fed. R. Civ. P. 56(d) to defer or deny summary judgment until this evidence is produced. In particular, the following specific materials are still needed:

46.    **Unredacted OSI Investigation File:** We have only a heavily redacted version of the OSI Report of Investigation and the associated OSI Form 40 (Agent's notes). We need the unredacted ROI and Form 40 to see the complete findings and narrative. The government has invoked privilege or security for some redactions, but I believe these documents contain exculpatory details (for example, SA Beall's acknowledgment that this was an administrative issue, not a true security incident). An unredacted version is necessary to show precisely what OSI found (or did not find).

47.    **Email titled "Roysdon write-up" (Classified Systems):** There is a critical email dated August 2020—often referred to as the "Roysdon write-up" email—that SA Beall sent to Capt. McVeigh, Lt. Col. Ekholm, and possibly others, summarizing "what we know" about me. This email was sent on a classified network (the Air Force's secure CORE email system) and we have not received the full content. It was referenced in testimony and by title in an index, but the full email (and any attachments) have never been produced. This document is likely to show the internal rationale (or lack thereof) for my removal and

could contain inaccuracies that I can refute. We have requested a classified disclosure or declassification review of this email, but to date it remains withheld.

48.    **JPAS/DISS Access Logs:** We seek the access and amendment logs from JPAS/DISS that show every time my security clearance record was viewed or modified, and by whom, from 2020 to present. This would reveal, for instance, who entered the "incident" in my file and who accessed my records (e.g., to spread the information to NSA or others). The Privacy Act entitles me to this log, but the government has not provided it. Such records are important to prove the extent of publication of the stigmatizing allegations.

49.    **Privileged Communications About My Removal:** We are aware that Air Force legal and security personnel discussed my situation internally (e.g., communications involving JAG attorneys, SAF/GC, or others, possibly asserting privilege). These internal communications likely show the real reasons for my removal (e.g., fear of funding issues, retaliation) as opposed to the stated reasons. We have requested an in camera review of any such communications, because if Air Force leadership decided to bar me for non-security reasons (e.g., personal retaliation or to appease Capt. McVeigh), that is highly relevant to my claims. So far, any such communications have not been produced or logged clearly.

50.    **Security Database Entries (Higher Headquarters):** There are indications that the Air Force Materiel Command (AFMC) or Headquarters Air Force (HAF/A1) have entries or reference notes about my status (for example, notations in incident databases or debarment lists). We have not received records from those sources. If there exists any formal "do not hire" or "deny access" listing with my name (even if informal), that would

directly prove my de facto debarment. We have asked for any records of this nature, but discovery is ongoing.

51.    Each of the above items is essential for painting a full picture of what happened and for rebutting the government's assertions in its summary judgment motion. The absence of this evidence—much of which is under Defendants' sole control—prejudices my ability to fully respond. I respectfully assert that the Court should compel production of these materials or, at minimum, postpone ruling on summary judgment until we have them. I have personal knowledge that these kinds of records should exist, and it is concerning that they remain unavailable. For instance, I know the "Roysdon write-up" email exists because SA Beall referenced it in the OSI index, and I know JPAS logs exist for any clearance entries.

52.    In sum, further discovery is needed and justified. I am prepared to detail why each item matters for my case, if required. The bottom line is that key pieces of evidence are missing—likely residing on classified systems or withheld—and fairness dictates that I get access to them before my case is adjudicated.

## X.    MY EXPERTISE WITH CLASSIFIED SYSTEMS AND DISCOVERY SHORTFALLS

53.    Given my 17-year career in the Intelligence Community, and as the former Deputy Director of National Intelligence (a Senior Government Official at ODNI), I want to provide context on how classified information is handled in government systems—context that strongly indicates relevant documents about my case exist on classified networks that were not searched or produced by Defendants. This is based on my direct experience authoring and handling highly classified materials:

54. **Classification Guides and "Over-Classification":** In general, classified programs operate under Security Classification Guides (SCGs) that define what information is classified and at what level. Only an Original Classification Authority (OCA) can classify new information that isn't already covered by an SCG. In the case of Project Fibonacci, a classification guide was drafted in August 2019, and I assisted Dan Brown in identifying what technical aspects might be sensitive. However, that classification guide was never officially approved at the time. I only discovered during this litigation that the guide we worked on was not signed off—meaning that during 2019–2020, Project Fibonacci's information was being handled without a formally adopted guide. In such situations, personnel often err on the side of caution and over-classify by default, because they lack clear guidance. I witnessed this first-hand: Dan Brown literally asked me "what do you consider sensitive" because he did not know what was classified and what wasn't. This confirms that much of the information may have been improperly labeled as classified when, objectively, it might not meet classification criteria. No portion of the project's content was ever submitted for a classification review or "challenge" to possibly downgrade or declassify it. In other words, everything was treated as classified by assumption, not due to a rigorous determination. This context is important because it suggests that many communications or documents could be unclassified or releasable if properly reviewed—yet they have been kept on classified systems and not produced, with the blanket claim that they are classified. I have actual knowledge that the Fibonacci classification guide was never finalized in 2020, so any claim now that "all things Fibonacci are classified" is suspect and likely an over-classification that should be revisited.

55. **Multiple Computer Systems (Unclassified vs Classified):** At NSA and in SAP environments like HNCO, it is standard to have separate computer networks for

different classification levels—e.g., NIPRNet for Unclassified, SIPRNet for Secret, JWICS for Top Secret, and other isolated systems for SAPs. In practice, however, people often conduct even routine, unclassified correspondence on the classified systems. This is done because it's more convenient (you don't have to switch workstations constantly), and also because there is a culture of caution—"when in doubt, use the higher classification system." I know for a fact that at HNCO, email communications about project matters, even if not explicitly classified, were done on the SAP network email (which I believe is the "SIC" or CORE system for that program). The 30(b)(6) corporate representative for the Air Force confirmed that coordination emails and documents for Fibonacci were handled on a secure SAP system and that all of those records reside on that system. Thus, when the Air Force responded to our discovery requests, if they only searched normal (unclassified) email accounts or systems, they would miss everything. I can confidently say that substantial government correspondence about me exists exclusively on SIPR, JWICS, or SAP networks and was not captured in the initial document productions.

56. **Discovery Shortfalls:** Based on the above, I have identified glaring gaps in what Defendants have produced. Notably, the government's production omits at least the following categories, which I would expect to find on classified systems (and which should be discoverable with proper classification review and safeguards):

57. **Classified Email Threads:** Any email traffic on SIPR, JWICS, or SAP-Net regarding me (Capt. McVeigh's communications with OSI, HNCO security, AFOSI headquarters, etc.). For example, when Capt. McVeigh first discovered I was working as a contractor, he notified others via classified email. We have only seen snippets of unclassified emails, but I am certain classified discussions occurred. Capt. McVeigh and

OSI would have used secure email for anything program-specific. None of those emails were produced.

58. **Classified Attachments or Annexes:** The OSI ROI's index references attachments/annexes that were classified (for instance, a classified addendum with detailed analysis of the program or the "nine paragraphs" of NSA email that were initially removed). These annexes were not produced to us. They likely contain the nuance and exculpatory context (e.g., the NSA attorney's full email explaining there was no conflict). Their omission is significant.

59. **HNCO Internal Briefing Slides:** HNCO leadership likely prepared briefing charts or memos about my removal for higher command. It would be customary, after an incident like this, to brief the Air Force Life Cycle Management Center (AFLCMC) chain or SAF/AQL on "what happened with Dr. Roe/Roysdon." Any such briefing slides (likely classified) have not been produced. These could show, for example, that the real concern was funding or politics, not security—or could show they internally acknowledged I did nothing wrong. We haven't seen any of that.

60. **Security Database Entries:** As mentioned, records from classified security databases (e.g., incident reporting systems accessible only on SIPRNet) referencing me were not produced. If an incident report was entered into, say, DoD's JPAS incident module or an AF security tracker, those are on secure systems and we got nothing from them except the final Bremer memo summary. There must be more detail recorded somewhere.

61. These omissions strongly suggest that relevant materials remain on classified networks and have not been searched or turned over, contrary to the Court's discovery

orders. It is not acceptable for the government to shield key evidence behind classification. There are established procedures (like protective orders and classified in-camera reviews) to handle sensitive info in litigation. I have lived and worked with classification rules for nearly two decades—I fully respect them, but I also know when classification is being misused to hide wrongdoing or avoid embarrassment. I firmly believe this may be the case here, given that an unapproved classification guide was used to label everything Top Secret, and now those "secrets" conveniently include emails and documents that would shed light on misconduct. I urge that these classified-system records be retrieved and reviewed by the Court if necessary. Without them, we do not have the whole truth.

62. **In conclusion on this point:** I have specialized knowledge of the government's information systems, and it is my professional assessment that the Defendants' document production is incomplete and deficient due to their failure to collect records from all relevant systems (especially the classified ones). This has materially prejudiced my ability to present all the facts.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 8 August 2025, at Boerne, TX.

Paul F. Roysdon, Ph.D.

UNCLASSIFIED//FOR OFFICIAL USE ONLY

ID: 8316036
Marking: U//FOUO
From: Automated, System <UNK>
To: McDonald, Alexandra Kane <CIV>, AFOSI PJ HQ
Date: 5/7/25, 1:42 PM
Subject: FWD: BEALL-DanBrown Dr. Paul Roysdon.... Need to talk sooner than Thurs

---

To: ALLEN.BEALL,BRIAN.BOHENEK,JOSEPH.BURGHARD,MICHAEL.CRUNK
From: JOSEPH.BURGHARD
Sent Date of Message: 2020-AUG-24 14:45

Copy, sounds good.  Standing by.

V/R
Danny Burghard

Program Element Monitor & Deputy Division Chief

Advanced Cyberspace Systems Division, SAF/AQLC

DSN(STE): 297-3974

COMM: 202-767-3974

TSVOIP: 982-9192

JWICS: joseph.burghard@af.ic.gov

---

**Marking:** U//FOUO

**Date:** 8/24/20 9:31 AM

**From:** Beall, Allen Ting <CIV>, AFOSI PJ DET 8/OL-B

**To:** Burghard, Joseph D <CIV>, SAF/AQLC

**Cc:** Crunk, Michael D <CIV>, AFOSI PJ DET 8; Bohenek, Brian J <MIL>, SAF/AQLC

**Subject:** Dr. Paul Roysdon.... Need to talk sooner than Thurs

OK, I'm playing catch-up here, but I will talk to Will today about Dan Brown and Mr. Roysdon.  We're (Jason Oliveira and I) leaving for the SPO in like 15 min.  I will try to call you when we get back.

Allen

---

**Marking:** U//FOUO

**Date:** 8/21/20 2:42 PM

**From:** Burghard, Joseph D <CIV>, SAF/AQLC

UNCLASSIFIED//FOR OFFICIAL USE ONLY

**EXHIBIT 24**

**Page 1 of 3**

Confidential - Subject to Protective Order                US0000790

UNCLASSIFIED//FOR OFFICIAL USE ONLY

**To:** Beall, Allen Ting <CIV>, AFOSI PJ DET 8/OL-B; Crunk, Michael D <CIV>, AFOSI PJ DET 8

**Cc:** Bohenek, Brian J <MIL>, SAF/AQLC

**Subject:** Dr. Paul Roysdon.... Need to talk sooner than Thurs

Hey Allen,

Just found out Dr. Roysdon put in his two weeks with NSA. We really need to talk about his conflict of interest situation soonest while he is still a government civilian. You are talking with Mcveigh on Monday so please let us know if there is a good time we can talk on Monday after you meet with Mcveigh.

Thank you,

V/R
Danny Burghard

Program Element Monitor & Deputy Division Chief

Advanced Cyberspace Systems Division, SAF/AQLC

DSN(STE): 297-3974

COMM: 202-767-3974

TSVOIP: 982-9192

JWICS: joseph.burghard@af.ic.gov

UNCLASSIFIED//FOR OFFICIAL USE ONLY

**EXHIBIT 24**

**Page 2 of 3**

Confidential - Subject to Protective Order

US0000791

UNCLASSIFIED//FOR OFFICIAL USE ONLY

ID: 8316004
Marking: U//FOUO
From: Automated, System <UNK>
To: McDonald, Alexandra Kane <CIV>, AFOSI PJ HQ
Date: 5/7/25, 1:41 PM
Subject: FWD: BEALL-ConflictOfInterest MFR for Dr. Roysdon Please

To:
ALLEN.BEALL,ALLEN.RABAYDA,ANGELA.IVEY,BRIAN.BOHENEK,CHRISTINE.UPTAIN,JOSEPH.BURGHARD,MICHAEL.CRUNK,WILLIAM.BRIDGES,WILLIAM.MCVEIGH
From: WILLIAM.MCVEIGH
Sent Date of Message: 2020-AUG-24 13:21

Sir,

Attached is the latest MFR. We found out some additional information.

Dr. Roysdon will be leaving NSA within the next two weeks and looking at the email from his legal team, we believe that there is likely at a minimum conflict of interest.

Let me know if you have any questions or need us to research anything else.

-Will

William McVeigh, Capt, USAF
AFLCMC/HNCO
COMM: (210) 925-1974
DSN: (312) 945-1974
VoIP: 981-5265
NIPR: william.mcveigh.1@us.af.mil
JWICS: william.m.mcveigh@af.ic.gov

Marking: U//FOUO

Date: 8/19/20 12:21 PM

From: Burghard, Joseph D <CIV>, SAF/AQLC

To: McVeigh, William M <MIL>, AFLCMC/HNCO

Cc: Crunk, Michael D <CIV>, AFOSI PJ DET 8; Beall, Allen Ting <CIV>, AFOSI PJ DET 8/OL-B; Bohenek, Brian J <MIL>, SAF/AQLC; Bridges, William P <CTR>, SAF/AQLC; Rabayda, Allen C <CTR>, SAF/AQLC; Ivey, Angela M <CIV>, AFOSI PJ HQ; Uptain, Christine Lanin <CTR>, SAF/AQLC

Subject: MFR for Dr. Roysdon Please

Will,

Thank you for notifying us about Dr. Roysdon's possible conflict of interest situation. Since this was a first heard for all of us and since we'll likely need to find out more information, could you please draft up a quick MFR to document what we know now about his contractor v.s. NSA government civilian status and how that relates to work he supports in the portfolio? Please also cc all those on distro when you get a chance to send it out.

Thank you again for bringing this to our attention,

V/R
Danny Burghard

Program Element Monitor & Deputy Division Chief

Advanced Cyberspace Systems Division, SAF/AQLC

DSN(STE): 297-3974

COMM: 202-767-3974

TSVOIP: 982-9192

JWICS: joseph.burghard@af.ic.gov

| Attachments | |
|---|---|
| Attachment | Dr. Roysdon Letter Signed.pdf |
| Marking | U//FOUO |
| Size | 659615 KB |

UNCLASSIFIED//FOR OFFICIAL USE ONLY

**EXHIBIT 24**

**Page 3 of 3**

Confidential - Subject to Protective Order                    US0000786

| From: | Skinner, Reginald M. (CIV) <Reginald.M.Skinner@usdoj.gov> |
|---|---|
| Sent time: | 02/15/2023 11:28:34 AM |
| To: | Jason R. Wareham |
| Cc: | John Hodges <john@hhtx.law>; Green, Robert \(USATXW\) <Robert.Green3@usdoj.gov> |
| Subject: | RE: [EXTERNAL]RE: Extension and Rule 26F |

Thanks for your email, Jason, and sorry I missed your call this morning.

