**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

DR. PAUL F. ROYSDON,

        *Plaintiff*,

    v.                                              No. 5:22-cv-00869-JKP-HJB

UNITED STATES, *et al.*,

        *Defendants*.

<u>**REPLY IN SUPPORT OF DEFENDANTS'**</u>
<u>**MOTION FOR SUMMARY JUDGMENT**</u>

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

ARGUMENT ...................................................................................................................... 2

I.     Defendants Are Entitled to Summary Judgment on Plaintiff's Stigma-Plus Due Process Claim (Count IV). ....................................................................................................... 2

     A.    Plaintiff failed to dispute material facts with record evidence; instead, he grossly misrepresents the factual record and relies on self-serving assertions. ................. 2

          1.    No one at HNCO or OSI labeled Plaintiff an "insider threat." ................. 3

          2.    It is undisputed that Plaintiff has no evidence of damaged reputation. ...... 5

          3.    Plaintiff mischaracterizes the Air Force inquiry communications and blatantly mispresents the NSA legal guidance. .......................................... 6

          4.    Plaintiff revived the circumstances of his departure with an OIG complaint. ........................................................................................................ 7

     B.    Plaintiff cannot prove a deprivation of a protected liberty interest because he has not experienced preclusion from his chosen field. ................................................ 8

II.    Plaintiff's De Facto Debarment Claim Fails (Count I). ................................................ 13

III.   Plaintiff's Privacy Act Claims Fail as a Matter of Law. .............................................. 17

     A.    Plaintiff's New Privacy Act Claims Are Procedurally Improper. ....................... 20

     B.    Plaintiff's Novel Privacy Act Claims Are Not Viable. ........................................ 21

IV.   Plaintiff's Requests for Additional Discovery and Sanctions are Untimely and Fail to Identify Evidence that Would Create a Dispute of Material Fact. .............................. 27

     A.    Plaintiff Failed to Comply with the Applicable Rules for Raising Any Discovery Dispute with Defendants or the Court Before the Close of Discovery. ............... 28

     B.    Plaintiff's Request for Rule 37(e) Sanctions is Untimely and Unsupported. ....... 30

          1.    SA Beall's NIPR, SIPR, and JWICS Accounts ........................................ 30

          2.    Dan Brown's Emails .................................................................................. 32

     C.    Plaintiff Fails to Demonstrate That the Additional Discovery Requested in His Rule 56(d) Affidavit Would Create a Dispute of Material Fact. ......................... 33

          1.    "Unredacted OSI Investigative File" ¶ 46 ............................................... 34

          2.    "Email Titled 'Roysdon write-up' Classified Systems" ¶ 47 ................... 35

          3.    "JPAS/DISS Access Logs" (¶ 48) ............................................................ 35

          4.    "Privileged Communications About [Plaintiff's] Removal" (¶ 49).......... 36

          5.    "Security Database Entries (Higher Headquarters)" (¶ 50) ...................... 37

          6.    Plaintiff's Unsupported Requests for Discovery ...................................... 37

CONCLUSION .................................................................................................................. 39

# TABLE OF AUTHORITIES

## CASES

*Adams v. City of Harahan,*
  95 F.4th 908 (5th Cir.) ................................................................................ 5, 8, 9
*Akl v. Sebelius,*
  No. 12-5315, 2013 WL 1164488 (D.C. Cir. Mar. 11, 2013) .............................. 26
*Am. Family Life Assurance Co. of Columbus v. Biles,*
  714 F.3d 887 (5th Cir. 2013) ............................................................................ 33
*Anderson v. Liberty Lobby,*
  477 U.S. 242 (1986) ...................................................................................... 4, 13
*Babatu v. Dallas Veterans Affs. Med. Ctr.,*
  No. 3:11-CV-00533-L, 2014 WL 626515 (N.D. Tex. Feb. 18, 2014) .................. 24
*Baker v. Winter,*
  210 F. App'x 16 (D.C. Cir. 2006) ...................................................................... 26
*Bernson v. I.C.C.,*
  625 F. Supp. 10 (D. Mass. 1984) ...................................................................... 26
*Bettersworth v. F.D.I.C.,*
  248 F.3d 386 (5th Cir. 2001) ...................................................................... 23, 25
*Bigelow v. Dep't of Def.,*
  217 F.3d 875 (D.C. Cir. 2000) .......................................................................... 23
*Bledsoe v. City of Horn Lake, Mississippi,*
  449 F.3d 650 (5th Cir. 2006) .................................................................... 7, 9, 10
*Brown v. Austin,*
  13 F.4th 1079 (10th Cir. 2021) ......................................................................... 27
*Brown v. Esper,*
  No. 1:17-CV-02004-RM-STV, 2019 WL 6893019 (D. Colo. Dec. 18, 2019) ....... 27
*Carrington v. U.S., Dep't of Def.,*
  46 F.3d 66 (5th Cir. 1995) ................................................................................ 27
*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986) ........................................................................................... 1
*Ciralsky v. C.I.A.,*
  689 F. Supp. 2d 141 (D.D.C. 2010) ................................................................... 23
*Clarkson v. IRS,*
  811 F.2d 1396 (11th Cir. 1987) .................................................................... 36, 38
*Coburn v. Potter,*
  No. 06 C 5397, 2008 WL 4390153 (N.D. Ill. Sept. 24, 2008) ................. 18, 23, 25
*Coleman v. United States,*
  912 F.3d 824 (5th Cir. 2019) ............................................................................ 27
*Compass Bank v. Shamgochian,*
  287 F.R.D. 397 (S.D. Tex. 2012) ....................................................................... 29
*Cox v. Roskelley,*
  359 F.3d 1105 (9th Cir. 2004) .......................................................................... 11
*Cutrera v. Bd. of Supervisors of La. State Univ.,*
  429 F.3d 108 (5th Cir. 2005) ............................................................................ 20

*Dellucky v. St. George Fire Prot. Dist.*,
  No. 23-30810, 2024 WL 3688722 (5th Cir. Aug. 7, 2024) ................................... 12
*Dinh Tran v. Dep't of Treasury*,
  351 F. Supp. 3d 130 (D.D.C. 2019) ................................................................ 25, 36
*Doctors Hosp. of Laredo v. Cigarroa*,
  2025 WL 1513443 (W.D. Tex. Jan. 28, 2025) ............................................... 4, 6, 16
*Dynamic Aviation v. Dep't of Interior*,
  898 F. Supp. 11 (D.D.C. 1995) ............................................................................ 14
*Fahim v. Marriott Hotel Servs.*,
  551 F.3d 344 (5th Cir. 2008) ............................................................................... 21
*Ford v. Anderson Cnty., Texas*,
  102 F.4th 292 (5th Cir. 2024) .............................................................................. 21
*Ghedi v. Mayorkas*,
  16 F.4th 456 (5th Cir. 2021) ............................................................................... 13
*Gordon v. Univ. of Tex. Med. Branch*,
  700 F. App'x 350 (5th Cir. 2017) ................................................................... 10, 12
*Highview Eng'g, Inc. v. U.S. Army Corps of Eng'rs*,
  864 F. Supp. 2d 645 (W.D. Ky. 2012) ............................................................ 15, 17
*Hill v. Dep't of Def.*,
  981 F. Supp. 2d 1 (D.D.C. 2013) ................................................................... passim
*Hughes v. City of Garland*,
  204 F.3d 223 (5th Cir. 2000) .......................................................................... 11, 12
*Jackson v. Gautreaux*,
  3 F.4th 182 (5th Cir. 2021) ............................................................................. 20, 21
*Leslie and Elliott Co., Inc. v. Garrett*,
  732 F. Supp. 191 (D.D.C. 1990) .......................................................................... 15
*Miller v. Michaels Stores, Inc.*,
  98 F.4th 211 (5th Cir. 2024) .................................................................................. 4
*Ortwein v. Mackey*,
  511 F.2d 696 (5th Cir. 1975) ............................................................................... 11
*Patel v. Shipper Servs. Express*,
  No. 5:20-cv-00267-OLG, 2020 WL 10056291 (W.D. Tex. Oct. 19, 2020) ............. 29
*Pearson v. U.S. Dep't of Homeland Sec.*,
  No. 3:08-CV-1885-BB, 2009 WL 4016414 (N.D. Tex. Nov. 17, 2009) .............. 36, 37
*Phillips v. Mabus*,
  894 F. Supp. 2d 71 (D.D.C. 2012) ................................................................... 14, 19
*Quinn v. Navy*,
  No. 94-56067, 1995 WL 341513 (9th Cir. June 8, 1995) ..................................... 36
*Quinn v. Shirey*,
  293 F.3d 315 (6th Cir. 2002) ............................................................................... 11
*Raby v. Livingston*,
  600 F.3d 552 (5th Cir. 2010) ............................................................................... 33
*Related Indus. v. United States*,
  2 Cl. Ct. 517 (1983) ............................................................................................ 15
*San Jacinto Sav. & Loan v. Kacal*,
  928 F.2d 697 (5th Cir. 1991) ................................................................................. 6

*Scott v. Harris*,
    550 U.S. 372 (2007)..................................................................................................... 3
*Shaw v. Hosp. Auth. of Cobb Cnty.*,
    507 F.2d 625 (5th Cir. 1975) ....................................................................................... 9
*Silo Rest. Inc. v. Allied Prop. and Cas. Ins. Co.*,
    420 F. Supp. 3d 562 (W.D. Tex. 2019)...................................................................... 33
*Sistrunk v. TitleMax, Inc.*,
    No. 5:14-cv-628-RP, 2017 WL 2392436 (W.D. Tex. June 2, 2017).......................... 33
*Smith v. McDonough*,
    No. 5:22-CV-01383-JKP, 2025 WL 1186904 (W.D. Tex. Apr. 23, 2025) ............... 21
*Smith v. Reg'l Transit Auth.*,
    827 F.3d 412 (5th Cir. 2016) ..................................................................................... 34
*Stapp Towing Inc. v. United States*,
    34 Fed. Cl. 300 (1995) ............................................................................................... 16
*TLT Const. Corp. v. United States*,
    50 Fed. Cl. 212 (2001) .......................................................................................... 14, 15
*United States v. Lawrence*,
    276 F.3d 193 (5th Cir. 2001) ....................................................................................... 3
*Vais Arms, Inc. v. Vais*,
    383 F.3d 287 (5th Cir. 2004) ....................................................................................... 3
*Vinewood Cap., LLC v. Dar Al-Maal Al-Islami Tr.*,
    541 F. App'x 443 (5th Cir. 2013) ............................................................................. 3, 5
*Walia v. Napolitano*,
    986 F. Supp. 2d 169 (E.D.N.Y. 2013) ....................................................................... 23

## STATUTES

5 U.S.C. § 552a(b)(1)...................................................................................................... 19
5 U.S.C. § 552a(c)........................................................................................................... 36
5 U.S.C. § 552a(g)(1)(D)................................................................................................. 36
18 U.S.C. § 203................................................................................................................. 7
Section 552a(e)(5)........................................................................................................... 36

## RULES

Fed. R. Civ. P. 4(i)(2) ..................................................................................................... 31
Fed. R. Civ. P. 16(b)(3)(A).............................................................................................. 28
Fed. R. Civ. P. 37(e) ....................................................................................................... 30
Fed. R. Civ. P. 56(e) ....................................................................................................... 13
Fed. R. Civ. P. 56(d) .................................................................................................. 33, 37

