**IN THE UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | |
|---|---|
| DR. JOHN ROE<br>*Plaintiff,*<br><br>v.<br><br>UNITED STATES OF AMERICA, *et. al.*,<br><br>*Defendant.* | CIVIL ACTION NO.<br>5:22-CV-00869-JKP-HJB<br><br><br>(JURY DEMANDED) |

**Declaration of Dr. Paul F. Roysdon**

I, Dr. Paul F. Roysdon, declare as follows:

1.      I served as the Deputy Director of National Intelligence for Policy and

Capabilities, a role in which I held a Top Secret//Sensitive Compartmented Information

(TS//SCI) clearance and was read into hundreds of Special Access Programs (SAPs).

2.      The designation "TS//SCI SAP" is not a separate clearance level but indicates that

I was granted access to a specific compartmented program at the TS//SCI level.

3.      In my government career, I had personal access to virtually all major classified

information systems, including the unclassified NIPRNet, the Secret-level SIPRNet, the Top

Secret/SCI-level JWICS, the NSA's NSANet, and various other compartmented networks (with

the exception of a system known as "CORE").

4.      Based on my training and experience in sensitive compartmented information

facilities (SCIFs), personnel conducting business in a SCIF use classified computer systems for

**all** email and messaging, even for content that may be unclassified, in order to avoid any

inadvertent spill of classified information.

5.      I have always been required to include portion markings in emails and documents on classified systems, labeling each paragraph or sentence with its classification level (e.g., **(TS//SAP)** for Top Secret SAP information or **(U//FOUO)** for Unclassified//For Official Use Only information).

6.      If any part of an email or document is classified (even a single sentence), the entire email or document is marked and treated at the highest classification level present, including appropriate headers and footers reflecting that highest level.

7.      In my experience, the majority of content within a "classified" email or document is often actually unclassified, with only specific facts or phrases requiring classification; those classified portions can be redacted to allow the rest of the document to be disclosed in for example a FOIA request.

8.      During a proper declassification review, an approved classification guide is used to identify exactly which facts or portions of a document are classified so that those parts can be redacted and all remaining unclassified information can be released.

9.      To date, the government has produced **no** emails or documents from any classified network (such as SIPRNet, JWICS, CORE, or NSANet) in this case.

10.      All emails that were produced in discovery came from the unclassified network (NIPRNet), as evidenced by headers marked "UNCLASSIFIED" and the presence of portion markings like "//FOUO" (For Official Use Only) in those emails (with the "FOUO" portions often being redacted).

11.      For example, an email that was produced from the system called "CORE" bore an "UNCLASSIFIED//FOUO" header, confirming that it was an unclassified communication; no classified CORE system communications were produced.

2

**EXHIBIT 1**
**Page 2 of 10**

12.      I am aware of multiple relevant communications that took place on classified systems which have not been provided as part of discovery in this case.

13.      In or around September 2019, I personally witnessed Dan Brown send a classified email regarding the "Fibonacci" project to Danny Burghard using a high-side classified email system.

14.      I similarly recall that in or around May and June of 2020, Dan Brown sent additional classified emails pertaining to the Fibonacci project, which I observed while these communications were being sent.

15.      In April 2019, I sent Dan Brown an email from my NSA classified email account (on the NSANet system) relating to the Fibonacci project.

16.      I also know that Dan Brown communicated via classified email with **[Defendant] McVeigh** regarding the Fibonacci project during the 2019–2020 timeframe.

17.      None of the classified emails that I sent or witnessed involving the Fibonacci project (including those between Dan Brown and Danny Burghard or Dan Brown and McVeigh) have been produced or declassified in these proceedings.

18.      I observed that email exchanges about the Fibonacci project often included multiple recipients and distribution lists.

19.      I observed recipients with "CTR" tags or contractor identifiers in the "To" or "Cc" lines on some project-related emails.

20.      I observed recipient domains including "us.af.mil" and "nsa.gov" on project-related emails during that period.

21.      I have reviewed the emails produced in this case and have not seen classified emails between Dan Brown and William McVeigh about me or my work.

22.    I have reviewed the emails produced in this case and have not seen classified emails between Dan Brown and Danny Burghard about the Fibonacci project.

23.    I have reviewed the emails produced in this case and have not seen any of my NSANet emails related to the Fibonacci project.

24.    The emails that I reviewed in this case bear "UNCLASSIFIED" headers and frequently show "//FOUO" portion markings.

25.    On March 14, 2025, I personally reviewed a government production that contained emails with "UNCLASSIFIED" headers and blacked-out text.

26.    On March 24, 2025, I attended or listened to portions of Dan Brown's deposition and heard him decline to answer questions based on classification.

27.    On March 24, 2025, I heard Dan Brown state that he was concerned about "talking around" classified matters during his testimony.

28.    In August 2020, I attended my read-out meeting at which I was shown an OSI Form 40.

29.    In that meeting, I was shown my Program Access Request (PAR) and the written justification associated with it.

30.    I saw classification markings on the PAR justification shown to me during that meeting.

31.    I was told at that meeting that I was being debriefed from the program because I was leaving NSA employment.

32.    I did not receive any notice at that time that I had been accused of a security violation.

33.    I did not receive any notice at that time that I had been designated an insider

threat.

34.    During my Air Force and NSA work, I became familiar with the use of JPAS and

DISS to record clearance status and incident entries.

35.    In my government roles, I routinely observed that contracting, security, and OSI

communications about personnel access were conducted on high-side systems.

36.    I observed that program managers and technical leads, e.g., William McVeigh,

exchanged email messages multiple times per day in 2019–2020.

37.    I observed that program managers and technical leads, e.g., William McVeigh,

routinely distributed attachments and meeting materials by email in 2019–2020.

