UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| DR. PAUL ROYSDON, <br><br> *Plaintiff*, <br><br> v. <br><br> UNITED STATES, *et al.*, <br><br> *Defendants*. | No. 5:22-cv-00869-JKP-HJB |

**DEFENDANTS' PRE-TRIAL
FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Defendants file their pretrial Proposed Findings of Fact and Conclusions of Law in accordance with the Local Rules and this Court's Amended Bench Trial Scheduling Order, ECF No. 99.

**INTRODUCTION**

1. Plaintiff asserts four claims: A claim of de facto debarment from government contracting in violation of the Fifth Amendment (Count 1); claimed violations of the Privacy Act by the Air Force Office of Special Investigations (OSI) (Count 2) and the Air Force (Count 3); and a claim of "unreasonable interference with employment (Count 4). ECF no. 65 at ¶¶ 160–254.

2. Plaintiff seeks purely equitable relief on his de facto debarment and interference with employment claims. Plaintiff seeks damages on his Privacy Act claims.

3. Plaintiff's claims are set to be tried to the Court, without a jury. ECF No. 99. The Court has considered the evidence presented at the trial of this case, the arguments of counsel, the post-trial briefs, and the controlling legal authority. It has made determinations as to

1

relevance and materiality, assessed the credibility of the witnesses, and ascertained the probative value of the testimony and exhibits presented by the parties. As required under Rule 52(a) of the Federal Rules of Civil Procedure, this Court articulates the following findings of fact and conclusions of law to provide a "sufficiently definite predicate for appellate review." *Century Marine Inc. v. United States*, 153 F.3d 225, 231 (5th Cir. 1998). In following Rule 52(a), this Court need not "parse or declaim every fact and each nuance and hypothesis," but rather may limit its discussion to those facts and legal issues that form the basis of its decision. *Id*. The Court finds the following facts by a preponderance of the evidence, and in applying the applicable law to such factual findings, the Court makes the following conclusions of law. To the extent any findings of fact may also be deemed to be conclusions of law, they shall also be considered conclusions. *See Compaq Computer Corp. & Subsidiaries v. C.I.R.*, 277 F.3d 778, 781 (5th Cir. 2001).

## FINDINGS OF FACT

**Plaintiff Brings His Ideas to the Air Force.**

4.      Plaintiff is a mathematician and software engineer who has developed CyberAI products. *See generally* Ex. 1, Plaintiff's CV; Pl. Expert Disclosure at 2, ECF. No. 87. In 2019, while working as an NSA data scientist, Plaintiff proposed several CyberAI ideas to the procurement office of the Air Force Life Cycle Management Center ("AFLCMC"), an Air Force component known only as HNCO.

5.      Todd Jaspers, an NSA employee known to Plaintiff, introduced Plaintiff to Dan Brown, an HNCO engineer who facilitated the 2019 meeting at which Plaintiff first pitched his ideas to Air Force Program Element Monitor Danny Burghard. Burghard later discussed his interest in Plaintiff's proposals with Captain William McVeigh, a project manager who supervised Dan Brown's projects. Burghard ultimately dedicated some funding to HNCO so that

HNCO could add funds to an existing prime contract and execute Plaintiff's ideas. Plaintiff had "the role of a technical advisor to those efforts," and Burghard understood that Plaintiff was providing that advice in his capacity as an NSA employee.

6. HNCO submitted—and the Air Force approved—Plaintiff's formal request for access to national security information (his Program Access Request, or PAR) only in his NSA government employee capacity and read him into the classified program only in his NSA capacity.

7. Plaintiff was never granted access to the classified program as a contractor.

**Plaintiff Moonlights at HNCO as a Subcontractor.**

8. On June 3, 2019, Plaintiff entered a consulting agreement with Global Infotek Inc. ("GITI") to work on a contract that GITI had with the Air Force. He would "[p]rovide computational and mathematical analysis for a classified project."

