**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

**DR. PAUL ROYSDON,**

    *Plaintiff*,

**v.**                                                          **Case No. 5:22-CV-00869-JKP**

**UNITED STATES OF AMERICA,
FRANK KENDALLIII, LT. GEN. KEV-
IN KENNEDY, (USAF); LT. GEN.
SHAUN Q. MORRIS, (USAF); JOSEPH
DANIEL BURGHARD, (USAF); AL-
LEN C. RABAYDA, (USAF); LT. COL.
JARED EKHOLM, (USAF); CAPTAIN
WILLIAM MCVEIGH, (USAF); UN-
KNOWN NAMED USAF OSI AGENT,
JOHN DOES 1-50, DEPARTMENT OF
THE AIR FORCE, AIR FORCE OF-
FICE OF SPECIAL INVESTIGA-
TIONS,**

    *Defendants*.

<u>**MEMORANDUM OPINION AND ORDER**</u>

Before the Court is Defendants' Motion for Summary Judgment, (*ECF No. 113*). Plaintiff

Dr. Paul Roysdon filed a Response, (*ECF No. 126*), to which Defendants filed a Reply, (*ECF*

*No. 130*). Upon consideration, the Court concludes Defendants' Motion for Summary Judgment,

(*ECF No. 113*), shall be **GRANTED**.

## FACTUAL BACKGROUND

This case arises out of Plaintiff Dr. Paul Roysdon's ("Dr. Roysdon") dual employment as a National Security Agency ("NSA") data scientist and "subcontractor for a commercial firm, referred to as 'GiTi.'" *ECF No. 65 at 14; ECF No. 113 at 8, 10*. The facts,[1] taken from the parties' Stipulated Joint Facts, are as follows. *ECF No. 141-1*.

During 2019 to 2020, the NSA employed Dr. Roysdon. *Id. at 1*. Dr. Roysdon held the clearances necessary to access a special access program ("the program") in his capacity as a government employee. *Id. at 1*.

In 2019, Dr. Roysdon proposed several Cyber AI ideas to the procurement office of the Air Force Life Cycle Management Center ("AFLCMC"), an Air Force component known only as HNCO.[2] *Id. at 1*.

On June 3, 2019, Dr. Roysdon entered a consulting agreement with Global Infotek Inc. ("GiTi") to work on a contract GiTi had with the Air Force. *Id. at 1*. Dr. Roysdon would "[p]rovide computational and mathematical analysis for a classified project." *Id. at 1*. Dr. Roysdon also kept his job at NSA. *Id. at 1*.

Dr. Roysdon attended several Air Force meetings, including two Project Management Review ("PMR") meetings in connection with the program. *Id. at 2*.

In the February 2020 PMR, Dr. Roysdon proffered "expert advice" and opined that another program ("the project") was "something that shouldn't continue" because it was "over budget, not delivering, and using old technology[.]" *Id. at 3*.

---

[1] The Court considers disputed facts in the light most favorable to Dr. Roysdon as required through the summary judgment process.
[2] It is known only by the acronym "HNCO," and is not known to have any independent title. *ECF No. 65 at 4 n.3; ECF No. 113 at 9*.

On August 13, 2020, Dr. Roysdon attended another PMR meeting with Joseph Burghard, Secretary of Air Force Special Programs, (*see ECF No. 122 at 1239*), and Dan Brown, lead engineer for the AFLCMC, (*see ECF No. 122 at 675*), and again expressed his views that the project was outdated.

On or about August 19th or 20th, 2020, Dr. Roysdon was told to discontinue his GiTi subcontractor work on the program. *Id. at 1*. He was permitted to continue supporting the program in his government-employee capacity. *Id. at 1*.

Dr. Roysdon announced his intention to resign from NSA on or about August 21, 2020. *Id. at 2*. On August 26, 2020, Dr. Roysdon was read out of the program. *Id. at 2*. Dr. Roysdon resigned from NSA effective September 21, 2020. *Id. at 2*. After resigning from NSA, Dr. Roysdon accepted a position at Leidos, a private firm. *Id. at 2*.

HNCO's material leader believed that the discovery of Dr. Roysdon's dual government employee-subcontractor status justified an inquiry into HNCO security practices and appointed an inquiry official. *Id. at 2*. The purpose of the inquiry was to determine whether a compromise of classified information occurred and to categorize this security incident. *Id. at 2*.

The inquiry official concluded that no compromise of classified information occurred. *Id. at 2*. No finding of a security violation or infraction was ever made against Dr. Roysdon by the Air Force. *Id. at 2*. No corrective actions were imposed on Dr. Roysdon. *Id. at 2*. No notice of suspension or debarment was issued to Dr. Roysdon. *Id. at 2*. No record of suspension or debarment for Dr. Roysdon appears in SAM.gov. *Id. at 2*. The Air Force did not commence a formal suspension or debarment proceeding against Dr. Roysdon. *Id. at 2*. Neither the Department of the Air Force nor any other federal agency issued a written communication barring Dr. Roysdon from seeking or performing future federal contract work. *Id. at 3*.

The parties agree to the authenticity of the CORE program documents, scheduling emails, items produced in discovery with Bates stamps, and the read-out form identified on their exhibit lists, without conceding their legal effect. *Id. at 3*.

Dr. Roysdon seeks injunctive relief and a declaratory judgment under the Declaratory Judgment Act, 28 U.S.C §§ 2201, et. seq., the Administrative Procedures Act ("APA"), 5 U.S.C. § 706, and the Fifth Amendment to the Constitution, alleging *de facto* debarment (Count 1) and unreasonable interference with employment (Count 4). *See ECF No. 65 at 28–34; 42–44*.

Dr. Roysdon also seeks damages under the Privacy Act of 1974, 5 U.S.C. § 552a ("§ 522a"), alleging Defendant Air Force Office of Special Investigations, (Count 2), and Defendant Department of the Air Force, (Count 3), failed to comply with its provisions. *See ECF No. 65 at 34–42*; *see also* § 522a(g)(1)(D).

On July 2, 2025, Defendants filed their Motion for Summary Judgment, (*ECF No. 113*). On August 7, 2025, Dr. Roysdon filed a Response, (*ECF No. 126*), to which on August 14, 2025, Defendants filed a Reply, (*ECF No. 130*).

In his Response, Dr. Roysdon requested relief pursuant to Federal Rules of Civil Procedure 56(d) and 37(e). *See ECF No. 126*. The Court held a hearing on this matter August 21, 2025. *See* Min. Ent. Aug. 21, 2025. Subsequently, the Court issued its Order denying Dr. Roysdon's requested relief. *ECF No. 135*.

## LEGAL STANDARD

Summary judgment is appropriate if the record shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Rodriguez v. Pacificare, Inc.*, 980 F.2d 1014, 1019 (5th Cir. 1993). "A fact is material only if its resolution would affect

the outcome of the action." *Wiley v. State Farm Fire & Cas. Co.*, 585 F.3d 206, 210 (5th Cir. 2009). A genuine dispute for trial exists if the record taken as a whole could lead a reasonable trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *Bayle v. Allstate Ins. Co.*, 615 F.3d 350, 355 (5th Cir. 2010). Because there must be a genuine dispute of material fact, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 247–48 (1986).