We do not agree that Dr. Roe is entitled to discovery for purposes of gathering facts to amend the complaint. Nor do we agree that there needs to be a "solution" for amending the complaint with classified information that Dr. Roe claims to possess.

As detailed in the Defendants' Response, the pending motion to dismiss raises several jurisdictional and substantive legal barriers that have nothing to do with the factual specificity of the complaint. For example, whether Dr. Roe has any Bivens remedy at all for the alleged retaliation or deprivation of his due process rights is a threshold question that does not turn on the content of any classified information. As for Dr. Roe's request for equitable relief (including reinstatement), the Court lacks jurisdiction to review Executive Branch security determinations or otherwise restore Dr. Roe's access to classified programs. Likewise, the jurisdictional bar that Section 2680 presents to Dr. Roe's FTCA claims raises an abstract legal question that has nothing to do with any classified facts Dr. Roe might possess. Ultimately, the motion to dismiss raises several pure questions of law—indeed, fundamental questions of subject matter jurisdiction and immunity. Unless and until the Court rejects those threshold defenses, it is premature to try to resolve the side issues you've raised about discovery or a "solution" for accessing/presenting classified information.

You should also be aware that in the event adjudication of your Dr. Roe's claims genuinely would require consideration of classified information, the government would have to consider invoking the state secrets privilege. But for the reasons I just mentioned, that too would be premature at this point.

Thanks,
Reggie
_____
Reginald M. Skinner
Senior Trial Attorney
U.S. Department of Justice, Civil Division, Torts Branch
Constitutional & Specialized Tort Litigation
Tel: 202-616-3111
Fax: 202-616-4314
E-mail: reginald.m.skinner@usdoj.gov
*For mail delivery:*
P.O. Box 7146, Ben Franklin Station, Washington DC 20044
*For courier or overnight mail:*
175 N Street, NE, 7th Fl., Washington DC 20002

**From:** Jason R. Wareham <jrwareham@thelawcenterpc.com>
**Sent:** Wednesday, February 15, 2023 9:37 AM
**To:** Skinner, Reginald M. (CIV) <Reginald.M.Skinner@usdoj.gov>
**Cc:** John Hodges <john@hhtx.law>; Green, Robert (USATXW) <RGreen@usa.doj.gov>
**Subject:** Re: [EXTERNAL]RE: Extension and Rule 26F

Reggie,

Tried to call. I'm not sure if we are talking past each other but I want to clarify. Assuming arguendo no discovery continues, this does not resolve the need for a classified information solution. Let me break it down.

1. I believe we all would agree that a remedy in a Rule 12b motion is amending a complaint.
2. You have made a number of arguments that we have failed to state a claim based on specificity or failure to allege sufficient facts on which relief could be granted.
3. We have notified the government that additional facts are available but classified; therefore unavailable to even discuss with our client outside a SCIF let alone write on an unclassified computer and submit (even under seal) to the court.
4. A solution to this is absolutely necessary or we are blocked from a rule 12 remedy.
5. This has zero to do with discovery even if you're correct that immunity arguments block discovery (not conceding).

Exhibit 25
Page 1 of 5

The overarching issue that seems to be missed here is that classified information/even if contained within someone's head, cannot be verbalized or written down unless the others who hear it are approved and read in as well and are sitting in a SCIF. The ability to submit under seal to the court is secondary. Before that can even happen, Roe must be authorized to tell me and I must be authorized to hear it or it violates the national security acts.

Does the government still maintain the position that we don't need a solution for how we amend the complaint with classified information? Just amend. Not talking discovery.

Please let me know your position on just that narrow issue before I reply to your response.

Best,

Jason

**Please keep my law clerk, Natalie Lamy, c/c'd on all emails to ensure prompt**
**action: nlamy@thelawcenterpc.com**

## Jason Wareham
### Managing Attorney

| | | | |
|---|---|---|---|

t:   3039915202
m:  (720) 819-6483 (After Hours)
e:   jrwareham@thelawcenterpc.com
a:   The Law Center, P.C., 300 Plaza Dr, Suite 200
     thelawcenterpc.com

TO AVOID THE POTENTIAL OF IMPROPERLY COMMUNICATING WITH OPPOSING PARTIES, OUR



This message is intended only for the use of the individual or entity to which it is addressed, and may contain information that is PRIVILEGED, CONFIDENTIAL and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone, at (866) 927-3426 and return the original to us by mail without making a copy. Thank you.

**From:** Skinner, Reginald M. (CIV) <Reginald.M.Skinner@usdoj.gov>
**Sent:** Wednesday, February 15, 2023 7:05:36 AM
**To:** Jason R. Wareham <jrwareham@thelawcenterpc.com>
**Cc:** John Hodges <john@hhtx.law>; Green, Robert (USATXW) <Robert.Green3@usdoj.gov>
**Subject:** RE: [EXTERNAL]RE: Extension and Rule 26F

Good morning,

The Defendants' response is attached. We will forward the file-stamped copy when it becomes available.

Thank you.

Reggie

Reginald M. Skinner

**EXHIBIT 25**
**Page 2 of 5**

Senior Trial Counsel
U.S. Department of Justice, Civil Division, Torts Branch
Constitutional & Specialized Tort Litigation
Tel: 202-616-3111
Fax: 202-616-4314
E-mail: reginald.m.skinner@usdoj.gov
*For mail delivery:*
P.O. Box 7146, Ben Franklin Station, Washington DC 20044
*For courier or overnight mail:*
175 N Street, NE, 7th Fl., Washington DC 20002

---

**From:** Jason R. Wareham <jrwareham@thelawcenterpc.com>
**Sent:** Tuesday, February 14, 2023 1:29 PM
**To:** Skinner, Reginald M. (CIV) Reginald.M.Skinner@usdoj.gov
**Cc:** John Hodges john@hhtx.law; Green, Robert (USATXW) RGreen@usa.doj.gov
**Subject:** RE: [EXTERNAL]RE: Extension and Rule 26F

Reggie,

This was just filed. I will have a stamped copy for you in due course.

Best,


**Please keep my law clerk, Natalie Lamy, c/c'd on all emails to ensure prompt action: nlamy@thelawcenterpc.com
Click Here to Book Meeting with Jason Wareham







| | |
|---|---|
| **t:** | (303) 991-5255 |
| **m:** | (720) 819-6483 (After Hours) |
| **e:** | jrwareham@thelawcenterpc.com |
| **a:** | The Law Center, P.C., 300 Plaza Dr, Suite 200 |
| | thelawcenterpc.com |



This message is intended only for the use of the individual or entity to which it is addressed, and may contain information that is PRIVILEGED, CONFIDENTIAL and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone, at (866) 927-3426 and return the original to us by mail without making a copy. Thank you.

---

**From:** Skinner, Reginald M. (CIV) <Reginald.M.Skinner@usdoj.gov>
**Sent:** Monday, February 6, 2023 2:22 PM
**To:** Jason R. Wareham <jrwareham@thelawcenterpc.com>
**Cc:** John Hodges <john@hhtx.law>; Green, Robert (USATXW) <Robert.Green3@usdoj.gov>
**Subject:** [EXTERNAL]RE: Extension and Rule 26F

EXTERNAL EMAIL. Use caution accessing links or attachments.

**EXHIBIT 25**

**Page 3 of 5**

Hi Jason,

I was just about to email you. As previously mentioned, I do not object to an extension on your opposition to the defendants' motion to dismiss. You were very accommodating to my earlier extension requests, and I am very happy to extend the same courtesy to you.

My co-counsel, AUSA Robert Green, and I are available to meet and confer tomorrow. How's 2:00 p.m. EST? I can circulate a conference line, if this time works.

We should also close the loop on the motion to unseal. The defendants will be prepared to move to unseal the case before the end of this week.

Thanks,
Reggie
_____

Reginald M. Skinner
Senior Trial Attorney
U.S. Department of Justice, Civil Division, Torts Branch
Constitutional & Specialized Tort Litigation
Tel: 202-616-3111
Fax: 202-616-4314
E-mail: reginald.m.skinner@usdoj.gov
*For mail delivery:*
P.O. Box 7146, Ben Franklin Station, Washington DC 20044
*For courier or overnight mail:*
175 N Street, NE, 7th Fl., Washington DC 20002

---

**From:** Jason R. Wareham <jrwareham@thelawcenterpc.com>
**Sent:** Monday, February 06, 2023 4:04 PM
**To:** Skinner, Reginald M. (CIV) <Reginald.M.Skinner@usdoj.gov>
**Cc:** John Hodges <john@hhtx.law>
**Subject:** [EXTERNAL] Extension and Rule 26F

Reggie,

While we already discussed a first extension, I'd like to discuss a bit more detail with you as well as execute the 26f conference.

Would you have time tomorrow for this call?

Best,


**Please keep my law clerk, Natalie Lamy, c/c'd on all emails to ensure prompt action: nlamy@thelawcenterpc.com
Click Here to Book Meeting with Jason Wareham







t:   (303) 991-5255
m:  (720) 819-6483 (After Hours)

**EXHIBIT 25**
**Page 4 of 5**

e:
a:    The Law Center, P.C., 300 Plaza Dr, Suite 200
      thelawcenterpc.com

This message is intended only for the use of the individual or entity to which it is addressed, and may contain information that is PRIVILEGED, CONFIDENTIAL and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone, at (866) 927-3426 and return the original to us by mail without making a copy. Thank you.

**EXHIBIT 25**
**Page 5 of 5**

| From: | Jason R. Wareham <jrwareham@thelawcenterpc.com> |
|---|---|
| Sent time: | 04/04/2023 10:54:17 AM |
| To: | Skinner, Reginald M. (CIV) <Reginald.M.Skinner@usdoj.gov> |
| Cc: | John Hodges <john@hhtx.law>; Natalie Lamy <nlamy@thelawcenterpc.com>; Green, Robert (USATXW) <Robert.Green3@usdoj.gov> |
| Subject: | RE: [EXTERNAL]RE: Extension and Rule 26F |

Reggie,

Thanks on all.

Possible to get the denial letter?

Best,


**Please keep my law clerk, Natalie Lamy, c/c'd on all emails to ensure prompt action: nlamy@thelawcenterpc.com
Book Teams Meeting with Jason Wareham






| t: | (303) 991-5255 |
|---|---|
| m: | (720) 819-6483 (After Hours) |
| e: | jrwareham@thelawcenterpc.com |
| a: | The Law Center, P.C., 300 Plaza Dr, Suite 200 |
| | thelawcenterpc.com |



**From:** Skinner, Reginald M. (CIV) <Reginald.M.Skinner@usdoj.gov>
**Sent:** Tuesday, April 4, 2023 10:47 AM
**To:** Jason R. Wareham <jrwareham@thelawcenterpc.com>
**Cc:** John Hodges <john@hhtx.law>; Green, Robert (USATXW) <Robert.Green3@usdoj.gov>; Natalie Lamy <nlamy@thelawcenterpc.com>
**Subject:** RE: [EXTERNAL]RE: Extension and Rule 26F


CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking links, especially from unknown senders.

Jason,

1. Thanks for sending the revised 26(f) with plaintiff's modifications. There is a lot of redlining in the document. It might help if we could all look at a clean copy to make sure things are properly formatted and easy for the Court to follow. I'm happy to circulate a clean copy later this afternoon.

2. The defendants do not object to your request for an additional 30-day extension to file plaintiff's opposition brief. Plaintiff's opposition is currently due by April 18, so the extension would extend the deadline for plaintiff's filing to May 18.

3. The relevant federal agencies have reviewed your letter dated February 13, 2023, requesting "that

**EXHIBIT 26**
**Page 1 of 11**

counsel and counsel by authorized access and the ability to discuss and share classified facts in this proceeding." The request for such access has been denied.

Thank you,
Reggie

_____

Reginald M. Skinner
Senior Trial Attorney
U.S. Department of Justice, Civil Division, Torts Branch
Constitutional & Specialized Tort Litigation
Tel: 202-616-3111
Fax: 202-616-4314
E-mail: reginald.m.skinner@usdoj.gov
*For mail delivery:*
P.O. Box 7146, Ben Franklin Station, Washington DC 20044
*For courier or overnight mail:*
175 N Street, NE, 7th Fl., Washington DC 20002

---

**From:** Jason R. Wareham <jrwareham@thelawcenterpc.com>
**Sent:** Monday, April 03, 2023 5:35 PM
**To:** Skinner, Reginald M. (CIV) <Reginald.M.Skinner@usdoj.gov>
**Cc:** John Hodges <john@hhtx.law>; Green, Robert (USATXW) <RGreen@usa.doj.gov>; Natalie Lamy <nlamy@thelawcenterpc.com>
**Subject:** RE: [EXTERNAL]RE: Extension and Rule 26F

Hey Reggie,

Made some tweaks to the 26f. Red (or Green as the case may be) line Attached.

Do you have a proposed timeline on the Classification Authority request?

Given the timetable around that request, Plaintiff requests an additional 30 day extension from the current MTD deadline to receive an answer to that request (and assumedly litigate) any potential issues. Will you consent? Of course, due considerations will be granted in return.

Best,

Jason


**Please keep my law clerk, Natalie Lamy, c/c'd on all emails to ensure prompt action: nlamy@thelawcenterpc.com
Book Teams Meeting with Jason Wareham





**EXHIBIT 26**
**Page 2 of 11**



| | |
|---|---|
| t | 3039915202 |
| m: | (720) 819-6483 (After Hours) |
| e: | jrwareham@thelawcenterpc.com |
| a: | The Law Center, P.C., 300 Plaza Dr, Suite 200 |
| | thelawcenterpc.com |

---

**From:** Skinner, Reginald M. (CIV) <Reginald.M.Skinner@usdoj.gov>
**Sent:** Tuesday, March 28, 2023 11:59 PM
**To:** Jason R. Wareham <jrwareham@thelawcenterpc.com>
**Cc:** John Hodges <john@hhtx.law>; Green, Robert (USATXW) <Robert.Green3@usdoj.gov>; Natalie Lamy <nlamy@thelawcenterpc.com>
**Subject:** RE: [EXTERNAL]RE: Extension and Rule 26F

CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking links, especially from unknown senders.

Jason and John,

Please see the attached redline with defendants' edits to the 26(f) report.

Thanks,
Reggie

_____

Reginald M. Skinner
Senior Trial Attorney
U.S. Department of Justice, Civil Division, Torts Branch
Constitutional & Specialized Tort Litigation
Tel: 202-616-3111
Fax: 202-616-4314
E-mail: reginald.m.skinner@usdoj.gov
*For mail delivery:*
P.O. Box 7146, Ben Franklin Station, Washington DC 20044
*For courier or overnight mail:*
175 N Street, NE, 7th Fl., Washington DC 20002

---

**From:** Jason R. Wareham <jrwareham@thelawcenterpc.com>
**Sent:** Monday, March 20, 2023 2:52 PM
**To:** Skinner, Reginald M. (CIV) <Reginald.M.Skinner@usdoj.gov>
**Cc:** John Hodges <john@hhtx.law>; Green, Robert (USATXW) <RGreen@usa.doj.gov>; Natalie Lamy <nlamy@thelawcenterpc.com>
**Subject:** Re: [EXTERNAL]RE: Extension and Rule 26F

Natalie will you please provide the copy he requests below?