## <u>INDEX OF ADDITIONAL EXHIBITS</u>

| No. | Description |
|-----|-------------|
| 29 | NSA Resignation |
| 30 | Colonel Ekholm 30(b)(6) Deposition Transcript Additional Excerpts |
| 31 | Email Chain re Tech SME (US0000581–589) |
| 32 | McVeigh and Ranft Text Messages |
| 33 | Wareham Email (Mar. 28, 2025) |
| 34 | Seeman Email (Apr. 14, 2025) |
| 35 | Defs.' Ans. to Interrog. No. 8 |
| 36 | Defendants' Objections to Plaintiff's Rule 30(b)(6) Notices |
| 37 | Gonzalez Email (Apr. 18, 2025) |
| 38 | Gonzalez Email (Apr. 23, 2025) |
| 39 | McVeigh Email to Macrina |

## INTRODUCTION

Plaintiff's 87-page opposition brief attempts to manufacture confusion in what remains a straightforward case. Defendants met their initial burden of demonstrating that they are entitled to summary judgment on Plaintiff's due process, de facto debarment, and Privacy Act claims because:

1.    Plaintiff has adduced no evidence that the Defendants excluded him from his chosen profession (Defs.' Mot. for Summ. J. at 14–17, ECF No. 113);

2.    Plaintiff's administrative "read out" from the Air Force's classified cyberweapons program (triggered by his own announcement that he was resigning from the NSA) did not violate due process (*Id.* at 17–20);

3.    Plaintiff never bid on or competed for government contracts, and thus has not experienced any broad preclusion from government contracting (*Id.* at 21-26); and

4.    Plaintiff has failed to adduce any evidence on the essential elements of his Privacy Act claims (*Id.* at 26–33).

As a result, Plaintiff must now come forward with competent *evidence* that creates a triable issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Because he cannot meet this burden, Plaintiff tries to avoid summary judgment by repeating the complaint's allegations without citation to any record evidence, grossly mischaracterizing and misrepresenting the factual record, raising new allegations and theories of liability not alleged in his complaint, and demanding that the Court reopen discovery and claiming (falsely) that a host of "discovery abuses" precludes summary judgment—even though Plaintiff never bothered to bring these issues to the Court's attention until months after discovery closed and only after Defendants moved for summary judgment.

For the reasons discussed below, Plaintiff has failed to identify a genuine dispute of material fact, and Rule 56 therefore requires the entry of summary judgment in Defendants' favor.

**ARGUMENT**

I.    <u>Defendants Are Entitled to Summary Judgment on Plaintiff's Stigma-Plus Due
      Process Claim (Count IV).</u>

    A.    <u>Plaintiff failed to dispute material facts with record evidence; instead, he
            grossly misrepresents the factual record and relies on self-serving assertions.</u>

The undisputed material facts remain uncomplicated. Plaintiff only had clearance to work

at HNCO as an NSA employee. Defs.' Mot. at 10, ECF No. 113.[1] When HNCO officials

discovered Plaintiff performed his work as a subcontractor, they initiated an inquiry to determine

in what capacity he was accessing SAP-protected information. But shortly after the agency began

fact finding and well before the inquiry concluded, Plaintiff told HNCO officials that he was

resigning from NSA. *Id.* at 12–13.[2] As a result, Plaintiff was administratively "read out" of the

classified program. *Id.* at 15–16. No finding of security violation, unlawfulness, or misconduct

was ever made against Plaintiff (but that does not mean an inquiry was not justified). *Id.* at 16.

No HNCO official has ever stated otherwise. In fact, HNCO's security incident inquiry

ultimately concluded that "no compromise of classified information occurred" and Plaintiff's

actions "should not be classified as such." **D-Ex. 21, Inquiry of Security Incident (Bremer**

**Report).** Far from "stigmatizing" Plaintiff, the inquiry ended the issue, and ended it in Plaintiff's

favor. There is no record evidence of any continued Air Force discussion about Plaintiff after the

---

[1]    For ease of reference, Defendants refer to the ECF-stamped pagination of the parties
filings.

[2]    Plaintiff stresses that he did not *formally* submit his resignation at NSA until August 28,
2020. Pl.'s Opp'n at 11–12, 54; **D-Ex. 29, NSA Resignation**. But the date Plaintiff tendered his
formal resignation is immaterial because he told Air Force employees of his intent to resign from
NSA as early as August 24, 2020, which is reflected in contemporaneous emails scheduling the
debrief and the OSI Form 40. **D-Ex. 11, McVeigh/Burghard Email Chain** at US0000479; **D-
Ex. 22, Beall Email (Aug. 24, 2020)**; **D-Ex. 6, OSI Form 40**; **P-Ex. 14, Burghard Dep.** at
45:5–10, 132:12–133:6.

inquiry concluded, much less any that denigrated him. To this day, Plaintiff still works in the field of Cyber AI development, has achieved career success, and remains free to bid on HNCO contracts. Defs.' Mot. at 16–19. Plaintiff has no proof to the contrary because, as he concedes, Plaintiff has never bid on any contract, ever, with HNCO or any other government entity. **D-Ex. 2, Pl. Dep.** at 308:15–19.

These facts, which are primarily premised on contemporaneously created documents, remain undisputed and dispositive as to Count IV. Nothing in Plaintiff's 87-page opposition meaningfully disputes these material facts. *See* Pl.'s Opp'n, ECF No. 126. Instead, Plaintiff relies on assertions unsupported by the record and his own uncorroborated self-serving statements. **P-Ex. 23, Pl. Decl.**, ECF No. 122 at 1558. A "party's uncorroborated self-serving testimony cannot prevent summary judgment, particularly if the overwhelming documentary evidence supports the opposite scenario." *Vinewood Cap., LLC v. Dar Al-Maal Al-Islami Tr.*, 541 F. App'x 443, 447 (5th Cir. 2013) (citing *Vais Arms, Inc. v. Vais*, 383 F.3d 287, 294 (5th Cir. 2004)); *see United States v. Lawrence*, 276 F.3d 193, 197 (5th Cir. 2001) (noting that "self-serving allegations are not the type of significant probative evidence required to defeat summary judgment.") (citations and quotations omitted). And assertions "blatantly contradicted by the record" cannot defeat summary judgment. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."). As explained below, nothing in Plaintiff's declaration creates a dispute of material fact.

### 1. No one at HNCO or OSI labeled Plaintiff an "insider threat."

Defendants established in their motion, indisputably, that no one at HNCO stigmatized

Plaintiff with a false allegation. Defs.' Mot. at 24–25. Indeed, HNCO's security inquiry determined that "no compromise of classified information occurred," and the debrief report simply stated Plaintiff was losing access because he was leaving the NSA. **D-Ex. 6, OSI Form 40;** *see also* **D-Ex. 22, Beall Email (Aug. 24, 2020)** ("I will debrief [Plaintiff] from the program this week since his clearance and program access were all based upon his position at NSA."). Plaintiff attempts to side-step these facts by repeating the complaint's allegations and misrepresenting the factual record.

The opposition rehashes the complaint's allegation that then-Captain William McVeigh and Air Force Office of Special Investigations (OSI) Special Agent Allen Beall called Plaintiff an "insider threat," a phrase which he repeats 21 times in his opposition. However, not only is this legally irrelevant, there is no record evidence of anyone ever assigning Plaintiff this label. With respect to McVeigh, Plaintiff has never heard him use the phrase. Rather, Plaintiff testified that Dan Brown told him that *he* heard McVeigh use the phrase. **D-Ex. 2, Pl. Dep.** at 194:17–195:2. *But see* **P-Ex. 7, Brown Dep.** at 126:10–15, 128:5–6, 134:4–9 (denying any knowledge about an "insider threat" allegations, testifying that McVeigh would not have spoken to Brown about that). This game of telephone,[3] for which Plaintiff lacks first-hand information, rises to nothing more than a self-serving and unsupported allegation. Allegations, of course, are not competent evidence at the Rule 56 stage. *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986) (non-moving party cannot rest on allegations in pleadings to avoid summary judgment).

---

[3]    In any event, Plaintiff's claims about what Brown told him—and what Brown told Plaintiff he had been told by McVeigh—are inadmissible hearsay that cannot create a genuine fact issue. *See, e.g.*, *Doctors Hosp. of Laredo v. Cigarroa*, --- F. Supp. 3d ----, slip op., 2025 WL 1513443, at *13–14 (W.D. Tex. Jan. 28, 2025) ("Hearsay is not competent summary judgment evidence unless its proponent can show that the statement can be presented in admissible form at trial.") (quoting *Miller v. Michaels Stores, Inc.*, 98 F.4th 211, 218 (5th Cir. 2024)).

Plaintiff's account of Beall's read-out underscores this shortcoming. The report states that Plaintiff was free to be submitted for access again with proper justification. **D-Ex. 6, OSI Form 40, ECF No. 113-6**. Thus, "overwhelming documentary evidence supports" an "opposite scenario" inconsistent with Plaintiff's self-serving assertions. *Vinewood Cap., LLC*, 541 F. App'x at 447. Although Plaintiff contends that the OSI Form 40 "labeled" him as an insider threat, this phrase (nor anything like it) appears nowhere in the document. Pl.'s Opp'n at 62.

## 2.    It is undisputed that Plaintiff has no evidence of damaged reputation.

Defendants established in their motion that Plaintiff has no evidence of a damaged reputation in his community, much less anything demonstrating that "he has been completely prevented from working in [his] field." *Adams v. City of Harahan*, 95 F.4th 908, 916 (5th Cir.), *cert. denied sub nom. Adams v. City of Harahan, Louisiana*, 145 S. Ct. 278 (2024). Plaintiff never seriously addresses the standard. Instead, he waters it down and states that "colleagues at NSA, IARPA, and DARPA later made reference to his trouble at the Air Force when discussing future opportunities." Pl.'s Opp'n at 62. To be clear, even if true, this is legally insufficient to maintain his claim. But also, this is also an eye-brow-raising distortion of the record.

Plaintiff testified that he has "not had anybody tell [him] that they could not work with [him] because of the investigation" at HNCO. **D-Ex. 2, Pl. Dep.** at 272:9–11, ECF No. 113-2 at 73. Moreover, the deposition testimony Plaintiff cites mentions neither HNCO nor an unwillingness to work with him. Pl.'s Opp'n at 62 (citing **P-Ex. 1, Pl. Dep.** at 264:22–268:1). Plaintiff testified that Jaspers "was sitting next to several folks from NSA . . . [a]nd they were making derogatory remarks about my presentation and who I was because of what they had heard at NSA Texas through other people." *Id.* at 264:3–7. Plaintiff, himself, heard nothing and conceded that he "can't remember the names right now" of any of the NSA employees. And

Jaspers never related this incident to questions about Plaintiff's reputation with government customers. **Ex. 25, Jaspers Dep.** at 88:24–89:4. Second-hand hearsay, premised on the statements of unidentified individuals, lacks any evidentiary value, especially when it originates in self-serving and uncorroborated testimony. *See Doctors Hosp. of Laredo v. Cigarroa*, 2025 WL 1513443, at *13–14.

### 3.    Plaintiff mischaracterizes the Air Force inquiry communications and blatantly mispresents the NSA legal guidance.