38.    I have reviewed the discovery record and have seen very few emails produced

from William McVeigh's accounts compared to his normal daily email activity that I observed in

2019–2020.

39.    I have reviewed the privilege log provided by the government in this case, which

indicates that certain documents are being withheld in full on the basis of "state secrets"

privilege.

40.    In my career, I have never encountered a multi-page document that was entirely

classified at the highest level without any segregable unclassified portions; even documents

containing extremely sensitive information typically also contain analysis, context, or general

information that is unclassified and could be released with appropriate redactions.

41.    I know from my decades of work with classified systems that if a document

contains specific "state secret" details, it is standard practice to redact those specific details

rather than withhold the entire document, thereby allowing the unclassified remainder to be shared.

42.    I am aware that Dan Brown testified under oath that his classified computer (high-side workstation) was wiped or "erased," despite the ongoing duty to preserve relevant data for this litigation.

43.    I am also aware that Dan Brown was instructed to search only his unclassified (NIPRNet) email account for responsive records and was **not** instructed to search any of his classified email accounts or systems for this case.

44.    Even if Dan Brown's individual classified workstation was wiped, emails on classified networks such as SIPRNet or JWICS are not permanently lost because those networks employ centralized servers and backups that retain the emails and files independent of any single user's computer.

45.    49. I know from my experience that high-side email systems such as SIPRNet and JWICS retain messages on centralized servers independent of any single workstation.

46.    I know from my experience that system administrators can search and retrieve email from high-side servers for audit or legal purposes.

47.    I know from my experience that declassification reviews can produce segregated and redacted versions of high-side emails for release in litigation.

48.    In this case, I have not received any declassified emails or messages from SIPRNet, JWICS, NSANet, or other high-side systems.

49.    In this case, I have not received any declassified chat or instant messages from high-side systems.

50.     I personally observed that program-related email traffic often included recipients outside the immediate HNCO organization, including AFRL and NSA personnel.

51.     I personally observed that some program-related emails included contractor recipients marked as "CTR."

52.     I personally observed that program distribution lists frequently included mixed government and contractor recipients.

53.     After August 2020, Dan Brown told me directly that I should not be on or near HNCO projects going forward.

54.     After August 2020, Dan Brown told me that proposals should not include my name for HNCO-facing material.

55.     In 2021 and 2022, I was advised by colleagues that HNCO leadership did not want my name associated with HNCO presentations.

56.     From late 2020 to 2025, my employment at Leidos included policies that restricted concurrent outside contractor work.

57.     From January 2025 to August 2025, my role at ODNI included policies that restricted concurrent outside contractor work.

58.     I did not receive any written notice from the Air Force that any restriction on my access or eligibility had been rescinded after my read-out.

59.     I remain interested in returning to contractor work in offensive cyber and AI when my eligibility and schedule allow.

60.     65. I am willing to assist in targeted searches of JPAS, DISS, I2MS, CI2MS, and JADE to locate entries relating to my access or clearance in 2020.

61.     I have asked my counsel to obtain and produce the high-side emails and messaging records that I sent or witnessed in 2019–2020.

62.     I have asked my counsel to obtain and produce any JPAS or DISS entries related to my access status in 2020.

63.     I have asked my counsel to obtain and produce any I2MS or CI2MS records relating to me from 2020.

64.     I have asked my counsel to obtain and produce any SAF/AQL or JADE entries connected to my PAR and SAP access history.

65.     I have read my counsel's correspondence to the government dated March 14, 2025 objecting to FOIA-style redactions in the production.

66.     I reviewed the March 14, 2025 production and observed that it contained blacked-out content in emails marked "UNCLASSIFIED."

67.     I authorized my counsel to seek a discovery extension on March 26–28, 2025 to address classified access and preservation concerns.

68.     I was informed that on May 22, 2025 the government served a privilege log invoking "state secrets" to withhold documents in full.

69.     I received notice on June 5, 2025 that the Air Force recovered Secure Integration Cloud and CORE email account data for Agent Beall.

70.     On July 16, 2025, I learned the government made a supplemental production that included material from these recovered sources.

71.     I have not received any declassified high-side emails sent or received by Dan Brown, William McVeigh, or Danny Burghard relating to me.

72.     I have not received any declassified high-side emails sent or received by me relating to the Fibonacci project.

73.     I know from my experience that email server logs and audit trails on classified networks can identify senders, recipients, dates, and subject lines.

74.     I know from my experience that those server logs and audit trails are retained independent of individual user mailboxes.

75.     I am personally aware that recovery and declassification of these records would allow me to identify the decision-makers and the information flows at issue.

76.     I am personally aware that my counsel and I took steps during discovery in March 2025 to address classification access and preservation issues.

77.     I am personally aware that I produced tax and employment records requested by the government in early 2025.

78.     I was deposed on May 30, 2025 about my employment history and contracting opportunities after August 2020.

79.     I took part in meet-and-confer efforts through my counsel to schedule Rule 30(b)(6) depositions of Air Force and OSI witnesses in April and May 2025.

80.     I took part in providing dates and availability in March through May 2025 for depositions of government and agency witnesses.

81.     I reviewed correspondence from DOJ counsel in April 2025 addressing search locations and repositories for classified and unclassified records.

82.     I did not receive any classified or declassified emails from the high-side systems despite the recovery of Agent Beall's SIC and CORE accounts.

83.     I did not receive any notification from the Air Force that my access status in any

SAP environment was restored after August 2020.

84.     In summary, based on my personal knowledge, there were extensive

communications and records related to the Fibonacci project on classified information systems,

and these materials have not been made available in this case through declassification or

discovery.

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge.

Executed on: 20 Aug 2025

Paul F. Roysdon