9. Plaintiff also kept his full-time job at the NSA as a government employee where he was required to work 40 hours a week.

10. Plaintiff contacted the NSA's Office of General Counsel to discuss his concerns about a possible conflict of interest arising from his simultaneous government employment for the NSA and his private subcontracting role with GITI.

11. The NSA attorney advised Plaintiff that any contracting work must be limited to the ministerial, "behind the scenes" work.

12. The NSA attorney advised that Plaintiff "may not be the individual responsible for communications with Air Force representatives (or any other federal employees) on the contract for which you are providing services." The NSA attorney further advised that in most cases, 18 U.S.C. § 203 criminalizes moonlighting as a contractor while also maintaining government employment, and thus "makes such employment impossible."

3

13. The NSA attorney explained that anything beyond purely ministerial communications was unlawful, as the statute would even criminalize, for example, "a security guard [] discuss[ing] with federal employees [] the guard's decision to deny admission to a visitor."

14. The NSA attorney concluded "Bottom line: . . . it is almost impossible for federal personnel to work for a contractor in the federal workplace."

15. NSA never approved the arrangement and Plaintiff knew NSA's OCG was not granting permission to him.

16. Plaintiff still took the consulting job with GITI.

17. Except for Brown, Plaintiff never shared with anyone at HNCO that he was working there as a consultant.

18. Over the course of the next 14 months, Plaintiff attended several Air Force meetings, including two Project Management Review (PMR) meetings.

19. Despite the NSA attorney's guidance that he could only have ministerial communications with government employees and must not engage in conversation in which differences of opinion may occur, he provided his opinions in both PMRs.

20. In the February 2020 PMR, he proffered "expert advice" and opined that another program was "something that shouldn't continue" because it was "over budget, not delivering, and using old technology[.]"

21. On August 13, 2020, Plaintiff attended another PMR meeting with Burghard and Brown and again expressed his views that the project was outdated.

22. Burghard assumed that Plaintiff attended the PMRs in "his NSA government capacity" and recalled "slides [Plaintiff] presented that say he was an NSA data scientist."

**The Air Force Discovers that Plaintiff is Moonlighting as a Subcontractor.**

23. Shortly before the August 13, 2020, PMR meeting, McVeigh learned from Dan Brown that Plaintiff was working as a subcontractor for GITI on the same matters on which he was advising the Air Force.

24. Subsequently, McVeigh noticed that Plaintiff was "acting and representing himself as a Government employee," not as a contractor.

25. McVeigh then looked up Plaintiff on a program called the Joint Access Data Environment (JADE) that memorializes various clearances such as Program Access Requests. McVeigh did this because he needed to determine whether Plaintiff had a clearance to the classified program as a contractor.

26. JADE showed that Plaintiff was only cleared to work at HNCO as NSA employee, not as a contractor.

27. Because of the possibility of unauthorized disclosures of classified information, this potentially qualified as a security incident and required review.

28. McVeigh notified Burghard, who asked McVeigh to "draft up a quick [Memorandum for Record] to document what we know."

29. McVeigh also notified his supervising officer, Materiel Leader Lt. Col. Jared Ekholm, the officer in charge of HNCO.

30. McVeigh was Eckholm's point of contact "for all staff-level programs" and, as the person "noticing [] these facts" about Plaintiff, he wanted him to "write those up [] for later adjudication" by someone else.

**Plaintiff Sends an Email Omitting Significant Portions of NSA OGC's Guidance.**

31. To gather information for the MFR, McVeigh asked Brown to explain "how [Plaintiff] is avoiding a conflict of interest" between his government and contractor roles.

32. Brown forwarded McVeigh an email he received from Plaintiff.

5

33. In that email, Plaintiff represented to Brown that NSA OGC "concurred" that Plaintiff's work as a contractor would not "violate[] any laws or statutes." Plaintiff's email also stated that "OGC Provided the following guidance in April 2019," and the email purported to copy and paste the guidance in the NSA attorney's email to Plaintiff.