The moving party bears the initial burden of informing the court of the basis for the motion and of identifying those portions of the record which demonstrate the absence of a genuine dispute of material fact or the appropriateness of judgment as a matter of law. *Celotex,* 477 U.S. at 323. The movant is not required to negate the elements of the nonmovant's case but may satisfy its summary judgment burden by demonstrating the absence of facts supporting specific elements of the nonmovant's cause(s) of action. *Little v. Liquid Air Corp.*, 37 F. 3d 1069, 1075, 1076 n. 16 (5th Cir. 1994). To satisfy this burden, the moving party must provide affidavits or identify any portion of the pleadings, discovery or admissions that demonstrate the absence of a triable dispute of material fact. *Celotex*, 477 U.S. at 323; *Rodriguez*, 980 F.2d at 1019. "If the moving party fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response." *Pioneer Expl., LLC v. Steadfast Ins. Co.*, 767 F.3d 503, 511 (5th Cir. 2014).

If the movant carries its initial burden, the burden shifts to the nonmovant to present competent summary judgment evidence showing the existence of a genuine dispute of material fact. *Matsushita*, 475 U.S. at 586–87. Upon the shifting burden, "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for

summary judgment." *Brown v. City of Houston, Tex.*, 337 F.3d 539, 541 (5th Cir. 2003). The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which this evidence raises a genuine dispute of material fact. *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). Further, should the non-moving party fail "to address or respond to a fact raised by the moving party and supported by evidence, then the court may consider the fact as undisputed" and "[s]uch undisputed facts may form the basis for a summary judgment." *Broadcast Music*, *Inc. v. Bentley*, 5:16-CV-00394, 2017 WL 782932 at *2 (W.D. Tex. Feb. 28, 2017).

In determining the merits of a motion for summary judgment, a court has no duty to search the record for material fact issues or to find a party's ill-cited evidence. *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012); *Ragas*, 136 F.3d at 458. In addition, a court may not make credibility determinations or weigh the evidence and must view all evidence and draw all reasonable inferences in the light most favorable to the party opposing the motion. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000); *Boudreaux v. Swift Transp. Co.*, *Inc.*, 402 F.3d 536, 540 (5th Cir. 2005) (citations omitted).

## ANALYSIS[3]

### I.    Counts 1 and 4: Equitable Relief

Dr. Roysdon seeks injunctive relief and a declaratory judgment under the Declaratory Judgment Act, 28 U.S.C §§ 2201, et. seq., the Administrative Procedures Act ("APA"), 5 U.S.C.

---

[3] As a preliminary matter, in his Response, Dr. Roysdon requested relief pursuant to Federal Rules of Civil Procedure 56(d) and 37(e). *See ECF No. 126*. The Court held a hearing on this matter August 21, 2025. *See* Min. Ent. Aug. 21, 2025. Subsequently, the Court issued its Order denying Dr. Roysdon's requested relief. *ECF No. 135*. To the extent the Court's Order, (*ECF No. 135*), did not explicitly address Dr. Roysdon's request for relief pursuant to Federal Rule of Civil Procedure 37(e), that request is **DENIED**. The Court finds no evidence of "the destruction or the significant and meaningful alteration of evidence." *Guzman v. Jones*, 804 F.3d 707 (5th Cir. 2015) (citing *Rimkus Consulting Grp., Inc. v. Cammarata,* 688 F. Supp.2d 598, 612 (S.D. Tex. 2010)).

§ 706, and the Fifth Amendment to the Constitution, alleging *de facto* debarment (Count 1) and unreasonable interference with employment (Count 4). *See ECF No. 65 at 28–34; 42–44*.

## A.    Count 1: *De Facto* Debarment

Defendants argue this cause of action "is too speculative to proceed to trial because [Dr. Roysdon] has never bid or competed for any government contracts *ever*." *ECF No. 113 at 29* (emphasis in original). Dr. Roysdon counters he "has produced direct and corroborated evidence of both statements and agency conduct that functionally blacklisted him from future HNCO contracting." *ECF No. 126 at 49*. In their Reply, Defendants claim Dr. Roysdon's "failure to ever bid on any contracts, which he does not dispute, is dispositive." *ECF No. 130 at 19, 20 n.5*.

*De facto* debarment occurs when a contractor or a subcontractor has, for all practical purposes, been suspended or blacklisted from working with a government agency without due process, namely, adequate notice and a meaningful hearing. *Phillips v. Spencer*, 390 F. Supp. 3d 155 (D.D.C. 2019) (citations omitted). The United States Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") has held:

> [W]hen the Government effectively bars a contractor from virtually *all* Government work due to charges that the contractor lacks honesty or integrity, due process requires that the contractor be given notice of those charges as soon as possible and some opportunity to respond to the charges before adverse action is taken.

*Id.* (citing *Old Dominion Dairy Prods., Inc. v. Sec'y of Def.*, 631 F.2d 953, 955–56 (D.C. Cir. 1980) (emphasis added)). "[T]he typical debarment [is a] ban on contracting for 'virtually all government work' for a fixed period of time." *Reeve Aleutian Airways, Inc. v. United States*, 982 F.2d 594, 598 (D.C. Cir. 1993) (citations omitted).

The standard for proving *de facto* debarment is high. *Spencer*, 390 F. Supp. 3d at 155; *E.g.*, *Pub. Warehousing Co. K.S.C. v. Def. Supply Ctr. Phila.*, 489 F. Supp. 2d 30, 45 n.13 (D.D.C. 2007); *Highview Eng'g, Inc. v. U.S. Army Corps of Eng'rs*, 864 F. Supp. 2d 645, 649

(W.D. Ky. 2012) ("*Highview II*") ("Plaintiffs must meet a high standard when seeking to prove a *de facto* debarment claim."). To survive summary judgment, Dr. Roysdon must present evidence establishing that there is a genuine dispute of material fact as to a "systematic effort by the procuring agency to reject *all* of the bidder's contract bids." *TLT Constr. Corp. v. United States*, 50 Fed. Cl. 212, 215 (2001) (emphasis added) (citation omitted). The Court can find *de facto* debarment based on either: (1) "a statement that the agency will not award a contract to the disappointed bidder in the future"; or (2) "the conduct of the agency." *Leslie & Elliott Co. v. Garrett*, 732 F. Supp. 191, 195 (D.D.C. 1990); *see also TLT Constr. Corp.*, 50 Fed. Cl. at 215-16.

No individual person debars a contractor. *Highview Eng'g, Inc. v. U.S. Army Corps of Eng'rs*, No. 3:08-CV-00647, 2010 WL 2106664, at *5 (W.D. Ky. May 24, 2010) ("*Highview I*"); *see* 2 C.F.R. § 180.800 ("A Federal agency may debar a person . . . ").