**\*\*Please keep my law clerk, Natalie Lamy, c/c'd on all emails to ensure prompt action:** nlamy@thelawcenterpc.com

**Jason Wareham**
Managing Attorney

| | |
|---|---|
| t | 3039915202 |
| m: | (720) 819-6483 (After Hours) |
| e: | jrwareham@thelawcenterpc.com |
| a: | The Law Center, P.C., 300 Plaza Dr, Suite 200 |
| | thelawcenterpc.com |

**EXHIBIT 26**
**Page 3 of 11**
TO AVOID THE POTENTIAL OF IMPROPERLY COMMUNICATING WITH OPPOSING PARTIES, OUR



This message is intended only for the use of the individual or entity to which it is addressed, and may contain information that is PRIVILEGED, CONFIDENTIAL and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone, at (866) 927-3426 and return the original to us by mail without making a copy. Thank you.

**From:** Skinner, Reginald M. (CIV) <Reginald.M.Skinner@usdoj.gov>
**Sent:** Monday, March 20, 2023 12:49:55 PM
**To:** Jason R. Wareham <jrwareham@thelawcenterpc.com>
**Cc:** John Hodges <john@hhtx.law>; Green, Robert (USATXW) <Robert.Green3@usdoj.gov>
**Subject:** RE: [EXTERNAL]RE: Extension and Rule 26F

CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking links, especially from unknown senders.

Thanks Jason. We have been in touch with the relevant agencies and hope to provide a formal response to your request for access to classified information in the coming days.

I clicked the link in your email below, and the working draft of the 26(f) report you've originated appears to already include track changes. I think it would be useful if you could please send over a clean copy that does not already include redlining—so that we can better keep track of who's proposing what edits. Also, please let me know if you don't mind sending the document as a stand-alone MS Word attachment, as opposed to linking to the SharePoint cloud?

Thanks,
Reggie
_____

Reginald M. Skinner
Senior Trial Attorney
U.S. Department of Justice, Civil Division, Torts Branch
Constitutional & Specialized Tort Litigation
Tel: 202-616-3111
Fax: 202-616-4314
E-mail: reginald.m.skinner@usdoj.gov
*For mail delivery:*
P.O. Box 7146, Ben Franklin Station, Washington DC 20044
*For courier or overnight mail:*
175 N Street, NE, 7th Fl., Washington DC 20002

**From:** Jason R. Wareham <jrwareham@thelawcenterpc.com>
**Sent:** Monday, March 20, 2023 2:33 PM
**To:** Skinner, Reginald M. (CIV) <Reginald.M.Skinner@usdoj.gov>
**Cc:** John Hodges <john@hhtx.law>; Green, Robert (USATXW) <RGreen@usa.doj.gov>
**Subject:** RE: [EXTERNAL]RE: Extension and Rule 26F

Greetings, Reggie:

I waited a bit as I was hoping to have some resolution on our request to the Classification Authorities, but with the time it is taking, I though it best we get this on file. Please see a clean copy here: 2023 02-11 DRAFT 26.F Report.docx  Feel free to make proposed edits. I would ask that we keep the redline going for easy tracking.

EXHIBIT 26
Page 4 of 11

Best,

Jason


**Please keep my law clerk, Natalie Lamy, c/c'd on all emails to ensure prompt action: nlamy@thelawcenterpc.com









t:          (303) 991-5255
m:         (720) 819-6483 (After Hours)
e:         jrwareham@thelawcenterpc.com
a:         The Law Center, P.C., 300 Plaza Dr, Suite 200
           thelawcenterpc.com

---

**From:** Jason R. Wareham <jrwareham@thelawcenterpc.com>
**Sent:** Wednesday, February 15, 2023 12:04 PM
**To:** Skinner, Reginald M. (CIV) <Reginald.M.Skinner@usdoj.gov>
**Cc:** John Hodges <john@hhtx.law>; Green, Robert (USATXW) <Robert.Green3@usdoj.gov>
**Subject:** RE: [EXTERNAL]RE: Extension and Rule 26F

Ok, understood. I am not allowed know what is in my client's head as "discovery."

Procedurally, have you submitted the letter sent this week to the Classification Authorities or are you refusing to forward given your position?

If refusing to forward, please consider this a conference on a motion to compel access to classified information in my client's own knowledge base as well as the relief contained in the letter.

Best,

Jason


**Please keep my law clerk, Natalie Lamy, c/c'd on all emails to ensure prompt action: nlamy@thelawcenterpc.com
Click Here to Book Meeting with Jason Wareham

**EXHIBIT 26**
**Page 5 of 11**







| | |
|---|---|
| **t:** | (303) 991-5255 |
| **m:** | (720) 819-6483 (After Hours) |
| **e:** | jrwareham@thelawcenterpc.com |
| **a:** | The Law Center, P.C., 300 Plaza Dr, Suite 200 |
| | thelawcenterpc.com |



This message is intended only for the use of the individual or entity to which it is addressed, and may contain information that is PRIVILEGED, CONFIDENTIAL and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone, at (866) 927-3426 and return the original to us by mail without making a copy. Thank you.

---

**From:** Skinner, Reginald M. (CIV) <Reginald.M.Skinner@usdoj.gov>
**Sent:** Wednesday, February 15, 2023 11:54 AM
**To:** Jason R. Wareham <jrwareham@thelawcenterpc.com>
**Cc:** John Hodges <john@hhtx.law>; Green, Robert (USATXW) <Robert.Green3@usdoj.gov>
**Subject:** RE: [EXTERNAL]RE: Extension and Rule 26F

I'm not sure how to state it any differently than below.

We do not agree that Dr. Roe is entitled to discovery for purposes of gathering facts to amend the complaint. Nor do we agree that there needs to be a "solution" for amending the complaint with classified information that Dr. Roe claims to possess.

So yes, the fact that Dr. Roe claims to currently possess classified information does not change the fundamental point that the pending dismissal motion raises several jurisdictional and substantive legal barriers that have nothing to do with the factual specificity of the complaint.

And again, unless and until the Court rejects those threshold defenses, it is premature to try to resolve the side issues you've raised about discovery or a "solution" for accessing/presenting classified information.

Reginald M. Skinner
Senior Trial Attorney
U.S. Department of Justice, Civil Division, Torts Branch
Constitutional & Specialized Tort Litigation
Tel: 202-616-3111
Fax: 202-616-4314
E-mail: reginald.m.skinner@usdoj.gov
*For mail delivery:*
P.O. Box 7146, Ben Franklin Station, Washington DC 20044
*For courier or overnight mail:*
175 N Street, NE, 7th Fl., Washington DC 20002

---

**From:** Jason R. Wareham <jrwareham@thelawcenterpc.com>
**Sent:** Wednesday, February 15, 2023 1:43 PM

**EXHIBIT 26**
**Page 6 of 11**

**To:** Skinner, Reginald M. (CIV) <Reginald.M.Skinner@usdoj.gov>
**Cc:** John Hodges <john@hhtx.law>; Green, Robert (USATXW) <RGreen@usa.doj.gov>
**Subject:** RE: [EXTERNAL]RE: Extension and Rule 26F

Ok, are you stating that discovery = speaking to my client about information he already knows?


**Please keep my law clerk, Natalie Lamy, c/c'd on all emails to ensure prompt action: nlamy@thelawcenterpc.com
Click Here to Book Meeting with Jason Wareham







| | |
|---|---|
| t: | (303) 991-5255 |
| m: | (720) 819-6483 (After Hours) |
| e: | jrwareham@thelawcenterpc.com |
| a: | The Law Center, P.C., 300 Plaza Dr, Suite 200 |
| | thelawcenterpc.com |



This message is intended only for the use of the individual or entity to which it is addressed, and may contain information that is PRIVILEGED, CONFIDENTIAL and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone, at (866) 927-3426 and return the original to us by mail without making a copy. Thank you.

**From:** Skinner, Reginald M. (CIV) <Reginald.M.Skinner@usdoj.gov>
**Sent:** Wednesday, February 15, 2023 11:29 AM
**To:** Jason R. Wareham <jrwareham@thelawcenterpc.com>
**Cc:** John Hodges <john@hhtx.law>; Green, Robert (USATXW) <Robert.Green3@usdoj.gov>
**Subject:** RE: [EXTERNAL]RE: Extension and Rule 26F

Thanks for your email, Jason, and sorry I missed your call this morning.

We do not agree that Dr. Roe is entitled to discovery for purposes of gathering facts to amend the complaint. Nor do we agree that there needs to be a "solution" for amending the complaint with classified information that Dr. Roe claims to possess.

As detailed in the Defendants' Response, the pending motion to dismiss raises several jurisdictional and substantive legal barriers that have nothing to do with the factual specificity of the complaint. For example, whether Dr. Roe has any Bivens remedy at all for the alleged retaliation or deprivation of his due process rights is a threshold question that does not turn on the content of any classified information. As for Dr. Roe's request for equitable relief (including reinstatement), the Court lacks jurisdiction to review Executive Branch security determinations or otherwise restore Dr. Roe's access to classified programs. Likewise, the jurisdictional bar that Section 2680 presents to Dr. Roe's FTCA claims raises an abstract legal question that has nothing to do with any classified facts Dr. Roe might possess. Ultimately, the motion to dismiss raises several pure questions of law—indeed, fundamental questions of subject matter jurisdiction and immunity. Unless and until the Court rejects those threshold defenses, it is premature to try to resolve the side issues you've raised about discovery or a "solution" for accessing/presenting classified information.

**EXHIBIT 26**
**Page 7 of 11**

You should also be aware that in the event deliberation of your Bivens claims generally would require consideration of classified information, the government would have to consider invoking the state secrets privilege. But for the reasons I just mentioned, that too would be premature at this point.

Thanks,
Reggie
_____
Reginald M. Skinner
Senior Trial Attorney
U.S. Department of Justice, Civil Division, Torts Branch
Constitutional & Specialized Tort Litigation
Tel: 202-616-3111
Fax: 202-616-4314
E-mail: reginald.m.skinner@usdoj.gov
*For mail delivery:*
P.O. Box 7146, Ben Franklin Station, Washington DC 20044
*For courier or overnight mail:*
175 N Street, NE., 7th Fl., Washington DC 20002

---

**From:** Jason R. Wareham <jrwareham@thelawcenterpc.com>
**Sent:** Wednesday, February 15, 2023 9:37 AM
**To:** Skinner, Reginald M. (CIV) <Reginald.M.Skinner@usdoj.gov>
**Cc:** John Hodges <john@hhtx.law>; Green, Robert (USATXW) <RGreen@usa.doj.gov>
**Subject:** Re: [EXTERNAL]RE: Extension and Rule 26F

Reggie,

Tried to call. I'm not sure if we are talking past each other but I want to clarify. Assuming arguendo no discovery continues, this does not resolve the need for a classified information solution. Let me break it down.

1. I believe we all would agree that a remedy in a Rule 12b motion is amending a complaint.
2. You have made a number of arguments that we have failed to state a claim based on specificity or failure to allege sufficient facts on which relief could be granted.
3. We have notified the government that additional facts are available but classified; therefore unavailable to even discuss with our client outside a SCIF let alone write on an unclassified computer and submit (even under seal) to the court.
4. A solution to this is absolutely necessary or we are blocked from a rule 12 remedy.
5. This has zero to do with discovery even if you're correct that immunity arguments block discovery (not conceding).

The overarching issue that seems to be missed here is that classified information, even if contained within someone's head, cannot be verbalized or written down unless the others who hear it are approved and read in as well and are sitting in a SCIF. The ability to submit under seal to the court is secondary. Before that can even happen, Roe must be authorized to tell me and I must be authorized to hear it or it violates the national security acts.

Does the government still maintain the position that we don't need a solution for how we amend the complaint with classified information? Just amend. Not talking discovery.

Please let me know your position on just that narrow issue before I reply to your response.

Best,

Jason

**\*\*Please keep my law clerk, Natalie Lamy, c/c'd on all emails to ensure prompt action:** nlamy@thelawcenterpc.com

## Jason Wareham
### Managing Attorney

t:   3039915202
m:  (720) 819-6483 (After Hours)

**EXHIBIT 26**
**Page 8 of 11**

a:    The Law Center, P.C., 300 Plaza Dr, Suite 200
thelawcenterpc.com

TO AVOID THE POTENTIAL OF IMPROPERLY COMMUNICATING WITH OPPOSING PARTIES, OUR



This message is intended only for the use of the individual or entity to which it is addressed, and may contain information that is PRIVILEGED, CONFIDENTIAL and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone, at (866) 927-3426 and return the original to us by mail without making a copy. Thank you.

**From:** Skinner, Reginald M. (CIV) <Reginald.M.Skinner@usdoj.gov>
**Sent:** Wednesday, February 15, 2023 7:05:36 AM
**To:** Jason R. Wareham <jrwareham@thelawcenterpc.com>
**Cc:** John Hodges <john@hhtx.law>; Green, Robert (USATXW) <Robert.Green3@usdoj.gov>
**Subject:** RE: [EXTERNAL]RE: Extension and Rule 26F

Good morning,

The Defendants' response is attached. We will forward the file-stamped copy when it becomes available.

Thank you.

Reggie

---

Reginald M. Skinner
Senior Trial Attorney
U.S. Department of Justice, Civil Division, Torts Branch
Constitutional & Specialized Tort Litigation
Tel: 202-616-3111
Fax: 202-616-4314
E-mail: reginald.m.skinner@usdoj.gov
*For mail delivery:*
P.O. Box 7146, Ben Franklin Station, Washington DC 20044
*For courier or overnight mail:*
175 N Street, NE, 7th Fl., Washington DC 20002

---

**From:** Jason R. Wareham <jrwareham@thelawcenterpc.com>
**Sent:** Tuesday, February 14, 2023 1:29 PM
**To:** Skinner, Reginald M. (CIV) Reginald.M.Skinner@usdoj.gov
**Cc:** John Hodges john@hhtx.law; Green, Robert (USATXW) RGreen@usa.doj.gov
**Subject:** RE: [EXTERNAL]RE: Extension and Rule 26F

Reggie,

This was just filed. I will have a stamped copy for you in due course.

Best,

**EXHIBIT 26**
**Page 9 of 11**

**Please keep my law clerk, Natalie Lamy, c/c'd on all emails to ensure prompt action: nlamy@thelawcenterpc.com

Click Here to Book Meeting with Jason Wareham







| | |
|---|---|
| **t:** | (303) 991-5255 |
| **m:** | (720) 819-6483 (After Hours) |
| **e:** | jrwareham@thelawcenterpc.com |
| **a:** | The Law Center, P.C., 300 Plaza Dr, Suite 200 |
| | thelawcenterpc.com |



This message is intended only for the use of the individual or entity to which it is addressed, and may contain information that is PRIVILEGED, CONFIDENTIAL and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone, at (866) 927-3426 and return the original to us by mail without making a copy. Thank you.

**From:** Skinner, Reginald M. (CIV) <Reginald.M.Skinner@usdoj.gov>
**Sent:** Monday, February 6, 2023 2:22 PM
**To:** Jason R. Wareham <jrwareham@thelawcenterpc.com>
**Cc:** John Hodges <john@hhtx.law>; Green, Robert (USATXW) <Robert.Green3@usdoj.gov>
**Subject:** [EXTERNAL]RE: Extension and Rule 26F

> **EXTERNAL EMAIL. Use caution accessing links or attachments.**

Hi Jason,

I was just about to email you. As previously mentioned, I do not object to an extension on your opposition to the defendants' motion to dismiss. You were very accommodating to my earlier extension requests, and I am very happy to extend the same courtesy to you.