A stigma claim requires "concrete, false factual representations or assertions, by a [government official], of wrongdoing on the part of the [plaintiff.]" *San Jacinto Sav. & Loan v. Kacal*, 928 F.2d 697, 701 (5th Cir. 1991). Defendants established that HNCO conducted an inquiry that resulted in a favorable determination for Plaintiff. Defs.' Mot. at 16, 24.

Plaintiff's opposition attempts to circumvent this fact by mischaracterizing communications involving McVeigh and contracting specialists leading up to inquiry. *See, e.g.*, Pl.'s Opp'n at 59 ("Internal correspondence shows that McVeigh's allegations were immediately framed in criminal terms."). These were not assertions of criminality. On August 24, 2020, one day before Ekholm assigned the official inquiry to Bremer, McVeigh reached out to two contract professionals, Thomas Parisi and Tanya Macrina, to better understand the issue. His opening email explained that he had put "together an MFR with what we know now" and had planned a "meeting with the [Security Officer] to get his take on the issue." **P-Ex. 30, McVeigh Email (Aug. 24, 2020)**, ECF No. 122 at 1610. Parisi and Macrina both understood this as a request for help understanding, as their emails discuss several possibilities, but make no conclusions. **P-Ex. 10, Parisi Dep.** at 53:9-10, ECF No. 122 at 1072 (Testifying that "we were trying to discover, whether or not it was a problem" that Plaintiff was not cleared as a contractor). In fact, Macrina then looped in a procurement attorney in the email chain and explicitly asked "Can you assist in

helping us understand if there are any issues/ concerns here?" **P-Ex. 34, Macrina Email (Aug. 24, 2020)**, ECF No. 122 at 1653–64**.**

Plaintiff attempts to buttress this mischaracterization by demonstrating that the discussion was unnecessary. Pl.'s Opp'n at 59. But he relies on a factual misrepresentation that is also legally irrelevant. Plaintiff claims that he "obtained written ethics clearance from NSA's Office of General Counsel to consult after-hours." Pl.'s Opp'n at 29; *see id* at 56 (Plaintiff "obtained written authorization from NSA legal and submitted that approval to the Government."). Yet, despite asserting this six times in his brief, Plaintiff cites no language from the NSA letters. Even a cursory reading of the emails establishes that no such "approval" language exists. To the contrary, the NSA ethics attorney expressly warned Plaintiff that "it is almost impossible for federal personnel to work for a contractor in the federal workplace" and that "in most cases" 18 U.S.C. § 203 "make[s] such employment impossible."). *See* **D-Ex. 9, NSA OGC Emails.** NSA never gave Plaintiff permission to moonlight as a government employee and a contractor. Indeed, Plaintiff *knows* this because he even testified that he knew NSA's OCG "was not [] granting permission" to him. **P-Ex. 1, Pl. Fact Dep.** at 100:10–11, ECF No. 122 at 320.

### 4. Plaintiff revived the circumstances of his departure with an OIG complaint.

A stigma claim requires the persistence of a "false and defamatory impression" that destroys employment prospects in a person's chosen field. *Bledsoe v. City of Horn Lake, Mississippi*, 449 F.3d 650, 653 (5th Cir. 2006). Only then can there be a reason to provide a name clearing hearing. *See id.* Defendants established that Plaintiff has no such reason. The inquiry indisputably ended the matter, and ended it in Plaintiff's favor, so there is nothing to clear. Plaintiff now invents stigma through distortion. He argues that "more than two years after [Plaintiff's] removal [] Capt. McVeigh repeated the accusations to the Department of Defense

7

Inspector General" with a "complaint [that] cited no new facts[.]" Pl.'s Opp'n at 60. However, Plaintiff omits an important fact: The OIG Complaint that he misleadingly attributes to McVeigh was actually filed *by Plaintiff*, setting forth *Plaintiff's* accusations *against McVeigh*. *See* **P-Ex. 5, OIG Hotline MFR (Sept 2022)**, ECF No. 122 at 660 ("ROYSDON completed a DoD IG complaint on 6 May 22. . . . ROYSDON believed he was dismissed and debriefed from the program due to negligent conduct of Maj WILLIAM MCVEIGH."). The inspector ultimately not only rejected Plaintiff's theory, but suggested that Plaintiff may have acted improperly. But, more to the point, Plaintiff, not McVeigh, unilaterally revived his departure from HNCO by making a complaint and nothing materialized from the OIG investigation.

### B.    Plaintiff cannot prove a deprivation of a protected liberty interest because he has not experienced preclusion from his chosen field.

The Fifth Circuit recognizes that "a plaintiff's liberty interest in pursuing a specific profession is only violated if he has been *completely prevented* from working in that field." *Adams*, 95 F.4th at 916 (emphasis added). Defendants established that Plaintiff failed to reach that high bar for three reasons. ***First***, his characterization of the relevant field was far too narrow. He claims only an inability to enter into contracts with one small Air Force division, HNCO, and for one type of contract, "offensive" Cyber AI products. Defs.' Mot. at 15. ***Second***, even accepting Plaintiff's narrow characterization of the field, he has not been precluded because (a) he was never a participant, and (b) he has never attempted to participate. *Id*. at 16. Plaintiff has never bid on any contract, with HNCO, or anyone else. *Id*. ***Finally***, Plaintiff cannot seriously claim that he has been "completely prevented" from working in the field of DoD Cyber AI. *Id*. His CV states that right after he left HNCO he worked at Leidos, a military contractor, for the next five years. **Ex. 1, CV** at 2. At Leidos he held multiple positions involving Cyber AI and even created the company's "Offense/Defense CyberAI research portfolio from scratch . . . and

led the team to a successful demonstration of 7 projects[.]" *Id.*

Plaintiff responds that he has not defined his field too narrowly. Rather, his field qualifies as a "highly specialized sector," analogous to other fields previously recognized by the Fifth Circuit. Pl.'s Opp'n at 64. In support, Plaintiff relies on *Shaw v. Hosp. Auth. of Cobb Cnty.*, 507 F.2d 625 (5th Cir. 1975), where a public hospital refused to grant a podiatrist licensure to practice. *Id.* at 628. *Shaw* is inapposite for several reasons. First, Plaintiff, unlike the doctor in *Shaw*, does not need HNCO to bid on DoD CyberAI contracts, let alone work in the DoD CyberAI field. Plaintiff worked in the field for Leidos. In his own account of DoD CyberAI contracts, he included several held by DoD entities other than HNCO. *See* Mot to Exclude Expert at 17 n. 7, ECF No. 103. Plaintiff points to no evidence showing that he was precluded from competing for those contracts.

But the deeper problem rests with Plaintiff's inaction. The podiatrist *applied* for licensure. Plaintiff, by contrast, has never bid on a contract with anyone. As a result, he can only speculate about what would happen *if* he did bid on a contract. *See Adams*, 95 F.4th at 916 (holding the plaintiff's "numerous speculative problems that the dilemma may cause" did not demonstrate field preclusion). Plaintiff tries to side-step this by repeatedly stating that he "has never been invited back" to work on HNCO contracts. Pl.'s Opp'n at 65. This argument lacks legal support and would vastly expand the stigma-plus doctrine. No one, no matter how brilliant, has a constitutional right to an invitation to compete for government contracts.

### C.    Plaintiff Fails to Satisfy the *Bledsoe* Factors.

To succeed on his stigma-plus claim, Plaintiff must satisfy all seven factors enumerated in *Bledsoe*, 449 F.3d at 653. Defendants argued that Plaintiff could not prove that he was discharged, that the charges were false, that the charges were made public, or that he requested

and was denied a name clearing hearing. Defs.' Mot. at 23–27. Each of these failures is dispositive. *Id.* Plaintiff focuses almost exclusively on the issues of whether the charges were false and publicly disclosed.

### 1.    The "Charges" Were Not False.

As outlined above, Plaintiff's contention that McVeigh "formally labeled" him a threat is unsupported by the record evidence, as is his contention that he had approval from NSA to work as a private consultant. Plaintiff fails to identify any *false* statements in any of the referenced documents. Further, "opinion" of the employee is insufficient; Plaintiff must offer proof that an Air Force employee made "concrete, false assertions of wrongdoing on the part of the plaintiff." *Gordon v. Univ. of Tex. Med. Branch*, 700 F. App'x 350, 351 (5th Cir. 2017).

As for the basis for Plaintiff's access—it remains undisputed that the Air Force granted him access strictly based on his NSA employment. **Ex. 5, Burghard Dep.** at 129:10–22. Plaintiff's disagreement does not create a material dispute, nor does it mean the document requires "correction." PARs are not documents that request or require the input of the individual because to do so would require release of information to someone not cleared to the program. PARs are the formal nomination by a person currently accessed to the same SAP who can establish the nominee's need to know and contribution recommendation to the access approval authority.[4] The PAR for Plaintiff was initiated in March of 2019, months before Plaintiff had any contractual relationship with GITI, *see* **D-Ex. 7, GITI Contract**, and at a time when Plaintiff himself believed he would be acting as a direct consultant to the Air Force, *see* **D-Ex. 9, NSA**

---

[4]    DoD Instruction 5205.11, Management, Administration, and Oversight of DoD Special Access Programs, Sections 5.1.a. (SAP Access Prerequisites), 5.2.e. (Access Management), available at https://irp.fas.org/doddir/dod/i5205_11.pdf (last accessed August 14, 2025).

**OGC Emails**, ECF No. 113-9 at 10. Plaintiff's suggestion that he should be able to alter the official reason that the Air Force requested and approved his SAP access is meritless and fails to identify any "false" charge.

### 2. HNCO and OSI Did Not Publicly Release Any Information About Plaintiff.

Plaintiff spends ample effort trying to identify public disclosures to satisfy the public disclosure requirement. But he relies on case law that does not support his theory, and the record evidence he references does not support his assertions of fact.

First, Plaintiff contends that "disclosure to a government contractor or to other agencies may satisfy [the public disclosure] element if the communication causes reputational harm or impairs future employment." Pl.'s Opp'n at 60. But the two cases Plaintiff relies on do not stand for this proposition at all. In *Quinn v. Shirey*, 293 F.3d 315, 320–21 (6th Cir. 2002), the court's ruling concerned the plaintiff's failure to request a name clearing hearing. *Cox v. Roskelley*, 359 F.3d 1105, 1112–13 (9th Cir. 2004) on the other hand provides a detailed discussion of "publication" in an employee's personnel file where state law mandates disclosure on request. Plaintiff offers no other case law in support of his disclosure arguments.