34. But the NSA attorney's email was altered. Specifically, nine paragraphs were removed.

35. The removed paragraphs contained the NSA attorney's strongest reservations, including that "it is almost impossible for federal personnel to work for a contractor in the federal workplace" and that "in most cases" 18 U.S.C. § 203 "make[s] such employment impossible."

**HNCO Appoints an Inquiry Official.**

36. On August 21, Ekholm signed the MFR which noted a "likely conflict of interest," given that Plaintiff "was cleared as a Government employee to [the project], but not as a contractor."

37. The MFR documented the fact that the Air Force would permit Plaintiff to "continue supporting the project as a Government employee under the NSA."

38. However, by this date, Plaintiff already told HNCO that "he [was] planning to resign from the NSA."

39. Ekholm believed that the discovery of Plaintiff's dual government employee-contractor status justified a short inquiry into HNCO security practices and appointed Richard Bremer, Chief of the Cyber Contracting Branch, to conduct the inquiry.

40. The purpose of the inquiry was to determine whether a compromise of classified information occurred and to categorize this security incident.

41. After Plaintiff advised HNCO officials that he was resigning from NSA, OSI Special Agent Allen Beall met with Plaintiff on August 26, 2020, to formally debrief him and conduct his "read out" from the classified program.

42. Beall performed the debrief in his capacity as a program security officer to HNCO. In that role, he had overall cognizance of security for the program that Plaintiff was accessed to.

43. During the debrief, Plaintiff confirmed that he had accepted a position with large government contactor and has submitted his letter of resignation to the NSA.

44. Beall explained to Plaintiff that he was losing access to the program as a result of his resignation from the NSA, and that if he wanted to work on it again in a different capacity (i.e., as a contractor) he would need to be submitted for access again with proper justification.

45. Plaintiff was read-out from the HNCO classified program for administrative reasons (i.e., his resignation from government employment), not "for cause" as in the case of a finding of misconduct.

46. During the debrief interview, Plaintiff provided Beall with the complete version of his correspondence with the NSA attorney.

47. The correspondence that Plaintiff provided to Beall during the debrief interview contained the nine paragraphs Plaintiff had previously removed from the versions of this correspondence he provided to Brown upon McVeigh's request.

48. On September 22, 2020, Bremer completed his inquiry.

49. He concluded that no compromise of classified information occurred, since Plaintiff had participated in classified briefings on the status of his project at HNCO as an NSA Official and thus maintained the proper security clearance for access to the briefings. Ekholm

determined that no further actions were needed, in part because Plaintiff "no longer had a contract" and "had also been read out" after he resigned from the NSA.

### Plaintiff's Purported De Facto Debarment and "Harm" to His Reputation.

50. After resigning from the NSA, Plaintiff accepted a position at Leidos, a private firm.

51. Plaintiff's starting compensation at Leidos was three times more than his compensation from the NSA.

52. At Leidos, Plaintiff continued to work in the CyberAI field.

53. Plaintiff created the Leidos Offense/Defense CyberAI research portfolio and led the Leidos team in their demonstration of 7 projects.

54. Similarly, in his position as AI Chief Scientist, Plaintiff provided general AI guidance across all Leidos business sectors.

55. In Plaintiff's final position with Leidos he oversaw AI developments across the company and was involved in more proposals and more presentations for the company.

56. In that capacity, he earned approximately $520,000 for 2024.

57. Plaintiff also gave numerous presentations in the CyberAI space during this period.

58. The conditions of Plaintiff's employment with Leidos made him ineligible to bid or compete for government contracts in his personal capacity.

59. In early 2025, Plaintiff was appointed to a government leadership position in the Office of the Director of National Intelligence (ODNI).

60. The conditions of Plaintiff's employment at ODNI made him ineligible to bid or compete for government contracts in his personal capacity.