Dr. Roysdon first argues, "[e]ven though Dr. [Roysdon] bears no burden to produce affirmative evidence at this stage, the record overwhelmingly supports both pathways recognized in this Court's [motion to dismiss] Opinion: a clear agency statement of exclusion, and agency conduct that functionally bars future awards." *ECF No. 126 at 49*. To be clear, as stated:

> The moving party bears the initial burden of informing the court of the basis for the motion and of identifying those portions of the record which demonstrate the absence of a genuine dispute of material fact or the appropriateness of judgment as a matter of law. *Celotex*, 477 U.S. at 323. The movant is not required to negate the elements of the nonmovant's case but may satisfy its summary judgment burden by demonstrating the absence of facts supporting specific elements of the nonmovant's cause(s) of action. *Little v. Liquid Air Corp.*, 37 F. 3d 1069, 1075, 1076 n. 16 (5th Cir. 1994).
>
> . . .
>
> If the movant carries its initial burden, the burden shifts to the nonmovant to present competent summary judgment evidence showing the existence of a genuine dispute of material fact. *Matsushita*, 475 U.S. at 586–87. Upon the shifting burden, "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." *Brown*

*v. City of Houston, Tex.*, 337 F.3d 539, 541 (5th Cir. 2003). The party opposing
summary judgment is required to identify specific evidence in the record and to
articulate the precise manner in which this evidence raises a genuine dispute of
material fact. *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

*See supra*. Here, Defendants specifically argue "the undisputed evidence shows that the Air

Force neither formally nor constructively debarred [Dr. Roysdon]," citing summary judgment

evidence in support thereof. *ECF No. 113 at 28–29*. As such, Dr. Roysdon's burden requires him

"to identify specific evidence in the record and to articulate the precise manner in which this evi-

dence raises a genuine dispute of material fact." *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455,

458 (5th Cir. 1998).

Dr. Roysdon next argues he need not show he bid on and was denied government con-

tracts, citing *Dynamic Aviation v. Dep't of Interior*, 898 F. Supp. 11, 13 (D.D.C. 1995). As sum-

marized in *Highview II*:

> In *Dynamic Aviation*, the plaintiff had his aviation "cards" revoked for a period of
> one year. A pilot could not be re-issued "cards" until his pilot skills had been re-
> tested and his helicopter had been re-inspected. The Office of Aviation Services
> refused to perform the tests and inspection until a [federal] bureau specifically re-
> quested his services, but a pilot could not be awarded an informal contract unless
> he was "carded." The court found that this placed the pilot in a "Catch–22" where
> he could not obtain the needed card unless his services were requested, but his
> services would not be requested unless he had a card. The court stopped short of
> finding *de facto* debarment. Rather, summary judgment was denied, as the case
> presented genuine issue of material fact. In *Dynamic Aviation*, the agency pre-
> vented the pilot from meeting a legal prerequisite to participation in the bid pro-
> cess for contracts.

*Highview II,* 864 F. Supp. 2d at 653 (citing *Dynamic*, 898 F. Supp. 11).

However, in his Second Amended Complaint, Dr. Roysdon does not allege Defendants

prevented him from obtaining a legal prerequisite to participate in the bidding process. *See ECF*

*Nos. 65, 126*. In fact, as Defendants point out, Dr. Roysdon's own deposition testimony indicates

his "ineligibility to bid or contract was due to the terms and conditions of his employment with

Leidos and ODNI, not a bar imposed by HNCO or the Air Force." *ECF No. 130 at 20 n.5*. A Declaration Dr. Roysdon submitted to the Court indicates this as well. *ECF No. 132-1* ("From late 2020 to 2025, my employment at Leidos included policies that restricted concurrent outside contractor work. From January 2025 to August 2025, my role at ODNI included policies that restricted outside concurrent work"). Thus, the facts of this case are readily distinguishable from the facts in *Dynamic Aviation*. The Court therefore applies the legal standard typically applied in these cases, as acknowledged in *Dynamic Aviation*. *See Dynamic*, 898 F. Supp. at 13 (citing *Leslie*, 732 F. Supp. at 197; *Geo–Con, Inc. v. United States*, 783 F. Supp. 1, 3 (D.D.C.1992)).

Defendants argue "[t]he record is undisputed that [Dr. Roysdon] never attempted to bid or compete for any government contract as a prime or subcontractor." *ECF No. 113 at 29* (citing *ECF No. 113-2 at 6–7, 22, 80*). As acknowledged in *Dynamic Aviation*, "*de facto* debarment has generally been found only where the party claiming debarment bid on and was denied more than one contract." *Dynamic*, 898 F. Supp. at 13 (citing *Leslie*, 732 F. Supp. At 197; *Geo–Con*, 783 F. Supp. At 3). Because preclusion from even a single contract is insufficient to establish *de facto* debarment,[4] and in his Response Dr. Roysdon does not demonstrate he bid on or was denied any government contracts, there is simply no evidence of a systematic effort by Defendants to reject all of Dr. Roysdon's contract bids. *TLT Constr. Corp.*, 50 Fed. Cl. at 215.[5] Accordingly, in this regard, Defendants' Motion for Summary Judgment is **GRANTED**.

---

[4] *TLT Const. Corp. v. U.S.*, 50 Fed.Cl. 212, 215 (2001); *National Career College, Inc. v. Spellings,* 371 Fed. App'x. 794, 796 (9th Cir. 2010); *Redondo–Borges v. U.S. Dept. of Hous. and Urban Dev.*, 421 F.3d 1, 8–9 (1st Cir. 2005).

[5] *See also Redondo-Borges*, 421 F.3d at 9 (construction contractor could not establish a "pattern or practice of exclusion" necessary for a *de facto* debarment claim given contractor's failure to allege that it bid on any government contracts post suspension); *IFONE NEDA Internet Servs. v. Army & Air Force Exch. Serv.*, No. 4:21-CV-00330, 2021 WL 1148345, at *5 (S.D. Tex. Mar. 25, 2021) (refusing to infer "that the government was prohibiting IFONE from all or virtually all future government work . . . without knowing, for example, if a bid by IFONE was rejected by the government following th[e] termination decision"); *Mitchell Eng'g v. City & Cnty. of San Francisco*, No. C 08-04022 SI, 2009 WL 440486, at *3 (N.D. Cal. Feb. 23, 2009) ("[P]laintiff has not pled a 'systematic effort' to reject all of its bids. Indeed, plaintiff does not allege that the City has rejected any of its bids. Plaintiff cites no authority establishing that a contractor can be constructively debarred when none of its bids has been rejected.").

For completeness, the Court also analyzes statements and conduct Dr. Roysdon argues amount to *de facto* debarment that ultimately fall short.

Dr. Roysdon argues statements made by Dan Brown "demonstrate the kind of institutional exclusion that courts have found sufficient to establish *de facto* debarment." *ECF No. 126 at 52*. As Defendants point out, numerous *de facto* debarment cases are based on a contracting officer's express statement and conduct with respect to bidders.[6]

However, Dan Brown is not a contracting officer. Per Dan Brown's deposition testimony, he is a "lead engineer for the . . . AFLCMC." *ECF No. 122 at 675*. He provides "technical advice" and his involvement in contracts consists of assisting in outlining what a project requires. *ECF No. 122 at 681–684*. In his role, he does not believe he ever evaluated any proposals. *Id. at 685–686; id. at 695* ("we don't get involved with contracting – contractors' decisions and vendors' decisions"). In his Response Dr Roysdon does not demonstrate there is any evidence Dan Brown has control over any government contracts.