My co-counsel, AUSA Robert Green, and I are available to meet and confer tomorrow. How's 2:00 p.m. EST? I can circulate a conference line, if this time works.

We should also close the loop on the motion to unseal. The defendants will be prepared to move to unseal the case before the end of this week.

Thanks,
Reggie

Reginald M. Skinner
Senior Trial Attorney
U.S. Department of Justice, Civil Division, Torts Branch
Constitutional & Specialized Tort Litigation
Tel: 202-616-3111
Fax: 202-616-4314
E-mail: reginald.m.skinner@usdoj.gov
For mail delivery:
P.O. Box 7146, Ben Franklin Station, Washington DC 2004

**EXHIBIT 26**
**Page 10 of 11**

*For confidential inquiries...*
175 N Street, NE, 7th Fl., Washington DC 20002

**From:** Jason R. Wareham <jrwareham@thelawcenterpc.com>
**Sent:** Monday, February 06, 2023 4:04 PM
**To:** Skinner, Reginald M. (CIV) <Reginald.M.Skinner@usdoj.gov>
**Cc:** John Hodges <john@hhtx.law>
**Subject:** [EXTERNAL] Extension and Rule 26F

Reggie,

While we already discussed a first extension, I'd like to discuss a bit more detail with you as well as execute the 26f conference.

Would you have time tomorrow for this call?

Best,

**\*\*Please keep my law clerk, Natalie Lamy, c/c'd on all emails to ensure prompt action:** nlamy@thelawcenterpc.com
Click Here to Book Meeting with Jason Wareham







| | |
|---|---|
| **t** | (303) 991-5255 |
| **m:** | (720) 819-6483 (After Hours) |
| **e:** | jrwareham@thelawcenterpc.com |
| **a:** | The Law Center, P.C., 300 Plaza Dr, Suite 200 |
| | thelawcenterpc.com |

This message is intended only for the use of the individual or entity to which it is addressed, and may contain information that is PRIVILEGED, CONFIDENTIAL and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone, at (866) 927-3426 and return the original to us by mail without making a copy. Thank you.

**EXHIBIT 26**
**Page 11 of 11**



# DEPARTMENT OF THE AIR FORCE
## OFFICE OF SPECIAL INVESTIGATIONS

29 Aug 22

MEMORANDUM FOR RECORD

FROM: HQ OSI/IG
      27130 Telegraph Road
      Quantico, VA 22134

SUBJECT: Hotline Completion Report

1. DoD Hotline case number: ███████████████

2. ACTS case number: ████████████

3. Allegation(s)

   a. Allegation:

      (1) Maj WILIAM MCVIEGH, Secretary of the Air Force for Acquisition, Technology, and Logistics (SAF/AQL), Pentagon, DC

      (2) Retaliation

      (3) 14 Aug 20

      (4) JBSA-Lackland, TX

      (5) 10 US Code § 932 – Article 132. Retaliation

      (6) Finding: Not Substantiated

      (7) Analysis: In FYI 19, Dr. PAUL ROYSDON, National Security Agency (NSA), JBSA- Lackland, TX, briefed the Fibonacci program at the TOP SECRET level to AFLCMC/HNCO and SAF/AQL, while employed by the NSA. The NSA decided not to fund this program, and the program was then funded by SAF/AQL as a ██████ project with unclassified components. At the time, ROYSDON was a government employee providing advice and guidance under the government.

      Starting in FYI 19, Civ DAN BROWN, JBSA-Lackland, TX brought ROYSDON on board to support the Fibonnaci program as a Technical Subject Matter Expert (contractor) and as a subcontractor under Global Info Tech Inc. (GITI). GITI held an Air Force Research Laboratory (AFRL) ACT2 prime contract. ROYSDON maintained his government position at the NSA. ROYSDON stated on 18 Aug 20, he obtained an Office

## DEPARTMENT OF THE AIR FORCE
### OFFICE OF SPECIAL INVESTIGATIONS

of General Council (OGC) letter providing agreement for the project to be worked. ROYSDON was cleared as a government employee to ██████, but not as a contractor. ROYSDON's Limited Liability Company (LLC) did not have a Field Security Officer (FSO), DD254, and cage code that would allow him contractor SCI and program access. ROYSDON's work as a government employee included ██████ discussions about the Fibonacci program.

ROYSDON was notified to stop work as an independent contractor since he was a government employee with the NSA. ROYSDON was informed he was allowed to continue supporting the project as a government employee under the NSA. However, ROYSDON informed ALFCMC/HNCO on 20 Aug 20 that he is was planning to resign from NSA.

ROYSDON completed a DoD IG complaint on 6 May 22. ROYSDON believed he was dismissed and debriefed from the program due to negligent conduct of Maj WILLIAM MCVEIGH, SAF/AG, Pentagon, DC and SA ALLEN BEALL, HAF, PSO, Pentagon, DC. ROYSDON believed SA BEALL and MCVEIGH reported ROYSDON as an insider threat and opened an unauthorized OSI investigation.

A review of the Investigative Information Management System (I2MS) and Classified Investigative Information Management System (CI2MS) revealed no records on file for ROYSDON.

MCVEIGH was the PM for the Fibonacci program while he was stationed at JBSA-Lackland, TX. Based on financial records, ROYSDON was paid $750,000.00 for his services as an independent contractor. Although ROYSDON was brought on to work on the Fibonacci program as a contractor, he would work on the program during normal work hours while he was employed by the NSA. ROYSDON was removed from the program due to his affiliation as a government employee and his contractor status. MCVEIGH instructed SA BEALL to debrief ROYSDON from the program (Agent Note: SA BEALL was not interviewed due to his untimely passing in August 2022). MCVEIGH only had ROYSDON removed and debriefed from the program but did not report him as an insider threat. MCVEIGH provided all documentation and email correspondence related to ROYSDON being removed from the program due to his misrepresentation as a contractor and NSA employee.

(8) Corrective actions: Recommend opening a fraud investigation and referring the case to OSI Office of Procurement Fraud (PF)

4. Security clearance actions: None

5. Location of report of inquiry or working papers: OSI PJ Detachment 9, Joint Base Anacostia-Bolling, DC

*"Eyes of the Eagle"*

**EXHIBIT 27**
**Page 2 of 3**

Confidential - Subject to Protective Order                US0000570

**DEPARTMENT OF THE AIR FORCE**
OFFICE OF SPECIAL INVESTIGATIONS

6. Investigation officer identification data:

    a. Rank & Name: SA CHRISTOPHER WEBB
    b. Organization: OSI PJ Detachment 9
    c. Duty location: JBAB, DC
    d. Telephone number: ███████████
    e. Email address: ███████████████

7. I certify that I complied with the Quality Standards for Hotline Inquiries in DOD Instruction 7050.01.

Christopher Webb, Special Agent
OSI PJ Det 9, JBAB, DC

DoD Hotline Coordinator's identification data:

    a. Rank & Name: ████████████
    b. Organization: AFOSI/IGQ
    c. Duty location: 27130 Telegraph Road, Quantico VA, 22134
    d. Telephone number: ████████████
    e. Email address: ██████████████████

*"Eyes of the Eagle"*

**EXHIBIT 27**
**Page 3 of 3**

Confidential - Subject to Protective Order

**Marking:** CUI

**Date:** 8/24/20 2:12 PM

**From:** McVeigh, William M <MIL>, Defense Technology Integration Program Office

**To:** Burghard, Joseph Daniel <CIV>, SAF/AQLQ

**Cc:** Crunk, Michael David <CIV>, AFOSI PJ DET 7; Beall, Allen Ting <UNK>; Bohenek, Brian J <MIL>, SAF/AQL; Bridges, William P <CTR>, SAF/AQLQ; Rabayda, Allen C <CTR>, SAF/AQLQ; Ivey, Angela M <CIV>, SAF/SQ; Uptain, Christine Laning <UNK>

**Subject:** MFR for Dr. Roysdon Please

Sir,

1. I'm not entirely sure when he became a contractor without asking him. However, the legal email appears to have been around Apr 2019. I forwarded you and Allen a copy on JWICS. Talking with Ted Oakley, the GITI PM, Dr. Roysdon has been on contract since at least Jun/Jul 19. I became aware of this roughly 2-3 weeks ago when your team asked me about the $300k SETA funding. I asked Dan Brown what it supported to verify it supported [redacted] projects. At that time, I learned from Dan that Dr. Royson was providing contractor support. I didn't think much of it until I looked him up in Jade last Wednesday after the PMR.

2. Dan likely informally directed GITI that he would like them to subcontract Dr. Roysdon to support the program. From, there it would've been a funding mod to GITI Excalibur/Mercury contract.

a. Now that I think about it Blur and Lattice did not have a SAP DD254 either until we realigned the FY20 Blue/Lattice funding to an internal contract: Harmony and next year on Saturn Lights. There's only one contractor on the GITI contract with a SAP DD254 and he works on Spectral Raptor.

For your awareness, Lt Col Ekholm directed me to do a complete inventory on the payloads DD254s, projects and classifications to see if there's any more issues out there.

Let me know if you have other questions.

-Will

William McVeigh, Capt, USAF
AFLCMC/HNCO
COMM: (210) 925-1974
DSN: (312) 945-1974
NIPR: william.mcveigh.1@us.af.mil
JWICS: william.m.mcveigh@af.ic.gov

**Marking:** U//FOUO

**EXHIBIT 28**
**Page 1 of 4**
Confidential - Subject to Protective Order

US0000477

**Date:** 8/24/20 11:06 AM

**From:** Burghard, Joseph D <CIV>, SAF/AQLC

**To:** McVeigh, William M <MIL>, AFLCMC/HNCO

**Cc:** Crunk, Michael D <CIV>, AFOSI PJ DET 8; Beall, Allen Ting <CIV>, AFOSI PJ DET 8/OL-B; Bohenek, Brian J <MIL>, SAF/AQLC; Bridges, William P <CTR>, SAF/AQLC; Rabayda, Allen C <CTR>, SAF/AQLC; Ivey, Angela M <CIV>, AFOSI PJ HQ; Uptain, Christine Lanin <CTR>, SAF/AQLC

**Subject:** MFR for Dr. Roysdon Please

Will,

Thank you very much for putting this MFR together. After reading it, a couple questions come to mind.

- When in FY19 did Dr. Roysdon become a contractor? Any chance you could narrow it down to which month in FY19? Also, when did you guys become aware that he was in a contractor status supporting our projects?
- Who awarded the contract without a DD254 knowing the work would support program level projects?

Thank you,

V/R
Danny Burghard

Program Element Monitor & Deputy Division Chief

Advanced Cyberspace Systems Division, SAF/AQLC

DSN(STE): 297-3974

COMM: 202-767-3974

TSVOIP: 982-9192

JWICS: joseph.burghard@af.ic.gov

**Marking:** U//FOUO

**EXHIBIT 28**
**Page 2 of 4**
Confidential - Subject to Protective Order

**Date:** 8/24/20 9:21 AM

**From:** McVeigh, William M <MIL>, AFLCMC/HNCO

**To:** Burghard, Joseph D <CIV>, SAF/AQLC

**Cc:** Crunk, Michael D <CIV>, AFOSI PJ DET 8; Beall, Allen Ting <CIV>, AFOSI PJ DET 8/OL-B; Bohenek, Brian J <MIL>, SAF/AQLC; Bridges, William P <CTR>, SAF/AQLC; Rabayda, Allen C <CTR>, SAF/AQLC; Ivey, Angela M <CIV>, AFOSI PJ HQ; Uptain, Christine Lanin <CTR>, SAF/AQLC

**Subject:** MFR for Dr. Roysdon Please

Sir,

Attached is the latest MFR. We found out some additional information.

Dr. Roysdon will be leaving NSA within the next two weeks and looking at the email from his legal team, we believe that there is likely at a minimum conflict of interest.

Let me know if you have any questions or need us to research anything else.

-Will

William McVeigh, Capt, USAF
AFLCMC/HNCO
COMM: (210) 925-1974
DSN: (312) 945-1974
VoIP: 981-5265
NIPR: william.mcveigh.1@us.af.mil
JWICS: william.m.mcveigh@af.ic.gov

---

**Marking:** U//FOUO

**Date:** 8/19/20 12:21 PM

**From:** Burghard, Joseph D <CIV>, SAF/AQLC

**To:** McVeigh, William M <MIL>, AFLCMC/HNCO

**Cc:** Crunk, Michael D <CIV>, AFOSI PJ DET 8; Beall, Allen Ting <CIV>, AFOSI PJ DET 8/OL-B; Bohenek, Brian J <MIL>, SAF/AQLC; Bridges, William P <CTR>, SAF/AQLC;

**EXHIBIT 28**
**Page 3 of 4**
Confidential - Subject to Protective Order

US0000479

Rabayda, Allen C <CTR>, SAF/AQLC; Ivey, Angela M <CIV>, AFOSI PJ HQ; Uptain, Christine Lanin <CTR>, SAF/AQLC

**Subject:** MFR for Dr. Roysdon Please

Will,

Thank you for notifying us about Dr. Roysdon's possible conflict of interest situation. Since this was a first heard for all of us and since we'll likely need to find out more information, could you please draft up a quick MFR to document what we know now about his contractor v.s. NSA government civilian status and how that relates to work he supports in the portfolio?  Please also cc all those on distro when you get a chance to send it out.

Thank you again for bringing this to our attention,

V/R
Danny Burghard

Program Element Monitor & Deputy Division Chief

Advanced Cyberspace Systems Division, SAF/AQLC

DSN(STE): 297-3974

COMM: 202-767-3974

TSVOIP: 982-9192

JWICS: joseph.burghard@af.ic.gov

**EXHIBIT 28**
**Page 4 of 4**
Confidential - Subject to Protective Order          US0000480

## McVeigh William M Maj USAF USA MIL

| | |
|---|---|
| **From:** | Rabayda Allen C CTR USAF USA CTR |
| **Sent:** | Monday, August 24, 2020 3:41 PM |
| **To:** | McVeigh William M Maj USAF USA MIL; Burghard Joseph D Mr USAF USA CIV |
| **Subject:** | RE: (U) paperwork |

Classification: UNCLASSIFIED//FOUO
=======================================================

Will.

My comments:

1. Ref: Paul's OGC Memo below, "...I perform unclassified machine learning research, and provide white papers and implement numerical prototypes for adoption into cyber-physical applications.."

   Comment: Research was unclassified wrt ML techniques however research and discovery and interactions with users as well as design of applying ML, I believe it required Dr. Roysdon to have classified threat and Cyber Operator TTP discussions. Dr. Roysdon likely would have had to consider both unclassified, academic/industry research as well as classified threats to adequately advise SPO on design and approach by SPO's vendors.

2. Ref: Amy's comments: "I am not sure how he was not representing GITI when briefing status of the effort ...he was not representing GITI when briefing status of the effort..."

   Comment-1: I believe Roysdon supported the SPO as a consultant. In this role, his presentations to other gov. offices could have been on behalf of the SPO gov office, which is the type of presentation I observed. In this manner, it seemed appropriate.