Dan Brown's statements do not amount to a public disclosure under Fifth Circuit law. Fifth Circuit authority conclusively establishes that "public disclosure must be fairly attributable to the defendant employer." *Hughes v. City of Garland*, 204 F.3d 223, 227 (5th Cir. 2000). Publicization occurs "where the governmental agency has made or is likely to make the allegedly stigmatizing charges public in any official or intentional manner, other than in connection with the defense of a [related legal] action." *Ortwein v. Mackey*, 511 F.2d 696, 699 (5th Cir. 1975). Brown's comments cannot legally be characterized as publication by the Air Force because, according to his own testimony regarding his position and job duties, he is not capable

of binding the Air Force. *See Dellucky v. St. George Fire Prot. Dist.*, No. 23-30810, 2024 WL 3688722, at *7 (5th Cir. Aug. 7, 2024) (Affirming grant of summary judgment where plaintiff failed to point to any evidence that fire chief's reason for terminating her was publicized by the agency, noting that comments by individuals who were not representatives of the department about plaintiff's termination did not amount to agency publication). Brown described himself as "only an engineer" and noted that he had no "[project management] responsibilities or authority." **D-Ex. 4, Brown Dep.** at 145:18-21. Brown's role as an engineer was to provide "technical advice" on projects. *Id.* at 145:22-25. Brown did not supervise personnel, write fitness reports, write evaluation reports, sign contracts, vet contractors, or recommend contractors to positions. *Id.* at 146:3-18. In short, Brown testified that he did not have authority over projects; he "just … provided technical advice." *Id.* at 146:19-23. Further, Brown's comments did not discuss Plaintiff's read-out from HNCO or any inquiry, **D-Ex. 4, Brown Dep.** at 104:11–12, and Jaspers believed they were made in reference to this lawsuit, not his read out over two years prior. **D-Ex. 25, Jaspers Dep.** at 104:10–12, 49:17–24. Brown's comments are nothing more than his opinion. *See Gordon*, 700 F. App'x at 351. And as argued in Defendants' motion, "casual gossip" cannot satisfy the public disclosure requirement. Defs.' Mot. at 26 (citing *Hughes*, 204 F.3d at 228).

Plaintiff's reliance on internal documents—which he only learned about and received in discovery—also fails to identify any false charge that was made public. Plaintiff offers no record evidence, and Defendants are aware of none, that his *classified* program access request (PAR) to a highly classified special access program was circulated "across HNCO, GITI, and contracting stakeholders." Pl.'s Opp'n at 61. The record evidence establishes that SA Beall sent the write-up of his debrief to HNCO security officials (attaching the PAR) in connection with the security

inquiry. **D-Ex. 28, Beall CORE Email.**

Plaintiff's contention that the OSI Form 40 was "published" to CORE is yet another misrepresentation. CORE is not a case management system; rather, it is a classified network, that (relevant to this case) SA Beall used to email the document. **P-Ex. 15, McDonald 30(b)(6)** at 15:13–16; **D-Ex. 28, Beall CORE Email**. And as Defendants argued in their motion, information in classified systems fails to meet the *public* disclosure standard. Defs.' Mot. at 26 (citing *Ghedi v. Mayorkas*, 16 F.4th 456, 467–68 (5th Cir. 2021)). After all, "[t]he very harm that a stigma inflicts comes from its public nature." *Ghedi*, 16 F.4th at 467.

Finally, Plaintiff's statement that he was "disinvited from future SAP roles" is contradicted by the record. Pl.'s Opp'n at 69. Plaintiff was read back into the same program and has not identified any time when he was unable to obtain access to any program. **P-Ex. 14, Burghard Dep.** at 43:13–19, 45:24–46:18, ECF No. 122 at 1326, 1328–29; **P-Ex. 1, Pl. Dep.** at 252:14–17, ECF No. 122 at 472.

## II.    <u>Plaintiff's De Facto Debarment Claim Fails (Count I).</u>

Relying primarily on the Court's ruling on Defendants' Motion to Dismiss and a *new* alleged statement by Dan Brown, Plaintiff argues that his de facto debarment claim should proceed to trial. Pl.'s Opp'n at 48, 52. As an initial matter, the fact that the Court denied Defendant' motion to dismiss is irrelevant to whether Defendants are entitled to summary judgment. At the Rule 12(b)(6) stage, the Court was constrained to allegations in the pleadings that—now with the benefit of discovery—lack record support. *See* Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 249 (non-moving party cannot rest on allegations in pleadings to avoid summary judgment). The Court now considers the record evidence as a whole. As explained below, Plaintiff's failure to ever bid on any contracts, which he does not dispute, is dispositive

and Dan Brown's statements do not create a triable issue of fact.

To succeed on Count I, Plaintiff must demonstrate a "systemic effort by the procuring agency to reject all of the bidder's contract bids." *TLT Const. Corp. v. United States*, 50 Fed. Cl. 212, 215 (2001). Yet Plaintiff contends that he need not have ever bid on, competed, or been eligible to receive government contracts to proceed on his de facto debarment claim. Pl.'s Opp'n at 48. The authority he relies on for this proposition is not as far reaching as he suggests, especially at the summary judgment stage. *Id.* (citing *Phillips v. Mabus*, 894 F. Supp. 2d 71, 84 (D.D.C. 2012) (denying motion to dismiss) (citing *Dynamic Aviation v. Dep't of Interior*, 898 F. Supp. 11, 13 (D.D.C. 1995)). As explained in Defendants' motion, to proceed on this no-bid theory, Plaintiff must demonstrate that the Air Force prevented him from obtaining a legal prerequisite to participate in the bidding process. Defs.' Mot. at 30. He has made no such showing here. The leading case courts cite for this theory is *Dynamic Aviation*, 898 F. Supp. at 13. In *Dynamic Aviation*, the court found plaintiff was in a "Catch-22" where his aviation cards had been revoked for a period of one year, but he could not have them reissued until his pilot skills were retested and his helicopter was reinspected. The Office of Aviation Services refused to perform either of these re-tests until a federal agency specifically requested him, but pilots could not be awarded this sort of informal contract unless and until they have their cards. The court found this predicament created a genuine issue of material fact and denied summary judgment. Plaintiff has no proof of a similar predicament here,[5] which is fatal to his claim at

---

[5]    To be sure, Plaintiff's ineligibility to bid or contract was due to the terms and conditions of his employment with Leidos and ODNI, not a bar imposed by HNCO or the Air Force. **D-Ex. 2, Pl. Dep.** at 307:3–21, 308:4–7. Plaintiff also refers to the fact that he has not been "invited" to work on any offensive Cyber AI projects with HNCO or the Air Force. Pl.'s Opp'n at 54. The Fifth Amendment does not require personal invitation or special treatment for Plaintiff; especially where all government contract opportunities are publicly available online. *See* https://sam.gov/contracting.

summary judgment. *See Highview Eng'g, Inc. v. U.S. Army Corps of Eng'rs*, 864 F. Supp. 2d 645, 653 (W.D. Ky. 2012).

Having failed to satisfy the condition precedent of a "systemic effort" to "reject all of [Plaintiff's] contract bids," Plaintiff still asks the Court to permit this claim to go to trial based on the purported statements made by Dan Brown to him and Todd Jaspers. In support of his argument, Plaintiff repeatedly misrepresents Brown's role within HNCO. Pl.'s Opp'n at 48, 52. Brown is a lead engineer at HNCO. **P-Ex. 7, Brown Dep.** at 12:2–4. He is not "a senior Air Force official," "responsible for HNCO technical programs," or a "Program Manager." Pl.'s Opp'n at 48, 52. *See also* **D-Ex. 30**, Ekholm 30(b)(6) Dep. at 22:21–23:9 (Major McVeigh was program manager.). Brown also has no control over any government contracts and provides only technical input; he has not provided any evaluation of any proposals. *Id.* at 18:9–23:7. As such, Brown's remarks cannot be understood to be the "agency's statement." *See TLT Const. Corp.*, 50 Fed. Cl. at 216. Plaintiff offers *no* citation for the proposition that de facto debarment "is almost always likely to be found in the 'ground-level' agency actors" as opposed to "the formal debarment authorities." Pl.'s Opp'n at 50 n.2. Nor could he, because this statement is inaccurate. Numerous de facto debarment claims are based on the contracting officer's express statements and conduct with respect to bidders. *See, e.g.*, *Related Indus. v. United States*, 2 Cl. Ct. 517, 525 (1983) (contracting officer's statement that under no circumstances will he award a contract to the business owner, plaintiff-company, or any company the owner is associated with amounts to de facto debarment); *Leslie and Elliott Co., Inc. v. Garrett*, 732 F. Supp. 191, 196 (D.D.C. 1990) (de facto debarment when Navy refused to award plaintiffs two contracts for which they were lowest bidder because the Navy—through representatives in charge of considering awarding contracts—"had determined it should no longer do business with" the contractor).

15

Plaintiff also fails to identify a single case where statements made outside of the context of a contract bid are sufficient proof of de facto debarment. *See, e.g.*, *Stapp Towing Inc. v. United States*, 34 Fed. Cl. 300, 312 (1995) (SBA's statement of non-responsibility for vendor insufficient to show pattern necessary to establish de facto debarment). Although Plaintiff cites to his deposition transcript, nowhere in the seven hours of testimony did he ever testify that Dan Brown told him that Plaintiff "would never work in HNCO again." Pl.'s Opp'n at 45 (citing **P-Ex. 1, Pl. Fact Dep.** at 195:4–20 (testifying that Dan Brown told Plaintiff that McVeigh was "spreading [his] personal information throughout the office[.]")). *But see* **P-Ex. 23, Pl. Decl. ¶ 17.** At his deposition, Plaintiff testified only that Brown told him that he could not talk to him about new research at Leidos, and through Jaspers, that the Leidos presentations on new tools could not have his name on them. **P-Ex. 1, Pl. Dep.** at 260:18–261:16. Now, in his declaration, Plaintiff claims that he kept notes of his calls with Dan Brown—notes that he does not attach to his opposition and failed to identify in his initial disclosures or produce in discovery—contending that Dan Brown in fact did make a statement about unidentified members of "HNCO leadership" to this effect. **P-Ex. 23, Pl. Decl. ¶ 17.** For his part, Dan Brown denied any recollection or knowledge of Plaintiff's allegation that Brown told him in a phone call in August 2020 or September 2021 that he "[could] never work at HNCO again." **D-Ex. 4, Brown Dep.** at 100:9–14. In response to the follow up question of whether Brown was aware if Plaintiff would be able to work at HNCO again, he responded "I don't see why he wouldn't be able to work." *Id.* at 100:15–20. This new, uncorroborated self-serving double hearsay statement should not be considered for the same reasons outlined in Section II.A. *See Doctors Hosp. of Laredo*, 2025 WL 1513443, at *13 (double hearsay that is not cured at the second layer is inadmissible and not competent summary judgment evidence).

16

But even crediting the new, purported statements made by Dan Brown, the game of telephone between Plaintiff, Brown, and Jaspers is insufficient to demonstrate broad preclusion from government work, and it bears repeating that the 2023 Leidos presentations were not for bids or contracts. Defs.' Mot. at 30–31. The court should follow the approach of *Highview Eng'g, Inc.*, 864 F. Supp. 2d at 652–53. In that case, there was some disputed evidence about statements made by a project manager to a prime contractor about the plaintiff's listed involvement on the bid, and ultimately the prime ended up removing plaintiff from its bid. The court found that even if it were proven that the prime was prevented from a subcontract with the plaintiff because of pressure from the agency, "[p]reclusion from a single contract is insufficient to establish de facto debarment." *Id.* at 653. "There is simply no evidence . . . of a systemic effort by the agency to reject all of the plaintiff's contract bids." *Id.* The same is true here.

## III.   Plaintiff's Privacy Act Claims Fail as a Matter of Law.

At this late stage of the proceedings, Plaintiff improperly attempts to amend his complaint through his summary judgment opposition brief. Throughout this litigation, Plaintiff has alleged Privacy Act violations based on two alleged disclosures: (1) the alleged disclosure by SA Beall of email correspondence between Plaintiff and the NSA Office of General Counsel (the NSA OGC emails); and (2) the alleged disclosure by Captain McVeigh of debrief records about Plaintiff—specifically, the NSA OGC emails and the OSI Form 40 and its attachments, included as Exhibit 6 to Defendant's Motion for Summary Judgment (the debrief records). *See* **D-Ex. 6, OSI Form 40** at 1–12 (US0000045–56); **D-Ex. 2, Pl. Dep.** at 240:20–241:21, 242:15–244:3.