61. Plaintiff resigned from his leadership position at ODNI to return to the private sector in August 2025.

62. In late 2022, Brown contacted Jaspers about whether Leidos had anything would "might help his team."

63. Jaspers, who now worked for Plaintiff at Leidos, was a part of Plaintiff's team.

64. Plaintiff claims that, before a demo presentation occurred in March or April 2023, Brown called Jaspers and told him that "[i]t probably wouldn't be, like, maybe good optically" if Plaintiff presented.

65. Notwithstanding Dan Brown's opinion about 'bad optics,' Plaintiff did attend and present in 2023.

66. Notwithstanding Dan Brown's opinion about 'bad optics,' several Air Force officials have confirmed that Plaintiff was not constructively debarred from Air Force or government work and has not been excluded from future contracting opportunities with the Air Force.

67. Burghard testified that he would welcome future opportunities to work with Plaintiff or work on products he developed.

68. Plaintiff has presented no specific evidence of impaired prospects aside from his claim of Dan Brown's opinion about "bad optics."

69. Jaspers testified that no other government customers ever had reservations about working with Plaintiff.

70. Brown testified that he had "no idea" about Plaintiff's industry reputation or how Plaintiff's reputation had been affected by leaving HNCO.

71. Plaintiff has never bid on any contract.

**Expert Opinions**

9

72. Plaintiff has designated himself as an expert witness and is the sole designated expert for either party in this case.

73. Prior to trial, the Court excluded Plaintiff's proffered expert opinions regarding the values of Artificial Intelligence/Machine Learning (AI/ML) contracts identified in Plaintiff's expert report; the average values of those contracts per company over a five-year period; and the likelihood that Plaintiff would have succeeded in securing those contracts. ECF No. 125.

74. Plaintiff has also designated himself as an expert regarding the background, purpose, applicability, and importance to national security of AI/ML and the use of such technology by the Air Force and the Department of Defense. The Court finds that Plaintiff has not adequately disclosed any opinion on these subjects that is helpful to the assessment by the trier of fact of any claim or defense in this action. Plaintiff's opinions on these subjects are therefore inadmissible and entitled to no weight under Federal Rule of Evidence 702.

75. Plaintiff has also designated himself as an expert regarding the selection of AI/ML contracts to serve as comparators for his damage assessment, as well as the valuation of those contracts. The Court finds that Plaintiff has failed to establish his qualifications as an expert to perform a market analysis of this type and has failed to show that any reliable methodology supported his opinions on the selection of relevant contracts. Plaintiff's opinions on these subjects are therefore inadmissible and entitled to no weight under Federal Rule of Evidence 702.

## CONCLUSIONS OF LAW

76. The Defendants answered Plaintiff's complaint and entered an appearance.

77. Venue is proper in the United States District Court for the Western District of Texas.

78. <u>Bench Trial.</u> The Court has set this matter for a Bench Trial ECF No. 99. Plaintiff is not entitled to a jury trial as to his Privacy Act claims. *See, e.g.*, *Payne v. EEOC, Casellas*, 242 F.3d 390 (10th Cir. 2000).

79. <u>Burden.</u> Plaintiff has the burden of proof by a preponderance of the evidence in this civil trial. Plaintiff must prove every part of his claims by a preponderance of the evidence. Burden of Proof: Preponderance of the Evidence 3.2 Fifth Circuit Pattern Jury Instruction (2020).

80. <u>Damages.</u> If Plaintiff carries his burden to show liability on his debarment and stigma claims (Counts 1 and 4), his remedy is non-monetary. The remedy is a name-clearing hearing or similar procedural remedy. If Plaintiff carries his burden to show a willful violation of the Privacy Act, his remedy is limited to "actual damages," which Plaintiff must prove. 5 U.S.C. § 552a(g)(4). If Plaintiff carries his burden to show a violation of the Privacy Act, but cannot show that violation was "willful," he is not entitled to money damages. *See Coleman v. United States*, 912 F.3d 824, 837 (5th Cir. 2019).