*Highview II* is not binding precedent, but the Court finds the reasoning in *Highview II*—a decision granting summary judgment in favor of a federal agency—persuasive. In that case, the plaintiff and his company argued that they were effectively debarred from working with the Army Corps of Engineers without due process. *Highview II*, 864 F. Supp. 2d at 648. The plaintiff and his business partner submitted a wetlands mitigation bank proposal to the federal agency, and the agency's program manager met with the plaintiff's business partner to express her concerns with working with the plaintiff. *Id.* at 647. The business partner interpreted the program

---

[6] *ECF No. 130 at 21* (citing *Related Indus. v. United States*, 2 Cl. Ct. 517, 525 (1983) (contracting officer's statement that under no circumstances will he award a contract to the business owner, plaintiff-company, or any company the owner is associated with amounts to *de facto* debarment); *Leslie and Elliott Co., Inc. v. Garrett*, 732 F. Supp. 191, 196 (D.D.C. 1990) (*de facto* debarment when Navy refused to award plaintiffs two contracts for which they were lowest bidder because the Navy—through representatives in charge of considering awarding contracts—"had determined it should no longer do business with" the contractor)).

manager's sentiments as if "she did not want any wetlands mitigation bank proposals in which [the plaintiff] played a role." *Id.* The business partner also interpreted her "comments and mannerisms to indicate that [the plaintiff] was being 'blacklisted' by the [agency]." *Id.* at 651. The plaintiff relied on the program manager's alleged comments, along with his business partner's notes and e-mail about the meeting, to attempt to establish *de facto* debarment. *Id.* at 649. The court noted that the details of the meeting were "not entirely clear[,]" but "[the business partner] was *not* told that 'the [agency] wanted no proposals in which [the plaintiff] played a role.'" *Id.* (emphasis in original).

The court granted the federal agency's motion for summary judgment and found that "[t]here was nothing stated or demonstrated by the Corps indicating that it would not grant [the plaintiff] future contracts, beyond the one contract then before it." *Id.* at 652. The court reasoned that the business partner admitted that the program manager's statement was not a quote, that it was his opinion that the agency was blacklisting the plaintiff, and that the program manager never told him that the Corps would not approve the proposal. *Id.* at 652-53. The court determined that the plaintiff could not establish *de facto* debarment through an agency statement that it would not award future contracts. *Id.* at 653. The court explained that even if the plaintiff could have proven that he was prevented from obtaining the contract with the Corps because he was removed from the project with his business partner, "such a finding would be insufficient to carry the day." *Id.* at 653. The court concluded that "[t]here [was] simply no evidence . . . of a systematic effort by the agency to reject all of the plaintiffs' contract bids." *Id.* (collecting cases).

Dr. Roysdon's case is weaker than the plaintiff's case in *Highview II* because in his Response Dr. Roysdon does not demonstrate Dan Brown is a program manager. *See ECF No. 130-2 at 3–5* (Captain McVeigh was the program manager). As the court indicated in *Highview II*, even

a program manager's statement does not mean that the federal agency would no longer grant future contracts. 864 F. Supp. 2d at 652-53.

Further, while Dr. Roysdon claims "Dan Brown . . . relayed to me . . . I would 'never work in HNCO again,'" per Dan Brown's deposition testimony he denies this. *ECF No. 122 at 1563–1564; id. at 763*. He also denies telling Todd Jaspers, a Leidos employee, Dr. Roysdon could not be in the room when Leidos made presentations to the Air Force or that Dr. Roysdon could not associate his name with Leidos Cyber AI products. *ECF No. 122 at 763–769*. When asked if he was aware if Dr. Roysdon would be able to work at HNCO again, Dan Brown responded "I don't see why he wouldn't be able to work." *Id. at 763*.

Viewing these disputed statements in Dr. Roysdon's favor does not create a triable issue because Dan Brown is not a contracting authority, and there is no evidence that any contracting authority prevented Dr. Roysdon from working.

Dr. Roysdon also argues Defendants "engaged in sustained conduct excluding Dr. Roysdon from future contracting." *ECF No. 126 at 53*. As the Court pointed out in its Memorandum Opinion and Order addressing Defendants' Motion to Dismiss "[t]o show that an agency's conduct amounts to debarment, a plaintiff "[does] not have to prove that it [has] lost 100% of its work," but only "that the government's actions were aimed at the overall status of the plaintiff as a contractor, specifically at plaintiff receiving new contracts." *ECF No. 63 at 10* (citing *IFONE NEDA Internet Servs. v. Army & Air Force Exch. Serv.*, No. 4:21-CV-00330, 2021 WL 1148345, at \*4 (S.D. Tex. Mar. 25, 2021); *Phillips v. Mabus*, 894 F. Supp.2d 71, 82 (D.D.C. 2012)). In other words, "*de facto* debarment may lie where there has been exclusion from virtually all government work for a fixed period of time, . . . or where the government's conduct has the broad

effect of largely precluding plaintiffs from pursuing government work." *Id.* (internal modifications and citations omitted).

In support of this proposition, Dr. Roysdon states Todd Jaspers told him his name had to be removed from presentation slides, and he was not allowed in the room for briefings. *ECF No. 126 at 53*. Dr. Roysdon also states he has not been invited to participate in any HNCO or Air Force offensive cyber programs since August 2020. *Id. at 54*.

Regarding Dr. Roysdon's name being removed from presentation slides and Dr. Roysdon not being welcomed on Teams calls, Todd Jaspers testified "it was pretty clear to me that it was probably because of [this] lawsuit." *ECF No. 122 at 932–933*. To the extent Dr. Roysdon quotes Todd Jaspers as stating Dr. Roysdon was "not allowed in the room for the briefing" and "was kept at arm's length from anything government-facing" from 2020 through 2023, the Court notes this testimony does not appear in Todd Jaspers' deposition. *See ECF No. 122 at 885–1019*. Finally, the Court agrees with Defendants Dr. Roysdon points to no authority indicating a right exists to an invitation to compete for government contracts. *ECF No. 130 at 15*.

The Court also notes for any reviewing court that Dr. Roysdon, as a Leidos executive, has been involved in numerous successful bids on government contracts, including with Department of Defense agencies. *ECF No. 113-2 at 80–83* ("Q Were any of those contracts in the cyber AI space? A Yes."). Further, Todd Jaspers testified that outside of statements from Dan Brown, no other government customers ever expressed any reservations about working with Dr. Roysdon. *ECF No. 122 at 972–973*. Therefore, in addition to not showing he bid on or was denied any government contracts as an individual, in his Response Dr. Roysdon also does not demonstrate statements and conduct that amount to *de facto* debarment or broad preclusion from government contracting. *Trifax Corp. v. D.C.*, 314 F.3d 641, 642 (D.C. Cir. 2003) (affirming summary judg-

ment on *de facto* debarment claim because even if "injured in some respects" plaintiff could not demonstrate broad preclusion from government contracting).

**B.     Count 4: Unreasonable Interference With Employment**

**1.     Occupational Liberty Interest**

Defendants argue Dr. Roysdon cannot prove a deprivation of a protected liberty interest because he has not experienced preclusion from his chosen field, Cyber AI. *ECF No. 113 at 20*. Confusingly, Dr. Roysdon counters by first arguing again that "the Court has already held that Dr. [Roysdon] plausibly alleges a liberty-interest violation" before further arguing the Fifth Circuit's seven-element "stigma-plus-infringement" test put forth in *Bledsoe v. City of Horn Lake, Miss.*, 449 F.3d 650, 653 (5th Cir. 2006)—discussed *infra* at I.B.2—is the applicable legal standard. *ECF No. 126 at 57*. In their Reply, Defendants claim Dr. Roysdon "cannot seriously claim that he has been 'completely prevented' from working in the field of [Department of Defense] Cyber AI" when "right after he left HNCO he worked at Leidos" and "[a]t Leidos held multiple positions involving Cyber AI." *ECF No. 130 at 14*.