   Comment-2: Other forms of communication like email. I only received emails from his gov NSA account via JWICS only. In this manner, the relationship as a contractor was not clear.

Hope this helps.

--Allen

**From:** McVeigh William M Capt USAF USA MIL
**Sent:** Monday, August 24, 2020 2:04 PM
**To:** Burghard Joseph D Mr USAF USA CIV; Rabayda Allen C CTR USAF USA CTR
**Subject:** FW: (U) paperwork

Classification: UNCLASSIFIED//FOUO
=======================================================

Sir,

FYSA

1

**EXHIBIT 29**
**Page 1 of 3**
Confidential - Subject to Protective Order

## McVeigh William M Maj USAF USA MIL

| | |
|---|---|
| **From:** | Beall Allen T Mr USAF USA CIV |
| **Sent:** | Monday, August 24, 2020 5:41 PM |
| **To:** | Macrina Tanya M Ms USAF USA CIV; McVeigh William M Maj USAF USA MIL |
| **Cc:** | Parisi Thomas J Mr USAF USA CIV |
| **Subject:** | RE: (U) paperwork |

Classification: UNCLASSIFIED//FOUO
=====================================================

Tanya,

Thank you for helping out with this. A few more things we noticed: It appears Roysdon's PAR and SAP access was based on his position at the NSA and purported it was his position there that was key to his access request. The more we discussed, this seemed to be improper as all of his work on the project was a subcontractor, not related to his NSA position. The HNCO security office and I have decided a security inquiry should be performed on this incident. My preference would be for the inquiry official, once appointed, to coordinate with your office and your JAG office and roll the JAG review/interpretation into one inquiry report, so we have all information in one document. I'm sure Will and the inquiry official will be in touch once that kicks off.

Also, since Roysdon has given notice of his resignation from the NSA, I will debrief from the program this week since his clearance and program access were all based upon his position at NSA.

Allen

**From:** Macrina Tanya M Ms USAF USA CIV <tanya.macrina@af.ic.gov>
**Sent:** Monday, August 24, 2020 9:49 AM
**To:** McVeigh William M Capt USAF USA MIL <william.m.mcveigh@af.ic.gov>; Beall Allen T Mr USAF USA CIV <allen.beall@af.ic.gov>
**Cc:** Parisi Thomas J Mr USAF USA CIV <thomas.parisi@af.ic.gov>
**Subject:** RE: (U) paperwork

Classification: UNCLASSIFIED//FOUO
=====================================================

Thanks Will.

A couple things catch my eye: (disclaimer – I am not a Lawyer or PSO)

- Amy states: "this law would prohibit you from representing GiTi to the Air Force (or any other Federal agency) on contract matters between GiTi and the Air Force. Providing "behind-the-scenes" services to GiTi in connection with its contract with the Air Force would not violate this law."
  - o I am not sure what defines "Contract Matters" – is this just financial or is project status part of this... because he would have been representing GITI if he was briefing classified progress of a program to the government. Since his "behind the scenes" efforts were only unclassified. If he gave unclassified status – I may not be as concerned.
  - o Also stated below: "A second criminal law (18 U.S.C. § 205) prohibits you from personally representing any other person (including companies) -- with or without compensation -- before a Federal department, agency or employee."

1

**EXHIBIT 29**
**Page 2 of 3**

Confidential - Subject to Protective Order

- I am not sure how he was not representing GITI when briefing status of the effort --- If he was using his NSA clearances to give status on a project being paid to a company – then wouldn't he be representing that company?
- Amy states: " This regulation prohibits you from allowing the use of nonpublic information to further your own financial interests or the financial interests of another. This regulation would prohibit you from using non-public information gained through the course of your employment with NSA the further your private work for GiTi."
  - o Are we absolutely POSITIVE he did not provide "non-public information" to further his payment with GITI or GITIs financial interest when briefing the status.

I will send along an email to Mr. Bill Whitman (RIJ Legal) and get his read on the situation.

Thanks,
Tanya

**From:** McVeigh William M Capt USAF USA MIL
**Sent:** Monday, August 24, 2020 10:16 AM
**To:** Macrina Tanya M Ms USAF USA CIV <tanya.macrina@af.ic.gov>; Parisi Thomas J Mr USAF USA CIV <thomas.parisi@af.ic.gov>; Beall Allen T Mr USAF USA CIV <allen.beall@af.ic.gov>
**Subject:** FW: (U) paperwork

```
Classification: UNCLASSIFIED//FOUO
=====================================================
```

FYSA

**From:** Brown Daniel D Mr USAF USA CIV <Daniel.D.Brown@af.ic.gov>
**Sent:** Thursday, August 20, 2020 2:47 PM
**To:** McVeigh William M Capt USAF USA MIL <william.m.mcveigh@af.ic.gov>
**Subject:** FW: (U) paperwork

```
Classification: UNCLASSIFIED//FOUO
=====================================================
```

Daniel Brown, CISSP, CEH, CSM, SCJP, SCJD, SCWCD
Payloads Architect
AFLCMC/HNC

NSTS: 981-5267
Commercial Desk: 210-925-6208 (DSN: 945), STE equipped
SIPR: daniel.d.brown8.civ@mail.smil.mil
NIPR: daniel.brown.5@us.af.mil

**From:** Roysdon Paul F NSA FTX12 USA GOV <pfroysd@nsa.ic.gov>
**Sent:** Thursday, August 20, 2020 2:16 PM
**To:** Brown Daniel D Mr USAF USA CIV <Daniel.D.Brown@af.ic.gov>
**Subject:** RE: (U) paperwork

2

**EXHIBIT 29**
**Page 3 of 3**
Confidential - Subject to Protective Order

| | |
|---|---|
| **From:** | PARISI, THOMAS J CIV USAF AFMC AFRL/RIGA [thomas.parisi.1@us.af.mil] |
| **Sent:** | 8/25/2020 6:16:03 PM |
| **To:** | MCVEIGH, WILLIAM M Capt USAF AFMC AFLCMC/HNCO [william.mcveigh.1@us.af.mil]; MACRINA, TANYA M CIV USAF AFMC AFRL/RIGA [tanya.macrina@us.af.mil] |
| **CC:** | MARX, JOHN T CIV USAF ACC 16 AF/AFRL/RIG/OL-SATX [john.marx.2@us.af.mil]; GAGLIO, JAMES T Capt USAF AFMC AFLCMC/HNCO [james.gaglio.2@us.af.mil]; GUERRERO, JULIO GG-13 USAF AFMC AFLCMC/HNCO [julio.guerrero.2@us.af.mil]; BROWN, DANIEL D GG-13 USAF AFMC AFLCMC/HNCYD [daniel.brown.5@us.af.mil] |
| **Subject:** | RE: FOUO\\Issue |

Becareful with this one.  Saying someone was "receiving Government pay while acting as a subcontractor" (outside of leave of course) insinuates double-dipping and is basically Felony Fraud.  They would be charging hours to the government for work they are performing and being compensated for by another organization = fraud.  That is a HUGE accusation that we should not be throwing around without some proof…and even if we had the proof, we should report it to the proper authorities and stay out of the investigation.  I see no reason to believe that is what happened here.  There just appears to be some confusion over who this guy is working for at what time…

---

**From:** MCVEIGH, WILLIAM M Capt USAF AFMC AFLCMC/HNCO <william.mcveigh.1@us.af.mil>
**Sent:** Monday, August 24, 2020 8:34 AM
**To:** PARISI, THOMAS J CIV USAF AFMC AFRL/RIGA <thomas.parisi.1@us.af.mil>; MACRINA, TANYA M CIV USAF AFMC AFRL/RIGA <tanya.macrina@us.af.mil>
**Cc:** MARX, JOHN T CIV USAF ACC 16 AF/AFRL/RIG/OL-SATX <john.marx.2@us.af.mil>; GAGLIO, JAMES T Capt USAF AFMC AFLCMC/HNCO <james.gaglio.2@us.af.mil>; GUERRERO, JULIO GG-13 USAF AFMC AFLCMC/HNCO <julio.guerrero.2@us.af.mil>; BROWN, DANIEL D GG-13 USAF AFMC AFLCMC/HNCYD <daniel.brown.5@us.af.mil>
**Subject:** FOUO\\Issue

This e-mail contains  FOR OFFICIAL USE ONLY (FOUO)
————————————————————————————————
Tom/Tanya,

If you're available to talk on a high-side phone today that'd be preferred.

Short version, there is the appearance that a GG-15 employee was receiving Government pay while acting as a subcontractor to GITI on behalf of Dan Brown for one of his projects. There's also some security issues that I'll have to tell you about on another network. We've put together an MFR with what we know now and are meeting with the PSO this morning to get his take on the issue. I'll also ask if I can share the MFR on NIPR. I talked with John briefly last week about it and I think he's coming in this morning to listen in. If you're available to talk on a VoIP, my number is 981-5265. There's more which makes it weirder which is why we documented it in an MFR.

I'll try giving you a call here shortly as well.

Thank you,
-Will

William McVeigh, Capt, USAF
Chief, Special Projects
AFLCMC/HNCO
DSN: (312) 945-1974
COMM: (210) 925-1974
CELL: (540) 840-9899
VoIP: 981-5265
NIPR: william.mcveigh.1@us.af.mil

**EXHIBIT 30**
**Page 1 of 1**

Confidential - Subject to Protective Order

**From:** MCVEIGH, WILLIAM M Capt USAF AFMC AFLCMC/HNCO [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=3A8E2838CD0C414A98AF11275B8C4A18-MCVEIGH.WIL]
**Sent:** 8/24/2020 6:18:37 PM
**To:** MACRINA, TANYA M CIV USAF AFMC AFRL/RIGA [tanya.macrina@us.af.mil]
**Subject:** RE: FOUO\\Issue

Yeah, I just sent it.

-Will

---

**From:** MACRINA, TANYA M CIV USAF AFMC AFRL/RIGA <tanya.macrina@us.af.mil>
**Sent:** Monday, August 24, 2020 11:51 AM
**To:** MCVEIGH, WILLIAM M Capt USAF AFMC AFLCMC/HNCO <william.mcveigh.1@us.af.mil>
**Subject:** RE: FOUO\\Issue

Hi Will – did you send along the memo?

Tanya

---

**From:** MCVEIGH, WILLIAM M Capt USAF AFMC AFLCMC/HNCO <william.mcveigh.1@us.af.mil>
**Sent:** Monday, August 24, 2020 9:55 AM
**To:** MACRINA, TANYA M CIV USAF AFMC AFRL/RIGA <tanya.macrina@us.af.mil>; PARISI, THOMAS J CIV USAF AFMC AFRL/RIGA <thomas.parisi.1@us.af.mil>
**Cc:** MARX, JOHN T CIV USAF ACC 16 AF/AFRL/RIG/OL-SATX <john.marx.2@us.af.mil>; GAGLIO, JAMES T Capt USAF AFMC AFLCMC/HNCO <james.gaglio.2@us.af.mil>; GUERRERO, JULIO GG-13 USAF AFMC AFLCMC/HNCO <julio.guerrero.2@us.af.mil>; BROWN, DANIEL D GG-13 USAF AFMC AFLCMC/HNCYD <daniel.brown.5@us.af.mil>
**Subject:** RE: FOUO\\Issue

Tanya,

Yeah, If you could, that'd be great!

-Will

---

**From:** MACRINA, TANYA M CIV USAF AFMC AFRL/RIGA <tanya.macrina@us.af.mil>
**Sent:** Monday, August 24, 2020 8:46 AM
**To:** MCVEIGH, WILLIAM M Capt USAF AFMC AFLCMC/HNCO <william.mcveigh.1@us.af.mil>; PARISI, THOMAS J CIV USAF AFMC AFRL/RIGA <thomas.parisi.1@us.af.mil>
**Cc:** MARX, JOHN T CIV USAF ACC 16 AF/AFRL/RIG/OL-SATX <john.marx.2@us.af.mil>; GAGLIO, JAMES T Capt USAF AFMC AFLCMC/HNCO <james.gaglio.2@us.af.mil>; GUERRERO, JULIO GG-13 USAF AFMC AFLCMC/HNCO <julio.guerrero.2@us.af.mil>; BROWN, DANIEL D GG-13 USAF AFMC AFLCMC/HNCYD <daniel.brown.5@us.af.mil>
**Subject:** RE: FOUO\\Issue

Will,

I can try to go into the SSO and see if there is a phone available. Want me to try at 1000 EST?

FYSA – Tom is on Leave today and tomorrow.

Thanks,
Tanya

**EXHIBIT 31**
**Page 1 of 2**
Confidential - Subject to Protective Order

**From:** MCVEIGH, WILLIAM M Capt USAF AFMC AFLCMC/HNCO <william.mcveigh.1@us.af.mil>
**Sent:** Monday, August 24, 2020 8:34 AM
**To:** PARISI, THOMAS J CIV USAF AFMC AFRL/RIGA <thomas.parisi.1@us.af.mil>; MACRINA, TANYA M CIV USAF AFMC AFRL/RIGA <tanya.macrina@us.af.mil>
**Cc:** MARX, JOHN T CIV USAF ACC 16 AF/AFRL/RIG/OL-SATX <john.marx.2@us.af.mil>; GAGLIO, JAMES T Capt USAF AFMC AFLCMC/HNCO <james.gaglio.2@us.af.mil>; GUERRERO, JULIO GG-13 USAF AFMC AFLCMC/HNCO <julio.guerrero.2@us.af.mil>; BROWN, DANIEL D GG-13 USAF AFMC AFLCMC/HNCYD <daniel.brown.5@us.af.mil>
**Subject:** FOUO\\Issue

This e-mail contains FOR OFFICIAL USE ONLY (FOUO)
_____
Tom/Tanya,

If you're available to talk on a high-side phone today that'd be preferred.

Short version, there is the appearance that a GG-15 employee was receiving Government pay while acting as a subcontractor to GITI on behalf of Dan Brown for one of his projects. There's also some security issues that I'll have to tell you about on another network. We've put together an MFR with what we know now and are meeting with the PSO this morning to get his take on the issue. I'll also ask if I can share the MFR on NIPR. I talked with John briefly last week about it and I think he's coming in this morning to listen in. If you're available to talk on a VoIP, my number is 981-5265. There's more which makes it weirder which is why we documented it in an MFR.

I'll try giving you a call here shortly as well.

Thank you,
-Will

William McVeigh, Capt, USAF
Chief, Special Projects
AFLCMC/HNCO
DSN: (312) 945-1974
COMM: (210) 925-1974
CELL: (540) 840-9899
VoIP: 981-5265
NIPR: william.mcveigh.1@us.af.mil

**EXHIBIT 31**
**Page 2 of 2**
Confidential - Subject to Protective Order

## McVeigh William M Maj USAF USA MIL

| | |
|---|---|
| **From:** | Brown Daniel D Mr USAF USA CIV |
| **Sent:** | Thursday, August 20, 2020 3:47 PM |
| **To:** | McVeigh William M Maj USAF USA MIL |
| **Subject:** | FW: (U) paperwork |

Classification: UNCLASSIFIED//FOUO
======================================================

Daniel Brown, CISSP, CEH, CSM, SCJP, SCJD, SCWCD
Payloads Architect
AFLCMC/HNC

NSTS: 981-5267
Commercial Desk: 210-925-6208 (DSN: 945), STE equipped
SIPR: daniel.d.brown8.civ@mail.smil.mil
NIPR: daniel.brown.5@us.af.mil

**From:** Roysdon Paul F NSA FTX12 USA GOV <pfroysd@nsa.ic.gov>
**Sent:** Thursday, August 20, 2020 2:16 PM
**To:** Brown Daniel D Mr USAF USA CIV <Daniel.D.Brown@af.ic.gov>
**Subject:** RE: (U) paperwork

## Classification: UNCLASSIFIED//FOR OFFICIAL USE ONLY

Dan,

This morning I contacted Office of General Council (OGC) to verify that I have not violated any laws or statutes. They reviewed the following and concurred.