At deposition, Plaintiff testified clearly that these two disclosures were the sole basis for his Privacy Act claims. *See* **D-Ex. 2, Pl. Fact Dep.** at 240:20–241:21 ("**Q** Are the documents you're referring to the materials that were attached to the OSI Form 40 in Exhibit 7? **A** Yes.

Among others, yes. **Q** Okay. What others that are not attached? **A** I don't know."); *id.* at 243:13–244:3 ("**Q** Is there any other document you believe was shared with Dan Brown about your – your debrief or an HNCO security inquiry or any other situation? **A** That's the only one that I remember."). Plaintiff also testified clearly that he had no basis to allege Privacy Act violations by anyone other than SA Beall and Captain McVeigh. *See id.* at 325:8–12 ("**Q** Other than Agent Beall and Captain McVeigh, do you believe any other members of the Air Force violated the Privacy Act with respect to you? **A** I don't know."). Plaintiff testified that he did not know whether Captain McVeigh ever disclosed information about him outside of HNCO. *See id.* at 240:9–11 ("**Q** Are you aware of whether Captain McVeigh spread your information outside of HNCO? **A** No, ma'am."). And Plaintiff testified—repeatedly and at length—that his Privacy Act allegations were entirely based on secondhand information he heard from Dan Brown. *See id.* at 241:2, 241:19–22, 242:12–14, 243:5–7, 244:1–3.

Defendants' summary judgment motion explained that these alleged disclosures cannot establish a triable Privacy Act claim, for several reasons. ***First***, the NSA OGC emails do not meet the Privacy Act's definition of a "record" retrieved from a "system of records." Defs.' Mot. at 34–35. ***Second***, by Plaintiff's own account, the disclosures occurred entirely within the Air Force—intra-agency disclosure not actionable under the Privacy Act. Defs.' Mot. at 36 (citing *Coburn v. Potter*, No. 06 C 5397, 2008 WL 4390153, at *4 (N.D. Ill. Sept. 24, 2008) ("[I]ntra-agency disclosure 'is not the evil against which the Privacy Act was enacted'"; "information shared within the same agency . . . is 'not subject to the requirements of the Privacy Act.'")). ***Third***, Plaintiff cannot satisfy the Privacy Act's requirement to show that an improper disclosure had an "adverse effect" on him, since the harms that he alleges flow not from the disclosure of his emails with the NSA OGC or his debriefing materials, but from his supposed debarment and

fear of criminal prosecution. Defs.' Mot. at 37. And **Fourth** and **Fifth**, Plaintiff cannot meet the Privacy Act's willfulness requirement (required to recover money damages), in large part because the disclosures he claimed all fell within the "Need to Know" exception of 5 U.S.C. § 552a(b)(1)—that is, the intra-agency disclosures all made to personnel involved in assessing Plaintiff's involvement in the handling of "classified material and other sensitive information and tasks." Defs.' Mot. at 38 (quoting *Hill v. Dep't of Def.*, 981 F. Supp. 2d 1, 11 (D.D.C. 2013)).

In his opposition, rather than defending his existing Privacy Act claims, Plaintiff now raises an entirely new set of claims. Plaintiff alleges that Captain McVeigh violated the Privacy Act by accessing Plaintiff's GITI subcontractor pay rate and affiliation and disclosing that information to other Air Force components; by describing Plaintiff's dual employee-subcontractor role as "improper"; by sending a text message to an Air Force colleague about Plaintiff in August 2020; and by "reviv[ing] disproven allegations" about Plaintiff in 2022 after Plaintiff filed an Office of the Inspector General (OIG) complaint against Captain McVeigh. *Id.* at 71–72. Plaintiff also alleges for the first time that Dan Brown violated the Privacy Act by making statements to Plaintiff and others at Leidos that caused Plaintiff "reputational harm"— telling Plaintiff that he was a "persona non grata" whose name should not be included on Leidos's presentations to HNCO. *Id.* at 81–82.

These newly minted Privacy Act claims are procedurally improper and should be denied on that basis alone. But even if considered, Plaintiff's new Privacy Act claims cannot overcome summary judgment largely for the same reasons that his original Privacy Act claims cannot— because he again alleges a series of intra-agency disclosures among individuals who had a need to know the information in question.

Plaintiffs' complaints of discovery deficiencies are untimely, since they are being raised

for the first time months after the close of discovery, and procedurally improper, since they are unsupported by the declaration required by Rule 56(d) and not asserted in violation of Rule 37(a)(1)'s good faith conferral requirement. And Plaintiffs' belated request to amend his Privacy Act pleadings, Pl.'s Opp'n at 91–93, is untimely, futile, and invokes the wrong legal standard. The Court should grant summary judgment on Plaintiff's Privacy Act claims in their entirety.

A.    **Plaintiff's New Privacy Act Claims Are Procedurally Improper.**

In the wake of Defendant's summary judgment motion, rather than defending the Privacy Act theories advanced in his Second Amended Complaint and in his deposition testimony, Plaintiff claims that the case should proceed to trial on an entirely different set of supposed Privacy Act violations alleged, for the first time, in Plaintiff's summary judgment opposition. But "[i]t is well settled in [the Fifth] [C]ircuit that '[a] claim which is not raised in the complaint but, rather, is raised only in response to a motion for summary judgment is not properly before the court.'" *Jackson v. Gautreaux*, 3 F.4th 182, 188 (5th Cir. 2021) (quoting *Cutrera v. Bd. of Supervisors of La. State Univ.*, 429 F.3d 108, 113 (5th Cir. 2005)) ("We've repeatedly emphasized this rule."). For that reason, in *Jackson*, the appeals court affirmed summary judgment on a failure-to-train claim, where the plaintiff initially advanced a theory of failure to train regarding excessive force, but revised his theory in a summary judgment opposition to argue failure to train in managing mentally unstable individuals. *Jackson*, 3 F.4th at 189.

Similarly, here, Plaintiff has throughout this litigation advanced claims that SA Beall and Captain McVeigh violated the Privacy Act by disclosing, to others within the Air Force, Plaintiff's email correspondence with NSA OGC and Plaintiff's debrief records. At deposition, Plaintiff testified that he didn't know of any other disclosure that he believed violated the Privacy Act. *See* **D-Ex. 2, Pl. Dep.** at 240:20–241:21; 243:13–244:3; 325:8–12; 240:9–11. The

summary judgment briefing accordingly focused on those two disclosures. For Plaintiff to now claim an entitlement to proceed to trial on an entirely different set of supposed Privacy Act violations is "precisely the sort of surprise switcheroo" that the Fifth Circuit's precedents forbid. *Jackson*, 3 F.4th at 189; *see also Ford v. Anderson Cnty., Texas*, 102 F.4th 292, 318 (5th Cir. 2024). For this reason alone, the Court should enter a summary judgment on the novel Privacy Act theories set forth in Plaintiff's summary judgment opposition—as well as on the initial Privacy Act claims that Plaintiff has failed to defend. *See, e.g.*, *Smith v. McDonough*, No. 5:22-CV-01383-JKP, 2025 WL 1186904, at *7 (W.D. Tex. Apr. 23, 2025) ("When a plaintiff fails to defend a claim in response to a motion to dismiss or summary judgment motion, the claim is deemed abandoned." (internal citations omitted)).

Plaintiff's request for leave to amend is untimely, the heightened standard for amendment set by Rule 16(b)—not the more permissible Rule 15 standard—controls. *Fahim v. Marriott Hotel Servs.*, 551 F.3d 344, 348 (5th Cir. 2008); *see also* Sched. Or., ECF No. 76 (setting July 21, 2024, deadline for the amendment of pleadings). And since, for the reasons set forth below, Plaintiff has failed to specify evidence showing disclosure outside the Department of Defense of Privacy Act-covered "records" from within a "system of records," allowing Plaintiff to amend his pleading to substitute the Air Force in place of Count 2 Defendant OSI would be futile under either the Rule 16 or the Rule 15 standard. *See, e.g.*, *Ford v. Anderson Cnty., Texas*, 102 F.4th 292, 319 (5th Cir. 2024).

### B.   Plaintiff's Novel Privacy Act Claims Are Not Viable.

Plaintiff's new theories of Privacy Act claims fail from many of the same defects as his initial Privacy Act claims. Summary judgment therefore remains appropriate even if these claims are considered.

21

Plaintiff now alleges that Captain McVeigh violated the Privacy Act when he "[a]ccessed Dr. Roysdon's pay, rate, and subcontractor affiliation" and "[r]elayed that information to SAF/AQL[6] and security personnel[.]" Pl.'s Opp'n at 71–72. In support of these allegations, Plaintiff cites an excerpt from the deposition of Tom Parisi, a contracting professional at the Air Force Research Laboratory (AFRL). *See* Pl.'s Opp'n at 72 (citing **P-Ex. 10, Parisi Dep.** at 84–85). But neither that deposition excerpt nor the email correspondence it references show Captain McVeigh "accessing" anything. Rather, they show Captain McVeigh *receiving* an email about Plaintiff, *see* **D-Ex. 31, Email Chain re Tech SME** (US0000581–589), and, in response, correcting an earlier misstatement about the Air Force's classification of Plaintiff's contract,[7] supporting Plaintiff's eligibility to be paid through the funding stream available. And although Plaintiff represents that Parisi characterized the Air Force's classification of the contract as "private and sensitive," *see* Pl.'s Opp'n at 72, 76, that language appears nowhere in Parisi's testimony.

Plaintiff's claim that Captain McVeigh "related that information to SAF/AQL and security personnel" is similarly unsupported by the record. The evidence that Plaintiff cites for that proposition—emails among various Air Force personnel on August 24, 2020, and the Memorandum for Record referenced therein, *see* **D-Ex. 16, MFR**, ECF No. 113-16—do not include "private" or "sensitive" information about Plaintiff, nor does it include information about

---

[6]     Secretary of the Air Force Office of Acquisitions for Special Programs, i.e., the division Burghard works in. **P-Ex. 10, Parisi Dep.** at 47:12–15, ECF No. 122 at 1066.

[7]     Specifically, Captain McVeigh clarified that Plaintiff would be engaged as a Subject Matter Expert (SME) contractor—thus eligible for the available funding stream—not as a funding-ineligible Systems Engineering and Technical Advisory (SETA) contractor. *See generally* P-Ex. 10, Parisi Dep. ECF No. 122 at 1096–1104 (Parisi deposition testimony explaining the SETA–SME distinction).

his pay, rate, or his subcontractor affiliation beyond the fact that he was engaged as an SME subcontractor under GITI. More pertinent to the Privacy Act analysis, those messages do not reflect any inter-agency exchange of "records" about Plaintiff retrieved from a "system of records." *Compare, e.g.*, *Bettersworth v. F.D.I.C.*, 248 F.3d 386, 391 (5th Cir. 2001); *Walia v. Napolitano*, 986 F. Supp. 2d 169, 186 (E.D.N.Y. 2013) (describing "records" and "system of records" requirements for Privacy Act coverage); *see also Coburn*, 2008 WL 4390153, at *4 ("information shared within the same agency . . . is 'not subject to the requirements of the Privacy Act.'"). And those exchanges all related to Air Force personnels' efforts to evaluate the security and ethics concerns raised by the belated revelation of Plaintiff's dual role as an SAP-cleared NSA employee and as a subcontractor to a prime contractor not approved to perform classified work.[8] *Compare, e.g.*, *Hill*, 981 F. Supp. 2d at 11; *Bigelow v. Dep't of Def.*, 217 F.3d 875, 877 (D.C. Cir. 2000).