**Count 1 – De Facto Debarment**

81. "De facto debarment occurs when a contactor has, for all practical purposes, been suspended or blacklisted form working with a government agency without due process, namely, adequate notice and a meaningful hearing." *Phillips v. Mabus*, 894 F. Supp. 2d 71, 81 (D.D.C. 2012) (citations omitted).

82. To succeed on his de facto debarment claim, Plaintiff must demonstrate a "systemic effort by the procuring agency to reject all of the bidder's contractor bids." *TLT Const. Corp. v. United States*, 50 Fed. Cl. 212, 215 (2001). Two options exist to establish a de facto debarment: (1) "an agency's statement that it will not award the contractor future contracts;" or (2) "an agency's conduct demonstrating that it will not award the contractor future contracts." *Id.*

But this sort of government action would only implicate the constitution if a contractor is effectively barred from "virtually all [g]overnment work." *Old Dominion Dairy Prods., Inc. v. Sec'y of Def.*, 631 F.2d 953, 955 (D.C. Cir. 1980); *see also Taylor v. Resolution Trust Corp.*, 56 F.3d 1497, 1506 (D.C. Cir. 1995) (quoting *Greene v. McElroy*, 360 U.S. 474, 492 (1959) (finding plaintiff must show that the government "has seriously affected, if not destroyed, his ability to obtain employment in [his] field" to show broad preclusion)). Merely showing that the plaintiff "won some and lost some in retaining and bidding on government contracts" is insufficient. *See Trifax Corp. v. District of Columbia*, 314 F.3d 641, 644 (D.C. Cir. 2003).

83. Plaintiff has failed to carry his burden to show that he was de facto debarred by the Air Force. Plaintiff's de facto debarment claim is too speculative to prevail, since he has never bid or competed for any government contract and has not shown the necessary broad preclusion from contracts government-wide.

84. The Air Force cannot have excluded Plaintiff from contracts that he never sought because "de facto debarment has generally been found only where the party claiming debarment bid on and was denied more than one contract." *Dynamic Aviation v. Dep't of Interior*, 898 F. Supp. 11, 13 (D.D.C. 1995); *see also Redondo-Borges v. U.S. Dep't of Hous. & Urb. Dev.*, 421 F.3d 1, 9 (1st Cir. 2005); *IFONE NEDA Internet Servs. v. Army & Air Force Exch. Serv.*, No. 4:21-CV-330, 2021 WL 1148345, at *5 (S.D. Tex. Mar. 25, 2021). Nor has Plaintiff shown that he was prevented from obtaining any legal prerequisite to participation in any bid process. *Cf. Dynamic Aviation*, 898 F. Supp. at 13.

85. Dan Brown's opinion that it would not have been "good optics" for Plaintiff to present Leidos's demos to HNCO in spring 2023 cannot show a constructive debarment. Loss of a contracting opportunity by Leidos would not support a constructive debarment claim by Plaintiff. In any event, Plaintiff is not aware of whether Leidos lost any contracts because of

12

Plaintiff's experience at HNCO. And the spring 2023 demos in question did not lead to any contract or bid opportunities, since HNCO was not interested in pursuing the technology. Preclusion from a single contract is insufficient to show de facto debarment. *Highview Eng'g, Inc. v. U.S. Army Corps of Engineers*, 864 F. Supp. 2d 645, 653 (W.D. Ky. 2012).

86. A de facto debarment claim requires proof of a systemic effort of exclusion from "virtually all government work[.]" *IFONE NEDA Internet Servs.*, 2021 WL 1148345, at *4. The parties do not dispute that the relevant field of offensive CyberAI contracts extends far beyond the narrow subclass of HNCO contracts that Plaintiff claims to have been excluded from. And the evidence shows that Plaintiff has performed work in his chosen field, as a 1099 consultant of StarNav, a government contractor (work performed with Leidos's approval), and, in his capacity as a Leidos executive, working on numerous successful bids for government contracts with other DoD agencies.