A plaintiff claiming deprivation of his right to work in a common occupation must "plead facts showing that [the defendants] effectively foreclosed him from practicing his chosen profession to show a deprivation." *Adams v. City of Harahan*, 95 F.4th 908, 913–916 (5th Cir. 2024), *cert. denied sub nom. Adams v. City of Harahan, Louisiana*, 145 S. Ct. 278 (2024) (citing *Ghedi v. Mayorkas*, 16 F.4th 456 467 (5th Cir. 2021)). The Fifth Circuit's precedent makes clear that a plaintiff's liberty interest remains intact when the Government simply makes his efforts to remain in a given vocation more difficult or even "nearly impossible[.]" *Id.* at 916.

As explained by the Fifth Circuit:

For example, in *Ferrell*, we explained that the school district did not interfere with the students' rights to seek a musical career by imposing hair-length re-

quirements. 392 F.2d at 703. And in *San Jacinto*, the violation of Kacal's liberty interest stemmed from the police's intentional efforts to discontinue her business entirely. 928 F.2d at 703. Even in *Shaw*, the podiatrist was blocked entirely from conducting his business in a public hospital by the Hospital Authority's refusal to grant him licensure. 507 F.2d at 628. The general principle from these cases is clear: a plaintiff's liberty interest in pursuing a specific profession is only violated if he has been completely prevented from working in that field.

*Id*. at 916. Because in his Response Dr. Roysdon wholly ignores Defendants' argument as to any occupational liberty interest and only addresses the seven-element "stigma-plus-infringement" test put forth in *Bledsoe v. City of Horn Lake, Miss*., 449 F.3d 650, 653 (5th Cir. 2006)—discussed *infra* at I.B.2—to the extent he asserts a cause of action on this basis it fails. Accordingly, in this regard, Defendants' Motion for Summary Judgment is also **GRANTED**.

### 2.    Procedural Due Process and the *Bledsoe* Elements

"If the government discharges an employee amidst allegations of misconduct, the employee may have a procedural due process right to notice and an opportunity to clear his name." *Bledsoe v. City of Horn Lake, Miss*., 449 F.3d 650, 653 (5th Cir. 2006) (citing *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 573 (1972)).

This is because "[a] public employee, even an at-will employee, has a constitutional right to notice and an opportunity to be heard when the employee is 'discharged in a manner that creates a false and defamatory impression about him and thus stigmatizes him and forecloses him from other employment opportunities.'" *Bellard v. Gautreaux*, 675 F.3d 454, 461 (5th Cir.2012) (quoting *Bledsoe*, 449 F.3d at 653). "Neither damage to reputation alone nor the stigma resulting from the discharge itself trigger the protections of due process." *Bledsoe*, 449 F.3d at 653 (citing *Paul v. Davis*, 424 U.S. 693, 701 (1976); *Wells v. Hico Indep. Sch. Dist.*, 736 F.2d 243, 256 & n. 16 (5th Cir.1984) (footnote omitted)).

"Rather, a liberty interest is infringed, and the right to notice and an opportunity to clear one's name arises, only when the employee is 'discharged in a manner that creates a false and defamatory impression about him and thus stigmatizes him and forecloses him from other employment opportunities.'" *Bledsoe*, 449 F.3d at 653 (quoting *White v. Thomas*, 660 F.2d 680, 684 (5th Cir.1981)) (emphasis added).

The Fifth Circuit employs a seven-element "stigma-plus-infringement" test to determine whether a plaintiff has a § 1983[7] claim for deprivation of liberty without notice or opportunity to clear his name. *Id.* (citing *Hughes v. City of Garland*, 204 F.3d 223, 226 (5th Cir. 2000)).

Specifically, a plaintiff must show:

(1) he was discharged; (2) stigmatizing charges were made against him in connection with the discharge; (3) the charges were false; (4) he was not provided notice or an opportunity to be heard prior to the discharge; (5) the charges were made public; (6) he requested a hearing to clear his name; and (7) the employer denied the request.

*Bledsoe*, 449 F.3d at 653. The Court questions whether Dr. Roysdon "was even entitled to a name-clearing hearing because a prerequisite to such a hearing is that [Defendants] created a false and defamatory impression about [Dr. Roysdon] in connection with his [discharge]." *Miller v. Metrocare Services*, 809 F.3d 827, 833 n.6 (5th Cir. 2016). Here, the evidence demonstrates to the extent Defendants "discharged" Dr. Roysdon it was because of his voluntary resignation. *ECF No. 113-6 at 1, 113-22 at 1, 113-23 at 21–22*. Still, now at the summary judgment stage of proceedings this cause of action fails on multiple fronts.

---

[7] The parties cite *Bledsoe v. City of Horn Lake, Miss.*, 449 F.3d 650, 653 (5th Cir. 2006), as applicable here. *Bledsoe* establishes a seven-element "stigma-plus-infringement" test to determine whether 42 U.S.C. § 1983 affords a government employee a remedy for deprivation of liberty without notice or an opportunity to clear his or her name. *Bledsoe*, 449 F.3d at 653. Dr. Roysdon generally alleges Defendants violated the Fifth Amendment pursuant to the Administrative Procedures Act (APA), 5 U.S.C. § 706, not 42 U.S.C. § 1983. *See ECF No. 65 at 42–44*. For purposes of its analysis, the Court assumes without deciding the seven-element "stigma-plus-infringement" test applies as the parties do not dispute this and, regardless, Dr. Roysdon fails to present evidence as to each of the elements.

Defendants argue Dr. Roysdon fails on the first, third, fifth, six, and seventh elements of the Fifth Circuit's seven-element "stigma-plus-infringement" test put forth in *Bledsoe*, 449 F.3d at 653. *ECF No. 113 at 23*.

### a.    Element One: Discharge

Defendants first argue Dr. Roysdon "was never 'discharged' from HNCO." *ECF No. 113 at 24*. The first element of the test requires Dr. Roysdon to demonstrate he was discharged. *Bledsoe*, 449 F.3d at 653. Defendants state:

> Plaintiff's voluntary resignation from NSA vitiated the basis for his access to classified information and precipitated his routine read-out from the Air Force classified program. The Air Force would have permitted him to continue working on the program at HNCO in his capacity as a government employee. Ex. 16, MFR. Plaintiff also was specifically advised that "if he wanted to continue his work" as a private sector employee that he would need to be submitted for access again with proper justification. Ex. 6, OSI Form 40. But Plaintiff elected to resign his government employment and pursue his career at Leidos, which was his choice. Ex. 2, Pl. Dep. at 213:5–9, 232:3–8. Thus, the undisputed evidence establishes that Plaintiff was never "discharged" from HNCO.

*ECF No. 113 at 24*. Because in his Response Dr. Roysdon wholly ignores Defendants' argument as to this element, completely failing to address or dispute it, he cannot meet the first element of the test and this cause of action fails. *See ECF No. 126*. Accordingly, in this regard, Defendants' Motion for Summary Judgment is **GRANTED**.

For completeness, the Court also analyzes the remaining challenged *Bledsoe* elements.