In April 2019 I contacted National Security Agency (NSA) OGC regarding outside work. OGC did not identify a conflict of interest because of the following:
1. I am employed by NSA as a Data Scientist, tasked with <u>academic engagement (AE) and work-force development (WFD)</u>.
   a. This means that I am a liaison to academia on matters related to data science, and I am tasked at NSA to build, train, and mentor a data science team.
   b. I do not implement data science or machine learning algorithms, but rather advise on their use and application.
   c. During my assignment at Office of the Director of National Intelligence (ODNI), my duties were exactly the same (AE and WFD), but at the IC level. However, at ODNI I was tasked with advising IC partners (not just NSA) on machine learning algorithms and their possible application in a variety of IC mission problems.
2. The proposed work (in April 2019) is a consultant for Global InfoTech (GiTi), not the US Government (USG), and my work is very specific: <u>implement applied mathematics for cyber-physical systems</u>. For nearly 20 years I have performed unclassified research, and published both papers and textbooks on this topic.
   a. As a consultant for GiTi, I perform unclassified machine learning research, and provide white papers and implement numerical prototypes for adoption into cyber-physical applications. To my knowledge, GiTi

1

**EXHIBIT 32**
**Page 1 of 4**
Confidential - Subject to Protective Order

US0000063

   has several sub-contractors that use the result of my work, or provides these results to other USG contractors.
b. My work for GiTi is "behind the scenes" and strictly task-oriented, and, to my knowledge, any interaction I have had with the USG is a factual presentation of progress updates on research or numerical prototypes.
c. I have never represented GiTi to the USG for current or future contracts, nor do I have a vested interest in GiTi nor influence in the company or its leadership. Furthermore, to my knowledge, the math solutions that I provide GiTi is not for any contract with NSA.
d. I have discussed this matter with my NSA leadership, and I have their approval to do this consulting outside of work hours.

**OGC summarized the April 2019 guidance in an email received this afternoon:**

Paul,

Following up on our conversation today, the primary ethics laws and regulations that we have discussed in connection with your outside contracting work for GiTi are:

- **18 U.S.C. § 208 and 5 C.F.R. § 2635.502:** Pursuant to this statute and regulation, you may not participate personally and substantially in any official NSA matter that affects the financial interests of your outside employer or to which an entity that you provide consulting services is a party. According to the information you have provided, you are not an employee of Giti, and you do not work on NSA matters affecting GiTi's financial interests or to which GiTi is a party. Based on the facts provided, I previously advised that your participation in this outside employment would not require your disqualification from any NSA matters to which you were assigned.
- **18 U.S.C. § 205:** This law prohibits you from personally representing anyone before a Federal department, agency, or employee in a covered matter in which the United States is a party or has a direct and substantial interest. As discussed in my previous email, this law would prohibit you from representing GiTi to the Air Force (or any other Federal agency) on contract matters between GiTi and the Air Force. Providing "behind-the-scenes" services to GiTi in connection with its contract with the Air Force would not violate this law.
- **5 C.F.R. § 2635.703(a):** This regulation prohibits you from allowing the use of nonpublic information to further your own financial interests or the financial interests of another. This regulation would prohibit you from using non-public information gained through the course of your employment with NSA the further your private work for GiTi.

I hope the above is helpful.

(U//          )
Amy
Attorney
Office of the General Counsel
Administrative Law & Ethics

**OGC Provided the following guidance in April 2019:**

Paul,

I am following up our emails and telephone conversation last week regarding your offer of employment outside your position with the NSA. As you indicated last week, you are the Chief/Lead Data Scientist for NSA-Texas. In that capacity, you are tasked with building a data science team, training and equipping them with the tools they need to solve mission

2

**EXHIBIT 32**
**Page 2 of 4**

Confidential - Subject to Protective Order

problems in ███████████████. You further indicated that you have recently received an opportunity from Air Force CyberCom ("CyberCom") to assist with mathematical calculations in furtherance of its cyber-related mission. In this capacity, you would serve as a sub-contractor to the prime CyberCom contractor. You have indicated that your official responsibilities with the NSA are not related to the work that you would be doing for CyberCom. Further, the prime CyberCom contractor is not a business whose interests you could affect in the performance of your official duties with the NSA.

With respect to your outside employment, there are a few areas of concern you should be aware of. Conflict of interest statutes, as well as other criminal statutes, affect your outside employment while you are an Agency employee (and even after you leave the Agency). Below, I have provided much of the pertinent information from our website; however, you should read over all of the information before pursuing any outside employment.

The first statute is the financial conflict of interest statute, which would prohibit you from personally and substantially participating in your official Government duties on any particular matter that may affect an entity with which you have an outside business relationship, such as the CyberCom prime contractor. You have indicated that you do not have current responsibilities with the Agency that would affect the CyberCom prime contractor, but if you did, either now or in the future, you would be required to disqualify yourself in writing from taking any official actions affecting that company. The disqualification requirement would continue as long as you remain in a business relationship with that outside company or seeking employment with that company. You can find the Disqualification Template here: ███████████████████████████████████████████.

A second criminal law (18 U.S.C. § 205) prohibits you from personally representing any other person (including companies) -- with or without compensation -- before a Federal department, agency or employee. You may not make representations to any federal officials (not just NSA personnel) on behalf of outside entities. Representation includes any oral or written communications that are intended to influence the official on a specific matter. Working "behind-the-scenes" on matters or strictly task-oriented activities do not violate this rule. Applying this rule to your circumstances, you may not be the individual responsible for communications with Air Force representatives (or any other federal employees) on the contract for which you are providing services. This includes oral or written communications. It does not include ministerial communications, such as requests for factual information. However, if a communication transitions from a factual exchange to a conversation in which differences of opinion may occur, this can create problems under the representation rule. Additionally, if the CyberCom prime contractor submits a product to CyberCom under your name, this would be considered a communication by you to CyberCom. Note that this rule does not prohibit you from identifying yourself as being associated with the CyberCom prime contractor for such things as being able to gain admittance to the facility where the work is to be performed.

In addition to the representation rule discussed immediately above, you are also prohibited by another rule (18 U.S.C. § 203) from receiving compensation that comes from the representation by others before a government department or agency on any matter in which the United States is a party or has a substantial interest. For example, you may not accept part of the profits in a profit-sharing arrangement if those profits come from representations to the Federal Government. Also, you may not work on a contingency fee basis for a private employer on a government contract (i.e., assist in preparing a response to a Federal RFP and receive a fee or payment only if the contractor is the successful bidder). You may accept a pre-set salary or a pre-established contractual fee (such as payment at an hourly rate) in connection with this outside engagement as long as there are no other benefits such as stock options, contingency fees, or profit sharing.

I hope the above guidance helps you in navigating this offer, but please do not hesitate to contact me anytime with questions.

(U//███████)
Amy ██. ████████
Attorney
Office of the General Counsel

3

Administrative Law & Ethics

Very Respectfully,
**Dr. Paul F. Roysdon**

**From:** Brown Daniel D Mr USAF USA CIV <Daniel.D.Brown@af.ic.gov>
**Sent:** Wednesday, August 19, 2020 1:31 PM
**To:** Roysdon Paul F NSA FTX12 USA GOV <pfroysd@nsa.ic.gov>
**Subject:** (U) paperwork

```
Classification: UNCLASSIFIED//FOUO
=====================================================
```

Paul – I need a copy of your paperwork from NSA saying that you can work as a contractor outside of NSA hours. Capt McVeigh is requesting this.

V/r,
Dan

Daniel Brown, CISSP, CEH, CSM, SCJP, SCJD, SCWCD
Payloads Architect
AFLCMC/HNC

NSTS: 981-5267
Commercial Desk: 210-925-6208 (DSN: 945), STE equipped
SIPR: daniel.d.brown8.civ@mail.smil.mil
NIPR: daniel.brown.5@us.af.mil
```
=====================================================
Classification: UNCLASSIFIED//FOUO
```

## Classification: UNCLASSIFIED//FOR OFFICIAL USE ONLY
```
=====================================================
Classification: UNCLASSIFIED//FOUO
```

## Classification: UNCLASSIFIED//FOR OFFICIAL USE ONLY
```
=====================================================
Classification: UNCLASSIFIED//FOUO
```

**EXHIBIT 32**
**Page 4 of 4**
Confidential - Subject to Protective Order

US0000066

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

CIVIL ACTION NO. 5:22-CV-00869-JKP-HJB

----------------------------------------------------

30(b)(6) VIDEOCONFERENCE AND VIDEO DEPOSITION
OF UNITED STATES AIR FORCE OFFICE OF SPECIAL
INVESTIGATIONS BY MICHAEL CRUNK - 04/24/2025

----------------------------------------------------

DR. JOHN ROE,

Plaintiff,

V.

UNITED STATES OF AMERICA, et. Al.,

Defendant.

----------------------------------------------------


                The 30(b)(6) VIDEOCONFERENCE AND VIDEO

DEPOSITION OF UNITED STATES AIR FORCE OFFICE OF

SPECIAL INVESTIGATIONS BY MICHAEL CRUNK was taken by

the Plaintiff on April 24, 2025,commencing at the

hour of 11:35 a.m., before ROSIE STAHL, Shorthand

Reporter and Notary Public within and for the State

of Colorado.

**EXHIBIT 33**
**Page 1 of 36**

```
 1                    R E M O T E

 2                  A P P E A R A N C E S

 3
    For the Plaintiff:
 4
         JASON R. WAREHAM, ESQ.
 5       LANCE HENRY, ESQ.
         ALLEN VELLONE WOLF HELFRICH & FACTOR P.C.
 6       1600 Stout Street, Suite 1900
         Denver, Colorado 80202
 7       Ph. 303-534-4499
         Jwareham@allen-vellone.com
 8
         JOHN W. HODGES JR., ESQ.
 9       HENDLEY & HODGES LAW PLLC
         4594 US Hwy 281 N
10       Spring Branch, Texas 78070
         Ph.  210-714-0924
11       John@hhtx.law

12
    For the Defendant:
13
         KATRINA M. SEEMAN, ESQ.
14       JOSEPH GONZALEZ, ESQ.
         U.S. DEPARTMENT OF JUSTICE, CIVIL
15       DIVISION, TORTS BRANCH CONSTITUTIONAL
         & SPECIALIZED TORT LITIGATION
16       950 Pennsylvania Avenue NW
         Washington DC 20530-0001
17       Ph. 202-616-3111
         Katrina.M.Seeman@usdoj.gov
18

19  For the Air Force:

20       DARRIN GILCHRIST, ESQ.
         ASSOCIATE GENERAL COUNSEL, SAF/GCI
21       1740 Air Force Pentagon, Suite 4C756
         Washington, D.C. 20330-1740
22       Ph. 703-697 4406
         Darrin.gilchrist@us.af.mil
23

24  Also Present:

25       Dwayne Beuthel - Videographer
```

EXHIBIT 33
Page 2 of 36

```
 1                    I N D E X

 2   EXAMINATION                              PAGE

 3   By Mr. Wareham                           5

 4

 5

 6

 7   DEPOSITION EXHIBITS:              INITIAL
                                       REFERENCE
 8
     (No Exhibits Marked.)
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

EXHIBIT 33
Page 3 of 36

```
 1                  APRIL 25, 2025, 11:35 A.M. MT
 2                  P R O C E E D I N G S
 3
 4                  THE VIDEOGRAPHER:  Okay.  We are on
 5       the record at 11:35 a.m.  Today is April 24th,
 6       2025.  This begins the 30 -- the video-recorded
 7       deposition of 30(b)(6) for United States Air Force
 8       Office of Special Investigations given by Michael
 9        Crunk taken in the matter of Dr. John Roe versus
10       the United States of America, et al.
11                  This deposition is being taken via
12       videoconferencing.  The court reporter today is
13       Rosie Stahl.  The videographer is Dwayne Beuthel.
14                  Counsel, please introduce yourselves
15       and the parties you represent beginning with
16       plaintiff's counsel first.
17                  MR. WAREHAM:  This is Jason Wareham,
18       lead counsel for Dr. Roe, plaintiff, along with
19       John Hodges, cocounsel, and Lance Henry.
20                  MS. SEEMAN:  Katrina Seeman on
21       behalf of the government defendants.  I'm joined by
22       my cocounsel Joseph Gonzalez.
23                  THE VIDEOGRAPHER:  Will our court
24       reporter please swear in the deponent.
25                  MICHAEL CRUNK,
```

EXHIBIT 33
Page 4 of 36

1    Being first duly sworn, was examined and testified

2    as follows:

3                    THE VIDEOGRAPHER:  You may begin.

4                         EXAMINATION

5    BY MR. WAREHAM:

6            Q.    Greetings, Mr. Crunk.  As I said

7    just now, my name is Jason Wareham.  I'm lead

8    counsel on the plaintiff's side.  Have you -- have

9    you ever been deposed before?

10           A.    I have.

11           Q.    I presumed.  Have you ever been a

12   30(b)(6) witness in a deposition before?

13           A.    No, I have not.

14           Q.    Okay.  So I'm just going to go

15   through a few instructions and clarifications and

16   we'll move to the substance today.  Okay?

17           A.    Okay.

18           Q.    So first off, as you know from prior

19   depositions, you know, our entire focus here is to

20   get at the truth of facts and circumstances.  It's

21   under oath.  We're not here trying to play games or

22   test your memory.  If you don't know something, we

23   don't want you to make it up obviously.  If you

24   don't know, saying "I don't know" is just fine.

25                    If there's any question that is

EXHIBIT 33
Page 5 of 36

```
 1          asked by me, and there probably will be more than
 2           one, where you don't understand what I'm asking,
 3          just ask me to clarify and I'll try to ask a better
 4          question.  Okay?
 5                    A.    Okay.
 6                    Q.    Also, there will be, I'm quite
 7          certain, objections by DOJ counsel.  The way
 8          objections work in depositions is once the
 9          objection is lodged, which we need to allow for a
10          little time to make sure the record is clear,
11          especially virtually, if nobody instructs you not
12          to answer that question, then you can go ahead and
13          answer the question even though there's an
14          objection.
15                    Okay.  Does that make sense?
16                    A.    Yes.
17                    Q.    Now, specific to 30(b)(6) witnesses,
18          do you understand that today you're giving
19          testimony that actually can bind the entity that is
20          in this case the Office of Special Investigations?
21                    A.    Yes.
22                    Q.    Okay.  And in -- well, what have you
23                    done to prepare for today's 30(b)(6)
24  deposition?
25                    MS. SEEMAN:  I'll just instruct the
```

**EXHIBIT 33**
**Page 6 of 36**

1    witness not to divulge the substance of our

2    communications in preparation for his deposition,

3    but outside of that, Mr. Crunk, you're free to

4    answer.

5    BY MR. WAREHAM:

6        Q.    Yeah.  Actually, go ahead and take

7    that durably throughout.  If there's a question

8    that invokes an answer that would be covered by

9    conversations you've had with the DOJ counsel, I'm

10   not seeking that information.  Okay?

11       A.    Okay.

12       Q.    All right.

13       A.    Perfect.

14       Q.    Go ahead.

15       A.    So in preparation, I was provided

16   several documents with US000 and various numbers on

17   the end to review, and so I have taken time to

18   review all of those documents.

19       Q.    Okay.  And -- well, and the other

20   thing I should probably say, especially since some

21   of this may or could tread into classified

22   material, I am not seeking to elicit classified

23   material today.  This is an unsecure environment,

24   as I'm sure you're aware, and so if any answer I'm

25   asking invites -- or any question I'm asking

EXHIBIT 33
Page 7 of 36

1    invites an answer that would tread into classified

2     material, I'd like you to say so and we can move

3    on.  Okay?

4            A.    Okay.

5            Q.    Other than that, you know, if it's

6     not classified, then -- then I'll be looking for

7    the answer.  Does that make sense?

8            A.    That makes sense.

9            Q.    Yeah.  Let's see, what else can I

10   cover?  So I'm going to go through -- and this one

11   is kind of a long list so I apologize ahead of

12   time.  I'm going to go through the different

13   questions that will be subject to the 30(b)(6) to

14   confirm that we're ready to answer each question.

15   It's kind of something I do for the record.  So I'm

16   just going to start by reading starting with No. 3,

17   and then just confirm that you're ready to answer

18    each question.  So it may take a little bit, but

19   that's what we're going to do.

20                So No. 3, the question specifically

21   is the specific complaints, reports or referrals,

22   including the dates, substance and source that

23   prompted OSI to investigate Dr. Roe.

24                Are you prepared to answer facts on

25   that question?

EXHIBIT 33
Page 8 of 36

```
 1              A.    Yes.