Plaintiff asserts, without citation to any evidence, that Captain McVeigh "refer[ed] to 'improper' access and insider threat status, despite knowing Dr. Roysdon had NSA ethics clearance and had resigned from government service[.]" Pl.'s Opp'n at 72. This unsupported conclusory claim once again does not identify any specific "record" about Plaintiff obtained from a "system of records," does not show any disclosure of any information about Plaintiff outside the Air Force (much less outside the Department of Defense), and does not show any disclosure unsupported by a need to know. Simply put, the belated discovery of Plaintiff's dual

---

[8]     Plaintiff also asserts in passing that information about him was disclosed to HNCO contractors GITI and Leidos, although he does not identify the specific records supposedly disclosed or cite any evidence in the summary judgment record showing such disclosures. Pl.'s Pl.'s Opp'n at 78. For Privacy Act purposes, disclosures to agency contractors are properly treated as intra-agency disclosures. *Ciralsky v. C.I.A.*, 689 F. Supp. 2d 141, 155 (D.D.C. 2010) (collecting cases).

roles as an SAP-cleared NSA employee and non-cleared private subcontractor *did* raise valid

concerns about possible improper access from both security and ethics perspectives, and there

was nothing improper about Air Force personnel making an inquiry. The advice Plaintiff

received from NSA OGC—which he acknowledges did *not* amount to "approval" or "clearance"

of his dual status—does not show otherwise. Plaintiff has no basis to now argue that Air Force

personnel were precluded from investigating possible ethics or security issues based on an

"ethics clearance" from NSA OGC that never occurred. Plaintiff represents that *Babatu v. Dallas*

*Veterans Affs. Med. Ctr.*, No. 3:11-CV-00533-L, 2014 WL 626515, at *6 (N.D. Tex. Feb. 18,

2014), stands for the proposition that "it is the agency's burden to establish a lawful basis when it

claims the disclosure was authorized or accidental." Pl.'s Opp'n at 73. But such a holding, which

is contrary to the Privacy Act caselaw, appears nowhere in *Babatu*. *Cf. Babatu*, 2014 WL

626515, at *7 ("a plaintiff asserting a cause of action for violation of section 552a(b) of the

Privacy Act must prove . . . the agency failed to comply with the Act by disclosing protected

information [and that] the agency's failure to comply with the Act was intentional or willful.");

*see also Hill*, 981 F. Supp. 2d at 5 ("The plaintiff bears the burden of proof.").

Next, Plaintiff claims that Captain McVeigh violated the Privacy Act by sending a text

message about Plaintiff to Richard Ranft in HNCO's security office, on August 27, 2020—a

message that Plaintiff characterizes as an act of "surveillance" since it occurred one day after he

was debriefed from HNCO. Pl.'s Opp'n at 72.[9] But once again, this exchange of information

between Air Force personnel—both of whom were involved in maintaining the security of the

HNCO SAPs and therefore had a need to know—does not implicate the Privacy Act. *See, e.g.,*

---

[9]    Plaintiff identifies the text message by date and time stamp, but did not include it with his
summary judgment exhibits. It is attached as **D-Ex. 32, McVeigh and Ranft Text Messages**.

*Coburn*, 2008 WL 4390153, at *4; *Hill*, 981 F. Supp. 2d at 11. And Plaintiff offers no explanation of how Captain McVeigh's disclosure of Plaintiff's publication of code to a public GitHub repository constitutes the release of "records" from within a "system of records" as is required for a Privacy Act claim to lie. *Bettersworth*, 248 F.3d at 391.

Plaintiff claims that Captain McVeigh "revived disproven allegations in 2022 in a renewed IG complaint[.]"[10] Pl.'s Opp'n at 72. Once again, Plaintiff's claim is unsupported by the record materials he cites. First, the "renewed IG complaint" that Plaintiff seems to attribute to Captain McVeigh is actually an OIG complaint submitted *by Plaintiff*. *See* **P-Ex. 5, OIG Hotline MFR**, ECF No. 122 at 660 ("ROYSDON completed a DoD IG complaint on 6 May 22."). The information provided by McVeigh to the OIG investigator—another intra-agency disclosure that does not implicate the Privacy Act—was supported by SA Webb's need to know because he assigned to investigate the OIG complaint Plaintiff had submitted. *See Hill*, 981 F. Supp. 2d at 11; *see also Dinh Tran v. Dep't of Treasury*, 351 F. Supp. 3d 130, 138 (D.D.C. 2019), *aff'd sub nom. Tran v. United States Dep't of Treasury*, 798 F. App'x 649 (D.C. Cir. 2020).

Plaintiff's newfound Privacy Act claims based on the statements allegedly made by Dan Brown fare no better. Plaintiff claims that Brown told Plaintiff and Leidos employee Todd Jaspers that Plaintiff was a "persona non grata" at HNCO, that his involvement in projects would

---

[10]    Plaintiff claims throughout his Response that he was "cleared of wrongdoing by legal, security, and contracting personnel" and refers to concerns about the security and ethical implications of his dual status as "disproven," "discredited," and using similar language. Pl.'s Pl.'s Opp'n at 58, 60, 66, 70, 72, 73, 85. But, as discussed above, the NSA OGC guidance Plaintiff received did not endorse or approve of his moonlighting. The HNCO security inquiry, for its part, explicitly did not consider any conflict-of-interest, ethical, or contractual implications of Plaintiff's conduct. **D-Ex. 21, Bremer Report**, ECF No. 113-21 at 1 ("The scope of my inquiry was limited to . . . access to classified information"). Plaintiff thus has no standing to claim that it was invalid or improper for Captain McVeigh or other Air Force personnel to raise concerns about a possible conflict of interest, either before or after completion of the HNCO security inquiry.

25

be a "showstopper," and that he should remove his name from any proposals submitted to HNCO. Pl.'s Opp'n at 74. But these supposed statements—even if assumed as true—reflect Brown's opinions about how others would react to Plaintiff seeking work with HNCO. Plaintiff points to no evidence showing that those opinions were derived from or memorialized in any agency record about Plaintiff contained within a system of records. And even if they were, Brown's opinions about how others would react to Plaintiff cannot give rise to Privacy Act liability. *See, e.g.*, *Baker v. Winter*, 210 F. App'x 16, 18 (D.C. Cir. 2006) ("The Privacy Act requires modification only of factual errors, not of errors in opinion"); *Akl v. Sebelius*, No. 12-5315, 2013 WL 1164488, at *1 (D.C. Cir. Mar. 11, 2013) (per curiam) (same); *Bernson v. I.C.C.*, 625 F. Supp. 10, 13 (D. Mass. 1984) ("These opinions, recommendations or judgments cannot be made more accurate by this Court, nor can this Court order that those opinions be amended to reflect the plaintiffs' version of the facts.").

As with Plaintiff's initial Privacy Act claims based on disclosure of the NSA OGC emails and debriefing records, Plaintiff has entirely failed to show that he was adversely affected by these disclosures or that they amounted to a "willful" violation of the Privacy Act. The harms that Plaintiff alleges—loss of future income, "reputational damage, and sleepless nights under fear of criminal indictment and clearance loss[,]" Pl.'s Opp'n 126 at 31—are not traceable to the alleged disclosure of the pay, hours, or other details of his GITI subcontract; to internal Air Force correspondence related to the security inquiry or ethical questions raised by Plaintiff's conduct; or to Dan Brown's supposed sharing of an opinion that Plaintiff would not be a "persona non grata" at HNCO. Rather, these damages flow from Plaintiff's debriefing interview and from his supposed debarment from HNCO—events not actionable under the Privacy Act.

As to willfulness, Plaintiff still has not come close to showing disclosures "somewhat

greater than gross negligence" as is required to recover money damages. *Carrington v. U.S., Dep't of Def.*, 46 F.3d 66 n.1 (5th Cir. 1995); *Coleman v. United States*, 912 F.3d 824, 837 (5th Cir. 2019).

Plaintiff argues that the very maintenance of information about Plaintiff in a system where others could access it reflects "a breakdown in accountability and oversight" that shows willfulness. Pl.'s Opp'n at 74. Under this approach, Plaintiff could theoretically establish a willful violation of the Privacy Act without making the fundamental showing of a wrongful disclosure. That is not the law. *Compare, e.g.*, *Hill.*, 981 F. Supp. 2d at 5 (Plaintiff's burden to show, *inter alia*, "improper[] disclos[ure]"); *Brown v. Esper*, No. 1:17-CV-02004-RM-STV, 2019 WL 6893019, at *9 (D. Colo. Dec. 18, 2019) ("The fact that DHA employees were able to locate files pertaining to Plaintiff on the shared drive is not indicative of flagrant or egregious conduct rising to this level."), *aff'd sub nom. Brown v. Austin*, 13 F.4th 1079 (10th Cir. 2021). At most, Plaintiff has shown disclosures of information about Plaintiff within the Air Force, occasioned by inquiries into the security and ethical concerns raised by his conduct. Willfulness is not met based on disclosures reasonably believed to be supported by a need to know, even if that belief is mistaken. This does not show a violation of the Privacy Act, much less a willful one.

## IV.    Plaintiff's Requests for Additional Discovery and Sanctions are Untimely and Fail to Identify Evidence that Would Create a Dispute of Material Fact.

The foregoing discussion demonstrates that Defendants are entitled to judgment as a matter of law on Plaintiff's stigma-plus, de facto debarment, and Privacy Act claims. The fully developed evidentiary record reveals no triable issue of fact as to any of these claims. As a last-gasp measure, Plaintiff claims that a litany of "discovery abuses" requires the reopening of discovery and precludes summary judgment. The Court needn't consider Plaintiff's recitation of

27

discovery grievances because they have been raised far too late in the day—almost two months after the close of discovery, deep in the parties' summary judgment briefing, and indeed, less than a month from the currently scheduled trial date. The Court afforded the parties ample time for discovery (well over a year); there were long periods of inactivity in discovery by Plaintiff. Plaintiff offers no excuse or explanation for not bringing these issues to the Court's attention sooner. On this ground alone, the Court should reject Plaintiffs' various discovery arguments.

In any event, Defendants demonstrate below that each of Plaintiff's claims of discovery noncompliance is meritless.