87. Plaintiff is not entitled to any relief on his Count 1 constructive debarment claim.

**Counts 2 and 3 – Privacy Act**

88. To recover money damages on his Privacy Act claims, Plaintiff "must present evidence of the following elements: (1) the information is a "record" in a "system of records"; (2) the agency disclosed the information; (3) the disclosure had an adverse effect on him; and (4) the disclosure was willful." *Jacobs v. Nat'l Drug Intel. Ctr.*, 423 F.3d 512, 516 (5th Cir. 2005).

89. Plaintiff has failed to satisfy his burden as to his Privacy Act claims based on the disclosure of his email correspondence with NSA OGC. Those emails are not a "record" and were not retrieved from a "system of records" within the meaning of the Privacy Act. Rather, those emails were provided to the Air Force by Plaintiff—first, through the modified version that Plaintiff sent to Dan Brown to be provided to Captain McVeigh, and second, when provided to SA Beall during Plaintiff's debrief interview. *Bettersworth v. F.D.I.C.*, 248 F.3d 386, 391 (5th

13

Cir. 2001) ("records not accessible under the Privacy Act, even though agency *could* search for the records by the plaintiff's name, because the agency *as a practical matter* did not use the information that way" (quoting *Henke v. United States Dep't of Commerce*, 83 F.3d 1453 (D.C. Cir. 1996); collecting cases)); *see also Walia v. Napolitano*, 986 F. Supp. 2d 169, 186 (E.D.N.Y. 2013), on reconsideration in part (Feb. 4, 2014) ("to be covered by the Privacy Act, a record must actually be retrieved from a system of records by using a personal identifier."); *McCarthy v. U.S. Section Int'l Boundary & Water Comm'n, U.S.-Mexico*, No. EP-11-CV-208-PRM, 2011 WL 11741033, at *5 (W.D. Tex. Nov. 30, 2011).

90. At most, Plaintiff has shown that information about him was disclosed among personnel at HNCO and within the Air Force. But "intra-agency disclosure 'is not the evil against which the Privacy Act was enacted'"—"thus information shared within the same agency . . . is 'not subject to the requirements of the Privacy Act.'" *Coburn v. Potter*, No. 06 C 5397, 2008 WL 4390153, at *4 (N.D. Ill. Sept. 24, 2008), *aff'd,* 329 F. App'x 644 (7th Cir. 2009) (quoting *Clarkson v. Internal Revenue Serv.*, 811 F.2d 1396, 1398 (11th Cir. 1987) and *Williams v. Reilly*, 743 F. Supp. 168, 175 (S.D.N.Y. 1990)). Plaintiff has not carried his burden as to his Privacy Act claims because he has not shown any disclosure outside the Department of Defense.

91. The individuals within the Air Force who received information about Plaintiff received that information in connection with a need to know—specifically, because of their involvement in the handling of "classified material and other sensitive information and tasks." *Hill v. Dep't of Def.*, 981 F. Supp. 2d 1, 11 (D.D.C. 2013) (discussing *Bigelow v. Dep't of Defense*, 217 F.3d 875, 877 (D.C. Cir. 2000)). The disclosures Plaintiff has shown—intra-agency disclosures that could not show a Privacy Act violation in any event—were therefore permitted disclosures under 5 U.S.C. § 552a(b)(1).

92. Plaintiff cannot show a willful violation of the Privacy Act, as is required to recover money damages. This standard requires Plaintiff to show Privacy Act violations "so patently egregious and unlawful that anyone undertaking the conduct should have known it unlawful, or conduct committed without grounds for believing it to be lawful[,] or action flagrantly disregarding others' rights under the Act[.]" *Coleman*, 912 F.3d at 837; *see also Carrington v. U.S., Dep't of Def.*, 46 F.3d 66 n.1 (5th Cir. 1995) (quoting *Edison v. Department of the Army*, 672 F.2d 840 (11th Cir. 1982)); *see also Maydak v. United States*, 630 F.3d 166, 179 (D.C. Cir. 2010). Plaintiff has not shown any Privacy Act violation, much less a violation of this severity.