### b.    Elements Two and Three: Stigmatizing, False Charges

Defendants next argue, "[a]s for the third element, the record reflects that Air Force officials were not initially aware of Plaintiff's dual role as a government employee and subcontractor." *ECF No. 113 at 24*. The second and third elements of the test require Dr. Roysdon to demonstrate stigmatizing charges were made against him in connection with the discharge and the charges were false. *Bledsoe*, 449 F.3d at 653. Defendants state:

Considering that Plaintiff failed to disclose his contractor status in his dealings with HNCO, Ex. 2, Pl. Dep. at 205:20–206:10, and at least some Air Force employees were under the impression he was consulting as a government employee only, *see* Ex. 5, Burghard Dep. at 130:21–131:2, there was a clear disconnect that warranted inquiry. Thus, the Air Force officials had a good faith basis to investigate a potential conflict of interest and determine whether a security incident occurred because Plaintiff lacked clearance to the SAP as a contractor. Ex. 13, Rowe 30(b)(6) Dep. at 16:14–17:3 (describing preliminary security inquiry process); 29:4–7 (inquiry was into individual cleared as NSA employee who was attending briefing as an industry contractor where he was not cleared); 31:24–32:19 (testifying that it is a security incident when someone is not cleared in the capacity they are working in); *see also* DoD Special Access Program Security Manual 5205.07, Enclosure 8, https://securityawareness.dcsa.mil/cdse/multimedia/shorts/sap-sec-incident/common/scenarios/industry_day/common/files/resources/5205.pdf (last accessed June 30, 2025); Ex. 5, Burghard Dep. at 132:1–11; Ex. 16, MFR; Ex. 20, Parisi Dep. at 52:17– 54:11. Even the NSA OGC emails Plaintiff provided to HNCO highlight the near impossibility of avoiding such a conflict if he continued working as a government employee. Ex. 9, NSA OGC Emails. And Plaintiff omitted information from the emails when forwarding the information to Brown, which suggests his own awareness that he may have violated conflict of interest rules. Ex. 15, Brown Email with Ex. 9, NSA OGC Emails. The "charges" against Plaintiff were not false, and the reasons for the inquiries were not pretextual.

*ECF No. 113 at 24–25*. Defendants contend the investigation followed the Air Force's discovery of Dr. Roysdon's dual employment with NSA and GiTi.

In his Response, Dr. Roysdon addresses the second element, and indirectly, the third element in a paragraph titled "Stigmatizing Allegations." *ECF No. 126 at 68–69*. In that paragraph, Dr. Roysdon states:

Capt. McVeigh, acting on behalf of the Air Force, formally labeled Dr. Roysdon an insider threat, alleged potential violations of 18 U.S.C. §§ 203 and 208, and asserted a "possible conflict of interest or fraud" in a written referral to AFOSI and SAF/AQL. These accusations were materially false, lacked factual support, and were refuted by security, legal, and contracting authorities. Nonetheless, they triggered Dr. Roysdon's immediate removal from a cleared SAP program without any formal notice or adjudication. See US0000704; Roysdon Fact Dep. 195:13-20 (May 30, 2025); Bremer 30(b)(6) Dep. 12:2–4 (Apr. 21, 2025).

*Id. at 69*. In contrast to Defendants, Dr. Roysdon therefore views the alleged stigmatizing charges as related to Captain McVeigh allegedly labeling Dr. Roysdon an "insider threat" and accus-

ing Dr. Roysdon of potentially violating federal law and having a conflict of interest due to his dual employment with NSA and GiTi.

In their Reply, Defendants focus on Dr. Roysdon's views and claim that despite using the phrase "insider threat" twenty-one times in his Response "there is no record evidence of anyone ever assigning [Dr. Roysdon] this label." *ECF No. 130 at 10*.

It is beyond debate conclusory allegations are insufficient to defeat a motion for summary judgment without probative evidence to support the claim. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A "party's uncorroborated self-serving testimony cannot prevent summary judgment, particularly if the overwhelming documentary evidence supports the opposite scenario." *Vinewood Cap., LLC v. Dar Al-Maal Al-Islami Tr.*, 541 F. App'x 443, 447 (5th Cir. 2013) (citing *Vais Arms, Inc. v. Vais*, 383 F.3d 287, 294 (5th Cir. 2004)). [8]

Even if the Court were to that accept being labeled an "insider threat" rises to the level of a stigmatizing, false charge, Dr. Roysdon points to no evidence beyond his own statements that anyone assigned him this label. Per Dan Brown's deposition testimony, he denies any knowledge about "insider threat" allegations and testified Captain McVeigh would not have spoken to him about that. *See ECF No. 122 at 789, 791, 797, 873* (responding to allegations in Dr. Roysdon's Second Amended Complaint). Dr Roysdon's uncorroborated self-serving testimony cannot prevent summary judgment.

The Court also notes for any reviewing court Dr. Roysdon misrepresents his citations to the record. *See ECF No. 126 at 57–71*. As just one example, Dr. Roysdon states:

---

[8] *See also United States v. Lawrence*, 276 F.3d 193, 197 (5th Cir. 2001) (noting that "self-serving allegations are not the type of significant probative evidence required to defeat summary judgment.") (citations and quotations omitted). And assertions "blatantly contradicted by the record" cannot defeat summary judgment. *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

> Here, the record establishes that Capt. McVeigh formally labeled Dr. Roe an "insider threat," alleged he had improperly used his NSA government credentials to secure and perform contractor duties with the Air Force, and claimed Dr. Roe accessed SAP facilities without proper authorization. See Roysdon Fact Dep. 282:22-283:5 (May 30, 2025); Statement of McVeigh at 2 (Sept. 10, 2020) (US0000704). These allegations were codified in Dr. Roe's Program Access Request (PAR) justification, which falsely stated that Roe was acting "for NSA," and were later cited as justification for his removal. Roysdon Fact Dep. 136:4-137:22 (May 30, 2025); US0000570 at 2.

*Id. at 58.* Nowhere in Captain McVeigh's Statement is the phrase "insider threat" found. *See ECF No. 122 at 1168–1169.* In the Memorandum For Record, the phrase "insider threat" appears only in reference to Dr. Roysdon's assertion he was labeled so. *See ECF No. 122 at 1600–1602.* The Memorandum For Record reports Captain McVeigh "only had [Dr. Roysdon] removed and debriefed from the program but did not report him as an insider threat. [Captain McVeigh] provided all documentation and email correspondence related to [Dr. Roysdon] being removed from the program due to his misrepresentation as a contractor and NSA employee." *Id. at 1602.*

To the extent Dr. Roysdon views the alleged stigmatizing charges as related to Captain McVeigh allegedly accusing Dr. Roysdon of potentially violating federal law and having a conflict of interest due to his dual employment with NSA and GiTi, Dr. Roysdon presents no evidence which negates Defendants' contention that his dual employment created a conflict of interest. *See ECF No. 126 at 57–71.*

### c.    Element Five: Publicization

Defendants next argue "the Air Force did not make any information about [Dr. Roysdon] public, including his potential conflict of interest, concerns about his access to [special access program ("SAP")]-protected information, or his clearance to any SAP programs." *ECF No. 113 at 25.* The fifth element requires Dr. Roysdon to demonstrate the charges were made public.

*Bledsoe*, 449 F.3d at 653. Defendants state there is no evidence of intentional or official disclosure by the Air Force. *ECF No. 113 at 26.*

In his Response, Dr. Roysdon argues disclosure occurred when:

1.    Dan Brown told Leidos engineer Todd Jaspers Dr. Roysdon was "persona non-grata" and warned him including Dr. Roysdon's name on a contract would be a "show stopper;"

2.    Dr. Roysdon's PAR justification "was circulated across HNCO, GiTi, and contracting stakeholders in August 2020;"

3.    Colleagues at NSA, IARPA, and DARPA later made reference to his trouble at the Air Force; and

4.    AFOSI's Report of Investigation was uploaded to CORE.

*ECF No. 126 at 61–62.* The Fifth Circuit's authority conclusively establishes that public disclosure must be fairly attributable to the defendant employer and the disclosure must be made in an "intentional or official" manner. *Hughes v. City of Garland*, 204 F.3d 223, 227–228 (5th Cir. 2000) (internal citations omitted).