 2              Q.    Great.

 3                    The -- No. 4, the timeline of OSI's

 4        actions in Dr. Roe's matter, including dates the

 5        investigation was opened and closed, identity of

 6        the OSI personnel assigned, substantive steps,

 7        interviews, evidence-gathering efforts and decision

 8        points.

 9                    Are you prepared to discuss that

10        question?

11              A.    Yes.

12              Q.    No. 5, any alleged grounds, for

13        example, insider threat, fraud, security risk, OSI

14        considered or cited in justifying its investigation

15         of Dr. Roe, including the factual basis for such

16        concerns.

17                    Are you prepared to discuss that

18        question?

19              A.    Yes.

20              Q.    No. 6, whether OSI adhered to its

21        standard protocols investigating Dr. Roe, and if

22         there were any deviations like, A, the rationale

23        and justification for any departure from SOPs; or,

24        B, any communications or authorizations permitting

25        such deviation.
```

**EXHIBIT 33**
**Page 9 of 36**

1              Are you prepared to discuss that

2    question?

3         A.    Yes.

4         Q.    All right.  No. 7, all statements or

5    communications made by OSI agents, officers, or

6    relevant personnel concerning:  A, Dr. Roe's

7    character, reliability, or integrity; B, the

8     viability or credibility of the allegations that

9    triggered the investigation; or, C, instructions or

10   directives about how to handle or finalize

11   Dr. Roe's case.

12             Are you prepared to discuss that

13   question?

14        A.    Yes.

15        Q.    No. 8, OSI's rationale and basis for

16    concluding, continuing, limiting, or terminating

17   the investigation, including any official or

18   unofficial findings, conclusions or

19   recommendations.

20             Are you prepared to answer that

21   question?

22        A.    Yes.

23        Q.    No. 9, OSI's general practices,

24   protocols or SOPs regarding interviews of

25   individuals under investigation, including how

**EXHIBIT 33**
**Page 10 of 36**

1    interviews are scheduled and documented, notice and

2    advisements given to interviewees, whether

3    interviews are recorded or transcribed, whether

4    counsel, representatives, or third parties are

5    permitted.

6                    Are you prepared to answer that

7    question?

8                    Do we have a freeze situation going

9    on?

10                   MS. SEEMAN:  It looks like it.

11                   THE VIDEOGRAPHER:  Let's go off the

12   record at 11:42 Mountain Time.

13                   (A break was taken from 11:42 a.m.

14   to 11:51 a.m.)

15                   THE VIDEOGRAPHER:  The time is 11:51

16   Mountain Time.  We're back on the record.

17   BY MR. WAREHAM:

18          Q.    All right.  So we lost you there for

19   a sec.  I'm going to go back to reading these

20   questions and confirming your understanding.  I was

21    on No. 9.  OSI's general practices, protocols or

22   SOPs regarding interviews of individuals under

23   investigation, including how interviews are

24    scheduled and documented, notice and advisements

25   given to interviewees, whether interviews are

**EXHIBIT 33**
**Page 11 of 36**

```
 1    recorded or transcribed, and whether counsel,

 2     representatives, or third parties are permitted?

 3                   Are you prepared to answer that

 4    question?

 5          A.    Yes.

 6          Q.    No. 10, each interview, attempted

 7    interview, or communication OSI had with Dr. Roe,

 8    including the identity of OSI personnel conducting

 9    or present during such interviews, the date, time,

10    location and circumstances of each interview, any

11     instructions, admonitions or warnings given, any

12    allegations, accusations or statements made during

13    these interviews, especially concerning Dr. Roe's

14    trustworthiness or insider threat potential.

15                   Are you prepared to discuss that

16    question?

17          A.    Yes.

18          Q.    No. 11, all OSI record systems or

19    databases consulted or utilized in the

20     investigation, including the scope and nature of

21    each system, whether the system is classified,

22    unclassified, or mixed, whether retention and

23    logging protocols for data access.

24                   Are you prepared to discuss that

25    question?
```

**EXHIBIT 33**
**Page 12 of 36**

```
 1              A.      Yes.

 2              Q.      No. 12, OSI's processes, directives,

 3      or guidance on controlling access to investigative

 4      files, how OSI determines need-to-know for each

 5      investigation; whether OSI documented who accessed

 6       or reviewed Dr. Roe's file; all measures used to

 7      track or log disclosures of Dr. Roe's investigative

 8      information.

 9                      Are you prepared to answer that

10      question?

11              A.      Yes.

12              Q.      14, any dissemination, formal or

13      informal, of Dr. Roe's investigative information to

14      third parties, including the identity of the

15      recipients, the reason for sharing, and the

16      policies or rules governing such disclosures.

17                      Are you prepared to answer that

18      question?

19              A.      Yes.

20              Q.      No. 16, whether any portion of Dr.

21      Roe's investigative materials were subject to

22      Special Access Programs, compartmentalization, or

23      other heightened restrictions, and how OSI handled

24      that data.

25                      Are you prepared to answer that
```

EXHIBIT 33
Page 13 of 36

1    question?

2            A.    Yes.

3            Q.    No. 17, the basis and authority for

4    any read-outs, revocations or changes to Dr. Roe's

5    clearance or access level during or after the

6    investigation.

7                 Are you prepared to answer that

8    question?

9            A.    Yes.

10           Q.    OSI's policies or guidelines

11   concerning the sharing of investigative findings or

12   allegations with other military or civilian

13   agencies, including any requirements for

14   documenting such communications, restricting or

15   limiting who may receive investigative outcomes or

16   data, gaining approval before transmitting

17   investigative information outside OSI.

18                Are you prepared to answer that

19   question?

20                MR. WAREHAM:  Uh-oh.  Let's go off

21   the record.

22                THE VIDEOGRAPHER:  The time is

23    11:54 a.m. Mountain Time.  We're off the record.

24                (A break was taken from 11:54 a.m.

25   to 12:03 p.m.)

EXHIBIT 33
Page 14 of 36

```
 1                    THE VIDEOGRAPHER:  The time is
 2   12:03.  We're back on the record.
 3                    (Discussion held off the record.)
 4   BY MR. WAREHAM:
 5            Q.    Okay.  16, whether any portion of
 6   Dr. Roe's investigative materials were subject to
 7    Special Access Programs, compartmentalization or
 8   other heightened restrictions and how OSI handled
 9   that data.
10                    Are you prepared to discuss that
11   question?
12            A.    Yes.
13            Q.    17, the basis and authority for any
14   read-outs, revocations or changes to Dr. Roe's
15   clearance or access level during or after the
16   investigation.
17                    Are you prepared to answer that
18   question?
19            A.    Yes.
20            Q.    No. 18, OSI's policies or guidelines
21   concerning the sharing of investigative findings or
22   allegations with other military civilian agencies,
23   including any requirements for documenting such
24   communications, restricting or limiting who may
25   receive investigative outcomes or data, gaining
```

**EXHIBIT 33**
**Page 15 of 36**

1    approval before transmitting investigative

2    information outside OSI.

3              Are you prepared to answer that

4    question?

5         A.    Yes.

6         Q.    No. 19, identification of all

7    individuals, commands, or agencies to whom OSI

8    provided any information regarding Dr. Roe's

9    investigation and the basis upon which OSI believed

10   such disclosure was authorized or appropriate.

11             Are you prepared to answer that

12   question?

13        A.    Yes.

14        Q.    No. 20, whether and how OSI followed

15   any mandatory reporting directives for insider

16   theft or national security findings, if applicable.

17             Are you prepared to answer that

18   question?

19        A.    Yes.

20        Q.    And then No. 26, all directives,

21   manuals, instructions, handbooks, or SOPs in effect

22   during Dr. Roe's investigation that govern:  A,

23   insider threat investigations; b, security

24   clearance adjudications, revocations, or readouts;

25   c, investigative procedures involving potential

EXHIBIT 33
Page 16 of 36

1    national security concerns; d, The Privacy Act,

2    need-to-know policies, or data handling protocols;

3    and, e, classification and declassification

4    responsibilities.

5             Are you prepared to discuss that

6    question?

7        A.    Yes.

8        Q.    And then 27, whether OSI followed

9    any such SOPs and guidelines in Dr. Roe's

10   investigation, including any documented reasons for

11   deviation.

12            Are you prepared to answer that

13   question?

14       A.    Yes.

15       Q.    All right.  Thank you for staying

16   with that particular reading test.

17            MS. SEEMAN:  And, counsel, just for

18   the record, I just want to say that the parties met

19    and conferred based on a timeline for several of

20   these topics and based on your email from Monday,

21   April 21st.  The agreed upon timeline for most of

22   these documents is 2019 to 2011; however, quoting

23   your email for more of the general questions around

24   systems and records and processes, the timeline

25   would be extended to the present.

EXHIBIT 33
Page 17 of 36

```
1                    MR. WAREHAM:  Great.  Thanks.
2    BY MR. WAREHAM:
3             Q.    Okay.  So, Mr. Crunk, will you just
4    give a little bit of background about who you are
5    and who you work for?
6             A.    Sure.  So my name is Michael Crunk.
7    I have been -- I started with Air Force Office of
8    Special Investigations, now known as the Department
9    of the Air Force Office of Special Investigations,
10   in 2005, stayed with them all the way up until 2021
11   when I transferred to a different federal agency,
12   and then in October of 2023, I transferred back to
13   OSI, and I'm currently the assistant special agent
14   in charge of Special Projects Detachment Seven in
15   Palmdale, California.
16            Q.    Oh, okay.  So you're commonly called
17   ASAC?
18            A.    Yes, sir.
19            Q.    All right.  And forgive me for the
20   Mister.  I'll try to remember Agent going forward.
21            A.    It doesn't matter to me.
22            Q.    All right.  Fair enough.  Okay.  So
23                  let's start -- and I apologize for
24   jumping around
25       on numbers a little bit, but I think what I want to
```

**EXHIBIT 33**
**Page 18 of 36**

1    do is I want to start broadly as much as possible,

2     and then we can shape the questions down to this

3    specific case.

4                    So let's start with the -- 26, which

5    involves all directives, manuals, instructions,

6    handbooks, or SOP in effect during Dr. Roe's

7    investigation that govern those categories.  So

8    let's start with insider threat investigations.

9                    Can you tell me what directives,

10    manuals, instructions, handbooks, or SOPs govern

11    insider threat investigations?

12            A.    So, in general, OSI -- I just want

13    to say, OSI did not conduct an investigation on

14    Dr. Roe, and so any policies, directives,

15    investigations and things related to investigations

16    would not have been applicable in OSI's involvement

17    in this.  So I didn't spend an inordinate amount of

18    time looking at those policies and regulations.

19            Q.    Okay.  Well, let's then -- thank you

20    for that answer.  I appreciate it.  Let's do this

21    around that answer.  I'm just searching for where

22    we'll go back to make sure that it's clear for the

23     record and for counsel which numbers we're under

24    here.

25                    So let's go to No. 4.  So I describe

EXHIBIT 33
Page 19 of 36

1    Dr. Roe's matter there, and that's actually -- for
2    clarity, that involves Dr. Roysdon.  So I've seen a
3    number of reports and communications by a Special
4    Agent Beall.  All right.  So when I -- I get that
5     no -- your answer was no investigation was open,
6    but when I'm asking questions, I'm going to be
7    referencing the actions of Agent Beall with respect
8    to Dr. Roysdon.  Does that make sense to you?
9          A.    Yes, it does.
10         Q.    So I don't want us to split hairs
11   unnecessarily.  I'll just call it Dr. Roysdon's
12   matter.  Does that work for you?
13         A.    Yes.
14         Q.    Okay.  So can you -- well, yeah.
15   Can you take me through the timeline of actions for
16   Dr. Roysdon's matter?
17         A.    Sure.  So based on the documentation
18    that I reviewed, it appears that OSI was brought
19   the information from HNCO in approximately
20   August 19th, 2020, and based on that email, it
21   contained a memorandum outlining some concerns
22   related to Dr. Roe, and then communications
23   happened over the next couple of days.  Mr. -- one
24   of the things that came out in the letter was that
25    Mr. Roysdon had informed AFCLC/HNCO on 20 August

EXHIBIT 33
Page 20 of 36

1    that he is planning to resign from the NSA.

2                    Based on that, Mr. Beall

3    communicated -- let's see.  Sorry, I need to get

4    the dates.  Mr. Beall communicated August 24th that

5    he had had a -- he and the HNCO security office

6    decided a security inquiry should be performed on

7    the incident, and also that since Mr. Roysdon had

8    given notice of his resignation from NSA, Mr. Beall

9    would debrief Mr. Roysdon from the program that he

10   had access to that week because his clearance and

11   program access were based upon his position within

12   the NSA.

13           Q.    Okay.  So can you, for record

14   clarity, recite what the Bates number, the little

15   number starting with leading zeros are for each of

16   those documents that just referenced?

17           A.    Sure.  So the letter that -- let me

18   back up.

19                 So the email, the initial email that

20   I have that indicates August 19, 2020 has

21   US0000271, and that goes into 272 and 273, and that

22   references the memorandum which is US0000106, and

23   that's where I referenced the information that Dr.

24   Roysdon had informed that he would leaving -- that

25   he was going to resign from NSA.

EXHIBIT 33
Page 21 of 36

1                    And then the document number -- an
2       email from Mr. Beall where he indicated he and the
3       agency security office had decided the security
4       inquiry would be performed and that Mr. Beall would
5       be debriefing Mr. Roysdon was US0000061.
6              Q.    So how would you describe the
7       actions taken by Special Agent Beall if we're not
8       using the term investigation was opened, how would
9       you describe the actions of Agent Beall?
10             A.    Sure.  In Mr. Beall's capacity, he
11      was serving as a program security officer, which is
12      overall cognizance of security for this program
13       that Dr. Roysdon was accessed to.  And so within
14      his security authorities that are derived from DOD
15      manual 5205.07, Volume 1 and DOD manual 5205.7,
16      Volume 2, those describe the roles and
17      responsibilities of a program security officer,
18      which Mr. Beall was.  So the actions taken by Mr.
19      Beall were under his authorities as a program
20      security officer.
21             Q.    Okay.  And what is the -- what are
22      the roles and responsibilities of an OSI agent
23      serving as a program securities officer?
24             A.    So the information about why OSI has
25       it organized that way between special agents and

EXHIBIT 33
Page 22 of 36

```
 1    also BMPSOs, program security officers, that

 2    information is outside the scope of my preparation.