### A.    **Plaintiff Failed to Comply with the Applicable Rules for Raising Any Discovery Dispute with Defendants or the Court Before the Close of Discovery.**

Rule 37 governs motions to compel discovery. Under Fed. R. Civ. P. 16(b)(3)(A), the scheduling order must limit the time to join other parties, amend the pleadings, complete discovery, and file motions. Further, Local Rule CV-16(e) states, "Absent exceptional circumstances, no motions relating to discovery, including motions under Rules 26(c), 29, and 37, shall be filed after the expiration of the discovery deadline, unless they are filed within 14 days after the discovery deadline and pertain to conduct occurring during the final 7 days of discovery." Although Local Rule CV-16(e) also permits counsel for the parties to agree to continue discovery beyond the deadline, the scheduling order warns "there will be no intervention by the Court except in exceptional circumstances" and "[n]o trial setting or other deadline set forth herein will be vacated due to information obtained in post-deadline discovery." First Am. Sched. Or. ¶ 1, ECF No. 89. In this case, discovery opened on May 8, 2024, and the First Amended Scheduling Order continued the deadline to complete discovery from October 15, 2024, until April 14, 2025. *Id.* The parties stipulated, without the Court's intervention, to

continue discovery until June 6, 2025, after a meet and confer on March 28, 2025. **D-Ex. 33, Wareham Email (Mar. 28, 2025).** Later, on April 15, 2025, the parties agreed to an extension of document discovery until June 13. **D-Ex. 34, Seeman Email (Apr. 14, 2025).**[11]

Rule 37 requires that the moving party certify that the parties met and conferred in good faith before moving to compel discovery. *See, e.g. Compass Bank v. Shamgochian*, 287 F.R.D. 397, 398–99 (S.D. Tex. 2012) (outlining deficient certifications and conferment). Local Rule CV-7(g) similarly requires parties to make a "good-faith attempt to resolve the matter by agreement, and, further, certifies the specific reason that no agreement could be made." "'Good faith' requires a genuine attempt to resolve the dispute and 'conferment' requires two-way communication which is necessary to genuinely discuss any issues to avoid judicial recourse." *Patel v. Shipper Servs. Express*, No. 5:20-cv-00267-OLG, 2020 WL 10056291, at *1 (W.D. Tex. Oct. 19, 2020) (citing *Compass Bank*, 287 F.R.D. at 399 (S.D. Tex. 2012)). Plaintiff never conferred with Defendants before the close of discovery or before filing their opposition. At best, Plaintiff continued to threaten a motion to compel for several months and kept promising to send a deficiency letter that never came. *See e.g.*, **P-Ex. 19, Henry Email (May 22, 2025, at 2:24 p.m.)**, ECF No. 122 at 1532–33.

Because Plaintiff's purported discovery disputes are untimely, and because he failed to

---

[11]     Plaintiff falsely suggests that Defendants produced numerous documents after the close of discovery. Pl.'s Opp'n at 26, 27, 28. Defendants actually produced, on July 16, 2025, a single email that is of marginal relevance to this case.   **P-Ex. 16, Gonazlez Email (July 16, 2025), ECF No. 122 at 1479.** On its face, the subject and focus of the email is Dan Brown (not Plaintiff). Defendants' counsel first learned of this email on July 14, 2025, when the Air Force identified the email and advised that it had undergone a declassification review. Out of an abundance of caution, counsel for Defendants promptly disclosed the email to Plaintiff's counsel in compliance with Defendants' Rule 26(e) obligations. Plaintiff's counsel never responded to this supplemental production.

meet and confer with Defendants before bringing these issues to the Court, the Court should not consider any claimed discovery dispute when ruling on Defendants' Motion for Summary Judgment.

### B.    Plaintiff's Request for Rule 37(e) Sanctions is Untimely and Unsupported.

Plaintiff's request for "spoliation" sanctions under Rule 37(e) is similarly untimely. But even if the Court considers this request, Plaintiff's two separate requests for sanctions are unsupported. The threshold requirements of Rule 37(e) are that the party in possession of the ESI (1) had a duty to preserve the ESI, (2) failed to take reasonable steps to preserve the ESI, and (3) the ESI cannot be restored or replaced. Fed. R. Civ. P. 37(e). As explained below, Plaintiff cannot make the required showing with respect to either SA Beall's accounts or Dan Brown's emails, so sanctions are unwarranted.

### 1.    SA Beall's NIPR, SIPR, and JWICS Accounts[12]

OSI Special Agent Allen Ting Beall passed away unexpectedly on August 3, 2022.[13] Plaintiff's notion that the Air Force should have been on notice of a duty to preserve SA Beall's accounts is dubious. Notably, Plaintiff's January 2022 administrative tort claim did not identify SA Beall by name, only as "unnamed OSI agent." Likewise, Plaintiff filed his original complaint on August 10, 2022, *under seal*, identifying SA Beall not by name, but only as an "unknown OSI agent." Compl., ECF No. 1. The Clerk issued summonses for the named parties on September 14, 2022, ECF No. 5. Plaintiff filed two affidavits of service indicating that the United States was

---

[12]    Non-secure Internet Protocol Router Network (NIPR); Secure Internet Protocol Router Network (SIPR); Joint Worldwide Intelligence Communications System (JWICS).

[13]    Obituaries: Allen Ting Beall, WILMINGTON STAR-NEWS, Aug. 5, 2022), available at https://www.starnewsonline.com/obituaries/pwlm0270556.

served on September 16, 2022, and Major William McVeigh was served on October 1, 2022. Summons Executed, ECF Nos. 6–7. Plaintiff never filed affidavits of service for the remaining named parties. *But see* Fed. R. Civ. P. 4(i)(2)–(3). Pursuant to the routine operation of the Air Force's electronic information system, SA Beall's NIPR, SIPR, and JWICS accounts were deleted after his separation from service. **P-Ex. 15, McDonald 30(b)(6) Dep.** at 23:3–7, ECF No. 122 at 1463.

Air Force OSI was able to restore SA Beall's Secure Integration Cloud (SIC) and Common Operating Environment (CORE) accounts and did a painstaking review of those documents. This review required a manual re-population of many of SA Beall's emails, identification of someone with appropriate clearances to review the thousands of emails, and a page-by-page review of all the emails in question. Defendants produced responsive emails to Plaintiff when they were cleared for release by the appropriate classification authority. **P-Ex. 16, Gonzalez Email (July 16, 2025)**, ECF No. 122 at 1479; **P-Ex. 18, Seeman Email (June 5, 2025)**, ECF No. 122 at 1519.

Plaintiff contends that spoliated records include "the PAR justification and surrounding communications," any findings or correspondence with McVeigh, security officials, or SAP access managers, and "post-read-out discussions." Pl.'s Opp'n at 81. As for the program access request (PAR), no one in OSI submitted the PAR, and there is no record evidence that SA Beall was involved in the approval process for Plaintiff's access. This is because the PAR is approved through Danny Burghard's office (SAF-AQL) and is stored in Joint Access Database Environment (JADE), which is a separate database unaffected by Beall's untimely passing. **P-Ex. 15, McDonald 30(b)(6) Dep.** at 23:8–10, ECF No. 122 at 1463; **D-Ex. 5, Burghard Dep.** at 43:20–44:5 (PAR goes into JADE); 129:5–22 (basis for Plaintiff's access was providing

technical guidance and advice in his government capacity to the government), ECF No. 113-5 at

15–16, 24. As for "correspondence" on SA Beall's NIPR, SIPR, or JWICs accounts, Plaintiff

cannot establish that *any* responsive emails were lost. All written correspondence with McVeigh,

the HNCO security office, Burghard, and others was not lost because the Air Force retained the

emails of the other parties to SA Beall's communications and produced those in discovery. And

Defendants are unaware of any missing responsive documents that they have not been able to

restore. **D-Ex. 35, Defs.' Ans. to Interrog. No. 8.**

### 2.    Dan Brown's Emails

Dan Brown testified that an Air Force attorney contacted him with instructions, but that

he did not remember what the instructions were, or all the details. **P-Ex. 7, Brown Dep.** at

166:20–167:13. Brown also testified that he *did not know* if anyone searched any other systems,

and Brown does not speak for the Air Force's overall search and collection of documents. **P-Ex.**

**7, Brown Dep.** at 169:17–19. With respect to his NIPR files that Plaintiff contends were

spoliated, Brown testified that "everything would have been on the email." *Id.* at 171:17–18. *See*

*also id.* at 170:14–24. Plaintiff also did not establish when in 2022 or 2023 that HNCO moved

buildings. But in any event, the emails were *not* lost and still were in Brown's Outlook

application and produced to Plaintiff. *Id.* at 170:2–4. Moreover, the Air Force performed a

separate forensic collection of Brown (and the other custodians') accounts which were searched

for responsive documents and produced to Plaintiff. Counsel for Defendants advised Counsel for

Plaintiff of this on at least one phone call on April 18, 2025, during a Rule 30(b)(6) meet and

confer when the parties were discussing Defendant's objections to Plaintiff's proposed

"discovery on discovery" topics. **D-Ex. 36, Defendants' Objections to Plaintiff's Rule 30(b)(6)**

**Notices; D-Ex 37, Gonzalez Email (Apr. 18, 2025)**. Defendants objected to Plaintiff taking

"discovery on discovery" on the adequacy of Defendants' process of collecting, preserving, and producing evidence in this case, especially with respect to HNCO employees, because Plaintiff could point to no evidence that any documents were missing. And Plaintiff *agreed* to limit discovery-on-discovery to issues concerning SA Beall's documents provided that Defendants provide a full list of the document repositories searched for responsive documents, which Defendants provided. **D-Ex 37, Gonzalez Email (Apr. 18, 2025); D-Ex. 38, Gonzalez Email (Apr. 23, 2025).** Defendants are not aware of any missing emails from Brown's accounts and have conducted an adequate search.

### C.    Plaintiff Fails to Demonstrate That the Additional Discovery Requested in His Rule 56(d) Affidavit Would Create a Dispute of Material Fact.

Relief under Rule 56(d) is only available when "a nonmovant shows by affidavit or declaration that, for specified reasons, it *cannot* present facts *essential* to justify its opposition." (emphasis added). The rule's "purpose is not to allow parties to defer adjudication of a motion so that they may bolster their opposition with evidence they neglected to retrieve earlier." *Sistrunk v. TitleMax, Inc.*, No. 5:14-cv-628-RP, 2017 WL 2392436, at *5 (W.D. Tex. June 2, 2017). Further, a party "may not simply rely on vague assertions that additional discovery will produce needed, but unspecified, facts.'" *Am. Family Life Assurance Co. of Columbus v. Biles*, 714 F.3d 887, 894 (5th Cir. 2013). Rather, the party must "set forth a plausible basis for believing that specified facts, susceptible of collection within a reasonable time frame, probably exist and indicate how the emergent facts, if adduced, will influence the outcome of the pending summary judgment motion." *Id.* (quoting *Raby v. Livingston*, 600 F.3d 552, 561 (5th Cir. 2010)).

Courts "properly deny a Rule 56(d) request for discovery when the request 'has failed to identify sufficiently specific or material evidence to affect a summary judgment ruling.'" *Silo Rest. Inc. v. Allied Prop. and Cas. Ins. Co.*, 420 F. Supp. 3d 562, 587 (W.D. Tex. 2019) (quoting

*Smith v. Reg'l Transit Auth.*, 827 F.3d 412, 423 (5th Cir. 2016)). In his Rule 56(d) affidavit, Plaintiff declares he needs discovery on five discrete categories of documents to oppose the motion for summary judgment.