93. Plaintiff has also not shown that he was 'adversely affected' by any of the disclosures alleged in connection with his Privacy Act claim. *Hernandez v. Johnson*, 514 F. App'x 492, 500 (5th Cir. 2013) (favorably noting holding in *Gowan v. United States Dep't of the Air Force*, 148 F.3d 1182, 1194 (10th Cir. 1998) that Air Force disclosure of information "did not have adverse effect on plaintiff within meaning of Privacy Act because plaintiff had disclosed the same information to the same entity"). The actual damages recoverable upon showing of a willful Privacy Act violation are "proven pecuniary or economic harm" and do not include damages for mental or emotional distress. *FAA v. Cooper*, 566 U.S. 284 (2012). The emotional distress and fear of indictment that Plaintiff has claimed are both not recoverable on a Privacy Act claim and are not traceable to any Privacy Act violation or disclosure of information by the Air Force. *Sweeney v. Chertoff*, 178 F. App'x 354, 357 (5th Cir. 2006). Plaintiff's only claims of pecuniary or economic harm are similarly not traceable to any disclosure of information or Privacy Act violation, but to the alleged due process violations and constructive debarment claims asserted in Counts 1 and 4—claims for which money damages are not available.

94. Plaintiff has failed to carry his burden to show that he is entitled to any recovery on either of his Privacy Act claims.

**Count 4 – Stigma**

95. The "right to follow [a] chosen business or occupation free from unreasonable government interference comes within the liberty and property concepts of the Fifth Amendment." *Adams v. City of Harahan*, 95 F.4th 908, 913–14 (5th Cir. 2024) (quoting *Ferrell v. Dallas Indep. Sch. Dist.*, 392 F.2d 697, 703 (5th Cir. 1969)).

96. To succeed on his stigma claim, Plaintiff must establish "(1) the deprivation of a protected property or liberty interest, and (2) that the deprivation occurred without due process of law."*Adams*, 95 F.4th at 918 (citations omitted).

97. Plaintiff alleges an inability to enter contracts with one small Air Force division, HNCO, and for one type of contract, developing offensive CyberAI products. Even if true, this does not show preclusion from a "chosen profession" or "career." *Adams*, 95 F.4th at 915; *see Trifax Corp.*, 314 F.3d at 644 (plaintiff must establish "broad preclusion" from the field).

98. Plaintiff was never shut out of work with HNCO, but was issued a stop work order limited to his work as a GITI consultant. Thereafter, Plaintiff's own actions—specifically, his resignation from the NSA—led to his routine administrative read-out from HNCO's classified programs, which he had been granted access to in his government capacity and based on his NSA employment.

99. Plaintiff has failed to show evidence of inability to enter into any contract with HNCO or any other U.S. government division or entity. He has never bid on any contract. Plaintiff therefore cannot show that he was ever previously a member of any field of government contracting or that he has attempted to re-enter any such field. Without such showings, he cannot carry his burden as to his stigma claim. *See Orange v. District of Columbia*, 59 F.3d 1267, 1275

(D.C. Cir. 1995) (Plaintiffs unable to establish preclusion because "neither sought a position in the government" since their terminations.); *Evangelou v. District of Columbia*, 63 F. Supp. 3d 96, 104 (D.D.C. 2014) (Plaintiff unable to establish preclusion because he "only applied to two police departments since his termination" and "admits that he never sent out other applications.") *aff'd*, 639 F. App'x 1 (D.C. Cir. 2016).