The Court finds the above referenced disclosures, to the extent they have evidentiary support, do not meet the "intentional or official" disclosure standard. As Defendants point out, "casual gossip falls well short of 'intentional or official' disclosure." *Id.* at 228 (internal citations omitted). Also, in his Response, Dr. Roysdon does not demonstrate his PAR justification "was circulated across HNCO, GiTi, and contracting stakeholders in August 2020." *See ECF No. 126*. To the extent Dr. Roysdon claims information about him was uploaded to classified systems, the Court notes "[t]he very harm that a stigma inflicts comes from its public nature." *Ghedi*, 16 F.4th at 467. Classified systems are not public in nature. *Id.* at 468 (dismissing stigma-plus cause of action where status on watchlist is government secret that is not public).

### a.    Elements Six and Seven: Name Clearing Hearing

Defendants finally argue Dr. Roysdon "never requested, and the Air Force never denied, a hearing to clear his name." *ECF No. 113 at 26–27*. The sixth and seventh elements of the test require Dr. Roysdon to demonstrate he requested a hearing to clear his name and the employer denied the request. *Bledsoe*, 449 F.3d at 653. Defendants state:

> Here, there is no evidence that Plaintiff ever requested a name-clearing hearing or that the Air Force denied such a request. In fact, Plaintiff never had any communication with anyone in the Contracting Office at HNCO. Ex. 2, Pl. Dep. at 262:4–7. Instead, Plaintiff only spoke with Brown, an engineer who provides technical advice in the context of the spring 2023 Leidos demos. Id.; Ex. 4, Brown Dep. at 12:2–4, 18:9–15, 145:18–146:22. He asked Brown if he could "present his case to somebody else at HNCO," and Brown purportedly told Plaintiff, "Don't even bother." Ex. 2, Pl. Dep. at 260:16–262:3.

*ECF No. 113 at 27*.

In his Response, Dr. Roysdon argues his exchange with Dan Brown "constitutes a timely and clear effort to seek redress—and a categorical denial by a decisionmaker with program authority."[9] *ECF No. 126 at 67*.

Though an employee need not use the term "name-clearing hearing" to satisfy the sixth element of the stigma-plus-infringement test, the employee must still petition the employer in a manner that can be construed as asking for an opportunity to clear his name. *Bledsoe*, 449 F.3d at 653 (citing *Rosenstein v. City of Dallas,* 876 F.2d 392, 396 (5th Cir.1989)). "Requests to participate in established grievance, appeals, or other review procedures to contest defamatory charges" can constitute a request for a name clearing hearing. *Rosenstein*, 876 F.2d at 396. "Such a hearing serves the purpose of 'providing a public forum or opportunity to clear one's name, not actual review of the decision to discharge the employee.'" *Dunn v. Tunica*, Case No. 3:18-CV-00200, 2021 WL 40266, at *8 (N.D. Miss. Jan. 5, 2021) (quoting *Hughes*, 204 F.3d at 226)).

---

[9] Dr. Roysdon does not argue that his May 6, 2022, Department of Defense Complaint constituted a request for a name-clearing hearing. *See ECF No. 122 at 659–661*. However, even if Dr. Roysdon did, the Court does not find this to be sufficient to satisfy the sixth and seventh elements of the test.

Confusingly, Dr. Roysdon cites out-of-circuit authority from the Sixth Circuit and mis-represents their holdings. *See, e.g., Quinn v. Shirey*, 293 F.3d 315, 322 (6th Cir. 2002) (finding plaintiff's alleged request for a name-clearing hearing was inadequate). Further, in the portion of Dr. Roysdon's own deposition testimony where he states Dan Brown told him "don't even both-er," he next confirms he never talked to anybody at HNCO about this matter. *ECF No. 122 at 481–482*. As such, the Court finds Dr. Roysdon does not even allege, much less demonstrate, that he made any attempt to publicly "confront [] the governing body that discharged him" and that subsequently Defendants denied that request. *Bledsoe*, 449 F.3d at 654.

## II.    Counts 2 and 3: Privacy Act of 1974

Dr. Roysdon seeks damages under the Privacy Act of 1974, 5 U.S.C. § 552a ("§ 522a"), alleging Defendant Air Force Office of Special Investigations, (Count 2), and Defendant De-partment of the Air Force, (Count 3), failed to comply with its provisions. *See ECF No. 65 at 34–42*; *see also* § 522a(g)(1)(D).

As explained by the Fifth Circuit, the Privacy Act of 1974 "safeguards the public from unwarranted collection, maintenance, use and dissemination of personal information contained in agency records . . . by allowing an individual to participate in ensuring that his records are accu-rate and properly used." *Jacobs v. Natl. Drug Intelligence Ctr.*, 423 F.3d 512, 515–516 (5th Cir. 2005) (citations omitted). The Act provides four causes of action: (1) for an agency's failure to amend an individual's record pursuant to his request;[10] (2) for an agency's denial of access to an individual's records;[11] (3) for an agency's failure to maintain an individual's records with "accu-racy, relevance, timeliness, and completeness";[12] and (4) for an agency's failure to comply with

---

[10] 5 U.S.C. § 552a(g)(1)(A).
[11] *Id.* § 552a(d)(1), (g)(1)(B).
[12] *Id.* § 552a(g)(1)(C).

other Privacy Act provisions, which has an "adverse effect" on the individual. *Id.*[13] (citations omitted).

The remedy available to a successful plaintiff depends on which cause of action he pursues. For the first two causes of action, a successful plaintiff is entitled to injunctive relief, and, if the plaintiff has "substantially prevailed," the court may also award attorney's fees and costs. *Id.* (citing § 552a(g)(2), (g)(3)). For the latter two, a successful plaintiff may recover damages, attorney's fees, and costs, but only if he proves that the governmental agency acted willfully. *Id.* (citing § 552a(g)(4)).

Here, Dr. Roysdon asserts the fourth cause of action, pursuant to §522(g)(1)(D), in Count 2 and Count 3. *ECF No. 65 at 34–42*. He claims that Defendant Air Force Office of Special Investigations, (Count 2), and Defendant Department of the Air Force, (Count 3), willfully disclosed a "record" contained in a "system of records" in violation of § 552a(b) and that the disclosure had an adverse effect on him. *ECF No. 65 at 34–42*.

"§ 552a(b) provides that "[n]o agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency," unless the disclosure falls within one of thirteen statutory exceptions." *Jacobs*, 423 F.3d at 516 (citing § 552a(b)).

Thus, for Dr. Roysdon to survive summary judgment on his disclosure causes of action, (Count 2 and Count 3), he must present evidence of the following elements:

> (1) the information is a "record" in a "system of records"; (2) the agency disclosed the information; (3) the disclosure had an adverse effect on him; and (4) the disclosure was willful.

*Id.* (citations omitted).

---

[13] *Id.* § 552a(g)(1)(D).