 3              Q.    Okay.  You know --

 4                    MR. WAREHAM:  And I'm sorry to put

 5    you on pause here actually.  Could I ask that the

 6     witness be moved to their own room briefly?  I'd

 7    like to discuss something with counsel.

 8                    THE VIDEOGRAPHER:  Do you want to

 9    stay on record or go off record?

10                    MR. WAREHAM:  Off record is fine.

11    Thank you.

12                    THE VIDEOGRAPHER:  The time would be

13    12:15.  We're off the record.

14                    (A break was taken from 12:16 p.m.

15    to 12:30 p.m.)

16                    THE VIDEOGRAPHER:  Okay.  The time

17    is 12:30 Mountain Time.  We're back on the record.

18    BY MR. WAREHAM:

19              Q.    So, Agent Crunk, this is not your

20    issue, just I want to be clear, but it appears in

21    our notice and in, you know, my conception of how I

22    was describing issues with respect to this notice

23    and what we would be looking into in today's

24    examination, I used the term "investigation,"

25     right?  And I used that to mean the personnel or
```

EXHIBIT 33
Page 23 of 36

1    the special access stuff that was going on.

2              What I want to do so that we can all

3    have efficiency in what we're going to do here is I

4    am going to go back with the knowledge that you

5    just provided and the distinction, and I'm going to

6    adapt these notices and questions to that

7    distinction so that you can be better prepared, or

8    whoever can be better prepared, and we can be more

9    efficient and like not run into this, well, I

10   didn't review that or this, okay, thing?

11             A.    Sure.

12             Q.    I believe DOJ has an objection for

13   the record on that, but I'm going to ask to

14    continue this, and I apologize that we took your

15   time today and that there was some clarity issues,

16   but I want to repair that so we're as effective as

17   possible.  Okay?

18             A.    No problem.

19             MR. WAREHAM:   Great.  DOJ, do you

20   have an objection to that?

21             MS. SEEMAN:   Yeah, just for the

22   record, defendants object to continuing this

23   deposition because we believe that this witness is

24   adequately prepared to testify on several, if not

25    all, of the topics he's been designated for, but

EXHIBIT 33
Page 24 of 36

1    it's your deposition, plaintiff, so we won't stand

2    in the way.

3                    MR. WAREHAM:  Thank you.  I

4    appreciate it.  And so I'm going to excuse you, Mr.

5    Crunk.

6                    We can go off the record and we'll

7    just take the next witness.  I appreciate it.

8    Thank you.

9                    THE VIDEOGRAPHER:  This concludes

10   this portion of today's proceedings.  The time is

11   12:32.  We're off the record.

12                    (The deposition was concluded at

13   12:32 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

**EXHIBIT 33**
**Page 25 of 36**

1          I, MICHAEL CRUNK, do hereby certify that I have

2     read the foregoing transcript and that the same and

3     accompanying amendment sheets, if any, constitute a true

4     and complete record of my testimony.

5

6

7

                    _____

8                   Signature of Deponent
                    ( ) No Amendments
9                   ( ) Amendments Attached

10         Acknowledged before me this

11    _____ day of _____, 2025.

12

13         Notary Public: _____

14         My commission expires _____

15         Seal:

16

17

18

19

20

21

22

23

24

25

**EXHIBIT 33**
**Page 26 of 36**

1                    REPORTER CERTIFICATE

2
                         I, ROSANNE M. STAHL, Shorthand
3     Reporter and Notary Public within and for the State
      Of Colorado, do hereby certify that previous to the
4     Commencement of the testimony, the said JOSEPH
      BURGHARD was sworn by me to testify to the truth in
5     Relation to the matters in controversy between the
      Said parties so far as he should be interrogated
6     Concerning the same; that the said deposition was
      Taken in stenograph by me at the time and place
7     Aforesaid and was thereafter reduced to typewritten
      Form; that the foregoing is a true and correct
8     Transcript of my stenographic notes thereof; and
      That Deposition Exhibit 1 was marked and used in
9     The interrogation.
                         I further certify that I am not
10    Employed by, related to, nor counsel for any of the
      Parties herein, nor otherwise interested in the
11    Event of this action.
                         IN WITNESS WHEREOF, I have affixed
12    My signature and seal this 7th day of May, 2025.

13

14

15                                  _____
                                    Rosanne M. Stahl
16                                  Notary Public

17

18    MY COMMISSION EXPIRES:  04/13/26.

19

20

21

22

23

24

25

EXHIBIT 33
Page 27 of 36

```
 1   AB LITIGATION SERVICES
     216 - 16th Street, Suite 600
 2   Denver, Colorado  80202

 3
     May 7, 2025
 4
     Katrina M. Seeman, Esq.
 5   950 Pennsylvania Avenue NW
     Washington, DC 20530
 6
     Re:  30(b)(6) VIDEOCONFERENCE AND VIDEO DEPOSITION
 7        OF UNITED STATES AIR FORCE OFFICE OF SPECIAL
          INVESTIGATIONS BY MICHAEL CRUNK
 8        Roe v. United States of America
          Civil Action No. 5:22-CV-00869-JKP-HJB
 9
     The aforementioned deposition is ready for reading and
10   signing.  Please attend to this matter by following BOTH
     of the items indicated below:
11
     _____ Call 303-296-0017 and arrange with us to read
12         and sign the deposition in our office.

13   _XXX_ Have the deponent read your copy and sign
           the signature page and amendment sheets, if
14         applicable; the signature page is attached.

15   _____ Read the enclosed copy of the deposition and
           sign the signature page and amendment
16         sheets, if applicable; the signature page is
           attached.
17
     _XXX_ WITHIN 30 DAYS OF THE DATE OF THIS LETTER
18
     _____ By _____ due to a trial date of _____
19
     Please be sure the original signature page and amendment
20   sheets, if any, are SIGNED BEFORE A NOTARY PUBLIC and
     returned to AB Litigation Services for filing with the
21   original deposition.  A copy of these changes should also
     be forwarded to counsel of record.  Thank you.
22
     AB LITIGATION SERVICES
23
24   cc:  All Counsel

25
```

**EXHIBIT 33**
**Page 28 of 36**

```
 1   AB LITIGATION SERVICES
     216 - 16th Street, Suite 600
 2   Denver, Colorado  80202

 3

 4

 5
            30(b)(6) VIDEOCONFERENCE AND VIDEO DEPOSITION
 6       OF UNITED STATES AIR FORCE OFFICE OF SPECIAL
                 INVESTIGATIONS BY MICHAEL CRUNK
 7                     April 24, 2025
               Roe v. United States of America
 8         Civil Action No. 5:22-CV-00869-JKP-HJB

 9

10   The original deposition was filed with

11   Jason R. Wareham, Esq., on approximately the

12   7th day of May, 2025.

13   _____ Signature waived.

14   _____ Signature not requested

15   _____ Unsigned; signed signature page and
            amendment sheets, if any, to be filed at
16          trial.

17   _XXX_ Unsigned; original amendment sheets and/or
           signature pages should be forwarded to AB
18         Litigation Services to be filed in the envelope
           attached to the sealed original.
19

20

21   Thank you.

22   AB LITIGATION SERVICES

23   cc:  All Counsel

24

25
```

**EXHIBIT 33**
**Page 29 of 36**

- AMENDMENT SHEET -

30(b)(6) VIDEOCONFERENCE AND VIDEO DEPOSITION
OF UNITED STATES AIR FORCE OFFICE OF SPECIAL
INVESTIGATIONS BY MICHAEL CRUNK
April 24, 2025
Roe v. United States of America
Civil Action No. 5:22-CV-00869-JKP-HJB

The deponent wishes to make the following changes in the
testimony as originally given:

Page   Line               Should Read            Reason

_____  _____   _____  _____

_____  _____   _____  _____

_____  _____   _____  _____

_____  _____   _____  _____

_____  _____   _____  _____

_____  _____   _____  _____

_____  _____   _____  _____

_____  _____   _____  _____

_____  _____   _____  _____

_____  _____   _____  _____

_____  _____   _____  _____

_____  _____   _____  _____

_____  _____   _____  _____

Signature of Deponent: _____

Acknowledged before me this _____ day of

_____, 2025.

(seal)        Notary's signature _____

              My commission expires _____.

**EXHIBIT 33**
**Page 30 of 36**

**EXHIBIT 33**
**Page 31 of 36**

**EXHIBIT 33**
**Page 32 of 36**

**EXHIBIT 33**
**Page 33 of 36**

**EXHIBIT 33**
**Page 34 of 36**

**EXHIBIT 33**
**Page 35 of 36**

**EXHIBIT 33**
**Page 36 of 36**

| | |
|---|---|
| **From:** | WHITMAN, WILLIAM S DO-03 USAF AFMC AFRL/RIJ [william.whitman.1@us.af.mil] |
| **Sent:** | 8/31/2020 12:37:59 PM |
| **To:** | MACRINA, TANYA M CIV USAF AFMC AFRL/RIGA [tanya.macrina@us.af.mil] |
| **CC:** | PARISI, THOMAS J CIV USAF AFMC AFRL/RIGA [thomas.parisi.1@us.af.mil]; MARX, JOHN T CIV USAF ACC 16 AF/AFRL/RIG/OL-SATX [john.marx.2@us.af.mil]; MCVEIGH, WILLIAM M Capt USAF AFMC AFLCMC/HNCO [william.mcveigh.1@us.af.mil] |
| **Subject:** | RE: Government/Contractor Role - Excalibur |

I'll have to pull this apart today Tanya but I'll get back with you asap.

Bill

**William S. Whitman**
**Acquisition Attorney**
**Air Force Research Lab, Information Directorate**
**Rome, NY**
**No phone available.**

CAUTION:  This communication may be privileged as an attorney work product or as an attorney-client communication, or both, or subject to another privilege recognized under law.  Do not distribute, forward or retransmit outside the Air Force without the specific prior approval of the originator or higher authority.  Not subject to discovery or release under the Freedom of Information Act, Pub. L. No. 93-502 (5 U.S.C. Section 552).

---

**From:** MACRINA, TANYA M CIV USAF AFMC AFRL/RIGA <tanya.macrina@us.af.mil>
**Sent:** Monday, August 24, 2020 2:06 PM
**To:** WHITMAN, WILLIAM S DO-03 USAF AFMC AFRL/RIJ <william.whitman.1@us.af.mil>
**Cc:** PARISI, THOMAS J CIV USAF AFMC AFRL/RIGA <thomas.parisi.1@us.af.mil>; MARX, JOHN T CIV USAF ACC 16 AF/AFRL/RIG/OL-SATX <john.marx.2@us.af.mil>; MCVEIGH, WILLIAM M Capt USAF AFMC AFLCMC/HNCO <william.mcveigh.1@us.af.mil>
**Subject:** Government/Contractor Role - Excalibur

Hi Bill,

I was asked to participate in a meeting this morning (8/24/20) and now we need to request your expertise/advice/recommended way forward.

We have a person that is currently a NSA employee (at least for another two weeks) as well as a subcontractor to Global InfoTek (GITI) (working for GITI outside of NSA hours).  This person does NOT work classified matters for the prime contractor (GITI).  Therefore there is no DD254/SCI nomination under the Excalibur contract/etc...

We (AFLCMC/AFRL) are trying to figure out if there is a COI situation and/or a "Double Dipping" violation.

*Dr. Paul Roysdon is the Chief/Lead Data Scientist for NSA-Texas. In this capacity, he is tasked with building a data science team, training and equipping them with the tools they need to solve mission problems in Enterprise Discovery Operations.

**EXHIBIT 34**
**Page 1 of 2**
Confidential - Subject to Protective Order

*Dr. Paul Roysdon is also a subcontractor to Global InfoTek for an effort that is funded by AFLCMC. In this capacity, he is assisting with mathematical calculations in furtherance of its cyber-related mission. He would serve as a subcontractor to the prime.

*Dr. Paul Roysdon indicates that his official responsibilities with the NSA are NOT related to the work that he does for the prime contractor (GITI).

Areas of concern/and review by an Attorney at NSA (███ A ███ R ███) were:
1.        Financial Conflict of Interest Statute – prohibit Dr. Roysdon from personally and substantially participating in his official Government duties on any particular matter that may affect an entity with which you have an outside business relationship, such as the prime contractor.
2.        18 U.S.C SS 205 – prohibits Dr. Roysdon from personally representing any other person (including companies) – with our without compensation – before a federal department, agency , or employee.
3.        18 U.S.C SS 203 – prohibits Dr. Roysdon from receiving compensation that comes from the representation by others before a government department or agency on any matter in which the United States is a party or has a substantial interest.

It has been stated that the OGC reviewed his situation and has concurred that Dr. Paul Roysdon has not violated any laws or statutes.

The situation here – is that Dr. Roysdon has given classified briefings on the status of the effort that GITI is getting paid to do under the Excalibur task order – in his NSA role. As well as, he has been getting paid by GITI since April 2019 to work unclassified effort for Excalibur, while working NSA tasking.

Can you assist in helping us understand if there are any issues/concerns here? Has Dr. Roysdon violated any laws or statutes that you see? As the contracting agency – I thought it would be our job to make a call on this.

Speaking to the AFLCMC PSO – we both agreed there is not a security incident – but potentially a contractual issue, or potentially false pretenses if he did not disclose his government employment to Global InfoTek. (I have sent an email to GITI requesting information on Dr. Roysdon's subcontract).

I hope I have laid out the scenario correctly – I am happy to provide further information as I have it.

V/r,
Tanya

Tanya M. Macrina, DR-III, DAF
Cyber Assurance Branch
Air Force Research Laboratory
Comm: 315-330-4715  (DNS: 587-4715)
Email: Tanya.Macrina@us.af.mil
SIPR: Tanya.M.Macrina.civ@mail.smil.mil
JWICS: Tanya.Macrina@af.ic.gov

This email may contain FOR OFFICIAL USE ONLY (FOUO) information which must be protected under the Freedom of Information Act (5 U.S.C 552) and/or the Privacy Act of 1974 (5 U.S.C. 552a). Unauthorized disclosure or misuse of this PERSONAL INFORMATION may result in disciplinary action, criminal and/or civil penalties. Further distribution is prohibited without the approval of the author of this message unless the recipient has a need-to-know in the performance of official duties. If you have received this message in error, please notify the sender and delete all copies of this message.

**EXHIBIT 34**
**Page 2 of 2**