### 1.    "Unredacted OSI Investigative File" ¶ 46

Plaintiff contends that he needs access to an unredacted version of OSI's "Report of Investigation and the associated OSI Form 40." **P-Ex. 23, Pl. Decl.** ¶ 46. It is unclear what Plaintiff means by the "investigative file," but it bears repeating that OSI did not perform an investigation into Plaintiff, so there is no OSI "investigative file" on him.[14] **P-Ex. 5, OIG Hotline MFR** at 1 ("A review of the Investigative Information Management System (I2MS) and Classified Investigative Information Management System (CI2MS) revealed no records on file for ROYSDON."); **P-Ex 15, McDonald 30(b)(6) Dep.** at 9:1–24, 20:7–9, 22:23–23:2. SA Beall documented his debrief and "read out" of Plaintiff on an OSI Form 40 (title "Report of Investigation"). But SA Beall read Plaintiff out of the program in his role as program security officer because of his intention to resign from NSA, not due to an investigation. **D-Ex. 23, Crunk 30(b)(6) Dep.** at 19:12–18, 20:17–21:12, 22:10–20. Other than program names, employee names, and the written justification for his program access request,[15] no other redactions exist in this document. Plaintiff saw the program access request in its full form at his debrief and responded to SA Beall at that time. **D-Ex. 6, OSI Form 40**, at 1 ¶ 5 ("SA Beall

---

[14]    If Plaintiff is instead referring to the OIG investigation that was opened following his own hotline complaint, those files have been produced with minimal redactions. *See, e.g.*, **P-Ex. 5, OIG Hotline MFR.**

[15]    The written justification remains classified. However, Burghard testified to the releasable information about the request, namely that Plaintiff was granted access to the program in his capacity as a government employee.  **D-Ex. 5, Burghard Dep.** at 129:5–22, ECF No. 113-5 at 24.

showed [Roysdon] his approved PAR and the justification language used."); **P-Ex. 23, Pl. Decl.**
**¶ 11** (SA Beall "confronted" Plaintiff with the PAR.). Plaintiff's speculation that there are
redactions that would reveal any "exculpatory details" is simply not supported by the record or
the redactions on the documents themselves.

### 2.    "Email Titled 'Roysdon write-up' Classified Systems" ¶ 47

Plaintiff claims that he has not "received the full context" of an email sent from SA Beall
on the CORE platform. **P-Ex. 23, Pl. Decl.** ¶ 47. Not so. The CORE email referenced was
produced to Plaintiff, and the attachment is the OSI Form 40 and its attachments. Defendants
attached both to their motion for summary judgment; Plaintiff did the same. **D-Ex. 6, OSI Form**
**40; D-Ex. 28, Beall CORE Email; P-Ex. 18, Seeman Email (June 5, 2025), ECF No. 122, at**
**1526; P-Ex. 4, OSI Form 40, ECF No. 122 at 647.**

### 3.    "JPAS/DISS Access Logs" (¶ 48)

Plaintiff alleges without any record support that an Air Force "security office" generated
a clearance action in the Joint Personnel Adjudication System (JPAS)/Defense Information
Security System (DISS), which "tracks clearance status." **P-Ex 23, Pl. Decl.** ¶ 48 (no
documentary support). According to Plaintiff there was an entry from "late 2020" that "flags" an
issue with his clearance but fails to include the result of the investigation. *Id.* JPAS—now,
DISS—is one of the platforms where HNCO looked up clearances. **P-Ex 13, Rowe 30(b)(6)**
**Dep.** at 24:15–18. "Anything related to an inquiry is outside of those databases." *Id.* at 25:16–17.
But in any event, "just the incident itself" would appear, not the result of any security incident.
*Id.* 24:19–25:17. Plaintiff now contends that, through counsel, he has requested access logs under
the Privacy Act. *See* **P-Ex. 23, Pl. Decl.** at ¶ 36. Plaintiff fails to identify when or how he
requested these logs, nor does he identify any discovery request made in this case that would

implicate this system. But regardless, it is undisputed that there was a security inquiry into Plaintiff's access to SAP-protected information. *See* Defs.' Mot. at 24–25.

Plaintiff appears to now request these logs to argue that the mere maintenance of records about him in systems for which "audit trails, access logs, or input metadata" have not been produced both amounts to a separate Privacy Act violation and supports imposing sanctions. Pl.'s Opp'n at 85–86. But Plaintiff has not asserted a claim under the Privacy Act's accounting provision, 5 U.S.C. § 552a(c), nor has he shown any violation of it. *See* SAC ¶¶ 193–246 (alleging improper disclosure violations under 5 U.S.C. § 552a(g)(1)(D)). The Privacy Act "does not require an agency to list those of its officers eligible to look at protected records[,]" *Dinh Tran*, 351 F. Supp. 3d at 138, and Plaintiff's evidence does not show a violation of 5 U.S.C. § 552a(c). *See, e.g.*, *Clarkson v. IRS*, 811 F.2d 1396, 1397-98 (11th Cir. 1987) (intra-agency disclosure not subject to accounting requirement under Section 552a(c)); *Quinn v. Navy*, No. 94-56067, 1995 WL 341513, at *1 (9th Cir. June 8, 1995) (same). As to the maintenance requirement, Section 552a(e)(5), Plaintiff has neither identified any specific record not maintained in accordance this section nor asserted an amendment claim (or exhausted the associated administrative remedies) to seek correction of any such record. *Pearson v. U.S. Dep't of Homeland Sec.*, No. 3:08-CV-1885-BB, 2009 WL 4016414, at *8 (N.D. Tex. Nov. 17, 2009).

### 4.    "Privileged Communications About [Plaintiff's] Removal" (¶ 49)

Plaintiff requests an "in camera review" of privileged communications about his removal that "have not been produced or logged clearly." **P-Ex 23, Pl. Decl.** ¶ 49. Plaintiff does not identify the custodians he is referring to, or any communications on Defendants' privilege log that were confusing. *Id.* Plaintiff's request for discovery of attorney-client privileged communications fails to satisfy Rule 56(d) because he seeks documents that are *not* discoverable.

### 5.    "Security Database Entries (Higher Headquarters)" (¶ 50)

Plaintiff supposes that "discovery is ongoing" in his request for records from Air Force

Materiel Command or Headquarters Air Force that have "entries or reference notes about [his]

status." **P-Ex 23, Pl. Decl.** ¶ 50. Relying on unnamed "indications," Plaintiff believes there may

be a formal "do not hire" or "deny access" listing with his name. *Id.* These records simply do not

exist because Plaintiff was never debarred, was later cleared to the same special access program

even after he was read out by SA Beall, and has never had any need to access HNCO's building

for his consulting work. **D-Ex. 26, Bremer 30(b)(6) Dep.** at 21:4–8, 21:25–22:2, ECF No. 113-

26 at 6–7; **P-Ex. 14, Burghard Fact Dep.** at 43:16–19, 46:5–25, 109:22–25, 133:1–17, ECF No.

122 at 1326, 1329, 1392 (testifying that Plaintiff was cleared to programs as ODNI employee);

**D-Ex. 13, Rowe 30(b)(6) Dep.** at 30:23–31:12, ECF No. 113-13 at 6–7; **P-Ex. 1, Pl. Fact Dep.**

at 226:21–227:1, ECF No. 122 at 446–47.

### 6.    Plaintiff's Unsupported Requests for Discovery

Although the Court should only consider the proposed discovery of evidence that

Plaintiff's declaration contends he needs to oppose summary judgment, *see* Fed. R. Civ. P. 56(d),

because of his repeated misrepresentations, Defendants have to correct the record on two other

discrete issues.

### i.    McVeigh's Emails (Opp'n at 81–82) and Other Access Logs

First, McVeigh's classified systems were searched for responsive documents, which were

produced. The reference to a memo discussed among Macrina, Parisi, and McVeigh is referring

to the Ekholm MFR, and Defendants *did* produce the transmission of McVeigh sending the

Ekholm MFR to Plaintiff in discovery. **D-Ex. 39, McVeigh to Macrina, et al.** (Aug. 24, 2020)

(transmitting **D-Ex. 16, Ekholm MFR**). As for Plaintiff's professed wonderment about how

37

McVeigh knew about information in the NSA emails, it is plainly evident that McVeigh received

them from two sources, (1) Brown forwarding to McVeigh the version that Plaintiff himself

altered and sent to Brown; and (2) the unaltered version that SA Beall obtained from Plaintiff

and attached to the OSI Form 40 that SA Beall sent to McVeigh. **D-Ex. 15, Brown Email (Aug.**

**20, 2020); D-Ex. 28, Beall CORE Email; D-Ex. 6, OSI Form 40** (NSA Emails). Notably,

Plaintiff opted to cancel McVeigh's deposition (multiple times) and never sought to reschedule

before the close of discovery or sought leave to conduct that deposition out of time. Plaintiff also

canceled Macrina's deposition shortly before it was scheduled to start and never rescheduled that

either. To the extent this strategy means Plaintiff lacks information about what McVeigh did or

did not do or how he learned certain information, Rule 56(d) relief is not justified.

### ii.    Classified Information and Defendants' Privilege Log

Plaintiff repeatedly misstates the contents of Defendants' privilege log. Pl. Opp'n at 38 ¶

11 (alleging that more than 130 documents on Defendants' privilege log were for state secrets);

81 (alleging Defendants withheld over 250 documents), 88 ("The Government withheld over 250

documents from its production on the grounds that they were classified, SAP-restricted, or

subject to DoD clearance restrictions."), 91 (same), 93 (same). There were only 231 entries on

Defendants' privilege log in total, which includes 51 documents with redactions. Each entry

provides information about the document being redacted or withheld, the privilege being

asserted, and the justification. Only 18 documents were withheld because they are classified at

the highest level. For those, a description of that information is provided. **P-Ex. 17, Defs.'**

**Privilege Log**, ECF No. 122 at 1487–1518. And documents compiling information about

AFLCMC/HNCO's program statuses or classified funding information are simply irrelevant to

Plaintiff's claims. *Id.* at 1487–89 (Doc Nos. 1–18). The CIPA-like procedures Plaintiff proposes

are simply unwarranted for these documents. Most withheld documents—in fact, 159 of them—were withheld under the attorney-client privilege or work product doctrine because they were communications with Air Force Attorney Marvelle Butler in response to this litigation, as indicated by the document dates.

## CONCLUSION

For these reasons and those set forth in Defendant's moving brief, the Court should grant this motion and enter judgment in favor of Defendants.

Dated: August 14, 2025                   Respectfully Submitted,

                                          BRETT A. SHUMATE
                                          Assistant Attorney General
                                          Civil Division

                                          C. SALVATORE D'ALESSIO, JR.
                                          Director, Torts Branch

                                          REGINALD M. SKINNER
                                          Senior Trial Attorney

                                          */s/ Joseph A. Gonzalez*
                                          Joseph A. Gonzalez
                                          D.C. Bar No. 995057
                                          Trial Attorney
                                          Torts Branch, Civil Division
                                          United States Department of Justice
                                          P.O. Box 7146, Ben Franklin Station
                                          Washington, D.C. 20044
                                          (202) 598-3888
                                          joseph.a.gonzalez@usdoj.gov

                                          */s/ Katrina M. Seeman*
                                          KATRINA M. SEEMAN
                                          D.C. Bar No. 1671729
                                          Trial Attorney
                                          Torts Branch, Civil Division
                                          United States Department of Justice
                                          P.O. Box 7146, Ben Franklin Station
                                          Washington, D.C. 20044
                                          (202) 616-0674

katrina.m.seeman@usdoj.gov

-and-

JUSTIN R. SIMMONS
United States Attorney

*/s/ Robert D. Green*
ROBERT D. GREEN
Texas Bar No. 24087626
Assistant United States Attorney
U.S. Attorney's Office
601 NW Loop 410, Suite 600
San Antonio, Texas 78216
(210) 384-7362 (phone)
(210) 384-7312 (fax)
robert.green3@usdoj.gov

*Counsel for Defendants*