100. "[A] liberty interest is infringed, and the right to notice and an opportunity to clear one's name arises, only when an employee is 'discharged in a manner that creates a false and defamatory impression about him and thus stigmatizes him and forecloses him from other employment opportunities.'" *Bledsoe v. City of Horn Lake, Mississippi*, 449 F.3d 650, 653 (5th Cir. 2006) (quoting *White v. Thomas*, 660 F.2d 680, 684 (5th Cir. 1981)). "Neither damage to reputation alone nor the stigma resulting from the discharge itself trigger the protections of due process." *Id.*

101. To succeed on a "stigma-plus-infringement" claim, a plaintiff must show: (1) he was discharged; (2) stigmatizing charges were made against him in connection with the discharge; (3) the charges were false; (4) he was not provided notice or an opportunity to be heard prior to the discharge; (5) the charges were made public; (6) he requested a hearing to clear his name; and (7) the employer denied the request. *Bledsoe*, 449 F.3d at 653. Plaintiff has failed to carry his burden as to a "stigma-plus-infringement" claim.

102. Plaintiff has not shown that he was "discharged" from HNCO. Rather, his voluntary resignation from the NSA precipitated his routine administrative read out from HNCO's classified programs. Prior to his resignation, the Air Force allowed Plaintiff to continue working with HNCO in his capacity as a government employee. After his resignation, Plaintiff was invited to continue his work as a private sector employee if again submitted for access with proper justification.

103. The HNCO inquiry was not based on false or pretextual information. Plaintiff failed to disclose his contractor status in his dealings with HNCO, leaving Air Force employees under the impression he was consulting as a government employee only. When those officials learned of Plaintiff's dual roles as a cleared government employee and as a subcontractor to a prime contractor not cleared to work on classified projects, there was a clear disconnect that warranted inquiry. Thus, the Air Force officials had a good faith basis to investigate a potential conflict of interest and determine whether a security incident had occurred. *See Zeng v. Texas Tech Univ. Health Sci. Ctr. at El Paso*, 836 F. App'x 203, 212 (5th Cir. 2020) (classifying termination for misconduct was accurate where employee violated university policy).

104. To satisfy the fifth factor of a stigma-plus-infringement claim, Plaintiff must show public disclosure that is "fairly attributable" to the defendant employer." *Hughes v. City of Garland*, 204 F.3d 223, 227 (5th Cir. 2000). The Air Force did not make any information about Plaintiff public, including his potential conflict of interest, concerns about his access to SAP-protected information, or his clearance to any SAP programs. Plaintiff only learned of the HNCO security inquiry through discovery in this lawsuit. He has presented no evidence that individuals outside the Air Force received information about possible ethics or security issues, only hearsay accounts of unspecified "derogatory remarks" by unidentified individuals relayed to Plaintiff by Jaspers. Casual gossip of this nature cannot show "'intentional or official disclosure'" by the Air Force. *Hughes*, 204 F.3d at 228.

105. Plaintiff cannot satisfy the sixth or seventh factors, because he has not shown that he sought to confront the Air Force seeking an opportunity to clear his name. *See Cunningham v. Castloo*, 983 F.3d 185, 194 (5th Cir. 2020); *see also Navarro v. City of Bryan*, No. H-22-2047, 2022 WL 3588050, at *3 (S.D. Tex. Aug. 22, 2022). At most, he has shown that he asked Dan Brown to "present his case to somebody else at HNCO," and that Dan Brown told him not to

18

bother. This is not a legally sufficient request for a name-clearing hearing, and Dan Brown, an engineer employed to provide technical advice to HNCO, did not exercise the authority to deny such a request on behalf of the Air Force. *Cunningham*, 983 F.3d at 194.

106. Plaintiff is not entitled to any relief on his Count 4 stigma claims.

107. Plaintiff is not entitled to an award of costs except as provided by 28 U.S.C. § 2412.

108. Post-judgment interest is only allowed pursuant to satisfying the requirements of statutory law.

109. <u>Judgment</u>. The Clerk of the Court is hereby instructed to enter judgment in favor of the Defendants and against the Plaintiff. The Court awards the United States taxable court costs.

[signature block]