Specifically, as to Count 2, [14] Dr. Roysdon claims Defendant Unknown Named USAF OSI Agent—later identified[15] as Special Agent Allen Beall of the Air Force Office of Special Investigations ("Special Agent Beall")—during the course of the inquiry into HNCO security practices, willfully disclosed a "record" contained in a "system of records" in violation of § 552a(b) and that the disclosure had an adverse effect on him. *ECF No. 65 at 34–39*.

As to Count 3, Dr. Roysdon claims "[t]he Defendant Officers, including Captain McVeigh, as well as Air Force employee, Dan Brown,"[16] willfully disclosed a "record" contained in a "system of records" in violation of § 552a(b) and that the disclosure had an adverse effect on him. *ECF No. 65 at 39–42*.

Defendants argue, among other things, Count 2 and Count 3 fail as a matter of law because: (1) intra-agency disclosure is not actionable under the Privacy Act; (2) Dr. Roysdon cannot show any alleged disclosure had an "adverse effect" on him; (3) Dr. Roysdon cannot meet the Privacy Act's willfulness requirement. *ECF No. 113 at 36–39*.

Regarding Count 2, in his Response Dr. Roysdon fails to address Defendants' arguments as to Special Agent Beall. *ECF No. 126 at 76–77*. Dr. Roysdon references Special Agent Beall only in the following conclusory statements, without citation to any evidence:

> The principal actors—Capt. McVeigh, Dan Brown, and AFOSI Agent Beall— each accessed and shared records they had no legal right to obtain or disseminate.
>
> . . .

---

[14] Regarding this cause of action, in Dr. Roysdon's Response to Defendants' Motion for Summary Judgment he seeks leave to substitute Defendant Air Force Office of Special Investigations for Defendant Department of the Air Force (the same Defendant named in Count 3). *See ECF No. 126 at 89–93*. This is due to Defendants arguing in their Motion for Summary Judgment Defendant Air Force Office of Special Investigations is not an "agency" subject to suit under the Privacy Act. *ECF No. 126 at 33 n.3*. Defendants cite a case recently decided by fellow U.S. District Judge David A. Ezra for this proposition, although the case does not mention Defendant Air Force Office of Special Investigations specifically. *See Rosales v. Wormuth,* No. 1:23-CV-00440-DAE, 2024 WL 5703320, at *4 (W.D. Tex. May 23, 2024). Regardless of the named Defendant, the evidence is lacking as to several of the cause of action's elements.

[15] *See ECF No. 122 at 431–32*.

[16] The Court notes Dan Brown is not a named Defendant. *See ECF No. 65*.

Agent Beall, for his part, shared the security inquiry across multiple offices and platforms, without control or audit logging.

*ECF No. 126 at 76–77.* Because in his Response Dr. Roysdon wholly ignores Defendants' arguments as to Special Agent Beall, completely failing to address or dispute them, to the extent he asserts a cause of action against Special Agent Beall it fails. *See ECF No. 126.* Accordingly, in this regard, Defendants' Motion for Summary Judgment is also **GRANTED**.

Regarding Count 3, in his Response Dr. Roysdon only argues Captain McVeigh's conduct was willful or intentional, ignoring Defendants other arguments that: (1) intra-agency disclosure is not actionable under the Privacy Act; and (2) Dr. Roysdon cannot show any alleged disclosure had an "adverse effect" on him. *See id. at 71–79.*

In their Motion for Summary Judgment, Defendants specifically argue Dr. Roysdon's "Privacy Act claims arise from information-sharing within and between OSI and HNCO—both Air Force components—and he cannot point to any evidence of any disclosure of information about him outside the Department of Defense." *ECF No. 113 at 36.*

"[I]ntra-agency disclosure 'is not the evil against which the Privacy Act was enacted'" and "thus information shared within the same agency . . . is 'not subject to the requirements of the Privacy Act.'" *Coburn v. Potter,* No. 06 C 5397, 2008 WL 4390153, at *4 (N.D. Ill. Sept. 24, 2008), *aff'd,* 329 F. App'x 644 (7th Cir. 2009) (quoting *Clarkson v. Internal Revenue Serv.,* 811 F.2d 1396, 1398 (11th Cir. 1987); *Williams v. Reilly,* 743 F. Supp. 168, 175 (S.D.N.Y. 1990)).[17] As Defendants point out, in Dr. Roysdon's own deposition testimony he testified he is not aware

---

[17] *Compare, e.g., Sullivan v. Fed. Bureau of Prisons,* No. CV 20-00269 LEK-KJM, 2021 WL 3519907, at *4 (D. Haw. Aug. 10, 2021), *aff'd,* No. 21-16527, 2022 WL 9730920 (9th Cir. Oct. 17, 2022) (granting summary judgment on Privacy Act claim arising from disclosure between the Bureau of Prisons and a U.S. Attorney's Office); *Williams v. Reilly,* 743 F. Supp. 168, 175 (S.D.N.Y. 1990) (granting motion to dismiss Privacy Act claim; noting that "[the Naval Investigative Service] and [the Defense Logistics Agency] are considered components of one agency, the Department of Defense. . . . any information shared between NIS and DLA was not subject to the requirements of the Privacy Act."); *Marcotte v. Sec'y of Def.,* 618 F. Supp. 756, 763 (D. Kan. 1985) (same result from disclosure between Air Force Office of Inspector General and Corrections Board).

of Captain McVeigh spreading his information outside of the HNCO. *ECF No. 130 at 24* (citing *ECF No. 113-2 at 54*); *see also ECF No. 122 at 460.*

Defendants also specifically argue Dr. Roysdon "cannot show that he was adversely affected by any disclosure of privacy act material." *ECF No. 113 at 37.* "[I]n order for [Dr. Roysdon] to recover damages for Privacy Act claims against the United States government, [Dr. Roysdon] was required to demonstrate 'proven pecuniary or economic harm.'" *Coleman v. U.S.*, 912 F.3d 824, 836 (5th Cir. 2019) (citing *F.A.A. v. Cooper*, 566 U.S. 284, 299 (2012). As Defendants point out, the only adverse effects Dr. Roysdon claims is emotional distress flowing not from the disclosure of any record, but—according to Dr. Roysdon's own deposition testimony— from the readout and "being investigated." *ECF No. 113 at 37* (citing *ECF No. 113-2 at 92–94*); *see also ECF No. 122 at 542–549.* As such, the Court finds in his Response Dr. Roysdon does not offer any evidence of actual harm resulting from the purported privacy violations other than his own unsubstantiated allegations of unrelated emotional trauma.

Because in his Response Dr. Roysdon wholly ignores Defendants' arguments that: (1) intra-agency disclosure is not actionable under the Privacy Act; and (2) Dr. Roysdon cannot show any alleged disclosure had an "adverse effect" on him, completely failing to address or dispute them, to the extent he asserts a cause of action against Captain McVeigh it fails. *See ECF No. 126*. As such, the Court need not consider Dr. Roysdon's argument Captain McVeigh's conduct was willful or intentional. *See ECF No. 126*. Accordingly, in this regard, Defendants' Motion for Summary Judgment is also **GRANTED**.

**CONCLUSION**

For the reasons stated above, Defendants' Motion for Summary Judgment, (*ECF No. 113*), is **GRANTED**. Consequently, as no causes of action remain, the final pretrial conference and trial settings in this matter are **TERMINATED**. The Court will separately issue its Final Judgment.

The Clerk of Court is **DIRECTED** to close this case.

It is so **ORDERED**.
SIGNED this 28th day of August, 2025.

JASON  PULLIAM
UNITED STATES DISTRICT JUDGE